CLOSED, ECF

# U.S. District Court
# United States District Court for the Southern District of New York (Foley Square)
# CIVIL DOCKET FOR CASE #: 1:07-cv-04634-GEL

| | |
|---|---|
| Winstar Holdings, LLC et al v. The Blackstone Group, LP et al | Date Filed: 06/01/2007 |
| Assigned to: Judge Gerard E. Lynch | Date Terminated: 12/10/2007 |
| Case in other court: State Court- Supreme, 601582-07 | Jury Demand: None |
| Cause: 28:1442 Notice of Removal | Nature of Suit: 190 Contract: Other |
| | Jurisdiction: Federal Question |

**Plaintiff**

| | | |
|---|---|---|
| **Winstar Holdings, LLC** | represented by | **Jed Lewin** |
| | | Cohen Tauber Spievack & Wagner, L.L.P. |
| | | 420 Lexington Avenue |
| | | Suite 2400 |
| | | New York, NY 10170 |
| | | (212) 586-5800 |
| | | Fax: (212) 586-5096 |
| | | Email: Jlewin@ctswlaw.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Joseph M. Vann** |
| | | Cohen Tauber Spievack & Wagner, L.L.P. |
| | | 420 Lexington Avenue |
| | | Suite 2400 |
| | | New York, NY 10170 |
| | | (212)-586-5800 |
| | | Fax: (212)-586-5800 |
| | | Email: jvann@ctswlaw.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **IDT Corp.** | represented by | **Jed Lewin** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Joseph M. Vann** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |

*ATTORNEY TO BE NOTICED*

**Melissa Ann Roover**
Grayson & Kubli, P.C
1420 Spring Hill Road
Mclean, VA 22102
(703)-749-0000
Fax: (703)-442-8672
Email: roover@graysonlaw.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**The Blackstone Group, LP**           represented by  **Yosef J Riemer**
Kirkland & Ellis LLP (NYC)
153 East 53rd Street
New York, NY 10022
(212)-446-4802
Fax: (212)-446-4900
Email: yriemer@kirkland.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Scott Flugman**
Kirkland & Ellis LLP (NYC)
153 East 53rd Street
New York, NY 10022
(212) 446-6408
Fax: (212) 446-6460
Email: dflugman@kirkland.com
*ATTORNEY TO BE NOTICED*

**Victoria Reznik**
Kirkland & Ellis LLP (NYC)
153 East 53rd Street
New York, NY 10022
212-446-4695
Fax: 212-446-4900
Email: vreznik@kirkland.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Impala Partners, LLC**           represented by  **Andrew C. Gold**
Herrick, Feinstein
2 Park Ave.
New York, NY 10016
(212)-592-1459
Fax: (212)-592-1500

Email: agold@herrick.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John P. Oleske**
Nixon, Peabody, LLP
437 Madison Avenue
New York, NY 10022
(212) 940-3191
Fax: 212-940-3111
Email: joleske@herrick.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Citicorp.**                    represented by **Stephen L. Saxl**
Greenberg Traurig, LLP(200 Park Ave.)

200 Park Avenue
New York, NY 10166
212-801-2100
Fax: 212-688-2449
Email: saxls@gtlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Andrew Wargo**
Greenberg Traurig, LLP (NYC)
200 Park Avenue
New York, NY 10166
(212)-801-3115
Fax: (212)-801-6400
Email: wargow@gtlaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 06/01/2007 | 1 | NOTICE OF REMOVAL from Supreme Court, County of New York. Case Number: 601582-07. (Filing Fee $ 350.00, Receipt Number 617001).Document filed by Impala Partners, LLC.(tro) Additional attachment(s) added on 6/6/2007 (Becerra, Maribel). (Entered: 06/04/2007) |
| 06/01/2007 |   | Magistrate Judge Andrew J. Peck is so designated. (tro) (Entered: 06/04/2007) |
| 06/01/2007 |   | Case Designated ECF. (tro) (Entered: 06/04/2007) |
| 06/01/2007 | 2 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Impala Partners, LLC.(tro) Additional attachment(s) added on 6/6/2007 (Becerra, Maribel). (Entered: |

| | | |
|---|---|---|
| | | 06/04/2007) |
| 06/11/2007 | 3 | ANSWER to Complaint. Document filed by Impala Partners, LLC. (Oleske, John) (Entered: 06/11/2007) |
| 06/12/2007 | 4 | STIPULATION AND ORDER: The time for defts The Blackstone Group, LP ; Impala Partners, LLC ; Citicorp. to move, answer, or respond to plts' complaint is extended to 6/25/2007. (Signed by Judge Gerard E. Lynch on 6/12/2007) (jar) (Entered: 06/13/2007) |
| 06/21/2007 | 5 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying The Blackstone Group Inc. as Corporate Parent. Document filed by The Blackstone Group, LP.(Riemer, Yosef) (Entered: 06/21/2007) |
| 06/21/2007 | 6 | JOINT MOTION to Transfer Case *to the United States District Court for the District of Delaware filed on behalf of all defendants*. Document filed by The Blackstone Group, LP.(Riemer, Yosef) (Entered: 06/21/2007) |
| 06/21/2007 | 7 | DECLARATION of David S. Flugman in Support re: 6 JOINT MOTION to Transfer Case *to the United States District Court for the District of Delaware filed on behalf of all defendants*.. Document filed by The Blackstone Group, LP. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F)(Riemer, Yosef) (Entered: 06/21/2007) |
| 06/21/2007 | 8 | JOINT MEMORANDUM OF LAW in Support re: 6 JOINT MOTION to Transfer Case *to the United States District Court for the District of Delaware filed on behalf of all defendants*.. Document filed by The Blackstone Group, LP. (Riemer, Yosef) (Entered: 06/21/2007) |
| 06/21/2007 | 9 | NOTICE OF APPEARANCE by Victoria Reznik on behalf of The Blackstone Group, LP (Reznik, Victoria) (Entered: 06/21/2007) |
| 06/21/2007 | 10 | NOTICE OF APPEARANCE by David Scott Flugman on behalf of The Blackstone Group, LP (Flugman, David) (Entered: 06/21/2007) |
| 06/21/2007 | 11 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. NO Corporate Parent. Document filed by Citicorp..(Saxl, Stephen) (Entered: 06/21/2007) |
| 06/22/2007 | 12 | NOTICE OF APPEARANCE by William Andrew Wargo on behalf of Citicorp. (Wargo, William) (Entered: 06/22/2007) |
| 06/22/2007 | 13 | NOTICE OF APPEARANCE by Stephen L. Saxl on behalf of Citicorp. (Saxl, Stephen) (Entered: 06/22/2007) |
| 06/25/2007 | 14 | CERTIFICATE OF SERVICE of Joint Notice of Motion, Delcaration of David S. Flugman and Memorandum of Law in Support of the Joint Motion by all Defendants to Transfer Venue with Exhibits A through F. served on plaintiffs on June 22, 2007. Document filed by The Blackstone Group, LP. (Flugman, David) (Entered: 06/25/2007) |
| 06/25/2007 | 15 | NOTICE OF APPEARANCE by Andrew C. Gold on behalf of Impala Partners, LLC (Gold, Andrew) (Entered: 06/25/2007) |

| 06/25/2007 | 16 | ENDORSED LETTER addressed to Judge Gerard E. Lynch from Stephen L. Saxl dated 6/22/2007 re: ENDORSED LETTER addressed to Judge Gerard E. Lynch from Stephen L. Saxl dated 6/22/2007 re: defendant request an extension of time to move against, answer or otherwise respond to Plaintiff's complaint, from the current deadline on Monday, June 25, 2007, either: (i) until twenty (20) days following an Order determing the Joint Motion by All Defendants to Transfer Venue to the United States District Court for the District of Delaware. ENDORSEMENT: SO ORDERED. (Signed by Judge Gerard E. Lynch on 6/25/2007) (jmi) (Entered: 06/27/2007) |
|---|---|---|
| 06/27/2007 | 17 | NOTICE OF APPEARANCE by Melissa Ann Roover on behalf of IDT Corp. (Roover, Melissa) (Entered: 06/27/2007) |
| 06/27/2007 | 18 | NOTICE OF APPEARANCE by Jed Lewin on behalf of Winstar Holdings, LLC, IDT Corp. (Lewin, Jed) (Entered: 06/27/2007) |
| 06/27/2007 | 19 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying IDT Corp. as Corporate Parent. Document filed by Winstar Holdings, LLC, IDT Corp..(Lewin, Jed) (Entered: 06/27/2007) |
| 06/28/2007 | 20 | NOTICE OF CHANGE OF ADDRESS by Jed Lewin on behalf of all plaintiffs. New Address: Cohen Tauber Spievack & Wagner LLP, 420 Lexington Ave, Suite 2400, New York, NY, USA 10170, (212)586-5800. (Lewin, Jed) (Entered: 06/28/2007) |
| 07/01/2007 | 21 | NOTICE of Motion to Remand. Document filed by Winstar Holdings, LLC, IDT Corp.. (Lewin, Jed) (Entered: 07/01/2007) |
| 07/01/2007 | 22 | MOTION to Remand. Document filed by Winstar Holdings, LLC, IDT Corp..(Lewin, Jed) (Entered: 07/01/2007) |
| 07/01/2007 | 23 | DECLARATION of Joseph M. Vann in Support re: 22 MOTION to Remand.. Document filed by Winstar Holdings, LLC, IDT Corp.. (Attachments: # 1 Exhibit 1# 2 Exhibit 2)(Lewin, Jed) (Entered: 07/01/2007) |
| 07/01/2007 | 24 | MEMORANDUM OF LAW in Support re: 22 MOTION to Remand.. Document filed by Winstar Holdings, LLC, IDT Corp.. (Lewin, Jed) (Entered: 07/01/2007) |
| 07/03/2007 | 25 | NOTICE OF APPEARANCE by Joseph M. Vann on behalf of Winstar Holdings, LLC, IDT Corp. (Vann, Joseph) (Entered: 07/03/2007) |
| 07/03/2007 | 26 | ORDER re: 6 MOTION to Transfer Case to the United States District Court for the District of Delaware filed on behalf of all defendants filed by The Blackstone Group, LP. Judicial efficiency counsels briefing of all these preliminary issues at once. Plts' motion is granted only to the extent that their time to respond is extended to coincide with the deadline for filing their projected motion to remand. The parties are directed to meet and confer on a coordinated briefing schedule for both motions, to be submitted to the Court for approval no later than 7/6/2007. (Signed by Judge Gerard E. Lynch on 7/2/2007) (jar) (Entered: 07/05/2007) |

| 07/06/2007 | 27 | AMENDED RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying The Blackstone Group, L.P. as Corporate Parent. Document filed by The Blackstone Group, LP.(Flugman, David) (Entered: 07/06/2007) |
|---|---|---|
| 07/06/2007 | 28 | STIPULATION AND ORDER, Set Deadlines/Hearing as to 6 JOINT MOTION to Transfer Case to the United States District Court for the District of Delaware filed on behalf of all defendants. Deadline for plaintiff's Opposition to motion to transfer venue due 7/19/07; Deadline for Defendants' opposition to Motion to remand due 7/31/07; Deadline for Defendants' Reply in Further Support of Motion to Transfer Venue due August 2, 2007; Deadline for Plaintiffs' Reply in further Support of Motion to Remand due August 13, 2007. (Signed by Judge Gerard E. Lynch on 7/6/07) (djc) (Entered: 07/09/2007) |
| 07/19/2007 | 29 | RESPONSE in Opposition re: 6 JOINT MOTION to Transfer Case *to the United States District Court for the District of Delaware filed on behalf of all defendants.*. Document filed by Winstar Holdings, LLC, IDT Corp.. (Lewin, Jed) (Entered: 07/19/2007) |
| 07/19/2007 | 30 | DECLARATION of Melissa A. Roover in Opposition re: 6 JOINT MOTION to Transfer Case *to the United States District Court for the District of Delaware filed on behalf of all defendants.*. Document filed by Winstar Holdings, LLC, IDT Corp.. (Attachments: # 1 Exhibit A)(Lewin, Jed) (Entered: 07/19/2007) |
| 07/31/2007 | 31 | JOINT MEMORANDUM OF LAW in Opposition re: 22 MOTION to Remand.. Document filed by Impala Partners, LLC. (Gold, Andrew) (Entered: 07/31/2007) |
| 07/31/2007 | 32 | DECLARATION of Andrew C. Gold in Opposition re: 22 MOTION to Remand.. Document filed by Impala Partners, LLC. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 Exhibit 5# 6 Exhibit 6# 7 Exhibit 7# 8 Exhibit 8# 9 Exhibit 9 (Part 1 of 2)# 10 Exhibit 9 (Part 2 of 2))(Gold, Andrew) (Entered: 07/31/2007) |
| 08/02/2007 | 33 | REPLY MEMORANDUM OF LAW in Support re: 6 JOINT MOTION to Transfer Case *to the United States District Court for the District of Delaware filed on behalf of all defendants.*. Document filed by The Blackstone Group, LP. (Reznik, Victoria) (Entered: 08/02/2007) |
| 08/02/2007 | 34 | DECLARATION of Vickie Reznik in Support re: 6 JOINT MOTION to Transfer Case *to the United States District Court for the District of Delaware filed on behalf of all defendants.*. Document filed by The Blackstone Group, LP. (Attachments: # 1 Exhibit G to Declaration in Further Support of Joint Motion by all Defendants to Transfer Venue.# 2 Exhibit H to Declaration# 3 Exhibit I to Declaration)(Reznik, Victoria) (Entered: 08/02/2007) |
| 08/02/2007 | 35 | AFFIDAVIT of Stefan Feuerabendt in Support re: 6 JOINT MOTION to Transfer Case *to the United States District Court for the District of Delaware filed on behalf of all defendants.*. Document filed by The Blackstone Group, LP. (Reznik, Victoria) (Entered: 08/02/2007) |

| 08/13/2007 | 36 | REPLY MEMORANDUM OF LAW in Support re: 22 MOTION to Remand.. Document filed by Winstar Holdings, LLC, IDT Corp.. (Lewin, Jed) (Entered: 08/13/2007) |
|---|---|---|
| 12/10/2007 | 37 | OPINION AND ORDER: For reasons further set forth in said Order, Plaintiff's 22 MOTION to Remand is DENIED and Defendants' 6 JOINT MOTION to Transfer Case to the United States District Court for the District of Delaware is GRANTED. (Signed by Judge Gerard E. Lynch on 12/10/07) (db) (Entered: 12/10/2007) |
| 12/10/2007 |  | CASE TRANSFERRED OUT from the U.S.D.C. Southern District of New York to the United States District Court - District of Delaware. Sent original file along with documents numbered 1-37, certified copy of docket entries and transfer order. Mailed via Federal Express AIRBILL # 8582 4869 9320 on 12/17/07. (db) (Entered: 12/10/2007) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/20/2007 08:52:16 | | | |
| **PACER Login:** | ud0037 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:07-cv-04634-GEL |
| **Billable Pages:** | 4 | **Cost:** | 0.32 |

HERRICK, FEINSTEIN LLP
Andrew C. Gold (ACG-4875)
Two Park Avenue
New York, NY 10016
(212) 592-1400
*Attorneys for Defendant,*
*Impala Partners, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

07 JUDGE LYNCH
CIV 4634

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

WINSTAR HOLDINGS, LLC and
IDT CORP.,

                       Plaintiffs,

-against-

THE BLACKSTONE GROUP LP; IMPALA
PARTNERS, LLC; and CITICORP,

                       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

**NOTICE OF REMOVAL**

RECEIVED
JUN 0 1 2007
U.S.D.C. S.D. N.Y.
CASHIERS

TO:    THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

      Defendant Impala Partners, LLC ("Impala") by its attorneys, Herrick, Feinstein LLP

respectfully applies for the removal of this civil action to the United States District Court for the

Southern District of New York, and that, upon such a removal, it be transferred to the United

States Bankruptcy Court for the District of Delaware, and states as follows:

      1.      On or about April 18, 2001, Winstar Communications, Inc. ("Winstar" or the

"Debtor") and certain of its subsidiaries and affiliates each filed a petition for relief under

chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code") in the

United States Bankruptcy Court for the District of Delaware, (the "Bankruptcy Court") entitled

<u>In re Winstar Communications, Inc. et al.</u>, bearing case number 01-1430 (KJC) (the "Bankruptcy Case"). As set forth below, Impala was retained as the restructuring advisor to Winstar and a principal of Impala, Paul Street, served as the Debtor's Chief Restructuring Officer.

2.    In this Notice of Removal, Impala is exercising its right pursuant to 28 U.S.C. §1452, *et. seq.,* and Federal Rules of Bankruptcy Procedure 9027, to remove a pending state court action entitled <u>Winstar Holdings, LLC and IDT Corp., v. The Blackstone Group LP, Impala Partners, LLC and Citicorp,</u>[1] Index No. 601582/07 (the "State Court Action") from the Supreme Court of New York, County of New York (the "State Court"), to the United States District Court for the Southern District of New York, with the request that this action, upon removal, be transferred to the United States Bankruptcy Court for the District of Delaware (Honorable Kevin J. Carey, U.S.B.J., presiding) for the reasons set forth herein.

3.    Plaintiffs filed the State Court Action on or about May 10, 2007. A copy of the Summons and Complaint are attached as <u>Exhibit "A"</u> in accordance with Rule 9027(1) of the Federal Rules of Bankruptcy Procedure. If any additional documents relating to the State Court Action are required, Impala will submit such documents.

4.    The Southern District of New York encompasses New York County, the place where the State Court Action is pending.

5.    This Court has original jurisdiction over this State Court Action pursuant to 28 U.S.C. § 1334(b), and it is hereby removed to this Court under the provisions of 28 U.S.C. §§ 1452(a) and 1446. The State Court Action is properly removable because of its close connection to the Debtor's Chapter 11 proceedings pending in the Bankruptcy Court.

---

[1]    Impala is advised that the remaining defendants, The Blackstone Group LP and Citicorp consent to removal.

6.      28 U.S.C. § 1452(a) provides as follows:

> (a)  A party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit's police or regulatory power, to the district court where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.

7.      The State Court Action, including all claims and causes of action asserted therein, is a civil action other than a proceeding before the United States Tax Court; and is not a civil action by a governmental unit to enforce such governmental unit's police or regulatory power. The State Court Action was initiated after to the commencement of the Bankruptcy Case.

8.      In the Complaint, Plaintiff Winstar Holdings, LLC (formerly known as IDT Winstar Acquisition, Inc.) asserted claims against Impala, and the other named defendants for alleged misrepresentations and fraud in connection with the sale of the substantially all of the Debtor's assets to the Plaintiffs, pursuant to a certain bankruptcy Asset Purchase Agreement amongst IDT Winstar Acquisition, Inc., as purchaser, and Winstar Communications, Inc. and certain of its subsidiaries, as sellers, dated December 18, 2001 (the "APA")  which sale was approved by the United States Bankruptcy Court for the District of Delaware. The Bankruptcy Court entered an order on December 19, 2001 (the "Sale Order") approving the sale of the Debtor's assets under the APA.

9.      Paragraph 15 of the Sale Order, a copy of which is annexed as Exhibit "B", contains the following provision, preserving the jurisdiction of the Bankruptcy Court:

> "This Court retains and shall have jurisdiction to endorse and implement the terms and provisions of the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection

3

therewith (including the Management Agreement) in all respects, including but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Buyer, (b) compel delivery of the purchase price or performance of other obligations owed to the Debtors, (c) resolve any disputes arising under or related to the Asset Purchase Agreement, and (d) interpret, implement, and enforce the provisions of the Asset Purchase Agreement and this Sale Order."

10.     The APA contains at least two provisions, copies of which are annexed as <u>Exhibit</u> <u>"C"</u>, pursuant to which the Plaintiffs irrevocably submitted to the jurisdiction of the Bankruptcy Court to hear all disputes arising out of or relating to the APA as follows:

<u>"The parties hereto irrevocably submit to the exclusive jurisdiction</u> <u>of the Bankruptcy Court (or any Court exercising appellate</u> <u>jurisdiction over the Bankruptcy Court) over any dispute arising</u> <u>out of or relating to this Agreement or any other agreement</u> or instrument contemplated hereby or entered into in connection herewith or any of the transactions contemplated hereby or thereby.  Each party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such dispute or proceedings may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such state court or any defense of inconvenient forum in connection therewith." (Section 9.10, emphasis added.)

11.     Further, Section 9.15 of the APA, entitled *"Remedies"* states that,

"Subject to Section 9.3, the Sellers and the Buyer hereby acknowledge and agree that money damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement and that, in such event, the Sellers or their successors or assigns, or the Buyer or its successors or assigns, as the case may be, may, in addition to any other rights and remedies existing in their favor, apply to the Bankruptcy Court *[note- the phrase, "or any other court of competent jurisdiction"* *was struck from the signed version]* for specific performance,

4

injunctive and/or other relief in order to enforce or prevent any violations under this Agreement."

12.     As the title to 28 U.S.C. § 1452 itself indicates, ("Removal of Claims related to "bankruptcy cases"), matters that can be removed include claims "related to" a bankruptcy case within the meaning of 28 U.S.C. § 1334(b).

13.     Defendant Impala requests that upon removal, the instant matter be transferred to the Bankruptcy Court of the District of Delaware, which has core jurisdiction to adjudicate the claims asserted by Plaintiffs.  The Second Circuit has construed a bankruptcy court's core jurisdiction "as broadly as possible" so as to be "close to or congruent with constitutional limits." *Luan Investment S.E. v. Franklin 145 Corp. (In re Petrie Retail)*, 304 F.3d 223, 229 (2d Cir. 2002) (internal quotations and citations omitted).  This jurisdiction reach is "essential to the efficient administration of bankruptcy proceedings."  Id.  Although some of Plaintiffs' claims are nominally state law claims, the relief requested implicates the Bankruptcy Court's authority to oversee the implementation of the APA.

14.     Bankruptcy courts may also adjudicate state law claims pursuant to "arising in" jurisdiction when those claims are at the "heart" of the administration of the bankruptcy estate, as is the case here. *See, e.g., Central Vermont Public Serv. Corp.*, 341 F.3d 186, 191 (2d Cir. 2003) (citing *In re Ben Cooper*, 896 F.2d 1394, 1399 (2d Cir. 1991)).  The removal of this State Court Action will assist in administering the Debtor's estate by avoiding concurrent proceedings addressing the same subject matter, because the Debtor has agreed to indemnify Impala and Paul Street.

15.     Pursuant to Annex "A" of Impala's retention agreement which was approved by the Bankruptcy Court, a copy of which is annexed as Exhibit "D", the Debtor agreed to indemnify Impala for, *inter alia*, any losses claims, damages or liabilities brought by any third party. Removing the instant action to the Bankruptcy Court, which is already fully familiar with the facts alleged in Plaintiffs' Complaint, will prevent the Trustee from being forced to waste estate resources by unnecessary devoting efforts in two separate forums.

16.     To the extent that the Bankruptcy Court does not possess core jurisdiction over Plaintiffs' claims, it possesses "related-to" jurisdiction over them. A proceeding meets the jurisdictional threshold of 28 U.S.C. § 1334(b) if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy. *See, e.g., In re Cayahoga Equipment Corp.*, 980 F.2d 110, 114 (2d Cir. 1992) (stating the bankruptcy court has "related to" jurisdiction over any action that might have a "conceivable effect" on the bankrupt estate). Here, the resolution of Plaintiffs' claims will directly affect whether there are additional monies available for distribution to the Debtor's creditors.

17.     No previous application has been made for this or any similar relief. Pursuant to Rule 9027(c) of the Federal Rules of Bankruptcy Procedure, after the filing of this Notice of Removal, Impala shall hereby give written Notice of Filing of Notice of Removal (a copy of which is attached hereto as Exhibit "E") to Plaintiffs and shall file a copy of the Notice of Filing of Notice of Removal with the Clerk of the Supreme Court of the State of New York, County of New York.

HF 3651621v.1 #10069/0000

WHEREFORE, Defendant, Impala Partners, LLC, respectfully requests that that matter of <u>Winstar Holdings, LLC and IDT Corp., v. The Blackstone Group LP., Impala Partners, LLC and Citicorp</u>, presently pending in the Supreme Court of the State of New York, County of New York, be removed to this Court, that this Court accept jurisdiction of said action, and, upon acceptance of jurisdiction, transfer this matter to the Honorable Kevin J. Carey of the United States Bankruptcy Court for the District of Delaware.

Dated:    New York, New York
          June 1, 2007

                              Respectfully submitted

                              Andrew C. Gold (ACG-4875)
                              HERRICK, FEINSTEIN LLP
                              2 Park Avenue
                              New York, NY 10016
                              (212) 592-1400

                              *Attorneys for Defendant,*
                              *Impala Partners, LLC*

**EXHIBIT A**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

**ORIGINAL**

---

WINSTAR HOLDINGS, LLC and
IDT CORP.,

                     Plaintiffs,

      -against-

THE BLACKSTONE GROUP LP;
IMPALA PARTNERS, LLC; and
CITICORP,

                    Defendants.

---

:  Index No.
:  Date Purchased
:
:  Plaintiff designates NEW YORK  07601582
:  County as the place of trial.
:
:  The basis of this venue is
:  residence of defendants; location where the cause
:  of action arose; and Plaintiffs' designation.
:
:         **SUMMONS**
:
:  Plaintiffs reside at
:  520 Broad Street
:  Newark, New Jersey
:
:  County of Essex

**FILED**
MAY 10 2007
NEW YORK
COUNTY CLERKS C...

To the above named Defendants:

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer on the Plaintiffs' Attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:  New York, New York
       May 10, 2007

                MOUND COTTON WOLLAN & GREENGRASS

                Philip C. Silverberg, Esq.
                Gretchen Henninger, Esq.
                One Battery Park Plaza
                New York, NY  10004-1486
                Telephone: (212) 804-4200

and

Melissa Roover, Esq.
GRAYSON & KUBLI, P.C
1420 Spring Hill Road, Suite 230
McLean, VA 22102
(703) 749-0000

Attorneys for Plaintiffs
WINSTAR HOLDINGS, LLC and
IDT CORP.

TO:    The Blackstone Group LP
345 Park Avenue
New York, NY 10154

Impala Partners, LLC
18 Marshall Street, Suite 112
Norwalk, CT 06854

Citicorp
399 Park Avenue
New York, NY 10043

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X

WINSTAR HOLDINGS, LLC,
 and IDT CORP.,

                 Index No.:

             Plaintiffs,

   -against-

THE BLACKSTONE GROUP LP;
IMPALA PARTNERS, LLC; and
CITICORP,

                      __COMPLAINT__ 07601582

             Defendants.
------------------------------------------------------------------X

        Plaintiffs, Winstar Holdings, LLC and IDT Corp., by and through its attorneys, Mound
Cotton Wollan & Greengrass, as and for its complaint against Defendants, The Blackstone
Group LPl, Impala Partners, LLC, and Citicorp, hereby allege as follows:

       1.    In 2001, Plaintiffs spent $42.5 million to acquire the business assets of Winstar
Communications, Inc., and related entities ("Old Winstar"). In doing so, they relied on the oral
and written misrepresentations of the Defendants regarding Old Winstar sales, customers, and
other material information. As a result, the Plaintiffs lost hundreds of millions of dollars. The
Plaintiffs bring this action to recover for those injuries.

## PARTIES

       2.    Plaintiff Winstar Holdings, LLC, formerly known as IDT Winstar Acquisition,
Inc. ("New Winstar"), is a Delaware corporation. It acquired the business assets of Old Winstar
in an Asset Purchase Agreement dated December 18, 2001.

1

3.     Plaintiff IDT Corp. ("IDT") is a Delaware corporation. It is, among other things, a telephone company. It provided the funds for the purchase of Old Winstar, and bore most of the resulting subsequent losses.

4.     Defendant The Blackstone Group LP ("Blackstone") is a Delaware limited partnership. Its principal office is at 345 Park Avenue, New York, NY 10154. In the sale of Old Winstar's assets, it acted as an investment advisor to various entities related to Old Winstar.

5.     Defendant Impala Partners, LLC ("Impala") is a Delaware limited partnership. Its principal office is at 18 Marshall Street, Suite 112, Norwalk, Connecticut 06854. Upon information and belief, at the time of the sale of Old Winstar's assets, it was acting as a restructuring advisor for Old Winstar.

6.     Defendant Citicorp ("Citicorp") is a Delaware corporation. Its principal office is at 399 Park Avenue, New York, New York 10043. It was the largest creditor of Old Winstar while Old Winstar was a debtor in bankruptcy. Impala's actions are, in large part, attributable to Citicorp because Citicorp acted as Impala's principal. Allegations regarding Citicorp include, but are not limited to, allegations regarding Impala that are imputed to Citicorp.

## JURISDICTION AND VENUE

7.     The Supreme Court of the State of New York, as a court of general original jurisdiction, has subject matter jurisdiction of this action.

8.     Personal jurisdiction exists in this action because, among other reasons: the Defendants transact business within the state or contracted to supply goods or services within the state; have committed a tortious act within the state; and own, use or possess real property within the state.

2

9.     Venue lies in this County because Defendants Blackstone's and Citicorp's principal offices are located in this County, the cause of action arose in the county, and the Plaintiffs designate the county.

## ALLEGATIONS

10.     In and around 2001, IDT examined several potential acquisitions in the field of telecommunications.

11.     Through 2001, Old Winstar provided telephone service to customers using a "fixed wireless" system. This system carried calls locally by wireless means, from customer locations to Old Winstar's local "hubs."

12.     On information and belief, Old Winstar maintained an office in New York City. It also maintained some of its books and records in New York City.

13.     Old Winstar was a publicly traded company. On April 18, 2001, Old Winstar petitioned for protection under Chapter 11 of the U.S. Bankruptcy Code. The bankruptcy petition was filed in the U.S. Bankruptcy Court for the District of Delaware.

14.     On information and belief, Blackstone was retained as a financial advisor, and Blackstone's responsibility was to obtain the highest possible sale price for the assets of Old Winstar. Upon information and belief, Blackstone's compensation varied with the sale price that it obtained for Old Winstar's assets. Specifically, Blackstone received, *inter alia,* a transaction fee equal to 1% of the first $200 million of consideration paid by an acquirer. This provided Blackstone with an incentive to maximize – or inflate -- that consideration.

15.     The division of Blackstone performing the financial advisory work for Old Winstar was Blackstone's Restructuring & Reorganization Advisory Group. This group claims

3

to have provided advisory services in over 150 "distressed situations." On information and belief, it is an unincorporated division of Blackstone.

16.    At all relevant times, the head of Blackstone's Restructuring & Reorganization Advisory Group was Arthur Newman ("Newman"). Newman also was a member of Blackstone's Executive Committee. The Executive Committee oversees all of Blackstone's policy decisions.

17.    Upon information and belief, Old Winstar retained Impala as a restructuring advisor, for the purpose of providing restructuring advice and other related services in connection with Old Winstar's Chapter 11 bankruptcy proceedings. As compensation, Impala charged Old Winstar $250,000 per month for the first two months of its services. Thereafter, Impala's compensation was $100,000 per month for the services of Paul Street, who acted as the Chief Restructuring Officer for Old Winstar. Impala charged various other amounts for other Impala personnel. In addition, upon the sale of all or substantially all of Old Winstar's assets, in one or more transactions, in which the aggregate consideration paid by the purchaser was less than $350 million, Impala earned a transaction fee of 0.25% of such consideration. Upon the sale of all or substantially all of the Old Winstar's assets, in one or more transactions, in which the aggregate consideration paid by the purchaser was equal to or greater than $350 million, Impala earned a transaction fee of 2.0% of such consideration. Thus Impala was motivated to obtain the highest possible sale price for the Winstar assets.

18.    Upon information and belief, Citicorp, as Old Winstar's largest creditor, assisted Old Winstar in negotiating its contract terms with Impala. Citicorp acted as Impala's principal.

19.    To promote the sale of Old Winstar's business assets, Blackstone prepared an offering statement. Upon information and belief, Impala assisted with the preparation of the

4

offering statement. Blackstone, Citicorp, and Impala also controlled bidder access to Winstar staff, and Winstar records.

20.    In connection with the sale of Old Winstar's business assets, Blackstone, Citicorp, and Impala assisted in the development of financial data and presentations to Old Winstar's Board of Directors, various creditors and other parties. Blackstone reviewed financial analyses generated by Old Winstar's finance staff and external advisors. Blackstone also performed various analyses, including cash reconciliation of Old Winstar's actual performance vs. various sets of projections. Blackstone petitioned for payment for this work, and the petition was granted.

21.    IDT was one of several entities that expressed an interest in acquiring Old Winstar's business assets.

22.    An auction of Old Winstar's business assets was planned for December 2001. Leading up to that auction, Blackstone circulated an "offering book." Blackstone also met with IDT and, on information and belief, other entities interested in bidding in the auction. In meetings organized by Blackstone, several Winstar officials also met with IDT and, on information and belief, other interested entities. The meetings generally were held within this County. Certain Old Winstar business records also were made available to IDT at that time, generally in an area known as the "data room," which was located within this County. Collectively, this communication and review was known as "due diligence."

23.    In accordance with the timing established for the auction, IDT's due diligence was conducted between Friday, November 30, 2001, and Wednesday, December 5, 2001.

24.    A number of IDT representatives engaged in this due diligence.

25.    Blackstone's representatives included Arthur Newman. Newman engaged in substantive discussions about Old Winstar's business with representatives of IDT, Howard Jonas, *inter alia*.

26.    Impala's representatives included Paul Street.

27.    Old Winstar's representatives included Chief Financial Officer David Duncan, *inter alia*.

28.    During this due diligence, Blackstone, Impala, and Old Winstar each made the following material representations (*inter alia*) regarding the status of Old Winstar's business:

    a.    that Old Winstar's business was generating $16 million or more per month in revenue;

    b.    that Old Winstar's "cash burn" (*i.e.*, losses) had been reduced to $10-12 million per month;

    c.    that Old Winstar had 9,000 paying customers;

    d.    that Old Winstar had 50,000 revenue-generating telephone lines;

    e.    that Old Winstar's "churn rate" (the rate at which existing customers discontinued service) was only 3% per year; and

    f.    that Old Winstar was employing an intercity optical network built by Lucent (the "Lucent network") to serve Old Winstar's customers.

29.    On occasions when Old Winstar made these representations, they were made in the presence of Blackstone, Citicorp, and Impala; and Blackstone, Citicorp, and Impala did not dispute them, even though they knew or should have known that these representations were false, and that the plaintiffs would rely on these representations.

30.    Each of these representations was false and fraudulent. The truth, known to the Defendants but not to IDT, was as follows:

    a.    that Old Winstar's business was generating substantially less than $16 million per month in revenue, and its revenue was declining;

6

b.    that Old Winstar's cash burn was materially higher than $10-$12 million per month;

c.    that Old Winstar had far fewer than 9,000 paying customers, and indeed was providing service to many customers who were not paying Old Winstar;

d.    that Old Winstar had far fewer than 50,000 revenue-generating telephone lines, and in fact was carrying and paying for many lines that were not generating any revenue;

e.    that Old Winstar's "churn rate" was far higher than 3%, in part because Old Winstar continued to maintain and pay for telephone lines, and count them as revenue-generating, long after customers had discontinued service; and

f.    that the Lucent network carried no Old Winstar customer traffic in or around December 2001 and, indeed, most of the Lucent network never would.

31.    Notably, despite this information being solely within their possession, Blackstone, Impala, Citicorp, and Old Winstar did not provide client information in any detail that would have allowed IDT and New Winstar to uncover the Defendants' false statements and material omissions.

32.    Indeed, Blackstone, Citicorp and Impala fraudulently withheld information within their possession, custody or control, including but not limited to the following: (a) that Winstar was required to continue to serve federal and other customers without regard to profit, and (b) that local telephone companies could extort concessions from Old Winstar by threatening to discontinue termination of calls placed by Old Winstar customers.

33.    On information and belief, Blackstone, Citicorp, Impala, and Old Winstar all hid and blocked IDT's access to material information about Old Winstar's finances and operations. Indeed, IDT had no access to this important information.

7

34.    The figures in the documents that were offered to IDT, including receivables reports, historical financial statements and contract summaries, were heavily distorted by (*inter alia*) Old Winstar's recording of revenue – sometimes for years – from customers who had discontinued service.

35.    Unaware of the true state of Old Winstar's affairs, IDT established New Winstar, for the purpose of acquiring Old Winstar's business assets.  IDT injected a substantial amount of capital into New Winstar.

36.    The information that Blackstone, Impala, and Old Winstar provided during due diligence regarding Old Winstar's business and operations was material to IDT's decision to acquire Old Winstar's business assets.  Upon information and belief, Blackstone, Citicorp,  and Old Winstar knew that this information was false, or they were negligent in not knowing that. Blackstone and Old Winstar intended that IDT and New Winstar would rely upon this information. IDT and New Winstar did rely upon this information.  This reliance was reasonable. IDT and New Winstar were deceived by this information.

37.    The information that Blackstone, Impala, Citicorp,  and Old Winstar omitted to provide during due diligence regarding Old Winstar's business and operations was material to IDT's decision to acquire Old Winstar's business assets.   Upon information and belief, Blackstone and Old Winstar knew that this information was material, or they were negligent in not knowing that.  Blackstone and Old Winstar intended that IDT and New Winstar would rely upon the absence of this information. IDT and New Winstar did rely upon the absence of this information.  This reliance was reasonable.  IDT and New Winstar were deceived by the failure to disclose this information.

8

38.    As a direct and proximate result of the Defendants' misrepresentations and omissions, IDT and New Winstar submitted a bid in the auction for Old Winstar's assets, conducted on December 5, 2001. Absent the misinformation provided by Blackstone and Old Winstar, Plaintiffs would not have done so.

39.    The apparent successful offeror in the auction was an entity other than IDT/New Winstar. That entity was related to William J. Rouhana, Jr., the former Chairman of the Board and CEO of Old Winstar. Despite this, Blackstone encouraged IDT to remain interested in purchasing Old Winstar's assets.

40.    On information and belief, the Rouhana entity was unable or unwilling to close the transaction.

41.    Between December 5, 2001 and December 17, 2001, there was no opportunity for any further due diligence by IDT because the Defendants did not permit it.

42.    On or about December 17, 2001, IDT learned that the Rouhana entity had failed to purchase Old Winstar's assets. The bankruptcy court required IDT to sign an agreement for these assets (if IDT desired to purchase them) by noon on the following day.

43.    As a result of the Defendants' misrepresentations and omissions, on or about December 18, 2001, Old Winstar and New Winstar entered into an Asset Purchase Agreement (the "Agreement") for the transfer of Old Winstar's business assets, and certain other assets.

44.    On or about December 19, 2001, the bankruptcy court approved the Agreement.

45.    On or about December 20, 2001, the Agreement closed, *i.e.,* payment was made and assets were transferred. On or around that date, New Winstar took over the operation of Winstar's business.

9

46.    New Winstar appointed employees to collect on accounts receivable. In many cases, the purported "customers" told those employees that service had been canceled years earlier, yet Old Winstar had continued to bill for the service.

47.    New Winstar learned that Old Winstar had inflated its reported revenue by a variety of means, including "swaps" (pairs of companies each reporting revenue from the other, without any actual payment), "dead" accounts, and "made-up" billing.

48.    As a result of the misrepresentations and material omissions during due diligence, New Winstar's revenues were materially less than represented. Between August 1, 2001 and July 31, 2002, a period that included several months preceding the asset purchase, Winstar's revenue was only $79.6 million, or less than $7 million a month. During the following year (8/02 - 7/03), revenue was only $87.5 million, and the year after that (8/03 - 7/04), revenue was only $71.6 million. In other words, Old Winstar's revenues had been overstated by over 200%.

49.    Much later, Winstar's business was sold to an entity independent of IDT.

50.    As a direct and proximate result of Blackstone's, Citicorp's, and Impala's tortuous misconduct, IDT and New Winstar have suffered losses of over $300 million.

### FIRST CAUSE OF ACTION
#### (Fraud)

51.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 50 as if fully set forth herein.

52.    Blackstone, Citicorp, and Impala knowingly engaged in the various deceitful means enumerated above to deprive IDT and New Winstar of their property permanently.

53.    More specifically, Blackstone, Citicorp, and Impala made numerous false representations of material fact and material omissions, as set forth above and below. The Defendants knew that these representations and material omissions were false, or they made

10

them with reckless disregard for their truth or falsity. Blackstone, Citicorp, and Impala intended IDT and New Winstar to rely on these false statements and omissions. IDT and New Winstar reasonably relied on them. As a result, IDT and New Winstar were injured.

54. The Defendants' false statements and material omissions were not mere projections or promises to perform, but actual representations of existing fact known only to the Defendants.

55. The representations were made by individuals acting as agents of Blackstone, Citicorp, and Impala, who acted within the scope of their employment.

56. The representations and omissions were made in New York, within this County. They were made during November and December 2001, by means of telephone, faxes, e-mail, in person, and indirectly through other authorized agents and through documents, as explained above.

57. Blackstone, Citicorp, and Impala knew that these misrepresentations were false and the omissions material, or acted in reckless disregard for their truth or falsity.

58. Blackstone, Citicorp, and Impala intended that IDT and New Winstar rely upon these misrepresentations and omissions, because they sought fraudulently to induce IDT and New Winstar to enter into the Agreement, and they sought to profit from that agreement. IDT and New Winstar reasonably relied on these misrepresentations and omissions.

59. Blackstone, Citicorp, and Impala also failed to inform IDT and New Winstar of numerous material facts. For instance, Blackstone, Citicorp, and Impala failed to inform IDT and New Winstar that Old Winstar customers who had terminated service continued to be counted as Old Winstar customers, that Old Winstar continued to book revenue from such customers, and that Old Winstar continued to pay for telephone lines to service such customers.

As alleged above, Blackstone, Citicorp, and Impala also fraudulently withheld the material information that Winstar was required to continue to serve federal and other customers without regard to profit, and that local telephone companies could extort concessions from Winstar by threatening to discontinue termination of calls placed by Winstar customers. These all were material fraudulent omissions that Blackstone, Citicorp, and Impala had a duty to disclose to IDT and New Winstar.

60.    If IDT and New Winstar had known the truth regarding Winstar's finances and operations, they would not have entered into the Agreement. They would have retained the purchase price under that Agreement, and they would have avoided the losses that they necessarily experienced as a direct result of acquiring Old Winstar's business assets. Therefore they have been injured.

61.    For the reasons alleged above, Blackstone, Citicorp, and Impala acted recklessly, willfully and wantonly. Their conduct was gross, and morally reprehensible. Blackstone, Citicorp, and Impala exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.

61.    For the reasons alleged above, IDT and New Winstar are entitled to the following relief against Blackstone, Citicorp and Impala:

    a.    A monetary award of compensatory damages for fraud;

    b.    A monetary award of punitive damages in the maximum amount permitted by law;

    c.    Interest and costs; and

    d.    Such further relief as the Court deems just.

## SECOND CAUSE OF ACTION
### (Aiding and Abetting Fraud)

62.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 61 as if fully set forth herein.

63.    Based upon the allegations stated above, IDT and New Winstar are victims of fraud.

64.    Blackstone, Citicorp and Impala knowingly aided and abetted in Old Winstar's commission of fraud, and participated in the fraud, in the manners alleged above.

65.    Blackstone, Citicorp, and Impala's conduct was gross, and morally reprehensible. Blackstone, Citicorp and Impala exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.

66.    IDT and New Winstar suffered significant injury as a direct result of the fraud.

67.    For the reasons alleged above, IDT and New Winstar are entitled the following relief against Blackstone, Citicorp and Impala:

    a.    A monetary award of compensatory damages for aiding and abetting fraud;

    b.    A monetary award of punitive damages in the maximum amount permitted by law;

    c.    Interest and costs; and

    d.    Such further relief as the Court deems just.

## THIRD CAUSE OF ACTION
### (Negligent Misrepresentation)

68.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 67 as if fully set forth herein.

13

69.    Blackstone, Citicorp and Impala made the misrepresentations and omissions to IDT and New Winstar enumerated under the claim for fraud above, directly or indirectly.

70.    The individuals who made the direct misrepresentations to IDT and New Winstar acted as agents for Blackstone, Citicorp and Impala.

71.    Blackstone, Citicorp and Impala owed IDT and New Winstar a duty of care to ensure that its statements to IDT and New Winstar were true.

72.    IDT and New Winstar reasonably and justifiably relied on Blackstone and Impala for accurate information.

73.    Blackstone, Citicorp and Impala intended for IDT and New Winstar to rely upon the information that they provided.

74.    The information that Blackstone, Citicorp and Impala provided to IDT and New Winstar was false, in the manner described under the claim for fraud above.

75.    IDT and New Winstar were injured by the false information that Blackstone, Citicorp and Impala provided to them.

76.    Blackstone, Citicorp and Impala's negligent misrepresentations were willful and wanton. They acted with such indifference as to whether IDT and New Winstar would be harmed as to be equivalent to an intent to harm them.

77.    Blackstone, Citicorp and Impala's conduct was gross, and morally reprehensible. Blackstone, Citicorp and Impala exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.

78.    For the reasons alleged above, IDT and New Winstar are entitled the following relief against Blackstone, Citicorp and Impala:

     a.    A monetary award of compensatory damages for negligent misrepresentation;

14

b.  A monetary award of punitive damages on account of Blackstone's willful and wanton negligence, in the maximum amount permitted by law;

c.  Interest and costs; and

d.  Such further relief as the Court deems just.

## FOURTH CAUSE OF ACTION
### (Negligence)

79.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 78 as if fully set forth herein.

80.  Blackstone, Citicorp and Impala are experienced professional organizations in the field of finance.

81.  Blackstone claims to be a world leader in private equity; among the largest in private equity real estate investments; a leader in private mezzanine and structured debt vehicles; and a leader in providing "unconflicted" advice and counsel to senior management. Blackstone's Restructuring & Reorganization Advisory Group claims to be a market leader, having advised in over 150 distressed situations, involving $350 billion of outstanding debt.

82.  Arthur Newman, the head of Blackstone's Restructuring & Reorganization Advisory Group, has forty years of experience, including thirty years in reorganization. He claims to have served as advisor on some of the largest business restructurings in history.

83.  Impala claims to be a world leader in restructuring advice to troubled companies. Impala claims to have been involved in transactions totaling over $7 billion since 1997.

84.  As alleged above, Blackstone, Citicorp and Impala directly and indirectly made representations to IDT and New Winstar regarding Old Winstar's finances and operations. On information and belief, Blackstone, Citicorp and Impala did not exercise due care in ascertaining or disseminating this information.

15

85.    Blackstone, Citicorp and Impala owed IDT and New Winstar a duty of care in ascertaining and disseminating this information. It was reasonably foreseeable to Blackstone, Citicorp and Impala that their negligence would injure IDT and New Winstar, because IDT and New Winstar would be induced to enter into the Agreement, and then to incur significant additional losses.

86.    Blackstone, Citicorp and Impala failed to exercise reasonable care in this regard. To the contrary, their lack of care was willful and wanton. They acted with malice, intending to harm IDT and New Winstar, because (on information and belief) the more that IDT and New Winstar paid under the Agreement, the more that Blackstone and Impala could receive as compensation. In the alternative, Blackstone, Citicorp and Impala acted with such indifference as to whether IDT and New Winstar would be harmed as to be equivalent to intent to harm IDT and New Winstar.

87.    In all other respects, the Defendants failed to act with due care to provide accurate information to IDT and New Winstar.

88.    The natural and probable consequence of the Defendants' negligence was that IDT and New Winstar were induced to enter into the Agreement, and to incur additional subsequent losses, which have caused significant injury to IDT and New Winstar.

89.    Blackstone, Citicorp and Impala's conduct was gross, and morally reprehensible. Blackstone, Citicorp and Impala exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations. They were reckless and willful.

90.    For the reasons alleged above, IDT and New Winstar are entitled the following relief against Blackstone, Citicorp and Impala:

a.    A monetary award of compensatory damages for negligence;

16

b.    A monetary award of punitive damages on account of the Defendant's willful and wanton negligence, in the maximum amount permitted by law;

c.    Interest and costs; and

d.    Such further relief as the Court deems just.

## FIFTH CAUSE OF ACTION
### (Civil Conspiracy)

91.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 90 as if fully set forth herein.

92.    The Defendants engaged in a combination and conspiracy involving four conspirators:

a.    the officers, employees and agents of Blackstone; and

b.    the officers, employees and agents of Impala; and

c.    the officers, employees and agents of Citicorp; and

d.    the officers, employees and agents of Old Winstar.

93.    These conspirators combined for the purpose of injuring IDT and New Winstar. Specifically, the conspirators sought to deprive IDT and New Winstar of their property interests in the purchase price of the Agreement, and the funds used to pay for subsequent Winstar losses. The Defendants did so not only in the manners alleged above, but also by means of the following overt acts, *inter alia*:

a.    announcing and conducting of the auction;

b.    creating the data room, and the invitation to IDT and New Winstar representatives (and, on information and belief, others) to examine its contents;

c.    engaging in other communications relating to Old Winstar's finances and operations, as alleged above;

d.    the negotiation, preparation and execution of the Agreement; and

17

e.    actions taken to obtain bankruptcy court approval of that Agreement.

94.    The Defendants' conspiracy has caused IDT and New Winstar injury, including the special damages of (*inter alia*) payment of the Purchase Price of $42,500,000 set forth in Section 3.1 of the Agreement. The Defendants' conspiracy deprived IDT and New Winstar of this amount. In addition to this, IDT and New Winstar have suffered special damages for losses incurred following the acquisition of Winstar's business assets, which total approximately $300 million.

95.    The conspirators acted recklessly, willfully and wantonly. Their conduct was gross, and morally reprehensible. They exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.

96.    For the reasons alleged above, IDT and New Winstar are entitled the following relief against Blackstone, Citicorp and Impala:

a.    A monetary award of compensatory damages for civil conspiracy;

b.    A monetary award of punitive damages for civil conspiracy, in the maximum amount permitted by law;

c.    Interest and costs; and

d.    Such further relief as the Court deems just.

## JURY REQUEST

97.    The Plaintiffs request a jury for all issues that may be tried by a jury.

WHEREFORE, IDT and New Winstar seek the following relief against Blackstone, Citicorp and Impala:

18

a.  A monetary award of compensatory damages for fraud; aiding and abetting fraud, negligent misrepresentation, negligence, and civil conspiracy;

b.  A monetary award of punitive damages in the maximum amount permitted by law for fraud, aiding and abetting fraud, negligent misrepresentation, negligence, and civil conspiracy;

c.  Interest and costs; and

d.  Such further relief as the Court deems just.

Dated: New York, New York
       May 10, 2007

MOUND COTTON WOLLAN & GREENGRASS

Philip C. Silverberg, Esq.
Gretchen Henninger, Esq.
One Battery Park Plaza
New York, NY 10004-1486
Telephone: (212) 804-4200

and

Melissa Roover, Esq.
GRAYSON & KUBLI, P.C
1420 Spring Hill Road, Suite 230
McLean, VA 22102
(703) 749-0000

Attorneys for Plaintiffs
WINSTAR HOLDINGS, LLC and
IDT CORP.

19

WINSTAR HOLDINGS, LLC,
and IDT CORP.,

                     Plaintiffs,

    -against-

THE BLACKSTONE GROUP LP;
IMPALA PARTNERS, LLC; and.
CITICORP,

                   Defendants.



## SUMMONS and COMPLAINT

MOUND, COTTON, WOLLAN & GREENGRASS
*Attorneys for*

Plaintiffs

*Office and Post Office Address, Telephone*
ONE BATTERY PARK PLAZA
NEW YORK, NY 10004
(212) 804-4200

**To:**

Service of a copy of the within is
hereby admitted.

Dated:_____ 20_____

**Attorney(s) for**

_____

# EXHIBIT B

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------x
                                                     :
                                                     :
In re:                                               : Chapter 11
                                                     :
WINSTAR COMMUNICATIONS, INC., et al.,                : Case No.: 01-1430 (JJF)
                                                     :
                                                     : Jointly Administered
            Debtors.                                 :
                                                     :
                                                     :
                                                     :
-----------------------------------------------------x
```

## ORDER AUTHORIZING (i) SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS ENCUMBRANCES, AND INTERESTS, (ii) APPROVING CURE AMOUNTS WITH RESPECT TO CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (iii) AUTHORIZING THE DEBTORS TO ENTER INTO AND APPROVING MANAGEMENT AGREEMENT, (iv) APPROVING REGULATORY TRANSITION PROCESS AND (v) GRANTING RELATED RELIEF

This matter having come before the court on (I) the motion (the "Original Motion"; terms not otherwise defined in this Sale Order shall have the meanings ascribed to such terms in the Original Motion) filed by Winstar Communications, Inc. and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), requesting the entry of (A) an order pursuant to sections 363(b) and 105(a) of title 11, United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i) approving bidding procedures, including bid protections, (ii) approving the form and manner of notice of (a) the hearing to consider granting certain bid protections (the "Bid Procedures Hearing"), (b) the hearing on the sale of certain of the Debtors' assets (the "Sale Hearing"), (c) proposed cure payments and (d) assumption and assignment of executory contracts and unexpired leases, and (iii) scheduling the Sale Hearing,

Purchase Agreement, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, other than the Permitted Encumbrances, arising prior to the Closing Date under the Asset Purchase Agreement, including, but not limited to, any liabilities under any revenue, pension, ERISA, tax, labor, environmental or natural resource law, rule or regulation, or any products liability law, arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' businesses prior to the Closing Date. After the Closing and the payment of the Purchase Price, the Buyer shall have no liability to the Debtors or their estates for any diminution in value or other damage of any kind whatsoever to the Regulated Assets or the Licenses that may result from the Buyer's operation of the Debtors' business.

15.    This Court retains and shall have exclusive jurisdiction to endorse and implement the terms and provisions of the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith (including the Management Agreement) in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Buyer, (b) compel delivery of the purchase price or performance of other obligations owed to the Debtors, (c) resolve any disputes arising under or related to the Asset Purchase Agreement, and (d) interpret, implement, and enforce the provisions of the Asset Purchase Agreement and this Sale Order.

16.    The transactions contemplated by the Asset Purchase Agreement are undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale of any Purchased Assets shall not affect the validity of the Sale of such Purchased Assets to the Buyer, unless such authorization is duly stayed pending such

14

some or all of Debtors' contracts with the GSA, the Buyer agrees that it will continue to provide telecommunications services to GSA until GSA has received sixty (60) days' notice of discontinuance, or such longer period as the FCC requires. In all other respects, the Buyer shall manage the operations of the Business and shall be responsible for such operation pursuant to the terms and subject to the conditions of the Asset Purchase Agreement and the Management Agreement. The period within which the Debtors may elect to assume or reject unexpired leases of nonresidential real property under Bankruptcy Code section 365(d)(4) is hereby extended through the duration of the Term.

25.     Upon receipt of the required regulatory approvals and establishment of the necessary service agreements and arrangements, the Debtors are authorized to convey the Licenses and the Regulated Assets to the Buyer, in accordance with the terms and conditions of the Asset Purchase Agreement and the Management Agreement.

26.     As provided by Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure, the effectiveness of this Sale Order shall not be stayed for 10 days after entry on the docket and shall be effective and enforceable immediately upon such entry. The Buyer and the Debtors shall consummate the Sale as promptly as is practicable following Court approval of this Sale Order, so long as no stay of this Sale Order has been entered and is continuing.

Dated: Wilmington, Delaware
     December _19_, 2001

                                      HONORABLE JOSEPH J. FARNAN, JR.
                                        UNITED STATES DISTRICT JUDGE

WP3:714361.3                                                                                                          58222.1001

**EXHIBIT C**

MASTER FINAL

EXECUTION COPY

ASSET PURCHASE AGREEMENT

AMONG

IDT WINSTAR ACQUISITION, INC.,

WINSTAR COMMUNICATIONS, INC.

AND

CERTAIN OF ITS SUBSIDIARIES
SET FORTH ON APPENDIX I HERETO

DATED AS OF DECEMBER 18, 2001

good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 9.9    *Governing Law.*  This Agreement shall be governed by and construed in accordance with the laws of the State of New York (regardless of the laws that might otherwise govern under applicable New York principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies.

Section 9.10    *Submission to Jurisdiction.*  The parties hereto irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith or any of the transactions contemplated hereby or thereby.  Each party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such dispute or proceedings may be heard and determined in such courts.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum in connection therewith.

Section 9.11    *Counterparts.*  This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which, when executed and delivered, shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

Section 9.12    *Incorporation of Schedule and Exhibits.*  The Disclosure Schedule and all Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

Section 9.13    *Entire Agreement.*  This Agreement (including the Exhibits and the Disclosure Schedule) and the Confidentiality Agreement constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings among the parties with respect thereto.

Section 9.14    *Headings.*  The descriptive headings contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.15    *Remedies.*  Subject to Section 9.3, the Sellers and the Buyer hereby acknowledge and agree that money damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement and that, in such event, the Sellers or their successors or assigns, or the Buyer or its successors or assigns, as the case may be, may, in addition to any other rights and remedies existing in their favor, apply to the Bankruptcy Court or any other court of competent jurisdiction for specific performance, injunctive and/or other relief in order to enforce or prevent any violations of this Agreement.

Section 9.16    *Bulk Sales or Transfer Laws.*  The Buyer hereby waives compliance by the Sellers with the provisions of the bulk sales or transfer laws of all applicable jurisdictions.

27

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written by their respective officers thereunto duly authorized.

**IDT WINSTAR ACQUISITION, INC.**

By: _____

Name: Charles HF Garner

Title: President

**WINSTAR COMMUNICATIONS, INC.**

By: _____

Name: T. R. Graham

Title: Executive Vice President

**WINSTAR WIRELESS, INC.**

By: _____

Name: T. R. GRAHAM

Title: VICE PRESIDENT

**WCI CAPITAL CORP.**

By: _____

Name: T. R. GRAHAM

Title: VICE PRESIDENT

**WINSTAR EQUIPMENT CORP.**

By: _____

Name: T. R. GRAHAM

Title: VICE PRESIDENT

**WINSTAR EQUIPMENT II CORP.**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


**WINSTAR GOVERNMENT SOLUTIONS, LLC.**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


**WINSTAR LMDS, LLC**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


**WINSTAR NETWORK EXPANSION, LLC**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


**WINSTAR WIRELESS FIBER CORP.**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


**WINSTAR WIRELESS OF DELAWARE, LLC**

By: _____
    Name: T. R. GRAHAM
    Title VICE PRESIDENT

WINSTAR WIRELESS OF GEORGIA, LLC

By:
 Name: T. R. GRAHAM
 Title: VICE PRESIDENT

WINSTAR WIRELESS OF INDIANA, LLC

By:
 Name: T. R. GRAHAM
 Title: VICE PRESIDENT

WINSTAR WIRELESS OF NEW JERSEY, LLC

By:
 Name: T. R. GRAHAM
 Title: VICE PRESIDENT

WINSTAR WIRELESS OF NEW YORK, LLC

By:
 Name: T. R. GRAHAM
 Title: VICE PRESIDENT

WINSTAR WIRELESS OF PENNSYLVANIA, LLC

By:
 Name: T. R. GRAHAM
 Title: VICE PRESIDENT

WINSTAR WIRELESS OF VIRGINIA, LLC

By:
 Name: T. R. GRAHAM
 Title: VICE PRESIDENT

WINSTAR WIRELESS OF WEST VIRGINIA,
LLC

By: _____
Name: T. R. GRAHAM
Title: VICE PRESIDENT


WWI LICENSE HOLDING, INC.

By: _____
Name: T. R. GRAHAM
Title: VICE PRESIDENT


WVF-CPQ 1, LLC

By: _____
Name: T. R. GRAHAM
Title: VICE PRESIDENT


WVF-CSC 1, LLC

By: _____
Name: T. R. GRAHAM
Title: VICE PRESIDENT


WVF-DL 1, LLC

By: _____
Name: T. R. GRAHAM
Title: VICE PRESIDENT


WVF-LU 2, LLC

By: _____
Name: T. R. GRAHAM
Title: VICE PRESIDENT

WVF-I LLC

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WINSTAR CREDIT CORP.

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WINSTAR INTERNATIONAL, INC.

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WINSTAR MIDCOM ACQUISITION CORP.

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WINSTAR NEW MEDIA COMPANY, INC.

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WINSTAR INTERACTIVE VENTURES I,
INC.

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

WINSTAR PUERTO RICO, INC.

By: _____
    Name: *T. R. GRAHAM*
    Title: *VICE PRESIDENT*

**EXHIBIT D**



**IMPALA**
P A R T N E R S

July 2, 2001

Mr. William Rouhana, Jr.
Chairman and Chief Executive Officer
Winstar Communications, Inc.
685 Third Avenue
New York, NY 10017

Dear Bill:

This letter confirms the retention of Impala Partners, LLC ("Impala") to provide advisory services to Winstar Communications, Inc. (the "Company"), including, without limitation, providing the services of Mr. Paul A. Street as Chief Restructuring Officer of the Company. We will advise you in connection with the restructuring of this Company ("the Restructuring") and, by signing this letter, we hereby accept the engagement under the terms hereof and subject to the approval of the Bankruptcy Court.

We will act as your advisor for a period of one (1) year from the date hereof, subject to earlier termination pursuant to section 5 or further extension by mutual agreement between the parties and subject to the following conditions:

      1.     You will furnish or cause to be furnished to us such current and historical financial information and other information regarding the business of the Company as we may request in connection with this engagement. You agree that you will use your good faith efforts to ensure that all of the foregoing information will be accurate in all material respects at the time it is furnished, and you agree to keep us advised of all developments materially affecting the Company or its financial or legal position. In connection with our activities hereunder, we agree to keep confidential all non-public information provided to us by the Company, except as required by law, or as agreed to by the Company in writing.

      2.     In consideration for our services, you agree to pay us a monthly retainer of $250,000 per month for the first two months. Thereafter, at the rate of $100,000 per month for the services of Paul A. Street; and $50,000 for the services of each of Peter C. Keenoy, Michael P. Borom, and J. Robert Vipond only in respect to those of the three aforementioned individuals who are actively involved in the Winstar advisory engagement, provided, that each of the persons set forth in this letter spend substantially all of their working time during such month in such activity. An initial advance of $250,000 is payable in full at the inception of the engagement as the first monthly payment hereunder, subject only to Bankruptcy Court approval. Thereafter, for as long as the engagement continues, the retainer shall be payable monthly in advance with expenses to be reimbursed in accordance with paragraph 3 below. You further

LA/672002.1         Impala Partners, LLC 300 First Stamford Place, Stamfod, CT 06902

PAGE 4/10 * RCVD AT 5/16/2007 2:06:48 PM [Eastern Daylight Time] * SVR:NYFX01/5 * DNIS:3499 * CSID:2039566546 * DURATION (mm-ss):03-24

agree to pay us an additional fee ("the Success Fee") which will be mutually agreed upon within 30 days of the date hereof, payable upon the earlier of confirmation of a plan under or other emergence from Chapter 11 of the U.S. Bankruptcy Code of the Company or its successor, whether through a recapitalization, merger, or sale of the Company, confirmation of a plan or otherwise and subject to Bankruptcy Court approval.

3.    You will reimburse us for all of our reasonable and actual out-of-pocket expenses incurred in connection with this engagement, including fees and expenses, up to a maximum of $20,000 of counsel that we determine is required to advise us in connection with carrying out our duties under this letter; provided, that before such counsel is retained we will provide advance written notice to the Company and consult with the General Counsel of the Company. All reimbursements shall be made promptly after such payments accrue and are submitted to you with appropriate documentation for payment hereunder.

4.    No fee payable to any other financial advisor, by you or any other party, shall reduce or otherwise affect any fee payable hereunder to us.

5.    Our engagement hereunder may be terminated by you or us at any time without liability or continuing obligation to you or us, except that following such termination and any expiration of this agreement (a) we shall remain entitled to any fees accrued pursuant to paragraph 2 but not yet paid prior to such termination or expiration, as the case may be, and to reimbursement of expenses incurred prior to such termination or expiration, as the case may be, as contemplated by paragraph 3 hereof; and (b) upon any expiration or termination of this agreement, we shall remain entitled to any full payment of any fee contemplated by paragraph 2 hereof in respect of any restructuring resulting from negotiations commenced during the term of this agreement which is consummated within nine (9) months following such termination or expiration, as the case may be. The provisions of this paragraph 5 shall survive the termination of this Agreement.

6.    Any written financial advice rendered by us pursuant to this agreement is intended solely for the benefit and use of management and the Board of Directors of the Company in considering the matters to which this agreement relates, and the Company agrees that such written advice may not be disclosed publicly or made available to third parties (except as required by law) without the prior written consent of Impala, which consent shall not be unreasonably withheld except that the Company may share such written advice with the members of the Post-petition and Pre-petition bank lenders and the members of the Creditor's Committee and each of their representatives without Impala's consent.

7.    The provisions hereof shall inure to the benefit of and be binding upon the successors and assigns of the Company and Impala. This agreement may not be amended or modified except in a writing executed by the Company and us and shall be

LA/672087.1

2

governed by and construed in accordance with the laws of the State of New York, without reference to principals of conflicts of law. This agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

8.    In consideration of our agreement to act as advisor to the Company in the Company agrees to the same indemnification provisions attached hereto as Annex A. In addition, the Company will notify its existing insurance carrier of its existing directors and officers' policy and cause Mr. Street to become covered under such policy immediately as an officer of the Company. The provisions of this paragraph 8 shall survive the termination of this Agreement.

9.    This agreement shall be subject to approval by the U.S. Bankruptcy Court. The Company will prepare and file with the Bankruptcy Court a motion seeking approval of this letter promptly.

If the foregoing correctly sets forth the understanding between us, please so indicate on the enclosed signed copy of this agreement in the space provided therefor and return it to us, whereupon this agreement shall constitute a binding agreement between us.

Very truly yours,

IMPALA PARTNERS

By: _____
    Paul A. Street

AGREED TO AND ACCEPTED
as of the date first above written:

Winstar Communications, Inc.

By: _____
    William J. Rouhana, Jr.
    Chairman and Chief Executive Officer

3

IA/672007.1

PAGE 6/10 * RCVD AT 5/16/2007 2:06:48 PM [Eastern Daylight Time] * SVR:NYFX01/5 * DNIS:3499 * CSID:2039566546 * DURATION (mm-ss):03-24

ANNEX A

Indemnification Provisions

1.  In connection with the engagement of Impala Partners, LLC ("Impala Partners") by Winstar Communications, Inc., (the "Company") pursuant to a letter agreement dated July 2, 2001 between the Company and Impala Partners, as it may be amended from time to time (the "Letter Agreement"), the Company hereby agrees as follows:

2.  The Company agrees to indemnify and hold harmless Impala Partners and each of its partners, agents, employees and controlling persons (within the meaning of the Securities Act of 1933, as amended) (each, an "Indemnified Person") against any losses, claims, damages or liabilities (or actions or proceedings in respect thereof) brought by any third party (i.e., a person not a party to the Letter Agreement or an Indemnified Party hereunder) arising out of the rendering of services by Impala Partners under the Letter Agreement and will reimburse Impala Partners and each other person indemnified hereunder for all reasonable legal and other expenses as incurred in connection with investigating or defending any such loss, claim, damage, liability, action or proceeding; provided, however, that the Company will not be liable in any such case for losses, claims, damages, liabilities or expenses arising from the negligence or willful misconduct of Impala Partners or any other party entitled to indemnification hereunder. In case any proceeding shall be instituted involving any Indemnified Party, such person shall promptly notify the Company, and the Company, upon the request of the Indemnified Party, shall retain counsel reasonably satisfactory to the Indemnified Party to represent the Indemnified Party and any others the Company may designate in such proceeding and shall pay all reasonable fees and expenses of such counsel related to such proceeding. In any such proceeding, any Indemnified Party shall have the right to retain its own counsel at its own expense, except that the Company shall pay as incurred the fees and expenses of counsel retained by the Indemnified Party only in the event that (i) the Company and the Indemnified Party shall have mutually agreed to the retention of such counsel, or (ii) the named parties to any such proceeding (including any impleaded parties) include both the Company and the Indemnified Party and representation of both parties by the same counsel would be inappropriate, in the reasonable opinion of the Company, due to actual or potential differing interests between them.

3.  The Company shall not be liable for any settlement of any proceeding effected without its written consent. In addition, the Company will not, without the prior written consent of Impala Partners, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder unless such settlement, compromise, consent or consent includes an unconditional release of each party for which indemnification is sought hereunder from all liability arising out of such claim, action, suit or proceeding.

4.  In the event that the indemnity provided for in paragraph 2 hereof is unavailable or insufficient to hold any Indemnified Party harmless, then the Company shall contribute to amounts paid or payable by an Indemnified Party in respect of such Indemnified Party's losses, claims, damages and liabilities as to which the indemnity provided for in paragraph 1 hereof is unavailable or insufficient (1) in such proportion as appropriately reflects the relative benefits received by the Company, on the one hand, and Impala Partners, on the other hand, in connection with the matters as to which such losses, claims, damages or liabilities relate, or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as appropriately reflects not only the relative benefits referred to in clause (i) but also the relative fault of the Company, on the one hand, and Impala Partners, on the other hand, as well as any other equitable considerations. The amounts paid or payable by a party in respect of losses, claims, damages and liabilities referred to above shall be deemed to include any reasonable legal or other fees and expenses incurred in defending any litigation, proceeding or other action or claim. Nothing herein shall be deemed to increase the scope of matters for which indemnity or contribution may be available beyond those described in paragraph 1 of these Indemnification Provisions.

5.  These Indemnification Provisions shall survive the expiration of the term of the Letter Agreement, and shall be in addition to any liability that the Company might otherwise have to any Indemnified Party under the Letter Agreement or otherwise. The Company and Impala Partners each hereby waives any right to a trial by jury with respect to any claim or action arising out of the engagement of Impala Partners under the Letter Agreement or the Indemnification Provisions. It is further agreed that no Indemnified Party (including Impala Partners) shall be liable to the Company or any affiliate of the Company in connection with any matter arising out of or relating to the engagement of Impala Partners under the Letter Agreement, or any actions take or omitted , services performed or matters contemplated by or in connection with the Letter Agreement, except to the extent that such liability resulted primarily from the willful misconduct or negligence of such Indemnified Party; provided that nothing herein shall excuse Impala Partners from its obligations to perform under the Letter Agreement in good faith and in accordance with the terms thereof.

2

**EXHIBIT E**

HERRICK, FEINSTEIN LLP
Andrew C. Gold (AG-4875)
2 Park Avenue
New York, NY 10016
(212) 592-1400
*Attorneys for Defendant,*
*Impala Partners, LLC*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------- x

WINSTAR HOLDINGS, LLC and
IDT CORP.,

                              Plaintiffs,

-against-

THE BLACKSTONE GROUP LP; IMPALA
PARTNERS, LLC; and CITICORP,

                              Defendants.

-------------------------------------------------------- x

Index No. 601582/07

Civil Action

**NOTICE OF FILING**
**OF NOTICE OF REMOVAL**

TO THE CLERK OF THE SUPREME COURT:

       PLEASE TAKE NOTICE that the within matter has been removed this day to the United States District Court for the District of New York based upon the Notice of Removal (the "Notice") annexed hereto as **Exhibit A**. Upon filing the Notice, Defendant Impala Partners, LLC has effected removal pursuant to 28 U.S.C. §§ 1441, 1446 and 1452.

Dated: June___, 2007

                              Respectfully submitted,

                              HERRICK, FEINSTEIN LLP
                              Attorneys for Defendant
                              Impala Partners, LLC

                              By: _____
                                  Andrew C. Gold (ACG-4875)
                              2 Park Avenue
                              New York, NY 10016
                              (212) 592-1400

**EXHIBIT A**

HF 3652173v.1 #10069/0000

HERRICK, FEINSTEIN LLP
Andrew C. Gold (ACG-4875)
2 Park Avenue
New York, NY 10016
(212) 592-1400
*Attorneys for Defendant,*
*Impala Partners, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

|  |  |
|---|---|
| WINSTAR HOLDINGS, LLC and IDT CORP., | **RULE 7.1 STATEMENT** |
| Plaintiffs, | |
| -against- | |
| THE BLACKSTONE GROUP LP; IMPALA PARTNERS, LLC; and CITICORP, | |
| Defendants. | |

-------------------------------------------------------- x

Pursuant to Federal Rules of Civil Procedure Rule 7.1 and to enable District Judges and Magistrate Judges of the Court to evaluate possible disqualification or recusal, the undersigned counsel for defendant Impala Partners, LLC (a private non-governmental party) (the "Defendant") certifies that there are no corporate parents, affiliates and/or subsidiaries of Defendant which are publicly held.

Dated:  New York, New York
        June 1, 2007

                                   HERRICK, FEINSTEIN LLP

                                   By: _____
                                       Andrew C. Gold (ACG-4875)
                                   Attorneys for Defendant
                                   Two Park Avenue
                                   New York, New York 10016
                                   (212) 592-1400

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| WINSTAR HOLDINGS, LLC and<br>IDT CORP., | : Case No. 07 Civ. 4634 (GEL) |
| Plaintiffs, | : **ANSWER** |
| -against- | : |
| THE BLACKSTONE GROUP LP;<br>IMPALA PARTNERS, LLC; and<br>CITICORP | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Defendant Impala Partners, LLC ("Impala"), by and through its attorneys, Herrick, Feinstein LLP, as and for its Answer to the Complaint (the "Complaint") filed by plaintiffs Winstar Holdings, LLC and IDT Corp., hereby respectfully alleges as follows:

1.      Impala admits that plaintiffs spent approximately $42.5 million to acquire the business assets of Winstar Communications, Inc. ("WinstarC"), and denies all of the other allegations contained in paragraph "1" of the Complaint.

## PARTIES

2.      Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "2" of the Complaint, except refers to that certain Asset Purchase Agreement dated December 18, 2001 for the truth of what is stated therein.

3.      Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "3" of the Complaint, except denies there were any losses.

4.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "4" of the Complaint.

5.    Impala admits the allegations contained in paragraph "5" of the Complaint, except avers that it was also serving as Chief Restructuring Officer of WinstarC.

6.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "6" of the Complaint, except denies that Citicorp acted as Impala's principal.

### JURISDICTION AND VENUE

7.    Impala denies the allegations contained in paragraph "7" of the Complaint.

8.    Impala denies the allegations contained in paragraph "8" of the Complaint.

9.    Impala denies the allegations contained in paragraph "9" of the Complaint.

### ALLEGATIONS

10.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "10" of the Complaint.

11.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "11" of the Complaint.

12.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "12" of the Complaint.

13.    Impala admits the allegations contained in paragraph "13" of the Complaint.

14.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "14" of the Complaint.

15.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "15" of the Complaint.

16.     Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "16" of the Complaint.

17.     Impala admits the allegations contained in paragraph "17" of the Complaint, except avers that Impala was retained by WinstarC and denies that Impala was "motivated to obtain the highest possible sale price."

18.     Impala denies the allegations contained in paragraph "18" of the Complaint.

19.     Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "19" of the Complaint, except admits that Blackstone prepared an offering statement and denies that Impala assisted with the preparation of the offering statement to any extent beyond supplying data and projections to WinstarC as to WinstarC's costs and burn rate, and denies that Impala "controlled bidder access to Winstar staff, and Winstar records".

20.     Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "20" of the Complaint, except admits that Impala assisted in the development of financial data and presentations relating to WinstarC's costs and burn rate to WinstarC's Board of Directors, and occasionally, at the request of WinstarC, to creditors of WinstarC.

21.     Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "21" of the Complaint.

22.     Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "22" of the Complaint.

23.     Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "23" of the Complaint.

24.     Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "24" of the Complaint.

25.     Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "25" of the Complaint.

26.     Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "26" of the Complaint, except admits that Paul Street was and is a partner in Impala and performed certain services for WinstarC on behalf of Impala.

27.     Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "27" of the Complaint.

28.     Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "28" of the Complaint, except denies those allegations as they relate to Impala.

29.     Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "29" of the Complaint, except denies those allegations as they relate to Impala.

30.     Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "30" of the Complaint, except denies those allegations as they relate to Impala.

31.     Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "31" of the Complaint, except denies those allegations as they relate to Impala.

32.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "32" of the Complaint, except denies those allegations as they relate to Impala.

33.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "33" of the Complaint, except denies those allegations as they relate to Impala.

34.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "34" of the Complaint.

35.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "35" of the Complaint.

36.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "36" of the Complaint, except denies those allegations as they relate to Impala.

37.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "37" of the Complaint, except denies those allegations as they relate to Impala.

38.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "38" of the Complaint.

39.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "39" of the Complaint.

40.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "40" of the Complaint.

41.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "41" of the Complaint, except denies those allegations as they relate to Impala.

42.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "42" of the Complaint.

43.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "43" of the Complaint, except denies those allegations as they relate to Impala.

44.    Impala admits the allegations contained in paragraph "44" of the Complaint.

45.    Impala admits the allegations contained in paragraph "45" of the Complaint.

46.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "46" of the Complaint.

47.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "47" of the Complaint.

48.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "48" of the Complaint.

49.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "49" of the Complaint.

50.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "50" of the Complaint, except denies those allegations as they relate to Impala.

## ANSWERING THE FIRST CAUSE OF ACTION

51.    With respect to the allegations contained in paragraph "51" of the Complaint, Impala repeats and realleges each and every allegation set forth in paragraphs "1" through "50" above as if set forth in full herein.

52.    Impala denies the allegations contained in paragraph "52" of the Complaint.

53.    Impala denies the allegations contained in paragraph "53" of the Complaint.

54.    Impala denies the allegations contained in paragraph "54" of the Complaint.

55.    Impala denies the allegations contained in paragraph "55" of the Complaint.

56.    Impala denies the allegations contained in paragraph "56" of the Complaint.

57.    Impala denies the allegations contained in paragraph "57" of the Complaint.

58.    Impala denies the allegations contained in paragraph "58" of the Complaint.

59.    Impala denies the allegations contained in paragraph "59" of the Complaint.

60.    Impala denies the allegations contained in paragraph "60" of the Complaint.

61.    Impala denies the allegations contained in paragraph "61" of the Complaint.

62.    Impala denies the allegations contained in paragraph "62" of the Complaint.

## ANSWERING THE SECOND CAUSE OF ACTION

63.    With respect to the allegations contained in paragraph "63" of the Complaint, Impala repeats and realleges each and every allegation set forth in paragraphs "1" through "62" above as if set forth in full herein.

64.    Impala denies the allegations contained in paragraph "64" of the Complaint.

65.    Impala denies the allegations contained in paragraph "65" of the Complaint.

66.    Impala denies the allegations contained in paragraph "66" of the Complaint.

67.    Impala denies the allegations contained in paragraph "67" of the Complaint.

## ANSWERING THE THIRD CAUSE OF ACTION

68.    With respect to the allegations contained in paragraph "68" of the Complaint, Impala repeats and realleges each and every allegation set forth in paragraphs "1" through "67" above as if set forth in full herein.

69.    Impala denies the allegations contained in paragraph "69" of the Complaint.

70.    Impala denies the allegations contained in paragraph "70" of the Complaint.

71.    Impala denies the allegations contained in paragraph "71" of the Complaint.

72.    Impala denies the allegations contained in paragraph "72" of the Complaint.

73.    Impala denies the allegations contained in paragraph "73" of the Complaint.

74.    Impala denies the allegations contained in paragraph "74" of the Complaint.

75.    Impala denies the allegations contained in paragraph "75" of the Complaint.

76.    Impala denies the allegations contained in paragraph "76" of the Complaint.

77.    Impala denies the allegations contained in paragraph "77" of the Complaint.

78.    Impala denies the allegations contained in paragraph "78" of the Complaint.

## ANSWERING THE FOURTH CAUSE OF ACTION

79.    With respect to the allegations contained in paragraph "79" of the Complaint, Impala repeats and realleges each and every allegation set forth in paragraphs "1" through "78" above as if set forth in full herein.

80.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "80" of the Complaint, except admits that Impala is experienced with respect to corporate cost-containment measures.

81.    Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "81" of the Complaint.

82.     Impala denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "82" of the Complaint.

83.     Impala denies the allegations contained in paragraph "83" of the Complaint, except admits that it is experienced and skilled in rendering restructuring advice and has done so in numerous transactions.

84.     Impala denies the allegations contained in paragraph "84" of the Complaint.

85.     Impala denies the allegations contained in paragraph "85" of the Complaint.

86.     Impala denies the allegations contained in paragraph "86" of the Complaint.

87.     Impala denies the allegations contained in paragraph "87" of the Complaint.

88.     Impala denies the allegations contained in paragraph "88" of the Complaint.

89.     Impala denies the allegations contained in paragraph "89" of the Complaint.

90.     Impala denies the allegations contained in paragraph "90" of the Complaint.

## ANSWERING THE FIFTH CAUSE OF ACTION

91.     With respect to the allegations contained in paragraph "91" of the Complaint, Impala repeats and realleges each and every allegation set forth in paragraphs "1" through "90" above as if set forth in full herein.

92.     Impala denies the allegations contained in paragraph "92" of the Complaint.

93.     Impala denies the allegations contained in paragraph "93" of the Complaint.

94.     Impala denies the allegations contained in paragraph "94" of the Complaint.

95.     Impala denies the allegations contained in paragraph "95" of the Complaint.

96.     Impala denies the allegations contained in paragraph "96" of the Complaint.

97.     With respect to the unnumbered paragraph of the Complaint, beginning with "WHEREFORE" that comprises plaintiffs' prayer for relief and judgment, Impala denies that plaintiffs are entitled to any of the relief requested therein, or to any relief whatsoever.

## As and for a First Affirmative Defense

98.     The Fifth Cause of Action, for Civil Conspiracy, fails to state a cause of action, because Civil Conspiracy is not an independent cause of action.

## As and for a Second Affirmative Defense

99.     To the extent that plaintiffs suffered any damages, those damages were caused by their own conduct, including, without limitation, their changes in the nature and use of the assets they acquired.

## As and for a Third Affirmative Defense

100.     To the extent that plaintiffs suffered any damages, those damages were caused by their own conduct, including, without limitation, their negligence in conducting due diligence with respect to the purchase of WinstarC's assets.

## As and for a Fourth Affirmative Defense

101.     Plaintiffs' claims are barred by the doctrine of estoppel.

## As and for a Fifth Affirmative Defense

102.     Plaintiffs' claims are subject to an order of the Bankruptcy Court for the District of Delaware, pursuant to which that court has exclusive jurisdiction over the claims made in the Complaint.

### As and for a Sixth Affirmative Defense

103.    Plaintiffs' claims for misrepresentation and fraud are barred by the Complaint's

failure to plead the circumstances of the wrong with particularity, as required by Fed. R. Civ. P.

9(b).

### As and for a Seventh Affirmative Defense

104.    Plaintiffs' claims are barred by the applicable statutes of limitations, which are the

three-year limitations imposed on all of Plaintiffs' claims by Delaware law.

WHEREFORE, defendant Impala Partners LLC demands judgment in its favor:

(a) (i) dismissing the Complaint in its entirety with prejudice; (b) awarding Impala the costs and

disbursements of this action; and (c) awarding such other and further relief as this Court deems

just and proper.


Dated:   New York, NY
         June 11, 2007

                                         HERRICK, FEINSTEIN LLP


                                         John Oleske (JO-0995)
                                         2 Park Avenue
                                         New York, NY 10016
                                         212.592.1400
                                         Attorneys for Defendant Impala Partners LLC



HF 3650820v.3 #88888/0181 06/11/2007 02:03 PM

$LAM45.$

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WINSTAR HOLDINGS, LLC and
IDT CORP.,

        Plaintiffs,

    -against-

THE BLACKSTONE GROUP LP;
IMPALA PARTNERS, LLC; and
CITICORP,

        Defendants.

Case No. 07 Civ. 4634 (GEL)

**STIPULATION FOR EXTENSION OF TIME TO MOVE, ANSWER, OR OTHERWISE RESPOND TO COMPLAINT**

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 6/12/07

    IT IS HEREBY STIPULATED AND AGREED by and among plaintiffs Winstar Holdings, LLC and IDT Corp., and defendants The Blackstone Group LP ("Blackstone"), Impala Partners, LLC ("Impala"), and Citicorp, by and through their undersigned counsel, that the time for defendants Blackstone, Impala and Citicorp to move, answer, or otherwise respond to plaintiffs' complaint in the above-captioned matter is extended to June 25, 2007.

    The original date for defendants to move, answer, or otherwise respond to plaintiffs' complaint was June 11, 2007.

    No prior extension of time to respond to the complaint has previously been sought by defendants Blackstone, Impala, or Citicorp.

    Facsimile signatures herein shall be deemed originals.

HF 3665118v.1 #10069/0007 06/08/2007 01:13 PM

Dated:  New York, New York
June 8, 2007

GRAYSON & KUBLI, P.C

*Melissa Roover*

Melissa Roover (MR - 1163)
1420 Spring Hill Road, Suite 230
McLean, VA 22102
Telephone: (703) 749-0000

and

Philip C. Silverberg
Gretchen Henninger
MOUND COTTON WOLLAN
& GREENGRASS
One Battery Park Plaza
New York, NY 10004-1486
Telephone: (212) 804-4200

*Attorneys for Plaintiffs*
*Winstar Holdings, LLC and*
*IDT Corp.*

KIRKLAND & ELLIS LLP

Yosef Riemer (YR-5974)
Vickie Reznik (VR-1897)
David Flugman (DF-9884)
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

*Attorneys for Defendant The Blackstone*
*Group LP*

HERRICK, FEINSTEIN LLP

Stephen M. Rathkopf (SR - 6189)
Andrew C. Gold (AG - 4875)
John Oleske (JO - 0995)
2 Park Avenue
New York, New York 10016
Telephone: (212) 592-1400
Facsimile: (212) 592-1500

*Attorneys for Defendant Impala Partners*
*LLC*

CITICORP

Kathleen McCarthy (KM-     )
399 Park Aveneue
New York, New York  10043
Telephone:  (212) 816-0068

*Attorneys for Defendant Citicorp*

SO ORDERED this __ day of _____ 2007

_____
United States District Judge

HF 3665118v.1 #10069/0007 06/08/2007 01:13 PM

-2-

Dated: New York, New York
       June 8, 2007

GRAYSON & KUBLI, P.C                    KIRKLAND & ELLIS LLP

_____               _____
Melissa Roover (MR -    )               Yosef Riemer (YR-6978)
1420 Spring Hill Road, Suite 230        Vickie Reznik (VR-1897)
McLean, VA 22102                        David Flugman (DF-9884)
Telephone: (703) 749-0000               Citigroup Center
                                        153 East 53rd Street
and                                     New York, New York  10022-4611
                                        Telephone:  (212) 446-4800
Philip C. Silverberg                    Facsimile: (212) 446-4900
Gretchen Henninger
MOUND COTTON WOLLAN                      *Attorneys for Defendant The Blackstone
& GREENGRASS                            Group LP*
One Battery Park Plaza
New York, NY 10004-1486
Telephone: (212) 804-4200
                                        HERRICK, FEINSTEIN LLP
*Attorneys for Plaintiffs
Winstar Holdings, LLC and
IDT Corp.*                              _____
                                        Stephen M. Rathkopf (SR - 6189)
                                        Andrew C. Gold (AG - 4875)
                                        John Oleske (JO - 0995)
                                        2 Park Avenue
                                        New York, New York 10016
                                        Telephone: (212) 592-1400
                                        Facsimile: (212) 592-1500

                                        *Attorneys for Defendant Impala Partners
                                        LLC*


                                        CITICORP


                                        _____
                                        Kathleen McCarthy (KM-    )
                                        399 Park Aveneue
                                        New York, New York  10043
                                        Telephone:  (212) 816-0068

                                        *Attorneys for Defendant Citicorp*

SO ORDERED this __ day of _____ 2007


_____
United States District Judge


HF 3665118v.1 #10069/0007 06/08/2007 01:13 PM          -2-

Dated: New York, New York
     June 8, 2007

GRAYSON & KUBLI, P.C                    KIRKLAND & ELLIS LLP

Melissa Roover (MR -    )               Yosef Riemer (YR-5974)
1420 Spring Hill Road, Suite 230        Vickie Reznik (VR-1897)
McLean, VA 22102                        David Flugman (DF-9884)
Telephone: (703) 749-0000               Citigroup Center
                                        153 East 53rd Street
and                                     New York, New York  10022-4611
                                        Telephone:  (212) 446-4800
Philip C. Silverberg                    Facsimile:  (212) 446-4900
Gretchen Henninger
MOUND COTTON WOLLAN                      *Attorneys for Defendant The Blackstone*
& GREENGRASS                            *Group LP*
One Battery Park Plaza
New York, NY 10004-1486
Telephone: (212) 804-4200               HERRICK, FEINSTEIN LLP

*Attorneys for Plaintiffs*
*Winstar Holdings, LLC and*             Stephen M. Rathkopf (SR - 6189)
*IDT Corp.*                             Andrew C. Gold (AG - 4875)
                                        John Oleske (JO - 0995)
                                        2 Park Avenue
                                        New York, New York 10016
                                        Telephone: (212) 592-1400
                                        Facsimile: (212) 592-1500

                                        *Attorneys for Defendant Impala Partners*
                                        *LLC*


                                        CITICORP


                                        Kathleen McCarthy (KM-    )
                                        399 Park Avenue
                                        New York, New York  10043
                                        Telephone:  (212) 816-0068

                                        *Attorneys for Defendant Citicorp*

SO ORDERED this __ day of _____ 2007

_____
United States District Judge

Dated: New York, New York
      June 8, 2007

GRAYSON & KUBLI, P.C                          KIRKLAND & ELLIS LLP

Melissa Roover (MR -   )                        Yosef Riemer (YR-5974)
1420 Spring Hill Road, Suite 230              Vickie Reznik (VR-1897)
McLean, VA 22102                              David Flugman (DF-9884)
Telephone: (703) 749-0000                     Citigroup Center
                                             153 East 53rd Street
and                                          New York, New York 10022-4611
                                             Telephone: (212) 446-4800
Philip C. Silverberg                         Facsimile: (212) 446-4900
Gretchen Henninger
MOUND COTTON WOLLAN                          *Attorneys for Defendant The Blackstone*
& GREENGRASS                                 *Group LP*
One Battery Park Plaza
New York, NY 10004-1486
Telephone: (212) 804-4200                    HERRICK, FEINSTEIN LLP

*Attorneys for Plaintiffs*
*Winstar Holdings, LLC and*                  Stephen M. Rathkopf (SR - 6189)
*IDT Corp.*                                  Andrew C. Gold (AG - 4875)
                                             John Oleske (JO - 0995)
                                             2 Park Avenue
                                             New York, New York 10016
                                             Telephone: (212) 592-1400
                                             Facsimile: (212) 592-1500

                                             *Attorneys for Defendant Impala Partners*
                                             *LLC*


                                             CITICORP

                                             Kathleen McCarthy (KM-7064)
                                             388 Greenwich, 17th Floor
                                             New York, New York 10013
                                             Telephone: (212) 816-0068

                                             *Attorney for Defendant Citicorp*

SO ORDERED this 12th day of June 2007

United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| _____ X | | |
| | : | |
| **WINSTAR HOLDINGS, LLC AND** | : | |
| **IDT CORP.,** | : | |
| | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | **Case No. 07 CV 4634 (GEL)(AJP)** |
| | : | |
| **THE BLACKSTONE GROUP LP;** | : | **ECF Case** |
| **IMPALA PARTNERS, LLC; AND** | : | |
| **CITICORP,** | : | |
| | : | |
| *Defendants.* | : | |
| _____ X | | |

**CORPORATE DISCLOSURE STATEMENT FOR**
**DEFENDANT THE BLACKSTONE GROUP L.P.**

Pursuant to Fed. R. Civ. P. 7.1, The Blackstone Group L.P. discloses as follows:

1.     As of March 12, 2007, the entity formerly known as "The Blackstone Group L.P." was renamed "Blackstone Advisory Services L.P." The parent company of Blackstone Advisory Services L.P. (f/k/a The Blackstone Group L.P.), is currently The Blackstone Group Inc. Currently, no public company holds a 10 percent or greater interest in Blackstone Advisory Services L.P

2.     At the time of this filing, an Initial Public Offering ("IPO") for The Blackstone Group L.P. is scheduled to take place on June 22, 2007.  After the IPO becomes effective, the ultimate parent of Blackstone Advisory Services L.P. will be The Blackstone Group L.P.  The Blackstone Group L.P. will be a publicly traded entity, holding a 10 percent or greater interest in Blackstone Advisory Services L.P.

Date:   June 21, 2007                    Respectfully submitted,


                                         s/ David Flugman
                                         Yosef J. Riemer (YR 5974)
                                         Vickie Reznik (VR 1897)
                                         David S. Flugman (DF 9884)

                                         KIRKLAND & ELLIS LLP
                                         Citigroup Center
                                         153 East 53rd Street
                                         New York, New York 10022
                                         (212) 446-4800
                                         (212) 446-4900 Fax

                                         *Attorneys for Defendant*
                                         *The Blackstone Group LP*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **WINSTAR HOLDINGS LLC and**<br>**IDT CORP.,**<br><br>                              *Plaintiffs*,<br><br>    **- against -**<br><br>**THE BLACKSTONE GROUP L.P.;**<br>**IMPALA PARTNERS, LLC; and**<br>**CITICORP,**<br><br>                              *Defendants*. | **Case No.:**    **07 CV 4634 (GEL)(AJP)**<br>                  **ECF Case** |

PLEASE TAKE NOTICE that, upon the accompanying Declaration of David S. Flugman and memorandum of law, the undersigned will move before the Honorable Gerald E. Lynch, Judge of the United States District Court for the Southern District of New York, at the United States District Courthouse, located at 500 Pearl Street, New York, NY 10007, at a time and place to be scheduled by this Court, for an order to transfer venue to the United States District Court for the District of Delaware in order that it be referred to the United States Bankruptcy Court for the District of Delaware, pursuant to 28 U.S.C. § 1406(a), or in the alternative, 28 U.S.C. § 1404(a).

Dated:  June 21, 2007

s/ Yosef. J. Riemer
_____

Yosef J. Riemer
Vickie Reznik
David S. Flugman

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Attorneys for Defendant*
*The Blackstone Group L.P.*


s/ Stephen M. Rathkopf
_____

Stephen M. Rathkopf
Andrew C. Gold
John Oleske

HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York 10016
Telephone:    (212) 592-1400
Facsimile:    (212) 592-1500

*Attorneys for Defendant*
*Impala Partners, LLC*

s/ Stephen L. Saxl
_____

Stephen L. Saxl
William Wargo

GREENBERG  TRAURIG, LLP
200 Park Avenue
New York, New York 10166
Telephone:    (212) 801-9200
Facsimile:    (212) 801-6400

*Attorneys for Defendant Citigroup, Inc., as*
*successor by merger to Citicorp*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **WINSTAR HOLDINGS LLC and**<br>**IDT CORP.,**<br><br>     *Plaintiffs*,<br><br> - against -<br><br>**THE BLACKSTONE GROUP L.P.;**<br>**IMPALA PARTNERS, LLC; and**<br>**CITICORP,**<br><br>     *Defendants*. | **Case No.:**  **07 CV 4634 (GEL)(AJP)**<br>       **ECF Case** |

## DECLARATION OF DAVID S. FLUGMAN

David S. Flugman, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1.  I am an associate of the law firm Kirkland & Ellis LLP, attorneys for Defendant The Blackstone Group LP ("Blackstone"). I am fully familiar with all of the matters set forth in this declaration either from personal knowledge or from my review of the file in this matter. I submit this declaration in further support of Defendant's Joint Motion to Transfer Venue to the United States District Court for the District of Delaware.

2.  Attached hereto as Exhibit A is a true and correct copy of the Asset Purchase Agreement among IDT Winstar Acquisition, Inc., Winstar Communications, Inc. and certain of its subsidiaries dated December 18, 2001.

3.  Attached hereto as Exhibit B is a true and correct copy of the Order authorizing the sale of Winstar's business assets and approving the Asset Purchase Agreement entered by the Bankruptcy Court for the District of Delaware on December 19, 2001.

4.  Attached hereto as Exhibit C is a true and correct copy of excerpts from the case docket of *In re Winstar Communications, Inc.*, Case No. 01-1430 (KJC), currently pending in the United States Bankruptcy Court for the District of Delaware.

5.  Attached hereto as Exhibit D is a true and correct copy of the Blackstone Retention Agreement and the Indemnification Agreement attached thereto as Attachment A

dated July 26, 2001 between Blackstone, Winstar Communications Inc., Winstar Wireless, Inc., and their affiliates ("Winstar" or the "Debtors") that were debtors in possession in the pending bankruptcy case in the Delaware Bankruptcy Court.

6.    Attached hereto as Exhibit E is a true and correct copy of a letter from counsel for Blackstone dated July 4, 2007 addressed to Christine Shubert, the Debtors' Trustee, and notifying her pursuant to the Retention Agreement of Blackstone's intention to seek indemnification from the Debtors for all expenses connected to the instant litigation.

7.    Attached hereto as Exhibit F is a true and correct copy of the Impala Retention Agreement and the Indemnification Agreement attached thereto as Attachment A dated July 2, 2001 and amended August 29, 2001 between Impala Partners and LLC, Winstar Communications Inc.,.

I declare under penalty of perjury that the foregoing is true and correct.

s/ David S. Flugman

Dated:  New York, New York
June 21, 2007

David S. Flugman

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Attorneys for Defendant*
*The Blackstone Group L.P.*

# EXHIBIT A

MASTER FINAL

EXECUTION COPY

ASSET PURCHASE AGREEMENT

AMONG

IDT WINSTAR ACQUISITION, INC.,

WINSTAR COMMUNICATIONS, INC.

AND

CERTAIN OF ITS SUBSIDIARIES
SET FORTH ON APPENDIX I HERETO

DATED AS OF DECEMBER 18, 2001

<u>TABLE OF CONTENTS</u>

<u>Page</u>

ARTICLE I
DEFINITIONS

Section 1.1   *Definitions*...................................................................................... *1*
Section 1.2   *Construction*.................................................................................... *6*

ARTICLE II
PURCHASE AND SALE

Section 2.1   *Purchase and Sale of Assets* ........................................................ *6*
Section 2.2   *Excluded Assets*............................................................................. *8*
Section 2.3   *Assumed Liabilities* ....................................................................... *9*
Section 2.4   *Excluded Liabilities* ....................................................................... *10*
Section 2.5   *Assumption of Certain Leases and Other Contracts* ...................... *10*
Section 2.6   *Intercompany Receivables* ............................................................ *11*
Section 2.7   *Winstar Building.* ........................................................................... *11*

ARTICLE III
PURCHASE PRICE

Section 3.1   *Purchase Price*............................................................................... *11*
Section 3.2   *Cash Payment at Signing* .............................................................. *12*
Section 3.3   *Allocation of Purchase Price* ......................................................... *12*

ARTICLE IV
THE CLOSING AND LICENSE TRANSFER

Section 4.1   *Time and Place of Closing*............................................................. *12*
Section 4.2   *Deliveries by the Sellers*............................................................... *13*
Section 4.3   *Deliveries by the Buyer* ................................................................ *13*
Section 4.4   *Management Transition* ................................................................. *13*

ARTICLE V
REPRESENTATIONS AND WARRANTIES OF THE BUYER

Section 5.1   *Organization* .................................................................................. *13*
Section 5.2   *Authority Relative to this Agreement* ............................................. *13*
Section 5.3   *Consents and Approvals; No Violation*........................................... *14*
Section 5.4   *Qualifications to Hold Permits* ....................................................... *14*
Section 5.5   *Legal Proceedings and Judgments* ............................................... *14*
Section 5.6   *Brokers*......................................................................................... *14*
Section 5.7   *Buyer Financing.*........................................................................... *14*
Section 5.8   *Capitalization*................................................................................ *14*

Section 5.9    *Valid Issuance of IDT and Buyer Shares* ................................................ *15*
Section 5.10   *Disclaimer of Other Representations and Warranties* ....................... *15*

## ARTICLE VI
## COVENANTS OF THE PARTIES

Section 6.1    *Conduct of Business* ................................................................... *15*
Section 6.2    *Access to Information; Maintenance of Records* ........................ *15*
Section 6.3    *Expenses* .................................................................................. *17*
Section 6.4    *Further Assurances* .................................................................. *17*
Section 6.5    *Public Statements* .................................................................... *17*
Section 6.6    *Governmental Authority Consents and Approvals* ...................... *18*
Section 6.7    *Tax Matters* ............................................................................. *19*
Section 6.8    *Litigation Support* .................................................................... *20*
Section 6.9    *Notification* .............................................................................. *20*
Section 6.10   *Submission for Bankruptcy Court Approval* ............................... *20*
Section 6.11   *D&O Policies* ........................................................................... *21*
Section 6.12   *Use of Winstar Name* ............................................................... *21*

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.1    *Conditions to Each Party's Obligations to Effect the Closing* ........... *21*
Section 7.2    *Conditions to Obligations of the Buyer* ..................................... *22*
Section 7.3    *Conditions to Obligations of the Sellers* .................................. *22*

## ARTICLE VIII
## TERMINATION AND ABANDONMENT

Section 8.1    *Termination* .............................................................................. *23*
Section 8.2    *Procedure and Effect of Termination* ....................................... *24*

## ARTICLE IX
## MISCELLANEOUS PROVISIONS

Section 9.1    *Amendment and Modification* .................................................... *24*
Section 9.2    *Waiver of Compliance; Consents* ............................................. *24*
Section 9.3    *Survival* ................................................................................... *24*
Section 9.4    *No Impediment to Liquidation* .................................................. *25*
Section 9.5    *Notices* ..................................................................................... *25*
Section 9.6    *Assignment* .............................................................................. *26*
Section 9.7    *Third-Party Beneficiaries* ......................................................... *26*
Section 9.8    *Severability* .............................................................................. *26*
Section 9.9    *Governing Law* ......................................................................... *27*
Section 9.10   *Submission to Jurisdiction* ....................................................... *27*
Section 9.11   *Counterparts* ............................................................................ *27*
Section 9.12   *Incorporation of Schedule and Exhibits* .................................... *27*
Section 9.13   *Entire Agreement* ..................................................................... *27*

Section 9.14  *Headings* .................................................................................. 27
Section 9.15  *Remedies* ................................................................................. 27
Section 9.16  *Bulk Sales or Transfer Laws* ............................................... 27

APPENDIX I       Subsidiaries of Winstar Parties Hereto

<u>EXHIBITS</u>

| | |
|---|---|
| Exhibit A | Assumed Agreements |
| Exhibit B | Form of Bill of Sale |
| Exhibit C | Form of Escrow Agreement |
| Exhibit D | Form of Management Agreement |
| Exhibit E | Form of Sale Order |

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "*Agreement*") is made as of December 18, 2001 by and among Winstar Communications, Inc., a Delaware corporation ("*Winstar*") and certain of its subsidiaries set forth on Appendix I hereto (collectively, the "*Sellers*"), and IDT Winstar Acquisition, Inc., a Delaware corporation (the "*Buyer*").

WHEREAS, the Buyer desires to purchase from the Sellers, and the Sellers desire to sell to the Buyer, the Purchased Assets (as hereinafter defined) upon the terms and conditions hereinafter set forth in this Agreement; and

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements hereinafter set forth, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1     *Definitions*. (a) As used in this Agreement, the following terms have the meanings specified in this Section 1.1(a).

"*Accounts Receivable*" means any and all accounts receivable, notes and other amounts receivable from third parties (including, to the extent permissible under applicable law, revenues from all accounts of the former and current customers of the Business), together with any interest or unpaid financing charges accrued thereon, excluding, all Excluded Receivables.

"*Affiliate*" means, with respect to any specified Person, any other Person that directly, or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, *provided* that Net 2 Phase, Inc. and Liberty Media, Inc. shall not be deemed to be Affiliates of the Buyer.

"*AON Sublease*" means the Assignment and Assumption of Lease Documents by and between AON Service Corporation and Winstar, dated as of September 25, 2001, with respect to the Winstar Building and related agreements and documentation thereto, as amended as of the date hereof.

"*Assumed Agreements*" means any contract, agreement, real or personal property lease, commitment, understanding or instrument which relates to the Business or the Purchased Assets for which the Sellers have obtained an order authorizing the assignment and assumption thereof to the Buyer and which is listed on Exhibit A attached hereto, which Exhibit may be amended from time to time by the Buyer for a period of time up to 120 days after the Closing Date.

"*Bankruptcy Code*" means Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware or such other court having competent jurisdiction over the Chapter 11 Cases.

"*Bill of Sale*" means the Bill of Sale to be executed and delivered by the Sellers at the Closing, substantially in the form of Exhibit B attached hereto.

"*Business*" means the activities carried on by the Sellers for the purpose of providing local and long distance voice services, Internet access, data transport services, application services and hosting services and any activities related thereto; *provided* that "*Business*" shall not include any of the activities carried on by any of the Excluded Subsidiaries (none of which are material to the Business, other than Office.com, Inc.).

"*Business Day*" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by law to be closed in the City of New York.

"*Buyer Representatives*" means the Buyer's accountants, employees, counsel, financial advisors and other authorized representatives.

"*Chapter 11 Cases*" means the Sellers' cases commenced under Chapter 11 of the Bankruptcy Code.

"*Code*" means the Internal Revenue Code of 1986, as amended through the date hereof.

"*Communications Act*" means the Communications Act of 1934, as amended.

"*Confidential Information*" has the meaning specified in the Confidentiality Agreement.

"*Confidentiality Agreement*" means, collectively, the confidentiality agreement, dated as of November 30, 2001, between Winstar or its advisors and the Buyer or its Affiliate.

"*Creditors' Committee*" means the official committee of unsecured creditors appointed in connection with the Chapter 11 Cases on April 27, 2001.

"*D&O Policies*" means the directors' and officers' liability insurance policies maintained by the Sellers and in effect as of the date hereof set forth on Schedule 1.1(a)(i).

"*Employee Records*" means all existing personnel files related to employees and former employees of the Sellers.

"*Encumbrances*" means any mortgages, pledges, liens, claims (as such term is defined in the Bankruptcy Code), charges, security interests, conditional and installment sale agreements, activity and use limitations, conservation easements, deed restrictions, encumbrances and charges of any kind.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Escrow Agent*" means Shearman & Sterling.

"*Escrow Agreement*" means the escrow agreement, dated as of the date hereof, by and among Winstar, the Buyer and the Escrow Agent, substantially in the form of Exhibit C.

2

"*Escrow Amount*" means, as of any date of determination, the amount on deposit, including any interest thereon, under the Escrow Agreement, without reduction or offset for any fees or costs, which shall be borne by Sellers.

"*Excess Inventory and Equipment*" means such inventory, equipment and other assets owned by the Sellers set forth on Schedule 1.1(a)(ii) which (x) has been sold by the Sellers prior to the date hereof or (y) was under binding contract dated prior to the date hereof to be sold and is subsequently sold pursuant thereto.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Excluded Subsidiaries*" means the Subsidiaries of Winstar set forth on Schedule 1.1(a)(iii).

"*FCC*" means the Federal Communications Commission (or any successor Governmental Authority).

"*FCC Consents*" means the granting by the FCC of its consent to the assignment of the FCC Licenses in connection with the consummation of the transactions contemplated hereby.

"*FCC Licenses*" means all licenses, authorizations, permits and construction permits issued by the FCC to the Sellers, including the Principal FCC Licenses, which are related to the Business, all of which are set forth on Schedule 1.1(a)(iv).

"*FCC Rules*" means the rules and regulations of the FCC, 47 Code of Federal Regulations, Part 1 et seq.

"*Final Order*" means, (i) for purposes of the FCC Consents, an administrative order issued by the FCC for which the deadline for lodging any administrative appeal, reconsideration, stay or review by any objecting Person has expired pursuant to the FCC Rules; and (ii) for purposes of the consents required from all other Governmental Authorities (including, the State Regulatory Consents), an action by any such Governmental Authority for which the time period has expired for any further action by such Governmental Authority.

"*Governmental Authority*" means any federal, state or local governmental or regulatory authority, department, agency, commission or body.

"*Intellectual Property*" means all of the following in any jurisdiction throughout the world: (i) patents, patent applications and patent disclosures, (ii) trademarks, service marks, trade dress, trade names, corporate names, logos and Internet domain names, together with all goodwill associated with each of the foregoing, (iii) copyrights and copyrightable works, (iv) registrations and applications for any of the foregoing, (v) trade secrets, confidential information and inventions and (vi) rights under any license agreements for any of the foregoing.

"*Knowledge*" means, with respect to each Seller, as to a particular matter, the actual knowledge of the acting chief executive officer, the chief financial officer or the general counsel of Winstar, in each case after a reasonable degree of independent investigation.

*, and (iii) obligations pursuant to the Communications Act of 1934, as amended 47 U.S.C. §§ 151 et seq. and regulations promulgated hereunder*

"*Material Adverse Effect*" means any change or changes in, or effect on, the Business or the Purchased Assets, since the date hereof, that is individually, or are in the aggregate, reasonably likely to be materially adverse to the Business or the Purchased Assets, each taken as a whole, other than (i) any change or effect in any way resulting from or arising in connection with this Agreement or any of the transactions contemplated hereby (including any announcement with respect to this Agreement or any of the transactions contemplated hereby and the obtaining of any FCC Consents or State Regulatory Consents) and (ii) any change in or effect on the Purchased Assets or the Business which is cured (including by the payment of money) by the applicable Seller or any of its Affiliates before the Termination Date.

"*Permitted Encumbrances*" means (i) zoning, entitlement, conservation restriction and other land use and environmental regulations by Governmental Authorities which do not materially interfere with the present use of the Purchased Assets, and (ii) all exceptions, restrictions, easements, charges, rights-of-way and other Encumbrances set forth in any state, local or municipal franchise under which the Business is conducted which do not materially interfere with the present use of the Purchased Assets ~~[ (and (ii) Need Margaret cannot]~~.

"*Person*" means any individual, corporation, partnership, limited partnership, limited liability company, syndicate, group, trust, association or other organization or entity or government, political subdivision, agency or instrumentality of a government.

"*Post-petition Agent*" means Citicorp USA, Inc.

"*Pre-petition Agent*" means The Bank of New York.

"*Principal FCC Licenses*" means all 38 and 28 GHZ spectrum licenses issued by the FCC to the Sellers set forth on Schedule 1.1(a)(iv).

"*Sale Hearing*" means the date of the scheduled hearing of the Bankruptcy Court during which the Bankruptcy Court considers the Sale Order.

"*SEC*" means the United States Securities and Exchange Commission.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Sellers' Representatives*" means the Sellers' accountants, employees, counsel, financial advisors and other authorized representatives.

"*State Regulatory Consents*" means any consents from state regulatory authorities with respect to the assignment of the State Regulatory Licenses in connection with the consummation of the transactions contemplated by this Agreement.

"*State Regulatory Licenses*" means any licenses, authorizations or permits issued by state regulatory authorities which are related to the Business and listed on Schedule 1.1(a)(v).

"*Subsidiary*" means, with respect to any Person, any corporation or other entity of which the outstanding securities or equity interests having ordinary voting power to elect a majority of

4

the board of directors or other Persons performing similar functions of such Person are owned directly or indirectly by such other Person.

"*Tax*" and "*Taxes*" means (i) all taxes, charges, fees, levies, penalties or other assessments of any kind whatsoever imposed by any federal, state, local or foreign taxing authority, including, but not limited to, income, excise, property, sales, transfer, franchise, payroll, withholding, social security or other taxes, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalties or additions attributable thereto or (ii) liability for the payment of any amounts of the type described in clause (i) above as a result of being party to any agreement or any express or implied obligation to indemnify or otherwise succeed to the liability of any other Person.

"*Tax Return*" means any return, report, information return or other document (including any related or supporting information) required to be supplied to any Governmental Authority with respect to Taxes.

"*Transferred Employee*" means each person who accepts the Buyer's offer of employment.

"*Winstar Building*" means 685 Third Avenue, in the Borough of Manhattan, New York County, City and State of New York.

(b) Each of the terms set forth below shall have the meaning ascribed thereto in the following section:

| Definition | Location |
|---|---|
| "*Agreement*" | Recitals |
| "*Assumed Liabilities*" | § 2.3 |
| "*Buyer*" | Recitals |
| "*Buyer Common Stock*" | § 3.1 |
| "*Buyer Financing*" | § 5.7 |
| "*Buyer Preferred Stock*" | § 3.1 |
| "*Buyer Shares*" | § 3.1 |
| "*Cash Payment*" | § 3.1 |
| "*Cash/Stock Payment*" | § 3.1 |
| "*Closing*" | § 4.1 |
| "*Closing Date*" | § 4.1 |
| "*Excluded Assets*" | § 2.2 |
| "*Excluded Liabilities*" | § 2.4 |
| "*Excluded Receivables*" | § 2.2(k) |
| "*IDT Class B Stock*" | § 3.1 |
| "*IDT Shares*" | § 3.1 |
| "*Management Agreement*" | § 4.4 |
| "*Other Regulatory Approvals*" | § 6.6(e) |
| "*Permits*" | § 2.1(f) |
| "*Purchase Price*" | § 3.1 |

| "*Purchased Assets*" | § 2.1 |
| "*Purchased Investments*" | § 2.1(m) |
| "*Sale Order*" | § 7.11 |
| "*Sellers*" | Recitals |
| "*Termination Date*" | § 8.1(g) |
| "*Topping Fee*" | § 6.10(d) |
| "*Transfer Taxes*" | § 6.7(b) |
| "*Transferable Permits*" | § 2.1(f) |
| "*Winstar*" | Recitals |

Section 1.2    *Construction.*  The terms "hereby," "hereto," "hereunder" and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used.  The term "including" when used herein without the qualifier, "without limitation," shall mean "including, without limitation." Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.  The word, "or," shall not be construed to be exclusive.  Provisions shall apply, when appropriate, to successive events and transactions.

ARTICLE II
PURCHASE AND SALE

Section 2.1    *Purchase and Sale of Assets.*  Except for the Excluded Assets, upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, the Sellers shall sell, assign, convey, transfer and deliver to the Buyer, and the Buyer shall, by payment of the Purchase Price, purchase and acquire from the Sellers, free and clear of all Encumbrances (except for Permitted Encumbrances), all of the rights, title and interest that the Sellers possess as of the Closing and have the right to transfer in, to and under the real, personal, tangible and intangible property or assets of every kind and description, wherever located, used, developed for use or intended for use in the conduct of the Business and related thereto and all other assets of the Sellers unless specifically excluded in Section 2.2 and subject to Section 4.4 (collectively, the "*Purchased Assets*").  Without limiting the effect of the foregoing, the parties hereto acknowledge and agree that the Purchased Assets shall include all rights, title and interest of the Sellers in, to and under all of the following (except the Excluded Assets):

(a) all inventories of supplies, materials and spares, other than the Excess Inventory and Equipment;

(b) all equipment (other than the Excess Inventory and Equipment);

(c) all machinery, vehicles, furniture and other tangible personal property;

(d) all of the Sellers' Accounts Receivable as of the Closing Date;

(e) the Assumed Agreements, in each case, to the extent the same are assignable under Section 365 of the Bankruptcy Code or to the extent consented to by the third party

or third parties to such agreements including any and all deposits and letters of credit related to any such Assumed Agreements, and with respect to such Assumed Agreements, all of Sellers' rights (including of recoupment), offsets, counterclaims and defenses (including under Sections 105(a), 361, 362, 363, 365, 366, 502, 503(b), 554 and 558 of the Bankruptcy Code);

(f) all permits, certificates, licenses (including the FCC Licenses and the State Regulatory Licenses), franchises and other governmental authorizations, consents and approvals held by the Sellers except to the extent related exclusively to the Excluded Assets (collectively, "*Permits*"), in each case, to the extent the same are assignable (the "*Transferable Permits*");

(g) to the extent assignable under Section 365 of the Bankruptcy Code or to the extent consented to by the third party or third parties to such agreements, all confidentiality, noncompete or nondisclosure agreements executed by vendors, suppliers or employees of the Sellers or other third parties, in each case, to the extent related to the Business;

(h) originals or copies of all employee records of the Sellers, books, operating records, operating, safety and maintenance manuals, engineering design plans, blueprints and as-built plans, specifications, procedures and similar items of the Sellers to the extent relating to the Purchased Assets, including books of account, all customer lists, billing records and other customer correspondence to the extent relating to the Business, all regulatory filings and other books and records relating to the Business in the possession of the Sellers;

(i) except as set forth on <u>Schedule 2.2(d)</u> and subject to <u>Section 2.2(d)</u>, all of the rights, claims or causes of action of any of the Sellers against a third party related to the Purchased Assets, the operation of the Business or the Assumed Liabilities or Assumed Agreements arising out of transactions occurring prior to the Closing Date, except where such rights, claims or causes of action relate to the Excluded Liabilities; to the extent such rights, claims or causes of action relate to both Assumed Liabilities and Excluded Liabilities, the Buyer and each Seller shall share such rights, claims or causes of action in the same proportion as their respective liabilities bear to the total liability relating to those rights, claims or causes of action;

(j) all Intellectual Property owned by or licensed to the Sellers together with all related income, royalties, damages and payments due or payable at the Closing or thereafter (including damages and payments for past or future infringements or misappropriations thereof), the right to sue and recover for past infringements or misappropriations thereof, any and all corresponding rights that, now or hereafter, may be secured throughout the world and all copies and tangible embodiments of any such Intellectual Property;

(k) to the extent assignable under Section 365 of the Bankruptcy Code or to the extent consented to by the insurance providers, the rights of the Sellers under those

7

insurance policies which primarily cover risks covering the Business or the Purchased Assets, but excluding the D&O Policies;

(l)  all historical information relating to accounts of the customers of the Business which, at the Closing Date, are users of any of the services provided by the Sellers in the operation of the Business; and

(m) shares of stock, securities, bonds, debentures, evidences of indebtedness or other interests issued by any third party (not affiliated with any of the Sellers) and owned by any Seller primarily for investment, excluding those set forth on Schedule 2.2(b) (the "*Purchased Investments*").

Section 2.2    *Excluded Assets.*  Notwithstanding any provision herein to the contrary, the Sellers shall not sell, convey, assign, transfer or deliver to the Buyer, and the Buyer shall not purchase, and the Purchased Assets shall not include the Sellers' right, title and interest to the following assets of the Sellers (the *"Excluded Assets"*):

(a)  cash (including all cash residing in any collateral cash account securing any obligation or contingent obligation of the Sellers after giving effect to the Closing), cash equivalents and bank deposits existing as of the Closing Date, subject to the Buyer's rights under Section 2.1(e);

(b)  any equity interests issued by the Sellers and their Subsidiaries and those equity interests set forth on Schedule 2.2(b);

(c)  rights to any Tax refunds of any of the Sellers, whether such refund is received as a payment or as a credit against future Taxes and any net operating losses of the Sellers;

(d)  the Sellers' claims, causes of action, choses of action and rights of recovery pursuant to Sections 544 through 550 and Section 553 of the Bankruptcy Code, any other avoidance actions under any other applicable provisions of the Bankruptcy Code and the claims, causes of action, choses of action and rights of recovery, including claims relating to Lucent Technologies, Inc., set forth on Schedule 2.2(d);

(e)  subject to Section 6.2(c), the corporate charter, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, blank stock certificates, and other documents relating to the organization, maintenance, and existence of each Seller as a corporation or a limited liability company, as the case may be, any books, records or the like of the Sellers;

(f)  all of the assets set forth on Schedule 2.2(f);

(g)  all of the agreements to which any of the Sellers is a party which are not Assumed Agreements and any and all customer deposits, customer advances and credits and security deposits related to any such agreements which are not Assumed Agreements;

8

(h) the rights of each Seller under this Agreement and any other agreements between any of the Sellers and the Buyer relating to the transactions contemplated hereby;

(i) all of the real, personal, tangible or intangible property (including Intellectual Property) or assets owned by the Excluded Subsidiaries except to the extent that such property or assets relate to the Business;

(j) any and all prepaid workers compensation premiums (other than the portion relating to the Transferred Employees);

(k) all accounts receivable, notes and other amounts receivable relating to third parties, together with any interest or unpaid financing charges accrued thereon and all proceeds thereof, set forth on Schedule 2.2(k) (the "*Excluded Receivables*");

(l) claims against current or former directors, officers or other employees of, or agents, accountants or other advisors of or to, any of the Sellers;

(m) the rights of the Sellers under the terms of the $7,500,000 original principal amount subordinate note issued on October 3, 2001 by Wam!Net Inc. and Wam!Net Government Services, Inc. to Winstar Wireless, Inc. and any equity of Wam!Net Inc. held by the Sellers;

(n) the rights of the Sellers under the AON Sublease, subject to Section 2.7; and

(o) the Excess Inventory and Equipment.

Section 2.3    *Assumed Liabilities.*  On the Closing Date, the Buyer shall assume and agree to pay, perform and discharge when due the following liabilities and obligations of the Sellers (the "Assumed Liabilities"), in accordance with the respective terms and subject to the respective conditions thereof:

(a) all liabilities and obligations of any of the Sellers under the Assumed Agreements (including all pre-petition and post-petition cure amounts payable in order to effectuate the assumption and assignment of each Assumed Agreement), subject to all of the Sellers' rights (including of recoupment), offsets, counterclaims and defenses (including under Sections 105(a), 361, 362, 363, 365, 366, 502, 503(b), 554 and 558 of the Bankruptcy Code), and the Transferable Permits in accordance with the terms thereof;

(b) all liabilities and obligations relating to any customer deposits and customer advances and credits, the security deposits and the Sellers' rights under any letters of credit or similar instruments securing customer deposits, advances or credits with respect to the revenue from customer accounts, to the extent  permissible under applicable law, *provided* that the Buyer has received possession of and rights to such security deposits, customer deposits, advances or credits and letters of credit;

(c) all liabilities and obligations under the Management Agreement; and

9

(d) all liabilities and obligations related to the Purchased Assets arising from any actions or omissions of the Buyer occurring after the Closing Date or the Business arising from any actions or omissions of the Buyer occurring after the Closing Date.

Section 2.4 *Excluded Liabilities. The Buyer shall not assume or be obligated to pay, perform or otherwise discharge any liabilities or obligations of any of the Sellers other than the Assumed Liabilities (collectively, the "*Excluded Liabilities*").*

Section 2.5 *Assumption of Certain Leases and Other Contracts. The Sellers shall assume and assign to the Buyer, effective upon the Closing, the Assumed Agreements on the following terms and conditions:*

(a) From and after the Closing Date until 120 days thereafter, the applicable Sellers shall assume and such Sellers shall assign to the Buyer the Assumed Agreements pursuant to Section 365 of the Bankruptcy Code. The Assumed Agreements are listed on Exhibit A hereto, as amended from time to time pursuant to this Section 2.5(a), and are identified by the date of the Assumed Agreement (if available), the other party or parties to the Assumed Agreement and the address of such party or parties (if available), as the case may be. From and after the date hereof until 120 days following the Closing Date, the Buyer shall have the right, in its sole discretion, to make additions and deletions to the list of Assumed Agreements by delivering a marked copy of such list to Sellers, and such changes shall be effective immediately upon receipt by Sellers. The Sellers shall give prompt notice of such addition or deletion to the counter-party to such agreement, and to the respective counsels to the Pre-petition Agent, the Post-petition Agent and the Creditors' Committee.

(b) If there exists any default related to an Assumed Agreement which is required to be cured as a condition to the Sellers' assumption and assignment pursuant to Section 365(a) of the Bankruptcy Code, the Buyer shall promptly cure any such default (including, paying any and all such amounts, whether arising pre-petition or post-petition, to effect such cure pursuant to Section 365(a) of the Bankruptcy Code) as a condition to the assumption and assignment of such Assumed Agreement. From time to time after the Closing, the Buyer shall provide funds to the Sellers or directly to the counter-party thereto (by wire transfer of immediately-available U.S. funds) in an amount sufficient to pay all such cure amounts required by the Bankruptcy Court, unless otherwise agreed by such counter-party, as a condition for assumption and assignment of the Assumed Agreements. Immediately upon receipt by the Sellers of such funds, the Sellers shall hold such funds in trust for such counter-party, and shall pay all cure amounts for such Assumed Agreements. The Buyer alone shall be liable for payment of any cure payment in respect of any Assumed Agreement. From and after the Closing Date, the Buyer shall designate the contracts and other agreements of Sellers that it desires Sellers to reject and Sellers shall promptly make appropriate motions with the Bankruptcy Court and take all other action to reject all such designated contracts and other agreements. In the case of non-residential real property leases, such notice shall be irrevocable and accompanied by delivery of all keys to the subject premises in the Buyer's possession.

(c) The Buyer shall be responsible for demonstrating and providing adequate assurance of future performance and any and all costs and expenses necessary in connection therewith regarding any of the Assumed Agreements under Section 365 of the Bankruptcy Code.

Section 2.6     *Intercompany Receivables.*  All intercompany receivables owed by and between the Sellers shall be cancelled on the Closing Date.

Section 2.7     *Winstar Building.*  The Buyer shall, at its option, be entitled to enter into a sublease following the Closing Date, with rent to be set at prevailing market rates in the building and otherwise on terms reasonably satisfactory to the Sellers, with the Sellers to occupy the office space in the Winstar Building to which the Sellers have occupancy rights under the terms of the AON Sublease (the thirty-first floor until January 31, 2002, the non-hub portion of the tenth floor until March 31, 2002, and the hub portion of the tenth floor until April 30, 2002). After the expiration of such term with respect to the hub portion of the tenth floor, the Buyer shall, at its option, be entitled to enter into an agreement with the Sellers to occupy such portion of the tenth floor of the Winstar Building (to the extent of such Sellers' occupancy rights) through the duration of the AON Sublease, and if the Buyer shall exercise such option, the Buyer shall pay rent at the prevailing market rate in the building for such space which rent shall be paid upon exercise of the option in a lump-sum payment based on the present value of such rent.

# ARTICLE III
# PURCHASE PRICE

Section 3.1     *Purchase Price.*  In consideration for the Purchased Assets, and subject to the terms and conditions of this Agreement, Buyer shall assume the Assumed Liabilities, and on the Closing Date, shall irrevocably (i) pay, at Sellers' election (which shall be exercised before the Closing Date), either (x) an amount in cash equal to $38,000,000 (the "*Cash Payment*") or (y) an amount in cash equal to $30,000,000 and cause to be issued to the Sellers a number of shares of Class B common stock, $0.01 par value per share, of IDT Corporation (the "*IDT Class B Stock*") having a value equal to $12,500,000 based on the average closing price of IDT Class B Stock during the seven trading day period ended December 14, 2001 (the "*IDT Shares*" and together with the $30,000,000, the "*Cash/Stock Payment*"), and (ii) issue to the Sellers such number of shares of common stock, $0.01 par value per share, of the Buyer (the "*Buyer Common Stock*"), representing 5% of the outstanding shares of Buyer Common Stock as of the date hereof (the "*Buyer Shares*" and together with either the Cash Payment or the Cash/Stock Payment, as applicable, the "*Purchase Price*").  It is understood and agreed that the Buyer shall issue to IDT Corporation or its designee shares representing the remaining 95% of the Buyer Common Stock and preferred stock, $0.01 par value per share, of the Buyer (the "*Buyer Preferred Stock*") which Buyer Preferred Stock grants to the holders thereof the right to recovery of amounts invested in the Buyer by its affiliates prior to any right of the Buyer or Sellers to receive amounts on account of the Buyer Common Stock (but having no other preferential rights or voting rights).

It is understood and agreed that the IDT Shares delivered at Closing shall not be registered in accordance with the Securities Act and shall be "restricted" as a result thereof.  IDT Corporation shall use its commercially reasonable ~~best~~ efforts to cause a registration statement to

11

*[handwritten margin notes: "any holder thereof"; "divided by the number of IDT Shares issued as part of the Purchase Price"; "all or a portion of"]*

become effective with respect to such IDT Shares within 60 days following the Closing Date. In the event that the IDT Shares are not duly registered within 60 days following the Closing Date, ~~the Sellers~~ may require at any time within 30 days thereafter that IDT Corporation repurchase the IDT Shares ~~from the Sellers~~ for cash consideration of $10,000,000 ~~in the aggregate.~~

Section 3.2    *Cash Payment at Signing.*    Pursuant to the Escrow Agreement, on or before the date hereof, the Buyer shall deliver, or shall have delivered, the Cash Payment to the Escrow Agent to be held in escrow pending the Closing.  On the Closing Date, the Sellers and the Buyer shall instruct the Escrow Agent to promptly release the Escrow Amount in accordance with the terms of the Escrow Agreement. *[handwritten: "held by it"]*

Section 3.3    *Allocation of Purchase Price.*    ~~Prior to the Closing,~~ the Buyer and the Sellers shall use their reasonable best efforts to agree as to the allocation of the Purchase Price pursuant to Section 1060 of the Code and the rules and regulations thereunder. The Buyer and the Sellers agree to use such allocation in filing all required forms under Section 1060 of the Code and all other Tax Returns, and the Buyer and the Sellers further agree that they shall not take any position inconsistent with such allocation on any examination of any such Tax Return, in any refund claim or in any Tax litigation. The Buyer acknowledges that, based upon the manner it valued the Purchased Assets, ~~a majority~~ of the Purchase Price is, to the extent permitted by applicable Tax laws and rules, allocated to Accounts Receivable. Upon the request of the other, the Buyer and the Sellers agree to provide the other information reasonably necessary to complete Form 8594. Not later than thirty (30) days prior to the filing of their respective Forms 8594 relating to this transaction, each party shall deliver to the other party a copy of its Form 8594. In the event of a dispute with respect to any part of the allocation of the Purchase Price, the Buyer and the Sellers shall attempt to reconcile their differences and any resolution by them as to any disputed allocation shall be final, binding and conclusive on the parties. If the Buyer and the Sellers are unable to reach a resolution on such differences within thirty (30) days after the date any such dispute arises, the Buyer and the Sellers shall submit the disputed allocations for determination and resolution to the Bankruptcy Court, which shall be instructed to determine and report to the parties, upon such disputed allocations, and such report shall be final, binding and conclusive on the parties hereto with respect to the disputed allocations. *[handwritten: "equal to a price per share"; "the substantial portion"]*

# ARTICLE IV
## THE CLOSING AND LICENSE TRANSFER

Section 4.1    Time and Place of Closing.    Upon the terms and subject to the satisfaction of the conditions contained in <u>Article VII</u> of this Agreement, the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities and Assumed Agreements contemplated by this Agreement (the "Closing") shall take place at the offices of Shearman & Sterling, 599 Lexington Avenue, New York, New York, at 10:00 A.M. (local time) no later than the second (2nd) Business Day following the date on which the conditions set forth in <u>Article VII</u> have been satisfied (other than the conditions with respect to actions the respective parties hereto will take at the Closing itself) or, to the extent permitted, waived in writing, or at such other place or time as the Buyer and Winstar (on behalf of the Sellers) may mutually agree.  The date and time at which the Closing actually occurs is hereinafter referred to as the "*Closing Date.*"

12

Section 4.2    *Deliveries by the Sellers.*  At or prior to the Closing, the Sellers shall deliver to the Buyer the Bill of Sale, duly executed by the Sellers for the personal property included in the Purchased Assets.

Section 4.3    *Deliveries by the Buyer.  At or prior to the Closing, the Buyer shall deliver the following to Winstar (on behalf of the Sellers) or the Escrow Agent, as the case may be:*

(a)  the Purchase Price;

(b)  copies of the Certificate of Incorporation and the Bylaws of the Buyer, each as in effect as of the Closing; and

(c)  copies of the resolutions duly adopted by the Buyer's board of directors authorizing the execution, delivery and performance of this Agreement and each of the other transactions contemplated hereby.

Section 4.4    *Management Transition.*  The Sellers and the Buyer shall enter into a management agreement substantially in the form of <u>Exhibit D</u> (the "<u>Management Agreement</u>") on the date hereof.  Pursuant to the Management Agreement, the Buyer shall agree to fund the continued operations of the Business as set forth in the Management Agreement and shall act as manager of the operations in each state or jurisdiction for which a FCC Consent or State Regulatory Consent has not been obtained on behalf of Winstar and at the direction of Winstar and consistent with all applicable laws and regulations.  At such time as any State Regulatory Consent and any FCC Consent shall have become Final Orders, the corresponding State Regulatory License and FCC License shall be promptly transferred in a manner reasonably requested by the Buyer.


ARTICLE V
REPRESENTATIONS AND WARRANTIES OF THE BUYER

As an inducement to the Sellers to enter this Agreement and to consummate the transactions contemplated hereby, the Buyer represents and warrants to the Sellers as follows:

Section 5.1    *Organization.*  The Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as is now being conducted.

Section 5.2    *Authority Relative to this Agreement.*  The Buyer has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by the board of directors of the Buyer and no other corporate proceedings on the part of the Buyer are necessary to authorize this Agreement or to consummate the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by the Buyer, and assuming that this Agreement constitutes a valid and binding agreement of the Sellers, constitutes a valid and binding agreement of the Buyer, enforceable against the Buyer in accordance with its terms,

13

except that such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

Section 5.3     *Consents and Approvals; No Violation.*  Subject to the entry of the Sale Order, the receipt of the FCC Consents, the receipt of the State Regulatory Consents and receipt of the Other Regulatory Approvals which may be required, neither the execution and delivery of this Agreement by the Buyer nor the purchase by the Buyer of the Purchased Assets and the assumption by the Buyer of the Assumed Liabilities and Assumed Agreements pursuant to this Agreement will (a) conflict with or result in any breach of any provision of the Certificate of Incorporation or Bylaws (or other similar governing documents) of the Buyer or (b) require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority which has not been otherwise obtained or made (other than any filings required by the Securities Act, the Exchange Act or the rules of the New York Stock Exchange).

Section 5.4     *Qualifications to Hold Permits.*  The Buyer is aware of no financial or other bases on which it would be reasonably be expected to be deemed not qualified to hold the FCC Licenses, the State Regulatory Licenses or any of the other Permits, including any foreign ownership that would disqualify or limit its ability to control the FCC Licenses and State Regulatory Licenses.  Other than revocations for failure to pay fees or make required filings (all of which have been remedied prior to the date hereof), neither the Buyer nor any of its Affiliates has had any material permit, certificate, license, franchise or other government authorization, consent or approval revoked or rescinded or has been subject to any material proceeding or investigation by the FCC or any comparable state regulatory agency with respect to any of its or its Affiliates' operations.

Section 5.5     *Legal Proceedings and Judgments.*  There are no material claims, actions, proceedings or investigations pending or, to the knowledge of the Buyer, threatened against or relating to the Buyer before any court or other Governmental Authority acting in an adjudicative capacity which could reasonably be expected to materially adversely affect the Buyer's ability to consummate the transactions contemplated hereby.

Section 5.6     *Brokers.*  No Person is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by the Buyer or any of its Affiliates in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Buyer.

Section 5.7     *Buyer Financing.*  As of the date hereof and as of the Closing Date, the Buyer has and will have funds available to it sufficient to (i) operate the Business pursuant to the terms of the Management Agreement, (ii) deliver the Purchase Price at the Closing, and (iii) pay all of its fees and expenses incurred in connection with the transactions contemplated hereby, including all cure payments that are required to be paid in respect of Assumed Agreements (the "*Buyer Financing*").

Section 5.8     *Capitalization.*  The authorized capital stock of the Buyer shall consist of 10,000 shares of Buyer Common Stock and 500,000 shares of Buyer Preferred Stock, of which 950 shares of Buyer Common Stock and 68,000 shares of Buyer Preferred Stock shall be issued

and outstanding immediately prior to the Closing. All such issued and outstanding shares of Buyer Common Stock and Buyer Preferred Stock have been duly authorized and validly issued, are fully paid and nonassessable, and have been issued in accordance with all applicable laws. The Buyer has reserved an aggregate of 50 shares of Buyer Common Stock for issuance hereunder.

Section 5.9    *Valid Issuance of IDT and Buyer Shares.*  The IDT Shares and the Buyer Shares, when issued and delivered hereunder will be duly and validly issued, fully paid, and nonassessable, with no personal liability attaching to ownership thereof, free of Encumbrances created by the Buyer or IDT Corporation and not subject to preemptive or similar rights of the shareholders of the Buyer and will be free of restrictions on transfer other than under applicable state and federal securities laws.

Section 5.10    *Disclaimer of Other Representations and Warranties.*  The Buyer hereby acknowledges and agrees that the Buyer is purchasing the Purchased Assets on an "as-is, where-is" basis and that the Sellers make no representation or warranty whatsoever and none shall be implied at law or in equity.

## ARTICLE VI
## COVENANTS OF THE PARTIES

Section 6.1    *Conduct of Business.*  (a) Except as required (other than pursuant to a request, application or motion by any Seller) by the Bankruptcy Court and the Bankruptcy Code, during the period commencing on the date of this Agreement and ending on the Closing Date, the Sellers shall (i) operate the Business in the usual, regular and ordinary course as conducted during the 30 days prior to December 17, 2001 (ii) other than as permitted in writing by the Buyer, use their reasonable efforts to preserve in all material respects the Business, its employees and its operations, and (iii) refrain from executing any material contract other than in the ordinary course as conducted during the 30 days prior to December 17, 2001.

(b) Prior to the Closing Date, without the prior written consent of the Buyer, no Seller shall terminate, extend or otherwise amend any of the FCC Licenses or State Regulatory Licenses, other than in the ordinary course of business. Prior to the Closing Date, without the prior written consent of the Buyer, no Seller shall sell, lease (as lessor), transfer or otherwise dispose of, any of the Purchased Assets.

Section 6.2    *Access to Information; Maintenance of Records.*  (a) Between the date of this Agreement and the Closing Date, each Seller shall, during ordinary business hours, upon reasonable notice (i) give the Buyer and the Buyer Representatives reasonable access to all books, records, plants, offices and other facilities and properties constituting the Purchased Assets to which the Buyer is not denied access by law, (ii) permit the Buyer to make such reasonable inspections thereof as the Buyer may reasonably request, (iii) furnish the Buyer with such financial and operating data and other information with respect to the Business as the Buyer may from time to time reasonably request, (iv) furnish the Buyer a copy of each material report, schedule or other document filed or received by such Seller with respect to the Business with the SEC and other Governmental Authorities; *provided, however,* that (A) any such access shall be

*Rider 6.1 (c)*

15

usual, regular and ordinary course as conducted during the 30 days prior to December 17, 2001 (ii) other than as permitted in writing by the Buyer, use their reasonable efforts to preserve in all material respects the Business, its employees and its operations, and (iii) refrain from executing any material contract other than ~~in the usual regular and~~ ordinary course as conducted during the 30 days prior to December 17, 2001.

(b) Prior to the Closing Date, without the prior written consent of the Buyer, no Seller shall terminate, extend or otherwise amend any of the FCC Licenses or State Regulatory Licenses, other than in the ordinary course of business. Prior to the <u>Closing Date, without the</u> prior written consent <u>of the Buyer, no Seller shall sell, lease (as lessor), transfer or otherwise</u> dispose of, any of the Purchased Assets. ~~these assets being~~ managed under the Management Agreement

~~(c) Prior to the termination of the Management Agreement, the Buyer shall take no action or actions which would constitute the exercise of control over the FCC Licenses or with respect to State Regulatory Licenses in violation of applicable law; provided that performance under the Management Agreement shall not be deemed a breach of this Section 7.1(d).~~

Section 6.2    *Access to Information; Maintenance of Records*

Redo 6.1(c)

(a) Between the date of this Agreement and the Closing Date, each Seller shall, during ordinary business hours, upon reasonable notice (i) give the Buyer and the Buyer Representatives reasonable access to all books, records, plants, offices and other facilities and properties constituting the Purchased Assets to which the Buyer is not denied access by law, (ii) permit the Buyer to make such reasonable inspections thereof as the Buyer may reasonably request, (iii) furnish the Buyer with such financial and operating data and other information with respect to the Business as the Buyer may from time to time reasonably request, (iv) furnish the Buyer a copy of each material report, schedule or other document filed or received by such Seller with respect to the Business with the SEC and other Governmental Authorities; *provided, however,* that (A) any such access shall be conducted in such a manner so as not to interfere unreasonably with the operation of the Business, (B) such Seller shall not be required to take any action which would constitute a waiver of the attorney-client privilege and (C) such Seller need not supply the Buyer with any information which such Seller is under a legal obligation not to supply. Notwithstanding anything in this <u>Section 6.2(a)</u> to the contrary, the Buyer shall not have access to any of the Employee Records and personnel and medical records, which in such Seller's good faith judgment is sensitive or the disclosure of which could subject such Seller to any material risk of substantial liability.

(b) The Buyer and the Sellers acknowledge that they are subject to the Confidentiality Agreement. All information furnished to or obtained by the Buyer or any of the Buyer Representatives or the Sellers or any of the Sellers' Representatives pursuant to this Agreement shall be subject to the provisions of the Confidentiality Agreement and shall be treated as Confidential Information for all purposes of the Confidentiality Agreement. Furthermore, the Buyer acknowledges that the Sellers or any of the Sellers' Representatives may furnish Confidential Information to counsel for the Creditors' Committee and to the Pre-petition Agent and the Post-petition Agent and their respective counsel, subject to the provisions of the

conducted in such a manner so as not to interfere unreasonably with the operation of the Business, (B) such Seller shall not be required to take any action which would constitute a waiver of the attorney-client privilege and (C) such Seller need not supply the Buyer with any information which such Seller is under a legal obligation not to supply. Notwithstanding anything in this Section 6.2(a) to the contrary, the Buyer shall not have access to any of the Employee Records and personnel and medical records, which in such Seller's good faith judgment is sensitive or the disclosure of which could subject such Seller to any material risk of substantial liability.

(b) The Buyer and the Sellers acknowledge that they are subject to the Confidentiality Agreement. All information furnished to or obtained by the Buyer or any of the Buyer Representatives or the Sellers or any of the Sellers' Representatives pursuant to this Agreement shall be subject to the provisions of the Confidentiality Agreement and shall be treated as Confidential Information for all purposes of the Confidentiality Agreement. Furthermore, the Buyer acknowledges that the Sellers or any of the Sellers' Representatives may furnish Confidential Information to counsel for the Creditors' Committee and to the Pre-petition Agent and the Post-petition Agent and their respective counsel, subject to the provisions of the Confidentiality Agreement. The terms of the Confidentiality Agreement shall cease to apply to the parties thereto after the Closing Date.

(c) For a period of the later of (x) three (3) years (subject to Section 6.7(a)) after the Closing Date and (y) the date of entry of an order of the Bankruptcy Court closing the Chapter 11 Cases, or if converted to a case under Chapter 7 of the Bankruptcy Code, an order of the Bankruptcy Court closing such case, each party and its representatives shall have reasonable access to all of the books and records relating to the Business or the Purchased Assets, including all information pertaining to the Assumed Agreements, all Employee Records or other personnel and medical records required by law, legal process or subpoena, in the possession of the other party to the extent that such access may reasonably be required by such party in connection with the Assumed Liabilities or the Excluded Liabilities, or other matters relating to or affected by the operation of the Business and the Purchased Assets. Such access shall be afforded by the party in possession of such books and records upon receipt of reasonable advance notice and during normal business hours; *provided, however,* that (i) any such access shall be conducted in such a manner as not to interfere unreasonably with the operation of the business of any party or its Affiliates, (ii) no party shall be required to take any action which would constitute a waiver of the attorney-client privilege, and (iii) no party need supply the other party with any information which such party is under a legal obligation not to supply. The party exercising this right of access shall be solely responsible for any costs or expenses incurred by it pursuant to this Section 6.2(c). If the party in possession of such books and records shall desire to dispose of any such books and records upon or prior to the expiration of such period, such party shall, prior to such disposition, give the other party a reasonable opportunity at such other party's expense, to segregate and remove such books and records as such other party may select. Furthermore, the Buyer acknowledges that Winstar shall have reasonable access (as set forth above) to all Transferred Employees with respect to the litigation matters set forth on Schedule 2.2(d) for so long as such matters are pending. In addition to the foregoing, the Buyer agrees to maintain the Employee Records in its possession for a period of three (3) years after the Closing Date and to give former and current employees of the Sellers reasonable access to such Employee Records during such period.

16

Section 6.3    *Expenses.*  Except to the extent specifically provided herein or in the Sale Order or the Management Agreement, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the party incurring such costs and expenses.

Section 6.4    *Further Assurances.*  (a) Subject to the terms and conditions of this Agreement, each of the parties hereto shall use reasonable best efforts (subject, in the case of the Sellers or any Chapter 7 trustee, to available funding and without being required to make any payment to any third party or to incur any significant economic burden) to take, or cause to be taken, all action, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable laws and regulations to consummate and make effective the sale of the Purchased Assets in accordance with this Agreement, including using reasonable best efforts to ensure timely satisfaction of the conditions precedent to each party's obligations hereunder. Neither any of the Sellers, on the one hand, nor the Buyer, on the other hand, shall, without the prior written consent of the other party (it being understood that the written consent of Winstar shall have the same effect as the consent of all of the Sellers), take any action which would reasonably be expected to prevent or materially impede, interfere with or delay the transactions contemplated by this Agreement.  From time to time on or after the Closing Date, each Seller shall, at its own expense, execute and deliver such documents to the Buyer as the Buyer may reasonably request in order to more effectively vest in the Buyer such Seller's title to the Purchased Assets subject to Permitted Encumbrances.  From time to time after the date hereof, the Buyer shall, at its own expense, execute and deliver such documents to each Seller as such Seller may reasonably request in order to more effectively consummate the sale of the Purchased Assets and the assumption and assignment of the Assumed Liabilities and the Assumed Agreements in accordance with this Agreement.

(b) In the event that any Purchased Asset shall not have been conveyed to the Buyer at the Closing, the applicable Seller shall, subject to Section 6.4(c), use reasonable best efforts to convey such asset to the Buyer as promptly as is practicable after the Closing.

(c) To the extent that any of the Sellers' rights under any Assumed Agreement may not be assigned without the consent of another Person which consent has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful and such Seller shall cooperate (without being required to make any payment to any third party or to incur any significant economic burden) to obtain any such required consent(s) as promptly as reasonably possible unless failure to obtain such consent would not, individually or in the aggregate, have a Material Adverse Effect, and the Buyer agrees to fully cooperate with such Seller in its efforts to obtain any such consent (including the submission of such financial or other information concerning the Buyer and the execution of any assumption agreements or similar documents reasonably requested by a third party) without being required to make any payment to any third party or to incur any economic burden.

Section 6.5    *Public Statements.*  Winstar and the Buyer shall consult with each other prior to issuing any public announcement, statement or other disclosure with respect to this Agreement or the transactions contemplated hereby, except that the parties may make disclosures with respect to this Agreement and the transactions contemplated hereby to the extent and under

17

the circumstances in which the parties are expressly permitted by the Confidentiality Agreement to make disclosures of Confidential Information or otherwise required by law or New York Stock Exchange regulations.

Section 6.6    *Governmental Authority Consents and Approvals.* (a) FCC Consents. Subject to Section 6.6(d), within thirty (30) days after the entry of the Sale Order, the Buyer shall prepare and file, or cause to be prepared and filed, the necessary application or applications with the FCC seeking the FCC Consents and thereafter, shall promptly make all other filings and notifications and promptly seek all such consents, licenses, approvals, permits, waivers, orders or authorizations as may be required to obtain the FCC Consents. The Sellers shall cooperate with the Buyer to the fullest extent reasonably possible to provide all necessary information for the preparation of such applications within ten (10) Business Days after entry of the Sale Order, including those portions of such applications which are required to be completed by the Sellers. The Sellers and the Buyer shall prosecute such applications with all reasonable diligence and otherwise use their reasonable best efforts (including, with respect to Buyer, providing financial assurance to the extent required) to obtain grants of approval as expeditiously as practicable. The Buyer shall bear all reasonable fees payable by the Buyer and/or the Sellers to the FCC and to any outside counsel employed by the Sellers or Buyer in connection with the preparation and filing of the applications for the FCC Consents.

(b) State Regulatory Consents. Subject to Section 6.6(e), within thirty (30) days after the entry of the Sale Order, the Sellers and/or the Buyer, as applicable, shall each file or cause to be filed with any state or local regulatory authorities analogous to the FCC applications for the approval of the assignment of the State Regulatory Licenses. The Sellers and the Buyer shall prosecute such applications with all reasonable diligence and otherwise use their reasonable best efforts (including, with respect to Buyer, providing financial assurance to the extent required) to obtain grants of approval as expeditiously as practicable. The Buyer shall bear all reasonable fees payable by the Buyer and/or the Sellers to the state and local regulatory entities and to any outside counsel employed by the Sellers or Buyer in connection with the preparation and filing of the applications for the State Regulatory Consents.

(c) Other Governmental Authority Approvals. The Sellers and the Buyer shall each use their reasonable best efforts to cooperate with each other in determining any filings, notifications and requests for approval (other than the FCC Consents and the State Regulatory Consents) required to be made and received prior to the Closing under applicable law or regulation (collectively, the "*Other Regulatory Approvals*"). In connection with any Other Regulatory Approvals, neither the Buyer nor any of the Sellers will, and each of them will use its reasonable best efforts not to, cause or permit any of its officers, directors, partners or other Affiliates to, take any action which could reasonably be expected to materially and adversely affect the submission of any required filings or notifications or the grant of any such approvals.

(d) Cooperation. The Sellers and the Buyer (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other party to review in advance any proposed written communication or information submitted to any such Governmental Authority in response thereto. In addition, each of the Sellers and the Buyer shall not agree to participate in any meeting with any

18

Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement, the transactions contemplated hereby or any such filing, notification or request for approval unless it consults with the other party in advance and, to the extent permitted by any such Governmental Authority, gives the other party the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to any restrictions under applicable laws, rules or regulations, each of the Sellers and the Buyer shall furnish the other party with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements and to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval. The Sellers and the Buyer shall also furnish the other party with such necessary information and assistance as such other party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration, or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval. The Sellers and the Buyer shall prosecute all required requests for approval with all necessary diligence and otherwise use their respective reasonable best efforts to obtain the grant thereof by a Final Order as soon as possible.

Section 6.7 *Tax Matters*. (a) <u>Cooperation on Tax Matters</u>. The Buyer and the Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of all Tax Returns in connection with matters relating to or affected by the operations of the Sellers prior to the Closing, including the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Notwithstanding anything to the contrary herein, the Buyer and the Sellers shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least six (6) years following the Closing Date. At the end of such period, each party shall provide the other with at least thirty (30) days prior written notice before destroying any such books and records, during which period the party receiving such notice can elect to take possession, at its own expense, of such books and records. The Sellers and the Buyer shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business.

(b) <u>Transfer Taxes</u>. All excise, sales, use, transfer, value added, registration, stamp, recording, documentary, conveyancing, franchise, property, transfer, gains and similar Taxes, levies, charges and recording, filing and other fees (collectively, "*Transfer Taxes*") incurred in connection with the transactions contemplated by this Agreement shall be paid by the Sellers. The Sellers shall, at their own expense, timely pay and file all necessary Tax returns and other documentation with respect to all such Transfer Taxes and, if required by applicable law, the Buyer shall join in the execution of any Tax Returns and other documentation at the Sellers' request. Notwithstanding the foregoing, the Sellers shall seek in the Sale Order a decretal paragraph which provides that, in accordance with Section 1146(c) of the Bankruptcy Code, the transactions contemplated hereby are steps in the formulation, or anticipation of the formulation, of a Chapter 11 plan for the Sellers and, as such, the making or delivery of any instrument of

19

transfer to effectuate the transactions contemplated hereby shall not be taxed under any law imposing a stamp tax or similar tax.

Section 6.8    *Litigation Support*.  In the event and for so long as any party is actively contesting or defending against any action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand in connection with (a) any transaction contemplated under this Agreement or (b) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving the Sellers, the other party will cooperate with the contesting or defending party and its counsel in the contest or defense, make available its personnel, and provide such testimony and access to its books and records as shall be reasonably necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending party.  In the event that the Sale Order is the subject of an appeal, the Buyer and the Sellers agree to use reasonable best efforts to seek an expedited review and decision of such appeal and to seek the dissolution of any stay which might be entered in connection with such an appeal; *provided* that each party shall bear the cost of complying with this provision.

Section 6.9    *Notification*.  The Sellers shall notify the Buyer and keep it advised of the occurrence, to the Knowledge of the Sellers, of (a) notice of any litigation or administrative proceeding commenced against any Seller which could, if adversely determined, have a Material Adverse Effect (other than any such action commenced in the Bankruptcy Court) and (b) any material damage or destruction of any of the Purchased Assets.  The Buyer shall notify the Sellers prior to the Closing Date and keep them advised of the occurrences of any event or occurrence which could reasonably be expected to materially adversely affect the Buyer's ability to consummate the transactions contemplated hereby.

*[handwritten margin note: or threatened (in writing)]*

Section 6.10    *Submission for Bankruptcy Court Approval*.  (a)  In connection with the transactions contemplated by this Agreement, the Sellers shall, within one (1) Business Day of the date hereof, file with the Bankruptcy Court a form of order or orders pursuant to Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code (A) authorizing and approving the sale to the Buyer pursuant to this Agreement of the Purchased Assets, and approving the terms of this Agreement, (B) finding the Buyer is acting in good faith, and is entitled to the protections of a Buyer under Section 363(m) of the Bankruptcy Code and (C) containing such other findings and provisions as may be reasonably requested by the Buyer (including a finding that notice of the transactions contemplated by this Agreement, including notice to all parties to the Assumed Agreements, has been properly given) in the form and substance of <u>Exhibit E</u> or otherwise in form and substance acceptable to the Buyer in its sole discretion (the "<u>*Sale Order*</u>").

(b)  The Sellers and the Buyer shall each use their reasonable best efforts, and shall cooperate, assist and consult with each other, to secure the Bankruptcy Court's approval of (i) the Sale Order no later than one (1) Business Day after the date of this Agreement and (ii) any other order of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby, within five (5) days following the date of filing of the motion for approval thereof.  The Sellers and the Buyer shall consult with, and seek the advice of, one another regarding pleadings which any of them intend to file, or positions any of them intend to take, with the Bankruptcy Court in connection with or which might reasonably affect, the Bankruptcy

20

Court's approval of the Sale Order.  None of Sellers or the Buyer will file any pleading or take any position that is inconsistent with obtaining the Bankruptcy Court's approval of the Sale Order or any other such order.  The Sellers shall promptly (and, in any event, within one (1) Business Day after the receipt of any written request) provide the Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court (and other courts) pertaining to the motion for approval of the Sale Order or any other order relating to any of the transactions contemplated by this Agreement.

(c)  If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Order or other such order), the Sellers and the Buyer will cooperate in taking such steps diligently to prosecute such appeal, petition or motion and each of the Seller and the Buyer shall use its reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.

(d)  As a condition to Buyer's obligations hereunder, Sellers have agreed to pay to Buyer an amount equal to 2.5% of the Cash Payment (the "*Topping Fee*") if (i) this Agreement is terminated (other than as a result of a default by the Buyer in the performance of its obligations hereunder), (ii) the Sellers shall enter into one or more sale transactions and (iii) such transaction or transactions shall be consummated and shall close, in accordance with its terms.  The Topping Fee shall be paid when the Sellers receive the purchase price(s) from another buyer (it being understood that placing funds in escrow shall not constitute receipt by the Sellers until such funds are released to the Sellers).

Section 6.11  *D&O Policies*.  The Sellers shall maintain in effect the D&O Policies for the benefit of the Sellers' respective current and former directors and officers until such time as the D&O Policies expire in accordance with their terms.

Section 6.12  *Use of Winstar Name*.  The Sellers agree that no later than 60 days after the Closing Date, the Sellers (i) shall cause the names of Winstar and its Subsidiaries which currently utilize the name "Winstar" to be changed to a name that does not include the name "Winstar" or contain any references thereto and (ii) shall, and shall cause their Affiliates, not to advertise or hold themselves out as Winstar or an Affiliate thereof.  It is expressly understood and agreed by and between the parties that this covenant shall survive the Closing and that Buyer shall have all rights and remedies available at law or in equity to ensure strict compliance with this covenant by the Sellers, or their current or former Affiliates.

ARTICLE VII
CONDITIONS TO CLOSING

Section 7.1  *Conditions to Each Party's Obligations to Effect the Closing*.  The respective obligations of each party to effect the sale and purchase of the Purchased Assets shall be subject to the fulfillment at or prior to the Closing Date of the following conditions:

(a)  no preliminary or permanent injunction or other order or decree by any federal or state court which prevents the consummation of the sale of a material part of the

21

Purchased Assets contemplated hereby shall have been issued and remain in effect (each party agreeing to use its reasonable efforts to have any such injunction, order or decree lifted) and no statute, rule or regulation shall have been enacted by any Governmental Authority which prohibits the consummation of the sale of the Purchased Assets; and

(b) the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be in full force and effect and shall not have been stayed, modified, reversed or amended (except, if modified or amended with the written consent of the Sellers and the Buyer).

Section 7.2    *Conditions to Obligations of the Buyer*. The obligation of the Buyer to effect the purchase of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions:

(a) the Sellers shall have performed and complied in all material respects with the covenants contained in this Agreement which are required to be performed and complied with by the Sellers on or prior to the Closing Date;

(b) the Sellers and the Buyer shall have entered into the Management Agreement substantially in the form of Exhibit D, if necessary, pursuant to Section 4.4;

(c) the Post-petition Agent, on behalf of its lender participants, shall have ~~agreed in writing that any and all of their Encumbrances on the Purchased Assets shall attach only to the proceeds of the transactions contemplated hereby and not to the Purchased Assets~~; and *[handwritten: consented to the Sale of the Purchased Assets as provided herein]*

(d) the Buyer shall have received the other items to be delivered pursuant to *[handwritten: and in the Sale Order]* Section 4.2.

Any condition specified in this Section 7.2 may be waived by the Buyer; *provided* that no such waiver shall be effective against the Buyer unless it is set forth in a writing executed by the Buyer.

Section 7.3    *Conditions to Obligations of the Sellers*. The obligation of each Seller to effect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions:

(a) the Buyer shall have performed and complied in all material respects with the covenants contained in this Agreement which are required to be performed and complied with by the Buyer on or prior to the Closing Date and the representations and warranties of the Buyer which are set forth in this Agreement (without regard as to any qualifications therein as to materiality) shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date (except to the extent that any such representation or warranty speaks as of a particular date) as though made at and as of the Closing Date;

(b) each Seller shall have received the other items to be delivered to it pursuant to Section 4.3; and

22

(c) the Escrow Agent shall have simultaneously with the Closing released the Purchase Price in accordance with the Escrow Agreement in accordance with <u>Section 3.2</u>.

Any condition specified in this <u>Section 7.3</u> may be waived by the Sellers; *provided* that no such waiver shall be effective against any Seller unless it is set forth in writing executed by such Seller.

ARTICLE VIII
TERMINATION AND ABANDONMENT

Section 8.1    *Termination.*  This Agreement may be terminated at any time prior to the Closing Date, unless otherwise stated, by:

(a) mutual written consent of Winstar (on behalf of the Sellers) and the Buyer;

(b) the Sellers, if there has been a material violation or breach by the Buyer of any covenant, representation or warranty made by it contained in this Agreement or the Management Agreement which has prevented the satisfaction of any condition to the obligations of the Sellers to effect the Closing;

(c) the Buyer, if there has been a material violation or breach by the Sellers of any covenant made by them in this Agreement or the Management Agreement which has prevented the satisfaction of any condition to the obligations of the Buyer to effect the Closing.

(d) the Buyer or the Sellers, if (i) there shall be any law or regulation that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited or (ii) consummation of the transactions contemplated hereby would violate any nonappealable final order, decree or judgment of (A) the Bankruptcy Court or (B) any court or governmental body having competent jurisdiction;

(e) the Buyer or the Sellers, if the Sale Order has not been entered by the Bankruptcy Court within one (1) Business Day after the date hereof; *provided* that the Buyer or the Sellers, as the case may be, shall not be entitled to terminate this Agreement pursuant to this <u>Section 8.1(e)</u> if the failure to obtain such approval within such time period results primarily from such party itself breaching any representation, warranty or covenant contained in this Agreement;

(f) the Buyer or the Sellers, if the Sale Order has been stayed, vacated, reversed or amended by any court of competent jurisdiction (except, as may be modified or amended with the written consent of the Sellers and the Buyer, in their sole discretion); and

(g) the Buyer or the Sellers, if the Closing Date shall not have occurred on or prior to noon, New York City time, on December 19, 2001 (the "*Termination Date*"); *provided* that the Buyer or the Sellers, as the case may be, shall not be entitled to terminate this Agreement pursuant to this <u>Section 8.1(g)</u> if the failure of the Closing to

23

occur on or prior to such date results primarily from such party itself breaching any representation, warranty or covenant contained in this Agreement.

Section 8.2     *Procedure and Effect of Termination.*  In the event of termination of this Agreement and abandonment of the transactions contemplated hereby by either or both of the parties pursuant to Section 8.1, written notice thereof shall forthwith be given by the terminating party to the other party (it being understood that notice to Winstar shall have the same effect as notice to all of the Sellers) and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any of the parties hereto.  If this Agreement is terminated as provided herein:

(a) said termination shall be the sole remedy, subject to Sections 6.10(d) and 8.2(b), of the parties hereto with respect to breaches of any covenant, representation or warranty contained in this Agreement and none of the parties hereto nor any of their respective trustees, directors, officers or Affiliates, as the case may be, shall have any liability or further obligation to the other party or any of their respective trustees, directors, officers or Affiliates, as the case may be, pursuant to this Agreement, except for the parties hereto in each case as stated in this Section 8.2, Section 9.15 and in Sections 6.2(b) and 6.3; *provided, however,* the Sellers shall not be responsible ~~for liability~~ for any misrepresentation or breach of any warranty or covenant by the Sellers contained in this Agreement prior to the time of such termination;
        or liable

(b) the Escrow Amount shall be released to the Buyer or the Sellers as set forth in the Escrow Agreement;

(c) all filings, applications and other submissions made pursuant to this Agreement, to the extent practicable, shall be withdrawn from the agency or other Person to which they were made; and

(d) all Confidential Information from any and all of the Sellers shall be returned to Winstar, and all Confidential Information from the Buyer shall be returned to the Buyer.

ARTICLE IX
MISCELLANEOUS PROVISIONS

Section 9.1     *Amendment and Modification.*  This Agreement may be amended, modified or supplemented only by written agreement of Winstar (on behalf of the Sellers) and the Buyer.

Section 9.2     *Waiver of Compliance; Consents.*  Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, covenant or condition herein may be waived by the party entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, or condition shall not operate as a waiver of, or estoppel with respect to any subsequent or other failure.

Section 9.3     *Survival.*  The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing Date hereunder, and neither party shall

24

have any liability to the other after the Closing Date for any breach thereof. The representations and warranties set forth in this Agreement constitute the only representations and warranties made by the Buyer with respect to the transactions contemplated hereby and the Purchased Assets transferred pursuant hereto, and such representations and warranties supersede all representations and warranties, written or oral, previously made by the Buyer. Furthermore, the parties agree that, other than the right to terminate as contained in <u>Article VIII</u> of this Agreement, neither party shall have any recourse to the other party, or to any of the officers, directors, or Affiliates of such party, in the event any of the representations and warranties made herein or deemed made are untrue as at any time. The only remedy of the Seller for a breach of such representations and warranties shall be the Seller's option, under certain circumstances, not to close and to retain the Purchase Price in accordance with and subject to the limitations in Section 7.1, 7.3, 8.1(b) and 8.2(b). The parties agree that specific performance shall be available as a remedy to require performance of each party's covenants contained in this Agreement. The parties hereto agree that only the covenants contained in this Agreement to be performed at or after the Closing Date shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing Date for any breach thereof.

Section 9.4    *No Impediment to Liquidation.* Subject to <u>Sections 2.2(e)</u>, <u>6.2(c)</u>, <u>6.4</u> and <u>6.7</u>, nothing herein shall be deemed or construed as to limit, restrict or impose any impediment to the Sellers' right to liquidate, dissolve and wind-up its affairs and to cease all business activities and operations at such time as it may determine following the Closing, including conversion to Chapter 7. Subject to <u>Sections 2.2(e)</u>, <u>6.2(c)</u>, <u>6.4</u> and <u>6.7</u>, the Sellers shall not be obligated to retain assets or employees or to continue operations following the Closing (or to retain outsource assistance) in order to satisfy its obligations hereunder except to the extent that such would directly contravene the obligations of the Sellers under this Agreement or the Management Agreement.

Section 9.5    *Notices.* All notices and other communications hereunder shall be in writing and shall be deemed given (i) when personally sent/delivered, by facsimile transmission (with hard copy to follow) or sent by reputable express courier (charges prepaid) or (ii) five (5) days following mailing by registered or certified mail postage prepaid and return receipt requested. Unless another address is specified in writing, notices, demands and communications to any Seller and the Buyer shall be sent to the addresses indicated below:

(a) If to any of the Sellers, to:

c/o Winstar Communications, Inc.
The Winstar Building
685 Third Avenue
31st Floor
New York, New York 10017
Facsimile: (212) 792-9348
Attention: Paul Street, CRO

with a copy to:

25

Shearman & Sterling
599 Lexington Avenue
New York, New York 10022
Facsimile: (212) 848-7179
Attention: Mark J. Shapiro, Esq.
                Stephen M. Besen, Esq.

(b) if to the Buyer, to:

c/o IDT Corporation
520 Broad Street
Newark, New Jersey 07102
Facsimile: (973) 438-1503
Attention: General Counsel

with a copy to:

McDermott, Will & Emery
50 Rockefeller Plaza
New York, New York 10020
Facsimile: (212) 547-5444
Attention: Mark S. Selinger, Esq.
                David C. Albalah, Esq.

Section 9.6    *Assignment.*  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns and with respect to any of the Sellers, any entity that may succeed to substantially all the assets of such Seller, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto, including by operation of law, without the prior written consent of the other party; *provided, however*, that the Buyer may assign this Agreement or any of the rights, interests or obligations hereunder to any Affiliate *provided* that Buyer shall remain liable hereunder.  Any assignment of this Agreement or any of the rights, interests or obligations hereunder in contravention of this Section 9.6 shall be null and void and shall not bind or be recognized by any of the Sellers or the Buyer. *Notwithstanding anything herein to the contrary, the Seller may, distribute subject to applicable law, distribute the*

Section 9.7    *Third-Party Beneficiaries.*  Nothing in this Agreement shall be construed as giving any Person, including any counter-party to an Assumed Agreement, other than the parties hereto, any legal or equitable right, remedy or claim under or with respect to this Agreement.

Section 9.8    *Severability.*  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in

*Purchase Price, including any IDT Shares or Buyer Shares to its Creditors*

26

WP3:714386.1                                                                                       58222.1001

good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 9.9     *Governing Law.*  This Agreement shall be governed by and construed in accordance with the laws of the State of New York (regardless of the laws that might otherwise govern under applicable New York principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies.

Section 9.10     *Submission to Jurisdiction.*  The parties hereto irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith or any of the transactions contemplated hereby or thereby.  Each party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such dispute or proceedings may be heard and determined in such courts.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum in connection therewith.

Section 9.11     *Counterparts.*  This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which, when executed and delivered, shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

Section 9.12     *Incorporation of Schedule and Exhibits.*  The Disclosure Schedule and all Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

Section 9.13     *Entire Agreement.*  This Agreement (including the Exhibits and the Disclosure Schedule) and the Confidentiality Agreement constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings among the parties with respect thereto.

Section 9.14     *Headings.*  The descriptive headings contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.15     *Remedies.*  Subject to <u>Section 9.3</u>, the Sellers and the Buyer hereby acknowledge and agree that money damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement and that, in such event, the Sellers or their successors or assigns, or the Buyer or its successors or assigns, as the case may be, may, in addition to any other rights and remedies existing in their favor, apply to the Bankruptcy Court ~~or any other court of competent jurisdiction~~ for specific performance, injunctive and/or other relief in order to enforce or prevent any violations of this Agreement.

Section 9.16     *Bulk Sales or Transfer Laws.*  The Buyer hereby waives compliance by the Sellers with the provisions of the bulk sales or transfer laws of all applicable jurisdictions.

27

* * * * *

WP3:714386.1                                                         58222.1001

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written by their respective officers thereunto duly authorized.

**IDT WINSTAR ACQUISITION, INC.**

By: _____
Name: Charles HF Gomer
Title: President

**WINSTAR COMMUNICATIONS, INC.**

By: _____
Name: T. R. Graham
Title: Executive Vice President

**WINSTAR WIRELESS, INC.**

By: _____
Name: T. R. GRAHAM
Title: VICE PRESIDENT

**WCI CAPITAL CORP.**

By: _____
Name: T. R. GRAHAM
Title: VICE PRESIDENT

**WINSTAR EQUIPMENT CORP.**

By: _____
Name: T. R. GRAHAM
Title: VICE PRESIDENT

**WINSTAR EQUIPMENT II CORP.**

By:
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

**WINSTAR GOVERNMENT SOLUTIONS, LLC.**

By:
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

**WINSTAR LMDS, LLC**

By:
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

**WINSTAR NETWORK EXPANSION, LLC**

By:
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

**WINSTAR WIRELESS FIBER CORP.**

By:
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

**WINSTAR WIRELESS OF DELAWARE, LLC**

By:
    Name: T. R. GRAHAM
    Title VICE PRESIDENT

**WINSTAR WIRELESS OF GEORGIA, LLC**

By: _____
Name: T. R. GRAHAM
Title: VICE PRESIDENT

**WINSTAR WIRELESS OF INDIANA, LLC**

By: _____
Name: T. R. GRAHAM
Title: VICE PRESIDENT

**WINSTAR WIRELESS OF NEW JERSEY, LLC**

By: _____
Name: T. R. GRAHAM
Title: VICE PRESIDENT

**WINSTAR WIRELESS OF NEW YORK, LLC**

By: _____
Name: T. R. GRAHAM
Title: VICE PRESIDENT

**WINSTAR WIRELESS OF PENNSYLVANIA, LLC**

By: _____
Name: T. R. GRAHAM
Title: VICE PRESIDENT

**WINSTAR WIRELESS OF VIRGINIA, LLC**

By: _____
Name: T. R. GRAHAM
Title: VICE PRESIDENT

**WINSTAR WIRELESS OF WEST VIRGINIA, LLC**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

**WWI LICENSE HOLDING, INC.**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

**WVF-CPQ 1, LLC**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

**WVF-CSC 1, LLC**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

**WVF-DL 1, LLC**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

**WVF-LU 2, LLC**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

**WVF-I LLC**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

**WINSTAR CREDIT CORP.**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

**WINSTAR INTERNATIONAL, INC.**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

**WINSTAR MIDCOM ACQUISITION CORP.**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

**WINSTAR NEW MEDIA COMPANY, INC.**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

**WINSTAR INTERACTIVE VENTURES I, INC.**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

WINSTAR PUERTO RICO, INC.

By: _____

    Name: *T. R. GRAHAM*

    Title: *VICE PRESIDENT*

APPENDIX I

SUBSIDIARIES OF WINSTAR
PARTIES HERETO

WCI Capital Corp.
Winstar Credit Corp.
Winstar Equipment Corp.
Winstar Equipment II Corp.
Winstar Government Solutions, LLC.
Winstar International, Inc.
Winstar LMDS, LLC
Winstar Midcom Acquisition Corp.
Winstar Network Expansion, LLC
Winstar Wireless Fiber Corp.
Winstar Wireless, Inc.
Winstar Wireless of Delaware, LLC
Winstar Wireless of Georgia, LLC
Winstar Wireless of Indiana, LLC
Winstar Wireless of New Jersey, LLC
Winstar Wireless of New York, LLC
Winstar Wireless of Pennsylvania, LLC
Winstar Wireless of Virginia, LLC
Winstar Wireless of Virginia, LLC
Winstar Wireless of West Virginia, LLC
WWI License Holding, Inc.
WVF-CPQ 1, LLC
WVF-CSC 1, LLC
WVF-DL 1, LLC
WVF-LU 2, LLC
WVF-I LLC
Winstar New Media Company, Inc.
Winstar Broadcasting Corp.
Winstar Interactive Ventures I, Inc.
Winstar Puerto Rico, Inc.

EXHIBIT A

ASSUMED AGREEMENTS

None.

EXHIBIT B

FORM OF BILL OF SALE

NYDOCS02/592885.4
WP3:714386.1

58222.1001

EXHIBIT C

FORM OF ESCROW AGREEMENT

EXHIBIT D

FORM OF MANAGEMENT AGREEMENT

EXHIBIT E

FORM OF SALE ORDER

**IDT CORPORATION**
**520 Broad Street**
**Newark, New Jersey  07102**

December 18, 2001

Reference is made to (a) the Asset Purchase Agreement, dated as of the date hereof (the "Purchase Agreement") among Winstar Communications, Inc., certain other Sellers and IDT Winstar Acquisition, Inc.and (b) the Management Agreement described therein.  Unless otherwise defined herein, capitalized terms which are used herein shall have the meaning assigned thereto in the Purchase Agreement.

This letter shall confirm our agreement that IDT Corporation shall comply with its obligations contained in Section 3.1 of the Purchase Agreement to (a) deliver the shares of IDT Class B Stock, (b) use commercially reasonable efforts to register the shares of IDT Class B Stock as provided therein and (c) repurchase the shares of IDT Class B Stock under the circumstances and for the consideration described therein.  Furthermore, IDT Corporation shall reimburse the Buyer for any amounts withdrawn from the Account (as defined in the Management Agreement) and not utilized for the purposes described in the Management Agreement.  Sections 9.9, 9.10 and 9.15 of the Purchase Agreement are expressly adopted for purposes of this letter.

Very truly yours,

IDT Corporation

By: _____
Name: Charles HF Garner
Title: EVP, New Ventures

# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

------------------------------------------------------x
                                             :

In re:                               : Chapter 11

WINSTAR COMMUNICATIONS, INC., et al.,  : Case No.: 01-1430 (JJF)

                                     : Jointly Administered

          Debtors.                  :

                                             :

                                             :

------------------------------------------------------x

**ORDER AUTHORIZING (i) SALE OF CERTAIN OF THE DEBTORS'
ASSETS FREE AND CLEAR OF LIENS, CLAIMS ENCUMBRANCES,
AND INTERESTS, (ii) APPROVING CURE AMOUNTS WITH RESPECT
TO CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
(iii) AUTHORIZING THE DEBTORS TO ENTER INTO AND APPROVING
MANAGEMENT AGREEMENT, (iv) APPROVING REGULATORY
TRANSITION PROCESS AND (v) GRANTING RELATED RELIEF**

This matter having come before the court on (I) the motion (the "Original

Motion"; terms not otherwise defined in this Sale Order shall have the meanings ascribed to such

terms in the Original Motion) filed by Winstar Communications, Inc. and its affiliated debtors

and debtors in possession in the above-captioned cases (collectively, the "Debtors"), requesting

the entry of (A) an order pursuant to sections 363(b) and 105(a) of title 11, United States Code

(the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") (i) approving bidding procedures, including bid

protections, (ii) approving the form and manner of notice of (a) the hearing to consider granting

certain bid protections (the "Bid Procedures Hearing"), (b) the hearing on the sale of certain of

the Debtors' assets (the "Sale Hearing"), (c) proposed cure payments and (d) assumption and

assignment of executory contracts and unexpired leases, and (iii) scheduling the Sale Hearing,

                                         

and (B) an order authorizing and approving (i) the sale of certain of the Debtors' assets free and clear of liens, claims and encumbrances (the "Sale") and (ii) the assumption and assignment of certain executory contracts and unexpired leases, and (II) the supplement to the Original Motion filed with the Bankruptcy Court on December 14, 2001 (the "Motion Supplement", and together with the Original Motion, the "Motion") seeking entry of an order (i) authorizing the Debtors to enter into, and approving, a management agreement substantially in the form annexed to the Motion Supplement as Exhibit A (the "Management Agreement"), (ii) approving, and authorizing the Debtors to implement, the Debtors' proposed regulatory transition process (the "Regulatory Transition Process") and (iii) granting related relief, including an extension of the period under Bankruptcy Code section 365(d)(4) within which the Debtors may decide whether to assume or reject unexpired leases of nonresidential real property; and the Court having conducted a hearing on November 27, 2001, and having entered an order dated November 27, 2001 approving the Bidding Procedures; and an auction having been held at the offices of Shearman & Sterling, counsel to the Debtors, on December 5, 2001, in accordance with the Bidding Procedures previously approved by this Court; and following the conclusion of the Auction, the Debtors, in consultation with their financial advisors, and after consultation with counsel to each of the Creditors' Committee, the Agent for the Prepetition Lenders and the Agent for the DIP Lenders, having (i) reviewed each bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale, and (ii) identified the bid of IDT Winstar Acquisition, Inc. (the "Buyer"), as set forth in the Asset Purchase Agreement, dated as of December 18, 2001 (the "Asset Purchase Agreement") as the highest and best offer for the Purchased Assets (as defined below in Paragraph H) at the Auction (the "Successful Bid"); and a hearing on the Motion

2

having been commenced on December 10, 2001 and continued on December 17, 2001 and December 18, 2001 (the "Sale Hearing"); and all interested parties having been afforded an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered (i) the Motion, (ii) the objections thereto, if any, and (iii) the arguments of counsel made, and the evidence proffered or adduced at the Sale Hearing; and it appearing that the relief requested in the Motion and approval of the Sale of the assets to be acquired under the Asset Purchase Agreement (as defined therein, the "Purchased Assets") and the entry of an order approving the Sale (this "Sale Order") is in the best interests of the Debtors, their estates, creditors, and other parties in interest; and upon the record of the Sale Hearing, and these cases; and after due deliberation thereon; and good cause appearing therefor, it is hereby

FOUND AND DETERMINED AS FOLLOWS:[1]

A.    This Court has jurisdiction over the Motion and the transactions contemplated by the Motion pursuant to 28 U.S.C. §§157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(M).  Venue of these cases and the Motion is proper pursuant to 28 U.S.C. §§1408 and 1409.

B.    The statutory predicates for the relief sought in the Motion are sections 105, 363 and 365 of 11 U.S.C. §§101 et seq. (the "Bankruptcy Code") and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure.

C.    As evidenced by the affidavits of service previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, the Cure Notices, the Sale of the Purchased

---

[1]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed.R.Bank.P. 7052.

Assets and of the related transactions contemplated thereby (including without limitation the entry of the Debtors into the Management Agreement and the implementation of the Regulatory Transition Process) has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure; (ii) such notice was reasonable, sufficient, and appropriate under the circumstances; and (iii) no other or further notice of the Motion, the Sale Hearing, the Cure Notices, the Sale of the Purchased Assets and all the related transactions contemplated thereby (including without limitation the entry of the Debtors into the Management Agreement and the implementation of the Regulatory Transition Process) shall be required.

D.     A reasonable opportunity to object or be heard with respect to the Motion and the relief requested in the Motion has been afforded to all interested persons and entities, including (i) counsel for the Buyer, (ii) counsel for The Bank of New York, as Agent under the Pre-Petition Credit Agreement, (iii) counsel for Citibank, N.A., as agent under the DIP Credit Agreement, (iv) counsel for the Official Committee of Unsecured Creditors (the "Creditors' Committee"), (v) the Office of the United States Trustee, (vi) each party identified by the Debtors as a potential Buyer of the Purchased Assets that was contacted as part of the Sale process, (vii) all entities known to have any asserted lien, claim, encumbrance, alleged interest in or with respect to the Purchased Assets, (viii) all applicable federal, state and local taxing authorities; and (ix) all other entities that have filed requests for notices pursuant to Bankruptcy Rule 2002.

E.     The Debtors (i) have full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated by the Motion, (ii) have all of the corporate power and authority necessary to consummate the transactions contemplated by the

4

Motion and the Asset Purchase Agreement and (iii) have taken all corporate action necessary to authorize and approve the Sale and the consummation by the Debtors of the transactions contemplated thereby.

F.    The Debtors have demonstrated sound business justifications for the Sale and the other transactions and actions contemplated by the Motion pursuant to section 363(b) of the Bankruptcy Code.

G.    Each of the Sale, the Management Agreement and the Asset Purchase Agreement were negotiated, proposed and agreed to by the Debtors and the Buyer as parties thereto without collusion, in good faith, and from arm's-length bargaining positions.  The Buyer is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such is entitled to all of the protections afforded thereby.

H.    The consideration provided by the Buyer for the Purchased Assets (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Purchased Assets and (iii) will provide a greater recovery for the Debtors' creditors and other interested parties than would be provided by any other practically available alternative.

I.    The transfer of the Purchased Assets to the Buyer under the Sale and the Asset Purchase Agreement will be a legal, valid, and effective transfer of such Purchased Assets, and will, upon the occurrence of the Closing (as defined in the Asset Purchase Agreement), vest in the Buyer all right, title and interest of the Debtors in the Purchased Assets free and clear of all Encumbrances and interests other than the Permitted Encumbrances (in each case, as defined in the Asset Purchase Agreement) (collectively, the "Interests") including, but not limited to, those (i) that purport to give to any party a right or option to give any of the foregoing in the future, any sale or contingent sale or title retention agreement or lease, or termination of the Debtors' or

the Buyer's interest in the Purchased Assets, or any similar rights, and (ii) relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Debtors' businesses prior to the Closing Date (as defined in the Asset Purchase Agreement).

J.    The transfer of the Purchased Assets to the Buyer free and clear of all Interests will not result in any undue burden or prejudice to any holders of any Interests since all such Interests of any kind or nature whatsoever shall attach to the net proceeds of the Sale (the "Sale Proceeds") in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets, subject to the Carveout (as defined in the Final Order Authorizing Debtors In Possession to Enter Into Post-Petition Credit Agreement and Obtain Post-Petition Financing Pursuant to Section 363 and 364 of the Bankruptcy Code, and Providing Adequate Protection and Granting Liens, Security Interests and Superpriority Claims, dated May 14, 2001 and entered in these cases) and to any claims and defenses the Debtors or other parties may possess with respect thereto.

K.    The Buyer would not consummate the transactions contemplated by the Sale, thus adversely affecting the Debtors, their estates, and their creditors, if the Sale of the Purchased Assets to the Buyer was not free and clear of all Interests of any kind or nature whatsoever, or if the Buyer would, or in the future could, be liable for any such Interests and if the assignment of the Purchased Assets could not be made under section 363 of the Bankruptcy Code.

L.    The Debtors may sell the Purchased Assets free and clear of all Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied.  Those (i) holders of Interests and (ii) non-debtor parties who did not object, or who withdrew their objections, to the Sale, the Sale of the Purchased Assets or the Motion are deemed to have consented pursuant to Bankruptcy Code

section 363(f)(2). Those holders of Interests fall within one or more of the other subsections of Bankruptcy Code section 363(f) and are adequately protected by having their Interests, if any, attach to the proceeds of the Sale ultimately attributable to the property against or in which they claim or may claim an Interest. Notwithstanding anything contained herein or in the Asset Purchase Agreement to the contrary, the Sale of the Purchased Assets is subject to the consent of the DIP Lenders.

M.     Due to the regulated environment in which certain of the Purchased Assets are operated, the entry of this Sale Order is necessary to ensure the uninterrupted provision of services to customers of the Debtors (the "Customers") during the period in which the Buyer and the Debtors seek to comply with the applicable federal and state regulatory laws and to enter into contractual or other legal arrangements necessary for the consummation of the Sale, the transfer of the Licenses (as defined below) to the Buyer and the operation of the Purchased Assets by the Buyer (the "Compliance Items").

N.     Approval at this time of the Sale, the Asset Purchase Agreement and the Management Agreement, and all the transactions contemplated thereby and hereby (including the Regulatory Transition Process) is in the best interests of the Debtors, their creditors, their estate and other parties in interest.

NOW THEREFORE, BASED UPON THE FOREGOING FINDINGS OF FACT, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, EFFECTIVE IMMEDIATELY, THAT:

1.     The Motion is granted, as further described herein.

2.     All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits, provided, however, that nothing herein shall alter or impair the rights of any party

WP3:714361.3                                                                                          58222.1001

that has filed and served a timely objection to dispute the amount of a cure payment listed on an applicable Cure Notice, which rights are specifically reserved and which disputes shall be resolved either consensually or, as necessary, by further order of the Court.  Notwithstanding anything in the Motion, the Asset Purchase Agreement or this Sale Order to the contrary, the Debtors shall not be authorized to assume and assign any executory contract(s) between any of the Debtors and the United States General Services Administration (the "GSA") without the prior consent of a person authorized to act on behalf of the GSA to the extent such consent is required by any contract or applicable law.

3.      The Asset Purchase Agreement substantially in the form attached as Exhibit A to the Notice of Filing of Asset Purchase Agreement, dated December 18, 2001 (including all exhibits, schedules and annexes thereto), and all of the terms and conditions thereof, are hereby approved.

4.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized to consummate the Sale of the Purchased Assets, pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, to enter into the Management Agreement and to implement the Regulatory Transition Process.

5.      The Debtors are authorized to execute and deliver, and are empowered to perform under, consummate and implement, the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement (including the Management Agreement), and to take all further actions as may be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer or reducing to possession, the Purchased Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by

the Asset Purchase Agreement, including without limitation the implementation of the Regulatory Transition Process. Notwithstanding anything in the Motion, the Asset Purchase Agreement or this Sale Order to the contrary, the Buyer assumes no employee liabilities that arose prior to the Closing Date, including any accrued but unbilled liabilities.

6.    The transfer of the Purchased Assets to the Buyer pursuant to, and subject to the terms of, the Asset Purchase Agreement shall constitute a legal, valid and effective transfer of the Purchased Assets, and shall, upon the occurrence of the Closing, vest in the Buyer all right, title and interest of the Debtors in and to the Purchased Assets to be acquired by such Buyer free and clear of all Interests of any kind or nature whatsoever, with all such Interests to attach to the Sale Proceeds in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets, subject to the Carveout and to any claims and defenses the Debtors or other parties may possess with respect thereto.

7.    In consideration for the Purchased Assets, and subject to the terms and conditions of the Asset Purchase Agreement, the Buyer shall assume the Assumed Liabilities (as defined therein) and, on the Closing Date, shall irrevocably (i) pay, at the Debtors' election, exercised prior to the Closing Date, (x) an amount in cash equal to $38,000,000 (the "Cash Payment") or (y) an amount in cash equal to $30,000,000 and cause to be issued to the Debtors a number of shares of Class B common stock of IDT Corporation, having a value equal to $12,500,000 based on the average closing price of such stock during the seven trading day period ended December 14, 2001 (the "IDT Shares", and together with the $30,000,000, the "Cash/Stock Payment"), and (ii) issue to the Debtors such number of shares of common stock of the Buyer, representing 5% of the outstanding shares of Buyer Common Stock as of the date hereof, all in accordance with the terms and conditions of the Asset Purchase Agreement.

9

Pursuant to the Escrow Agreement (as defined in the Asset Purchase Agreement), which is hereby approved, on or before the date of this Sale Order, the Buyer shall deliver or shall have delivered the Cash Payment to the Escrow Agent (as defined in the Asset Purchase Agreement) to be held in escrow pending Closing.  On the Closing Date, the Debtors and the Buyer shall instruct the Escrow Agent to promptly release the Escrow Amount (as defined in the Asset Purchase Agreement) to an account or accounts designated by the Debtors, on behalf of the Debtors in accordance with the terms of the Escrow Agreement.  Such account shall be an interest-bearing account in the name of one or more of the Debtors established at Citibank, N.A. for the purpose of receiving such funds (the "Proceeds Account").  The Sale Proceeds shall be maintained in the Proceeds Account and shall not be distributed to any party in interest, including professionals and secured parties, pending further order of the Court following notice and a hearing.  Accrued interest on such funds shall constitute part of the Sale Proceeds available for distribution.  The Buyer shall have no claim whatsoever to or against any of the funds in the Proceeds Account or to the IDT Shares or the Buyer Common Stock subsequent to the Closing. Any allocation of the Purchase Price agreed to by the Debtors and the Buyer shall not be binding on any other party.

       8.     On the Closing Date, the Buyer and the Debtors shall enter into the Management Agreement, and the Buyer shall deposit into an account at Citibank, N.A. (the "Operating Account") an amount in cash equal to $60 million in immediately available funds, to be used from and after the Closing Date through and including the Cutoff Date (as defined in the Management Agreement) exclusively to pay all costs set forth in subsection 3.1(a) of the Management Agreement.  In the event that the Buyer shall fail to pay, as and when due, any such costs and the Debtors shall be held liable therefore, the Buyer hereby agrees to indemnify the

Debtors for all such costs. In the event that any funds shall be on deposit in the Account (as defined in the Management Agreement) after the Cutoff Date, and all accrued and unpaid costs required to be paid in accordance with the Management Agreement shall have been paid, any balance may, upon five (5) days' written notice to the Debtors, the Agent for the Postpetition Lenders and such telecommunications service providers that shall send written request to the Buyer requesting such notice and the Buyer shall provide such notice to each party to the extent such party shall continue to provide services to the Debtors or the Buyer, be withdrawn by the Buyer.

9.      Except as expressly permitted or otherwise specifically provided for in the Asset Purchase Agreement or this Sale Order, effective upon the occurrence of the Closing, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and other regulatory authorities, lenders, trade and other creditors holding Interests (including but not limited to any claims under any applicable revenue, pension, ERISA, tax, labor, environmental or natural resource law, rule or regulation, or any products liability law) of any kind or nature whatsoever against or in the Debtors or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors' businesses prior to the Closing Date of the Sale of the Purchased Assets, or the transfer of such Purchased Assets to the Buyer, hereby are forever barred, estopped, and permanently enjoined from asserting against the Buyer, its successors or assigns (to the extent allowed by law), its property, its officers, directors and shareholders or the Purchased Assets, such persons' or entities' Interests. Notwithstanding anything herein to the contrary, nothing

11

herein shall in any way affect or diminish any rights of the Debtors or any successor thereto (including any chapter 11 or chapter 7 trustee) with respect to obligations of the Buyer arising under the Asset Purchase Agreement, the Management Agreement or this Sale Order. This Sale Order shall be binding on the Debtors and the Debtors' estates, including, following any conversion of these cases, any successor chapter 7 estates, and any chapter 7 trustees appointed in these cases.

10.    The consideration provided by the Buyer for the Purchased Assets under the Asset Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

11.    Notwithstanding any provision to the contrary in this Sale Order, the Motion or the Asset Purchase Agreement, certain prototype laboratory equipment (as listed on Exhibit A hereto, the "Lab Equipment") and certain disbursement and investment accounts established in connection with the Lucent Credit Agreement (as listed on Exhibit B hereto, the "Accounts") shall be segregated from the Debtors' other assets, shall not constitute part of the Purchased Assets and shall not be included in the Sale. Nothing in this Sale Order, the Motion or the Asset Purchase Agreement shall impair or affect the rights and interests of Lucent in the Lab Equipment and the Accounts. The Buyer hereby reserves the right, subject to notice and a hearing, to seek to characterize the Lab Equipment as owned by the Debtors, and to the extent an Order so providing is entered by the court, the Lab Equipment shall constitute Purchased Assets.

12.    This Sale Order (a) shall be effective as a determination that, on the Closing Date, and subject to the occurrence of the Closing, all Interests of any kind or nature whatsoever existing prior to the Closing as to the Purchased Assets transferred pursuant to the

Asset Purchase Agreement (including but not limited to any claims under any applicable revenue, pension, ERISA, tax, labor, environmental or natural resource law, rule or regulation, or any products liability law) have been unconditionally released and terminated as to such Purchased Assets, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the act of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

13.    Each and every federal, state and local governmental agency, department or unit is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement, except the FCC as regards its approval of the transfer of the Licenses.

14.    Except as expressly permitted or otherwise specifically provided for in the Asset Purchase Agreement or this Sale Order in respect of the Asset Purchase Agreement or the Purchased Assets to be transferred pursuant to such Asset Purchase Agreement, the Buyer shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to such Purchased Assets and, to the extent allowed by law, the Buyer (and its officers, managers and members) shall not be liable for any other claims against the Debtors or any of their predecessors or affiliates, and the Buyer shall have no successor or vicarious liabilities of any kind or character whether known or unknown as of the Closing Date under the Asset

13

Purchase Agreement, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, other than the Permitted Encumbrances, arising prior to the Closing Date under the Asset Purchase Agreement, including, but not limited to, any liabilities under any revenue, pension, ERISA, tax, labor, environmental or natural resource law, rule or regulation, or any products liability law, arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' businesses prior to the Closing Date. After the Closing and the payment of the Purchase Price, the Buyer shall have no liability to the Debtors or their estates for any diminution in value or other damage of any kind whatsoever to the Regulated Assets or the Licenses that may result from the Buyer's operation of the Debtors' business.

15.    This Court retains and shall have exclusive jurisdiction to endorse and implement the terms and provisions of the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith (including the Management Agreement) in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Buyer, (b) compel delivery of the purchase price or performance of other obligations owed to the Debtors, (c) resolve any disputes arising under or related to the Asset Purchase Agreement, and (d) interpret, implement, and enforce the provisions of the Asset Purchase Agreement and this Sale Order.

16.    The transactions contemplated by the Asset Purchase Agreement are undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale of any Purchased Assets shall not affect the validity of the Sale of such Purchased Assets to the Buyer, unless such authorization is duly stayed pending such

14

appeal prior to the Closing with respect to such Purchased Assets. The Buyer is a purchaser in good faith of the Purchased Assets, and the Buyer is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

17. The terms and provisions of the Asset Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors, the Buyer and their respective affiliates, successors and assigns and any affected third parties (including, but not limited to, all persons asserting Interests in the Purchased Assets to be sold to the Buyer pursuant to the Asset Purchase Agreement), notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

18. The failure specifically to include any particular provisions of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety. To the extent that any provision of this Sale Order is inconsistent with the Asset Purchase Agreement or the Management Agreement, the terms of this Sale Order shall control.

19. The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates and is, if occurring prior to the Closing Date, approved by counsel for each of the Creditors' Committee, the agent for the lenders under the Pre-Petition Credit Agreement, and the agent for the lenders under the DIP Credit Agreement. The Debtors shall also notify counsel for Lucent of any

modification, amendment or supplement to the Asset Purchase Agreement and, if such modification, amendment or supplement impairs or adversely affects Lucent's rights as a secured creditor in these chapter 11 cases, shall obtain Lucent's prior consent thereto.

20.    The transfer of the Purchased Assets pursuant to the Asset Purchase Agreement, and the transactions contemplated thereby constitute steps toward the formulation, or in anticipation of the formulation of, a chapter 11 plan for the Debtors and as such, in accordance with section 1146(c) of the Bankruptcy Code, the making or delivery of any instrument of transfer to effectuate the Asset Purchase Agreement and the transactions contemplated thereby shall not be taxed under any law imposing a stamp tax or a sale, transfer or any other similar tax, and the recordation of any instruments (including bills of sale, leases, assignments and amendments thereto) to evidence the Sale of the Purchased Assets shall not be subject to any such tax.

21.    All of the Debtors' interests in the Purchased Assets to be acquired by the Buyer under the Asset Purchase Agreement shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Buyer.  Upon the occurrence of the Closing, this Sale Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Purchased Assets acquired by the Buyer under the Asset Purchase Agreement and/or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in the Purchased Assets acquired by the Buyer under the Asset Purchase Agreement to the Buyer.

22.    As of the Closing Date, the Buyer shall be hereby granted immediate and unfettered access to the Purchased Assets (other than the Licenses) acquired by the Buyer.

<u>Regulatory Transition Process</u>

16

23.    The Debtors and the Buyer shall have a period (the "Regulatory Compliance Period") of one hundred-twenty (120) days (subject to extension) from the Closing Date to obtain the requisite federal and state regulatory approvals necessary to operate the Business and to enter into contractual or other legal arrangements necessary for the consummation of the Sale, transfer of the Licenses and the Regulated Assets (as defined below) to the Buyer and the operation of the Purchased Assets by the Buyer (the "Compliance Items"). In order to ensure the uninterrupted provision of services to the Customers during the Regulatory Compliance Period, and the orderly transfer of the Licenses and, to the extent required by any other applicable law, any other assets subject to similar transfer restrictions (the "Regulated Assets") to the Buyer, the Buyer, the Debtors and all providers of goods and services to the Debtors, including but not limited to the common carrier service providers that provide services to the Debtors and any landlords of properties used by the Debtors (the "Service Providers") are hereby authorized and directed as follows:

a.    As soon as practicable following the entry of this Sale Order, the Debtors and the Buyer are directed to file such applications as are required to seek the federal and state regulatory authority necessary for the Debtors to assign, and the Buyer to acquire, own and operate, the Licenses and the Regulated Assets.

b.    On the Closing Date, the Buyer and the Debtors are directed to enter into a Management Agreement substantially in the form appended as Exhibit E to the Asset Purchase Agreement, pursuant to which the Buyer shall be entitled to manage and operate the business of the Debtors during the Regulatory Compliance Period on the terms and conditions set forth therein.

c.    From the Closing Date to the Cutoff Date, all agreements and other arrangements with Service Providers relating to the Debtors providing service to Customers shall, subject to compliance with paragraph (d) below, remain in effect and

17

may not be canceled or terminated, and absent an event of default occurring after the Closing Date in respect of facts arising after the Closing Date that has not been cured within three (3) business days after written notice (by email and facsimile) thereof has been received by the Buyer (Attention: Chief Financial Officer, email: steveb@corp.idt.net, facsimile: 973-438-1414, and McDermott, Will & Emery, Attention: David C. Albalah, Esq., email: dalbalah@mwe.com, facsimile: 212-574-5444), no Service Provider shall reduce or otherwise alter in any adverse manner its performance under any such agreement(s) or arrangement(s) until the Cutoff Date.

d.    The Buyer shall be responsible for, and is directed to pay on a timely basis, all charges incurred for services used by the Debtors to provide services to the Customers from the Closing Date to the Cutoff Date, including all charges incurred with respect to Service Providers.  The rates charged by Service Providers for such services shall not exceed the rates for those services in effect as of the date of this Sale Order. Neither the Debtors or Buyer shall have any obligation or liability for services not actually being utilized and each Service Provider shall, upon written notice from the Debtors and the Buyer, immediately and without charge or further liability of any kind discontinue and disconnect any such services provided to the Debtors and/or the Buyer.

e.    The Buyer is further authorized to promptly establish such contractual or other legal arrangements as the Buyer and the Debtors deem necessary to operate the Debtors' assets and to provide service to Customers (including interconnection and other common carrier service agreements with Service Providers) and that will permit Buyer to provide service to Customers in a manner similar to the manner in which the Debtors provided such service prior to the date of this Sale Order and that will enable the Customers to continue to receive service in an uninterrupted and transparent manner.

f.    During the 120-day period commencing on the Closing Date, in the event that any contract with any Service Provider that is a telecommunications carrier shall be rejected:  (i) no termination liabilities shall arise; (ii) such telecommunications carrier

18

shall provide telecommunications services in accordance with, and to the extent required by, applicable law in a non-discriminatory manner; and (iii) such telecommunications carrier will charge the Buyer for replacement circuits the lower of actual costs and tariff rates to set up or establish such replacement circuits.

24.     The Buyer is hereby directed to pay all costs of the ongoing operations of the Business in accordance with the Management Agreement. The Buyer shall have the ability during the Regulatory Compliance Period to direct the Debtors to seek the entry of one or more orders of the Court authorizing the Debtors to assume and assign to the Buyer any executory contract or unexpired lease to which the Debtors are a party, provided that the Buyer shall be solely responsible for paying any cure payment that is payable in connection with any such assumption and assignment. The Buyer shall have the ability during the Regulatory Compliance Period to direct the Debtors to reject any executory contract or unexpired lease to which the Debtors are a party provided that the Buyer must elect whether to assume and assign or reject any contracts with the GSA and must provide written notice of such election to the GSA on or before January 2, 2002. The Debtors may effect any such rejection by delivery of two (2) business days prior written notice (and the irrevocable waiver of the right to withdraw such notice) to the non-Debtor party to any such executory contract or unexpired lease of the Debtors' unequivocal intent to reject such executory contract or unexpired lease. In the event that the Buyer elects to reject any contract on account of which a prepayment has been made pursuant to Section 3.1(a) of the Management Agreement, the counterparty to such contract shall be obligated to refund promptly to the Buyer (without setoff or counterclaim) the unused portion of such prepayment and in the event of any dispute with respect thereto, the Buyer reserves the right to seek adjudication in the Bankruptcy Court. In the event that the Buyer elects rejection of

some or all of Debtors' contracts with the GSA, the Buyer agrees that it will continue to provide telecommunications services to GSA until GSA has received sixty (60) days' notice of discontinuance, or such longer period as the FCC requires. In all other respects, the Buyer shall manage the operations of the Business and shall be responsible for such operation pursuant to the terms and subject to the conditions of the Asset Purchase Agreement and the Management Agreement. The period within which the Debtors may elect to assume or reject unexpired leases of nonresidential real property under Bankruptcy Code section 365(d)(4) is hereby extended through the duration of the Term.

25.    Upon receipt of the required regulatory approvals and establishment of the necessary service agreements and arrangements, the Debtors are authorized to convey the Licenses and the Regulated Assets to the Buyer, in accordance with the terms and conditions of the Asset Purchase Agreement and the Management Agreement.

26.    As provided by Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure, the effectiveness of this Sale Order shall not be stayed for 10 days after entry on the docket and shall be effective and enforceable immediately upon such entry. The Buyer and the Debtors shall consummate the Sale as promptly as is practicable following Court approval of this Sale Order, so long as no stay of this Sale Order has been entered and is continuing.

Dated: Wilmington, Delaware
       December 19, 2001

                                    _____
                                    HONORABLE JOSEPH J. FARNAN, JR.
                                    UNITED STATES DISTRICT JUDGE

20

WP3:714361.3                                                              58222.1001

## EXHIBIT A

### Description of Lab Equipment

The following equipment currently is located at the Winstar lab facility, 2545 Horse Pen Road, Herdon, Virginia (the "Winstar Lab").

1.    Metropolis "evaluation" configuration description --

    a.    Metropolis 4500 System consisting of 1 Large Service Shelf, a High Speed optical Shelf and associated circuit packs;
    b.    Metropolis 2500 system consisting of a Large Service Shelf and associated circuit packs;
    c.    Metropolis 2000 system consisting of a Service Shelf and associated circuit packs.

The systems are installed in two seven foot equipment racks in the Winstar Lab.

2.    AnyMedia "evaluation" configuration description --

    a.    AnyMedia Access Unit consisting of common circuit packs & associated interface circuit packs;

    b.    Breakdown for AnyMedia:

        FAC 100 S1:1 SL1EJDCAA
        FAC 100 S1:1 SLC1EJDCAA
        COM100 S2:2 SLC1CGLCAA
        COM100 S2:3 SLC1CGLCA8
        DTP100 S1:1 SLC1DH0CAA
        DTP101 S1:2 SLC1DHKCAB
        LPA380 S3:3 E51SFBAAAA
        LPA300 S1:1 SLCUVR0BAA
        LPA380 S3:3 E51SFBAAAA
        LPU 116 S2:3 SN980CD953522L 107743536002 ESPQAYKAA
        Two tip ring cables - new
        Two T-1 Cables pieced together from parts
        Power cables

The trial configuration is a shelf mounted within a single seven foot equipment rack.

**EXHIBIT B**

**Description of Accounts**

| Account | Account Number |
|---|---|
| Fleet Bank Investment Account | 9427772529 |
| Fleet Bank Investment Account | 9428385707 |
| State Street Investment Account | 3274457 |
| State Street Investment Account | 3324773 |
| Fleet Bank Disbursement Account | 9427772510 |
| Fleet Bank Disbursement Account | 9428385694 |

# EXHIBIT C

**LEAD, MEGA, APPEAL, CONVERTED, CLMSAGNT, Sealed Doc(s)**

**U.S. Bankruptcy Court**
**District of Delaware (Delaware)**
**Bankruptcy Petition #: 01-01430-KJC**

*Assigned to:* Kevin J. Carey                                  *Date Filed:* 04/18/2001
Chapter 7                                                      *Date Converted:* 01/24/2002
Previous chapter 11
Voluntary
Asset

| | |
|---|---|
| *Debtor*<br>**WINSTAR COMMUNICATIONS, INC.**<br>685 Third Avenue<br>New York, NY 10017<br>SSN:<br>Tax id: 13-3585278 | represented by **Brendan Linehan Shannon**<br>Young, Conaway, Stargatt & Taylor<br>The Brandywine Bldg.<br>1000 West Street, 17th Floor<br>PO Box 391<br>Wilmington, DE 19899-0391<br>usa<br>302 571-6600<br>Fax : 302-571-1253<br>Email: bankruptcy@ycst.com<br>*TERMINATED: 10/18/2006*<br><br>**Christopher A. Ward**<br>The Bayard Firm<br>500 Delaware Avenue<br>8th Floor<br>Wilmington, DE 19801<br>usa<br>302-655-5000<br>Fax : 302-658-6395<br>Email: bankserve@bayardfirm.com<br><br>**David C. Albalah**<br>Bracewell & Giuliani LLP<br>1177 Avenue of Americas<br>New York, NY 10036<br>212-508-6100<br>Fax : 212-508-6101<br>Email:<br>david.albalah@bracewellgiuliani.com<br><br>**Edward J. Kosmowski**<br>Young, Conaway, Stargatt & Taylor<br>1000 West Street, 17th Floor<br>PO Box 391<br>Wilmington, DE 19899<br>usa |

302 571-6600
Fax : 302-571-1253
Email: bankruptcy@ycst.com

**Edwin J. Harron**
Young, Conaway, Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
PO Box 391
Wilmington, DE 19899-0391
usa
302 571-6600
Fax : 302-571-1253
Email: bankruptcy@ycst.com

**M. Blake Cleary**
Young, Conaway, Stargatt & Taylor
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE 19899-0391
usa
302-571-6600
Fax : 302-571-1253
Email: bankruptcy@ycst.com

**Michael R. Lastowski**
Duane Morris LLP
1100 North Market Street
Suite 1200
Wilmington, DE 19801-1246
302-657-4900
Fax : 302-657-4901
Email:
mlastowski@duanemorris.com

**Michael G. Menkowitz**
Fox, Rothschild, O'Brien & Frankel
2000 Market Street
10th Floor
Philadelphia, PA 19103
usa
215-299-2756
Fax : 215-299-2150
Email: mmenkowitz@frof.com

**Pauline K. Morgan**
Young, Conaway, Stargatt & Taylor
1000 West Street, 17th Floor,
PO Box 391
Wilmington, DE 19899-0391
usa

302 571-6600
Fax : 302-571-1253
Email: bankruptcy@ycst.com

**Sheldon K. Rennie**
Fox Rothschild LLP
919 market Street
Suite 1300
Wilmington, DE 19801
302-654-7444
Fax : 302-656-8920
Email: bankruptcy@frof.com

**William K. Harrington**
Duane Morris, LLP
1100 North Market Street
Suite 1200
Wilmington, DE 19801
302-657-4900
Fax : 302-657-4901

*Trustee*                                    represented by **Francis G. X. Pileggi**
**Christine Shubert**                                    Fox Rothschild LLP
Fox Rothschild LLP                                    919 N. Market Street
919 N. Market Street                                    Suite 1300
Suite 1300                                    Wilmington, DE 19801
P.O. Box 2323                                    usa
Wilmington, DE 19899-2323                                    302-654-7444
856-983-7735                                    Fax : 302-656-8920
                                    Email: fpileggi@foxrothschild.com
                                    *TERMINATED: 12/03/2004*

                                    **James F. Bailey, Jr**
                                    James F. Bailey & Associates, P.A.
                                    Suite 306A
                                    3 Mill Road
                                    Wilmington, DE 19806
                                    302-658-5686
                                    Fax : 302-658-8051
                                    *TERMINATED: 10/26/2006*

                                    **Jonathan M. Stemerman**
                                    Cozen O'Connor
                                    1900 Market Street
                                    Philadelphia, PA 19103
                                    215-665-2142
                                    Fax : 215-701-2241
                                    Email: jstemerman@cozen.com

                                    **L. Jason Cornell**
                                    Fox Rothschild LLP

919 N. Market Street, Suite 1300
P.O. Box 2323
Wilmington, DE 19899-2323
302-654-7444
Fax : 302-656-8920
Email: jcornell@frof.com

**Magdalena Schardt**
Fox Rothschild O'Brien & Frankel
LL
2000 Market Street
10th Floor
Philadelphia, PA 19103
usa
215-299-2009
Fax : 215-299-2150
Email: mschardt@frof.com

**Michael G. Menkowitz**
(See above for address)

**Raymond Howard Lemisch**
Benesch Friedlander Coplan &
Aronoff, LL
222 Delaware Avenue
Suite 801
Wilmington, DE 19801
302.442.7010
Fax : 302.442.7012
Email: rlemisch@bfca.com

**Raymond Howard Lemisch**
Adelman Lavine Gold and Levin, PC
919 N. Market Street, Suite 710
Wilmington, DE 19801
302-654-8200
Fax : 302-654-8217
Email: rlemisch@adelmanlaw.com

**Sheldon K. Rennie**
Fox Rothschild LLP
919 N. Market Street
Suite 1300
Wilmington, DE 19801
302-654-7444
Fax : 302-656-8920
Email: srennie@foxrothschild.com

**Sheldon K. Rennie**
Fox Rothschild
919 North Market Street

Suite 1300
Wilmington, DE 19801
302-654-7444
Fax : 302-656-8920
Email: bankruptcy@frof.com

**Sheldon K. Rennie**
(See above for address)

*Trustee*                                     represented by **Daniel K. Astin**
**Christine C. Shubert, as Chapter 7 Trustee**               Fox Rothschild LLP
                                              919 N. Market Street
                                              Suite 1300
                                              P.O. Box 2323
                                              Wilmington, DE 19899
                                              302-622-4212
                                              Fax : 302-658-6395
                                              Email: dastin@foxrothschild.com

                                              **Magdalena Schardt**
                                              (See above for address)

                                              **Raymond Howard Lemisch**
                                              (See above for address)

                                              **Sheldon K. Rennie**
                                              (See above for address)

                                              **Sheldon K. Rennie**
                                              (See above for address)

*U.S. Trustee*
**U.S. TRUSTEE**
Office of the U.S. Trustee
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801
302-573-6491

*Creditor Committee*                          represented by **Christopher A. Ward**
**Former Counsel to the Official Committee of**               The Bayard Firm
**Unsecured Creditors**                       222 Delaware Avenue
                                              Suite 900
                                              Wilmington, DE 19899
                                              usa
                                              302-655-5000
                                              Fax : 302-658-6395
                                              Email: bankserve@bayardfirm.com

| 04/17/2007 | 4739 | Certificate of No Objection *to the Motion of the Law Offices of Andrew Sklar, P.C. Special Counsel to the Trustee, for Allowance and Payment of Fourth Interim Compensation* (related document(s)4738 ) Filed by Christine C. Shubert, as Chapter 7 Trustee. (Rennie, Sheldon) (Entered: 04/17/2007) |
|---|---|---|
| 04/17/2007 | 4740 | Notice of Agenda of Matters Scheduled for Hearing Filed by Christine C. Shubert, as Chapter 7 Trustee. Hearing scheduled for 4/24/2007 at 11:00 AM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #5, Wilmington, Delaware. (Attachments: # 1 Certificate of Service) (Rennie, Sheldon) (Entered: 04/17/2007) |
| 04/18/2007 | 4741 | Motion to Authorize *Herrick, Feinstein LLP and Impala Partners, LLC to enter into Agreement* Filed by Herrick, Feinstein LLP. Hearing scheduled for 5/16/2007 at 02:00 PM at US District Court, 844 King St., Courtroom #5, Wilmington, Delaware. Objections due by 5/11/2007. (Attachments: # 1 Notice of Motion# 2 Proposed Form of Order # 3 Certificate of Service) (August, John) (Entered: 04/18/2007) |
| 04/20/2007 | 4742 | Notice To Substitute Attorney */Notice of Association of Counsel* Filed by Terry Roberts. (Roberts, Terri) (Entered: 04/20/2007) |
| 04/24/2007 | 4743 | Order Allowing Fourth Interim Compensation to the Law Offices of Andrew Sklar, P.C. Special Counsel to the Trustee. (related document (s)4738 ) Order Signed on 4/23/2007. (LCN, ) (Entered: 04/24/2007) |
| 04/24/2007 | 4744 | Affidavit *(Supplemental) of Sheldon L. Solow on behalf of Kaye Scholer LLP as Attorneys for the Chapter 7 Trustee Pursuant to Fed. R. Bankr. P. 2014* (related document(s)2016, 2472 ) Filed by Christine C. Shubert, as Chapter 7 Trustee. (Attachments: # 1 Certificate of Service) (Schardt, Magdalena) (Entered: 04/24/2007) |
| 05/11/2007 | 4745 | Objection to *Motion of Herrick, Feinstein LLP and Impala Partners, LLC for Authority to Enter Into Agreement to Share Their Professional Fees* (related document(s)4741 ) Filed by U.S. TRUSTEE (Attachments: # 1 Certificate of Service) (Kenney, Mark) (Entered: 05/11/2007) |
| 05/14/2007 | 4746 | Notice of Agenda of Matters Scheduled for Hearing Filed by Christine C. Shubert. Hearing scheduled for 5/16/2007 at 02:00 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #5, Wilmington, Delaware. (Attachments: # 1 Certificate of Service) (Rennie, Sheldon) (Entered: 05/14/2007) |
| 05/14/2007 | 4747 | Amended Notice of Agenda of Matters Scheduled for Hearing *(adjourned to 6/5/07 at 10:00 a.m.)* (related document(s)4746 ) Filed by Christine C. Shubert, as Chapter 7 Trustee. Hearing scheduled for |

| | | |
|---|---|---|
| | | 5/16/2007 at 02:00 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #5, Wilmington, Delaware. (Attachments: # 1 Certificate of Service) (Rennie, Sheldon) (Entered: 05/14/2007) |
| 05/15/2007 | 4748 | Motion to Approve Compromise under Rule 9019 *by and between the Chapter 7 Trustee and Wellspring Media, Inc. f/k/a Regulus International Capital Co., Inc., a Delaware corporation* Filed by Christine C. Shubert, as Chapter 7 Trustee. Hearing scheduled for 6/19/2007 at 01:30 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #5, Wilmington, Delaware. Objections due by 6/8/2007. (Attachments: # 1 Notice # 2 Proposed Form of Order # 3 Exhibit A to Order# 4 Certificate of Service) (Rennie, Sheldon) (Entered: 05/15/2007) |
| 05/23/2007 | 4749 | Motion to Approve Compromise under Rule 9019 *by and between Chapter 7 Trustee and Citicorp a/k/a Citicorp Industrial Credit, Inc.* Filed by Christine C. Shubert, as Chapter 7 Trustee. Hearing scheduled for 6/19/2007 at 01:30 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #5, Wilmington, Delaware. Objections due by 6/8/2007. (Attachments: # 1 Notice # 2 Proposed Form of Order # 3 Exhibit A to Order# 4 Certificate of Service) (Rennie, Sheldon) (Entered: 05/23/2007) |
| 05/25/2007 | 4750 | Notice of Address Change Filed by PA Department of Labor & Industry. (ALC, ) (Entered: 05/25/2007) |
| 05/31/2007 | 4751 | Reply *to the United States Trustee's Objection to Herrick and Impala's Motion to Enter into a Hedging Transaction* (related document(s)4741 ) Filed by Herrick, Feinstein LLP (Attachments: # 1 Certificate of Service) (August, John) (Entered: 05/31/2007) |
| 06/01/2007 | 4752 | Notice of Agenda of Matters Scheduled for Hearing Filed by Christine C. Shubert, as Chapter 7 Trustee. Hearing scheduled for 6/5/2007 at 10:00 AM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #5, Wilmington, Delaware. (Attachments: # 1 Certificate of Service) (Rennie, Sheldon) (Entered: 06/01/2007) |
| 06/05/2007 | 4753 | **Minutes of Hearing held on: 06/05/2007** **Subject:** Motion to Enter Into Agreement to Assign a Portion of Contingency Fee. (vCal Hearing ID (44394)). (related document(s) 4752) (NJH, ) Additional attachment(s) added on 6/7/2007 (LCN, ). (Entered: 06/06/2007) |
| 06/08/2007 | 4754 | Affidavit */Counsel's Supplemental Affidavit Pursuant to Fed R Bankr P 2014* (related document(s)4521, 3222, 2921 ) Filed by Herrick, Feinstein LLP. (August, John) (Entered: 06/08/2007) |
| | | |

| 06/13/2007 | 4755 | Certificate of No Objection *to the Motion of Chapter 7 Trustee for an Order Approving Settlement Agreement by and between Christine C. Shubert, Chapter 7 Trustee, and Wellspring Media, Inc. f/k/a Regulus International Capital Co., Inc., a Delaware Corporation, Pursuant to Fed. R. Bankr. P. 9019* (related document(s)4748 ) Filed by Christine C. Shubert, as Chapter 7 Trustee. (Rennie, Sheldon) (Entered: 06/13/2007) |
| --- | --- | --- |
| 06/13/2007 | 4756 | Certificate of No Objection *to the Motion of Chapter 7 Trustee for an Order Approving Settlement Agreement by and between Christine C. Shubert, Chapter 7 Trustee, and Citicorp a/k/a Citicorp Industrial Credit, Inc., Pursuant to Fed. R. Bankr. P. 9019* (related document(s) 4749 ) Filed by Christine C. Shubert, as Chapter 7 Trustee. (Rennie, Sheldon) (Entered: 06/13/2007) |
| 06/13/2007 | 4757 | Notice of Agenda of Matters Scheduled for Hearing Filed by Christine Shubert. Hearing scheduled for 6/19/2007 at 01:30 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #5, Wilmington, Delaware. (Attachments: # 1 Certificate of Service) (Rennie, Sheldon) (Entered: 06/13/2007) |

# EXHIBIT D



# MEMORANDUM

**TO:**        Distribution

**FROM:**    Michelle Gaynor

**RE:**        Winstar Communications, Inc.
              Winstar Wireless, Inc.

**DATE:**    August 3, 2001

The attached Engagement Letter is for your file.

<u>Distribution</u>
J.  Abrams
D.  Casanova
Central Files
Fireproof Vault (Original)
R.  Gentile
J.  Page
C.  Riker

**MEMO**

To: From: *7/30*

Dennis Walsh
MAP

| | |
|---|---|
| **To:** | Michael A. Puglisi |
| **From:** | Geraldine Bolger |
| **Subject:** | Agreement Letter |
| **Date:** | July 30, 2001 |

---------------------------------------------------------------

Attached is the revised signed original agreement letter with Winstar.

Att.



The Blackstone Group

Arthur Newman
Senior Managing Director

July 26, 2001

Mr. Timothy R. Graham
Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.

685 Third Avenue
Suite 3100
New York, NY 10017

Dear Tim:

This letter agreement (this "Agreement") amends and supercedes our letter agreement dated April 16, 2001 (the "April 16 Agreement") and confirms the understanding and the agreement between The Blackstone Group L.P. ("Blackstone") and Winstar Communications, Inc., Winstar Wireless, Inc. and their affiliates that are debtors in possession in the pending chapter 11 bankruptcy cases (collectively, "Winstar" or the "Company") regarding the retention of Blackstone by Winstar as its financial advisor for the purposes set forth herein. This agreement together with the attached indemnification agreement is effective nunc pro tunc April 18, 2001 ("Effective Date").

Since April 6, 2001, Blackstone has acted as financial advisor to Winstar in connection with its reorganization under chapter 11 of Title 11, United States Code (the "Bankruptcy Code"). Effective as of July 6, 2001, the Company has requested Blackstone to serve as its exclusive M&A advisor to provide the financial advisory services described herein and has indicated it no longer requires the broader financial advisory services provided prior thereto. Under this Agreement, Blackstone will provide financial advisory services to Winstar in connection with (i) a sale of the Company, (ii) the sale of all or substantially all of the assets of the Company, (iii) an investment by a third party under a plan of reorganization, and/or (iv) a merger, acquisition or other similar transaction by the Company, in one or a series of transactions (each such transaction listed in (i) through (iv), a "Transaction").

The financial advisory services to be rendered by Blackstone include, without limitation, the following:

The Blackstone Group L.P.
345 Park Avenue
New York, NY 10154
Tel 212 583 5372
Fax 212 583 5707

Blackstone Financial Services®

Mr. Timothy R. Graham, Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.
July 26, 2001
Page 2

(a)     Assisting in the development of financial data and presentations to the Company's Board of Directors, various creditors and other third parties regarding a Transaction;

(b)     Assisting the Company in preparing marketing materials in conjunction with a possible Transaction;

(c)     Assisting the Company in identifying potential buyers or parties in interest to a Transaction and assist in the due diligence process;

(d)     Assisting and advising the Company concerning the terms, conditions and impact of any proposed Transaction;

(e)     Negotiating a Transaction with potential buyers; and

(f)     Providing expert testimony with respect to any Transaction and bidding procedures therefor.

Notwithstanding anything contained in this Agreement or the April 16 Agreement to the contrary, Blackstone shall have no responsibility for designing or implementing any initiatives to improve the Company's operations, profitability, cash management or liquidity. Blackstone makes no representations or warranties about the Company's ability to (i) successfully improve its operations, (ii) maintain or secure sufficient liquidity to operate its business, or (iii) successfully complete a Transaction or consummate a reorganization. Blackstone is retained under this Agreement solely to provide advice regarding a Transaction and shall have no duties, responsibilities or obligations in respect of "crisis management."

The Company agrees to pay the following fees to Blackstone for its financial advisory services:

(i)     a monthly advisory fee in the amount of $200,000 for each of the two months during the period from May 6, 2001 through July 5, 2001 for services rendered in accordance with the April 16 Agreement. Blackstone has received $200,000 from the Company with respect to financial advisory services rendered for the month commencing April 6, 2001;

(ii)     a monthly advisory fee in the amount of $100,000 for the period commencing July 6, 2001 for services rendered in connection with a Transaction (the "Monthly Fee"), with the first such Monthly Fee due on July 6, 2001, and additional installments of the Monthly Fee payable in advance on each monthly anniversary of such date prior to the termination of this Agreement;

Mr. Timothy R. Graham, Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.
July 26, 2001
Page 3

(iii) upon the consummation of a Transaction, a Transaction fee ("Transaction Fee") payable in cash equal to 1% of the first $200,000,000 of Consideration (as defined below) plus 1.25% of Consideration above $200,000,000.

In this Agreement, Consideration means the gross value of all cash, securities and other properties paid or payable, directly or indirectly, in one transaction or in a series or combination of transactions, in connection with the Transaction or a transaction related thereto (including, without limitation, amounts paid (A) pursuant to covenants not to compete, employment contracts, employee benefit plans or other similar arrangements and (B) to holders of any warrants, stock purchase rights, convertible securities or similar rights and to holders of any options or stock appreciation rights, whether or not vested). Consideration shall also include the face amount of any long-term liabilities or preferred stock (including indebtedness for borrowed money and the amount set forth in the Company's financial statements for any pension liabilities and guarantees) indirectly or directly assumed or acquired, or otherwise repaid or retired by one or more purchasers of, or investors in, the Company, in connection with or in anticipation of the Transaction, excluding all operating lease obligations that are not characterized as liabilities on the balance sheet of the Company. If the Transaction involves an investment in the Company, Consideration shall equal the total enterprise value of the Transaction (calculated based upon the amount of the investment and the percentage ownership acquired therefor), including the face amounts of any long-term liabilities or preferred stock (as defined above), indirectly or directly assumed or acquired, or otherwise repaid or retired, in connection with or in anticipation of the Transaction. If the Transaction takes the form of a purchase of assets, Consideration shall also include (i) the value of any current assets not purchased, minus (ii) the value of any current liabilities not assumed. If the Consideration to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such Consideration is paid; and

(iv) reimbursement of all necessary and reasonable out-of-pocket expenses commencing on April 6, 2001, incurred during this engagement, including, but not limited to, out-of-town travel requested by the Company and related lodging, direct identifiable data processing and communication charges, courier services, working meals, reasonable fees and expenses of Blackstone's external counsel not to exceed $5,000 (unless consented to by the Company, which consent shall not be unreasonably withheld) and other necessary expenditures, payable upon rendition of invoices setting forth in reasonable detail the nature and amount of such expenses.

Mr. Timothy R. Graham, Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.
July 26, 2001
Page 4

The Company shall use its good faith efforts to promptly apply to the bankruptcy court having jurisdiction over the Chapter 11 case or cases (the "Bankruptcy Court") for the approval pursuant to sections 327 and 328 of the Bankruptcy Code of this Agreement and Blackstone's retention by the Company under the terms of this Agreement and subject to the standard of review provided in section 328(a) of the Bankruptcy Code and not subject to any other standard of review under section 330 of the Bankruptcy Code.  The Company shall supply Blackstone with a draft of such application and any proposed order authorizing Blackstone's retention sufficiently in advance of the filing of such application and proposed order to enable Blackstone and its counsel to review and comment thereon.  Blackstone shall have no obligation to provide any services under this Agreement unless Blackstone's retention under the terms of this Agreement is approved under section 328(a) of the Bankruptcy Code by an order of the Bankruptcy Court acceptable to Blackstone in all respects.  Blackstone acknowledges that in the event that the Bankruptcy Court approves its retention by the Company, Blackstone's fees and expenses shall be subject to the jurisdiction and approval of the Bankruptcy Court under section 328(a) of the Bankruptcy Code and any applicable fee and expense guideline orders; provided, however, that to the extent time records are required, Blackstone will keep them in one-half hour increments.

The advisory services and compensation arrangement set forth in this Agreement do not encompass other investment banking services or transactions that may be undertaken by Blackstone at the request of the Company, including the arranging of debt capital, issuing fairness opinions, or any other specific services not set forth in this Agreement.  The terms and conditions of any such investment banking services, including compensation arrangements, would be set forth in a separate written agreement between Blackstone and the Company.

Except as contemplated by the terms hereof or as required by applicable law or legal process, Blackstone shall keep confidential all material non-public information provided to it by or at the request of the Company, and shall not disclose such information to any third party or to any of its employees or advisors except to those persons who have a need to know such information in connection with Blackstone's performance of its responsibilities hereunder and who are advised of the confidential nature of the information and who agree to keep such information confidential.

The Company will furnish or cause to be furnished to Blackstone such information as Blackstone and the Company believe appropriate to its assignment (all such information so furnished being the "Information").  The Company recognizes and confirms that Blackstone (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having independently verified the same, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information, (c) is entitled to rely upon the Information without independent verification, and (d) will not make an appraisal of any assets in

Mr. Timothy R. Graham, Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.
July 26, 2001
Page 5

connection with its assignment. The Company agrees to promptly notify Blackstone regarding any inquiries or solicitations related to a potential Transaction (to the extent any such inquiry or solicitation becomes known to the executive officers of the Company), and agrees to enter into any related negotiations with the assistance of Blackstone.

In the event that the Information belonging to the Company is stored electronically on Blackstone's computer systems, Blackstone shall not be liable for any damages resulting from unauthorized access, misuse or alteration of such information by persons not acting on its behalf, provided that in protecting the confidentiality of, and in preventing unauthorized access to, the Company's information, Blackstone exercises the same degree of care (and in any event exercises at least a reasonable degree of care) as it exercises with regard to its own most sensitive proprietary information.

Except as required by applicable law, any advice to be provided by Blackstone under this Agreement shall not be disclosed publicly or made available to third parties (other than the Company's other professional advisors or, if appropriate in the Company's judgement, in the Chapter 11 proceeding) without the prior written consent of Blackstone or as otherwise provided herein. All services, advice and information and reports provided by Blackstone to the Company in connection with this assignment shall be for the sole benefit of the Company (including its board of directors) and shall not be relied upon by any other person.

The Company acknowledges and agrees that Blackstone has been retained to act solely as financial advisor to the Company. In such capacity, Blackstone shall act as an independent contractor, and any duties of Blackstone arising out of its engagement pursuant to this Agreement shall be owed solely to the Company. Because Blackstone will be acting on the Company's behalf in this capacity, it is customary for us to receive indemnification. A copy of our standard form of indemnification agreement is attached to this Agreement as Attachment A.

In the event that Blackstone is requested or authorized by the Company or required by government regulation, subpoena, or other legal process to produce documents, or to make its current or former personnel available as witnesses at deposition or trial, arising as a result of or in connection with Blackstone's engagement for the Company, the Company will, if Blackstone is not a party to the proceeding in which the information is sought, reimburse Blackstone for the reasonable fees and expenses of its counsel incurred in responding to such a request. Nothing in this paragraph shall affect in any way the Company's obligations pursuant to the separate indemnification agreement attached hereto.

The term of Blackstone's engagement hereunder shall extend until the earliest of the effectiveness of the Plan for the Company under Chapter 11 of the Bankruptcy Code, the consummation of a Transaction as defined above, or the conversion of any Chapter 11 case for the Company to a case under Chapter 7 of the Bankruptcy Code. Blackstone's engagement

*engagement ma2.DOC*

Mr. Timothy R. Graham, Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.
July 26, 2001
Page 6

hereunder may be terminated upon 30 days' written notice without cause by either the Company or Blackstone; termination for cause by either party will occur immediately upon delivery of written notice to the other party. Notwithstanding the foregoing, (a) the provisions relating to the payment of fees and expenses accrued through the date of termination, the status of Blackstone as an independent contractor, and the limitation as to whom Blackstone shall owe any duties will survive any such termination, (b) any such termination shall not affect the Company's obligations under the indemnification agreement attached as Attachment A, and (c) Blackstone shall be entitled to the full Transaction Fee in the event that a Transaction is consummated at any time prior to the expiration of nine full months following the termination of this Agreement.

Notwithstanding anything to the contrary provided elsewhere herein, none of the provisions of this Agreement shall in any way limit the activities of the private equity businesses of Blackstone and its affiliates in their businesses distinct from the restructuring advisory business of Blackstone provided that the Information is not shared with representatives of Blackstone and its affiliates who are not involved in the restructuring or mergers and acquisitions advisory businesses of Blackstone and that appropriate "Chinese wall" measures are taken to insure confidentiality.

This Agreement (including the attached indemnification agreement) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any provision of this Agreement is determined to be invalid or unenforceable in any respect, such determination will not affect such provision in any other respect, which will remain in full force and effect. No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed in and to be performed in that state.

The Company hereby agrees that any action or proceeding brought by the Company against Blackstone based hereon or arising out of Blackstone's engagement hereunder, shall be brought and maintained by the Company exclusively in the United States Bankruptcy Court for the District of Delaware. The Company irrevocably submits to the jurisdiction of the United States Bankruptcy Court for the District of Delaware for the purpose of any action or proceeding based hereon or arising out of Blackstone's engagement hereunder and irrevocably agrees to be bound by any judgment rendered thereby in connection with such action or proceedings. The Company hereby irrevocably waives, to the fullest extent permitted by law, any objection it may have or hereafter may have to the laying of venue of any such action or proceeding brought in any such court referred to above and any claim that such action or proceeding has been brought in an inconvenient forum and agrees not to plead or claim the same.

Mr. Timothy R. Graham, Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.
July 26, 2001
Page 7

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Blackstone the duplicate copy of this Agreement and the indemnification agreement attached hereto as Attachment A.

Very truly yours,

THE BLACKSTONE GROUP L.P.

By: _____

Arthur B. Newman
Senior Managing Director

Accepted and Agreed to as
of the date first written above:

WINSTAR COMMUNICATIONS, INC.
WINSTAR WIRELESS, INC.

By: _____

Timothy R. Graham
Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.

*Winstar Revised Blackstone engagement letter1.DOC*

ATTACHMENT A

July 26, 2001

The Blackstone Group L.P.
345 Park Avenue
New York, NY  10154

INDEMNIFICATION AGREEMENT

Gentlemen:

This letter will confirm that we have engaged The Blackstone Group L.P. ("Blackstone") to advise and assist us in connection with the matters referred to in our letter of agreement dated as of July 26, 2001 (the "Engagement Letter"). This indemnification shall be effective nunc pro tunc April 18, 2001. In consideration of your agreement to act on our behalf in connection with such matters, we agree to indemnify and hold harmless you and your affiliates and your and their respective partners (both general and limited), members, officers, directors, employees and agents and each other person, if any, controlling you or any of your affiliates (you and each such other person being an "Indemnified Party") from and against any losses, claims, damages, expenses and liabilities whatsoever, whether they be joint or several, related to, arising out of or in connection with the engagement (the "Engagement") under the Engagement Letter and will reimburse each Indemnified Party for all expenses (including reasonable fees, expenses and disbursements of counsel) as they are incurred in connection with investigation, preparing, pursuing, defending or assisting in the defense of any action, claim, suit, investigation or proceeding related to, arising out of or in connection with the Engagement or this agreement, whether or not pending or threatened, whether or not any Indemnified Party is a party, whether or not resulting in any liability and whether or not such action, claim, suit, investigation or proceeding is initiated or brought by us. We will not, however, be liable under the foregoing indemnification provision for any losses, claims, damages or liabilities (or expenses relating thereto) that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from the bad faith, gross negligence or willful misconduct of Blackstone. We also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to us or our owners, parents, affiliates, security holders or creditors for or in connection with the Engagement except for any such liability for losses, claims, damages or liabilities incurred by us that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from the bad faith, gross negligence or willful misconduct of Blackstone.

If the indemnification provided for in the preceding paragraph is for any reason unavailable to an Indemnified Party in respect of any losses, claims, damages or liabilities referred to herein, then, in lieu of indemnifying such Indemnified Party hereunder, we shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages or liabilities (and expenses relating thereto) (i) in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by you, on the one hand, and us, on the other hand, from the Engagement or (ii) if and only if the allocation provided by clause (i) above is for any reason not available, in such proportion as is appropriate to reflect not only the relative benefits referred to in such clause (i) but also the relative fault of each of you and us, as well as any other relevant equitable considerations; provided, however, to the extent permitted by applicable law, in no event shall your aggregate contribution to the amount paid or payable exceed the aggregate amount of fees actually received by you under the Engagement Letter. For the purposes of this agreement, the relative benefits to us and you of the Engagement shall be deemed to be in the same proportion as (a) the total value paid or contemplated to be paid or received or contemplated to be received by us, our security holders and our creditors in the transaction or transactions that are subject to the Engagement, whether or not any such transaction is consummated, bears to (b) the fees paid or to be paid to Blackstone under the Engagement Letter.

No party to this agreement will, without the prior written consent of the other party (which consent will not be unreasonably withheld), settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (a "Judgment"), whether or not we or any Indemnified Party is an actual or potential party to such claim, action, suit or proceeding. In the event that we seek to settle or compromise or consent to the entry of any Judgment, we agree that such settlement, compromise or consent shall include an unconditional release of Blackstone and each other Indemnified Party hereunder from all liability arising out of such claim, action, suit or proceeding.

Promptly after receipt by an Indemnified Party of notice of any complaint or the commencement of any action or proceeding with respect to which indemnification is being sought hereunder, such person will notify us in writing of such complaint or of the commencement of such action or proceeding, but failure to so notify us will not relieve us from any liability which we may have hereunder or otherwise, except to the extent that such failure materially prejudices our rights. If we so elect or are requested by such Indemnified Party, we will assume the defense of such action or proceeding, including the employment of counsel reasonably satisfactory to Blackstone and the payment of the fees and disbursements of such counsel.

In the event, however, such Indemnified Party reasonably determines in its judgment that having common counsel would present such counsel with a conflict of interest or if we fail to assume the defense of the action or proceeding in a timely manner, then such Indemnified Party may employ separate counsel reasonably satisfactory to us to represent or defend it in any such

action or proceeding and we will pay the fees and disbursements of such counsel; provided, however, that we will not be required to pay the fees and disbursements of more than one separate counsel for all Indemnified Parties in any jurisdiction in any single action or proceeding. In any action or proceeding the defense of which we assume, the Indemnified Party will have the right to participate in such litigation and to retain its own counsel at such Indemnified Party's own expense.

The foregoing reimbursement, indemnity and contribution obligations of the Company under this agreement shall be in addition to any rights that an Indemnified Party may have at common law or otherwise, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company and such Indemnified Party.

The provisions of this agreement shall apply to the Engagement and any written modification of the Engagement and shall remain in full force and effect regardless of any termination or the completion of your services under the Engagement Letter.

This agreement and the Engagement Letter shall be governed by and construed in accordance with the laws of the state of New York applicable to contracts executed in and to be performed in that state.

Very truly yours,

WINSTAR COMMUNICATIONS, INC.
WINSTAR WIRELESS, INC.

By: _____

Timothy R. Graham
Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.

Accepted and Agreed
to as of the date first
written above:

THE BLACKSTONE GROUP L.P.

By: _____

Arthur B. Newman
Senior Managing Director

Winstar Revised Blackstone engagement letter1.DOC

TOTAL P.02

# EXHIBIT E

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

Citigroup Center
153 East 53rd Street
New York, New York 10022-4611

Yosef J. Riemer
To Call Writer Directly:
212-446-4802
yriemer@kirkland.com

(212) 446-4800

www.kirkland.com

Facsimile:
(212) 446-4900

Dir. Fax: 212 446-4900

June 4, 2007

**By Federal Express and U.S. Mail**

Timothy R. Graham
Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.
685 Third Avenue
Suite 3100
New York, New York 10017

Christine Shubert
Trustee, Winstar Communications, Inc.
Fox Rothschild LLP
919 North Market Street
Suite 1300
P.O. Box 2323
Wilmington, Delaware 19899-2323

Re:    Notification of Indemnification

Dear Mr. Graham and Ms. Shubert:

Pursuant to Attachment A to the Agreement dated July 26, 2001 between The Blackstone Group L.P. ("Blackstone), Winstar Communications, Inc., Winstar Wireless, Inc., and their affiliates, I write today to inform you of our receipt, on May 22, 2007, of a complaint commencing an action against Blackstone in Supreme Court for the County of New York. For your convenience, I am enclosing a copy of the aforementioned Agreement, Attachment A thereto, and the complaint. The case has now been removed by Impala Partners from Supreme Court to the United States District Court for the Southern District of New York, and we anticipate that a motion will be filed shortly requesting a transfer of venue back to the federal courts in Delaware.

Please consider this letter to be notification to you of our intention to enforce our contractual right to indemnification for any losses, claims, damages, expenses and liabilities that already have been or in the future will be incurred by Blackstone in connection with this suit.

Plaintiffs in this action, *Winstar Holdings, LLC & IDT Corp. v. The Blackstone Group, L.P.; Impala Partners, LLC; & Citicorp,* No. 601582/07, allege that Blackstone, in its advisory role

Chicago        Hong Kong        London        Los Angeles        Munich        San Francisco        Washington, D.C.

**KIRKLAND & ELLIS LLP**

June 4, 2007
Page 2

during the asset sale of Winstar Communications, Inc. ("Old Winstar"), conspired with the other defendants to defraud Plaintiffs by making material misrepresentations about the status of Old Winstar's business.  Specifically, Plaintiffs bring claims for fraud, aiding and abetting fraud, negligent misrepresentation, negligence, and civil conspiracy.  As these allegations arise out of Blackstone's engagement under the July 26, 2001 Agreement they are within the scope of the Indemnification Agreement attached thereto.

Sincerely yours,

Yosef J. Riemer

# EXHIBIT F



**IMPALA**
P A R T N E R S

July 2, 2001

Mr. William Rouhana, Jr.
Chairman and Chief Executive Officer
Winstar Communications, Inc.
685 Third Avenue
New York, NY 10017

Dear Bill:

This letter confirms the retention of Impala Partners, LLC ("Impala") to provide advisory services to Winstar Communications, Inc. (the "Company"), including, without limitation, providing the services of Mr. Paul A. Street as Chief Restructuring Officer of the Company. We will advise you in connection with the restructuring of the Company ("the Restructuring") and, by signing this letter, we hereby accept the engagement under the terms hereof and subject to the approval of the Bankruptcy Court.

We will act as your advisor for a period of one (1) year from the date hereof, subject to earlier termination pursuant to section 5 or further extension by mutual agreement between the parties and subject to the following conditions:

    1.    You will furnish or cause to be furnished to us such current and historical financial information and other information regarding the business of the Company as we may request in connection with this engagement. You agree that you will use your good faith efforts to ensure that all of the foregoing information will be accurate in all material respects at the time it is furnished, and you agree to keep us advised of all developments materially affecting the Company or its financial or legal position. In connection with our activities hereunder, we agree to keep confidential all non-public information provided to us by the Company, except as required by law, or as agreed to by the Company in writing.

    2.    In consideration for our services, you agree to pay us a monthly retainer of $250,000 per month for the first two months. Thereafter, at the rate of $100,000 per month for the services of Paul A. Street; and $50,000 for the services of each of Peter C. Keenoy, Michael P. Borom, and J. Robert Vipond only in respect to those of the three aforementioned individuals who are actively involved in the Winstar advisory engagement, provided, that each of the persons set forth in this letter spend substantially all of their working time during such month in such activity. An initial advance of $250,000 is payable in full at the inception of the engagement as the first monthly payment hereunder, subject only to Bankruptcy Court approval. Thereafter, for as long as the engagement continues, the retainer shall be payable monthly in advance with expenses to be reimbursed in accordance with paragraph 3 below. You further

LN/672087.1

**Impala Partners, LLC** 300 First Stamford Place, Stamfod, CT 06902
Tel: (203) 975-5908   Fax: (203) 975-5955

agree to pay us an additional fee ("the Success Fee") which will be mutually agreed upon within 30 days of the date hereof, payable upon the earlier of confirmation of a plan under or other emergence from Chapter 11 of the U.S. Bankruptcy Code of the Company or its successor, whether through a recapitalization, merger, or sale of the Company, confirmation of a plan or otherwise and subject to Bankruptcy Court approval.

3.    You will reimburse us for all of our reasonable and actual out-of-pocket expenses incurred in connection with this engagement, including fees and expenses, up to a maximum of $20,000 of counsel that we determine is required to advise us in connection with carrying out our duties under this letter; provided, that before such counsel is retained we will provide advance written notice to the Company and consult with the General Counsel of the Company. All reimbursements shall be made promptly after such payments accrue and are submitted to you with appropriate documentation for payment hereunder.

4.    No fee payable to any other financial advisor, by you or any other party, shall reduce or otherwise affect any fee payable hereunder to us.

5.    Our engagement hereunder may be terminated by you or us at any time without liability or continuing obligation to you or us, except that following such termination and any expiration of this agreement (a) we shall remain entitled to any fees accrued pursuant to paragraph 2 but not yet paid prior to such termination or expiration, as the case may be, and to reimbursement of expenses incurred prior to such termination or expiration, as the case may be, as contemplated by paragraph 3 hereof; and (b) upon any expiration or termination of this agreement, we shall remain entitled to any full payment of any fee contemplated by paragraph 2 hereof in respect of any restructuring resulting from negotiations commenced during the term of this agreement which is consummated within nine (9) months following such termination or expiration, as the case may be. The provisions of this paragraph 5 shall survive the termination of this Agreement.

6.    Any written financial advice rendered by us pursuant to this agreement is intended solely for the benefit and use of management and the Board of Directors of the Company in considering the matters to which this agreement relates, and the Company agrees that such written advice may not be disclosed publicly or made available to third parties (except as required by law) without the prior written consent of Impala, which consent shall not be unreasonably withheld except that the Company may share such written advice with the members of the Post-petition and Pre-petition bank lenders and the members of the Creditor's Committee and each of their representatives without Impala's consent.

7.    The provisions hereof shall inure to the benefit of and be binding upon the successors and assigns of the Company and Impala. This agreement may not be amended or modified except in a writing executed by the Company and us and shall be

2

LN/672007/1

governed by and construed in accordance with the laws of the State of New York, without reference to principals of conflicts of law. This agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

8.    In consideration of our agreement to act as advisor to the Company in the Company agrees to the same indemnification provisions attached hereto as Annex A. In addition, the Company will notify its existing insurance carrier of its existing directors and officers' policy and cause Mr. Street to become covered under such policy immediately as an officer of the Company. The provisions of this paragraph 8 shall survive the termination of this Agreement.

9.    This agreement shall be subject to approval by the U.S. Bankruptcy Court. The Company will prepare and file with the Bankruptcy Court a motion seeking approval of this letter promptly.

If the foregoing correctly sets forth the understanding between us, please so indicate on the enclosed signed copy of this agreement in the space provided therefor and return it to us, whereupon this agreement shall constitute a binding agreement between us.

Very truly yours,

IMPALA PARTNERS

By: _____
Paul A. Street

AGREED TO AND ACCEPTED
as of the date first above written:

Winstar Communications, Inc.

By: _____
William J. Rouhana, Jr.
Chairman and Chief Executive Officer

3

1A/672087.2

ANNEX A

Indemnification Provisions

1.　In connection with the engagement of Impala Partners, LLC ("Impala Partners") by Winstar Communications, Inc., (the "Company") pursuant to a letter agreement dated July 2, 2001 between the Company and Impala Partners, as it may be amended from time to time (the "Letter Agreement"), the Company hereby agrees as follows:

2.　The Company agrees to indemnify and hold harmless Impala Partners and each of its partners, agents, employees and controlling persons (within the meaning of the Securities Act of 1933, as amended) (each, an "Indemnified Person") against any losses, claims, damages or liabilities (or actions or proceedings in respect thereof) brought by any third party (i.e., a person not a party to the Letter Agreement or an Indemnified Party hereunder) arising out of the rendering of services by Impala Partners under the Letter Agreement and will reimburse Impala Partners and each other person indemnified hereunder for all reasonable legal and other expenses as incurred in connection with investigating or defending any such loss, claim, damage, liability, action or proceeding; provided, however, that the Company will not be liable in any such case for losses, claims, damages, liabilities or expenses arising from the negligence or willful misconduct of Impala Partners or any other party entitled to indemnification hereunder. In case any proceeding shall be instituted involving any Indemnified Party, such person shall promptly notify the Company, and the Company, upon the request of the Indemnified Party, shall retain counsel reasonably satisfactory to the Indemnified Party to represent the Indemnified Party and any others the Company may designate in such proceeding and shall pay all reasonable fees and expenses of such counsel related to such proceeding. In any such proceeding, any Indemnified Party shall have the right to retain its own counsel at its own expense, except that the Company shall pay as incurred the fees and expenses of counsel retained by the Indemnified Party only in the event that (i) the Company and the Indemnified Party shall have mutually agreed to the retention of such counsel, or (ii) the named parties to any such proceeding (including any impleaded parties) include both the Company and the Indemnified Party and representation of both parties by the same counsel would be inappropriate, in the reasonable opinion of the Company, due to actual or potential differing interests between them.

3. The Company shall not be liable for any settlement of any proceeding effected without its written consent. In addition, the Company will not, without the prior written consent of Impala Partners, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder unless such settlement, compromise or consent includes an unconditional release of each party for which indemnification is sought hereunder from all liability arising out of such claim, action, suit or proceeding.

4. In the event that the indemnity provided for in paragraph 2 hereof is unavailable or insufficient to hold any Indemnified Party harmless, then the Company shall contribute to amounts paid or payable by an Indemnified Party in respect of such Indemnified Party's losses, claims, damages and liabilities as to which the indemnity provided for in paragraph 1 hereof is unavailable or insufficient (1) in such proportion as appropriately reflects the relative benefits received by the Company, on the one hand, and Impala Partners, on the other hand, in connection with the matters as to which such losses, claims, damages or liabilities relate, or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as appropriately reflects not only the relative benefits referred to in clause (i) but also the relative fault of the Company, on the one hand, and Impala Partners, on the other hand, as well as any other equitable considerations. The amounts paid or payable by a party in respect of losses, claims, damages and liabilities referred to above shall be deemed to include any reasonable legal or other fees and expenses incurred in defending any litigation, proceeding or other action or claim. Nothing herein shall be deemed to increase the scope of matters for which indemnity or contribution may be available beyond those described in paragraph 1 of these Indemnification Provisions.

5. These Indemnification Provisions shall survive the expiration of the term of the Letter Agreement, and shall be in addition to any liability that the Company might otherwise have to any Indemnified Party under the Letter Agreement or otherwise. The Company and Impala Partners each hereby waives any right to a trial by jury with respect to any claim or action arising out of the engagement of Impala Partners under the Letter Agreement or the Indemnification Provisions. It is further agreed that no Indemnified Party (including Impala Partners) shall be liable to the Company or any affiliate of the Company in connection with any matter arising out of or relating to the engagement of Impala Partners under the Letter Agreement, or any actions take or omitted , services performed or matters contemplated by or in connection with the Letter Agreement, except to the extent that such liability resulted primarily from the willful misconduct or negligence of such Indemnified Party; provided that nothing herein shall excuse Impala Partners from its obligations to perform under the Letter Agreement in good faith and in accordance with the terms thereof.

2


**IMPALA**
P A R T N E R S

August 29, 2001

William Rouhana, Jr.
Chairman and Chief Executive Officer
Winstar Communications, Inc.
685 Third Avenue
New York, New York   10017

Dear Bill:

Effective September 1, 2001, we agree to amend the agreement dated July 2, 2001, as follows:

Paragraph 2 will be amended such that in consideration for our services you agree to pay us at a daily rate of $5,000 per day for the services of Paul A. Street and at $2,500 per day for the services of each of Peter C. Keenoy, J. Robert Vipond and Michael P. Borom and $1,000 per day for any associates of Impala Partners only in respect of actual days worked on this engagement. However, the total fees paid during any one month shall not exceed $100,000 in respect of the services of Paul A. Street and $50,000 each in respect of the services of Peter C. Keenoy, J. Robert Vipond or Michael P. Borom, and the aggregate monthly fees paid to Impala Partners shall not exceed $250,000.

Effective September 1, 2001 and at the beginning of each month following, for the duration of this assignment, Impala Partners shall estimate the monthly professional fees for the month and submit an estimated bill which will be due and payable upon presentation.

A bill reflecting the actual days worked shall be prepared within three (3) business days of the first business day of each month. Any adjustment to the estimated bill must be paid by either party (the Company or Impala) within three (3) business days of the presentation of the actual bill. Nothing in the agreement dated July 2, 2001 other than section two (2) is modified by this amendment.

Page 2

     If this is acceptable to you, please sign below and return to me at your earliest convenience.

Regards,

Paul A. Street

Agreed and accepted to by:

William Rouhana, Jr.
Dated:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WINSTAR HOLDINGS, LLC and
IDT CORP.,

     *Plaintiffs,*

 - against -

THE BLACKSTONE GROUP L.P.;
IMPALA PARTNERS, LLC; and
CITICORP,

     *Defendants.*

Case No.:  **07 CV 4634 (GEL)(AJP)**

**ECF Case**

---

## MEMORANDUM OF LAW IN SUPPORT OF THE JOINT MOTION
## BY ALL DEFENDANTS TO TRANSFER VENUE TO THE
## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

Yosef J. Riemer
Vickie Reznik
David S. Flugman

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Attorneys for Defendant
The Blackstone Group L.P.*

Stephen M. Rathkopf
Andrew C. Gold
John Oleske

HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York 10016
Telephone: (212) 592-1400
Facsimile: (212) 592-1500

*Attorneys for Defendant
Impala Partners, LLC*

Stephen L. Saxl
William Wargo

GREENBERG  TRAURIG, LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400

*Attorneys for Defendant Citigroup, Inc. as
successor by merger to Citicorp*

## <u>TABLE OF CONTENTS</u>

**Page(s)**

**Preliminary Statement**........................................................................................................1

**Background Facts and Procedural Posture**............................................................................4

**Argument**.............................................................................................................................7

I.    THIS CASE SHOULD BE TRANSFERRED PURSUANT TO SECTION 1406(A) TO DELAWARE DISTRICT COURT FOR REFERRAL TO DELAWARE BANKRUPTCY COURT BECAUSE THE CLAIMS ARE SUBJECT TO BOTH THE MANDATORY FORUM SELECTION CLAUSE IN THE ASSET PURCHASE AGREEMENT AND THE BANKRUPTCY COURT ORDER RETAINING EXCLUSIVE JURISDICTION.........................................................7

    A.    Jurisdiction in this District is Inappropriate Given the Retention of Jurisdiction by the Delaware Bankruptcy Court..........................................7

    B.    Because the Forum Selection Clause in the Asset Purchase Agreement Designates the Delaware Bankruptcy Court as the Exclusive Forum for Plaintiffs' Claims, Venue in the Southern District of New York is Inappropriate...........................................................................................8

    C.    Jurisdiction in the Delaware Bankruptcy Court is Proper Because This Case Falls Within the Broad Scope of 28 U.S.C. § 1334. .....................10

II.    IN THE ALTERNATIVE, EVEN IF VENUE EXISTS IN THIS DISTRICT, THE CASE SHOULD BE TRANSFERRED TO DELAWARE DISTRICT COURT FOR REFERRAL TO DELAWARE BANKRUPTCY COURT IN THE INTERESTS OF JUSTICE PURSUANT TO SECTION 1404(A)..................................12

**Conclusion** .......................................................................................................................13

# TABLE OF AUTHORITIES

## Cases

*Bense v. Interstate Battery System of America*,
    683 F.2d 718 (2d Cir. 1982)................................................................. 8

*Credit Suisse Secs. (USA) LLC v. Hilliard*,
    469 F. Supp. 2d 103 (S.D.N.Y. 2007)................................................. 9

*Full-Sight Contact Lens Corp. v. Soft Lenses, Inc.*,
    466 F. Supp. 71 (S.D.N.Y. 1978)....................................................... 7

*G & R Moojestic Treats Inc. v. MaggieMoo's Int'l, LLC*,
    No. 03 Civ. 10027 (RWS), 2004 WL 1110423 (S.D.N.Y. May 19, 2004) ...................... 12

*Huntingdon Engineering & Envt'l Inc. v. Platinum Software Corp.*,
    882 F. Supp. 54 (W.D.N.Y. 1995)..................................................... 12

*In re Cuyahoga Equipment Corp.*,
    980 F.2d 110 (2d Cir. 1992)............................................................. 11

*In re Houbigant, Inc.*,
    914 F. Supp. 964 (S.D.N.Y. 1995)..................................................... 13

*In re S & K Air Power of Florida*,
    166 B.R. 193 (Bankr. S.D. Fla. 1994) ............................................... 3

*In re Winstar Communications, Inc. et al*,
    Case No. 01-1430 (KJC)................................................................... 4

*Int'l Secs. Exchange, LLC v. Chicago Board Options Exchange Inc.*,
    No. 06 Civ. 13445 (RMB)(THK), 2007 WL 1541087 (S.D.N.Y. May 24, 2007) ..... 10, 13

*Korean Press Agency, Inc. v. Yonhap News Agency*,
    421 F. Supp. 2d 775 (S.D.N.Y. 2006)................................................. 9

*Luan Investment S.E. v. Franklin 145 Corp. (In re Petrie Retail)*,
    304 F.3d 223 (2d Cir. 2002)............................................................. 10

*M/S Bremen v. Zapata Off-Shore Co.*,
    407 U.S. 1 (1972)................................................................. 8, 9, 10

*Ruby v. Pan Am World Airways, Inc.*,
    252 F. Supp. 873 (S.D.N.Y. 1965)..................................................... 8

*Starad, Inc. v. Lawson Software, Inc.*,
    04 Civ. 5554 (GEL), 2004 WL 2093512 (S.D.N.Y. Sept. 16, 2004) .............. 10

*Stewart Org., Inc. v. Ricoh Corp.*,
    487 U.S. 22 (1988)....................................................................... 8

*Strategic Marketing & Commc'ns, Inc. v. Kmart Corp.*,
    41 F. Supp. 2d 268 (S.D.N.Y. 1998).......................................... 8, 9, 12

*Weiss v. Columbia Pictures Television, Inc.*,
    801 F. Supp. 1276 (S.D.N.Y. 1992)..................................................................... 3, 8, 10

**Statutes**

28 U.S.C. § 1334................................................................................................... 7, 10, 11

28 U.S.C. § 1404(a) ........................................................................................... 1, 3, 12, 13

28 U.S.C. § 1406(a) .................................................................................................... passim

28 U.S.C. § 1409(a) ........................................................................................................... 11

28 U.S.C. § 1452(a) .......................................................................................................... 3, 7

**Other Authorities**

*Black's Law Dictionary* 856 (7th ed. 1999)................................................................. 8

Defendants The Blackstone Group L.P.[1] ("Blackstone"), Impala Partners, LLC ("Impala") and Citigroup, Inc., as successor by merger to Citicorp ("Citicorp") hereby submit this memorandum of law in support of their joint motion to transfer venue pursuant to 28 U.S.C. § 1406(a), or in the alternative 28 U.S.C. § 1404(a), to the United States District Court for the District of Delaware for referral to the United States Bankruptcy Court for the District of Delaware.[2]

## PRELIMINARY STATEMENT

This action arises out of the purchase by Plaintiffs IDT Corp. ("IDT") and Winstar Holdings, LLC of certain assets that had belonged to Winstar Communications Inc. ("Old Winstar" or "Debtor"). Old Winstar was at the time of the transaction (and remains today) a Debtor in a bankruptcy proceeding in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court" or "Delaware Bankruptcy Court"). Plaintiffs purchased the assets pursuant to an Asset Purchase Agreement which contained a mandatory forum selection clause in which Plaintiffs agreed to "irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court . . . any dispute arising out of or relating to this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith or any of the transactions contemplated hereby or thereby." (Declaration of David S. Flugman in Support of Defendants' Joint Motion to Transfer Venue to the United States District Court for the District

---

[1]    As of March 12, 2007, the entity formerly known as "The Blackstone Group L.P." has been renamed "Blackstone Advisory Services L.P."

[2]    Because pursuant to both § 1404 and § 1406 this Court is empowered to transfer a civil action "to any other district or division" where it could have been brought, Defendants request that the Court transfer this case to the District Court in Delaware so that it may refer the case to the Delaware Bankruptcy Court.

of Delaware, Ex. A (Asset Purchase Agreement) § 9.10.)[3]  The Asset Purchase Agreement was

approved by the Bankruptcy Court in a separate order (the "Order") which specifically provided

that the Bankruptcy Court "retains and shall have exclusive jurisdiction to . . . resolve any

disputes arising under or related to the Asset Purchase Agreement."  (Ex. B (Order) ¶ 15.)

Old Winstar's bankruptcy proceeding is still pending in the Delaware Bankruptcy Court.

(*See* Ex. C (Bankruptcy Court Docket).)  Nonetheless, Plaintiffs commenced this action in the

Supreme Court for the County of New York (the "State Court Action") in which they make

allegations arising under and related to the Asset Purchase Agreement which thus fall squarely

within the mandatory forum selection provision and the Bankruptcy Court Order retaining

exclusive jurisdiction.  For example, the Complaint asserts that "[a]s a result" of what Plaintiffs

contend were fraudulent or negligent representations about Old Winstar's business, Plaintiffs

"entered into an Asset Purchase Agreement . . ."  (Compl. ¶ 43.)

Given the retention of exclusive jurisdiction by the Delaware Bankruptcy Court and the

mandatory forum selection clause in the Asset Purchase Agreement, this case can only be

litigated in that court.  Thus, venue is proper in the Delaware Bankruptcy Court.  By seeking to

litigate in New York instead of Delaware, Plaintiffs are violating the clear language of a

Bankruptcy Court Order.  The Bankruptcy Court has broad jurisdiction over disputes like this

and Plaintiffs are bound by that Order.  Moreover, Plaintiffs are violating their contractual duty

by ignoring the forum selection clause in the Asset Purchase Agreement.  It is well settled that a

contractual forum selection clause should be given effect except in the rare case where plaintiffs

can "demonstrate exceptional facts explaining why [they] should be relieved from [their]

contractual duty" to litigate in the designated forum.  *Weiss v. Columbia Pictures Television,*

---

[3]    All exhibits referenced herein are attached to the Declaration of David S. Flugman, and hereafter will only be
cited as "Ex." for simplicity.

*Inc.*, 801 F. Supp. 1276, 1278 (S.D.N.Y. 1992). Plaintiffs have not – and cannot – meet their high burden of showing such "exceptional facts."

Where, as here, a plaintiff files suit in a district where venue is improper, Section 1406 of the Judicial Code empowers the Court to "dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."[4]  28 U.S.C. § 1406(a). Because venue is improper in this District, this Court should exercise its authority pursuant to that section to transfer this case to the United States District Court for the District of Delaware ("Delaware District Court") for referral to Delaware Bankruptcy Court.  (*See* Part I, *infra.*)

This Court's power to transfer a case is not limited to situations where venue is improper in the Southern District of New York.  If venue is proper in this District, this Court can still transfer a case "in the interest of justice . . . to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).  Thus, if this Court were to find that venue was proper in this District, this Court should "in the interest of justice" give effect to the Bankruptcy Court's retention of exclusive jurisdiction and the mandatory forum selection clause in the Asset Purchase Agreement, as well as the important public policy of consolidating litigation that could have a potential effect on a bankrupt estate in one forum, by entering an order transferring this case to the Delaware District Court for referral to Delaware Bankruptcy Court pursuant to 28 U.S.C. § 1404(a).[5]  (*See* Part II, *infra.*)

---

[4]    While Plaintiff's suit was originally filed in New York State Supreme Court, removal to this district was a necessary preliminary step to the Defendants' request to transfer venue to the Delaware Bankruptcy Court. *See In re S & K Air Power of Florida*, 166 B.R. 193, 194 (Bankr. S.D. Fla. 1994) (state court actions must be removed to the district court for the district in which the case is pending before moving for a transfer of venue to the district for the bankruptcy court where the case should have been filed).  The case was removed on June 4, 2007 by Defendant Impala pursuant to 28 U.S.C. § 1452(a)

[5]    Plaintiffs' agreement to the forum selection provision in the Asset Purchase Agreement further demonstrates that Delaware is not an inconvenient forum for Plaintiffs -- both of whom are Delaware Corporations.  (Compl. ¶¶ 2-3.)

## BACKGROUND FACTS AND PROCEDURAL POSTURE

In April 2001, Old Winstar and certain of its subsidiaries and affiliates each filed a petition for relief under chapter 11 of Title 11 of the United States Code, as amended, in the Delaware Bankruptcy Court.[6]  Pursuant to a letter agreement ("Blackstone Agreement") executed some time thereafter, the Debtors retained Blackstone to act as their exclusive M&A advisor to provide financial advisory services, including with respect to the sale of Old Winstar's assets.  (*See* Ex. D (Blackstone Agreement).)  Pursuant to the Blackstone Agreement, the Debtors agreed to indemnify Blackstone for "all expenses (including reasonable fees, expenses and disbursements of counsel) as they are incurred in connection with investigation, preparing, pursuing, defending, or assisting in the defense of any action, claim, suit, investigation or proceeding related to, arising out of or in connection with" Blackstone's retention by the Debtors.  (*Id.* at Attachment A.)[7]

On August 2, 2001, the Delaware Bankruptcy Court approved the retention of Impala *nunc pro tunc* to July 2, 2001 pursuant to a letter agreement originally dated July 2, 2001 and amended on August 29, 2001 (the "Impala Agreement").  Pursuant to the Impala Agreement, Impala was engaged to provide advisory services to the Debtors and to function as the Debtors' Chief Restructuring Officer.[8]  The Impala Agreement requires the Debtors to indemnify and hold harmless Impala and each of its partners, agents, employees, and control persons from third party

---

[6]    *In re Winstar Communications, Inc. et al*, Case No. 01-1430 (KJC).

[7]    The indemnification provision also requires Blackstone to promptly notify the Debtors in writing of the receipt of "any complaint or the commencement of any action or proceeding with respect to which indemnification is being sought."  (Ex. D (Attachment A) at 2.)  Pursuant to this provision, Blackstone notified the Bankrupt Estate Trustee on June 4, 2007 of the receipt of the Complaint and Summons in the instant action and of Blackstone's intention to seek indemnification from the Debtors.  (*See* Ex. E (6/4/07 Indemnification Notification Letter.)

[8]    By naming Impala as a Defendant, Plaintiffs seek damages against one of Debtors' Corporate Officers, which provides further support for transfer of the State Court Action to Delaware Bankruptcy Court.  *See infra*, § II.

claims arising out of the services rendered to the Debtors.  (*See* Ex. F (Impala Agreement) at Attachment A.)  Additionally, the Debtors agreed to pay Impala's legal fees in connection with any such claims.  (*Id.*)

During the Fall of 2001, Old Winstar, with the assistance of Blackstone, circulated an offering book and allowed prospective buyers of its business assets to conduct due diligence. (Compl. at ¶¶ 22-23.)  Thereafter, on December 18, 2001, IDT entered into an Asset Purchase Agreement by which it contracted to buy Old Winstar's business assets for $42.5 million.  (*Id.* at ¶¶ 1, 43.)  Notably, the Asset Purchase Agreement contains a mandatory forum selection clause by which the Plaintiffs agreed to "irrevocably submit to the exclusive jurisdiction of the [United States] Bankruptcy Court [for the District of Delaware] (or any court exercising appellate jurisdiction over the Bankruptcy Court) over *any dispute arising out of or relating to this Agreement* or any other agreement or instrument contemplated hereby or entered into in connection herewith or any of the transactions contemplated hereby or thereby."  (Ex. A (Asset Purchase Agreement) § 9.10 (emphasis added).)   In addition, Plaintiffs irrevocably agreed "that all claims in respect of such dispute or proceedings may be heard and determined in such courts" and "irrevocably waive[d], to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum in connection therewith." (*Id.*)

Moreover, the Plaintiffs further emphasized their intent to submit exclusively to jurisdiction in Delaware Bankruptcy Court by their conduct in executing the Asset Purchase Agreement.  The typed text of the Agreement originally contained language in Section 9.15 allowing the Plaintiffs to "apply to the Bankruptcy Court or any other court of competent jurisdiction for specific performance. . . "  (Ex. A (Asset Purchase Agreement) § 9.15.)  The typed words "or any other court of competent jurisdiction" were then crossed out by hand and the strike-out was confirmed by initials in the margins as shown on page 27 of the Agreement.

(*Id.*) By crossing out those words, Section 9.15 was made consistent with the mandatory forum selection clause in Section 9.10 so that no matter what remedy the Plaintiffs might seek, disputes arising under or relating to the Asset Purchase Agreement could only be brought in the Bankruptcy Court. (*Id.* at § 9.10, § 9.15.)

The following day, the Bankruptcy Court issued the Order approving the Asset Purchase Agreement. (Ex. B (Order) at ¶ 3.) Included therein was a finding that the Asset Purchase Agreement and related agreements "were negotiated, proposed and agreed to by the Debtors and [IDT Winstar Acquisition, Inc.] as parties thereto *without collusion, in good faith, and from arm's-length bargaining positions.*" (*Id.* at ¶ G (emphasis added).) Additionally, the Order specifically designates the Delaware Bankruptcy Court as the forum for all disputes by explicitly stating that the Bankruptcy Court "retains and shall have exclusive jurisdiction to…resolve any disputes arising under or related to the Asset Purchase Agreement." (Ex. B (Order) at ¶ 15.) [9]

On May 10, 2007, in direct contravention of the Bankruptcy Court's Order and the forum selection clause, Plaintiffs filed the instant suit in the New York Supreme Court for the County of New York alleging that the Defendants fraudulently or negligently made misrepresentations about the value of the assets of Old Winstar and that Plaintiffs relied on those alleged misrepresentations in entering into the court-approved Asset Purchase Agreement. [10] On June 4, 2007, Defendant Impala Partners, with the consent of all Defendants, removed the case to this

---

[9]   Paragraph 15 of the Order reads: "This court retains and shall have exclusive jurisdiction to endorse and implement the terms and provisions of the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith (including the Management Agreement) in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Buyer, (b) compel delivery of the purchase price or performance of other obligations owed to the Debtors, (c) resolve any disputes arising under or related to the Asset Purchase Agreement, and (d) interpret, implement, and enforce the provisions of the Asset Purchase Agreement and this Sale Order."

[10]   Blackstone and Citicorp were served with the Complaint on May 22, 2007. Impala was served on May 23, 2007.

Court pursuant to the bankruptcy removal provision, 28 U.S.C. § 1452(a), which permits

removal of cases subject to bankruptcy jurisdiction pursuant to 28 U.S.C. § 1334.[11]

## ARGUMENT

**I.     THIS CASE SHOULD BE TRANSFERRED PURSUANT TO SECTION 1406(A) TO DELAWARE DISTRICT COURT FOR REFERRAL TO DELAWARE BANKRUPTCY COURT BECAUSE THE CLAIMS ARE SUBJECT TO BOTH THE MANDATORY FORUM SELECTION CLAUSE IN THE ASSET PURCHASE AGREEMENT AND THE BANKRUPTCY COURT ORDER RETAINING EXCLUSIVE JURISDICTION.**

Because of the retention of exclusive jurisdiction by the Delaware Bankruptcy Court in

the ongoing bankruptcy proceedings in that court and the mandatory forum selection clause in

the Asset Purchase Agreement covering Plaintiffs' claims, venue is improper in this District.  *See*

*Full-Sight Contact Lens Corp. v. Soft Lenses, Inc.*, 466 F. Supp. 71, 73 (S.D.N.Y. 1978) (in the

face of a mandatory forum selection clause, venue is improper in alternative forum for § 1406

purposes).  Accordingly, this court should transfer the case to the Delaware Bankruptcy Court

pursuant to 28 U.S.C. § 1406(a).  *See, e.g., Lexington Investment Co. v. Southwest Stainless, Inc.*,

697 F. Supp. 139, 144 (S.D.N.Y. 1988) (transferring case pursuant to § 1406(a) to forum

specified in mandatory forum selection clause).

### A.     Jurisdiction in this District is Inappropriate Given the Retention of Jurisdiction by the Delaware Bankruptcy Court.

Venue in either the New York State Supreme Court or in this Court is inappropriate

because the Delaware Bankruptcy Court explicitly retained exclusive jurisdiction over "any

disputes arising under or related to the Asset Purchase Agreement."  (*See*  Ex. B (Order) ¶ 15.)

As explained above, Plaintiffs' claims arise out of and relate to the sale of Old Winstar's assets

---

[11]   This case falls within the scope of § 1334(b) as Plaintiffs' allegations arise under the bankruptcy statute and are related to the ongoing bankruptcy case pending in the Delaware Bankruptcy Court. *See* 28 U.S.C. § 1334(b) (vesting jurisdiction in the district courts over cases "arising in or related to cases under title 11 [bankruptcy]").

via the Asset Purchase Agreement, approved by the Order issued by the Delaware Bankruptcy Court.  (*See* Compl. at ¶¶ 43-44.)  Therefore, this litigation falls within the ambit of the jurisdiction retained by the Delaware Bankruptcy Court and venue is thus inappropriate in the New York State Supreme Court or in this Court.  *See Ruby v. Pan Am World Airways, Inc.*, 252 F. Supp. 873, 880 (S.D.N.Y. 1965) (dismissing claims involving an interpretation of pilots association agreement because of exclusive jurisdiction over interpretation vested in alternative forum); *Black's Law Dictionary* 856 (7th ed. 1999) (defining "exclusive jurisdiction" as "[a] court's power to adjudicate an action or class of actions to the exclusion of all other courts").  Because venue is inappropriate in this District, the case should be transferred pursuant to 28 U.S.C. § 1406(a).

> **B.    Because the Forum Selection Clause in the Asset Purchase Agreement Designates the Delaware Bankruptcy Court as the Exclusive Forum for Plaintiffs' Claims, Venue in the Southern District of New York is Inappropriate.**

It is well-settled in this Circuit that forum selection clauses are given substantial deference, and will only be disturbed in rare instances.  *See M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972) (a forum selection clause is enforceable unless it is shown that "enforcement would be unreasonable and unjust, or that the clause [is] invalid for such reasons as fraud or overreaching"); *see also Bense v. Interstate Battery System of America*, 683 F.2d 718, 720-22 (2d Cir. 1982) (upholding a forum selection clause which applied to "causes of action arising directly or indirectly from the agreement"); *Strategic Marketing & Commc'ns, Inc. v. Kmart Corp.*, 41 F. Supp. 2d 268, 270 (S.D.N.Y. 1998)  ("Since *Bremen*, this Circuit has developed a strong policy of honoring forum selection clauses.").  Forum selection clauses are treated as "prima facie valid" and in order to set one aside, it is the plaintiff's burden to "demonstrate exceptional facts explaining why he should be relieved from his contractual duty." *Weiss*, 801 F. Supp. at 1278; *see also Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988)

("a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases") (Kennedy, J., concurring).  In order to meet this burden, a plaintiff would have to show that suit in the alternative forum is "so gravely difficult and inconvenient that plaintiff will for all practical purposes be deprived of its day in court." *Bremen*, 407 U.S. at 18.

Where, as here, a motion to transfer involves a forum selection clause, and the language of the clause is mandatory rather than permissive, "deference to the plaintiff's choice of forum is inappropriate." *Kmart Corp.*, 41 F. Supp. 2d at 273.  The language of the forum selection clause in the Asset Purchase Agreement could not be clearer that not only did Plaintiffs agree to "exclusive jurisdiction" in the Delaware Bankruptcy Court over "any dispute arising out of or relating to this Agreement," but they also "irrevocably waive . . . any objection which they [may] have to the laying of venue" in that Court or "any defense of inconvenient forum in connection therewith."[12]  (Ex. A (Asset Purchase Agreement) § 9.10.)  Furthermore, the intent of the Plaintiffs to submit exclusively to jurisdiction in Delaware is revealed by the striking of the language "or any other court of competent jurisdiction" from the section of the Asset Purchase Agreement pertaining to remedies, making it wholly consistent with the forum selection clause. (*Id.* at § 9.15.)

---

[12]  The forum selection clause clearly covers the claims brought by Plaintiffs in this litigation because they arise out of the Asset Purchase Agreement.  *See Credit Suisse Secs. (USA) LLC v. Hilliard*, 469 F. Supp. 2d 103, 107 (S.D.N.Y. 2007) ("When 'arising out of,' 'relating to,' or similar words appear in a forum selection clause, such language is regularly construed to encompass . . . tort claims associated with the underlying contract."); *see also Starad, Inc. v. Lawson Software, Inc.*, No. 04 Civ. 5554 (GEL), 2004 WL 2093512, at *1 (S.D.N.Y. Sept. 16, 2004) (finding clause applying to "any proceeding relating to this Lease Agreement" as "clearly broad enough to encompass not merely claims for breach of the agreements, or even claims arising from the agreements, but any claims that so much as relate to the agreement").  Further, it is clear that the Plaintiffs could not maintain their claims absent the existence of the Asset Purchase Agreement.  *See Korean Press Agency, Inc. v. Yonhap News Agency*, 421 F. Supp. 2d 775, 781 (S.D.N.Y. 2006) (interpreting broad forum selection clause as "squarely within the rule that a contractually-based forum selection clause will also encompass tort claims if the tort claims ultimately depended on the existence of a contractual relationship between the parties") (internal quotations omitted).

In light of the prima facie valid forum selection clause described above, Plaintiffs cannot meet the "heavy burden" necessary to avoid its enforcement.  *See Starad, Inc. v. Lawson Software, Inc.*, 04 Civ. 5554 (GEL), 2004 WL 2093512, at *1 (S.D.N.Y. Sept. 16, 2004); *see also Weiss*, 801 F. Supp. at 1278.  Not only was the Asset Purchase Agreement and its mandatory forum selection clause negotiated among sophisticated parties, but the Bankruptcy Court explicitly found that the Asset Purchase Agreement was negotiated and executed in good faith and at arm's length.  (Ex. B (Order) at ¶ G); *see also Bremen*, 407 U.S. at 12 (enforcing forum selection clause "made in an arm's length negotiation by experienced and sophisticated businessmen").  Accordingly, this Court should uphold the contractual designation of forum for this litigation by transferring this case to the Delaware District Court for referral to the Delaware Bankruptcy Court.

**C.    Jurisdiction in the Delaware Bankruptcy Court is Proper Because This Case Falls Within the Broad Scope of 28 U.S.C. § 1334.**

While venue is improper in the Southern District of New York or the New York State Supreme Court, it *is* proper in the Delaware Bankruptcy Court, and thus this Court has the power to transfer this case to Delaware pursuant to § 1406.  For a case to be transferable, the transferee court must be one in which the case could have been brought originally.  *See Int'l Secs. Exchange, LLC v. Chicago Board Options Exchange Inc.*, No. 06 Civ. 13445 (RMB)(THK), 2007 WL 1541087 (S.D.N.Y. May 24, 2007).  Under the jurisdictional provisions in 28 U.S.C. § 1334(b), district courts have original jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11."  Because broad bankruptcy jurisdiction is "essential to the efficient administration of bankruptcy proceedings," this Circuit has construed the core jurisdiction of the bankruptcy courts "as broadly as possible" so as to be "close to or congruent with constitutional limits."  *See Luan Investment S.E. v. Franklin 145 Corp. (In re Petrie Retail)*, 304 F.3d 223, 229 (2d Cir. 2002) (internal quotations and citations omitted).

Furthermore, this Circuit has broadly interpreted "related-to" jurisdiction under § 1334(b) to cover any action whose "outcome might have any 'conceivable effect' on the bankrupt estate." *See, e.g., In re Cuyahoga Equipment Corp.*, 980 F.2d 110, 114 (2d Cir. 1992). Venue in actions arising under or related to bankruptcy cases is proper in the district in which the bankruptcy case is pending. 28 U.S.C. § 1409(a) ("[A] proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending.").

Here, there can be no dispute that venue is proper in Delaware Bankruptcy Court because the assets at issue in this litigation are at the heart of the bankrupt estates, and because adjudication of Plaintiffs' claims will have a direct effect on the bankrupt estates. *See id.* As Plaintiffs' claims pertain to the purchase of the vast majority of Old Winstar's business assets, this suit strikes at the core of the bankruptcy estates and the still ongoing bankruptcy proceedings, and is thus firmly within the jurisdiction of the Bankruptcy Court. (*See* Compl. at ¶¶ 13, 43; *see also* Ex. C (Bankruptcy Docket).) Further, pursuant to the Blackstone Agreement between the Debtors and Blackstone, Blackstone is entitled to be indemnified for any and all costs of defending the instant litigation. (*See* Ex. A (Attachment A).) The Impala Agreement similarly requires the Debtors to indemnify Impala for these costs. (See Ex. F (Impala Agreement) Payment of these costs will affect the amount of money that will be available for distribution to the Debtors' creditors in connection with the pending bankruptcy cases in the Delaware Bankruptcy Court. Accordingly, this case this case falls within the broad jurisdictional provisions of 28 U.S.C. § 1334, and thus venue is proper in the Delaware Bankruptcy Court.

**II.    IN THE ALTERNATIVE, EVEN IF VENUE EXISTS IN THIS DISTRICT, THE CASE SHOULD BE TRANSFERRED TO DELAWARE DISTRICT COURT FOR REFERRAL TO DELAWARE BANKRUPTCY COURT IN THE INTERESTS OF JUSTICE PURSUANT TO SECTION 1404(A).**

If this court determines that venue is proper in this District, it should nonetheless transfer the case to the Delaware District Court for referral to the Delaware Bankruptcy Court pursuant to 28 U.S.C. § 1404(a), which permits such transfers in the interests of justice.[13]  As a threshold matter, a transfer pursuant to that provision would give effect to the chosen forum selection clause and the Bankruptcy Court Order.  *See, e.g., Kmart Corp.*, 41 F. Supp. 2d at 274 (transferring case pursuant to § 1404 in the face of mandatory forum selection clause); *Huntingdon Engineering & Envt'l Inc. v. Platinum Software Corp.*, 882 F. Supp. 54, 58 (W.D.N.Y. 1995) (same).  Even under § 1404(a), "mere inconvenience and expense of travelling are not, standing alone, adequate reasons to disturb the parties' contractual choice of forum;" rather the plaintiff still has the burden to "demonstrate exceptional facts" to avoid litigation in the designated forum.  *Id.*; *see also G & R Moojestic Treats Inc. v. MaggieMoo's Int'l, LLC,* No. 03 Civ. 10027 (RWS), 2004 WL 1110423, at *5 (S.D.N.Y. May 19, 2004).  While an enforceable forum selection clause "is a significant factor that figures centrally in the district court's § 1404(a) calculus," should the Court transfer this case pursuant to § 1404(a) it must also consider additional factors that "come under the heading of 'the interest of justice.'"  *Kmart Corp.*, 41 F. Supp. 2d at 273.

In this case, it is clear that Plaintiffs cannot demonstrate "exceptional facts" such as to preclude this Court from transferring this case to the Delaware Bankruptcy Court.  That the Delaware Bankruptcy Court continues to exercise jurisdiction over the ongoing bankruptcy proceedings for Old Winstar militates strongly in favor of transferring the case to that court, both

---

[13]    Just as this Court could transfer this case to Delaware Bankruptcy Court pursuant to § 1406 because venue is proper there, so too can it transfer the case pursuant to § 1404 for the same reasons.  *See supra*, § I.C.

because transfer of the action will alleviate the Trustee from expending estate resources unnecessarily as a result of litigating in multiple forums, and because of the strong public policy favoring consolidation of actions that could potentially have an effect on the bankrupt estates.[14] *See, e.g., In re Houbigant, Inc.*, 914 F. Supp. 964, 981 (S.D.N.Y. 1995) (noting "strong policy in Bankruptcy to consolidate the proceedings").  Further, Plaintiffs are both Delaware corporations who have already shown a willingness to submit to the jurisdiction of the Delaware Bankruptcy Court.[15]  (*See* Compl. at ¶ 2-6; Ex. A (Asset Purchase Agreement) §§ 9.10, 9.15; Ex. B (Order) ¶ 15.)  Finally, the Delaware Bankruptcy Court is already fully familiar with the operative facts at issue here, and thus adjudication in that forum will save not only the parties' resources, but also judicial resources as well.  *See Int'l Secs. Exchange*, 2007 WL 1541087 at *2 (noting that as part of § 1404(a) analysis, a court should consider "public interest factors" including the transferee court's familiarity with the governing law as well as trial efficiency).

## <u>CONCLUSION</u>

For all the foregoing reasons, Defendants Blackstone, Impala, and Citicorp respectfully request that this Court issue an order transferring venue for this case pursuant to 28 U.S.C. § 1406(a), or in the alternative 28 U.S.C. § 1404(a), to the United States District Court for the District of Delaware so that it may be referred to the United States Bankruptcy Court for the District of Delaware.

---

[14]  As stated above, the fact that the Debtors are contractually bound to indemnify Blackstone and Impala for all costs relating to this suit directly implicates the resources of the bankrupt estate.  *See supra*, note 7, § I.C.

[15]  As it was not inconvenient for Plaintiffs to go to the Delaware Bankruptcy Court to buy Old Winstar's Assets, it should be no less convenient for them to prosecute this action there.

Respectfully submitted,

Dated:  June 21, 2007

s/ Yosef. J. Riemer
_____
;
Yosef J. Riemer
Vickie Reznik
David S. Flugman

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Attorneys for Defendant*
*The Blackstone Group L.P.*


s/ Stephen M. Rathkopf
_____

Stephen M. Rathkopf
Andrew C. Gold
John Oleske

HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York 10016
Telephone:    (212) 592-1400
Facsimile:    (212) 592-1500

*Attorneys for Defendant*
*Impala Partners, LLC*

s/ Stephen L. Saxl
_____

Stephen L. Saxl
William Wargo

GREENBERG  TRAURIG, LLP
200 Park Avenue
New York, New York 10166
Telephone:    (212) 801-9200
Facsimile:    (212) 801-6400

*Attorneys for Defendant Citgroup, Inc., as*
*successor by merger to Citicorp*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**WINSTAR HOLDINGS, LLC and**
**IDT CORP.,**

                    *Plaintiffs*,

        - against -

**THE BLACKSTONE GROUP L.P.;**
**IMPALA PARTNERS, LLC; and**
**CITICORP,**

                    *Defendants*.

Case No.:        **07 CV 4634 (GEL)(AJP)**

                 **ECF Case**

---

        To the Clerk of this Court and all parties of record:

        Enter my appearance as counsel in this case for Defendant The Blackstone Group

L.P.

        I certify that I am admitted to practice in this court.

Dated: June 21, 2007

/s Vickie Reznik

---

Vickie Reznik (VR 1897)
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

*Attorneys for Defendant*
*The Blackstone Group L.P.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**WINSTAR HOLDINGS, LLC and**
**IDT CORP.,**

              *Plaintiffs*,

    - against -

**THE BLACKSTONE GROUP L.P.;**
**IMPALA PARTNERS, LLC; and**
**CITICORP,**

              *Defendants*.

Case No.:    **07 CV 4634 (GEL)(AJP)**

         **ECF Case**

---

To the Clerk of this Court and all parties of record:

Enter my appearance as counsel in this case for Defendant The Blackstone Group L.P.

I certify that I am admitted to practice in this court.

Dated: June 21, 2007

/s David S. Flugman

---

David S. Flugman (DF 9884)
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Attorneys for Defendant*
*The Blackstone Group L.P.*

GREENBERG TRAURIG, LLP
Stephen L. Saxl  (SS-1028)
William A. Wargo (WW-9417)
200 Park Avenue
New York, New York 10016
Tel.:  (212) 801-9200
*Attorneys for defendant Citigroup Inc., as*
*successor by merger to Citicorp*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x

WINSTAR HOLDINGS, LLC, and          :
IDT CORP.,                          :
                                    :
                        Plaintiffs, :    Case No. 07 Civ. 4634 (GEL) (AJP)
                                    :
           -against-                :    **RULE 7.1**
                                    :    **DISCLOSURE STATEMENT**
THE BLACKSTONE GROUP LP;            :
IMPALA PARTNERS, LLC; and           :
CITICORP,                           :
                        Defendants. :
-------------------------------------------------------------- x


        Pursuant to Rule 7.1, Fed. R. Civ. P., the undersigned attorneys of record for defendant

Citigroup Inc., as successor by merger to Citicorp (the "Defendant"), certify that Defendant is a

publicly held corporation.  Defendant has no parent corporation and no publicly held corporation

owns 10% or more of Defendant's stock.

Dated: New York, New York
       June 21, 2007

                              GREENBERG TRAURIG, LLP

                              By: s/ Stephen L. Saxl
                                      Stephen L. Saxl (SS-1028)
                                      William A. Wargo (WW-9417)
                              200 Park Avenue
                              New York, New York  10166
                              Tel: (212) 801-9200
                              *Attorneys for defendant Citigroup Inc., as*
                              *successor by merger to Citicorp*

AO 458 (Rev. 10/95)   Appearance

# UNITED STATES DISTRICT COURT

SOUTHERN                    DISTRICT OF        NEW YORK

Winstar Holdings, LLC

v.

The Blackstone Group LP

**APPEARANCE**

Case Number:    07 Civ. 4634 (GBL)

To the Clerk of this court and all parties of record:

Enter my appearance as counsel in this case for

Defendant Citigroup, as successor by merger to Citicorp.

I certify that I am admitted to practice in this court.

June 22, 2007

Date

Signature

William A. Wargo

WW 9417

Print Name                                   Bar Number

Greenberg Traurig, LLP - 200 Park Avenue

Address

New York             NY              10166

City                State           Zip Code

(212) 801-3115                (212) 801-6400

Phone Number                             Fax Number

AO 458 (Rev. 10/95)   Appearance

# UNITED STATES DISTRICT COURT

SOUTHERN _____ DISTRICT OF _____ NEW YORK

Winstar Holdings, LLC

v.

The Blackstone Group LP

**APPEARANCE**

Case Number: 07 Civ. 4634 (GBL)

To the Clerk of this court and all parties of record:

Enter my appearance as counsel in this case for

Defendant Citigroup, as successor by merger to Citicorp.

I certify that I am admitted to practice in this court.

June 22, 2007

Date

Signature

Stephen L. Saxl

Print Name

SS 1028

Bar Number

Greenberg Traurig, LLP - 200 Park Avenue

Address

New York          NY          10166

City          State          Zip Code

(212) 801-2184          (212) 805-9371

Phone Number          Fax Number

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **WINSTAR HOLDINGS, LLC and IDT CORP.,** | **Case No.:**    **07 CV 4634 (GEL)(AJP)** |
| *Plaintiffs,* | **ECF Case** |
| - against - | |
| **THE BLACKSTONE GROUP L.P.; IMPALA PARTNERS, LLC; and CITICORP,** | |
| *Defendants.* | |

## CERTIFICATE OF SERVICE

I, Omar W. Ruffin, the undersigned certify under penalty of Perjury, that on June 22, 2007, I caused a true and correct copy of the attached Joint Notice of Motion, Declaration of David S. Flugman and Memorandum of Law in Support of the Joint Motion by all Defendants to Transfer Venue to the United States District Court for the District of Delaware to be served upon:

**By Hand:**
**Philip C. Silverberg**
**Gretchen Henniger**
**Mound Cotton Wollan & Greengrass**
**One Battery Park Plaza**
**New York, NY  10004-1486**
*Attorneys for Plaintiffs*

**By FedEx/Overnight Mail:**
**Melissa Roover**
**Grayson & Kubli, P.C.**
**1420 Spring Hill Road, Suite 230**
**McLean, VA  22102**
*Attorneys for Plaintiffs*

Omar W. Ruffin, MPA
Legal Assistant

Andrew C. Gold
Stephen M. Rathkopf
HERRICK, FEINSTEIN LLP
Attorneys for Impala Partners, LLC
2 Park Avenue
New York, NY  10016
212.592.1400

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| WINSTAR HOLDINGS, LLC and<br>IDT CORP., | : | Case No.: 07 Civ. 4634 (GEL) |
| | : | |
| | : | ECF Case |
| Plaintiffs, | : | |
| | : | **NOTICE OF APPEARANCE** |
| -against- | : | |
| | : | |
| THE BLACKSTONE GROUP LP; | : | |
| IMPALA PARTNERS, LLC; and | : | |
| CITICORP, | : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PLEASE TAKE NOTICE that Herrick, Feinstein LLP hereby appears as counsel for Defendant Impala Partners, LLC ("Impala"), in the above-captioned action, and demands that all notices and other correspondence given or required to be given to Impala in this case, be served upon the undersigned attorneys on Impala's behalf, at the address set forth below.

Dated:  June 25, 2007

HERRICK, FEINSTEIN LLP

By    /s/ Andrew C. Gold
_____
Andrew C. Gold
Stephen M. Rathkopf
2 Park Avenue
New York, NY  10016
Phone:  212.592.1400

*Attorneys for Impala Partners, LLC*

TO:

Grayson & Kubli, P.C.
Melissa Roover
1420 Spring Hill Road, Suite 230
McLean, VA 22102


Mound Cotton Wollan &
Greengrass
Philip C. Silverberg
Gretchen Henninger
One Battery Park Plaza
New York, NY 10004-1486

Kirkland & Ellis LLP
Yosef Riemer
Vickie Reznik
David Flugman
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611

Greenberg Traurig, LLP
Stephen L. Saxl
William A. Wargo
200 Park Avenue
New York, NY  10166

HF 3689956v.1 #10069/0007

# Greenberg Traurig



Stephen L. Saxl
(212) 801-2184
saxls@gtlaw.com





June 22, 2007

**BY HAND**

The Honorable Gerard E. Lynch
United States District Judge
United States Courthouse
500 Pearl Street, Room 910
New York, New York 10007

Re:  *Winstar Holdings, LLC, et al. v. The Blackstone Group LP, et al.*
     Case No.: 07 Civ. 4634 (GBL)

Dear Judge Lynch:

We represent defendant Citigroup Inc., as successor by merger to Citicorp ("Citigroup"), in the above-referenced action. We respectfully request that the Court grant defendants Citigroup and The Blackstone Group LP ("Blackstone") an extension of time to move against, answer or otherwise respond to Plaintiffs' complaint, from the current deadline of **Monday, June 25, 2007**, either:

(i) until twenty (20) days following an Order determining the Joint Motion by All Defendants to Transfer Venue to the United States District Court for the District of Delaware (for referral to the United States Bankruptcy Court for the District of Delaware), filed by Defendants yesterday; or, in the alternative,

(ii) for two (2) weeks, through and including July 9, 2007.

Plaintiffs refused both of these requests at 5:40 p.m. yesterday evening, which necessitates this application. Counsel for Blackstone joins in these requests.

This is the second request for an extension of time for defendants Citicorp and Blackstone to move against, answer or otherwise respond to Plaintiffs' complaint. Prior to our law firm's retention in this case, at the request of Blackstone's counsel, Plaintiffs consented to an initial two (2) week extension of time for Blackstone and Citicorp to move against, answer or otherwise respond to Plaintiffs' Complaint, until June 25, 2007.

Our firm was retained earlier this week. On Wednesday (June 20), I spoke with Plaintiffs' counsel (Melissa Roover, Esq.) and requested Plaintiffs' consent to an additional extension -- either (i) tying defendants' time to respond to a ruling on the transfer motion, which Defendants believe is the most efficient and logical way to proceed, or (ii) a short additional courtesy extension (two weeks) to prepare motion to dismiss papers. Plaintiffs' counsel told me that they would get back to us.

Honorable Gerard E. Lynch
June 22, 2007
Page 2

Yesterday (Thursday, June 21), not having heard back from Plaintiffs' counsel, I left two telephone messages for Plaintiffs' counsel. Finally, in response to our follow-up e-mail, at 5:40 p.m., we received a letter from Plaintiffs' counsel refusing to consent to any additional extension of Monday's deadline, stating as the reasons: "As the complaint was served on your client on May 22, 2007, and we previously granted all defendants a two-week extension on this matter, we decline your request for a further extension. We also see no reason to defer the deadline to answer or otherwise respond to the complaint until after the removal issue has been decided, as in our view the two are not connected."

This is a suit for money damages arising out of events in 2001. This action was filed in the Supreme Court of the State of New York, County of New York on May 10, 2007. Defendants were served on or about May 22, 2007 (31 days ago). Defendant Impala Partners, LLC removed the action to this Court on federal bankruptcy jurisdiction grounds, with the stated intention of transferring the action to the Delaware Court. Yesterday, defendants filed their Joint Motion to Transfer Venue to the United States District Court for the District of Delaware (for referral to the United States Bankruptcy Court for the District of Delaware). Plaintiffs confirmed on Wednesday that it is their intention to move to remand the case to New York State Court (though they have not yet done so). Accordingly, *all parties* are asking that the case be moved from this Court to some other forum.

Defendants believe that under the circumstances, it would be most efficient for all parties to have a determination of the forum in which the case will proceed -- Delaware Bankruptcy Court, New York State Supreme Court, or this Court -- before the parties proceed to brief motions to dismiss and opposition papers without knowing what procedural rules apply and the forum.

In any event, given that we are newly retained in this action this week and that Citicorp and Blackstone presently intend to file coordinated motions to dismiss on numerous grounds, we believe that a two week extension of this deadline is warranted even if the Court is not inclined to tie the deadline to the resolution of the transfer motion.

Given the imminent deadline (Monday, June 25), we respectfully request that the Court rule on this request today, or at least grant Defendants an interim extension.

Respectfully,

Stephen L. Saxl

cc (via e-mail):
  Melissa Roover, Esq.
  Philip C. Silverberg, Esq.
  Vickie Reznik, Esq.
  Andrew C. Gold, Esq.

SO ORDERED

GERARD E. LYNCH, U.S.D.J.
6/25/07

AO 458 (Rev. 10/95)  Appearance

# UNITED STATES DISTRICT COURT

SOUTHERN    DISTRICT OF    NEW YORK

WINSTAR HOLDINGS, LLC and
IDT CORP.,

            *Plaintiffs*,

v.

THE BLACKSTONE GROUP L.P.;
IMPALA PARTNERS, LLC; and
CITICORP,

            *Defendants*.

**APPEARANCE**

Case Number:  07 Civ. 4634 (GBL)

To the Clerk of this court and all parties of record:

    Enter my appearance as counsel in this case for

    Plaintiffs Winstar Holdings, LLC and IDT Corp.

    I certify that I am admitted to practice in this court.

| | |
|---|---|
| 6/27/2007 | *(signature)* |
| Date | Signature |
| | Melissa Roover      MR-1163 |
| | Print Name    Bar Number |
| | Grayson & Kubli, P.C. - 1420 Spring Hill Rd, Suite 230 |
| | Address |
| | McLean    VA    22102 |
| | City    State    Zip Code |
| | (703) 749-0000    (703) 442-8672 |
| | Phone Number    Fax Number |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

WINSTAR HOLDINGS, LLC and
IDT CORP.,

                     Plaintiff,

        -against-

THE BLACKSTONE GROUP LP; IMPALA
PARTNERS, LLC; AND CITICORP

                     Defendants.

-------------------------------------------------------------------x

Civ. No.: 07 CV 4634 (GEL)

ECF Case

## <u>NOTICE OF APPEARANCE</u>

       PLEASE TAKE NOTICE that Cohen Tauber Spievack & Wagner LLP hereby

enters its appearance in this action on behalf of Plaintiffs Winstar Holdings, LLC and

IDT Corp., and requests that copies of all papers in this action be served upon the

undersigned.


Dated: New York, New York
       June 26, 2007

                    COHEN TAUBER SPIEVACK & WAGNER, LLP

By: _____
                  Joseph M. Vann (JMV 7601)
                  Jed Lewin (JL 2428)
                  Attorney for Plaintiffs
                  420 Lexington Avenue, 24th Floor
                  New York, New York 10170
                  (212) 586-5800

                  and

GRAYSON & KUBLI, P.C.
Melissa Roover (ML 1163)
Attorney for Plaintiffs
1420 Spring Hill Road, Suite 230
McLean, Virginia 22102
(703) 749-0000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

WINSTAR HOLDINGS, LLC and
IDT CORP.,

                                          Plaintiff,

                    -against-

THE BLACKSTONE GROUP LP; IMPALA
PARTNERS, LLC; AND CITICORP

                                          Defendants.
--------------------------------------------------------------x

Civ. No.: 07 CV 4634 (GEL)

ECF Case

**RULE 7.1 STATEMENT**

Pursuant to Rule 7.1 of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York, and to enable Judges and Magistrate Judges of the Court to evaluate possible disqualification or recusal, the undersigned counsel for plaintiffs Winstar Holdings, LLC and IDT Corp., certify that Winstar Holdings, LLC is a wholly-owned subsidiary of IDT Corp., a publicly traded company under the ticker symbol "IDT."

Dated: New York, New York
           June 26, 2007

                              COHEN TAUBER SPIEVACK & WAGNER, LLP

                              By:  _____
                                      Joseph M. Vann (JMV 7601)
                                      Jed Lewin (JL 2428)
                                      Attorney for Plaintiffs
                                      420 Lexington Avenue, 24th Floor
                                      New York, New York  10170
                                      (212) 586-5800

                                      and

GRAYSON & KUBLI, P.C.
Melissa Roover (ML 1163)
Attorney for Plaintiffs
1420 Spring Hill Road, Suite 230
McLean, Virginia 22102
(703) 749-0000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
WINSTAR HOLDINGS, LLC and
IDT CORP.,

                              Plaintiff,

       -against-

THE BLACKSTONE GROUP LP; IMPALA
PARTNERS, LLC; AND CITICORP

                            Defendants.
--------------------------------------------------------------x

Civ. No.: 07 CV 4634 (GEL)

ECF Case

# NOTICE   OF   CHANGE   OF ADDRESS

**To: Attorney Admission Clerk and All Other Parties**

Pursuant to Local Rule 1.3 of this Court, please take notice of the following attorney information change(s) for: _____

☐     *Attorney*

      ☒     I am a U.S.D.C., Southern District of New York attorney. My Bar Number is: JL 2428 _____

      ☐     I am a Pro Hac Vice attorney

      ☐     I am a Government Agency attorney

☐     *Law Firm/Government Agency Association*

From: Anderson Kill & Olick, P.C _____

To:    Cohen Tauber Spievack & Wagner LLP _____

      ☒     I will continue to be counsel of record on the above-entitled case at my new firm/agency.

      ☐     I am no longer counsel of record on the above-entitled case. An order withdrawing my appearance was entered on _____ by Judge _____

☐     *Address:*    **_Cohen Tauber Spievack & Wagner LLP, 420 Lexington Ave.,_**

                **_New York, New York 10170_**

☐     *Telephone Number:*    **_(212) 586-5800\_**

☐     *Fax Number:*    **_(212) 586-5096_**

☐     *E-Mail Address:*    **_JLewin@ctstwlaw.com_**

Dated: 6|28|07 _____      _signature_ _____

{00004893.DOC; 1}

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
WINSTAR HOLDINGS, LLC and
IDT CORP.,

                                 Plaintiff,

                 -against-

THE BLACKSTONE GROUP LP; IMPALA
PARTNERS, LLC; AND CITICORP

                               Defendants.
-----------------------------------------------------------------x

Civ. No.: 07 CV 4634 (GEL)

ECF Case

## <u>NOTICE OF MOTION TO REMAND</u>

PLEASE TAKE NOTICE that, upon the accompanying Memorandum of Law and Declaration of Joseph M. Vann, the undersigned will move before the Honorable Gerard E. Lynch, Judge of the United States District Court for the Southern District of New York, at the United States District Courthouse, located at 500 Pearl Street, New York, New York, 10007, at a time and place to be scheduled by this Court, for an order

(a) remanding the above-captioned lawsuit to the Supreme Court of the State of New York, Commercial Division, (i) on the basis that there is no jurisdiction or right of removal for lack of "relatedness" under 28 U.S.C. §1334(b) or pursuant to the mandatory abstention provisions of §1334(c)(2); or, in the alternative, (ii) pursuant to permissive abstention under §1334(c)(1) or equitably under §1452(b);

(b) denying Impala's "request" to transfer this lawsuit to the Bankruptcy Court of the District of Delaware, and

(c) for such other and further relief as this Court may deem just and proper.

Dated: New York, New York
      July 1, 2007

                        COHEN TAUBER SPIEVACK & WAGNER, LLP


                By:        s/Joseph M. Vann
                        Joseph M. Vann (JMV 7601)
                        Jed Lewin (JL 2428)
                        *Attorneys for Plaintiffs*
                        420 Lexington Avenue, 24th Floor
                        New York, New York 10170
                        (212) 586-5800

                              and

                        GRAYSON & KUBLI, P.C.
                        Melissa Roover (ML 1163)
                        *Attorneys for Plaintiffs*
                        1420 Spring Hill Road, Suite 230
                        McLean, Virginia 22102
                        (703) 749-0000

TO:
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
(212) 446-4800

*Attorneys for Defendant*
*The Blackstone Group L.P.*

GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
(212) 801-9200

*Attorneys for Defendant Citigroup, Inc., as*
*successor by merger to Citicorp*

HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York 10016
(212) 592-1400

*Attorneys for Defendant*
*Impala Partners, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
WINSTAR HOLDINGS, LLC and
IDT CORP.,

                                                  Civ. No.: 07 CV 4634 (GEL)
                         Plaintiff,           ECF Case

        -against-

THE BLACKSTONE GROUP LP; IMPALA
PARTNERS, LLC; AND CITICORP

                       Defendants.
----------------------------------------------------------------x

## PLAINTIFFS' MOTION TO REMAND

      Plaintiffs Winstar Holdings, LLC and IDT Corp. ("Plaintiffs") hereby respectfully request that the Court enter an order:  (a) acknowledging no right of removal for lack of "relatedness" under 28 U.S.C. §1334(b) or pursuant to the mandatory abstention provisions of §1334(c)(2); or, in the alternative, (b) abstaining from exercising this Court's jurisdiction pursuant to permissive abstention under §1334(c)(1) or equitably under §1452(b), and remanding the Lawsuit to the Supreme Court of the State of New York.  The Court also should deny Impala's "request" to transfer this Lawsuit the Bankruptcy Court of the District of Delaware.

Dated: New York, New York
July 1, 2007

Respectfully submitted,


____s/ Joseph M. Vann_____

Joseph M. Vann (JMV 7601)
Jed Lewin (JL 2428)
COHEN TAUBER SPIEVACK &
WAGNER, LLP
420 Lexington Avenue, 24th Floor
New York, New York 10170
(212) 586-5800

-and-

_____s/Melissa A. Roover_____
Alan M. Grayson, of counsel
Melissa A. Roover (MR 1163)
GRAYSON & KUBLI, P.C.
Attorneys for Plaintiff
1420 Spring Hill Road, Suite 230
McLean, Virginia 22102
(703) 749-0000

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
WINSTAR HOLDINGS, LLC and
IDT CORP.,

                                 Plaintiff,

                -against-

THE BLACKSTONE GROUP LP; IMPALA
PARTNERS, LLC; AND CITICORP

                             Defendants.
-----------------------------------------------------------------x

Civ. No.: 07 CV 4634 (GEL)

ECF Case

## <u>DECLARATION OF JOSEPH M. VANN IN SUPPORT OF MOTION TO REMAND</u>

Joseph M. Vann, pursuant to 28 U.S.C. §1746, declares under penalty of perjury that the following is true and correct:

1.     I am a partner in the law firm of Cohen Tauber Spievack & Wagner LLP, co-attorneys for Plaintiffs[1]. I am fully familiar with all of the matters set forth in this declaration either from personal knowledge or from my review of the file in this matter. I submit this declaration in further support of Plaintiffs' Motion to Remand this Lawsuit to the Supreme Court of the State of New York, Commercial Division.

2.     Attached hereto as Exhibit 1 is a true and correct copy of the Complaint in this Lawsuit, as filed on May 10, 2007 in the Supreme Court of the State of New York, County of New York (Commercial Division).

---

[1] Capitalized terms not defined herein shall have their respective definitions the meanings ascribed to such terms in Plaintiffs' Memorandum of Law in Support of Their Motion to Remand submitted herewith.

3.     Attached hereto as Exhibit 2 is a true and correct copy of excerpted portions of

the Docket Sheet maintained by the Clerk of the Delaware Bankruptcy Court in

respect of the Old Winstar Liquidation Proceeding.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: New York, New York
          July 2, 2007

                                        COHEN TAUBER SPIEVACK & WAGNER, LLP



                              By:        s/Joseph M. Vann
                                        Joseph M. Vann (JMV 7601)
                                        Jed Lewin (JL 2428)
                                        *Attorneys for Plaintiffs*
                                        420 Lexington Avenue, 24th Floor
                                        New York, New York 10170
                                        (212) 586-5800

                                             and

                                        GRAYSON & KUBLI, P.C.
                                        Melissa Roover (ML 1163)
                                        *Attorneys for Plaintiffs*
                                        1420 Spring Hill Road, Suite 230
                                        McLean, Virginia 22102
                                        (703) 749-0000

`

Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

**ORIGINAL**

|  |  |  |
|---|---|---|
| WINSTAR HOLDINGS, LLC and IDT CORP., | : | Index No. |
|  | : | Date Purchased |
|  | : | Plaintiff designates NEW YORK  0 7 6 0 1 5 8 2 |
| Plaintiffs, | : | County as the place of trial. |
|  | : |  |
| -against- | : | The basis of this venue is |
|  | : | residence of defendants; location where the cause |
| THE BLACKSTONE GROUP LP; | : | of action arose; and Plaintiffs' designation. |
| IMPALA PARTNERS, LLC; and | : |  |
| CITICORP, | : | **SUMMONS** |
|  | : |  |
| Defendants. | : | Plaintiffs reside at |
|  | : | 520 Broad Street |
|  | : | Newark, New Jersey |
|  |  | County of Essex |

**FILED**
MAY 10 2007
NEW YORK
COUNTY CLERKS C...

To the above named Defendants:

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer on the Plaintiffs' Attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:   New York, New York
         May 10, 2007

MOUND COTTON WOLLAN & GREENGRASS

Philip C. Silverberg, Esq.
Gretchen Henninger, Esq.
One Battery Park Plaza
New York, NY 10004-1486
Telephone: (212) 804-4200

and

Melissa Roover, Esq.
GRAYSON & KUBLI, P.C
1420 Spring Hill Road, Suite 230
McLean, VA 22102
(703) 749-0000

Attorneys for Plaintiffs
WINSTAR HOLDINGS, LLC and
IDT CORP.

TO:    The Blackstone Group LP
       345 Park Avenue
       New York, NY 10154

       Impala Partners, LLC
       18 Marshall Street, Suite 112
       Norwalk, CT 06854

       Citicorp
       399 Park Avenue
       New York, NY 10043

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X

WINSTAR HOLDINGS, LLC,
 and IDT CORP.,                                    Index No.:

                    Plaintiffs,

        -against-

THE BLACKSTONE GROUP LP;
IMPALA PARTNERS, LLC; and            **COMPLAINT** 7601582
CITICORP,

                    Defendants.

-------------------------------------------------------------------X

        Plaintiffs, Winstar Holdings, LLC and IDT Corp., by and through its attorneys, Mound

Cotton Wollan & Greengrass, as and for its complaint against Defendants, The Blackstone

Group LPI, Impala Partners, LLC, and Citicorp, hereby allege as follows:

        1.      In 2001, Plaintiffs spent $42.5 million to acquire the business assets of Winstar

Communications, Inc., and related entities ("Old Winstar"). In doing so, they relied on the oral

and written misrepresentations of the Defendants regarding Old Winstar sales, customers, and

other material information. As a result, the Plaintiffs lost hundreds of millions of dollars. The

Plaintiffs bring this action to recover for those injuries.

                                **PARTIES**

        2.      Plaintiff Winstar Holdings, LLC, formerly known as IDT Winstar Acquisition,

Inc. ("New Winstar"), is a Delaware corporation. It acquired the business assets of Old Winstar

in an Asset Purchase Agreement dated December 18, 2001.

                                    1

3.      Plaintiff IDT Corp. ("IDT") is a Delaware corporation. It is, among other things, a telephone company. It provided the funds for the purchase of Old Winstar, and bore most of the resulting subsequent losses.

4.      Defendant The Blackstone Group LP ("Blackstone") is a Delaware limited partnership. Its principal office is at 345 Park Avenue, New York, NY 10154. In the sale of Old Winstar's assets, it acted as an investment advisor to various entities related to Old Winstar.

5.      Defendant Impala Partners, LLC ("Impala") is a Delaware limited partnership. Its principal office is at 18 Marshall Street, Suite 112, Norwalk, Connecticut 06854. Upon information and belief, at the time of the sale of Old Winstar's assets, it was acting as a restructuring advisor for Old Winstar.

6.      Defendant Citicorp ("Citicorp") is a Delaware corporation. Its principal office is at 399 Park Avenue, New York, New York 10043. It was the largest creditor of Old Winstar while Old Winstar was a debtor in bankruptcy. Impala's actions are, in large part, attributable to Citicorp because Citicorp acted as Impala's principal. Allegations regarding Citicorp include, but are not limited to, allegations regarding Impala that are imputed to Citicorp.

## JURISDICTION AND VENUE

7.      The Supreme Court of the State of New York, as a court of general original jurisdiction, has subject matter jurisdiction of this action.

8.      Personal jurisdiction exists in this action because, among other reasons: the Defendants transact business within the state or contracted to supply goods or services within the state; have committed a tortious act within the state; and own, use or possess real property within the state.

2

9.      Venue lies in this County because Defendants Blackstone's and Citicorp's principal offices are located in this County, the cause of action arose in the county, and the Plaintiffs designate the county.

## ALLEGATIONS

10.     In and around 2001, IDT examined several potential acquisitions in the field of telecommunications.

11.     Through 2001, Old Winstar provided telephone service to customers using a "fixed wireless" system.  This system carried calls locally by wireless means, from customer locations to Old Winstar's local "hubs."

12.     On information and belief, Old Winstar maintained an office in New York City. It also maintained some of its books and records in New York City.

13.     Old Winstar was a publicly traded company.  On April 18, 2001, Old Winstar petitioned for protection under Chapter 11 of the U.S. Bankruptcy Code.  The bankruptcy petition was filed in the U.S. Bankruptcy Court for the District of Delaware.

14.     On information and belief, Blackstone was retained as a financial advisor, and Blackstone's responsibility was to obtain the highest possible sale price for the assets of Old Winstar.  Upon information and belief, Blackstone's compensation varied with the sale price that it obtained for Old Winstar's assets.  Specifically, Blackstone received, *inter alia,* a transaction fee equal to 1% of the first $200 million of consideration paid by an acquirer.  This provided Blackstone with an incentive to maximize – or inflate -- that consideration.

15.     The division of Blackstone performing the financial advisory work for Old Winstar was Blackstone's Restructuring & Reorganization Advisory Group.  This group claims

3

to have provided advisory services in over 150 "distressed situations." On information and belief, it is an unincorporated division of Blackstone.

16.    At all relevant times, the head of Blackstone's Restructuring & Reorganization Advisory Group was Arthur Newman ("Newman"). Newman also was a member of Blackstone's Executive Committee. The Executive Committee oversees all of Blackstone's policy decisions.

17.    Upon information and belief, Old Winstar retained Impala as a restructuring advisor, for the purpose of providing restructuring advice and other related services in connection with Old Winstar's Chapter 11 bankruptcy proceedings. As compensation, Impala charged Old Winstar $250,000 per month for the first two months of its services. Thereafter, Impala's compensation was $100,000 per month for the services of Paul Street, who acted as the Chief Restructuring Officer for Old Winstar. Impala charged various other amounts for other Impala personnel. In addition, upon the sale of all or substantially all of Old Winstar's assets, in one or more transactions, in which the aggregate consideration paid by the purchaser was less than $350 million, Impala earned a transaction fee of 0.25% of such consideration. Upon the sale of all or substantially all of the Old Winstar's assets, in one or more transactions, in which the aggregate consideration paid by the purchaser was equal to or greater than $350 million, Impala earned a transaction fee of 2.0% of such consideration. Thus Impala was motivated to obtain the highest possible sale price for the Winstar assets.

18.    Upon information and belief, Citicorp, as Old Winstar's largest creditor, assisted Old Winstar in negotiating its contract terms with Impala. Citicorp acted as Impala's principal.

19.    To promote the sale of Old Winstar's business assets, Blackstone prepared an offering statement. Upon information and belief, Impala assisted with the preparation of the

4

offering statement. Blackstone, Citicorp, and Impala also controlled bidder access to Winstar staff, and Winstar records.

20.     In connection with the sale of Old Winstar's business assets, Blackstone, Citicorp, and Impala assisted in the development of financial data and presentations to Old Winstar's Board of Directors, various creditors and other parties. Blackstone reviewed financial analyses generated by Old Winstar's finance staff and external advisors. Blackstone also performed various analyses, including cash reconciliation of Old Winstar's actual performance vs. various sets of projections. Blackstone petitioned for payment for this work, and the petition was granted.

21.     IDT was one of several entities that expressed an interest in acquiring Old Winstar's business assets.

22.     An auction of Old Winstar's business assets was planned for December 2001. Leading up to that auction, Blackstone circulated an "offering book." Blackstone also met with IDT and, on information and belief, other entities interested in bidding in the auction. In meetings organized by Blackstone, several Winstar officials also met with IDT and, on information and belief, other interested entities. The meetings generally were held within this County. Certain Old Winstar business records also were made available to IDT at that time, generally in an area known as the "data room," which was located within this County. Collectively, this communication and review was known as "due diligence."

23.     In accordance with the timing established for the auction, IDT's due diligence was conducted between Friday, November 30, 2001, and Wednesday, December 5, 2001.

24.     A number of IDT representatives engaged in this due diligence.

25.     Blackstone's representatives included Arthur Newman.  Newman engaged in substantive discussions about Old Winstar's business with representatives of IDT,  Howard Jonas, *inter alia*.

26.     Impala's representatives included Paul Street.

27.     Old Winstar's representatives included Chief Financial Officer David Duncan, *inter alia*.

28.     During this due diligence, Blackstone, Impala, and Old Winstar each made the following material representations (*inter alia*) regarding the status of Old Winstar's business:

> a.     that Old Winstar's business was generating $16 million or more per month in revenue;
>
> b.     that Old Winstar's "cash burn" (*i.e.*, losses) had been reduced to $10-12 million per month;
>
> c.     that Old Winstar had 9,000 paying customers;
>
> d.     that Old Winstar had 50,000 revenue-generating telephone lines;
>
> e.     that Old Winstar's "churn rate" (the rate at which existing customers discontinued service) was only 3% per year; and
>
> f.     that Old Winstar was employing an intercity optical network built by Lucent (the "Lucent network") to serve Old Winstar's customers.

29.     On occasions when Old Winstar made these representations, they were made in the presence of Blackstone, Citicorp, and Impala; and Blackstone, Citicorp, and Impala did not dispute them, even though they knew or should have known that these representations were false, and that the plaintiffs would rely on these representations.

30.     Each of these representations was false and fraudulent.  The truth, known to the Defendants but not to IDT, was as follows:

> a.     that Old Winstar's business was generating substantially less than $16 million per month in revenue, and its revenue was declining;

6

    b.     that Old Winstar's cash burn was materially higher than $10-$12 million per month;

    c.     that Old Winstar had far fewer than 9,000 paying customers, and indeed was providing service to many customers who were not paying Old Winstar;

    d.     that Old Winstar had far fewer than 50,000 revenue-generating telephone lines, and in fact was carrying and paying for many lines that were not generating any revenue;

    e.     that Old Winstar's "churn rate" was far higher than 3%, in part because Old Winstar continued to maintain and pay for telephone lines, and count them as revenue-generating, long after customers had discontinued service; and

    f.     that the Lucent network carried no Old Winstar customer traffic in or around December 2001 and, indeed, most of the Lucent network never would.

31.    Notably, despite this information being solely within their possession, Blackstone, Impala, Citicorp, and Old Winstar did not provide client information in any detail that would have allowed IDT and New Winstar to uncover the Defendants' false statements and material omissions.

32.    Indeed, Blackstone, Citicorp and Impala fraudulently withheld information within their possession, custody or control, including but not limited to the following: (a) that Winstar was required to continue to serve federal and other customers without regard to profit, and (b) that local telephone companies could extort concessions from Old Winstar by threatening to discontinue termination of calls placed by Old Winstar customers.

33.    On information and belief, Blackstone, Citicorp, Impala, and Old Winstar all hid and blocked IDT's access to material information about Old Winstar's finances and operations. Indeed, IDT had no access to this important information.

7

34.    The figures in the documents that were offered to IDT, including receivables reports, historical financial statements and contract summaries, were heavily distorted by (*inter alia*) Old Winstar's recording of revenue – sometimes for years – from customers who had discontinued service.

35.    Unaware of the true state of Old Winstar's affairs, IDT established New Winstar, for the purpose of acquiring Old Winstar's business assets.  IDT injected a substantial amount of capital into New Winstar.

36.    The information that Blackstone, Impala, and Old Winstar provided during due diligence regarding Old Winstar's business and operations was material to IDT's decision to acquire Old Winstar's business assets.  Upon information and belief, Blackstone, Citicorp,  and Old Winstar knew that this information was false, or they were negligent in not knowing that.  Blackstone and Old Winstar intended that IDT and New Winstar would rely upon this information. IDT and New Winstar did rely upon this information.  This reliance was reasonable. IDT and New Winstar were deceived by this information.

37.    The information that Blackstone, Impala, Citicorp,  and Old Winstar omitted to provide during due diligence regarding Old Winstar's business and operations was material to IDT's decision to acquire Old Winstar's business assets.   Upon information and belief, Blackstone and Old Winstar knew that this information was material, or they were negligent in not knowing that.  Blackstone and Old Winstar intended that IDT and New Winstar would rely upon the absence of this information. IDT and New Winstar did rely upon the absence of this information.  This reliance was reasonable.  IDT and New Winstar were deceived by the failure to disclose this information.

8

38.     As a direct and proximate result of the Defendants' misrepresentations and omissions, IDT and New Winstar submitted a bid in the auction for Old Winstar's assets, conducted on December 5, 2001.  Absent the misinformation provided by Blackstone and Old Winstar, Plaintiffs would not have done so.

39.     The apparent successful offeror in the auction was an entity other than IDT/New Winstar.  That entity was related to William J. Rouhana, Jr., the former Chairman of the Board and CEO of Old Winstar.  Despite this, Blackstone encouraged IDT to remain interested in purchasing Old Winstar's assets.

40.     On information and belief, the Rouhana entity was unable or unwilling to close the transaction.

41.     Between December 5, 2001 and December 17, 2001, there was no opportunity for any further due diligence by IDT because the Defendants did not permit it.

42.     On or about December 17, 2001, IDT learned that the Rouhana entity had failed to purchase Old Winstar's assets.  The bankruptcy court required IDT to sign an agreement for these assets (if IDT desired to purchase them) by noon on the following day.

43.     As a result of the Defendants' misrepresentations and omissions, on or about December 18, 2001, Old Winstar and New Winstar entered into an Asset Purchase Agreement (the "Agreement") for the transfer of Old Winstar's business assets, and certain other assets.

44.     On or about December 19, 2001, the bankruptcy court approved the Agreement.

45.     On or about December 20, 2001, the Agreement closed, *i.e.,* payment was made and assets were transferred.  On or around that date, New Winstar took over the operation of Winstar's business.

9

46.   New Winstar appointed employees to collect on accounts receivable.  In many cases, the purported "customers" told those employees that service had been canceled years earlier, yet Old Winstar had continued to bill for the service.

47.   New Winstar learned that Old Winstar had inflated its reported revenue by a variety of means, including "swaps" (pairs of companies each reporting revenue from the other, without any actual payment), "dead" accounts, and "made-up" billing.

48.   As a result of the misrepresentations and material omissions during due diligence, New Winstar's revenues were materially less than represented.  Between August 1, 2001 and July 31, 2002, a period that included several months preceding the asset purchase, Winstar's revenue was only $79.6 million, or less than $7 million a month.  During the following year (8/02 - 7/03), revenue was only $87.5 million, and the year after that (8/03 - 7/04), revenue was only $71.6 million.  In other words, Old Winstar's revenues had been overstated by over 200%.

49.   Much later, Winstar's business was sold to an entity independent of IDT.

50.   As a direct and proximate result of Blackstone's, Citicorp's, and Impala's tortuous misconduct, IDT and New Winstar have suffered losses of over $300 million.

## FIRST CAUSE OF ACTION
### (Fraud)

51.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 50 as if fully set forth herein.

52.   Blackstone, Citicorp, and Impala knowingly engaged in the various deceitful means enumerated above to deprive IDT and New Winstar of their property permanently.

53.   More specifically, Blackstone, Citicorp, and Impala made numerous false representations of material fact and material omissions, as set forth above and below.  The Defendants knew that these representations and material omissions were false, or they made

10

them with reckless disregard for their truth or falsity. Blackstone, Citicorp, and Impala intended IDT and New Winstar to rely on these false statements and omissions. IDT and New Winstar reasonably relied on them. As a result, IDT and New Winstar were injured.

54. The Defendants' false statements and material omissions were not mere projections or promises to perform, but actual representations of existing fact known only to the Defendants.

55. The representations were made by individuals acting as agents of Blackstone, Citicorp, and Impala, who acted within the scope of their employment.

56. The representations and omissions were made in New York, within this County. They were made during November and December 2001, by means of telephone, faxes, e-mail, in person, and indirectly through other authorized agents and through documents, as explained above.

57. Blackstone, Citicorp, and Impala knew that these misrepresentations were false and the omissions material, or acted in reckless disregard for their truth or falsity.

58. Blackstone, Citicorp, and Impala intended that IDT and New Winstar rely upon these misrepresentations and omissions, because they sought fraudulently to induce IDT and New Winstar to enter into the Agreement, and they sought to profit from that agreement. IDT and New Winstar reasonably relied on these misrepresentations and omissions.

59. Blackstone, Citicorp, and Impala also failed to inform IDT and New Winstar of numerous material facts. For instance, Blackstone, Citicorp, and Impala failed to inform IDT and New Winstar that Old Winstar customers who had terminated service continued to be counted as Old Winstar customers, that Old Winstar continued to book revenue from such customers, and that Old Winstar continued to pay for telephone lines to service such customers.

11

As alleged above, Blackstone, Citicorp, and Impala also fraudulently withheld the material information that Winstar was required to continue to serve federal and other customers without regard to profit, and that local telephone companies could extort concessions from Winstar by threatening to discontinue termination of calls placed by Winstar customers. These all were material fraudulent omissions that Blackstone, Citicorp, and Impala had a duty to disclose to IDT and New Winstar.

60.    If IDT and New Winstar had known the truth regarding Winstar's finances and operations, they would not have entered into the Agreement. They would have retained the purchase price under that Agreement, and they would have avoided the losses that they necessarily experienced as a direct result of acquiring Old Winstar's business assets. Therefore they have been injured.

61.    For the reasons alleged above, Blackstone, Citicorp, and Impala acted recklessly, willfully and wantonly. Their conduct was gross, and morally reprehensible. Blackstone, Citicorp, and Impala exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.

61.    For the reasons alleged above, IDT and New Winstar are entitled to the following relief against Blackstone, Citicorp and Impala:

     a.     A monetary award of compensatory damages for fraud;

     b.     A monetary award of punitive damages in the maximum amount permitted by law;

     c.     Interest and costs; and

     d.     Such further relief as the Court deems just.

## SECOND CAUSE OF ACTION
### (Aiding and Abetting Fraud)

62.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 61 as if fully set forth herein.

63.    Based upon the allegations stated above, IDT and New Winstar are victims of fraud.

64.    Blackstone, Citicorp and Impala knowingly aided and abetted in Old Winstar's commission of fraud, and participated in the fraud, in the manners alleged above.

65.    Blackstone, Citicorp, and Impala's conduct was gross, and morally reprehensible. Blackstone, Citicorp and Impala exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.

66.    IDT and New Winstar suffered significant injury as a direct result of the fraud.

67.    For the reasons alleged above, IDT and New Winstar are entitled the following relief against Blackstone, Citicorp and Impala:

    a.    A monetary award of compensatory damages for aiding and abetting fraud;

    b.    A monetary award of punitive damages in the maximum amount permitted by law;

    c.    Interest and costs; and

    d.    Such further relief as the Court deems just.

## THIRD CAUSE OF ACTION
### (Negligent Misrepresentation)

68.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 67 as if fully set forth herein.

13

69.    Blackstone, Citicorp and Impala made the misrepresentations and omissions to IDT and New Winstar enumerated under the claim for fraud above, directly or indirectly.

70.    The individuals who made the direct misrepresentations to IDT and New Winstar acted as agents for Blackstone, Citicorp and Impala.

71.    Blackstone, Citicorp and Impala owed IDT and New Winstar a duty of care to ensure that its statements to IDT and New Winstar were true.

72.    IDT and New Winstar reasonably and justifiably relied on Blackstone and Impala for accurate information.

73.    Blackstone, Citicorp and Impala intended for IDT and New Winstar to rely upon the information that they provided.

74.    The information that Blackstone, Citicorp and Impala provided to IDT and New Winstar was false, in the manner described under the claim for fraud above.

75.    IDT and New Winstar were injured by the false information that Blackstone, Citicorp and Impala provided to them.

76.    Blackstone, Citicorp and Impala's negligent misrepresentations were willful and wanton.  They acted with such indifference as to whether IDT and New Winstar would be harmed as to be equivalent to an intent to harm them.

77.    Blackstone, Citicorp and Impala's conduct was gross, and morally reprehensible. Blackstone, Citicorp and Impala exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.

78.    For the reasons alleged above, IDT and New Winstar are entitled the following relief against Blackstone, Citicorp and Impala:

    a.    A monetary award of compensatory damages for negligent misrepresentation;

14

b.     A monetary award of punitive damages on account of Blackstone's willful and wanton negligence, in the maximum amount permitted by law;

c.     Interest and costs; and

d.     Such further relief as the Court deems just.

## FOURTH CAUSE OF ACTION
### (Negligence)

79.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 78 as if fully set forth herein.

80.    Blackstone, Citicorp and Impala are experienced professional organizations in the field of finance.

81.    Blackstone claims to be a world leader in private equity; among the largest in private equity real estate investments; a leader in private mezzanine and structured debt vehicles; and a leader in providing "unconflicted" advice and counsel to senior management. Blackstone's Restructuring & Reorganization Advisory Group claims to be a market leader, having advised in over 150 distressed situations, involving $350 billion of outstanding debt.

82.    Arthur Newman, the head of Blackstone's Restructuring & Reorganization Advisory Group, has forty years of experience, including thirty years in reorganization. He claims to have served as advisor on some of the largest business restructurings in history.

83.    Impala claims to be a world leader in restructuring advice to troubled companies. Impala claims to have been involved in transactions totaling over $7 billion since 1997.

84.    As alleged above, Blackstone, Citicorp and Impala directly and indirectly made representations to IDT and New Winstar regarding Old Winstar's finances and operations. On information and belief, Blackstone, Citicorp and Impala did not exercise due care in ascertaining or disseminating this information.

15

85.    Blackstone, Citicorp and Impala owed IDT and New Winstar a duty of care in ascertaining and disseminating this information.  It was reasonably foreseeable to Blackstone, Citicorp and Impala that their negligence would injure IDT and New Winstar, because IDT and New Winstar would be induced to enter into the Agreement, and then to incur significant additional losses.

86.    Blackstone, Citicorp and Impala failed to exercise reasonable care in this regard. To the contrary, their lack of care was willful and wanton.  They acted with malice, intending to harm IDT and New Winstar, because (on information and belief) the more that IDT and New Winstar paid under the Agreement, the more that Blackstone and Impala could receive as compensation.  In the alternative, Blackstone, Citicorp and Impala acted with such indifference as to whether IDT and New Winstar would be harmed as to be equivalent to intent to harm IDT and New Winstar.

87.    In all other respects, the Defendants failed to act with due care to provide accurate information to IDT and New Winstar.

88.    The natural and probable consequence of the Defendants' negligence was that IDT and New Winstar were induced to enter into the Agreement, and to incur additional subsequent losses, which have caused significant injury to IDT and New Winstar.

89.    Blackstone, Citicorp and Impala's conduct was gross, and morally reprehensible. Blackstone, Citicorp and Impala exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.  They were reckless and willful.

90.    For the reasons alleged above, IDT and New Winstar are entitled the following relief against Blackstone, Citicorp and Impala:

a.    A monetary award of compensatory damages for negligence;

16

b.    A monetary award of punitive damages on account of the Defendant's willful and wanton negligence, in the maximum amount permitted by law;

c.    Interest and costs; and

d.    Such further relief as the Court deems just.

## FIFTH CAUSE OF ACTION
### (Civil Conspiracy)

91.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 90 as if fully set forth herein.

92.    The Defendants engaged in a combination and conspiracy involving four conspirators:

a.    the officers, employees and agents of Blackstone; and

b.    the officers, employees and agents of Impala; and

c.    the officers, employees and agents of Citicorp; and

d.    the officers, employees and agents of Old Winstar.

93.    These conspirators combined for the purpose of injuring IDT and New Winstar. Specifically, the conspirators sought to deprive IDT and New Winstar of their property interests in the purchase price of the Agreement, and the funds used to pay for subsequent Winstar losses. The Defendants did so not only in the manners alleged above, but also by means of the following overt acts, *inter alia*:

a.    announcing and conducting of the auction;

b.    creating the data room, and the invitation to IDT and New Winstar representatives (and, on information and belief, others) to examine its contents;

c.    engaging in other communications relating to Old Winstar's finances and operations, as alleged above;

d.    the negotiation, preparation and execution of the Agreement; and

17

e.     actions taken to obtain bankruptcy court approval of that Agreement.

94.     The Defendants' conspiracy has caused IDT and New Winstar injury, including the special damages of (*inter alia*) payment of the Purchase Price of $42,500,000 set forth in Section 3.1 of the Agreement. The Defendants' conspiracy deprived IDT and New Winstar of this amount. In addition to this, IDT and New Winstar have suffered special damages for losses incurred following the acquisition of Winstar's business assets, which total approximately $300 million.

95.     The conspirators acted recklessly, willfully and wantonly. Their conduct was gross, and morally reprehensible. They exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.

96.     For the reasons alleged above, IDT and New Winstar are entitled the following relief against Blackstone, Citicorp and Impala:

a.     A monetary award of compensatory damages for civil conspiracy;

b.     A monetary award of punitive damages for civil conspiracy, in the maximum amount permitted by law;

c.     Interest and costs; and

d.     Such further relief as the Court deems just.

### JURY REQUEST

97.     The Plaintiffs request a jury for all issues that may be tried by a jury.

WHEREFORE, IDT and New Winstar seek the following relief against Blackstone, Citicorp and Impala:

18

a.  A monetary award of compensatory damages for fraud; aiding and abetting fraud, negligent misrepresentation, negligence, and civil conspiracy;

b.  A monetary award of punitive damages in the maximum amount permitted by law for fraud, aiding and abetting fraud, negligent misrepresentation, negligence, and civil conspiracy;

c.  Interest and costs; and

d.  Such further relief as the Court deems just.

Dated: New York, New York
       May 10, 2007

MOUND COTTON WOLLAN & GREENGRASS

Philip C. Silverberg, Esq.
Gretchen Henninger, Esq.
One Battery Park Plaza
New York, NY 10004-1486
Telephone: (212) 804-4200

and

Melissa Roover, Esq.
GRAYSON & KUBLI, P.C
1420 Spring Hill Road, Suite 230
McLean, VA 22102
(703) 749-0000

Attorneys for Plaintiffs
WINSTAR HOLDINGS, LLC and
IDT CORP.

19

WINSTAR HOLDINGS, LLC,
and IDT CORP.,

                        Plaintiffs,

    -against-

THE BLACKSTONE GROUP LP;
IMPALA PARTNERS, LLC; and.
CITICORP,

                  Defendants.



---

## SUMMONS and COMPLAINT

---

MOUND, COTTON, WOLLAN & GREENGRASS
*Attorneys for*

           Plaintiffs


*Office and Post Office Address, Telephone*
ONE BATTERY PARK PLAZA
NEW YORK, NY 10004
(212) 804-4200

---

To:                                         Service of a copy of the within is
                                            hereby admitted.

                                            Dated:_____ 20_____

Attorney(s) for

                                            _____

---

Exhibit 2

**LEAD, MEGA, APPEAL, CONVERTED, CLMSAGNT, Sealed Doc(s)**

# U.S. Bankruptcy Court
## District of Delaware (Delaware)
## Bankruptcy Petition #: 01-01430-KJC

*Assigned to:* Kevin J. Carey
Chapter 7
Previous chapter 11
Voluntary
Asset

*Date Filed:* 04/18/2001
*Date Converted:* 01/24/2002

*Debtor*
**WINSTAR COMMUNICATIONS, INC.**
685 Third Avenue
New York, NY 10017
SSN:
Tax id: 13-3585278

represented by **Brendan Linehan Shannon**
Young, Conaway, Stargatt & Taylor
The Brandywine Bldg.
1000 West Street, 17th Floor
PO Box 391
Wilmington, DE 19899-0391
usa
302 571-6600
Fax : 302-571-1253
Email: bankruptcy@ycst.com
*TERMINATED: 10/18/2006*

**Christopher A. Ward**
The Bayard Firm
500 Delaware Avenue
8th Floor
Wilmington, DE 19801
usa
302-655-5000
Fax : 302-658-6395
Email: bankserve@bayardfirm.com

**David C. Albalah**
Bracewell & Giuliani LLP
1177 Avenue of Americas
New York, NY 10036
212-508-6100
Fax : 212-508-6101
Email:
david.albalah@bracewellgiuliani.com

**Edward J. Kosmowski**
Young, Conaway, Stargatt & Taylor
1000 West Street, 17th Floor
PO Box 391
Wilmington, DE 19899
usa
302 571-6600
Fax : 302-571-1253
Email: bankruptcy@ycst.com

**Edwin J. Harron**
Young, Conaway, Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
PO Box 391
Wilmington, DE 19899-0391
usa
302 571-6600
Fax : 302-571-1253
Email: bankruptcy@ycst.com

**M. Blake Cleary**
Young, Conaway, Stargatt & Taylor
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE 19899-0391
usa
302-571-6600
Fax : 302-571-1253
Email: bankruptcy@ycst.com

**Michael R. Lastowski**
Duane Morris LLP
1100 North Market Street
Suite 1200
Wilmington, DE 19801-1246
302-657-4900
Fax : 302-657-4901
Email:
mlastowski@duanemorris.com

**Michael G. Menkowitz**
Fox, Rothschild, O'Brien & Frankel
2000 Market Street
10th Floor
Philadelphia, PA 19103
usa
215-299-2756
Fax : 215-299-2150
Email: mmenkowitz@frof.com

**Pauline K. Morgan**
Young, Conaway, Stargatt & Taylor
1000 West Street, 17th Floor,
PO Box 391
Wilmington, DE 19899-0391
usa
302 571-6600
Fax : 302-571-1253
Email: bankruptcy@ycst.com

**Sheldon K. Rennie**

Fox Rothschild LLP
919 market Street
Suite 1300
Wilmington, DE 19801
302-654-7444
Fax : 302-656-8920
Email: bankruptcy@frof.com

**William K. Harrington**
Duane Morris, LLP
1100 North Market Street
Suite 1200
Wilmington, DE 19801
302-657-4900
Fax : 302-657-4901

*Trustee*                                    represented by **Francis G. X. Pileggi**
**Christine Shubert**                        Fox Rothschild LLP
Fox Rothschild LLP                           919 N. Market Street
919 N. Market Street                         Suite 1300
Suite 1300                                   Wilmington, DE 19801
P.O. Box 2323                                usa
Wilmington, DE 19899-2323                    302-654-7444
856-983-7735                                 Fax : 302-656-8920
                                             Email: fpileggi@foxrothschild.com
                                             *TERMINATED: 12/03/2004*

**James F. Bailey, Jr**
James F. Bailey & Associates, P.A.
Suite 306A
3 Mill Road
Wilmington, DE 19806
302-658-5686
Fax : 302-658-8051
*TERMINATED: 10/26/2006*

**Jonathan M. Stemerman**
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
215-665-2142
Fax : 215-701-2241
Email: jstemerman@cozen.com

**L. Jason Cornell**
Fox Rothschild LLP
919 N. Market Street, Suite 1300
P.O. Box 2323
Wilmington, DE 19899-2323
302-654-7444
Fax : 302-656-8920
Email: jcornell@frof.com

**Magdalena Schardt**
Fox Rothschild O'Brien & Frankel
LL
2000 Market Street
10th Floor
Philadelphia, PA 19103
usa
215-299-2009
Fax : 215-299-2150
Email: mschardt@frof.com

**Michael G. Menkowitz**
(See above for address)

**Raymond Howard Lemisch**
Benesch Friedlander Coplan &
Aronoff, LL
222 Delaware Avenue
Suite 801
Wilmington, DE 19801
302.442.7010
Fax : 302.442.7012
Email: rlemisch@bfca.com

**Raymond Howard Lemisch**
Adelman Lavine Gold and Levin, PC
919 N. Market Street, Suite 710
Wilmington, DE 19801
302-654-8200
Fax : 302-654-8217
Email: rlemisch@adelmanlaw.com

**Sheldon K. Rennie**
Fox Rothshild LLP
919 N. Market Street
Suite 1300
Wilmington, DE 19801
302-654-7444
Fax : 302-656-8920
Email: srennie@foxrothschild.com

**Sheldon K. Rennie**
Fox Rothschild
919 North Market Street
Suite 1300
Wilmington, DE 19801
302-654-7444
Fax : 302-656-8920
Email: bankruptcy@frof.com

**Sheldon K. Rennie**
(See above for address)

| | |
|---|---|
| ***Trustee*** **Christine C. Shubert, as Chapter 7 Trustee** | represented by **Daniel K. Astin** Fox Rothschild LLP 919 N. Market Street Suite 1300 P.O. Box 2323 Wilmington, DE 19899 302-622-4212 Fax : 302-658-6395 Email: dastin@foxrothschild.com |

**Magdalena Schardt**
(See above for address)

**Raymond Howard Lemisch**
(See above for address)

**Sheldon K. Rennie**
(See above for address)

**Sheldon K. Rennie**
(See above for address)

***U.S. Trustee***
**U.S. TRUSTEE**
Office of the U.S. Trustee
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801
302-573-6491

| | |
|---|---|
| ***Creditor Committee*** **Former Counsel to the Official Committee of Unsecured Creditors** | represented by **Christopher A. Ward** The Bayard Firm 222 Delaware Avenue Suite 900 Wilmington, DE 19899 usa 302-655-5000 Fax : 302-658-6395 Email: bankserve@bayardfirm.com |

| Filing Date | # | Docket Text |
|---|---|---|
| 04/18/2001 | 1 | VOLUNTARY Petition Under Chapter 11 with Exhibit A, List of Creditors Holding 20 Largest Unsecured Claims, Declaration and Certificate of Resolutions, [BG], ORIGINAL NIBS DOCKET ENTRY #1 (Entered: 04/18/2001) |

| | | |
|---|---|---|
| | | Amount $15. Filed by WINSTAR COMMUNICATIONS, INC.. Hearing scheduled for 1/24/2002 at 02:30 PM (check with court for location). (Morgan, Pauline) Modified on 1/29/2002 (LML, ). (Entered: 01/24/2002) |
| 01/24/2002 | 1910 | Motion to Shorten Time *Regarding Docket No. 1909* Filed by WINSTAR COMMUNICATIONS, INC.. Hearing scheduled for 1/24/2002 at 02:30 PM (check with court for location). (Morgan, Pauline) (Entered: 01/24/2002) |
| 01/24/2002 | 1911 | Objection to Motion *for Order (a) Under 11 U.S.C. ?365 Rejecting a Certain Unexpired Lease of Nonresidential Real Property and (B) Under 11 U.S.C. ? 554 Abandoning to Secured Creditor Equipment Located at Leased Premises* Filed by Winstar Holdings, LLC. (Attachments: # 1 Certificate of Service # 2 Service List) (Harrington, William) (Entered: 01/24/2002) |
| 01/24/2002 | 1912 | Rule 2019 Statement *First Amended Verified Statement Of Saul Ewing LLP Pursuant To Bankruptcy Rule 2019* Filed by Saul Ewing LLP. (Attachments: # 1 Certificate of Service) (Minuti, Mark) (Entered: 01/24/2002) |
| 01/24/2002 | 1913 | Limited Objection to Motion *[Limited Objection of Secured Creditor Lucent Technologies Inc. to Motions Requesting Immediate Payment of Administrative Claims [Re: Docket Nos. 1851 and 1884]]* Filed by Lucent Technologies. (Heath, Paul) (Entered: 01/24/2002) |
| 01/24/2002 | 1914 | Objection to Motion *OBJECTION OF ELECTRIC LIGHTWAVE, INC. TO THE MOTION OF 1710 BROADWAY, INC. FOR ORDER COMPELLING IMMEDIATE PAYMENT OF POST- PETITION OBLIGATIONS PURSUANT TO 11 U.S.C. Sec. 365(d)(3)* Filed by Electric Lightware, Inc.. (Attachments: # 1 Certificate of Service) (Sullivan, Brian) (Entered: 01/24/2002) |
| 01/24/2002 | 1915 | Objection to Motion *OBJECTION OF ELECTRIC LIGHTWAVE, INC. TO THE MOTION OF BRIGHT PROPERTIES WEST, INC. TO COMPEL PAYMENT OF ADMINISTRATIVE CLAIM, OR IN THE ALTERNATIVE, COMPEL REJECTION OF UNEXPIRED NON-RESIDENTIAL REAL PROPERTY LEASE* Filed by Electric Lightware, Inc.. (Attachments: # 1 Certificate of Service) (Sullivan, Brian) (Entered: 01/24/2002) |
| 01/24/2002 | 1916 | Notice of Withdrawal *Notice of Withdrawal of Motion Without Prejudice* Filed by Hines Interests, L.P. (related document(s)1591). (Zahralddin-Aravena, Rafael) (Entered: 01/24/2002) |
| 01/24/2002 | 1917 | Motion to Appear pro hac vice *for George H. Barber, Esquire on behalf of Aptis, Inc. f/n/a Concepts Systems, Inc.* Filed by Aptis, Inc. f/k/a Concepts Systems, Inc.. (Stickles, J.) (Entered: 01/24/2002) |
| 01/24/2002 | 1919 | Order signed on 1/24/2002 Converting Case To Chapter 7, Reaffirming Regulatory Transition Process Under Asset Sale Order Dated 12/19/01, Shortening Time For & Approving The Manner Of Notice Of Meeting Of Creditors Under Bankruptcy Code Section 341 & Granting Related Relief (related document(s)1909). (LKG, ) (Entered: 01/25/2002) |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
WINSTAR HOLDINGS, LLC and
IDT CORP.,

                                                    Civ. No.: 07 CV 4634 (GEL)

                             Plaintiff,             ECF Case

              -against-

THE BLACKSTONE GROUP LP; IMPALA
PARTNERS, LLC; AND CITICORP

                             Defendants.
-----------------------------------------------------------------x


## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION TO REMAND

COHEN TAUBER SPIEVACK WAGNER LLP
Joseph M. Vann (JMV 7601)
Jed Lewin (JL 2428)
420 Lexington Avenue
New York, New York 10170
(212) 586-5800

and

GRAYSON & KUBLI, P.C.
Alan M. Grayson, of counsel
Melissa Roover (MR 1163)
1420 Spring Hill Road, Suite 230
McLean, Virginia 22102
(703) 749-0000


*Attorneys for Plaintiffs Winstar Holdings, LLC and IDT Corp.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ........................................................................................... 1

PRELIMINARY STATEMENT ...................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND............................................ 3

    A.    The Old Winstar Bankruptcy Liquidation Proceeding...................... 3
    B.    Retention of Blackstone ................................................................ 3
    C.    Retention of Impala...................................................................... 4
    D.    Citicorp's Role in Liquidation Proceeding .................................... 4
    E.    The Old Winstar Due Diligence Team............................................ 4
    F.    The Misrepresentations ................................................................ 5
    G.    The Liquidation Proceeding Auction Process.................................. 7
    H.    Plaintiffs' Discovery of the Fraud and Misrepresentations.............. 8
    I.    Plaintiffs' Losses ......................................................................... 8
    J    The Lawsuit................................................................................. 8

ARGUMENT ................................................................................................ 9

    POINT I - IMPALA HAS NOT ESTABLISHED
             "RELATED TO" JURISDICTION ........................................ 10

    POINT II - MANDATORY ABSTENTION REQUIRES
             THAT THE LAWSUIT BE REMANDED TO
             THE STATE COURT ........................................................ 12

        1.    The Motion to Abstain Was Made on Time ...................... 13
        2.    The Lawsuit Involves Only State Law Claims ................... 14
        3.    The Lawsuit Does Not Arise Under the Bankruptcy Code ...........14
        4.    Section 1334 Provides the Sole Would-Be Basis for Jurisdiction..... 15
        5.    The Lawsuit Was Commenced in State Court................... 16
        6.    The Lawsuit Can Be Adjudicated in a Timely Manner
             in the Supreme Court of the State of New York............... 16

    POINT III - ALTERNATIVELY, THIS COURT SHOULD
             ABSTAIN FROM EXCERCISING JURISDICTION
             OVER THE LAWSUIT, ON "PERMISSIVE" OR
             "EQUITABLE" GROUNDS ........................................... 17

        1.    The Effect on the Efficient Administration of the Bankruptcy ........ 18
        2.    The Predominance of State Law Issues ........................... 19
        3.    Difficulty or Unsettled Nature of State Law Issues........... 20

{00004185.DOC; 3.4}

4.  Comity ............................................................................................ 20
5.  The Relationship of the Lawsuit to the Bankruptcy Proceeding ....... 21
6.  Right to a Jury Trial ........................................................................ 21
7.  Prejudice to the Removed Parties ..................................................... 22
8.  Duplicative Litigation; Wasted Resources and Inconsistent Results. 22

POINT IV - IMPALA'S "REQUEST" TO TRANSFER
             THE LAWSUIT TO THE DELAWARE
`            BANKRUPTCY COURT MUST BE DENIED
             AS PREMATURE AND IMPROPERLY RAISED.......................... 23

CONCLUSION ................................................................................................ 24

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## Cases

*Amanat v. Wollmuth Maher & Deutsch, LLP*
    338 B.R. 574, 582 (Bankr. S.D.N.Y. 2005) ................................................................. 13, 15, 16

*Bay Ridge Air Rights, Inc. v. State,*
    375 N.E.2d 29 (N.Y. 1978) ........................................................................................ 12

*Certain Underwriters at Lloyd's, London v. ABB Lummus Global, Inc.,*
    337 B.R. 22 (S.D.N.Y. 2005) ..................................................................................... 13

*Digital Satellite Lenders, LLC v. Ferchill,*
    Case No. 03-8803, 2004 WL 1794502, at *5 (S.D.N.Y. Aug. 10, 2004) ................................. 18

*Drexel Burnham Lambert Group, Inc. v. Vigilant Ins. Co.,*
    130 B.R. 405 (S.D.N.Y. 1991) ............................................................................. 19, 21, 23

*General Elec. Cap. Corp. v. Pro-Fac Coop.,*
    No. 01 Civ. 10215, 2002 WL 1300054, at *2 (S.D.N.Y. June 12, 2002) ................................ 11

*Guccione v. Bell,*
    Case No. 06-492, 2006 WL 2032641, at *5 (S.D.N.Y. July 20, 2006) .............................. 18, 21

*In re Chateaugay Corp.,* 213 B.R. 633, 640 (S.D.N.Y. 1997 ...................................................... 11

*In re Leco Enters., Inc.,*
    144 B.R. 244 (S.D.N.Y. 1992) .............................................................................. 14, 15

*In re Turner,*
    724 F.2d 338 (2d Cir. 1983) ....................................................................................... 10

*In re WorldCom, Inc. Sec. Litig.,*
    293 B.R. 308 (S.D.N.Y. 2003) ............................................................................... 10, 11

*Kerusa Co. v. W10Z/515 Real Estate Ltd.,*
    2004 WL 1048239, at *2 (S.D.N.Y. May 7, 2004) ........................................................ passim

*Linardos v. Fortuna,*
    157 F.3d 945  (2d Cir. 1998) ..................................................................................... 10

*Mt. McKinley Ins. Co. v. Corning Inc.,* 399 F.3d 436 (2d Cir. 2005) ..................................... 13, 16

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,*
    458 U.S. 50 (1982) .................................................................................................. 22

**Statutes**

11 U.S.C. §502(e) ................................................................................................ 12

28 U.S.C. §1334(b) ........................................................................................ passim

28 U.S.C. §1447(c), ............................................................................................ 13

28 U.S.C. §1452(b) .............................................................................. 1, 2, 10, 18

28 U.S.C. §157(b)(2) ............................................................................. 15, 21, 23

## INTRODUCTION

Plaintiffs Winstar Holdings, LLC and IDT Corp. (together, "Plaintiffs") respectfully submit this Memorandum of Law in support of their Motion to Remand, dated July 1, 2007, for the entry of an Order, pursuant to 28 U.S.C. § 1334(c)(2), remanding this lawsuit to the Supreme Court of the State of New York, because of the absence of bankruptcy jurisdiction or pursuant to the mandatory abstention doctrine.  In the alternative, this action should be remanded to state court pursuant to 28 U.S.C. §§ 1334(c)(1) and 1452(b), because of permissive abstention.

## PRELIMINARY STATEMENT

Plaintiffs commenced this action on May 10, 2007, in the Supreme Court of the State of New York, Commercial Division, against The Blackstone Group, L.P. ("Blackstone"),[1] Impala Partners, LLC ("Impala") and Citicorp ("Citicorp") (collectively, the "Defendants").  The action is captioned *Winstar Holdings, LLC and IDT Corp. v. The Blackstone Group LP, Impala Partners, LLC and Citicorp* (Index No. 601582/07) (the "Lawsuit").  The Lawsuit is grounded completely in state law tort claims of fraud and misrepresentation.  Plaintiffs allege that they have suffered losses exceeding $300 million resulting from their December 2001 acquisition of substantially all of the assets of Winstar Communications, Inc. and certain related entities ("Old Winstar").  Plaintiffs seek damages from Defendants for Defendants' acts of fraud and misrepresentation, made within the State of New York, in connection with the Old Winstar acquisition.

By Notice of Removal dated June 1, 2007 (the "Notice of Removal"), Defendant Impala removed this Lawsuit to this Court, purportedly pursuant to 28 U.S.C. §1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure.  The only ground for removal articulated by Impala

---

[1]     Upon information and belief, effective March 12, 2007, defendant "The Blackstone Group, L.P." has been renamed "Blackstone Advisory Services, L.P."

is that this Lawsuit is somehow "related" to Old Winstar's chapter 7 liquidation proceeding, solely because Impala holds a *potential* right of indemnification against Old Winstar, which is a *non-party* to this Lawsuit.  That right of indemnification specifically excludes "willful misconduct," (*see*, Exhibit D to Notice of Removal) which is what Plaintiffs allege here. Significantly, Impala does not allege any other basis of jurisdiction in this Court.  There is no diversity jurisdiction and no federal question or bankruptcy law is at issue here.

Contrary to Impala's assertion, Impala has not established that its potential indemnification rights against Old Winstar give rise to "related-to" jurisdiction that establishes jurisdiction in this Court.  Moreover, the mandatory abstention provision of 28 U.S.C. §1334(c)(2) unequivocally mandates that "related" proceedings based upon state law causes of action -- such as this Lawsuit -- be heard in a state court, and not a federal court, if a lawsuit has been commenced in the state court and can be adjudicated in a timely manner in that forum. Accordingly, this Court must abstain from exercising jurisdiction over this Lawsuit and remand it to the Supreme Court of the State of New York.

In the alternative, this Court should abstain on "permissive" or "discretionary" grounds under 28 U.S.C. §§ 1334(c)(1) and 1452(b), because, *inter alia*, state law claims predominate in this Lawsuit, this Lawsuit is not sufficiently "related to" the Liquidation Proceeding, and Plaintiffs seek a jury trial to decide its state law claims.  For these reasons, this Court should abstain from exercising jurisdiction over this Lawsuit and remand it back to the Supreme Court of the State of New York, where it rightfully belongs.[2]

---

[2]    Nor, a fortiori, is there any basis for transfer of this Lawsuit to the United States Bankruptcy Court for the District of Delaware, as Impala appears to request in Paragraph 13 of its Notice of Removal (without citing any statutory basis for doing so).  In any event, in requesting that the Lawsuit be transferred, Impala places the proverbial cart before the horse, in that this Court must first determine whether it has (or will exercise) jurisdiction. Absent jurisdiction, the Court lacks the ability to transfer this Lawsuit anywhere (other than remanding it back to the Supreme Court of the State of New York from, where it originated).

{00004185.DOC; 3.4}

## FACTUAL AND PROCEDURAL BACKGROUND[3]

In December 2001, Plaintiffs paid $42.5 million at a bankruptcy court-sanctioned auction, to acquire substantially all of the assets of Old Winstar.  In doing so, Plaintiffs relied on what turned out to be misrepresentations by the Defendants.  As a direct result of this reliance, Plaintiffs subsequently suffered losses in excess of $300 million. (Ex. 1 ¶ 1).

A.    The Old Winstar Bankruptcy Liquidation Proceeding.

Old Winstar was a publicly traded company providing telephone service to customers, using a "fixed wireless" system.  On April 18, 2001, it commenced a bankruptcy proceeding by filing a voluntary petition seeking protection under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code").  That petition evolved into a Chapter 7 liquidation proceeding under Case No. 01-1430 (the "Liquidation Proceeding").[4]  This proceeding remains pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

B.    Retention of Blackstone.

In the Liquidation Proceeding, Old Winstar retained Blackstone as a financial advisor, to obtain the highest possible sale price for the assets of Old Winstar.  Blackstone's compensation depended upon the sale price that it obtained for Old Winstar's assets.  Specifically, Blackstone received, *inter alia*, a transaction fee equal to 1% of the first $200 million of consideration paid

---

[3]    The facts are drawn from the Complaint (Ex. 1), and other documents referenced in the Complaint, and are presented in full detail there.  For the Court's convenience, these documents are attached to the Declaration of Joseph Vann, Esq., dated July 1, 2007 (the "Vann Decl."), which is submitted herewith in support of Plaintiff's Motion to Remand.  All exhibits referred to in this Memorandum of Law are appended to the Vann Decl. and will be referenced simply as "Ex. __").

[4]    The Old Winstar bankruptcy proceeding started as a reorganization proceeding, but by Order of the Bankruptcy Court, entered on or about January 24, 2002, it was converted to a liquidation proceeding under Chapter 7 of the Bankruptcy Code.  A true and correct copy the relevant excerpts from the docket of the Liquidation Proceeding is attached to the Vann Decl. as Ex. 2.

{00004185.DOC; 3.4}

by an acquirer.  This fee arrangement provided Blackstone with an incentive to maximize – or inflate – that consideration.  (Ex. 1 ¶ 14).

C.       Retention of Impala.

Old Winstar also retained Impala as a restructuring advisor, to provide restructuring advice and other related services in connection with the Liquidation Proceeding.  In addition to its fixed compensation, upon the sale of substantially all of Old Winstar's assets in which the aggregate paid by the purchaser was less than $350 million, Impala earned a transaction fee of 0.25% of such consideration.  (If the sale of substantially all of Old Winstar's assets exceeded $350 million in the aggregate, Impala's transaction fee rose to 2.0% of such consideration.)  This fee arrangement similarly provided Impala with an incentive to maximize – or inflate – that consideration.  (Ex. 1 ¶ 17).

D.       Citicorp's Role in Liquidation Proceeding.

Citicorp, as Old Winstar's largest creditor, assisted Old Winstar in negotiating its contract terms with Impala.  Citicorp acted as Impala's principal, and Impala as Citicorp's agent.  (Ex. 1 ¶ 18).

E.       The Old Winstar Due Diligence Team.

To promote the sale of Old Winstar's business assets, Blackstone prepared an offering statement.  Impala assisted in its preparation.  Blackstone, Citicorp and Impala controlled bidder access to Old Winstar staff and to Old Winstar records.  (Ex. 1 ¶ 1).

In connection with the sale of Old Winstar's business assets, Blackstone, Citicorp and Impala assisted in the development of financial data and presentations to Old Winstar's Board of Directors, various creditors and other parties.  Blackstone reviewed financial analyses generated

by Old Winstar's finance staff and external advisors.  Blackstone also performed various

financial analyses itself.  (Ex. 1 ¶ 20).

　　　　An auction of Old Winstar's assets was planned for December 2001.  Leading up to that

auction, Blackstone circulated an "offering book."  Blackstone met with IDT as one of the

potential bidders.  In meetings in New York, organized by Blackstone, IDT also met with several

Old Winstar officials.  Certain Old Winstar business records were also made available to IDT at

that time in New York, in an office generally known as the "data room."  The data room was

located in New York.  Collectively, this communication and review was known as "due

diligence."  (Ex. 1 ¶ 22).

　　　　In accordance with the timing established for the auction, IDT's due diligence was

conducted between Friday, November 30, 2001, and Wednesday, December 5, 2001.  Several

IDT representatives engaged in the due diligence and met with representatives from Blackstone,

Impala and Old Winstar.  (Ex. 1 ¶¶ 24-27).

　　　　F.　　The Misrepresentations.

　　　　During this due diligence, Blackstone, Impala and Old Winstar each made the following

material misrepresentations (*inter alia*) regarding the status of Old Winstar's business:

　　　　　　a.　　that Old Winstar's business was generating $16 million or more per month in
　　　　　　　　　revenue;
　　　　　　b.　　that Old Winstar's "cash burn" (*i.e.*, losses) had been reduced to $10-$12 million
　　　　　　　　　per month;
　　　　　　c.　　that Old Winstar had 9,000 paying customers;
　　　　　　d.　　that Old Winstar had 50,000 revenue-generating telephone lines;
　　　　　　e.　　that Old Winstar's "churn rate" (the rate at which existing customers discontinued
　　　　　　　　　service) was only 3% per year; and
　　　　　　f.　　that Old Winstar was employing an intercity optical network built by Lucent (the
　　　　　　　　　"Lucent network") to serve Old Winstar's customers.  (Ex. 1 ¶ 28).

　　　　On occasions where Old Winstar made these material misrepresentations, they were

made in the presence of Blackstone, Citicorp and Impala.  Blackstone, Citicorp and Impala did

not dispute them, even though they knew or should have known that these misrepresentations

were false, and that the Plaintiffs would rely on these misrepresentations.  (Ex. 1 ¶ 29).

Each of the above misrepresentations (*inter alia*) was false and fraudulent.  The truth,

known to the Defendants but not to IDT, was as follows:

a.    that Old Winstar's business was generating substantially less than $16 million per
      month in revenue, and its revenue was declining;
b.    that Old Winstar's "cash burn" (*i.e.*, losses) was materially higher than $10-$12
      million per month;
c.    that Old Winstar had far fewer than 9,000 paying customers, and indeed was
      providing service to many customers who were not paying Old Winstar;
d.    that Old Winstar had far fewer than 50,000 revenue-generating telephone lines,
      and in fact was carrying and paying for many lines that were not generating
      revenue;
e.    that Old Winstar's "churn rate" was far higher than 3% per year, in part because
      Old Winstar continued to maintain and pay for telephone lines, and count them as
      revenue-generating, long after customers had discontinued service; and
f.    that the Lucent network carried no Old Winstar customer traffic in or around
      December 2001 and, indeed, most of the Lucent network never would.  (Ex. 1 ¶
      31).

Notably, despite this information being solely in their possession, Defendants failed to

provide information in any detail that would have allowed Plaintiffs to uncover the Defendants'

false statements and material omissions.  (Ex. 1 ¶ 31).

Indeed, Defendants fraudulently withheld information within their possession, custody or

control, including but not limited to the following:  (a) that Old Winstar was required to continue

to serve federal and other customers without regard to profit; and (b) that local telephone

companies could extort concessions from Old Winstar by threatening to discontinue the

termination of calls placed by Old Winstar customers.  (Ex. 1 ¶ 32).  Defendants all hid and

blocked Plaintiffs' access to material information about Old Winstar's finances and operations.

(Ex. 1 ¶ 33).

The information that Defendants provided during due diligence regarding Old Winstar's business and operations was material to Plaintiffs' decision to acquire substantially all of Old Winstar's business assets.  Defendants knew this information was false, or they were negligent in not knowing it was false.  Defendants provided this information intending that Plaintiffs would rely upon it, which Plaintiffs did.  (Ex. 1 ¶ 36).

The information that Defendants omitted to provide during due diligence regarding Old Winstar's business and operations also was material to Plaintiffs' decision to acquire substantially all of Old Winstar's business assets.   Defendants knew this information was material, or they were negligent in not knowing it was material.  Defendants intended that Plaintiffs would rely upon the absence of this information, which Plaintiffs did.  (Ex. 1 ¶ 37).

G.    The Liquidation Proceeding Auction Process.

Unaware of the true state of Old Winstar's affairs, and based upon the false information provided and the material information omitted, IDT established "New Winstar" for the purpose of acquiring substantially all of Old Winstar's business assets.  (Ex. 1 ¶ 35).

As a direct and proximate result of the Defendants' misrepresentations and omissions, Plaintiffs submitted a bid in the auction for Old Winstar's assets, conducted on December 5, 2001.  Absent the misinformation provided by Defendants, Plaintiffs would not have done so.  (Ex. 1 ¶ 38).

As a direct and proximate result of the Defendants' misrepresentations and omissions, on or about December 18, 2001, Plaintiffs entered into an Asset Purchase Agreement (the "APA") for the acquisition of Old Winstar's business assets, and certain other assets.  (Ex. 1 ¶ 43).

On or about December 19, 2001, the Bankruptcy Court approved the APA.  Following the Court's approval, on or about December 20, 2001, the APA closed (*i.e.,* payment was made

and the assets were transferred).  On or around that date, New Winstar took over the operation of Old Winstar's business.  (Ex. 1 ¶¶ 44-45).

H.    Plaintiffs' Discovery of the Fraud and Misrepresentations.

After its acquisition of the assets of Old Winstar,  New Winstar learned that Old Winstar had inflated its reported revenue by a variety of means, including "swaps" (pairs of companies each reporting revenue from each other without any actual payment being made), "dead" accounts, and made-up billing.  (Ex. 1 ¶ 47).

In fact, New Winstar's revenues were materially less than represented.  Between August 1, 2001 and July 31, 2002, a period that included several months preceding the asset purchase, Winstar's revenue was only $79.6 million, or less than $7 million per month.  During the following year (8/02–7/03), revenue was only $87.5 million, and the year after that (8/03–7/04), revenue was only $71.6 million.  In other words, Old Winstar's revenues had been overstated by over 200%.  (Ex. 1 ¶ 48).

I.    Plaintiffs' Losses.

As the direct and proximate cause of Blackstone's, Citicorp's and Impala's tortious conduct, Plaintiffs have suffered losses of over $300 million.  (Ex. 1 ¶ 50).

J.    The Lawsuit.

On May 10, 2007, Plaintiffs filed this Lawsuit in the Supreme Court for the State of New York, County of New York, alleging exclusively State law causes of action against the Defendants for their misrepresentations and material omissions.  Old Winstar is not a party to the action.  The Defendants are all located in New York, the misrepresentations and material omissions occurred in New York, the witnesses are located in New York, the discoverable

evidence is located in New York, and this action is and was properly commenced in the venue of the Supreme Court of the State of New York (New York County).

## **ARGUMENT**

This Lawsuit is strictly a state law matter, involving solely state law causes of action. It should therefore be remanded to the Supreme Court for the State of New York. As its only basis for alleged jurisdiction in this Court, Impala asserts that it holds potential indemnification claims against Old Winstar, which it argues gives rise to "related to" jurisdiction *vis-à-vis* the Liquidation Proceeding. However, the cited indemnification clause excludes indemnification for "willful misconduct." *See,* Exhibit D to Notice of Removal. Moreover, this case neither involves Old Winstar as a party, nor involves any bankruptcy issues or bankruptcy claims. This case turns on Defendants' wrongful conduct in New York, giving rise to New York State law causes of action against Impala and the other Defendants. Impala's attempt to remove this Lawsuit to this Court on the basis of some tenuous purported connection to the Liquidation Proceeding is a thinly disguised (and desperate) attempt by Impala to deflect to Old Winstar blame for Impala's own wrongdoing. The possibility of an Impala indemnification claim against Old Winstar (that has not even been asserted against Old Winstar in its Liquidation Proceeding) does not convert this otherwise purely state law proceeding to a case "related to" the Liquidation Proceeding.

Even if an indemnification claim (actual or, as here, potential) were to give rise to "related to" jurisdiction sufficient to confer jurisdiction over the Lawsuit in this Court, the mandatory abstention provision of 28 U.S.C. 1334(c)(2) requires that this Lawsuit be remanded to the Supreme Court of the State of New York, because the Lawsuit was commenced in the Supreme Court of the State of New York, and it can be adjudicated in a timely manner there.

{00004185.DOC; 3.4}

Alternatively, there are ample grounds for this Court to abstain on permissive or equitable grounds pursuant to 28 U.S.C. §§ 1334(c)(1) and 1452(b) because, *inter alia*, the Lawsuit involves solely state law issues, and Plaintiffs have demanded a jury trial.

Accordingly, whether for lack of "relatedness" to the Liquidation Proceeding, or based on the doctrines of "mandatory abstention," "permissive abstention," or equitable grounds, this Court either has no jurisdiction of this Lawsuit, or should not entertain jurisdiction of this Lawsuit. For these reasons, Plaintiffs respectfully request that this Court enter an order remanding this Lawsuit back to the Supreme Court of the State of New York.

## POINT I

## IMPALA HAS NOT ESTABLISHED "RELATED TO" JURISDICTION

"A party seeking to remove an action from state to federal court bears the burden of proving federal jurisdiction." *In re WorldCom, Inc. Sec. Litig.,* 293 B.R. 308, 317 (S.D.N.Y. 2003) *citing Linardos v. Fortuna*, 157 F.3d 945, 947 (2d Cir. 1998) ("'It is also hornbook law that the party invoking federal jurisdiction bears the burden of proving facts to establish that jurisdiction.'").

28 U.S.C. §1334(b) provides that: "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under Title 11, or arising in or related to cases under title ll." 28 U.S.C. §1334(b). In its Notice of Removal, Impala has failed to carry its burden to establish that the Lawsuit is "related to" the Liquidation Proceeding.

In this Circuit, the test to determine whether an action is "related to" a bankruptcy is whether there is a "significant connection" between the two. *In re Turner*, 724 F.2d 338, 341 (2d Cir. 1983). This is true if "the outcome could alter the debtor's rights, liabilities, options, or

freedom of action" or impacts upon the "handling and administration of the bankrupt estate."[5] *WorldCom, Inc.*, 293 B.R. at 317. "Related to" jurisdiction "extends more broadly when it concerns a reorganization under Chapter 11 [as in *WorldCom*] as opposed to a liquidation under Chapter 7," as here. *Id.*

Here, Impala has failed to establish that this Lawsuit will have such an effect on the Liquidation Proceeding. Impala's indemnification clause excludes indemnification for "willful misconduct," which is precisely what the Lawsuit alleges. Moreover, at best, if Impala: (a) unsuccessfully defends against the Lawsuit, (b) brings an indemnification action against Old Winstar, and (c) wins such an action, then it would merely be a creditor to a bankrupt estate. Impala, however, has failed to establish that creditors will receive *anything* in the Liquidation Proceeding. If not, then the Lawsuit cannot have any effect on the bankrupt estate. In stark contrast to the facts of this case are the facts of *In re WorldCom, Inc. Sec. Litig.,* where the Court found that the contribution claim there could conceivably affect the bankruptcy estate because the unsecured creditors were to receive 36 cents on the dollar.[6] *WorldCom, Inc.,* 293 B.R. at 324. Simply put, where there is no money left in the bankrupt estate, there can be no "conceivable effect" on the estate. *Id.*

In *In re Chateaugay Corp.,* 213 B.R. 633, 640 (S.D.N.Y. 1997), this Court held that it lacked jurisdiction over state court actions where there was no "articulated" basis for such a

---

[5]    Notably, in *General Elec. Cap. Corp. v. Pro-Fac Coop.*, No. 01 Civ. 10215, 2002 WL 1300054, at *2 (S.D.N.Y. June 12, 2002), this Court recognized that even though contribution and indemnification claims *could* conceivably "affect" the estate, these claims were an "insufficient basis for jurisdiction." Even if it could exercise "related to" jurisdiction, that Court determined that remand would still be appropriate "in light of the non-exclusive nature of federal court jurisdiction . . . as well as on equitable grounds, including respect for Plaintiff's choice of forum, [and] the ability of the chosen forum to conduct a jury trial." *Id.* at *3.

[6]    "[G]eneral unsecured creditors of WorldCom are slated to receive approximately 36 cents per dollar in cash and newly issued MCI stock." H. Jason Gould, *WorldCom Granted Extension to Emerge from Bankruptcy,* BANKRUPTCY PROTECTOR, Feb. 25, 2004.

{00004185.DOC; 3.4}

claim.  Here, Impala has not "articulated" any basis for its claim that its potential indemnification claim actually could overcome the "willful misconduct" exclusion much less lead to its recovery of estate funds.[7]

Impala has not met its burden to demonstrate "related to" jurisdiction.[8]  Assuming *arguendo,* that it had, mandatory abstention would necessitate, and permissive abstention militates strongly in favor of, remand of the Lawsuit to State Court, as explained below.

## POINT II

### MANDATORY ABSTENTION REQUIRES THAT THE LAWSUIT BE REMANDED TO THE STATE COURT

The "mandatory abstention" statute, 28 U.S.C. §1334(c)(2), provides as follows:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court *shall* abstain from hearing such proceeding if an action *is commenced* and *can be timely adjudicated* in a State forum of appropriate jurisdiction.

28 U.S.C. §1334(c)(2) (emphasis added).

---

[7]    Neither Blackstone nor Citicorp have alleged similar indemnification claims that might give rise to a "related to" connection to the Liquidation Proceeding.

[8]    Impala also has not met its burden of proving an impact upon the Liquidation Proceeding sufficient to create "related to" jurisdiction for three other independent reasons.  First, if a claim for indemnification exists at all – which it does not because the type of claims alleged in the Lawsuit are expressly *excluded* from Impala's indemnification agreement with Old Winstar – such claim is unripe and premature, as it is settled law in New York that an action for indemnity or contribution does not generally accrue until the payment is made by the party seeking recovery.  *Bay Ridge Air Rights, Inc. v. State*, 375 N.E.2d 29 (N.Y. 1978).  Second, Section 502(e) of the Bankruptcy Code provides for disallowance of a claim for indemnity, if at the time such claim is considered for allowance or disallowance, it is still contingent and unliquidated.  *See*, 11 U.S.C. §502(e) ("the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that … (B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution …").  Here, Impala's claim for indemnification is thus far contingent and unliquidated.  Finally, third, it is more than likely that any claim of Impala for indemnification against Old Winstar is barred from consideration in the Liquidation Proceeding for failure of Impala to file any claim in the Liquidation Proceeding seeking indemnification against Old Winstar.

{00004185.DOC; 3.4}

It is well-settled in this Circuit that mandatory abstention applies to actions removed from state courts. *Mt. McKinley Ins. Co. v. Corning Inc.*, 399 F.3d 436, 446-47 (2d Cir. 2005); *Amanat v. Wollmuth Maher & Deutsch, LLP*, 338 B.R. 574, 582 (Bankr. S.D.N.Y. 2005) Federal courts considering mandatory abstention pursuant to 28 U.S.C. 1334(c)(2) have consistently held, in accordance with the plain language of the statute, that they must abstain from exercising jurisdiction over an action removed from a state court whenever the following six factors are present: (1) the motion to abstain is made on time; (2) the action is based on state law claims; (3) the action is "related to" but not "arising in" a bankruptcy case or "arising under" the Bankruptcy Code; (4) Section §1334(b) would provide the sole basis for federal jurisdiction; (5) an action was commenced in state court; and (6) that action can be adjudicated in a timely manner in state court. *Amanat*), 338 B.R. at 581 (and cases cited therein); *see also Certain Underwriters at Lloyd's, London v. ABB Lummus Global, Inc.*, 337 B.R. 22, 27 (S.D.N.Y. 2005). As demonstrated below, this Lawsuit satisfies all six factors. Indeed, the Notice of Removal does not allege otherwise. This requires the Court to abstain from exercising jurisdiction over the Lawsuit.

1.   The Motion to Abstain Was Made on Time.

Impala filed the Notice of Removal on or about June 1, 2007. It was entered on this Court's ECF Docket on June 4, 2007. Pursuant to 28 U.S.C. §1447(c), "[a] motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." Plaintiffs have filed herewith their Motion to Remand. Accordingly, the Motion to Remand is timely.

{00004185.DOC; 3.4}

-13-

2.      The Lawsuit Involves Only State Law Claims.

The causes of action asserted in the Complaint -- fraud, aiding and abetting fraud, negligent misrepresentation, negligence and civil conspiracy -- are all State law causes of action, which satisfy the second factor.  (Ex. 1 ¶¶ 51-96).

3.      The Lawsuit Does Not Arise Under the Bankruptcy Code.

Under 28 U.S.C. §1334(a), federal courts have exclusive jurisdiction of cases "under" the Bankruptcy Code ("core" cases).  Under *id.* §1334(b), federal courts have nonexclusive jurisdiction, subject to both mandatory and permissive abstention, of cases "related to cases under" the Bankruptcy Code ("non-core" cases).[9]  A proceeding falls within the bankruptcy court's "core" jurisdiction only if it "invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise *only* in the context of a bankruptcy case."  *In re Leco Enters., Inc.*, 144 B.R. 244, 249 (S.D.N.Y. 1992) (emphasis added).  A proceeding is "non-core" if it "exists independently under state law and is merely 'related to' the bankruptcy case because of a conceivable effect upon the debtor's estate."  *Kerusa Co. v. W10Z/515 Real Estate Ltd.*, 2004 WL 1048239, at *2 (S.D.N.Y. May 7, 2004) (Lynch, J.).  "'Related to' jurisdiction is presumptively non-core." *Amanat,* 338 B.R. at 581.

As noted above, the sole basis for Impala's claim that this Lawsuit is "under" (*i.e.*, core) the Bankruptcy Code or "related to" (*i.e.*, non-core) a case under the Bankruptcy Code is that Old Winstar allegedly must indemnify Impala against claims from third parties, and therefore (supposedly) "the resolution of Plaintiffs' claims will directly affect whether there are additional monies available for distribution to [Old Winstar's] creditors."[10]  Notice of Removal ¶ 16.

---

[9]    Notably, Impala fails to indicate whether or not it consents to entry of final orders or judgments by the bankruptcy judge.  This is an express requirement under Rule 9027 with respect to non-core matters.

[10]    Impala also argues that the Plaintiffs "irrevocably submitted to the jurisdiction of the Bankruptcy Court" in the APA, and therefore, the Bankruptcy Court in Delaware somehow retains jurisdiction over the Lawsuit.  Notice of

{00004185.DOC; 3.4}

Paragraphs 13 and 14 of the Notice of Removal contend that the Bankruptcy Court has core jurisdiction, by positing that the State law causes of action in the Lawsuit somehow strike "at the 'heart' of the administration of the bankruptcy estate." Notice of Removal ¶¶ 13, 14. This argument is specious. The Lawsuit does not seek one dollar from Old Winstar. Impala cites no statutory or case law authority for the purported "core" nature of the claims in the Lawsuit, nor could it - because Plaintiffs' claims of fraud and misrepresentation under New York law simply are not listed in 28 U.S.C. §157(b)(2) (defining core proceedings). Nor do the claims alleged in the Complaint "invoke[] a substantive right provided by title 11 or … by its nature, could arise only in the context of a bankruptcy case." *In re Leco Enters., Inc.*, 144 B.R. at 249. "[T]here is no authority that a party with a contingent claim for indemnification can bootstrap its claim onto the Bankruptcy Court's core jurisdiction." *Amanat,* 338 B.R. at 581.

Therefore, the Lawsuit does not "aris[e] in" a bankruptcy case or "aris[e] under" the Bankruptcy Code, and the third factor of 28 U.S.C. §1334(c)(2) has been satisfied.

4.    Section 1334 Provides the Sole Would-Be Basis for Jurisdiction.

The sole basis asserted by Impala for federal jurisdiction over the removed lawsuit is 28 U.S.C. § 1334. There is no diversity among the parties; no federal question has been raised and no bankruptcy code provision is at issue. The Court's sole basis for jurisdiction over this Lawsuit therefore arises, if at all, under "related to" jurisdiction under 28 U.S.C. § 1334 (as Impala acknowledges in its Notice of Removal). Therefore, the fourth factor is satisfied.

5.    The Lawsuit Was Commenced in State Court.

---

Removal ¶¶ 9-11. The APA governs relations between "[t]he parties hereto," *id.*, and the Lawsuit is not an action between those parties. Impala has not established that it qualifies as a beneficiary of the APA. Plaintiffs are not looking to enforce the APA. In this Lawsuit, indeed, Plaintiffs allege tort claims of fraud and misrepresentation by Defendants for inducing Plaintiffs to enter into the APA at all. It is doubtful that even Old Winstar, much less Impala, could enforce the APA against the Plaintiffs to defeat a claim that the APA was fraudulently induced.
{00004185.DOC; 3.4}

The Notice of Removal attaches the Complaint filed in the Supreme Court of the State of New York. Thus, the fifth factor has been satisfied. "[T]here is no longer an issue in the Second Circuit that a lawsuit was "commenced" and can be adjudicated in State Court under 28 U.S.C.§1334(c)(2) even if the lawsuit was removed to federal court, provided that the suit can be remanded." *Amanat,* 338 B.R. at 574, *citing Mt. McKinley Ins. v. Corning Inc.,* 399 F.3d 436, 446-47 (2d Cir. 2005)*.*

6.      The Lawsuit Can Be Adjudicated in a Timely Manner
        in the Supreme Court of the State of New York.

The sixth and final factor of mandatory abstention requires that the Lawsuit can be adjudicated on a timely basis in state court. The state courts of New York are ideally suited to adjudicate New York state causes of action, arising out of acts and omissions occurring in New York, involving parties located in New York, and with discoverable evidence located in New York. Furthermore, this action had been assigned to the Supreme Court's Commercial Division, a specialized docket in New York State's Court system with a faster docket than other state courts. *Amanat,* 338 B.R. at 582 (recognizing that cases assigned to the Commercial Division of the Supreme Court "move on a fast-track basis").

Moreover, the court to which Impala seeks to transfer this case has hardly set a speed record in the Liquidation Proceeding. It has been pending for more than six years, with no end in sight. Impala is hard-pressed to explain how the Commercial Division of the Supreme Court of the State of New York cannot adjudicate the Lawsuit at least within a similar time frame, if not much sooner.

Because all six factors for mandatory abstention under 28 U.S.C. 1334(c)(2) are therefore satisfied, this Court **must** abstain, and remand the Lawsuit to the Supreme Court for the State of New York, where it rightfully belongs.

{00004185.DOC; 3.4}

-16-

**POINT III**

**ALTERNATIVELY, THIS COURT SHOULD
ABSTAIN FROM EXCERCISING JURISDICTION OVER
THE LAWSUIT, ON "PERMISSIVE" OR "EQUITABLE" GROUNDS**

Assuming, *arguendo*, that mandatory abstention were somehow inapplicable to the Lawsuit (although it is), there is a separate and independent basis for this Court to abstain from exercising jurisdiction over the Lawsuit – the interest of justice and comity.  28 U.S.C. §1334(b)(1) (permissive abstention).

Congress codified this discretion in 28 U.S.C. §1334(c)(1), which provides:  "Nothing in this section prevents a district court in the interests of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."  The Court's power to abstain or remand on a "permissive" or "discretionary" basis is therefore very broad.

"Congress has recognized that the bankruptcy jurisdiction, particularly in its 'related to' aspect, is potentially so broad that federal courts require equally broad discretion to remand cases to the state courts where fairness and judicial efficiency will be better served by litigating the matters in state court than by sucking into the federal courts large and complex actions lacking any specifically federal component merely because they tangentially effect a bankrupt estate." *Kerusa Co.,* 2004 WL 1048239, at *3.

Courts in this district have abstained on a permissive basis pursuant to 28 U.S.C. §1334(c)(1) upon considering eight relevant factors.  The factors are:  "(1) the effect on the efficient administration of the bankruptcy estate; (2) the extent to which issues of state law predominate; (3) the difficulty or unsettled nature of the applicable state law; (4) comity with state courts; (5) the degree of relatedness or remoteness of the proceeding to the main bankruptcy

case; (6) the existence of a right to trial by jury; (7) prejudice to the involuntarily removed parties; and (8) the potential for duplicative and uneconomical use of judicial resources and the lessened possibility of inconsistent results." *Kerusa Co.,* 2004 WL 1048239 at *3.

As this Court itself has noted, "the list of factors analyzed above is non-exclusive and was developed simply as a guide to the required inquiry; the wise exercise of discretion is rarely a matter of score-keeping or bean-counting. Ultimately, the pursuit of 'equity,' 'justice' and 'comity' involves a thoughtful, complex assessment of what makes good sense in the totality of the circumstances." *Kerusa Co.,* 2004 WL 1048239, at *7 (holding that an overall assessment of what was at stake in the non-bankruptcy related state law claims "pointed towards remand even more decisively than the already lopsided calculation of conventionally-listed factors").

Courts exercising "equitable" authority to remand removed actions to state courts are guided by the same factors. Regarding removed lawsuits that give rise to "related to" jurisdiction, 28 U.S.C. §1452(b) provides that "[t]he court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground." Courts in this Circuit treat the analysis for discretionary abstention under 28 U.S.C. §1334(c)(1) and equitable remand under 28 U.S.C. §1452(b) as essentially identical. *Kerusa Co.,* 2004 WL 1048239, at *3; *see also Digital Satellite Lenders, LLC v. Ferchill*, Case No. 03-8803, 2004 WL 1794502, at *5 (S.D.N.Y. Aug. 10, 2004); *Guccione v. Bell*, Case No. 06-492, 2006 WL 2032641, at *5 (S.D.N.Y. July 20, 2006).

These guiding factors militate strongly in favor of abstention and remand here.

1.    <u>The Effect on the Efficient Administration of the Bankruptcy</u>

"The principal federal interest in any invocation of bankruptcy jurisdiction is in the efficient administration of the underlying bankruptcy estate." *Kerusa Co.,* 2004 WL 1048239, at

*4.  Impala has not established that this Lawsuit will have any effect on the liquidation of the Old Winstar estate in the Liquidation Proceeding.  First, Old Winstar itself is not a party to this Lawsuit.  Second, Old Winstar is no longer an entity going through a complicated reorganization any more.  Having sold substantially all of its assets to Plaintiffs in 2001, it is a "lame duck" in liquidation.  Old Winstar is merely awaiting the outcome of an adversary proceeding in bankruptcy.  That outcome will determine the distributions, if any, from its Liquidation Proceeding.[11]  In short, though the bankrupt estate of Old Winstar still exists, there is no discernible impact that this Lawsuit can have upon that Liquidation Proceeding.  As this Court determined in *Kerusa Co.*, the administration of an estate not in reorganization, but in liquidation, with substantially all of the assets to be sold, and with no requirement to oversee the complexities of a company in reorganization, does not favor retention of federal jurisdiction.  *Id.* at *4-5.[12]

       2.     <u>The Predominance of State Law Issues</u>

The Lawsuit does not implicate any federal question or question of bankruptcy law, or any other matters in which the federal court has interest or expertise.  *Drexel Burnham Lambert Group, Inc. v. Vigilant Ins. Co.*, 130 B.R. 405, 408 (S.D.N.Y. 1991) (holding that while the action was sufficiently related to bankruptcy action for jurisdictional purposes, the predominance of state law claims warranted remand).  Accordingly, the fact that the Lawsuit involves solely issues of state law weighs heavily in favor of abstention and remand.  *Kerusa Co.,* 2004 WL 1048239, at *5 (holding that questions solely of state law are a factor weighing in favor of remand).

---

[11]  On or about December 28, 2005, in Adversary Proceeding No. 01-01063 commenced in the Delaware Bankruptcy Court, Old Winstar obtained a judgment against Lucent Technologies, Inc. ("Lucent") in an amount exceeding $278 million. The District Court affirmed on April 26, 2007 and Lucent has appealed to the Third Circuit.
[12]  Notably, nothing prevents Impala from asserting a claim in those proceedings, even if this Court returns this action to the state court.

{00004185.DOC; 3.4}

3.    Difficulty or Unsettled Nature of State Law Issues

Whether there are unsettled or complex issues regarding the fraud and misrepresentation claims that are the center of the Lawsuit cannot be known until the Lawsuit progresses. But, as with the second factor above, these are matters best left for development in State court to the extent they exist at all.

4.    Comity

This factor weighs heavily in favor of remand, as States retain a vested interest in seeing that their laws are enforced as intended. The claims against the Defendants -- fraud, aiding and abetting fraud, negligent misrepresentation, negligence and civil conspiracy – are solely New York law causes of action sounding in tort, and concern fraudulent misrepresentations and material omissions committed in New York, by some of New York's most powerful and influential financial institutions. New York state courts have a compelling interest in adjudicating these claims in their court system, to ensure that the laws of New York are given their full weight and effect. In fact, this Court has noted that the prospect of removing a New York state court action concerning New York tort claims to this Court, and then transferring the case to the Bankruptcy Court for the District of North Carolina for adjudication of the state law claims there, "verges on the bizarre." *Id.* at *6. Clearly, in the interest of comity, this action should be remanded for the speedy adjudication of New York causes of action, in New York's Commercial Division.

5.    The Relationship of the Lawsuit to the Bankruptcy Proceeding

As previously noted, there is virtually no connection between this Lawsuit and the

Liquidation Proceeding.  The Plaintiffs have not filed any claims arising from or in connection

with the Liquidation Proceeding.  Nor to Plaintiffs' knowledge, despite Impala's contentions

regarding potential indemnification rights, have any of the Defendants filed any claims against

Old Winstar or its estate in the Liquidation Proceeding seeking such indemnification.  When the

thrust of the matters in dispute in a removed lawsuit have nothing at all to do with bankruptcy

laws or a bankruptcy case, this fifth factor points strongly toward remand.  *Kerusa Co.,* 2004

WL 1048239, at *6; *Guccione*, 2006 WL 2032641, at *6 (holding same).

6.    Right to a Jury Trial

This factor also militates strongly in favor of abstention and remand.  "Because a

bankruptcy court cannot conduct a jury trial absent special designation and the consent of all

parties, 28 U.S.C. § 157(e), the presence of a Seventh Amendment jury trial right in a removed

action weighs heavily in favor of remand."  *Kerusa Co.,* 2004 WL 1048239 at *6; *see also*

*Drexel Burnham Lambert Group, Inc. v. Vigilant Ins. Co.*, 130 B.R. 405, 409 (S.D.N.Y. 1991)

(holding that demands for jury trials in non-core proceedings are considered "sufficient

ground[s] for an equitable remand").   In this action, Plaintiffs have demanded a jury trial, as is

their constitutional right.  Defendants -- powerful and influential New York financial institutions

-- seek to avoid having their tortious acts and material admissions aired before a local jury, by

utilizing the forum shopping maneuver of removal.  Not content merely with removal of the

action to this Court, Defendants seek to avoid appearing before a jury altogether by requesting a

transfer of the action to the Bankruptcy Court of the District of Delaware.[13]  The imperative of

the Plaintiffs' right to a trial by jury heavily favors remanding this action to the State Court.

    7.    <u>Prejudice to the Removed Parties</u>

    The prejudice to Plaintiffs in removing this action to this Court, if then transferred to the

District of Delaware where the Liquidation proceeding is pending, will be enormous.  Thus, this

factor weights heavily in favor of remand as well.  All of the parties to this action maintain

offices in or nearby New York.  The misrepresentations and material omissions occurred in New

York.  The witnesses are located in New York.  The discoverable evidence is located in New

York.  Plaintiffs specifically commenced the Lawsuit in New York precisely because every

causal nexus of this action is in New York, and because the courts of New York are the best

possible adjudicators of purely state law causes of action.  To deprive Plaintiffs of their chosen

forum to litigate, to deny Plaintiffs access to a constitutionally guaranteed right to a trial by jury,

and to force Plaintiffs to litigate their claims hundreds of miles from the *situs* of the entire action,

would be of enormous prejudice to the Plaintiffs.  This factor therefore also weighs in favor of

remand.  *Kerusa Co.,* 2004 WL 1048239 at *7.

    8.    <u>Duplicative Litigation; Wasted Resources and Inconsistent Results</u>

    The likelihood of duplicative litigation is increased by removal.  Plaintiffs have

demanded a jury trial, which the Bankruptcy Court is not empowered to conduct absent special

designation by the district court, and by consent of all parties.  Wrangling and maneuvering over

this aspect of the case alone would likely result in substantial motion practice and wasted judicial

resources, long before the action is actually heard on its merits.  Additionally, the Bankruptcy

---

[13]    As this Court has previously held, under well-established constitutional and statutory authority, this action, if removed "must be tried before a jury in a district court and not the bankruptcy court."  *Kerusa Co.,* 2004 WL 1048239 at *6; *see* 28 U.S.C. §§ 157(b)(5) and (e); *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982).
{00004185.DOC; 3.4}

Courts lack jurisdiction to enter a final judgment in this action, and any decision of the Bankruptcy Court would have to be reviewed *de novo* by the District Court. This would be the antithesis of judicial economy. "Only a district court, and not a bankruptcy court, may enter final judgment in a non-core 'related to' proceeding." *Id.* at *2; *see also* 28 U.S.C §157(b)(1) & §157(c)(1). Moreover, if this Lawsuit may be transferred to the Bankruptcy Court, this will necessarily produce multiple stages of review. This factor points strongly towards remand for adjudication in the State Court.

Based on the analysis of the eight factors listed above, Plaintiffs respectfully submit that this Court (if it reaches the question) should exercise its "permissive" and "equitable" authority to remand this action to the Supreme Court of the State of New York.

**POINT IV**

**IMPALA'S "REQUEST" TO TRANSFER THE LAWSUIT
TO THE DELAWARE BANKRUPTCY COURT
MUST BE DENIED AS PREMATURE AND IMPROPERLY RAISED**

In its Notice of Removal, Impala seems to argue for a transfer of venue to the Delaware Bankruptcy Court. Yet Impala has not articulated in its Notice for Removal any statutory basis for such a transfer.[14] This request for transfer of the Lawsuit is premature at best, because this Court has yet to rule on its jurisdiction over the Lawsuit. In addition, as demonstrated above, this Court either must recognize lack of "relatedness" or mandatory abstention and remand the Lawsuit, or it should remand the Lawsuit to New York State Court for permissive and equitable reasons.

Accordingly, Plaintiffs oppose the request for transfer of the Lawsuit to the Delaware Bankruptcy Court. They fully reserve their right to address all venue issues: (a) in opposition to

---

[14] Implicitly recognizing such infirmities in Impala's Notice of Removal, all Defendants joined in a Motion to Transfer Venue, filed on June 21, 2007.

{00004185.DOC; 3.4}

Defendants' joint motion for transfer of venue, filed June 21, 2007, and (b) after this Court determines whether or not to abstain and remand this Lawsuit to the Supreme Court of the State of New York.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order: (a) acknowledging no right of removal for lack of "relatedness" under 28 U.S.C. §1334(b) or pursuant to the mandatory abstention provisions of § 1334(c)(2); or, in the alternative, (b) abstaining from exercising this Court's jurisdiction pursuant to permissive abstention under §1334(c)(1) or equitably under § 1452(b), and remanding the Lawsuit to the Supreme Court of the State of New York.  The Court also should deny Impala's "request" to transfer this Lawsuit to the Bankruptcy Court of the District of Delaware.

Dated: New York, New York
      July 1, 2007

                        Respectfully submitted,

                        ____s/ Joseph M. Vann_____
                        Joseph M. Vann (JMV 7601)
                        Jed Lewin (JL 2428)
                        COHEN TAUBER SPIEVACK & WAGNER, LLP
                        420 Lexington Avenue, 24th Floor
                        New York, New York  10170
                        (212) 586-5800

                               -and-

                        ____s/Melissa A. Roover_____
                        Alan M. Grayson, of counsel
                        Melissa A. Roover (MR 1163)
                        GRAYSON & KUBLI, P.C.
                        1420 Spring Hill Road, Suite 230
                        McLean, Virginia 22102
                        (703) 749-0000

                        Attorneys for Plaintiffs

{00004185.DOC; 3.4}

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
WINSTAR HOLDINGS, LLC and
IDT CORP.,

                     Plaintiff,

       -against-

THE BLACKSTONE GROUP LP; IMPALA
PARTNERS, LLC; AND CITICORP

                    Defendants.
-------------------------------------------------------------------x

Civ. No.: 07 CV 4634 (GEL)

ECF Case

## NOTICE OF APPEARANCE

PLEASE TAKE NOTICE that Cohen Tauber Spievack & Wagner LLP hereby enters its appearance in this action on behalf of Plaintiffs Winstar Holdings, LLC and IDT Corp., and requests that copies of all papers in this action be served upon the undersigned.

Dated: New York, New York
       June 26, 2007

                    COHEN TAUBER SPIEVACK & WAGNER, LLP

By: _____
               Joseph M. Vann (JMV 7601)
               Jed Lewin (JL 2428)
               Attorney for Plaintiffs
               420 Lexington Avenue, 24th Floor
               New York, New York 10170
               (212) 586-5800

                  and

GRAYSON & KUBLI, P.C.
Melissa Roover (ML 1163)
Attorney for Plaintiffs
1420 Spring Hill Road, Suite 230
McLean, Virginia 22102
(703) 749-0000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                         :

WINSTAR HOLDINGS, LLC, et al.,       :
                                           :

                     Plaintiffs,   :           07 Civ. 4634 (GEL)
                                           :

          -against-              :             **ORDER**
                                         :

THE BLACKSTONE GROUP L.P., et al.,  :
                                         :

                    Defendants.  :
                                         :
-------------------------------------------------------------x

GERARD E. LYNCH, District Judge:

      Defendants removed this action from the state court, and immediately moved to transfer venue to the District of Delaware. Plaintiffs have asked that their time to respond be extended until twenty days after the Court decides plaintiffs' anticipated motion to remand the case to state court.

      Plaintiffs are correct that analytically, a motion to remand takes precedence over a transfer motion, since a decision to remand to state court would moot the question of the most appropriate federal venue. However, it does not follow that the motions should be briefed seriatim. As defendants point out, the issues involved in the transfer motion substantially overlap with those involved in deciding whether the case is so closely related to Delaware bankruptcy proceedings such that the case is best transferred there. It is true that, if plaintiffs' motion is granted, they will be spared the burden of briefing a response to defendants' transfer motion. In view of the overlap of issues, however, that burden will be slight. If plaintiffs' motion is denied, in contrast, the proceeding will be delayed by seriatim consideration of preliminary matters.

      Accordingly, judicial efficiency counsels briefing of all of these preliminary issues at once. Plaintiffs' motion is granted only to the extent that their time to respond is extended to coincide with the deadline for filing their projected motion to remand. The parties are directed to meet and confer on a coordinated briefing schedule for both motions, to be submitted to the Court for approval no later than July 6, 2007.

SO ORDERED.

Dated: New York, New York
     July 2, 2007

 

GERARD E. LYNCH
United States District Court Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

—————————————————————— X
                                          :
**WINSTAR HOLDINGS, LLC AND**             :
**IDT CORP.,**                            :
                                          :
                    *Plaintiffs,*         :
                                          :
            v.                            :        **Case No. 07 CV 4634 (GEL)(AJP)**
                                          :
**THE BLACKSTONE GROUP L.P.;**            :                **ECF Case**
**IMPALA PARTNERS, LLC; AND**             :
**CITICORP,**                             :
                                          :
                    *Defendants.*         :
—————————————————————— X

### AMENDED CORPORATE DISCLOSURE STATEMENT FOR
### DEFENDANT THE BLACKSTONE GROUP L.P.

Pursuant to Fed. R. Civ. P. 7.1(b)(2), The Blackstone Group L.P. supplements its

Corporate Disclosure Statement filed on June 21, 2007 as follows:

1.      As of March 12, 2007, the entity formerly known as "The Blackstone Group L.P."

was renamed "Blackstone Advisory Services L.P."  Until June 22, 2007, the parent company of

Blackstone Advisory Services L.P. (f/k/a The Blackstone Group L.P.) was "The Blackstone

Group, Inc."

2.      On June 22, 2007, there was an Initial Public Offering for "The Blackstone Group

L.P." on the New York Stock Exchange.  As of that date, the ultimate parent company of

Blackstone Advisory Services L.P. is "The Blackstone Group L.P."

3.     The Blackstone Group L.P. is a publicly traded entity which holds a 10 percent or greater interest in Blackstone Advisory Services L.P.

Date:   July 6, 2007                              Respectfully submitted,

s/ David S. Flugman
Yosef J. Riemer (YR 5974)
Vickie Reznik (VR 1897)
David S. Flugman (DF 9884)

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022
(212) 446-4800
(212) 446-4900 Fax

*Attorneys for Defendant*
*The Blackstone Group LP*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

WINSTAR HOLDINGS, LLC and
IDT CORP.,

                    Plaintiffs,

      -against-

THE BLACKSTONE GROUP LP; IMPALA
PARTNERS, LLC; AND CITICORP

                  Defendants.

-------------------------------------------------------------x

Civ. No.: 07 CV 4634 (GEL)

**STIPULATION RE BRIEFING
SCHEDULE**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/6/07

        **IT IS HEREBY STIPULATED AND AGREED** by and among plaintiffs

Winstar Holdings, LLC and IDT Corp., and defendants The Blackstone Group LP

("Blackstone"), Impala Partners, LLC ("Impala"), and Citicorp, by and through their

undersigned counsel, that the following briefing schedule shall apply to Defendants' Joint

Motion to Transfer Venue, filed on June 21, 2007, and Plaintiffs' Motion to Remand, filed on

July 1, 2007:

| | | |
|---|---|---|
| July 19, 2007 | - | Deadline for Plaintiffs' Opposition to Motion to Transfer Venue |
| July 31, 2007 | - | Deadline for Defendants' Opposition to Motion to Remand |
| August 2, 2007 | - | Deadline for Defendants' Reply in Further Support of Motion to Transfer Venue |
| August 13, 2007 | - | Deadline for Plaintiffs' Reply in Further Support of Motion to Remand. |

Facsimile signatures herein shall be deemed originals.

{00005330.DOC. 1}

Dated: New York, New York
       July 6, 2007

COHEN TAUBER SPIEVACK & WAGNER, LLP    KIRKLAND & ELLIS LLP

Joseph M. Vann
Jed Lowih
420 Lexington Avenue, 24th Floor
New York, New York 10170
Telephone: (212) 586-5800

and

Alan M. Grayson, Of Counsel
Melissa A. Roover
GRAYSON & KUBLI, P.C
1420 Spring Hill Road, Suite 230
McLean, VA 22102
Telephone: (703) 749-0000

*Attorneys for Plaintiffs*
*Winstar Holdings, LLC and*
*IDT Corp.*

Yosef Riemer
Vickie Reznik
David Flugman
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Attorneys for Defendant The Blackstone*
*Group LP*

HERRICK, FEINSTEIN LLP

Stephen M. Rathkopf
Andrew C. Gold
John Oleske
2 Park Avenue
New York, New York 10016
Telephone: (212) 592-1400
Facsimile: (212) 592-1500

*Attorneys for Defendant Impala Partners*
*LLC*

GREENBERG TRAURIG, LLP

Stephen L. Saxl
200 Park Avenue
New York, New York 10166
Teephone.: (212) 801-2184
Facsimile:   (212) 805-9371

*Attorneys for Defendant Citicorp*

**SO ORDERED:**

Dated: New York, New York
       July __, 2007

_____
GERARD E. LYNCH
United States District Court Judge

Dated: New York, New York
July 6, 2007

COHEN TAUBER SPIEVACK & WAGNER, LLP     KIRKLAND & ELLIS LLP

Joseph M. Vann
Jed Lewin
420 Lexington Avenue, 24th Floor
New York, New York 10170
Telephone: (212) 586-5800

**and**

Alan M. Grayson, Of Counsel
Melissa A. Roover
GRAYSON & KUBLI, P.C
1420 Spring Hill Road, Suite 230
McLean, VA 22102
Telephone: (703) 749-0000

*Attorneys for Plaintiffs*
*Winstar Holdings, LLC and*
*IDT Corp.*

Yosef Riemer
Vickie Reznik
David Flugman
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Attorneys for Defendant The Blackstone*
*Group LP*

HERRICK, FEINSTEIN LLP

Stephen M. Rathkopf
Andrew C. Gold
John Oleske
2 Park Avenue
New York, New York 10016
Telephone: (212) 592-1400
Facsimile: (212) 592-1500

*Attorneys for Defendant Impala Partners*
*LLC*

GREENBERG TRAURIG, LLP

Stephen L. Saxl
200 Park Avenue
New York, New York 10166
Teephone.: (212) 801-2184
Facsimile:   (212) 805-9371

*Attorneys for Defendant Citicorp*

**SO ORDERED**:

Dated: New York, New York
July __, 2007

GERARD E. LYNCH
United States District Court Judge

{00005330.DOC; 1}

Dated: New York, New York
July 6, 2007

COHEN TAUBER SPIEVACK & WAGNER, LLP    KIRKLAND & ELLIS LLP

_____    _____

Joseph M. Vann                          Yosef Riemer
Jed Lewin                               Vickie Reznik
420 Lexington Avenue, 24th Floor        David Flugman
New York, New York 10170                Citigroup Center
Telephone: (212) 586-5800               153 East 53rd Street
                                        New York, New York 10022-4611
and                                     Telephone: (212) 446-4800
                                        Facsimile: (212) 446-4900
Alan M. Grayson, Of Counsel
Melissa A. Roover                       *Attorneys for Defendant The Blackstone*
GRAYSON & KUBLI, P.C                    *Group LP*
1420 Spring Hill Road, Suite 230
McLean, VA 22102
Telephone: (703) 749-0000               HERRICK, FEINSTEIN LLP

*Attorneys for Plaintiffs*              _____
*Winstar Holdings, LLC and*             Stephen M. Rathkopf
*IDT Corp.*                             Andrew C. Gold
                                        John Oleske
                                        2 Park Avenue
                                        New York, New York 10016
                                        Telephone: (212) 592-1400
                                        Facsimile: (212) 592-1500

                                        *Attorneys for Defendant Impala Partners*
                                        *LLC*

                                        GREENBERG TRAURIG, LLP

                                        _____

                                        Stephen L. Saxl
                                        200 Park Avenue
                                        New York, New York 10166
                                        Teephone.: (212) 801-2184
                                        Facsimile:  (212) 805-9371

                                        *Attorneys for Defendant Citicorp*

**SO ORDERED**:

Dated: New York, New York              _____
July 6, 2007                           GERARD E. LYNCH
                                        United States District Court Judge

{00005330.DOC; 1}

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

WINSTAR HOLDINGS, LLC and
IDT CORP.,

                                                    Civ. No.: 07 CV 4634 (GEL)
                              Plaintiff,            ECF Case


             -against-


THE BLACKSTONE GROUP LP; IMPALA
PARTNERS, LLC; AND CITICORP

                              Defendants.
----------------------------------------------------------------x


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO TRANSFER VENUE TO THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF DELAWARE**


GRAYSON & KUBLI, P.C.
Alan M. Grayson, of counsel
Melissa Roover (MR 1163)
1420 Spring Hill Road, Suite 230
McLean, Virginia 22102
(703) 749-0000


and


COHEN TAUBER SPIEVACK WAGNER LLP
Joseph M. Vann (JMV 7601)
Jed Lewin (JL 2428)
420 Lexington Avenue
New York, New York 10170
(212) 586-5800


*Attorneys for Plaintiffs Winstar Holdings, LLC and IDT Corp.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

PRELIMINARY STATEMENT AND BACKGROUND.......................................1

ARGUMENT ..........................................................................................................3

I.     THIS LAWSUIT DOES NOT BELONG IN BANKRUPTCY
    COURT, AND THEREFORE, IT CANNOT
    BE TRANSFERRED PURSUANT TO SECTION 1406(a) ............................4

    A.     The Forum Selection Clause Is Not Available to
        Defendants Nor Applicable to This Lawsuit ..........................................4

    B.     The Bankruptcy Court Did Not Retain
        Jurisdiction Over the Lawsuit ...............................................................8

    C.     The Lawsuit is Not "Related To" the
        Liquidation Proceeding..........................................................................9

II.     THE INTERESTS OF JUSTICE WOULD NOT BE
    SERVED BY TRANSFERRING THE CASE TO
    THE DELAWARE BANKRUPTCY COURT...............................................12

    1.     The Convenience of the Witnesses.......................................................14
    2.     The Convenience of the Parties. ..........................................................14
    3.     The Locus of Operative Facts. .............................................................15
    4.     The Location of Relevant Documents. .................................................15
    5.     The Availability of Process..................................................................16
    6.     The Forum's Familiarity with Relevant Law.......................................16
    7.     The Relative Financial Means of the Parties .......................................17
    8.     Calendar Congestions and Trial Efficiency .........................................17
    9.     The Interests of Justice Generally.......................................................18

CONCLUSION......................................................................................................19

# TABLE OF AUTHORITIES

## Cases

*Aetna, Inc. v. Medtest Express, Inc.*,
No. 01-CV-4398 (ILG), 2001 WL 1776155, at *5 (E.D.N.Y. Nov. 30, 2001) .................. 16, 17

*Bay Ridge Air Rights, Inc. v. State*,
375 N.E. 2d 29 (N.Y. 1978)........................................................................................... 11

*Berman v. Informix Corp.*,
30 F. Supp. 2d 653 (S.D.N.Y. 1998)........................................................................ passim

*Connors v. Lexington Ins. Co.*,
666 F. Supp. 434 (S.D.N.Y. 1987)................................................................................. 18

*Credit Suisse Secs. (USA) LLC v. Hilliard*,
469 F. Supp. 2d 103 (S.D.N.Y. 2007)............................................................................. 7

*Dan-Dee Int'l, Ltd. v. Kmart Corp.*,
No. 99-11689, 2000 WL 1346865 (S.D.N.Y. Sept. 19, 2000) ................................ 7, 8, 12, 13

*Frene N.V. v. Kmart Corp.*,
1998 WL 427688, at *3 (S.D.N.Y., 1998)..................................................................... 15

*General Elec. Cap. Corp. v. Pro-Fac Coop.*,
No. 01 Civ. 10215, 2002 WL 1300054 (S.D.N.Y. June 12, 2002)........................................ 10

*In re Turner*,
724 F.2d 338 (2d Cir. 1983)........................................................................................... 10

*In re WorldCom, Inc. Sec. Litig.*,
293 B.R. 308 (S.D.N.Y. 2003)............................................................................... 9, 10, 11

*Int'l Securities Exchange, LLC v. Chicago Board Options Exchange, Inc.*,
No. 06-13445, 2007 WL 1541087, at *3 (S.D.N.Y. May 24, 2007) ........................... 14, 15, 16

*Kerusa Co., LLC v. W10Z/515 Real Estate Ltd.*,
No. 04-cv-708(GEL), 2004 WL 1048239, at *6 (S.D.N.Y. May 7, 2004).............................. 17

*Korean Press Agency, Inc. v. Yonhap News Agency*,
421 F. Supp. 2d 775 (S.D.N.Y. 2006)............................................................................. 7

*Linardos v. Fortuna*,
157 F.3d 945 (2d Cir. 1998)........................................................................................... 9

*Ruby v. Pam Am World Airways, Inc.*,
    252 F. Supp. 873 (S.D.N.Y. 1965) ........................................................... 8

*Saferstein v. Paul, Mardinly, Durham, James, Flandreau & Rodger, P.C.*,
    927 F. Supp. 731 (S.D.N.Y. 1996) ........................................................... 5

*Victor G. Reiling & Assoc. v. Fisher-Price, Inc.*,
    No. 03-222, 2003 WL 21785580, at *2 (D. Conn. July 31, 2003). ........................................................... 5

*Weiss v. Columbia Pictures Television, Inc.*,
    801 F. Supp. 1276 (S.D.N.Y. 1992) ........................................................... 5, 6

**Statutes**

11 U.S.C. §502(e) (2000) ........................................................... 11

28 U.S.C. § 1404(a) ........................................................... 4, 12, 15

28 U.S.C. § 1406(a) (2000) ........................................................... 2, 11

28 U.S.C. § 1452 (2000) ........................................................... 1

28 U.S.C. §1334(b) ........................................................... 9

**Rules**

Fed. R. Civ. P. 45(b)(2) ........................................................... 16

Rule 9027 of the Federal Rules of Bankruptcy Procedure ........................................................... 1

iii

## INTRODUCTION

Plaintiffs Winstar Holdings, LLC and IDT Corp. (together, "Plaintiffs") respectfully submit this Memorandum of Law in Opposition to Defendants' Motion to Transfer Venue to the United States District Court for the District of Delaware ("Motion to Transfer Venue" or "Defendants' Motion"), dated July 19, 2007.

## PRELIMINARY STATEMENT AND BACKGROUND

Plaintiffs commenced this action on May 10, 2007 (the "Lawsuit"), in the Supreme Court of the State of New York, Commercial Division, against The Blackstone Group, L.P. ("Blackstone"), Impala Partners, LLC ("Impala") and Citicorp ("Citicorp") (collectively, the "Defendants"). The Lawsuit is grounded completely in tort claims of fraud and misrepresentation arising under New York law. Plaintiffs allege that they have suffered losses exceeding $300 million resulting from Defendants' misrepresentations and omissions that induced Plaintiffs to acquire, in December 2001, substantially all of the assets of Winstar Communications, Inc. and certain related entities ("Old Winstar"). Plaintiffs seek damages from Defendants for Defendants' acts of fraud and misrepresentation, made within the State of New York, in connection with the Old Winstar acquisition.

By Notice of Removal dated June 1, 2007 (the "Notice of Removal" or "Notice"), Defendant Impala removed this Lawsuit to this Court, purportedly pursuant to 28 U.S.C. § 1452 (2000) and Rule 9027 of the Federal Rules of Bankruptcy Procedure. Plaintiffs timely filed their Motion to Remand in response to the Notice of Removal, on July 1, 2007, and hereby incorporate their Motion to Remand by reference.

The only ground for removal articulated by Impala in its Notice is that this Lawsuit is somehow "related" to Old Winstar's Chapter 7 liquidation proceeding ("Liquidation

Proceeding"), solely because Impala holds a *potential* right of indemnification against Old Winstar, which is *not a party* to this Lawsuit.  Importantly, that right of indemnification specifically excludes "willful misconduct," (*see*, Exhibit F to Defendants' Motion) which is what Plaintiffs allege here.  Impala evidently has not filed any claim against Old Winstar purporting to assert such a right, and its time to do so has expired.

In its Notice of Removal, Impala informally, and without basis, also requested a transfer of venue to the Delaware Bankruptcy Court.  Yet Impala did not articulate in its Notice for Removal any statutory basis for such a transfer.  Implicitly conceding the infirmities of the ineffective request to transfer venue in Impala's Notice of Removal, all Defendants joined in a formal Motion to Transfer Venue, filed on June 21, 2007.  In their Motion, Defendants now request that this Court transfer venue to the United States District Court for the District of Delaware for referral to the United States Bankruptcy Court for the District of Delaware, pursuant to 28 U.S.C. § 1406(a) (2000) (wrong district), or in the alternative *id.* § 1404(a) (convenience of parties & witnesses/interest of justice).

As an initial matter, Plaintiffs reiterate their position, articulated in their Motion to Remand, that this Court does not have jurisdiction of the Lawsuit.  Accordingly, the Court need not (and cannot) decide Defendants' Motion to Transfer Venue until it decides Plaintiffs' Motion to Remand.  And, if Plaintiffs' Motion to Remand is granted, Defendants' Motion to Transfer Venue becomes moot.

If, notwithstanding, this Court elects to consider Defendants' Motion to Transfer Venue on its merits, Defendants' Motion must be denied.  Defendants argue that this case

belongs in the Delaware Bankruptcy Court for three reasons:  (1) a forum selection clause in the Asset Purchase Agreement ("APA") by which Plaintiffs purchased the assets of Old Winstar – an Agreement to which none of the Defendants is a party;  (2) the Delaware Bankruptcy Court's purported retention of "exclusive" jurisdiction over "any disputes arising under or related to the Asset Purchase Agreement;" and (3)  based on an Indemnification Agreement between Impala and Old Winstar, to which Plaintiffs were not a party.[1]  Defendants also argue, in the alternative, that even if venue exists in this District, the Court should transfer the Lawsuit to Delaware "in the interests of justice," pursuant to Section 1404(a).  However, as set forth below, all of these arguments for transfer lack merit.  This Lawsuit concerns activities in New York, raising issues of New York State law and the Lawsuit therefore belongs in New York.

## ARGUMENT

Contrary to Defendants' conclusory assertions, the issues in this case are not "related" to, and have no "significant connection" to the Delaware Liquidation Proceeding. Plaintiffs filed this Lawsuit in the Supreme Court for the State of New York, County of New York, alleging exclusively New York State law causes of action against Defendants who are all located in (or close to) New York.  The misrepresentations and material omissions occurred in

---

[1]  Defendants now also assert that an Indemnification Agreement between Blackstone and Old Winstar provides a basis for a venue transfer.  However, that Indemnification Agreement similarly excludes indemnification for actions arising out of "gross negligence or willful misconduct."  Def. Mot. Ex. D.  Pursuant to a letter agreement (the "Blackstone Agreement"), Old Winstar retained Blackstone to act as its exclusive M & A advisor to provide financial advisory services, including with respect to the sale of Old Winstar's assets.  Pursuant to that Agreement, Old Winstar agreed to indemnify Blackstone for "all expenses (including reasonable fees, expenses and disbursements of counsel) as they are incurred in connection with investigation, preparing, pursuing, defending, or assisting in the defense of any action, claim, suit, investigation or proceeding related to, arising out of or in connection with" Blackstone's retention by Old Winstar.  Def. Mot. at 4, citing Def. Ex. D.  This is similar to the purported Indemnification Agreement between Old Winstar and Defendant Impala, which formed the basis for this Court's alleged jurisdiction.  *See* Def. Mot. Ex. F.  Any argument concerning alleged Indemnification Agreements is an effort to mislead the Court, however, as the next sentence of both the Blackstone and the Impala Indemnification Agreements state that Old Winstar will "not be liable" under the foregoing indemnification provision for claims arising from "negligence" or "willful misconduct."  *See* Def. Mot. Exs. D, F.  Plaintiffs assert claims of fraud and misrepresentation, *i.e.*, willful misconduct.

3

New York.  The witnesses are located in the New York metropolitan area.  The discoverable

evidence is located in New York.  Old Winstar, the debtor in the Liquidation Proceeding, is not a

party to this Lawsuit.  The lawsuit focuses solely on Defendants' wrongful conduct that occurred

prior to the APA.  Defendants nevertheless argue that this case now belongs "exclusively" in

Delaware because of the mandatory forum selection clause in the APA, to which they are not

parties.[2]  However, the Defendants, as strangers to the APA, are not entitled to enforce the forum

selection clause in the APA or the Order approving the APA.[3]    Accordingly, Defendants'

primary argument for transfer of venue lacks merit.  Moreover, as demonstrated in the annexed

Declaration of Melissa Roover and below, the interests of justice under 28 U.S.C. § 1404(a)

strongly militate against any transfer of venue.

## I.    THIS LAWSUIT DOES NOT BELONG IN BANKRUPTCY COURT, AND THEREFORE, IT CANNOT BE TRANSFERRED PURSUANT TO SECTION 1406(a)

### A.    The Forum Selection Clause Is Not Available to Defendants Nor Applicable to This Lawsuit

Defendants argue that this case should be transferred to the United States District

Court for the District of Delaware for referral to the Delaware Bankruptcy Court, pursuant to

Section 1406(a), because Plaintiffs' claims supposedly are subject to the mandatory forum

---

[2]  The tort causes of action of fraud and misrepresentation asserted in the Lawsuit are inherently independent of the APA, for Plaintiffs assert no breach of the APA.  Plaintiffs assert that Defendants committed fraud and made misrepresentations that induced Plaintiffs to participate in the auction of Old Winstar's asserts, and ultimately, to enter into the APA.  Had Plaintiff not entered into the APA, Plaintiffs could still maintain the lawsuit to recover the significant expenses it incurred to participate in and bid at the bankruptcy auction of Old Winstar's assets.  *See*, Complaint ¶ 38.  Accordingly, while the APA may be relevant to the damages suffered by Plaintiffs, Defendants' tortious acts, which occurred in New York, remain actionable independent of the APA.

[3]  The APA expressly states that it does not provide any rights to third parties. Specifically, Section 9.7 of the APA states: "*Third-Party Beneficiaries*.  Nothing in this Agreement shall be construed as giving any person, including any counter-party to an Assumed Agreement, other than the parties hereto, any legal or equitable right, remedy or claim under or with respect to this Agreement."  (emphasis in original). *See,* Def. Mot., Ex. A.

selection clause in the APA and because the Bankruptcy Court, when approving the APA, supposedly retained exclusive jurisdiction.  Def. Mot. at 7-11.  Defendants are incorrect.

Section 1406(a) "applies to claims for which venue is improper in this district." *Saferstein v. Paul, Mardinly, Durham, James, Flandreau & Rodger, P.C.*, 927 F. Supp. 731, 737 (S.D.N.Y. 1996).  "When venue lies in the wrong division or district, the district court 'shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.'"  *Victor G. Reiling & Assoc. v. Fisher-Price, Inc.*, No. 03-222, 2003 WL 21785580, at *2 (D. Conn. July 31, 2003).

Defendants present the "mandatory" forum selection clause in their Motion as a *fait accompli* to support their circular (and meritless) argument that venue in this Court is improper because the APA and Order approving the APA make venue proper only in the District of Delaware. Yet, Defendants were not parties to, and cannot avail themselves of, the APA provisions. Moreover, even if Defendants had been parties to the APA (which they were not), while "the parties' expressed preference for a forum in a forum selection clause is entitled to substantial consideration, [] it is not dispositive."  *Weiss v. Columbia Pictures Television, Inc.*, 801 F. Supp. 1276, 1278 (S.D.N.Y. 1992).

"While '[a] forum selection clause is enforceable unless it is shown that to enforce it would be unreasonable and unjust or that some invalidity such as fraud or overreaching is attached to it,'" "'[t]his general rule applies, however, only when *the contract containing the forum selection clause is the subject of the suit*.'"  *Fisher Price,* 2003 WL 21785580, at *2 (emphasis added) (citations omitted).  In *Fisher-Price*, plaintiff toy creators entered into an Option Agreement with the defendant toy company.  Under the Option Agreement, plaintiffs manufactured various doll prototypes, all of which the defendants rejected.

5

After the expiration of the Option Agreement, defendants marketed a toy incorporating plaintiffs' ideas. Plaintiffs filed suit alleging breach of contract, unfair competition and misappropriation of an idea, and defendants moved to transfer venue.

The court in *Fisher Price* denied defendant's motion to transfer. It stated that the forum selection clause of the Option Agreement was inapplicable where, as here, plaintiffs did not sue under that agreement, but brought other claims only tangentially related to the Option Agreement. That court determined that the forum selection clause applied only to claims arising under the Option Agreement, and consequently, not to any claim or dispute that did not arise under it. *Id.* The fact that there would be discovery on the Option Agreement was "unexceptional," given that the Option Agreement was part of the "contextual background" of the case. *Id.* Such discovery did not justify transfer. *Id.*

Similarly, here, the fact that Plaintiffs bought the assets of Old Winstar under the APA is simply part of the "contextual background" of the Lawsuit. It is hardly enough to justify, let alone require, transfer of this case to the Delaware Bankruptcy Court. Contrary to Defendants' argument, this Lawsuit does not seek to reverse "the purchase of the vast majority of Old Winstar's business assets," nor does the Lawsuit "strike[] at the core of the bankruptcy estates and the still ongoing bankruptcy proceedings." Def. Mot. at 11. Rather, the Lawsuit seeks a remedy for Defendants' misrepresentations and omissions, and the consequences that flowed from them.

Defendants argue that the Plaintiffs agreed to "irrevocably submit to the exclusive jurisdiction of the [United States] Bankruptcy Court [for the District of Delaware] (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement or any other agreement or instrument contemplated hereby or entered

6

into in connection herewith or any of the transactions contemplated hereby or thereby." Def. Mot. at 5. Yet the APA governs relations solely between "[t]he parties hereto," Def. Ex. A. *The Lawsuit, however, is not an action between those parties.* This critical fact, standing alone, distinguishes all of the cases relied upon by Defendants for the enforceability of forum selection clauses, as those cases -- unlike here -- involved disputes between the actual parties to the contract containing the forum selection clause.[4]

      Defendants are not parties (or beneficiaries) of the APA.[5] Plaintiffs are not looking to enforce or interpret the APA. To the contrary, in this Lawsuit, Plaintiffs allege tort claims of fraud and misrepresentation against Defendants for, *inter alia*, inducing Plaintiffs to enter into the APA. It is doubtful that even Old Winstar, much less Impala or Blackstone, could enforce the APA against the Plaintiffs to defeat a claim that the APA was fraudulently induced.

      The public policy of enforcing forum selection clauses applies only "when the contract containing the forum selection clause is the subject of the suit." *Dan-Dee Int'l, Ltd. v. Kmart Corp.*, No. 99-11689, 2000 WL 1346865, at *5 (S.D.N.Y. Sept. 19, 2000) (court refused to apply forum selection clause where plaintiff did not sue under the contract).[6] Here, Plaintiffs likewise did not sue under the APA. They are not "'attempting to assert contractual rights

---

[4] Indeed, Defendants cite no authority for their contention that a tort committed by a party unrelated to a contract can enforce a forum selection clause in that contract. Defendants reply upon *Credit Suisse Secs. (USA) LLC v. Hilliard*, 469 F. Supp. 2d 103 (S.D.N.Y. 2007) and *Korean Press Agency, Inc. v. Yonhap News Agency*, 421 F. Supp. 2d 775 (S.D.N.Y. 2006) for this proposition. Such reliance is misplaced. In these cases, it is the parties *to the contract containing the forum selection clause* that are seeking to enforce that clause in subsequent litigation.

[5] *See*, footnote 3, *supra*.

[6] It is also well-established that a plaintiff's choice of forum is "generally entitled to considerable weight and should not be disturbed unless the balance of the factors is strongly in favor of the defendant." *Berman v. Informix Corp.*, 30 F. Supp. 2d 653, 659 (S.D.N.Y. 1998). Because the typical transfer case involves a defendant seeking to transfer the case to its home forum, a plaintiff's choice of forum should be afforded "considerable weight" where, as here, Plaintiffs' choice of forum is the Defendants' home forum.

7

arising from'" the APA.  *Id.*  Plaintiffs sued Defendants, none of whom is a party to the APA, for

fraud and misrepresentation occurring prior to the APA, not for breach of contract of the APA.

### B.    The Bankruptcy Court Did Not Retain Jurisdiction Over the Lawsuit

Defendants next argue that the Bankruptcy Court, in its Order approving the APA,

somehow "retained" exclusive jurisdiction over the Lawsuit filed five years later.  Def. Mot. at 6.

Defendants rely on Paragraph 15 of the Order, which states:

> This court retains exclusive jurisdiction to endorse and implement
> the terms and provisions of the Asset Purchase Agreement, all
> amendments thereto, any waivers and consents thereunder, and
> each of the agreements executed in connection therewith
> (including the Management Agreement) in all respects, including,
> but not limited to, retaining jurisdiction to (a) compel the delivery
> of the Purchased Assets to the Buyer, (b) compel delivery of the
> purchase price or performance of other obligations owed to the
> Debtors, (c) resolve any disputes arising under or related to the
> Asset Purchase Agreement, and (d) interpret, implement, and
> enforce the provisions of the Asset Purchase Agreement and this
> Sale Order.  *Id.*

Plaintiffs do not seek to compel the delivery of the assets listed in the APA;

Plaintiffs have delivered the purchase price of the assets; all duties have been performed under

the APA; the dispute between Plaintiffs and Defendants does not "arise under or relate to the"

APA; and Plaintiffs do not seek to interpret, implement or enforce any provision of the APA.  To

the contrary, Plaintiffs claim that but for the Defendants' misrepresentations and omissions, the

APA never would have been signed, and the Order never would have come into being.[7]

Defendant's reliance on *Ruby v. Pam Am World Airways, Inc.*, 252 F. Supp. 873,

880 (S.D.N.Y. 1965) is misplaced.   In *Ruby*, the court dismissed claims involving an

interpretation of the pilots' association agreement because exclusive jurisdiction over

interpretation vested in an alternative forum. Here, Plaintiffs do not seek an "interpretation" of the APA; rather, they seek damages from Defendants for Defendants' fraud, misrepresentations and omissions.

**C.    The Lawsuit is Not "Related To" the Liquidation Proceeding**

Defendants also argue that venue is proper in the Delaware Bankruptcy Court under the "broad scope" of "related to" jurisdiction under 28 U.S.C. §1334(b). Def. Mot. at 10-11. This is incorrect, because this Lawsuit is neither "related" nor "significantly connected" to the Old Winstar Liquidation Proceeding in Delaware, but rather focuses on Defendants' wrongful conduct in New York.

The test under Section 1406(a) is not, however, whether venue is "proper" in Delaware; the test is whether it is "improper" in New York. Apparently, Defendants' have no authority that venue is improper in New York other than their argument that venue is purportedly also proper in Delaware under the APA or 28 U.S.C. § 1334(b) (2000).

In any case, under Section 1334(b), the district courts have "original **but not exclusive jurisdiction** of all civil proceedings arising under Title 11, or arising in or related to cases under Title 11." 28 U.S.C. §1334(b) (emphasis added). "A party seeking to remove an action from state to federal court bears the burden of proving federal jurisdiction." *In re WorldCom, Inc. Sec. Litig.,* 293 B.R. 308, 317 (S.D.N.Y. 2003) *citing Linardos v. Fortuna*, 157 F.3d 945, 947 (2d Cir. 1998) ("'It is also hornbook law that the party invoking federal jurisdiction bears the burden of proving facts to establish that jurisdiction.'"). Defendants have failed, both in Impala's Notice of Removal and in their Motion to Transfer Venue, to carry their

---

[7] One can only surmise that Defendants' motivation for defrauding and misrepresenting Old Winstar's financial health was to attract as many bidders as possible to the bankruptcy auction given Defendants' respective "success fees" due upon sale. *See, e.g.*, Def. Mot., Ex. D at ¶ (iii) (1-1.25% "Transaction Fee").

9

burden to establish that the Lawsuit is "related to" the Liquidation Proceeding, within the meaning of Section 1334(b).

In this Circuit, the test to determine whether an action is "related to" a bankruptcy is whether there is a "significant connection" between the two. *In re Turner*, 724 F.2d 338, 341 (2d Cir. 1983). This is true if "the outcome could alter the debtor's rights, liabilities, options, or freedom of action" or impacts upon the "handling and administration of the bankrupt estate."[8] *WorldCom, Inc.*, 293 B.R. at 317. "Related to" jurisdiction "extends more broadly when it concerns a reorganization under Chapter 11 [as in *WorldCom*] as opposed to a liquidation under Chapter 7," as here. *Id.*

In this case, Impala and Blackstone, however, have failed to establish that: (i) their potential "claims" for indemnification are recognizable or allowable in the Liquidation Proceeding, or (ii) that creditors of the earlier Chapter 11 stage of the Liquidation Proceeding (now in Chapter 7 liquidation) will receive *anything* in the Liquidation Proceeding. In the absence of factor (i) or (ii), the Lawsuit cannot have any effect on the bankrupt estate.[9] In stark contrast to the facts of this case are the facts of *In re WorldCom, Inc. Sec. Litig.,* where the Court found that the contribution claim there could conceivably affect its reorganizing (not liquidating)

---

[8] Notably, in *General Elec. Cap. Corp. v. Pro-Fac Coop.*, No. 01 Civ. 10215, 2002 WL 1300054, at *2 (S.D.N.Y. June 12, 2002), this Court recognized that even though contribution and indemnification claims *could* conceivably "affect" the estate, these claims were an "insufficient basis for jurisdiction." Even if it could exercise "related to" jurisdiction, the Court determined that remand would still be appropriate "in light of the non-exclusive nature of federal court jurisdiction . . . as well as on equitable grounds, including respect for Plaintiff's choice of forum, [and] the ability of the chosen forum to conduct a jury trial." *Id.* at *3.

[9] Even if creditors eventually do receive a distribution from the Liquidation Proceeding, a contingent and unliquidated claim by Defendants cannot possibly have a significant impact on the Liquidation Proceeding. For, if Defendants can somehow get around the Bar Date Order in the Liquidation Proceeding precluding their claims, their indemnification claims will either be disallowed as being contingent, or estimated and reserved.

bankruptcy estate, because the unsecured creditors were to receive 36 cents on the dollar.[10]

*WorldCom, Inc.,* 293 B.R. at 324.   Where Old Winstar is in liquidation, not reorganization, and

Defendants have failed to demonstrate that there are any funds presently available in the

Liquidation Proceeding to distribute to creditors at their level of priority, or that they even have a

right to file a claim in the Liquidation Proceeding (which is apparently time barred), there can be

no "conceivable effect" on the estate.   *Id.*   Accordingly, Defendants have not met their burden to

demonstrate "related to" jurisdiction.[11]

In sum, try as Defendants might to shoehorn this Lawsuit into a case suitable for

adjudication in the Bankruptcy Court, neither the APA, nor the Order approving the APA, nor

the Impala and Blackstone purported indemnification agreements confer original jurisdiction

over this Lawsuit in the Delaware Bankruptcy Court.   Venue for this Lawsuit remains

appropriate in New York.   Certainly, Defendants have failed to establish that the Lawsuit was

"wrongly . . . filed" in New York.  28 U.S.C. § 1406(a) (2000).

---

[10]  "[G]eneral unsecured creditors of WorldCom are slated to receive approximately 36 cents per dollar in cash and newly issued MCI stock."  H. Jason Gould, *WorldCom Granted Extension to Emerge from Bankruptcy,* Bankruptcy Protector, Feb. 25, 2004.

[11]  Impala and Blackstone also have not met their burden of proving an impact upon the Liquidation Proceeding sufficient to create "related to" jurisdiction for three other independent reasons.  First, if a claim for indemnification exists at all – which it does not because the type of claims alleged in the Lawsuit are expressly *excluded* from Impala's and Blackstone's indemnification agreements with Old Winstar – such claim is unripe and premature, because it is settled law in New York that an action for indemnity or contribution does not generally accrue until the payment is made by the party seeking recovery.  *Bay Ridge Air Rights, Inc. v. State,* 375 N.E. 2d 29 (N.Y. 1978).  Second, Section 502(e) of the Bankruptcy Code provides for disallowance of a claim for indemnity, if at the time such claim is considered for allowance or disallowance, it is still contingent and unliquidated. *See* 11 U.S.C. §502(e) (2000) ("the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that … (B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution …").  Here, Impala's and Blackstone's claims for indemnification are thus far contingent and unliquidated.  Third, Impala and Blackstone have not filed any proof of claim for indemnification against Old Winstar in the Liquidation Proceeding, and more than likely such claims are now time-barred from doing so.  A June 11, 2002 Order in the Liquidation Proceeding sets August 30, 2002 as the bar date for the filing of all Administrative Claims (whether or not contingent or unliquidated).  *See* Ex. 1 [Roover Declaration], Ex. A.

11

## II. THE INTERESTS OF JUSTICE WOULD NOT BE SERVED BY TRANSFERRING THE CASE TO THE DELAWARE BANKRUPTCY COURT

The Court may transfer a case "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a) (2000). "'Motions for transfer lie within the broad discretion of the district court and are determined upon notions of convenience and fairness on a case-by-case basis.'" *Dan-Dee*, 2000 WL 1346865, at *5 (citations omitted). On a motion to transfer, the moving party bears the burden of demonstrating the desirability of transfer. *Id.* A "court should not disturb a plaintiff's choice of forum unless the defendant makes a clear and convincing showing that the balance of convenience favors the defendant's choice." *Id.* Indeed, the plaintiff's choice of forum is "accorded more deference where [as here] there is a material connection or significant contact between the forum state and the underlying events allegedly underlying the claim." *Berman*, 30 F. Supp. 2d at 659.

In addition, in applications for transfer under 28 U.S.C. §1404(a) (2000), the movant must "support the transfer application with an affidavit containing detailed factual statements relevant to the factors [to be considered by the court in its transfer decision], including the potential principal witnesses expected to be called and a general statement of the substance of their testimony." *Id.* at 656, *see also Dan-Dee Int'l , Ltd.*, 2000 WL 1346865, at *6. Defendants have submitted no such affidavit here; their application to transfer under Section 1404(a) is therefore facially invalid.

Assuming *arguendo*, that the Court considers Defendants' Motion to Transfer Venue anyway (which it should not), the inquiry on a motion to transfer is twofold. First, courts must determine whether the action sought to be transferred is one that "'might have been

brought' in the transferee court." *Id.* Second, the court must determine whether transfer is warranted for "'the convenience of parties and witnesses' and [in] the 'interests of justice.'" *Id.*

Here, the relevant events to Plaintiffs' claims for fraud and misrepresentation took place *solely* in New York. Only Plaintiffs' purchase of Old Winstar's assets occurred in the transferee court. As discussed above, this is not sufficient to confer jurisdiction in the transferee court.

Even if the Lawsuit could have been brought in the transferee court, the district court would then consider the following factors to determine if the balance of convenience favors transfer: "(1) the convenience of the witnesses; (2) the convenience of the parties; (3) the locus of operative facts (that is, the place where the events at issue occurred); (4) the location of relevant documents and relative ease of access to sources of proof; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the forum's familiarity with governing law; (7) the relative financial means of the parties; (8) calendar congestions and trial efficiency; and (9) the interests of justice generally." *Dan-Dee Int'l, Ltd.,* 2000 WL 1346865, at *5 (citations omitted). "The convenience of party and non-party witnesses is generally considered the most important factor in deciding a motion to transfer venue." *Id.* Here, all parties, and the notable non-party witnesses, are located in the New York metropolitan area. "A party who seeks to transfer venue on the grounds of witness convenience must 'clearly specify the key witnesses to be called and must make a general statements [sic] of what their testimony would cover.'" *Id.* Here, Defendants have done no such thing, because they cannot.

The guiding factors militate strongly in favor of denial of transfer here.

1.    The Convenience of the Witnesses.

"Convenience of witnesses 'is probably the single-most important factor in the analysis of whether transfer should be granted.'" *Int'l Securities Exchange, LLC v. Chicago Board Options Exchange, Inc.*, No. 06-13445, 2007 WL 1541087, at *3 (S.D.N.Y. May 24, 2007) (granting motion to transfer where defendants, most relevant witnesses and documents were located in the Northern District of Illinois) (citation omitted); *see also Berman v. Informix Corp.*, 30 F. Supp. 2d 653, 657 (S.D.N.Y. 1998) (motion to transfer granted where virtually all witnesses and documents are located in the Northern District of California).  When considering the convenience of the witnesses, a court "'must consider the materiality, nature, and quality of each witness, not merely the number of witnesses in each district.'" *Int'l Securities Exchange, LLC,* 2007 WL 1541087, at *3 (citations omitted).  In this case, virtually all witnesses with knowledge are located in the New York metropolitan area.  Ex. 1, ¶ 3. Defendants have not identified any material witnesses that are located in Delaware, because they cannot.  Thus, this factor favors denial of Defendants' Motion.

2.    The Convenience of the Parties.

All of the parties to this action maintain offices in or near New York.  *Id.* ¶ 2. Defendants Blackstone and Citicorp, among New York's most powerful and influential financial institutions, have their principal offices in New York City.  *Id.*  Defendant Impala Partners' ("Impala's") principal office is just outside New York in Norwalk, Connecticut.  *Id.*  The Plaintiffs are located in Newark, New Jersey.  *Id.*  This district is thus centrally located for all parties.  It is certainly more convenient than Delaware.[12]  No party is located in Delaware.

---

[12]  Defendants also argue that Plaintiffs' agreement to the forum selection clause in the APA demonstrates that Delaware is not an inconvenient forum for Plaintiffs.  Def. Mot. at 3.  Plaintiffs' agreement to allow the Delaware Bankruptcy Court to oversee the *interpretation* and *enforcement* of the APA, *i.e.,* whether Old Winstar

Tellingly, the typical transfer motion involves a defendant seeking to transfer the lawsuit to its home district. *See Berman*, 30 F. Supp.2d at 657 (case moved to California from New York for the convenience of the defendants and other witnesses); *Int'l Securities Exchange, LLC*, 2007 WL 1541087, at *3 (transferring case to Illinois, where Defendant was located); *Frene N.V. v. Kmart Corp.*, 1998 WL 427688, at *3 (S.D.N.Y., 1998) (transferring case to Michigan). Here, the opposite is true. Defendants oddly seek to transfer this case from a district convenient to all parties, to one inconvenient to all parties. This factor also favors denial of Defendants' Motion.

3.     The Locus of Operative Facts.

"'Where the operative facts occurred is an obvious factor to consider.'" *Berman*, 30 F. Supp. 2d at 658 (citation omitted). "Courts routinely transfer cases when the principal events occurred and the principal witnesses are located in another district." *Id.* Again, that is not the case here. The claims against the Defendants – fraud, aiding and abetting fraud, negligent misrepresentation, negligence and civil conspiracy – concern fraudulent misrepresentations and material omissions committed in New York. Complaint ¶ 22. Plaintiffs met with Defendants, and conducted their due diligence, in New York. *Id.* ¶¶ 22-29. New York is therefore the locus of operative facts in this case.

4.     The Location of Relevant Documents.

"The location of documents and ease of access to sources of proof weighs in favor of transfer[, and is] 'clearly an important consideration in motions to transfer pursuant to 28 U.S.C. § 1404(a).'" *Berman*, 30 F. Supp. 2d at 658 (citation omitted). Again, in the typical

---

delivered the Purchased Assets and Plaintiffs delivered the purchase price, has no bearing on whether Plaintiffs agreed to litigate this Lawsuit – against Defendants that were not a party to the APA and for claims that are unrelated to the APA – in Delaware.

motion to transfer, the movant seeks to transfer the case to where the relevant documents are located. *Id.* (transferring case to Northern California where the documents were located). Here, however, the relevant documents and discoverable evidence are located in or about New York.

        5.     <u>The Availability of Process.</u>

    "Availability of compulsory process 'is an important consideration in transfer motions.'" *Int'l Securities Exchange, LLC,* 2007 WL 1541087, at *4. The bulk of the non-party witnesses to this action are believed to be located in the New York metropolitan area.[13] Ex. 1, ¶ 3. Non-party David Duncan, Winstar's Chief Financial Officer at the relevant time and a key participant in Plaintiffs' due diligence, is located in New York. *Id.* To move this action to Delaware, where this, and perhaps other, witnesses may not be subject to subpoena power, would prejudice Plaintiffs. *See* Fed. R. Civ. P. 45(b)(2) (district court can enforce a trial subpoena served on a witness within a judicial district of the court, or within 100 miles of the court). "The fact that these key witnesses may not be compelled to testify in [the Delaware] action is an important factor weighing in favor of transfer." *Berman*, 30 F. Supp. 2d at 658. Therefore, this factor weighs heavily in favor of denying Defendants' Motion.

        6.     <u>The Forum's Familiarity with Relevant Law.</u>

    "When a case is transferred pursuant to Section 1404(a), the transferee forum must apply the law, including the choice of law rules, that the transferor forum would have applied." *Aetna, Inc. v. Medtest Express, Inc.*, No. 01-CV-4398 (ILG), 2001 WL 1776155, at *5 (E.D.N.Y. Nov. 30, 2001). "For tort claims, New York law requires courts to apply the law of the state with the greatest interest in the outcome of the litigation." *Id.* This is determined

---

[13] Plaintiffs note again that Defendants did not submit the required affidavit in support of their Motion to Transfer under section 1404(a), which requires movants to list expected witnesses and the subjects of their testimony.

"'almost exclusively [by] the parties' domiciles and the locus of the tort.'" *Id.* (citation omitted).
The claims against Defendants are solely New York causes of action sounding in tort. New
York courts are therefore "familiar" with the relevant law, and indeed, have a compelling interest
in adjudicating these claims in their court system. Again, this factor favors denial of the
Defendants' Motion.

> 7.    The Relative Financial Means of the Parties.

"Where disparity exists between the parties, such as an individual plaintiff suing a
large corporation, the relative means of the parties may be considered." *Berman*, 30 F. Supp. 2d
at 659. Here, all parties are large corporations. Accordingly, this factor weighs neutrally in the
overall analysis.

> 8.    Calendar Congestions and Trial Efficiency.

District courts also look to whether transfer "will prevent duplicative litigation
and avoid the risk of inconsistent results." *Id.* at 660. Here, transfer to Delaware will actually
increase the likelihood of duplicative litigation, for two reasons. First, Plaintiffs have demanded
a jury trial, which the Delaware Bankruptcy Court is not empowered to conduct absent special
designation by the district court, and by consent of all parties. *Kerusa Co., LLC v. W10Z/515
Real Estate Ltd.*, No. 04-cv-708(GEL), 2004 WL 1048239, at *6 (S.D.N.Y. May 7, 2004).[14]
Wrangling over this aspect of the case would likely result in substantial motion practice and
wasted judicial resources, long before the action is actually heard on its merits. Second,
Bankruptcy Courts lack jurisdiction to enter final judgment in this action, requiring any decision
of the Bankruptcy Court to be reviewed *de novo* by the District Court. *Id.* at *2. This would be
the antithesis of judicial economy.

---

[14]  Notably, Defendants have not proffered such consent. Plaintiffs also have not consented.

Finally, one of the factors considered by courts is the existence of similar litigation in the transferee district. *Berman*, 30 F. Supp. 2d at 660, *quoting Connors v. Lexington Ins. Co.,* 666 F. Supp. 434, 455 (S.D.N.Y. 1987) (where pending related litigation involves the same issues, the same allegedly fraudulent transactions and the same defendants, litigation was transferred).   Here, the Liquidation Proceeding involves different issues, different parties and different causes of actions.   This factor thus weighs heavily in favor of denial of Defendants' Motion.

9.    The Interests of Justice Generally.

This Lawsuit is strictly a state law matter, involving solely state law causes of action, based on events that occurred in the State of New York.   As noted above, to get jurisdiction in this Court, Defendant Impala asserts that it holds potential indemnification claims against Old Winstar, which it argues gives rise to "related to" jurisdiction *vis-à-vis* the Liquidation Proceeding.   However, the cited indemnification clause excludes indemnification for "willful misconduct."   Def. Mot. Ex. F.   Moreover, this case neither involves Old Winstar as a party, nor involves any bankruptcy issues or bankruptcy claims.   To then transfer this Lawsuit to a non-related Liquidation Proceeding does not serve the interests of justice.   This case turns on Defendants' wrongful conduct in New York, giving rise to New York State law causes of action against Impala and the other Defendants.   As such, it should be heard in New York.

Based on the analysis of the nine factors listed above, Plaintiffs respectfully submit that this Court should deny Defendants' Motion to Transfer Venue, and grant Plaintiffs' Motion to Remand that is presently pending before this Court.

18

## <u>CONCLUSION</u>

Plaintiffs reiterate their belief that this Court does not have jurisdiction of the Lawsuit.  If the Court determines that it does have such jurisdiction, then, for the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Transfer Venue.

Dated: New York, New York
         July 19, 2007

Respectfully submitted,

_____s/Melissa A. Roover_____
Alan M. Grayson, Of Counsel
Melissa A. Roover (MR 1163)
GRAYSON & KUBLI, P.C.
1420 Spring Hill Road, Suite 230
McLean, Virginia 22102
(703) 749-0000

-and-

s/ Joseph M. Vann_____
Joseph M. Vann (JMV 7601)
Jed Lewin (JL 2428)
COHEN TAUBER SPIEVACK & WAGNER, LLP
420 Lexington Avenue, 24th Floor
New York, New York  10170
(212) 586-5800

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
WINSTAR HOLDINGS, LLC and
IDT CORP.,

                                 Civ. No.: 07 CV 4634 (GEL)(AJP)
                Plaintiff,           ECF Case

      -against-

THE BLACKSTONE GROUP LP; IMPALA
PARTNERS, LLC; AND CITICORP

                Defendants.
----------------------------------------------------------------x

### <u>DECLARATION OF MELISSA A. ROOVER, ESQ.</u>

      Melissa A. Roover, Esq., pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

      1.      I am an attorney with the law firm of Grayson & Kubli, P.C., attorneys for Winstar Holdings, LLC and IDT Corp. ("Plaintiffs"), Plaintiffs in the above-mentioned action. I am fully familiar with all of the matters set forth in this declaration. I submit this declaration in opposition to Defendants' Motion to Transfer Venue to the United States District Court for the District of Delaware.

      2.      All of the parties to this case are located in the New York metropolitan area. As alleged in the Complaint, Defendant Blackstone Group's principal office is located at 345 Park Avenue, New York, New York 10154; Defendant Citigroup, Inc.'s principal office is located at 399 Park Avenue, New York, New York, 10043 and Defendant Impala Partners' principal office is located at 18 Marshall Street, Norwalk, CT 06854 (approximately 48 miles from the

{00006240.DOC; 1}

Courthouse).  Plaintiffs Winstar Holdings, LLC and IDT Corp. are located at 520 Broad Street, Newark, NJ 07102.

3.      Several key witnesses expected to testify in this case are also located in the New York Metropolitan area.  These witnesses  include, but are not limited to: (1) Arthur Newman, 345 Park Avenue, New York, NY 10154; (2) Paul A. Street, 18 Marshall Street, Norwalk, CT 06854; (3) non-party David Duncan, 500 West 37th Street, New York, NY 10001 (as reflected on his current employer's website (http://www.denihan.com));  (4) Howard Jonas, 520 Broad Street, Newark, NJ 07102; (5) Motti Lichtenstein, 520 Broad Street, Newark, NJ 07102; and (6) Norman Rosenberg, 520 Broad Street, Newark, NJ 07102.

4.      Attached hereto as Exhibit A is a true and correct copy of the June 11, 2002 Order entered by the Bankruptcy Court for the District of Delaware.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 19, 2001
McLean, Virginia 22102

s/ Melissa A. Roover
Melissa A. Roover

**Exhibit A**

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:                                              )          CASE NO.   01-1430 (JCA)
                                                    )
WINSTAR COMMUNICATIONS, INC., <u>et al.</u>,       )
                                                    )          JOINTLY ADMINISTERED
                                                    )
                          DEBTORS.                  )          CHAPTER 7
                                                    )

### ORDER (i) FIXING AUGUST 30, 2002 AS THE LAST DATE FOR THE FILING OF PROOFS OF CLAIM FOR ADMINISTRATIVE COSTS AND EXPENSES THAT AROSE, ACCRUED, OR OTHERWISE BECAME DUE AND PAYABLE ON AND BETWEEN *# 2310* APRIL 18, 2001 AND JANUARY 24, 2002 AND <u>(ii) SPECIFYING THE FORM AND MANNER OF NOTICE THEREOF</u>

Upon the application (the "Application") of Christine C. Shubert, the chapter 7

trustee (the "Trustee") in the above-captioned cases, seeking the issuance and entry of an order

(i) fixing August 30, 2002 as the last date for the filing of proofs of claim for administrative costs

and expenses that arose, accrued, or otherwise became due and payable on and between April 18,

2001 and January 24, 2002 (the "Administrative Expense Period"), (ii) specifying the form and

manner of notice thereof, and (iii) for such other and further relief as this Court deems just and

proper; and it appearing that the relief requested in the Application is reasonable and necessary

and in the best interests of the Debtors' estates and their respective creditors; and after due

deliberation and sufficient cause appearing therefor, it is

ORDERED, that for purposes hereof, Administrative Claim shall mean the (a)

right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated,

fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or

unsecured, or (b) right to an equitable remedy for breach of performance if such breach gives rise

Doc #30443318.WPD/6.1

*2631*

to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured; and with respect to either (a) or (b) above, which arose or accrued on and between between April 18, 2001 and January 24, 2002 (the "Administrative Expense Period") and which is entitled to priority in accordance with sections 503 and 507(a)(1) of the Bankruptcy Code; and it is further

ORDERED, that pursuant to Bankruptcy Rule 3003(c)(3) and except as otherwise provided herein, all persons and entities, including, without limitation, individuals, partnerships, corporations, estates, trusts, and governmental units, who hold or assert any Administrative Claims against any of the Debtors, which Administrative Claims arose, accrued, or otherwise became due and payable during the Administrative Expense Period, shall file a complete and duly executed proof of Administrative Claim conforming to Official Form No. 10 of the Official Bankruptcy Forms by no later than 5:00 p.m. Eastern Time on August 30, 2002 (the "Administrative Bar Date"), with such proofs of Administrative Claim to be deemed filed only when actually received at the locations set forth hereinbelow; *provided, however,* that pending further order of the Court, the holders of Administrative Claims of the following type or nature need not file proofs of Administrative Expense Claims held by persons on or prior to the Administrative Bar Date:

> (a)    Any person or professional holding an Administrative Claim for compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331 or 503(b) of the Bankruptcy Code;
>
> (b)    Any holder of an Administrative Claim which arose or accrued or otherwise became due and payable subsequent to the Administrative Bar Date;

    (c)      Any Administrative Claim of any of the Debtors or their affiliates against one or more of the Debtors;

    (d)      Any holder of an Administrative Claim that has been allowed by order of this Court, or who has previously filed proof of such Administrative Claim with the Court; and

    (e)      The Office of the United States Trustee with respect to Administrative Claims that arise in connection with fees due under section 1930 of title 28 of the United States Code;

and it is further

ORDERED, that, pursuant to Bankruptcy Rule 9009, each proof of Administrative Claim filed pursuant to this Order shall specifically set forth the full name or names of the Debtor or Debtors against which any such Administrative Claim is asserted; and it is further

ORDERED, that, pursuant to Bankruptcy Rule 3003(c)(2), each and every holder of an Administrative Claim against any of the Debtors who, by this Order, is required to file a proof of Administrative Claim in the form and manner specified herein, but who fails to do so on or before the Administrative Bar Date, shall not, with respect to any such Administrative Claim(s), be treated as the holder of such Administrative Claim(s) against any of the Debtors for the purposes of receiving any distribution from the Trustee herein, and shall be forever barred, estopped, restrained, and enjoined from asserting any such Administrative Claim(s) against any of the Debtors or their successors or assigns, and the Debtors and their properties shall be forever discharged from any and all indebtedness or liability with respect to such Administrative Claim(s); and it is further

ORDERED, that pursuant to Bankruptcy Rule 2002(a)(7), (j), and (k), service of notice of the Administrative Bar Date (the "Notice"), substantially in the form attached to the Application as Exhibit "A" thereof, the form of which is hereby approved in all respects, shall be deemed good and sufficient notice of the Administrative Bar Date if served by first class United States mail on or before June 18, 2002 upon: (i) the Office of the United States Trustee; (ii) counsel for the postpetition bank group; (iii) counsel for the prepetition bank group; (iv) counsel to the Committee (as defined in the Application); (v) all persons and entities that have filed notices of appearance herein; (vi) all persons or entities listed in the Debtors' schedules and statement of financial affairs, or any amendments thereto (the "Schedules"), as holding "claims," as that term is defined in section 101(5) of the Bankruptcy Code, against the Debtors; (vii) all persons or entities listed in the Schedules as being a party to an executory contract or unexpired lease with the Debtors; (viii) the Director of the Internal Revenue Service for the District of Delaware; (ix) the Securities and Exchange Commission; (x) the United States Attorney for the District of Delaware; and (xi) all other persons or entities whom the Debtors believe may hold an Administrative Claim; and it is further

ORDERED, that pursuant to Bankruptcy Rule 2002(*l*), the Debtors shall cause a copy of the Notice to be published once in the national edition of *The New York Times* and/or *The Wall Street Journal* (or similar publication), on or before June 25, 2002; and it is further

ORDERED, that a proof of Administrative Expense Claim shall be deemed filed (i) if by first class United States mail, only when it is **actually received** by and at:

Bankruptcy Services, LLC
c/o Winstar Communications, Inc. *et al.*
Claims Processing
P.O. Box 5287
FDR Station
New York, New York 10150-5287

or, (ii) if filed in person or by hand delivery, only when it is **actually** **received** by and at:

Bankruptcy Services, LLC
c/o Winstar Communications, Inc. *et al.*
Claims Processing
Heron Tower
70 East 55th Street,
Sixth Floor
New York, New York 10022

and it is further

ORDERED, that nothing in this Order shall be deemed to prejudice the right of

any of the Trustee or any other party in interest herein to dispute the allowance of, or assert

setoff rights or any other defenses or counter-claims to, any Administrative Claim, including

any objection to amount, liability, or classification, and to subsequently designate any

Administrative Claim as disputed, contingent, or unliquidated; and it is further

ORDERED, that the Trustee is hereby authorized and empowered to do such

things and expend such funds as may be necessary and appropriate to implement and effectuate

the terms of this Order.

Dated:    Wilmington, Delaware
          June ⫽, 2002

_____
UNITED STATES BANKRUPTCY JUDGE

ORAL ARGUMENT REQUESTED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| WINSTAR HOLDINGS, LLC and IDT CORP., | Case No.: | 07 CV 4634 (GEL) (AJP) |
| *Plaintiffs,* | | **ECF CASE** |
| - against - | | |
| THE BLACKSTONE GROUP L.P., IMPALA PARTNERS, LLC, and CITICORP, | | |
| *Defendants.* | | |

## DEFENDANTS' JOINT MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND

HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York 10016
Telephone:     (212) 529-1400
Facsimile:     (212) 592-1500
Stephen M. Rathkopf
Andrew C. Gold

*Attorneys for Defendant Impala Partners, LLC*

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Yosef J. Riemer
Vickie Reznik
David S. Flugman

*Attorneys for Defendant The Blackstone Group L.P.*

GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
Telephone:     (212) 801-9200
Facsimile:     (212) 801-6400

Stephen L. Saxl
William Wargo

*Attorneys for Defendant Citigroup Inc., as successor by merger to Citicorp*

## Table of Contents

Page

I   THIS COURT HAS JURISDICTION TO ADJUDICATE  THE ACTION PURSUANT TO
28 U.S.C. § 1334(b) ...................................................................................................5

A.   The Action Gives Rise To "Arising In" Jurisdiction Because It Involves Post-Petition
Activities Which Constitute "Core Proceedings" ...............................................7

B.   The Action Gives Rise To "Arising Under" Jurisdiction  Because It Implicates The
Bankruptcy Court's Authority To  Oversee The Implementation of the APA And To
Interpret The Sale Order, And Because Plaintiffs Consented To Exclusive
Jurisdiction.........................................................................................................9

C.   Plaintiffs' Action Is "Related To" Winstar's Bankruptcy ..................................11

II   MANDATORY ABSTENTION IS NOT WARRANTED AS ALL OF THE REQUIRED
FACTORS HAVE NOT BEEN SATISFIED.......................................................15

A.   "Arising In" or "Arising Under" Jurisdiction  Renders Mandatory Abstention
Inapplicable.......................................................................................................15

B.   The Motion Was Not Timely..............................................................................16

C.   The Action Involves Federal Law In Addition To State Law ...........................16

D.   The Action May Not Be More Timely Adjudicated  In The State Court Rather Than In
The Bankruptcy Court........................................................................................17

III   DISCRETIONARY ABSTENTION OR EQUITABLE REMAND IS NOT
WARRANTED ...................................................................................................18

A.   Efficient Administration .....................................................................................19

B.   State Law Issues Do Not Predominate................................................................20

C.   The Complaint Does Not Allege Any Complicated State Law Issues ..............21

D.   Comity Concerns Are Misplaced........................................................................21

E.   Judicial Resources..............................................................................................22

F.   The Action Is At The Heart Of The Bankruptcy ...............................................22

G.   A Jury Trial Remains Possible...........................................................................23

H.   All Of The Defendants Consented To The Removal..........................................24

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Agent Systems, Inc. v. Capital Metropolitan Transportation Authority (In re Agent Systems, Inc.)*, 289 B.R. 828 (Bankr. N.D. Tex. 2002) .....................................16

*Beightol v. UBS Painewebber (In re Global Crossing, Ltd. Securities Litigation)*, 311 B.R. 345 (S.D.N.Y. 2003).........................................................................6, 11, 12

*Beneficial Trust Deeds v. Franklin (In re Franklin)*, 802 F.2d 324 (9th Cir. 1986)............9

*Bethlehem Contracting Company v. Lehrer/McGovern, Inc.*, 800 F.2d 325 (2d Cir. 1986) .........................................................................................................18

*Bondi v. Grant Thornton International*, 322 B.R. 44 (S.D.N.Y. 2005).............................15

*Celotex Corp. v. Edwards*, 514 U.S. 300 (1995) ..........................................................5, 14

*Chambers v. Silliman (In re Bryan)*, 308 B.R. 583 (Bankr. N.D. Ga. 2004).....................16

*Comco Associates v. Faraldi Food Industries Ltd.*, 170 B.R. 765 (E.D.N.Y. 1994) ..........9

*International Fidelity Insurance Co. v. Robb (In re Robb)*, 139 B.R. 791 (Bankr. S.D.N.Y. 1992) .........................................................................................................19

*J.D. Marshall International v. Redstart, Inc.*, 74 B.R. 651 (N.D. Ill. 1987) .....................17

*Kerusa, Co. LLC v. W10Z/515 Real Estate Ltd. Partnership*, No. 04 Civ. 708 (GEL), 2004 WL.1048239 (S.D.N.Y. May 7, 2004)...........................................11, 22

*Luan Investment S.E. v. Franklin 145 Corp. (In re Petrie Retail)*, 304 F.3d 223 (2d Cir. 2002)..................................................................................................................6

*ML Media Partners LP v. Century/ML Cable Venture, (In re Adelphia Communications Corp.)*, 285 B.R. 127 (Bankr. S.D.N.Y. 2002) ...............................15

*Maitland v. Mitchell (In re Harris Pine Mills)*, 44 F.3d 1431 (9th Cir. 1995) ...................9

*Nemsa Establishment, S.A. v. Viral Testing Systems Corp.*, No. 95 Civ. 0277 (LAP), 1995 U.S. Dist. LEXIS 11650 (S.D.N.Y. Aug. 14, 1995)...................11, 19, 21

*Neuman v. Goldberg*, *159* Bankr. 681 (S.D.N.Y. 1993)....................................................20

*New York City Employees' Retirement System v. Ebbers (In re WorldCom Securities Litigation)*, 293 B.R. 308 (S.D.N.Y. 2003)................................11, 12, 14, 15

*Owens-Illinois, Inc. v. Rapid American Corp. (In re Celotex Corp.)*, 124 F.3d 619
(4th Cir. 1997)..................................................................................................14

*Publicker Industries Inc. v. United States (In re Cuyahoga)*, 980 F.2d 110 (2d Cir.
1992) ...........................................................................................................11, 12

*Riverside Nursing Home*, 144 Bankr. 951 (Bankr. S.D.N.Y. 1992)....................................19

*Sterling Vision, Inc. v. Sterling Optical Corp. (In re Sterling Optical Corp.)*, 302
B.R. 792 (Bankr. S.D.N.Y. 2003).......................................................................6, 7, 9

*Texaco Inc. v. Sanders (In re Texaco)*, 182 B.R. 937 (Bankr. S.D.N.Y. 1995)................18

*Turner v. Ermiger (In re Turner)*, 724 F.2d 338 (2d Cir. 1983).........................................12

*Union Turnpike, Inc. v. Howard Beach Fitness Center, Inc.*, 209 B.R. 307
(S.D.N.Y. 1997) ................................................................................................6

*In re United States Lines*, 197 F.3d 631 (2d Cir. 1999).......................................................7

*Unity Natural Foods v. Ridgefield, Inc.*, 35 B.R. 876 (Bankr. N.D. Ga. 1983)................21

*Willcox v. Consolidated Gas Co. of New York*, 212 U.S. 19 (1909)...................................18

*Senorx, Inc. v. Coudert Brothers, LLP*, No. C-07-1075, 2007 WL. 1520966 (N.D.
Cal. May 24, 2007) ..........................................................................................22

## FEDERAL STATUTES AND RULES

11 U.S.C. § 363............................................................................................................24

11 U.S.C. § 502(e) ......................................................................................................15

28 U.S.C. § 157(b)....................................................................................................6, 17

28 U.S.C. § 157(b)(2)(A).....................................................................................4, 7, 8, 9

28 U.S.C. § 1334............................................................................5, 6, 11, 15, 18, 19

28 U.S.C. § 1452(a) ......................................................................................................7

28 U.S.C. § 1452(b) ....................................................................................................19

Fed. R. Bankr. P. 9027(e)(3)............................................................................................4

Defendants Impala Partners, LLC ("Impala"), The Blackstone Group L.P. ("Blackstone"), and Citigroup Inc., as successor by merger to Citicorp ("Citigroup" together with Blackstone and Impala, the "Defendants") respectfully submit this Memorandum of Law in opposition to the motion (the "Remand Motion") by plaintiffs Winstar Holdings, LLC ("New Winstar") and IDT Corp ("IDT," together with New Winstar, the "Plaintiffs") to remand this matter to the New York State Supreme Court or, in the alternative, abstain from hearing this action on the grounds of mandatory or permissive abstention.

## **Preliminary Statement**

This is an action in which Plaintiffs allege that they were fraudulently and negligently induced to purchase the business assets of Winstar Communications, Inc. ("Winstar" or the "Debtor") from the bankruptcy estate of Winstar for approximately $40 million in cash pursuant to an Asset Purchase Agreement dated December 18, 2001 (the "APA"). The APA contains a mandatory forum selection clause pursuant to which Plaintiffs consented to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court") to hear any dispute arising out of or relating to the APA. (APA Section 9.10.) The APA was approved by the Delaware Bankruptcy Court in an Order dated December 19, 2001 (the "Sale Order") in which the Delaware Bankruptcy Court retained "exclusive jurisdiction" "to . . . resolve any disputes arising under or related to the" APA and to "interpret, implement, and enforce the provisions of the [APA] and the Sale Order."[1]

Plaintiffs allege in their complaint (the "Complaint") that the Debtor itself (although not named as a defendant), as well as its investment advisor (Blackstone) and its restructuring advisor/chief restructuring officer (Impala), both of whose retention was approved

---

[1]  The APA and the Sale Order approving it are attached as Exhibits 1 and 2 to the accompanying Declaration of Andrew C. Gold in Support of Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Motion to Remand, dated July 31, 2007 (hereinafter the "Gold Dec.").

HF 3739358v.2 #10069/0007

by the Bankruptcy Court, made misrepresentations and withheld information which led to Plaintiffs' entering into the APA and purchasing the assets.

This Action is based solely on a transaction that is inextricably linked to the Winstar Bankruptcy Case and the Delaware Bankruptcy Court. Plaintiffs approached the Debtors in Wilmington, Delaware - - just outside the courtroom of the Delaware Bankruptcy Court - - with their offer to purchase Winstar's assets and quickly appeared in the Bankruptcy Court to outline the details of their proposed Agreement. (Gold Dec. Ex. 9 at 17-28.) IDT's counsel made clear to the Bankruptcy Court that "It's an as is, where is acquisition, with no reps and warranties." (Id. at 24). The subsequent APA reflected those terms (and Defendants will rely on IDT's in-court statements and the APA in defending this Action). (APA § 5.10.)

As Plaintiffs acknowledge, the Winstar Bankruptcy Case is still a pending bankruptcy proceeding in the Delaware Bankruptcy Court.[2] Nevertheless, rather than raising these allegations in the Delaware Bankruptcy Court, Plaintiffs attempted to do an end run around the Bankruptcy Court's exclusive jurisdiction by filing this action (the "Action") in New York State Supreme Court, five and one-half years after the bankruptcy sale. The Action asserts claims for the first time against the Debtor's retained advisors, Blackstone and Impala, and a creditor (Citigroup) of the Debtor, claiming that entering into the APA damaged Plaintiffs to the tune of $300 million (approximately eight times the cash actually paid by Plaintiffs for the assets purchased). Plaintiffs assert that this is a purely state law matter involving Defendants' alleged wrongful conduct in New York, with no connection to the Delaware Bankruptcy Court. (Pl. mem. at pp. 9.) Indeed, Plaintiffs consistently assert that this case neither involves Winstar as a party, nor involves any bankruptcy issues or bankruptcy claims. (Pl. mem. at pp. 2, 8, 9, 15, and

---

[2] *In re* Winstar Communications, Inc., et al. Case No. 01-1430 (KJC) (the "Winstar Bankruptcy Case").

21.) Yet Plaintiffs allege throughout the Complaint that the Debtor made the misstatements and omissions for which Plaintiffs sue the named Defendants.

Despite the fact that Plaintiffs consented to the exclusive jurisdiction of the Bankruptcy Court in the APA and the Bankruptcy Court retained exclusive jurisdiction in the Sale Order, Plaintiffs' Remand Motion simply ignores that these facts provide this Court with "arising in" and "arising under" jurisdiction over this matter pursuant to 28 U.S.C. § 1334.[3] Rather, the Remand Motion solely addresses whether or not this Court has "related to" jurisdiction.

Plaintiffs likewise ignore many of the key indisputable facts that give rise to "arising in" or "arising under" jurisdiction in this Action. For example:

- Plaintiffs fail to mention the Delaware Bankruptcy Court Order approving the sale, or that the Bankruptcy Court retained "exclusive jurisdiction" to . . . resolve any disputes arising under or related to the Asset Purchase Agreement," (Sale Order ¶ 15(c)), and thus preserved its core jurisdiction to adjudicate this dispute;

- The Bankruptcy Court also retained "exclusive jurisdiction to "interpret, implement, and enforce the provisions of the Asset Purchase Agreement," (Sale Order ¶ 15(d)), as will be required in this Action, in which Plaintiffs seek, *inter alia*, to hold Defendants liable for alleged misrepresentations and omissions by the Debtor and its advisors;

- Plaintiffs ignore the fact that this matter involves the post-petition purchase of assets through the APA and that they consented in the APA (Section 9.10) to the "exclusive jurisdiction of the Bankruptcy Court. . . over any dispute arising out of or relating to this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith or any of the transactions contemplated hereby or thereby";

- Plaintiffs ignore their own allegations of misrepresentations and material omissions by the Debtor (see, e.g., Complaint ¶¶ 28, 29, 31 & 33), and the obvious impact of this Action on the administration of the Debtor's estate, including the financial ramifications of the indemnities (which began as soon as Defendants incurred attorneys' fees in this Action), the possibility of third-

---

[3]    Indeed, while Plaintiffs repeatedly assert that Defendants removed solely on the grounds of "related to" jurisdiction, in fact the Notice of Removal invoked "core jurisdiction" as grounds for removal of this Action. See, e.g., Notice of Removal, ¶¶ 13-16.

party claims against the Debtor's estate, and the necessity for substantial discovery against the Debtor if the Action survives initial motion practice; and

- Plaintiffs ignore that this Action "concerns the administration" of the Winstar estate and thus comes within the core jurisdiction of the Bankruptcy Court under 28 U.S.C. § 157(b)(2)(A).

Contrary to Plaintiffs' assertions, because Impala and Blackstone have contractual indemnities from Winstar, this Court also has "related to" jurisdiction. (Gold Dec. Exs. 3 & 4.) First, the right of indemnification arose as soon as Impala and Blackstone began incurring attorneys' fees in connection with this Action. Second, Plaintiffs' claims are not limited to "willful misconduct," but include negligent conduct, and, in any event, there is a right to indemnity unless and until "willful misconduct" is proven. Third, the indemnification will impact the Winstar Bankruptcy Case because the Winstar Chapter 7 Trustee has recovered a $300 million judgment (the "Judgment") (Gold Dec. Ex. 5) against Lucent Technologies, Inc. ("Lucent") - - a fact about which Plaintiffs fail to inform the Court. The Judgment has been affirmed by the United States District Court for the District of Delaware. (Gold Dec. Ex. 6.) Lucent has appealed the judgment to the Third Circuit Court of Appeals and has provided the Trustee with a $300 million letter of credit to bond the Judgment. Thus, with two courts already having ruled in the Winstar Trustee's favor and a $300 million letter of credit to look to, there is a significant likelihood that there will be substantial funds to be distributed to Winstar's creditors and, accordingly, the indemnities will have a real effect on the Winstar Bankruptcy Case.

Plaintiffs' request for mandatory abstention is likewise unwarranted in this case as all of the required factors have not been satisfied. As noted above, Plaintiffs' claims "arise in" a case under the Bankruptcy Code and "arise under" the Bankruptcy Code, making mandatory abstention inapplicable. In addition, Plaintiffs failed to file a "timely" abstention motion in accordance with Federal Rule of Bankruptcy Procedure 9027(e)(3). Moreover, because this Action involves federal and bankruptcy law issues and is intertwined with the efficient resolution

4

of the pending bankruptcy proceedings, timely adjudication of this action will more appropriately take place in Delaware Bankruptcy Court. Plaintiffs' failure to establish any one of these factors is sufficient to deny their request for mandatory abstention.

As set forth below, most if not all of the relevant factors weigh against this Court's exercise of permissive abstention or equitable remand. Importantly, a number of defenses on the merits will relate to the terms and provisions of the Sale Order and APA and their interpretation by the Delaware Bankruptcy Court, including what was said on the record at the sale hearing. Furthermore, Plaintiffs do not cite a single case where permissive abstention occurred in a case where the Bankruptcy Court retained exclusive jurisdiction in a still pending bankruptcy case and Defendants do not believe such a case exists. As the Court is aware, Defendants have asked this Court to transfer this matter to the Delaware Bankruptcy Court which retained exclusive jurisdiction over the claims asserted. Thus in petitioning this Court to remand, Plaintiffs are in effect asking the Court to ignore the Delaware Bankruptcy Court's own retention of exclusive jurisdiction. This request by Plaintiffs can only be made to the Delaware Bankruptcy Court itself.

For all of these reasons, Plaintiffs' Motion to Remand should be denied and this Action should be transferred to the United States District Court for the District of Delaware, for referral to the Delaware Bankruptcy Court.

## I    THIS COURT HAS JURISDICTION TO ADJUDICATE THE ACTION PURSUANT TO 28 U.S.C. § 1334(b)

The jurisdiction of the bankruptcy court is delineated in 28 U.S.C. § 1334(b), which states that "the district courts shall have original but not exclusive jurisdiction of all proceedings arising under title 11, or arising in or related to cases under title 11." Celotex Corp. v. Edwards, 514 U.S. 300, 307 (1995).

Section 1334 provides the jurisdictional basis for removal of an action pursuant to 28 U.S.C. § 1452(a).  District courts (and bankruptcy courts) may exercise three types of jurisdiction pursuant to the statute.  They are "arising under" and "arising in" jurisdiction, which courts regard as a type of federal question jurisdiction, and "related to" jurisdiction. <u>Sterling Vision, Inc. v. Sterling Optical Corp. (<i>In re</i> Sterling Optical Corp.)</u>, 302 B.R. 792, 801 (Bankr. S.D.N.Y. 2003).  A bankruptcy judge may hear and determine any "core proceeding" that "arises under" or "arises in" an action under title 11 but may only hear a "non-core" proceeding if it is "related to" a bankruptcy action.  <u>Union Turnpike, Inc. v. Howard Beach Fitness Center, Inc.</u>, 209 B.R. 307, 310-11 (S.D.N.Y. 1997).  The Second Circuit has construed a bankruptcy court's core jurisdiction "as broadly as possible" so as to be "close to or congruent with constitutional limits." <u>Luan Investment S.E. v. Franklin 145 Corp. (<i>In re</i> Petrie Retail)</u>, 304 F.3d 223, 229 (2d Cir. 2002) (internal quotations and citations omitted).  This jurisdictional reach is "essential to the efficient administration of bankruptcy proceedings." <u>Id</u>.

Here, although Plaintiffs' claims are nominally state law claims and they have failed to name the Debtor as a party,[4] the nature of the proceedings and the relief requested nevertheless provide this Court with "arising in," "arising under," and "related to" jurisdiction over this action, pursuant to 28 U.S.C. § 1334(b).  First, this action "arises in" a case under Title 11 because (i) the Bankruptcy Court retained exclusive jurisdiction, (ii) it involves the post-petition sale by the Debtor of its assets, (iii) it concerns the administration of the Winstar estate - all of which constitute "core proceedings" under 28 U.S.C. § 157(b).  Second, this Action "arises under" Title 11 because it not only implicates the Bankruptcy Court's authority to oversee the implementation of the APA and to interpret the Sale Order (in adjudicating the claims and

---

[4]    Indeed, the Remand Motion should be denied if for no other reason than, as this Court has already ruled, that a plaintiff will not be permitted to engage in this type of procedural chicanery in order to avoid bankruptcy court jurisdiction.  <u>Beightol v. UBS Painewebber (<i>In re</i> Global Crossing, Ltd. Securities Litigation)</u>, 311 B.R. 345 (S.D.N.Y. 2003).

defenses and this Action) as a core proceeding, but because the Plaintiffs specifically consented to exclusive Bankruptcy Court jurisdiction in the APA. Third, at a minimum, this Action is "related to" a case under Title 11 because it will have a conceivable impact on the handling and administration of the bankrupt estate in light of the significant damages requested by Plaintiffs coupled with the Debtors' ongoing indemnification obligations to Defendants Impala and Blackstone as a result of this Action.

A.    **The Action Gives Rise To "Arising In" Jurisdiction Because It Involves Post-Petition Activities Which Constitute "Core Proceedings."**

This Action "arises in" the ongoing Winstar Bankruptcy Case and thus remand should be denied. First, the Delaware Bankruptcy Court retained "exclusive jurisdiction" to adjudicate disputes relating to the APA in the Sale Order. (Sale Order ¶ 15.) The sale arose in the Winstar Bankruptcy and the Delaware Bankruptcy Court in the Bankruptcy Case preserved its jurisdiction over such claims. For this reason alone, "arising in" jurisdiction exists. Moreover, Plaintiffs themselves consented to exclusive Bankruptcy Court jurisdiction in the APA. (APA § 9.10.)

Second, this Action involves claims arising from a contract and involves only post-petition conduct by the Debtor and its retained advisors and post-petition creditor. A claim "arises in" bankruptcy if, by its very nature, the claim has no existence outside of bankruptcy. Sterling, 302 B.R. at 801. In addition, a threshold question in determining if a contractual dispute is core (and thus "arises in" the bankruptcy by its timing is whether the contract was formed post-petition, not whether the cause of action accrued post-petition. *In re* United States Lines, 197 F.3d 631, 637-638 (2d Cir. 1999). The bankruptcy court has core jurisdiction over claims arising from a contract formed post-petition under 28 U.S.C. § 157(b)(2)(A). Id. Here, the Action could not have existed outside of the Winstar Bankruptcy Case because it involves a contract and a sale that took place within the Winstar Bankruptcy Case.

7

In addition, the contract and all of the facts relevant to Plaintiffs' claims arose post-petition. These include the retention of Impala, the retention of Blackstone, the alleged misrepresentations, omissions and negligence, and the ultimate sale. Moreover, all of the relevant aspects of Plaintiffs' claims arose post petition.[5] For example, Plaintiffs allege that Impala and Blackstone's retention, which occurred post-petition, gave rise to transaction fees and related expenses that motivated Defendants to fraudulently misrepresent the Debtor's assets. (Compl. at ¶ 14, 17.) Likewise, Plaintiffs allege that the misrepresentations and omissions that induced them to enter into the APA took place within the context of the auction and bidding process for the Debtor's assets and the due diligence process conducted in connection therewith - - all of which took place post-petition. (Compl. at ¶ 22.) Moreover, Plaintiffs allege that the ultimate sale of the Debtor's assets, pursuant to the APA reviewed and approved by the Bankruptcy Court, was the result of fraud. (Compl. at ¶ 60.) Because Plaintiffs allege that they were fraudulently and negligently induced by the Debtor and its retained advisors into the court-approved post-petition purchase of the Debtor's assets "arising in" jurisdiction exists.

Third, this Action "concerns the administration" of the Debtor's estate, and thus comes within the core jurisdiction of the Bankruptcy Court under 28 U.S.C. § 157(b)(2)(A). The claims at issue turn on the conduct of the Debtor and its retained advisors during the Winstar Bankruptcy Case and in connection with a Bankruptcy Court-approved transaction. Moreover, if the Complaint survives initial motion practice, the Action will require substantial discovery against the Debtor, as it involves the nature and scope of the information provided by the Debtor to Plaintiffs in connection with the APA (Compl. at ¶ 22.) In addition, Blackstone and Impala have claims for contractual indemnification from the Debtor (including for attorneys' fees

---

[5]  This matter is distinguishable from <u>Global Crossing</u> and <u>WorldCom</u>, in which suits were commenced against officers and directors of those companies for <u>pre-petition</u> securities fraud and other <u>pre-petition</u> defalcations. Those actions could have been maintained independent of any bankruptcy proceeding and were not predicated on alleged actions taken post-petition by retained professionals in connection with bankruptcy-related transactions.

8

incurred) and Defendants may assert third-party claims against the Debtor to the extent that any of the alleged misrepresentations were made by any of the Debtor's officers, directors, or employees.

For all these reasons, the Court has "arising in" jurisdiction.

**B.      The Action Gives Rise To "Arising Under" Jurisdiction Because It Implicates The Bankruptcy Court's Authority To Oversee The Implementation of the APA And To Interpret The <u>Sale Order, And Because Plaintiffs Consented To Exclusive Jurisdiction.</u>**

The Court also has "arising under"[6] jurisdiction over this Action because it will be necessary for the Delaware Bankruptcy Court to interpret the Sale Order. "Simply put, bankruptcy courts must retain jurisdiction to construe their own orders if they are to be capable of monitoring whether those orders are ultimately executed in the intended manner. Requests for bankruptcy courts to construe their own orders must be considered to arise under title 11 if the policies underlying the Code are to be effectively implemented." <u>Beneficial Trust Deeds v. Franklin (<i>In re</i> Franklin)</u>, 802 F.2d 324, 326 (9th Cir. 1986).

The Sale Order specifically provides that the Delaware Bankruptcy Court retains "exclusive jurisdiction to. . .  resolve <u>any</u> disputes arising under or <u>related</u> to the APA" (Sale Order ¶ 15) and that its provisions "inure to the benefit of . . . creditors . . . and any affected third parties . . ." (Sale Order ¶ 17.)

Thus, the court which tries this Action will be called upon to review and construe the Sale Order and APA and all of the attendant findings, covenants and determinations of law contained therein. Provisions of the APA will necessarily be raised in defense of this action. For example, the effect of the merger provision (APA § 9.13), "survival of the representations"

---

[6]    "Arising under" jurisdiction relates to federal question claims of a particular type - those federal questions that have their origin in Title 11 of the United States Code - i.e., the Bankruptcy Code - and rest on provisions of Title 11 <u>Sterling</u>, 302 B.R. at 801. Claims that arise under Title 11 are deemed to be core proceedings. <u>Maitland v. Mitchell (<i>In re</i> Harris Pine Mills)</u>, 44 F.3d 1431, 1435 (9th Cir. 1995). "Arising under" jurisdiction can exist where the Debtor is not named as a party. <u>See, e.g., Comco Associates v. Faraldi Food Industries Ltd.</u>, 170 B.R. 765, 772 (E.D.N.Y. 1994).

9

provision (APA § 9.3), and the "as is/where is" provision (APA § 5.10) will be at issue in the substance of this case.   The court will also be asked to interpret the Delaware Bankruptcy Court's findings of fact contained in the Sale Order.  For example, the Court found: (a) "Each of the Sale, the Management Agreement and the Asset Purchase Agreement were negotiated, proposed and agreed to by the Debtors and the Buyer as parties thereto without collusion, in good faith, and from arm's-length bargaining positions."   (Sale Order ¶ G); and (b) "The consideration provided by the Buyer for the Purchased Assets (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Purchased Assets and (iii) will provide a greater recovery for the Debtors' creditors and other interested parties than would be provided by any other practically available alternative." (Sale Order ¶ H; see also ¶ 10.)  The Delaware Bankruptcy Court which approved the Sale Order and the APA, and has overseen the sale and lived through the Winstar Bankruptcy, is the best forum to interpret and apply the Sale Order and APA provisions.

Additionally, Plaintiffs consented to the Delaware Bankruptcy Court's exclusive jurisdiction "over any dispute arising out of or relating to" the APA.  (APA § 9.10.)  Plaintiffs should not be relieved of this contractual provision merely because they made the strategic decision not to name the Debtor as a party defendant while at the same time alleging that the Debtor engaged in the same actionable conduct as Impala and Blackstone.  Indeed, provisions of the Sale Order are clearly not limited to actions between Plaintiffs and the Debtor but encompass Citigroup, a "creditor," and any "affected third party."  This language is surely broad enough to encompass Impala and Blackstone, both of whom were the Debtor's retained professionals and both of whom have been sued in connection with the services rendered on behalf of the Debtor in connection with the Winstar Bankruptcy Case.   Indeed, suing Impala, the Debtor's chief restructuring officer, is essentially the equivalent of suing the Debtor.

10

C.      **Plaintiffs' Action Is "Related To" Winstar's Bankruptcy.**

As noted earlier, in the Remand Motion the Plaintiffs do not even address the fact that the Action falls under the "arising in" and "arising under" jurisdiction provisions of 28 U.S.C. § 1334.  Although any one basis is sufficient, Plaintiffs only address the "related to" basis for jurisdiction.

Plaintiffs' claims are "related to" the Winstar Bankruptcy Case as they will have a "conceivable effect" on the Winstar estate.  28 U.S.C. § 1334(b) confers upon this Court original, but not exclusive, jurisdiction of all civil proceedings related to cases under title 11.  Although 28 U.S.C. § 1334(b) does not provide a definition for "related to" actions,[7] the Second Circuit applies the following test to determine if a third party action is related to a bankruptcy proceeding:

> The test for determining whether litigation has a significant connection with a pending bankruptcy proceeding is whether its outcome might have any *"conceivable effect"* on the bankruptcy estate.  If that question is answered affirmatively, the litigation falls within the "related to" jurisdiction of the bankruptcy court. (Emphasis supplied.)

Publicker Industries Inc. v. United States (*In re* Cuyahoga), 980 F.2d 110, 114 (2d Cir. 1992). See also Kerusa, Co. LLC v.W10Z/515 Real Estate Ltd. Partnership, No. 04 Civ. 708 (GEL), 2004 WL1048239 at *3 (S.D.N.Y. May 7, 2004) (claims against non-debtor were clearly "related to" bankruptcy case because they likely give rise to contribution or indemnity claims); *In re* Global Crossing, 311 B.R. at 347 (potential claim for contribution against debtor has a conceivable effect on bankrupt estate); New York City Employees' Retirement System v. Ebbers (In re WorldCom Securities Litigation), 293 B.R. 308, 317-24 (S.D.N.Y. 2003).

---

[7]   Nemsa Establishment, S.A. v. Viral Testing Systems Corp., No. 95 Civ. 0277 (LAP), 1995 U.S. Dist. LEXIS 11650, at *5, 6 (S.D.N.Y. Aug. 14, 1995).

Plaintiffs cite only the "significant connection" test set forth in Turner v. Ermiger (<u>In re</u> Turner), 724 F.2d 338 (2d Cir. 1983). But that test was redefined by the Second Circuit in <u>In re</u> Cuyahoga, 980 F.2d at 114 (2d Cir. 1992) in favor of the "conceivable effect" test. As this Court and the <u>WorldCom</u> court recognized, an action is related to a bankruptcy proceeding if it "in any way impacts on the handling and administration of the bankruptcy estate." <u>Global Crossing</u>, 311 B.R. at 345 (quoting <u>WorldCom</u>, 293 B.R. at 317).

The Court's analysis in <u>Global Crossing</u> is particularly on point. In finding that the Court had jurisdiction of a suit originally filed in state court, the Court found that "litigation against an officer of a bankrupt corporation which could lead to a contribution claim would certainly have a 'conceivable effect' on the bankrupt estate." <u>Id.</u> at 347. As with the potential contribution claims in <u>Global Crossing</u>, so too could Impala and Blackstone's contractual indemnity claims[8] against the Debtor have a "conceivable effect" on the Winstar Bankruptcy Case. Indeed, Plaintiffs seek the not insignificant sum of $300 million in damages. This figure is, coincidentally, the approximate amount of the Judgment that Plaintiffs fail to mention in the Remand Motion.

Plaintiffs raise three grounds as to why they believe the Impala and Blackstone indemnities do not provide a basis for "related to" jurisdiction: first, that the indemnities exclude indemnification for "willful misconduct;" second, that the Defendants have not established that creditors will receive anything in the Winstar Bankruptcy Case and therefore even if the Debtor is liable under the indemnifications it will have no effect on the Winstar estate; and third, that Defendant have only a "potential" claim for indemnification.

Plaintiffs' repeated assertion that the Complaint alleges only "willful misconduct" is demonstrably false. Plaintiffs simply ignore that their own Complaint in this Action seeks

---

[8]  As Chief Restructuring Officer, Impala would have a contribution claim regardless of the contractual indemnity since Plaintiffs have alleged that the Debtor also made misrepresentations to Plaintiffs.

12

damages not only for fraud, but for negligent misrepresentation and negligence as well. (Compl., Third and Fourth Causes of Action).[9] These negligence claims, if proven, are indisputably covered by Blackstone's indemnification agreement ("we will not, however be liable for any losses…. that are finally determined…. to have primarily resulted from bad faith, gross negligence or willful misconduct of Blackstone.") (Gold Dec., Ex. 4 at ¶ 1). In addition, the Impala (Gold Dec., Ex. 3 at ¶ 2) and Blackstone (Gold Dec., Ex. 4 at ¶ 1) indemnities require the Debtor to reimburse Impala and Blackstone for all reasonable legal and other expenses, as incurred, regardless of the nature of the allegations at issue.

Moreover, Plaintiffs cannot at this stage of the litigation invoke these indemnification exceptions simply by pointing to their own allegations of willful misconduct, because they are at this point unproven. The indemnities apply unless and until there is a final determination of "willful misconduct." As stated in WorldCom:

> The argument that any claim for contribution or indemnification must be reduced to judgment to provide a basis for jurisdiction can be swiftly rejected. The *Pacor* standard, including the language cited with apparent approval by the Supreme Court in *Celotex*, 514 U.S. at 208 n. 6, 115 S.Ct. 1493, does not require the level of certainty that NYCERS proposes. If the litigation against the NYCERS Director and Underwriter Defendants had already concluded and resulted in a judgment against them, then the effect of their contribution claims on the bankruptcy proceeding would not simply be "conceivable," it would be certain and quantifiable.

WorldCom, 293 B.R. at 322.

Second, Plaintiffs have not cited even a single authority for the novel (and erroneous) proposition that in order to invoke "related to" jurisdiction, Defendants must prove that there will be a distribution to creditors which may be affected by this Action. In any case, Plaintiffs conveniently ignore the fact that the Trustee *has* obtained the Judgment. (Gold Dec.

---

[9] Although Impala's indemnity excludes both fraud and negligence, Impala is still entitled to be reimbursed its legal fees as incurred in this matter. Those fees will be substantial as this matter progresses to possible trial. The payment of those fees will have a "conceivable effect" on the Winstar Bankruptcy Case.

13

Ex. 5.) At a bare minimum, because of the Judgment, the resolution of Plaintiffs' claims will directly affect the estate, including whether or not there will be less money available for distribution to the Debtor's creditors.

Finally, in footnote 8 of their Memorandum, Plaintiffs raise three additional reasons why the indemnities supposedly cannot support "related to" jurisdiction: first, that the indemnity claims do not accrue until payment; second, that Bankruptcy Code section 502(e) prohibits claims that are contingent and that the indemnity is such a claim until liquidated; and third, that Impala failed to file a claim for indemnification prior to the deadline in the administrative bar order entered in June 11, 2002 (the "2002 Bar Order") (Gold Dec. Ex. 7.)

The first two of these arguments were addressed and rejected by the WorldCom court. The court found -- as logic dictates -- that a contribution claim which is similar to an indemnification claim need not be liquidated to have a "conceivable effect" on the bankruptcy proceedings. WorldCom, 293 B.R. at 321-322. The court stated that if an indemnity claim were liquidated it would not be "conceivable," rather, "it would be certain and justifiable." Id. WorldCom also rejected the argument that the bar against contingent claims in Bankruptcy Code § 502(e) prevents a finding of "related to" jurisdiction. The court found that "claims that are contingent today nonetheless have a 'conceivable' effect on the bankruptcy." Id. at 323. See also Owens-Illinois, Inc. v. Rapid American Corp. (In re Celotex Corp.), 124 F.3d 619, 626 (4th Cir. 1997).

As to the third argument in footnote 8, Plaintiffs' argument that Impala and Blackstone are barred from seeking indemnification based on this action because they did not file a claim prior to the Bar Order is nonsense. The Bar Order itself applies only to administrative claims "which arose or accrued on and between April 18, 2001 and January 24, 2002." Clearly, this Action was not commenced during that period and, accordingly, Impala and Blackstone

14

would have had no reason to file a proof of claim.  Plaintiffs cannot wait four years after the Bar

Order to bring this Action and then claim that Impala and Blackstone's indemnities are invalid

because they did not file indemnity claims in 2002 for a then non-existent action.[10]

**II      MANDATORY ABSTENTION IS NOT WARRANTED AS
        ALL OF THE REQUIRED FACTORS HAVE NOT BEEN SATISFIED.**

If, as Defendants submit, this Court has "arising in" and/or "arising under"

jurisdiction, it is undisputed that this Court cannot abstain from hearing this Action under 28

U.S.C. § 1334(c)(2).[11]  Indeed, given the Bankruptcy Court's retention of exclusive jurisdiction,

mandatory abstention would make no sense here.

Under 28 U.S.C. § 1334(c)(2), commonly referred to as a "mandatory abstention

provision," the party seeking mandatory abstention must show that: (1) the abstention motion

was "timely" brought; (2) the action is based upon a state law claim; (3) the action is "related to"

a bankruptcy proceeding, as opposed to "arising under" the Bankruptcy Code or "arising in" a

case under the Bankruptcy Code; (4) the sole federal jurisdiction for the Action is Section 1334;

(5) there is an action "commenced" in state court; and (6) the action is capable of being "timely

adjudicated" in state court.  ML Media Partners LP v. Century/ML Cable Venture, (In re

Adelphia Communications Corp.), 285 B.R. 127, 140-141 (Bankr. S.D.N.Y. 2002).  A party is

not entitled to mandatory abstention if it fails to prove any one of the statutory requirements.

WorldCom, 293 B.R. at 331.  Here, Plaintiffs fail to meet at least four of the statutory

requirements.

    **A.      "Arising In" or "Arising Under" Jurisdiction
             Renders Mandatory Abstention Inapplicable.**

---

[10]  Impala and Blackstone have in fact notified the Chapter 7 Trustee of their indemnification claims.  (Gold Dec. Ex. 8).

[11]    As a threshold matter, making a motion to abstain is a prerequisite to obtaining abstention under section 1334(c)(2).  Bondi v. Grant Thornton Int'l, 322 B.R. 44, 49 (S.D.N.Y. 2005).  Remand is not the same as abstention. Id. at 49.  The Plaintiffs couched the Remand Motion as a motion for remand to the State Court.  Although Plaintiffs request abstention in their Memorandum of Law, procedurally, no motion for abstention has been made.

15

As to the third factor, Plaintiffs assert that the action does not "arise under" the Bankruptcy Code or "arise in" the Winstar Bankruptcy Case. The Plaintiffs base their argument on the assertion that Impala's sole basis for removal was "related to" jurisdiction resulting from the Debtor's indemnification. However, as set forth above, the Plaintiffs disregard and fail to address that removal is also appropriate because this Court has "arising in" and "arising under" jurisdiction. This alone disposes of the argument for mandatory abstention.

### B.    The Motion Was Not Timely.

Plaintiffs' motion was not timely made. Federal Rule of Bankruptcy Procedure 9027(e)(3) requires that Plaintiffs, within 10 days of the removal, file a statement admitting or denying any allegation in the notice of removal that upon removal of the claim the proceeding is core or non-core. Plaintiffs never filed such statement. Therefore, Plaintiffs "effectively waived any right [they] may have had to seek abstention." Agent Systems, Inc. v. Capital Metropolitan Transportation Authority (In re Agent Systems, Inc.), 289 B.R. 828, 835 (Bankr. N.D. Tex. 2002); also Chambers v. Silliman (In re Bryan), 308 B.R. 583, 586 (Bankr. N.D. Ga. 2004.) ("Plaintiffs' failure to file that statement constitutes a waiver.")

### C.    The Action Involves Federal Law In Addition To State Law.

The Action involves federal bankruptcy law in addition to state law claims. Each of the underlying issues must be examined in the context of the Winstar Bankruptcy Case. For instance, the Plaintiffs' allegations revolve around the sale transaction, the APA and the corresponding Sale Order, which invoked various sections of the Bankruptcy Code. The Plaintiffs again fail to acknowledge that the Sale Order contains findings of fact and law with regard to the sale process and the conduct of the parties, all of which will necessarily need to be addressed in the context of this litigation. For example, Paragraph G of the Sale Order, states, inter alia, that the APA and related agreements were "negotiated, proposed and agreed to by the

16

Debtors and the Buyer as parties thereto without collusion, in good faith, and from arm's-length bargaining positions." These findings premised upon Bankruptcy Code provisions will be part of the defense to the Action.

**D.    The Action May Not Be More Timely Adjudicated
In The State Court Rather Than In The Bankruptcy Court.**

The Action may not be more timely adjudicated in the state court rather then the Bankruptcy Court. Courts routinely examine the following factors in connection with timely adjudication: 1) backlog of the state's court calendar, 2) status of the bankruptcy proceeding, 3) complexity of the issues, and 4) whether the state court proceeding would prolong the administration or liquidation of the estate. J.D. Marshall Int'l v. Redstart, Inc., 74 B.R. 651, 654-655 (N.D. Ill. 1987). Here, Plaintiffs do not offer any factual basis for their assertion that the Action can be more timely adjudicated in state court than the Bankruptcy Court, other than that the New York Supreme Court Commercial Division maintains a specialized, fast docket. But even in that docket, a fraud or negligence case still takes several years to be adjudicated *via* a trial on the merits. The plain truth is that the Bankruptcy Court is fully familiar with all the underlying facts at bar, including the negotiations of the APA. An adversarial proceeding in that court will be determined on the merits much more quickly than a state court action. Additionally, because Plaintiffs' $300 million damage claim against Blackstone and Impala – both indemnified by Debtor (Impala to the extent of legal fees) -- will substantially impact the rights of the other existing creditors in the pending Winstar Bankruptcy Case to the proceeds of the Judgment and other bankruptcy assets, the Bankruptcy Court, and the other creditors, may require that this proceeding be determined on a fast track basis in order that all creditors receive distributions sooner, rather than later.

Ultimately, the Bankruptcy Court possesses a strong incentive to move the matter quickly along so as to further the Debtor's ability to make distributions to creditors. The New

17

York State Court does not share such a concern and, accordingly, the Action is more likely to be prolonged in the state court forum.

Because Plaintiffs fail to meet at least four of the statutory requirements for mandatory abstention, this Court should continue to exercise jurisdiction over this Action.

## III    DISCRETIONARY ABSTENTION OR EQUITABLE REMAND IS NOT WARRANTED.

Finally, Plaintiffs alternatively seek abstention pursuant to section 1334(c)(1).[12] This portion of the statute permits discretionary abstention in the interest of justice, comity with state courts or respect for state law. Here, where the Bankruptcy Court retained exclusive jurisdiction and the subject of the lawsuit is so closely intertwined with the federal bankruptcy proceedings, discretionary abstention is certainly not warranted. Indeed, this court is not being asked to hear this matter. Defendants have requested transfer to the Delaware Bankruptcy Court which retains exclusive jurisdiction under these circumstances. That Plaintiffs even request discretionary abstention is absurd given the retention of jurisdiction by the Delaware Bankruptcy Court. Plaintiffs fail to cite any authority where a District Court has abstained in a matter where a bankruptcy court has retained exclusive jurisdiction and the Defendants do not believe such a case exists.

The United States Supreme Court has stated that the federal courts should be "sparing" in their exercise of discretionary abstention. Texaco Inc. v. Sanders (In re Texaco), 182 B.R. 937, 946-947 (Bankr. S.D.N.Y. 1995) (quoting Willcox v. Consolidated Gas Co. of New York, 212 U.S. 19, 40 (1909) (acknowledging that if a litigant properly turns to a federal court to adjudicate an issue it is the Federal Court's "duty to take such jurisdiction" also Bethlehem Contracting Company v. Lehrer/McGovern, Inc., 800 F.2d 325, 327 (2d Cir. 1986) (if a "federal court properly has subject matter jurisdiction it has a 'virtually unflagging obligation'

---

[12]    This request is procedurally defective for the same reasons set forth in footnote 11, supra.

18

to exercise that jurisdiction even if an action concerning the same matter is pending in state court"); International Fidelity Insurance Co. v. Robb (*In re* Robb), 139 B.R. 791, 796 (Bankr. S.D.N.Y. 1992). As set forth below, Plaintiffs fail to demonstrate any reason why this Court should abstain from taking jurisdiction over the Action.

Plaintiffs also argue for equitable remand pursuant to 28 U.S.C. § 1452(b), which authorizes a federal court to remand a case on any equitable ground. The factors relevant to such a determination are: 1) the effect on the efficient administration of the bankruptcy estate; 2) the extent to which issues of state law predominate; 3) the difficulty or unsettled nature of the applicable state law; 4) comity; 5) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; 6) the existence of a right to a jury trial; 7) the prejudice to the involuntarily removed defendants; and 8) waste of judicial resources. Nemsa, 1995 U.S. Dist. LEXIS 11650, at *21-22.

Courts routinely consider the same factors when deliberating over a request for discretionary abstention and in deciding equitable remand. Id. at *28. See also Riverside Nursing Home, 144 Bankr. 951, 957 (Bankr. S.D.N.Y. 1992) (finding that the equitable grounds that warrant a decision to remand under 28 U.S.C. §1452(b) are similar to the factors that authorize abstention under 28 U.S.C. § 1334(c)). As set forth below, Plaintiffs cannot satisfy the requirements for equitable remand and permissive abstention, and this request should be denied.

### A.    **Efficient Administration.**

Plaintiffs argue that Defendants have not established that the Action will have any effect on the Winstar Bankruptcy Case. In doing so, Plaintiffs ignore that the Winstar Bankruptcy Case is still an ongoing matter. The Trustee is actively engaged in many actions seeking to recover assets, including the litigation resulting in the Judgment against Lucent. The

Trustee will also have to reconcile, through litigation or otherwise, the substantial claims brought in the Winstar Bankruptcy Case. This Action, if successful, could result in a potential $300 million indemnification claim that will significantly reduce, if not eliminate, distributions to Winstar's creditors and significantly affect the administration of the Winstar Bankruptcy Case. Thus, the Winstar Bankruptcy Case will effectively be put on hold pending the determination of this Action. There will be no administration of the Winstar Bankruptcy Case, much less "efficient" administration if the Action proceeds in New York State Court because, at a minimum the Trustee will not be able to make distributions to creditors or to close the Winstar Bankruptcy Case until after the Action and any state court appeals thereof are determined.

**B.    State Law Issues Do Not Predominate.**

Second, the Plaintiffs assert that this Action should be remanded to State Court just because the action involves issues of state law. While that is a factor to be considered, it alone is not sufficient to support remand. See, e.g., Neuman v. Goldberg, 159 Bankr. 681, 688 (S.D.N.Y. 1993) (opining that the fact that a complaint is based on state law causes of action does not mandate equitable abstention or remand, particularly where the state law claims are not novel or complex).

Here, although the underlying causes of action are state law claims of fraud and negligence, the defenses to the Action will necessarily involve federal law issues. Specifically, the defenses will rely in part on the interpretation of the APA and the factual and legal findings of the Delaware Bankruptcy Court contained in the Sale Order approving the APA. Furthermore, the alleged fraud was committed in connection with a bankruptcy sale, the procedures for which are governed by the Bankruptcy Code and Rules. The Delaware Bankruptcy Court, not the New York State Court, is the tribunal more suited to interpret the APA

20

and Sale Order and to determine whether or not fraud was committed in connection with the sale if approved.

C.    **The Complaint Does Not Allege Any Complicated State Law Issues.**

The Complaint alleges fraud and negligence neither of which present novel or complex issues of law. In an attempt to avoid this fact, Plaintiffs make an argument that they will not know the complexity of the claims until they take discovery. Under well settled law, in order to support discretionary abstention, Plaintiffs must explain why the state law claims they assert are unsettled or complex. Failure to do so "significantly undercuts the degree to which the state law factor weighs in favor of remand to the New York courts." See Nemsa, 1995 U.S. Dist. LEXIS 11650, at *23.

In addition, the issues of fraud and negligence alleged in the Complaint are ones with which the Bankruptcy Court is fully familiar. See Unity Natural Foods v. Ridgefield, Inc. 35 B.R. 876, 879 (Bankr. N.D. Ga. 1983) (noting that the matter involved "application of state contract and commercial law which commonly arises in the bankruptcy court as the bankruptcy court deals with business debtors on a daily basis" and that the case "simply requires the bankruptcy court to interpret the bargain between the parties and to assess the damages for any breach thereof as is determined by the application of well-settled state law.") And, in this case, as set forth above, any alleged wrongdoing took place in part in the Bankruptcy Court itself. Thus, Plaintiffs fail to meet this element for discretionary abstention.

D.    **Comity Concerns Are Misplaced.**

Fourth, given the history underlying this Action and the Bankruptcy Court's role and preservation of exclusive jurisdiction, supposed comity concerns are misplaced.

21

Plaintiffs rely heavily on this Court's decision in <u>Kerusa</u>, 2004 WL1048239 at *6, to support their comity argument. <u>Kerusa</u> is not helpful to Plaintiffs. The underlying facts in <u>Kerusa</u> involved the pre-petition construction of a residential apartment building located in New York City. These facts and the legal issues that needed to be resolved were applicable solely to the residents of New York City because they involved unique "local matters of real estate development" and affected the health and safety of the specific residents of the building. <u>Id</u>., at *5. In contrast, this Action involves nothing other than fraud and negligence claims asserted by a Delaware corporation (IDT) arising out of a Delaware Bankruptcy proceeding. Moreover, as noted above, the Bankruptcy Court's interest in this case is significant in light of the effect it will have on the Bankruptcy Court's previous Sale Order and the ongoing Winstar Bankruptcy Case. Indeed, if anything the Delaware Bankruptcy Court certainly has more of an interest then the New York State Courts in ensuring that its sales are free from fraud. New York State has no special interest in these causes of action or the facts of this case.

E.    **Judicial Resources.**

An additional factor considered by courts to determine if abstention is appropriate is the possible waste of judicial resources. Removal of the Action occurred almost immediately after the initiation of the Action. As such, the New York State Court had not yet proceeded in any way, and no resources were expended by the New York State Court in this matter. Accordingly, there is no concern that judicial resources were wasted. <u>See, e.g.</u>, <u>Senorx, Inc. v. Coudert Brothers, LLP</u>, No. C-07-1075, 2007 WL 1520966, at *3 (N.D. Cal. May 24, 2007) quoting <u>H.J. Rowe, Inc. v. Sea Products, Inc. (<i>In re</i> Talon Holdings, Inc.)</u>, 221 B.R. 214, 220 (Bankr. N.D. Ill. 1998) (opining that at the time of removal, the proceedings were not sufficiently advanced such that concerns for comity and waste of judicial resources are implicated).

F.    **The Action Is At The Heart Of The Bankruptcy.**

22

Sixth, for all of the reasons set forth above, the Action is at the heart of the existing Winstar Bankruptcy Case. The Action arises from a Bankruptcy Code § 363 sale in the Delaware Bankruptcy Court, is subject to the exclusive jurisdiction of the Bankruptcy Court, and involves the interpretation of the APA and the Sale Order. Furthermore should Plaintiffs recover a $300 million judgment against Impala and Winstar, the resulting indemnity claim will wipe out the possibility that other Winstar creditors will receive a distribution. This Action is inextricably intertwined with the Winstar Bankruptcy Case. Consequently, the high degree of relatedness between this Action and the Winstar Bankruptcy case is undeniable.

**G.      A Jury Trial Remains Possible.**

Seventh, Plaintiffs' request for a jury trial cavils with the court. Plaintiffs availed themselves of the Delaware Bankruptcy Court to participate in the auction and bidding process for the Debtor's assets (transcript of sale hearing dated December 17, 2001, Gold Dec. Ex. 9.) Likewise, Plaintiffs approached the Debtor in Wilmington, Delaware - - just outside the courtroom of the Delaware Bankruptcy Court - - with their offer to purchase the Debtor's assets and later appeared in court before Judge Farnan to outline the details of their proposed agreement. (Gold Dec. Ex. 9 at 19; see also Ex. 9 at 17-28.) In purchasing the Debtor's assets, Plaintiffs entered into the APA with the Debtor in which they submitted exclusively to the jurisdiction of the Delaware Bankruptcy Court to resolve any and all disputes arising from that agreement, with the express understanding that a jury trial would likely not be available. (APA § 9.10.) Moreover, Plaintiffs sought and received approval of the transaction from the Delaware Bankruptcy Court, which retained exclusive jurisdiction over any and all disputes arising from its approval of the transaction. (Sale Order ¶ 15(c).) Plaintiffs should therefore not be permitted to circumvent the jurisdiction of the Delaware Bankruptcy Court and their concomitant waiver of a right to a jury trial, by now arguing that their right to a jury trial will be compromised.

23

Accordingly, the question of whether a jury trial remains possible in the Delaware Bankruptcy Court should not weigh in Plaintiffs' favor.

### H.    All Of The Defendants Consented To The Removal.

The final factor to consider in discretionary abstention is whether any of the Defendants will be prejudiced by their involuntary removal. Here, this factor weighs against remand because all of the Defendants consented to the Removal and now jointly oppose Plaintiffs' request for remand. Nor is the Bankruptcy Court jurisdiction inequitable to Plaintiffs given their prior consent to it - and the Sale Order's retention of exclusive jurisdiction.

24

## CONCLUSION

WHEREFORE, for all of the foregoing reasons it is respectfully requested that the Court deny the relief sought in the Plaintiffs' Remand Motion and grant Defendants such other and further relief as is proper under the circumstances.

Dated: July 31, 2007

Respectfully submitted,

/s/Vickie Reznik                          /s/ Andrew C. Gold
Yosef J. Riemer                           Stephen M. Rathkopf
Vickie Reznik                             Andrew C. Gold
David S. Flugman                          HERICK, FEINSTEIN LLP
KIRKLAND & ELLIS LLP                      2 Park Avenue
Citigroup Center                          New York, New York 10016
153 East 53rd Street                      Telephone:    (212) 529-1400
New York, New York 10022-4611             Facsimile:    (212) 592-1500
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900              *Attorneys for Defendant Impala Partners, LLC*

*Attorneys for Defendant The
Blackstone Group, L.P.*


                                          /s/ Stephen L. Saxl
                                          Stephen L. Saxl
                                          William Wargo
                                          GREENBERG TRAURIG, LLP
                                          200 Park Avenue
                                          New York, New York 10166
                                          Telephone:    (212) 801-9200
                                          Facsimile:    (212) 801-6400

                                          *Attorneys for Defendant Citigroup Inc., as successor
                                          by merger to Citicorp*

25

UNITED STATES DISTRICT COURT         **Electronically Filed**
SOUTHERN DISTRICT OF NEW YORK

---

**WINSTAR HOLDINGS, LLC and IDT CORP.,**    Case No.:     **07 CV 4634 (GEL) (AJP)**

           *Plaintiffs,*                  **ECF CASE**

    **- against -**

**THE BLACKSTONE GROUP L.P., IMPALA
PARTNERS, LLC, and CITICORP,**

           *Defendants.*

---

## DECLARATION OF ANDREW C. GOLD
## IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND

     I, ANDREW C. GOLD, hereby declare under 28 U.S.C. § 1746 that the following is true to the best of my knowledge, information and belief:

     1.     I am a partner at the law firm of Herrick, Feinstein LLP, attorneys for defendant Impala Partners, LLC ("Impala") and am an attorney licensed to practice law before the Courts of the State of New York and before this Court. I am fully familiar with the matters set forth herein.

     2.     This declaration is submitted in support of the Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Motion to Remand (the "Opposition") and specifically to place before this Court certain documents referred to in the Opposition, dated July 31, 2007.[1]

     3.     Attached hereto as <u>Exhibit "1"</u> is a true and correct copy of the Asset Purchase Agreement among IDT Winstar Acquisition, Inc., Winstar Communications, Inc. and certain of its subsidiaries, dated as of December 18, 2001 *(Delaware Bankruptcy Court Case No. 01-1430 (KJC); Docket No. 1629).*

---

[1]      Unless otherwise defined herein, capitalized terms shall have the same meanings subscribed to them in the Opposition.

4.     Attached hereto as Exhibit "2" is a true and correct copy of the Delaware Bankruptcy Court Order Authorizing (i) Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims Encumbrances and Interests, (ii) Approving Cure Amounts with Respect to Certain Executory Contracts and Unexpired Leases, (iii) Authorizing the Debtors to Enter into and Approving Management Agreement, (iii) Approving Regulatory Transition Process and (v) Granting Related Relief *(Delaware Bankruptcy Court Case No. 01-1430 (KJC); Docket No. 1627).*

5.     Attached hereto as Exhibit "3" is a true and correct copy of the indemnification agreement dated July 2, 2001 entered into by and between Winstar and Impala.

6.     Attached hereto as Exhibit "4" is a true and correct copy of the indemnification agreement dated July 26, 2001 entered into by and between Winstar and Blackstone.

7.     Attached hereto as Exhibit "5" is a true and correct copy of the Judgment in favor of Winstar against Lucent Technologies Inc. *(Delaware Bankruptcy Court Adversary Proceeding No. 01-01063 (KJC); Docket No. 373).*

8.     Attached hereto as Exhibit "6" is a true and correct copy of the Memorandum Opinion as well as a true and correct copy of the Final Order of the United States District Court for the District of Delaware in favor of Winstar against Lucent Technologies Inc. *(Delaware Bankruptcy Court Adversary Proceeding No. 01-01063 (KJC); Docket Nos. 400 & 401 respectively ).*

9.     Attached hereto as Exhibit "7" is a true and correct copy of the Order (i) Fixing August 30, 2002 as the Last Date for the Filing of Proofs of Claim for Administrative Costs and Expenses that Arose, Accrued, or Otherwise Became Due and Payable on and Between April 18, 2001 and January 24, 2002 and (ii) Specifying the Form and Manner of Notice Thereof *(Delaware Bankruptcy Court Case No. 01-1430 (KJC); Docket No. 2631).*

HF 3735331v.1 #10069/0007

10.    Attached hereto as <u>Exhibit "8"</u> is a true and correct copy of the letter dated June 1, 2007 from Impala to the Winstar Trustee notifying her of the Action and of Impala's intention to seek indemnification from the Debtor for all expenses connected to the Action pursuant to its indemnification agreement; and a true and correct copy of the letter dated June 4, 2007 from Blackstone to the Winstar Trustee notifying her of the Action and of Blackstone's intention to seek indemnification from the Debtor for all expenses connected to the Action pursuant to its indemnification agreement.

11.    Attached hereto as <u>Exhibit "9"</u> is a true and correct copy of the Delaware Bankruptcy Court transcript dated December 17, 2001 of the hearing on the sale of the Debtor's assets *(Delaware Bankruptcy Court Case No. 01-1430 (KJC); Docket No. 1850).*

I declare under penalty of perjury that the following is true and correct. Executed at New York, New York on July 31, 2007.

<u>/s/ Andrew C. Gold</u>
Andrew C. Gold

- 3 -

EXHIBIT 1

MASTER FINAL

<u>EXECUTION COPY</u>

---

**ASSET PURCHASE AGREEMENT**

**AMONG**

**IDT WINSTAR ACQUISITION, INC.,**

**WINSTAR COMMUNICATIONS, INC.**

**AND**

**CERTAIN OF ITS SUBSIDIARIES**
**SET FORTH ON APPENDIX I HERETO**

**DATED AS OF DECEMBER 18, 2001**

---

NYDOCS02/592885.4
WP3:714386.1

58222.1001

## TABLE OF CONTENTS

Page

### ARTICLE I
### DEFINITIONS

Section 1.1    *Definitions* .................................................................................. *1*
Section 1.2    *Construction* ............................................................................... *6*

### ARTICLE II
### PURCHASE AND SALE

Section 2.1    *Purchase and Sale of Assets* ...................................................... *6*
Section 2.2    *Excluded Assets* .......................................................................... *8*
Section 2.3    *Assumed Liabilities* .................................................................... *9*
Section 2.4    *Excluded Liabilities* ................................................................. *10*
Section 2.5    *Assumption of Certain Leases and Other Contracts* ................. *10*
Section 2.6    *Intercompany Receivables* ........................................................ *11*
Section 2.7    *Winstar Building* ....................................................................... *11*

### ARTICLE III
### PURCHASE PRICE

Section 3.1    *Purchase Price* .......................................................................... *11*
Section 3.2    *Cash Payment at Signing* .......................................................... *12*
Section 3.3    *Allocation of Purchase Price* .................................................... *12*

### ARTICLE IV
### THE CLOSING AND LICENSE TRANSFER

Section 4.1    *Time and Place of Closing* ........................................................ *12*
Section 4.2    *Deliveries by the Sellers* ........................................................... *13*
Section 4.3    *Deliveries by the Buyer* ............................................................ *13*
Section 4.4    *Management Transition* ............................................................. *13*

### ARTICLE V
### REPRESENTATIONS AND WARRANTIES OF THE BUYER

Section 5.1    *Organization* ............................................................................. *13*
Section 5.2    *Authority Relative to this Agreement* ........................................ *13*
Section 5.3    *Consents and Approvals; No Violation* ..................................... *14*
Section 5.4    *Qualifications to Hold Permits* ................................................ *14*
Section 5.5    *Legal Proceedings and Judgments* ........................................... *14*
Section 5.6    *Brokers* ...................................................................................... *14*
Section 5.7    *Buyer Financing* ....................................................................... *14*
Section 5.8    *Capitalization* ........................................................................... *14*

Section 5.9    *Valid Issuance of IDT and Buyer Shares* ........................................................ *15*
Section 5.10   *Disclaimer of Other Representations and Warranties* ...................................... *15*

## ARTICLE VI
## COVENANTS OF THE PARTIES

Section 6.1    *Conduct of Business* ................................................................................... *15*
Section 6.2    *Access to Information; Maintenance of Records* ........................................ *15*
Section 6.3    *Expenses* ..................................................................................................... *17*
Section 6.4    *Further Assurances* ..................................................................................... *17*
Section 6.5    *Public Statements* ........................................................................................ *17*
Section 6.6    *Governmental Authority Consents and Approvals* ..................................... *18*
Section 6.7    *Tax Matters* ................................................................................................. *19*
Section 6.8    *Litigation Support* ....................................................................................... *20*
Section 6.9    *Notification* .................................................................................................. *20*
Section 6.10   *Submission for Bankruptcy Court Approval* .............................................. *20*
Section 6.11   *D&O Policies* .............................................................................................. *21*
Section 6.12   *Use of Winstar Name* ................................................................................... *21*

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.1    *Conditions to Each Party's Obligations to Effect the Closing* ..................... *21*
Section 7.2    *Conditions to Obligations of the Buyer* ...................................................... *22*
Section 7.3    *Conditions to Obligations of the Sellers* ..................................................... *22*

## ARTICLE VIII
## TERMINATION AND ABANDONMENT

Section 8.1    *Termination* ................................................................................................. *23*
Section 8.2    *Procedure and Effect of Termination* .......................................................... *24*

## ARTICLE IX
## MISCELLANEOUS PROVISIONS

Section 9.1    *Amendment and Modification* ...................................................................... *24*
Section 9.2    *Waiver of Compliance; Consents* ................................................................ *24*
Section 9.3    *Survival* ....................................................................................................... *24*
Section 9.4    *No Impediment to Liquidation* ..................................................................... *25*
Section 9.5    *Notices* .......................................................................................................... *25*
Section 9.6    *Assignment* ................................................................................................... *26*
Section 9.7    *Third-Party Beneficiaries* ........................................................................... *26*
Section 9.8    *Severability* .................................................................................................. *26*
Section 9.9    *Governing Law* ............................................................................................. *27*
Section 9.10   *Submission to Jurisdiction* .......................................................................... *27*
Section 9.11   *Counterparts* ................................................................................................ *27*
Section 9.12   *Incorporation of Schedule and Exhibits* ..................................................... *27*
Section 9.13   *Entire Agreement* ......................................................................................... *27*

Section 9.14   *Headings* ........................................................................................ 27
Section 9.15   *Remedies* ........................................................................................ 27
Section 9.16   *Bulk Sales or Transfer Laws* ........................................................ 27

APPENDIX I     Subsidiaries of Winstar Parties Hereto

<u>EXHIBITS</u>

Exhibit A      Assumed Agreements
Exhibit B      Form of Bill of Sale
Exhibit C      Form of Escrow Agreement
Exhibit D      Form of Management Agreement
Exhibit E      Form of Sale Order

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "*Agreement*") is made as of December 18, 2001 by and among Winstar Communications, Inc., a Delaware corporation ("*Winstar*") and certain of its subsidiaries set forth on Appendix I hereto (collectively, the "*Sellers*"), and IDT Winstar Acquisition, Inc., a Delaware corporation (the "*Buyer*").

WHEREAS, the Buyer desires to purchase from the Sellers, and the Sellers desire to sell to the Buyer, the Purchased Assets (as hereinafter defined) upon the terms and conditions hereinafter set forth in this Agreement; and

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements hereinafter set forth, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    *Definitions.*  (a) As used in this Agreement, the following terms have the meanings specified in this Section 1.1(a).

"*Accounts Receivable*" means any and all accounts receivable, notes and other amounts receivable from third parties (including, to the extent permissible under applicable law, revenues from all accounts of the former and current customers of the Business), together with any interest or unpaid financing charges accrued thereon, excluding, all Excluded Receivables.

"*Affiliate*" means, with respect to any specified Person, any other Person that directly, or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, *provided* that Net 2 Phase, Inc. and Liberty Media, Ipe. shall not be deemed to be Affiliates of the Buyer.

"*AON Sublease*" means the Assignment and Assumption of Lease Documents by and between AON Service Corporation and Winstar, dated as of September 25, 2001, with respect to the Winstar Building and related agreements and documentation thereto, as amended as of the date hereof.

"*Assumed Agreements*" means any contract, agreement, real or personal property lease, commitment, understanding or instrument which relates to the Business or the Purchased Assets for which the Sellers have obtained an order authorizing the assignment and assumption thereof to the Buyer and which is listed on Exhibit A attached hereto, which Exhibit may be amended from time to time by the Buyer for a period of time up to 120 days after the Closing Date.

"*Bankruptcy Code*" means Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware or such other court having competent jurisdiction over the Chapter 11 Cases.

"*Bill of Sale*" means the Bill of Sale to be executed and delivered by the Sellers at the Closing, substantially in the form of Exhibit B attached hereto.

"*Business*" means the activities carried on by the Sellers for the purpose of providing local and long distance voice services, Internet access, data transport services, application services and hosting services and any activities related thereto; *provided* that "*Business*" shall not include any of the activities carried on by any of the Excluded Subsidiaries (none of which are material to the Business, ~~other than Office.com, Inc.~~).

"*Business Day*" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by law to be closed in the City of New York.

"*Buyer Representatives*" means the Buyer's accountants, employees, counsel, financial advisors and other authorized representatives.

"*Chapter 11 Cases*" means the Sellers' cases commenced under Chapter 11 of the Bankruptcy Code.

"*Code*" means the Internal Revenue Code of 1986, as amended through the date hereof.

"*Communications Act*" means the Communications Act of 1934, as amended.

"*Confidential Information*" has the meaning specified in the Confidentiality Agreement.

"*Confidentiality Agreement*" means, collectively, the confidentiality agreement, dated as of November 30, 2001, between Winstar or its advisors and the Buyer or its Affiliate.

"*Creditors' Committee*" means the official committee of unsecured creditors appointed in connection with the Chapter 11 Cases on April 27, 2001.

"*D&O Policies*" means the directors' and officers' liability insurance policies maintained by the Sellers and in effect as of the date hereof set forth on Schedule 1.1(a)(i).

"*Employee Records*" means all existing personnel files related to employees and former employees of the Sellers.

"*Encumbrances*" means any mortgages, pledges, liens, claims (as such term is defined in the Bankruptcy Code), charges, security interests, conditional and installment sale agreements, activity and use limitations, conservation easements, deed restrictions, encumbrances and charges of any kind.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Escrow Agent*" means Shearman & Sterling.

"*Escrow Agreement*" means the escrow agreement, dated as of the date hereof, by and among Winstar, the Buyer and the Escrow Agent, substantially in the form of Exhibit C.

2

"*Escrow Amount*" means, as of any date of determination, the amount on deposit, including any interest thereon, under the Escrow Agreement, without reduction or offset for any fees or costs, which shall be borne by Sellers.

"*Excess Inventory and Equipment*" means such inventory, equipment and other assets owned by the Sellers set forth on Schedule 1.1(a)(ii) which (x) has been sold by the Sellers prior to the date hereof or (y) was under binding contract dated prior to the date hereof to be sold and is subsequently sold pursuant thereto.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Excluded Subsidiaries*" means the Subsidiaries of Winstar set forth on Schedule 1.1(a)(iii).

"*FCC*" means the Federal Communications Commission (or any successor Governmental Authority).

"*FCC Consents*" means the granting by the FCC of its consent to the assignment of the FCC Licenses in connection with the consummation of the transactions contemplated hereby.

"*FCC Licenses*" means all licenses, authorizations, permits and construction permits issued by the FCC to the Sellers, including the Principal FCC Licenses, which are related to the Business, all of which are set forth on Schedule 1.1(a)(iv).

"*FCC Rules*" means the rules and regulations of the FCC, 47 Code of Federal Regulations, Part 1 et seq.

"*Final Order*" means, (i) for purposes of the FCC Consents, an administrative order issued by the FCC for which the deadline for lodging any administrative appeal, reconsideration, stay or review by any objecting Person has expired pursuant to the FCC Rules; and (ii) for purposes of the consents required from all other Governmental Authorities (including, the State Regulatory Consents), an action by any such Governmental Authority for which the time period has expired for any further action by such Governmental Authority.

"*Governmental Authority*" means any federal, state or local governmental or regulatory authority, department, agency, commission or body.

"*Intellectual Property*" means all of the following in any jurisdiction throughout the world: (i) patents, patent applications and patent disclosures, (ii) trademarks, service marks, trade dress, trade names, corporate names, logos and Internet domain names, together with all goodwill associated with each of the foregoing, (iii) copyrights and copyrightable works, (iv) registrations and applications for any of the foregoing, (v) trade secrets, confidential information and inventions and (vi) rights under any license agreements for any of the foregoing.

"*Knowledge*" means, with respect to each Seller, as to a particular matter, the actual knowledge of the acting chief executive officer, the chief financial officer or the general counsel of Winstar, ~~in each case after a reasonable degree of independent investigation.~~

58222.1001

*, and (iii) obligations pursuant to the Communications Act of 1934, as amended, 47 U.S.C. §§ 151 et seq., and regulations promulgated thereunder*

"*Material Adverse Effect*" means any change or changes in, or effect on, the Business or the Purchased Assets, since the date hereof, that is individually, or are in the aggregate, reasonably likely to be materially adverse to the Business or the Purchased Assets, each taken as a whole, other than (i) any change or effect in any way resulting from or arising in connection with this Agreement or any of the transactions contemplated hereby (including any announcement with respect to this Agreement or any of the transactions contemplated hereby and the obtaining of any FCC Consents or State Regulatory Consents) and (ii) any change in or effect on the Purchased Assets or the Business which is cured (including by the payment of money) by the applicable Seller or any of its Affiliates before the Termination Date.

"*Permitted Encumbrances*" means (i) zoning, entitlement, conservation restriction and other land use and environmental regulations by Governmental Authorities which do not materially interfere with the present use of the Purchased Assets ~~and~~ (ii) all exceptions, restrictions, easements, charges, rights-of-way and other Encumbrances set forth in any state, local or municipal franchise under which the Business is conducted which do not materially interfere with the present use of the Purchased Assets / ~~and (ii) Need Margaret counsel~~.

"*Person*" means any individual, corporation, partnership, limited partnership, limited liability company, syndicate, group, trust, association or other organization or entity or government, political subdivision, agency or instrumentality of a government.

"*Post-petition Agent*" means Citicorp USA, Inc.

"*Pre-petition Agent*" means The Bank of New York.

"*Principal FCC Licenses*" means all 38 and 28 GHZ spectrum licenses issued by the FCC to the Sellers set forth on Schedule 1.1(a)(iv).

"*Sale Hearing*" means the date of the scheduled hearing of the Bankruptcy Court during which the Bankruptcy Court considers the Sale Order.

"*SEC*" means the United States Securities and Exchange Commission.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Sellers' Representatives*" means the Sellers' accountants, employees, counsel, financial advisors and other authorized representatives.

"*State Regulatory Consents*" means any consents from state regulatory authorities with respect to the assignment of the State Regulatory Licenses in connection with the consummation of the transactions contemplated by this Agreement.

"*State Regulatory Licenses*" means any licenses, authorizations or permits issued by state regulatory authorities which are related to the Business and listed on Schedule 1.1(a)(v).

"*Subsidiary*" means, with respect to any Person, any corporation or other entity of which the outstanding securities or equity interests having ordinary voting power to elect a majority of

4

the board of directors or other Persons performing similar functions of such Person are owned directly or indirectly by such other Person.

"*Tax*" and "*Taxes*" means (i) all taxes, charges, fees, levies, penalties or other assessments of any kind whatsoever imposed by any federal, state, local or foreign taxing authority, including, but not limited to, income, excise, property, sales, transfer, franchise, payroll, withholding, social security or other taxes, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalties or additions attributable thereto or (ii) liability for the payment of any amounts of the type described in clause (i) above as a result of being party to any agreement or any express or implied obligation to indemnify or otherwise succeed to the liability of any other Person.

"*Tax Return*" means any return, report, information return or other document (including any related or supporting information) required to be supplied to any Governmental Authority with respect to Taxes.

"*Transferred Employee*" means each person who accepts the Buyer's offer of employment.

"*Winstar Building*" means 685 Third Avenue, in the Borough of Manhattan, New York County, City and State of New York.

(b) Each of the terms set forth below shall have the meaning ascribed thereto in the following section:

| Definition | Location |
|---|---|
| "*Agreement*" | Recitals |
| "*Assumed Liabilities*" | § 2.3 |
| "*Buyer*" | Recitals |
| "*Buyer Common Stock*" | § 3.1 |
| "*Buyer Financing*" | § 5.7 |
| "*Buyer Preferred Stock*" | § 3.1 |
| "*Buyer Shares*" | § 3.1 |
| "*Cash Payment*" | § 3.1 |
| "*Cash/Stock Payment*" | § 3.1 |
| "*Closing*" | § 4.1 |
| "*Closing Date*" | § 4.1 |
| "*Excluded Assets*" | § 2.2 |
| "*Excluded Liabilities*" | § 2.4 |
| "*Excluded Receivables*" | § 2.2(k) |
| "*IDT Class B Stock*" | § 3.1 |
| "*IDT Shares*" | § 3.1 |
| "*Management Agreement*" | § 4.4 |
| "*Other Regulatory Approvals*" | § 6.6(e) |
| "*Permits*" | § 2.1(f) |
| "*Purchase Price*" | § 3.1 |

5

| | |
|---|---|
| "*Purchased Assets*" | § 2.1 |
| "*Purchased Investments*" | § 2.1(m) |
| "*Sale Order*" | § 7.11 |
| "*Sellers*" | Recitals |
| "*Termination Date*" | § 8.1(g) |
| "*Topping Fee*" | § 6.10(d) |
| "*Transfer Taxes*" | § 6.7(b) |
| "*Transferable Permits*" | § 2.1(f) |
| "*Winstar*" | Recitals |

Section 1.2    *Construction*. The terms "hereby," "hereto," "hereunder" and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used. The term "including" when used herein without the qualifier, "without limitation," shall mean "including, without limitation." Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require. The word, "or," shall not be construed to be exclusive. Provisions shall apply, when appropriate, to successive events and transactions.

ARTICLE II
PURCHASE AND SALE

Section 2.1    *Purchase and Sale of Assets*. Except for the Excluded Assets, upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, the Sellers shall sell, assign, convey, transfer and deliver to the Buyer, and the Buyer shall, by payment of the Purchase Price, purchase and acquire from the Sellers, free and clear of all Encumbrances (except for Permitted Encumbrances), all of the rights, title and interest that the Sellers possess as of the Closing and have the right to transfer in, to and under the real, personal, tangible and intangible property or assets of every kind and description, wherever located, used, developed for use or intended for use in the conduct of the Business and related thereto and all other assets of the Sellers unless specifically excluded in Section 2.2 and subject to Section 4.4 (collectively, the "*Purchased Assets*"). Without limiting the effect of the foregoing, the parties hereto acknowledge and agree that the Purchased Assets shall include all rights, title and interest of the Sellers in, to and under all of the following (except the Excluded Assets):

(a) all inventories of supplies, materials and spares, other than the Excess Inventory and Equipment;

(b) all equipment (other than the Excess Inventory and Equipment);

(c) all machinery, vehicles, furniture and other tangible personal property;

(d) all of the Sellers' Accounts Receivable as of the Closing Date;

(e) the Assumed Agreements, in each case, to the extent the same are assignable under Section 365 of the Bankruptcy Code or to the extent consented to by the third party

6

or third parties to such agreements including any and all deposits and letters of credit related to any such Assumed Agreements, and with respect to such Assumed Agreements, all of Sellers' rights (including of recoupment), offsets, counterclaims and defenses (including under Sections 105(a), 361, 362, 363, 365, 366, 502, 503(b), 554 and 558 of the Bankruptcy Code);

(f) all permits, certificates, licenses (including the FCC Licenses and the State Regulatory Licenses), franchises and other governmental authorizations, consents and approvals held by the Sellers except to the extent related exclusively to the Excluded Assets (collectively, "*Permits*"), in each case, to the extent the same are assignable (the "*Transferable Permits*");

(g) to the extent assignable under Section 365 of the Bankruptcy Code or to the extent consented to by the third party or third parties to such agreements, all confidentiality, noncompete or nondisclosure agreements executed by vendors, suppliers or employees of the Sellers or other third parties, in each case, to the extent related to the Business;

(h) originals or copies of all employee records of the Sellers, books, operating records, operating, safety and maintenance manuals, engineering design plans, blueprints and as-built plans, specifications, procedures and similar items of the Sellers to the extent relating to the Purchased Assets, including books of account, all customer lists, billing records and other customer correspondence to the extent relating to the Business, all regulatory filings and other books and records relating to the Business in the possession of the Sellers;

(i) except as set forth on Schedule 2.2(d) and subject to Section 2.2(d), all of the rights, claims or causes of action of any of the Sellers against a third party related to the Purchased Assets, the operation of the Business or the Assumed Liabilities or Assumed Agreements arising out of transactions occurring prior to the Closing Date, except where such rights, claims or causes of action relate to the Excluded Liabilities; to the extent such rights, claims or causes of action relate to both Assumed Liabilities and Excluded Liabilities, the Buyer and each Seller shall share such rights, claims or causes of action in the same proportion as their respective liabilities bear to the total liability relating to those rights, claims or causes of action;

(j) all Intellectual Property owned by or licensed to the Sellers together with all related income, royalties, damages and payments due or payable at the Closing or thereafter (including damages and payments for past or future infringements or misappropriations thereof), the right to sue and recover for past infringements or misappropriations thereof, any and all corresponding rights that, now or hereafter, may be secured throughout the world and all copies and tangible embodiments of any such Intellectual Property;

(k) to the extent assignable under Section 365 of the Bankruptcy Code or to the extent consented to by the insurance providers, the rights of the Sellers under those

7

insurance policies which primarily cover risks covering the Business or the Purchased Assets, but excluding the D&O Policies;

(l) all historical information relating to accounts of the customers of the Business which, at the Closing Date, are users of any of the services provided by the Sellers in the operation of the Business; and

(m) shares of stock, securities, bonds, debentures, evidences of indebtedness or other interests issued by any third party (not affiliated with any of the Sellers) and owned by any Seller primarily for investment, excluding those set forth on Schedule 2.2(b) (the "*Purchased Investments*").

Section 2.2    *Excluded Assets.*  Notwithstanding any provision herein to the contrary, the Sellers shall not sell, convey, assign, transfer or deliver to the Buyer, and the Buyer shall not purchase, and the Purchased Assets shall not include the Sellers' right, title and interest to the following assets of the Sellers (the *"Excluded Assets"*):

(a) cash (including all cash residing in any collateral cash account securing any obligation or contingent obligation of the Sellers after giving effect to the Closing), cash equivalents and bank deposits existing as of the Closing Date, subject to the Buyer's rights under Section 2.1(e);

(b) any equity interests issued by the Sellers and their Subsidiaries and those equity interests set forth on Schedule 2.2(b);

(c) rights to any Tax refunds of any of the Sellers, whether such refund is received as a payment or as a credit against future Taxes and any net operating losses of the Sellers;

(d) the Sellers' claims, causes of action, choses of action and rights of recovery pursuant to Sections 544 through 550 and Section 553 of the Bankruptcy Code, any other avoidance actions under any other applicable provisions of the Bankruptcy Code and the claims, causes of action, choses of action and rights of recovery, including claims relating to Lucent Technologies, Inc., set forth on Schedule 2.2(d);

(e) subject to Section 6.2(c), the corporate charter, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, blank stock certificates, and other documents relating to the organization, maintenance, and existence of each Seller as a corporation or a limited liability company, as the case may be, any books, records or the like of the Sellers;

(f) all of the assets set forth on Schedule 2.2(f);

(g) all of the agreements to which any of the Sellers is a party which are not Assumed Agreements and any and all customer deposits, customer advances and credits and security deposits related to any such agreements which are not Assumed Agreements;

8

(h) the rights of each Seller under this Agreement and any other agreements between any of the Sellers and the Buyer relating to the transactions contemplated hereby;

(i) all of the real, personal, tangible or intangible property (including Intellectual Property) or assets owned by the Excluded Subsidiaries except to the extent that such property or assets relate to the Business;

(j) any and all prepaid workers compensation premiums (other than the portion relating to the Transferred Employees);

(k) all accounts receivable, notes and other amounts receivable relating to third parties, together with any interest or unpaid financing charges accrued thereon and all proceeds thereof, set forth on Schedule 2.2(k) (the "*Excluded Receivables*");

(l) claims against current or former directors, officers or other employees of, or agents, accountants or other advisors of or to, any of the Sellers;

(m) the rights of the Sellers under the terms of the $7,500,000 original principal amount subordinate note issued on October 3, 2001 by Wam!Net Inc. and Wam!Net Government Services, Inc. to Winstar Wireless, Inc. and any equity of Wam!Net Inc. held by the Sellers;

(n) the rights of the Sellers under the AON Sublease, subject to Section 2.7; and

(o) the Excess Inventory and Equipment.

Section 2.3    *Assumed Liabilities.*  On the Closing Date, the Buyer shall assume and agree to pay, perform and discharge when due the following liabilities and obligations of the Sellers (the "Assumed Liabilities"), in accordance with the respective terms and subject to the respective conditions thereof:

(a) all liabilities and obligations of any of the Sellers under the Assumed Agreements (including all pre-petition and post-petition cure amounts payable in order to effectuate the assumption and assignment of each Assumed Agreement), subject to all of the Sellers' rights (including of recoupment), offsets, counterclaims and defenses (including under Sections 105(a), 361, 362, 363, 365, 366, 502, 503(b), 554 and 558 of the Bankruptcy Code), and the Transferable Permits in accordance with the terms thereof;

(b) all liabilities and obligations relating to any customer deposits and customer advances and credits, the security deposits and the Sellers' rights under any letters of credit or similar instruments securing customer deposits, advances or credits with respect to the revenue from customer accounts, to the extent  permissible under applicable law, *provided* that the Buyer has received possession of and rights to such security deposits, customer deposits, advances or credits and letters of credit;

(c) all liabilities and obligations under the Management Agreement; and

9

(d) all liabilities and obligations related to the Purchased Assets arising from any actions or omissions of the Buyer occurring after the Closing Date or the Business arising from any actions or omissions of the Buyer occurring after the Closing Date.

Section 2.4    *Excluded Liabilities.  The Buyer shall not assume or be obligated to pay, perform or otherwise discharge any liabilities or obligations of any of the Sellers other than the Assumed Liabilities (collectively, the "Excluded Liabilities").*

Section 2.5    *Assumption of Certain Leases and Other Contracts.  The Sellers shall assume and assign to the Buyer, effective upon the Closing, the Assumed Agreements on the following terms and conditions:*

(a) From and after the Closing Date until 120 days thereafter, the applicable Sellers shall assume and such Sellers shall assign to the Buyer the Assumed Agreements pursuant to Section 365 of the Bankruptcy Code.  The Assumed Agreements are listed on Exhibit A hereto, as amended from time to time pursuant to this Section 2.5(a), and are identified by the date of the Assumed Agreement (if available), the other party or parties to the Assumed Agreement and the address of such party or parties (if available), as the case may be.  From and after the date hereof until 120 days following the Closing Date, the Buyer shall have the right, in its sole discretion, to make additions and deletions to the list of Assumed Agreements by delivering a marked copy of such list to Sellers, and such changes shall be effective immediately upon receipt by Sellers.  The Sellers shall give prompt notice of such addition or deletion to the counter-party to such agreement, and to the respective counsels to the Pre-petition Agent, the Post-petition Agent and the Creditors' Committee.

(b) If there exists any default related to an Assumed Agreement which is required to be cured as a condition to the Sellers' assumption and assignment pursuant to Section 365(a) of the Bankruptcy Code, the Buyer shall promptly cure any such default (including, paying any and all such amounts, whether arising pre-petition or post-petition, to effect such cure pursuant to Section 365(a) of the Bankruptcy Code) as a condition to the assumption and assignment of such Assumed Agreement.  From time to time after the Closing, the Buyer shall provide funds to the Sellers or directly to the counter-party thereto (by wire transfer of immediately-available U.S. funds) in an amount sufficient to pay all such cure amounts required by the Bankruptcy Court, unless otherwise agreed by such counter-party, as a condition for assumption and assignment of the Assumed Agreements.  Immediately upon receipt by the Sellers of such funds, the Sellers shall hold such funds in trust for such counter-party, and shall pay all cure amounts for such Assumed Agreements.  The Buyer alone shall be liable for payment of any cure payment in respect of any Assumed Agreement.  From and after the Closing Date, the Buyer shall designate the contracts and other agreements of Sellers that it desires Sellers to reject and Sellers shall promptly make appropriate motions with the Bankruptcy Court and take all other action to reject all such designated contracts and other agreements.  In the case of non-residential real property leases, such notice shall be irrevocable and accompanied by delivery of all keys to the subject premises in the Buyer's possession.

(c) The Buyer shall be responsible for demonstrating and providing adequate assurance of future performance and any and all costs and expenses necessary in connection therewith regarding any of the Assumed Agreements under Section 365 of the Bankruptcy Code.

Section 2.6    *Intercompany Receivables*.  All intercompany receivables owed by and between the Sellers shall be cancelled on the Closing Date.

Section 2.7    *Winstar Building*.  The Buyer shall, at its option, be entitled to enter into a sublease following the Closing Date, with rent to be set at prevailing market rates in the building and otherwise on terms reasonably satisfactory to the Sellers, with the Sellers to occupy the office space in the Winstar Building to which the Sellers have occupancy rights under the terms of the AON Sublease (the thirty-first floor until January 31, 2002, the non-hub portion of the tenth floor until March 31, 2002, and the hub portion of the tenth floor until April 30, 2002). After the expiration of such term with respect to the hub portion of the tenth floor, the Buyer shall, at its option, be entitled to enter into an agreement with the Sellers to occupy such portion of the tenth floor of the Winstar Building (to the extent of such Sellers' occupancy rights) through the duration of the AON Sublease, and if the Buyer shall exercise such option, the Buyer shall pay rent at the prevailing market rate in the building for such space which rent shall be paid upon exercise of the option in a lump-sum payment based on the present value of such rent.

## ARTICLE III
## PURCHASE PRICE

Section 3.1    *Purchase Price*.  In consideration for the Purchased Assets, and subject to the terms and conditions of this Agreement, Buyer shall assume the Assumed Liabilities, and on the Closing Date, shall irrevocably (i) pay, at Sellers' election (which shall be exercised before the Closing Date), either (x) an amount in cash equal to $38,000,000 (the "*Cash Payment*") or (y) an amount in cash equal to $30,000,000 and cause to be issued to the Sellers a number of shares of Class B common stock, $0.01 par value per share, of IDT Corporation (the "*IDT Class B Stock*") having a value equal to $12,500,000 based on the average closing price of IDT Class B Stock during the seven trading day period ended December 14, 2001 (the "*IDT Shares*" and together with the $30,000,000, the "*Cash/Stock Payment*")), and (ii) issue to the Sellers such number of shares of common stock, $0.01 par value per share, of the Buyer (the "*Buyer Common Stock*"), representing 5% of the outstanding shares of Buyer Common Stock as of the date hereof (the "*Buyer Shares*" and together with either the Cash Payment or the Cash/Stock Payment, as applicable, the "*Purchase Price*").  It is understood and agreed that the Buyer shall issue to IDT Corporation or its designee shares representing the remaining 95% of the Buyer Common Stock and preferred stock, $0.01 par value per share, of the Buyer (the "*Buyer Preferred Stock*") which Buyer Preferred Stock grants to the holders thereof the right to recovery of amounts invested in the Buyer by its affiliates prior to any right of the Buyer or Sellers to receive amounts on account of the Buyer Common Stock (but having no other preferential rights or voting rights).

It is understood and agreed that the IDT Shares delivered at Closing shall not be registered in accordance with the Securities Act and shall be "restricted" as a result thereof.  IDT Corporation shall use its commercially reasonable ~~best~~ efforts to cause a registration statement to

11

become effective with respect to such IDT Shares within 60 days following the Closing Date. In the event that the IDT Shares are not duly registered within 60 days following the Closing Date, the Sellers may require at any time within 30 days thereafter that IDT Corporation repurchase the IDT Shares from the Sellers for cash consideration of $10,000,000 in the aggregate.

Section 3.2 *Cash Payment at Signing.* Pursuant to the Escrow Agreement, on or before the date hereof, the Buyer shall deliver, or shall have delivered, the Cash Payment to the Escrow Agent to be held in escrow pending the Closing. On the Closing Date, the Sellers and the Buyer shall instruct the Escrow Agent to promptly release the Escrow Amount in accordance with the terms of the Escrow Agreement.

Section 3.3 *Allocation of Purchase Price.* Prior to the Closing, the Buyer and the Sellers shall use their reasonable best efforts to agree as to the allocation of the Purchase Price pursuant to Section 1060 of the Code and the rules and regulations thereunder. The Buyer and the Sellers agree to use such allocation in filing all required forms under Section 1060 of the Code and all other Tax Returns, and the Buyer and the Sellers further agree that they shall not take any position inconsistent with such allocation on any examination of any such Tax Return, in any refund claim or in any Tax litigation. The Buyer acknowledges that, based upon the manner it valued the Purchased Assets, a majority of the Purchase Price is, to the extent permitted by applicable Tax laws and rules, allocated to Accounts Receivable. Upon the request of the other, the Buyer and the Sellers agree to provide the other information reasonably necessary to complete Form 8594. Not later than thirty (30) days prior to the filing of their respective Forms 8594 relating to this transaction, each party shall deliver to the other party a copy of its Form 8594. In the event of a dispute with respect to any part of the allocation of the Purchase Price, the Buyer and the Sellers shall attempt to reconcile their differences and any resolution by them as to any disputed allocation shall be final, binding and conclusive on the parties. If the Buyer and the Sellers are unable to reach a resolution on such differences within thirty (30) days after the date any such dispute arises, the Buyer and the Sellers shall submit the disputed allocations for determination and resolution to the Bankruptcy Court, which shall be instructed to determine and report to the parties, upon such disputed allocations, and such report shall be final, binding and conclusive on the parties hereto with respect to the disputed allocations.

ARTICLE IV
THE CLOSING AND LICENSE TRANSFER

Section 4.1 Time and Place of Closing. Upon the terms and subject to the satisfaction of the conditions contained in <u>Article VII</u> of this Agreement, the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities and Assumed Agreements contemplated by this Agreement (the "Closing") shall take place at the offices of Shearman & Sterling, 599 Lexington Avenue, New York, New York, at 10:00 A.M. (local time) no later than the second (2nd) Business Day following the date on which the conditions set forth in <u>Article VII</u> have been satisfied (other than the conditions with respect to actions the respective parties hereto will take at the Closing itself) or, to the extent permitted, waived in writing, or at such other place or time as the Buyer and Winstar (on behalf of the Sellers) may mutually agree. The date and time at which the Closing actually occurs is hereinafter referred to as the *"Closing Date."*

12

Section 4.2    *Deliveries by the Sellers.*  At or prior to the Closing, the Sellers shall deliver to the Buyer the Bill of Sale, duly executed by the Sellers for the personal property included in the Purchased Assets.

Section 4.3    *Deliveries by the Buyer.  At or prior to the Closing, the Buyer shall deliver the following to Winstar (on behalf of the Sellers) or the Escrow Agent, as the case may be:*

(a)  the Purchase Price;

(b)  copies of the Certificate of Incorporation and the Bylaws of the Buyer, each as in effect as of the Closing; and

(c)  copies of the resolutions duly adopted by the Buyer's board of directors authorizing the execution, delivery and performance of this Agreement and each of the other transactions contemplated hereby.

Section 4.4    *Management Transition.*  The Sellers and the Buyer shall enter into a management agreement substantially in the form of <u>Exhibit D</u> (the "<u>Management Agreement</u>") on the date hereof.  Pursuant to the Management Agreement, the Buyer shall agree to fund the continued operations of the Business as set forth in the Management Agreement and shall act as manager of the operations in each state or jurisdiction for which a FCC Consent or State Regulatory Consent has not been obtained on behalf of Winstar and at the direction of Winstar and consistent with all applicable laws and regulations.  At such time as any State Regulatory Consent and any FCC Consent shall have become Final Orders, the corresponding State Regulatory License and FCC License shall be promptly transferred in a manner reasonably requested by the Buyer.

ARTICLE V
REPRESENTATIONS AND WARRANTIES OF THE BUYER

As an inducement to the Sellers to enter this Agreement and to consummate the transactions contemplated hereby, the Buyer represents and warrants to the Sellers as follows:

Section 5.1    *Organization.*  The Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as is now being conducted.

Section 5.2    *Authority Relative to this Agreement.*  The Buyer has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by the board of directors of the Buyer and no other corporate proceedings on the part of the Buyer are necessary to authorize this Agreement or to consummate the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by the Buyer, and assuming that this Agreement constitutes a valid and binding agreement of the Sellers, constitutes a valid and binding agreement of the Buyer, enforceable against the Buyer in accordance with its terms,

13

except that such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

Section 5.3     *Consents and Approvals; No Violation.*  Subject to the entry of the Sale Order, the receipt of the FCC Consents, the receipt of the State Regulatory Consents and receipt of the Other Regulatory Approvals which may be required, neither the execution and delivery of this Agreement by the Buyer nor the purchase by the Buyer of the Purchased Assets and the assumption by the Buyer of the Assumed Liabilities and Assumed Agreements pursuant to this Agreement will (a) conflict with or result in any breach of any provision of the Certificate of Incorporation or Bylaws (or other similar governing documents) of the Buyer or (b) require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority which has not been otherwise obtained or made (other than any filings required by the Securities Act, the Exchange Act or the rules of the New York Stock Exchange).

Section 5.4     *Qualifications to Hold Permits.*  The Buyer is aware of no financial or other bases on which it would be reasonably be expected to be deemed not qualified to hold the FCC Licenses, the State Regulatory Licenses or any of the other Permits, including any foreign ownership that would disqualify or limit its ability to control the FCC Licenses and State Regulatory Licenses.  Other than revocations for failure to pay fees or make required filings (all of which have been remedied prior to the date hereof), neither the Buyer nor any of its Affiliates has had any material permit, certificate, license, franchise or other government authorization, consent or approval revoked or rescinded or has been subject to any material proceeding or investigation by the FCC or any comparable state regulatory agency with respect to any of its or its Affiliates' operations.

Section 5.5     *Legal Proceedings and Judgments.*  There are no material claims, actions, proceedings or investigations pending or, to the knowledge of the Buyer, threatened against or relating to the Buyer before any court or other Governmental Authority acting in an adjudicative capacity which could reasonably be expected to materially adversely affect the Buyer's ability to consummate the transactions contemplated hereby.

Section 5.6     *Brokers.*  No Person is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by the Buyer or any of its Affiliates in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Buyer.

Section 5.7     *Buyer Financing.*  As of the date hereof and as of the Closing Date, the Buyer has and will have funds available to it sufficient to (i) operate the Business pursuant to the terms of the Management Agreement, (ii) deliver the Purchase Price at the Closing, and (iii) pay all of its fees and expenses incurred in connection with the transactions contemplated hereby, including all cure payments that are required to be paid in respect of Assumed Agreements (the "*Buyer Financing*").

Section 5.8     *Capitalization.*  The authorized capital stock of the Buyer shall consist of 10,000 shares of Buyer Common Stock and 500,000 shares of Buyer Preferred Stock, of which 950 shares of Buyer Common Stock and 68,000 shares of Buyer Preferred Stock shall be issued

and outstanding immediately prior to the Closing. All such issued and outstanding shares of Buyer Common Stock and Buyer Preferred Stock have been duly authorized and validly issued, are fully paid and nonassessable, and have been issued in accordance with all applicable laws. The Buyer has reserved an aggregate of 50 shares of Buyer Common Stock for issuance hereunder.

Section 5.9    *Valid Issuance of IDT and Buyer Shares*. The IDT Shares and the Buyer Shares, when issued and delivered hereunder will be duly and validly issued, fully paid, and nonassessable, with no personal liability attaching to ownership thereof, free of Encumbrances created by the Buyer or IDT Corporation and not subject to preemptive or similar rights of the shareholders of the Buyer and will be free of restrictions on transfer other than under applicable state and federal securities laws.

Section 5.10   *Disclaimer of Other Representations and Warranties*. The Buyer hereby acknowledges and agrees that the Buyer is purchasing the Purchased Assets on an "as-is, where-is" basis and that the Sellers make no representation or warranty whatsoever and none shall be implied at law or in equity.

## ARTICLE VI
## COVENANTS OF THE PARTIES

Section 6.1    *Conduct of Business*. (a) Except as required (other than pursuant to a request, application or motion by any Seller) by the Bankruptcy Court and the Bankruptcy Code, during the period commencing on the date of this Agreement and ending on the Closing Date, the Sellers shall (i) operate the Business in the usual, regular and ordinary course as conducted during the 30 days prior to December 17, 2001 (ii) other than as permitted in writing by the Buyer, use their reasonable efforts to preserve in all material respects the Business, its employees and its operations, and (iii) refrain from executing any material contract other than in the ordinary course as conducted during the 30 days prior to December 17, 2001.

(b) Prior to the Closing Date, without the prior written consent of the Buyer, no Seller shall terminate, extend or otherwise amend any of the FCC Licenses or State Regulatory Licenses, other than in the ordinary course of business. Prior to the Closing Date, without the prior written consent of the Buyer, no Seller shall sell, lease (as lessor), transfer or otherwise dispose of, any of the Purchased Assets.

Section 6.2    *Access to Information; Maintenance of Records*. (a) Between the date of this Agreement and the Closing Date, each Seller shall, during ordinary business hours, upon reasonable notice (i) give the Buyer and the Buyer Representatives reasonable access to all books, records, plants, offices and other facilities and properties constituting the Purchased Assets to which the Buyer is not denied access by law, (ii) permit the Buyer to make such reasonable inspections thereof as the Buyer may reasonably request, (iii) furnish the Buyer with such financial and operating data and other information with respect to the Business as the Buyer may from time to time reasonably request, (iv) furnish the Buyer a copy of each material report, schedule or other document filed or received by such Seller with respect to the Business with the SEC and other Governmental Authorities; *provided, however*, that (A) any such access shall be

*Rider 6.1 (c)*

15

usual, regular and ordinary course as conducted during the 30 days prior to December 17, 2001 (ii) other than as permitted in writing by the Buyer, use their reasonable efforts to preserve in all material respects the Business, its employees and its operations, and (iii) refrain from executing any material contract other than ~~in the usual regular and~~ ordinary course as conducted during the 30 days prior to December 17, 2001.

(b) Prior to the Closing Date, without the prior written consent of the Buyer, no Seller shall terminate, extend or otherwise amend any of the FCC Licenses or State Regulatory Licenses, other than in the ordinary course of business. Prior to the Closing Date, without the prior written consent of the Buyer, no Seller shall sell, lease (as lessor), transfer or otherwise dispose of, any of the Purchased Assets. ~~the assets acquired by~~ *managed under* *the Management Agreement*

~~(c) Prior to the termination of the Management Agreement, the Buyer shall take no action or actions which would constitute the exercise of control over the FCC Licenses or with respect to State Regulatory Licenses, in violation of applicable law; provided that performance under the Management Agreement shall not be deemed a breach of this Section 7.1(d).~~

*Redline 6.1(c)*

~~Section 6.2~~    ~~*Access to Information; Maintenance of Records*~~

. (a) Between the date of this Agreement and the Closing Date, each Seller shall, during ordinary business hours, upon reasonable notice (i) give the Buyer and the Buyer Representatives reasonable access to all books, records, plants, offices and other facilities and properties constituting the Purchased Assets to which the Buyer is not denied access by law, (ii) permit the Buyer to make such reasonable inspections thereof as the Buyer may reasonably request, (iii) furnish the Buyer with such financial and operating data and other information with respect to the Business as the Buyer may from time to time reasonably request (iv) furnish the Buyer a copy of each material report, schedule or other document filed or received by such Seller with respect to the Business with the SEC and other Governmental Authorities; *provided, however,* that (A) any such access shall be conducted in such a manner so as not to interfere unreasonably with the operation of the Business, (B) such Seller shall not be required to take any action which would constitute a waiver of the attorney-client privilege and (C) such Seller need not supply the Buyer with any information which such Seller is under a legal obligation not to supply. Notwithstanding anything in this Section 6.2(a) to the contrary, the Buyer shall not have access to any of the Employee Records and personnel and medical records, which in such Seller's good faith judgment is sensitive or the disclosure of which could subject such Seller to any material risk of substantial liability.

(b) The Buyer and the Sellers acknowledge that they are subject to the Confidentiality Agreement. All information furnished to or obtained by the Buyer or any of the Buyer Representatives or the Sellers or any of the Sellers' Representatives pursuant to this Agreement shall be subject to the provisions of the Confidentiality Agreement and shall be treated as Confidential Information for all purposes of the Confidentiality Agreement. Furthermore, the Buyer acknowledges that the Sellers or any of the Sellers' Representatives may furnish Confidential Information to counsel for the Creditors' Committee and to the Pre-petition Agent and the Post-petition Agent and their respective counsel, subject to the provisions of the

conducted in such a manner so as not to interfere unreasonably with the operation of the Business, (B) such Seller shall not be required to take any action which would constitute a waiver of the attorney-client privilege and (C) such Seller need not supply the Buyer with any information which such Seller is under a legal obligation not to supply. Notwithstanding anything in this Section 6.2(a) to the contrary, the Buyer shall not have access to any of the Employee Records and personnel and medical records, which in such Seller's good faith judgment is sensitive or the disclosure of which could subject such Seller to any material risk of substantial liability.

(b) The Buyer and the Sellers acknowledge that they are subject to the Confidentiality Agreement. All information furnished to or obtained by the Buyer or any of the Buyer Representatives or the Sellers or any of the Sellers' Representatives pursuant to this Agreement shall be subject to the provisions of the Confidentiality Agreement and shall be treated as Confidential Information for all purposes of the Confidentiality Agreement. Furthermore, the Buyer acknowledges that the Sellers or any of the Sellers' Representatives may furnish Confidential Information to counsel for the Creditors' Committee and to the Pre-petition Agent and the Post-petition Agent and their respective counsel, subject to the provisions of the Confidentiality Agreement. The terms of the Confidentiality Agreement shall cease to apply to the parties thereto after the Closing Date.

(c) For a period of the later of (x) three (3) years (subject to Section 6.7(a)) after the Closing Date and (y) the date of entry of an order of the Bankruptcy Court closing the Chapter 11 Cases, or if converted to a case under Chapter 7 of the Bankruptcy Code, an order of the Bankruptcy Court closing such case, each party and its representatives shall have reasonable access to all of the books and records relating to the Business or the Purchased Assets, including all information pertaining to the Assumed Agreements, all Employee Records or other personnel and medical records required by law, legal process or subpoena, in the possession of the other party to the extent that such access may reasonably be required by such party in connection with the Assumed Liabilities or the Excluded Liabilities, or other matters relating to or affected by the operation of the Business and the Purchased Assets. Such access shall be afforded by the party in possession of such books and records upon receipt of reasonable advance notice and during normal business hours; *provided, however*, that (i) any such access shall be conducted in such a manner as not to interfere unreasonably with the operation of the business of any party or its Affiliates, (ii) no party shall be required to take any action which would constitute a waiver of the attorney-client privilege, and (iii) no party need supply the other party with any information which such party is under a legal obligation not to supply. The party exercising this right of access shall be solely responsible for any costs or expenses incurred by it pursuant to this Section 6.2(c). If the party in possession of such books and records shall desire to dispose of any such books and records upon or prior to the expiration of such period, such party shall, prior to such disposition, give the other party a reasonable opportunity at such other party's expense, to segregate and remove such books and records as such other party may select. Furthermore, the Buyer acknowledges that Winstar shall have reasonable access (as set forth above) to all Transferred Employees with respect to the litigation matters set forth on Schedule 2.2(d) for so long as such matters are pending. In addition to the foregoing, the Buyer agrees to maintain the Employee Records in its possession for a period of three (3) years after the Closing Date and to give former and current employees of the Sellers reasonable access to such Employee Records during such period.

16

Section 6.3    *Expenses*. Except to the extent specifically provided herein or in the Sale Order or the Management Agreement, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the party incurring such costs and expenses.

Section 6.4    *Further Assurances*. (a) Subject to the terms and conditions of this Agreement, each of the parties hereto shall use reasonable best efforts (subject, in the case of the Sellers or any Chapter 7 trustee, to available funding and without being required to make any payment to any third party or to incur any significant economic burden) to take, or cause to be taken, all action, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable laws and regulations to consummate and make effective the sale of the Purchased Assets in accordance with this Agreement, including using reasonable best efforts to ensure timely satisfaction of the conditions precedent to each party's obligations hereunder. Neither any of the Sellers, on the one hand, nor the Buyer, on the other hand, shall, without the prior written consent of the other party (it being understood that the written consent of Winstar shall have the same effect as the consent of all of the Sellers), take any action which would reasonably be expected to prevent or materially impede, interfere with or delay the transactions contemplated by this Agreement. From time to time on or after the Closing Date, each Seller shall, at its own expense, execute and deliver such documents to the Buyer as the Buyer may reasonably request in order to more effectively vest in the Buyer such Seller's title to the Purchased Assets subject to Permitted Encumbrances. From time to time after the date hereof, the Buyer shall, at its own expense, execute and deliver such documents to each Seller as such Seller may reasonably request in order to more effectively consummate the sale of the Purchased Assets and the assumption and assignment of the Assumed Liabilities and the Assumed Agreements in accordance with this Agreement.

(b) In the event that any Purchased Asset shall not have been conveyed to the Buyer at the Closing, the applicable Seller shall, subject to <u>Section 6.4(c)</u>, use reasonable best efforts to convey such asset to the Buyer as promptly as is practicable after the Closing.

(c) To the extent that any of the Sellers' rights under any Assumed Agreement may not be assigned without the consent of another Person which consent has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful and such Seller shall cooperate (without being required to make any payment to any third party or to incur any significant economic burden) to obtain any such required consent(s) as promptly as reasonably possible unless failure to obtain such consent would not, individually or in the aggregate, have a Material Adverse Effect, and the Buyer agrees to fully cooperate with such Seller in its efforts to obtain any such consent (including the submission of such financial or other information concerning the Buyer and the execution of any assumption agreements or similar documents reasonably requested by a third party) without being required to make any payment to any third party or to incur any economic burden.

Section 6.5    *Public Statements*. Winstar and the Buyer shall consult with each other prior to issuing any public announcement, statement or other disclosure with respect to this Agreement or the transactions contemplated hereby, except that the parties may make disclosures with respect to this Agreement and the transactions contemplated hereby to the extent and under

the circumstances in which the parties are expressly permitted by the Confidentiality Agreement to make disclosures of Confidential Information or otherwise required by law or New York Stock Exchange regulations.

Section 6.6    *Governmental Authority Consents and Approvals*.    (a)    FCC Consents. Subject to Section 6.6(d), within thirty (30) days after the entry of the Sale Order, the Buyer shall prepare and file, or cause to be prepared and filed, the necessary application or applications with the FCC seeking the FCC Consents and thereafter, shall promptly make all other filings and notifications and promptly seek all such consents, licenses, approvals, permits, waivers, orders or authorizations as may be required to obtain the FCC Consents. The Sellers shall cooperate with the Buyer to the fullest extent reasonably possible to provide all necessary information for the preparation of such applications within ten (10) Business Days after entry of the Sale Order, including those portions of such applications which are required to be completed by the Sellers. The Sellers and the Buyer shall prosecute such applications with all reasonable diligence and otherwise use their reasonable best efforts (including, with respect to Buyer, providing financial assurance to the extent required) to obtain grants of approval as expeditiously as practicable. The Buyer shall bear all reasonable fees payable by the Buyer and/or the Sellers to the FCC and to any outside counsel employed by the Sellers or Buyer in connection with the preparation and filing of the applications for the FCC Consents.

(b) State Regulatory Consents.    Subject to Section 6.6(e), within thirty (30) days after the entry of the Sale Order, the Sellers and/or the Buyer, as applicable, shall each file or cause to be filed with any state or local regulatory authorities analogous to the FCC applications for the approval of the assignment of the State Regulatory Licenses. The Sellers and the Buyer shall prosecute such applications with all reasonable diligence and otherwise use their reasonable best efforts (including, with respect to Buyer, providing financial assurance to the extent required) to obtain grants of approval as expeditiously as practicable. The Buyer shall bear all reasonable fees payable by the Buyer and/or the Sellers to the state and local regulatory entities and to any outside counsel employed by the Sellers or Buyer in connection with the preparation and filing of the applications for the State Regulatory Consents.

(c) Other Governmental Authority Approvals.    The Sellers and the Buyer shall each use their reasonable best efforts to cooperate with each other in determining any filings, notifications and requests for approval (other than the FCC Consents and the State Regulatory Consents) required to be made and received prior to the Closing under applicable law or regulation (collectively, the "*Other Regulatory Approvals*"). In connection with any Other Regulatory Approvals, neither the Buyer nor any of the Sellers will, and each of them will use its reasonable best efforts not to, cause or permit any of its officers, directors, partners or other Affiliates to, take any action which could reasonably be expected to materially and adversely affect the submission of any required filings or notifications or the grant of any such approvals.

(d) Cooperation.    The Sellers and the Buyer (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other party to review in advance any proposed written communication or information submitted to any such Governmental Authority in response thereto. In addition, each of the Sellers and the Buyer shall not agree to participate in any meeting with any

18

Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement, the transactions contemplated hereby or any such filing, notification or request for approval unless it consults with the other party in advance and, to the extent permitted by any such Governmental Authority, gives the other party the opportunity to attend and participate threat, in each case to the maximum extent practicable. Subject to any restrictions under applicable laws, rules or regulations, each of the Sellers and the Buyer shall furnish the other party with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements and to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval. The Sellers and the Buyer shall also furnish the other party with such necessary information and assistance as such other party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration, or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval. The Sellers and the Buyer shall prosecute all required requests for approval with all necessary diligence and otherwise use their respective reasonable best efforts to obtain the grant thereof by a Final Order as soon as possible.

Section 6.7 *Tax Matters.* (a) <u>Cooperation on Tax Matters</u>. The Buyer and the Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of all Tax Returns in connection with matters relating to or affected by the operations of the Sellers prior to the Closing, including the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Notwithstanding anything to the contrary herein, the Buyer and the Sellers shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least six (6) years following the Closing Date. At the end of such period, each party shall provide the other with at least thirty (30) days prior written notice before destroying any such books and records, during which period the party receiving such notice can elect to take possession, at its own expense, of such books and records. The Sellers and the Buyer shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business.

(b) <u>Transfer Taxes</u>. All excise, sales, use, transfer, value added, registration, stamp, recording, documentary, conveyancing, franchise, property, transfer, gains and similar Taxes, levies, charges and recording, filing and other fees (collectively, "*Transfer Taxes*") incurred in connection with the transactions contemplated by this Agreement shall be paid by the Sellers. The Sellers shall, at their own expense, timely pay and file all necessary Tax returns and other documentation with respect to all such Transfer Taxes and, if required by applicable law, the Buyer shall join in the execution of any Tax Returns and other documentation at the Sellers' request. Notwithstanding the foregoing, the Sellers shall seek in the Sale Order a decretal paragraph which provides that, in accordance with Section 1146(c) of the Bankruptcy Code, the transactions contemplated hereby are steps in the formulation, or anticipation of the formulation, of a Chapter 11 plan for the Sellers and, as such, the making or delivery of any instrument of

19

transfer to effectuate the transactions contemplated hereby shall not be taxed under any law imposing a stamp tax or similar tax.

Section 6.8    *Litigation Support.*  In the event and for so long as any party is actively contesting or defending against any action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand in connection with (a) any transaction contemplated under this Agreement or (b) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving the Sellers, the other party will cooperate with the contesting or defending party and its counsel in the contest or defense, make available its personnel, and provide such testimony and access to its books and records as shall be reasonably necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending party.  In the event that the Sale Order is the subject of an appeal, the Buyer and the Sellers agree to use reasonable best efforts to seek an expedited review and decision of such appeal and to seek the dissolution of any stay which might be entered in connection with such an appeal; *provided* that each party shall bear the cost of complying with this provision.

Section 6.9    *Notification.*  The Sellers shall notify the Buyer and keep it advised of the occurrence, to the Knowledge of the Sellers, of (a) notice of any litigation or administrative proceeding commenced against any Seller which could, if adversely determined, have a Material Adverse Effect (other than any such action commenced in the Bankruptcy Court) and (b) any material damage or destruction of any of the Purchased Assets.  The Buyer shall notify the Sellers prior to the Closing Date and keep them advised of the occurrences of any event or occurrence which could reasonably be expected to materially adversely affect the Buyer's ability to consummate the transactions contemplated hereby.

*or threatened in writing*

Section 6.10    *Submission for Bankruptcy Court Approval.*  (a)  In connection with the transactions contemplated by this Agreement, the Sellers shall, within one (1) Business Day of the date hereof, file with the Bankruptcy Court a form of order or orders pursuant to Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code (A) authorizing and approving the sale to the Buyer pursuant to this Agreement of the Purchased Assets, and approving the terms of this Agreement, (B) finding the Buyer is acting in good faith, and is entitled to the protections of a Buyer under Section 363(m) of the Bankruptcy Code and (C) containing such other findings and provisions as may be reasonably requested by the Buyer (including a finding that notice of the transactions contemplated by this Agreement, including notice to all parties to the Assumed Agreements, has been properly given) in the form and substance of <u>Exhibit E</u> or otherwise in form and substance acceptable to the Buyer in its sole discretion (the "<u>*Sale Order*</u>").

(b) The Sellers and the Buyer shall each use their reasonable best efforts, and shall cooperate, assist and consult with each other, to secure the Bankruptcy Court's approval of (i) the Sale Order no later than one (1) Business Day after the date of this Agreement and (ii) any other order of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby, within five (5) days following the date of filing of the motion for approval thereof.  The Sellers and the Buyer shall consult with, and seek the advice of, one another regarding pleadings which any of them intend to file, or positions any of them intend to take, with the Bankruptcy Court in connection with or which might reasonably affect, the Bankruptcy

Court's approval of the Sale Order. None of Sellers or the Buyer will file any pleading or take any position that is inconsistent with obtaining the Bankruptcy Court's approval of the Sale Order or any other such order. The Sellers shall promptly (and, in any event, within one (1) Business Day after the receipt of any written request) provide the Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court (and other courts) pertaining to the motion for approval of the Sale Order or any other order relating to any of the transactions contemplated by this Agreement.

(c) If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Order or other such order), the Sellers and the Buyer will cooperate in taking such steps diligently to prosecute such appeal, petition or motion and each of the Seller and the Buyer shall use its reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.

(d) As a condition to Buyer's obligations hereunder, Sellers have agreed to pay to Buyer an amount equal to 2.5% of the Cash Payment (the "*Topping Fee*") if (i) this Agreement is terminated (other than as a result of a default by the Buyer in the performance of its obligations hereunder), (ii) the Sellers shall enter into one or more sale transactions and (iii) such transaction or shall be consummated and shall close, in accordance with its terms. The Topping Fee shall be paid when the Sellers receive the purchase price from another buyer (it being understood that placing funds in escrow shall not constitute receipt by the Sellers until such funds are released to the Sellers).

Section 6.11   *D&O Policies*. The Sellers shall maintain in effect the D&O Policies for the benefit of the Sellers' respective current and former directors and officers until such time as the D&O Policies expire in accordance with their terms.

Section 6.12   *Use of Winstar Name*. The Sellers agree that no later than 60 days after the Closing Date, the Sellers (i) shall cause the names of Winstar and its Subsidiaries which currently utilize the name "Winstar" to be changed to a name that does not include the name "Winstar" or contain any references thereto and (ii) shall, and shall cause their Affiliates, not to advertise or hold themselves out as Winstar or an Affiliate thereof. It is expressly understood and agreed by and between the parties that this covenant shall survive the Closing and that Buyer shall have all rights and remedies available at law or in equity to ensure strict compliance with this covenant by the Sellers, or their current or former Affiliates.

ARTICLE VII
CONDITIONS TO CLOSING

Section 7.1   *Conditions to Each Party's Obligations to Effect the Closing*. The respective obligations of each party to effect the sale and purchase of the Purchased Assets shall be subject to the fulfillment at or prior to the Closing Date of the following conditions:

(a) no preliminary or permanent injunction or other order or decree by any federal or state court which prevents the consummation of the sale of a material part of the

21

Purchased Assets contemplated hereby shall have been issued and remain in effect (each party agreeing to use its reasonable efforts to have any such injunction, order or decree lifted) and no statute, rule or regulation shall have been enacted by any Governmental Authority which prohibits the consummation of the sale of the Purchased Assets; and

(b) the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be in full force and effect and shall not have been stayed, modified, reversed or amended (except, if modified or amended with the written consent of the Sellers and the Buyer).

Section 7.2    *Conditions to Obligations of the Buyer*.  The obligation of the Buyer to effect the purchase of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions:

(a) the Sellers shall have performed and complied in all material respects with the covenants contained in this Agreement which are required to be performed and complied with by the Sellers on or prior to the Closing Date;

(b) the Sellers and the Buyer shall have entered into the Management Agreement substantially in the form of Exhibit D, if necessary, pursuant to Section 4.4;

(c) the Post-petition Agent, on behalf of its lender participants, shall have ~~agreed in writing that any and all of their Encumbrances on the Purchased Assets shall attach only to the proceeds of the transactions contemplated hereby and not to the Purchased Assets~~; and consented to the sale of the Purchased Assets as provided herein and in the Sale Order,

(d) the Buyer shall have received the other items to be delivered pursuant to Section 4.2.

Any condition specified in this Section 7.2 may be waived by the Buyer; *provided* that no such waiver shall be effective against the Buyer unless it is set forth in a writing executed by the Buyer.

Section 7.3    *Conditions to Obligations of the Sellers*.  The obligation of each Seller to effect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions:

(a) the Buyer shall have performed and complied in all material respects with the covenants contained in this Agreement which are required to be performed and complied with by the Buyer on or prior to the Closing Date and the representations and warranties of the Buyer which are set forth in this Agreement (without regard as to any qualifications therein as to materiality) shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date (except to the extent that any such representation or warranty speaks as of a particular date) as though made at and as of the Closing Date;

(b) each Seller shall have received the other items to be delivered to it pursuant to Section 4.3; and

22

(c) the Escrow Agent shall have simultaneously with the Closing released the Purchase Price in accordance with the Escrow Agreement in accordance with <u>Section 3.2</u>.

Any condition specified in this <u>Section 7.3</u> may be waived by the Sellers; *provided* that no such waiver shall be effective against any Seller unless it is set forth in writing executed by such Seller.

ARTICLE VIII
TERMINATION AND ABANDONMENT

Section 8.1    *Termination.*  This Agreement may be terminated at any time prior to the Closing Date, unless otherwise stated, by:

(a) mutual written consent of Winstar (on behalf of the Sellers) and the Buyer;

(b) the Sellers, if there has been a material violation or breach by the Buyer of any covenant, representation or warranty made by it contained in this Agreement or the Management Agreement which has prevented the satisfaction of any condition to the obligations of the Sellers to effect the Closing;

(c) the Buyer, if there has been a material violation or breach by the Sellers of any covenant made by them in this Agreement or the Management Agreement which has prevented the satisfaction of any condition to the obligations of the Buyer to effect the Closing.

(d) the Buyer or the Sellers, if (i) there shall be any law or regulation that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited or (ii) consummation of the transactions contemplated hereby would violate any nonappealable final order, decree or judgment of (A) the Bankruptcy Court or (B) any court or governmental body having competent jurisdiction;

(e) the Buyer or the Sellers, if the Sale Order has not been entered by the Bankruptcy Court within one (1) Business Day after the date hereof; *provided* that the Buyer or the Sellers, as the case may be, shall not be entitled to terminate this Agreement pursuant to this <u>Section 8.1(e)</u> if the failure to obtain such approval within such time period results primarily from such party itself breaching any representation, warranty or covenant contained in this Agreement;

(f) the Buyer or the Sellers, if the Sale Order has been stayed, vacated, reversed or amended by any court of competent jurisdiction (except, as may be modified or amended with the written consent of the Sellers and the Buyer, in their sole discretion); and

(g) the Buyer or the Sellers, if the Closing Date shall not have occurred on or prior to noon, New York City time, on December 19, 2001 (the "*Termination Date*"); *provided* that the Buyer or the Sellers, as the case may be, shall not be entitled to terminate this Agreement pursuant to this <u>Section 8.1(g)</u> if the failure of the Closing to

occur on or prior to such date results primarily from such party itself breaching any representation, warranty or covenant contained in this Agreement.

Section 8.2     *Procedure and Effect of Termination.*  In the event of termination of this Agreement and abandonment of the transactions contemplated hereby by either or both of the parties pursuant to <u>Section 8.1</u>, written notice thereof shall forthwith be given by the terminating party to the other party (it being understood that notice to Winstar shall have the same effect as notice to all of the Sellers) and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any of the parties hereto.  If this Agreement is terminated as provided herein:

(a) said termination shall be the sole remedy, subject to <u>Sections 6.10(d)</u> and <u>8.2(b)</u>, of the parties hereto with respect to breaches of any covenant, representation or warranty contained in this Agreement and none of the parties hereto nor any of their respective trustees, directors, officers or Affiliates, as the case may be, shall have any liability or further obligation to the other party or any of their respective trustees, directors, officers or Affiliates, as the case may be, pursuant to this Agreement, except for the parties hereto in each case as stated in this <u>Section 8.2</u>, <u>Section 9.15</u> and in <u>Sections 6.2(b)</u> and <u>6.3</u>; *provided, however*, the Sellers shall not be responsible ~~for liability~~ for any misrepresentation or breach of any warranty or covenant by the Sellers contained in this Agreement prior to the time of such termination;
〔or liable

(b) the Escrow Amount shall be released to the Buyer or the Sellers as set forth in the Escrow Agreement;

(c) all filings, applications and other submissions made pursuant to this Agreement, to the extent practicable, shall be withdrawn from the agency or other Person to which they were made; and

(d) all Confidential Information from any and all of the Sellers shall be returned to Winstar, and all Confidential Information from the Buyer shall be returned to the Buyer.

ARTICLE IX
MISCELLANEOUS PROVISIONS

Section 9.1     *Amendment and Modification.*  This Agreement may be amended, modified or supplemented only by written agreement of Winstar (on behalf of the Sellers) and the Buyer.

Section 9.2     *Waiver of Compliance; Consents.*  Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, covenant or condition herein may be waived by the party entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, or condition shall not operate as a waiver of, or estoppel with respect to any subsequent or other failure.

Section 9.3     *Survival.*  The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing Date hereunder, and neither party shall

24

have any liability to the other after the Closing Date for any breach thereof. The representations and warranties set forth in this Agreement constitute the only representations and warranties made by the Buyer with respect to the transactions contemplated hereby and the Purchased Assets transferred pursuant hereto, and such representations and warranties supersede all representations and warranties, written or oral, previously made by the Buyer. Furthermore, the parties agree that, other than the right to terminate as contained in Article VIII of this Agreement, neither party shall have any recourse to the other party, or to any of the officers, directors, or Affiliates of such party, in the event any of the representations and warranties made herein or deemed made are untrue as at any time. The only remedy of the Seller for a breach of such representations and warranties shall be the Seller's option, under certain circumstances, not to close and to retain the Purchase Price in accordance with and subject to the limitations in Section 7.1, 7.3, 8.1(b) and 8.2(b). The parties agree that specific performance shall be available as a remedy to require performance of each party's covenants contained in this Agreement. The parties hereto agree that only the covenants contained in this Agreement to be performed at or after the Closing Date shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing Date for any breach thereof.

Section 9.4     *No Impediment to Liquidation.* Subject to Sections 2.2(e), 6.2(c), 6.4 and 6.7, nothing herein shall be deemed or construed as to limit, restrict or impose any impediment to the Sellers' right to liquidate, dissolve and wind-up its affairs and to cease all business activities and operations at such time as it may determine following the Closing, including conversion to Chapter 7. Subject to Sections 2.2(e), 6.2(c), 6.4 and 6.7, the Sellers shall not be obligated to retain assets or employees or to continue operations following the Closing (or to retain outsource assistance) in order to satisfy its obligations hereunder except to the extent that such would directly contravene the obligations of the Sellers under this Agreement or the Management Agreement.

Section 9.5     *Notices.* All notices and other communications hereunder shall be in writing and shall be deemed given (i) when personally sent/delivered, by facsimile transmission (with hard copy to follow) or sent by reputable express courier (charges prepaid) or (ii) five (5) days following mailing by registered or certified mail postage prepaid and return receipt requested. Unless another address is specified in writing, notices, demands and communications to any Seller and the Buyer shall be sent to the addresses indicated below:

(a) If to any of the Sellers, to:

c/o Winstar Communications, Inc.
The Winstar Building
685 Third Avenue
31st Floor
New York, New York 10017
Facsimile: (212) 792-9348
Attention: Paul Street, CRO

with a copy to:

25

Shearman & Sterling
599 Lexington Avenue
New York, New York  10022
Facsimile:  (212) 848-7179
Attention:  Mark J. Shapiro, Esq.
　　　　　Stephen M. Besen, Esq.

(b) if to the Buyer, to:

c/o IDT Corporation
520 Broad Street
Newark, New Jersey 07102
Facsimile:  (973) 438-1503
Attention:  General Counsel

with a copy to:

McDermott, Will & Emery
50 Rockefeller Plaza
New York, New York 10020
Facsimile: (212) 547-5444
Attention: Mark S. Selinger, Esq.
　　　　　David C. Albalah, Esq.

Section 9.6    *Assignment*.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns and with respect to any of the Sellers, any entity that may succeed to substantially all the assets of such Seller, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto, including by operation of law, without the prior written consent of the other party; *provided, however,* that the Buyer may assign this Agreement or any of the rights, interests or obligations hereunder to any Affiliate *provided* that Buyer shall remain liable hereunder.  Any assignment of this Agreement or any of the rights, interests or obligations hereunder in contravention of this Section 9.6 shall be null and void and shall not bind or be recognized by any of the Sellers or the Buyer. *Notwithstanding any thing herein to the contrary, the Seller may ~~distribute~~ subject to applicable law, distribute the*

Section 9.7    *Third-Party Beneficiaries*.  Nothing in this Agreement shall be construed as giving any Person, including any counter-party to an Assumed Agreement, other than the parties hereto, any legal or equitable right, remedy or claim under or with respect to this Agreement.

Section 9.8    *Severability*.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in

*Purchase Price, including any IDT Shares or Buyer Shares to its Creditors.*

26

58222.1001

good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 9.9    *Governing Law.*    This Agreement shall be governed by and construed in accordance with the laws of the State of New York (regardless of the laws that might otherwise govern under applicable New York principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies.

Section 9.10    *Submission to Jurisdiction.*    The parties hereto irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith or any of the transactions contemplated hereby or thereby. Each party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such dispute or proceedings may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum in connection therewith.

Section 9.11    *Counterparts.*    This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which, when executed and delivered, shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

Section 9.12    *Incorporation of Schedule and Exhibits.*    The Disclosure Schedule and all Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

Section 9.13    *Entire Agreement.*    This Agreement (including the Exhibits and the Disclosure Schedule) and the Confidentiality Agreement constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings among the parties with respect thereto.

Section 9.14    *Headings.*    The descriptive headings contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.15    *Remedies.*    Subject to Section 9.3, the Sellers and the Buyer hereby acknowledge and agree that money damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement and that, in such event, the Sellers or their successors or assigns, or the Buyer or its successors or assigns, as the case may be, may, in addition to any other rights and remedies existing in their favor, apply to the Bankruptcy Court or any other court of competent jurisdiction for specific performance, injunctive and/or other relief in order to enforce or prevent any violations of this Agreement.

Section 9.16    *Bulk Sales or Transfer Laws.*    The Buyer hereby waives compliance by the Sellers with the provisions of the bulk sales or transfer laws of all applicable jurisdictions.

27

* * * * *

WP3:714386.1

58222.1001

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written by their respective officers thereunto duly authorized.

**IDT WINSTAR ACQUISITION, INC.**

By: _____
   Name: Charles HF Garner
   Title: President

**WINSTAR COMMUNICATIONS, INC.**

By: _____
   Name: T. R. Grah
   Title: Executive Vice Presdt.

**WINSTAR WIRELESS, INC.**

By: _____
   Name: T. R. GRAHAM
   Title: VICE PRESIDENT

**WCI CAPITAL CORP.**

By: _____
   Name: T. R. GRAHAM
   Title: VICE PRESIDENT

**WINSTAR EQUIPMENT CORP.**

By: _____
   Name: T. R. GRAHAM
   Title: VICE PRESIDENT

WINSTAR EQUIPMENT II CORP.

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WINSTAR GOVERNMENT SOLUTIONS, LLC.

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WINSTAR LMDS, LLC

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WINSTAR NETWORK EXPANSION, LLC

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WINSTAR WIRELESS FIBER CORP.

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WINSTAR WIRELESS OF DELAWARE, LLC

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

**WINSTAR WIRELESS OF GEORGIA, LLC**

By: _____
      Name: T. R. GRAHAM
      Title: VICE PRESIDENT


**WINSTAR WIRELESS OF INDIANA, LLC**

By: _____
      Name: T. R. GRAHAM
      Title: VICE PRESIDENT


**WINSTAR WIRELESS OF NEW JERSEY, LLC**

By: _____
      Name: T. R. GRAHAM
      Title: VICE PRESIDENT


**WINSTAR WIRELESS OF NEW YORK, LLC**

By: _____
      Name: T. R. GRAHAM
      Title: VICE PRESIDENT


**WINSTAR WIRELESS OF PENNSYLVANIA, LLC**

By: _____
      Name: T. R. GRAHAM
      Title: VICE PRESIDENT


**WINSTAR WIRELESS OF VIRGINIA, LLC**

By: _____
      Name: T. R. GRAHAM
      Title: VICE PRESIDENT

WINSTAR WIRELESS OF WEST VIRGINIA, LLC

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WWI LICENSE HOLDING, INC.

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WVF-CPQ 1, LLC

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WVF-CSC 1, LLC

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WVF-DL 1, LLC

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WVF-LU 2, LLC

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

WVF-I LLC

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WINSTAR CREDIT CORP.

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WINSTAR INTERNATIONAL, INC.

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WINSTAR MIDCOM ACQUISITION CORP.

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WINSTAR NEW MEDIA COMPANY, INC.

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WINSTAR INTERACTIVE VENTURES I,
INC.

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

**WINSTAR PUERTO RICO, INC.**

By: _____

    Name: *T. R. GRAHAM*

    Title: *VICE PRESIDENT*

APPENDIX I

## SUBSIDIARIES OF WINSTAR
## PARTIES HERETO

WCI Capital Corp.
Winstar Credit Corp.
Winstar Equipment Corp.
Winstar Equipment II Corp.
Winstar Government Solutions, LLC.
Winstar International, Inc.
Winstar LMDS, LLC
Winstar Midcom Acquisition Corp.
Winstar Network Expansion, LLC
Winstar Wireless Fiber Corp.
Winstar Wireless, Inc.
Winstar Wireless of Delaware, LLC
Winstar Wireless of Georgia, LLC
Winstar Wireless of Indiana, LLC
Winstar Wireless of New Jersey, LLC
Winstar Wireless of New York, LLC
Winstar Wireless of Pennsylvania, LLC
Winstar Wireless of Virginia, LLC
Winstar Wireless of Virginia, LLC
Winstar Wireless of West Virginia, LLC
WWI License Holding, Inc.
WVF-CPQ 1, LLC
WVF-CSC 1, LLC
WVF-DL 1, LLC
WVF-LU 2, LLC
WVF-I LLC
Winstar New Media Company, Inc.
Winstar Broadcasting Corp.
Winstar Interactive Ventures I, Inc.
Winstar Puerto Rico, Inc.

EXHIBIT A

ASSUMED AGREEMENTS

None.

EXHIBIT B

FORM OF BILL OF SALE

EXHIBIT C

FORM OF ESCROW AGREEMENT

EXHIBIT D

FORM OF MANAGEMENT AGREEMENT

EXHIBIT E

FORM OF SALE ORDER

**IDT CORPORATION**
520 Broad Street
Newark, New Jersey 07102


December 18, 2001


Reference is made to (a) the Asset Purchase Agreement, dated as of the date hereof (the "Purchase Agreement") among Winstar Communications, Inc., certain other Sellers and IDT Winstar Acquisition, Inc. and (b) the Management Agreement described therein. Unless otherwise defined herein, capitalized terms which are used herein shall have the meaning assigned thereto in the Purchase Agreement.

This letter shall confirm our agreement that IDT Corporation shall comply with its obligations contained in Section 3.1 of the Purchase Agreement to (a) deliver the shares of IDT Class B Stock, (b) use commercially reasonable efforts to register the shares of IDT Class B Stock as provided therein and (c) repurchase the shares of IDT Class B Stock under the circumstances and for the consideration described therein. Furthermore, IDT Corporation shall reimburse the Buyer for any amounts withdrawn from the Account (as defined in the Management Agreement) and not utilized for the purposes described in the Management Agreement. Sections 9.9, 9.10 and 9.15 of the Purchase Agreement are expressly adopted for purposes of this letter.

Very truly yours,

IDT Corporation


By: _____
Name: Charles HF Garner
Title: EVP, New Ventures

Exhibit 2

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------x
                                                     :
In re:                                               :  Chapter 11
                                                     :
WINSTAR COMMUNICATIONS, INC., et al.,                :  Case No.: 01-1430 (JJF)
                                                     :
                                                     :  Jointly Administered
              Debtors.                               :
                                                     :
                                                     :
                                                     :
-----------------------------------------------------x
```

**ORDER AUTHORIZING (i) SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS ENCUMBRANCES, AND INTERESTS, (ii) APPROVING CURE AMOUNTS WITH RESPECT TO CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (iii) AUTHORIZING THE DEBTORS TO ENTER INTO AND APPROVING MANAGEMENT AGREEMENT, (iv) APPROVING REGULATORY TRANSITION PROCESS AND (v) GRANTING RELATED RELIEF**

This matter having come before the court on (I) the motion (the "Original Motion"; terms not otherwise defined in this Sale Order shall have the meanings ascribed to such terms in the Original Motion) filed by Winstar Communications, Inc. and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), requesting the entry of (A) an order pursuant to sections 363(b) and 105(a) of title 11, United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i) approving bidding procedures, including bid protections, (ii) approving the form and manner of notice of (a) the hearing to consider granting certain bid protections (the "Bid Procedures Hearing"), (b) the hearing on the sale of certain of the Debtors' assets (the "Sale Hearing"), (c) proposed cure payments and (d) assumption and assignment of executory contracts and unexpired leases, and (iii) scheduling the Sale Hearing,

WP3:714361.3                                                          58222.1001

and (B) an order authorizing and approving (i) the sale of certain of the Debtors' assets free and clear of liens, claims and encumbrances (the "Sale") and (ii) the assumption and assignment of certain executory contracts and unexpired leases, and (II) the supplement to the Original Motion filed with the Bankruptcy Court on December 14, 2001 (the "Motion Supplement", and together with the Original Motion, the "Motion") seeking entry of an order (i) authorizing the Debtors to enter into, and approving, a management agreement substantially in the form annexed to the Motion Supplement as Exhibit A (the "Management Agreement"), (ii) approving, and authorizing the Debtors to implement, the Debtors' proposed regulatory transition process (the "Regulatory Transition Process") and (iii) granting related relief, including an extension of the period under Bankruptcy Code section 365(d)(4) within which the Debtors may decide whether to assume or reject unexpired leases of nonresidential real property; and the Court having conducted a hearing on November 27, 2001, and having entered an order dated November 27, 2001 approving the Bidding Procedures; and an auction having been held at the offices of Shearman & Sterling, counsel to the Debtors, on December 5, 2001, in accordance with the Bidding Procedures previously approved by this Court; and following the conclusion of the Auction, the Debtors, in consultation with their financial advisors, and after consultation with counsel to each of the Creditors' Committee, the Agent for the Prepetition Lenders and the Agent for the DIP Lenders, having (i) reviewed each bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale, and (ii) identified the bid of IDT Winstar Acquisition, Inc. (the "Buyer"), as set forth in the Asset Purchase Agreement, dated as of December 18, 2001 (the "Asset Purchase Agreement") as the highest and best offer for the Purchased Assets (as defined below in Paragraph H) at the Auction (the "Successful Bid"); and a hearing on the Motion

WP3:714361.3

58222.1001

having been commenced on December 10, 2001 and continued on December 17, 2001 and December 18, 2001 (the "Sale Hearing"); and all interested parties having been afforded an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered (i) the Motion, (ii) the objections thereto, if any, and (iii) the arguments of counsel made, and the evidence proffered or adduced at the Sale Hearing; and it appearing that the relief requested in the Motion and approval of the Sale of the assets to be acquired under the Asset Purchase Agreement (as defined therein, the "Purchased Assets") and the entry of an order approving the Sale (this "Sale Order") is in the best interests of the Debtors, their estates, creditors, and other parties in interest; and upon the record of the Sale Hearing, and these cases; and after due deliberation thereon; and good cause appearing therefor, it is hereby

FOUND AND DETERMINED AS FOLLOWS:[1]

A.     This Court has jurisdiction over the Motion and the transactions contemplated by the Motion pursuant to 28 U.S.C. §§157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(M). Venue of these cases and the Motion is proper pursuant to 28 U.S.C. §§1408 and 1409.

B.     The statutory predicates for the relief sought in the Motion are sections 105, 363 and 365 of 11 U.S.C. §§101 et seq. (the "Bankruptcy Code") and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure.

C.     As evidenced by the affidavits of service previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, the Cure Notices, the Sale of the Purchased

---

[1]     Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed.R.Bank.P. 7052.

WP3:714361.3                                                                                    58222.1001

Assets and of the related transactions contemplated thereby (including without limitation the entry of the Debtors into the Management Agreement and the implementation of the Regulatory Transition Process) has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure; (ii) such notice was reasonable, sufficient, and appropriate under the circumstances; and (iii) no other or further notice of the Motion, the Sale Hearing, the Cure Notices, the Sale of the Purchased Assets and all the related transactions contemplated thereby (including without limitation the entry of the Debtors into the Management Agreement and the implementation of the Regulatory Transition Process) shall be required.

D.     A reasonable opportunity to object or be heard with respect to the Motion and the relief requested in the Motion has been afforded to all interested persons and entities, including (i) counsel for the Buyer, (ii) counsel for The Bank of New York, as Agent under the Pre-Petition Credit Agreement, (iii) counsel for Citibank, N.A., as agent under the DIP Credit Agreement, (iv) counsel for the Official Committee of Unsecured Creditors (the "Creditors' Committee"), (v) the Office of the United States Trustee, (vi) each party identified by the Debtors as a potential Buyer of the Purchased Assets that was contacted as part of the Sale process, (vii) all entities known to have any asserted lien, claim, encumbrance, alleged interest in or with respect to the Purchased Assets, (viii) all applicable federal, state and local taxing authorities; and (ix) all other entities that have filed requests for notices pursuant to Bankruptcy Rule 2002.

E.     The Debtors (i) have full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated by the Motion, (ii) have all of the corporate power and authority necessary to consummate the transactions contemplated by the

4

Motion and the Asset Purchase Agreement and (iii) have taken all corporate action necessary to authorize and approve the Sale and the consummation by the Debtors of the transactions contemplated thereby.

F.    The Debtors have demonstrated sound business justifications for the Sale and the other transactions and actions contemplated by the Motion pursuant to section 363(b) of the Bankruptcy Code.

G.    Each of the Sale, the Management Agreement and the Asset Purchase Agreement were negotiated, proposed and agreed to by the Debtors and the Buyer as parties thereto without collusion, in good faith, and from arm's-length bargaining positions.  The Buyer is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such is entitled to all of the protections afforded thereby.

H.    The consideration provided by the Buyer for the Purchased Assets (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Purchased Assets and (iii) will provide a greater recovery for the Debtors' creditors and other interested parties than would be provided by any other practically available alternative.

I.    The transfer of the Purchased Assets to the Buyer under the Sale and the Asset Purchase Agreement will be a legal, valid, and effective transfer of such Purchased Assets, and will, upon the occurrence of the Closing (as defined in the Asset Purchase Agreement), vest in the Buyer all right, title and interest of the Debtors in the Purchased Assets free and clear of all Encumbrances and interests other than the Permitted Encumbrances (in each case, as defined in the Asset Purchase Agreement) (collectively, the "Interests") including, but not limited to, those (i) that purport to give to any party a right or option to give any of the foregoing in the future, any sale or contingent sale or title retention agreement or lease, or termination of the Debtors' or

the Buyer's interest in the Purchased Assets, or any similar rights, and (ii) relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Debtors' businesses prior to the Closing Date (as defined in the Asset Purchase Agreement).

J.    The transfer of the Purchased Assets to the Buyer free and clear of all Interests will not result in any undue burden or prejudice to any holders of any Interests since all such Interests of any kind or nature whatsoever shall attach to the net proceeds of the Sale (the "Sale Proceeds") in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets, subject to the Carveout (as defined in the Final Order Authorizing Debtors In Possession to Enter Into Post-Petition Credit Agreement and Obtain Post-Petition Financing Pursuant to Section 363 and 364 of the Bankruptcy Code, and Providing Adequate Protection and Granting Liens, Security Interests and Superpriority Claims, dated May 14, 2001 and entered in these cases) and to any claims and defenses the Debtors or other parties may possess with respect thereto.

K.    The Buyer would not consummate the transactions contemplated by the Sale, thus adversely affecting the Debtors, their estates, and their creditors, if the Sale of the Purchased Assets to the Buyer was not free and clear of all Interests of any kind or nature whatsoever, or if the Buyer would, or in the future could, be liable for any such Interests and if the assignment of the Purchased Assets could not be made under section 363 of the Bankruptcy Code.

L.    The Debtors may sell the Purchased Assets free and clear of all Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied.  Those (i) holders of Interests and (ii) non-debtor parties who did not object, or who withdrew their objections, to the Sale, the Sale of the Purchased Assets or the Motion are deemed to have consented pursuant to Bankruptcy Code

WP3:714361.3                                                                                                          58222.1001

section 363(f)(2). Those holders of Interests fall within one or more of the other subsections of Bankruptcy Code section 363(f) and are adequately protected by having their Interests, if any, attach to the proceeds of the Sale ultimately attributable to the property against or in which they claim or may claim an Interest. Notwithstanding anything contained herein or in the Asset Purchase Agreement to the contrary, the Sale of the Purchased Assets is subject to the consent of the DIP Lenders.

M.    Due to the regulated environment in which certain of the Purchased Assets are operated, the entry of this Sale Order is necessary to ensure the uninterrupted provision of services to customers of the Debtors (the "Customers") during the period in which the Buyer and the Debtors seek to comply with the applicable federal and state regulatory laws and to enter into contractual or other legal arrangements necessary for the consummation of the Sale, the transfer of the Licenses (as defined below) to the Buyer and the operation of the Purchased Assets by the Buyer (the "Compliance Items").

N.    Approval at this time of the Sale, the Asset Purchase Agreement and the Management Agreement, and all the transactions contemplated thereby and hereby (including the Regulatory Transition Process) is in the best interests of the Debtors, their creditors, their estate and other parties in interest.

NOW THEREFORE, BASED UPON THE FOREGOING FINDINGS OF FACT, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, EFFECTIVE IMMEDIATELY, THAT:

1.    The Motion is granted, as further described herein.

2.    All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits, provided, however, that nothing herein shall alter or impair the rights of any party

58222.1001

that has filed and served a timely objection to dispute the amount of a cure payment listed on an applicable Cure Notice, which rights are specifically reserved and which disputes shall be resolved either consensually or, as necessary, by further order of the Court. Notwithstanding anything in the Motion, the Asset Purchase Agreement or this Sale Order to the contrary, the Debtors shall not be authorized to assume and assign any executory contract(s) between any of the Debtors and the United States General Services Administration (the "GSA") without the prior consent of a person authorized to act on behalf of the GSA to the extent such consent is required by any contract or applicable law.

3.    The Asset Purchase Agreement substantially in the form attached as Exhibit A to the Notice of Filing of Asset Purchase Agreement, dated December 18, 2001 (including all exhibits, schedules and annexes thereto), and all of the terms and conditions thereof, are hereby approved.

4.    Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized to consummate the Sale of the Purchased Assets, pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, to enter into the Management Agreement and to implement the Regulatory Transition Process.

5.    The Debtors are authorized to execute and deliver, and are empowered to perform under, consummate and implement, the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement (including the Management Agreement), and to take all further actions as may be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer or reducing to possession, the Purchased Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by

8

the Asset Purchase Agreement, including without limitation the implementation of the Regulatory Transition Process. Notwithstanding anything in the Motion, the Asset Purchase Agreement or this Sale Order to the contrary, the Buyer assumes no employee liabilities that arose prior to the Closing Date, including any accrued but unbilled liabilities.

6.    The transfer of the Purchased Assets to the Buyer pursuant to, and subject to the terms of, the Asset Purchase Agreement shall constitute a legal, valid and effective transfer of the Purchased Assets, and shall, upon the occurrence of the Closing, vest in the Buyer all right, title and interest of the Debtors in and to the Purchased Assets to be acquired by such Buyer free and clear of all Interests of any kind or nature whatsoever, with all such Interests to attach to the Sale Proceeds in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets, subject to the Carveout and to any claims and defenses the Debtors or other parties may possess with respect thereto.

7.    In consideration for the Purchased Assets, and subject to the terms and conditions of the Asset Purchase Agreement, the Buyer shall assume the Assumed Liabilities (as defined therein) and, on the Closing Date, shall irrevocably (i) pay, at the Debtors' election, exercised prior to the Closing Date, (x) an amount in cash equal to $38,000,000 (the "Cash Payment") or (y) an amount in cash equal to $30,000,000 and cause to be issued to the Debtors a number of shares of Class B common stock of IDT Corporation, having a value equal to $12,500,000 based on the average closing price of such stock during the seven trading day period ended December 14, 2001 (the "IDT Shares", and together with the $30,000,000, the "Cash/Stock Payment"), and (ii) issue to the Debtors such number of shares of common stock of the Buyer, representing 5% of the outstanding shares of Buyer Common Stock as of the date hereof, all in accordance with the terms and conditions of the Asset Purchase Agreement.

WP3:714361.3

58222.1001

Pursuant to the Escrow Agreement (as defined in the Asset Purchase Agreement), which is hereby approved, on or before the date of this Sale Order, the Buyer shall deliver or shall have delivered the Cash Payment to the Escrow Agent (as defined in the Asset Purchase Agreement) to be held in escrow pending Closing.  On the Closing Date, the Debtors and the Buyer shall instruct the Escrow Agent to promptly release the Escrow Amount (as defined in the Asset Purchase Agreement) to an account or accounts designated by the Debtors, on behalf of the Debtors in accordance with the terms of the Escrow Agreement.  Such account shall be an interest-bearing account in the name of one or more of the Debtors established at Citibank, N.A. for the purpose of receiving such funds (the "Proceeds Account").  The Sale Proceeds shall be maintained in the Proceeds Account and shall not be distributed to any party in interest, including professionals and secured parties, pending further order of the Court following notice and a hearing.  Accrued interest on such funds shall constitute part of the Sale Proceeds available for distribution.  The Buyer shall have no claim whatsoever to or against any of the funds in the Proceeds Account or to the IDT Shares or the Buyer Common Stock subsequent to the Closing. Any allocation of the Purchase Price agreed to by the Debtors and the Buyer shall not be binding on any other party.

        8.      On the Closing Date, the Buyer and the Debtors shall enter into the Management Agreement, and the Buyer shall deposit into an account at Citibank, N.A. (the "Operating Account") an amount in cash equal to $60 million in immediately available funds, to be used from and after the Closing Date through and including the Cutoff Date (as defined in the Management Agreement) exclusively to pay all costs set forth in subsection 3.1(a) of the Management Agreement.  In the event that the Buyer shall fail to pay, as and when due, any such costs and the Debtors shall be held liable therefore, the Buyer hereby agrees to indemnify the

Debtors for all such costs.  In the event that any funds shall be on deposit in the Account (as defined in the Management Agreement) after the Cutoff Date, and all accrued and unpaid costs required to be paid in accordance with the Management Agreement shall have been paid, any balance may, upon five (5) days' written notice to the Debtors, the Agent for the Postpetition Lenders and such telecommunications service providers that shall send written request to the Buyer requesting such notice and the Buyer shall provide such notice to each party to the extent such party shall continue to provide services to the Debtors or the Buyer, be withdrawn by the Buyer.

        9.      Except as expressly permitted or otherwise specifically provided for in the Asset Purchase Agreement or this Sale Order, effective upon the occurrence of the Closing, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and other regulatory authorities, lenders, trade and other creditors holding Interests (including but not limited to any claims under any applicable revenue, pension, ERISA, tax, labor, environmental or natural resource law, rule or regulation, or any products liability law) of any kind or nature whatsoever against or in the Debtors or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors' businesses prior to the Closing Date of the Sale of the Purchased Assets, or the transfer of such Purchased Assets to the Buyer, hereby are forever barred, estopped, and permanently enjoined from asserting against the Buyer, its successors or assigns (to the extent allowed by law), its property, its officers, directors and shareholders or the Purchased Assets, such persons' or entities' Interests.  Notwithstanding anything herein to the contrary, nothing

11

herein shall in any way affect or diminish any rights of the Debtors or any successor thereto (including any chapter 11 or chapter 7 trustee) with respect to obligations of the Buyer arising under the Asset Purchase Agreement, the Management Agreement or this Sale Order. This Sale Order shall be binding on the Debtors and the Debtors' estates, including, following any conversion of these cases, any successor chapter 7 estates, and any chapter 7 trustees appointed in these cases.

10.     The consideration provided by the Buyer for the Purchased Assets under the Asset Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

11.     Notwithstanding any provision to the contrary in this Sale Order, the Motion or the Asset Purchase Agreement, certain prototype laboratory equipment (as listed on Exhibit A hereto, the "Lab Equipment") and certain disbursement and investment accounts established in connection with the Lucent Credit Agreement (as listed on Exhibit B hereto, the "Accounts") shall be segregated from the Debtors' other assets, shall not constitute part of the Purchased Assets and shall not be included in the Sale. Nothing in this Sale Order, the Motion or the Asset Purchase Agreement shall impair or affect the rights and interests of Lucent in the Lab Equipment and the Accounts. The Buyer hereby reserves the right, subject to notice and a hearing, to seek to characterize the Lab Equipment as owned by the Debtors, and to the extent an Order so providing is entered by the court, the Lab Equipment shall constitute Purchased Assets.

12.     This Sale Order (a) shall be effective as a determination that, on the Closing Date, and subject to the occurrence of the Closing, all Interests of any kind or nature whatsoever existing prior to the Closing as to the Purchased Assets transferred pursuant to the

WP3:714361.3    58222.1001

Asset Purchase Agreement (including but not limited to any claims under any applicable revenue, pension, ERISA, tax, labor, environmental or natural resource law, rule or regulation, or any products liability law) have been unconditionally released and terminated as to such Purchased Assets, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the act of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

13.    Each and every federal, state and local governmental agency, department or unit is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement, except the FCC as regards its approval of the transfer of the Licenses.

14.    Except as expressly permitted or otherwise specifically provided for in the Asset Purchase Agreement or this Sale Order in respect of the Asset Purchase Agreement or the Purchased Assets to be transferred pursuant to such Asset Purchase Agreement, the Buyer shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to such Purchased Assets and, to the extent allowed by law, the Buyer (and its officers, managers and members) shall not be liable for any other claims against the Debtors or any of their predecessors or affiliates, and the Buyer shall have no successor or vicarious liabilities of any kind or character whether known or unknown as of the Closing Date under the Asset

13

Purchase Agreement, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, other than the Permitted Encumbrances, arising prior to the Closing Date under the Asset Purchase Agreement, including, but not limited to, any liabilities under any revenue, pension, ERISA, tax, labor, environmental or natural resource law, rule or regulation, or any products liability law, arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' businesses prior to the Closing Date.  After the Closing and the payment of the Purchase Price, the Buyer shall have no liability to the Debtors or their estates for any diminution in value or other damage of any kind whatsoever to the Regulated Assets or the Licenses that may result from the Buyer's operation of the Debtors' business.

15.    This Court retains and shall have exclusive jurisdiction to endorse and implement the terms and provisions of the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith (including the Management Agreement) in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Buyer, (b) compel delivery of the purchase price or performance of other obligations owed to the Debtors, (c) resolve any disputes arising under or related to the Asset Purchase Agreement, and (d) interpret, implement, and enforce the provisions of the Asset Purchase Agreement and this Sale Order.

16.    The transactions contemplated by the Asset Purchase Agreement are undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale of any Purchased Assets shall not affect the validity of the Sale of such Purchased Assets to the Buyer, unless such authorization is duly stayed pending such

14

appeal prior to the Closing with respect to such Purchased Assets. The Buyer is a purchaser in good faith of the Purchased Assets, and the Buyer is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

17.    The terms and provisions of the Asset Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors, the Buyer and their respective affiliates, successors and assigns and any affected third parties (including, but not limited to, all persons asserting Interests in the Purchased Assets to be sold to the Buyer pursuant to the Asset Purchase Agreement), notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

18.    The failure specifically to include any particular provisions of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety. To the extent that any provision of this Sale Order is inconsistent with the Asset Purchase Agreement or the Management Agreement, the terms of this Sale Order shall control.

19.    The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates and is, if occurring prior to the Closing Date, approved by counsel for each of the Creditors' Committee, the agent for the lenders under the Pre-Petition Credit Agreement, and the agent for the lenders under the DIP Credit Agreement. The Debtors shall also notify counsel for Lucent of any

15

modification, amendment or supplement to the Asset Purchase Agreement and, if such modification, amendment or supplement impairs or adversely affects Lucent's rights as a secured creditor in these chapter 11 cases, shall obtain Lucent's prior consent thereto.

   20. The transfer of the Purchased Assets pursuant to the Asset Purchase Agreement, and the transactions contemplated thereby constitute steps toward the formulation, or in anticipation of the formulation of, a chapter 11 plan for the Debtors and as such, in accordance with section 1146(c) of the Bankruptcy Code, the making or delivery of any instrument of transfer to effectuate the Asset Purchase Agreement and the transactions contemplated thereby shall not be taxed under any law imposing a stamp tax or a sale, transfer or any other similar tax, and the recordation of any instruments (including bills of sale, leases, assignments and amendments thereto) to evidence the Sale of the Purchased Assets shall not be subject to any such tax.

   21. All of the Debtors' interests in the Purchased Assets to be acquired by the Buyer under the Asset Purchase Agreement shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Buyer.  Upon the occurrence of the Closing, this Sale Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Purchased Assets acquired by the Buyer under the Asset Purchase Agreement and/or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in the Purchased Assets acquired by the Buyer under the Asset Purchase Agreement to the Buyer.

   22. As of the Closing Date, the Buyer shall be hereby granted immediate and unfettered access to the Purchased Assets (other than the Licenses) acquired by the Buyer.

**Regulatory Transition Process**

16

23.     The Debtors and the Buyer shall have a period (the "Regulatory Compliance Period") of one hundred-twenty (120) days (subject to extension) from the Closing Date to obtain the requisite federal and state regulatory approvals necessary to operate the Business and to enter into contractual or other legal arrangements necessary for the consummation of the Sale, transfer of the Licenses and the Regulated Assets (as defined below) to the Buyer and the operation of the Purchased Assets by the Buyer (the "Compliance Items"). In order to ensure the uninterrupted provision of services to the Customers during the Regulatory Compliance Period, and the orderly transfer of the Licenses and, to the extent required by any other applicable law, any other assets subject to similar transfer restrictions (the "Regulated Assets") to the Buyer, the Buyer, the Debtors and all providers of goods and services to the Debtors, including but not limited to the common carrier service providers that provide services to the Debtors and any landlords of properties used by the Debtors (the "Service Providers") are hereby authorized and directed as follows:

a.      As soon as practicable following the entry of this Sale Order, the Debtors and the Buyer are directed to file such applications as are required to seek the federal and state regulatory authority necessary for the Debtors to assign, and the Buyer to acquire, own and operate, the Licenses and the Regulated Assets.

b.      On the Closing Date, the Buyer and the Debtors are directed to enter into a Management Agreement substantially in the form appended as Exhibit E to the Asset Purchase Agreement, pursuant to which the Buyer shall be entitled to manage and operate the business of the Debtors during the Regulatory Compliance Period on the terms and conditions set forth therein.

c.      From the Closing Date to the Cutoff Date, all agreements and other arrangements with Service Providers relating to the Debtors providing service to Customers shall, subject to compliance with paragraph (d) below, remain in effect and

17

may not be canceled or terminated, and absent an event of default occurring after the

Closing Date in respect of facts arising after the Closing Date that has not been cured

within three (3) business days after written notice (by email and facsimile) thereof has

been received by the Buyer (Attention: Chief Financial Officer, email:

steveb@corp.idt.net, facsimile: 973-438-1414, and McDermott, Will & Emery,

Attention: David C. Albalah, Esq., email: dalbalah@mwe.com, facsimile: 212-574-5444),

no Service Provider shall reduce or otherwise alter in any adverse manner its

performance under any such agreement(s) or arrangement(s) until the Cutoff Date.

     d.     The Buyer shall be responsible for, and is directed to pay on a timely

basis, all charges incurred for services used by the Debtors to provide services to the

Customers from the Closing Date to the Cutoff Date, including all charges incurred with

respect to Service Providers. The rates charged by Service Providers for such services

shall not exceed the rates for those services in effect as of the date of this Sale Order.

Neither the Debtors or Buyer shall have any obligation or liability for services not

actually being utilized and each Service Provider shall, upon written notice from the

Debtors and the Buyer, immediately and without charge or further liability of any kind

discontinue and disconnect any such services provided to the Debtors and/or the Buyer.

     e.     The Buyer is further authorized to promptly establish such contractual or

other legal arrangements as the Buyer and the Debtors deem necessary to operate the

Debtors' assets and to provide service to Customers (including interconnection and other

common carrier service agreements with Service Providers) and that will permit Buyer to

provide service to Customers in a manner similar to the manner in which the Debtors

provided such service prior to the date of this Sale Order and that will enable the

Customers to continue to receive service in an uninterrupted and transparent manner.

     f.     During the 120-day period commencing on the Closing Date, in the event

that any contract with any Service Provider that is a telecommunications carrier shall be

rejected: (i) no termination liabilities shall arise; (ii) such telecommunications carrier

     

shall provide telecommunications services in accordance with, and to the extent required by, applicable law in a non-discriminatory manner; and (iii) such telecommunications carrier will charge the Buyer for replacement circuits the lower of actual costs and tariff rates to set up or establish such replacement circuits.

24.    The Buyer is hereby directed to pay all costs of the ongoing operations of the Business in accordance with the Management Agreement.  The Buyer shall have the ability during the Regulatory Compliance Period to direct the Debtors to seek the entry of one or more orders of the Court authorizing the Debtors to assume and assign to the Buyer any executory contract or unexpired lease to which the Debtors are a party, provided that the Buyer shall be solely responsible for paying any cure payment that is payable in connection with any such assumption and assignment.  The Buyer shall have the ability during the Regulatory Compliance Period to direct the Debtors to reject any executory contract or unexpired lease to which the Debtors are a party provided that the Buyer must elect whether to assume and assign or reject any contracts with the GSA and must provide written notice of such election to the GSA on or before January 2, 2002.  The Debtors may effect any such rejection by delivery of two (2) business days prior written notice (and the irrevocable waiver of the right to withdraw such notice) to the non-Debtor party to any such executory contract or unexpired lease of the Debtors' unequivocal intent to reject such executory contract or unexpired lease.  In the event that the Buyer elects to reject any contract on account of which a prepayment has been made pursuant to Section 3.1(a) of the Management Agreement, the counterparty to such contract shall be obligated to refund promptly to the Buyer (without setoff or counterclaim) the unused portion of such prepayment and in the event of any dispute with respect thereto, the Buyer reserves the right to seek adjudication in the Bankruptcy Court.  In the event that the Buyer elects rejection of

WP3:714361.3                                                                                                                       58222.1001

some or all of Debtors' contracts with the GSA, the Buyer agrees that it will continue to provide telecommunications services to GSA until GSA has received sixty (60) days' notice of discontinuance, or such longer period as the FCC requires. In all other respects, the Buyer shall manage the operations of the Business and shall be responsible for such operation pursuant to the terms and subject to the conditions of the Asset Purchase Agreement and the Management Agreement. The period within which the Debtors may elect to assume or reject unexpired leases of nonresidential real property under Bankruptcy Code section 365(d)(4) is hereby extended through the duration of the Term.

25.    Upon receipt of the required regulatory approvals and establishment of the necessary service agreements and arrangements, the Debtors are authorized to convey the Licenses and the Regulated Assets to the Buyer, in accordance with the terms and conditions of the Asset Purchase Agreement and the Management Agreement.

26.    As provided by Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure, the effectiveness of this Sale Order shall not be stayed for 10 days after entry on the docket and shall be effective and enforceable immediately upon such entry. The Buyer and the Debtors shall consummate the Sale as promptly as is practicable following Court approval of this Sale Order, so long as no stay of this Sale Order has been entered and is continuing.

Dated: Wilmington, Delaware
      December 19, 2001

                            HONORABLE JOSEPH J. FARNAN, JR.
                            UNITED STATES DISTRICT JUDGE

WP3:714361.3                                       58222.1001

## EXHIBIT A

### Description of Lab Equipment

The following equipment currently is located at the Winstar lab facility, 2545 Horse Pen Road, Herdon, Virginia (the "Winstar Lab").

1.    Metropolis "evaluation" configuration description --

a.    Metropolis 4500 System consisting of 1 Large Service Shelf, a High Speed optical Shelf and associated circuit packs;

b.    Metropolis 2500 system consisting of a Large Service Shelf and associated circuit packs;

c.    Metropolis 2000 system consisting of a Service Shelf and associated circuit packs.

The systems are installed in two seven foot equipment racks in the Winstar Lab.

2.    AnyMedia "evaluation" configuration description --

a.    AnyMedia Access Unit consisting of common circuit packs & associated interface circuit packs;

b.    Breakdown for AnyMedia:

        FAC 100 S1:1 SL1EJDCAA
        FAC 100 S1:1 SLC1EJDCAA
        COM100 S2:2 SLC1CGLCAA
        COM100 S2:3 SLC1CGLCA8
        DTP100 S1:1 SLC1DH0CAA
        DTP101 S1:2 SLC1DHKCAB
        LPA380 S3:3 E51SFBAAAA
        LPA300 S1:1 SLCUVR0BAA
        LPA380 S3:3 E51SFBAAAA
        LPU 116 S2:3 SN980CD953522L 107743536002 ESPQAYKAA
        Two tip ring cables - new
        Two T-1 Cables pieced together from parts
        Power cables

The trial configuration is a shelf mounted within a single seven foot equipment rack.

## EXHIBIT B

### Description of Accounts

| Account | Account Number |
|---|---|
| Fleet Bank Investment Account | 9427772529 |
| Fleet Bank Investment Account | 9428385707 |
| State Street Investment Account | 3274457 |
| State Street Investment Account | 3324773 |
| Fleet Bank Disbursement Account | 9427772510 |
| Fleet Bank Disbursement Account | 9428385694 |

EXHIBIT 3

<u>ANNEX A</u>

<u>Indemnification Provisions</u>

1.  In connection with the engagement of Impala Partners, LLC ("Impala Partners") by Winstar Communications, Inc., (the "Company") pursuant to a letter agreement dated July 2, 2001 between the Company and Impala Partners, as it may be amended from time to time (the "Letter Agreement"), the Company hereby agrees as follows:

2.  The Company agrees to indemnify and hold harmless Impala Partners and each of its partners, agents, employees and controlling persons (within the meaning of the Securities Act of 1933, as amended) (each, an "Indemnified Person") against any losses, claims, damages or liabilities (or actions or proceedings in respect thereof) brought by any third party (i.e., a person not a party to the Letter Agreement or an Indemnified Party hereunder) arising out of the rendering of services by Impala Partners under the Letter Agreement and will reimburse Impala Partners and each other person indemnified hereunder for all reasonable legal and other expenses as incurred in connection with investigating or defending any such loss, claim, damage, liability, action or proceeding; provided, however, that the Company will not be liable in any such case for losses, claims, damages, liabilities or expenses arising from the negligence or willful misconduct of Impala Partners or any other party entitled to indemnification hereunder. In case any proceeding shall be instituted involving any Indemnified Party, such person shall promptly notify the Company, and the Company, upon the request of the Indemnified Party, shall retain counsel reasonably satisfactory to the Indemnified Party to represent the Indemnified Party and any others the Company may designate in such proceeding and shall pay all reasonable fees and expenses of such counsel related to such proceeding. In any such proceeding, any Indemnified Party shall have the right to retain its own counsel at its own expense, except that the Company shall pay as incurred the fees and expenses of counsel retained by the Indemnified Party only in the event that (i) the Company and the Indemnified Party shall have mutually agreed to the retention of such counsel, or (ii) the named parties to any such proceeding (including any impleaded parties) include both the Company and the Indemnified Party and representation of both parties by the same counsel would be inappropriate, in the reasonable opinion of the Company, due to actual or potential differing interests between them.

3.    The Company shall not be liable for any settlement of any proceeding effected without its written consent. In addition, the Company will not, without the prior written consent of Impala Partners, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder unless such settlement, compromise or consent includes an unconditional release of each party for which indemnification is sought hereunder from all liability arising out of such claim, action, suit or proceeding.

4.    In the event that the indemnity provided for in paragraph 2 hereof is unavailable or insufficient to hold any Indemnified Party harmless, then the Company shall contribute to amounts paid or payable by an Indemnified Party in respect of such Indemnified Party's losses, claims, damages and liabilities as to which the indemnity provided for in paragraph 1 hereof is unavailable or insufficient (1) in such proportion as appropriately reflects the relative benefits received by the Company, on the one hand, and Impala Partners, on the other hand, in connection with the matters as to which such losses, claims, damages or liabilities relate, or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as appropriately reflects not only the relative benefits referred to in clause (i) but also the relative fault of the Company, on the one hand, and Impala Partners, on the other hand, as well as any other equitable considerations. The amounts paid or payable by a party in respect of losses, claims, damages and liabilities referred to above shall be deemed to include any reasonable legal or other fees and expenses incurred in defending any litigation, proceeding or other action or claim. Nothing herein shall be deemed to increase the scope of matters for which indemnity or contribution may be available beyond those described in paragraph 1 of these Indemnification Provisions.

5.    These Indemnification Provisions shall survive the expiration of the term of the Letter Agreement, and shall be in addition to any liability that the Company might otherwise have to any Indemnified Party under the Letter Agreement or otherwise. The Company and Impala Partners each hereby waives any right to a trial by jury with respect to any claim or action arising out of the engagement of Impala Partners under the Letter Agreement or the Indemnification Provisions. It is further agreed that no Indemnified Party (including Impala Partners) shall be liable to the Company or any affiliate of the Company in connection with any matter arising out of or relating to the engagement of Impala Partners under the Letter Agreement, or any actions take or omitted , services performed or matters contemplated by or in connection with the Letter Agreement, except to the extent that such liability resulted primarily from the willful misconduct or negligence of such Indemnified Party; provided that nothing herein shall excuse Impala Partners from its obligations to perform under the Letter Agreement in good faith and in accordance with the terms thereof.

2

EXHIBIT 4

ATTACHMENT A

July 26, 2001

The Blackstone Group L.P.
345 Park Avenue
New York, NY 10154

INDEMNIFICATION AGREEMENT

Gentlemen:

This letter will confirm that we have engaged The Blackstone Group L.P. ("Blackstone") to advise and assist us in connection with the matters referred to in our letter of agreement dated as of July 26, 2001 (the "Engagement Letter"). This indemnification shall be effective nunc pro tunc April 18, 2001. In consideration of your agreement to act on our behalf in connection with such matters, we agree to indemnify and hold harmless you and your affiliates and your and their respective partners (both general and limited), members, officers, directors, employees and agents and each other person, if any, controlling you or any of your affiliates (you and each such other person being an "Indemnified Party") from and against any losses, claims, damages, expenses and liabilities whatsoever, whether they be joint or several, related to, arising out of or in connection with the engagement (the "Engagement") under the Engagement Letter and will reimburse each Indemnified Party for all expenses (including reasonable fees, expenses and disbursements of counsel) as they are incurred in connection with investigation, preparing, pursuing, defending or assisting in the defense of any action, claim, suit, investigation or proceeding related to, arising out of or in connection with the Engagement or this agreement, whether or not pending or threatened, whether or not any Indemnified Party is a party, whether or not resulting in any liability and whether or not such action, claim, suit, investigation or proceeding is initiated or brought by us. We will not, however, be liable under the foregoing indemnification provision for any losses, claims, damages or liabilities (or expenses relating thereto) that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from the bad faith, gross negligence or willful misconduct of Blackstone. We also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to us or our owners, parents, affiliates, security holders or creditors for or in connection with the Engagement except for any such liability for losses, claims, damages or liabilities incurred by us that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from the bad faith, gross negligence or willful misconduct of Blackstone.

If the indemnification provided for in the preceding paragraph is for any reason unavailable to an Indemnified Party in respect of any losses, claims, damages or liabilities referred to herein, then, in lieu of indemnifying such Indemnified Party hereunder, we shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages or liabilities (and expenses relating thereto) (i) in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by you, on the one hand, and us, on the other hand, from the Engagement or (ii) if and only if the allocation provided by clause (i) above is for any reason not available, in such proportion as is appropriate to reflect not only the relative benefits referred to in such clause (i) but also the relative fault of each of you and us, as well as any other relevant equitable considerations; provided, however, to the extent permitted by applicable law, in no event shall your aggregate contribution to the amount paid or payable exceed the aggregate amount of fees actually received by you under the Engagement Letter. For the purposes of this agreement, the relative benefits to us and you of the Engagement shall be deemed to be in the same proportion as (a) the total value paid or contemplated to be paid or received or contemplated to be received by us, our security holders and our creditors in the transaction or transactions that are subject to the Engagement, whether or not any such transaction is consummated, bears to (b) the fees paid or to be paid to Blackstone under the Engagement Letter.

No party to this agreement will, without the prior written consent of the other party (which consent will not be unreasonably withheld), settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (a "Judgment"), whether or not we or any Indemnified Party is an actual or potential party to such claim, action, suit or proceeding. In the event that we seek to settle or compromise or consent to the entry of any Judgment, we agree that such settlement, compromise or consent shall include an unconditional release of Blackstone and each other Indemnified Party hereunder from all liability arising out of such claim, action, suit or proceeding.

Promptly after receipt by an Indemnified Party of notice of any complaint or the commencement of any action or proceeding with respect to which indemnification is being sought hereunder, such person will notify us in writing of such complaint or of the commencement of such action or proceeding, but failure to so notify us will not relieve us from any liability which we may have hereunder or otherwise, except to the extent that such failure materially prejudices our rights. If we so elect or are requested by such Indemnified Party, we will assume the defense of such action or proceeding, including the employment of counsel reasonably satisfactory to Blackstone and the payment of the fees and disbursements of such counsel.

In the event, however, such Indemnified Party reasonably determines in its judgment that having common counsel would present such counsel with a conflict of interest or if we fail to assume the defense of the action or proceeding in a timely manner, then such Indemnified Party may employ separate counsel reasonably satisfactory to us to represent or defend it in any such

action or proceeding and we will pay the fees and disbursements of such counsel; provided, however, that we will not be required to pay the fees and disbursements of more than one separate counsel for all Indemnified Parties in any jurisdiction in any single action or proceeding. In any action or proceeding the defense of which we assume, the Indemnified Party will have the right to participate in such litigation and to retain its own counsel at such Indemnified Party's own expense.

The foregoing reimbursement, indemnity and contribution obligations of the Company under this agreement shall be in addition to any rights that an Indemnified Party may have at common law or otherwise, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company and such Indemnified Party.

The provisions of this agreement shall apply to the Engagement and any written modification of the Engagement and shall remain in full force and effect regardless of any termination or the completion of your services under the Engagement Letter.

engagement ma2.DOC

This agreement and the Engagement Letter shall be governed by and construed in accordance with the laws of the state of New York applicable to contracts executed in and to be performed in that state.

Very truly yours,

WINSTAR COMMUNICATIONS, INC.
WINSTAR WIRELESS, INC.

By: _____

Timothy R. Graham
Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.

Accepted and Agreed
to as of the date first
written above:

THE BLACKSTONE GROUP L.P.

By: _____

Arthur B. Newman
Senior Managing Director

TOTAL P.02

EXHIBIT 5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>WINSTAR COMMUNICATIONS, INC., et al.,<br><br>Debtors. | Chapter 7<br><br>Case No. 01-1430<br>Jointly Administered |
| CHRISTINE C. SHUBERT, CHAPTER 7 TRUSTEE OF WINSTAR COMMUNICATIONS, INC. AND WINSTAR WIRELESS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>LUCENT TECHNOLOGIES INC.,<br><br>Defendant. | Adv. Pro. No. 01-01063 (JBR) |

## JUDGMENT

Counts VII, X, and XI of the Second Amended Complaint (the "Complaint") of Christine C. Shubert (the "Trustee"), the Chapter 7 Trustee for the estates of Winstar Communications, Inc., *et al.* (the "Winstar Estate") against Lucent Technologies Inc. ("Lucent") and Counts 5 and 6 of the Second Amended Answer and Counterclaims of Lucent (the "Counterclaims"), having come on for trial before the Court, after due notice to the parties, and the Court having heretofore made and filed its Memorandum of Decision Including Findings of Fact and Conclusions of Law with Respect to Counts VII, X, and XI of the Second Amended Complaint and Counts 5 and 6 of the Second Amended Answer and Counterclaims (the "Findings of Fact and Conclusions of Law")[1] determining, among other things, that (i) on Count VII of the Complaint, Lucent is in

---

[1] All terms not otherwise defined herein shall be given the meaning ascribed to them in the Findings of Fact and Conclusions of Law.

ach-for bg.TIF

breach of the Subcontract; (ii) on Count X of the Complaint, all statutory elements establishing a preference have been satisfied and the payment of the Seimens proceeds constitutes a preference, and that Lucent has failed to establish the elements of the New Value defense set forth in 11 U.S.C. § 547(c)(2); (iii) on Count XI of the Complaint, Lucent's claims against the Winstar Estate shall be subordinated pursuant to 11 U.S.C. § 510(c); and (iv) that each of Lucents' Counterclaims shall be dismissed, and an order having been duly entered thereon on December 21, 2005, directing the entry of judgment in favor of the Trustee and against defendant Lucent (i) for the sum of $55,750,742 (after the set-off as agreed to by the parties), plus interest on Count VII of the Complaint; (ii) for the sum of $188,180,000, plus interest on Count X of the Complaint; (iii) subordinating Lucent's claim under 11 U.S.C. § 510(c) of the Bankruptcy Code to the claims of all creditors, including all unsecured claims which includes the deficiency claim of Seimens, if any, and to the interests of those entities who infused the $270 million of equity in Winstar on December 7, 2000 and preserving Lucent's lien for the benefit of the estate and transferring the lien to the Trustee in her representative capacity; and (iv) dismissing the Counterclaims, it is

ORDERED, ADJUDGED AND DECREED that judgment be and hereby is entered in favor of the Trustee against Lucent on Count VII of the Complaint and the Trustee shall have and recover from defendant Lucent in the sum of $55,750,742.00, plus pre-judgment interest in accordance with N.Y.C.P.L.R. 5001 at the rate set forth in N.Y.C.P.L.R. 5004 from April 18, 2001, the date of the original complaint,[2] until December 21, 2005, the date the Court issued its Decision, totaling $23,479,466.08, and in accordance with N.Y.C.P.L.R. 5002 for further pre-judgment interest from December 21, 2005, until the date this Judgment is entered in a per diem

---

[2] The Court awards interest from the date of the complaint rather than the date of the breach. *See In re USN Communications, Inc.*, 280 B.R. 573, 602-03 (Bankr. D. Del. 2002).

2

ach-bg.TIF

amount of $19,536.22, and for post-judgment interest at the rate fixed pursuant to 28 U.S.C. § 1961 from such date the Judgment is entered until such date that this Judgment is satisfied; and it is further

ORDERED, ADJUDGED AND DECREED that judgment be and hereby is entered in favor of the Trustee against Lucent on Count X of the Complaint and the Trustee shall have and recover from defendant Lucent the sum of $188,180,000, plus pre-judgment interest at the rate fixed pursuant to 28 U.S.C. § 1961 from September 27, 2002, until December 21, 2005, the date the Court issued its Decision, totaling $10,734,642.82, plus per diem interest until the date this Judgment is entered totaling $9,390.18, and for post-judgment interest at the rate fixed pursuant to 28 U.S.C. § 1961 from such date the Judgment is entered until such date that this Judgment is satisfied; and it is further

ORDERED, ADJUDGED AND DECREED that judgment be and hereby is entered in favor of the Trustee against Lucent on Count XI of the Complaint and, pursuant thereto, (i) Lucent's claims against the Winstar Estate shall be subordinated pursuant to 11 U.S.C. § 510(c) to the claims of all creditors, including all unsecured claims which includes the deficiency claim of Siemens, if any, and to the interests of those entities who infused the $270 million of equity in Winstar on December 7, 2000; and (ii) any lien on or claim held by Lucent on Winstar's assets, including but not limited to the three escrow accounts established by stipulations between the Trustee and Lucent (Bankruptcy Case 01-1430 Docket Nos. 3544, 4026 and 4360), is preserved for the benefit of the Winstar Estate and transferred to the Trustee in her representative capacity; and it is further

ORDERED, ADJUDGED AND DECREED that judgment be and hereby is entered in favor of the Trustee against Lucent dismissing with prejudice any and all claims asserted by

3

ach-for bg.TIF

Lucent in the Counterclaims, including any claims set forth in Counts 5 and 6 of the Counterclaims.

**ORDERED, ADJUDGED AND DECREED** that the Trustee shall be awarded costs to be taxed.

Judgment signed on this 28th day of December, 2005

*Joel B. Rosenthal*

Joel B. Rosenthal
United States Bankruptcy Judge

4

ach-for bg.TIF

EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 7 |
| | : | |
| WINSTAR COMMUNICATIONS, INC., | : | Bankruptcy Case NO. 01-01430-KJC |
| ET AL., | : | |
| | : | |
| Debtors. | : | |
| | : | |
| LUCENT TECHNOLOGIES, INC., | : | |
| | : | Adversary No. 01-01063-KJC |
| Appellant, | : | |
| | : | |
| v. | : | Civil Action No. 06-147-JJF |
| | : | |
| CHRISTINE C. SHUBERT, | : | |
| CHAPTER 7 TRUSTEE, | : | |
| | : | |
| Appellee. | : | |

### FINAL ORDER

At Wilmington, this 26th day of April 2007, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that the Bankruptcy Court's December 28, 2005 Order is **AFFIRMED**.

*Joseph J. Farnan Jr.*
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 7 |
| | : | |
| WINSTAR COMMUNICATIONS, INC., | : | Bankruptcy Case NO. 01-01430-KJC |
| ET AL., | : | |
| | : | |
| Debtors. | : | |

| | | |
|---|---|---|
| LUCENT TECHNOLOGIES, INC., | : | |
| | : | Adversary No. 01-01063-KJC |
| Appellant, | : | |
| | : | |
| v. | : | Civil Action No. 06-147-JJF |
| | : | |
| CHRISTINE C. SHUBERT, | : | |
| CHAPTER 7 TRUSTEE, | : | |
| | : | |
| Appellee. | : | |

Paul C. Saunders, Esquire, Daniel Slifkin, Esquire and Michael A. Paskin, Esquire of CRAVATH, SWAINE & MOORE LLP, New York, New York.
Seth P. Waxman, Esquire, Craig Goldblatt, Esquire, Danielle Spinelli, Esquire and Michelle Glassman Bock, Esquire of WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, DC.
Paul N. Heath, Esquire, Jason Michael Madron, Esquire, and Daniel J. DeFranceschi, Esquire of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware.

Attorneys for Appellant.

David R. King, Esquire, Stephen M. Rathkopf, Esquire and Andrew C. Gold, Esquire of HERRICK, FEINSTEIN LLP, New York, New York.
Sheldon Kevin Rennie, Esquire of FOX ROTHSCHILD LLP, Wilmington, Delaware.

Attorneys for Appellee.

## MEMORANDUM OPINION

April 26, 2007
Wilmington, Delaware

*Joseph J. Farnan Jr.*

Farnan, District Judge

Pending before the Court is an appeal filed by Lucent Technologies, Inc. ("Lucent") from the December 28, 2005 Order of the United States Bankruptcy Court for the District of Delaware, entering judgment in favor of Christine C. Shubert (the "Trustee"). For the reasons set forth below, the Court will affirm the Bankruptcy Court's Order.

## I.    PARTIES' CONTENTIONS

Lucent raises three issues on appeal. The Court has considered the parties' contentions concerning each issue and reached the following conclusions.

### A.    Count X: Preference

Lucent contends that the Bankruptcy Court erroneously awarded the Trustee the recovery of a preferential payment. Specifically, Lucent contends that the Bankruptcy Court erred in finding it was an insider of Winstar at the time of the transfer of the payment in question because Lucent did not exercise managerial control over Winstar. In this regard, Lucent contends that the Bankruptcy Court erred in drawing an adverse inference from the testimony of two former Lucent employees who invoked their rights under the Fifth Amendment. Additionally, Lucent contends that the payment at issue was not a transfer of Winstar's property because the funds were earmarked for Lucent. Finally, Lucent contends that the Bankruptcy Court erred in rejecting its new value defense.

1

In response, the Trustee contends that the Bankruptcy Court properly concluded that the elements of a preferential payment were met because Lucent was an insider under the statutory and non-statutory definitions, and the payment was a transfer of Winstar's property.  The Trustee further contends that Lucent waived its earmarking defense by failing to raise it in its Answer or pretrial submissions and, in the alternative, that the Bankruptcy Court correctly found that the payment was not earmarked for Lucent.  Finally, the Trustee contends that the Bankruptcy Court properly concluded that Lucent failed to meet its burden to prove it provided new value under Section 547(c)(4) of the Bankruptcy Code.

B.    Count XI: Equitable Subordination

Lucent contends that the Bankruptcy Court erroneously subordinated its claims against the Winstar estate by: 1) improperly determining that Lucent was an insider of Winstar; 2) applying the doctrine punitively rather than remedially by failing to quantify the harm; and 3) subordinating Lucent's claims to the interests of equity holders in contravention of Bankruptcy Code § 510(c).

In response, the Trustee contends that the Bankruptcy Court properly subordinated Lucent's claims because, regardless of whether Lucent is an insider, its conduct was sufficiently egregious to warrant a finding of inequitable conduct to justify subordination.  The Trustee further contends that the Bankruptcy

2

Court adequately quantified the harm and Lucent failed to prove that the harm did not exceed the amount of escrowed funds. Additionally, the Trustee contends that the Bankruptcy Court correctly interpreted Section 510(c) to allow subordination of Lucent's claims to the interests of equity holders.

C.   Count VII: Breach of Subcontract

Lucent contends that the Bankruptcy Court erred in finding that the Subcontract between Lucent and Wireless was modified by the parties' course of conduct and breached by Lucent. Specifically, Lucent contends, for the first time on this appeal, that there was a waiver of the original Subcontract rather than a modification.  Lucent further contends that even if there was no waiver, there was no modification by course of conduct because the Subcontract contained an enforceable express prohibition on oral modifications.  Lucent contends that, even if the terms of the contract were modified, it did not breach the contract because Winstar made a request for a loan rather than submit a "Task Order" that would have given rise to Lucent's obligation to pay under the Subcontract.  Additionally, Lucent argues in a footnote that the Bankruptcy Court erroneously determined that the subcontract issue was a core matter within its jurisdiction.

In response, the Trustee contends that the Bankruptcy Court correctly concluded that the contract was modified by the parties' course of conduct and, as modified, was breached by Lucent.  Specifically, the Trustee contends that Lucent's waiver

3

argument is time-barred as it is raised for the first time here, and even if not barred, is not supported by the record evidence. The Trustee further contends that New York law allows a modification of a contract by course of conduct even where a "no oral modifications" clause is present.

## II.  STANDARD OF REVIEW

The Court has jurisdiction to hear appeals from the Bankruptcy Court pursuant to 28 U.S.C. §158(a).  The appellate responsibilities of this Court are further defined by the jurisdiction exercised by the Third Circuit, which focuses and reviews the Bankruptcy Court decision on a de novo basis in the first instance.  Baroda Hiss Inv., Inc. v. Telegroup Inc., 281 F.3d 133, 136 (3d Cir. 2002).

## III. DISCUSSION

A.  Whether The Bankruptcy Court Erred In Awarding The Trustee Recovery Of The Preferential Payment

Section 547(b) of the Bankruptcy Code reads in pertinent part: "The trustee may avoid any transfer of an interest of the debtor in property. . made. . . between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider. . .." 11 U.S.C. § 547(b)(4)(b).  The payment at issue is $188.2 million in proceeds from a loan made to Winstar by Siemens and transferred to Lucent the same day, more than ninety days but less than one year before Winstar's bankruptcy filing.  Therefore, whether the Trustee may

4

avoid the payment of the Siemens loan made to Lucent hinges on Lucent's status as an insider of Winstar. Lucent contends that the Bankruptcy Court applied the wrong standard for determining insider status and erred in finding that the facts supported its conclusion.

After reviewing the decision of the Bankruptcy Court under a plenary standard of review, the Court concludes that the Bankruptcy Court correctly concluded that Lucent was an insider of Winstar. The relevant subsection of the Bankruptcy Code describes an insider as a "person in control of the debtor." 11 U.S.C. §101(31). However, Section 101(31) is not an exhaustive list and courts are left to determine whether a party is an insider on a case by case basis. As the Bankruptcy Court correctly points out, the legislative history of the Code defines an insider as "one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor." Butler v. Shaw, 72 F.3d 437, 443 (4th Cir. 1996). Lucent cites In re Badger Freightways, Inc. for the proposition that insider status depends on a finding of managerial control. 106 B.R. 971, 980 (Bankr. N.D. Ill. 1989). However, the Court is not persuaded that case law in this Circuit supports Lucent's argument.

After reviewing the Bankruptcy Court's reasoning, the Court concludes that the Bankruptcy Court thoroughly considered the facts and properly concluded that Lucent was an insider of

Winstar because the parties' relationship was more than a mere debtor-creditor relationship conducted at arm's length and sufficiently close to warrant such a finding. Specifically, the Bankruptcy Court found that throughout the course of the parties' relationship, Lucent controlled Winstar's purchasing decisions in order to inflate its own revenue, even when Winstar neither needed Lucent equipment or services. Additionally, the Bankruptcy Court found that communications showing that former Lucent employees William Plunkett and Deborah Harris were involved in the scheme to use Winstar as a captive buyer to inflate end-of-quarter revenues were sufficient corroborative evidence to support drawing an adverse inference from their Fifth Amendment responses to questions. With respect to the Siemens loan funds, the Bankruptcy Court found that Lucent demanded that Winstar agree to transfer the funds to Lucent or it would terminate negotiations for a necessary transition agreement and refuse further financing under the parties' credit agreement. In the circumstances, the Court cannot conclude that the Bankruptcy Court's findings were clearly erroneous. Thus, the Court concludes that the Bankruptcy Court correctly concluded that Lucent was an insider at the time of the transfer for purposes of Section 547(b).

With respect to Lucent's additional contentions, the Court cannot conclude that the Bankruptcy's findings were clearly erroneous. Specifically, the Bankruptcy Court found that the

6

Siemens loan funds were not earmarked for Lucent and thus, a transfer of Winstar's interest of property occurred when it paid the funds to Lucent.  Additionally, after thoroughly analyzing the expert testimony regarding several different methods to determine insolvency, the Bankruptcy Court found that Winstar was insolvent on the date of the transfer to Lucent.  Further, the Bankruptcy Court considered the facts and circumstances with respect to Lucent's new value defense and properly concluded that Lucent did not meet its burden to establish its defense pursuant to 11 U.S.C. § 547(g).

In sum, the Court concludes that the Bankruptcy Court's factual findings with respect to the preferential payment are supported by the record and are not clearly erroneous.  Further, the Court concludes that the Bankruptcy Court correctly concluded as a matter of law that the elements of a preferential payment under Section 547(b) were met.  Accordingly the decision of the Bankruptcy Court with regard to the preference judgment will be affirmed.

B.    <u>Whether The Bankruptcy Court Erred In Subordinating Lucent's Claims</u>

Pursuant to Section 510(c) of the Bankruptcy Code, the Bankruptcy Court may, after notice and a hearing, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim under the principles of equitable subordination.  11 U.S.C. § 510(c).  To apply equitable

7

subordination, three requirements must be met: 1) the claimant engaged in some type of inequitable conduct; 2) the misconduct resulted in injury to other creditors and conferred an unfair advantage on the claimant; and 3) equitable subordination of the claim is not inconsistent with the provisions of the Bankruptcy Code. Citicorp Venture Capital Corp. v. Committee of Creditors Holding Unsecured Claims, 160 F.3d 982, 989 (3d Cir. 1998) (citing In re Mobile Steel Co., 563 F.2d 692, 699-700 (5th Cir. 1977)). Where the creditor is not an insider, the party seeking to apply equitable subordination bears a higher burden of proof for which he must show that the creditor engaged in egregious conduct such as fraud, spoilation or overreaching. In re Epic Capital Corp., 307 B.R. 767, 772 (D. Del. 2004).

In reviewing equitable subordination decisions, the Third Circuit has applied a clearly erroneous standard to the Bankruptcy Court's findings of fact and a plenary standard to its legal conclusions. Id. at 771. Accordingly, the Court will review the Bankruptcy Court's legal conclusions under the de novo standard of review and its factual determinations under the clearly erroneous standard of review. Id.

In the circumstances, the Court cannot conclude that the Bankruptcy Court's findings were clearly erroneous. With respect to the first prong of the Mobile Steel test, Lucent contends that the Bankruptcy Court erroneously premised its conclusion on the determination that Lucent was an insider of Winstar. The

8

Bankruptcy Court determined that the same facts which led it to conclude that Lucent was an insider in the context of the preferential payment also supported its finding that Lucent engaged in inequitable conduct. The Bankruptcy Court went a step further, however, and analyzed the facts and circumstances of Lucent's conduct to conclude that, regardless of whether Lucent was an insider, its conduct was so egregious as to warrant equitable subordination. Thus, the Court concludes that Lucent's assertion that the Bankruptcy Court's conclusion was premised solely on the determination that Lucent was an insider is not supported by the record. Rather, the Bankruptcy Court correctly analyzed the Mobile Steel test for equitable subordination in both the context of insider and non-insider status and concluded that Lucent engaged in sufficient inequitable conduct.

With respect to the second prong of the Mobile Steel test, Lucent contends that the Bankruptcy Court erred in applying the doctrine of equitable subordination punitively by not tailoring the relief to identifiable harm. Specifically, Lucent contends that the Bankruptcy Court erred because the damages cited do not constitute the type of harm that justifies subordination, the harm to the bankruptcy estate from the payment of the Siemens loan to Lucent was remedied by the preference judgment, and the Bankruptcy Court failed to quantify the harm in proportion to the remedy. The doctrine of equitable subordination is remedial and is intended to offset specific harm caused the debtor or other

9

creditors by the claimant's inequitable conduct. In re SubMicron Systems Corp, 432 F.3d 448, 462 (3d Cir. 2006). However, although a bankruptcy court should identify the nature and extent of the injury to determine the proportionality of the remedy, quantification of harm is not always feasible nor is it required in every case. In re Mid-American Waste Sys., 284 B.R. 53, 47-48 (Bankr. D. Del. 2002); Citicorp, 160 F.3d at 991. The Bankruptcy Court considered, apart from the preferential payment itself, the interest paid by Winstar on unnecessary equipment, storage costs and insurance costs for equipment purchased to generate revenue for Lucent, the below-cost sale price for Lucent equipment in Winstar's inventory, and Lucent's deliberate delay in sending the refinancing notice despite its knowledge of Winstar's financial situation. The Court cannot agree with Lucent's characterization of its conduct as not injurious to Winstar or other creditors or not the type of harm that could justify equitable subordination. The Court concludes that, in determining the extent of equitable subordination warranted in the circumstances, the Bankruptcy Court thoroughly analyzed the facts and correctly concluded that Winstar and its creditors were substantially harmed by and Lucent substantially benefitted from Lucent's inequitable conduct.

With respect to the third prong of the Mobile Steel test, Lucent contends that Section 510(c) does not allow the Bankruptcy Court to subordinate its claims as a creditor to the interests of equity holders. The Court is not aware of any Third Circuit

10

precedent directly addressing this point. As the Trustee correctly points out, at least one appellate court has concluded that subordination of a claim to an equity interest is consistent with the Bankruptcy Code. In re Lifschultz Fast Freight, 132 F.3d 339, 342 (7th Cir. 1997).[1] Further, the Third Circuit has opined that the doctrine of equitable subordination was intended by Congress to allow for flexible application by the courts and that equitable subordination is a remedy that requires the Court to balance the equities of a claim on a case-by-case basis. In re Burden, 917 F.2d 115, 120 (3d Cir. 1990). Additionally, the purpose of equitable subordination is to preclude a creditor from participating in the distribution of the debtor's estate at the same level as the creditors or claimants for whom his conduct has injured. See In re Mid-American Waste Sys., 284 B.R. at 73. Thus, in the circumstances here, the Court concludes that the Bankruptcy Court properly considered and weighed the equities in order to conclude that, because of the nature and extent of Lucent's inequitable conduct, Lucent's claims should be subordinated to the holders of equity interest.

In sum, the Court concludes that the Bankruptcy Court's factual findings regarding Lucent's status as an insider and the extent of harm caused by Lucent's inequitable conduct are

---

[1] The Court acknowledges that some authority counsels that claims may only be subordinated to claims and not interests. Collier on Bankruptcy § 510.05 (15th ed. 2006). However, the same authority also recognizes the Seventh Circuit's conclusion in In re Lifschultz. See Id. at FN 5.

supported by the record and are not clearly erroneous.  Further, the Court concludes that the Bankruptcy Court correctly concluded as a matter of law that the facts and equities in this case warrant application of the doctrine to subordinate Lucent's claims to those of other creditors and the interests of equity holders.  Accordingly the decision of the Bankruptcy Court with respect to equitable subordination will be affirmed.

C.   Whether The Bankruptcy Court Erred In Finding Lucent
     Breached The Subcontract

Because Lucent had not developed the competency to build the telecommunications network and deliver a turnkey operation to Winstar as the parties had originally intended in their original Supply Agreement, Lucent and Wireless, a wholly-owned subsidiary of Winstar, entered into a Subcontract in January 1999 for Wireless to build the telecommunications network and bill Lucent. According to the Subcontract, Winstar was to submit a "Task Order" to Lucent in accordance with the specific requirements as described in the Subcontract.  Then, Wireless would perform the services described on the "Task Order."

The Bankruptcy Court found that the parties ignored this Task Order requirement and proceeded with a "pass-through" arrangement by which, generally, Winstar sent a purchase order to Lucent for services, Lucent in turn sent a purchase order to Wireless reflecting Winstar's request, Wireless performed the services and sent Lucent an invoice, Lucent invoiced Winstar,

12

Winstar drew from its Credit Agreement with Lucent in order to pay Lucent, and finally, Lucent used this money to pay Wireless. The Bankruptcy Court found that the parties employed this procedure from around March 1999 through March 2001 when Lucent refused to pay for services already performed by Wireless. Lucent contends it did not pay because no Task Order was issued. The Bankruptcy Court concluded that, despite the presence of a "no oral modification clause" in the Subcontract, the Task Order requirement was modified by the parties' course of conduct. The Bankruptcy further concluded that Lucent breached the contract when it refused to pay for Wireless services performed.

After reviewing the decision of the Bankruptcy Court under a plenary standard of review, the Court concludes that the Bankruptcy Court correctly concluded that the "no oral modifications clause" was made unenforceable by the parties' course of conduct, that the Subcontract was modified, and that Lucent breached the Subcontract when it refused to pay Wireless in March 2001. Assuming _arguendo_ that Lucent properly raises, for the first time before this Court, the contention that it waived the Task Order requirement, the Court is not persuaded by Lucent's argument that its conduct constituted a waiver rather than a modification and concludes that the Bankruptcy Court correctly analyzed this issue as a modification. Specifically, with respect to the conclusion that the parties' course of

13

conduct was sufficient under New York law to render the "no oral modifications clause" unenforceable and modify the Subcontract, the Court concludes that the Bankruptcy Court properly considered Lucent's history of not requiring Task Orders and its repeated but unenforced threats of paying "one last time" without requiring a Task Order. Particularly, the Court cannot conclude that the Bankruptcy Court erred in finding that it was not unreasonable for Winstar and Wireless to expect payment based on the history of the parties' transactions.

Further, the Court concludes that the Bankruptcy Court's conclusion that Lucent breached the Subcontract is not erroneous. Lucent contends that Winstar made a draw request under the Credit Agreement rather than a request in the nature of the parties' pass-through arrangement. However, the Bankruptcy Court properly considered the facts and circumstances surrounding a prior similar request which Lucent paid, and concluded that the request at issue gave rise to Lucent's obligation to pay. Additionally, the Court cannot conclude that the Bankruptcy Court erred in finding that a letter sent to Winstar by Lucent on September 27, 2000 and signed by Winstar did not change the terms of the arrangement because there was no mutual assent to do so. Thus, the Court concludes that the Bankruptcy Court's decision in this regard was not erroneous and agrees with the Bankruptcy Court that Lucent's refusal to pay Winstar's "Notice of Request for

14

Borrowing" of March 27, 2001 constituted a breach of the Subcontract.

Lastly, Lucent contends that the Subcontract issue is a non-core matter; thus raising an issue already addressed by this Court when it concluded that the Subcontract claim was part of the claims allowance process triable in equity in the context of denying Lucent's Motion To Withdraw The Reference (No. 04-928-JJF, D.I. 11). Further, the Bankruptcy Court concluded that regardless of the interpretation of this Court's above conclusion on the issue, it found that the Subcontract claim fell within its jurisdiction as a core matter. The Court finds no reason to alter its previous conclusion or that of the Bankruptcy Court.

In sum, the Court concludes that the Bankruptcy Court's factual findings and conclusions of law with respect to modification and breach of the Subcontract are supported by the record and not clearly erroneous. Accordingly, the Court will affirm the Bankruptcy Court's decision.

## IV.   CONCLUSION

For the reasons discussed, the Court will affirm the December 28, 2005 Order of the Bankruptcy Court.

An appropriate Order will be entered.

EXHIBIT 7

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:                   )      CASE NO.   01-1430 (JCA)

                               )

WINSTAR COMMUNICATIONS, INC., et al.,   )

                               )      JOINTLY ADMINISTERED

                               )

            DEBTORS.        )      CHAPTER 7

---

## ORDER (i) FIXING AUGUST 30, 2002 AS THE LAST DATE FOR THE FILING OF PROOFS OF CLAIM FOR ADMINISTRATIVE COSTS AND EXPENSES THAT AROSE, ACCRUED, OR OTHERWISE BECAME DUE AND PAYABLE ON AND BETWEEN APRIL 18, 2001 AND JANUARY 24, 2002 AND (ii) SPECIFYING THE FORM AND MANNER OF NOTICE THEREOF

*# 2310*

Upon the application (the "Application") of Christine C. Shubert, the chapter 7 trustee (the "Trustee") in the above-captioned cases, seeking the issuance and entry of an order (i) fixing August 30, 2002 as the last date for the filing of proofs of claim for administrative costs and expenses that arose, accrued, or otherwise became due and payable on and between April 18, 2001 and January 24, 2002 (the "Administrative Expense Period"), (ii) specifying the form and manner of notice thereof, and (iii) for such other and further relief as this Court deems just and proper; and it appearing that the relief requested in the Application is reasonable and necessary and in the best interests of the Debtors' estates and their respective creditors; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED, that for purposes hereof, Administrative Claim shall mean the (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or (b) right to an equitable remedy for breach of performance if such breach gives rise

*2431*

to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured; and with respect to either (a) or (b) above, which arose or accrued on and between between April 18, 2001 and January 24, 2002 (the "Administrative Expense Period") and which is entitled to priority in accordance with sections 503 and 507(a)(1) of the Bankruptcy Code; and it is further

ORDERED, that pursuant to Bankruptcy Rule 3003(c)(3) and except as otherwise provided herein, all persons and entities, including, without limitation, individuals, partnerships, corporations, estates, trusts, and governmental units, who hold or assert any Administrative Claims against any of the Debtors, which Administrative Claims arose, accrued, or otherwise became due and payable during the Administrative Expense Period, shall file a complete and duly executed proof of Administrative Claim conforming to Official Form No. 10 of the Official Bankruptcy Forms by no later than 5:00 p.m. Eastern Time on August 30, 2002 (the "Administrative Bar Date"), with such proofs of Administrative Claim to be deemed filed only when actually received at the locations set forth hereinbelow; *provided, however,* that pending further order of the Court, the holders of Administrative Claims of the following type or nature need not file proofs of Administrative Expense Claims held by persons on or prior to the Administrative Bar Date:

    (a)    Any person or professional holding an Administrative Claim for compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331 or 503(b) of the Bankruptcy Code;

    (b)    Any holder of an Administrative Claim which arose or accrued or otherwise became due and payable subsequent to the Administrative Bar Date;

2

(c)    Any Administrative Claim of any of the Debtors or their affiliates against one or more of the Debtors;

(d)    Any holder of an Administrative Claim that has been allowed by order of this Court, or who has previously filed proof of such Administrative Claim with the Court; and

(e)    The Office of the United States Trustee with respect to Administrative Claims that arise in connection with fees due under section 1930 of title 28 of the United States Code;

and it is further

ORDERED, that, pursuant to Bankruptcy Rule 9009, each proof of Administrative Claim filed pursuant to this Order shall specifically set forth the full name or names of the Debtor or Debtors against which any such Administrative Claim is asserted; and it is further

ORDERED, that, pursuant to Bankruptcy Rule 3003(c)(2), each and every holder of an Administrative Claim against any of the Debtors who, by this Order, is required to file a proof of Administrative Claim in the form and manner specified herein, but who fails to do so on or before the Administrative Bar Date, shall <u>not</u>, with respect to any such Administrative Claim(s), be treated as the holder of such Administrative Claim(s) against any of the Debtors for the purposes of receiving any distribution from the Trustee herein, and shall be forever barred, estopped, restrained, and enjoined from asserting any such Administrative Claim(s) against any of the Debtors or their successors or assigns, and the Debtors and their properties shall be forever discharged from any and all indebtedness or liability with respect to such Administrative Claim(s); and it is further

ORDERED, that pursuant to Bankruptcy Rule 2002(a)(7), (j), and (k), service of notice of the Administrative Bar Date (the "Notice"), substantially in the form attached to the Application as Exhibit "A" thereof, the form of which is hereby approved in all respects, shall be deemed good and sufficient notice of the Administrative Bar Date if served by first class United States mail on or before June 18, 2002 upon: (i) the Office of the United States Trustee; (ii) counsel for the postpetition bank group; (iii) counsel for the prepetition bank group; (iv) counsel to the Committee (as defined in the Application); (v) all persons and entities that have filed notices of appearance herein; (vi) all persons or entities listed in the Debtors' schedules and statement of financial affairs, or any amendments thereto (the "Schedules"), as holding "claims," as that term is defined in section 101(5) of the Bankruptcy Code, against the Debtors; (vii) all persons or entities listed in the Schedules as being a party to an executory contract or unexpired lease with the Debtors; (viii) the Director of the Internal Revenue Service for the District of Delaware; (ix) the Securities and Exchange Commission; (x) the United States Attorney for the District of Delaware; and (xi) all other persons or entities whom the Debtors believe may hold an Administrative Claim; and it is further

ORDERED, that pursuant to Bankruptcy Rule 2002(*l*), the Debtors shall cause a copy of the Notice to be published once in the national edition of *The New York Times* and/or *The Wall Street Journal* (or similar publication), on or before June 25, 2002; and it is further

ORDERED, that a proof of Administrative Expense Claim shall be deemed filed (i) if by first class United States mail, only when it is **actually received** by and at:

Bankruptcy Services, LLC
c/o Winstar Communications, Inc. *et al.*
Claims Processing
P.O. Box 5287
FDR Station
New York, New York 10150-5287

or, (ii) if filed in person or by hand delivery, only when it is **actually received** by and at:

Bankruptcy Services, LLC
c/o Winstar Communications, Inc. *et al.*
Claims Processing
Heron Tower
70 East 55th Street,
Sixth Floor
New York, New York 10022

and it is further

ORDERED, that nothing in this Order shall be deemed to prejudice the right of

any of the Trustee or any other party in interest herein to dispute the allowance of, or assert

setoff rights or any other defenses or counter-claims to, any Administrative Claim, including

any objection to amount, liability, or classification, and to subsequently designate any

Administrative Claim as disputed, contingent, or unliquidated; and it is further

ORDERED, that the Trustee is hereby authorized and empowered to do such

things and expend such funds as may be necessary and appropriate to implement and effectuate

the terms of this Order.

Dated:    Wilmington, Delaware
          June ⫽, 2002

_____
UNITED STATES BANKRUPTCY JUDGE

Doc #30443318.WPD/6.1                                    5

EXHIBIT 8



**IMPALA**
P A R T N E R S

June 1, 2007

Christine Schubert, Esq.
10 Teaberry Drive
Medford, NJ 08055-3608

Re: Winstar Holdings, LLC and IDT Corp. v. Impala Partners, LLC et al.

Dear Christine:

As you know, IDT commenced a lawsuit in New York Supreme Court against Impala Partners, the Blackstone Group LP and Citicorp in connection with the sale of certain of Winstar's assets to IDT in December, 2001. Pursuant to Impala's retention arrangement with Winstar, Winstar agreed to indemnify Impala against any losses, claims, damages or liabilities brought by any third-party arising out of the services provided by Impala to Winstar. Impala has retained Herrick Feinstein LLP to represent it in the above-referenced litigation.

I would appreciate it if you could confirm that Winstar will indemnify Impala, including but not limited to, payment of legal fees in connection with the above-referenced litigation.

Very truly yours,

Paul A. Street (CKMR)

Paul A. Street

cc: Stephen Rathkopf

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

Citigroup Center
153 East 53rd Street
New York, New York 10022-4611

Yosef J. Riemer
To Call Writer Directly:
212-446-4802
yriemer@kirkland.com

(212) 446-4800

www.kirkland.com

Facsimile:
(212) 446-4900

Dir. Fax: 212 446-4900

June 4, 2007

**By Federal Express and U.S. Mail**

Timothy R. Graham
Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.
685 Third Avenue
Suite 3100
New York, New York 10017

Christine Shubert
Trustee, Winstar Communications, Inc.
Fox Rothschild LLP
919 North Market Street
Suite 1300
P.O. Box 2323
Wilmington, Delaware 19899-2323

Re:    Notification of Indemnification

Dear Mr. Graham and Ms. Shubert:

Pursuant to Attachment A to the Agreement dated July 26, 2001 between The Blackstone Group L.P. ("Blackstone), Winstar Communications, Inc., Winstar Wireless, Inc., and their affiliates, I write today to inform you of our receipt, on May 22, 2007, of a complaint commencing an action against Blackstone in Supreme Court for the County of New York. For your convenience, I am enclosing a copy of the aforementioned Agreement, Attachment A thereto, and the complaint. The case has now been removed by Impala Partners from Supreme Court to the United States District Court for the Southern District of New York, and we anticipate that a motion will be filed shortly requesting a transfer of venue back to the federal courts in Delaware.

Please consider this letter to be notification to you of our intention to enforce our contractual right to indemnification for any losses, claims, damages, expenses and liabilities that already have been or in the future will be incurred by Blackstone in connection with this suit.

Plaintiffs in this action, *Winstar Holdings, LLC & IDT Corp. v. The Blackstone Group, L.P.; Impala Partners, LLC; & Citicorp*, No. 601582/07, allege that Blackstone, in its advisory role

Chicago        Hong Kong        London        Los Angeles        Munich        San Francisco        Washington, D.C.

**KIRKLAND & ELLIS LLP**

June 4, 2007
Page 2

during the asset sale of Winstar Communications, Inc. ("Old Winstar"), conspired with the other defendants to defraud Plaintiffs by making material misrepresentations about the status of Old Winstar's business.  Specifically, Plaintiffs bring claims for fraud, aiding and abetting fraud, negligent misrepresentation, negligence, and civil conspiracy.  As these allegations arise out of Blackstone's engagement under the July 26, 2001 Agreement they are within the scope of the Indemnification Agreement attached thereto.

Sincerely yours,

Yosef J. Riemer

EXHIBIT 9
PART 1 OF 2

1          IN THE UNITED STATES BANKRUPTCY COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -

4   In re                    :      Case No.
                             :
5   WINSTAR COMMUNICATIONS,   :
    INC., et al.,             :
6                            :
                             :
7           Debtors.          :    〈 No. 01-1430 (JJF)

8
                          -/- -
9


10                  Wilmington, Delaware
                Monday, December 17, 2001
11                    3:05 p.m.

12
                          - - -
13


14
    BEFORE:  HONORABLE JOSEPH J. FARNAN, JR., U.S.D.C.J.
15

16
                          - - -
17

18

19

20

21

22

23

24

25

1850

1          (The following took place in chambers, Ms.

2   Morgan, Mr. Shapiro, Mr. Cobb, Mr. Karotkin, and Mr. Kenney

3   being present.)

4          THE COURT:  There is a hearing today scheduled

5   for a sale motion, and that was the only item that I had put

6   on the agenda.  As I understand it, there is no sale.  I have

7   asked counsel to come in and speak to me about the status of

8   this Chapter 11 and whether or not there still is no sale.

9   If counsel could put their appearances for the court reporter

10  on the record.

11         MR. SHAPIRO:  Mark Shapiro from Shearman &

12  Sterling for the debtors.

13         MS. MORGAN:  Pauline Morgan from Young Conaway

14  for the debtors.

15         MR. COBB:  Richard Cobb of Klett Rooney on behalf

16  of the debtor-in-possession lenders.

17         MR. KAROTKIN:  Steven Karotkin, Weil, Gotshal &

18  Manges, for the debtor-in-position lenders.

19         MR. KENNEY:  Mark Kenney for the United States

20  Trustee.

21         THE COURT:  Is it still correct that we have no

22  sale to rule upon?

23         MR. SHAPIRO:  Yes.

24         THE COURT:  I don't know how this fellow got in

25  chambers, but his name is Howard Jonas.

1          MR. KAROTKIN:  Can I respond to that, Howard

2     Jonas?

3          THE COURT:  Let me just put it on the record.  He

4     is from IDT Corporation, Newark, New Jersey, who presented a

5     card to my secretary saying he is a bidder.

6          Your turn.

7          MR. KAROTKIN:  IDT has kind of floated in and out

8     of this over the last three or four weeks with various

9     proposals, submitting proposals, withdrawing proposals.  As I

10    understand it, they submitted a proposal on Friday or

11    Saturday --

12         MR. SHAPIRO:  Friday afternoon.

13         MR. KAROTKIN:  -- pursuant to which they made an

14    offer to purchase some of the assets out of a Chapter 7.  The

15    people from Blackstone have been trying to understand what

16    they are proposing and exactly what they mean.  And right

17    before we came in here now, there were some discussions going

18    on with them to try to figure out whether a potential

19    transaction was possible.  I was involved in those

20    discussions.  I think that probably within ten or 15 minutes

21    there would be some more definiteness to whether or not that

22    was a potential.  But I don't want to overstate anything.

23         THE COURT:  All right.  I am going to take the

24    view presently -- of course, it could change, because I

25    assume they are still talking out there -- that there is a

1    motion for a sale but no sale pending for me to rule on.  So

2    the question is, scheduling going forward, what do I need to

3    schedule to move this case, either what was discussed at the

4    hearing that we continued to today, the possible conversion

5    to a Chapter 7, and what Court time would you need if that

6    was the application, or some other application.

7              MR. SHAPIRO:  I think where we are right now is

8    the bidder, the one bidder who was left said that they had

9    the money.  But of course we haven't seen it yet.  And of

10   course, as recently --

11             THE COURT:  I am beyond that.  I am saying there

12   is no sale.

13             MR. SHAPIRO:  Assuming there is no sale, I think

14   we have no choice but to convert the case.  We were there

15   last week and I think that's where we are now.  I think what

16   we have been talking to Mr. Kenney about is we tried to do

17   this, because it is a regulated company, in the absolutely

18   least disruptive way to everybody involved.  That is my goal,

19   to do something that will not harm people.  So I think it is

20   our view -- we have talked to the U.S. Trustee's Office about

21   it -- that we try to put into place a Chapter 7 trustee, have

22   a very, very shortened order for a hearing, a 341 meeting,

23   and put into place a permanent trustee very quickly so that

24   this whole 30-day migration program can be effectuated

25   quickly and in a way that is consistent with what the FCC is

1    interested in having and in a way that is consistent with

2    what the banks have been having.

3              I think he is amenable to that general concept.

4              MR. KENNEY:  Right.  I think what I get within

5    that concept, Your Honor, is because this is a regulated

6    company and because there are some significant governmental

7    interests involved here, we would want to make sure that the

8    order converting the case not only authorizes but directs the

9    trustee to operate the company to whatever extent is

10   necessary to avoid these disruptions.  I am not sure if we

11   can avoid all of the disruptions to all customers, but

12   certainly the federal and state agencies that are involved.

13             I had an inquiry from the district executive for

14   the Southern District of New York, who said their entire

15   system is on Winstar, and Verizon right now is not a viable

16   alternative for them because Verizon is still trying to

17   restore service to people after September 11.

18             MS. BAER (Court's Secretary):  There were

19   representatives from the Zimmerman Group that just knocked on

20   the door to let you know that they are here and that they

21   have an offer.

22             THE COURT:  So what I am hearing is that you

23   probably need to do some strategizing and paperwork, limited

24   paperwork, and, we had an omnibus hearing scheduled in this

25   case for --

1          MS. MORGAN:  The 20th.

2          MR. COBB:  Thursday.

3          THE COURT:  What time was it?

4          MS. MORGAN:  3:30, I think.

5          THE COURT:  Would you want to use that date or

6     have me give you a date next week, where you could come back

7     with whatever you didn't get in interim relief today?

8          MR. SHAPIRO:  One of the questions is whether we

9     can do it more quickly.  I think everyone is very concerned

10    that if we keep going we could --

11         THE COURT:  Quicker than the 20th, sure.  I want

12    to be available to help you get through this.

13         MR. SHAPIRO:  Our thought was to try to construct

14    an order that is consistent with what we just talked about,

15    that is consistent with ultimately making sure that the

16    system stays up for 30 days.  The banks and the carriers have

17    not yet reached agreement on how that will work.  The banks

18    are agreeing to allow some use of cash collateral to keep

19    this going.  The carriers want to be paid in full.  And you

20    have a negotiation that is currently ongoing between how much

21    they should get and how much the banks are willing to let

22    them have.  That hasn't been concluded.  I think if we can

23    have some out date by which everyone has got to reach an

24    agreement, put pressure on everyone to reach a deal, that

25    will be very helpful to us, if we could say we are converting

1    the case, and subject to working out an acceptable order in

2    the next 24 hours, and we will come back to Your Honor with

3    an order, hopefully that is consensual, with the U.S.

4    Trustee, the banks, and the FCC.

5           THE COURT:  So let's assume that I say 24 hours,

6    would you want me to schedule a hearing, if it is not

7    consensual, for tomorrow afternoon?

8           MR. SHAPIRO:  Yes, I think that would make sense,

9    if you had the time.

10          MR. KAROTKIN:  I think that is fine.

11          THE COURT:  A hearing on an intended motion to

12   convert.

13          MR. KAROTKIN:  I think that is fine.  I think we

14   had made progress with the FCC, and I am hopeful -- with the

15   FCC and with the carriers, and I am hopeful we can reach an

16   understanding.  I think to the extent that everyone has some

17   certainty, knowing there are no certainties in the world,

18   that the 30-day period is a 30-day period because there is a

19   limited amount of money here and everyone has to work really

20   hard to make sure it works, that is fine.  I would only ask

21   if we could impose upon the Court to participate by

22   telephone, it would make our lives really easy.

23          THE COURT:  We could actually do the whole thing

24   on telephone if someone initiates the call and you all line

25   up who you want on it, and we will do it by telephone.

1              MR. SHAPIRO:  We can set up a call-in number.

2              THE COURT:  Sure.

3              MR. SHAPIRO:  The other issue that we have is we

4    also have a bunch of -- your TRO that you issued on last

5    Monday will run out today.  I don't know if you want to

6    extend that, because we need 24 more hours to work this out.

7    Hopefully, no one will terminate us, but it makes sense to

8    extend it to the telephonic hearing.

9              THE COURT:  I will just enter an order that

10   continues it until tomorrow to whatever time we set the

11   hearing for.  Now, there will be some folks that won't

12   appreciate that, but probably nobody that is integral to what

13   you are trying to work out.  They will be involved in trying

14   to work it out.

15             MR. KAROTKIN:  I think that's right.  I think

16   most of the people we were on the phone with today.

17             MR. SHAPIRO:  We spent the weekend trying to work

18   this out.  It is not quite done, but I think, as Steve

19   characterized it, it's close.

20             MR. KAROTKIN:  If anything materializes with

21   these IDT people, are you available this afternoon?

22             THE COURT:  Yes.

23             MR. KAROTKIN:  I think people would like to stay

24   here to see if something could be worked out and if possible

25   come back before Your Honor.

1              MR. KENNEY:  Is Zimmerman one of the people who

2    was bidding?

3              MR. KAROTKIN:  He was here last week.

4              MR. KENNEY:  He never came up with anything.

5              MR. SHAPIRO:  He says he is here with his money.

6              THE COURT:  If you want to do the phone

7    conference at 2:00 tomorrow, we will enter an order extending

8    the TRO that was entered last Monday, and then we will take

9    off the hearing on the 20th, and then I will be here if

10   something develops with a potential buyer.

11             MR. KAROTKIN:  Great.  Thank you.

12             MR. KENNEY:  Your Honor, I have another

13   engagement that probably will not be over by 2:00.  If I

14   don't have all of my issues resolved with the debtors, I will

15   arrange for somebody from my office.

16             THE COURT:  We can move it.  When will you be

17   available.  3?

18             MR. KENNEY:  3 would work better.

19             THE COURT:  We will make it 3 tomorrow.

20             MR. SHAPIRO:  Just so Your Honor knows, we did

21   spend, to update you beyond my letter, we did spend all day

22   Friday with the Zimmerman folks trying to work out the

23   contract because we still hadn't finished with them on the

24   contract.  We weren't able to resolve -- there were about

25   half a dozen pretty significant issues that still could not

1    be agreed to between the debtors, the DIP lenders, and the

2    potential buyer.  And we said, look, you know, we are not

3    going to spend the whole weekend negotiating with you guys

4    when you are not telling us there is money.

5            I asked on Friday, can you provide me with at

6    least evidence that the money will be there on Monday.  Give

7    me something that tells me that we should continue this,

8    because this is becoming ridiculous and we have 25 people

9    working away on this in different places.  The best he could

10   tell me was that they were working with three bridge lenders

11   on a term sheet.  He didn't want to give it to me.

12           Frankly, a term sheet from a bridge lender for

13   the 15 million dollars wasn't particularly useful.  That is

14   where we ended up on Friday afternoon.  Over the weekend, I

15   called Susheel Kirpalani, their counsel at Milbank, a number

16   of times.  I exchanged a couple of voice mails.  And he had

17   nothing to report to me over the weekend in terms of ability

18   of his client to raise the funds.  The last I heard, they may

19   have been trying to get moneys wired from some third party

20   into a Wintel, which is the buyer's name, account somewhere,

21   and that in turn, Wintel, once it receives those funds from

22   wherever they are coming, would wire those funds to

23   Shearman & Sterling.

24           I asked them, when would that happen.  They

25   couldn't answer that.  I said, what about the rest of the

1    money?  15 is just a deposit, and you need a lot more money

2    to operate this company and close the deal.  And he had no

3    response.

4              THE COURT:  The kind of buyer you are looking for

5    may have a problem, I would think, may have some problem with

6    terms, but wouldn't be shallow on that 15 million.

7              MR. KAROTKIN:  The concern that we have is that

8    you have someone who has consistently said they are going to

9    put up money.  And let's say they do come up with some money

10   and you enter into a transaction which can't close for

11   another 30 days, where they are going to need more money, and

12   another 90 days where they are going to need more money, the

13   risk that doesn't show up, we are in a much worse situation

14   than we are in today.  That is a big concern of ours, and

15   ought to be of the FCC as well.

16             THE COURT:  Again, the kind of buyer that you are

17   looking for and need, that third-level money may not be tied

18   down, but the first and part of the second level would not be

19   a problem for them.  And it sounds like what they are doing

20   is hustling your conversation to try and get somebody to put

21   up some money.  The conversation isn't being seen by the

22   people that they are trying to get the money from as

23   something they want to invest in.

24             People with money, they drive deals.  If they are

25   not buying the hype -- you all see that every day.  There is

1  probably someone out there that had the money that they were

2  talking to but they are just not liking what they have to do

3  to make this deal.

4        MR. SHAPIRO:  This is the only one that actually

5  got a DIP.  The reason it did is everyone believed it could

6  be reorganized or sold.

7        THE COURT:  That was the big thing they were

8  talking about in the Journal.

9        MR. KAROTKIN:  The first and last DIP.

10       MR. KENNEY:  Maybe the Journal writer knows where

11 the money is.

12       THE COURT:  Actually, the numbers aren't that bad

13 for what you would get if you knew how to operate it.  If you

14 had some foresight that you could actually make it work, this

15 is like salvage.  It's not that bad.  But I guess, who is out

16 there to operate it?  The first round couldn't do it.  There

17 won't be many lenders coming in on these.

18       MR. KAROTKIN:  There aren't many DIPS that don't

19 get paid.  First of all, there are not many DIPS that don't

20 get paid in full and hardly any that are going to get 20

21 cents on the dollar or whatever, maybe 30 cents.

22       THE COURT:  DIPs don't lose money.  But there is

23 risk.

24       MR. KAROTKIN:  We know that now.

25       MR. KENNEY:  This is the case that proves the

1   rule.

2           THE COURT:  This proves the rule.  The worst part

3   of this case, you took forced financing for a week, too,

4   which will make DIPS wonder.

5           Well, okay.  I will be around if something

6   breaks.  I think you could tell those folks I will be real

7   focused on dollars today, and I think the three or four

8   levels they need dollars, not just today.  And absent that,

9   all those other folks out there, their problems are going to

10  be dealt with by a trustee.  There is nothing I can tell

11  them.  Mr. Kenney is going to work to get us something here.

12          MR. KENNEY:  We will try to get a trustee in real

13  quick.  One of the things Mr. Shapiro points out was the need

14  to, we will have a trustee with the authority and directive

15  to operate the company, but the reality is the learning curve

16  is going to be very steep.  And I think it's a given at this

17  point that at the 341 meeting the creditors will elect their

18  own trustee to replace the interim trustee.  So I think what

19  they want to do is accelerate the process.  And we had some

20  discussion about that, Rule 2002 says it is a 20-day notice

21  and it kind of falls into a twilight zone of whether the

22  Court can shorten that period.  I am going to let them do the

23  selling job on that and not take a position.

24          MS. MORGAN:  Your Honor, I don't think it is a

25  twilight zone.  I think 9006 says reduction is permitted in

14

1  certain circumstances.  It cites the rules under which

2  reduction is not permitted.  And the scheduling of a 20-day

3  notice of a 341 is not listed there.  That means reduction is

4  permitted.  I think we would ask the Court for a motion to

5  shorten that period so that that 341 meeting could be held in

6  about a week's time.  We would publish it on our website.  We

7  haven't thought about how else we could publish it.

8            MR. SHAPIRO:  Put out a press release.

9            MS. MORGAN:  Yes, to give people notice so they

10  could elect a trustee promptly.

11            MR. KENNEY:  We would ask for those kind of

12  safeguards.

13            THE COURT:  Those safeguards and take no

14  position -- right, which will work.

15            MR. SHAPIRO:  We can build that all into the

16  order.

17            MS. MORGAN:  If I may clarify.  There are a

18  couple agreements that we have in place, for instance,

19  assumptions and assignments with consent, there is one that I

20  have here with me today that would result in, for instance, a

21  waiver of a large administrative claim.  To the extent we can

22  get those approved, can we just submit those if they are

23  consensual?

24            THE COURT:  Anything that is consensual, just

25  send over, we will get them signed and stop the clock, or

1    avoid a claim, if we can.  If they are consensual, no one

2    cares.

3            MS. MORGAN:  As far as the motion to convert, is

4    the U.S. Trustee's motion --

5            MR. KENNEY:  We will move orally.

6            MS. MORGAN:  And we will file the motion to

7    shorten then.

8            MR. SHAPIRO:  We will prepare a consensual order.

9            MR. KAROTKIN:  I just have one question.  I

10   assume when we go outside Mr. Zimmerman is going to say, you

11   know, I have a bid to make, I want to make a bid --

12           THE COURT:  This isn't an option, that's what you

13   tell him.

14           MR. KAROTKIN:  I assume at this point a

15   determination of whether to consider these things rests with

16   the debtor and the creditors.

17           THE COURT:  The Judge doesn't get involved in

18   deciding whether he is -- doesn't take bids and doesn't

19   decide whether, you know, they are of some value to the

20   estate.

21           He has to sell the debtor.  But the motion that

22   was pending is now denied as moot.

23           Now, the debtor can get to reopen that motion,

24   what do they call it, reconsider, I mean that ruling, that it

25   is denied as moot, but he has to, I assume the debtor would

1  have to be convinced that there was some reason to move

2  that.  Somebody out there in the world who wanted to be in

3  the game can't come in and do that.

4          Does anybody disagree with that?

5          MR. KAROTKIN:  No.

6          MR. SHAPIRO:  No.

7          THE COURT:  I told Ms. Morgan when I was worried

8  about scheduling or concerned about scheduling that unless

9  there was some premise to the sale motion, that the hearing

10 was canceled, because that's what I had before me, a sale

11 motion.  And that's what I did.

12         Now I am going to deny the motion on the record

13 as moot, and you can move for me to reconsider that ruling on

14 some basis.  But there is nothing there now.  He should be

15 talking to the debtor and to you.

16         MR. KAROTKIN:  Okay.  Thank you.

17         THE COURT:  Our friend from the Trustee's Office,

18 whose motion to convert is just hours away from being

19 considered and ruled on.

20         MR. SHAPIRO:  The TRO --

21         THE COURT:  I will do that on my own, based on

22 the conversation we had here that you need time -- why I got

23 you in here was scheduling and what was going to, you know,

24 be your idea about going forward.  And based on what you told

25 me, I will extend that for 24 hours, to our 3:00 hearing

1  tomorrow, with the understanding, as I hope I said before,

2  that all the parties subject to that restraining order are

3  working with you to reach something consensual so they are

4  not being in any way unduly prejudiced.  If they can't agree

5  with you, we will hear them tomorrow at 3:00.  But that's

6  unlikely.  I would hope it's unlikely.  Hopefully, they are

7  going to work to make this a smooth landing -- there is no

8  smooth landing here -- but so that no one has to suffer a

9  fatality, is the hope.

10  MR. KAROTKIN:  Can we go off the record a

11  minute?

12  THE COURT:  Sure.

13  (Discussion off the record.)

14  MS. MORGAN:  I guess those people want to hear

15  what is happening and we are telling them what is happening.

16  THE COURT:  It is over.  There is no sale.  There

17  is nothing to do.  Right?

18  (Conference in chambers adjourned.)

19  (The following took place in open court, at

20  approximately 5:50 p.m.).

21  THE COURT:  Proceed, please.

22  MR. SHAPIRO:  Good afternoon, Your Honor.  Mark

23  Shapiro from Shearman & Sterling for Winstar Communications,

24  debtors.

25  Your Honor, after our chambers conference earlier

1    this afternoon, during that chambers conference, a party

2    named IDT Corporation, who had been a party that the debtors

3    had been having on-and-off discussions with through the

4    entire auction process but whom debtors could not reach

5    agreement with, made an offer to the financial advisors to

6    the debtor, Blackstone.  Since that time we have worked to

7    try to flesh out all the terms of that offer.

8            I think we have what I will call the principle

9    points agreed to in principle but not in writing.  And what

10   we would like to do is have the attorney for IDT Corporation

11   present those to the Court so that the Court understands

12   their offer.  We would work this evening to try to finish a

13   contract with them and come back at 3:00 tomorrow to see

14   whether in fact we have a deal, and if we don't have a deal

15   or it is not an agreed upon deal that we have a meeting of

16   the minds on, then we would go back to the plan we discussed

17   with Your Honor in chambers earlier today.

18           We believe that this deal, if we could consummate

19   this deal, would be beneficial to the estate, would

20   potentially be beneficial to some of the employees, and would

21   allow, certainly allow an orderly transition period for

22   customers.

23           With that, I would like to have David Albalah,

24   counsel for IDT, present to the Court the details of their

25   offer.  We will supplement that to the extent it differs from

1    our understanding.  And then what I would propose we do is

2    adjourn to the offices of Young Conaway to see whether we can

3    work out between now and 3:00 p.m. a contract and management

4    agreement and order that we would present tomorrow at 3:00

5    p.m. in court.

6              THE COURT:  All right.

7              MR. HARRINGTON:  Good afternoon, Your Honor.

8    William Harrington, Duane Morris & Heckscher.  I would like

9    to move the admission of David Albalah.  His pro hac motion

10   was previously filed with the Court electronically but has

11   not been signed yet.

12             THE COURT:  I will grant the application.

13             MR. ALBALAH:  Thank you, Your Honor.  Good

14   afternoon, Your Honor.  Thank you for your patience.  David

15   Albalah from McDermott, Will & Emery on behalf of IDT

16   Corporation.

17             As counsel for the debtor just communicated, we

18   have spent a fair amount of time today, and I do believe we

19   have an agreement in principle.  What I will do is go through

20   the salient points.  At the conclusion thereof, I will ask

21   Your Honor to so order the record.

22             The transaction is as follows --

23             THE COURT:  Let me understand something.  When

24   you suggested I would so order the record, my understanding

25   is that, and because of the history here, that I would listen

1   to this proposed offer, and then, because it would be

2   something that no one had notice of, we would have the record

3   on this offer closed, come back tomorrow at the hearing we

4   thought we were going to have today, and it would be in

5   court.  We were going to have a telephonic hearing about a

6   conversion.  But we would come back tomorrow, and then I

7   would listen to anybody that wanted to be heard on this

8   proposed transaction, and then at that point I would consider

9   approving this transaction.  Otherwise, nobody else had

10  notice of what you are going to tell me, and I am hearing it

11  for the first time.

12          Mr. Shapiro, is that what you were thinking?

13          MR. SHAPIRO:  Yes.  I am not sure what Mr.

14  Albalah meant by being so ordered.  I think this is just an

15  explanation to the Court of what is to come for tomorrow.

16  Tomorrow's hearing would be a presentation of the contract

17  and the order.  Yes, I agree with Your Honor's remarks.

18          MR. ALBALAH:  Part of the concern, Your Honor --

19  I don't want to dwell on it now, I think we should go through

20  the points and circle back to this.  Part of the concern, and

21  I want to consult with my client, is whether the debtor is

22  shopping this thing.  We haven't discussed the breakup fee or

23  anything along those lines.  So we expect this to be the

24  deal.  We will circle back with Your Honor, with Your Honor's

25  permission, to get comfort in that regard.

1          The transaction would be as follows.

2          IDT Corporation or its designee would purchase

3   all of the assets, free and clear of all liens, claims,

4   interests, and encumbrances, except for specifically

5   delineated assets.  And I will tell you what they are.  The

6   purchase price will be 38 million dollars cash or 30 million

7   dollars cash plus Class B IDT common stock in the value of

8   12.5 million, measured based upon the last seven trading days

9   from today.

10          If IDT does not get a registration within 60

11  days, then the debtor would be able to put that stock

12  interest on IDT for ten million dollars cash.  So either it's

13  38 million dollars cash, or 30 million dollars cash plus 12.5

14  million dollars in stock, or 40 million dollars cash.

15          MR. JONAS:  I think that is the choice.

16          MR. ALBALAH:  The debtor will elect as to whether

17  it wants the cash option or the cash and stock option.  It is

18  at the debtors' election.  All or nothing.

19          The excluded assets are Lucent litigation,

20  Office.com, Aon Put, Wamnet (phonetic) Debt & Equity,

21  RadioNote, TVVideo Note, avoidance actions, D&O claims, any

22  prepaid workers' compensation, tax refunds, if any, cash as

23  distinguished from accounts receivables, claims against

24  Savis, I believe that's S-a-v-i-s, claims against Velocita,

25  V-e-l-o-c-i-t-a, PSINet Hong Kong, excluded subs, that's

1          The transaction would be as follows.

2          IDT Corporation or its designee would purchase

3   all of the assets, free and clear of all liens, claims,

4   interests, and encumbrances, except for specifically

5   delineated assets.  And I will tell you what they are.  The

6   purchase price will be 38 million dollars cash or 30 million

7   dollars cash plus Class B IDT common stock in the value of

8   12.5 million, measured based upon the last seven trading days

9   from today.

10          If IDT does not get a registration within 60

11  days, then the debtor would be able to put that stock

12  interest on IDT for ten million dollars cash.  So either it's

13  38 million dollars cash, or 30 million dollars cash plus 12.5

14  million dollars in stock, or 40 million dollars cash.

15          MR. JONAS:  I think that is the choice.

16          MR. ALBALAH:  The debtor will elect as to whether

17  it wants the cash option or the cash and stock option.  It is

18  at the debtors' election.  All or nothing.

19          The excluded assets are Lucent litigation,

20  Office.com, Aon Put, Wamnet (phonetic) Debt & Equity,

21  RadioNote, TVVideo Note, avoidance actions, D&O claims, any

22  prepaid workers' compensation, tax refunds, if any, cash as

23  distinguished from accounts receivables, claims against

24  Savis, I believe that's S-a-v-i-s, claims against Velocita,

25  V-e-l-o-c-i-t-a, PSINet Hong Kong, excluded subs, that's

1  it -- the above net claims, correct.

2       Those are the excluded assets.  Everything else

3  is to be purchased, and again free and clear of all liens,

4  claims, interests and encumbrances.  And we will have an

5  order obviously that I will comment on.

6       The debtor -- I am going through this in no

7  particular order.

8       The debtor intended to notice termination to

9  customers.  The debtor will not do that.  My client will have

10  the right to determine the timing of the sending of that

11  notice.  My client will be obligated to fund costs going

12  forward for the transition period pending regulatory, FCC and

13  state regulatory approvals.

14       The only exception to the concept of my client

15  controlling when the notice is circulated, if at all, is to

16  the extent that there is any Hart-Scott requirement.  If

17  there is a Hart-Scott requirement, and we determine that

18  there is a Hart-Scott requirement, then the notices will go

19  out Thursday.

20       There would be in the order, and in appropriate

21  other documents, clarity with respect to no employee

22  liability whatsoever.  My client, in addition to the general

23  free and clear, assumes no liabilities with respect to

24  employees of any kind or nature.

25       There is no out for regulatory consents.  If the

1    FCC, if the state regulatory authorities, do not consent to

2    the transaction for any reason, there is no out.

3            To the extent that the licenses have any value

4    and proceeds are realized, that would be part of the assets

5    purchased.

6            The parties contemplate that this Court would

7    issue an order similar to the order that I understand is in

8    effect, compelling service providers of all nature and kind,

9    including telecom companies, landlords, et cetera, to

10    continue providing services during the transition period.

11    But my client will pay all those services.  My client may

12    negotiate discounts, may negotiate terms, but there is a

13    guarantee for the payment of that money.

14            In addition to the purchase price, there is a

15    five-percent interest that the estate would get in an entity

16    to be formed by my client.  That five percent the estate

17    would share, as, when, and if my client gets back its

18    investment in an unknown amount at this point in time.  We

19    know what we are making in terms of, in other words, cash and

20    stock.  We can quantify that.  We can't quantify the costs

21    that my client will pay to keep this alive.  As, when, and if

22    all of those costs come back, then the estate will have a

23    five-percent interest in the upside.

24            It is my understanding that the contemplation is

25    that the case may convert from 11 to 7.  We would have

1  assurances that this agreement is binding upon the Chapter 7

2  trustee and the estate.

3          It's an as is, where is acquisition, with no reps

4  and warranties.

5          My client has not yet determined the extent to

6  which it intends to seek approval and assignment of executory

7  contracts and nonresidential real property leases.  To the

8  extent it does not, it is the understanding of the parties

9  that the estate will have the burden, financial or otherwise,

10 to physically deliver the assets that my client is buying.

11 So, for instance, if there is a landlord with a lease that is

12 not assumed and assigned, and the landlord has a piece of

13 equipment on the premises, we are buying that equipment free

14 and clear.  And the order, as the parties contemplate it,

15 would provide protection to my client that it can get that

16 equipment.

17         If I didn't mention the time period, in terms of

18 the continuing order of Your Honor keeping the going-forward

19 service providers providing services, it's the parties'

20 understanding that that order would provide the time period

21 of the next 60 days.

22         Both parties will work diligently starting

23 immediately at the conclusion of this hearing to paper the

24 transaction.  In addition, the estate will cooperate and use

25 its best efforts to assist the buyer in terms of getting

1   regulatory approvals and the like.

2           My firm is holding 15 million dollars cash in an

3   escrow account.  I will work with debtors' counsel to work

4   out an escrow agreement.  Upon conclusion and the

5   satisfactory manner of that, we will forward that money to

6   the estate's counsel.

7           We are going to work on a management agreement,

8   which I won't burden the record with, that is necessary for

9   regulatory reasons and the like.

10          (Pause.)

11          MR. ALBALAH:  Thank you, Your Honor.

12          The 30 million dollars to cover -- as I said, the

13  buyer will be responsible for the ongoing expenses of the

14  business.  There will be 30 million dollars regarding that

15  that we will put in escrow.  That doesn't mean it will cost

16  30 million.  It may cost less or more.  We are going to put

17  30 million dollars in escrow.  And I neglected to mention

18  that earlier.

19          The purchase price, whatever form it comes in,

20  cash or stock, cash, or cash and stock, will be paid at

21  closing in an irrevocable manner.

22          I think I used the word guarantee in terms of the

23  estate delivering the assets.  And if there is a piece of

24  equipment, and the landlord doesn't want it, guarantee is the

25  wrong word.  It is the intent they will get all those

1    assets.  If there is a cost in terms of physically removing

2    it, the buyer would pay those costs.

3            Your Honor, if I may, Howard Jonas, the chairman

4    of the company, chairman of the board of IDT, is here.  May

5    he address Your Honor very briefly?

6            THE COURT:  Sure.

7            MR. JONAS:  Thank you.

8            I, fortunately, have never been in court before.

9            I think this is a very good deal for the public,

10   because I think there is a need for competitive telephone

11   service.  And in our diligence on the company, we found an

12   Intelligent, which is a company that we previously controlled

13   and made an offer for, even though unfortunately it wasn't

14   accepted at the time, and the business went down the hill,

15   but the business was not put together properly.

16           We do over a billion and a half dollars in

17   telecom business a year.  We are noticing a technical

18   infrastructure and a business infrastructure so poorly

19   operated.  It is our hope -- what we are planning to do is

20   one of two things.  We will probably have to terminate a lot

21   of the clients who are on net now, but we will be giving them

22   sufficient time to get out so they can get other services.

23   We are hoping a lot of the other services, like long-distance

24   services and data services and so forth from our company, it

25   is our intent to restart the business in the proper way with

1    the proper knocks in the proper cities, so we can provide the

2    service to the public, and hopefully there will be a number

3    of clients that we will be able to keep on who are already

4    on.

5            So I think approving this order serves the dual

6    purpose of, I can't say that the creditors are made whole

7    because they are six billion dollars in the hole, but it does

8    get them money, it does see that the public is not left

9    without telephone service for a long time, and somebody is

10    not forced to pay for it who doesn't want to be a creditor

11    anymore, and it does give a reasonable chance that we will be

12    able to continue operating these kind of services into the

13    future.

14            The last thing is our company has over a billion

15    dollars in cash, over a billion dollars in paid-up assets.

16    We turn a profit of close to a hundred million dollars a

17    year.  We have zero debt.  We will easily be able to carry

18    through and finance this acquisition and see that all the

19    commitments that our counsel made are in fact complied with.

20            I hope this doesn't have to go on to tomorrow.

21    You can order it tonight.

22            But that's all I want to say, thank you.

23            THE COURT:  Thank you, Mr. Jonas.

24            MR. SHAPIRO:  Mr. Albalah also wanted me to put

25    on the record that they will have the ability to speak with

1    management and have input to speak with management tomorrow

2    morning, which we agreed to.

3           I think, notwithstanding the fact that all, I

4    will call it, the salient points have been put on the record,

5    obviously, until we have a contract that is agreed to and

6    signed by the buyer and debtor, there is no agreement.  So

7    what we would try to do is between now and 3:00 p.m. tomorrow

8    complete a contract.  We have actually already worked on

9    contracts, obviously, with them and other people, so we have

10   a basic form of contract that we will work on tonight, see

11   whether we can reach an agreement, and be back here tomorrow

12   to see whether we can get it approved.

13          THE COURT:  All right.  Mr. Kenney, did you have

14   anything you wanted to add?

15          MR. KENNEY:  I think, Your Honor, what we have

16   heard is good.  I am obviously going to have to wait and see

17   what develops between now and 3:00 p.m. tomorrow, at which

18   point I would make any comments I have and anyone else would

19   have the opportunity to do so then.

20          THE COURT:  When would you anticipate, Mr.

21   Shapiro and Mr. Kenney, because I want you to review any

22   proposed agreement, that that would be available for people

23   to review?  We are going to come at 3.  I would like to have

24   a little time.

25          MR. SHAPIRO:  In fairness to everyone, I would

1  think by 12:00 tomorrow we need to have a contract

2  available.  We will send Your Honor whatever we have or

3  inform the Court we don't have an agreement.  But I think at

4  that point anyone who would like a copy ought to get in touch

5  with Pauline Morgan at Young Conaway, get her e-mail address,

6  so we have it in e-mailable form so we will e-mail it to

7  people starting at noon tomorrow.

8         THE COURT:  So we have the principles of

9  agreement.  And you are going to work to get it to a document

10 by noon tomorrow, so that it is available for purposes of the

11 3:00 hearing.

12        MR. SHAPIRO:  As well as the form of order we

13 would ask Your Honor to sign.

14        THE COURT:  The proposed form of order.  Mr.

15 Kenney?

16        MR. KENNEY:  That is fine, Your Honor.

17        MS. NEWELL:  Hello, Your Honor.  Margaret Newell

18 from the Department of Justice on behalf of the FCC and the

19 GSA.

20        Obviously, my comments about the order can wait

21 for tomorrow.  But I wanted to clarify, there is a hearing

22 scheduled tomorrow at 3:00 before Your Honor, but given the

23 fluidity of events today, there wouldn't be a hearing before

24 that time, would there?

25        THE COURT:  No.  Before 3:00 tomorrow on this

1    matter, no.

2                    MS. NEWELL:  Thank you, Your Honor.  Just

3    checking.

4                    THE COURT:  Okay.  The only thing that I am going

5    to do between now and 3:00 tomorrow is, or I have already

6    done it, I have extended the temporary restraining order that

7    was entered last week till 5:00 p.m. tomorrow, so that we

8    would have an opportunity, in the first instance, to proceed

9    to a conversion, but now to proceed to consider this

10   agreement.

11                   So that's the only thing I am going to do between

12   now and tomorrow at 3:00.

13                   All right.

14                   MR. GWYNNE:  Your Honor, Kurt Gwynne on behalf of

15   MCI Worldcom.

16                   I understand Your Honor is continuing the TRO.

17   Notwithstanding that, may I be heard on that issue, Your

18   Honor, just to create a record?  I have talked with my client

19   about the potential -- well, I have put in a call to the

20   client about the potential for appealing that.  The client is

21   on a flight to Chicago.  I would like to make a few

22   statements for the record.

23                   THE COURT:  Sure.

24                   MR. GWYNNE:  Thank you.  First of all, Your

25   Honor, as I think Your Honor knows, I have a tremendous

1  amount of respect for this Court and am proud to be a member

2  of the Bar of the District Court for the District of

3  Delaware.

4           THE COURT:  You must really want something.

5           MR. GWYNNE:  Your Honor, I have significant

6  concerns about the manner in which the original TRO was

7  entered and the manner in which the TRO was continued today.

8  Under Rule 65, it is clear that in order for a TRO to be

9  issued ex parte, counsel is supposed to exercise, quote, all

10 reasonable efforts, close quote, to notify opposing counsel.

11          Although I had called and left messages for

12 debtors' counsel the night before, just curious about the

13 sale process, I was never told about any TRO process.  And in

14 fact, when the motion was filed, although it wasn't filed

15 until 12 or 18 minutes before the hearing, it obviously was

16 prepared sometime during the day, as it was five or six

17 pages, had a four-page affidavit.  No telephone call was ever

18 made to me.

19          I think with respect to that, Your Honor, that

20 TRO was improperly granted for that reason, should not have

21 been issued ex parte.  And also, it is my understanding,

22 since I was not at that hearing, that the TRO did not even

23 issue at the hearing but issued as a result of a conference

24 in chambers.

25          We filed --

1     THE COURT:  I think, actually, it issued at the

2     end of a Court hearing, when I asked Shearman & Sterling to

3     present it predicated on the argument of the FCC.

4     MR. GWYNNE:  Your Honor, again, without

5     sufficient notice, I am not really sure what happened, unless

6     and until we obtain a transcript.  Then when the hearing was

7     scheduled for today, we filed an objection, which I don't

8     know if Your Honor had time to read it.  I realize it was on

9     file only two hours before.  But today, we understood that

10    the carriers, many of which are here today, were coming to

11    Court and would have the opportunity to have some discussions

12    with Your Honor about the TRO and/or the sale or winddown

13    process and what, if anything, the carriers were willing to

14    do.

15    Debtors' counsel came out of chambers and advised

16    us that the TRO was going to be continued.

17    Your Honor, I think, respectfully, with the

18    carriers being here in court, and debtors' counsel knowing we

19    were in court, I don't know if Your Honor knew, we should

20    have had an opportunity for a hearing, which hearing should

21    have been an evidentiary hearing, on whether or not the TRO

22    should have continued till tomorrow.

23    Debtors owe, under our original adequate

24    assurance agreement, 13.9 million to Worldcom.  Under the

25    modification agreement, where we made significant concessions

1    with the debtor, it is not scheduled to be heard until the

2    20th, the debtors would only owe approximately 2.9 million,

3    still a significant amount owed under the adequate assurance

4    stip as modified by what I call the modification agreement.

5              Under the adequate assurance, which was a

6    stipulation and order, we have the right to terminate based

7    upon certain postpetition defaults.  Not only was that an

8    agreement of the parties, but it was an order of this Court,

9    which no one has filed a motion to vacate, to modify, nor do

10   we think that that obviously would be the appropriate relief.

11             There is no adversary proceeding here, Your

12   Honor.  We have a TRO that has been issued based upon a

13   motion for a TRO and now a motion for a preliminary

14   injunction.

15             Injunctive relief requires an adversary

16   proceeding under Rule 7001, Subsection 7. And in In Re

17   Connectus, Your Honor held that a hearing was enjoined base

18   upon an oral motion before Judge Walrath that a lack of a

19   required adversary proceeding was a basis alone to deny the

20   request for injunctive relief.

21             THE COURT:  Are you of the view that, for

22   instance, your client could terminate service tonight absent

23   that temporary restraining order?

24             MR. GWYNNE:  No, Your Honor.  We have a two-day

25   notice period under our contract with the debtor and we have

1    never sent a termination notice, to this day, we haven't.

2    And we were surprised to be included in the ex parte motion,

3    when we hadn't even issued a termination notice.

4              THE COURT:  But you could do it within 48 hours.

5              MR. GWYNNE:  I believe, Your Honor, under our

6    adequate assurance stipulation, which specifically provides

7    we can terminate in I think it's two business days or 48

8    hours notice, yes, we can.

9              Now, I understand the FCC has raised some issues

10   about termination periods and notice.  Under Section 214 of

11   the Telecommunications Act, the debtor has a duty to give

12   notice to its end users.  We are not providing service to the

13   end users.  This is carrier-to-carrier service.  There is no

14   requirement that we give any period of notice to the debtors

15   unless it's required by some applicable tariff or contract or

16   what have you.

17             So we do believe that we could terminate in two

18   business days notice.  In fact, Your Honor, we have done that

19   in many other cases where there have been defaults, and other

20   cases that have sort of headed south the way this one has.  I

21   do believe we could.  I am not asking Your Honor to give us a

22   right we don't have.

23             THE COURT:  I am just trying to understand,

24   because the FCC takes a different view.  And what I could do

25   is I could schedule a hearing to give you an opportunity to

1    be heard against the FCC's issues and in the meantime leave

2    the order in place, and we could have a quick hearing,

3    because I think that's what you are asking for, an

4    opportunity to be heard, because of the disagreement that

5    your clients would have with the position that was put forth

6    by Mr. Scheimer (phonetic) on behalf of the FCC.   Then I

7    could resolve that, the tension between those positions.   I

8    wouldn't be able to do it at 3:00 tomorrow, just like I

9    wasn't able to do it today, because I only scheduled the sale

10   hearing for today.   But we could do it certainly before the

11   end of the week and have that heard.

12           MR. GWYNNE:   We would appreciate the opportunity

13   to do that.   But with respect to whether or not the TRO

14   should issue, again, we haven't given the termination

15   notice.   Whether or not the TRO should even be continued,

16   which would involve those issues, which we would be happy to

17   address at a hearing, would also involve whether or not --

18   again, Your Honor held in In Re Connectus that the Bankruptcy

19   Court couldn't use 105 to overrule the utilities' rights

20   under 366, albeit for a short time.   That was only a four-day

21   injunction that Judge Walrath entered.   Your Honor properly

22   reversed her for doing so, enjoining a utility in violation

23   of Section 366.   I think that's the same thing that is going

24   on here.

25           THE COURT:   I don't think anybody in that case,

1  and in my mind, at least at this point, who is potentially

2  distinguishable ever raised what Mr. Scheimer raised.

3             MR. GWYNNE:  Which is, Your Honor?

4             THE COURT:  His issue is about the amount of time

5  necessary for termination.  I understand your view that you

6  are not a provider in the sense that the debtor is and that

7  your relationship with the debtor is the debtor has the

8  obligation.

9             MR. GWYNNE:  Correct.

10            THE COURT:  But I don't recall the FCC appearing

11  in Judge Walrath's case.

12            MR. GWYNNE:  I don't believe so, Your Honor.

13  Frankly, as I understand it, this is the debtors' motion, not

14  the FCC's motion anyway.

15            THE COURT:  Absolutely.  But the FCC weighed in

16  on their behalf, agreeing with what other folks wanted to

17  happen when we had the hearing on December 10.

18            MR. GWYNNE:  Your Honor, the only thing we would

19  ask is during that time period prior to the hearing, who is

20  going to pay the charges that are being incurred?  We think

21  that we are entitled to that.  While Rule 65 provides that

22  the Court can enter injunctive relief and the debtor not have

23  to post a bond, if Your Honor is ordering us to provide

24  services to the GSA or some government entity or

25  quasi-government entity --

1    THE COURT:  Have you met Mr. Jonas?

2    MR. GWYNNE:  Yes, Your Honor.

3    THE COURT:  As I understand it, if his

4    transaction is approved tomorrow, he wants to talk with you

5    about that very issue.

6    MR. GWYNNE:  But I don't understand that he was

7    going to pay for postpetition charges that have been incurred

8    but not paid and enter a default now.  They are talking about

9    going forward, which I assume is from tomorrow until sometime

10    forward.

11    THE COURT:  You are talking about since December

12    10th.

13    MR. GWYNNE:  There is from the 10th to today,

14    Your Honor.  There is also charges that are due and owing

15    from prior to the 10th as well.

16    THE COURT:  I am only liable from the 10th.

17    (Laughter.)

18    I think I have immunity.

19    I am taking this seriously.  I am trying to

20    understand.  But I can't deal with before the 10th, you know,

21    in the context of what you are presenting today.  If the sale

22    is approved tomorrow, Mr. Jonas' transaction takes care of

23    that.  So we are talking about from the 10th to either today

24    or tomorrow at 3:00.

25    MR. GWYNNE:  Whenever the hearing is.  Or if the

1           THE COURT:  Have you met Mr. Jonas?

2           MR. GWYNNE:  Yes, Your Honor.

3           THE COURT:  As I understand it, if his

4    transaction is approved tomorrow, he wants to talk with you

5    about that very issue.

6           MR. GWYNNE:  But I don't understand that he was

7    going to pay for postpetition charges that have been incurred

8    but not paid and enter a default now.  They are talking about

9    going forward, which I assume is from tomorrow until sometime

10   forward.

11          THE COURT:  You are talking about since December

12   10th.

13          MR. GWYNNE:  There is from the 10th to today,

14   Your Honor.  There is also charges that are due and owing

15   from prior to the 10th as well.

16          THE COURT:  I am only liable from the 10th.

17          (Laughter.)

18          I think I have immunity.

19          I am taking this seriously.  I am trying to

20   understand.  But I can't deal with before the 10th, you know,

21   in the context of what you are presenting today.  If the sale

22   is approved tomorrow, Mr. Jonas' transaction takes care of

23   that.  So we are talking about from the 10th to either today

24   or tomorrow at 3:00.

25          MR. GWYNNE:  Whenever the hearing is.  Or if the

# EXHIBIT 9
## PART 2 OF 2

1    sale goes forward, right.  That's correct, Your Honor.

2              THE COURT:  What we should do is, I understand

3    MCI is not going to turn anyone's phone off or service off

4    between now and tomorrow at 3:00.

5              MR. GWYNNE:  Correct.  We wouldn't have the right

6    to do it.

7              THE COURT:  Even under your analysis of the two

8    days.  So that is kind of like a no prejudice, if I enter the

9    order, because I am concerned about everybody else.

10             MR. GWYNNE:  You could carve Worldcom out.  There

11   is precedent, with all the attorneys in this room, debtors'

12   counsel, somebody will be saying to Judge Robinson, this

13   order is the standard injunction, Judge.

14             THE COURT:  I don't even understand that word,

15   precedent.

16             MR. GWYNNE:  I realize it doesn't have any

17   binding precedent.

18             THE COURT:  It really doesn't.  And this case is

19   so unusual, because of the public interest, that I would be

20   literally shocked if another judge out there said there was

21   something here to be followed in the orders I have issued to

22   get us to this hearing tomorrow at 3:00.  I guess that's

23   possible.  But actually, there is an opinion out there by

24   Judge Mansley in an asbestos case that talks about there is

25   no precedent to be followed in the same court or in different

1  courts at the same level.  But there is no precedent here.

2  This is truly a unique case.

3              MR. GWYNNE:  Since we won't be terminating, we

4  may issue a notice, but there is not going to be any

5  termination before tomorrow, could we have the hearing

6  scheduled?

7              THE COURT:  What I am thinking about doing is

8  giving you a hearing tomorrow after the sale hearing, or the

9  next day.  I don't know how long the hearing will take

10  tomorrow.

11              MR. ALBALAH:  Your Honor, may I suggest, to

12  address Mr. Gwynne's concern with respect to the injunction

13  as distinguished from with respect to getting payment from

14  the 10th until the closing of our transaction, I think his

15  concern is whether the injunction that we have asked Your

16  Honor to continue is permissible from a procedural and

17  substantive standpoint.  Therefore, I think it is necessary,

18  given that a condition precedent to our deal is to have the

19  continuation of that injunction, that this hearing be

20  scheduled at the same time or before our transaction is

21  hopefully approved.

22              Do you understand what I am addressing, Your

23  Honor?

24              MR. GWYNNE:  We could go first at 3:00.

25              THE COURT:  I understand.  But I just see it a

1    little differently.  I would take it afterwards, particularly

2    since you are going to be negotiating with them, you would

3    probably want it afterwards, too, I would think, because we

4    might have a different situation.

5         MR. GWYNNE:  I understand.

6         THE COURT:  What I am going to do is schedule you

7    for tomorrow for the agenda, but presently, my thought is

8    that I will hear any application you have subsequent to the

9    sale application.

10        MR. GWYNNE:  Thank you very much, Your Honor.

11        THE COURT:  Again, I wanted to get your position

12   clear and have some reference to what occurred previously.

13        Is there anything else you want to put on the

14   record with regard to your client's position?

15        MR. GWYNNE:  No, thank you, Your Honor.

16        MR. PALACIO:  Good evening, Your Honor.  Ricardo

17   Palacio from Ashby & Geddes on behalf of Williams

18   Communications as well as Time Warner.  I am going to address

19   the Williams Communications/Time Warner position as merely a

20   joinder to the motion to vacate and the objection to

21   preliminary injunction.

22        To start off, I would like to join in and

23   basically echo the comments made by Mr. Gwynne.  I think

24   Williams Communications, it is one of the largest carriers to

25   the debtors, has much at stake here, to say the least, as

1    such incorporates the comments of Mr. Gwynne.

2            Your Honor, there is one spin with respect to

3    Williams Communications that has been different from

4    Worldcom, and that is with respect to the notice.  In our

5    motion/objection, if you will, again, I don't know if Your

6    Honor had an opportunity to review it, but the one difference

7    I am referring to is that prior to the issuance of the TRO,

8    Williams had terminated its obligation to provide further

9    services to Winstar.  Subsequently, thereafter, after

10   terminating its obligation, it commenced the issuance of

11   notice to the appropriate regulatory agencies, both state and

12   federal level, and the time period runs anywhere from ten to

13   30 days, depending on the jurisdiction.

14           Some of those notices have already gone out.  The

15   impact of the TRO on those notices -- we understand, Your

16   Honor, we are not to cut off any service.  However, Your

17   Honor, we believe that this puts a little bit of a different

18   spin on what Worldcom has asserted, and we would again like

19   the opportunity, as I am sure many other carriers, to come

20   forward before Your Honor and seek a vacation, if you will,

21   of the TRO.

22           Quite frankly, we have the same issues with the

23   postpetition obligations, as well as the debt that is

24   incurring each and every day at this pace, we are incurring

25   approximately $170,000 a day that goes unpaid.  I think there

1   are some issues that go to the proposed, quote-unquote,

2   selling and terms of the deal, as far as any assurance of

3   being paid on a going-forward basis.

4           That is what I wanted to get on the record.  We

5   would request also that we be heard prior to the sale itself.

6           THE COURT:  Thank you.

7           MR. KIRPALANI:  Good evening, Your Honor.

8   Susheel Kirpalani of the firm Milbank Tweed Hadley & McCloy.

9   I will be very brief, Your Honor.  We appreciate the Court's

10  indulgence and your expertise in trying to facilitate this

11  transaction.

12          I wanted to confirm, Your Honor, that other

13  competing bidders will have an opportunity to outbid IDT's

14  bid provided that their 15-million-dollar deposit is within

15  Shearman & Sterling's account prior to the hearing tomorrow.

16          We have, we believe, fully negotiated a purchase

17  agreement that has been circulated to debtors' counsel as of

18  this morning.  And subject to understanding the terms and

19  conditions of the competing bid, I will contact Ms. Morgan

20  from Young Conaway.  We just wanted to make sure the record

21  was clear with respect to competing bidders.

22          THE COURT:  I don't want to get into that part of

23  it because I think it would be inappropriate.  But I

24  assume -- I don't know anything about this -- I was told that

25  there was no consummated agreement.  But if there was, you

1    should be talking with Mr. Shapiro.  And if there is 15

2    million dollars or whatever the conditions were that's been

3    deposited or wired as we were talking about a week ago and

4    that came before me, there were two competing bids, then I

5    would have to make a decision between them.

6            But I am not going to get into the detail of

7    where you are with Mr. Shapiro and the debtor.  In my view,

8    nobody is foreclosed, because I can't do that.  And if you

9    are not able to talk to Mr. Shapiro because, for whatever

10   reason, you think that you have a better offer, I assume you

11   will be here at 3:00 tomorrow to tell me what a terrible deal

12   the debtor has negotiated and why I shouldn't approve it.

13           MR. KIRPALANI:  We hope to be, Your Honor.  Thank

14   you.

15           MR. SHAPIRO:  Just to clarify the record.  I

16   don't think Mr. Kirpalani means to suggest that we had a

17   fully documented agreed-upon contract.  As he knows, there

18   are at least half a dozen or more issues that we have been on

19   the phone discussing since last Monday that haven't been

20   resolved.  So I don't think --

21           THE COURT:  As I understood it, the biggest issue

22   was they couldn't come up with the money.

23           MR. SHAPIRO:  That was a really big issue, Your

24   Honor.  They didn't come up with the money nor have they come

25   up with the money.

1          THE COURT:  So you decided it wasn't worthwhile

2   to keep talking.

3          MR. SHAPIRO:  We decided to suspend discussions

4   about 7:00 Friday night until they could show us that they

5   actually had the money.  Unfortunately, they didn't today

6   come up with the money.  I think, more importantly, if they

7   were to come up with the money between now and when we come

8   to Court tomorrow, that's just one, as Your Honor has heard

9   before, that is just one segment of this transaction.  As has

10  been expressed by IDT, there is a need to be able to show

11  that the purchase price can be paid and that the operations

12  can be funded, which are equally important.

13         THE COURT:  You would understand that because you

14  would be trying to knock out Mr. Jonas' company.

15         MR. KIRPALANI:  That's correct, Your Honor.

16         THE COURT:  He has represented that he has got

17  the wherewithal to fully perform.  But it would probably

18  behoove you, Mr. Shapiro, just to listen about those other

19  five or six issues, so that if you come tomorrow and you are

20  supporting Mr. Jonas' company's bid, that you are at least

21  prepared for what others might claim to be a better

22  transaction.

23         MR. SHAPIRO:  What I would propose, since there

24  obviously is a limited period of time between now and 12:00

25  tomorrow when we still have to try to finish a contract, and

1    we have been talking to his client now for a few weeks, we

2    are going to present a contract, as I said, at noon

3    tomorrow.  Anyone who is interested in bidding can bid off

4    that contract.  If they want to change the contract, they can

5    describe it in court tomorrow.  The IDT contract will be the

6    contract offered which other bidders can bid off, not the

7    current contract that we have been negotiating with his

8    client, because unfortunately his client didn't show up with

9    the money with which we were going to do a deal.

10              THE COURT:  That is all you are asking for.

11              MR. KIRPALANI:  Yes, Your Honor.  It is subject

12   to understanding the agreement with IDT.  Quinn Telecom

13   Holdings believes it is much more of a going-concern offer.

14   The five or six points that Mr. Shapiro mentioned were fully

15   discussed on Friday with Blackstone and Shearman & Sterling.

16   And what I meant earlier with respect to we believe those

17   issues had been resolved, in terms of documenting and

18   papering it, the agreement we circulated this morning covered

19   our offer, and we have not heard back obviously because there

20   was a lot of dealings going on today.

21              But we will certainly look at the IDT agreement.

22   If it fits outside the liquidation type agreement and it fits

23   a going-concern value type agreement, that will benefit the

24   customers and the employees, in particular, then we will

25   certainly work off of that agreement.  I have no intention to

1    recreate the wheel at all.

2                MR. SHAPIRO:  Again, for the record, what we will

3    be asking IDT to do is show up with the 15 million dollars

4    plus all of the funds that are needed to operate the business

5    for the 30-day period plus the funds for the purchase price

6    of 38 million dollars.  Anyone who chooses to show up

7    tomorrow with that much cash we would be happy to talk to.

8                MR. ALBALAH:  Your Honor, may I very briefly.

9                (Counsel confer.)

10               MR. ALBALAH:  Your Honor, this is something we

11   danced around but I want to confront now head on.  I spoke

12   very briefly with a representative of Blackstone Group.  You

13   saw me speak very, very briefly of debtors' counsel.  You

14   heard the chairman of the board of IDT Corporation.  You know

15   the financial wherewithal of my client.  The debtor, its

16   advisors, have, as Your Honor painfully knows, has been

17   spending a fair amount of time keeping the telecom providers

18   of the world at bay, waiting for --

19               THE COURT:  You just gave him more pain.

20               MR. ALBALAH:  -- waiting for Mr. Zimmerman to come

21   up with money to close the case.  Your Honor, obviously,

22   accurately portrayed why the debtor stopped that process.  We

23   are here.  We read the salient points of the agreement into

24   the record.  We are prepared to close.  We would like, as a

25   condition to that arrangement, in the event that we are

1    ready, willing, and able to close, and Mr. Zimmerman comes up

2    with the money, we view, I view, categorically, that

3    benefited the estate, I respectfully submit, there is no way,

4    to the extent that Mr. Zimmerman does come up with the money,

5    there is no way that he would have, or there is no way that

6    the estate would have been in as good of a position that it

7    will be in tomorrow but for IDT.

8          Therefore, it is customary, as Your Honor is

9    well-aware, for a reasonable breakup fee, I believe a

10    two-and-a-half-percent breakup fee, in the event that we are

11    prepared to close, is reasonable in these circumstances.  And

12    I would respectfully request that Your Honor now, so that

13    when we work literally around the clock to get this deal

14    done, we know that we are working and IDT knows that IDT's

15    professionals are working around the clock so that they

16    either get the deal or they benefit the estate.

17          MR. KIRPALANI:  Your Honor, briefly.  In terms of

18    who has been working around the clock to get us to where we

19    were, I didn't think it was IDT.  But I would not comment on

20    the breakup fee at this time.

21          MR. SHAPIRO:  Your Honor, I have never come

22    before a Court for a breakup fee without a signed contract in

23    hand.  We don't have a signed contract in hand.  I think IDT

24    is obviously showing they are interested in this, and

25    hopefully without the breakup fee they would be willing to

1    work the night to get this done.  So I would respectfully

2    disagree with counsel to IDT and say let's go forward on the

3    basis that we have previously discussed.

4            MR. ALBALAH:  Your Honor, you know better than

5    anyone because the first thing I asked you was to so order

6    the record, there is no better way -- obviously, we can't

7    manufacture documents now.  By requesting the Court to so

8    order the record, I respectfully suggest that it's clear that

9    we are ready to close.

10           When Mr. Shapiro suggests that normally there is

11   no breakup fee without a signed agreement, I agree with Mr.

12   Shapiro.  But as Your Honor correctly said, this is not the

13   normal case.  We are coming in here, we believe, I don't want

14   to be melodramatic, but we are coming in here and providing

15   excellent exit strategy for everyone, for the Court, for the

16   telecom companies, for the debtor, for the bank.

17           I submit that it is simply wrong to have IDT

18   provide that benefit without being compensated in the event

19   that the benefit that it gives the estate, the estate

20   benefits.  The fact there is no signed agreement, we are

21   prepared to so order the record.

22           THE COURT:  I know everybody is anxious and kind

23   of rushing over issues.  But you want to put a breakup fee in

24   your deal.  You have every right to negotiate that with the

25   debtor.  When that document is done at 12:00, that will

1    either be in there or not.  I don't get into that today in

2    any way.  But there is nothing that prevents you from further

3    negotiating that with the debtor.  And then your document,

4    with or without that fee, goes out for public scrutiny and

5    if -- who is the other bidder -- Mr. Zimmerman, if he decides

6    that he can qualitatively and quantitatively up your offer,

7    he will have a chance to do that and you will have your

8    breakup fee in it.

9            Again, I don't want to get into that detail,

10   because I am supposed to sit back and be objective at 3:00

11   tomorrow about whatever comes before me.  So I don't want to

12   participate.  But, I mean, you know how to get your breakup

13   fee, and it's by negotiation into your written document that

14   is going to be the subject of the 3:00 hearing.

15           MR. ALBALAH:  Actually, I respectfully submit

16   that it can't -- I don't want to -- I don't think it will

17   work that way because of the following reason.  We are here

18   tomorrow.  If Mr. Zimmerman comes up with the 15 million

19   dollars and the adequate assurance of closing and the

20   carrier, there would be no incentive -- again, I am not

21   trying to talk against my interest -- but at that point in

22   time, there would be no incentive whatsoever for the debtor

23   to support a breakup fee because the debtor, if it has the

24   assurance --

25           THE COURT:  If he does it before 12:00, you are

1 right.

2           MR. ALBALAH:  What I am suggesting --

3           THE COURT:  If Mr. Zimmerman puts more end money

4 on the table, and his -- Mr. Kenney, did you want to say

5 something?

6           MR. KENNEY:  I will wait, Your Honor.

7           THE COURT:  -- that will happen.

8           MR. ALBALAH:  What I am asking, Your Honor, is if

9 we are here tomorrow, ready, willing, and able to close...

10          THE COURT:  At 3:00.

11          MR. ALBALAH:  Yes. ...and Mr. Zimmerman, or for

12 that matter anyone else, comes out of the woodwork, and the

13 debtor, which I believe is expressing a change in position --

14 it was my understanding loosely that it was the debtors'

15 opinion --

16          THE COURT:  I don't think the debtor is shopping

17 your offer.  It is just that everybody wanted to come into

18 Court and put it on the record.  In essence, they are

19 record-shopping your offer.  I guess Mr. Zimmerman knows what

20 your deal is now.

21          MR. SHAPIRO:  Maybe I can suggest something he

22 would find acceptable.  We are going to try to reach a

23 contract with them by noon tomorrow, maybe even tonight.  If

24 we have a signed contract and as Your Honor suggested if they

25 insist as a condition that there is a breakup fee, the debtor

1  if they sign that contract will be bound by that contract.

2  THE COURT:  That's right.

3  MR. SHAPIRO:  Then we have a contract upon which

4  I am comfortable coming to Your Honor and saying as part of

5  this we have a breakup fee.  Right now we have nothing.  We

6  don't have a contract.  We have an expression of intent.

7  When we get to a contract and have a breakup fee, we can come

8  before Your Honor tomorrow.

9  MR. ALBALAH:  I accept that proposal in large

10 part and I appreciate the creativity and flexibility.

11 Normally, as Your Honor knows, this would be the time the

12 Court would say, if we do that, Your Honor now approves the

13 breakup fee, because otherwise, there is no order.  Normally,

14 there are bidding procedures which contemplate a breakup fee.

15 THE COURT:  What I can tell you is if in any case

16 that comes before me somebody proposes a deal that goes to a

17 written contract and it has a breakup fee in it, and that

18 contract ultimately motivates someone else to come in and pay

19 a lot more money, they get their breakup fee.

20 MR. ALBALAH:  Thank you, Your Honor.

21 THE COURT:  I don't know what is going to happen

22 in this case, because there is no written document for me to

23 consider.

24 MR. KIRPALANI:  Nor do I think there is any

25 evidence that IDT's interest is what stirred Wintel's

1    interest in any sense.  We have always been negotiating

2    subject to obtaining financing.  IDT was at the auction just

3    like Wintel telecom was at the auction.  If there was a time

4    to start up interest, it would have occurred a long time ago.

5            THE COURT:  Write that down and tell me tomorrow,

6    if things don't go well.

7            MR. KENNEY:  Your Honor, he backed down.  I don't

8    need to say anything.

9            MR. ALBALAH:  For the record, I don't know if I

10   backed down, but the record speaks for itself.

11           MR. WHITE:  Your Honor, Bill White for

12   BellSouth.  Did I understand Your Honor correctly that any of

13   the service providers who wish to be heard tomorrow on the

14   issue of the temporary restraining order will be able to be

15   heard?

16           THE COURT:  Yes.

17           MR. WHITE:  The other issue I wanted to raise

18   with Your Honor was this particular proposal that the Court

19   indicated would be available at noon with a hearing at 3:00,

20   I don't see realistically how the carriers will be able to

21   review that proposal, particularly to be able to consult with

22   their clients to determine whether they would oppose that.

23           This particular proposal, the scheduling of this,

24   alters even the bid procedures order, which itself was fairly

25   truncated.  I am concerned about, particularly in light of

1  the supplemental motion that was filed by the debtor over the

2  weekend, that the carriers that I have discussed it with have

3  a number of problems because of the potential for the

4  assumption and assignment of contracts under the guise of the

5  sale of assets.

6          So I can only say that I think that three hours

7  notice for a deal to the service providers who are the

8  biggest constituency that are going to be affected by this is

9  too short.

10          THE COURT:  All right.  Thank you.

11          MR. SHAPIRO:  Just in response to that, Your

12  Honor.  I think the salient points of the deal were put on

13  the table tonight.  He obviously can get in touch with his

14  client and has the better part of tomorrow.  Obviously, it is

15  very short.  On the other hand, I think that this is a deal

16  that if we can make it happen, it is in everyone's interest,

17  and therefore he ought to take the name of counsel to IDT and

18  have his client speaking to them between now and 3:00

19  tomorrow.

20          MR. PALACIO:  Your Honor, I apologize.  On behalf

21  of Williams.  Your Honor, I just want to touch on that last

22  point briefly.  What they are doing when they say the salient

23  terms have been discussed, what their salient terms are, at

24  least one of them is a de facto assumption and assignment.

25  There is a big issue there.

1          A lot of the telecoms, a lot of the other

2   creditors in this case, for lack of a better word, have an

3   issue there.  So by saying there is salient terms, get in

4   contact with somebody, we are talking about 18 hours really

5   to hammer out their differences.  And you are not talking

6   about a couple thousand dollars.  You are talking millions

7   and millions of dollars here.

8          When they sent out their cure objection notices,

9   if you will, with respect to Williams, they said, certain

10  contracts, we had no idea what contracts they are talking

11  about.  It is something that is not that easy.  That is the

12  one issue I wanted to highlight for Your Honor before we go

13  on this course, if you will, of contacting them and see if

14  you can work something out by tomorrow.

15         The second is merely a request for Your Honor,

16  that is with respect to my co-counsel, who flew from

17  Oklahoma, has since left, has asked to the extent Your Honor

18  is inclined to grant a hearing on the TRO, which Your Honor

19  has, that he be able to participate telephonically.

20         THE COURT:  Well, I have to be careful about

21  that, because the numbers of people that are involved, I

22  don't know if we can do that.  But to the extent we can,

23  mechanically, I will allow it.

24         MR. PALACIO:  Thank you, Your Honor.

25         MR. SHAPIRO:  Your Honor, to address the point.

1    I don't think there is any intention of assuming or assigning

2    any contracts whatsoever tomorrow.  That is not the game

3    plan.  The game plan is to close a contract with the buyer.

4    The buyer would then have the right for a period of time to

5    determine which contracts it wants to assume and have assumed

6    and assigned to it or not have assumed and assigned to it.

7            In the meantime, as I think you heard, the buyer

8    understands that they are picking up all accruals that would

9    occur from the time they take over the business, the closing

10    date, forward, they are not picking up any arrearages.  We

11    are talking about nobody having to deal with the notice

12    period for a cure amount tomorrow or anything like that.  We

13    are talking about that being done in the future if and to the

14    extent the buyer determines that any of the contracts should

15    be assumed and assigned.

16            MR. PALACIO:  Your Honor, with all due respect to

17    Mr. Shapiro, my point is to the extent this sale goes

18    through, one of the terms there requires that the service

19    providers continue and are obligated to provide service.  If

20    that is the case, they are basically taking that obligation

21    that is already there and transferring that pursuant to a

22    sale.  You can't have a sale without an assumption and

23    assignment.  That is my point.  Then there is a cure issue

24    there.

25            MS. SAWCZUK:  Your Honor, Maria Sawczuk on behalf

1    of Eastwire (phonetic) Communications.  I will be very

2    brief.

3              I wanted to bring it to Your Honor's attention

4    that I believe Eastwire is the only service provider at this

5    point that is also in bankruptcy.  So to the extent any of

6    these negotiations affect or change or modify the claims that

7    Eastwire has in this bankruptcy, it may be necessary -- I am

8    not going to opine on this at this point because I am not

9    entirely sure how it is going to be affected -- it may be

10   necessary to bring those changes to our Bankruptcy Court for

11   approval.  We do have a fiduciary duty to our creditors in

12   our case.

13             THE COURT:  Where are they in bankruptcy?

14             MS. SAWCZUK:  Here, Your Honor, in front of Judge

15   Katz.

16             THE COURT:  All right.

17             MR. LADDIN:  Good evening, Your Honor.  Daryl

18   Laddin on behalf of Verizon.

19             Your Honor, I am here before the Court because

20   Verizon is owed over five million dollars in postpetition

21   administrative expenses that remain unpaid, despite an order

22   that this Court previously entered in the case.  At the

23   outset of the case, Verizon entered into a stipulation under

24   Section 366 with the debtors that required semi-monthly

25   prepayments, and also gave Verizon the right to terminate

1  service on two business days notice in the event that

2  payments were not made.  The debtor failed to make those

3  payments on several occasions.  Verizon worked with the

4  debtors, continued to try to work with the debtors, the

5  debtors continued to fail to pay.  As a result of that, we

6  are now here being owed over five million dollars.

7           Your Honor, I am very concerned with the

8  procedural posture that we are in here.  In particular,

9  without reiterating what Mr. Gwynne had to say, I would like

10 to state that Verizon does join in the comments and objection

11 of MCI Worldcom.

12          In addition to that, Your Honor, we have

13 significant concerns about the due process with respect to

14 this particular sale.  As I understood Your Honor's comments

15 during the meeting with the debtors earlier, Your Honor had

16 denied the sale motion because there was no bidder.  The sale

17 that has just been discussed with the Court here is not the

18 subject of a motion.  It has never been noticed.  There is no

19 opportunity for any of the carriers, including Verizon, to

20 review the terms of the sale.  And it is not reasonable to

21 require any party in interest to review the terms of a

22 contract on what will amount to less than three hours notice

23 and be able to address all of the issues.

24          Substantively, I would expect quite a few

25 objections, including, in particular, the injunction that

1    apparently the purchaser is asking the Court to issue. I
2    will acknowledge for the Court that there is a difference
3    between issuing an injunction against service providers based
4    upon the request of the FCC for the concerns of the FCC -- as
5    I understand, that was a significant reason why the Court
6    entered the initial injunction -- there is a significant
7    difference between that and issuing an injunction that
8    benefits the purchaser in this case as well as the banks,
9    particularly if they are going to request that that
10   injunction be issued if there are any unpaid administrative
11   expenses. I would expect that issue to be raised tomorrow,
12   and we would expect that to the extent that they are seeking
13   to be paid -- excuse me, to receive service during any period
14   subsequent to tomorrow, that they pay all of the past due
15   administrative expenses that are owed.
16            THE COURT:  Just so the record is clear, we came
17   here for a sale hearing today. I was informed by the debtor
18   there was no sale. So I said procedurally what I was
19   prepared to do is deny their motion as moot but I would
20   reconsider if the debtor got to me any information that there
21   was somebody around the courtroom that wanted to make a
22   proposal. And that's what happened. So the procedural
23   status of the sale motion is that it's not denied, because
24   the offer of Mr. Jonas' company is still pending, and the
25   hearing is continued till tomorrow.

1      MR. LADDIN:  For the record, I would go ahead and

2  state my objection for the record on due process grounds

3  going forward with the hearing tomorrow.

4      THE COURT:  Okay.

5      MS. SILVERSTEIN:  Laurie Silverstein on behalf of

6  certain affiliates of SBC.

7      I would join in Mr. Gwynne's comments with

8  respect to the issuance of the TRO.  And I would also add

9  that I was in the courtroom at the last hearing, and it was

10  my understanding that the sale hearing and the TRO were being

11  put over until today, and I believed the hearing to be

12  adjourned and left with my client, only to find out

13  subsequently that a TRO was entered.  So we were here at the

14  time, but since the TRO was put over until today we left.  I

15  don't know what comments were made by the FCC.  I did not

16  receive any notice of the TRO hearing prior to being in

17  court.  And I also believe there are significant procedural

18  issues with respect to the entry of the TRO.

19      I also agree that there are procedural issues

20  with respect to going forward with the sale hearing on a

21  completely different as yet undocumented sale motion.

22      One salient point that I would like clarified,

23  because it has now come up twice during the discussions that

24  have happened, is that the buyer will be taking on the

25  going-forward obligations from the closing date.  That's what

1  I keep hearing.  I don't know when the closing date is going

2  to be.

3      THE COURT:  You will hear about that tomorrow.

4      MS. SILVERSTEIN:  That is a salient term.  If

5  they know, we would like to hear today, if it is different

6  than tomorrow.

7      THE COURT:  The hearing that was scheduled for

8  today is adjourned until 3:00 tomorrow, which includes the

9  sale and the temporary restraining order.  When I was told

10 there wasn't a sale, there was a discussion of how we would

11 have a hearing that would consider all the interests that

12 would be affected by a conversion to Chapter 7.  So I

13 adjourned the hearing on the basis of that information to

14 3:00 tomorrow by teleconference.

15     Then I was advised that there was the possibility

16 of a sale.  So all I have done is adjourned it to an open

17 hearing in the courtroom at 3:00 tomorrow, because it appears

18 we are not in a conversion mode, unless I am misunderstanding

19 something.  To get to that, in either instance, we had to

20 extend the TRO another 24 hours, until tomorrow.  But all

21 those issues about what is in the deal, I assume, will be in

22 the document and you can get it at 12:00 tomorrow.

23     MR. SHAPIRO:  The debtor agrees with Your Honor's

24 position.  It's clear that we came to Court hoping to come to

25 Court at some point today with a sale.  We didn't think we

1   had one this morning.  Now we may have one.  We are

2   continuing and adjourning the hearing until tomorrow and we

3   will find out tomorrow whether in fact we do.  And we will

4   address all the issues that people will be raising tomorrow

5   once they have an opportunity to see the contract.

6                   THE COURT:  If there is no transaction to be

7   considered at 3:00 tomorrow, then we will go forward with the

8   premise that the teleconference was going to be, and that

9   would be to consider with the United States Trustee the

10  conversion.

11                  MR. SHAPIRO:  I agree, Your Honor.

12                  THE COURT:  Rather than be on a teleconference,

13  we will come here at 3:00 and consider that.

14                  MR. SHAPIRO:  Hopefully Pauline Morgan has a lot

15  of space in her house tonight.

16                  THE COURT:  We are going to -- unless somebody

17  has something that is different from what we have been

18  talking about...

19                  MS. MELNIK:  Selinda Melnik for Lexend

20  (phonetic).

21                  We had put on a motion for today on shortened

22  notice because of this hearing, and I was wondering whether

23  that would be put over not until tomorrow but to the omnibus

24  hearing on Thursday.  I wanted to clarify that.

25                  THE COURT:  The only thing that was to be heard

1    today was the sale motion and a reconsideration of any

2    comments that folks wanted to make with regard to a TRO.

3    There was nothing else really on the agenda.  We are going to

4    move to tomorrow.  But anything else will be heard at a

5    to-be-scheduled omnibus hearing, because I am not sure what's

6    going to happen tomorrow that it would make any sense to have

7    an omnibus hearing on the 20th.  It's still possible this

8    case could go to Chapter 7 tomorrow.

9            MS. MELNIK:  I don't think that would moot our

10    motion, no.

11            THE COURT:  No.  But it would put it in a

12    different context.  And the Trustee, the reason why we

13    couldn't consider that information today is because the

14    United States Trustee has to find somebody to come in.

15            MS. MELNIK:  There may or may not be an omnibus

16    hearing on the 20th.

17            THE COURT:  There won't be for sure, because I

18    don't think -- Mr. Kenney, you can help us -- are you able --

19    I thought that was part of the stress of doing anything

20    today, because we have to get somebody to come in.

21            MR. KENNEY:  Your Honor, we do.  We might be able

22    to do it in a couple days.  But I know, if I get a trustee in

23    even this week, the trustee is not going to be able to

24    respond to Ms. Melnik's motion.

25            THE COURT:  So I don't think the 20th is going to

 1  be a day that anything can be done.  So we are going to focus

 2  on tomorrow and see what happens.  If it is a sale -- it

 3  would be different than if it is converted.  And then if it

 4  is converted, he will have to get somebody that can be --

 5            MS. MELNIK:  So we will take one day at a time.

 6            MR. JESSUP:  Douglas Jessup on behalf of Univance

 7  (phonetic), Your Honor.  I flew out from Denver last Monday

 8  coming for a sale.  I flew out again for a sale.  I will

 9  probably stay overnight and wait for another sale.  I did

10  have last week set a motion for adequate assurance, Your

11  Honor.  Obviously, this is all moving very quickly, and we

12  did also have it set today.  I was one of the other motions

13  that was set today at 2:30.  I think we ought to roll that

14  over to tomorrow, if that is possible, Your Honor.

15            What I am faced with and what I have learned in

16  this whole process is the FCC came in and said we are going

17  to need 31 days to shut things down, and therefore, carriers,

18  you are going to have to go along with that, and we are all

19  scrambling to figure out who is going to pay for that and

20  things like that.  Now we have a new party who says they will

21  pay for things going forward, although I have not

22  heard -- they have left open when they get to terminate.

23  What I don't want to see is, they dance together for 45 days,

24  60 days, they say they are out of here and by the way send

25  their termination notice.  Now we are right back to where we

1    started again, 30 days, with nobody paying for it again.  It

2    has all kind of come to a head on this.  I bring that to your

3    attention, Your Honor, and also ask for my motion to be

4    continued.

5         THE COURT:  The motion was put on, again, the

6    agenda, without my agreement to hear those kind of matters

7    today.  You can present any kind of a position that you want

8    in response to whatever sale is proposed to be heard

9    tomorrow.  But again, if there is no sale tomorrow, then the

10   context is much different.  So I don't want to hear anything

11   in the nature of adequate assurance if there is going to be a

12   trustee appointed by the United States Trustee.

13        MR. JESSUP:  Agreed, Your Honor.

14        THE COURT:  Everybody here is sophisticated

15   enough to understand that there would have been a great

16   difference today if we continued with no buyer in a whole lot

17   of ways.  And we are still not sure that there is a buyer.

18        MR. JESSUP:  Your Honor, I feel the same way.

19   That is why we are trying to protect ourselves, trying to

20   understand what is going on.  I would also join in the other

21   comments of the carriers' counsel.  Thank you, Your Honor.

22        MR. SHERMAN:  Andrew Sherman, Seals Cummis, on

23   behalf of Qwest Corporation and Qwest Corporation

24   Communications.

25        We join in the comments by the other telecoms.

1          Your Honor, one point we would like some

2    clarification on is what contracts will the debtor be

3    assuming or will the purchaser be utilizing from the closing

4    date forward.  We still have yet to be supplied with a list

5    of contracts.  And if there is going to be this, quote,

6    management agreement, we need to know what business the

7    purchaser is going to manage, meaning what are the

8    contracts.  And if that list can be provided by tomorrow at

9    12:00, at least that might get some type of notice out to the

10   counter-parties to the contract of what --

11         THE COURT:  I don't think they are going to have

12   that tomorrow.  I think they contemplated, I will let Mr.

13   Shapiro a little bit -- when the presentation was made, my

14   understanding is that that was what they were going to do

15   between tomorrow and the presentation to the state and

16   federal regulatory authority.

17         MR. SHAPIRO:  Let me try to explain how I think

18   it would work.  This is again really the buyer's

19   transaction.  As I understand it, the buyer will not be

20   seeking to assume and assign any contracts tomorrow.  So the

21   debtor will continue to utilize let's say the transaction

22   actually closed after Your Honor entered an order tomorrow

23   immediately, so on Thursday, or Wednesday or Thursday, the

24   buyer will have bought the equipment.  Obviously, the

25   licenses won't be transferred, the customers won't be

1  transferred until subsequent regulatory approval by the FCC

2  and the appropriate states.

3          However, in the interim, as we have heard, the

4  buyer intends to operate the business and has said they will

5  continue to pay all the ongoing costs of operating the

6  business.  To the extent that the buyer continues to use the

7  services of Mr. Sherman's client, Qwest, then they would have

8  to pay on a current basis, on a go-forward basis from the

9  closing forward for those services.

10          THE COURT:  As I understood it, they were going

11  to escrow some funds.

12          MR. SHAPIRO:  They agreed to put 30 million

13  dollars in escrow to support their obligation to do so.  If,

14  however, three days into their ownership they decide to

15  terminate the Qwest relationship, then they would obviously

16  have to give Qwest notice and have to terminate and stop

17  paying --

18          THE COURT:  While that process was occurring,

19  they would be getting paid from the escrow funds.

20          MR. SHAPIRO:  Correct.

21          MR. SHERMAN:  We can address it tomorrow.  Who is

22  going to be the party to our contract subsequent to this?  Is

23  the debtor going to remain on the hook or is it going to be

24  the purchaser?  As the purchaser, there has to be a formal

25  assumption and assignment.  There has to be a cure.

1          THE COURT:  It sounds to me like they are both on

2   the hook, but the debtor has no money.  It's the purchaser,

3   and once they notice you, either for, it would be an

4   assignment, you will have an opportunity to come in and

5   object to that assignment.  And if they reject you, you have

6   an opportunity to come in, being paid till that point, and to

7   present your cure.

8          MR. SHERMAN:  I guess everybody can imagine what

9   will happen is they will not give that notice of assignment

10  for 60 days, allow the carriers to continue to provide

11  service, then on the 60th day or whatever they decide to

12  reject, again, you have sort of abdicated or pushed off the

13  rights the telecoms, including Qwest, has under 365.  We can

14  get into that tomorrow.

15         THE COURT:  Well, again, it would depend on the

16  agreement and what the time frames of the agreement are and

17  the amount of money and what determination I will make that

18  they have protected companies like your client.

19         MR. SHERMAN:  The last point, Your Honor, I guess

20  we will get into it tomorrow, it appears the debtors seem to

21  be transferring their rights under 366 to the purchaser.  In

22  essence, the carriers will be forced to begin anew under this

23  management arrangement, with no deposit or otherwise, and

24  again, we are going to be providing full services, I think

25  the management agreement had a five-day cure.  And again, we

1  will reserve those rights and more likely than not object to

2  that tomorrow.

3          THE COURT:  Well, what would happen to your

4  client if tomorrow I signed a conversion order and I continue

5  the injunction till I feel comfortable with the evidence that

6  I have relied on from the FCC that you not terminate?  How

7  long could you be pushed out then, with no money?

8          MR. SHERMAN:  As long as Your Honor continues the

9  injunction.  That is up to Your Honor's discretion, I

10  imagine.

11          THE COURT:  But assuming it's the 31 days, I am

12  not so sure you are in a better situation there.  That is

13  your best situation without a purchaser.

14          MR. SHERMAN:  That could be.

15          THE COURT:  How much would your client lose in 35

16  days?

17          MR. SHERMAN:  Over a million dollars.  A

18  million-five.  But at that point, we would know there would

19  be a finite date and that services would terminate if the

20  arrangement -- we can deal with it if in the sale continues.

21          THE COURT:  I guess my point is, I don't think

22  that that finite amount of money changes whether you get 60

23  days and get paid or whether you get it tomorrow.  That is

24  why I am having a hard time understanding the position.

25          MR. SHERMAN:  Well, first, we are not assured,

1      and I understand --

2            THE COURT:  You would like to get out of this

3      Winstar situation as quickly as possible, I understand that.

4      But absent that, I don't see your exposure shifting in any

5      way from that outside amount of money, based on what I know

6      from what I have heard from the FCC to date.

7            MR. SHERMAN:  We are continuing to provide

8      services, yes, you will have a guarantee of IDT, I guess

9      however they are going to phrase it, in the document.  But --

10           THE COURT:  I think it is more than a written

11     guarantee.  I think it is a cash guarantee.  They are going

12     to put money in the bank.  If that starts to run short, I

13     assume you can run back in here and tell me, Judge, there is

14     not enough money in there, we need more.  And I would tell

15     Mr. Jonas to ante up because things are taking longer, if you

16     want to stay in that game or your 31 days or 35 days would

17     kick in because I wouldn't enjoin you any longer.

18           But again, I don't see how the outside gets any

19     worse than five or six days for you.

20           MR. SHERMAN:  Maybe it's semantics or if it was

21     structured as a prepay, this 30 million dollars, you started

22     a prepay arrangement with the various carriers, that might

23     gives the carriers a little more comfort on a go-forward

24     basis.  Just to have the 30 million sit there in escrow and

25     you have to apply for it and be paid in arrears is different

1    than the arrangement we negotiated with the debtor --

2    THE COURT:  I understood it to be an ongoing

3    thing.  We will see tomorrow when they present the document.

4    But I think you got to focus on that potential of a 30- to

5    40-day loss is out there no matter, and what saves you from

6    that is a deal.

7    MR. SHERMAN:  That is one perspective and maybe

8    my client will disagree with that.  Maybe, as Your Honor

9    said, they want to get out of this situation.

10    THE COURT:  Because it is unsettled and I can

11    understand that.

12    MR. SHAPIRO:  Your Honor, I suggest we need to

13    resolve all these things in the contract.  We haven't reached

14    agreement on all these points.  We will reach agreement,

15    hopefully get a document.

16    THE COURT:  You are getting some information of

17    what could help you work through.

18    MR. SHAPIRO:  It is helpful to know people's

19    concerns.  We anticipated these concerns, and we will be

20    address them tomorrow.

21    THE COURT:  Anyone else want to be heard?

22    We will be in recess until 3:00 tomorrow.

23    (Hearing concluded at 7:05 p.m)

24    - - -

25    Reporter:  Kevin Maurer

I hereby certify that these shorthand notes
are, to the best of my skill and ability, true
and accurate notes of the proceedings con-
tained therein.

Official Court Reporter
U. S. District Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WINSTAR HOLDINGS, LLC and
IDT CORP.,

        *Plaintiffs*,

  - against -

THE BLACKSTONE GROUP L.P.;
IMPALA PARTNERS, LLC; and
CITICORP,

        *Defendants.*

**Case No.:**    **07 CV 4634 (GEL)(AJP)**

**ECF Case**

---

**REPLY MEMORANDUM OF LAW IN SUPPORT OF THE JOINT MOTION
BY ALL DEFENDANTS TO TRANSFER VENUE TO THE
<u>UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE</u>**

Yosef J. Riemer
Vickie Reznik
David S. Flugman

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900

*Attorneys for Defendant
The Blackstone Group L.P.*

Stephen M. Rathkopf
Andrew C. Gold

HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York 10016
Telephone:   (212) 592-1400
Facsimile:   (212) 592-1500

*Attorneys for Defendant
Impala Partners, LLC*

Stephen L. Saxl
William Wargo

GREENBERG  TRAURIG, LLP
200 Park Avenue
New York, New York 10166
Telephone:   (212) 801-9200
Facsimile:   (212) 801-6400

*Attorneys for Defendant Citigroup Inc., as
successor by merger to Citicorp*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...............................................................................................1

ARGUMENT ....................................................................................................................2

I.     BECAUSE BOTH THE BANKRUPTCY COURT SALE ORDER AND THE
ASSET PURCHASE AGREEMENT MANDATE THAT PLAINTIFFS'
CLAIMS BE BROUGHT EXCLUSIVELY IN DELAWARE BANKRUPTCY
COURT, THIS CASE SHOULD BE TRANSFERRED TO DELAWARE
PURSUANT TO § 1406. ......................................................................................2

     A.     Because Plaintiffs' Claims Both Relate to and Require an Interpretation of
the Asset Purchase Agreement and the Sale Order, This Case is Subject to
the Exclusive Jurisdiction of the Delaware Bankruptcy Court. ..............................3

     B.     Plaintiffs' Claims Can Only Be Brought in Delaware Bankruptcy Court
Because they Fall Within the Broadly Worded Mandatory Forum
Selection Clause in the Asset Purchase Agreement, Which Is Enforceable
By Defendants. ......................................................................................................4

     C.     Jurisdiction Is Proper in the Delaware Bankruptcy Court. .....................................7

II.     EVEN IF VENUE IS DEEMED PROPER IN NEW YORK, THIS CASE
SHOULD NONETHELESS BE TRANSFERRED TO DELAWARE
BANKRUPTCY COURT PURSUANT TO § 1404 IN THE INTERESTS OF
JUSTICE. ...........................................................................................................8

CONCLUSION..................................................................................................................10

# TABLE OF AUTHORITIES

**Cases**

*Bayside Fuel Oil Corp. v. Savino (In re V. Savino Oil & Heating Corp.)*,
No. 91 Civ. 0038 (RJD), 1992 WL 118801 (E.D.N.Y. May 21, 1992)...........................8

*Dan-Dee Int'l, Ltd. v. Kmart Corp.*,
No. 99 Civ. 11689 (DC), 2000 WL 1346865 (S.D.N.Y. Sept. 19, 2000)..........................6

*In re Cuyahoga Equipment Corp.*,
980 F.2d 110 (2d Cir. 1992)..........................................7

*In re Global Crossing, Ltd. Secs. Litig.*,
311 B.R. 345 (S.D.N.Y. 2003)..........................................7

*Mercury West A.G., Inc. v. R.J. Reynolds Tobacco Co.*,
No. 03 Civ. 5262 (JFK), 2004 WL 421793 (S.D.N.Y. Mar. 5, 2004)................................6

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*,
No. 02 Civ. 0767 (LBS), 2002 WL 31819207 (S.D.N.Y. Oct. 10, 2002).........................6

*Ruby v. Pan Am World Airways, Inc.*,
252 F. Supp. 873 (S.D.N.Y. 1965)..........................................4

*Turtur v. Rothschild Registry Int'l.*,
26 F.3d 304 (2d Cir. 1994).....................................1, 3, 6, 7

*Victor G. Reiling & Assocs. v. Fisher-Price, Inc.*
No. 3:03 CV 222 (JBA), 2003 WL 21785580 (D. Conn. July 31, 2003)..........................6

*Walker v. Jon Renau Collection, Inc.*,
423 F. Supp. 2d 115 (S.D.N.Y. 2005)..........................................9

*Wards Co., Inc. v. Jonnet Development Corp. (In re Lafayette Radio Electronics Corp.)*,
761 F.2d 84 (2d Cir. 1982)..........................................8

*Weingrad v. Telepathy, Inc.*,
No. 05 Civ. 2024 (MBM), 2005 WL 2990645 (S.D.N.Y. Nov. 7, 2005)..........................5

*Weiss v. Columbia Pictures Television, Inc.*,
801 F. Supp. 1276 (S.D.N.Y. 1992)..........................................8

**Statutes**

28 U.S.C. § 1334(b).............................................................7, 8

28 U.S.C. § 1404.............................................................2, 8

28 U.S.C. § 1406.............................................................2, 8

## PRELIMINARY STATEMENT

In December 2001, plaintiff IDT Corp. ("IDT") purchased the business assets of Winstar Communications, Inc. ("Old Winstar" or "Debtor") out of bankruptcy for a "fair and reasonable" price through a court-approved Asset Purchase Agreement ("APA").  (Ex. B (Order) at ¶ H.)[1] Now, five and a half years later, IDT asks this Court to permit its collateral attack on the validity of the APA and Sale Order to go forward in New York state court despite an Order ("Sale Order") from the United States Bankruptcy Court for the District of Delaware ("Delaware Bankruptcy Court") and a clause in the APA designating the Delaware Bankruptcy Court as the exclusive forum for this dispute.  Though Plaintiffs style their suit as sounding in tort and not contract, they cannot escape the fact that their claims -- which will necessarily require interpretation of both the APA and Sale Order  -- fall firmly within the mandatory forum provisions.  *See, e.g., Turtur v. Rothschild Registry Int'l.*, 26 F.3d 304, 309-10 (2d Cir. 1994) (use of "arising out of or relating to" language in contract is sufficiently broad to encompass claims of fraudulent inducement).  Plaintiffs' opposition merely asserts, *ipse dixit*, that this dispute does not "relate to" the APA (*see, e.g.,* Pl. Br. at 8), despite the Complaint's repeated reference to the APA and Plaintiffs' entire theory of reliance and damages predicated on the APA.  (*See* Complaint (hereinafter "Compl.") at ¶¶ 1, 2, 43-45, 58, 60, 85, 88, 93, 94.)

Although the Complaint is strewn with allegations of wrongdoing against the Debtor, Plaintiffs conspicuously chose not to name them as a party.[2]  Yet even without Old Winstar as a

---

[1] Exhibit references A through F refer to those documents attached to the Flugman Declaration submitted with Defendants' Opening Brief.

[2] *See, e.g.*, Complaint (hereinafter "Compl.") at ¶ 28 ("During this due diligence, Blackstone, Impala, *and Old Winstar* each made the following material representations . . ."); ¶ 31 ("Blackstone, Impala, Citicorp, *and Old Winstar* did not provide client information . . ."); ¶ 33 ("Blackstone, Citicorp, Impala, *and Old Winstar* all hid and blocked IDT's access . . ."); ¶ 34 ("The figures . . . were heavily distorted by (*inter alia*) *Old Winstar's* recording of revenue . . ."); ¶ 36 ("Blackstone, Citicorp, *and Old Winstar* knew that this information was false .

(Continued…)

party, the Defendants can still enforce the terms of the APA.  Plaintiffs ignore the plain language of the Sale Order, which states that "the terms and provisions of the Asset Purchase Agreement and this Sale Order shall be binding in all respects upon, and *shall inure to the benefit of . . . creditors . . . and any affected third parties*."  (Ex. B (Order) at ¶ 17 (emphasis added).) Likewise, as explained more fully in Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Remand Motion ("Joint Remand Opp."), filed on July 31, 2007, even without Old Winstar in this suit, the case falls firmly within the jurisdiction of the Bankruptcy Court.  (*Id.* at 12-14.)  Plaintiffs' attempt to deprive the Delaware Bankruptcy Court of jurisdiction over claims challenging the validity of the seminal event in Old Winstar's bankruptcy proceeding should be rejected.  Accordingly, whether pursuant to § 1406 or § 1404, this Court should transfer this case to the Delaware District Court for referral to the Delaware Bankruptcy Court.

## ARGUMENT

**I.    BECAUSE BOTH THE BANKRUPTCY COURT SALE ORDER AND THE ASSET PURCHASE AGREEMENT MANDATE THAT PLAINTIFFS' CLAIMS BE BROUGHT EXCLUSIVELY IN DELAWARE BANKRUPTCY COURT, THIS CASE SHOULD BE TRANSFERRED TO DELAWARE PURSUANT TO § 1406.**

Venue is improper in any court other than the Delaware Bankruptcy Court both because that court in its Sale Order retained exclusive jurisdiction over Plaintiffs' claims and because the APA contains a broadly-worded mandatory forum selection clause that covers Plaintiffs' claims. (*See* Defendants' Opening Brief (hereinafter "Def. Br.") at 7.)  In response, Plaintiffs advance two meritless theories:  *first*, that neither the APA (which Plaintiffs say is simply "contextual background") nor the Sale Order applies to their fraud claims, and *second*, that Defendants as

---

. ."); ¶ 64 ("Blackstone, Citicorp, and Impala knowingly aided and abetted in *Old Winstar's commission of fraud . . .*"); ¶ 92 ("The Defendants engaged in a combination and conspiracy involving four conspirators . . .(d) the officers, employees and agents of *Old Winstar*.") (emphasis added throughout).

non-parties to the APA cannot enforce its mandatory venue provisions.  (Pl. Br. at 4-8.)  As set forth below, each of these arguments fail.

> **A.    Because Plaintiffs' Claims Both Relate to and Require an Interpretation of the Asset Purchase Agreement and the Sale Order, This Case is Subject to the Exclusive Jurisdiction of the Delaware Bankruptcy Court.**

Despite the Bankruptcy Court's retention of exclusive jurisdiction in the Sale Order to "resolve any disputes arising under or related to the Asset Purchase Agreement" and to "interpret, implement, and enforce the provisions of the Asset Purchase Agreement and this Sale Order" (Ex. B (Order) at ¶ 15), Plaintiffs baldly assert that the Bankruptcy Court's jurisdiction does not apply to their claims. (Pl. Br. at 8-9.)  Plaintiffs' arguments are devoid of any merit.

In the first instance, under the law of this Circuit, Plaintiffs' asserted claims, including their fraud claims, arise under or relate to the APA.  *See Turtur*, 26 F.3d at 309-10 (fraudulent inducement claim "clearly 'arises out of' or 'relates to'" contract at issue).  And while Plaintiffs may not seek to interpret the provisions of the APA or Sale Order, their claims and allegations require exactly that.[3]  For example:

- Plaintiffs assert that Defendants fraudulently misrepresented Old Winstar's assets and collectively with the Debtor "hid and blocked IDT's access to material information." (Compl. at ¶¶ 30, 33.) Yet, the Bankruptcy Court Sale Order found as a matter of fact that the sale and APA were "negotiated, proposed and agreed to . . . without collusion, in good faith," and for "fair and reasonable" consideration.  (*See* Ex. B (Order) at ¶¶ G, H, 10.)

- Likewise, Plaintiffs allege that they detrimentally relied on Old Winstar's and Defendants' alleged misrepresentations, which induced them to enter into the APA. (Compl. at ¶ 43.)  Yet, the APA specifically states that Old Winstar made "no representation or warranty whatsoever" and that IDT purchased the assets "on an 'as-is where-is' basis."  (Ex. A (APA) at § 5.10.)  Indeed, when Howard Jonas (the Chairman of the Board of IDT) and IDT's counsel appeared in Delaware Bankruptcy Court to outline the terms of their agreement in principle with Old Winstar, IDT represented that "[i]t's an as is, where is acquisition, with no reps and warranties."  (Declaration of Vickie Reznik (hereinafter "Reznik Decl."), Ex. I (Transcript) at 24.)

---

[3]    Allegations involving the negotiations, good faith of the parties, and the APA itself appear throughout Plaintiffs' Complaint.  (*See, e.g,* Compl. at ¶¶ 30, 33 (allegations of bad faith); Ex. A (APA) at ¶¶ 2, 43, 60, 93.)

Consequently, the court that adjudicates Plaintiffs' dispute will be called upon to decide, among other things, whether the terms of the APA bar any or all of Plaintiffs' claims, and the key issues of whether, as the Delaware Bankruptcy Court concluded, the parties to the APA negotiated in good faith and paid "fair and reasonable" consideration. (*See* Ex. B (Order) at ¶¶ G, H.)

Because the plain terms of the Sale Order vest the Delaware Bankruptcy Court with exclusive jurisdiction to interpret both the APA and Sale Order, Plaintiffs' claims should be transferred to that forum. *See Ruby v. Pan Am World Airways, Inc.*, 252 F. Supp. 873, 880 (S.D.N.Y. 1965).

> **B.    Plaintiffs' Claims Can Only Be Brought in Delaware Bankruptcy Court Because they Fall Within the Broadly Worded Mandatory Forum Selection Clause in the Asset Purchase Agreement, Which Is Enforceable By Defendants.**

In this Circuit, a forum selection clause is treated as "prima facie valid," and in order to avoid the agreed-upon forum, a plaintiff must "demonstrate exceptional facts explaining why he should be relieved from his contractual duty."[4] (*See* Def. Br. at 8-9.) Cognizant of this heavy burden, Plaintiffs try to avoid it entirely by arguing *first* that the Defendants, as non-parties to the APA, cannot enforce its provisions, and *second* that because they are not suing on a breach of contract theory, their claims are beyond the scope of the APA's forum selection clause. (Pl. Br. at 4-8.) The law of this Circuit, however, is to the contrary.

First, the Defendants can properly enforce the terms of the Asset Purchase Agreement both independently and by virtue of the Sale Order. Defendants, although not parties to the APA, can enforce its provisions -- including the forum selection clause -- because Plaintiffs allege only collective acts of wrongdoing by the named Defendants taken in concert with Old

---

[4]    Although "a plaintiff's choice of forum is generally entitled to considerable weight" (*see* Pl. Br. at 7 n.6 (internal citations omitted)), where, as here, a motion to transfer involves a mandatory forum selection clause "deference to the plaintiff's choice of forum is inappropriate." (*See* Def. Br. at 9.)

Winstar.  (*See, supra*, at 1 n.1.)  Likewise, Defendants' alleged concealment and

misrepresentation of the value of Old Winstar's assets are predicated on the alleged underlying

wrongful conduct of Old Winstar itself.  (*See, e.g.*, Compl. at ¶¶ 29, 34, 47.)  In such cases, non-

parties to an agreement may enforce its terms.  *See Weingrad v. Telepathy, Inc.*, No. 05 Civ.

2024 (MBM), 2005 WL 2990645, at *5-6 (S.D.N.Y. Nov. 7, 2005) (allowing non-signatory

defendants to enforce terms of contract where plaintiff alleged action in concert with signatory,

and non-parties' interests were "completely derivative of" and "directly related to, if not

predicated upon" the signatory's interests).

　　　　Moreover, Plaintiffs are bound by the Sale Order pursuant to which Defendants

Blackstone, Impala, and Citigroup Inc., as successor by merger to Citigroup ("Citigroup"), may

enforce not only the terms of the Order, but also the terms of the APA.  (*See* Ex. B (Order) at

¶ 17.)  The plain language of the Sale Order states that "the terms and provisions of the Asset

Purchase Agreement and this Sale Order shall be binding in all respects upon, and *shall inure to

the benefit of creditors  . . . and any affected third parties*."  (Ex. B (Order) at ¶ 17 (emphasis

added).)  Even if the Court were to find that the named Defendants were unable to independently

enforce the terms of the APA, they clearly would be able to do so pursuant to the Sale Order

because "to the extent that any provision of [the] Sale Order is inconsistent with the Asset

Purchase Agreement . . . the terms of [the] Sale Order shall control."  (*Id*. at ¶ 18.)

　　　　Second, Plaintiffs' claims fall squarely within the APA's broadly worded mandatory

forum selection clause, and thus can only be brought in Delaware Bankruptcy Court.  That

Plaintiffs' claims sound in tort rather than contract makes no difference because where, as here, a

forum selection clause is broadly worded to include within its scope any claim "arising out of or

relating to [the] contract," such language is interpreted to include tort as well as contract claims.[5]
*See Turtur*, 26 F.3d at 309-10; *Mercury West A.G., Inc. v. R.J. Reynolds Tobacco Co.*, No. 03
Civ. 5262 (JFK), 2004 WL 421793, at *7 (S.D.N.Y. Mar. 5, 2004) ("[F]orum selection clauses
are not restricted solely to breach of contract claims.").  While Plaintiffs may not be attempting
to assert rights arising from the APA, their fraud claims "arise out of" and "relate to" the
transaction it memorializes and as such fall within the forum selection clause.[6]  (*See* Def. Br. at 9
n.12.)

Equally unavailing is Plaintiffs' misplaced reliance on *Victor G. Reiling & Assocs. v.
Fisher-Price, Inc.* and *Dan-Dee Int'l, Ltd. v. Kmart Corp.* (Pl. Br. at 5-8.)  In *Fisher-Price*,
defendants sought to invoke the forum selection clause of an **expired** option contract over
plaintiff's misappropriation claims on the grounds that the claims covered the same subject
matter as the earlier agreement.  *Fisher-Price,* No. 3:03 CV 222 (JBA), 2003 WL 21785580, at
*2 (D. Conn. July 31, 2003)  (emphasis added).  Characterizing the agreement as part of the mere
"contextual background" of the case, the court refused to transfer the case.  *Id.*  Likewise, in
*Dan-Dee*, the court held a forum selection clause inapplicable to copyright infringement claims
wholly independent of the contract containing the venue provision.  *Dan-Dee Int'l, Ltd.*, No. 99
Civ. 11689 (DC), 2000 WL 1346865, at *5 (S.D.N.Y. Sept. 19, 2000).  Unlike the contracts in
*Fisher-Price* and *Dan-Dee*, which were wholly foreign and bore no relationship to the claims in
those cases, the APA in this case is integrally intertwined with Plaintiffs' claims.  *See*, *supra*
§ I.A.  In fact, Plaintiffs' entire theory of damages is predicated on the execution of the APA,

---

[5]    The forum selection clause in the APA employs nearly identical language to the one in *Turtur*.  (*See* Ex. A
(APA) § 9.10; Def. Br. at 9.)

[6]    *See also Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767 (LBS), 2002 WL
31819207, at *10 (S.D.N.Y. Oct. 10, 2002) (fraud claims arising out of transaction fall within language of
broadly worded forum selection).

making their attempt to brush it aside as mere "contextual background" incredible.  (*See* Compl. at ¶ 60; *see also* Compl. at ¶¶ 1, 2, 43-45, 58, 85, 88, 93, 94.)

Because Plaintiffs' claims arise out of and relate to the APA, they fall within its forum selection clause mandating venue in the Delaware Bankruptcy Court and this Court should transfer the case to that forum.  *See Turtur*, 26 F.3d at 309-10.

### C.    Jurisdiction Is Proper in the Delaware Bankruptcy Court.

As discussed more fully in Defendants' Joint Remand Opposition, although Plaintiffs' claims are nominally state law claims and they chose not to name the Debtor as a party, the nature of the proceedings and the relief requested nevertheless provide this Court with "arising in," "arising under," and "related to" jurisdiction over this action, pursuant to 28 U.S.C. § 1334(b).  (Joint Remand Opp. at 5-16.)

Insisting that no such jurisdiction exists and focusing only on "related-to" jurisdiction, Plaintiffs mistakenly cite a narrow test requiring a "significant connection" between the bankrupt estate and the instant action.  (Pl. Br. at 10.)  However, the Second Circuit has modified this standard and has broadly interpreted "related-to" jurisdiction under § 1334(b) to include any action whose "outcome might have *any conceivable effect* on the bankrupt estate."  *In re Cuyahoga Equipment Corp.*, 980 F.2d 110, 114 (2d Cir. 1992).  As discussed more fully in Defendants' Joint Remand Opposition, the fact that the bankrupt estate is contractually obligated to indemnify Blackstone for defending these claims "*as they are incurred*" constitutes a direct effect on the assets of the bankrupt estate and, thus, satisfies related-to jurisdiction.[7]  *See In re Global Crossing, Ltd. Secs. Litig.*, 311 B.R. 345, 347 (S.D.N.Y. 2003) (finding the mere

---

[7]    As explained in the Preliminary Statement, the exception for willful misconduct on the part of Blackstone, upon which Plaintiffs rely so heavily, only applies to claims "finally adjudged by a court of competent jurisdiction." (*See* Ex. A (Blackstone Agreement) at Attachment A.)

"possibility" that litigation could lead to a claim against the corporation for contribution as "certainly hav[ing] a conceivable effect on the bankrupt estate").  Accordingly, Plaintiffs' claims fall within the jurisdictional provisions in § 1334(b) and thus venue is proper in the Delaware Bankruptcy Court.[8]

## II.   EVEN IF VENUE IS DEEMED PROPER IN NEW YORK, THIS CASE SHOULD NONETHELESS BE TRANSFERRED TO DELAWARE BANKRUPTCY COURT PURSUANT TO § 1404 IN THE INTERESTS OF JUSTICE.

In the event that the Court determines that § 1406 is not the correct mechanism by which to enforce the mandatory venue provisions of the Sale Order and APA, the Court should instead transfer the case in the interests of justice pursuant to 28 U.S.C. § 1404(a).  Even if venue is not improper in New York, the venue provisions in the Sale Order and APA are applicable and militate heavily in favor of a transfer to the Delaware Bankruptcy Court for all the reasons above.  *See*, *supra*, § I.  Indeed, even under § 1404(a), Plaintiffs still have the burden to "demonstrate exceptional facts" to avoid litigation in the parties' contractual choice of forum, which they have demonstrably failed to do here.  (*See* Def. Br. at 12.)

For example, Plaintiffs assert that convenience of witnesses is the "single-most important factor" in the transfer analysis.  (Pl. Br. at 14.)  Yet, "mere inconvenience and expense of traveling are not, standing alone, adequate reasons to disturb the parties' contractual choice of forum."[9]  *Weiss v. Columbia Pictures Television, Inc.*, 801 F. Supp. 1276, 1279 (S.D.N.Y. 1992).  In any case, even if these witnesses are located in the New York metropolitan area, depositions

---

[8]   Even if neither arising under, arising in nor related to jurisdiction existed in this case -- which it does -- jurisdiction in the Delaware Bankruptcy Court would still be proper because the bankruptcy court has inherent ancillary jurisdiction to enforce the terms of the Sale Order.  *See Wards Co., Inc. v. Jonnet Development Corp. (In re Lafayette Radio Electronics Corp.)*, 761 F.2d 84, 92 (2d Cir. 1982); *see also Bayside Fuel Oil Corp. v. Savino (In re V. Savino Oil & Heating Corp.)*, No. 91 Civ. 0038 (RJD), 1992 WL 118801, at *2 (E.D.N.Y. May 21, 1992).

[9]   Notably Plaintiffs had no problem traveling the 115 miles from Newark to Wilmington when they wanted to buy Old Winstar.

and other discovery are typically conducted where the witness is located. Similarly, "the location of documents is neutral in today's era of photocopying, fax machines, and Federal Express." *Walker v. Jon Renau Collection, Inc.*, 423 F. Supp. 2d 115, 117-18 & n.3 (S.D.N.Y. 2005). Further, all but one of the witnesses listed in the Roover Declaration are people over which the parties have control.[10] And Defendants have already agreed to submit themselves to the jurisdiction of the Delaware Bankruptcy Court. (*See* Reznik Decl. at ¶ 2.)

Indeed, for Plaintiffs to complain about the "inconvenience" of the Delaware forum and to assert that all relevant operative facts for this case occurred in New York is disingenuous at best. Plaintiff IDT is a Delaware corporation that does business in Delaware.[11] (Reznik Decl., Ex. G (14A) at 1, 31, A1, B2, B15; Ex. H (10K) at 44.) In addition, Plaintiffs specifically availed themselves of the Delaware forum by arriving in Delaware and making an offer to buy Old Winstar's assets outside the courtroom of the Delaware Bankruptcy Court. (Reznik Decl., Ex. I (Transcript) at 17-19; Affidavit of Stefan Feuerabendt (hereinafter "Feuerabendt Aff.") at ¶ 3.)[12] After IDT's proposal, negotiations and discussions involving IDT took place outside the courtroom of the Delaware Bankruptcy Court to work out an agreement in principle on the key terms of a transaction. (*See* Feuerabendt Aff. at ¶¶ 3-5.) Moreover, IDT's Chairman of the Board and counsel both appeared in Delaware Bankruptcy Court to outline the details of the proposed agreement and represented that "a fair amount of time" had been spent negotiating the agreement in Delaware. (Reznik Decl., Ex. I (Transcript) at 19; *see also id.* at 17-28.)

---

[10]   That the one non-party witness, David Duncan, the former Chief Financial Officer of Old Winstar is by Plaintiffs' own estimation a "key participant in Plaintiffs' due diligence" further illustrates the centrality of Old Winstar to Plaintiffs' allegations. (*See* Pl. Br. at 16.)

[11]   Defendants Blackstone and Citigroup are also Delaware entities.

[12]   Plaintiffs concede that IDT is a large corporation with financial resources (Pl. Br. at 17), and its lead counsel in this action practices in Virginia, closer to Wilmington, Delaware than to New York.

Ultimately, the interests of justice favor resolving this dispute in the Delaware

Bankruptcy Court as that court has a compelling interest in seeing its own Sale Order properly

enforced.  Because the Delaware Bankruptcy Court was intimately involved in the sale of Old

Winstar's assets to Plaintiffs, it is best suited to determine the impact of Plaintiffs' claims on the

ongoing bankruptcy proceeding.  As Plaintiffs' claims raise no novel issues of state law, the

Bankruptcy Court is perfectly capable of adjudicating this case, especially given the federal

bankruptcy issues with which the claims are intertwined.  (*See also* Joint Remand Opp. at 19-24.)

## CONCLUSION

For all the foregoing reasons, and for those in the Defendants' opening brief, all

Defendants respectfully request that this Court transfer this case to the United States District

Court for the District of Delaware so that it may be transferred to the United States Bankruptcy

Court for the District of Delaware where it rightfully belongs.

|  | Respectfully submitted, |
|--|--|
|  | s/ Yosef. J. Riemer |
| Dated:  August 2, 2007 | Yosef J. Riemer<br>Vickie Reznik<br>David S. Flugman<br>KIRKLAND & ELLIS LLP<br>Citigroup Center<br>153 East 53rd Street<br>New York, New York  10022-4611<br>Telephone:    (212) 446-4800<br>Facsimile:    (212) 446-4900 |
|  | *Attorneys for Defendant*<br>*The Blackstone Group L.P.* |
| s/ Stephen M. Rathkopf | s/ Stephen L. Saxl |
| Stephen M. Rathkopf<br>Andrew C. Gold<br>HERRICK, FEINSTEIN LLP<br>2 Park Avenue<br>New York, New York 10016<br>Telephone:    (212) 592-1400<br>Facsimile:    (212) 592-1500 | Stephen L. Saxl<br>William Wargo<br>GREENBERG TRAURIG, LLP<br>200 Park Avenue<br>New York, New York 10166<br>Telephone:    (212) 801-9200<br>Facsimile:    (212) 801-6400 |
| *Attorneys for Defendant*<br>*Impala Partners, LLC* | *Attorneys for Defendant Citigroup Inc., as*<br>*successor by merger to Citicorp* |

-10-

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **WINSTAR HOLDINGS LLC and IDT CORP.,** | **Case No.:**    **07 CV 4634 (GEL)(AJP)** **ECF Case** |
| *Plaintiffs*, | |
| - against - | |
| **THE BLACKSTONE GROUP L.P.; IMPALA PARTNERS, LLC; and CITICORP,** | |
| *Defendants*. | |

<u>**DECLARATION OF VICKIE REZNIK**</u>

Vickie Reznik, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1.      I am a partner of the law firm Kirkland & Ellis LLP, attorneys for Defendant The Blackstone Group LP ("Blackstone"). I am fully familiar with all of the matters set forth in this declaration either from personal knowledge or from my review of the file in this matter. I submit this declaration in further support of the Joint Motion By All Defendants to Transfer Venue to the United States District Court for the District of Delaware.

2.      Defendants agree to make themselves available in Delaware and to submit to the jurisdiction of the Delaware Bankruptcy Court.

3.      Moreover, as reflected in public filings, Plaintiff IDT has availed itself of the Delaware forum in numerous ways, which supports a finding that the Delaware forum is not "inconvenient." IDT is a Delaware corporation, whose corporate governance and related stock plans -- among other things -- are governed by Delaware law. (*See e.g.,* IDT Corp. DEF 14A, for the period ending December 14, 2006, at 1, 31, A1, B2, B15 (excerpts attached hereto as Exhibit G).) In addition, IDT does business in Delaware by offering its U.S. bundled, flat-rate local and long distance phone service plans to Delaware customers. (*See* IDT Corp. 10K, for fiscal year ended July 31, 2006, at 44 (excerpts attached hereto as Exhibit H).) Likewise, Plaintiff IDT

specifically availed itself of the Delaware forum by participating in the Old Winstar bankruptcy proceedings out of which IDT entered into the Asset Purchase Agreement at issue in this case.

4.      As reflected in the transcript of the proceedings before Judge Farnan in the United States Bankruptcy Court in and for the District of Delaware on December 17, 2001 (attached hereto as Exhibit I ), material portions of the negotiations and discussions regarding the Asset Purchase Agreement and Sale Order took place between IDT, Old Winstar, Blackstone and others in Wilmington, Delaware.  In particular, Howard Jonas, the Chairman of the Board of IDT, and IDT's counsel appeared in Court before Judge Farnan to outline the details of their proposed Agreement with Old Winstar and represented that "a fair amount of time" had been spent negotiating the agreement in Delaware.  (Ex. I (Transript) at 19; *see also id.* at 17-28.)  In addition, Old Winstar's counsel represented that additional negotiations were going to continue to take place -- at least in part -- in Delaware and that the parties would return to the Court in Delaware the following day to seek approval of the proposed transaction. (*Id.* at 18-19, 27-28.)

I declare under penalty of perjury that the foregoing is true and correct.


s/ Vickie Reznik
_____

Dated:  New York, New York          Vickie Reznik
August 2, 2007
                                    KIRKLAND & ELLIS LLP
                                    Citigroup Center
                                    153 East 53rd Street
                                    New York, New York  10022-4611
                                    Telephone:    (212) 446-4800
                                    Facsimile:    (212) 446-4900

                                    *Attorneys for Defendant*
                                    *The Blackstone Group L.P.*

EXHIBIT G

# IDT CORP (IDT)

520 BROAD ST
NEWARK, NJ 07102
973 438 1000
http://www.idt.net

# DEF 14A

**DEFINITIVE PROXY STATEMENT**
**Filed on 11/09/2006 - Period: 12/14/2006**
File Number 001-16371



**LIVEDGAR**[®] Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

UNITED STATES

## SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# SCHEDULE 14A

**Proxy Statement Pursuant to Section 14(a) of the**

**Securities Exchange Act of 1934**

Filed by the Registrant ☒   Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐     Preliminary Proxy Statement

☐     **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒     Definitive Proxy Statement

☐     Definitive Additional Materials

☐     Soliciting Material Pursuant to §240.14a-12

**IDT Corporation**

**(Name of Registrant as Specified In Its Charter)**

Payment of Filing Fee (Check the appropriate box):

☒　　No fee required.

☐　　Fee computed on table below per Exchange Act Rule 14a-6(i)(1), and 0-11.

　　(1)　　　Title of each class of securities to which transaction applies:

　　　　

　　(2)　　　Aggregate number of securities to which transactions applies:

　　　　

　　(3)　　　Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee is calculated and state how it was determined):

　　　　

　　(4)　　　Proposed maximum aggregate value of transaction:

　　　　

　　(5)　　　Total fee paid:

　　　　

☐　　Fee paid previously with preliminary materials.

☐　　Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

　　(1)　　　Amount Previously Paid:

　　　　

　　(2)　　　Form, Schedule or Registration Statement No.:

　　　　

　　(3)　　　Filing Party:

(4)    Date Filed:

# IDT CORPORATION

520 Broad Street

Newark, New Jersey 07102

(973) 438-1000

# GENERAL INFORMATION

**General Information**

This Proxy Statement is furnished to the stockholders of IDT Corporation, a Delaware corporation (the "Company" or "IDT"), in connection with the solicitation by the Company's Board of Directors (the "Board of Directors") of proxies for use in voting at the Company's Annual Meeting of Stockholders (the "Annual Meeting"). The Annual Meeting will be held on Thursday, December 14, 2006 at 10:30 a.m., local time, at the Company's headquarters located at 520 Broad Street, Newark, New Jersey 07102. The shares of the Company's common stock, par value $0.01 per share ("Common Stock"), Class A common stock, par value $0.01 per share ("Class A Common Stock"), and Class B common stock, par value $0.01 per share ("Class B Common Stock"), present at the Annual Meeting or represented by the proxies received by telephone, Internet or mail (properly marked, dated and executed) and not revoked will be voted at the Annual Meeting. This Proxy Statement is being mailed to the Company's stockholders starting on November 10, 2006.

Any proxy given pursuant to this solicitation may be revoked by the person giving it at any time before it is exercised by delivering to the Company (to the attention of Joyce J. Mason, Esq., Executive Vice President, General Counsel and Corporate Secretary) a written notice of revocation or by executing a later-dated proxy by telephone, Internet or mail, or by attending the Annual Meeting and voting in person.

**Solicitation and Voting Procedures**

This solicitation of proxies is being made by the Company. The solicitation is being conducted by mail and by e-mail, and the Company will bear all attendant costs. These costs will include the expense of preparing and mailing proxy materials for the Annual Meeting and any reimbursements paid to brokerage firms and others for their expenses incurred in forwarding the solicitation materials regarding the Annual Meeting to the beneficial owners of Common Stock, Class A Common Stock and Class B Common Stock. The Company may conduct further solicitations personally, by telephone or by facsimile through its officers, directors and employees, none of whom will receive additional compensation for assisting with the solicitation.

The close of business on Friday, October 20, 2006 has been fixed as the record date (the "Record Date") for determining the holders of shares of Common Stock, Class A Common Stock and Class B Common Stock entitled to notice of, and to vote at, the Annual Meeting. As of the close of business on the Record Date, the Company had 96,981,295 shares issued, of which 81,546,353, the outstanding shares, are entitled to vote at the Annual Meeting, consisting of 15,178,173 shares of Common Stock, 9,816,988 shares of Class A Common Stock and 56,551,192 shares of Class B Common Stock. The remaining 15,434,942 shares issued, consisting of 9,896,687 shares of Common Stock and 5,538,255 shares of Class B Common Stock, are beneficially owned by the Company, and are not entitled to vote or to be counted as present at the Annual Meeting for purposes of determining whether a quorum is present. The shares of stock owned by the Company will not be deemed to be outstanding for determining whether a majority of the votes cast, or the majority of the outstanding shares of a class, if required, have voted in favor of any proposal.

Stockholders are entitled to one vote for each share of Common Stock held by them, three votes for each share of Class A Common Stock held by them and one-tenth of one vote for each share of Class B Common Stock held by

them. The holders of Common Stock, Class A Common Stock and Class B Common Stock will vote as a single body on all matters presented to the stockholders, except that, with regard to the approval of Proposal No. 2, the holders of Class B Common Stock will vote as a single class and the holders of Common Stock and Class A Common Stock will vote together as a group.

**PROPOSAL NO. 2**

### APPROVAL OF AN AMENDMENT TO THE COMPANY'S

### RESTATED CERTIFICATE OF INCORPORATION

The Company's stockholders are being asked to approve an amendment to the Company's Restated Certificate of Incorporation, as amended, to increase the number of shares of Class B Common Stock authorized for issuance by 100,000,000 to 200,000,000.

The amendment to the Company's Restated Certificate of Incorporation is reflected in the preamble of Article Fourth of the Certificate and it is attached hereto as Exhibit A and incorporated herein by reference. The Board of Directors adopted the proposed amendment on September 27, 2006, subject to stockholder approval at the Annual Meeting.

The Board of Directors approved the amendment to the Restated Certificate of Incorporation and the authorization of additional shares of Class B Common Stock, and recommended the same to the stockholders, as it would provide the Company with the ability to pay a dividend in Class B Common Stock and to have available authorized but unissued shares of Class B Common Stock for whatever purpose, consistent with applicable law, the Company's Restated Certificate of Incorporation and the interests of the Company's stockholders, as determined by the Board of Directors. Although the Company has no present plans with respect to any of the following, such purposes could include making acquisitions, providing additional equity compensation to employees, officers, directors and others and capital raising. If declared by the Board of Directors, the dividend currently being considered would result in the issuance by the Company of one share of Class B Common Stock to the holder of every share of Common Stock, Class A Common Stock and Class B Common Stock that is issued and outstanding as of the record date for the dividend determined by the Board of Directors. The purpose of the dividend would be to improve the liquidity of the market for the Class B Common Stock by increasing the number of shares of Class B Common Stock that are outstanding and held by stockholders. Shares held by the Company would not be eligible to receive the dividend.

The dividend has not yet been declared and may never be declared. If there are a sufficient number of authorized (and not outstanding) shares of Class B Common Stock, the Board of Directors would have the authority to declare the dividend, set a record date therefor and pay the dividend at the time that it deems advantageous to the Company and its stockholders, or to refrain from ever declaring the dividend. The record date for determining stockholders entitled to receive the dividend would be set by the Board of Directors, would be on or after the date the dividend is approved by the Board of Directors and would be within the time period prior to the payments as is in accordance with the provision of the Delaware General Corporation Law.

If approved, declared and paid, the dividend would result in there being outstanding twice as many shares of capital stock of the Company as there were outstanding on the record date, with all the additional shares being shares of Class B Common Stock. We expect that all the additional shares of Class B Common Stock would be approved for listing and trading on the New York Stock Exchange (or other market on which the Class B Common Stock is then traded) and, other than those held by certain officers, directors and affiliates of the Company, freely tradable. This would have the following effect:

- The trading price for each of the Class B Common Stock and Common Stock will likely decrease, and the amount of such decrease will depend on the relative aggregate number of shares of Class B Common Stock, Common Stock and Class A Common Stock outstanding before and after the payment of the dividend, the pre-dividend stock price, market reaction to the dividend and other factors outside of the control of the Company;

- The number of shares of Class B Common Stock would exceed the number of shares of Common Stock by a significantly greater margin than at the present time;

31

### CERTIFICATE OF AMENDMENT

### TO THE

### RESTATED CERTIFICATE OF INCORPORATION

### OF

### IDT CORPORATION

(pursuant to Section 242 of the Delaware General Corporation Law)

IDT Corporation, a Delaware corporation, hereby certifies as follows:

1.   The name of the corporation is IDT Corporation (hereinafter the "Corporation").

2.   The Corporation's Certificate of Incorporation was initially filed with the Secretary of State of the State of Delaware on December 22, 1995, a Restated Certificate of Incorporation was filed on February 7, 1996, and amendments were filed to the Restated Certificate of Incorporation July 3, 2000 and April 18, 2006.

3.   The Restated Certificate of Incorporation of the Corporation, as amended is hereby amended by deleting the preamble of Article Fourth thereof and replacing it with the following:

"FOURTH: The aggregate number of shares of all classes of capital stock which the Corporation shall have the authority to issue is three hundred and forty five million (345,000,000) shares, consisting of (a) 100,000,000 shares of common stock, par value $0.01 per share ("Common Stock"), (b) 35,000,000 shares of Class A Common Stock, par value $0.01 per share (the "Class A Stock"), (c) 200,000,000 shares of Class B Common Stock, par value $0.01 per share (the "Class B Stock", and collectively, such Common Stock, Class A Stock and Class B Stock are referred to herein as the "Common Shares"), and (d) 10,000,000 shares of preferred stock, par value $0.01 per share ("Preferred Stock")."

4.   The foregoing amendment was duly approved by the Board of Directors and recommended to be adopted by the stockholders of the Corporation in accordance with Section 242 of the Delaware General Corporation Law, and was adopted by the written consent of the majority stockholder in accordance with Section 228 of the Delaware General Corporation Law.

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Amendment to be executed on its behalf this 14th day of December, 2006.

IDT CORPORATION

By:

Name:        **Joyce J. Mason**
Title:       **Secretary and Executive Vice President**

A-1

**IDT CORPORATION**

**2005 STOCK OPTION AND INCENTIVE PLAN**

*(As Amended by Proposal No. 3)*

*1. Purpose; Types of Awards; Construction.*

The purpose of the IDT Corporation 2005 Stock Option and Incentive Plan (the "Plan") is to provide incentives to executive officers, employees, directors and consultants of IDT Corporation (the "Company"), or any subsidiary of the Company which now exists or hereafter is organized or acquired by the Company, to acquire a proprietary interest in the Company, to continue as officers, employees, directors or consultants, to increase their efforts on behalf of the Company and to promote the success of the Company's business. The provisions of the Plan are intended to satisfy the requirements of Section 16(b) of the Securities Exchange Act of 1934, as amended, and of Section 162(m) of the Internal Revenue Code of 1986, as amended, and shall be interpreted in a manner consistent with the requirements thereof.

*2. Definitions.*

As used in this Plan, the following words and phrases shall have the meanings indicated:

(a) "Agreement" shall mean a written agreement entered into between the Company and a Grantee in connection with an award under the Plan.

(b) "Board" shall mean the Board of Directors of the Company.

(c) "Change in Control" means a change in ownership or control of the Company effected through either of the following:

(i) any "person," as such term is used in Sections 13(d) and 14(d) of the Exchange Act (other than (A) the Company, (B) any trustee or other fiduciary holding securities under an employee benefit plan of the Company, (C) any corporation or other entity owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of common stock, or (D) any person who, immediately prior to the Initial Public Offering, owned more than 25% of the combined voting power of the Company's then outstanding voting securities), is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company (not including in the securities beneficially owned by such person any securities acquired directly from the Company or any of its affiliates other than in connection with the acquisition by the Company or its affiliates of a business) representing 25% or more of the combined voting power of the Company's then outstanding voting securities; or

(ii) during any period of not more than two consecutive years, not including any period prior to the initial adoption of this Plan by the Board, individuals who at the beginning of such period constitute the Board, and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including, but not limited to a consent solicitation, relating to the election of directors of the Company) whose election by the Board or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds (2/3) of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute at least a majority thereof.

(d) "Class B Common Stock" shall mean shares of Class B Common Stock, par value $.01 per share, of the Company.

(e) "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(f) "Committee" shall mean the Compensation Committee of the Board or such other committee as the Board may designate from time to time to administer the Plan.

B-1

(g) "Common Stock" shall mean shares of Common Stock, par value $.01 per share, of the Company.

(h) "Company" shall mean IDT Corporation, a corporation incorporated under the laws of the State of Delaware, or any successor corporation.

(i) "Continuous Service" means that the provision of services to the Company or a Related Entity in any capacity of officer, employee, director or consultant is not interrupted or terminated. Continuous Service shall not be considered interrupted in the case of (i) any approved leave of absence, (ii) transfers between locations of the Company or among the Company, any Related Entity or any successor in any capacity of officer, employee, director or consultant, or (iii) any change in status as long as the individual remains in the service of the Company or a Related Entity in any capacity of officer, employee, director or consultant (except as otherwise provided in the applicable Agreement). An approved leave of absence shall include sick leave, maternity leave, military leave (including without limitation service in the National Guard or the Army Reserves) or any other personal leave approved by the Committee. For purposes of Incentive Stock Options, no such leave may exceed ninety (90) days unless reemployment upon expiration of such leave is guaranteed by statute or contract.

(j) "Corporate Transaction" means any of the following transactions:

(i) a merger or consolidation of the Company with any other corporation or other entity, other than (A) a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving or parent entity) 80% or more of the combined voting power of the voting securities of the Company or such surviving or parent entity outstanding immediately after such merger or consolidation or (B) a merger or consolidation effected to implement a recapitalization of the Company (or similar transaction) in which no "person" (as defined in the Exchange Act) acquired 25% or more of the combined voting power of the Company's then outstanding securities; or

(ii) a plan of complete liquidation of the Company or an agreement for the sale or disposition by the Company of all or substantially all of its assets (or any transaction having a similar effect).

(k) "Deferred Stock Units" mean a Grantee's rights to receive shares of Class B Common Stock or Common Stock, as applicable, on a deferred basis, subject to such restrictions, forfeiture provisions and other terms and conditions as shall be determined by the Committee.

(l) "Disability" shall mean a Grantee's inability to perform his or her duties with the Company or any of its affiliates by reason of any medically determinable physical or mental impairment, as determined by a physician selected by the Grantee and acceptable to the Company.

(m) "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended from time to time.

(n) "Fair Market Value" per share as of a particular date shall mean (i) the closing sale price per share of Class B Common Stock or Common Stock, as applicable, on the national securities exchange on which the Class B Common Stock or Common Stock, as applicable, is principally traded for the last preceding date on which there was a sale of such Class B Common Stock or Common Stock, as applicable, on such exchange, or (ii) if the shares of Class B Common Stock or Common Stock, as applicable, are then traded in an over-the-counter market, the average of the closing bid and asked prices for the shares of Class B Common Stock or Common Stock, as applicable, in such over-the-counter market for the last preceding date on which there was a sale of such Class B Common Stock or Common Stock, as applicable, in such market, or (iii) if the shares of Class B Common Stock or Common Stock, as applicable, are not then listed on a national securities exchange or traded in an over-the-counter market, such value as the Committee, in its sole discretion, shall determine.

(o) "Grantee" shall mean a person who receives a grant of Options, Stock Appreciation Rights, Limited Rights, Deferred Stock Units or Restricted Stock under the Plan.

B-2

(p) "Incentive Stock Option" shall mean any option intended to be, and designated as, an incentive stock option within the meaning of Section 422 of the Code.

(q) "Insider" shall mean a Grantee who is subject to the reporting requirements of Section 16(a) of the Exchange Act.

(r) "Insider Trading Policy" shall mean the Insider Trading Policy of the Company, as may be amended from time to time.

(s) "Limited Right" shall mean a limited stock appreciation right granted pursuant to Section 10 of the Plan.

(t) "Non-Employee Director" means a member of the Board or the board of directors of any Subsidiary (other than Net2Phone, Inc., Film Roman, Inc. or any other Subsidiary that has either (A) a class of "equity securities" (as defined in Rule 3a11-1 promulgated under the Exchange Act) registered under the Exchange Act or a similar foreign statute or (B) adopted any stock option plan, equity compensation plan or similar employee benefit plan in which non-employee directors of such Subsidiary are eligible to participate) who is not an employee of the Company or any Subsidiary.

(u) "Non-Employee Director Annual Grant" shall mean an award of 3,750 shares of Restricted Stock.

(v) "Non-Employee Director Grant Date" shall mean January 5 of the applicable year (or the following business day if January 5 is not a business day).

(w) "Nonqualified Stock Option" shall mean any option not designated as an Incentive Stock Option.

(x) "Option" or "Options" shall mean a grant to a Grantee of an option or options to purchase shares of Class B Common Stock or Common Stock, as applicable.

(y) "Option Agreement" shall have the meaning set forth in Section 6 of the Plan.

(z) "Option Price" shall mean the exercise price of the shares of Class B Common Stock or Common Stock, as applicable, covered by an Option.

(aa) "Parent" shall mean any company (other than the Company) in an unbroken chain of companies ending with the Company if, at the time of granting an award under the Plan, each of the companies other than the Company owns stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other companies in such chain.

(bb) "Plan" means this IDT Corporation 2005 Stock Option and Incentive Plan, as amended or restated from time to time.

(cc) "Related Entity" means any Parent, Subsidiary or any business, corporation, partnership, limited liability company or other entity in which the Company, a Parent or a Subsidiary holds a substantial ownership interest, directly or indirectly.

(dd) "Related Entity Disposition" means the sale, distribution or other disposition by the Company of all or substantially all of the Company's interest in any Related Entity effected by a sale, merger or consolidation or other transaction involving such Related Entity or the sale of all or substantially all of the assets of such Related Entity.

(ee) "Restricted Period" shall have the meaning set forth in Section 11(b) of the Plan.

(ff) "Restricted Stock" means shares of Class B Common Stock or Common Stock, as applicable, issued under the Plan to a Grantee for such consideration, if any, and subject to such restrictions on transfer, rights of refusal, repurchase provisions, forfeiture provisions and other terms and conditions as shall be determined by the

Committee.

(gg) "Retirement" shall mean a Grantee's retirement in accordance with the terms of any tax-qualified retirement plan maintained by the Company or any of its affiliates in which the Grantee participates.

B-3

(hh) "Rule 16b-3" shall mean Rule 16b-3, as from time to time in effect, promulgated under the Exchange Act, including any successor to such Rule.

(ii) "Stock Appreciation Right" shall mean the right, granted to a Grantee under Section 9 of the Plan, to be paid an amount measured by the appreciation in the Fair Market Value of a share of Class B Common Stock or Common Stock, as applicable, from the date of grant to the date of exercise of the right, with payment to be made in cash or Class B Common Stock or Common Stock, as applicable, as specified in the award or determined by the Committee.

(jj) "Subsidiary" shall mean any company (other than the Company) in an unbroken chain of companies beginning with the Company if each of the companies other than the last company in the unbroken chain owns stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other companies in such chain.

(kk) "Tax Event" shall have the meaning set forth in Section 17 of the Plan.

(ll) "Ten Percent Stockholder" shall mean a Grantee who at the time an Incentive Stock Option is granted, owns stock possessing more than ten percent (10%) of the total combined voting power of all classes of stock of the Company or any Parent or Subsidiary.

*3. Administration.*

(a) The Plan shall be administered by the Committee, the members of which may be composed of (i) "non-employee directors" under Rule 16b-3 and "outside directors" under Section 162(m) of the Code, or (ii) any other members of the Board.

(b) The Committee shall have the authority in its discretion, subject to and not inconsistent with the express provisions of the Plan, to administer the Plan and to exercise all the powers and authorities either specifically granted to it under the Plan or necessary or advisable in the administration of the Plan, including, without limitation, the authority to grant Options, Stock Appreciation Rights, Limited Rights, Deferred Stock Units and Restricted Stock; to determine which options shall constitute Incentive Stock Options and which Options shall constitute Nonqualified Stock Options; to determine which Options (if any) shall be accompanied by Limited Rights; to determine the purchase price of the shares of Class B Common Stock or Common Stock, as applicable, covered by each Option; to determine the persons to whom, and the time or times at which awards shall be granted; to determine the number of shares to be covered by each award; to interpret the Plan and any award under the Plan; to reconcile any inconsistent terms in the Plan or any award under the Plan; to prescribe, amend and rescind rules and regulations relating to the Plan; to determine the terms and provisions of the Agreements (which need not be identical) and to cancel or suspend awards, as necessary; and to make all other determinations deemed necessary or advisable for the administration of the Plan.

(c) All decisions, determination and interpretations of the Committee shall be final and binding on all Grantees of any awards under this Plan. No member of the Board or Committee shall be liable for any action taken or determination made in good faith with respect to the Plan or any award granted hereunder.

(d) The Committee may delegate to one or more executive officers of the Company the authority to (i) grant awards under the Plan to employees of the Company and its Subsidiaries who are not officers or directors of the Company, (ii) execute and deliver documents or take such other ministerial actions on behalf of the Committee with respect to awards and (iii) to make interpretations of the Plan. The grant of authority in this Section 3(d) shall be subject to such conditions and limitations as may be determined by the Committee. If the Committee delegates authority to any such executive officer or executive officers of the Company pursuant to this Section 3(d), and such executive officer or executive officers grant awards pursuant to such delegated authority, references in this Plan to the "Committee" as they relate to such awards shall be deemed to refer to such executive officer or executive officers, as applicable.

*4. Eligibility.*

Awards may be granted to executive officers, employees, directors and consultants of the Company or of any Subsidiary. In addition to any other awards granted to Non-Employee Directors hereunder, awards shall be granted to Non-Employee Directors pursuant to Section 14 of the Plan. In determining the persons to whom awards shall be granted and the number of shares to be covered by each award, the Committee shall take into account the duties of the respective persons, their present and potential contributions to the success of the Company and such other factors as the Committee shall deem relevant in connection with accomplishing the purposes of the Plan.

*5. Stock.*

(a) The maximum number of shares of Class B Common Stock reserved for the grant of awards under the Plan shall be 4,000,000, subject to adjustment as provided in Section 12 of the Plan. Such shares may, in whole or in part, be authorized but unissued shares or shares that shall have been or may be reacquired by the Company.

(b) If any outstanding award under the Plan should, for any reason expire, be canceled or be forfeited (other than in connection with the exercise of a Stock Appreciation Right or a Limited Right), without having been exercised in full, the shares of Class B Common Stock allocable to the unexercised, canceled or terminated portion of such award shall (unless the Plan shall have been terminated) become available for subsequent grants of awards under the Plan, unless otherwise determined by the Committee.

(c) In no event may a Grantee be granted during any calendar year Options to acquire more than an aggregate of 2,000,000 shares of Class B Common Stock and Common Stock or more than 2,000,000 shares of Restricted Stock or Deferred Stock Units, subject to adjustment as provided in Section 12 of the Plan.

*6. Terms and Conditions of Options.*

(a) OPTION AGREEMENT. Each Option granted pursuant to the Plan shall be evidenced by a written agreement between the Company and the Grantee (the "Option Agreement"), in such form and containing such terms and conditions as the Committee shall from time to time approve, which Option Agreement shall comply with and be subject to the following terms and conditions, unless otherwise specifically provided in such Option Agreement. For purposes of interpreting this Section 6, a director's service as a member of the Board or a consultant's service shall be deemed to be employment with the Company.

(b) NUMBER OF SHARES. Each Option Agreement shall state the number of shares of Class B Common Stock or Common Stock, as applicable, to which the Option relates.

(c) TYPE OF OPTION. Each Option Agreement shall specifically state that the Option constitutes an Incentive Stock Option or a Nonqualified Stock Option. In the absence of such designation, the Option will be deemed to be a Nonqualified Stock Option.

(d) OPTION PRICE. Each Option Agreement shall state the Option Price, which, in the case of an Incentive Stock Option, shall not be less than one hundred percent (100%) of the Fair Market Value of the shares of Class B Common Stock or Common Stock, as applicable, covered by the Option on the date of grant. The Option Price shall be subject to adjustment as provided in Section 12 of the Plan.

(e) MEDIUM AND TIME OF PAYMENT. The Option Price shall be paid in full, at the time of exercise, in cash or in shares of Class B Common Stock or Common Stock, as applicable, having a Fair Market Value equal to such Option Price or in a combination of cash and Class B Common Stock or Common Stock, as applicable, including a cashless exercise procedure through a broker-dealer; provided, however, that in the case of an Incentive Stock Option, the medium of payment shall be determined at the time of grant and set forth in the applicable Option Agreement.

(f) TERM AND EXERCISABILITY OF OPTIONS. Each Option Agreement shall provide the exercise schedule for the Option as determined by the Committee, provided, that, the Committee shall have the authority to accelerate the exercisability of any outstanding option at such time and under such circumstances as it, in its sole discretion, deems appropriate. The exercise period will be ten (10) years from the date of the grant of the option unless otherwise determined by the Committee; provided, however, that in the case of an Incentive Stock Option, such exercise period shall not exceed ten (10) years from the date of grant of such Option. The exercise period shall be subject to earlier termination as provided in Sections 6(g) and 6(h) of the Plan. An Option may be exercised, as to any or all full shares of Class B Common Stock or Common Stock, as applicable, as to which the Option has become exercisable, by written notice delivered in person or by mail to the Company's transfer agent or other administrator designated by the Company, specifying the number of shares of Class B Common Stock or Common Stock, as applicable, with respect to which the Option is being exercised.

(g) TERMINATION. Except as provided in this Section 6(g) and in Section 6(h) of the Plan, an Option may not be exercised unless the Grantee is then in the employ of or maintaining a director or consultant relationship with the Company or a Subsidiary thereof (or a company or a Parent or Subsidiary of such company issuing or assuming the Option in a transaction to which Section 424(a) of the Code applies), and unless the Grantee has remained in Continuous Service with the Company or any Subsidiary since the date of grant of the Option. In the event that the employment or consultant relationship of a Grantee shall terminate (other than by reason of death, Disability or Retirement), all Options of such Grantee that are exercisable at the time of Grantee's termination may, unless earlier terminated in accordance with their terms, be exercised within 180 days after the date of termination (or such different period as the Committee shall prescribe).

(h) DEATH, DISABILITY OR RETIREMENT OF GRANTEE. If a Grantee shall die while employed by, or maintaining a director or consultant relationship with, the Company or a Subsidiary thereof, or within thirty (30) days after the date of termination of such Grantee's employment, director or consultant relationship (or within such different period as the Committee may have provided pursuant to Section 6(g) of the Plan), or if the Grantee's employment, director or consultant relationship shall terminate by reason of Disability, all Options theretofore granted to such Grantee (to the extent otherwise exercisable) may, unless earlier terminated in accordance with their terms, be exercised by the Grantee or by the Grantee's estate or by a person who acquired the right to exercise such Options by bequest or inheritance or otherwise by result of death or Disability of the Grantee, at any time within 180 days after the death or Disability of the Grantee (or such different period as the Committee shall prescribe). In the event that an Option granted hereunder shall be exercised by the legal representatives of a deceased or former Grantee, written notice of such exercise shall be accompanied by a certified copy of letters testamentary or equivalent proof of the right of such legal representative to exercise such Option. In the event that the employment or consultant relationship of a Grantee shall terminate on account of such Grantee's Retirement, all Options of such Grantee that are exercisable at the time of such Retirement may, unless earlier terminated in accordance with their terms, be exercised at any time within one hundred eighty (180) days after the date of such Retirement (or such different period as the Committee shall prescribe).

(i) OTHER PROVISIONS. The Option Agreements evidencing awards under the Plan shall contain such other terms and conditions not inconsistent with the Plan as the Committee may determine.

*7. Nonqualified Stock Options.*

Options granted pursuant to this Section 7 are intended to constitute Nonqualified Stock Options and shall be subject only to the general terms and conditions specified in Section 6 of the Plan.

B-6

*8. Incentive Stock Options.*

Options granted pursuant to this Section 8 are intended to constitute Incentive Stock Options and shall be subject to the following special terms and conditions, in addition to the general terms and conditions specified in Section 6 of the Plan:

(a) LIMITATION ON VALUE OF SHARES. To the extent that the aggregate Fair Market Value of shares of Class B Common Stock or Common Stock, as applicable, subject to Options designated as Incentive Stock Options which become exercisable for the first time by a Grantee during any calendar year (under all plans of the Company or any Subsidiary) exceeds $100,000, such excess Options, to the extent of the shares covered thereby in excess of the foregoing limitation, shall be treated as Nonqualified Stock Options. For this purpose, Incentive Stock Options shall be taken into account in the order in which they were granted, and the Fair Market Value of the shares of Class B Common Stock or Common Stock, as applicable, shall be determined as of the date that the Option with respect to such shares was granted.

(b) TEN PERCENT STOCKHOLDER. In the case of an Incentive Stock Option granted to a Ten Percent Stockholder, (i) the Option Price shall not be less than one hundred ten percent (110%) of the Fair Market Value of the shares of Class B Common Stock or Common Stock, as applicable, on the date of grant of such Incentive Stock Option, and (ii) the exercise period shall not exceed five (5) years from the date of grant of such Incentive Stock Option.

*9. Stock Appreciation Rights.*

The Committee shall have authority to grant a Stock Appreciation Right, either alone or in tandem with any Option. A Stock Appreciation Right granted in tandem with an Option shall, except as provided in this Section 9 or as may be determined by the Committee, be subject to the same terms and conditions as the related Option. Each Stock Appreciation Right granted pursuant to the Plan shall be evidenced by a written Agreement between the Company and the Grantee in such form as the Committee shall from time to time approve, which Agreement shall comply with and be subject to the following terms and conditions, unless otherwise specifically provided in such Agreement:

(a) TIME OF GRANT. A Stock Appreciation Right may be granted at such time or times as may be determined by the Committee.

(b) PAYMENT. A Stock Appreciation Right shall entitle the holder thereof, upon exercise of the Stock Appreciation Right or any portion thereof, to receive payment of an amount computed pursuant to Section 9(d) of the Plan.

(c) EXERCISE. A Stock Appreciation Right shall be exercisable at such time or times and only to the extent determined by the Committee, and will not be transferable. A Stock Appreciation Right granted in connection with an Incentive Stock Option shall be exercisable only if the Fair Market Value of a share of Class B Common Stock or Common Stock, as applicable, on the date of exercise exceeds the purchase price specified in the related Incentive Stock Option. Unless otherwise approved by the Committee, no Grantee shall be permitted to exercise any Stock Appreciation Right during the period beginning two weeks prior to the end of each of the Company's fiscal quarters and ending on the second business day following the day on which the Company releases to the public a summary of its fiscal results for such period.

(d) AMOUNT PAYABLE. Upon the exercise of a Stock Appreciation Right, the Optionee shall be entitled to receive an amount determined by multiplying (i) the excess of the Fair Market Value of a share of Class B Common Stock or Common Stock, as applicable, on the date of exercise of such Stock Appreciation Right over the exercise or other base price of the Stock Appreciation Right or, if applicable, the Option Price of the related Option, by (ii) the number of shares of Class B Common Stock or Common Stock, as applicable, as to which such Stock Appreciation Right is being exercised.

(e) TREATMENT OF RELATED OPTIONS AND STOCK APPRECIATION RIGHTS UPON EXERCISE. Upon

the exercise of a Stock Appreciation Right, the related Option, if any, shall be canceled

B-7

to the extent of the number of shares of Class B Common Stock or Common Stock, as applicable, as to which the Stock Appreciation Right is exercised. Upon the exercise or surrender of an option granted in connection with a Stock Appreciation Right, the Stock Appreciation Right shall be canceled to the extent of the number of shares of Class B Common Stock or Common Stock, as applicable, as to which the Option is exercised or surrendered.

(f) METHOD OF EXERCISE. Stock Appreciation Rights shall be exercised by a Grantee only by a written notice delivered to the Company in accordance with procedures specified by the Company from time to time. Such notice shall state the number of shares of Class B Common Stock or Common Stock, as applicable, with respect to which the Stock Appreciation Right is being exercised. A Grantee may also be required to deliver to the Company the underlying Agreement evidencing the Stock Appreciation Right being exercised and any related Option Agreement so that a notation of such exercise may be made thereon, and such Agreements shall then be returned to the Grantee.

(g) FORM OF PAYMENT. Payment of the amount determined under Section 9(d) of the Plan may be made solely in whole shares of Class B Common Stock or Common Stock, as applicable, in a number based upon their Fair Market Value on the date of exercise of the Stock Appreciation Right or, alternatively, at the sole discretion of the Committee, solely in cash, or in a combination of cash and shares of Class B Common Stock or Common Stock, as applicable, as the Committee deems advisable. If the Committee decides to make full payment in shares of Class B Common Stock or Common Stock, as applicable, and the amount payable results in a fractional share, payment for the fractional share will be made in cash.

*10. Limited Stock Appreciation Rights.*

The Committee shall have authority to grant a Limited Right, either alone or in tandem with any Option. Each Limited Right granted pursuant to the Plan shall be evidenced by a written Agreement between the Company and the Grantee in such form as the Committee shall from time to time approve, which Agreement shall comply with and be subject to the following terms and conditions, unless otherwise specifically provided in such Agreement:

(a) TIME OF GRANT. A Limited Right may be granted at such time or times as may be determined by the Committee.

(b) EXERCISE. A Limited Right may be exercised only (i) during the ninety-day period following the occurrence of a Change in Control or (ii) immediately prior to the effective date of a Corporate Transaction. A Limited Right shall be exercisable at such time or times and only to the extent determined by the Committee, and will not be transferable except to the extent any related Option is transferable or as otherwise determined by the Committee. A Limited Right granted in connection with an Incentive Stock Option shall be exercisable only if the Fair Market Value of a share of Class B Common Stock or Common Stock, as applicable, on the date of exercise exceeds the purchase price specified in the related Incentive Stock Option.

(c) AMOUNT PAYABLE. Upon the exercise of a Limited Right, the Grantee thereof shall receive in cash whichever of the following amounts is applicable:

(i) in the case of the realization of Limited Rights by reason of an acquisition of common stock described in clause (i) of the definition of "Change in Control" (Section 2(c) above), an amount equal to the Acquisition Spread as defined in Section 10(d)(ii) below; or

(ii) in the case of the realization of Limited Rights by reason of stockholder approval of an agreement or plan described in clause (i) of the definition of "Corporate Transaction" (Section 2(j) above), an amount equal to the Merger Spread as defined in Section 10(d)(iv) below; or

(iii) in the case of the realization of Limited Rights by reason of the change in composition of the Board described in clause (ii) of the definition of "Change in Control" or stockholder approval of a plan or agreement described in clause (ii) of the definition of Corporate Transaction, an amount equal to the Spread as defined in Section 10(d)(v) below.

Notwithstanding the foregoing provisions of this Section 10(c) (or unless otherwise approved by the Committee), in the case of a Limited Right granted in respect of an Incentive Stock Option, the Grantee may not receive an amount in excess of the maximum amount that will enable such option to continue to qualify under the Code as an Incentive Stock Option.

(d) DETERMINATION OF AMOUNTS PAYABLE. The amounts to be paid to a Grantee pursuant to Section 10 (c) shall be determined as follows:

(i) The term "Acquisition Price per Share" as used herein shall mean, with respect to the exercise of any Limited Right by reason of an acquisition of common stock described in clause (i) of the definition of Change in Control, the greatest of (A) the highest price per share shown on the Statement on Schedule 13D or amendment thereto filed by the holder of 25% or more of the voting power of the Company that gives rise to the exercise of such Limited Right, (B) the highest price paid in any tender or exchange offer which is in effect at any time during the ninety-day period ending on the date of exercise of the Limited Right, or (C) the highest Fair Market Value per share of common stock during the ninety day period ending on the date the Limited Right is exercised.

(ii) The term "Acquisition Spread" as used herein shall mean an amount equal to the product computed by multiplying (A) the excess of (1) the Acquisition Price per Share over (2) the exercise or other base price of the Limited Right or, if applicable, the Option Price per share of common stock at which the related Option is exercisable, by (B) the number of shares of common stock with respect to which such Limited Right is being exercised.

(iii) The term "Merger Price per Share" as used herein shall mean, with respect to the exercise of any Limited Right by reason of stockholder approval of an agreement described in clause (ii) of the definition of Corporate Transaction, the greatest of (A) the fixed or formula price for the acquisition of shares of common stock specified in such agreement, if such fixed or formula price is determinable on the date on which such Limited Right is exercised, (B) the highest price paid in any tender or exchange offer which is in effect at any time during the ninety-day period ending on the date of exercise of the Limited Right, (C) the highest Fair Market Value per share of common stock during the ninety-day period ending on the date on which such Limited Right is exercised.

(iv) The term "Merger Spread" as used herein shall mean an amount equal to the product. computed by multiplying (A) the excess of (1) the Merger Price per Share over (2) the exercise or other base price of the Limited Right or, if applicable, the Option Price per share of common stock at which the related Option is exercisable, by (B) the number of shares of common stock with respect to which such Limited Right is being exercised.

(v) The term "Spread" as used herein shall mean, with respect to the exercise of any Limited Right by reason of a change in the composition of the Board described in clause (ii) of the definition of Change in Control or stockholder approval of a plan or agreement described in clause (ii) of the definition of Corporate Transaction, an amount equal to the product computed by multiplying (i) the excess of (A) the greater of (1) the highest price paid in any tender or exchange offer which is in effect at any time during the ninety-day period ending on the date of exercise of the Limited Right or (2) the highest Fair Market Value per share of common stock during the ninety day period ending on the date the Limited Right is exercised over (B) the exercise or other base price of the Limited Right or, if applicable, the Option Price per share of common stock at which the related Option is exercisable, by (ii) the number of shares of common stock with respect to which the Limited Right is being exercised.

(e) TREATMENT OF RELATED OPTIONS AND LIMITED RIGHTS UPON EXERCISE. Upon the exercise of a Limited Right, the related Option, if any, shall cease to be exercisable to the extent of the shares of Class B Common Stock or Common Stock, as applicable, with respect to which such Limited Right is exercised but shall be considered to have been exercised to that extent for purposes of determining the number of shares of Class B Common Stock or Common Stock, as applicable, available for the grant of future awards pursuant to this Plan. Upon the exercise or termination of a related Option, if any, the Limited

B-9

Right with respect to such related Option shall terminate to the extent of the shares of Class B Common Stock or Common Stock, as applicable, with respect to which the related Option was exercised or terminated.

(f) METHOD OF EXERCISE. To exercise a Limited Right, the Grantee shall (i) deliver written notice to the Company specifying the number of shares of Class B Common Stock or Common Stock, as applicable, with respect to which the Limited Right is being exercised, and (ii) if requested by the Committee, deliver to the Company the Agreement evidencing the Limited Rights being exercised and, if applicable, the Option Agreement evidencing the related Option; the Company shall endorse thereon a notation of such exercise and return such Agreements to the Grantee. The date of exercise of a Limited Right that is validly exercised shall be deemed to be the date on which there shall have been delivered the instruments referred to in the first sentence of this paragraph (f).

*11. Restricted Stock.*

The Committee may award shares of Restricted Stock to any eligible employee, director or consultant of the Company or of any Subsidiary. Each award of Restricted Stock under the Plan shall be evidenced by a written Agreement between the Company and the Grantee, in such form as the Committee shall from time to time approve, which Agreement shall comply with and be subject to the following terms and conditions, unless otherwise specifically provided in such Agreement:

(a) NUMBER OF SHARES. Each Agreement shall state the number of shares of Restricted Stock to be subject to an award.

(b) RESTRICTIONS. Shares of Restricted Stock may not be sold, assigned, transferred, pledged, hypothecated or otherwise disposed of, except by will or the laws of descent and distribution, for such period as the Committee shall determine from the date on which the award is granted (the "Restricted Period"). The Committee may also impose such additional or alternative restrictions and conditions on the shares as it deems appropriate including, but not limited to, the satisfaction of performance criteria. Such performance criteria may include sales, earnings before interest and taxes, return on investment, earnings per share, any combination of the foregoing or rate of growth of any of the foregoing, as determined by the Committee. The Company may, at its option, maintain issued shares in book entry form. Certificates, if any, for shares of stock issued pursuant to Restricted Stock awards shall bear an appropriate legend referring to such restrictions, and any attempt to dispose of any such shares of stock in contravention of such restrictions shall be null and void and without effect. During the Restricted Period, any such certificates shall be held in escrow by an escrow agent appointed by the Committee. In determining the Restricted Period of an award, the Committee may provide that the foregoing restrictions shall lapse with respect to specified percentages of the awarded shares on successive anniversaries of the date of such award.

(c) FORFEITURE. Subject to such exceptions as may be determined by the Committee, if the Grantee's Continuous Service with the Company or any Subsidiary shall terminate for any reason prior to the expiration of the Restricted Period of an award, any shares remaining subject to restrictions (after taking into account the provisions of Subsection (e) of this Section 11) shall thereupon be forfeited by the Grantee and transferred to, and retired by, the Company without cost to the Company or such Subsidiary, and such shares shall become available for subsequent grants of awards under the Plan, unless otherwise determined by the Committee.

(d) OWNERSHIP. During the Restricted Period, the Grantee shall possess all incidents of ownership of such shares, subject to Subsection (b) of this Section 11, including the right to receive dividends with respect to such shares and to vote such shares.

(e) ACCELERATED LAPSE OF RESTRICTIONS. Upon the occurrence of any of the events specified in Section 13 of the Plan (and subject to the conditions set forth therein), all restrictions then outstanding on any shares of Restricted Stock awarded under the Plan shall lapse as of the applicable date set forth in Section 13. The Committee shall have the authority (and the Agreement may so provide) to cancel all or any

portion of any outstanding restrictions prior to the expiration of the Restricted Period with respect to any or all of the shares of Restricted Stock awarded on such terms and conditions as the Committee shall deem appropriate.

*11A. Deferred Stock Units.*

The Committee may award Deferred Stock Units to any outside director, eligible employee or consultant of the Company or of any Subsidiary. Each award of Deferred Stock Units under the Plan shall be evidenced by a written Agreement between the Company and the Grantee, in such form as the Committee shall from time to time approve, which Agreement shall comply with and be subject to the following terms and conditions, unless otherwise specifically provided in such Agreement:

(a) NUMBER OF SHARES. Each Agreement for Deferred Stock Units shall state the number of shares of Class B Common Stock or Common Stock, as applicable, to be subject to an award.

(b) RESTRICTIONS. Deferred Stock Units may not be sold, assigned, transferred, pledged, hypothecated or otherwise disposed of, except by will or the laws of descent and distribution, until shares of Class B Common Stock or Common Stock, as applicable, are payable with respect to an award. The Committee may impose such vesting restrictions and conditions on the payment of shares as it deems appropriate including the satisfaction of performance criteria. Such performance criteria may include sales, earnings before interest and taxes, return on investment, earnings per share, any combination of the foregoing or rate of growth of any of the foregoing, as determined by the Committee.

(c) FORFEITURE. Subject to such exceptions as may be determined by the Committee, if the Grantee's Continuous Service with the Company or any Subsidiary shall terminate for any reason prior to the Grantee becoming fully vested in the award, then the Grantee's rights under any unvested Deferred Stock Units shall be forfeited without cost to the Company or such Subsidiary.

(d) OWNERSHIP. Until shares are delivered with respect to Deferred Stock Units, the Grantee shall not possess any incidents of ownership of such shares, including the right to receive dividends with respect to such shares and to vote such shares.

(e) ACCELERATED LAPSE OF RESTRICTIONS. Upon the occurrence of any of the events specified in Section 13 of the Plan (and subject to the conditions set forth therein), all restrictions then outstanding on any Deferred Stock Units awarded under the Plan shall lapse as of the applicable date set forth in Section 13. The Committee shall have the authority (and the Agreement may so provide) to cancel all or any portion of any outstanding restrictions prior to the expiration of any restricted period with respect to any or all of the shares of Deferred Stock Units awarded on such terms and conditions as the Committee shall deem appropriate.

*12. Effect of Certain Changes.*

(a) ADJUSTMENTS UPON CHANGES IN CAPITALIZATION. In the event of any extraordinary dividend, stock dividend, recapitalization, merger, consolidation, stock split, warrant or rights issuance, or combination or exchange of such shares, or other similar transactions, the Committee shall equitably adjust (i) the maximum number of Options or shares of Restricted Stock that may be awarded to a Grantee in any calendar year (as provided in Section 5 hereof), (ii) the number of shares of Class B Common Stock or Common Stock, as applicable, available for awards under the Plan, (iii) the number and/or kind of shares covered by outstanding awards and (iv) the price per share of Options or the applicable market value of Stock Appreciation Rights or Limited Rights, in each such case so as to reflect such event and preserve the value of such awards; provided, however, that any fractional shares resulting from such adjustment shall be eliminated.

(b) CHANGE IN CLASS B COMMON STOCK OR COMMON STOCK. In the event of a change in the Class B Common Stock or Common Stock as presently constituted that is limited to a change of all of its authorized shares of Class B Common Stock or Common Stock, as applicable, into the same number of

B-11

shares with a different par value or without par value, the shares resulting from any such change shall be deemed to be the Class B Common Stock or Common Stock, as applicable, within the meaning of the Plan.

*13. Corporate Transaction; Change in Control; Related Entity Disposition.*

(a) CORPORATE TRANSACTION. In the event of a Corporate Transaction, each award which is at the time outstanding under the Plan shall automatically become fully vested and exercisable and, in the case of an award of Restricted Stock or an award of Deferred Stock Units, shall be released from any restrictions on transfer (except with regard to the Insider Trading Policy and such other agreements between the Grantee and the Company) and repurchase or forfeiture rights, immediately prior to the specified effective date of such Corporate Transaction. Effective upon the consummation of the Corporate Transaction, all outstanding awards of Options, Stock Appreciation Rights and Limited Rights under the Plan shall terminate, unless otherwise determined by the Committee. However, all such awards shall not terminate if the awards are, in connection with the Corporate Transaction, assumed by the successor corporation or Parent thereof.

(b) CHANGE IN CONTROL. In the event of a Change in Control (other than a Change in Control which is also a Corporate Transaction), each award which is at the time outstanding under the Plan automatically shall become fully vested and exercisable and, in the case of an award of Restricted Stock or an award of Deferred Stock Units, shall be released from any restrictions on transfer and repurchase or forfeiture rights, immediately prior to the specified effective date of such Change in Control.

(c) RELATED ENTITY DISPOSITION. The Continuous Service of each Grantee (who is primarily engaged in service to a Related Entity at the time it is involved in a Related Entity Disposition) shall terminate effective upon the consummation of such Related Entity Disposition, and each outstanding award of such Grantee under the Plan shall become fully vested and exercisable and, in the case of an award of Restricted Stock or an award of Deferred Stock Units, shall be released from any restrictions on transfer (except with regard to the Insider Trading Policy and such other agreements between the Grantee and the Company). Unless otherwise determined by the Committee, the Continuous Service of a Grantee shall not be deemed to terminate (and each outstanding award of such Grantee under the Plan shall not become fully vested and exercisable and, in the case of an award of Restricted Stock or an award of Deferred Stock Units, shall not be released from any restrictions on transfer) if (i) a Related Entity Disposition involves the spin-off of a Related Entity, for so long as such Grantee continues to remain in the service of such entity that constituted the Related Entity immediately prior to the consummation of such Related Entity Disposition ("SpinCo") in any capacity of officer, employee, director or consultant or (ii) an outstanding award is assumed by the surviving corporation (whether SpinCo or otherwise) or its parent entity in connection with a Related Entity Disposition.

(d) SUBSTITUTE AWARDS. The Committee may grant awards under the Plan in substitution of stock-based incentive awards held by employees, consultants or directors of another entity who become employees, consultants or directors of the Company or any Subsidiary by reason of a merger or consolidation of such entity with the Company or any Subsidiary, or the acquisition by the Company or a Subsidiary of property or equity of such entity, upon such terms and conditions as the Committee may determine, and such awards shall not count against the share limitation set forth in Section 5 of the Plan.

*14. Non-Employee Director Restricted Stock.*

The provisions of this Section 14 shall apply only to certain grants of Restricted Stock to Non-Employee Directors, as provided below. Except as set forth in this Section 14, the other provisions of the Plan shall apply to grants of Restricted Stock to Non-Employee Directors to the extent not inconsistent with this Section. For purposes of interpreting Section 6 of the Plan and this Section 14, a Non-Employee Director's service as a member of the Board or the board of directors of any Subsidiary shall be deemed to be employment with the Company.

(a) GENERAL. Non-Employee Directors shall receive Restricted Stock in accordance with this Section 14. Restricted Stock granted pursuant to this Section 14 shall be subject to the terms of such section

and shall not be subject to discretionary acceleration of vesting by the Committee. Unless determined otherwise by the Committee, Non-Employee Directors shall not receive separate and additional grants hereunder for being a Non-Employee Director of (i) the Company and a Subsidiary or (ii) more than one Subsidiary.

(b) INITIAL GRANTS OF RESTRICTED STOCK. A Non-Employee Director who first becomes a Non-Employee Director shall receive a pro-rata amount (based on projected quarters of service to the following Non-Employee Director Grant Date) of a Non-Employee Director Annual Grant on his date of appointment as a Non-Employee Director. Also, a Non-Employee Director who first becomes a member of one or more committees of the Board shall receive a pro-rata amount (based on projected quarters of service to the following Non-Employee Director Grant Date) of a Non-Employee Director Annual Grant on his date of appointment to a committee (without duplication).

(c) ANNUAL GRANTS OF RESTRICTED STOCK. On each Non-Employee Director Grant Date, each Non-Employee Director shall receive a Non-Employee Director Annual Grant. Also on each Non-Employee Director Grant Date, each Non-Employee Director who serves as a member of one or more committees of the Board as of such date shall receive an additional Non-Employee Director Annual Grant (without duplication).

(d) VESTING OF RESTRICTED STOCK. Restricted Stock granted under this Section 14 shall be fully vested on the date of grant.

*15. Period During which Awards May Be Granted.*

Awards may be granted pursuant to the Plan from time to time within a period of ten (10) years from September 21, 2005, the date the Board initially adopted the Plan. No awards shall be effective prior to the approval of the Plan by a majority of the Company's stockholders.

*16. Transferability of Awards.*

(a) Incentive Stock Options and Stock Appreciation Rights may not be sold, pledged, assigned, hypothecated, transferred or disposed of in any manner other than by the laws of descent and distribution and may be exercised, during the lifetime of the Grantee, only by the Grantee or his or her guardian or legal representative.

(b) Nonqualified Stock Options shall be transferable in the manner and to the extent acceptable to the Committee, as evidenced by a writing signed by the Company and the Grantee. Nonqualified Stock Options (together with any Stock Appreciation Rights or Limited Rights related thereto) shall be transferable by a Grantee as a gift to the Grantee's "family members" (as defined in Form S-8) under such terms and conditions as may be established by the Committee; provided that the Grantee receives no consideration for the transfer. Notwithstanding the transfer by a Grantee of a Nonqualified Stock Option, the transferred Nonqualified Stock Option shall continue to be subject to the same terms and conditions as were applicable to the Nonqualified Stock Option immediately before the transfer (including, without limitation, the Insider Trading Policy) and the Grantee will continue to remain subject to the withholding tax requirements set forth in Section 17 hereof.

(c) The terms of any award granted under the Plan, including the transferability of any such award, shall be binding upon the executors, administrators, heirs and successors of the Grantee.

(d) Restricted Stock shall remain subject to the Insider Trading Policy after the expiration of the Restricted Period. Deferred Stock Units shall remain subject to the Insider Trading Policy after payment thereof.

*17. Agreement by Grantee regarding Withholding Taxes.*

If the Committee shall so require, as a condition of exercise of an Option, Stock Appreciation Right or Limited Right, the expiration of a Restricted Period or payment of a Deferred Stock Unit (each, a "Tax Event"),

each Grantee shall agree that no later than the date of the Tax Event, the Grantee will pay to the Company or make arrangements satisfactory to the Committee regarding payment of any federal, state or local taxes of any kind required by law to be withheld upon the Tax Event. Unless determined otherwise by the Committee, a Grantee shall permit, to the extent permitted or required by law, the Company to withhold federal, state and local taxes of any kind required by law to be withheld upon the Tax Event from any payment of any kind due to the Grantee. Unless otherwise determined by the Committee, any such above-described withholding obligation may, in the discretion of the Company, be satisfied by the withholding by the Company or delivery to the Company of Class B Common Stock or Common Stock, as applicable.

*18. Rights as a Stockholder.*

Except as provided in Section 11(d) of the Plan, a Grantee or a transferee of an award shall have no rights as a stockholder with respect to any shares covered by the award until the date of the issuance of such shares to him or her. No adjustment shall be made for dividends (ordinary or extraordinary, whether in cash, securities or other property) or distribution of other rights for which the record date is prior to the date such shares are issued, except as provided in Section 12(a) of the Plan.

*19. No Rights to Employment; Forfeiture of Gains.*

Nothing in the Plan or in any award granted or Agreement entered into pursuant hereto shall confer upon any Grantee the right to continue as a director of, in the employ of, or in a consultant relationship with, the Company or any Subsidiary or to be entitled to any remuneration or benefits not set forth in the Plan or such Agreement or to interfere with or limit in any way the right of the Company or any such Subsidiary to terminate such Grantee's employment or consulting relationship. Awards granted under the Plan shall not be affected by any change in duties or position of a Grantee as long as such Grantee continues to be employed by, or in a consultant relationship with, or a director of the Company or any Subsidiary. The Agreement for any award under the Plan may require the Grantee to pay to the Company any financial gain realized from the prior exercise, vesting or payment of the award in the event that the Grantee engages in conduct that violates any non-compete, non-solicitation or non-disclosure obligation of the Grantee under any agreement with the Company or any Subsidiary, including, without limitation, any such obligations provided in the Agreement.

*20. Beneficiary.*

A Grantee may file with the Committee a written designation of a beneficiary on such form as may be prescribed by the Committee and may, from time to time, amend or revoke such designation. If no designated beneficiary survives the Grantee, the executor or administrator of the Grantee's estate shall be deemed to be the Grantee's beneficiary.

*21. Authorized Share Approval; Amendment and Termination of the Plan.*

(a) AUTHORIZED SHARE APPROVAL. The Plan initially became effective when adopted by the Board on September 21, 2005 and shall terminate on the tenth anniversary of such date. The Plan was ratified by the Company's stockholders on December 15, 2005, with 2,500,000 shares of Class B Common Stock authorized for awards under the Plan. The Board amended the Plan on September 27, 2006 to, among other things, increase the amount of shares authorized for award under the Plan to 4,000,000 shares of Class B Common Stock. The Company's stockholders ratified such amendment to the Plan on December 14, 2006.

(b) AMENDMENT AND TERMINATION OF THE PLAN. The Board, or the Committee if so delegated by the Board, at any time and from time to time may suspend, terminate, modify or amend the Plan; however, unless otherwise determined by the Board, or the Committee if applicable, an amendment that requires stockholder approval in order for the Plan to continue to comply with any law, regulation or stock exchange requirement shall not be effective unless approved by the requisite vote of stockholders.

Except as provided in Section 12(a) of the Plan, no suspension, termination, modification or amendment of the Plan may adversely affect any award previously granted, unless the written consent of the Grantee is obtained.

*22. Governing Law.*

The Plan and all determinations made and actions taken pursuant hereto shall be governed by the laws of the State of Delaware.

B-15

EXHIBIT H

# IDT CORP (IDT)

520 BROAD ST
NEWARK, NJ 07102
973 438 1000
http://www.idt.net

# 10-K

**ANNUAL REPORT**
**Filed on 10/16/2006 - Period: 07/31/2006**
File Number 001-16371



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

**Table of Contents**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

## FORM 10-K

[✓] Annual report pursuant to section 13 or 15(d) of the securities exchange act of 1934 for the fiscal year ended July 31, 2006, or

[   ] Transition report pursuant to section 13 or 15(d) of the securities exchange act of 1934.

Commission File Number: 1-16371

# IDT Corporation

(Exact name of registrant as specified in its charter)

| **Delaware** | **22-3415036** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**520 Broad Street Newark, New Jersey 07102**

(Address of principal executive offices, zip code)

**(973) 438-1000**

(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Class B common stock, par value $.01 per share | New York Stock Exchange |
| Common stock, par value $.01 per share | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes [✔]   No [   ]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes [   ]   No [✔]

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes [✔]   No [   ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  [✔]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer  [   ]      Accelerated filer  [✔]      Non-accelerated filer  [   ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes [   ]   No [✔]

The aggregate market value of the voting stock held by non-affiliates of the registrant, based on the closing price on January 31, 2006 (the last business day of the registrant's most recently completed second fiscal quarter) of the Class B common stock of $12.35 and of the common stock of $12.22, as reported on the New York Stock Exchange, was approximately $572,152,373 million.

As of October 5, 2006, the registrant had outstanding 56,462,342 shares of Class B common stock, 9,816,988 shares of Class A common stock, and 15,178,173 shares of common stock. Excluded from these numbers are 5,565,255 shares of Class B common stock and 9,896,687 shares of common stock held in treasury by IDT Corporation.

**Table of Contents**

**IDT Telecom—Retail Telecommunications Services and Wholesale Telecommunications Services Segments**

| (in millions, except revenue-per-minute) Year ended July 31, | 2006 | 2005 | Change $ | % |
|---|---|---|---|---|
| Revenues | | | | |
| Calling cards | $ 1,172.6 | $ 1,220.4 | $ (47.8 ) | (3.9 )% |
| Consumer phone services | 261.4 | 333.5 | (72.1 ) | (21.6 ) |
| Total retail telecommunications services | 1,434.0 | 1,553.9 | (119.9 ) | (7.7 ) |
| Wholesale telecommunications services | 526.5 | 544.7 | (18.2 ) | (3.3 ) |
| Total revenues | $ 1,960.5 | $ 2,098.6 | $ (138.1 ) | (6.6 )% |
| Minutes of use | | | | |
| Calling cards | 15,778 | 17,224 | (1,446 ) | (8.4 )% |
| Wholesale telecommunications services | 7,305 | 6,331 | 974 | 15.4 |
| Total minutes of use | 23,083 | 23,555 | (472 ) | (2.0 )% |
| Average revenue-per-minute: | | | | |
| Calling cards | $ 0.0736 | $ 0.0697 | $ 0.0039 | 5.5 % |
| Wholesale telecommunications services | 0.0721 | 0.0864 | (0.0143 ) | (16.6 ) |
| Total average revenue per minute | $ 0.0731 | $ 0.0742 | $ (0.0011 ) | (1.5 )% |

*Revenues.*  Revenue declines in fiscal 2006 occurred at our U.S. consumer phone services business, U.S. and European calling card businesses, and U.S. wholesale carrier business, partially offset by an increase in our European consumer phone services business and South American wholesale carrier business. Our total minutes-of-use declined by 2.0%. A decline of 8.4% in minutes-of-use in our calling card business in the United States and Europe was partially offset by a growth of 15.4% in minutes-of-use in our Wholesale Telecommunications Services segment. The calling card volume decline resulted mostly from the impact on our operations from the competitive landscape, a gradual shift in market share to wireless products and management's decision to raise prices in an effort to generate higher gross margins from this business.

Average price realization represents the average revenue per minute we recognize on the minutes that we sell within our calling card and wholesale carrier businesses. It excludes minutes of use related to our consumer phone services business, as the domestic traffic generated by that business is not carried on our network, and the international traffic generated by this business, though carried on our own network, is relatively insignificant. Our average termination cost per minute represents our average direct cost for minutes that we buy in order to terminate calls related to our calling card and wholesale carrier businesses. These costs exclude minutes of use related to our consumer phone services business, as its in-network traffic is insignificant.

The decrease in total average revenue-per-minute in our wholesale carrier business is due primarily to continued competition. During the second half of fiscal 2006, we instituted selective price increases on our calling card businesses in the United States and Europe, in an effort to improve gross margins, which has resulted in improved revenue-per-minute price realizations in both the United States and Europe.

The customer base for our U.S. bundled, flat-rate local and long distance phone service plans was approximately 135,000 as of July 31, 2006 compared to 220,000 as of July 31, 2005. We currently offer local service in the following 13 states: New York, New Jersey, Pennsylvania, Maryland, Delaware, Massachusetts, New Hampshire, West Virginia, Maine, Rhode Island, Florida, Georgia and California. In addition, we had approximately 257,000 stand-alone long distance customers as of July 31, 2006 compared to 325,000 customers as of July 31, 2005. The decreases in our customer base occurred as a result of our decision, in mid-fiscal year 2005, to significantly reduce our marketing and advertising efforts because of the increased cost structure and inferior economics we were faced with upon the abolishment of the UNE-P regime by the Federal Communications Commission. Since then, we have entered into agreements with Verizon, AT&T/SBC and BellSouth granting us access to their respective networks, albeit at higher rates than we paid under the UNE-P system. Despite our recent agreements with the RBOC's, we have generally not been able to attract new customers at an economically desirable cost, and we have therefore significantly reduced the marketing of our bundled phone service. Consequently, our customer count has continued to decline during fiscal 2006, and we expect further declines in the future. As a result of the decline in this business, we made the decision during the third

44

EXHIBIT I

1        IN THE UNITED STATES BANKRUPTCY COURT

2        IN AND FOR THE DISTRICT OF DELAWARE

3                        - - -

4   In re                    :        Case No.
                             :
5   WINSTAR COMMUNICATIONS,   :
    INC., et al.,            :
6                            :
                             :
7           Debtors.         :        No. 01-1430 (JJF)

8

9                        - - -

10                  Wilmington, Delaware
                 Monday, December 17, 2001
11                    3:05 p.m.

12

13                        - - -

14

    BEFORE:  HONORABLE JOSEPH J. FARNAN, JR., U.S.D.C.J.
15

16

17                        - - -

18

19

20

21

22

23

24

25

1850

1              (The following took place in chambers, Ms.

2    Morgan, Mr. Shapiro, Mr. Cobb, Mr. Karotkin, and Mr. Kenney

3    being present.)

4              THE COURT:  There is a hearing today scheduled

5    for a sale motion, and that was the only item that I had put

6    on the agenda.  As I understand it, there is no sale.  I have

7    asked counsel to come in and speak to me about the status of

8    this Chapter 11 and whether or not there still is no sale.

9    If counsel could put their appearances for the court reporter

10   on the record.

11             MR. SHAPIRO:  Mark Shapiro from Shearman &

12   Sterling for the debtors.

13             MS. MORGAN:  Pauline Morgan from Young Conaway

14   for the debtors.

15             MR. COBB:  Richard Cobb of Klett Rooney on behalf

16   of the debtor-in-possession lenders.

17             MR. KAROTKIN:  Steven Karotkin, Weil, Gotshal &

18   Manges, for the debtor-in-position lenders.

19             MR. KENNEY:  Mark Kenney for the United States

20   Trustee.

21             THE COURT:  Is it still correct that we have no

22   sale to rule upon?

23             MR. SHAPIRO:  Yes.

24             THE COURT:  I don't know how this fellow got in

25   chambers, but his name is Howard Jonas.

1              MR. KAROTKIN:  Can I respond to that, Howard

2    Jonas?

3              THE COURT:  Let me just put it on the record.  He

4    is from IDT Corporation, Newark, New Jersey, who presented a

5    card to my secretary saying he is a bidder.

6              Your turn.

7              MR. KAROTKIN:  IDT has kind of floated in and out

8    of this over the last three or four weeks with various

9    proposals, submitting proposals, withdrawing proposals.  As I

10   understand it, they submitted a proposal on Friday or

11   Saturday --

12             MR. SHAPIRO:  Friday afternoon.

13             MR. KAROTKIN:  -- pursuant to which they made an

14   offer to purchase some of the assets out of a Chapter 7.  The

15   people from Blackstone have been trying to understand what

16   they are proposing and exactly what they mean.  And right

17   before we came in here now, there were some discussions going

18   on with them to try to figure out whether a potential

19   transaction was possible.  I was involved in those

20   discussions.  I think that probably within ten or 15 minutes

21   there would be some more definiteness to whether or not that

22   was a potential.  But I don't want to overstate anything.

23             THE COURT:  All right.  I am going to take the

24   view presently -- of course, it could change, because I

25   assume they are still talking out there -- that there is a

1    motion for a sale but no sale pending for me to rule on.  So

2    the question is, scheduling going forward, what do I need to

3    schedule to move this case, either what was discussed at the

4    hearing that we continued to today, the possible conversion

5    to a Chapter 7, and what Court time would you need if that

6    was the application, or some other application.

7              MR. SHAPIRO:  I think where we are right now is

8    the bidder, the one bidder who was left said that they had

9    the money.  But of course we haven't seen it yet.  And of

10   course, as recently --

11             THE COURT:  I am beyond that.  I am saying there

12   is no sale.

13             MR. SHAPIRO:  Assuming there is no sale, I think

14   we have no choice but to convert the case.  We were there

15   last week and I think that's where we are now.  I think what

16   we have been talking to Mr. Kenney about is we tried to do

17   this, because it is a regulated company, in the absolutely

18   least disruptive way to everybody involved.  That is my goal,

19   to do something that will not harm people.  So I think it is

20   our view -- we have talked to the U.S. Trustee's Office about

21   it -- that we try to put into place a Chapter 7 trustee, have

22   a very, very shortened order for a hearing, a 341 meeting,

23   and put into place a permanent trustee very quickly so that

24   this whole 30-day migration program can be effectuated

25   quickly and in a way that is consistent with what the FCC is

1    interested in having and in a way that is consistent with

2    what the banks have been having.

3              I think he is amenable to that general concept.

4              MR. KENNEY:   Right.   I think what I get within

5    that concept, Your Honor, is because this is a regulated

6    company and because there are some significant governmental

7    interests involved here, we would want to make sure that the

8    order converting the case not only authorizes but directs the

9    trustee to operate the company to whatever extent is

10   necessary to avoid these disruptions.   I am not sure if we

11   can avoid all of the disruptions to all customers, but

12   certainly the federal and state agencies that are involved.

13             I had an inquiry from the district executive for

14   the Southern District of New York, who said their entire

15   system is on Winstar, and Verizon right now is not a viable

16   alternative for them because Verizon is still trying to

17   restore service to people after September 11.

18             MS. BAER (Court's Secretary):   There were

19   representatives from the Zimmerman Group that just knocked on

20   the door to let you know that they are here and that they

21   have an offer.

22             THE COURT:   So what I am hearing is that you

23   probably need to do some strategizing and paperwork, limited

24   paperwork, and, we had an omnibus hearing scheduled in this

25   case for --

1            MS. MORGAN:  The 20th.

2            MR. COBB:  Thursday.

3            THE COURT:  What time was it?

4            MS. MORGAN:  3:30, I think.

5            THE COURT:  Would you want to use that date or

6    have me give you a date next week, where you could come back

7    with whatever you didn't get in interim relief today?

8            MR. SHAPIRO:  One of the questions is whether we

9    can do it more quickly.  I think everyone is very concerned

10    that if we keep going we could --

11            THE COURT:  Quicker than the 20th, sure.  I want

12    to be available to help you get through this.

13            MR. SHAPIRO:  Our thought was to try to construct

14    an order that is consistent with what we just talked about,

15    that is consistent with ultimately making sure that the

16    system stays up for 30 days.  The banks and the carriers have

17    not yet reached agreement on how that will work.  The banks

18    are agreeing to allow some use of cash collateral to keep

19    this going.  The carriers want to be paid in full.  And you

20    have a negotiation that is currently ongoing between how much

21    they should get and how much the banks are willing to let

22    them have.  That hasn't been concluded.  I think if we can

23    have some out date by which everyone has got to reach an

24    agreement, put pressure on everyone to reach a deal, that

25    will be very helpful to us, if we could say we are converting

1  the case, and subject to working out an acceptable order in

2  the next 24 hours, and we will come back to Your Honor with

3  an order, hopefully that is consensual, with the U.S.

4  Trustee, the banks, and the FCC.

5           THE COURT:  So let's assume that I say 24 hours,

6  would you want me to schedule a hearing, if it is not

7  consensual, for tomorrow afternoon?

8           MR. SHAPIRO:  Yes, I think that would make sense,

9  if you had the time.

10          MR. KAROTKIN:  I think that is fine.

11          THE COURT:  A hearing on an intended motion to

12  convert.

13          MR. KAROTKIN:  I think that is fine.  I think we

14  had made progress with the FCC, and I am hopeful -- with the

15  FCC and with the carriers, and I am hopeful we can reach an

16  understanding.  I think to the extent that everyone has some

17  certainty, knowing there are no certainties in the world,

18  that the 30-day period is a 30-day period because there is a

19  limited amount of money here and everyone has to work really

20  hard to make sure it works, that is fine.  I would only ask

21  if we could impose upon the Court to participate by

22  telephone, it would make our lives really easy.

23          THE COURT:  We could actually do the whole thing

24  on telephone if someone initiates the call and you all line

25  up who you want on it, and we will do it by telephone.

1          MR. SHAPIRO:  We can set up a call-in number.

2          THE COURT:  Sure.

3          MR. SHAPIRO:  The other issue that we have is we

4  also have a bunch of -- your TRO that you issued on last

5  Monday will run out today.  I don't know if you want to

6  extend that, because we need 24 more hours to work this out.

7  Hopefully, no one will terminate us, but it makes sense to

8  extend it to the telephonic hearing.

9          THE COURT:  I will just enter an order that

10 continues it until tomorrow to whatever time we set the

11 hearing for.  Now, there will be some folks that won't

12 appreciate that, but probably nobody that is integral to what

13 you are trying to work out.  They will be involved in trying

14 to work it out.

15         MR. KAROTKIN:  I think that's right.  I think

16 most of the people we were on the phone with today.

17         MR. SHAPIRO:  We spent the weekend trying to work

18 this out.  It is not quite done, but I think, as Steve

19 characterized it, it's close.

20         MR. KAROTKIN:  If anything materializes with

21 these IDT people, are you available this afternoon?

22         THE COURT:  Yes.

23         MR. KAROTKIN:  I think people would like to stay

24 here to see if something could be worked out and if possible

25 come back before Your Honor.

1              MR. KENNEY:  Is Zimmerman one of the people who

2    was bidding?

3              MR. KAROTKIN:  He was here last week.

4              MR. KENNEY:  He never came up with anything.

5              MR. SHAPIRO:  He says he is here with his money.

6              THE COURT:  If you want to do the phone

7    conference at 2:00 tomorrow, we will enter an order extending

8    the TRO that was entered last Monday, and then we will take

9    off the hearing on the 20th, and then I will be here if

10   something develops with a potential buyer.

11             MR. KAROTKIN:  Great.  Thank you.

12             MR. KENNEY:  Your Honor, I have another

13   engagement that probably will not be over by 2:00.  If I

14   don't have all of my issues resolved with the debtors, I will

15   arrange for somebody from my office.

16             THE COURT:  We can move it.  When will you be

17   available.  3?

18             MR. KENNEY:  3 would work better.

19             THE COURT:  We will make it 3 tomorrow.

20             MR. SHAPIRO:  Just so Your Honor knows, we did

21   spend, to update you beyond my letter, we did spend all day

22   Friday with the Zimmerman folks trying to work out the

23   contract because we still hadn't finished with them on the

24   contract.  We weren't able to resolve -- there were about

25   half a dozen pretty significant issues that still could not

1    be agreed to between the debtors, the DIP lenders, and the

2    potential buyer.  And we said, look, you know, we are not

3    going to spend the whole weekend negotiating with you guys

4    when you are not telling us there is money.

5            I asked on Friday, can you provide me with at

6    least evidence that the money will be there on Monday.  Give

7    me something that tells me that we should continue this,

8    because this is becoming ridiculous and we have 25 people

9    working away on this in different places.  The best he could

10   tell me was that they were working with three bridge lenders

11   on a term sheet.  He didn't want to give it to me.

12           Frankly, a term sheet from a bridge lender for

13   the 15 million dollars wasn't particularly useful.  That is

14   where we ended up on Friday afternoon.  Over the weekend, I

15   called Susheel Kirpalani, their counsel at Milbank, a number

16   of times.  I exchanged a couple of voice mails.  And he had

17   nothing to report to me over the weekend in terms of ability

18   of his client to raise the funds.  The last I heard, they may

19   have been trying to get moneys wired from some third party

20   into a Wintel, which is the buyer's name, account somewhere,

21   and that in turn, Wintel, once it receives those funds from

22   wherever they are coming, would wire those funds to

23   Shearman & Sterling.

24           I asked them, when would that happen.  They

25   couldn't answer that.  I said, what about the rest of the

money?  15 is just a deposit, and you need a lot more money to operate this company and close the deal.  And he had no response.

THE COURT:  The kind of buyer you are looking for may have a problem, I would think, may have some problem with terms, but wouldn't be shallow on that 15 million.

MR. KAROTKIN:  The concern that we have is that you have someone who has consistently said they are going to put up money.  And let's say they do come up with some money and you enter into a transaction which can't close for another 30 days, where they are going to need more money, and another 90 days where they are going to need more money, the risk that doesn't show up, we are in a much worse situation than we are in today.  That is a big concern of ours, and ought to be of the FCC as well.

THE COURT:  Again, the kind of buyer that you are looking for and need, that third-level money may not be tied down, but the first and part of the second level would not be a problem for them.  And it sounds like what they are doing is hustling your conversation to try and get somebody to put up some money.  The conversation isn't being seen by the people that they are trying to get the money from as something they want to invest in.

People with money, they drive deals.  If they are not buying the hype -- you all see that every day.  There is

1    probably someone out there that had the money that they were

2    talking to but they are just not liking what they have to do

3    to make this deal.

4              MR. SHAPIRO:  This is the only one that actually

5    got a DIP.  The reason it did is everyone believed it could

6    be reorganized or sold.

7              THE COURT:  That was the big thing they were

8    talking about in the Journal.

9              MR. KAROTKIN:  The first and last DIP.

10             MR. KENNEY:  Maybe the Journal writer knows where

11   the money is.

12             THE COURT:  Actually, the numbers aren't that bad

13   for what you would get if you knew how to operate it.  If you

14   had some foresight that you could actually make it work, this

15   is like salvage.  It's not that bad.  But I guess, who is out

16   there to operate it?  The first round couldn't do it.  There

17   won't be many lenders coming in on these.

18             MR. KAROTKIN:  There aren't many DIPS that don't

19   get paid.  First of all, there are not many DIPS that don't

20   get paid in full and hardly any that are going to get 20

21   cents on the dollar or whatever, maybe 30 cents.

22             THE COURT:  DIPs don't lose money.  But there is

23   risk.

24             MR. KAROTKIN:  We know that now.

25             MR. KENNEY:  This is the case that proves the

1  rule.

2           THE COURT:  This proves the rule.  The worst part

3  of this case, you took forced financing for a week, too,

4  which will make DIPS wonder.

5           Well, okay.  I will be around if something

6  breaks.  I think you could tell those folks I will be real

7  focused on dollars today, and I think the three or four

8  levels they need dollars, not just today.  And absent that,

9  all those other folks out there, their problems are going to

10  be dealt with by a trustee.  There is nothing I can tell

11  them.  Mr. Kenney is going to work to get us something here.

12           MR. KENNEY:  We will try to get a trustee in real

13  quick.  One of the things Mr. Shapiro points out was the need

14  to, we will have a trustee with the authority and directive

15  to operate the company, but the reality is the learning curve

16  is going to be very steep.  And I think it's a given at this

17  point that at the 341 meeting the creditors will elect their

18  own trustee to replace the interim trustee.  So I think what

19  they want to do is accelerate the process.  And we had some

20  discussion about that, Rule 2002 says it is a 20-day notice

21  and it kind of falls into a twilight zone of whether the

22  Court can shorten that period.  I am going to let them do the

23  selling job on that and not take a position.

24           MS. MORGAN:  Your Honor, I don't think it is a

25  twilight zone.  I think 9006 says reduction is permitted in

1    certain circumstances.  It cites the rules under which

2    reduction is not permitted.  And the scheduling of a 20-day

3    notice of a 341 is not listed there.  That means reduction is

4    permitted.  I think we would ask the Court for a motion to

5    shorten that period so that that 341 meeting could be held in

6    about a week's time.  We would publish it on our website.  We

7    haven't thought about how else we could publish it.

8              MR. SHAPIRO:  Put out a press release.

9              MS. MORGAN:  Yes, to give people notice so they

10   could elect a trustee promptly.

11             MR. KENNEY:  We would ask for those kind of

12   safeguards.

13             THE COURT:  Those safeguards and take no

14   position -- right, which will work.

15             MR. SHAPIRO:  We can build that all into the

16   order.

17             MS. MORGAN:  If I may clarify.  There are a

18   couple agreements that we have in place, for instance,

19   assumptions and assignments with consent, there is one that I

20   have here with me today that would result in, for instance, a

21   waiver of a large administrative claim.  To the extent we can

22   get those approved, can we just submit those if they are

23   consensual?

24             THE COURT:  Anything that is consensual, just

25   send over, we will get them signed and stop the clock, or

1    avoid a claim, if we can.  If they are consensual, no one

2    cares.

3              MS. MORGAN:  As far as the motion to convert, is

4    the U.S. Trustee's motion --

5              MR. KENNEY:  We will move orally.

6              MS. MORGAN:  And we will file the motion to

7    shorten then.

8              MR. SHAPIRO:  We will prepare a consensual order.

9              MR. KAROTKIN:  I just have one question.  I

10   assume when we go outside Mr. Zimmerman is going to say, you

11   know, I have a bid to make, I want to make a bid --

12             THE COURT:  This isn't an option, that's what you

13   tell him.

14             MR. KAROTKIN:  I assume at this point a

15   determination of whether to consider these things rests with

16   the debtor and the creditors.

17             THE COURT:  The Judge doesn't get involved in

18   deciding whether he is -- doesn't take bids and doesn't

19   decide whether, you know, they are of some value to the

20   estate.

21             He has to sell the debtor.  But the motion that

22   was pending is now denied as moot.

23             Now, the debtor can get to reopen that motion,

24   what do they call it, reconsider, I mean that ruling, that it

25   is denied as moot, but he has to, I assume the debtor would

1    have to be convinced that there was some reason to move

2    that.  Somebody out there in the world who wanted to be in

3    the game can't come in and do that.

4              Does anybody disagree with that?

5              MR. KAROTKIN:  No.

6              MR. SHAPIRO:  No.

7              THE COURT:  I told Ms. Morgan when I was worried

8    about scheduling or concerned about scheduling that unless

9    there was some premise to the sale motion, that the hearing

10   was canceled, because that's what I had before me, a sale

11   motion.  And that's what I did.

12             Now I am going to deny the motion on the record

13   as moot, and you can move for me to reconsider that ruling on

14   some basis.  But there is nothing there now.  He should be

15   talking to the debtor and to you.

16             MR. KAROTKIN:  Okay.  Thank you.

17             THE COURT:  Our friend from the Trustee's Office,

18   whose motion to convert is just hours away from being

19   considered and ruled on.

20             MR. SHAPIRO:  The TRO --

21             THE COURT:  I will do that on my own, based on

22   the conversation we had here that you need time -- why I got

23   you in here was scheduling and what was going to, you know,

24   be your idea about going forward.  And based on what you told

25   me, I will extend that for 24 hours, to our 3:00 hearing

1    tomorrow, with the understanding, as I hope I said before,

2    that all the parties subject to that restraining order are

3    working with you to reach something consensual so they are

4    not being in any way unduly prejudiced.  If they can't agree

5    with you, we will hear them tomorrow at 3:00.  But that's

6    unlikely.  I would hope it's unlikely.  Hopefully, they are

7    going to work to make this a smooth landing -- there is no

8    smooth landing here -- but so that no one has to suffer a

9    fatality, is the hope.

10                   MR. KAROTKIN:  Can we go off the record a

11   minute?

12                   THE COURT:  Sure.

13                   (Discussion off the record.)

14                   MS. MORGAN:  I guess those people want to hear

15   what is happening and we are telling them what is happening.

16                   THE COURT:  It is over.  There is no sale.  There

17   is nothing to do.  Right?

18                   (Conference in chambers adjourned.)

19                   (The following took place in open court, at

20   approximately 5:50 p.m.).

21                   THE COURT:  Proceed, please.

22                   MR. SHAPIRO:  Good afternoon, Your Honor.  Mark

23   Shapiro from Shearman & Sterling for Winstar Communications,

24   debtors.

25                   Your Honor, after our chambers conference earlier

1  this afternoon, during that chambers conference, a party

2  named IDT Corporation, who had been a party that the debtors

3  had been having on-and-off discussions with through the

4  entire auction process but whom debtors could not reach

5  agreement with, made an offer to the financial advisors to

6  the debtor, Blackstone.  Since that time we have worked to

7  try to flesh out all the terms of that offer.

8           I think we have what I will call the principle

9  points agreed to in principle but not in writing.  And what

10 we would like to do is have the attorney for IDT Corporation

11 present those to the Court so that the Court understands

12 their offer.  We would work this evening to try to finish a

13 contract with them and come back at 3:00 tomorrow to see

14 whether in fact we have a deal, and if we don't have a deal

15 or it is not an agreed upon deal that we have a meeting of

16 the minds on, then we would go back to the plan we discussed

17 with Your Honor in chambers earlier today.

18          We believe that this deal, if we could consummate

19 this deal, would be beneficial to the estate, would

20 potentially be beneficial to some of the employees, and would

21 allow, certainly allow an orderly transition period for

22 customers.

23          With that, I would like to have David Albalah,

24 counsel for IDT, present to the Court the details of their

25 offer.  We will supplement that to the extent it differs from

1    our understanding.   And then what I would propose we do is

2    adjourn to the offices of Young Conaway to see whether we can

3    work out between now and 3:00 p.m. a contract and management

4    agreement and order that we would present tomorrow at 3:00

5    p.m. in court.

6              THE COURT:  All right.

7              MR. HARRINGTON:  Good afternoon, Your Honor.

8    William Harrington, Duane Morris & Heckscher.  I would like

9    to move the admission of David Albalah.  His pro hac motion

10   was previously filed with the Court electronically but has

11   not been signed yet.

12             THE COURT:  I will grant the application.

13             MR. ALBALAH:  Thank you, Your Honor.  Good

14   afternoon, Your Honor.  Thank you for your patience.  David

15   Albalah from McDermott, Will & Emery on behalf of IDT

16   Corporation.

17             As counsel for the debtor just communicated, we

18   have spent a fair amount of time today, and I do believe we

19   have an agreement in principle.  What I will do is go through

20   the salient points.  At the conclusion thereof, I will ask

21   Your Honor to so order the record.

22             The transaction is as follows --

23             THE COURT:  Let me understand something.  When

24   you suggested I would so order the record, my understanding

25   is that, and because of the history here, that I would listen

1    to this proposed offer, and then, because it would be

2    something that no one had notice of, we would have the record

3    on this offer closed, come back tomorrow at the hearing we

4    thought we were going to have today, and it would be in

5    court.  We were going to have a telephonic hearing about a

6    conversion.  But we would come back tomorrow, and then I

7    would listen to anybody that wanted to be heard on this

8    proposed transaction, and then at that point I would consider

9    approving this transaction.   Otherwise, nobody else had

10   notice of what you are going to tell me, and I am hearing it

11   for the first time.

12          Mr. Shapiro, is that what you were thinking?

13          MR. SHAPIRO:  Yes.  I am not sure what Mr.

14   Albalah meant by being so ordered.  I think this is just an

15   explanation to the Court of what is to come for tomorrow.

16   Tomorrow's hearing would be a presentation of the contract

17   and the order.  Yes, I agree with Your Honor's remarks.

18          MR. ALBALAH:  Part of the concern, Your Honor --

19   I don't want to dwell on it now, I think we should go through

20   the points and circle back to this.  Part of the concern, and

21   I want to consult with my client, is whether the debtor is

22   shopping this thing.  We haven't discussed the breakup fee or

23   anything along those lines.  So we expect this to be the

24   deal.  We will circle back with Your Honor, with Your Honor's

25   permission, to get comfort in that regard.

1          The transaction would be as follows.

2          IDT Corporation or its designee would purchase

3   all of the assets, free and clear of all liens, claims,

4   interests, and encumbrances, except for specifically

5   delineated assets.  And I will tell you what they are.  The

6   purchase price will be 38 million dollars cash or 30 million

7   dollars cash plus Class B IDT common stock in the value of

8   12.5 million, measured based upon the last seven trading days

9   from today.

10          If IDT does not get a registration within 60

11  days, then the debtor would be able to put that stock

12  interest on IDT for ten million dollars cash.  So either it's

13  38 million dollars cash, or 30 million dollars cash plus 12.5

14  million dollars in stock, or 40 million dollars cash.

15          MR. JONAS:  I think that is the choice.

16          MR. ALBALAH:  The debtor will elect as to whether

17  it wants the cash option or the cash and stock option.  It is

18  at the debtors' election.  All or nothing.

19          The excluded assets are Lucent litigation,

20  Office.com, Aon Put, Wamnet (phonetic) Debt & Equity,

21  RadioNote, TVVideo Note, avoidance actions, D&O claims, any

22  prepaid workers' compensation, tax refunds, if any, cash as

23  distinguished from accounts receivables, claims against

24  Savis, I believe that's S-a-v-i-s, claims against Velocita,

25  V-e-l-o-c-i-t-a, PSINet Hong Kong, excluded subs, that's

1    it -- the above net claims, correct.

2            Those are the excluded assets.  Everything else

3    is to be purchased, and again free and clear of all liens,

4    claims, interests and encumbrances.  And we will have an

5    order obviously that I will comment on.

6            The debtor -- I am going through this in no

7    particular order.

8            The debtor intended to notice termination to

9    customers.  The debtor will not do that.  My client will have

10   the right to determine the timing of the sending of that

11   notice.  My client will be obligated to fund costs going

12   forward for the transition period pending regulatory, FCC and

13   state regulatory approvals.

14           The only exception to the concept of my client

15   controlling when the notice is circulated, if at all, is to

16   the extent that there is any Hart-Scott requirement.  If

17   there is a Hart-Scott requirement, and we determine that

18   there is a Hart-Scott requirement, then the notices will go

19   out Thursday.

20           There would be in the order, and in appropriate

21   other documents, clarity with respect to no employee

22   liability whatsoever.  My client, in addition to the general

23   free and clear, assumes no liabilities with respect to

24   employees of any kind or nature.

25           There is no out for regulatory consents.  If the

1    FCC, if the state regulatory authorities, do not consent to

2    the transaction for any reason, there is no out.

3         To the extent that the licenses have any value

4    and proceeds are realized, that would be part of the assets

5    purchased.

6         The parties contemplate that this Court would

7    issue an order similar to the order that I understand is in

8    effect, compelling service providers of all nature and kind,

9    including telecom companies, landlords, et cetera, to

10   continue providing services during the transition period.

11   But my client will pay all those services.  My client may

12   negotiate discounts, may negotiate terms, but there is a

13   guarantee for the payment of that money.

14        In addition to the purchase price, there is a

15   five-percent interest that the estate would get in an entity

16   to be formed by my client.  That five percent the estate

17   would share, as, when, and if my client gets back its

18   investment in an unknown amount at this point in time.  We

19   know what we are making in terms of, in other words, cash and

20   stock.  We can quantify that.  We can't quantify the costs

21   that my client will pay to keep this alive.  As, when, and if

22   all of those costs come back, then the estate will have a

23   five-percent interest in the upside.

24        It is my understanding that the contemplation is

25   that the case may convert from 11 to 7.  We would have

24

1  assurances that this agreement is binding upon the Chapter 7

2  trustee and the estate.

3          It's an as is, where is acquisition, with no reps

4  and warranties.

5          My client has not yet determined the extent to

6  which it intends to seek approval and assignment of executory

7  contracts and nonresidential real property leases.  To the

8  extent it does not, it is the understanding of the parties

9  that the estate will have the burden, financial or otherwise,

10 to physically deliver the assets that my client is buying.

11 So, for instance, if there is a landlord with a lease that is

12 not assumed and assigned, and the landlord has a piece of

13 equipment on the premises, we are buying that equipment free

14 and clear.  And the order, as the parties contemplate it,

15 would provide protection to my client that it can get that

16 equipment.

17         If I didn't mention the time period, in terms of

18 the continuing order of Your Honor keeping the going-forward

19 service providers providing services, it's the parties'

20 understanding that that order would provide the time period

21 of the next 60 days.

22         Both parties will work diligently starting

23 immediately at the conclusion of this hearing to paper the

24 transaction.  In addition, the estate will cooperate and use

25 its best efforts to assist the buyer in terms of getting

1  regulatory approvals and the like.

2          My firm is holding 15 million dollars cash in an

3  escrow account.  I will work with debtors' counsel to work

4  out an escrow agreement.  Upon conclusion and the

5  satisfactory manner of that, we will forward that money to

6  the estate's counsel.

7          We are going to work on a management agreement,

8  which I won't burden the record with, that is necessary for

9  regulatory reasons and the like.

10          (Pause.)

11          MR. ALBALAH:  Thank you, Your Honor.

12          The 30 million dollars to cover -- as I said, the

13  buyer will be responsible for the ongoing expenses of the

14  business.  There will be 30 million dollars regarding that

15  that we will put in escrow.  That doesn't mean it will cost

16  30 million.  It may cost less or more.  We are going to put

17  30 million dollars in escrow.  And I neglected to mention

18  that earlier.

19          The purchase price, whatever form it comes in,

20  cash or stock, cash, or cash and stock, will be paid at

21  closing in an irrevocable manner.

22          I think I used the word guarantee in terms of the

23  estate delivering the assets.  And if there is a piece of

24  equipment, and the landlord doesn't want it, guarantee is the

25  wrong word.  It is the intent they will get all those

1    assets.   If there is a cost in terms of physically removing

2    it, the buyer would pay those costs.

3              Your Honor, if I may, Howard Jonas, the chairman

4    of the company, chairman of the board of IDT, is here.  May

5    he address Your Honor very briefly?

6              THE COURT:  Sure.

7              MR. JONAS:  Thank you.

8              I, fortunately, have never been in court before.

9              I think this is a very good deal for the public,

10   because I think there is a need for competitive telephone

11   service.  And in our diligence on the company, we found an

12   Intelligent, which is a company that we previously controlled

13   and made an offer for, even though unfortunately it wasn't

14   accepted at the time, and the business went down the hill,

15   but the business was not put together properly.

16             We do over a billion and a half dollars in

17   telecom business a year.  We are noticing a technical

18   infrastructure and a business infrastructure so poorly

19   operated.  It is our hope -- what we are planning to do is

20   one of two things.  We will probably have to terminate a lot

21   of the clients who are on net now, but we will be giving them

22   sufficient time to get out so they can get other services.

23   We are hoping a lot of the other services, like long-distance

24   services and data services and so forth from our company, it

25   is our intent to restart the business in the proper way with

1    the proper knocks in the proper cities, so we can provide the

2    service to the public, and hopefully there will be a number

3    of clients that we will be able to keep on who are already

4    on.

5            So I think approving this order serves the dual

6    purpose of, I can't say that the creditors are made whole

7    because they are six billion dollars in the hole, but it does

8    get them money, it does see that the public is not left

9    without telephone service for a long time, and somebody is

10   not forced to pay for it who doesn't want to be a creditor

11   anymore, and it does give a reasonable chance that we will be

12   able to continue operating these kind of services into the

13   future.

14           The last thing is our company has over a billion

15   dollars in cash, over a billion dollars in paid-up assets.

16   We turn a profit of close to a hundred million dollars a

17   year.  We have zero debt.  We will easily be able to carry

18   through and finance this acquisition and see that all the

19   commitments that our counsel made are in fact complied with.

20           I hope this doesn't have to go on to tomorrow.

21   You can order it tonight.

22           But that's all I want to say, thank you.

23           THE COURT:  Thank you, Mr. Jonas.

24           MR. SHAPIRO:  Mr. Albalah also wanted me to put

25   on the record that they will have the ability to speak with

1   management and have input to speak with management tomorrow

2   morning, which we agreed to.

3          I think, notwithstanding the fact that all, I

4   will call it, the salient points have been put on the record,

5   obviously, until we have a contract that is agreed to and

6   signed by the buyer and debtor, there is no agreement.  So

7   what we would try to do is between now and 3:00 p.m. tomorrow

8   complete a contract.  We have actually already worked on

9   contracts, obviously, with them and other people, so we have

10  a basic form of contract that we will work on tonight, see

11  whether we can reach an agreement, and be back here tomorrow

12  to see whether we can get it approved.

13         THE COURT:  All right.  Mr. Kenney, did you have

14  anything you wanted to add?

15         MR. KENNEY:  I think, Your Honor, what we have

16  heard is good.  I am obviously going to have to wait and see

17  what develops between now and 3:00 p.m. tomorrow, at which

18  point I would make any comments I have and anyone else would

19  have the opportunity to do so then.

20         THE COURT:  When would you anticipate, Mr.

21  Shapiro and Mr. Kenney, because I want you to review any

22  proposed agreement, that that would be available for people

23  to review?  We are going to come at 3.  I would like to have

24  a little time.

25         MR. SHAPIRO:  In fairness to everyone, I would

1    think by 12:00 tomorrow we need to have a contract

2    available.   We will send Your Honor whatever we have or

3    inform the Court we don't have an agreement.   But I think at

4    that point anyone who would like a copy ought to get in touch

5    with Pauline Morgan at Young Conaway, get her e-mail address,

6    so we have it in e-mailable form so we will e-mail it to

7    people starting at noon tomorrow.

8            THE COURT:   So we have the principles of

9    agreement.   And you are going to work to get it to a document

10   by noon tomorrow, so that it is available for purposes of the

11   3:00 hearing.

12           MR. SHAPIRO:   As well as the form of order we

13   would ask Your Honor to sign.

14           THE COURT:   The proposed form of order.   Mr.

15   Kenney?

16           MR. KENNEY:   That is fine, Your Honor.

17           MS. NEWELL:   Hello, Your Honor.   Margaret Newell

18   from the Department of Justice on behalf of the FCC and the

19   GSA.

20           Obviously, my comments about the order can wait

21   for tomorrow.   But I wanted to clarify, there is a hearing

22   scheduled tomorrow at 3:00 before Your Honor, but given the

23   fluidity of events today, there wouldn't be a hearing before

24   that time, would there?

25           THE COURT:   No.   Before 3:00 tomorrow on this

1    matter, no.

2              MS. NEWELL:  Thank you, Your Honor.  Just

3    checking.

4              THE COURT:  Okay.  The only thing that I am going

5    to do between now and 3:00 tomorrow is, or I have already

6    done it, I have extended the temporary restraining order that

7    was entered last week till 5:00 p.m. tomorrow, so that we

8    would have an opportunity, in the first instance, to proceed

9    to a conversion, but now to proceed to consider this

10   agreement.

11             So that's the only thing I am going to do between

12   now and tomorrow at 3:00.

13             All right.

14             MR. GWYNNE:  Your Honor, Kurt Gwynne on behalf of

15   MCI Worldcom.

16             I understand Your Honor is continuing the TRO.

17   Notwithstanding that, may I be heard on that issue, Your

18   Honor, just to create a record?  I have talked with my client

19   about the potential -- well, I have put in a call to the

20   client about the potential for appealing that.  The client is

21   on a flight to Chicago.  I would like to make a few

22   statements for the record.

23             THE COURT:  Sure.

24             MR. GWYNNE:  Thank you.  First of all, Your

25   Honor, as I think Your Honor knows, I have a tremendous

1     amount of respect for this Court and am proud to be a member

2     of the Bar of the District Court for the District of

3     Delaware.

4               THE COURT:  You must really want something.

5               MR. GWYNNE:  Your Honor, I have significant

6     concerns about the manner in which the original TRO was

7     entered and the manner in which the TRO was continued today.

8     Under Rule 65, it is clear that in order for a TRO to be

9     issued ex parte, counsel is supposed to exercise, quote, all

10    reasonable efforts, close quote, to notify opposing counsel.

11              Although I had called and left messages for

12    debtors' counsel the night before, just curious about the

13    sale process, I was never told about any TRO process.  And in

14    fact, when the motion was filed, although it wasn't filed

15    until 12 or 18 minutes before the hearing, it obviously was

16    prepared sometime during the day, as it was five or six

17    pages, had a four-page affidavit.  No telephone call was ever

18    made to me.

19              I think with respect to that, Your Honor, that

20    TRO was improperly granted for that reason, should not have

21    been issued ex parte.  And also, it is my understanding,

22    since I was not at that hearing, that the TRO did not even

23    issue at the hearing but issued as a result of a conference

24    in chambers.

25              We filed --

1          THE COURT:  I think, actually, it issued at the

2     end of a Court hearing, when I asked Shearman & Sterling to

3     present it predicated on the argument of the FCC.

4          MR. GWYNNE:  Your Honor, again, without

5     sufficient notice, I am not really sure what happened, unless

6     and until we obtain a transcript.  Then when the hearing was

7     scheduled for today, we filed an objection, which I don't

8     know if Your Honor had time to read it.  I realize it was on

9     file only two hours before.  But today, we understood that

10    the carriers, many of which are here today, were coming to

11    Court and would have the opportunity to have some discussions

12    with Your Honor about the TRO and/or the sale or winddown

13    process and what, if anything, the carriers were willing to

14    do.

15          Debtors' counsel came out of chambers and advised

16    us that the TRO was going to be continued.

17          Your Honor, I think, respectfully, with the

18    carriers being here in court, and debtors' counsel knowing we

19    were in court, I don't know if Your Honor knew, we should

20    have had an opportunity for a hearing, which hearing should

21    have been an evidentiary hearing, on whether or not the TRO

22    should have continued till tomorrow.

23          Debtors owe, under our original adequate

24    assurance agreement, 13.9 million to Worldcom.  Under the

25    modification agreement, where we made significant concessions

1    with the debtor, it is not scheduled to be heard until the

2    20th, the debtors would only owe approximately 2.9 million,

3    still a significant amount owed under the adequate assurance

4    stip as modified by what I call the modification agreement.

5         Under the adequate assurance, which was a

6    stipulation and order, we have the right to terminate based

7    upon certain postpetition defaults.  Not only was that an

8    agreement of the parties, but it was an order of this Court,

9    which no one has filed a motion to vacate, to modify, nor do

10   we think that that obviously would be the appropriate relief.

11        There is no adversary proceeding here, Your

12   Honor.  We have a TRO that has been issued based upon a

13   motion for a TRO and now a motion for a preliminary

14   injunction.

15        Injunctive relief requires an adversary

16   proceeding under Rule 7001, Subsection 7. And in In Re

17   Connectus, Your Honor held that a hearing was enjoined base

18   upon an oral motion before Judge Walrath that a lack of a

19   required adversary proceeding was a basis alone to deny the

20   request for injunctive relief.

21        THE COURT:  Are you of the view that, for

22   instance, your client could terminate service tonight absent

23   that temporary restraining order?

24        MR. GWYNNE:  No, Your Honor.  We have a two-day

25   notice period under our contract with the debtor and we have

34

1    never sent a termination notice, to this day, we haven't.

2    And we were surprised to be included in the ex parte motion,

3    when we hadn't even issued a termination notice.

4                THE COURT:  But you could do it within 48 hours.

5                MR. GWYNNE:  I believe, Your Honor, under our

6    adequate assurance stipulation, which specifically provides

7    we can terminate in I think it's two business days or 48

8    hours notice, yes, we can.

9                Now, I understand the FCC has raised some issues

10   about termination periods and notice.  Under Section 214 of

11   the Telecommunications Act, the debtor has a duty to give

12   notice to its end users.  We are not providing service to the

13   end users.  This is carrier-to-carrier service.  There is no

14   requirement that we give any period of notice to the debtors

15   unless it's required by some applicable tariff or contract or

16   what have you.

17               So we do believe that we could terminate in two

18   business days notice.  In fact, Your Honor, we have done that

19   in many other cases where there have been defaults, and other

20   cases that have sort of headed south the way this one has.  I

21   do believe we could.  I am not asking Your Honor to give us a

22   right we don't have.

23               THE COURT:  I am just trying to understand,

24   because the FCC takes a different view.  And what I could do

25   is I could schedule a hearing to give you an opportunity to

```
 1    be heard against the FCC's issues and in the meantime leave

 2    the order in place, and we could have a quick hearing,

 3    because I think that's what you are asking for, an

 4    opportunity to be heard, because of the disagreement that

 5    your clients would have with the position that was put forth

 6    by Mr. Scheimer (phonetic) on behalf of the FCC.  Then I

 7    could resolve that, the tension between those positions.  I

 8    wouldn't be able to do it at 3:00 tomorrow, just like I

 9    wasn't able to do it today, because I only scheduled the sale

10    hearing for today.  But we could do it certainly before the

11    end of the week and have that heard.

12              MR. GWYNNE:  We would appreciate the opportunity

13    to do that.  But with respect to whether or not the TRO

14    should issue, again, we haven't given the termination

15    notice.  Whether or not the TRO should even be continued,

16    which would involve those issues, which we would be happy to

17    address at a hearing, would also involve whether or not --

18    again, Your Honor held in In Re Connectus that the Bankruptcy

19    Court couldn't use 105 to overrule the utilities' rights

20    under 366, albeit for a short time.  That was only a four-day

21    injunction that Judge Walrath entered.  Your Honor properly

22    reversed her for doing so, enjoining a utility in violation

23    of Section 366.  I think that's the same thing that is going

24    on here.

25              THE COURT:  I don't think anybody in that case,
```

1    and in my mind, at least at this point, who is potentially

2    distinguishable ever raised what Mr. Scheimer raised.

3                MR. GWYNNE:  Which is, Your Honor?

4                THE COURT:  His issue is about the amount of time

5    necessary for termination.  I understand your view that you

6    are not a provider in the sense that the debtor is and that

7    your relationship with the debtor is the debtor has the

8    obligation.

9                MR. GWYNNE:  Correct.

10               THE COURT:  But I don't recall the FCC appearing

11   in Judge Walrath's case.

12               MR. GWYNNE:  I don't believe so, Your Honor.

13   Frankly, as I understand it, this is the debtors' motion, not

14   the FCC's motion anyway.

15               THE COURT:  Absolutely.  But the FCC weighed in

16   on their behalf, agreeing with what other folks wanted to

17   happen when we had the hearing on December 10.

18               MR. GWYNNE:  Your Honor, the only thing we would

19   ask is during that time period prior to the hearing, who is

20   going to pay the charges that are being incurred?  We think

21   that we are entitled to that.  While Rule 65 provides that

22   the Court can enter injunctive relief and the debtor not have

23   to post a bond, if Your Honor is ordering us to provide

24   services to the GSA or some government entity or

25   quasi-government entity --

1              THE COURT:  Have you met Mr. Jonas?

2              MR. GWYNNE:  Yes, Your Honor.

3              THE COURT:  As I understand it, if his

4    transaction is approved tomorrow, he wants to talk with you

5    about that very issue.

6              MR. GWYNNE:  But I don't understand that he was

7    going to pay for postpetition charges that have been incurred

8    but not paid and enter a default now.  They are talking about

9    going forward, which I assume is from tomorrow until sometime

10   forward.

11             THE COURT:  You are talking about since December

12   10th.

13             MR. GWYNNE:  There is from the 10th to today,

14   Your Honor.  There is also charges that are due and owing

15   from prior to the 10th as well.

16             THE COURT:  I am only liable from the 10th.

17             (Laughter.)

18             I think I have immunity.

19             I am taking this seriously.  I am trying to

20   understand.  But I can't deal with before the 10th, you know,

21   in the context of what you are presenting today.  If the sale

22   is approved tomorrow, Mr. Jonas' transaction takes care of

23   that.  So we are talking about from the 10th to either today

24   or tomorrow at 3:00.

25             MR. GWYNNE:  Whenever the hearing is.  Or if the

1   sale goes forward, right.  That's correct, Your Honor.

2           THE COURT:  What we should do is, I understand

3   MCI is not going to turn anyone's phone off or service off

4   between now and tomorrow at 3:00.

5           MR. GWYNNE:  Correct.  We wouldn't have the right

6   to do it.

7           THE COURT:  Even under your analysis of the two

8   days.  So that is kind of like a no prejudice, if I enter the

9   order, because I am concerned about everybody else.

10          MR. GWYNNE:  You could carve Worldcom out.  There

11  is precedent, with all the attorneys in this room, debtors'

12  counsel, somebody will be saying to Judge Robinson, this

13  order is the standard injunction, Judge.

14          THE COURT:  I don't even understand that word,

15  precedent.

16          MR. GWYNNE:  I realize it doesn't have any

17  binding precedent.

18          THE COURT:  It really doesn't.  And this case is

19  so unusual, because of the public interest, that I would be

20  literally shocked if another judge out there said there was

21  something here to be followed in the orders I have issued to

22  get us to this hearing tomorrow at 3:00.  I guess that's

23  possible.  But actually, there is an opinion out there by

24  Judge Mansley in an asbestos case that talks about there is

25  no precedent to be followed in the same court or in different

```
 1    courts at the same level.  But there is no precedent here.
 2    This is truly a unique case.
 3              MR. GWYNNE:  Since we won't be terminating, we
 4    may issue a notice, but there is not going to be any
 5    termination before tomorrow, could we have the hearing
 6    scheduled?
 7              THE COURT:  What I am thinking about doing is
 8    giving you a hearing tomorrow after the sale hearing, or the
 9    next day.  I don't know how long the hearing will take
10    tomorrow.
11              MR. ALBALAH:  Your Honor, may I suggest, to
12    address Mr. Gwynne's concern with respect to the injunction
13    as distinguished from with respect to getting payment from
14    the 10th until the closing of our transaction, I think his
15    concern is whether the injunction that we have asked Your
16    Honor to continue is permissible from a procedural and
17    substantive standpoint.  Therefore, I think it is necessary,
18    given that a condition precedent to our deal is to have the
19    continuation of that injunction, that this hearing be
20    scheduled at the same time or before our transaction is
21    hopefully approved.
22              Do you understand what I am addressing, Your
23    Honor?
24              MR. GWYNNE:  We could go first at 3:00.
25              THE COURT:  I understand.  But I just see it a
```

1   little differently.  I would take it afterwards, particularly

2   since you are going to be negotiating with them, you would

3   probably want it afterwards, too, I would think, because we

4   might have a different situation.

5              MR. GWYNNE:  I understand.

6              THE COURT:  What I am going to do is schedule you

7   for tomorrow for the agenda, but presently, my thought is

8   that I will hear any application you have subsequent to the

9   sale application.

10             MR. GWYNNE:  Thank you very much, Your Honor.

11             THE COURT:  Again, I wanted to get your position

12  clear and have some reference to what occurred previously.

13             Is there anything else you want to put on the

14  record with regard to your client's position?

15             MR. GWYNNE:  No, thank you, Your Honor.

16             MR. PALACIO:  Good evening, Your Honor.  Ricardo

17  Palacio from Ashby & Geddes on behalf of Williams

18  Communications as well as Time Warner.  I am going to address

19  the Williams Communications/Time Warner position as merely a

20  joinder to the motion to vacate and the objection to

21  preliminary injunction.

22             To start off, I would like to join in and

23  basically echo the comments made by Mr. Gwynne.  I think

24  Williams Communications, it is one of the largest carriers to

25  the debtors, has much at stake here, to say the least, as

1    such incorporates the comments of Mr. Gwynne.

2              Your Honor, there is one spin with respect to

3    Williams Communications that has been different from

4    Worldcom, and that is with respect to the notice.  In our

5    motion/objection, if you will, again, I don't know if Your

6    Honor had an opportunity to review it, but the one difference

7    I am referring to is that prior to the issuance of the TRO,

8    Williams had terminated its obligation to provide further

9    services to Winstar.  Subsequently, thereafter, after

10   terminating its obligation, it commenced the issuance of

11   notice to the appropriate regulatory agencies, both state and

12   federal level, and the time period runs anywhere from ten to

13   30 days, depending on the jurisdiction.

14             Some of those notices have already gone out.  The

15   impact of the TRO on those notices -- we understand, Your

16   Honor, we are not to cut off any service.  However, Your

17   Honor, we believe that this puts a little bit of a different

18   spin on what Worldcom has asserted, and we would again like

19   the opportunity, as I am sure many other carriers, to come

20   forward before Your Honor and seek a vacation, if you will,

21   of the TRO.

22             Quite frankly, we have the same issues with the

23   postpetition obligations, as well as the debt that is

24   incurring each and every day at this pace, we are incurring

25   approximately $170,000 a day that goes unpaid.  I think there

1    are some issues that go to the proposed, quote-unquote,

2    selling and terms of the deal, as far as any assurance of

3    being paid on a going-forward basis.

4              That is what I wanted to get on the record.  We

5    would request also that we be heard prior to the sale itself.

6              THE COURT:  Thank you.

7              MR. KIRPALANI:  Good evening, Your Honor.

8    Susheel Kirpalani of the firm Milbank Tweed Hadley & McCloy.

9    I will be very brief, Your Honor.  We appreciate the Court's

10   indulgence and your expertise in trying to facilitate this

11   transaction.

12             I wanted to confirm, Your Honor, that other

13   competing bidders will have an opportunity to outbid IDT's

14   bid provided that their 15-million-dollar deposit is within

15   Shearman & Sterling's account prior to the hearing tomorrow.

16             We have, we believe, fully negotiated a purchase

17   agreement that has been circulated to debtors' counsel as of

18   this morning.  And subject to understanding the terms and

19   conditions of the competing bid, I will contact Ms. Morgan

20   from Young Conaway.  We just wanted to make sure the record

21   was clear with respect to competing bidders.

22             THE COURT:  I don't want to get into that part of

23   it because I think it would be inappropriate.  But I

24   assume -- I don't know anything about this -- I was told that

25   there was no consummated agreement.  But if there was, you

1    should be talking with Mr. Shapiro. And if there is 15

2    million dollars or whatever the conditions were that's been

3    deposited or wired as we were talking about a week ago and

4    that came before me, there were two competing bids, then I

5    would have to make a decision between them.

6          But I am not going to get into the detail of

7    where you are with Mr. Shapiro and the debtor. In my view,

8    nobody is foreclosed, because I can't do that. And if you

9    are not able to talk to Mr. Shapiro because, for whatever

10   reason, you think that you have a better offer, I assume you

11   will be here at 3:00 tomorrow to tell me what a terrible deal

12   the debtor has negotiated and why I shouldn't approve it.

13          MR. KIRPALANI: We hope to be, Your Honor. Thank

14   you.

15          MR. SHAPIRO: Just to clarify the record. I

16   don't think Mr. Kirpalani means to suggest that we had a

17   fully documented agreed-upon contract. As he knows, there

18   are at least half a dozen or more issues that we have been on

19   the phone discussing since last Monday that haven't been

20   resolved. So I don't think --

21          THE COURT: As I understood it, the biggest issue

22   was they couldn't come up with the money.

23          MR. SHAPIRO: That was a really big issue, Your

24   Honor. They didn't come up with the money nor have they come

25   up with the money.

1          THE COURT:  So you decided it wasn't worthwhile

2    to keep talking.

3          MR. SHAPIRO:  We decided to suspend discussions

4    about 7:00 Friday night until they could show us that they

5    actually had the money.  Unfortunately, they didn't today

6    come up with the money.  I think, more importantly, if they

7    were to come up with the money between now and when we come

8    to Court tomorrow, that's just one, as Your Honor has heard

9    before, that is just one segment of this transaction.  As has

10   been expressed by IDT, there is a need to be able to show

11   that the purchase price can be paid and that the operations

12   can be funded, which are equally important.

13         THE COURT:  You would understand that because you

14   would be trying to knock out Mr. Jonas' company.

15         MR. KIRPALANI:  That's correct, Your Honor.

16         THE COURT:  He has represented that he has got

17   the wherewithal to fully perform.  But it would probably

18   behoove you, Mr. Shapiro, just to listen about those other

19   five or six issues, so that if you come tomorrow and you are

20   supporting Mr. Jonas' company's bid, that you are at least

21   prepared for what others might claim to be a better

22   transaction.

23         MR. SHAPIRO:  What I would propose, since there

24   obviously is a limited period of time between now and 12:00

25   tomorrow when we still have to try to finish a contract, and

1    we have been talking to his client now for a few weeks, we

2    are going to present a contract, as I said, at noon

3    tomorrow.  Anyone who is interested in bidding can bid off

4    that contract.  If they want to change the contract, they can

5    describe it in court tomorrow.  The IDT contract will be the

6    contract offered which other bidders can bid off, not the

7    current contract that we have been negotiating with his

8    client, because unfortunately his client didn't show up with

9    the money with which we were going to do a deal.

10            THE COURT:  That is all you are asking for.

11            MR. KIRPALANI:  Yes, Your Honor.  It is subject

12   to understanding the agreement with IDT.  Quinn Telecom

13   Holdings believes it is much more of a going-concern offer.

14   The five or six points that Mr. Shapiro mentioned were fully

15   discussed on Friday with Blackstone and Shearman & Sterling.

16   And what I meant earlier with respect to we believe those

17   issues had been resolved, in terms of documenting and

18   papering it, the agreement we circulated this morning covered

19   our offer, and we have not heard back obviously because there

20   was a lot of dealings going on today.

21            But we will certainly look at the IDT agreement.

22   If it fits outside the liquidation type agreement and it fits

23   a going-concern value type agreement, that will benefit the

24   customers and the employees, in particular, then we will

25   certainly work off of that agreement.  I have no intention to

1    recreate the wheel at all.

2            MR. SHAPIRO:  Again, for the record, what we will

3    be asking IDT to do is show up with the 15 million dollars

4    plus all of the funds that are needed to operate the business

5    for the 30-day period plus the funds for the purchase price

6    of 38 million dollars.  Anyone who chooses to show up

7    tomorrow with that much cash we would be happy to talk to.

8            MR. ALBALAH:  Your Honor, may I very briefly.

9            (Counsel confer.)

10            MR. ALBALAH:  Your Honor, this is something we

11    danced around but I want to confront now head on.  I spoke

12    very briefly with a representative of Blackstone Group.  You

13    saw me speak very, very briefly of debtors' counsel.  You

14    heard the chairman of the board of IDT Corporation.  You know

15    the financial wherewithal of my client.  The debtor, its

16    advisors, have, as Your Honor painfully knows, has been

17    spending a fair amount of time keeping the telecom providers

18    of the world at bay, waiting for --

19            THE COURT:  You just gave him more pain.

20            MR. ALBALAH: -- waiting for Mr. Zimmerman to come

21    up with money to close the case.  Your Honor, obviously,

22    accurately portrayed why the debtor stopped that process.  We

23    are here.  We read the salient points of the agreement into

24    the record.  We are prepared to close.  We would like, as a

25    condition to that arrangement, in the event that we are

1    ready, willing, and able to close, and Mr. Zimmerman comes up

2    with the money, we view, I view, categorically, that

3    benefited the estate, I respectfully submit, there is no way,

4    to the extent that Mr. Zimmerman does come up with the money,

5    there is no way that he would have, or there is no way that

6    the estate would have been in as good of a position that it

7    will be in tomorrow but for IDT.

8            Therefore, it is customary, as Your Honor is

9    well-aware, for a reasonable breakup fee, I believe a

10   two-and-a-half-percent breakup fee, in the event that we are

11   prepared to close, is reasonable in these circumstances.  And

12   I would respectfully request that Your Honor now, so that

13   when we work literally around the clock to get this deal

14   done, we know that we are working and IDT knows that IDT's

15   professionals are working around the clock so that they

16   either get the deal or they benefit the estate.

17           MR. KIRPALANI:  Your Honor, briefly.  In terms of

18   who has been working around the clock to get us to where we

19   were, I didn't think it was IDT.  But I would not comment on

20   the breakup fee at this time.

21           MR. SHAPIRO:  Your Honor, I have never come

22   before a Court for a breakup fee without a signed contract in

23   hand.  We don't have a signed contract in hand.  I think IDT

24   is obviously showing they are interested in this, and

25   hopefully without the breakup fee they would be willing to

1    work the night to get this done.  So I would respectfully

2    disagree with counsel to IDT and say let's go forward on the

3    basis that we have previously discussed.

4              MR. ALBALAH:  Your Honor, you know better than

5    anyone because the first thing I asked you was to so order

6    the record, there is no better way -- obviously, we can't

7    manufacture documents now.  By requesting the Court to so

8    order the record, I respectfully suggest that it's clear that

9    we are ready to close.

10             When Mr. Shapiro suggests that normally there is

11   no breakup fee without a signed agreement, I agree with Mr.

12   Shapiro.  But as Your Honor correctly said, this is not the

13   normal case.  We are coming in here, we believe, I don't want

14   to be melodramatic, but we are coming in here and providing

15   excellent exit strategy for everyone, for the Court, for the

16   telecom companies, for the debtor, for the bank.

17             I submit that it is simply wrong to have IDT

18   provide that benefit without being compensated in the event

19   that the benefit that it gives the estate, the estate

20   benefits.  The fact there is no signed agreement, we are

21   prepared to so order the record.

22             THE COURT:  I know everybody is anxious and kind

23   of rushing over issues.  But you want to put a breakup fee in

24   your deal.  You have every right to negotiate that with the

25   debtor.  When that document is done at 12:00, that will

49

1    either be in there or not.  I don't get into that today in

2    any way.  But there is nothing that prevents you from further

3    negotiating that with the debtor.  And then your document,

4    with or without that fee, goes out for public scrutiny and

5    if -- who is the other bidder -- Mr. Zimmerman, if he decides

6    that he can qualitatively and quantitatively up your offer,

7    he will have a chance to do that and you will have your

8    breakup fee in it.

9            Again, I don't want to get into that detail,

10   because I am supposed to sit back and be objective at 3:00

11   tomorrow about whatever comes before me.  So I don't want to

12   participate.  But, I mean, you know how to get your breakup

13   fee, and it's by negotiation into your written document that

14   is going to be the subject of the 3:00 hearing.

15           MR. ALBALAH:  Actually, I respectfully submit

16   that it can't -- I don't want to -- I don't think it will

17   work that way because of the following reason.  We are here

18   tomorrow.  If Mr. Zimmerman comes up with the 15 million

19   dollars and the adequate assurance of closing and the

20   carrier, there would be no incentive -- again, I am not

21   trying to talk against my interest -- but at that point in

22   time, there would be no incentive whatsoever for the debtor

23   to support a breakup fee because the debtor, if it has the

24   assurance --

25           THE COURT:  If he does it before 12:00, you are

1    right.

2            MR. ALBALAH:  What I am suggesting --

3            THE COURT:  If Mr. Zimmerman puts more end money

4    on the table, and his -- Mr. Kenney, did you want to say

5    something?

6            MR. KENNEY:  I will wait, Your Honor.

7            THE COURT: -- that will happen.

8            MR. ALBALAH:  What I am asking, Your Honor, is if

9    we are here tomorrow, ready, willing, and able to close...

10           THE COURT:  At 3:00.

11           MR. ALBALAH:  Yes. ...and Mr. Zimmerman, or for

12   that matter anyone else, comes out of the woodwork, and the

13   debtor, which I believe is expressing a change in position --

14   it was my understanding loosely that it was the debtors'

15   opinion --

16           THE COURT:  I don't think the debtor is shopping

17   your offer.  It is just that everybody wanted to come into

18   Court and put it on the record.  In essence, they are

19   record-shopping your offer.  I guess Mr. Zimmerman knows what

20   your deal is now.

21           MR. SHAPIRO:  Maybe I can suggest something he

22   would find acceptable.  We are going to try to reach a

23   contract with them by noon tomorrow, maybe even tonight.  If

24   we have a signed contract and as Your Honor suggested if they

25   insist as a condition that there is a breakup fee, the debtor

1   if they sign that contract will be bound by that contract.

2            THE COURT:  That's right.

3            MR. SHAPIRO:  Then we have a contract upon which

4   I am comfortable coming to Your Honor and saying as part of

5   this we have a breakup fee.  Right now we have nothing.  We

6   don't have a contract.  We have an expression of intent.

7   When we get to a contract and have a breakup fee, we can come

8   before Your Honor tomorrow.

9            MR. ALBALAH:  I accept that proposal in large

10  part and I appreciate the creativity and flexibility.

11  Normally, as Your Honor knows, this would be the time the

12  Court would say, if we do that, Your Honor now approves the

13  breakup fee, because otherwise, there is no order.  Normally,

14  there are bidding procedures which contemplate a breakup fee.

15           THE COURT:  What I can tell you is if in any case

16  that comes before me somebody proposes a deal that goes to a

17  written contract and it has a breakup fee in it, and that

18  contract ultimately motivates someone else to come in and pay

19  a lot more money, they get their breakup fee.

20           MR. ALBALAH:  Thank you, Your Honor.

21           THE COURT:  I don't know what is going to happen

22  in this case, because there is no written document for me to

23  consider.

24           MR. KIRPALANI:  Nor do I think there is any

25  evidence that IDT's interest is what stirred Wintel's

1    interest in any sense.  We have always been negotiating

2    subject to obtaining financing.  IDT was at the auction just

3    like Wintel telecom was at the auction.  If there was a time

4    to start up interest, it would have occurred a long time ago.

5              THE COURT:  Write that down and tell me tomorrow,

6    if things don't go well.

7              MR. KENNEY:  Your Honor, he backed down.  I don't

8    need to say anything.

9              MR. ALBALAH:  For the record, I don't know if I

10    backed down, but the record speaks for itself.

11              MR. WHITE:  Your Honor, Bill White for

12    BellSouth.  Did I understand Your Honor correctly that any of

13    the service providers who wish to be heard tomorrow on the

14    issue of the temporary restraining order will be able to be

15    heard?

16              THE COURT:  Yes.

17              MR. WHITE:  The other issue I wanted to raise

18    with Your Honor was this particular proposal that the Court

19    indicated would be available at noon with a hearing at 3:00,

20    I don't see realistically how the carriers will be able to

21    review that proposal, particularly to be able to consult with

22    their clients to determine whether they would oppose that.

23              This particular proposal, the scheduling of this,

24    alters even the bid procedures order, which itself was fairly

25    truncated.  I am concerned about, particularly in light of

1    the supplemental motion that was filed by the debtor over the

2    weekend, that the carriers that I have discussed it with have

3    a number of problems because of the potential for the

4    assumption and assignment of contracts under the guise of the

5    sale of assets.

6              So I can only say that I think that three hours

7    notice for a deal to the service providers who are the

8    biggest constituency that are going to be affected by this is

9    too short.

10             THE COURT:  All right.  Thank you.

11             MR. SHAPIRO:  Just in response to that, Your

12   Honor.  I think the salient points of the deal were put on

13   the table tonight.  He obviously can get in touch with his

14   client and has the better part of tomorrow.  Obviously, it is

15   very short.  On the other hand, I think that this is a deal

16   that if we can make it happen, it is in everyone's interest,

17   and therefore he ought to take the name of counsel to IDT and

18   have his client speaking to them between now and 3:00

19   tomorrow.

20             MR. PALACIO:  Your Honor, I apologize.  On behalf

21   of Williams.  Your Honor, I just want to touch on that last

22   point briefly.  What they are doing when they say the salient

23   terms have been discussed, what their salient terms are, at

24   least one of them is a de facto assumption and assignment.

25   There is a big issue there.

1          A lot of the telecoms, a lot of the other

2    creditors in this case, for lack of a better word, have an

3    issue there.  So by saying there is salient terms, get in

4    contact with somebody, we are talking about 18 hours really

5    to hammer out their differences.  And you are not talking

6    about a couple thousand dollars.  You are talking millions

7    and millions of dollars here.

8          When they sent out their cure objection notices,

9    if you will, with respect to Williams, they said, certain

10   contracts, we had no idea what contracts they are talking

11   about.  It is something that is not that easy.  That is the

12   one issue I wanted to highlight for Your Honor before we go

13   on this course, if you will, of contacting them and see if

14   you can work something out by tomorrow.

15         The second is merely a request for Your Honor,

16   that is with respect to my co-counsel, who flew from

17   Oklahoma, has since left, has asked to the extent Your Honor

18   is inclined to grant a hearing on the TRO, which Your Honor

19   has, that he be able to participate telephonically.

20         THE COURT:  Well, I have to be careful about

21   that, because the numbers of people that are involved, I

22   don't know if we can do that.  But to the extent we can,

23   mechanically, I will allow it.

24         MR. PALACIO:  Thank you, Your Honor.

25         MR. SHAPIRO:  Your Honor, to address the point.

 1    I don't think there is any intention of assuming or assigning

 2    any contracts whatsoever tomorrow.  That is not the game

 3    plan.  The game plan is to close a contract with the buyer.

 4    The buyer would then have the right for a period of time to

 5    determine which contracts it wants to assume and have assumed

 6    and assigned to it or not have assumed and assigned to it.

 7              In the meantime, as I think you heard, the buyer

 8    understands that they are picking up all accruals that would

 9    occur from the time they take over the business, the closing

10    date, forward, they are not picking up any arrearages.  We

11    are talking about nobody having to deal with the notice

12    period for a cure amount tomorrow or anything like that.  We

13    are talking about that being done in the future if and to the

14    extent the buyer determines that any of the contracts should

15    be assumed and assigned.

16              MR. PALACIO:  Your Honor, with all due respect to

17    Mr. Shapiro, my point is to the extent this sale goes

18    through, one of the terms there requires that the service

19    providers continue and are obligated to provide service.  If

20    that is the case, they are basically taking that obligation

21    that is already there and transferring that pursuant to a

22    sale.  You can't have a sale without an assumption and

23    assignment.  That is my point.  Then there is a cure issue

24    there.

25              MS. SAWCZUK:  Your Honor, Maria Sawczuk on behalf

1    of Eastwire (phonetic) Communications.  I will be very

2    brief.

3                    I wanted to bring it to Your Honor's attention

4    that I believe Eastwire is the only service provider at this

5    point that is also in bankruptcy.  So to the extent any of

6    these negotiations affect or change or modify the claims that

7    Eastwire has in this bankruptcy, it may be necessary -- I am

8    not going to opine on this at this point because I am not

9    entirely sure how it is going to be affected -- it may be

10   necessary to bring those changes to our Bankruptcy Court for

11   approval.  We do have a fiduciary duty to our creditors in

12   our case.

13                   THE COURT:  Where are they in bankruptcy?

14                   MS. SAWCZUK:  Here, Your Honor, in front of Judge

15   Katz.

16                   THE COURT:  All right.

17                   MR. LADDIN:  Good evening, Your Honor.  Daryl

18   Laddin on behalf of Verizon.

19                   Your Honor, I am here before the Court because

20   Verizon is owed over five million dollars in postpetition

21   administrative expenses that remain unpaid, despite an order

22   that this Court previously entered in the case.  At the

23   outset of the case, Verizon entered into a stipulation under

24   Section 366 with the debtors that required semi-monthly

25   prepayments, and also gave Verizon the right to terminate

1  service on two business days notice in the event that

2  payments were not made.  The debtor failed to make those

3  payments on several occasions.  Verizon worked with the

4  debtors, continued to try to work with the debtors, the

5  debtors continued to fail to pay.  As a result of that, we

6  are now here being owed over five million dollars.

7          Your Honor, I am very concerned with the

8  procedural posture that we are in here.  In particular,

9  without reiterating what Mr. Gwynne had to say, I would like

10  to state that Verizon does join in the comments and objection

11  of MCI Worldcom.

12          In addition to that, Your Honor, we have

13  significant concerns about the due process with respect to

14  this particular sale.  As I understood Your Honor's comments

15  during the meeting with the debtors earlier, Your Honor had

16  denied the sale motion because there was no bidder.  The sale

17  that has just been discussed with the Court here is not the

18  subject of a motion.  It has never been noticed.  There is no

19  opportunity for any of the carriers, including Verizon, to

20  review the terms of the sale.  And it is not reasonable to

21  require any party in interest to review the terms of a

22  contract on what will amount to less than three hours notice

23  and be able to address all of the issues.

24          Substantively, I would expect quite a few

25  objections, including, in particular, the injunction that

1    apparently the purchaser is asking the Court to issue.  I

2    will acknowledge for the Court that there is a difference

3    between issuing an injunction against service providers based

4    upon the request of the FCC for the concerns of the FCC -- as

5    I understand, that was a significant reason why the Court

6    entered the initial injunction -- there is a significant

7    difference between that and issuing an injunction that

8    benefits the purchaser in this case as well as the banks,

9    particularly if they are going to request that that

10   injunction be issued if there are any unpaid administrative

11   expenses.  I would expect that issue to be raised tomorrow,

12   and we would expect that to the extent that they are seeking

13   to be paid -- excuse me, to receive service during any period

14   subsequent to tomorrow, that they pay all of the past due

15   administrative expenses that are owed.

16           THE COURT:  Just so the record is clear, we came

17   here for a sale hearing today.  I was informed by the debtor

18   there was no sale.  So I said procedurally what I was

19   prepared to do is deny their motion as moot but I would

20   reconsider if the debtor got to me any information that there

21   was somebody around the courtroom that wanted to make a

22   proposal.  And that's what happened.  So the procedural

23   status of the sale motion is that it's not denied, because

24   the offer of Mr. Jonas' company is still pending, and the

25   hearing is continued till tomorrow.

1    MR. LADDIN:  For the record, I would go ahead and

2 state my objection for the record on due process grounds

3 going forward with the hearing tomorrow.

4    THE COURT:  Okay.

5    MS. SILVERSTEIN:  Laurie Silverstein on behalf of

6 certain affiliates of SBC.

7    I would join in Mr. Gwynne's comments with

8 respect to the issuance of the TRO.  And I would also add

9 that I was in the courtroom at the last hearing, and it was

10 my understanding that the sale hearing and the TRO were being

11 put over until today, and I believed the hearing to be

12 adjourned and left with my client, only to find out

13 subsequently that a TRO was entered.  So we were here at the

14 time, but since the TRO was put over until today we left.  I

15 don't know what comments were made by the FCC.  I did not

16 receive any notice of the TRO hearing prior to being in

17 court.  And I also believe there are significant procedural

18 issues with respect to the entry of the TRO.

19    I also agree that there are procedural issues

20 with respect to going forward with the sale hearing on a

21 completely different as yet undocumented sale motion.

22    One salient point that I would like clarified,

23 because it has now come up twice during the discussions that

24 have happened, is that the buyer will be taking on the

25 going-forward obligations from the closing date.  That's what

1    I keep hearing.  I don't know when the closing date is going

2    to be.

3              THE COURT:  You will hear about that tomorrow.

4              MS. SILVERSTEIN:  That is a salient term.  If

5    they know, we would like to hear today, if it is different

6    than tomorrow.

7              THE COURT:  The hearing that was scheduled for

8    today is adjourned until 3:00 tomorrow, which includes the

9    sale and the temporary restraining order.  When I was told

10   there wasn't a sale, there was a discussion of how we would

11   have a hearing that would consider all the interests that

12   would be affected by a conversion to Chapter 7.  So I

13   adjourned the hearing on the basis of that information to

14   3:00 tomorrow by teleconference.

15             Then I was advised that there was the possibility

16   of a sale.  So all I have done is adjourned it to an open

17   hearing in the courtroom at 3:00 tomorrow, because it appears

18   we are not in a conversion mode, unless I am misunderstanding

19   something.  To get to that, in either instance, we had to

20   extend the TRO another 24 hours, until tomorrow.  But all

21   those issues about what is in the deal, I assume, will be in

22   the document and you can get it at 12:00 tomorrow.

23             MR. SHAPIRO:  The debtor agrees with Your Honor's

24   position.  It's clear that we came to Court hoping to come to

25   Court at some point today with a sale.  We didn't think we

1  had one this morning.  Now we may have one.  We are

2  continuing and adjourning the hearing until tomorrow and we

3  will find out tomorrow whether in fact we do.  And we will

4  address all the issues that people will be raising tomorrow

5  once they have an opportunity to see the contract.

6          THE COURT:  If there is no transaction to be

7  considered at 3:00 tomorrow, then we will go forward with the

8  premise that the teleconference was going to be, and that

9  would be to consider with the United States Trustee the

10  conversion.

11          MR. SHAPIRO:  I agree, Your Honor.

12          THE COURT:  Rather than be on a teleconference,

13  we will come here at 3:00 and consider that.

14          MR. SHAPIRO:  Hopefully Pauline Morgan has a lot

15  of space in her house tonight.

16          THE COURT:  We are going to -- unless somebody

17  has something that is different from what we have been

18  talking about...

19          MS. MELNIK:  Selinda Melnik for Lexend

20  (phonetic).

21          We had put on a motion for today on shortened

22  notice because of this hearing, and I was wondering whether

23  that would be put over not until tomorrow but to the omnibus

24  hearing on Thursday.  I wanted to clarify that.

25          THE COURT:  The only thing that was to be heard

1    today was the sale motion and a reconsideration of any

2    comments that folks wanted to make with regard to a TRO.

3    There was nothing else really on the agenda.  We are going to

4    move to tomorrow.  But anything else will be heard at a

5    to-be-scheduled omnibus hearing, because I am not sure what's

6    going to happen tomorrow that it would make any sense to have

7    an omnibus hearing on the 20th.  It's still possible this

8    case could go to Chapter 7 tomorrow.

9              MS. MELNIK:  I don't think that would moot our

10   motion, no.

11             THE COURT:  No.  But it would put it in a

12   different context.  And the Trustee, the reason why we

13   couldn't consider that information today is because the

14   United States Trustee has to find somebody to come in.

15             MS. MELNIK:  There may or may not be an omnibus

16   hearing on the 20th.

17             THE COURT:  There won't be for sure, because I

18   don't think -- Mr. Kenney, you can help us -- are you able --

19   I thought that was part of the stress of doing anything

20   today, because we have to get somebody to come in.

21             MR. KENNEY:  Your Honor, we do.  We might be able

22   to do it in a couple days.  But I know, if I get a trustee in

23   even this week, the trustee is not going to be able to

24   respond to Ms. Melnik's motion.

25             THE COURT:  So I don't think the 20th is going to

1    be a day that anything can be done.  So we are going to focus

2    on tomorrow and see what happens.  If it is a sale -- it

3    would be different than if it is converted.  And then if it

4    is converted, he will have to get somebody that can be --

5              MS. MELNIK:  So we will take one day at a time.

6              MR. JESSUP:  Douglas Jessup on behalf of Univance

7    (phonetic), Your Honor.  I flew out from Denver last Monday

8    coming for a sale.  I flew out again for a sale.  I will

9    probably stay overnight and wait for another sale.  I did

10   have last week set a motion for adequate assurance, Your

11   Honor.  Obviously, this is all moving very quickly, and we

12   did also have it set today.  I was one of the other motions

13   that was set today at 2:30.  I think we ought to roll that

14   over to tomorrow, if that is possible, Your Honor.

15              What I am faced with and what I have learned in

16   this whole process is the FCC came in and said we are going

17   to need 31 days to shut things down, and therefore, carriers,

18   you are going to have to go along with that, and we are all

19   scrambling to figure out who is going to pay for that and

20   things like that.  Now we have a new party who says they will

21   pay for things going forward, although I have not

22   heard -- they have left open when they get to terminate.

23   What I don't want to see is, they dance together for 45 days,

24   60 days, they say they are out of here and by the way send

25   their termination notice.  Now we are right back to where we

1   started again, 30 days, with nobody paying for it again.  It

2   has all kind of come to a head on this.  I bring that to your

3   attention, Your Honor, and also ask for my motion to be

4   continued.

5         THE COURT:  The motion was put on, again, the

6   agenda, without my agreement to hear those kind of matters

7   today.  You can present any kind of a position that you want

8   in response to whatever sale is proposed to be heard

9   tomorrow.  But again, if there is no sale tomorrow, then the

10  context is much different.  So I don't want to hear anything

11  in the nature of adequate assurance if there is going to be a

12  trustee appointed by the United States Trustee.

13        MR. JESSUP:  Agreed, Your Honor.

14        THE COURT:  Everybody here is sophisticated

15  enough to understand that there would have been a great

16  difference today if we continued with no buyer in a whole lot

17  of ways.  And we are still not sure that there is a buyer.

18        MR. JESSUP:  Your Honor, I feel the same way.

19  That is why we are trying to protect ourselves, trying to

20  understand what is going on.  I would also join in the other

21  comments of the carriers' counsel.  Thank you, Your Honor.

22        MR. SHERMAN:  Andrew Sherman, Seals Cummis, on

23  behalf of Qwest Corporation and Qwest Corporation

24  Communications.

25        We join in the comments by the other telecoms.

1          Your Honor, one point we would like some

2     clarification on is what contracts will the debtor be

3     assuming or will the purchaser be utilizing from the closing

4     date forward.  We still have yet to be supplied with a list

5     of contracts.  And if there is going to be this, quote,

6     management agreement, we need to know what business the

7     purchaser is going to manage, meaning what are the

8     contracts.  And if that list can be provided by tomorrow at

9     12:00, at least that might get some type of notice out to the

10    counter-parties to the contract of what --

11         THE COURT:  I don't think they are going to have

12    that tomorrow.  I think they contemplated, I will let Mr.

13    Shapiro a little bit -- when the presentation was made, my

14    understanding is that that was what they were going to do

15    between tomorrow and the presentation to the state and

16    federal regulatory authority.

17         MR. SHAPIRO:  Let me try to explain how I think

18    it would work.  This is again really the buyer's

19    transaction.  As I understand it, the buyer will not be

20    seeking to assume and assign any contracts tomorrow.  So the

21    debtor will continue to utilize let's say the transaction

22    actually closed after Your Honor entered an order tomorrow

23    immediately, so on Thursday, or Wednesday or Thursday, the

24    buyer will have bought the equipment.  Obviously, the

25    licenses won't be transferred, the customers won't be

1    transferred until subsequent regulatory approval by the FCC

2    and the appropriate states.

3            However, in the interim, as we have heard, the

4    buyer intends to operate the business and has said they will

5    continue to pay all the ongoing costs of operating the

6    business.  To the extent that the buyer continues to use the

7    services of Mr. Sherman's client, Qwest, then they would have

8    to pay on a current basis, on a go-forward basis from the

9    closing forward for those services.

10           THE COURT:  As I understood it, they were going

11   to escrow some funds.

12           MR. SHAPIRO:  They agreed to put 30 million

13   dollars in escrow to support their obligation to do so.  If,

14   however, three days into their ownership they decide to

15   terminate the Qwest relationship, then they would obviously

16   have to give Qwest notice and have to terminate and stop

17   paying --

18           THE COURT:  While that process was occurring,

19   they would be getting paid from the escrow funds.

20           MR. SHAPIRO:  Correct.

21           MR. SHERMAN:  We can address it tomorrow.  Who is

22   going to be the party to our contract subsequent to this?  Is

23   the debtor going to remain on the hook or is it going to be

24   the purchaser?  As the purchaser, there has to be a formal

25   assumption and assignment.  There has to be a cure.

1          THE COURT:  It sounds to me like they are both on

2    the hook, but the debtor has no money.  It's the purchaser,

3    and once they notice you, either for, it would be an

4    assignment, you will have an opportunity to come in and

5    object to that assignment.  And if they reject you, you have

6    an opportunity to come in, being paid till that point, and to

7    present your cure.

8          MR. SHERMAN:  I guess everybody can imagine what

9    will happen is they will not give that notice of assignment

10   for 60 days, allow the carriers to continue to provide

11   service, then on the 60th day or whatever they decide to

12   reject, again, you have sort of abdicated or pushed off the

13   rights the telecoms, including Qwest, has under 365.  We can

14   get into that tomorrow.

15         THE COURT:  Well, again, it would depend on the

16   agreement and what the time frames of the agreement are and

17   the amount of money and what determination I will make that

18   they have protected companies like your client.

19         MR. SHERMAN:  The last point, Your Honor, I guess

20   we will get into it tomorrow, it appears the debtors seem to

21   be transferring their rights under 366 to the purchaser.  In

22   essence, the carriers will be forced to begin anew under this

23   management arrangement, with no deposit or otherwise, and

24   again, we are going to be providing full services, I think

25   the management agreement had a five-day cure.  And again, we

1    will reserve those rights and more likely than not object to

2    that tomorrow.

3                THE COURT:  Well, what would happen to your

4    client if tomorrow I signed a conversion order and I continue

5    the injunction till I feel comfortable with the evidence that

6    I have relied on from the FCC that you not terminate?  How

7    long could you be pushed out then, with no money?

8                MR. SHERMAN:  As long as Your Honor continues the

9    injunction.  That is up to Your Honor's discretion, I

10   imagine.

11               THE COURT:  But assuming it's the 31 days, I am

12   not so sure you are in a better situation there.  That is

13   your best situation without a purchaser.

14               MR. SHERMAN:  That could be.

15               THE COURT:  How much would your client lose in 35

16   days?

17               MR. SHERMAN:  Over a million dollars.  A

18   million-five.  But at that point, we would know there would

19   be a finite date and that services would terminate if the

20   arrangement -- we can deal with it if in the sale continues.

21               THE COURT:  I guess my point is, I don't think

22   that that finite amount of money changes whether you get 60

23   days and get paid or whether you get it tomorrow.  That is

24   why I am having a hard time understanding the position.

25               MR. SHERMAN:  Well, first, we are not assured,

1    and I understand --

2         THE COURT:  You would like to get out of this

3    Winstar situation as quickly as possible, I understand that.

4    But absent that, I don't see your exposure shifting in any

5    way from that outside amount of money, based on what I know

6    from what I have heard from the FCC to date.

7         MR. SHERMAN:  We are continuing to provide

8    services, yes, you will have a guarantee of IDT, I guess

9    however they are going to phrase it, in the document.  But --

10         THE COURT:  I think it is more than a written

11    guarantee.  I think it is a cash guarantee.  They are going

12    to put money in the bank.  If that starts to run short, I

13    assume you can run back in here and tell me, Judge, there is

14    not enough money in there, we need more.  And I would tell

15    Mr. Jonas to ante up because things are taking longer, if you

16    want to stay in that game or your 31 days or 35 days would

17    kick in because I wouldn't enjoin you any longer.

18         But again, I don't see how the outside gets any

19    worse than five or six days for you.

20         MR. SHERMAN:  Maybe it's semantics or if it was

21    structured as a prepay, this 30 million dollars, you started

22    a prepay arrangement with the various carriers, that might

23    gives the carriers a little more comfort on a go-forward

24    basis.  Just to have the 30 million sit there in escrow and

25    you have to apply for it and be paid in arrears is different

1  than the arrangement we negotiated with the debtor --

2            THE COURT:  I understood it to be an ongoing

3  thing.  We will see tomorrow when they present the document.

4  But I think you got to focus on that potential of a 30- to

5  40-day loss is out there no matter, and what saves you from

6  that is a deal.

7            MR. SHERMAN:  That is one perspective and maybe

8  my client will disagree with that.  Maybe, as Your Honor

9  said, they want to get out of this situation.

10           THE COURT:  Because it is unsettled and I can

11 understand that.

12           MR. SHAPIRO:  Your Honor, I suggest we need to

13 resolve all these things in the contract.  We haven't reached

14 agreement on all these points.  We will reach agreement,

15 hopefully get a document.

16           THE COURT:  You are getting some information of

17 what could help you work through.

18           MR. SHAPIRO:  It is helpful to know people's

19 concerns.  We anticipated these concerns, and we will be

20 address them tomorrow.

21           THE COURT:  Anyone else want to be heard?

22           We will be in recess until 3:00 tomorrow.

23           (Hearing concluded at 7:05 p.m)

24                        - - -

25 Reporter:  Kevin Maurer

*I hereby certify that these shorthand notes are, to the best of my skill and ability, true and accurate notes of the proceedings contained therein.*

*Official Court Reporter*
*U. S. District Court*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **WINSTAR HOLDINGS LLC and IDT CORP.,** | **Case No.:    07 CV 4634 (GEL)(AJP)** |
| | **ECF Case** |
| *Plaintiffs,* | |
| - against - | |
| **THE BLACKSTONE GROUP L.P.; IMPALA PARTNERS, LLC; and CITICORP,** | |
| *Defendants.* | |

## AFFIDAVIT OF STEFAN FEUERABENDT

Stefan Feuerabendt, pursuant to 28 U.S.C. § 1746, affirms under penalty of perjury that the following is true and correct:

1.       I am a Managing Director of Blackstone Advisory Services LP, formerly known as The Blackstone Group LP ("Blackstone").  I am fully familiar with all of the matters set forth in this affidavit from personal knowledge.  I submit this affidavit in further support of Defendants' Joint Motion to Transfer Venue to the United States District Court for the District of Delaware.

2.       I was involved in the negotiations and discussions regarding the Asset Purchase Agreement and Sale Order that are the subject of Plaintiffs' lawsuit in this case.  Material portions of those negotiations and discussions took place in Wilmington, Delaware among Plaintiff IDT Corporation ("IDT"), Old Winstar, Defendant Blackstone and others.

3.       Prior to December 17, 2001, IDT had numerous on-and-off discussions with Old Winstar and Blackstone about an acquisition, but no agreement had been reached. Then, on December 17, 2001, negotiations and discussions took place among IDT, Old Winstar, Defendant Blackstone and others outside the courtroom of the Delaware Bankruptcy Court to work out an agreement in principle on the key terms of a transaction.

4.       Following discussions outside the courtroom, on December 17, 2001 IDT's Chairman of the Board Howard Jonas and IDT's counsel attended a hearing before Judge Farnan

in the Delaware Bankruptcy Court to present the terms of the proposed transaction that were negotiated and discussed outside the courtroom.

5.    Upon the conclusion of the hearing, Plaintiff IDT, Old Winstar, Defendant Blackstone and others continued to discuss the terms of the proposed transaction and to draft the necessary paperwork to reflect the parties' agreement.  Those discussions continued in Wilmington, Delaware, en route to New York, and in New York on December 17, 2001 late into the evening.

6.    On December 18, 2001, the parties returned to the Delaware Bankruptcy Court to present the terms of the final deal and to get the Court's final approval of the transaction.  In particular, the parties had negotiated a Sales Order, in addition to the Asset Purchase Agreement, for the Court's review and approval.

I declare under penalty of perjury that the foregoing is true and correct.

_____

Stefan Feuerabendt

Dated:  New York, New York
August 2, 2007

Sworn before me this 2nd day of
August, 2007

_____
Notary Public

**SOOAH PARK**
NOTARY PUBLIC, State of New York
No. 01PA6042031
Certificate Filed in New York County
Commission Expires May 15, 2010

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

WINSTAR HOLDINGS, LLC and
IDT CORP.,

                            Plaintiff,

              -against-

THE BLACKSTONE GROUP LP; IMPALA
PARTNERS, LLC; AND CITICORP

                         Defendants.
-----------------------------------------------------------------x

Civ. No.: 07 CV 4634 (GEL)

ECF Case

## PLAINTIFFS' REPLY MEMORANDUM OF LAW IN
## FURTHER SUPPORT OF THEIR MOTION TO REMAND

COHEN TAUBER SPIEVACK & WAGNER LLP
Joseph M. Vann (JMV 7601)
Ira R. Abel (IA-1869)
Jed Lewin (JL 2428)
420 Lexington Avenue
New York, New York 10170
(212) 586-5800

and

GRAYSON & KUBLI, P.C.
Alan M. Grayson, of counsel
Melissa Roover (MR 1163)
1420 Spring Hill Road, Suite 230
McLean, Virginia 22102
(703) 749-0000

*Attorneys for Plaintiffs Winstar Holdings, LLC and IDT Corp.*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT..................................................................................................1

ARGUMENT .......................................................................................................................2

POINT I - PLAINTIFFS' STATE LAW TORT CLAIMS ARE NOT WITHIN
THE BANKRUPTCY COURT'S "CORE" JURISDICTION ...................................2

    A.    The Bankruptcy Court Does Not Have "Arising In"
Jurisdiction Over This Non-Core Lawsuit........................................................3

    B.    The Bankruptcy Court Does Not Have "Arising Under"
Jurisdiction Over This Non-Core Proceeding....................................................5

    C.    The Bankruptcy Court Does Not Have "Related to"
Jurisdiction Over This Non-Core Proceeding....................................................6

POINT II – MANDATORY ABSTENTION REQUIRES THAT
THE LAWSUIT BE REMANDED TO THE STATE COURT ................................7

POINT III - ALTERNATIVELY, THIS COURT SHOULD
ABSTAIN FROM EXERCISING JURISDICTION OVER
THE LAWSUIT, ON "PERMISSIVE" OR "EQUITABLE" GROUNDS ..............8

CONCLUSION....................................................................................................................10

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Amanat v. Wollmuth Maher & Deutsch, LLP* (*In re Amanat*),
    338 B.R. 574 (Bankr. S.D.N.Y. 2005) ........................................................................ 9

*Anselmo v. Univision Station Group Inc.*,
    No. 92 Civ. 1471 (RLC), 1993 WL 17173, at *1 (S.D.N.Y. Jan. 15, 1993) ........................ 5, 6

*Armco Inc. v. North Atlantic Ins. Co.*,
    68 F. Supp. 2d 330 (S.D.N.Y. 1999) ..................................................................... 4, 5, 6

*Beightol v. UBS Painewebber* (*In re Global Crossings, Ltd. Secs. Litig.*),
    311 B.R. 345 (S.D.N.Y. 2003) ............................................................................... 7

*Certain Underwriters at Lloyd's, London v. ABB Lummus Global, Inc.*,
    337 B.R. 22 (S.D.N.Y. 2005) ................................................................................ 9

*Consulting Actuarial Partners, Ltd. v. Descap Planning, Inc.* (*In re Consulting Actuarial Partners*),
    72 B.R. 821 (Bankr. S.D.N.Y. 1987) ...................................................................... 3

*Digital Satellite Lenders, LLC v. Ferchill*,
    No. 03-8803, 2004 WL 1794502, at *5 (S.D.N.Y. Aug. 10, 2004) ................................. 10

*General Elec. Cap. Corp. v. Pro-Fac Coop.*,
    No. 01 Civ. 10215, 2002 WL 1300054 (S.D.N.Y. June 12, 2002) ................................. 7, 8

*Guccione v. Bell*,
    No. 06-492, 2006 WL 2032641, at *5 (S.D.N.Y. July 20, 2006) ................................... 10

*In re Paolo Gucci*,
    193 B.R. 417 (Bankr. S.D.N.Y. 1996) .................................................................... 3

*Kerusa Co. v. W10Z/515 Real Estate Ltd.*,
    No. 04 Civ. 708, 2004 WL 1043239, at *3 (S.D.N.Y. May 7, 2004) ........................... 8, 9, 10

*Kolinsky v. Russ* (*In re Kolinsky*),
    100 B.R. 695 (Bankr. S.D.N.Y. 1989) .................................................................... 4

*Linardos v. Fortuna*,
    157 F.3d 945 (2d Cir. 1998) ................................................................................ 3

**Page**

*LTV Steel Co. v. Shahala (In re Chateaugay Corp.),*
    53 F.3d 478 (2d Cir. 1995)........................................................................... 8

*Mt. McKinley Ins. Co. v. Corning Inc.,*
    399 F.3d 436 (2d Cir. 2005)......................................................................... 8

*Neuman v. Goldberg,*
    159 B.R. 681 (S.D.N.Y. 1993)..................................................................... 11

*New Moon Shipping Co., Ltd., v. Man B&W Diesel Ag,*
    121 F.3d 24 (2d Cir.1997)............................................................................ 4

*New York City Employees' Retirement Sys. v. Ebbers (In re WorldCom, Inc. Sec. Litig.),*
    293 B.R. 308 (Bankr. S.D.N.Y. 2003) ..................................................... 3, 8

*Olin Corp. v. Riverwood Int'l Corp. (In re Manville),*
    209 F.3d 125 (2d Cir. 2000)......................................................................... 8

*Orion Pictures Corporation v. Showtime Networks, Inc. (In re Orion),*
    4 F.3d 1095 ................................................................................................. 11

*Osanitsch v. Marconi PLC (In re Marconi PLC),*
    363 B.R. 361 (Bankr. S.D.N.Y. 2007)......................................................... 4

*Silverman v. General Railway Signal Co. (In re Leco Enterp.),*
    144 B.R. 244 (Bankr. S.D.N.Y. 1992)............................................... 3, 4, 6, 7

*Stahl v. Stahl,*
    No. 03 Civ. 0405 VM, 2003 WL 22595288, at *3 (S.D.N.Y. Nov. 7, 2003).......................... 11

*Sterling Vision, Inc. v. Sterling Optical Corp. (In re Sterling Optical Corp.),*
    302 B.R. 792 (Bankr. S.D.N.Y. 2003)......................................................... 3

## Other Authorities

28 U.S.C. § 1334(c)(2)........................................................................ passim

28 U.S.C. § 1452............................................................................................ 2

## Rules

Federal Rule of Bankruptcy Procedure 9027 ..................................... 1, 2, 9

Plaintiffs Winstar Holdings, LLC and IDT Corp. (together, "Plaintiffs") respectfully submit this Reply Memorandum of Law in Further Support of their Motion to Remand ("Motion to Remand") seeking the entry of an Order, pursuant to 28 U.S.C. § 1334(c)(2), remanding this Lawsuit[1] to the Supreme Court of the State of New York.[2]  The Motion to Remand should be granted because of the absence of bankruptcy jurisdiction or pursuant to the mandatory abstention doctrine, or, in the alternative, pursuant to the permissive abstention or discretionary remand provisions of 28 U.S.C. §§ 1334(c)(1) and 1452(b).[3]

## PRELIMINARY STATEMENT

In its Notice of Removal, defendant Impala initially alleged that this Court has jurisdiction over the Lawsuit because its contingent, never-asserted indemnification claim against a non-party somehow "relates" to the Old Winstar Liquidation Proceeding.  Recognizing that this argument is without merit, Defendants, in their Opposition to Plaintiffs' Motion to Remand, manufacture an alternate route to alleged federal bankruptcy jurisdiction.  They now claim that this Lawsuit was removed to this Court pursuant to

---

[1] Any capitalized term not defined herein shall have as its meaning the definition ascribed to the term in Plaintiffs' Memorandum of Law in Support of their Motion to Remand.

[2] In their desperation to manufacture jurisdiction in the Bankruptcy Court, Defendants claim in footnote 11 of their Joint Memorandum of Law in Opposition ("Opp. Br.") that Plaintiffs have not "formally" moved for abstention. This is demonstrably incorrect.  Plaintiffs expressly requested mandatory abstention in both their Notice of Motion dated July 1, 2007 (Docket Entry No. 21) and in their Motion to Remand, dated July 1, 2007 (Docket Entry No. 22) ("…or pursuant to the mandatory abstention provisions of §1334(c)(2)…").  Plaintiffs titled their pleadings "Motion for Remand" rather than "abstention" to reflect the reality that irrespective of the grounds upon which this Court ultimately recognizes that it lacks, or declines to exercise, jurisdiction over the Lawsuit, the ultimate relief this Court will grant to Plaintiffs is remand of the Lawsuit to the Supreme Court of the State of New York.  Similarly, Defendants incorrectly claim that "Plaintiffs failed to file a 'timely' abstention motion in accordance with Federal Rule of Bankruptcy Procedure 9027(e)(3)." (Opp. Brief at 4.)  Rule 9027(e)(3) does not require an abstention motion.  Rather, it requires a response to the removing party's statement as to whether the action is core or non-core. Because Defendants never filed a statement indicating whether the removed Lawsuit is core or non-core, no statement exists to which Plaintiffs had to respond under Rule 9027(e)(3).

[3] Presently pending before this Court are Plaintiffs' Motion to Remand and Defendants' Joint Motion for Transfer of Venue.  It is undisputed that "[w]hen presented with competing motions to remand a case and to transfer venue, a court is to consider the remand motion first, and then address the motion to transfer venue only if it first denies the motion to remand."  *Stahl vs. Stahl*, No. 03-0405, 2003 WL 22595288, at *2 (S.D.N.Y. Nov. 7, 2003) (Marrero, J.). Nevertheless, pursuant to this Court's Order, dated July 2, 2007 (Docket Entry No. 26), the parties were directed to brief the issues of remand and venue contemporaneously for reasons of judicial efficiency. That led to some overlap in the arguments and counter-arguments by the parties.  Plaintiffs incorporate herein their opposition to Defendants' Joint Motion for Transfer of Venue (Docket Entry Nos. 29 and 30).

the bankruptcy court's "arising under" and "arising in" jurisdiction[4] because Plaintiffs' state law tort claims supposedly are closely entwined with the APA.  Accordingly, Defendants claim that bankruptcy "core" jurisdiction, rather than "related to" jurisdiction governs.  As demonstrated herein, this is incorrect. For the reasons stated herein, the Court should reject Defendants' proposed grounds for seeking bankruptcy court jurisdiction over this Lawsuit.   To the extent Defendants still argue "related to" jurisdiction, this Court should abstain on mandatory abstention grounds.

In the alternative, this Court should abstain on "permissive" or "discretionary" grounds under 28 U.S.C. §§ 1334(c)(1) and 1452(b), because, *inter alia*, state law claims predominate in this Lawsuit, this Lawsuit is not sufficiently "related to" the Liquidation Proceeding, and Plaintiffs seek a jury trial to decide their state law claims (and Bankruptcy Courts cannot try non-core jury cases).

## ARGUMENT

### POINT I

### PLAINTIFFS' STATE LAW TORT CLAIMS ARE NOT WITHIN THE BANKRUPTCY COURT'S "CORE" JURISDICTION

"A party seeking to remove an action from state to federal court bears the burden of proving federal jurisdiction."  *New York City Employees' Retirement Sys. v. Ebbers* (*In re WorldCom, Inc. Sec. Litig.),* 293 B.R. 308, 317 (Bankr. S.D.N.Y. 2003) (*citing Linardos v. Fortuna*, 157 F.3d 945, 947 (2d Cir. 1998).  Bankruptcy court jurisdiction, while broad, is limited to "matters 'arising in,' 'arising under,' or

---

[4] Defendants claim that Impala asserted "core" jurisdiction in its Notice of Removal.  However, the only basis of bankruptcy jurisdiction actually articulated by Impala is "related to" jurisdiction.  Impala first stated in its Notice of Removal that "[t]he State Court Action is properly removable ***because of its close connection*** to the Debtor's Chapter 11 proceedings pending in the Bankruptcy Court."  Notice of Removal, ¶ 5 (emphasis supplied).  Then, after a discussion of the APA and Sale Order in Paragraphs 8-11, Impala asserted that under 28 U.S.C. § 1452, "matters that can be removed include claims "related" to a bankruptcy case…"  Notice of Removal, ¶ 13.  Similarly, Impala thereafter stated that "[t]o the extent that the Bankruptcy Court does not possess core jurisdiction over Plaintiff's claims, it possesses "related-to" jurisdiction over them."  Notice of Removal, ¶ 16.  Although Impala also referenced in passing "core" and "arising in" jurisdiction (in paragraphs 13-14), Impala did not articulate any specific basis for such assertions. Of course, Impala could have avoided any ambiguity as to "core" or "non-core" by simply complying with Rule 9027(a)(1) of the Federal Rules of Bankruptcy Procedure, which it did not.  Rule 9027(a)(1) requires that a notice of removal "contain a statement that upon removal of the claim or cause of action the proceeding is core or non-core, and, if non-core that the party filing the notice does or does not consent to entry of final orders or judgment by the bankruptcy judge," which Defendants also failed to do (and have still failed to do).

'related to' a case filed under the Bankruptcy Code." *In re Paolo Gucci,* 193 B.R. 417, 418 (Bankr.

S.D.N.Y. 1996). Defendants have failed to satisfy their burden of establishing federal jurisdiction.

> **A.    The Bankruptcy Court Does Not Have "Arising In"
> Jurisdiction Over This Non-Core Lawsuit.**

In this Circuit, "a claim 'arises in' bankruptcy if, by its very nature, the claim can only be brought

in a bankruptcy action, because it has no existence outside of bankruptcy." *Sterling Vision, Inc. v.*

*Sterling Optical Corp.* (*In re Sterling Optical Corp.*), 302 B.R. 792, 801 (Bankr. S.D.N.Y. 2003).

"'Arising in' and 'arising under' proceedings encompass the matters that are at the core of the jurisdiction

of the bankruptcy courts, and 'depend upon the application or construction of bankruptcy law as

expressed in Title 11.'" *Silverman v. General Railway Signal Co.* (*In re Leco Enterp.*), 144 B.R. 244, 248

(Bankr. S.D.N.Y. 1992) (quoting *Consulting Actuarial Partners, Ltd. v. Descap Planning, Inc.* (*In re*

*Consulting Actuarial Partners*), 72 B.R. 821, 828 (Bankr. S.D.N.Y. 1987)). Such proceedings must

"invoke[] a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise

only in the context of a bankruptcy case." *In re Leco Enterp.*, 144 B.R. at 249.

Couching their arguments in bankruptcy nomenclature, Defendants attempt to turn Plaintiffs'

simple, straightforward Lawsuit for damages based on Defendants' acts and omissions made *prior* to the

APA - to which the Defendants were not parties - into a "core" bankruptcy proceeding by asserting,

without basis, that extensive analysis and interpretation of the APA will be required[5] and that the forum

selection clause of the APA therefore governs the Lawsuit.[6] To be a core proceeding, however, "an

action must have as its foundation the creation, recognition or adjudication of rights which would not

exist independent of a bankruptcy." *Id; see also Osanitsch v. Marconi PLC (In re Marconi PLC)*, 363

---

[5] Contrary to Defendants' unfounded assertion, the December 19, 2001 order of the bankruptcy court approving the APA (the "Sale Order") has no bearing whatsoever on this Lawsuit against these Defendants for damages caused by Defendants' pre-APA tortious conduct. The Defendants were not parties to the APA and never owned any assets transferred under the APA. Defendants were not impacted or "effected" [sic] by the APA (or the Sale Order). No claim in the Lawsuit turns on the APA or the Sale Order or requires the APA to be interpreted, implemented, modified, enforced or rescinded.

[6] Plaintiffs, as "[t]he 'party seeking to avoid enforcement of [a forum selection clause is] entitled to have the facts viewed in the light most favorable to it... .' " *Armco Inc. v. North Atlantic Ins. Co.*, 68 F. Supp. 2d 330, 338 (S.D.N.Y. 1999) *citing, New Moon Shipping Co., Ltd., v. Man B&W Diesel Ag,* 121 F.3d 24, 29 (2d Cir.1997).

B.R. 361, 366 (Bankr. S.D.N.Y. 2007) (holding that plaintiff's complaint alleging tort and contract claims against debtor were "manifestly" not created by or unique to bankruptcy law); *Kolinsky v. Russ* (*In re Kolinsky*), 100 B.R. 695, 701 (Bankr. S.D.N.Y. 1989) (holding that the sale of the majority of a non-debtor's assets to plaintiff during pendency of debtor's chapter 11, which resulted in plaintiff's claim for rescission due to the alleged fraudulent conduct of the defendants, did not implicate any provision of Title 11 and was therefore not a case "arising under" Title 11).

Defendants argue that 'core' jurisdiction exists because their defense to the Lawsuit requires extensive analysis and interpretation of the APA (to which the Defendants were not even parties).[7] Plaintiffs, however, assert only tort claims for damages relating to Defendants' improper acts prior to the creation of the APA which, by their very nature, precede and have no bearing upon or relationship to the APA.[8] *See, e.g., Armco,* 68 F. Supp. 2d at 338 (holding defendants' pre-contract fraud and misrepresentations made prior to the formation of the sale contract did not "arise under" or "arise in connection with" the contract); *see also Anselmo v. Univision Station Group Inc.*, No. 92 Civ. 1471 (RLC), 1993 WL 17173, at *1 (S.D.N.Y. Jan. 15, 1993) (concluding that plaintiff's tort claims did not "relate to" the agreement because the tort grew out of events which preceded the agreement).

Defendants' most brazen attempt to create bankruptcy court jurisdiction where none exists, however, is their attempt to claim that the Lawsuit is a "core" proceeding because it "involves a contract and sale that took place within the Winstar bankruptcy," and that therefore the Lawsuit "could not have

---

[7] Defendants also ironically assert that because their tortious acts and omissions induced Plaintiffs to enter into the APA, the APA must be enforced against the Plaintiffs. This argument makes no sense in light of the fact that Plaintiffs are not seeking to enforce, circumvent, challenge, alter, modify, rescind or otherwise affect the APA in any manner.

[8] Plaintiffs concede that the Delaware Bankruptcy Court retained "exclusive jurisdiction" to adjudicate disputes concerning the enforcement or interpretation of the APA in the Sale Order. However, the jurisdiction of the bankruptcy court is established by statute; a bankruptcy court order does not and cannot somehow expand that jurisdiction beyond what the statutes provide. The APA is merely a red-herring raised by Defendants to confuse the Court into thinking that non-existent bankruptcy issues somehow bear on Defendants' fraudulent and tortious conduct. Moreover, this Lawsuit has absolutely nothing to do with the enforcement or interpretation of the APA. This is evident because it is based upon Defendants' pre-APA activities and, had Plaintiffs not entered into the APA, Plaintiffs still could maintain the Lawsuit to recover the significant expenses they incurred to participate in and bid at the bankruptcy auction of Old Winstar's assets. *See* Complaint ¶ 38. Accordingly, Defendants' tortious acts remain actionable independent of the APA.

4

existed outside of the Winstar Bankruptcy Case." (Opp. Br. at 7). By this logic, any action, relating to any contract or any sale, entered into during a bankruptcy, must necessarily be within the bankruptcy court's "core" jurisdiction, regardless of the claims alleged or the parties involved. This is not true and tellingly, Defendants cite no authority for this novel proposition.[9]

Defendants also assert that this action "concerns the administration of the Debtor's estate, and thus comes within the core jurisdiction of the bankruptcy court." (Opp. Br. at 8). Defendants fail to demonstrate how a tort Lawsuit against non-debtors will "concern the administration of Debtor's estate," except to state that defendants Blackstone and Impala have potential claims for indemnification from the Debtor, that discovery will be required of the Debtor and that Defendants "may assert third-party claims against the Debtor." (Opp. Br. at 9). Those assertions, however, fail to establish "core" jurisdiction. As demonstrated below, Defendants indemnification claims against the Old Winstar Chapter 7 Trustee are time barred by the June 11, 2002 bar date order of the Bankruptcy Court (the "Bar Order").[10] Accordingly, Defendants' assertions fail to establish even "related to" jurisdiction, let alone "arising in" (core) jurisdiction.

### B. The Bankruptcy Court Does Not Have "Arising Under" Jurisdiction Over This Non-Core Proceeding.

"Arising under jurisdiction includes only those proceedings that involve a cause of action created or determined by a statutory provision of title 11." *In re Leco Enterp.*, 144 B.R. at 249. Defendants once again put the cart before the horse and allege that the Court has "arising under" jurisdiction over the Lawsuit "because it will be necessary for the Delaware Bankruptcy Court to interpret the Sale Order." (Opp. Br. at 9). First, the Sale Order has no relevance to the Lawsuit. *See,* Section A, *supra.* Second, the

---

[9] Moreover, as noted above, pre-APA conduct does not "arise under" or "relate to" the APA and therefore requires no interpretation or enforcement of the APA. Nor can Defendants create a relationship between the Lawsuit and the APA, where none exists, by their conclusory assertions that their defense will require reference to and interpretation of provisions of the APA and Sale Order. Similarly, therefore, the forum selection clause in the APA is also inapplicable to the Lawsuit. *See, Armco,* 68 F. Supp. 2d at 338; *Anselmo,* 1993 WL 17173, at *1.

[10] Moreover, the Lawsuit cannot possibly have any effect on the "administration" of a Liquidation Proceeding whose sole focus and "administration" for the better part of the past five years has been to pursue the Debtors' claims against Lucent, an exercise that even after the passage of five years continues to wind its tortured way through the appellate courts.

Sale Order terms are uncontested, so its interpretation is neither instructive nor vested entirely in the bankruptcy court. Finally, even if the Sale Order were somehow implicated in this Lawsuit – and it is not – Defendants' argument misses the point entirely. Defendants have not alleged or even alluded to any substantive right created in their favor by a statutory provision of Title 11, nor have they established how the Lawsuit concerns matters that could only have arisen under Title 11. *In re Leco Enterp.*, 144 B.R. at 249.

### C.    The Bankruptcy Court Does Not Have "Related to" Jurisdiction Over This Non-Core Proceeding.

Although Defendants purport to rely heavily on this Court's opinion in *In re Global Crossings, Ltd. Securities Litigation*, Defendants continually misstate the correct standard for establishing "related to" jurisdiction, as set forth in that decision. The test to determine whether an action is "related to" a bankruptcy is whether the outcome of the proceeding could conceivably have any effect on the estate *being administered in bankruptcy*." *Beightol v. UBS Painewebber* (*In re Global Crossings, Ltd. Secs. Litig.)*, 311 B.R. 345 (S.D.N.Y. 2003) (Lynch, J.) (emphasis added).[11] For a federal court to have "related to" jurisdiction over an action, "the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way *impacts upon the handling and administration of the bankrupt estate*." *Id.*[12] "Related to" jurisdiction "extends more broadly when it concerns a reorganization under Chapter 11, as opposed to a liquidation under Chapter 7," as here. *In re WorldCom, Inc. Sec. Litig.,* 293 B.R. at 317.

---

[11] Defendants conveniently misconstrue the portion of this Circuit's "related to" test to address the impact that the outcome of an action might have on the bankruptcy estate, clearly ignoring the fact that the impact must be on the **administration** of the debtor's estate.

[12] Notably, in *General Elec. Cap. Corp. v. Pro-Fac Coop.*, No. 01 Civ. 10215, 2002 WL 1300054 (S.D.N.Y. June 12, 2002), the Court recognized that even though contribution and indemnification claims *could* conceivably "affect" the estate, such claims were an "insufficient basis for jurisdiction. *Id.* at *2. Even if it could exercise "related to" jurisdiction, the Court determined that remand would still be appropriate "in light of the non-exclusive nature of federal court jurisdiction . . . as well as on equitable grounds, including respect for Plaintiff's choice of forum, [and] the ability of the chosen forum to conduct a jury trial." *Id.* at *3.

In any event, Defendants' arguments of "related to" jurisdiction are fatally flawed, because they have not filed any claims for indemnity in the Liquidation proceeding, nor can they in the face of the Bar Order precluding such claims.[13]  Amazingly, Defendants, despite having not filed any timely claims for indemnity in the Liquidation Proceeding, argue that such nonexistent claims form a basis for "related to" jurisdiction.

Accordingly, Defendants have not met their burden of demonstrating "related to" jurisdiction. But even if they had, as demonstrated below, mandatory abstention requires remand of the Lawsuit to State Court anyway.

## POINT II

### MANDATORY ABSTENTION REQUIRES THAT
### THE LAWSUIT BE REMANDED TO THE STATE COURT

It is well-settled in this Circuit that mandatory abstention under 28 U.S.C. § 1334(c) applies to actions removed from state courts.  *Mt. McKinley Ins. Co. v. Corning Inc.*, 399 F.3d 436, 446-47 (2d Cir. 2005); *Amanat v. Wollmuth Maher & Deutsch, LLP* (*In re Amanat*), 338 B.R. 574, 582 (Bankr. S.D.N.Y. 2005).  Federal courts considering mandatory abstention pursuant to 28 U.S.C. 1334(c)(2) have consistently held, in accordance with the plain language of the statute, that they must abstain from exercising jurisdiction over an action removed from a state court whenever six factors of the statute are

---

[13] Defendants concede that the Bar Order precludes the filing now of any administrative claims "which arose or accrued on and between April 18, 2001 and January 4, 2002," but nevertheless maintain that the Lawsuit was not filed until May 2007 and therefore any potential indemnity claims by Defendants against Debtor did not "arise" until the Lawsuit was filed.  This is false.  For "[w]hether a claim exists is determined by bankruptcy law, while the time a claim *arises* is determined under relevant non-bankruptcy law.  *Olin Corp. v. Riverwood Int'l Corp. (In re Manville),* 209 F.3d 125, 128 (2d Cir. 2000) (*citing LTV Steel Co. v. Shahala (In re Chateaugay Corp.),* 53 F.3d 478, 497 (2d Cir. 1995)).  A contractual claim for indemnity "arises" upon signing of the agreement giving rise to the indemnity.  *Olin,* 209 F.3d at 129 ("Under contract law, a right to payment based on a written indemnification contract arises at the time the indemnification agreement is executed.").  Here, the purported indemnification agreements all were executed in or around July, 2001.  Accordingly, Defendants, who concede that they have not filed any administrative claims against the Old Winstar estate (Impala and Blackstone first "notified" the Old Winstar Chapter 7 Trustee in July 2007 of their alleged indemnity right, Gold Decl., Exhibit 8), are time barred by the Bar Order from doing so.  As a result, unlike in *Global Crossing* where there was apparently no bar to the filing of claims against the debtor estate by a defendant/indemnitee, there are no indemnity claims that can be asserted by Defendants here that can have **_any_** impact whatsoever on the administration of the Liquidation Proceeding.

present.[14]  In their Opposition, Defendants unsuccessfully argue that:  (1) "arising in" or "arising under" jurisdiction renders mandatory abstention inapplicable; (2) Plaintiffs' Motion was not timely for failure of Plaintiffs to file a Rule 9027(e)(3) response; (3) the Lawsuit involves federal law in addition to state law; and (4) the Lawsuit may not be timely adjudicated in the state court.  (Opp. Br. at 15-18).  As discussed above, there is no "arising in" or "arising under" jurisdiction here; Defendants never filed the necessary Rule 9027(a)(1) statement that would require Plaintiffs' 9027(e)(3) response; the Lawsuit involves only state law claims; and the action will be more timely adjudicated in state court.  *See* Point I *supra.*[15]  As demonstrated in the Motion to Remand, all six factors for mandatory abstention under 28 U.S.C. 1334(c)(2) are satisfied here, and, accordingly, even if "related to" jurisdiction existed, which it does not, this Court **must** abstain, and remand the Lawsuit to the Supreme Court for the State of New York, where it rightfully belongs.

### POINT III

### ALTERNATIVELY, THIS COURT SHOULD ABSTAIN FROM EXERCISING JURISDICTION OVER THE LAWSUIT, ON "PERMISSIVE" OR "EQUITABLE" GROUNDS

Courts in this district have abstained from exercising jurisdiction on permissive grounds under 28 U.S.C. §1334(c)(1) if the eight relevant factors (as set forth in Plaintiffs' Motion to Remand) are satisfied. *See, Kerusa Co. v. W10Z/515 Real Estate Ltd.,* No. 04 Civ. 708, 2004 WL 1043239, at *3 (S.D.N.Y.

---

[14] Namely, (1) the motion to abstain is made on time; (2) the action is based on state law claims; (3) the action is "related to" but not "arising in" a bankruptcy case or "arising under" the Bankruptcy Code; (4) Section §1334(b) would provide the sole basis for federal jurisdiction; (5) an action was commenced in state court; and (6) that action can be adjudicated in a timely manner in state court.  *Amanat*, 338 B.R. at 581 (and cases cited therein); *see also Certain Underwriters at Lloyd's, London v. ABB Lummus Global, Inc.*, 337 B.R. 22, 27 (S.D.N.Y. 2005).

[15] Defendants are wrong in claiming that  the State Court could not conclude the Lawsuit as expeditiously as the Bankruptcy Court.  *See Amanat vs. Wollmuth, Maher & Deutsch, LLP,* 338 B.R. 574, 582 (Bankr. S.D.N.Y. 2005) (recognizing the "fast-track" of the Commercial Division of the Supreme Court of the State of New York).  This is particularly true given that the Lucent lawsuit, now on appeal to the Third Circuit Court of Appeals, has been pending for six (6) years.  Indeed, it took more than four (4) years for the Old Winstar Trustee just to obtain a judgment against Lucent (*see Gold. Decl. (Docket Entry No. 32), at Ex.5*) and another year and a half to obtain an affirmance by the District Court of that judgment (*see Gold Decl., at Ex. 6*).  It is unknown how long the Third Circuit Court of Appeals will take to render a decision on appeal, nor how many more years of litigation between the Old Winstar Trustee and Lucent any such decision may engender.  Of course, the Trustee has no reason to administer any claims in the Liquidation Proceeding until the Lucent litigation is completely concluded, for that is apparently the only known source of funds that may become available for distribution to Old Winstar's creditors.

May 7, 2004) (Lynch, J.).  Courts exercising "equitable" authority to remand removed actions to state courts are guided by the same factors.  Courts in this Circuit treat the analysis for discretionary abstention under 28 U.S.C. §1334(c)(1) and equitable remand under 28 U.S.C. §1452(b) as essentially identical. *Kerusa Co.,* 2004 WL 1048239, at * 3; *see also Digital Satellite Lenders, LLC v. Ferchill*,  No. 03-8803, 2004 WL 1794502, at *5 (S.D.N.Y. Aug. 10, 2004); *Guccione v. Bell*, No. 06-492, 2006 WL 2032641, at *5 (S.D.N.Y. July 20, 2006).

Plaintiffs have amply demonstrated in their Motion for Remand that these factors weigh decidedly in favor of abstention and remand.  Plaintiffs' Memorandum of Law in Support of Their Motion to Remand, at 17-23.  To reiterate one important factor, Plaintiffs assert that the Lawsuit is non-core and non-related and they do not consent to a final determination by the Bankruptcy Court of the Lawsuit. Plaintiffs also insist upon their right to a jury trial,[16] which the Bankruptcy Court cannot conduct.[17]  Accordingly, a hearing in the Bankruptcy Court, which cannot enter final judgment or conduct a jury trial, merely duplicates proceedings. The Bankruptcy Court cannot enter final judgment, which will require a subsequent *de novo* review by the district court.  And, the Bankruptcy Court cannot even conduct the jury trial. For this reason alone, abstention and remand is appropriate.

Defendants contend, in part, that they are entitled to remain in federal court because the state law issues do not predominate, and are not a sufficient basis for abstention and remand.  (Opp. Br. at 20). This is incorrect.  Defendants' reliance on *Neuman v. Goldberg*, 159 B.R. 681, 685-86 (S.D.N.Y. 1993) (overruled on other grounds), for this point is misplaced.  The Court in *Neuman* determined that state law did not predominate in that action because the state court action overlapped with both a pre-existing action in bankruptcy court and a consolidated multidistrict litigation before the district court, and in many instances the allegations in the federal actions were repeated in the state court action "verbatim."  *Id.*  The

---

[16] Contrary to Defendants' assertion, Plaintiffs did not waive jury rights against Defendants for Defendants' pre-APA tortious conduct by entering into an APA with Old Winstar, nor have Defendants cited any statute or case in support of their unfounded assertion.

[17] *See, Orion Pictures Corporation v. Showtime Networks, Inc. (In re Orion),* 4 F.3d 1095, 1101 ("We now reach the issue reserved in *Ben Cooper I,* and hold that the Constitution prohibits bankruptcy courts from holding jury trials in non-core matters").

same is not true in this case.  More instructive is *Stahl v. Stahl*, holding that "though the predominance of state law issues in a case does not alone require remand, it does not mean that that consideration, in combination with others, could not usually tilt in favor of remand."  *Stahl v. Stahl*, No. 03 Civ. 0405 VM, 2003 WL 22595288, at *3 (S.D.N.Y. Nov. 7, 2003).  *See also Kerusa Co.*, 2004 WL 1048239, at *5 (holding that questions solely of state law are a factor weighing in favor of remand).  Moreover, Defendants' argument misses the point entirely, because the lawsuit concerns *only* issues of state law as relates to Defendants' pre-APA tortious conduct. There are no federal questions or bankruptcy law issues that are raised by Plaintiffs on account of Defendants' pre-APA misrepresentations and other tortious conduct. There is no federal subject matter jurisdiction over Plaintiffs' claims.  Accordingly, Defendants' argument that state law issues do not predominate – given the absence of any federal claims by Plaintiff – makes no sense whatsoever.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order:  (a) abstaining and remanding the Lawsuit for lack of "relatedness" under 28 U.S.C. §1334(b) or pursuant to the mandatory abstention provisions of § 1334(c)(2); or, in the alternative, (b) abstaining from exercising this Court's jurisdiction pursuant to permissive abstention under  §1334(c)(1) or equitably under § 1452(b), and, in either event, remanding the Lawsuit to the Supreme Court of the State of New York.  If the Court does so, Impala's "request" to transfer the Lawsuit to the Bankruptcy Court of the District of Delaware will be moot, but otherwise should be denied.

Dated:  New York, New York
          August 13, 2007

Respectfully submitted,

| _____ s/ Joseph M. Vann _____ | | _____ s/Melissa A. Roover _____ |
| --- | --- | --- |
| Joseph M. Vann (JMV 7601) | | Alan M. Grayson, of counsel |
| Jed Lewin (JL 2428) | | Melissa A. Roover (MR 1163) |
| COHEN TAUBER SPIEVACK & WAGNER LLP | and | GRAYSON & KUBLI, P.C. |
| 420 Lexington Avenue, 24th Floor | | 1420 Spring Hill Road, Suite 230 |
| New York, New York 10170 | | McLean, Virginia 22102 |
| (212) 586-5800 | | (703) 749-0000 |
| *Attorneys for Plaintiffs* | | *Attorneys for Plaintiffs* |

10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                  :
WINSTAR HOLDINGS, LLC                             :
and IDT CORP.,                                    :
                                                  :
                              Plaintiffs,         :
                                                  :         07 Civ. 4634 (GEL)
       -against-                                  :
                                                  :         **OPINION AND ORDER**
THE BLACKSTONE GROUP L.P.,                        :
IMPALA PARTNERS, LLC, and                         :
CITICORP,                                         :
                                                  :
                              Defendants.         :
                                                  :
-------------------------------------------------------------x

Joseph M. Vann (Jed Lewin, of counsel), Cohen
Tauber Spievack & Wagner LLP, New York, NY,
and Melissa A. Roover (Alan M. Grayson, of counsel),
Grayson & Kubli, P.C., McLean, VA, <u>for plaintiffs</u>.

Vickie Reznik (Yosef J. Riemer, David S. Flugman, of
counsel), Kirkland & Ellis LLP, New York, NY, <u>for
defendant The Blackstone Group, L.P.</u>

Andrew C. Gold (Stephen M. Rathkopf, of counsel),
Herick, Feinstein LLP, New York, NY, <u>for defendant
Impala Partners, LLC</u>.

Stephen L. Saxl (William Wargo, of counsel), Greenberg
Traurig, LLP, New York, NY, <u>for defendant Citicorp</u>.

GERARD E. LYNCH, <u>District Judge</u>:

  The parties to this case agree on one thing: they don't want to be here. They disagree,

however, on where they should be. Plaintiffs filed this action in the Supreme Court of the State

of New York, where they believe it should remain; accordingly, they have moved to remand the

case to the state court. Defendants removed the case to this Court, only in order to move to

transfer the case to the United States Bankruptcy Court for the District of Delaware.  The plaintiffs' motion will be denied, and defendants' motion granted.

## BACKGROUND

Plaintiff IDT Corp. formed plaintiff Winstar Holdings, LLC, in order to acquire the assets of Winstar Communications, Inc. ("Old Winstar"), and related entities.  Old Winstar had filed for bankruptcy protection in the Bankruptcy Court in Delaware, and was in the process of liquidation.  With the approval of the Bankruptcy Court, Old Winstar retained defendant Blackstone Group, L.P. as its financial advisor, and defendant Impala Partners, LLC ("Impala") as a restructuring advisor.  Defendant Citicorp, Old Winstar's largest creditor, played a role in negotiating the terms of the contract between Old Winstar and Impala.  Plaintiffs purchased the business assets of Old Winstar from the bankruptcy estate at an auction approved by the Bankruptcy Court for $42.5 million pursuant to an Asset Purchase Agreement ("APA") dated December 18, 2001, which was approved by the Bankruptcy Court the following day.  The APA contains a forum selection clause in which the parties agree that the United States Bankruptcy Court for the District of Delaware shall have exclusive jurisdiction to resolve any dispute arising out of or related to the APA.  (APA § 9.10, Gold Decl. Ex. 1.)  The Bankruptcy Court's order approving the sale similarly provides that that court retains "exclusive jurisdiction" to "resolve any disputes arising under or related to" the APA.  (Sale Order ¶ 15, Gold Decl. Ex. 2.)

Plaintiffs allege that they were induced to enter the APA by various misrepresentations made by the defendants and by Old Winstar in an offering statement.  Their claims sound solely in New York common law.

2

**DISCUSSION**

I.    Plaintiffs' Motion to Remand

The threshold issue in addressing plaintiffs' remand motion is whether federal

jurisdiction over this case exists because it "aris[es] in" a bankruptcy case or "aris[es] under" the

bankruptcy code, or merely because it is "related to" a bankruptcy case.  Although 28 U.S.C. §

1334(b) provides for federal jurisdiction in either situation, if the case is merely one "related to"

the Old Winstar bankruptcy, and could not otherwise be brought in a federal court, statutory

provisions requiring (28 U.S.C. § 1334(c)(2)) or permitting (28 U.S.C. § 1334(c)(1)) the Court to

abstain from exercising jurisdiction and deferring to the state courts may apply.  If, however, the

case is a "core" bankruptcy proceeding that "arises under" the bankruptcy code or "arises in" a

bankruptcy case, the mandatory abstention provision by its own terms do not apply and

permissive abstention is less likely.  Plaintiffs, accordingly, argue that the Court has, at most,

 "related to" jurisdiction,[1] while defendants contend that the case comes within the "arising in"

_____

[1] Plaintiffs argue, in fact, that defendants have not established even "related to"
jurisdiction (P. Remand Mem. 10-12), but their arguments in this regard are unpersuasive.
Whether an action is "related to" a bankruptcy depends on whether there is "a significant
connection" between the action and the underlying bankruptcy.  In re Turner, 724 F.2d 338, 341
(2d Cir. 1983) (citations and internal quotation marks omitted).  The "proceeding need not
necessarily be against the debtor or against the debtor's property."  In re WorldCom, Inc. Sec.
Litig., 293 B.R. 308, 317 (S.D.N.Y. 2003), quoting Celotex Corp. v. Edwards, 514 U.S. 300, 308
n. 6 (1995).  In any ordinary sense, the connection between this case and the bankruptcy is
obvious: the sale that is the subject of the litigation was an aspect of the bankruptcy proceeding.
More importantly, the outcome of the action "'could alter the debtor's rights, liabilities, options
or freedom of action'" and affect "'the handling and administration of the bankrupt estate.'"
WorldCom, 293 B.R. at 317, quoting Celotex, 514 U.S. at 308 n. 6 (1995).  Although plaintiffs
have not named Old Winstar as a defendant, Impala allegedly has indemnification rights against
Old Winstar.  While plaintiffs claim that the indemnification cannot apply to this case because of
an exclusion for "willful misconduct," and because (according to plaintiffs) there is no estate left
to affect, the bankruptcy proceedings are on-going, as is litigation that could bring assets into the
estate.  The Court cannot assume the correctness of plaintiffs' assertions, which turn on facts yet

3

or "arising under" headings of jurisdiction.

A.    "Arising Under" Jurisdiction

The most frequently cited explanation of the meaning of "arising under" jurisdiction can be found in the legislative history of the Bankruptcy Reform Act of 1978.  The House Report accompanying the bill that became that Act noted that

> The phrase "arising under" has a well defined and broad meaning in the jurisdictional context.  By a grant of jurisdiction over all proceedings arising under title 11, the bankruptcy courts will be able to hear any matter under which a claim is made under a provision of title 11.  For example, a claim of exemptions under 11 U.S.C. § 522 would be cognizable by the bankruptcy court, as would a claim of discrimination in violation of 11 U.S.C. § 525.  Any action by the trustee under an avoiding power would be a proceeding arising under title 11, because the trustee would be claiming based on a right given by one of the sections in subchapter III of chapter 5 of title 11.

H.R. Rep. No. 595, 95th Cong., 1st Sess. 445 (1977).  As the leading commentator on bankruptcy law puts it, "What this language seems to mean is that, when a cause of action is one which is created by title 11, then that civil proceeding is one 'arising under title 11.'" 1 Collier on Bankruptcy ¶ 3.01[4][c][i] at 3-21 (15th ed. rev. 2007).

---

to be found or even in some instances to occur.  It is unquestionable that the outcome of this case "could" affect the debtor, and that is sufficient to invoke the "related to" jurisdiction.  "Related to" jurisdiction exists where "the outcome of [the] proceeding could conceivably have any effect on the estate being administered in bankruptcy." Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984) (citations and italics omitted); In re Cuyahoga Equip. Corp., 980 F.2d 110, 114 (2d Cir. 1992) (A litigation has a "significant connection with a pending bankruptcy proceeding" and "falls within the 'related to' jurisdiction of the bankruptcy court" if the outcome "might have any 'conceivable effect' on the bankrupt estate.")  As the courts have recognized, "'A key word in [the] test is 'conceivable.'  Certainty, or even likelihood, is not required.  Bankruptcy jurisdiction will exist so long as it is possible'" that the proceeding may affect the debtor's rights or the administration of the estate. In re Dow Corning Corp., 86 F.3d 482, 491 (6th Cir. 1996), quoting In re Marcus Hook Dev. Park Inc., 943 F.2d 261, 264 (3d Cir. 1991).

4

The language of the statute is self-consciously patterned on that of the general federal question jurisdiction statute, which provides for federal court jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  See also U.S. Const. Art. III § 2, cl. 1 ("The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority.").  While the precise meaning of "arising under" in the general federal question context has vexed courts and commentators, see 13B Wright, Miller and Cooper, Federal Practice and Procedure § 3562 (2d ed. 1984), it has been suggested that an action arises under federal law "if in order for the plaintiff to secure the relief sought he will be obliged to establish both the correctness and the applicability to his case of a proposition of federal law."  Bator, Mishkin, Shapiro & Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 889 (2d ed. 1973), quoted with approval in Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 9 (1983).  Moreover, it is well established that a case does not arise under federal law unless "the plaintiff's statement of his own cause of action shows that it is based upon" federal law.  Louisville & Nashville R.R. Co. v. Mottley, 211 U.S. 149, 152 (1908).

Applying these standards to this case, it is plain that the instant case does not arise under title 11.  Simply put, plaintiffs' causes of action are based on state tort law, and rest on familiar common-law principles prohibiting fraud and misrepresentation.  No proposition of bankruptcy law must be established for plaintiffs to prevail, and no provision of the bankruptcy code is implicated in their allegations.  The causes of action asserted in the complaint are in no sense "created by" title 11 of the United States Code.

Defendants argue that the case nevertheless arises under the bankruptcy code "because it will be necessary for the Delaware Bankruptcy Court to interpret" its own order approving the APA in the course of deciding the case.  (D. Remand Mem. 9.)  But this argument misconstrues what it means for a case to "arise under" bankruptcy law.  It may be that provisions of the APA and of the Bankruptcy Court's order approving it will be relevant to the outcome of the case.  However, as the Supreme Court held in <u>Mottley</u> in the context of general federal question jurisdiction, "[a]lthough such allegations show that very likely, in the course of the litigation, a question under [bankruptcy law] would arise, they do not show that the suit, that is, the plaintiff's original cause of action, arises under [title 11]."  211 U.S. at 153.

Accordingly, this is not a case of "arising under" jurisdiction.

B.    <u>"Arising In" Jurisdiction</u>

The extent of the "arising in" jurisdiction is less clearly defined.  The leading bankruptcy treatise refers to it as a "residual category of civil proceedings," that "includes such things as administrative matters, orders to turn over property of the estate and determinations of the validity, extent, or priority of liens."  Collier on Bankruptcy, ¶ 3.01[4][c][iv] (15th ed. 2004) (internal quotation marks and footnotes omitted).  Courts too have stated that

> [t]he meaning of 'arising in' proceedings is less clear, but seems to be a reference to those 'administrative' matters that arise only in bankruptcy cases.  In other words, 'arising in' proceedings are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy.

<u>In re Wood</u>, 825 F.2d 90, 96-97 (5th Cir. 1987).

Defendants argue that this standard is met, pointing out that had Old Winstar not been in bankruptcy, the sale would never have taken place, the alleged misrepresentations would never

have occurred, and so this action would have no existence absent the bankruptcy. (D. Remand Mem. 7-9.) This argument may be somewhat oversimplified. The courts and commentators using the "no existence outside of the bankruptcy" formulation seem to be referring to proceedings that by their nature cannot exist outside of bankruptcy, and not merely to actions that, as a factual matter, have their origins in events occurring during a bankruptcy proceeding. The Bankruptcy Court in this district, for example, in a case relied upon by defendants themselves, puts the matter this way:

> A claim "arises in" bankruptcy if, by its very nature, the claim can only be brought in a bankruptcy action, because it has no existence outside of bankruptcy. See [In re] Riverside Nursing Home, 144 B.R. [951,] 955 [S.D.N.Y. 1992]; 176-60 Union Turnpike v. Howard Beach Fitness Center, 209 B.R. 307, 311, n. 2 (S.D.N.Y. 1997) (Sprizzo, J.). Matters involving the enforcement or construction of a bankruptcy court order are in this category.

In re Sterling Optical Corp., 302 B.R. 792, 801 (Bankr. S.D.N.Y. 2003). Plaintiffs here sue for fraud. Such a claim is not one that "*by its very nature* . . . can only be brought in a bankruptcy action." Rather, it is a garden-variety common-law claim that most usually is brought outside of bankruptcy.

The type of administrative matters cited in Collier, and in Sterling, as examples of "arising in" jurisdiction are closely tied to the administration of the estate itself. Actions such as motions for contempt of bankruptcy court orders, motions to change the composition of a creditors' committee or appoint or elect trustees or examiners, are matters that, while the cause of action is not created by title 11, could not "have been the subject of a lawsuit absent the filing of a bankruptcy case." Collier, ¶ 3.01[4][c][iv]. The mere fact that the cause of action would never have arisen absent this particular bankruptcy is not enough to confer jurisdiction.

Nevertheless, the claims at issue here are more closely connected to the administration of the bankruptcy than most garden-variety common-law claims. There is persuasive precedent for treating a state-law tort suit regarding the conduct of professionals involved in the administration of the bankruptcy estate as a matter that "arises in" a bankruptcy case. In re Southmark Corp., 163 F.3d 925 (5th Cir. 1999), involved a professional malpractice action against an accounting firm that worked for the court-appointed Examiner in a bankruptcy reorganization. When the defendant removed the case to the bankruptcy court that had presided over the reorganization, the plaintiff argued, like plaintiffs here, that mandatory abstention applied because the bankruptcy court's jurisdiction was of the "related to" variety because the matter was not a "core" bankruptcy proceeding. Id. at 928-29. Like plaintiffs here, the plaintiff in Southmark argued that its claims were simple state common-law tort claims that were not the sort that could arise only in a bankruptcy action, since "Southmark could have sued any accounting firm that worked for it on similar grounds of disloyalty, non-disclosure and malpractice." Id. at 930-31.

The Fifth Circuit rejected the argument, finding that "the professional malpractice claims alleged against [the accounting firm] are inseparable from the bankruptcy context." Id. at 931. The court's reasoning is instructive, and is applicable here:

> A *sine qua non* in restructuring the debtor-creditor relationship is the court's ability to police the fiduciaries, whether trustees or debtors-in-possession and other court-appointed professionals, who are responsible for managing the debtor's estate in the best interest of creditors. The bankruptcy court must be able to assure itself and the creditors who rely on the process that court-approved managers of the debtor's estate are performing their work, conscientiously and cost-effectively.

Id.

Here, too, plaintiffs' claims go directly to the proper performance of duties by professionals retained by the bankruptcy estate, with the approval of the Bankruptcy Court, to assist it in maximizing the assets of the estate.  As the <u>Southmark</u> court pointed out, "[s]upervising the court-appointed professionals also bears directly on the distribution of the debtor's estate.  If the estate is not marshaled and liquidated or reorganized expeditiously, there will be far less money available to pay creditors' claims."  <u>Id</u>.  Here, of course, the claim is not brought by the bankruptcy estate itself, and the claim is rather that the professionals advising the estate obtained *excessive* compensation by defrauding the purchaser of the estate's assets.  But the matter is still intimately related to the administration of the bankruptcy.  The Bankruptcy Court has a vital interest in policing the integrity of the bankruptcy process in general, and of the sales of estate assets under the court's supervision in particular.

The Bankruptcy Court itself recognized the importance of the sale to its on-going administration of the case.  Its order approving the sale expressly provides that the Delaware Bankruptcy Court retains "exclusive jurisdiction to . . . resolve any dispute arising under or related to the Asset Purchase Agreement."  (Sale Order ¶ 15, Gold Decl. Ex. 2.)  This language is broad, encompassing not merely contract disputes or disputes between the parties to the APA themselves, and at a minimum expresses the Bankruptcy Court's keen interest in the resolution of disputes relating to the sale of Old Winstar's assets.  It plainly covers the dispute at hand, which unquestionably is a dispute "related to" the APA.[2]

---

[2] Plaintiffs cannot be surprised by being asked to litigate a matter relating to the APA in the Delaware Bankruptcy Court, as they themselves agreed in the APA to a choice of forum clause in which they "irrevocably submit to the exclusive jurisdiction" of that court "over any dispute arising out of or relating to this Agreement," and waived any objection to venue in that court.  (APA § 9.10, Gold Decl. Ex. 1.)  Defendants do not contend that this clause of the APA,

The Second Circuit has construed the core jurisdiction of the bankruptcy courts "as broadly as possible," because wide bankruptcy jurisdiction is "essential to the efficient administration of bankruptcy proceedings." Luan Investment S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.), 304 F.3d 223, 229 (2d Cir. 2002). Given this jurisdictional sweep, it is clear that this is a case "arising in" the Old Winstar bankruptcy case.

C.    Abstention

Since this case "aris[es] in" a bankruptcy case and is not merely "related to" a bankruptcy case, mandatory abstention under 28 U.S.C. § 1334(c)(2) by its own terms does not apply. However, this Court may still, in its discretion, abstain from hearing the proceeding "in the interest of justice, or in the interest of comity with State courts or respect for State law." 28 U.S.C. § 1334(c)(1). Such abstention is not appropriate here.

Federal courts should be "sparing" in their exercise of discretionary abstention. In re Texaco Inc., 182 B.R. 937, 946-47 (Bankr. S.D.N.Y. 1995), citing New Orleans Public Serv., Inc. v. Council of the City of New Orleans, 491 U.S. 350, 358 (1989), Willcox v. Consolidated Gas Co., 212 U.S. 19, 40 (1909), and Chicot County v. Sherwood, 148 U.S. 529, 534 (1893). There is little basis to invoke comity to the state courts here, and every reason to invoke the federal jurisdiction. Although plaintiffs' claims are based on state law, the state law claims are straightforward common-law claims that do not involve arcane or idiosyncratic provisions of New York law. As the case was promptly removed, the New York courts have invested no effort in the case.

---

to which they were not parties, of itself controls the outcome of this motion. At a minimum, however, it reflects plaintiffs' own understanding that the Delaware Bankruptcy Court is the proper forum for disputes about the sale of Old Winstar.

In contrast, the matter is closely tied to the bankruptcy case. The very sale that is the subject of the proceedings was a central aspect and basic function of the bankruptcy proceedings. The sale of Old Winstar's assets was pursuant to directives issued by the Bankruptcy Court, and the APA was specifically approved by that court. The conduct of the debtor and its advisors (who were retained with the approval of the Bankruptcy Court) that is the subject of the plaintiffs' claims is post-petition conduct that took place under the Bankruptcy Court's auspices. Although the plaintiffs' claims are asserted as tort claims of fraud in the inducement, the evaluation of those claims will necessarily involve the interpretation of the Bankruptcy Court-approved APA, which contains provisions (including a merger clause, APA §9.13; two disclaimers of warranties, id. §§ 5.10, 9.3; and an "as is" clause, id. § 5.10) that are arguably inconsistent with plaintiffs' claims, and of the Bankruptcy Court's own orders and findings (including a finding that the consideration was fair and reasonable and a finding that the APA was negotiated in good faith, Order ¶¶ G, H). Most significantly, both the plaintiffs and the Bankruptcy Court expressly stipulated that the Bankruptcy Court would be the exclusive forum for resolving claims related to the sale.

Under all these circumstances, common sense dictates the conclusion that the Bankruptcy Court is the proper forum for resolving these disputes, and that the Court should exercise its discretion to direct the case to that forum.[3]

---

[3] For the same reasons that abstention is inappropriate, the closely-related doctrine of equitable remand, 28 U.S.C. § 1452(b), is also inapplicable here.

11

II.    Defendants' Motion to Transfer

In light of the above discussion, little further need be said regarding defendants' motion to transfer the case to the United States District Court for the District of Delaware for referral to its Bankruptcy Court.  The *only* reason why this case belongs in federal court is because of its close association to the Old Winstar liquidation proceedings in Delaware.  The case "arises in" those proceedings, the Delaware Bankruptcy Court reserved its jurisdiction to deal with matters related to the bankruptcy sale that is the subject of this proceeding, and the defendants are accused of fraud in executing a sale that was ordered and approved by that court.

There is a strong argument that venue must be laid in Delaware under the APA's mandatory choice of forum clause.  As the Second Circuit has held, a contract clause electing a forum for all disputes "arising out of or related to" the contract encompasses claims of fraudulent inducement.  Turtur v. Rothschild Registry Int'l., 26 F.3d 304, 309-10 (2d Cir. 1994).  Although defendants are not parties to that clause, plaintiffs are.  The plaintiffs agreed to resolve any disputes related to the APA in the Delaware Bankruptcy Court.  Moreover, the defendants are sued for wrongdoing that essentially without exception is charged to have been committed jointly with the plaintiffs' counterparty in the APA, Old Winstar.  Weingrad v. Telepathy, Inc., No. 05 Civ. 2024, 2005 WL 2990645, at *5-6 (S.D.N.Y. Nov. 7, 2005).

But even if transfer is not mandatory pursuant to 28 U.S.C. § 1406, discretionary transfer under § 1404(a) in the interests of justice is clearly appropriate.  As noted above, the whole point of federal jurisdiction here is the close connection of the case to the bankruptcy proceedings.  There is no plausible rationale for removing the case to federal court in order to decide it in a forum remote from the court where that proceeding is pending.  Plaintiffs seek to avoid this

obvious point by retreating to a conventional analysis of the factors ordinarily applicable in

deciding transfer applications. Even if their convenience arguments did not ring hollow – and

they do, where the physical distance between the courts involved is a short train ride and given

that in real-world modern litigation the greatest expenditure of litigation effort in most cases

takes place away from court – the plain fact is that in entering the APA plaintiffs "irrevocably

waive[d]" any objections to venue in the District of Delaware on grounds of inconvenience.

## CONCLUSION

For the reasons stated above, plaintiffs' motion to remand is denied and defendants'

motion to transfer the case to the United States District Court for the District of Delaware is

granted.

SO ORDERED.

Dated: New York, New York
      December 10, 2007

                                      GERARD E. LYNCH
                                   United States District Judge