HERRICK, FEINSTEIN LLP
Andrew C. Gold (ACG-4875)
Two Park Avenue
New York, NY 10016
(212) 592-1400
*Attorneys for Defendant,*
*Impala Partners, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



- - - - - - - - - - - - - - - - - - - - - - - x

WINSTAR HOLDINGS, LLC and
IDT CORP.,

                Plaintiffs,

-against-

THE BLACKSTONE GROUP LP; IMPALA
PARTNERS, LLC; and CITICORP,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - x

**NOTICE OF REMOVAL**

RECEIVED
JUN 0 1 2007
U.S.D.C. S.D. N.Y.
CASHIERS

TO:    THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF NEW YORK

    Defendant Impala Partners, LLC ("Impala") by its attorneys, Herrick, Feinstein LLP

respectfully applies for the removal of this civil action to the United States District Court for the

Southern District of New York, and that, upon such a removal, it be transferred to the United

States Bankruptcy Court for the District of Delaware, and states as follows:

    1.      On or about April 18, 2001, Winstar Communications, Inc. ("Winstar" or the

"Debtor") and certain of its subsidiaries and affiliates each filed a petition for relief under

chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code") in the

United States Bankruptcy Court for the District of Delaware, (the "Bankruptcy Court") entitled

HF 3651621v.1 #10069/0000

In re Winstar Communications, Inc. et al., bearing case number 01-1430 (KJC) (the "Bankruptcy Case"). As set forth below, Impala was retained as the restructuring advisor to Winstar and a principal of Impala, Paul Street, served as the Debtor's Chief Restructuring Officer.

2.     In this Notice of Removal, Impala is exercising its right pursuant to 28 U.S.C. §1452, et. seq., and Federal Rules of Bankruptcy Procedure 9027, to remove a pending state court action entitled Winstar Holdings, LLC and IDT Corp., v. The Blackstone Group LP, Impala Partners, LLC and Citicorp,[1] Index No. 601582/07 (the "State Court Action") from the Supreme Court of New York, County of New York (the "State Court"), to the United States District Court for the Southern District of New York, with the request that this action, upon removal, be transferred to the United States Bankruptcy Court for the District of Delaware (Honorable Kevin J. Carey, U.S.B.J., presiding) for the reasons set forth herein.

3.     Plaintiffs filed the State Court Action on or about May 10, 2007. A copy of the Summons and Complaint are attached as Exhibit "A" in accordance with Rule 9027(1) of the Federal Rules of Bankruptcy Procedure. If any additional documents relating to the State Court Action are required, Impala will submit such documents.

4.     The Southern District of New York encompasses New York County, the place where the State Court Action is pending.

5.     This Court has original jurisdiction over this State Court Action pursuant to 28 U.S.C. § 1334(b), and it is hereby removed to this Court under the provisions of 28 U.S.C. §§ 1452(a) and 1446. The State Court Action is properly removable because of its close connection to the Debtor's Chapter 11 proceedings pending in the Bankruptcy Court.

---

[1]     Impala is advised that the remaining defendants, The Blackstone Group LP and Citicorp consent to removal.

6.    28 U.S.C. § 1452(a) provides as follows:

(a) A party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit's police or regulatory power, to the district court where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.

7.    The State Court Action, including all claims and causes of action asserted therein, is a civil action other than a proceeding before the United States Tax Court; and is not a civil action by a governmental unit to enforce such governmental unit's police or regulatory power. The State Court Action was initiated after to the commencement of the Bankruptcy Case.

8.    In the Complaint, Plaintiff Winstar Holdings, LLC (formerly known as IDT Winstar Acquisition, Inc.) asserted claims against Impala, and the other named defendants for alleged misrepresentations and fraud in connection with the sale of the substantially all of the Debtor's assets to the Plaintiffs, pursuant to a certain bankruptcy Asset Purchase Agreement amongst IDT Winstar Acquisition, Inc., as purchaser, and Winstar Communications, Inc. and certain of its subsidiaries, as sellers, dated December 18, 2001 (the "APA") which sale was approved by the United States Bankruptcy Court for the District of Delaware. The Bankruptcy Court entered an order on December 19, 2001 (the "Sale Order") approving the sale of the Debtor's assets under the APA.

9.    Paragraph 15 of the Sale Order, a copy of which is annexed as <u>Exhibit "B"</u>, contains the following provision, preserving the jurisdiction of the Bankruptcy Court:

"This Court retains and shall have jurisdiction to endorse and implement the terms and provisions of the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection

3

therewith (including the Management Agreement) in all respects, including but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Buyer, (b) compel delivery of the purchase price or performance of other obligations owed to the Debtors, (c) resolve any disputes arising under or related to the Asset Purchase Agreement, and (d) interpret, implement, and enforce the provisions of the Asset Purchase Agreement and this Sale Order."

10.    The APA contains at least two provisions, copies of which are annexed as <u>Exhibit "C"</u>, pursuant to which the Plaintiffs irrevocably submitted to the jurisdiction of the Bankruptcy Court to hear all disputes arising out of or relating to the APA as follows:

"<u>The parties hereto irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court (or any Court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement or any other agreement</u> or instrument contemplated hereby or entered into in connection herewith or any of the transactions contemplated hereby or thereby. Each party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such dispute or proceedings may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such state court or any defense of inconvenient forum in connection therewith." (Section 9.10, emphasis added.)

11.    Further, Section 9.15 of the APA, entitled "*Remedies*" states that,

"Subject to Section 9.3, the Sellers and the Buyer hereby acknowledge and agree that money damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement and that, in such event, the Sellers or their successors or assigns, or the Buyer or its successors or assigns, as the case may be, may, in addition to any other rights and remedies existing in their favor, apply to the Bankruptcy Court *[note- the phrase, "or any other court of competent jurisdiction" was struck from the signed version]* for specific performance,

4

injunctive and/or other relief in order to enforce or prevent any
violations under this Agreement."

12.     As the title to 28 U.S.C. § 1452 itself indicates, ("Removal of Claims related to

"bankruptcy cases"), matters that can be removed include claims "related to" a bankruptcy case

within the meaning of 28 U.S.C. § 1334(b).

13.     Defendant Impala requests that upon removal, the instant matter be transferred to

the Bankruptcy Court of the District of Delaware, which has core jurisdiction to adjudicate the

claims asserted by Plaintiffs.   The Second Circuit has construed a bankruptcy court's core

jurisdiction "as broadly as possible" so as to be "close to or congruent with constitutional limits."

*Luan Investment S.E. v. Franklin 145 Corp. (In re Petrie Retail)*, 304 F.3d 223, 229 (2d Cir.

2002) (internal quotations and citations omitted).   This jurisdiction reach is "essential to the

efficient administration of bankruptcy proceedings." Id.   Although some of Plaintiffs' claims are

nominally state law claims, the relief requested implicates the Bankruptcy Court's authority to

oversee the implementation of the APA.

14.     Bankruptcy courts may also adjudicate state law claims pursuant to "arising in"

jurisdiction when those claims are at the "heart" of the administration of the bankruptcy estate, as

is the case here. *See, e.g., Central Vermont Public Serv. Corp.*, 341 F.3d 186, 191 (2d Cir. 2003)

(citing *In re Ben Cooper*, 896 F.2d 1394, 1399 (2d Cir. 1991)).   The removal of this State Court

Action will assist in administering the Debtor's estate by avoiding concurrent proceedings

addressing the same subject matter, because the Debtor has agreed to indemnify Impala and Paul

Street.

5

15.    Pursuant to Annex "A" of Impala's retention agreement which was approved by the Bankruptcy Court, a copy of which is annexed as Exhibit "D", the Debtor agreed to indemnify Impala for, *inter alia*, any losses claims, damages or liabilities brought by any third party. Removing the instant action to the Bankruptcy Court, which is already fully familiar with the facts alleged in Plaintiffs' Complaint, will prevent the Trustee from being forced to waste estate resources by unnecessary devoting efforts in two separate forums.

16.    To the extent that the Bankruptcy Court does not possess core jurisdiction over Plaintiffs' claims, it possesses "related-to" jurisdiction over them.  A proceeding meets the jurisdictional threshold of 28 U.S.C. § 1334(b) if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.  *See, e.g., In re Cayahoga Equipment Corp.*, 980 F.2d 110, 114 (2d Cir. 1992) (stating the bankruptcy court has "related to" jurisdiction over any action that might have a "conceivable effect" on the bankrupt estate).  Here, the resolution of Plaintiffs' claims will directly affect whether there are additional monies available for distribution to the Debtor's creditors.

17.    No previous application has been made for this or any similar relief.  Pursuant to Rule 9027(c) of the Federal Rules of Bankruptcy Procedure, after the filing of this Notice of Removal, Impala shall hereby give written Notice of Filing of Notice of Removal (a copy of which is attached hereto as Exhibit "E") to Plaintiffs and shall file a copy of the Notice of Filing of Notice of Removal with the Clerk of the Supreme Court of the State of New York, County of New York.

HF 3651621v.1 #10069/0000

WHEREFORE, Defendant, Impala Partners, LLC, respectfully requests that that matter of <u>Winstar Holdings, LLC and IDT Corp., v. The Blackstone Group LP., Impala Partners, LLC and Citicorp</u>, presently pending in the Supreme Court of the State of New York, County of New York, be removed to this Court, that this Court accept jurisdiction of said action, and, upon acceptance of jurisdiction, transfer this matter to the Honorable Kevin J. Carey of the United States Bankruptcy Court for the District of Delaware.

Dated:   New York, New York
         June 1,  2007

                                   Respectfully submitted

                                   _____
                                   Andrew C. Gold (ACG-4875)
                                   HERRICK, FEINSTEIN LLP
                                   2 Park Avenue
                                   New York, NY 10016
                                   (212) 592-1400

                                   *Attorneys for Defendant,*
                                   *Impala Partners, LLC*

7

HF 3651621v.1 #10069/0000

**EXHIBIT A**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ORIGINAL

---

WINSTAR HOLDINGS, LLC and
IDT CORP.,

                  Plaintiffs,

       -against-

THE BLACKSTONE GROUP LP;
IMPALA PARTNERS, LLC; and
CITICORP,

                  Defendants.

---

:   Index No.
:   Date Purchased
:
:   Plaintiff designates NEW YORK   07601582
:   County as the place of trial.
:
:   The basis of this venue is
:   residence of defendants; location where the cause
:   of action arose; and Plaintiffs' designation.
:
:   **SUMMONS**
:
:   Plaintiffs reside at
:   520 Broad Street
:   Newark, New Jersey
:   County of Essex

FILED
MAY 10 2007
NEW YORK
COUNTY CLERKS

To the above named Defendants:

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer on the Plaintiffs' Attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:   New York, New York
        May 10, 2007

                  MOUND COTTON WOLLAN & GREENGRASS

                  Philip C. Silverberg, Esq.
                  Gretchen Henninger, Esq.
                  One Battery Park Plaza
                  New York, NY   10004-1486
                  Telephone: (212) 804-4200

and

Melissa Roover, Esq.
GRAYSON & KUBLI, P.C
1420 Spring Hill Road, Suite 230
McLean, VA 22102
(703) 749-0000

Attorneys for Plaintiffs
WINSTAR HOLDINGS, LLC and
IDT CORP.

TO:    The Blackstone Group LP
        345 Park Avenue
        New York, NY 10154

        Impala Partners, LLC
        18 Marshall Street, Suite 112
        Norwalk, CT 06854

        Citicorp
        399 Park Avenue
        New York, NY 10043

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------------X
WINSTAR HOLDINGS, LLC,
 and IDT CORP.,                                                    Index No.:

                              Plaintiffs,

        -against-

THE BLACKSTONE GROUP LP;                              <u>COMPLAINT</u> 7601582
IMPALA PARTNERS, LLC; and
CITICORP,

                              Defendants.
--------------------------------------------------------------------X

        Plaintiffs, Winstar Holdings, LLC and IDT Corp., by and through its attorneys, Mound

Cotton Wollan & Greengrass, as and for its complaint against Defendants, The Blackstone

Group LPI, Impala Partners, LLC, and Citicorp, hereby allege as follows:

        1.       In 2001, Plaintiffs spent $42.5 million to acquire the business assets of Winstar

Communications, Inc., and related entities ("Old Winstar").  In doing so, they relied on the oral

and written misrepresentations of the Defendants regarding  Old Winstar sales, customers, and

other material information.  As a result, the Plaintiffs lost hundreds of millions of dollars.  The

Plaintiffs bring this action to recover for those injuries.

                                       **PARTIES**

        2.       Plaintiff Winstar Holdings, LLC, formerly known as IDT Winstar Acquisition,

Inc. ("New Winstar"), is a Delaware corporation.  It acquired the business assets of Old Winstar

in an Asset Purchase Agreement dated December 18, 2001.

3.      Plaintiff IDT Corp. ("IDT") is a Delaware corporation.  It is, among other things, a telephone company.  It provided the funds for the purchase of Old Winstar, and bore most of the resulting subsequent losses.

4.      Defendant The Blackstone Group LP ("Blackstone") is a Delaware limited partnership.  Its principal office is at 345 Park Avenue, New York, NY 10154.   In the sale of Old Winstar's assets, it acted as an investment advisor to various entities related to Old Winstar.

5.      Defendant Impala Partners, LLC ("Impala") is a Delaware limited partnership.  Its principal office is at 18 Marshall Street, Suite 112, Norwalk, Connecticut 06854.   Upon information and belief, at the time of the sale of Old Winstar's assets, it was acting as a restructuring advisor for Old Winstar.

6.      Defendant Citicorp ("Citicorp") is a Delaware corporation.  Its principal office is at 399 Park Avenue, New York, New York 10043.  It was the largest creditor of Old Winstar while Old Winstar was a debtor in bankruptcy.  Impala's actions are, in large part, attributable to Citicorp because Citicorp acted as Impala's principal.  Allegations regarding Citicorp include, but are not limited to, allegations regarding Impala that are imputed to Citicorp.

## JURISDICTION AND VENUE

7.      The Supreme Court of the State of New York, as a court of general original jurisdiction, has subject matter jurisdiction of this action.

8.      Personal jurisdiction exists in this action because, among other reasons: the Defendants transact business within the state or contracted to supply goods or services within the state; have committed a tortious act within the state; and own, use or possess real property within the state.

2

9.      Venue lies in this County because Defendants Blackstone's and Citicorp's principal offices are located in this County, the cause of action arose in the county, and the Plaintiffs designate the county.

## ALLEGATIONS

10.     In and around 2001, IDT examined several potential acquisitions in the field of telecommunications.

11.     Through 2001, Old Winstar provided telephone service to customers using a "fixed wireless" system. This system carried calls locally by wireless means, from customer locations to Old Winstar's local "hubs."

12.     On information and belief, Old Winstar maintained an office in New York City. It also maintained some of its books and records in New York City.

13.     Old Winstar was a publicly traded company. On April 18, 2001, Old Winstar petitioned for protection under Chapter 11 of the U.S. Bankruptcy Code. The bankruptcy petition was filed in the U.S. Bankruptcy Court for the District of Delaware.

14.     On information and belief, Blackstone was retained as a financial advisor, and Blackstone's responsibility was to obtain the highest possible sale price for the assets of Old Winstar. Upon information and belief, Blackstone's compensation varied with the sale price that it obtained for Old Winstar's assets. Specifically, Blackstone received, *inter alia,* a transaction fee equal to 1% of the first $200 million of consideration paid by an acquirer. This provided Blackstone with an incentive to maximize – or inflate -- that consideration.

15.     The division of Blackstone performing the financial advisory work for Old Winstar was Blackstone's Restructuring & Reorganization Advisory Group. This group claims

3

to have provided advisory services in over 150 "distressed situations." On information and belief, it is an unincorporated division of Blackstone.

16.    At all relevant times, the head of Blackstone's Restructuring & Reorganization Advisory Group was Arthur Newman ("Newman"). Newman also was a member of Blackstone's Executive Committee. The Executive Committee oversees all of Blackstone's policy decisions.

17.    Upon information and belief, Old Winstar retained Impala as a restructuring advisor, for the purpose of providing restructuring advice and other related services in connection with Old Winstar's Chapter 11 bankruptcy proceedings. As compensation, Impala charged Old Winstar $250,000 per month for the first two months of its services. Thereafter, Impala's compensation was $100,000 per month for the services of Paul Street, who acted as the Chief Restructuring Officer for Old Winstar. Impala charged various other amounts for other Impala personnel. In addition, upon the sale of all or substantially all of Old Winstar's assets, in one or more transactions, in which the aggregate consideration paid by the purchaser was less than $350 million, Impala earned a transaction fee of 0.25% of such consideration. Upon the sale of all or substantially all of the Old Winstar's assets, in one or more transactions, in which the aggregate consideration paid by the purchaser was equal to or greater than $350 million, Impala earned a transaction fee of 2.0% of such consideration. Thus Impala was motivated to obtain the highest possible sale price for the Winstar assets.

18.    Upon information and belief, Citicorp, as Old Winstar's largest creditor, assisted Old Winstar in negotiating its contract terms with Impala. Citicorp acted as Impala's principal.

19.    To promote the sale of Old Winstar's business assets, Blackstone prepared an offering statement. Upon information and belief, Impala assisted with the preparation of the

4

offering statement. Blackstone, Citicorp, and Impala also controlled bidder access to Winstar staff, and Winstar records.

20.    In connection with the sale of Old Winstar's business assets, Blackstone, Citicorp, and Impala assisted in the development of financial data and presentations to Old Winstar's Board of Directors, various creditors and other parties. Blackstone reviewed financial analyses generated by Old Winstar's finance staff and external advisors. Blackstone also performed various analyses, including cash reconciliation of Old Winstar's actual performance vs. various sets of projections. Blackstone petitioned for payment for this work, and the petition was granted.

21.    IDT was one of several entities that expressed an interest in acquiring Old Winstar's business assets.

22.    An auction of Old Winstar's business assets was planned for December 2001. Leading up to that auction, Blackstone circulated an "offering book." Blackstone also met with IDT and, on information and belief, other entities interested in bidding in the auction. In meetings organized by Blackstone, several Winstar officials also met with IDT and, on information and belief, other interested entities. The meetings generally were held within this County. Certain Old Winstar business records also were made available to IDT at that time, generally in an area known as the "data room," which was located within this County. Collectively, this communication and review was known as "due diligence."

23.    In accordance with the timing established for the auction, IDT's due diligence was conducted between Friday, November 30, 2001, and Wednesday, December 5, 2001.

24.    A number of IDT representatives engaged in this due diligence.

5

25.    Blackstone's representatives included Arthur Newman.   Newman engaged in substantive discussions about Old Winstar's business with representatives of IDT,   Howard Jonas, *inter alia.*

26.    Impala's representatives included Paul Street.

27.    Old Winstar's representatives included Chief Financial Officer David Duncan, *inter alia.*

28.    During this due diligence, Blackstone, Impala, and Old Winstar each made the following material representations (*inter alia*) regarding the status of Old Winstar's business:

    a.    that Old Winstar's business was generating $16 million or more per month in revenue;

    b.    that Old Winstar's "cash burn" (*i.e.*, losses) had been reduced to $10-12 million per month;

    c.    that Old Winstar had 9,000 paying customers;

    d.    that Old Winstar had 50,000 revenue-generating telephone lines;

    e.    that Old Winstar's "churn rate" (the rate at which existing customers discontinued service) was only 3% per year; and

    f.    that Old Winstar was employing an intercity optical network built by Lucent (the "Lucent network") to serve Old Winstar's customers.

29.    On occasions when Old Winstar made these representations, they were made in the presence of Blackstone, Citicorp, and Impala; and Blackstone, Citicorp, and Impala did not dispute them, even though they knew or should have known that these representations were false, and that the plaintiffs would rely on these representations.

30.    Each of these representations was false and fraudulent.  The truth, known to the Defendants but not to IDT, was as follows:

    a.    that Old Winstar's business was generating substantially less than $16 million per month in revenue, and its revenue was declining;

6

b.      that Old Winstar's cash burn was materially higher than $10-$12 million per month;

c.      that Old Winstar had far fewer than 9,000 paying customers, and indeed was providing service to many customers who were not paying Old Winstar;

d.      that Old Winstar had far fewer than 50,000 revenue-generating telephone lines, and in fact was carrying and paying for many lines that were not generating any revenue;

e.      that Old Winstar's "churn rate" was far higher than 3%, in part because Old Winstar continued to maintain and pay for telephone lines, and count them as revenue-generating, long after customers had discontinued service; and

f.      that the Lucent network carried no Old Winstar customer traffic in or around December 2001 and, indeed, most of the Lucent network never would.

31.     Notably, despite this information being solely within their possession, Blackstone, Impala, Citicorp, and Old Winstar did not provide client information in any detail that would have allowed IDT and New Winstar to uncover the Defendants' false statements and material omissions.

32.     Indeed, Blackstone, Citicorp and Impala fraudulently withheld information within their possession, custody or control, including but not limited to the following: (a) that Winstar was required to continue to serve federal and other customers without regard to profit, and (b) that local telephone companies could extort concessions from Old Winstar by threatening to discontinue termination of calls placed by Old Winstar customers.

33.     On information and belief, Blackstone, Citicorp, Impala, and Old Winstar all hid and blocked IDT's access to material information about Old Winstar's finances and operations. Indeed, IDT had no access to this important information.

7

34.    The figures in the documents that were offered to IDT, including receivables reports, historical financial statements and contract summaries, were heavily distorted by (*inter alia*) Old Winstar's recording of revenue – sometimes for years – from customers who had discontinued service.

35.    Unaware of the true state of Old Winstar's affairs, IDT established New Winstar, for the purpose of acquiring Old Winstar's business assets.  IDT injected a substantial amount of capital into New Winstar.

36.    The information that Blackstone, Impala, and Old Winstar provided during due diligence regarding Old Winstar's business and operations was material to IDT's decision to acquire Old Winstar's business assets.  Upon information and belief, Blackstone, Citicorp, and Old Winstar knew that this information was false, or they were negligent in not knowing that. Blackstone and Old Winstar intended that IDT and New Winstar would rely upon this information. IDT and New Winstar did rely upon this information.  This reliance was reasonable. IDT and New Winstar were deceived by this information.

37.    The information that Blackstone, Impala, Citicorp, and Old Winstar omitted to provide during due diligence regarding Old Winstar's business and operations was material to IDT's decision to acquire Old Winstar's business assets.  Upon information and belief, Blackstone and Old Winstar knew that this information was material, or they were negligent in not knowing that.  Blackstone and Old Winstar intended that IDT and New Winstar would rely upon the absence of this information. IDT and New Winstar did rely upon the absence of this information.  This reliance was reasonable.  IDT and New Winstar were deceived by the failure to disclose this information.

38.    As a direct and proximate result of the Defendants' misrepresentations and omissions, IDT and New Winstar submitted a bid in the auction for Old Winstar's assets, conducted on December 5, 2001. Absent the misinformation provided by Blackstone and Old Winstar, Plaintiffs would not have done so.

39.    The apparent successful offeror in the auction was an entity other than IDT/New Winstar. That entity was related to William J. Rouhana, Jr., the former Chairman of the Board and CEO of Old Winstar. Despite this, Blackstone encouraged IDT to remain interested in purchasing Old Winstar's assets.

40.    On information and belief, the Rouhana entity was unable or unwilling to close the transaction.

41.    Between December 5, 2001 and December 17, 2001, there was no opportunity for any further due diligence by IDT because the Defendants did not permit it.

42.    On or about December 17, 2001, IDT learned that the Rouhana entity had failed to purchase Old Winstar's assets. The bankruptcy court required IDT to sign an agreement for these assets (if IDT desired to purchase them) by noon on the following day.

43.    As a result of the Defendants' misrepresentations and omissions, on or about December 18, 2001, Old Winstar and New Winstar entered into an Asset Purchase Agreement (the "Agreement") for the transfer of Old Winstar's business assets, and certain other assets.

44.    On or about December 19, 2001, the bankruptcy court approved the Agreement.

45.    On or about December 20, 2001, the Agreement closed, *i.e.,* payment was made and assets were transferred. On or around that date, New Winstar took over the operation of Winstar's business.

9

46.    New Winstar appointed employees to collect on accounts receivable. In many cases, the purported "customers" told those employees that service had been canceled years earlier, yet Old Winstar had continued to bill for the service.

47.    New Winstar learned that Old Winstar had inflated its reported revenue by a variety of means, including "swaps" (pairs of companies each reporting revenue from the other, without any actual payment), "dead" accounts, and "made-up" billing.

48.    As a result of the misrepresentations and material omissions during due diligence, New Winstar's revenues were materially less than represented. Between August 1, 2001 and July 31, 2002, a period that included several months preceding the asset purchase, Winstar's revenue was only $79.6 million, or less than $7 million a month. During the following year (8/02 - 7/03), revenue was only $87.5 million, and the year after that (8/03 - 7/04), revenue was only $71.6 million. In other words, Old Winstar's revenues had been overstated by over 200%.

49.    Much later, Winstar's business was sold to an entity independent of IDT.

50.    As a direct and proximate result of Blackstone's, Citicorp's, and Impala's tortuous misconduct, IDT and New Winstar have suffered losses of over $300 million.

## FIRST CAUSE OF ACTION
### (Fraud)

51.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 50 as if fully set forth herein.

52.    Blackstone, Citicorp, and Impala knowingly engaged in the various deceitful means enumerated above to deprive IDT and New Winstar of their property permanently.

53.    More specifically, Blackstone, Citicorp, and Impala made numerous false representations of material fact and material omissions, as set forth above and below. The Defendants knew that these representations and material omissions were false, or they made

10

them with reckless disregard for their truth or falsity. Blackstone, Citicorp, and Impala intended IDT and New Winstar to rely on these false statements and omissions. IDT and New Winstar reasonably relied on them. As a result, IDT and New Winstar were injured.

54.    The Defendants' false statements and material omissions were not mere projections or promises to perform, but actual representations of existing fact known only to the Defendants.

55.    The representations were made by individuals acting as agents of Blackstone, Citicorp, and Impala, who acted within the scope of their employment.

56.    The representations and omissions were made in New York, within this County. They were made during November and December 2001, by means of telephone, faxes, e-mail, in person, and indirectly through other authorized agents and through documents, as explained above.

57.    Blackstone, Citicorp, and Impala knew that these misrepresentations were false and the omissions material, or acted in reckless disregard for their truth or falsity.

58.    Blackstone, Citicorp, and Impala intended that IDT and New Winstar rely upon these misrepresentations and omissions, because they sought fraudulently to induce IDT and New Winstar to enter into the Agreement, and they sought to profit from that agreement. IDT and New Winstar reasonably relied on these misrepresentations and omissions.

59.    Blackstone, Citicorp, and Impala also failed to inform IDT and New Winstar of numerous material facts. For instance, Blackstone, Citicorp, and Impala  failed to inform IDT and New Winstar that Old Winstar customers who had terminated service continued to be counted as Old Winstar customers, that Old Winstar continued to book revenue from such customers, and that Old Winstar continued to pay for telephone lines to service such customers.

11

As alleged above, Blackstone, Citicorp, and Impala also fraudulently withheld the material information that Winstar was required to continue to serve federal and other customers without regard to profit, and that local telephone companies could extort concessions from Winstar by threatening to discontinue termination of calls placed by Winstar customers. These all were material fraudulent omissions that Blackstone, Citicorp, and Impala had a duty to disclose to IDT and New Winstar.

60.    If IDT and New Winstar had known the truth regarding Winstar's finances and operations, they would not have entered into the Agreement. They would have retained the purchase price under that Agreement, and they would have avoided the losses that they necessarily experienced as a direct result of acquiring Old Winstar's business assets. Therefore they have been injured.

61.    For the reasons alleged above, Blackstone, Citicorp, and Impala acted recklessly, willfully and wantonly. Their conduct was gross, and morally reprehensible. Blackstone, Citicorp, and Impala exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.

61.    For the reasons alleged above, IDT and New Winstar are entitled to the following relief against Blackstone, Citicorp and Impala:

    a.    A monetary award of compensatory damages for fraud;

    b.    A monetary award of punitive damages in the maximum amount permitted by law;

    c.    Interest and costs; and

    d.    Such further relief as the Court deems just.

## SECOND CAUSE OF ACTION
### (Aiding and Abetting Fraud)

62.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 61 as if fully set forth herein.

63.     Based upon the allegations stated above, IDT and New Winstar are victims of fraud.

64.     Blackstone, Citicorp and Impala knowingly aided and abetted in Old Winstar's commission of fraud, and participated in the fraud, in the manners alleged above.

65.     Blackstone, Citicorp, and Impala's conduct was gross, and morally reprehensible. Blackstone, Citicorp and Impala exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.

66.     IDT and New Winstar suffered significant injury as a direct result of the fraud.

67.     For the reasons alleged above, IDT and New Winstar are entitled the following relief against Blackstone, Citicorp and Impala:

    a.     A monetary award of compensatory damages for aiding and abetting fraud;

    b.     A monetary award of punitive damages in the maximum amount permitted by law;

    c.     Interest and costs; and

    d.     Such further relief as the Court deems just.

## THIRD CAUSE OF ACTION
### (Negligent Misrepresentation)

68.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 67 as if fully set forth herein.

13

69.    Blackstone, Citicorp and Impala made the misrepresentations and omissions to IDT and New Winstar enumerated under the claim for fraud above, directly or indirectly.

70.    The individuals who made the direct misrepresentations to IDT and New Winstar acted as agents for Blackstone, Citicorp and Impala.

71.    Blackstone, Citicorp and Impala owed IDT and New Winstar a duty of care to ensure that its statements to IDT and New Winstar were true.

72.    IDT and New Winstar reasonably and justifiably relied on Blackstone and Impala for accurate information.

73.    Blackstone, Citicorp and Impala intended for IDT and New Winstar to rely upon the information that they provided.

74.    The information that Blackstone, Citicorp and Impala provided to IDT and New Winstar was false, in the manner described under the claim for fraud above.

75.    IDT and New Winstar were injured by the false information that Blackstone, Citicorp and Impala provided to them.

76.    Blackstone, Citicorp and Impala's negligent misrepresentations were willful and wanton.  They acted with such indifference as to whether IDT and New Winstar would be harmed as to be equivalent to an intent to harm them.

77.    Blackstone, Citicorp and Impala's conduct was gross, and morally reprehensible. Blackstone, Citicorp and Impala exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.

78.    For the reasons alleged above, IDT and New Winstar are entitled the following relief against Blackstone, Citicorp and Impala:

        a.    A monetary award of compensatory damages for negligent misrepresentation;

b.    A monetary award of punitive damages on account of Blackstone's willful and wanton negligence, in the maximum amount permitted by law;

c.    Interest and costs; and

d.    Such further relief as the Court deems just.

## FOURTH CAUSE OF ACTION
### (Negligence)

79.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 78 as if fully set forth herein.

80.    Blackstone, Citicorp and Impala are experienced professional organizations in the field of finance.

81.    Blackstone claims to be a world leader in private equity; among the largest in private equity real estate investments; a leader in private mezzanine and structured debt vehicles; and a leader in providing "unconflicted" advice and counsel to senior management. Blackstone's Restructuring & Reorganization Advisory Group claims to be a market leader, having advised in over 150 distressed situations, involving $350 billion of outstanding debt.

82.    Arthur Newman, the head of Blackstone's Restructuring & Reorganization Advisory Group, has forty years of experience, including thirty years in reorganization. He claims to have served as advisor on some of the largest business restructurings in history.

83.    Impala claims to be a world leader in restructuring advice to troubled companies. Impala claims to have been involved in transactions totaling over $7 billion since 1997.

84.    As alleged above, Blackstone, Citicorp and Impala directly and indirectly made representations to IDT and New Winstar regarding Old Winstar's finances and operations. On information and belief, Blackstone, Citicorp and Impala did not exercise due care in ascertaining or disseminating this information.

15

85.     Blackstone, Citicorp and Impala owed IDT and New Winstar a duty of care in ascertaining and disseminating this information.  It was reasonably foreseeable to Blackstone, Citicorp and Impala that their negligence would injure IDT and New Winstar, because IDT and New Winstar would be induced to enter into the Agreement, and then to incur significant additional losses.

86.     Blackstone, Citicorp and Impala failed to exercise reasonable care in this regard. To the contrary, their lack of care was willful and wanton.  They acted with malice, intending to harm IDT and New Winstar, because (on information and belief) the more that IDT and New Winstar paid under the Agreement, the more that Blackstone and Impala could receive as compensation.  In the alternative, Blackstone, Citicorp and Impala acted with such indifference as to whether IDT and New Winstar would be harmed as to be equivalent to intent to harm IDT and New Winstar.

87.     In all other respects, the Defendants failed to act with due care to provide accurate information to IDT and New Winstar.

88.     The natural and probable consequence of the Defendants' negligence was that IDT and New Winstar were induced to enter into the Agreement, and to incur additional subsequent losses, which have caused significant injury to IDT and New Winstar.

89.     Blackstone, Citicorp and Impala's conduct was gross, and morally reprehensible. Blackstone, Citicorp and Impala exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.  They were reckless and willful.

90.     For the reasons alleged above, IDT and New Winstar are entitled the following relief against Blackstone, Citicorp and Impala:

      a.      A monetary award of compensatory damages for negligence;

16

b.    A monetary award of punitive damages on account of the Defendant's willful and wanton negligence, in the maximum amount permitted by law;

c.    Interest and costs; and

d.    Such further relief as the Court deems just.

### FIFTH CAUSE OF ACTION
### (Civil Conspiracy)

91.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 90 as if fully set forth herein.

92.    The Defendants engaged in a combination and conspiracy involving four conspirators:

a.    the officers, employees and agents of Blackstone; and

b.    the officers, employees and agents of Impala; and

c.    the officers, employees and agents of Citicorp; and

d.    the officers, employees and agents of Old Winstar.

93.    These conspirators combined for the purpose of injuring IDT and New Winstar. Specifically, the conspirators sought to deprive IDT and New Winstar of their property interests in the purchase price of the Agreement, and the funds used to pay for subsequent Winstar losses. The Defendants did so not only in the manners alleged above, but also by means of the following overt acts, *inter alia*:

a.    announcing and conducting of the auction;

b.    creating the data room, and the invitation to IDT and New Winstar representatives (and, on information and belief, others) to examine its contents;

c.    engaging in other communications relating to Old Winstar's finances and operations, as alleged above;

d.    the negotiation, preparation and execution of the Agreement; and

17

e.    actions taken to obtain bankruptcy court approval of that Agreement.

94.    The Defendants' conspiracy has caused IDT and New Winstar injury, including the special damages of (*inter alia*) payment of the Purchase Price of $42,500,000 set forth in Section 3.1 of the Agreement. The Defendants' conspiracy deprived IDT and New Winstar of this amount. In addition to this, IDT and New Winstar have suffered special damages for losses incurred following the acquisition of Winstar's business assets, which total approximately $300 million.

95.    The conspirators acted recklessly, willfully and wantonly. Their conduct was gross, and morally reprehensible. They exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.

96.    For the reasons alleged above, IDT and New Winstar are entitled the following relief against Blackstone, Citicorp and Impala:

    a.    A monetary award of compensatory damages for civil conspiracy;

    b.    A monetary award of punitive damages for civil conspiracy, in the maximum amount permitted by law;

    c.    Interest and costs; and

    d.    Such further relief as the Court deems just.

### **JURY REQUEST**

97.    The Plaintiffs request a jury for all issues that may be tried by a jury.

WHEREFORE, IDT and New Winstar seek the following relief against Blackstone, Citicorp and Impala:

18

a.    A monetary award of compensatory damages for fraud; aiding and abetting fraud, negligent misrepresentation, negligence, and civil conspiracy;

b.    A monetary award of punitive damages in the maximum amount permitted by law for fraud, aiding and abetting fraud, negligent misrepresentation, negligence, and civil conspiracy;

c.    Interest and costs; and

d.    Such further relief as the Court deems just.

Dated: New York, New York
       May 10, 2007

MOUND COTTON WOLLAN & GREENGRASS

Philip C. Silverberg, Esq.
Gretchen Henninger, Esq.
One Battery Park Plaza
New York, NY 10004-1486
Telephone: (212) 804-4200

and

Melissa Roover, Esq.
GRAYSON & KUBLI, P.C
1420 Spring Hill Road, Suite 230
McLean, VA 22102
(703) 749-0000

Attorneys for Plaintiffs
WINSTAR HOLDINGS, LLC and
IDT CORP.

19

WINSTAR HOLDINGS, LLC,
and IDT CORP.,

                Plaintiffs,

      -against-

THE BLACKSTONE GROUP LP;
IMPALA PARTNERS, LLC; and.
CITICORP,

             Defendants.



---

## SUMMONS and COMPLAINT

---

### Mound, Cotton, Wollan & Greengrass
*Attorneys for*

Plaintiffs

*Office and Post Office Address, Telephone*

One Battery Park Plaza
New York, NY 10004
(212) 804-4200

---

To:

Attorney(s) for

Service of a copy of the within is
hereby admitted.

Dated:_____ 20_____

_____

**EXHIBIT B**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------x
                                             :
In re:                                       :  Chapter 11
                                             :
WINSTAR COMMUNICATIONS, INC., et al.,        :  Case No.: 01-1430 (JJF)
                                             :
       Debtors.                              :  Jointly Administered
                                             :
                                             :
                                             :
                                             :
-----------------------------------------------------------x
```

### ORDER AUTHORIZING (i) SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS ENCUMBRANCES, AND INTERESTS, (ii) APPROVING CURE AMOUNTS WITH RESPECT TO CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (iii) AUTHORIZING THE DEBTORS TO ENTER INTO AND APPROVING MANAGEMENT AGREEMENT, (iv) APPROVING REGULATORY TRANSITION PROCESS AND (v) GRANTING RELATED RELIEF

This matter having come before the court on (I) the motion (the "Original Motion"; terms not otherwise defined in this Sale Order shall have the meanings ascribed to such terms in the Original Motion) filed by Winstar Communications, Inc. and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), requesting the entry of (A) an order pursuant to sections 363(b) and 105(a) of title 11, United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i) approving bidding procedures, including bid protections, (ii) approving the form and manner of notice of (a) the hearing to consider granting certain bid protections (the "Bid Procedures Hearing"), (b) the hearing on the sale of certain of the Debtors' assets (the "Sale Hearing"), (c) proposed cure payments and (d) assumption and assignment of executory contracts and unexpired leases, and (iii) scheduling the Sale Hearing,

Purchase Agreement, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, other than the Permitted Encumbrances, arising prior to the Closing Date under the Asset Purchase Agreement, including, but not limited to, any liabilities under any revenue, pension, ERISA, tax, labor, environmental or natural resource law, rule or regulation, or any products liability law, arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' businesses prior to the Closing Date. After the Closing and the payment of the Purchase Price, the Buyer shall have no liability to the Debtors or their estates for any diminution in value or other damage of any kind whatsoever to the Regulated Assets or the Licenses that may result from the Buyer's operation of the Debtors' business.

15. This Court retains and shall have exclusive jurisdiction to endorse and implement the terms and provisions of the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith (including the Management Agreement) in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Buyer, (b) compel delivery of the purchase price or performance of other obligations owed to the Debtors, (c) resolve any disputes arising under or related to the Asset Purchase Agreement, and (d) interpret, implement, and enforce the provisions of the Asset Purchase Agreement and this Sale Order.

16. The transactions contemplated by the Asset Purchase Agreement are undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale of any Purchased Assets shall not affect the validity of the Sale of such Purchased Assets to the Buyer, unless such authorization is duly stayed pending such

14

some or all of Debtors' contracts with the GSA, the Buyer agrees that it will continue to provide telecommunications services to GSA until GSA has received sixty (60) days' notice of discontinuance, or such longer period as the FCC requires. In all other respects, the Buyer shall manage the operations of the Business and shall be responsible for such operation pursuant to the terms and subject to the conditions of the Asset Purchase Agreement and the Management Agreement. The period within which the Debtors may elect to assume or reject unexpired leases of nonresidential real property under Bankruptcy Code section 365(d)(4) is hereby extended through the duration of the Term.

25.     Upon receipt of the required regulatory approvals and establishment of the necessary service agreements and arrangements, the Debtors are authorized to convey the Licenses and the Regulated Assets to the Buyer, in accordance with the terms and conditions of the Asset Purchase Agreement and the Management Agreement.

26.     As provided by Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure, the effectiveness of this Sale Order shall not be stayed for 10 days after entry on the docket and shall be effective and enforceable immediately upon such entry. The Buyer and the Debtors shall consummate the Sale as promptly as is practicable following Court approval of this Sale Order, so long as no stay of this Sale Order has been entered and is continuing.

Dated: Wilmington, Delaware
      December _19_, 2001

                             HONORABLE JOSEPH J. FARNAN, JR.
                             UNITED STATES DISTRICT JUDGE

**EXHIBIT C**

MASTER FINAL

EXECUTION COPY

ASSET PURCHASE AGREEMENT

AMONG

IDT WINSTAR ACQUISITION, INC.,

WINSTAR COMMUNICATIONS, INC.

AND

CERTAIN OF ITS SUBSIDIARIES
SET FORTH ON APPENDIX I HERETO

DATED AS OF DECEMBER 18, 2001

good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 9.9    *Governing Law.*  This Agreement shall be governed by and construed in accordance with the laws of the State of New York (regardless of the laws that might otherwise govern under applicable New York principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies.

Section 9.10    *Submission to Jurisdiction.*  The parties hereto irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith or any of the transactions contemplated hereby or thereby.  Each party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such dispute or proceedings may be heard and determined in such courts.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum in connection therewith.

Section 9.11    *Counterparts.*  This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which, when executed and delivered, shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

Section 9.12    *Incorporation of Schedule and Exhibits.*  The Disclosure Schedule and all Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

Section 9.13    *Entire Agreement.*  This Agreement (including the Exhibits and the Disclosure Schedule) and the Confidentiality Agreement constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings among the parties with respect thereto.

Section 9.14    *Headings.*  The descriptive headings contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.15    *Remedies.*  Subject to Section 9.3, the Sellers and the Buyer hereby acknowledge and agree that money damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement and that, in such event, the Sellers or their successors or assigns, or the Buyer or its successors or assigns, as the case may be, may, in addition to any other rights and remedies existing in their favor, apply to the Bankruptcy Court or any other court of competent jurisdiction for specific performance, injunctive and/or other relief in order to enforce or prevent any violations of this Agreement.

Section 9.16    *Bulk Sales or Transfer Laws.*  The Buyer hereby waives compliance by the Sellers with the provisions of the bulk sales or transfer laws of all applicable jurisdictions.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written by their respective officers thereunto duly authorized.

**IDT WINSTAR ACQUISITION, INC.**

By: _____

Name: _Charles HF Garner_

Title: _President_

**WINSTAR COMMUNICATIONS, INC.**

By: _____

Name: _T. R. Grah_

Title: _Executive Vice Presd._

**WINSTAR WIRELESS, INC.**

By: _____

Name: _T. R. GRAHAM_

Title: _VICE PRESIDENT_

**WCI CAPITAL CORP.**

By: _____

Name: _T. R. GRAHAM_

Title: _VICE PRESIDENT_

**WINSTAR EQUIPMENT CORP.**

By: _____

Name: _T. R. GRAHAM_

Title: _VICE PRESIDENT_

WINSTAR EQUIPMENT II CORP.

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WINSTAR GOVERNMENT SOLUTIONS, LLC.

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WINSTAR LMDS, LLC

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WINSTAR NETWORK EXPANSION, LLC

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WINSTAR WIRELESS FIBER CORP.

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


WINSTAR WIRELESS OF DELAWARE, LLC

By: _____
    Name: T. R. GRAHAM
    Title VICE PRESIDENT

WINSTAR WIRELESS OF GEORGIA, LLC

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

WINSTAR WIRELESS OF INDIANA, LLC

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

WINSTAR WIRELESS OF NEW JERSEY, LLC

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

WINSTAR WIRELESS OF NEW YORK, LLC

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

WINSTAR WIRELESS OF PENNSYLVANIA, LLC

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

WINSTAR WIRELESS OF VIRGINIA, LLC

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

**WINSTAR WIRELESS OF WEST VIRGINIA, LLC**

By: _____
Name: T. R. GRAHAM
Title: VICE PRESIDENT

**WWI LICENSE HOLDING, INC.**

By: _____
Name: T. R. GRAHAM
Title: VICE PRESIDENT

**WVF-CPQ 1, LLC**

By: _____
Name: T. R. GRAHAM
Title: VICE PRESIDENT

**WVF-CSC 1, LLC**

By: _____
Name: T. R. GRAHAM
Title: VICE PRESIDENT

**WVF-DL 1, LLC**

By: _____
Name: T. R. GRAHAM
Title: VICE PRESIDENT

**WVF-LU 2, LLC**

By: _____
Name: T. R. GRAHAM
Title: VICE PRESIDENT

**WVF-I LLC**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


**WINSTAR CREDIT CORP.**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


**WINSTAR INTERNATIONAL, INC.**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


**WINSTAR MIDCOM ACQUISITION CORP.**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


**WINSTAR NEW MEDIA COMPANY, INC.**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


**WINSTAR INTERACTIVE VENTURES I, INC.**

By: _____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

WINSTAR PUERTO RICO, INC.

By: _____

Name: *T. R. Graham*

Title: *Vice President*

**EXHIBIT D**



July 2, 2001

Mr. William Rouhana, Jr.
Chairman and Chief Executive Officer
Winstar Communications, Inc.
685 Third Avenue
New York, NY 10017

Dear Bill:

This letter confirms the retention of Impala Partners, LLC ("Impala") to provide advisory services to Winstar Communications, Inc. (the "Company"), including, without limitation, providing the services of Mr. Paul A. Street as Chief Restructuring Officer of the Company. We will advise you in connection with the restructuring of this Company ("the Restructuring") and, by signing this letter, we hereby accept the engagement under the terms hereof and subject to the approval of the Bankruptcy Court.

We will act as your advisor for a period of one (1) year from the date hereof, subject to earlier termination pursuant to section 5 or further extension by mutual agreement between the parties and subject to the following conditions:

    1.    You will furnish or cause to be furnished to us such current and historical financial information and other information regarding the business of the Company as we may request in connection with this engagement. You agree that you will use your good faith efforts to ensure that all of the foregoing information will be accurate in all material respects at the time it is furnished, and you agree to keep us advised of all developments materially affecting the Company or its financial or legal position. In connection with our activities hereunder, we agree to keep confidential all non-public information provided to us by the Company, except as required by law, or as agreed to by the Company in writing.

    2.    In consideration for our services, you agree to pay us a monthly retainer of $250,000 per month for the first two months. Thereafter, at the rate of $100,000 per month for the services of Paul A. Street; and $50,000 for the services of each of Peter C. Keenoy, Michael P. Borom, and J. Robert Vipond only in respect to those of the three aforementioned individuals who are actively involved in the Winstar advisory engagement, provided, that each of the persons set forth in this letter spend substantially all of their working time during such month in such activity. An initial advance of $250,000 is payable in full at the inception of the engagement as the first monthly payment hereunder, subject only to Bankruptcy Court approval. Thereafter, for as long as the engagement continues, the retainer shall be payable monthly in advance with expenses to be reimbursed in accordance with paragraph 3 below. You further

Impala Partners, LLC 300 First Stamford Place, Stamfod, CT 06902

agree to pay us an additional fee ("the Success Fee") which will be mutually agreed upon within 30 days of the date hereof, payable upon the earlier of confirmation of a plan under or other emergence from Chapter 11 of the U.S. Bankruptcy Code of the Company or its successor, whether through a recapitalization, merger, or sale of the Company, confirmation of a plan or otherwise and subject to Bankruptcy Court approval.

3.    You will reimburse us for all of our reasonable and actual out-of-pocket expenses incurred in connection with this engagement, including fees and expenses, up to a maximum of $20,000 of counsel that we determine is required to advise us in connection with carrying out our duties under this letter; provided, that before such counsel is retained we will provide advance written notice to the Company and consult with the General Counsel of the Company. All reimbursements shall be made promptly after such payments accrue and are submitted to you with appropriate documentation for payment hereunder.

4.    No fee payable to any other financial advisor, by you or any other party, shall reduce or otherwise affect any fee payable hereunder to us.

5.    Our engagement hereunder may be terminated by you or us at any time without liability or continuing obligation to you or us, except that following such termination and any expiration of this agreement (a) we shall remain entitled to any fees accrued pursuant to paragraph 2 but not yet paid prior to such termination or expiration, as the case may be, and to reimbursement of expenses incurred prior to such termination or expiration, as the case may be, as contemplated by paragraph 3 hereof; and (b) upon any expiration or termination of this agreement, we shall remain entitled to any full payment of any fee contemplated by paragraph 2 hereof in respect of any restructuring resulting from negotiations commenced during the term of this agreement which is consummated within nine (9) months following such termination or expiration, as the case may be. The provisions of this paragraph 5 shall survive the termination of this Agreement.

6.    Any written financial advice rendered by us pursuant to this agreement is intended solely for the benefit and use of management and the Board of Directors of the Company in considering the matters to which this agreement relates, and the Company agrees that such written advice may not be disclosed publicly or made available to third parties (except as required by law) without the prior written consent of Impala, which consent shall not be unreasonably withheld except that the Company may share such written advice with the members of the Post-petition and Pre-petition bank lenders and the members of the Creditor's Committee and each of their representatives without Impala's consent.

7.    The provisions hereof shall inure to the benefit of and be binding upon the successors and assigns of the Company and Impala. This agreement may not be amended or modified except in a writing executed by the Company and us and shall be

LA/672087.1

2

governed by and construed in accordance with the laws of the State of New York, without reference to principals of conflicts of law. This agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

8.    In consideration of our agreement to act as advisor to the Company in the Company agrees to the same indemnification provisions attached hereto as Annex A. In addition, the Company will notify its existing insurance carrier of its existing directors and officers' policy and cause Mr. Street to become covered under such policy immediately as an officer of the Company. The provisions of this paragraph 8 shall survive the termination of this Agreement.

9.    This agreement shall be subject to approval by the U.S. Bankruptcy Court. The Company will prepare and file with the Bankruptcy Court a motion seeking approval of this letter promptly.

If the foregoing correctly sets forth the understanding between us, please so indicate on the enclosed signed copy of this agreement in the space provided therefor and return it to us, whereupon this agreement shall constitute a binding agreement between us.

Very truly yours,

IMPALA PARTNERS

By:_____
    Paul A. Street

AGREED TO AND ACCEPTED
as of the date first above written:

Winstar Communications, Inc.

By:_____
    William J. Rouhana, Jr.
    Chairman and Chief Executive Officer

3

IA/672007.1

ANNEX A


Indemnification Provisions


1.  In connection with the engagement of Impala Partners, LLC ("Impala Partners") by Winstar Communications, Inc., (the "Company") pursuant to a letter agreement dated July 2, 2001 between the Company and Impala Partners, as it may be amended from time to time (the "Letter Agreement"), the Company hereby agrees as follows:

2.  The Company agrees to indemnify and hold harmless Impala Partners and each of its partners, agents, employees and controlling persons (within the meaning of the Securities Act of 1933, as amended) (each, an "Indemnified Person") against any losses, claims, damages or liabilities (or actions or proceedings in respect thereof) brought by any third party (i.e., a person not a party to the Letter Agreement or an Indemnified Party hereunder) arising out of the rendering of services by Impala Partners under the Letter Agreement and will reimburse Impala Partners and each other person indemnified hereunder for all reasonable legal and other expenses as incurred in connection with investigating or defending any such loss, claim, damage, liability, action or proceeding; provided, however, that the Company will not be liable in any such case for losses, claims, damages, liabilities or expenses arising from the negligence or willful misconduct of Impala Partners or any other party entitled to indemnification hereunder. In case any proceeding shall be instituted involving any Indemnified Party, such person shall promptly notify the Company, and the Company, upon the request of the Indemnified Party, shall retain counsel reasonably satisfactory to the Indemnified Party to represent the Indemnified Party and any others the Company may designate in such proceeding and shall pay all reasonable fees and expenses of such counsel related to such proceeding. In any such proceeding, any Indemnified Party shall have the right to retain its own counsel at its own expense, except that the Company shall pay as incurred the fees and expenses of counsel retained by the Indemnified Party only in the event that (i) the Company and the Indemnified Party shall have mutually agreed to the retention of such counsel, or (ii) the named parties to any such proceeding (including any impleaded parties) include both the Company and the Indemnified Party and representation of both parties by the same counsel would be inappropriate, in the reasonable opinion of the Company, due to actual or potential differing interests between them.

3.    The Company shall not be liable for any settlement of any proceeding effected without its written consent. In addition, the Company will not, without the prior written consent of Impala Partners, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder unless such settlement, compromise or consent includes an unconditional release of each party for which indemnification is sought hereunder from all liability arising out of such claim, action, suit or proceeding.

4.    In the event that the indemnity provided for in paragraph 2 hereof is unavailable or insufficient to hold any Indemnified Party harmless, then the Company shall contribute to amounts paid or payable by an Indemnified Party in respect of such Indemnified Party's losses, claims, damages and liabilities as to which the indemnity provided for in paragraph 1 hereof is unavailable or insufficient (1) in such proportion as appropriately reflects the relative benefits received by the Company, on the one hand, and Impala Partners, on the other hand, in connection with the matters as to which such losses, claims, damages or liabilities relate, or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as appropriately reflects not only the relative benefits referred to in clause (i) but also the relative fault of the Company, on the one hand, and Impala Partners, on the other hand, as well as any other equitable considerations. The amounts paid or payable by a party in respect of losses, claims, damages and liabilities referred to above shall be deemed to include any reasonable legal or other fees and expenses incurred in defending any litigation, proceeding or other action or claim. Nothing herein shall be deemed to increase the scope of matters for which indemnity or contribution may be available beyond those described in paragraph 1 of these Indemnification Provisions.

5.    These Indemnification Provisions shall survive the expiration of the term of the Letter Agreement, and shall be in addition to any liability that the Company might otherwise have to any Indemnified Party under the Letter Agreement or otherwise. The Company and Impala Partners each hereby waives any right to a trial by jury with respect to any claim or action arising out of the engagement of Impala Partners under the Letter Agreement or the Indemnification Provisions. It is further agreed that no Indemnified Party (including Impala Partners) shall be liable to the Company or any affiliate of the Company in connection with any matter arising out of or relating to the engagement of Impala Partners under the Letter Agreement, or any actions take or omitted , services performed or matters contemplated by or in connection with the Letter Agreement, except to the extent that such liability resulted primarily from the willful misconduct or negligence of such Indemnified Party; provided that nothing herein shall excuse Impala Partners from its obligations to perform under the Letter Agreement in good faith and in accordance with the terms thereof.

2

**EXHIBIT E**

HERRICK, FEINSTEIN LLP
Andrew C. Gold (AG-4875)
2 Park Avenue
New York, NY 10016
(212) 592-1400
*Attorneys for Defendant,*
*Impala Partners, LLC*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------- x

WINSTAR HOLDINGS, LLC and
IDT CORP.,

                       Plaintiffs,

-against-

THE BLACKSTONE GROUP LP; IMPALA
PARTNERS, LLC; and CITICORP,

                    Defendants.
--------------------------------------------------------- x

Index No. 601582/07

Civil Action

**NOTICE OF FILING**
**OF NOTICE OF REMOVAL**

TO THE CLERK OF THE SUPREME COURT:

      PLEASE TAKE NOTICE that the within matter has been removed this day to the United States District Court for the District of New York based upon the Notice of Removal (the "Notice") annexed hereto as **Exhibit A**. Upon filing the Notice, Defendant Impala Partners, LLC has effected removal pursuant to 28 U.S.C. §§ 1441, 1446 and 1452.

Dated: June___, 2007

      Respectfully submitted,

      HERRICK, FEINSTEIN LLP
      Attorneys for Defendant
      Impala Partners, LLC

      By: _____
           Andrew C. Gold (ACG-4875)
      2 Park Avenue
      New York, NY 10016
      (212) 592-1400

HF 3652173v.1 #10069/0000

**EXHIBIT A**

HF 3652173v.1 #10069/0000