## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------x
WINSTAR HOLDINGS, LLC and              )
IDT CORP.,                             )        Case No.: 07-828-GMS
                                       )
              Plaintiffs,              )
                                       )
       - against -                     )
                                       )
THE BLACKSTONE GROUP LP;               )
IMPALA PARTNERS, LLC; and              )
CITICORP,                              )
              Defendants.              )
                                       )
                                       )
-------------------------------------------------x
```

## DEFENDANT CITIGROUP INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' COMPLAINT

GREENBERG TRAURIG, LLP
Victoria W. Counihan (No. 3488)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Tel:  (302) 661-7000
Fax: (302) 661-7360
counihanv@gtlaw.com
melorod@gtlaw.com

- and -

Stephen L. Saxl
William A. Wargo
GREENBERG TRAURIG, LLP
200 Park Avenue, 39th Floor
New York, New York 10166
Tel:  (212) 801-9200
Fax: (212) 801-6400

*Attorneys for Defendant Citigroup Inc., as*
*successor by merger to Citicorp*

Dated: January 22, 2008

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

THE ALLEGATIONS OF THE COMPLAINT ................................................................ 5

    The Parties ............................................................................................................ 5

    Old Winstar's Bankruptcy And Its Retention Of Blackstone And Impala .......... 6

    Old Winstar's Sale Of Its Business Assets To Plaintiffs ..................................... 6

    The Only Allegations Concerning Citigroup ....................................................... 7

    Allegations Concerning All Defendants ............................................................... 7

    The Claims For Relief .......................................................................................... 8

    Procedural History ............................................................................................... 8

ARGUMENT ....................................................................................................... 10

I.    MOTION TO DISMISS STANDARD ........................................................... 10

II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR FRAUD AGAINST CITIGROUP. .... 13

    A.    Plaintiffs Do Not Allege Any Statements By Citigroup ......................... 13

    B.    Plaintiffs Do Not Allege Facts Supporting Their Counter-Factual
        Assertion That Impala Was Citigroup's "Agent." .................................. 13

    C.    Plaintiffs Fail To Allege Any Facts Establishing That Citigroup Had A
        Duty To Speak. ....................................................................................... 16

III    PLAINTIFFS FAIL TO STATE A CLAIM FOR AIDING AND ABETTING FRAUD
    AGAINST CITIGROUP. ............................................................................. 17

IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR NEGLIGENT
    MISREPRESENTATION OR NEGLIGENCE AGAINST CITIGROUP ...................... 18

V.    PLAINTIFFS FAIL TO STATE A CLAIM FOR CIVIL CONSPIRACY AGAINST
    CITIGROUP. ........................................................................................... 20

CONCLUSION ..................................................................................................... 21

# TABLE OF AUTHORITIES

<u>Cases</u>

*Albert v. Alex Brown Management Services, Inc.,*
   2005 WL 2130607 (Del. Ch. Aug. 26, 2005) ............................................................14

*Anspach v. City of Philadelphia Dept. of Public Health,*
   503 F.3d 256 (3d Cir. 2007) .........................................................................................5

*Bell Atlantic Corp. v. Twombly,*
   127 S. Ct. 1955 (2007).........................................................................................*passim*

*Brug v. The Enstar Group, Inc.,*
   755 F. Supp. 1247 (D. Del. 1991).........................................................................17, 19

*Cannon v. Douglas Elliman, LLC,*
   2007 WL 4358456 (S.D.N.Y. Dec. 10, 2007) ...........................................................14

*Conley v. Gibson,*
   355 U.S. 41 (1957).............................................................................................10, 14

*Cromer Finance Ltd. v. Berger,*
   137 F. Supp. 2d 452 (S.D.N.Y. 2001) .......................................................................14

*De Lage Landen Fin. Servs., Inc. v. Cardservice Int'l, Inc.,*
   2001 WL 799870 (E.D. Pa. July 12, 2001) ...............................................................12

*Eisenmann Corp. v. General Motors Corp.,*
   2000 WL 140781 (Del. Sup. Ct. Jan. 28, 2000) ........................................................14

*Gordon v. Diagnostek, Inc.,*
   812 F. Supp. 57 (E.D. Pa. 1993)................................................................................12

*Hudson River Club v. Consolidated Edison Co. of N.Y., Inc.,*
   275 A.D.2d 218, 712 N.Y.S.2d 104 (1st Dep't 2000)................................................18

*In re Am. Bus. Fin. Servs., Inc.,*
   361 B.R. 747 (Bankr. D. Del. 2007)........................................................12, 13, 20, 21

*In re Crown-Simplimatic, Inc.,*
   299 B.R. 319 (Bankr. D. Del. 2003)........................................................................4, 20

*In re Exxon Mobil Corp. Sec. Litig.,*
   500 F. 3d 189 (3d Cir. 2007) .....................................................................................11

*Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.,*
   871 F. Supp. 709 (S.D.N.Y. 1995) ........................................................................20

*Kalmanovitz v. G. Heilman Brewing Co. Inc.,*
   595 F. Supp. 1385 (D. Del. 1984) .......................................................................20

*Lum v. Bank of America,*
   361 F.3d 217 (3rd Cir. 2004) ........................................................................11, 15

*Matthews Office Designs, Inc. v. Taub Invs.,*
   1994 WL 267479 (Del. May 25, 1994) ................................................................16

*MetCap Securities LLC v. Pearl Senior Care, Inc.,*
   2007 WL 1498989 (Del. Ch. May 16, 2007)........................................................16

*Naporano Iron & Metal Co. v. American Crane Corp.,*
   79 F. Supp. 2d 494 (D.N.J. 1999) .......................................................................12

*Pfizer, Inc. v. Ranbaxy Labs., Ltd.,*
   2007 WL 4226417 (D. Del. Nov. 29, 2007) ...................................................2, 11

*U.S. Aircraft Ins. Grp. v. Dwiggins, L.L.C.,*
   2003 WL 22432915 (D. Del. Oct. 15, 2003) .......................................................18

*WestRM-West Risk Markets, Ltd. v. XL Reinsurance America, Inc.,*
   2006 WL 2034627 (S.D.N.Y. July 19, 2006) .....................................................17

*Winer Family Trust v. Queen,*
   503 F.3d 319 (3d Cir. 2007) ...............................................................................11

<u>Statutes and Rules</u>

11 U.S.C. § 363...........................................................................................................2

28 U.S.C. § 1334(b).....................................................................................................8

28 U.S.C. §§ 1404(a), 1406 .........................................................................................8

Fed. R. Civ. P. 9(b)..............................................................................................passim

Fed. R. Civ. P. 12(b)(6) .......................................................................................passim

Defendant Citigroup Inc. ("Citigroup"), as successor by merger to Citicorp, submits this Memorandum of Law in support of its motion ("the Motion") to dismiss the Complaint (the "Complaint" or "Compl.") filed by Plaintiffs IDT Corp. ("IDT") and Winstar Holdings, LLC ("Winstar Holdings") (collectively, "Plaintiffs"), pursuant to Rule 12(b)(6), Fed. R. Civ. P., because the Complaint fails to state a claim upon which relief can be granted, and to dismiss the fraud, aiding and abetting fraud and conspiracy claims (First, Second and Fifth Causes of Action) pursuant to Rule 9(b), Fed. R. Civ. P., because the Complaint fails to allege fraud with the required particularity.

In support of the Motion, in addition to the points herein, Citicorp hereby joins in and adopts the points advanced by defendant Blackstone Group LP ("Blackstone") in support of its motion to dismiss.[1]

## PRELIMINARY STATEMENT

Citigroup has no logical place in this lawsuit. This is an action in which Plaintiffs claim that they were defrauded into purchasing the business assets of Winstar Communications, Inc. ("Old Winstar") out of bankruptcy in 2001 based on alleged misrepresentations by Blackstone (Old Winstar's financial advisor), Impala Partners, LLC ("Impala") (Old Winstar's restructuring advisor) and Old Winstar itself. Plaintiffs do not allege that Citigroup made any misrepresentations to them. Rather, they seek to impose some duty on Citigroup on which they could hold it liable for alleged omissions or hold it vicariously liable for alleged misrepresentations by others. But Citigroup was merely a creditor of Old Winstar, not an advisor of Old Winstar, and owed no duties to Plaintiffs as a matter of law. Thus, Citigroup does

---

[1]    Plaintiffs have consented to the referral of this action to the Bankruptcy Court for this District. Defendants anticipate filing a motion for referral to the Bankruptcy Court forthwith.

not belong in this lawsuit even if the action was not barred by the legal barriers set forth in Blackstone's concurrently filed motion to dismiss.

For the reasons set forth in full in support of Blackstone's motion to dismiss, each of Plaintiffs' claims should be dismissed as against all Defendants because they are barred by the applicable statutes of limitations. Further, as Blackstone establishes in detail, Plaintiffs' claims fail because they constitute an impermissible collateral attack on the final and binding Order entered by the Bankruptcy Court pursuant to 11 U.S.C. § 363, which authorized and approved the sale of Old Winstar's assets to Plaintiffs. Plaintiffs' claims also fail as a matter of law because of the broad disclaimer provision in the Asset Purchase Agreement ("APA") dated December 18, 2001, and approved by the Bankruptcy Court on December 19, 2001, in which Plaintiffs disclaim any reliance on representations made in connection with their purchase of Old Winstar's assets. Citigroup joins in Blackstone's motion to dismiss establishing these dispositive points, each of which independently requires dismissal of the entire Complaint as against all the Defendants, and the Court need look no further.

Further, however, there are additional, independent grounds to dismiss all of Plaintiffs' Claims against Citigroup, a creditor of Old Winstar. Plaintiffs do not allege any misrepresentations by Citigroup. Instead, Plaintiffs attempt to proceed against Citigroup solely on the bases of Citigroup's alleged vicarious liability for the acts of Impala and Citigroup's silence in the face of alleged misrepresentations by Blackstone, Impala or Old Winstar. But there is no factual or legal basis for alleging that Citigroup acted as Impala's principal or that Citigroup had a duty to speak.

Under the Supreme Court's recent restatement of the pleading standard, Plaintiffs must allege "sufficiently detailed facts to 'raise a right to relief above the speculative level.'" *Pfizer,*

*Inc. v. Ranbaxy Labs., Ltd.*, 2007 WL 4226417, at *2 (D. Del. Nov. 29, 2007) (quoting *Bell Atlantic v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007)). The Complaint completely fails to allege facts sufficient to support Plaintiffs' speculative theories of liability against Citigroup.

First, the Complaint fails to state a claim for fraud against Citigroup. The Complaint does not allege any misrepresentations by Citigroup. It alleges only that Citigroup was silent in the face of misrepresentations by others. But no legal basis for an omissions claim against Citigroup is alleged. The Complaint does not allege any facts that could establish that Citigroup had any duty to disclose anything to Plaintiffs. To the contrary, the facts that the Complaint does allege establish that there was no relationship between Citigroup and Plaintiffs, let alone a relationship imposing a "duty to speak" upon Citigroup — there was no contract between Plaintiffs and Citigroup, and Citigroup was not the seller of the Old Winstar assets, nor an agent or principal of the seller, but rather a creditor of the seller.

Nor can Plaintiffs sustain their fraud claim against Citigroup on the basis of their illogical assertion that Citigroup was Impala's "principal." This conclusory allegation is implausible on its face. As Plaintiffs themselves allege, Impala was retained and paid by Old Winstar (with the approval of the Bankruptcy Court), and Impala's duties ran to Old Winstar. Thus, the allegation that Citigroup was Impala's principal is mere counter-factual speculation. It certainly cannot support a claim under the *Twombly* standard. Further, even if Plaintiffs' allegation that Citigroup was Impala's principal rises above mere unsupported speculation (and it does not), Plaintiffs have failed to allege any misrepresentations by Impala with the particularity required by Rule 9(b), Fed. R. Civ. P., and thus have not alleged any basis for vicarious liability on the part of Citigroup for this reason as well.

Second, Plaintiffs' claim against Citigroup for aiding and abetting fraud should be dismissed because the Complaint does not allege any facts establishing that Citigroup knowingly and substantially participated in or provided substantial assistance for the alleged fraud. This claim also fails because Plaintiffs do not specify which parties are primary violators and which are the aiders and abettors. Nor do Plaintiffs allege facts showing how the aiders and abettors assisted the primary violators.

Third, Plaintiffs fail to allege any facts that could form a sufficient basis for their claim of negligent misrepresentation against Citigroup. As noted above, Plaintiffs fail to allege any misrepresentations by Citigroup. Moreover, Plaintiffs fail to allege any basis for a duty on the part of Citigroup towards Plaintiffs. As the Complaint alleges, Citigroup was not retained by Plaintiffs and was not the seller of the Old Winstar assets.

Fourth, Plaintiffs' claim for negligence against Citigroup is merely their negligent misrepresentation claim under a different label, and, accordingly, it fails for same reasons as that claim.

Fifth, Plaintiffs fail to state a claim for civil conspiracy against Citigroup. Such a claim cannot be sustained as an independent tort, but rather the allegations of conspiracy must relate to the completion of an intentional tort independent of the conspiracy itself. *In re Crown-Simplimatic, Inc.*, 299 B.R. 319, 327 (Bankr. D. Del. 2003). Here, the only independent intentional tort alleged is fraud. Because that claim fails as a matter of law, Plaintiffs' conspiracy claim against Citigroup must also be dismissed. Further, Plaintiffs fail to allege with the required particularity any agreement between Citigroup and its alleged co-conspirators, nor do they allege any illegal acts in furtherance of the alleged conspiracy.

## THE ALLEGATIONS OF THE COMPLAINT

The following allegations are taken from the Complaint in this action.  (A true and correct copy of the Complaint is attached hereto as Exhibit A).  Solely for purposes of this motion to dismiss, Citigroup assumes the factual allegations of the Complaint (but not the bare legal conclusions or characterizations) to be true.  *Anspach v. City of Philadelphia Dept. of Public Health*, 503 F.3d 256, 260 (3d Cir. 2007).

**The Parties**

Plaintiff Winstar Holdings is a Delaware corporation.  Compl. ¶ 2.  It acquired the business assets of Old Winstar in the APA approved by the Bankruptcy Court in December 2001.  *Id.*

Plaintiff IDT is also a Delaware corporation.  *Id.* ¶ 3.  The Complaint alleges that IDT "provided the funds for the purchase of Old Winstar, and bore most of the resulting subsequent losses."  *Id.*

Defendant Blackstone is a Delaware limited partnership.  *Id.* ¶ 4.  The Complaint alleges that in "the sale of Old Winstar's assets, [Blackstone] acted as an investment advisor to various entities related to Old Winstar."  *Id.*

Defendant Impala is alleged to be a Delaware limited partnership.  *Id.* ¶ 5.  The Complaint alleges that "at the time of the sale of Old Winstar's assets, [Impala] was acting as a restructuring advisor for Old Winstar."  *Id.*

Defendant Citigroup is a Delaware corporation.  *Id.* ¶ 6.  The Complaint alleges that Citigroup "was the largest creditor of Old Winstar while Old Winstar was a debtor in bankruptcy."  *Id.*

**Old Winstar's Bankruptcy And Its Retention Of Blackstone And Impala**

Old Winstar provided wireless telephone service to customers. *Id.* ¶ 11. On April 18, 2001, Old Winstar filed a bankruptcy petition under Chapter 11 of the U.S. Bankruptcy Code in the Bankruptcy Court for the District of Delaware. *Id.* ¶ 13. Old Winstar retained Blackstone as a financial advisor to assist it with the sale of the business assets of Old Winstar. *Id.* ¶¶ 14-15. Further, Old Winstar retained Impala as a restructuring advisor, for the purpose of providing it with restructuring advice and other related services in connection with Old Winstar's Chapter 11 bankruptcy proceedings. *Id.* ¶ 17. Impala charged Old Winstar for its services, including the services of Paul Street, who acted as the Chief Restructuring Officer for Old Winstar. *Id.*

**Old Winstar's Sale Of Its Business Assets To Plaintiffs**

An auction of Old Winstar's business assets was planned for December 2001. *Id.* ¶ 22. Plaintiffs allege that Blackstone circulated an "offering book" concerning Old Winstar (however, Plaintiffs do not expressly allege what this book stated, nor that they received the book, nor that they relied upon any contents of the book). *Id.*

Plaintiff IDT was interested in acquiring the assets of Old Winstar in this auction. *Id.* ¶ 21. Prior to the auction IDT had meetings with Blackstone and with Old Winstar officials. *Id.* ¶ 22. According to Plaintiffs, certain Old Winstar business records were made available to IDT in a "data room." *Id.* Plaintiffs do not identify any of the records in the "data room," or what those records stated, and do not allege which, if any, of the documents IDT reviewed and relied upon during its alleged "due diligence." IDT claims that it conducted its "due diligence" in a six-day period between November 30, 2001 and December 5, 2001. *Id.* ¶ 23.

Plaintiffs allege that, during this due diligence period, representatives of Blackstone, Impala and Old Winstar made various representations concerning the status of Old Winstar's business, including its monthly revenue, number of customers and other information. *Id.* ¶ 28.

Plaintiffs allege that these statements were false and fraudulent. *Id.* ¶ 30. Plaintiffs do not allege which entity made which statement, whether the statements were made in writing or orally (or both), when the statements were made (other than some time between November 30 and December 5, 2001), which individuals made the statements, and which representatives of IDT heard or read the statements. *Id.* ¶¶ 28-30.

Plaintiffs also allege that Blackstone and Impala fraudulently withheld information concerning Old Winstar's business. *Id.* ¶ 32.

Plaintiffs entered into the APA for the transfer of Old Winstar's business assets on or about December 18, 2001. *Id.* ¶ 43. On December 19, 2001, the Bankruptcy Court approved the APA. *Id.* ¶ 44.

### The Only Allegations Concerning Citigroup

Plaintiffs allege that Citigroup was Old Winstar's largest creditor. *Id.* ¶ 18. Plaintiffs do not allege any representations by Citigroup to Plaintiffs, and they do not allege that Citigroup assisted in the negotiation of the terms of the purchase of Old Winstar's business assets.

Plaintiffs further allege that Citigroup assisted Old Winstar in negotiating Old Winstar's contract terms with Impala. Despite acknowledging that Old Winstar retained Impala, and that Impala charged Old Winstar for its restructuring advice and other related services, Plaintiffs assert without explanation that Citigroup "acted as Impala's principal." *Id.* ¶¶ 17-18.

### Allegations Concerning All Defendants

Plaintiffs allege that "Blackstone, Citicorp, and Impala assisted in the development of financial data and presentations to Old Winstar's Board of Directors, various creditors and other parties." *Id.* ¶ 20. Plaintiffs do not allege that they were among those creditors or other parties.

Plaintiffs allege that Old Winstar made various representations about its business in "the presence of Blackstone, Citicorp, and Impala; and Blackstone, Citicorp and Impala did not

dispute them, even though they knew or should have known that these representations were false, and that the Plaintiffs would rely on these representations." *Id.* ¶ 29. Plaintiffs also allege that Blackstone, Impala and Citigroup "did not provide client information in any detail that would have allowed IDT and New Winstar to uncover Defendants' false statements and material omissions," and that Blackstone, Citigroup and Impala withheld information within their possession, custody or control concerning Winstar's business. *Id.* ¶¶ 31-32.

Plaintiffs allege that "Blackstone, Citicorp, Impala and Old Winstar all hid and blocked access to material information about Old Winstar's finances and operations." *Id.* ¶ 33. Plaintiffs do not allege how Citigroup, a creditor of Old Winstar, "hid and blocked access" to information. *Id.*

**The Claims For Relief**

Based on the foregoing allegations, Plaintiffs assert five causes of action against all Defendants: (1) fraud; (2) aiding and abetting fraud; (3) negligent misrepresentation; (4) negligence; and (5) civil conspiracy. (Compl. pp. 10-18). They seek compensatory and punitive damages.

**Procedural History**

On May 10, 2007, Plaintiffs filed the Complaint commencing this civil action against Defendants in the Supreme Court of the State of New York. Defendants removed the Complaint to the United States District Court, Southern District of New York (the "Southern District") on June 1, 2007 on the basis of 28 U.S.C. § 1334(b) because, alternatively, it arises in a bankruptcy case or arises under the bankruptcy code or is related to a bankruptcy case (the bankruptcy of Old Winstar). Defendants also requested that the Southern District transfer this action to the District of Delaware pursuant to 28 U.S.C. §§ 1404(a) & 1406 for referral to the United States

Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Plaintiffs moved to remand the action back to New York state court.

On December 10, 2007, the Southern District denied Plaintiffs' motion to remand and granted Defendants' motion for transfer because "it is clear that this is a case 'arising in' the Old Winstar bankruptcy case." *Winstar Holdings, LLC v. The Blackstone Group, LP*, 2007 WL 4323003 (S.D.N.Y. Dec. 10, 2007) (the "Order"), a true and correct copy of which is attached hereto as Exhibit B. The Southern District held that Plaintiffs' "claims go directly to the proper performance of duties by professionals retained by the bankruptcy estate, with the approval of the Bankruptcy Court, to assist it in maximizing the assets of the estate." Order at *5. The Southern District emphasized the significance of the Bankruptcy Court's December 2001 Order approving the sale of Old Winstar's assets by which the Bankruptcy Court "itself recognized the importance of the sale to its on-going administration of the case" and retained "'exclusive jurisdiction to ... resolve any dispute arising under or related to the Asset Purchase Agreement.'" *Id.* (quoting Sale Order ¶ 15). The Southern District found that this language "plainly covers the dispute at hand, which unquestionably is a dispute 'related to' the APA." *Id.*

The Southern District granted the motion to transfer because "the very sale that is the subject of the proceedings was a central aspect and basic function of the bankruptcy proceedings." *Id.* at *6. Indeed, the "sale of Old Winstar's assets was pursuant to directives issued by the Bankruptcy Court, and the APA was specifically approved by that court." *Id.* The Southern District found that although Plaintiffs' "claims are asserted as tort claims of fraud in the inducement, the evaluation of those claims will necessarily involve the interpretation of the Bankruptcy Court-approved APA, which contains provisions (including a merger clause, APA §9.13; two disclaimers of warranties, *id.* §§5.10, 9.3; and an 'as is' clause, *id.* § 5.10) that are

9

arguably inconsistent with plaintiffs' claims, and of the Bankruptcy Court's own orders and findings (including a finding that the consideration was fair and reasonable and a finding that the APA was negotiated in good faith, Order ¶¶ G, H)." *Id.*

Accordingly, this action was transferred to the United States District Court for the District of Delaware.

## ARGUMENT

## I.

## MOTION TO DISMISS STANDARD

In *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the United States Supreme Court issued a landmark decision regarding what a plaintiff must plead under Rule 8(a)(2), Fed. R. Civ. P., to survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), Fed. R. Civ. P. In *Twombly*, the Supreme Court stated that the often-quoted observation in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief" is "best forgotten as an incomplete, negative gloss on an accepted pleading standard" and "has earned its retirement." 127 S. Ct. at 1960, 1969.

The Court held that a "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions and a formulaic recitation of a cause of action's elements will not do." *Id.* at 1959 (citation omitted). Instead, Plaintiffs must make "[f]actual allegations" sufficient "to raise a right to relief above the speculative level." *Id.* Plaintiffs' factual allegations in support of their causes of action must "possess enough heft" to "'sho[w] that the pleader is entitled to relief.'" *Id.* (citation omitted). In other words, Plaintiffs,

to survive a motion to dismiss, must make factual allegations sufficient to show that they have a "plausibility" of entitlement to relief, not a mere "possibility" of relief. *Id.*

The Third Circuit and the District of Delaware have already acknowledged that *Twombly* establishes the governing pleading standard under Rule 12(b)(6), and that *Twombly* applies to all claims, not merely to antitrust claims. *See, e.g., In re Exxon Mobil Corp. Sec. Litig.*, 500 F. 3d 189, 191 (3d Cir. 2007) (citing *Twombly* in securities fraud action); *Pfizer, Inc. v. Ranbaxy Labs., Ltd.*, 2007 WL 4226417 at *2 (D. Del. Nov. 9, 2007) (holding in patent infringement action that "[t]he Supreme Court has retired the standard for dismissal under Rule 12(b)(6) announced in *Conley v. Gibson* …. Instead, the Supreme Court has instructed that dismissal is not appropriate if the plaintiff alleges sufficiently detailed facts to raise a right to relief above the speculative level.") (quotation marks omitted).

In determining a motion to dismiss pursuant to Rule 12(b)(6), Fed. R. Civ. P., the Court may consider documents incorporated by reference in the Complaint and those of which plaintiff had knowledge and relied upon in commencing the lawsuit. *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007) (affirming lower court's dismissal of plaintiff's claims and noting that in ruling on 12(b)(6) motions to dismiss, courts must consider "documents incorporated into the complaint by reference.").

All allegations of fraud must comply with Rule 9(b), Fed. R. Civ. P. *Lum v. Bank of America*, 361 F.3d 217, 223-224 (3d Cir. 2004). Plaintiffs must plead with particularity "the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Lum*, 361 F.3d at 223-224 (citations and quotation marks omitted). Plaintiffs may satisfy this requirement by pleading the "date, place or time" of the

fraud, or through "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.* at 224 (quotation marks omitted). Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation. *Id.* (affirming dismissal of mail and wire fraud claims because the plaintiffs' "conclusory allegations" did not indicate the "date, time, or place of any misrepresentation" and because the allegations did not "indicate which defendant(s) made misrepresentations to which plaintiff(s)").

Further, because Plaintiffs are alleging fraud against a group of defendants, Rule 9(b), Fed R. Civ. P., requires that fraud be pleaded with specificity and particularity as to each defendant. *Naporano Iron & Metal Co. v. American Crane Corp.*, 79 F. Supp. 2d 494, 511 (D.N.J. 1999) ("plaintiff must plead fraud with particularity with respect to each defendant, thereby informing each defendant of the nature of its alleged participation in the fraud"); *De Lage Landen Fin. Servs., Inc. v. Cardservice Int'l, Inc.*, 2001 WL 799870, at *3 (E.D. Pa. July 12, 2001) (when allegations of fraud are alleged against multiple defendants, complaint "must also separately allege each defendant's fraudulent conduct").

In addition, the elements of conspiracy to commit fraud and aiding and abetting fraud must also be pleaded with particularity. *In re Am. Bus. Fin. Servs., Inc.*, 361 B.R. 747, 762 (Bankr. D. Del. 2007) (holding that elements of conspiracy must be pleaded with particularity); *Gordon v. Diagnostek, Inc.*, 812 F. Supp. 57, 62 (E.D. Pa. 1993) (holding that aiding and abetting fraud claim requires that acts of alleged substantial participation in fraud must be pleaded with particularity).

## II.

## PLAINTIFFS FAIL TO STATE A CLAIM FOR FRAUD AGAINST CITIGROUP.

### A.    Plaintiffs Do Not Allege Any Statements By Citigroup.

To allege fraud, Plaintiffs must plead facts showing (1) a specific false representation of material fact to Plaintiffs; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by Plaintiffs; (4) the intention that it should be acted upon; and (5) that Plaintiffs acted upon it to their damage. *In re Crown-Simplimatic, Inc.*, 299 B.R. 319, 323 (Bankr. D. Del. 2003). The facts in support of these elements must be alleged with the particularity required by Rule 9(b), Fed. R. Civ. P.

In this action, Plaintiffs do not allege *any* false representations of material fact by Citigroup. Instead, Plaintiffs' fraud claim against Citigroup appears to be based on two theories: (1) that Citigroup is responsible for alleged misrepresentations by Impala on an agency theory; and (2) that Citigroup committed fraud by remaining silent when representatives of Impala, Blackstone and/or Old Winstar made false representations to IDT. As shown below, Plaintiffs have not adequately pleaded facts to support either of these implausible theories.

### B.    Plaintiffs Do Not Allege Facts Supporting Their Counter-Factual Assertion That Impala Was Citigroup's "Agent."

The Complaint asserts that "Impala's actions are in, in large part, attributable to [Citigroup] because [Citigroup] acted as Impala's principal." Compl. ¶ 6. Notably, Plaintiffs do not even allege that Citigroup *was* Impala's principal, nor do they allege that Impala was Citigroup's agent. There is no factual allegation to support the illogical notion that the debtor's restructuring advisor was the agent of a creditor.

To allege an agency relationship between Impala and Citigroup, Plaintiffs must allege that Impala had actual or apparent authority to bind Citigroup. Plaintiffs' assertions of "agency,"

however, are insufficient to state a claim. *Cannon v. Douglas Elliman, LLC*, 2007 WL 4358456 (S.D.N.Y. Dec. 10, 2007) (dismissing agency claims because allegation of agency relationship was merely conclusory); *Cromer Finance Ltd. v. Berger*, 137 F. Supp. 2d 452, 487 (S.D.N.Y. 2001) (dismissing agency claims because the complaint did not contain facts evincing actual or apparent authority); *Albert v. Alex Brown Management Services, Inc.*, 2005 WL 2130607, at *10 (Del. Ch. Aug. 26, 2005) (holding that to allege claim based on agency theory plaintiff must allege facts giving rise to reasonable inference that alleged agent had actual or apparent authority to bind its alleged principal); *Eisenmann Corp. v. General Motors Corp.*, 2000 WL 140781, at *13 (Del. Sup. Ct. Jan. 28, 2000) (dismissing claim based on allegation of agency because plaintiff "merely alleges an agency relationship with no factual predicate whatsoever"). Plaintiffs' assertion that Citigroup "acted as" Impala's "principal" is at best a mere conclusory allegation of an agency relationship between Citigroup and Impala that is insufficient to survive a motion to dismiss pursuant to Rule 12(b)(6), Fed. R. Civ. P. *Cannon*, 2007 WL 4358456, at *5; *Cromer*, 137 F. Supp. 2d at 487. Plaintiffs allege no facts from which inferences of actual or apparent authority of Citigroup over Impala can be drawn. *Cannon*, 2007 WL 4358456, at *5; *Cromer*, 137 F. Supp. 2d at 487. Plaintiffs do not allege that there was any agreement, oral or in writing, between Citigroup and Impala, nor do Plaintiffs allege that Citigroup controlled Impala's actions or any other facts that could support the allegation that Citigroup was Impala's principal. Plaintiffs' use of the conclusory label "principal" is precisely the kind of use of mere "labels and conclusions" that the Supreme Court rejected in *Twombly*. 127 S. Ct. at 1964-65.

In fact, not only is Plaintiffs' assertion that Citigroup was Impala's principal merely conclusory, and thus fails to state a claim even under the old *Conley v. Gibson* standard, it is implausible given the other allegations in the Complaint concerning Impala and Old Winstar, and

thus fails for that reason as well under *Twombly*. Plaintiffs' allegations indicate that Impala acted on behalf of Old Winstar in regard to the sale of Old Winstar's business assets, not Citigroup, a creditor of Old Winstar. Plaintiffs expressly allege that "at the time of the sale of Old Winstar's assets, [Impala] was acting as a restructuring advisor *for Old Winstar*." Compl. ¶ 5 (emphasis added). Further, Plaintiffs allege that "*Old Winstar retained* Impala as a restructuring advisor, for the purpose of providing restructuring advice and other related services in connection with Old Winstar's Chapter 11 bankruptcy proceedings." *Id.* ¶ 17 (emphasis added). Plaintiffs also allege that "Impala charged Old Winstar" for its services as a restructuring advisor. *Id.* Further, Plaintiffs allege that Old Winstar had a contract with Impala. *Id.* ¶ 18.

Given these allegations indicating a principal/agent relationship between Old Winstar and Impala, Plaintiffs' conclusory allegation that Citigroup was Impala's principal is implausible. Under *Twombly*, therefore, Plaintiffs have failed to make factual allegations showing that they have a "plausibility" of entitlement to relief on the basis of their conclusory assertion that Citigroup was Impala's principal. *Twombly*, 127 S. Ct. at 1966.

Finally, even if Plaintiffs had adequately alleged facts establishing that Citigroup was Impala's "principal," Plaintiffs have not alleged with specificity the time or place of the alleged fraud by Impala for which Citigroup is allegedly responsible, nor do they utilize an "alternative means of injecting precision" in their allegations of misrepresentation. *Lum*, 361 F.3d at 224. Instead, Plaintiffs merely allege that misrepresentations were made during the alleged "due diligence" period between November 30, 2001 and December 5, 2001, without further identifying the times or places that the alleged misrepresentations were made. Compl. ¶¶ 22-30. Nor do Plaintiffs allege which representatives of Impala, Blackstone or Old Winstar made the

alleged misrepresentations or which representatives of IDT received the alleged misrepresentations. Indeed, Plaintiffs do not even allege whether the alleged misrepresentations were made in writing or orally. Thus, Plaintiffs' allegations of misrepresentations, lacking even the most basic identifying information, fail to satisfy Rule 9(b), Fed. R. Civ. P.

**C.      Plaintiffs Fail To Allege Any Facts Establishing That Citigroup Had A Duty To Speak.**

Plaintiffs' other theory of liability for fraud against Citigroup appears to be that Citigroup should have, but did not, dispute representations by Old Winstar, Blackstone and/or Impala to IDT. Fraud can occur by silence only in the face of a duty to speak. Generally, a duty to disclose arises only when there is a fiduciary or other similar relationship of trust between the parties or where the custom or course of dealing between the parties merits disclosure. *Matthews Office Designs, Inc. v. Taub Invs.*, 1994 WL 267479, at *2 (Del. May 25, 1994). Where there is no fiduciary or contractual relationship, generally there is not a duty to speak. *Id.*

Plaintiffs have failed to set forth any facts that could support any inference that Citigroup had some fiduciary or other obligation to IDT to disclose facts concerning Old Winstar's business. The Complaint alleges only that Citigroup was a creditor of the bankrupt company from which Plaintiffs decided to purchase assets. Plaintiffs do not allege any contractual or fiduciary relationship between themselves and Citigroup, nor do they allege a course of dealing with Citigroup that entitled them to any particular disclosure. *MetCap Securities LLC v. Pearl Senior Care, Inc.*, 2007 WL 1498989 (Del. Ch. May 16, 2007) (dismissing fraud claim based on allegations of fraudulent omission because plaintiffs failed to allege facts demonstrating duty to speak on part of defendant). There are no allegations, as required by Rule 12(b)(6), and under *Twombly*, providing a plausible basis for Plaintiffs to proceed under a theory that Citigroup had a duty to speak. 127 S. Ct. at 1966.

Accordingly, Plaintiffs have not stated a claim for fraud against Citigroup based on an alleged failure to disclose.

## III.

### PLAINTIFFS FAIL TO STATE A CLAIM FOR AIDING AND ABETTING FRAUD AGAINST CITIGROUP.

To state a claim for aiding and abetting fraud against Citigroup, Plaintiffs must allege facts demonstrating that (1) fraud was committed; (2) Citigroup had knowledge of the fraud; and (3) Citigroup knowingly and substantially participated in or provided substantial assistance for the wrongful act. *Brug v. The Enstar Group, Inc.*, 755 F. Supp. 1247, 1256 (D. Del. 1991); *WestRM-West Risk Markets, Ltd. v. XL Reinsurance America, Inc.*, No. 02 Civ. 7344 (MGC), 2006 WL 2034627 (S.D.N.Y. July 19, 2006). As demonstrated above, Plaintiffs have failed to state a claim for fraud against any defendant. Accordingly, they cannot state a claim for aiding and abetting fraud.

Moreover, even if Plaintiffs had adequately alleged fraud against another defendant, they have failed to allege facts demonstrating that Citigroup substantially participated in or provided substantial assistance for the alleged fraud. Plaintiffs do not allege any specific acts by Citigroup which furthered any fraud against Plaintiffs. *Brug*, 755 F. Supp. at 1256 (dismissing aiding and abetting fraud claim because plaintiffs failed to allege facts demonstrating specific acts of substantial assistance to alleged fraud).

Accordingly, Plaintiffs have failed to state a claim for aiding and abetting fraud against Citigroup and have also failed to plead the claim with particularity.

17

IV.

## PLAINTIFFS FAIL TO STATE A CLAIM FOR NEGLIGENT MISREPRESENTATION OR NEGLIGENCE AGAINST CITIGROUP.

To state a claim for negligent misrepresentation against Citigroup, Plaintiffs must allege facts demonstrating that (1) that Citigroup had a "pecuniary duty" to provide accurate information to Plaintiffs, (2) that Citigroup supplied false information to Plaintiffs, (3) that Citigroup failed to exercise reasonable care in obtaining or communicating the information, and (4) that Plaintiffs suffered pecuniary loss caused by justifiable reliance on the false information. *U.S. Aircraft Ins. Grp. v. Dwiggins, L.L.C.*, 2003 WL 22432915 at *5 (D. Del. Oct. 15, 2003); *see also Hudson River Club v. Consolidated Edison Co. of N.Y., Inc.*, 275 A.D.2d 218, 220, 712 N.Y.S.2d 104, 106 (1st Dep't 2000) ("A claim for negligent misrepresentation can only stand where there is a special relationship of trust or confidence, which creates a duty for one party to impart correct information to another, the information given was false, and there was reasonable reliance upon the information given.").

Plaintiffs fail to allege any facts that could support a claim for negligent misrepresentation against Citigroup. First, Plaintiffs fail to allege any basis for claiming that Citigroup had any duty to provide accurate information to Plaintiffs or any facts demonstrating that such a duty plausibly existed. *U.S. Aircraft Ins. Grp.*, 2003 WL 22432915, at *5 (holding that plaintiff failed to allege facts establishing duty of care in support of negligent misrepresentation claim).

Second, Plaintiffs do not allege any facts demonstrating that Citigroup supplied information to IDT, much less false information. To the contrary, Plaintiffs' allegations are that Impala, Blackstone and Old Winstar, not Citigroup, supplied information regarding the Old Winstar assets to IDT. Compl. ¶ 28. Plaintiffs cannot predicate a negligent misrepresentation

18

claim based on silence. *Brug*, 755 F. Supp. at 1259 (holding that "liability for the tort of negligent misrepresentation is premised on a defendant's supplying 'false information,' and not on the omission of material information" and dismissing negligent misrepresentation claim because "each of the six allegations of non-disclosure in plaintiff's complaint appears to concern an omission rather than a false statement" and "[t]his pleading defect is even more severe as to the Lodestar Defendants, because plaintiffs have not even claimed that Lodestar made any statements, false or otherwise").

Third, Plaintiffs do not allege that they justifiably relied upon any information supplied by Citigroup. Instead, Plaintiffs allege only that they relied on "Blackstone and Impala for accurate information" (Compl. ¶ 72) without making any allegation that they relied upon information supplied by Citigroup.[2]

Plaintiffs' "negligence" claim is indistinguishable from their "negligent misrepresentation" claim. *See* Compl. ¶¶ 84-85 (basing negligence claim on the same alleged representations regarding Old Winstar's finances and operations as their fraud and negligent misrepresentation claims). Accordingly, it fails for the same reasons — no allegations of fact establishing a basis for a duty on the part of Citigroup, no allegations of fact demonstrating that Citigroup supplied false information to Plaintiffs, and no allegations of justifiable reliance on false information provided by Citigroup.

---

[2]    Insofar as Plaintiffs seek to hold Citigroup responsible for any alleged negligent misrepresentation by Impala, their claim must be dismissed because, as discussed above, they have failed to allege any facts establishing a principal/agent relationship between Citigroup and Impala. (Point II(b), above).

**V.**

## PLAINTIFFS FAIL TO STATE A CLAIM FOR CIVIL CONSPIRACY AGAINST CITIGROUP.

Plaintiffs' Fifth Cause of Action is for "Civil Conspiracy" (Compl. ¶ 17). There is no substantive tort of conspiracy. *In re Crown-Simplimatic, Inc.*, 299 B.R. 319, 327 (Bankr. D. Del. 2003); *Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*, 871 F. Supp. 709, 731 (S.D.N.Y. 1995). Thus, there can be no separate claim for conspiracy, and this cause of action should be dismissed.

Moreover, insofar as Plaintiffs seek to hold Citigroup liable for conspiring to defraud Plaintiffs as to the value of Old Winstar's business assets, their claim fails because they fail to allege facts that establish the elements of such a claim against Citigroup. To state a claim predicated on civil conspiracy, Plaintiffs must plead facts supporting (1) the existence of a confederation or combination with two or more persons; (2) that an unlawful act was done in furtherance of the conspiracy; and (3) actual damages to Plaintiffs caused by the conspirators. *In re Am. Bus. Fin. Servs., Inc.*, 361 B.R. 747, 762 (Bankr. D. Del. 2007). The allegations of conspiracy to commit fraud must be made with particularity. *Id.* (citing *Kalmanovitz v. G. Heilman Brewing Co. Inc.*, 595 F. Supp. 1385, 1401 (D. Del. 1984) ("Only allegations of conspiracy which are particularized, such as those addressing the period of the conspiracy, the object of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose, will be deemed sufficient.")).

Here Plaintiffs have failed to allege any facts with the required particularity establishing that there was any combination between Citigroup and the other defendants. Further, Plaintiffs have failed to allege any facts with the required particularity establishing illegal acts done in furtherance of any conspiracy. Accordingly, to the extent Plaintiffs seek to predicate their fraud

20

claim on civil conspiracy, it must be dismissed. *In re Am. Bus. Fin. Servs., Inc.*, 361 B.R. at 763 (dismissing civil conspiracy claim because "the facts surrounding the alleged civil conspiracy are pled inadequately").

**CONCLUSION**

For all of the foregoing reasons, Defendant Citigroup respectfully requests that the Court grant its motion to dismiss Plaintiffs' Complaint, pursuant to Rules 12(b)(6) and 9(b),  Fed. R. Civ. P., and grant such other and further relief as the Court may deem just and proper.

Dated: January 22, 2008

> Respectfully submitted,
>
> GREENBERG TRAURIG, LLP
>
> By: _____
> Victoria W. Counihan (No. 3488)
> Dennis A. Meloro (No. 4435)
> The Nemours Building
> 1007 North Orange Street, Suite 1200
> Wilmington, Delaware 19801
> Tel:  (302) 661-7000
> Fax: (302) 661-7360
> counihanv@gtlaw.com
> melorod@gtlaw.com
>
> - and -
>
> Stephen L. Saxl
> William A. Wargo
> GREENBERG TRAURIG, LLP
> 200 Park Avenue, 39th Floor
> New York, New York 10166
> Tel:  (212) 801-9200
> Fax: (212) 801-6400
>
> *Attorneys for Defendant Citigroup Inc., as
> successor by merger to Citicorp*

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ORIGINAL

|  |  |
|---|---|
| WINSTAR HOLDINGS, LLC and<br>IDT CORP.,<br><br>　　　　　　　　　Plaintiffs,<br><br>　　　-against-<br><br>THE BLACKSTONE GROUP LP;<br>IMPALA PARTNERS, LLC; and<br>CITICORP,<br><br>　　　　　　　　　Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

Index No.
Date Purchased

Plaintiff designates NEW YORK 07601582
County as the place of trial.

The basis of this venue is
residence of defendants; location where the cause
of action arose; and Plaintiffs' designation.

**SUMMONS**

Plaintiffs reside at
520 Broad Street
Newark, New Jersey

County of Essex

FILED
MAY 10 2007
NEW YORK
COUNTY CLERKS

To the above named Defendants:

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer on the Plaintiffs' Attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:　New York, New York
　　　　May 10, 2007

　　　　　　　MOUND COTTON WOLLAN & GREENGRASS

　　　　　　　Philip C. Silverberg, Esq.
　　　　　　　Gretchen Henninger, Esq.
　　　　　　　One Battery Park Plaza
　　　　　　　New York, NY  10004-1486
　　　　　　　Telephone: (212) 804-4200

and

Melissa Roover, Esq.
GRAYSON & KUBLI, P.C
1420 Spring Hill Road, Suite 230
McLean, VA 22102
(703) 749-0000

Attorneys for Plaintiffs
WINSTAR HOLDINGS, LLC and
IDT CORP.

TO:     The Blackstone Group LP
        345 Park Avenue
        New York, NY 10154

        Impala Partners, LLC
        18 Marshall Street, Suite 112
        Norwalk, CT 06854

        Citicorp
        399 Park Avenue
        New York, NY 10043

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X
WINSTAR HOLDINGS, LLC,
 and IDT CORP.,

                                                       Index No.:

              Plaintiffs,

    -against-

THE BLACKSTONE GROUP LP;
IMPALA PARTNERS, LLC; and        **COMPLAINT** 7601582
CITICORP,

            Defendants.
-------------------------------------------------------------------X

FILED
MAY 10 2007

Plaintiffs, Winstar Holdings, LLC and IDT Corp., by and through its attorneys, Mound

Cotton Wollan & Greengrass, as and for its complaint against Defendants, The Blackstone

Group LPI, Impala Partners, LLC, and Citicorp, hereby allege as follows:

    1.     In 2001, Plaintiffs spent $42.5 million to acquire the business assets of Winstar

Communications, Inc., and related entities ("Old Winstar"). In doing so, they relied on the oral

and written misrepresentations of the Defendants regarding Old Winstar sales, customers, and

other material information. As a result, the Plaintiffs lost hundreds of millions of dollars. The

Plaintiffs bring this action to recover for those injuries.

<u>**PARTIES**</u>

    2.     Plaintiff Winstar Holdings, LLC, formerly known as IDT Winstar Acquisition,

Inc. ("New Winstar"), is a Delaware corporation. It acquired the business assets of Old Winstar

in an Asset Purchase Agreement dated December 18, 2001.

3.    Plaintiff IDT Corp. ("IDT") is a Delaware corporation. It is, among other things, a telephone company. It provided the funds for the purchase of Old Winstar, and bore most of the resulting subsequent losses.

4.    Defendant The Blackstone Group LP ("Blackstone") is a Delaware limited partnership. Its principal office is at 345 Park Avenue, New York, NY 10154. In the sale of Old Winstar's assets, it acted as an investment advisor to various entities related to Old Winstar.

5.    Defendant Impala Partners, LLC ("Impala") is a Delaware limited partnership. Its principal office is at 18 Marshall Street, Suite 112, Norwalk, Connecticut 06854. Upon information and belief, at the time of the sale of Old Winstar's assets, it was acting as a restructuring advisor for Old Winstar.

6.    Defendant Citicorp ("Citicorp") is a Delaware corporation. Its principal office is at 399 Park Avenue, New York, New York 10043. It was the largest creditor of Old Winstar while Old Winstar was a debtor in bankruptcy. Impala's actions are, in large part, attributable to Citicorp because Citicorp acted as Impala's principal. Allegations regarding Citicorp include, but are not limited to, allegations regarding Impala that are imputed to Citicorp.

## JURISDICTION AND VENUE

7.    The Supreme Court of the State of New York, as a court of general original jurisdiction, has subject matter jurisdiction of this action.

8.    Personal jurisdiction exists in this action because, among other reasons: the Defendants transact business within the state or contracted to supply goods or services within the state; have committed a tortious act within the state; and own, use or possess real property within the state.

9.    Venue lies in this County because Defendants Blackstone's and Citicorp's principal offices are located in this County, the cause of action arose in the county, and the Plaintiffs designate the county.

## ALLEGATIONS

10.    In and around 2001, IDT examined several potential acquisitions in the field of telecommunications.

11.    Through 2001, Old Winstar provided telephone service to customers using a "fixed wireless" system. This system carried calls locally by wireless means, from customer locations to Old Winstar's local "hubs."

12.    On information and belief, Old Winstar maintained an office in New York City. It also maintained some of its books and records in New York City.

13.    Old Winstar was a publicly traded company. On April 18, 2001, Old Winstar petitioned for protection under Chapter 11 of the U.S. Bankruptcy Code. The bankruptcy petition was filed in the U.S. Bankruptcy Court for the District of Delaware.

14.    On information and belief, Blackstone was retained as a financial advisor, and Blackstone's responsibility was to obtain the highest possible sale price for the assets of Old Winstar. Upon information and belief, Blackstone's compensation varied with the sale price that it obtained for Old Winstar's assets. Specifically, Blackstone received, *inter alia,* a transaction fee equal to 1% of the first $200 million of consideration paid by an acquirer. This provided Blackstone with an incentive to maximize – or inflate -- that consideration.

15.    The division of Blackstone performing the financial advisory work for Old Winstar was Blackstone's Restructuring & Reorganization Advisory Group. This group claims

3

to have provided advisory services in over 150 "distressed situations." On information and belief, it is an unincorporated division of Blackstone.

16. At all relevant times, the head of Blackstone's Restructuring & Reorganization Advisory Group was Arthur Newman ("Newman"). Newman also was a member of Blackstone's Executive Committee. The Executive Committee oversees all of Blackstone's policy decisions.

17. Upon information and belief, Old Winstar retained Impala as a restructuring advisor, for the purpose of providing restructuring advice and other related services in connection with Old Winstar's Chapter 11 bankruptcy proceedings. As compensation, Impala charged Old Winstar $250,000 per month for the first two months of its services. Thereafter, Impala's compensation was $100,000 per month for the services of Paul Street, who acted as the Chief Restructuring Officer for Old Winstar. Impala charged various other amounts for other Impala personnel. In addition, upon the sale of all or substantially all of Old Winstar's assets, in one or more transactions, in which the aggregate consideration paid by the purchaser was less than $350 million, Impala earned a transaction fee of 0.25% of such consideration. Upon the sale of all or substantially all of the Old Winstar's assets, in one or more transactions, in which the aggregate consideration paid by the purchaser was equal to or greater than $350 million, Impala earned a transaction fee of 2.0% of such consideration. Thus Impala was motivated to obtain the highest possible sale price for the Winstar assets.

18. Upon information and belief, Citicorp, as Old Winstar's largest creditor, assisted Old Winstar in negotiating its contract terms with Impala. Citicorp acted as Impala's principal.

19. To promote the sale of Old Winstar's business assets, Blackstone prepared an offering statement. Upon information and belief, Impala assisted with the preparation of the

4

offering statement. Blackstone, Citicorp, and Impala also controlled bidder access to Winstar staff, and Winstar records.

20.     In connection with the sale of Old Winstar's business assets, Blackstone, Citicorp, and Impala assisted in the development of financial data and presentations to Old Winstar's Board of Directors, various creditors and other parties. Blackstone reviewed financial analyses generated by Old Winstar's finance staff and external advisors. Blackstone also performed various analyses, including cash reconciliation of Old Winstar's actual performance vs. various sets of projections. Blackstone petitioned for payment for this work, and the petition was granted.

21.     IDT was one of several entities that expressed an interest in acquiring Old Winstar's business assets.

22.     An auction of Old Winstar's business assets was planned for December 2001. Leading up to that auction, Blackstone circulated an "offering book." Blackstone also met with IDT and, on information and belief, other entities interested in bidding in the auction. In meetings organized by Blackstone, several Winstar officials also met with IDT and, on information and belief, other interested entities. The meetings generally were held within this County. Certain Old Winstar business records also were made available to IDT at that time, generally in an area known as the "data room," which was located within this County. Collectively, this communication and review was known as "due diligence."

23.     In accordance with the timing established for the auction, IDT's due diligence was conducted between Friday, November 30, 2001, and Wednesday, December 5, 2001.

24.     A number of IDT representatives engaged in this due diligence.

25.    Blackstone's representatives included Arthur Newman.  Newman engaged in substantive discussions about Old Winstar's business with representatives of IDT,  Howard Jonas, *inter alia.*

26.    Impala's representatives included Paul Street.

27.    Old Winstar's representatives included Chief Financial Officer David Duncan, *inter alia.*

28.    During this due diligence, Blackstone, Impala, and Old Winstar each made the following material representations (*inter alia*) regarding the status of Old Winstar's business:

    a.    that Old Winstar's business was generating $16 million or more per month in revenue;

    b.    that Old Winstar's "cash burn" (*i.e.,* losses) had been reduced to $10-12 million per month;

    c.    that Old Winstar had 9,000 paying customers;

    d.    that Old Winstar had 50,000 revenue-generating telephone lines;

    e.    that Old Winstar's "churn rate" (the rate at which existing customers discontinued service) was only 3% per year; and

    f.    that Old Winstar was employing an intercity optical network built by Lucent (the "Lucent network") to serve Old Winstar's customers.

29.    On occasions when Old Winstar made these representations, they were made in the presence of Blackstone, Citicorp, and Impala; and Blackstone, Citicorp, and Impala did not dispute them, even though they knew or should have known that these representations were false, and that the plaintiffs would rely on these representations.

30.    Each of these representations was false and fraudulent.  The truth, known to the Defendants but not to IDT, was as follows:

    a.    that Old Winstar's business was generating substantially less than $16 million per month in revenue, and its revenue was declining;

b. that Old Winstar's cash burn was materially higher than $10-$12 million per month;

c. that Old Winstar had far fewer than 9,000 paying customers, and indeed was providing service to many customers who were not paying Old Winstar;

d. that Old Winstar had far fewer than 50,000 revenue-generating telephone lines, and in fact was carrying and paying for many lines that were not generating any revenue;

e. that Old Winstar's "churn rate" was far higher than 3%, in part because Old Winstar continued to maintain and pay for telephone lines, and count them as revenue-generating, long after customers had discontinued service; and

f. that the Lucent network carried no Old Winstar customer traffic in or around December 2001 and, indeed, most of the Lucent network never would.

31. Notably, despite this information being solely within their possession, Blackstone, Impala, Citicorp, and Old Winstar did not provide client information in any detail that would have allowed IDT and New Winstar to uncover the Defendants' false statements and material omissions.

32. Indeed, Blackstone, Citicorp and Impala fraudulently withheld information within their possession, custody or control, including but not limited to the following: (a) that Winstar was required to continue to serve federal and other customers without regard to profit, and (b) that local telephone companies could extort concessions from Old Winstar by threatening to discontinue termination of calls placed by Old Winstar customers.

33. On information and belief, Blackstone, Citicorp, Impala, and Old Winstar all hid and blocked IDT's access to material information about Old Winstar's finances and operations. Indeed, IDT had no access to this important information.

7

34.    The figures in the documents that were offered to IDT, including receivables reports, historical financial statements and contract summaries, were heavily distorted by (*inter alia*) Old Winstar's recording of revenue – sometimes for years – from customers who had discontinued service.

35.    Unaware of the true state of Old Winstar's affairs, IDT established New Winstar, for the purpose of acquiring Old Winstar's business assets. IDT injected a substantial amount of capital into New Winstar.

36.    The information that Blackstone, Impala, and Old Winstar provided during due diligence regarding Old Winstar's business and operations was material to IDT's decision to acquire Old Winstar's business assets. Upon information and belief, Blackstone, Citicorp, and Old Winstar knew that this information was false, or they were negligent in not knowing that. Blackstone and Old Winstar intended that IDT and New Winstar would rely upon this information. IDT and New Winstar did rely upon this information. This reliance was reasonable. IDT and New Winstar were deceived by this information.

37.    The information that Blackstone, Impala, Citicorp, and Old Winstar omitted to provide during due diligence regarding Old Winstar's business and operations was material to IDT's decision to acquire Old Winstar's business assets. Upon information and belief, Blackstone and Old Winstar knew that this information was material, or they were negligent in not knowing that. Blackstone and Old Winstar intended that IDT and New Winstar would rely upon the absence of this information. IDT and New Winstar did rely upon the absence of this information. This reliance was reasonable. IDT and New Winstar were deceived by the failure to disclose this information.

8

38.     As a direct and proximate result of the Defendants' misrepresentations and omissions, IDT and New Winstar submitted a bid in the auction for Old Winstar's assets, conducted on December 5, 2001.  Absent the misinformation provided by Blackstone and Old Winstar, Plaintiffs would not have done so.

39.     The apparent successful offeror in the auction was an entity other than IDT/New Winstar.  That entity was related to William J. Rouhana, Jr., the former Chairman of the Board and CEO of Old Winstar.  Despite this, Blackstone encouraged IDT to remain interested in purchasing Old Winstar's assets.

40.     On information and belief, the Rouhana entity was unable or unwilling to close the transaction.

41.     Between December 5, 2001 and December 17, 2001, there was no opportunity for any further due diligence by IDT because the Defendants did not permit it.

42.     On or about December 17, 2001, IDT learned that the Rouhana entity had failed to purchase Old Winstar's assets.  The bankruptcy court required IDT to sign an agreement for these assets (if IDT desired to purchase them) by noon on the following day.

43.     As a result of the Defendants' misrepresentations and omissions, on or about December 18, 2001, Old Winstar and New Winstar entered into an Asset Purchase Agreement (the "Agreement") for the transfer of Old Winstar's business assets, and certain other assets.

44.     On or about December 19, 2001, the bankruptcy court approved the Agreement.

45.     On or about December 20, 2001, the Agreement closed, *i.e.,* payment was made and assets were transferred.  On or around that date, New Winstar took over the operation of Winstar's business.

9

46.    New Winstar appointed employees to collect on accounts receivable. In many cases, the purported "customers" told those employees that service had been canceled years earlier, yet Old Winstar had continued to bill for the service.

47.    New Winstar learned that Old Winstar had inflated its reported revenue by a variety of means, including "swaps" (pairs of companies each reporting revenue from the other, without any actual payment), "dead" accounts, and "made-up" billing.

48.    As a result of the misrepresentations and material omissions during due diligence, New Winstar's revenues were materially less than represented. Between August 1, 2001 and July 31, 2002, a period that included several months preceding the asset purchase, Winstar's revenue was only $79.6 million, or less than $7 million a month. During the following year (8/02 - 7/03), revenue was only $87.5 million, and the year after that (8/03 - 7/04), revenue was only $71.6 million. In other words, Old Winstar's revenues had been overstated by over 200%.

49.    Much later, Winstar's business was sold to an entity independent of IDT.

50.    As a direct and proximate result of Blackstone's, Citicorp's, and Impala's tortuous misconduct, IDT and New Winstar have suffered losses of over $300 million.

## FIRST CAUSE OF ACTION
## (Fraud)

51.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 50 as if fully set forth herein.

52.    Blackstone, Citicorp, and Impala knowingly engaged in the various deceitful means enumerated above to deprive IDT and New Winstar of their property permanently.

53.    More specifically, Blackstone, Citicorp, and Impala made numerous false representations of material fact and material omissions, as set forth above and below. The Defendants knew that these representations and material omissions were false, or they made

10

them with reckless disregard for their truth or falsity. Blackstone, Citicorp, and Impala intended IDT and New Winstar to rely on these false statements and omissions. IDT and New Winstar reasonably relied on them. As a result, IDT and New Winstar were injured.

54.    The Defendants' false statements and material omissions were not mere projections or promises to perform, but actual representations of existing fact known only to the Defendants.

55.    The representations were made by individuals acting as agents of Blackstone, Citicorp, and Impala, who acted within the scope of their employment.

56.    The representations and omissions were made in New York, within this County. They were made during November and December 2001, by means of telephone, faxes, e-mail, in person, and indirectly through other authorized agents and through documents, as explained above.

57.    Blackstone, Citicorp, and Impala knew that these misrepresentations were false and the omissions material, or acted in reckless disregard for their truth or falsity.

58.    Blackstone, Citicorp, and Impala intended that IDT and New Winstar rely upon these misrepresentations and omissions, because they sought fraudulently to induce IDT and New Winstar to enter into the Agreement, and they sought to profit from that agreement. IDT and New Winstar reasonably relied on these misrepresentations and omissions.

59.    Blackstone, Citicorp, and Impala also failed to inform IDT and New Winstar of numerous material facts. For instance, Blackstone, Citicorp, and Impala  failed to inform IDT and New Winstar that Old Winstar customers who had terminated service continued to be counted as Old Winstar customers, that Old Winstar continued to book revenue from such customers, and that Old Winstar continued to pay for telephone lines to service such customers.

11

As alleged above, Blackstone, Citicorp, and Impala also fraudulently withheld the material information that Winstar was required to continue to serve federal and other customers without regard to profit, and that local telephone companies could extort concessions from Winstar by threatening to discontinue termination of calls placed by Winstar customers. These all were material fraudulent omissions that Blackstone, Citicorp, and Impala had a duty to disclose to IDT and New Winstar.

60.     If IDT and New Winstar had known the truth regarding Winstar's finances and operations, they would not have entered into the Agreement. They would have retained the purchase price under that Agreement, and they would have avoided the losses that they necessarily experienced as a direct result of acquiring Old Winstar's business assets. Therefore they have been injured.

61.     For the reasons alleged above, Blackstone, Citicorp, and Impala acted recklessly, willfully and wantonly. Their conduct was gross, and morally reprehensible. Blackstone, Citicorp, and Impala exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.

61.     For the reasons alleged above, IDT and New Winstar are entitled to the following relief against Blackstone, Citicorp and Impala:

> a.     A monetary award of compensatory damages for fraud;
>
> b.     A monetary award of punitive damages in the maximum amount permitted by law;
>
> c.     Interest and costs; and
>
> d.     Such further relief as the Court deems just.

## SECOND CAUSE OF ACTION
### (Aiding and Abetting Fraud)

62.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 61 as if fully set forth herein.

63.    Based upon the allegations stated above, IDT and New Winstar are victims of fraud.

64.    Blackstone, Citicorp and Impala knowingly aided and abetted in Old Winstar's commission of fraud, and participated in the fraud, in the manners alleged above.

65.    Blackstone, Citicorp, and Impala's conduct was gross, and morally reprehensible. Blackstone, Citicorp and Impala exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.

66.    IDT and New Winstar suffered significant injury as a direct result of the fraud.

67.    For the reasons alleged above, IDT and New Winstar are entitled the following relief against Blackstone, Citicorp and Impala:

      a.    A monetary award of compensatory damages for aiding and abetting fraud;

      b.    A monetary award of punitive damages in the maximum amount permitted by law;

      c.    Interest and costs; and

      d.    Such further relief as the Court deems just.

## THIRD CAUSE OF ACTION
### (Negligent Misrepresentation)

68.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 67 as if fully set forth herein.

13

69.    Blackstone, Citicorp and Impala made the misrepresentations and omissions to IDT and New Winstar enumerated under the claim for fraud above, directly or indirectly.

70.    The individuals who made the direct misrepresentations to IDT and New Winstar acted as agents for Blackstone, Citicorp and Impala.

71.    Blackstone, Citicorp and Impala owed IDT and New Winstar a duty of care to ensure that its statements to IDT and New Winstar were true.

72.    IDT and New Winstar reasonably and justifiably relied on Blackstone and Impala for accurate information.

73.    Blackstone, Citicorp and Impala intended for IDT and New Winstar to rely upon the information that they provided.

74.    The information that Blackstone, Citicorp and Impala provided to IDT and New Winstar was false, in the manner described under the claim for fraud above.

75.    IDT and New Winstar were injured by the false information that Blackstone, Citicorp and Impala provided to them.

76.    Blackstone, Citicorp and Impala's negligent misrepresentations were willful and wanton.  They acted with such indifference as to whether IDT and New Winstar would be harmed as to be equivalent to an intent to harm them.

77.    Blackstone, Citicorp and Impala's conduct was gross, and morally reprehensible. Blackstone, Citicorp and Impala exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.

78.    For the reasons alleged above, IDT and New Winstar are entitled the following relief against Blackstone, Citicorp and Impala:

        a.    A monetary award of compensatory damages for negligent misrepresentation;

14

b.    A monetary award of punitive damages on account of Blackstone's willful and wanton negligence, in the maximum amount permitted by law;

c.    Interest and costs; and

d.    Such further relief as the Court deems just.

### FOURTH CAUSE OF ACTION
#### (Negligence)

79.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 78 as if fully set forth herein.

80.    Blackstone, Citicorp and Impala are experienced professional organizations in the field of finance.

81.    Blackstone claims to be a world leader in private equity; among the largest in private equity real estate investments; a leader in private mezzanine and structured debt vehicles; and a leader in providing "unconflicted" advice and counsel to senior management. Blackstone's Restructuring & Reorganization Advisory Group claims to be a market leader, having advised in over 150 distressed situations, involving $350 billion of outstanding debt.

82.    Arthur Newman, the head of Blackstone's Restructuring & Reorganization Advisory Group, has forty years of experience, including thirty years in reorganization. He claims to have served as advisor on some of the largest business restructurings in history.

83.    Impala claims to be a world leader in restructuring advice to troubled companies. Impala claims to have been involved in transactions totaling over $7 billion since 1997.

84.    As alleged above, Blackstone, Citicorp and Impala directly and indirectly made representations to IDT and New Winstar regarding Old Winstar's finances and operations. On information and belief, Blackstone, Citicorp and Impala did not exercise due care in ascertaining or disseminating this information.

15

85.     Blackstone, Citicorp and Impala owed IDT and New Winstar a duty of care in ascertaining and disseminating this information. It was reasonably foreseeable to Blackstone, Citicorp and Impala that their negligence would injure IDT and New Winstar, because IDT and New Winstar would be induced to enter into the Agreement, and then to incur significant additional losses.

86.     Blackstone, Citicorp and Impala failed to exercise reasonable care in this regard. To the contrary, their lack of care was willful and wanton. They acted with malice, intending to harm IDT and New Winstar, because (on information and belief) the more that IDT and New Winstar paid under the Agreement, the more that Blackstone and Impala could receive as compensation. In the alternative, Blackstone, Citicorp and Impala acted with such indifference as to whether IDT and New Winstar would be harmed as to be equivalent to intent to harm IDT and New Winstar.

87.     In all other respects, the Defendants failed to act with due care to provide accurate information to IDT and New Winstar.

88.     The natural and probable consequence of the Defendants' negligence was that IDT and New Winstar were induced to enter into the Agreement, and to incur additional subsequent losses, which have caused significant injury to IDT and New Winstar.

89.     Blackstone, Citicorp and Impala's conduct was gross, and morally reprehensible. Blackstone, Citicorp and Impala exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations. They were reckless and willful.

90.     For the reasons alleged above, IDT and New Winstar are entitled the following relief against Blackstone, Citicorp and Impala:

a.      A monetary award of compensatory damages for negligence;

16

b.    A monetary award of punitive damages on account of the Defendant's willful and wanton negligence, in the maximum amount permitted by law;

c.    Interest and costs; and

d.    Such further relief as the Court deems just.

### FIFTH CAUSE OF ACTION
### (Civil Conspiracy)

91.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 90 as if fully set forth herein.

92.    The Defendants engaged in a combination and conspiracy involving four conspirators:

a.    the officers, employees and agents of Blackstone; and

b.    the officers, employees and agents of Impala; and

c.    the officers, employees and agents of Citicorp; and

d.    the officers, employees and agents of Old Winstar.

93.    These conspirators combined for the purpose of injuring IDT and New Winstar. Specifically, the conspirators sought to deprive IDT and New Winstar of their property interests in the purchase price of the Agreement, and the funds used to pay for subsequent Winstar losses. The Defendants did so not only in the manners alleged above, but also by means of the following overt acts, *inter alia*:

a.    announcing and conducting of the auction;

b.    creating the data room, and the invitation to IDT and New Winstar representatives (and, on information and belief, others) to examine its contents;

c.    engaging in other communications relating to Old Winstar's finances and operations, as alleged above;

d.    the negotiation, preparation and execution of the Agreement; and

17

e.  actions taken to obtain bankruptcy court approval of that Agreement.

94.  The Defendants' conspiracy has caused IDT and New Winstar injury, including the special damages of (*inter alia*) payment of the Purchase Price of $42,500,000 set forth in Section 3.1 of the Agreement. The Defendants' conspiracy deprived IDT and New Winstar of this amount. In addition to this, IDT and New Winstar have suffered special damages for losses incurred following the acquisition of Winstar's business assets, which total approximately $300 million.

95.  The conspirators acted recklessly, willfully and wantonly. Their conduct was gross, and morally reprehensible. They exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.

96.  For the reasons alleged above, IDT and New Winstar are entitled the following relief against Blackstone, Citicorp and Impala:

a.  A monetary award of compensatory damages for civil conspiracy;

b.  A monetary award of punitive damages for civil conspiracy, in the maximum amount permitted by law;

c.  Interest and costs; and

d.  Such further relief as the Court deems just.

## JURY REQUEST

97.  The Plaintiffs request a jury for all issues that may be tried by a jury.

WHEREFORE, IDT and New Winstar seek the following relief against Blackstone, Citicorp and Impala:

18

a.    A monetary award of compensatory damages for fraud; aiding and abetting fraud, negligent misrepresentation, negligence, and civil conspiracy;

b.    A monetary award of punitive damages in the maximum amount permitted by law for fraud, aiding and abetting fraud, negligent misrepresentation, negligence, and civil conspiracy;

c.    Interest and costs; and

d.    Such further relief as the Court deems just.

Dated: New York, New York
       May 10, 2007

MOUND COTTON WOLLAN & GREENGRASS

Philip C. Silverberg, Esq.
Gretchen Henninger, Esq.
One Battery Park Plaza
New York, NY 10004-1486
Telephone: (212) 804-4200

and

Melissa Roover, Esq.
GRAYSON & KUBLI, P.C
1420 Spring Hill Road, Suite 230
McLean, VA 22102
(703) 749-0000

Attorneys for Plaintiffs
WINSTAR HOLDINGS, LLC and
IDT CORP.

19

# EXHIBIT B

Westlaw.

Slip Copy
Slip Copy, 2007 WL 4323003 (S.D.N.Y.)
**(Cite as: Slip Copy)**

Winstar Holdings, LLC v. Blackstone Group L.P.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
WINSTAR HOLDINGS, LLC and IDT Corp.,
Plaintiffs,
v.
The BLACKSTONE GROUP L.P., Impala Partners,
LLC, and Citicorp, Defendants.
**No. 07 Civ. 4634(GEL).**

Dec. 10, 2007.

Joseph M. Vann (Jed Lewin, of counsel), Cohen Tauber Spievack & Wagner LLP, New York, NY, and Melissa A. Roover (Alan M. Grayson, of counsel), Grayson & Kubli, P.C., McLean, VA, for plaintiffs.
Vickie Reznik (Yosef J. Riemer, David S. Flugman, of counsel), Kirkland & Ellis LLP, New York, NY, for defendant The Blackstone Group, L.P.
Andrew C. Gold (Stephen M. Rathkopf, of counsel), Herick, Feinstein LLP, New York, NY, for defendant Impala Partners, LLC.
Stephen L. Saxl (William Wargo, of counsel), Greenberg Traurig, LLP, New York, NY, for defendant Citicorp.

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge.

*1 The parties to this case agree on one thing: they don't want to be here. They disagree, however, on where they should be. Plaintiffs filed this action in the Supreme Court of the State of New York, where they believe it should remain; accordingly, they have moved to remand the case to the state court. Defendants removed the case to this Court, only in order to move to transfer the case to the United States Bankruptcy Court for the District of Delaware. The plaintiffs' motion will be denied, and defendants' motion granted.

**BACKGROUND**

Plaintiff IDT Corp. formed plaintiff Winstar Holdings, LLC, in order to acquire the assets of Winstar Communications, Inc. ("Old Winstar"), and related entities. Old Winstar had filed for bankruptcy

protection in the Bankruptcy Court in Delaware, and was in the process of liquidation. With the approval of the Bankruptcy Court, Old Winstar retained defendant Blackstone Group, L.P. as its financial advisor, and defendant Impala Partners, LLC ("Impala") as a restructuring advisor. Defendant Citicorp, Old Winstar's largest creditor, played a role in negotiating the terms of the contract between Old Winstar and Impala. Plaintiffs purchased the business assets of Old Winstar from the bankruptcy estate at an auction approved by the Bankruptcy Court for $42.5 million pursuant to an Asset Purchase Agreement ("APA") dated December 18, 2001, which was approved by the Bankruptcy Court the following day. The APA contains a forum selection clause in which the parties agree that the United States Bankruptcy Court for the District of Delaware shall have exclusive jurisdiction to resolve any dispute arising out of or related to the APA. (APA § 9.10, Gold Decl. Ex. 1.) The Bankruptcy Court's order approving the sale similarly provides that that court retains "exclusive jurisdiction" to "resolve any disputes arising under or related to" the APA. (Sale Order ¶ 15, Gold Decl. Ex. 2.)

Plaintiffs allege that they were induced to enter the APA by various misrepresentations made by the defendants and by Old Winstar in an offering statement. Their claims sound solely in New York common law.

**DISCUSSION**

I. *Plaintiffs' Motion to Remand*

The threshold issue in addressing plaintiffs' remand motion is whether federal jurisdiction over this case exists because it "aris[es] in" a bankruptcy case or "aris[es] under" the bankruptcy code, or merely because it is "related to" a bankruptcy case. Although 28 U.S.C. § 1334(b) provides for federal jurisdiction in either situation, if the case is merely one "related to" the Old Winstar bankruptcy, and could not otherwise be brought in a federal court, statutory provisions requiring (28 U.S.C. § 1334(c)(2)) or permitting (28 U.S.C. § 1334(c)(1)) the Court to abstain from exercising jurisdiction and deferring to the state courts may apply. If, however, the case is a "core" bankruptcy proceeding that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"arises under" the bankruptcy code or "arises in" a bankruptcy case, the mandatory abstention provision by its own terms do not apply and permissive abstention is less likely. Plaintiffs, accordingly, argue that the Court has, at most, "related to" jurisdiction,[FN1] while defendants contend that the case comes within the "arising in" or "arising under" headings of jurisdiction.

> FN1. Plaintiffs argue, in fact, that defendants have not established even "related to" jurisdiction (P. Remand Mem. 10-12), but their arguments in this regard are unpersuasive. Whether an action is "related to" a bankruptcy depends on whether there is "a significant connection" between the action and the underlying bankruptcy. *In re Turner,* 724 F.2d 338, 341 (2d Cir.1983) (citations and internal quotation marks omitted). The "proceeding need not necessarily be against the debtor or against the debtor's property."*In re WorldCom, Inc. Sec. Litig.,* 293 B.R. 308, 317 (S.D.N.Y.2003), quoting *Celotex Corp. v. Edwards,* 514 U.S. 300, 308 n. 6 (1995). In any ordinary sense, the connection between this case and the bankruptcy is obvious: the sale that is the subject of the litigation was an aspect of the bankruptcy proceeding. More importantly, the outcome of the action " 'could alter the debtor's rights, liabilities, options or freedom of action' " and affect " 'the handling and administration of the bankrupt estate.' " *WorldCom,* 293 B.R. at 317, quoting *Celotex,* 514 U.S. at 308 n. 6 (1995). Although plaintiffs have not named Old Winstar as a defendant, Impala allegedly has indemnification rights against Old Winstar. While plaintiffs claim that the indemnification cannot apply to this case because of an exclusion for "willful misconduct," and because (according to plaintiffs) there is no estate left to affect, the bankruptcy proceedings are on-going, as is litigation that could bring assets into the estate. The Court cannot assume the correctness of plaintiffs' assertions, which turn on facts yet to be found or even in some instances to occur. It is unquestionable that the outcome of this case "could" affect the debtor, and that is sufficient to invoke the "related to" jurisdiction. "Related to" jurisdiction exists where "the outcome of

[the] proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984) (citations and italics omitted); *In re Cuyahoga Equip. Corp.,* 980 F.2d 110, 114 (2d Cir.1992) (A litigation has a "significant connection with a pending bankruptcy proceeding" and "falls within the 'related to' jurisdiction of the bankruptcy court" if the outcome "might have any 'conceivable effect' on the bankrupt estate.") As the courts have recognized, " 'A key word in [the] test is 'conceivable.' Certainty, or even likelihood, is not required. Bankruptcy jurisdiction will exist so long as it is possible' " that the proceeding may affect the debtor's rights or the administration of the estate. *In re Dow Corning Corp.,* 86 F.3d 482, 491 (6th Cir.1996), quoting *In re Marcus Hook Dev. Park Inc.,* 943 F.2d 261, 264 (3d Cir.1991).

A. *"Arising Under" Jurisdiction*

**\*2** The most frequently cited explanation of the meaning of "arising under" jurisdiction can be found in the legislative history of the Bankruptcy Reform Act of 1978. The House Report accompanying the bill that became that Act noted that

The phrase "arising under" has a well defined and broad meaning in the jurisdictional context. By a grant of jurisdiction over all proceedings arising under title 11, the bankruptcy courts will be able to hear any matter under which a claim is made under a provision of title 11. For example, a claim of exemptions under 11 U.S.C. § 522 would be cognizable by the bankruptcy court, as would a claim of discrimination in violation of 11 U.S.C. § 525. Any action by the trustee under an avoiding power would be a proceeding arising under title 11, because the trustee would be claiming based on a right given by one of the sections in subchapter III of chapter 5 of title 11.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 445 (1977). As the leading commentator on bankruptcy law puts it, "What this language seems to mean is that, when a cause of action is one which is created by title 11, then that civil proceeding is one 'arising under title 11.' " 1 Collier on Bankruptcy ¶ 3.01[4][c][i] at 3-21 (15th ed. rev.2007).

The language of the statute is self-consciously

Slip Copy
Slip Copy, 2007 WL 4323003 (S.D.N.Y.)
(Cite as: Slip Copy)

patterned on that of the general federal question jurisdiction statute, which provides for federal court jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States."28 U.S.C. § 1331. *See also*U.S. Const. Art. III § 2, cl. 1 ("The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority."). While the precise meaning of "arising under" in the general federal question context has vexed courts and commentators, *see*13B Wright, Miller and Cooper, Federal Practice and Procedure § 3562 (2d ed.1984), it has been suggested that an action arises under federal law "if in order for the plaintiff to secure the relief sought he will be obliged to establish both the correctness and the applicability to his case of a proposition of federal law."Bator, Mishkin, Shapiro & Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 889 (2d ed.1973), quoted with approval in *Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U .S. 1, 9 (1983). Moreover, it is well established that a case does not arise under federal law unless "the plaintiff's statement of his own cause of action shows that it is based upon" federal law. *Louisville & Nashville R.R. Co. v. Mottley,* 211 U.S. 149, 152 (1908).

Applying these standards to this case, it is plain that the instant case does not arise under title 11. Simply put, plaintiffs' causes of action are based on state tort law, and rest on familiar common-law principles prohibiting fraud and misrepresentation. No proposition of bankruptcy law must be established for plaintiffs to prevail, and no provision of the bankruptcy code is implicated in their allegations. The causes of action asserted in the complaint are in no sense "created by" title 11 of the United States Code.

*3 Defendants argue that the case nevertheless arises under the bankruptcy code "because it will be necessary for the Delaware Bankruptcy Court to interpret" its own order approving the APA in the course of deciding the case. (D. Remand Mem. 9.) But this argument misconstrues what it means for a case to "arise under" bankruptcy law. It may be that provisions of the APA and of the Bankruptcy Court's order approving it will be relevant to the outcome of the case. However, as the Supreme Court held in *Mottley* in the context of general federal question jurisdiction, "[a]lthough such allegations show that very likely, in the course of the litigation, a question

under [bankruptcy law] would arise, they do not show that the suit, that is, the plaintiff's original cause of action, arises under [title 11]."211 U.S. at 153.

Accordingly, this is not a case of "arising under" jurisdiction.

B. *"Arising In" Jurisdiction*

The extent of the "arising in" jurisdiction is less clearly defined. The leading bankruptcy treatise refers to it as a "residual category of civil proceedings," that "includes such things as administrative matters, orders to turn over property of the estate and determinations of the validity, extent, or priority of liens."Collier on Bankruptcy, ¶ 3.01[4][c][iv] (15th ed.2004) (internal quotation marks and footnotes omitted). Courts too have stated that

[t]he meaning of 'arising in' proceedings is less clear, but seems to be a reference to those 'administrative' matters that arise only in bankruptcy cases. In other words, 'arising in' proceedings are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy.

*In re Wood,* 825 F.2d 90, 96-97 (5th Cir.1987).

Defendants argue that this standard is met, pointing out that had Old Winstar not been in bankruptcy, the sale would never have taken place, the alleged misrepresentations would never have occurred, and so this action would have no existence absent the bankruptcy. (D. Remand Mem. 7-9.) This argument may be somewhat oversimplified. The courts and commentators using the "no existence outside of the bankruptcy" formulation seem to be referring to proceedings that by their nature cannot exist outside of bankruptcy, and not merely to actions that, as a factual matter, have their origins in events occurring during a bankruptcy proceeding. The Bankruptcy Court in this district, for example, in a case relied upon by defendants themselves, puts the matter this way:

A claim "arises in" bankruptcy if, by its very nature, the claim can only be brought in a bankruptcy action, because it has no existence outside of bankruptcy. *See [In re]* Riverside Nursing Home, 144 B.R. [951,] 955 [S.D.N.Y.1992]; *176-60 Union Turnpike v. Howard Beach Fitness Center,* 209 B.R. 307, 311, n. 2 (S.D.N.Y.1997) (Sprizzo, J.). Matters

Slip Copy
Slip Copy, 2007 WL 4323003 (S.D.N.Y.)
(Cite as: Slip Copy)

involving the enforcement or construction of a bankruptcy court order are in this category.

*4*In re Sterling Optical Corp.*, 302 B.R. 792, 801 (Bankr.S.D.N.Y.2003). Plaintiffs here sue for fraud. Such a claim is not one that *"by its very nature... can only be brought in a bankruptcy action."*Rather, it is a garden-variety common-law claim that most usually is brought outside of bankruptcy.

The type of administrative matters cited in Collier, and in *Sterling,* as examples of "arising in" jurisdiction are closely tied to the administration of the estate itself. Actions such as motions for contempt of bankruptcy court orders, motions to change the composition of a creditors' committee or appoint or elect trustees or examiners, are matters that, while the cause of action is not created by title 11, could not "have been the subject of a lawsuit absent the filing of a bankruptcy case."Collier, ¶ 3.01[4][c][iv]. The mere fact that the cause of action would never have arisen absent this particular bankruptcy is not enough to confer jurisdiction.

Nevertheless, the claims at issue here are more closely connected to the administration of the bankruptcy than most garden-variety common-law claims. There is persuasive precedent for treating a state-law tort suit regarding the conduct of professionals involved in the administration of the bankruptcy estate as a matter that "arises in" a bankruptcy case. *In re Southmark Corp.*, 163 F.3d 925 (5th Cir.1999), involved a professional malpractice action against an accounting firm that worked for the court-appointed Examiner in a bankruptcy reorganization. When the defendant removed the case to the bankruptcy court that had presided over the reorganization, the plaintiff argued, like plaintiffs here, that mandatory abstention applied because the bankruptcy court's jurisdiction was of the "related to" variety because the matter was not a "core" bankruptcy proceeding. *Id.* at 928-29.Like plaintiffs here, the plaintiff in *Southmark* argued that its claims were simple state common-law tort claims that were not the sort that could arise only in a bankruptcy action, since "Southmark could have sued any accounting firm that worked for it on similar grounds of disloyalty, non-disclosure and malpractice."*Id.* at 930-31.

The Fifth Circuit rejected the argument, finding that "the professional malpractice claims alleged

against [the accounting firm] are inseparable from the bankruptcy context."*Id.* at 931.The court's reasoning is instructive, and is applicable here:

A *sine qua non* in restructuring the debtor-creditor relationship is the court's ability to police the fiduciaries, whether trustees or debtors-in-possession and other court-appointed professionals, who are responsible for managing the debtor's estate in the best interest of creditors. The bankruptcy court must be able to assure itself and the creditors who rely on the process that court-approved managers of the debtor's estate are performing their work, conscientiously and cost-effectively.

*5*Id.*

Here, too, plaintiffs' claims go directly to the proper performance of duties by professionals retained by the bankruptcy estate, with the approval of the Bankruptcy Court, to assist it in maximizing the assets of the estate. As the *Southmark* court pointed out, "[s]upervising the court-appointed professionals also bears directly on the distribution of the debtor's estate. If the estate is not marshaled and liquidated or reorganized expeditiously, there will be far less money available to pay creditors' claims."*Id.* Here, of course, the claim is not brought by the bankruptcy estate itself, and the claim is rather that the professionals advising the estate obtained *excessive* compensation by defrauding the purchaser of the estate's assets. But the matter is still intimately related to the administration of the bankruptcy. The Bankruptcy Court has a vital interest in policing the integrity of the bankruptcy process in general, and of the sales of estate assets under the court's supervision in particular.

The Bankruptcy Court itself recognized the importance of the sale to its on-going administration of the case. Its order approving the sale expressly provides that the Delaware Bankruptcy Court retains "exclusive jurisdiction to ... resolve any dispute arising under or related to the Asset Purchase Agreement."(Sale Order ¶ 15, Gold Decl. Ex. 2.) This language is broad, encompassing not merely contract disputes or disputes between the parties to the APA themselves, and at a minimum expresses the Bankruptcy Court's keen interest in the resolution of disputes relating to the sale of Old Winstar's assets. It plainly covers the dispute at hand, which unquestionably is a dispute "related to" the APA.[FN2]

FN2. Plaintiffs cannot be surprised by being

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 4323003 (S.D.N.Y.)
(Cite as: Slip Copy)

asked to litigate a matter relating to the APA in the Delaware Bankruptcy Court, as they themselves agreed in the APA to a choice of forum clause in which they "irrevocably submit to the exclusive jurisdiction" of that court "over any dispute arising out of or relating to this Agreement," and waived any objection to venue in that court. (APA § 9.10, Gold Decl. Ex. 1.) Defendants do not contend that this clause of the APA, to which they were not parties, of itself controls the outcome of this motion. At a minimum, however, it reflects plaintiffs' own understanding that the Delaware Bankruptcy Court is the proper forum for disputes about the sale of Old Winstar.

The Second Circuit has construed the core jurisdiction of the bankruptcy courts "as broadly as possible," because wide bankruptcy jurisdiction is "essential to the efficient administration of bankruptcy proceedings."*Luan Investment S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.), 304 F.3d 223, 229 (2d Cir.2002). Given this jurisdictional sweep, it is clear that this is a case "arising in" the Old Winstar bankruptcy case.

*C. Abstention*

Since this case "aris[es] in" a bankruptcy case and is not merely "related to" a bankruptcy case, mandatory abstention under 28 U.S.C. § 1334(c)(2) by its own terms does not apply. However, this Court may still, in its discretion, abstain from hearing the proceeding "in the interest of justice, or in the interest of comity with State courts or respect for State law."28 U.S.C. § 1334(c)(1). Such abstention is not appropriate here.

Federal courts should be "sparing" in their exercise of discretionary abstention. *In re Texaco Inc.*, 182 B.R. 937, 946-47 (Bankr.S.D.N.Y.1995), citing *New Orleans Public Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 358 (1989), *Willcox v. Consolidated Gas Co.*, 212 U.S. 19, 40 (1909), and *Chicot County v. Sherwood*, 148 U.S. 529, 534 (1893). There is little basis to invoke comity to the state courts here, and every reason to invoke the federal jurisdiction. Although plaintiffs' claims are based on state law, the state law claims are straightforward common-law claims that do not involve arcane or idiosyncratic provisions of New York law. As the case was promptly removed, the New York courts have invested no effort in the case.

*6 In contrast, the matter is closely tied to the bankruptcy case. The very sale that is the subject of the proceedings was a central aspect and basic function of the bankruptcy proceedings. The sale of Old Winstar's assets was pursuant to directives issued by the Bankruptcy Court, and the APA was specifically approved by that court. The conduct of the debtor and its advisors (who were retained with the approval of the Bankruptcy Court) that is the subject of the plaintiffs' claims is post-petition conduct that took place under the Bankruptcy Court's auspices. Although the plaintiffs' claims are asserted as tort claims of fraud in the inducement, the evaluation of those claims will necessarily involve the interpretation of the Bankruptcy Court-approved APA, which contains provisions (including a merger clause, APA § 9.13; two disclaimers of warranties, *id.* §§ 5.10, 9.3; and an "as is" clause, *id.* § 5.10) that are arguably inconsistent with plaintiffs' claims, and of the Bankruptcy Court's own orders and findings (including a finding that the consideration was fair and reasonable and a finding that the APA was negotiated in good faith, Order ¶¶ G, H). Most significantly, both the plaintiffs and the Bankruptcy Court expressly stipulated that the Bankruptcy Court would be the exclusive forum for resolving claims related to the sale.

Under all these circumstances, common sense dictates the conclusion that the Bankruptcy Court is the proper forum for resolving these disputes, and that the Court should exercise its discretion to direct the case to that forum.[FN3]

FN3. For the same reasons that abstention is inappropriate, the closely-related doctrine of equitable remand, 28 U.S.C. § 1452(b), is also inapplicable here.

*II. Defendants' Motion to Transfer*

In light of the above discussion, little further need be said regarding defendants' motion to transfer the case to the United States District Court for the District of Delaware for referral to its Bankruptcy Court. The *only* reason why this case belongs in federal court is because of its close association to the Old Winstar liquidation proceedings in Delaware. The case "arises in" those proceedings, the Delaware Bankruptcy Court reserved its jurisdiction to deal

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 4323003 (S.D.N.Y.)
(Cite as: Slip Copy)

with matters related to the bankruptcy sale that is the subject of this proceeding, and the defendants are accused of fraud in executing a sale that was ordered and approved by that court.

There is a strong argument that venue must be laid in Delaware under the APA's mandatory choice of forum clause. As the Second Circuit has held, a contract clause electing a forum for all disputes "arising out of or related to" the contract encompasses claims of fraudulent inducement. *Turtur v. Rothschild Registry Int'l, 26 F.3d 304, 309-10 (2d Cir.1994)*. Although defendants are not parties to that clause, plaintiffs are. The plaintiffs agreed to resolve any disputes related to the APA in the Delaware Bankruptcy Court. Moreover, the defendants are sued for wrongdoing that essentially without exception is charged to have been committed jointly with the plaintiffs' counterparty in the APA, Old Winstar. *Weingrad v. Telepathy, Inc., No. 05 Civ.2024, 2005 WL 2990645, at *5-6 (S.D.N.Y. Nov. 7, 2005)*.

**\*7** But even if transfer is not mandatory pursuant to 28 U.S.C. § 1406, discretionary transfer under § 1404(a) in the interests of justice is clearly appropriate. As noted above, the whole point of federal jurisdiction here is the close connection of the case to the bankruptcy proceedings. There is no plausible rationale for removing the case to federal court in order to decide it in a forum remote from the court where that proceeding is pending. Plaintiffs seek to avoid this obvious point by retreating to a conventional analysis of the factors ordinarily applicable in deciding transfer applications. Even if their convenience arguments did not ring hollow-and they do, where the physical distance between the courts involved is a short train ride and given that in real-world modern litigation the greatest expenditure of litigation effort in most cases takes place away from court-the plain fact is that in entering the APA plaintiffs "irrevocably waive[d]" any objections to venue in the District of Delaware on grounds of inconvenience.

## CONCLUSION

For the reasons stated above, plaintiffs' motion to remand is denied and defendants' motion to transfer the case to the United States District Court for the District of Delaware is granted.

SO ORDERED.

S.D.N.Y.,2007.
Winstar Holdings, LLC v. Blackstone Group L.P.
Slip Copy, 2007 WL 4323003 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.