**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------------X
WINSTAR HOLDINGS, LLC and          )
IDT CORP.,                         )          Case No.: 07-828-GMS
                                   )
               Plaintiffs,         )
                                   )
      - against -                  )
                                   )
THE BLACKSTONE GROUP LP;           )
IMPALA PARTNERS, LLC; and          )
CITICORP,                          )
                   Defendants.     )
                                   )
-------------------------------------------------------X
```

## COMPENDIUM OF UNREPORTED CASES WITH RESPECT TO DEFENDANT CITIGROUP INC.'S MEMORANDUM OF LAW

GREENBERG TRAURIG, LLP
Victoria W. Counihan (No. 3488)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Tel:  (302) 661-7000
Fax: (302) 661-7360
counihanv@gtlaw.com
melorod@gtlaw.com

- and -

Stephen L. Saxl
William A. Wargo
GREENBERG TRAURIG, LLP
200 Park Avenue, 39th Floor
New York, New York 10166
Tel:  (212) 801-9200
Fax: (212) 801-6400

*Attorneys for Defendant Citigroup Inc., as
successor by merger to Citicorp*

Dated: January 22, 2008

| Decision | Tab |
|---|---|
| *Albert v. Alex Brown Management Services, Inc.*, No. Civ.A. 762-N, Civ.A. 763-N, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005) | 1 |
| *Cannon v. Douglas Elliman, LLC*, No. 05 Civ. 7092 (NRB), 2007 WL 4358456 (S.D.N.Y. Dec. 10, 2007) | 2 |
| *De Lage Landen Fin. Servs., Inc. v. Cardservice Int'l, Inc.*, No. CIV. A. 00-2355, 2001 WL 799870 (E.D. Pa. July 12, 2001) | 3 |
| *Eisenmann Corp. v. General Motors Corp.*, No. C.A.99C-07-260-WTQ, 2000 WL 140781 (Del. Sup. Ct. Jan. 28, 2000) | 4 |
| *Matthews Office Designs, Inc. v. Taub Invs.*, No. 430, 1993, 1994 WL 267479 (Del. May 25, 1994) | 5 |
| *MetCap Securities LLC v. Pearl Senior Care, Inc.*, No. Civ.A. 2129-VCN, 2007 WL 1498989 (Del. Ch. May 16, 2007) | 6 |
| *Pfizer, Inc. v. Ranbaxy Labs., Ltd.*, Civil Action No. 07-138-JJF, 2007 WL 4226417 (D. Del. Nov. 29, 2007) | 7 |
| *WestRM-West Risk Markets, Ltd. v. XL Reinsurance America, Inc.*, No. 02 Civ 7344 (MGC), 2006 WL 2034627 (S.D.N.Y. July 19, 2006) | 8 |
| *U.S. Aircraft Ins. Grp. v. Dwiggins, L.L.C.*, No. Civ.A. 03-173-SLR, 2003 WL 22432915 (D. Del. Oct. 15, 2003) | 9 |

**TAB 1**

Westlaw.

Not Reported in A.2d                                                                 Page 1
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

▷Albert v. Alex. Brown Management Services, Inc.
Del.Ch.,2005.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
Todd ALBERT, Joseph M. Bryan, Jr., Kevin
Calderwood, Katherine D. Crothall, Scott W. Frazier,
FU Family Revocable Trust, Robert B. Goergen, Sr.,
Robert G. Goergen, Jr., Todd A. Goergen, Hasan
1995 Living Trust, Wai Yan Ho, Willis James
Hindman, Johnson Family Living Trust, Michael R.
Kidder Revocable Trust, Mark and Ann Kington,
Jeffrey A. Koser, Marlenko Inc., Elaine McKay
Family, LP, David Mixer, MRW Trust, James
Murray, Jim K. Omura 1996 Trust, Jennifer Owen
and Michael J. Ross, Nicholas Peay, Douglas G.
Smith, Frederick G. Smith, Jane Vei-Chun Sun, Mark
Wabschall, Karen L. Walsh, Warmenhoven 1995
Children's Trust, Yan 1996 Revocable Trust, Barbara
J. Zale, and Charles A. Ziering, Plaintiffs,
v.
ALEX. BROWN MANAGEMENT SERVICES,
INC.; Deutsche Bank Securities, Inc.; Deutsche
Bank, AG; Richard Hale; Gary Fearnow; Bruns
Grayson; E. Robert Kent, Jr.; Truman T. Semans; DC
Investment Partners, LLC; Doctor Robert Cants, III;
and Michael W. Devlin, Defendants.
Elizabeth J. BAKER, Bender 1996 Revocable Trust,
Dr. Steven J. Berlin, Estate of Robert B. Blow,
Luther C. Boliek, Stephen E. Coit, Sara Crowder,
Gerald K. and Teresa K. Fehr, FU Family Revocable
Trust, Ralph Glasgal, Robert G. Goergen, Jr.1985
Trust, Todd A. Goergen 1985 Trust, Peter O.
Hausmann, Willis James Hindman, William F.
Kaiser, Mark and Ann Kington, Timothy K.
Krauskopf, William T. McConnell, Philip R. McKee,
David Mixer, MRW Trust, James Murray, Paul D.
and Judith F. Newman, W.L. Norton, Gregory
Packer, Howard E. Rose, Ruben Family Limited
Partnership, 5 S Trust, Saladrigas Family Ltd.
Partnership, Ricardo A. Salas, Jose M. Sanchez,
Samuel Siegel, Silverman 1996 Irrevocable Trust,
Douglas G. Smith, Frederick G. Smith, Ronald B.
Stakland, Strauch Kulhanjain Family Trust, Bruce E.
Toll, Alexander R. and Marjorie L. Vaccaro, Yanover
Family Ltd. Partnership, Michael Yokell, and Justin
A. Zivin, Plaintiffs,
v.
ALEX. BROWN MANAGEMENT SERVICES;

Deutsche Bank Securities, Inc.; Deutsche Bank, AG;
Richard Hale; E. Robert Kent, Jr.; Truman T.
Semans; DC Investment Partners, LLC; Doctor
Robert Crants, III, and Michael W. Devlin,
Defendants.
**No. Civ.A. 762-N, Civ.A. 763-N.**

Submitted July 22, 2005.
Decided Aug. 26, 2005.

Jeffrey S. Goddess, Jessica Zeldin, Rosenthal,
Monhait, Gross & Goddess, P.A., Wilmington,
Delaware; Steven E. Fineman, Hector D. Geribon,
Daniel P. Chiplock, Lieff, Cabraser, Heimann &
Bernstein, LLP, New York, New York, for the
Plaintiffs.
Michael D. Goldman, Peter J. Walsh, Jr., Melony R.
Anderson, Potter Anderson & Corroon LLP,
Wilmington, Delaware; Christopher P. Hall, Kevin
Rover, John Vassos, Marilyn B. Ampolsk, Morgan
Lewis & Bockius, LLP, New York, New York, for
the Defendants Alex. Brown Management Services,
Inc., Deutsche Bank Securities, Inc. and Deutsche
Bank A.G.
Daniel Griffith, Marshall Dennehey, Warner,
Coleman & Goggin, Wilmington, Delaware, for
Defendants DC Investment Partners, LLC, Dr. Robert
Crants, III, and Michael W. Devlin.
Richard D. Allen, Thomas W. Briggs, Jr., Morris,
Nichols, Arsht & Tunnell, Wilmington, Delaware, for
Defendants Richard Hale, Gary Fearnow, Bruns
Grayson, E. Robert Kent, Jr. and Truman T. Semans.

*MEMORANDUM OPINION*
LAMB, Vice Chancellor.

I.

*1 In a recent opinion in these two related cases on
the defendants' motion to **dismiss** under Court of
Chancery Rule 12(b)(6), the court addressed the
defendants' statute of limitations argument and
concluded that any claims arising before November
11, 2000, the date upon which the parties entered into
an agreement tolling the statute of limitations, were
barred.[FN1]Because it was unclear which, if any,
claims for relief set out in the complaints arise after
that date, the court requested additional submissions
from the parties.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                              Page 2
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
(Cite as: Not Reported in A.2d)

FN1. The facts alleged in the complaints are recited in detail in the earlier opinion. *Albert v. Alex. Brown Mgmt. Servs.,* 2005 Del. Ch. LEXIS 100, at *43-58, 2005 WL 1594085 (Del. Ch. June 29, 2005). Reference is made to that opinion for a complete recitation of the facts and for the definition of terms used herein. However, to avoid confusion, the court refers in this opinion to Alex. Brown Management Services, Inc. as "AB Management." Unless otherwise noted, the facts recited in this opinion are taken from the well-pleaded allegations of the complaints.

In this opinion, the court now addresses the issues raised in the additional submissions as well as the remaining issues raised by the defendants' motion to **dismiss**. Included among the latter are: (i) whether any surviving claims are derivative, rather than direct claims as to which demand was neither made nor excused; and (ii) whether the court can exercise personal jurisdiction over several defendants (the "DCIP Defendants") who served as agents, or employees of agents, of the partnerships.

II.

In the earlier opinion, the court noted that some of the factual allegations in the complaints occurred after November 11, 2000 and that, therefore, viable claims based on these factual allegations are not time-barred.[FN2] The Plaintiffs' Response Brief [FN3] identified five other factual allegations in the complaints (all involving allegedly material misrepresentations or non-disclosures) which, they contend, support viable claims for relief. These are: (i) the Managers' failure in the December 2000 semi-annual reports (dated on or about February 28, 2001) to inform the defendants that hedging was desirable, but the Funds could not afford to do so; (ii) the allegedly misleading statement in the December 31, 2000 report to the unitholders that the Managers remained "comfortable with the broad diversification achieved by the Fund[s'] portfolio of public securities and private investments ....;" (iii) the defendants' failure to inform the unitholders of the Funds' "liquidity issues," "steps that the management could take to improve liquidity," and "alternatives to raise additional liquidity," although these themes were the focus of the Management Committee meetings of October 3, 2000, March 23, 2001, and September 6, 2001; (iv)

the defendants' failure to inform the unitholders that, in June of 2001, AmSouth Bank withdrew from the credit syndicates for the Funds, thereby leaving Bank of America as the only lender for the Funds; and (v) the defendants' failure to inform the unitholders of the Funds violation of their credit arrangements with their lenders, including their eventual defaults, on June 5, 2002 (for the Fund I loan), and June 28 and September 30, 2002 (for the Fund II loan).

FN2. The factual allegations specifically discussed in the earlier opinion are as follows: First, the Managers failed to provide financial statements and reports as they are required to under the Partnership Agreements and Delaware law. Second, the Managers wrongfully allowed certain withdrawals from the Funds, thereby causing or exacerbating a liquidity crisis. Specifically, the Fund II Complaint alleges that three withdrawals from Fund II occurred after November 11, 2000. These allegedly occurred on January 17, 2001, October 25, 2001, and December 31, 2001 (the "Fund II 2001 Withdrawals"). Additionally, the Fund I Complaint alleges approximately $8.0 million in withdrawals occurred in December of 2000 from Fund I (the "Fund I December 2000 Withdrawals"). Third, the Managers failed to provide active and competent management of the Funds. *Alex. Brown,* 2005 Del. Ch. LEXIS 100, at *78-*79, 2005 WL 1594085 (Del.Ch.).

FN3. The Plaintiffs' Response Brief is titled "Plaintiffs' Brief In Response To The Court's Memorandum Opinion And Order Of June 29, 2005" and was filed on July 15, 2005.

All five of these factual allegations are found in the complaints. Furthermore, they allegedly occurred after November 11, 2000. Therefore, claims based on these allegations are timely. However, a threshold question is whether the information that the plaintiffs allege should have been disclosed, or was disclosed but was allegedly false and misleading, is material. If this information is not material as a matter of law, the allegations will not support claims that the Managers violated their disclosure duties.

**\*2** The determination of materiality is a mixed question of fact and law that generally cannot be

Not Reported in A.2d                                                                                          Page 3
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

resolved on the pleadings.[FN4] Therefore, the court cannot (and does not) make any final findings on the materiality of these alleged disclosure allegations. However, on a Rule 12(b)(6) motion, the court must determine whether, under the facts alleged in the complaints, these disclosure (or non-disclosure) allegations support a reasonable inference of materiality. If they do not, these factual allegations cannot support a claim for relief.

> FN4. *O'Malley v. Boris,* 742 A.2d 845, 850 (Del.1999)

An omitted fact is material if "under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[FN5]

> FN5. *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1983) (quoting *TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

The first alleged non-disclosure is that the Managers' failed in the December 2000 semi-annual reports to inform the unitholders that hedging was desirable, but the Funds could not afford to do so. This allegation of non-disclosure, viewed in the context of the allegations contained in the complaints, supports a reasonable inference that this information is material. According to the complaints, the defendants marketed the Funds as being actively managed by experienced, professional managers. Viewed in this context, a unitholder would likely find it important to know that the Managers could not manage the Funds in what they believed to be the Funds' best interests, because they were facing liquidity problems and could not afford to purchase collars.

The second alleged non-disclosure is that the defendants failed to inform the unitholders of the Funds' "liquidity issues," "steps that the management could take to improve liquidity," and "alternatives to raise additional liquidity." As alleged in the complaints, the real cause of the Funds' losses was the lack of liquidity. The lack of liquidity allegedly prevented the Managers from properly hedging the Funds as they (allegedly) thought was best for the

Funds. Viewed in that context, a reasonable investor would likely find it important to know such information.

The third alleged non-disclosure is that the defendants failed to inform the unitholders that, in June of 2001, AmSouth Bank withdrew from the credit syndicates for the Funds, thereby leaving Bank of America as the only lender for the Funds. Under the facts alleged, the court cannot reasonably infer that this information is material. The complaints allege that the unitholders understood from the very beginning that the Funds would have to borrow money. This is because the contributed securities were illiquid and the Funds needed cash to purchase collars. Given that fact, it is unlikely that a reasonable investor would find it important to know that the Funds were borrowing from one lender as opposed to multiple lenders. In fact, such information would likely only confuse an investor by giving him more information than is necessary to understand the Funds. Therefore, the plaintiffs cannot bring any claims based on this factual allegation.

\*3 The fourth alleged non-disclosure is that the defendants failed to inform the unitholders of the Funds' violations of the credit arrangements with their lenders, including the eventual defaults, on June 5, 2002 (for the Fund I loan), and June 28 and September 30, 2002 (for the Fund II loan). This allegation supports a reasonable inference of materiality. As opposed to the information about a bank withdrawing from the credit syndicate, the fact that the Funds were in default on their loans directly speaks to the financial condition of the Funds. A reasonable investor would want to know this information.

Finally, the plaintiffs allege that the claim in the December 31, 2000 report that the Managers remained "comfortable with the broad diversification achieved by the Fund[s'] portfolio of public securities and private investments" was materially false and misleading. This allegation does *not* support a reasonable inference that this information is material. It is simply a statement of the Managers' opinion. Furthermore, there is no allegation in the complaints that this statement of opinion was not honestly held, i.e. false. Therefore, the plaintiffs cannot bring any claims based on this factual allegation.

The Non-Disclosure Allegations [FN6] relate to failures to disclose allegedly material information. There is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 4
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

not, of course, any general duty to disclose information. To bring a non-disclosure claim, a party must allege either a fiduciary duty or a contractual duty to disclose. The plaintiffs have attempted to allege both. Therefore, the court will address the Non-Disclosure Allegations in the context of the plaintiffs' claims for breach of fiduciary duty and breach of contract.

> FN6. Collectively, the court refers to the three remaining factual allegations of non-disclosure as the "Non-Disclosure Allegations."

### III.

The allegations set out in the two complaints are nearly identical and the complaints are both set out in eleven counts: breach of fiduciary duty (Count 1); aiding and abetting a breach of fiduciary duty (Count 2); common law fraud (Count 3); aiding and abetting common law fraud (Count 4); breach of contract against AB Management (with respect to Fund I) and breach of contract against DCIP (with respect to Fund II) (Count 5); breach of the covenant of good faith and fair dealing against AB Management (with respect to Fund I) and breach of the covenant of good faith and fair dealing against DCIP (with respect to Fund II) (Count 6); gross negligence (Count 7); unjust enrichment against all defendants (Count 8); conspiracy liability (Count 9); an accounting (Count 10); and agency liability against Deutsche Bank and DBSI (Count 11). The court first addresses each of the substantive claims (Counts 1, 3, 5-8, & 10). The court then considers the vicarious liability claims (Counts 2, 4, 9, & 11).

#### A. *Breach Of Fiduciary Duty (Count 1)*

##### 1. *Failure To Provide Financial Statements*

The complaints allege that the Managers failed to provide the unitholders with the 2001 audited financial statements until 2003, and failed to provide any investor reports or audited financial statements for 2002. The plaintiffs argue that this amounted to a breach of the Managers' fiduciary duties.

**\*4** There is not, of course, a general fiduciary duty to provide financial statements. Instead, under the Partnership Agreements, the Managers had a contractual duty to provide the unitholders with such

reports.[FN7] The plaintiffs have not articulated why the violation of this contractual right amounted to a breach of fiduciary duty.[FN8] Thus, this factual allegation does not state a claim for breach of fiduciary duty.

> FN7. Partnership Agreements § 11.2.

> FN8. In the Plaintiffs' Response Brief, the plaintiffs argue that the Managers failed to make material disclosures, when they had a fiduciary obligation to do so. They further outline specific factual allegations, the Non-Disclosure Allegations, they contend are material and should have been disclosed. The Non-Disclosure Allegations are discussed below.

##### 2. *Withdrawal Allegations*

The plaintiffs argue that the Managers wrongfully allowed the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals. The plaintiffs contend that the defendants violated their fiduciary duties "by failing to ensure that the Funds had 'sufficient financial resources' to accomplish their 'investment objectives,' and failed to ensure that the Managers were providing professional and active supervision, oversight and management of the Funds."[FN9]

> FN9. Pls.'s Resp. Br. at 7.

From these factual allegations, the court cannot reasonably infer a breach of the fiduciary duty of loyalty. The complaints do not allege that the Managers benefited personally in any way by allowing the withdrawals. In fact, the amount of fees that the Managers received were based on the amount of money the Funds had under management. Therefore, if anything, the Managers had an incentive *not* to allow redemptions.

Likewise, the plaintiffs' allegations relating to the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals do not rise to the level of a breach of the duty of care. Director liability for breaching the duty of care "is predicated upon concepts of gross negligence."[FN10] A court faced with an allegation of lack of due care should look for evidence of whether a board has acted in a deliberate and knowledgeable way in identifying and exploring alternatives.[FN11]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                         Page 5
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

FN10.*Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984); *accord Citron v. Fairchild Camera & Instrument Corp.,* 569 A.2d 53, 66 (Del.1989).

FN11.*Citron,* 569 A.2d at 66

Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one "which involves a devil-may-care attitude or indifference to duty amounting to recklessness."[FN12]"In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason."[FN13]In order to prevail on a claim of gross negligence, a plaintiff must plead and prove that the defendant was "recklessly uninformed" or acted "outside the bounds of reason."[FN14]

FN12. William T. Allen, Jack B. Jacobs and Leo E. Strine, Jr., *Function over Form: A Reassessment of Standards of Review in Delaware Corporation Law,* 56 BUS. LAW. 1287, 1300 (2001); *accord Tomczak v. Morton Thiokol, Inc.,* 1990 Del. Ch. LEXIS 47, at *35, 1990 WL 42607 (Del. Ch. Apr. 5, 1990) ("In the corporate context, gross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders' or actions 'without the bounds of reason.' ') (citations omitted).

FN13.*In re Walt Disney Co. Derivative Litig.,* 2005 Del. Ch. LEXIS 113, at *162, 2005 WL 2056651, 907 A.2d 693, (Del. Ch. Aug. 9, 2005) (internal citations and quotations omitted).

FN14.*Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc.,* 1996 Del. Ch. LEXIS 116, at *42, 1996 WL 506906 (Del. Ch. Sept. 3, 1996) (citations omitted), *aff'd,* 692 A.2d 411 (Del.1997) (TABLE); *see also Solash v. Telex Corp.,* 1988 Del. Ch. LEXIS 7, at *24-*25, 1988 WL 3587 (Del. Ch. Jan. 19, 1988) (stating that the standard for gross negligence is a high one, requiring proof of "reckless indifference" or "gross abuse of discretion") (citations omitted).

The plaintiffs argue that the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals were actionably wrongful. Yet, the plaintiffs specifically allege in the complaints that the Partnership Agreements gave limited partners, in defined circumstances, the right to redeem. While the agreements also gave the Managers the power to delay or deny redemption requests "in [their] sole discretion," [FN15] it is difficult to read that discretionary power as imposing a positive duty to exercise that power to prevent or delay a withdrawal in order "to ensure that the Funds had 'sufficient financial resources' to accomplish their 'investment objectives." ' Thus, while the redemptions may have exacerbated the Funds' liquidity crunch, this is not enough to say that the Managers' failure to delay or deny those redemptions can give rise to a duty of care claim.

FN15. Fund I Compl. ¶ 82; Fund II Compl. ¶ 94.

*5 Therefore, the factual allegation that the Managers wrongfully allowed the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals does not give rise to a claim for breach of fiduciary duty.

### 3. Active And Competent Management And Disclosure Allegations

First, the complaints allege that the Managers lacked the experience and expertise to manage the Funds. Second, the complaints allege that the Managers devoted inadequate time and attention to managing the Funds. The complaints also allege that the Managers failed to disclose material information, and made misleading disclosures.

The claim that the Managers lacked the experience and expertise to manage the Funds is completely without merit. The defendants disclosed the qualifications of the Funds' Management Committee in the Private Placement Memoranda (the "PPMs") that the defendants gave to all of the unitholders. The "Management" sections of the PPMs disclosed the names, titles, affiliations, ages, educations, and experience of the Management Committee members, DCIP's principals, and DCIP's degree of experience with exchange funds.[FN16]The unitholders received this information before they ever made their investment in the Funds. They, therefore, implicitly

Not Reported in A.2d                                                                                      Page 6
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
(Cite as: Not Reported in A.2d)

agreed that the Managers were sufficiently qualified to manage the Funds.

> FN16. *See* Fund I PPM at 27-29; Fund II PPM at 29-31.

However, the plaintiffs' other claim, that the Managers devoted inadequate time and attention to managing the Funds and committed disclosure violations, is more substantial. The complaints allege that the Managers made false and misleading statements to the unitholders, and failed to disclose material information. While many of the alleged misstatements took place before November 11, 2000, some (specifically, the Non-Disclosure Allegations) took place after this date.

The complaints allege that the Managers met only sporadically, less than once a year since the inception of the Funds. During this time, the Funds were facing difficult challenges. The Managers originally set up the Funds with collars, attempting to limit the upside and downside potential of the Funds.[FN17] The appreciation of certain contributed securities (especially Yahoo!) was causing the Funds to blow through the collars. The Managers then made the decision to remove the collars on the Funds, a decision that had beneficial effects in the short-term, but over the long-term, when the defendants failed to reinstate the collars, resulted in sharp losses.

> FN17. "Collaring" is financial jargon for purchasing offsetting calls and puts on a security to limit upside and downside exposure. At the inception of the Funds, the Managers attempted to limit upside and downside exposure to roughly 10%. *Alex. Brown,* 2005 Del. Ch. LEXIS 100, at *9, 2005 WL 1594085 (Del.Ch.).

Viewed in the light most favorable to the plaintiffs, these alleged facts do (just barely) raise a duty of care claim. Whether the Managers exercised the requisite amount of due care in managing the Funds is, of course, a fact sensitive inquiry. In certain circumstances, meeting once a year to manage an investment vehicle would be sufficient. This would be the case when the investment is relatively straight-forward, or where the complexity of the investment lies in its original design. In fact, a typical exchange fund could require less active management than other types of investments. These funds are often designed to avoid tax liability and to provide diversification, *not* to generate spectacular returns. Therefore, under normal circumstances, a properly hedged and diversified exchange fund might need less active management than, say, a typical mutual fund.

**\*6** The facts alleged in the complaints, however, paint a picture of the Funds being faced with exceptional challenges, first by the sharply rising value of the securities that made up the Funds, and second by the rapid fall in value of those same securities. The response of the Managers was, allegedly, almost nonexistent, meeting less than once a year.

Furthermore, the complaints allege that the Managers failed to disclose the challenges facing the Funds and the meager steps they were taking to meet those challenges. These alleged disclosure violations were potentially material because, had the plaintiffs known the truth, they could have asked for withdrawals, or brought suit before the value of the Funds plummeted.

It is quite possible that the Managers acted appropriately in both the amount of time they spent managing the Funds and the disclosures they made. However, the complaints paint a picture of the Managers taking almost *no* action over the course of several years to protect the unitholders' investments, while the value of the Funds first skyrocketed and later plummeted. Under the circumstances, the plaintiffs should at least be allowed discovery to find out if, as the complaints imply, the Managers received millions of dollars in fees for doing almost nothing.

Therefore, for all of the above reasons, the court holds that the plaintiffs have plead sufficient facts to give rise to a duty of care claim.

B. *Breach Of Contract And The Implied Covenant Of Good Faith And Fair Dealing (Counts 5 & 6)*

In order to survive a motion to **dismiss** for failure to state a breach of contract claim, a plaintiff must demonstrate: (i) the existence of the contract, (ii) a breach of an obligation imposed by that contract, and (iii) resultant damages to the plaintiff.[FN18]

> FN18. *VLIW Tech., L.L.C. v. Hewlett-Packard Co.,* 840 A.2d 606, 612 (Del.2003).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                Page 7
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

### 1. *Failure To Provide Financial Statements Allegations*

The complaints allege that the Managers had a contractual duty under the Partnership Agreements to provide semi-annual unaudited financial statements reporting on the financial condition of the Funds, and an annual audited report. The complaint further alleges that the Managers did not provide the unitholders with these reports for 2002 and did not provide the 2001 audited financial statements until 2003. Further, the court reasonably infers from the facts alleged in the complaints that the plaintiffs were harmed by either not being able to ask for a redemption, or not being able to sue for rescission or a like remedy. Therefore, the plaintiffs have satisfied the pleading requirements for a breach of contract claim and this claim cannot be **dismissed**.

### 2. *Withdrawal Allegations*

The plaintiffs argue that the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals constituted a breach of contract. They argue that the withdrawals caused, or made worse, the Funds' liquidity crunch. However, the Partnership Agreements gave the unitholders the right to withdraw their investments after two years.[FN19] As alleged in the complaints, the unitholders' right to withdraw was limited by the power of the Managers to delay or deny redemptions "in [their] sole discretion."[FN20]

FN19. *See* Partnership Agreements ¶¶ 6.3.

FN20. Fund I Compl. ¶ 82, Fund II Compl. ¶ 94.

*7 This contractual provision did not create a duty for the Managers to individually assess the financial position of the Funds and the effect that such a withdrawal would have each time a unitholder requested a withdrawal. Instead, it placed a restriction on the unitholders' right to receive withdrawals. It gave the Managers the power to limit withdrawals, in their sole discretion. Therefore, the plaintiffs have not identified a contractual obligation that the Managers have violated and this claim must be **dismissed**.[FN21]

FN21. In the Plaintiffs' Response Brief, the plaintiffs implicitly admit that the Managers

had the authority to allow the withdrawals. Instead of arguing this point, the plaintiffs argue that the Managers had a contractual obligation to report the withdrawals.

### 3. *Active And Competent Management And Disclosure Allegations*

The plaintiffs allege that the defendants owed them a contractual duty to provide active management and to disclose all material information. The complaints allege that the Managers made false and misleading statements to the unitholders, failed to disclose material information, and that the Managers met only sporadically, less than once a year since the inception of the Funds.

As stated above, the Managers are alleged to have owed the unitholders a contractual duty to provide regular financial reports. Of course, concomitant to the duty to provide information is the duty that such information not be false or misleading. In other words, the defendants had a contractual duty to provide the information in good faith. The complaints allege that the Managers failed to provide reports when they were contractually obligated to do so, and that, when they did provide the reports, they were false and misleading. Specifically, the plaintiffs argue that the Managers failed to disclose certain material information-the Non-Disclosure Allegations and the withdrawals.

These allegations, if proven, are sufficient to support a claim for breach of contract. Therefore, this claim survives the motion to **dismiss**.

### C. *Fraud (Count 3)*

The plaintiffs' third claim is for fraud. Common law fraud in Delaware requires that: (1) the defendant made a false representation, usually one of fact; (2) the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; (3) the defendant had the intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted or did not act in justifiable reliance on the representation; and (5) the plaintiff suffered damages as a result of such reliance.[FN22] In addition to overt representations, where there is a fiduciary relationship, fraud may also occur through deliberate concealment of material facts, or by silence in the face of a duty to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 8
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

speak.[FN23]Fraud claims are subject to the heightened pleading standards of Rule 9(b). This means that the pleading must identify the "time, place and contents of the false representations, the facts misrepresented, as well as the identity of the person making the misrepresentation and what he obtained thereby."[FN24]

> FN22.*Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983).

> FN23.*Id.*

> FN24.*York Linings v. Roach,* 1999 Del. Ch. LEXIS 160, at *25, 1999 WL 608850 (Del. Ch. July 28, 1999). (internal quotations and citations omitted).

The plaintiffs argue that the defendants committed fraud by failing to disclose material information which they had a contractual and fiduciary duty to disclose, specifically the Non-Disclosure Allegations. Obviously, this claim (resting principally on alleged omissions) is merely a rehash of Count 1's claim of breach of fiduciary duty and Count 5's claim for breach of contract. It does not independently support a claim for relief. Moreover, the plaintiffs fail to plead with particularity what the defendants obtained through their alleged fraud. The plaintiffs plead generally that the Managers received management fees based on the amount of money that the Funds had under management, thereby giving them an incentive to keep money in the Funds. But the plaintiffs' arguments on this score are inherently contradictory. While they argue that the defendants had an incentive to keep money in the Funds to earn great management fees, they also argue that the Managers wrongfully allowed withdrawals, thereby reducing the amount of money they had under management. Are the withdrawals also part of the alleged fraud?

*8 For the above reasons, the plaintiffs have failed to adequately state a claim for fraud. Therefore, Count 3 will be **dismissed** without prejudice to the claims asserted in Count 1 or Count 5.

### D. *Gross Negligence (Count 7)*

The plaintiffs' fourth claim is for gross negligence. Both of the Funds' Partnership Agreements contain an exculpatory provision, limiting the liability of the Managers for losses the unitholders incurred with respect to the Funds. Except for misrepresentation or breach of the Partnership Agreements, the General Partners of the Funds (AB Management for Fund I and DCIP for Fund II), and those who perform service on their behalf, are not liable to the unitholders, unless their conduct constituted "gross negligence or intentional misconduct." [FN25]As such, the unitholders are forced to argue that the Managers' alleged misconduct amounted to gross negligence.

> FN25. Partnership Agreements § 3.5.

First, as discussed above, the allegations of the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals do not state a claim for gross negligence. Second, also as stated above, claims for breach of the duty of care are predicated on concepts of gross negligence. The court has already found that the plaintiffs' claim for breach of the duty of care survive the motion to **dismiss**. Therefore, this claim survives as well.

### E. *Unjust Enrichment (Count 8)*

The plaintiffs, in the alternative, plead both a claim for breach of contract and a claim for unjust enrichment. In some circumstances, alternative pleading allows a party to seek recovery under theories of contract or quasi-contract. This is generally so, however, only when there is doubt surrounding the enforceability or the existence of the contract. Courts generally **dismiss** claims for *quantum meruit* on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls.[FN26]It is undisputed that a written contract existed between the unitholders and the defendants. The Partnership Agreements for the Funds spelled out the relationship between the parties, and the plaintiffs specifically brought claims based on these contracts.

> FN26.*Rossdeutscher v. Viacom, Inc.,* 768 A.2d 8, 24 (Del.2001) (applying New York law); *ID Biomedical Corp. v. TM Tech., Inc.,* 1995 WL 130743, at *15 (Del.Ch. Mar.16, 1995) (applying Delaware law).

Notwithstanding the existence of these contractual relationships, the plaintiffs make the bald claim that the Managers were unjustly enriched at the unitholders expense. This is insufficient to state a claim for unjust enrichment, when the existence of a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 9
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
(Cite as: Not Reported in A.2d)

contractual relationship is not controverted. Thus, this claim must be **dismissed**.

### F. *Agency Liability (Count 11)*

The plaintiffs also bring claims against Deustche Bank and DBSI (as controlling persons of AB Management) based on agency liability. A parent corporation can be held liable for the acts of its subsidiary under either of two theories of agency liability. The first is where "piercing the corporate veil" is appropriate. While many factors are considered in deciding whether to pierce the corporate veil, "the concept of complete domination by the parent is decisive."[FN27]

> FN27.*Phoenix Canada Oil Co. v. Texaco, Inc.*, 842 F.2d 1466, 1477 (3d Cir.1988).

**\*9** Second, while one corporation whose shares are owned by a second corporation does not, by that fact alone, become the agent of the second company, a corporation-completely independent of a second corporation-may assume the role of the second corporation's agent in the course of one or more specific transactions. This restricted agency relationship may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside the limited agency setting. Under this second theory, total domination or general alter ego criteria need not be proven.[FN28]

> FN28.*Id.* (citing RESTATEMENT (SECOND) OF AGENCY § 14M, cmt. (a) (1958)).

With respect to DBSI, the plaintiffs argue that AB Management was dominated and controlled by DBSI. In essence, the plaintiffs ask the court to disregard AB Management's corporate form [FN29] and impose liability on DBSI. The complaints allege that: (i) DBSI and AB Management operate out of the same Maryland office; (ii) AB Management, although incorporated, has no functioning board of directors and no business other than the management of the Funds; (iii) AB Management is run by its Management Committee, which is comprised of employees and executives of DBSI; (iv) DBSI provided margin accounts for the Funds; and (v) DBSI served as the placement agent and custodian for the Funds' accounts.[FN30]

> FN29. AB Management is a corporation, organized under the laws of Maryland.

> FN30. Fund I Compl. ¶¶ 44, 45, 247, 250, 332, 334; Fund II Compl. ¶¶ 54, 179, 253-259.

"Persuading a Delaware Court to disregard the corporate entity is a difficult task. The legal entity of a corporation will not be disturbed until sufficient reason appears."[FN31]Allegations (i), (iv) and (v) above, while consistent with an obviously close relationship between DBSI and its wholly owned subsidiary, do not alone or together support any inference that would lead this court to disregard the separate legal existence of AB Management; nor does the allegation that AB Management's business is run by DBSI employees. However, the well pleaded factual allegation that AB Management has "no functioning board of directors," when viewed most favorably to the plaintiffs in light of the other facts alleged, if proven, could provide a basis to conclude that the corporate form should be ignored. The corporate veil may be pierced where a subsidiary is in fact a mere instrumentality or alter ego of its parent.[FN32]The complaints allege that AB Management does not have board meetings or follow other corporate formalities. Instead, employees of DBSI allegedly perform the activities that, in a properly functioning corporation, the board of directors would perform. If these facts are true and the other relationships are shown to exist, an adequate basis for piercing the corporate veil could be established. Therefore, this claim against DBSI cannot be **dismissed**.

> FN31.*Mason v. Network of Wilmington, Inc.*, 2005 Del. Ch. LEXIS 99, at \*9, 2005 WL 1653954 (Del. Ch. July 1, 2005) (internal quotations omitted).

> FN32.*Mabon, Nugent & Co. v. Texas Amer. Energy Corp.*, 1990 Del. Ch. LEXIS 46, at \*14-\*15, 1990 WL 44267 (Del. Ch. Apr. 12, 1990); *Phoenix Canada Oil,* 842 F.2d at 1477.

The complaints make additional allegations as to why AB Management is a mere agent of Deutsche Bank. These are: (i) Deutsche Bank purchased Alex. Brown, Inc. (the parent company of AB Management) thereby acquiring 100% ownership of

Not Reported in A.2d                                                                                      Page 10
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

AB Management; (ii) Deutsche Bank changed the name of the Funds the reflect the "Deutsche Bank" name; (iii) when the liquidity crisis became acute, the Management Committee decided that it needed to alert officials at Deutsche Bank; and (iv) in July of 2002, Deutsche Bank fired all the members of the Management Committee.[FN33]

> FN33. Fund I Compl. ¶¶ 153, 163, 239-240; Fund II Compl. ¶¶ 179, 253-259.

*10 First, these factual allegations do not give rise a reasonable inference that Deutsche Bank dominated and controlled AB Management and the Management Committee. These factual allegations show little more than Deutsche Bank owned the parent company of AB Management and, indirectly, AB Management itself. Ownership alone is not sufficient proof of domination or control.[FN34] The complaints allege that Deutsche Bank bought AB Management in June of 1999 and changed its name a few months later. The complaints do not allege any action by Deutsche Bank to influence or control the management of the Funds until July of 2002, when it fired the majority of the Management Committee. From these bare factual allegations, the court simply cannot infer domination or control.

> FN34.*Aronson,* 473 A.2d at 815;*see also In re W. Nat'l S'holders Litig.,* 2000 Del. Ch. LEXIS 82, 2000 WL 710192 (Del. Ch. May 22, 2000) (holding that a 46% shareholder does not control or dominate the board due to stock ownership alone).

Second, these factual allegations do not give rise a reasonable inference that, in the managing and/or sale of the Funds, AB Management and the Management Committee were Deutsche Bank's agent. Under the rubric of agency liability, there are two main theories-actual authority and apparent authority. Because the plaintiffs do not describe which theory of liability they assert, the court addresses both.

Actual authority is that authority which a principal expressly or implicitly grants to an agent.[FN35] There is simply no allegation in the complaints that Deutsche Bank expressly gave either AB Management or the Management Committee the authority to bind it as its agent.

> FN35.*Billops v. Magness Constr. Co.,* 391

A.2d 196, 197 (Del.1978).

Apparent authority is that authority which, though not actually granted, the principal knowingly or negligently permits an agent to exercise, or which he holds him out as possessing.[FN36] In order to hold a defendant liable under apparent authority, a plaintiff must show reliance on indicia of authority originated by principal, and such reliance must have been reasonable.[FN37] The plaintiffs have not alleged any facts showing that Deutsche Bank held out either AB Management or the Management Committee as its agent; nor have the plaintiffs alleged facts from which the court can reasonably infer reliance.

> FN36.*Henderson v. Chantry,* 2002 Del. Ch. LEXIS 14, at *14, 2002 WL 244692 (Del. Ch. Feb. 5, 2002).

> FN37.*Billops,* 391 A.2d at 198.

For the above reasons, the plaintiffs have failed to **pleadsufficient** facts to support a claim for **agency** liability against Deutsche Bank and Count 11 against Deutsche Bank must be **dismissed.** However, the plaintiffs plead sufficient facts to support a claim for liability against DBSI. Therefore, Count 11 against DBSI will not be **dismissed.**

### G. *Conspiracy, Aiding And Abetting Fraud, And Breach Of Fiduciary Duty (Count 2, 4, & 9)*

The plaintiffs allege that the defendants conspired to commit fraud and to commit a breach of fiduciary duty. The elements for civil conspiracy under Delaware law are: (i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance of the conspiracy; and (iii) damages resulting from the action of the conspiracy parties.[FN38] While the plaintiffs caption their claim as aiding and abetting breach of fiduciary duty, the court treats it as a claim for civil conspiracy. Claims for civil conspiracy are sometimes called aiding and abetting.[FN39] However, the basis of such a claim, regardless of how it is captioned, is the idea that a third party who *knowingly* participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship.[FN40]

> FN38.*AeroGlobal Capital Mgmt., LLC v. Cirrus Indus.,* 871 A.2d 428, 437 n. 8 (Del.2005); *Nicolet, Inc. v. Nutt,* 525 A.2d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                Page 11
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

146, 149-50 (Del.1987).

> FN39.*See Benihana of Tokyo, Inc. v. Benihana, Inc.,* 2005 Del. Ch. LEXIS 19, at *26, 2005 WL 583828 (Del. Ch. Feb. 28, 2005).

> FN40.*Gilbert v. El Paso Co.,* 490 A.2d 1050, 1057 (Del.Ch.1984), *aff'd,* 575 A.2d 1131 (Del.1990).

**\*11** However captioned, civil conspiracy is vicarious liability.[FN41]It holds a third party, not a fiduciary, responsible for a violation of fiduciary duty.[FN42]Therefore, it does not apply to the defendants which owe the unitholders a direct fiduciary duty. Instead, the plaintiffs attempt to hold Deustche Bank and DBSI responsible for the Managers' alleged breaches of fiduciary duty.

> FN41.*See, e.g., Parfi Holding AB v. Mirror Image Internet. Inc.,* 794 A.2d 1211, 1238 (Del.Ch.2001) ("Civil conspiracy thus provides a mechanism to impute liability to those not a direct party to the underlying tort."), *rev'd on other grounds,* 817 A.2d 149 (Del.2002).

> FN42.*Gilbert,* 490 A.2d at 1057.

The defendants argue that the plaintiffs have not adequately alleged that Deustche Bank and DBSI had knowledge of the alleged wrongful acts, the breach of fiduciary duty and fraud. Where a complaint alleges fraud or conspiracy to commit fraud, the Rules of this court call for a higher pleading standard, requiring the circumstances constituting the fraud or conspiracy to "be pled with particularity." [FN43]While Rule 9(b) provides that "knowledge ... may be averred generally," where pleading a claim of fraud or breach of fiduciary duty that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this "something" was knowable and that the defendant was in a position to know it.[FN44]

> FN43.*Atlantis Plastics Corp. v. Sammons,* 558 A.2d 1062, 1066 (Del.Ch.1989) (citing Rule 9(b), which states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated

with particularity.").

> FN44.*IOTEX Communs., Inc. v. Defries,* 1998 Del. Ch. LEXIS 236, at *12-*13, 1998 WL 914265 (Del. Ch. Dec. 21, 1998).

Furthermore, Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal.[FN45] With respect to DBSI, the complaints allege repeatedly that its employees, acting within the scope of their employment, had knowledge of the underlying factual allegations. Specifically, the complaints allege that the Funds were run by the Management Committee, all the members of which were employees of DBSI.[FN46]This knowledge is thereby imputed to DBSI.

> FN45.*J.I. Kislak Mtg. Corp. v. William Matthews Bldr., Inc.,* 287 A.2d 686, 689 (Del.Super.1972), *aff'd,* 303 A.2d 648 (Del.1972).

> FN46. Fund I Compl. ¶¶ 45, 47-51, 247-251; Fund II Compl. ¶¶ 55, 57-61, 261-266.

With respect to Deutsche Bank, the plaintiffs allege that AB Management and the Management Committee are mere agents of Deutsche Bank. However, as discussed above, the factual allegations in the complaints are insufficient to infer that AB Management and the Management Committee are the agents of Deutsche Bank.

For the above reasons, the court holds that the plaintiffs have not adequately pleaded facts that, if proven, would support an inference that Deustche Bank had knowledge of the alleged wrongful acts, the breach of fiduciary duty and fraud. The plaintiffs have adequately pleaded that DBSI had knowledge of the alleged wrongful acts. Therefore, with respect to Deutsche Bank, Counts 2, 4, and 9 must be **dismissed**. With respect to DBSI, these counts will not be **dismissed**.

### H. Accounting (Count 10)

The plaintiffs' tenth claim is for an accounting. An accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained to be due to either as a result.[FN47]As it is a remedy,

Not Reported in A.2d                                                                                    Page 12
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

should the plaintiffs ultimately be successful on one or more of their claims, the court will address their arguments for granting an accounting.

> FN47.*Jacobson v. Dryson Acceptance Corp.,* 2002 Del. Ch. LEXIS 4, at *12-*13, 2002 WL 31521109 (Del. Ch.2002).

V.

The defendants argue that several of the claims in the complaints are derivative and that, since the plaintiffs did not make demand upon the Funds, and demand was not excused, these claims should be **dismissed** pursuant to Rule 23.1.[FN48]

> FN48. The claims that the defendants contend are derivative are as follows: breach of fiduciary duty (Count 1), aiding and abetting breach of fiduciary duty (Count 2), breach of contract (Count 5), breach of the covenant of good faith (Count 6), gross negligence (Count 7), unjust enrichment (Count 8), accounting (Count 10), and agency liability (Count 11). As the court has already **dismissed** the claim for unjust enrichment (Count 8) and agency liability as to Deutsche Bank (Count 11), and deferred granting the equitable remedy of an accounting (Count 10), it will not discuss those claims here.

**\*12** The demand requirement in the limited partnership context is codified in 6 Del. C. § 17-1001. That statute states:
A limited partner or an assignee of a partnership interest may bring an action in the Court of Chancery in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed.

Likewise, the determination of whether a claim is derivative or direct in nature is substantially the same for corporate cases as it is for limited partnership cases.[FN49]Accordingly, throughout this decision, the court relies on corporate as well as partnership case law for its determination of this lawsuit's nature.

> FN49.*Litman v. Prudential-Bache Prop., Inc.,* 611 A.2d 12, 15 (Del.Ch.1992).

The Delaware Supreme Court's recent decision in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.* revised the standard for determining whether a claim is direct or derivative. Now, the determination "turn[s] solely on the following questions: (i) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (ii) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[FN50]"[U]nder *Tooley,* the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint."[FN51]"Instead the court must look to all the facts of the complaint and determine for itself whether a direct claim exists."[FN52]

> FN50.845 A.2d 1031, 1033 (Del.2004).

> FN51.*In re Syncor Int'l Corp. S'holders Litig.,* 857 A.2d 994, 997 (Del.Ch.2004).

> FN52.*Dieterich v. Harrer,* 857 A.2d 1017, 1027 (Del.Ch.2004).

As they are factually distinct, the court deals with the claims separately. First, the court addresses the claims for breach of contract and the breach of fiduciary duty based on the Non-Disclosure Allegations. Second, the court addresses the claims for gross negligence and failing to provide active and competent management, and the fiduciary duty claims based thereon.

A. *Breach Of Contract And The Non-Disclosure Allegations*

The claims for breach of contract and the claims for breach of fiduciary duty based on the Non-Disclosure Allegations are direct. First, the unitholders, not the partnerships, suffered the alleged harm. In order to show a direct injury under *Tooley,* a unitholder "must demonstrate that the duty breached was owed to the [unitholder] and that he or she can prevail without showing an injury to the [partnership]."[FN53] The gravamen of these claims is that the Managers failed to disclose material information when they had a duty to disclose it and made other misleading or fraudulent statements, in violation of their contractual and fiduciary duties. Generally, non-disclosure claims are direct claims.[FN54]Moreover, the partnerships were not harmed by the alleged disclosure violations. Any

Not Reported in A.2d                                                                                           Page 13
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

harm was to the unitholders, who either lost their opportunity to request a withdrawal from the Funds from the Managers, or to bring suit to force the Managers to redeem their interests.

> FN53.*Tooley,* 845 A.2d at 1039.

> FN54.*See, e.g., Dieterich,* 857 A.2d at 1029 (characterizing non-disclosure claims as direct claims); *Abajian v. Kennedy,* 1992 Del. Ch. LEXIS 6, at *10, 1992 WL 8794 (Del. Ch. Jan. 17, 1992) (same).

*13 Second, the unitholders would receive any recovery, not the Funds. Under the second prong of *Tooley,* in order to maintain a direct claim, stockholders must show that they will receive the benefit of any remedy.[FN55] While the best remedy for a disclosure violation is to force the partnership to disclose the information, due to the passage of time since the alleged wrongdoing, that remedy would likely be inadequate. In order to compensate the unitholders for their alleged harm, the court may find it appropriate to grant monetary damages. Such damages would be awarded to the unitholders, and not the partnerships.

> FN55.*Tooley,* 845 A.2d at 1033.

For all of the above reasons, the court concludes that the claims based on the Non-Disclosure Allegations and the alleged breach of contract are direct claims and, thus, demand was not required.

### B. Gross Negligence And Failure To Provide Competent And Active Management

The claims for gross negligence and failure to provide competent and active management are clearly derivative. First, as stated above, in order to show a direct injury under *Tooley,* a unitholder "must demonstrate that the duty breached was owed to the [unitholder] and that he or she can prevail without showing an injury to the [partnership]."[FN56] The gravamen of these claims is that the Managers devoted inadequate time and effort to the management of the Funds, thereby causing their large losses. Essentially, this a claim for mismanagement, a paradigmatic derivative claim.[FN57] The Funds suffered any injury that resulted from the Managers' alleged inattention. Any injury that the unitholders suffered is derivative of the injury to the Funds.

> FN56.*Tooley,* 845 A.2d at 1039.

> FN57.*See, e.g., Kramer v. W. Pac. Indus., Inc.,* 546 A.2d 348, 353 (Del.1988) ("A claim of mismanagement ... represents a direct wrong to the corporation that is indirectly experienced by all shareholders. Any devaluation of stock is shared collectively by all the shareholders, rather than independently by the plaintiff or any other individual shareholder. Thus, the wrong alleged is entirely derivative in nature.").

Second, the Funds, not the unitholders, would receive any recovery. Again, under the second prong of *Tooley,* in order to maintain a direct claim, stockholders must show that they will benefit from the remedy.[FN58] If the court finds that the Managers violated their fiduciary duties by failing to devote adequate time and effort to managing the Funds, any recovery would go to the party harmed, namely the Funds. Thus, these claims are derivative claims.

> FN58.*Tooley,* 845 A.2d at 1033.

If a party brings derivative claims without first making demand, and demand is not excused, those claims must be **dismissed**.[FN59] In this case, the plaintiffs have not alleged that they made demand on the Fund, nor have they alleged why demand should be excused. Accordingly, the derivative claim must be **dismissed**. However, in the interest of justice, the court **dismisses** these claims with leave to replead.[FN60]

> FN59.*Haber v. Bell,* 465 A.2d 353, 357 (Del.Ch.1983).

> FN60. In a letter to the court, the plaintiffs stated that AB Management sent letters to all the unitholders of the Funds (the "Redemption Letters"), stating that the Managers would allow the unitholders to redeem their units and that the Managers are pursuing the dissolution of the Partnerships. The plaintiffs argue that the Redemption Letters bolster their contention that their claims are direct, not derivative. However, the complaints do not contain the information in the Redemption Letters and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 14
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

the Redemption Letters are not referenced in the complaints. Therefore, these documents are not properly before the court on a Rule 12(b)(6) motion.

## VI.

The DCIP Defendants argue that, with respect to the Fund I Complaint, this court lacks personal jurisdictions over them. With respect to the Fund II Complaint, they argue that this court lacks personal jurisdiction over Crants and Devlin.[FN61]

> FN61. DCIP is the General Partner of Fund II. As such, there is no dispute that the court has personal jurisdiction over DCIP viz. Fund II. See *RJ Assocs. v. Health Payors' Org. Ltd. P'ship.,* 1999 Del. Ch. LEXIS 161, at *12, 1999 WL 550350 (Del. Ch. July 16, 1999) (quoting 6 Del. C. § 17-109(a) and holding that, as a matter of law, by accepting the position of general partner, a corporation consents to be subjected to a Delaware court's jurisdiction if the limited partnership has chosen to incorporate under Delaware law).

In support of their Rule 12(b)(2) motion, the DCIP Defendants adduced affidavits of both Devlin and Crants. The plaintiffs have not adduced any affidavits rebutting the Devlin and Crants affidavits, nor have they asked to take discovery. Instead, they have decided to rely on the well-pleaded allegations in their complaint. Moreover, since they have not been rebutted, the court must take as true the facts contained in the Devlin and Crants affidavits. However, where the well-pleaded allegations in the complaints are not rebutted by affidavit, the court will, for the purposes of this Rule 12(b)(2) motion, assume the truthfulness of those allegations.[FN62]

> FN62.See *Hart Holding Co. v. Drexel Burnham Lambert, Inc.,* 593 A.2d 535, 539 (Del.Ch.1991) (citing *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2nd Cir.1981)) (stating that a trial court is vested with broad discretion in shaping the procedure by which a motion under Rule 12(b)(2) is resolved).

**\*14** According to the Devlin and Crants affidavits, DCIP is a Tennessee limited liability company, with

its principal place of business in Nashville, Tennessee. Both Crants and Devlin are residents of Tennessee and perform the vast majority of their duties from their office in Nashville. Neither Crants nor Devlin recall ever traveling to Delaware. None of the DCIP Defendants solicit any business in Delaware or engage in any regular conduct with Delaware.

When a defendant moves to **dismiss** for lack of personal jurisdiction, the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the nonresident defendant.[FN63]In determining whether it has personal jurisdiction over a nonresident defendant, the court will generally engage in a two-step analysis. First, was service of process on the nonresident authorized by statute? Second, does the exercise of jurisdiction, in the context presented, comport with due process?[FN64]

> FN63.See *Plummer & Co. Realtors v. Crisafi,* 533 A.2d 1242, 1244 (Del.Super.1987); *see also Finkbiner v. Mullins,* 532 A.2d 609, 617 (Del.Super.1987) (stating that, on a Rule 12(b)(2) motion, "the burden is on the plaintiff to make a specific showing that this Court has jurisdiction under a long-arm statute.") (citing *Greenly v. Davis,* 486 A.2d 669 (Del.1984)).

> FN64.*LaNuova D & B, S.P.A. v. Bowe Co.,* 513 A.2d 764, 768 (Del.1986).

### A. The Long-Arm Statute

The plaintiffs argue that the court has personal jurisdiction over the DCIP Defendants under 10 Del. C. § 3104, the Delaware long-arm statute.Section 3104(c) provides, in relevant part: "As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident ... who ... (1) Transacts any business or performs any character of work or service in the State ... [or] (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State...."Section 3104 has been broadly construed to confer jurisdiction to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 15
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

maximum extent possible under the due process clause.[FN65] Furthermore, when *in personam* jurisdiction is challenged on a motion to **dismiss**, the record is construed most strongly against the moving party. [FN66]

> FN65.*Id.*

> FN66.*RJ Assocs.,* 1999 Del. Ch. LEXIS 161, at *13, 1999 WL 550350 (Del.Ch.).

The complaints lay out detailed allegations of the connections between the DCIP Defendants and the Funds. The Funds were established as Delaware limited partnerships and are governed by Delaware law. DCIP is the Sub-Advisor of Fund I and the General Partner and Sub-Advisor of Fund II. Crants and Devlin are the managing members and owners of DCIP. DCIP acts principally through Crants and Devlin. The PPMs touted the DCIP Defendants' experience and qualifications in order to sell units in the Funds.

The PPMs also state that DCIP is responsible for the day-to-day management of the Funds. DCIP, in the persons of Crants and Devlin, attended every meeting of the Management Committee (none of which took place in Delaware). Also, DCIP, which acted through Crants and Devlin, was primarily responsible for choosing the securities included in the Funds.

In *RJ Associates,* Justice (then-Vice Chancellor) Jacobs held that this court could exercise personal jurisdiction over a limited partner in a Delaware limited partnership under Section 3104(c)(1). Justice Jacobs held that the following three contacts, taken together, were sufficient to constitute "transacting business" under the Delaware long-arm statute: (i) the limited partner participated in the formation of the limited partnership, (ii) the limited partnership indirectly participated in the limited partnership's management by 'controlling' the general partner, and (iii) the limited partner caused the Partnership Agreement to be amended to alter the method of distributions to the partners.[FN67]

> FN67.*RJ Assocs.,* 1999 Del. Ch. LEXIS 161, at *18, 1999 WL 550350 (Del.Ch.).

**\*15** The operative facts of this case, as alleged in the complaints, are similar to those in *RJ Associates.*First, DCIP participated in the formation

of the Funds. In fact, DCIP was primarily responsible for selecting the initial securities accepted by the Funds.[FN68]Second, DCIP not only participated in the management of the Funds, DCIP was primarily responsible for the management of the Funds. The PPMs state that "the Sub-Advisor will provide day-to-day management and administration of the Fund and investment advisory services, including, among other matters, the screening of contributed securities, advice regarding the selection of the illiquid Assets and hedging and borrowing strategies."[FN69]Finally, DCIP received millions of dollars in fees to manage the two Delaware entities.

> FN68.*See* Fund I Compl. ¶ 71; Fund II Compl. ¶¶ 82, 241.

> FN69. Fund I PPM at 3-4, Fund II PPM at 3.

With respect to Crants and Devlin, the complaints allege that they are the owners and managing partners of DCIP. The complaints further allege that DCIP only acts through Crants and Devlin. In essence, the complaints allege that it was Crants and Devlin who selected the securities for the Funds, and managed the Funds on a day-to-day basis.

The court finds that these contacts are sufficient to constitute "transacting business" under the long-arm statute.

B. *Due Process*

The focus of a minimum contacts inquiry is whether a nonresident defendant engaged in sufficient minimum contacts with the State of Delaware to require it to defend itself in the courts of the state consistent with the traditional notions of fair play and justice.[FN70]In order to establish jurisdiction over a nonresident defendant, the nonresident defendant's contacts with the forum must rise to such a level that it should reasonably anticipate being required to defend itself in Delaware's courts.[FN71]The minimum contacts which are necessary to establish jurisdiction must relate to some act by which the defendant has deliberately created obligations between itself and the forum.[FN72]Consequently, the defendant's activities are shielded by the benefits and protection of the forum's laws and it is not unreasonable to require it to submit to the forum's jurisdiction.[FN73]

> FN70.*AeroGlobal,* 871 A.2d at 440 (citing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 16
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

*Int'l Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

FN71.*Id.*

FN72.*Sternberg v. O'Neil,* 550 A.2d 1105, 1120 (Del.1988).

FN73.*Id.; see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (U.S.1985) (requiring "purposeful availment" of the benefits of the state's laws to satisfy the minimum contacts test).

In addition to the contacts outlined above that the complaints allege between DCIP Defendants and the Funds, the plaintiffs also allege that the DCIP Defendants enjoyed the benefits of Delaware law. They claim that the DCIP Defendants have received millions of dollars in fees for managing the Delaware partnerships and are entitled to claim limited liability under the terms of the Partnership Agreements, which established the Funds and limit the DCIP Defendants' liability to cases of gross negligence.[FN74]

FN74. Partnership Agreements § 3.5.

In *RJ Associates,* Justice Jacobs found that the following contacts were sufficient to satisfy due process: (i) the limited partner took an active role in establishing the Delaware Partnership; (ii) the limited partner owned a 50% interest in the partnership's general partner, and appointed four of the general partner's seven board members; (iii) the limited partner received 49 .5% of the partnership's cash flow distributions; (iv) the limited partner allegedly controlled the partnership; (v) the limited partner allegedly caused the partnership agreement to be amended under Delaware law to change the agreed-upon cash flow distribution payments to the limited partners; and (vi) the limited partner agreed to a Delaware choice of law provision in the partnership agreement.[FN75]

FN75.*RJ Assocs.,* 1999 Del. Ch. LEXIS 161, at *19-*20, 1999 WL 550350 (Del.Ch.).

**\*16** While not exactly the same, the contacts that DCIP has with Delaware are substantially similar to those in *RJ Associates.*DCIP took part in the formation of the Funds, two Delaware entities. DCIP

managed the Funds on a day-to-day basis and received millions of dollars in fees for doing so. In addition, the Partnership Agreements which established the Funds limited the DCIP Defendants' liability to cases of gross negligence.[FN76]They have, thereby, benefited by expressly limiting their liability under Delaware law. Given all of these contacts, DCIP should have reasonably expected to be haled before the courts in Delaware.

FN76. Partnership Agreements § 3.5.

Crants and Devlin also should have reasonably expected to be haled before the courts of this state. As stated above, the complaints allege that DCIP could only act through Crants and Devlin. All the actions attributed to DCIP were really performed by them. Moreover, in the case of Fund II, Crants and Devlin are alleged to be the managing partners of the general partner of a Delaware limited partnership. In the case of Fund I, Crants and Devlin are alleged to have managed a Delaware limited partnership, despite the fact that DCIP is not that entity's general partner.

In *In re USACafes,* former Chancellor Allen found that the directors of a corporation that was the general partner of a Delaware limited partnership were subject to the jurisdiction of this state's courts, due to their positions with the general partner.[FN77]Chancellor Allen focused on the important state interest that Delaware has in regulating entities created under its laws, and how that interest could only be served by exercising jurisdiction over those who managed the Delaware entity.

FN77.600 A.2d 43, 52 (Del.Ch.1991).

The relationship between the General Partner and the limited partners was created by the law of Delaware. The state empowered defendants to act, and this state is obliged to govern the exercise of that power insofar as the issues of corporate power and fiduciary obligation are concerned. These factors bear importantly on the fairness of exercising supervisory jurisdiction at this point in the relationship of the various parties. The wrongs here alleged are not tort or contract claims unconnected with the internal affairs or corporate governance issues that Delaware law is especially concerned with.[FN78]

FN78.*Id.*

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

Likewise, the wrongs alleged in this case go essentially to the management of a Delaware limited partnership. The DCIP Defendants voluntarily undertook to mange the Funds and received millions of dollars in compensation for doing so. Now, limited partners in the Delaware entity seek to hold them accountable for alleged wrongs they committed. It is both necessary and proper for the courts of this state to ensure that the managers of a Delaware entity are held responsible for their actions in managing the Delaware entity. When a person manages a Delaware entity, and receives substantial benefit from doing so, he should reasonably expect to be held responsible for his wrongful acts relating to the Delaware entity in Delaware.[FN79]

> FN79.*See Assist Stock Mgmt. L.L.C. v. Rosheim,* 753 A.2d 974, 975 (Del.Ch.2000) ("When nonresidents agree to serve as directors or managers of Delaware entities, it is only reasonable that they anticipate that ... they will be subject to personal jurisdiction in Delaware courts.").

*\*17* For the above reasons, the court concludes that it has personal jurisdiction over the DCIP Defendants in both cases. Therefore, the DCIP Defendants' motion to **dismiss** pursuant to Rule 12(b)(2) must be denied.

### VII.

For the above reasons, the defendants' motion to **dismiss** is GRANTED in part and DENIED in part. The defendants are directed to submit a form of order, on notice, within 10 days.

Del.Ch.,2005.
Albert v. Alex. Brown Management Services, Inc.
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Westlaw.

Slip Copy
Slip Copy, 2007 WL 4358456 (S.D.N.Y.)
(Cite as: Slip Copy)

Page 1

Cannon v. Douglas Elliman, LLC
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Diana CANNON and Jane Klaris, Plaintiffs,
v.
DOUGLAS ELLIMAN, LLC, Operating as
Prudential Douglas Elliman; Douglas Elliman, LLC
Employee Benefits Plan; Cipriani 55 Wall, LLC;
Cipriani USA, Inc.; 55 Wall Associates LLC; and the
Witcoff Group, Defendants.
No. 06 Civ. 7092(NRB).

Dec. 10, 2007.

Jeffrey W. Pagano, Esq., Ira M. Saxe, Esq., Crowell
& Moring LLP, New York, NY, for Plaintiffs.
Christy L. Reuter, Esq., Felicia S. Ennis, Esq.,
Robinson Brog Leinwand Greene Genovese & Gluck
P.C., New York, NY, for Cipriani/Witkoff
Defendants.
John A. Snyder II, Esq., Jackson Lewis LLP, New
York, NY, for Douglas Elliman Defendants.

**MEMORANDUM and ORDER**

NAOMI REICE BUCHWALD, District Judge.

*1 Defendants Douglas Elliman, LLC and Douglas
Elliman, LLC Employee Benefits Plan (collectively
"Douglas Elliman") and defendants Cipriani 55 Wall,
LLC, Cipriani USA, Inc., and 55 Wall Associates
LLC, and the Witkoff Group (collectively
"Cipriani/Witkoff") have moved to dismiss ten of the
eleven counts in plaintiffs Diana Cannon's
("Cannon") and Jane Klaris's ("Klaris") complaint.
The complaint contains breach of contract claims, to
which federal and state labor law, ERISA, fraud,
negligence, and injust enrichment claims are
appended. Douglas Elliman is a real estate brokerage
firm with its principal place of business in New York.
Cipriani/Witkoff is a real estate development
company. Douglas Elliman moves to dismiss Counts
3, 5, 7, 8, 9, and 10. Cipriani/Witkoff moves to
dismiss these same counts,[FN1] but separately moves to
dismiss Counts 1, 2, 4, and 11.[FN2]

> FN1. Cipriani/Witkoff need not move to
> dismiss Count 5, which alleges a violation of
> ERISA, because it is not named as a
> defendant in this count.

> FN2. Neither defendant has moved to
> dismiss Count 6, which alleges that Douglas
> Elliman breached its contract with plaintiff
> Cannon by not paying her commissions on
> various real estate sales she made on
> Douglas Elliman's behalf.

**BACKGROUND**

This background statement is based on the complaint,
the factual allegations of which we accept as true.
Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469
(2d Cir.1995). On this motion to dismiss, we also
draw all reasonable inferences in plaintiffs' favor. Id.
The complaint alleges that defendants entered into a
joint venture to sell luxury units in a new building
called the Cipriani Club Residences located at 55
Wall Street in Manhattan. Second Amend. Compl. ¶
44. The gravamen of plaintiffs' claims is that
defendants induced plaintiffs into serving as full-time
salespersons but never intended to, and did not, pay
them for their services as the parties had agreed. See
id. at ¶ 58.

Defendants established an on-site sales office and,
according to the complaint, both defendants used the
office. Id. at ¶ 48.In February 2006, defendant
Douglas Elliman offered plaintiffs Diane Cannon and
Jane Klaris employment at the 55 Wall Street office.
Douglas Elliman managers named Laura Cordovano
and Dolly Lenz allegedly promised plaintiffs that
they would receive a salary of $85,000 per year, plus
commissions on all sales they made at 55 Wall Street,
certain expenses, and other "additional payments."
Id. at ¶¶ 53, 56.It was suggested to plaintiff Klaris
that a successful employee could "make in excess of
$400,000.00 plus per year."Id. at ¶ 56.

Plaintiff Cannon was already engaged as a
commissioned broker for Douglas Elliman. Id. at ¶
35.In this capacity, she had been an independent
contractor and could work the hours of her choosing,
could operate outside of Douglas Elliman's offices,
and was free to accept other employment. Id. at ¶
34.Through her separate broker agreement with
Douglas Elliman, she had the right to access Douglas
Elliman's computer system, post listings through
Douglas Elliman, and maintain a profile on its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

website. *Id.* at ¶ 40.When she was hired, Douglas Elliman represented that she would continue to receive commissions on sales she made at other buildings.

**\*2** When plaintiffs started work in February, Cordovano and Lenz allegedly provided plaintiffs with a packet of documents assembled for new employees.*Id.* at ¶ 61.It included: (1) employee welfare and pension benefits documents; (2) health care, life, and disability insurance enrollment forms; and (3) a 401(k) retirement plan enrollment form. *Id.* Some, if not all, of these benefits were described in "summary plan descriptions" provided to plaintiffs. *Id.* Plaintiffs allege that they completed these forms and transmitted them to Douglas Elliman's human resources department. *Id.* at ¶ 62.

Plaintiffs began working regular hours at the 55 Wall Street sales office, which was allegedly shared by both sets of defendants. *Id.* at ¶¶ 67-68.Klaris worked through early May and Cannon remained employed at the office until July. During this time, they made numerous sales, some of which closed after they were terminated. According to the complaint, Cannon only received two payments from defendants: a $7,500 payment in March and a $10,000 in May. Klaris also only received two payments: a $10,000 payment in March and a $10,000 payment in May. *Id.* at ¶¶ 76-77.They each made repeated requests to receive the regular paychecks due to them under the alleged agreement but were never paid on a monthly (or more frequent) basis, were not paid all of their wages, and did not receive all the commission payments that they had earned.*Id.* at ¶¶ 78, 84, 86.In addition, plaintiffs claim they were never allowed to participate in the employee benefits plans to which they were entitled.*Id.* at ¶¶ 107-08.Plaintiff Cannon also claims that defendants have not reimbursed her for her parking expenses, as agreed. *Id.* at ¶ 91.

Plaintiffs claim that, throughout the spring and early summer, they complained about their lack of pay but were induced to remain employed at 55 Wall Street by repeated promises to rectify the situation. Plaintiffs claim that, in fact, defendants never intended to pay them.

Moreover, Cannon claims she was terminated for her repeated complaints. In mid-July, shortly after asking for her earnings and benefits, Cannon informed Cordovano that she would be unavailable to work during the upcoming weekend. Cordovano responded

that because Cannon was "not able to commit to this job," defendants "no longer desire[d][her] services."*Id.* at ¶ 102.Cannon continued to attempt to obtain her wages and commissions from defendants and her attorney sent a demand letter asking for the payments. *Id.* at ¶ 104.The complaint states that, in response to the demand, Cannon's profile was removed from the Douglas Elliman website and she was denied access to its computer system, effectively ending her status as an affiliated broker. *Id .* at ¶ 105.

Plaintiff Cannon instituted this action and, after Klaris was added as a plaintiff, they filed the Second Amended Complaint on May 14, 2007. It alleges eleven causes of action:
**\*3** (1) Violation of the Federal Labor Standards Act (FLSA) by failing to pay wages;
(2) Violation of Articles 6 and 9 of the New York Labor Law by failing to pay wages;
(3) Retaliation in violation of FLSA;
(4) Retaliation in violation of <u>Section 215 of the New York Labor Law</u>;
(5) Violation of employees rights under ERISA by not providing benefits for which they were eligible;
(6) Breach of contract against Douglas Elliman for failure to pay commissions due to plaintiff Cannon pursuant to her independent broker agreement;
(7) Breach of contract for failure to pay wages, commissions, and Cannon's parking expenses under plaintiffs' employment contracts;
(8) Fraud;
(9) Negligent misrepresentation;
(10) Negligence; and
(11) Unjust Enrichment.

Collectively, defendants Douglas Elliman and Cipriani/Witkoff move to dismiss all of these claims except Count 6.

## *DISCUSSION*

### I. Motion to Dismiss Standard

As noted, in considering a Rule 12(b)(6) motion to dismiss, this Court must accept as true the facts alleged in the amended complaint, drawing all reasonable inferences in plaintiffs' favor. <u>Bolt Elec., 53 F.3d at 469</u>. Though the amended complaint "does not need detailed factual allegations" to survive a motion to dismiss, plaintiffs cannot rely on a "formulaic recitation of the elements of a cause of action" and must, at a minimum, sufficiently plead

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the facts underlying the claim "to raise the right to relief above the speculative level on the assumption that all the allegations in the complaint are true."*Bell Atlantic Corp. v. Twombly, --- U.S. ----, 127 S.Ct. 1955, 1965 (2007)* (internal citations omitted). In other words, to state a claim, the complaint must contain enough facts to suggest that the allegations are "plausible." *See id.; see also In re AOL Time Warner, Inc. Sec. Litig., 503 F.Supp.2d. 666, 670 (S.D.N.Y.2007)* ("[T]he touchstone for a well-pleaded complaint under Federal Rules of Civil Procedure 8(a) and 12(b)(6) is plausibility.").

## II. Plaintiffs' Claims

### A. Claims Against Cipriani/Witkoff

Plaintiffs claim that due its "joint venture" with Douglas Elliman, Cipriani/Witkoff is jointly liable for Douglas Elliman's actions. First, plaintiffs claim that Cipriani/Witkoff is liable for plaintiffs' unpaid wages because Cipriani/Witkoff was a "joint employer" of the plaintiffs along with Douglas Elliman. Second, plaintiffs claim that Cipriani/Witkoff is liable on plaintiffs' breach of contract, fraud, negligence, and unjust enrichment theories because Douglas Elliman acted as Cipriani/Witkoff's agent.

### 1. Labor Law Claims

Plaintiffs claim that they were not paid proper wages in violation of FLSA (Count 1) and Articles 6 and 9 of the New York Labor Law (Count 2). Plaintiff Cannon also alleges that Cipriani/Witkoff unlawfully retaliated against her under the FLSA (Count 3) and Section 215 of the New York Labor Law (Count 4). Cipriani/Witkoff contends that it cannot be held liable for these alleged violations because it was not plaintiffs' employer. Plaintiffs assert that they have properly stated labor law claims against Cipriani/Witkoff because Cipriani/Witkoff was a "joint employer" with Douglas Elliman, which hired plaintiffs and supervised their work on a daily basis.

*4 The FLSA defines employer broadly to include "any person acting directly or indirectly in the interest of an employer."*29 U.S.C. § 203(d)*. To determine whether joint employer status is present, courts have developed the "economic realities test." Because the FLSA and New York Labor Law employ similar standards with respect to employment status,

this test has been used to analyze both federal and state wage claims. *See Ansoumana v. Gristede's Operating Corp ., 255 F.Supp.2d 184, 189 (S.D.N.Y.2003)* (citing *Lopez v. Silverman, 14 F.Supp.2d 405, 411 n. 4 (S.D.N.Y.1998)* and explaining that the issue of employer status for plaintiffs' state-law causes of action was governed by the same standards as those applicable to plaintiffs' FLSA claims).

The "economic realities" test considers the totality of the circumstances of the employment relationship and analyzes different factors depending on the situation. *See Zheng v. Liberty Apparel Co., 355 F.3d 61, 71 (2d Cir.2003)* (quoting *Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947)* (stating that the determination is based on "the circumstances of the whole activity")). While the list is not formulaic and the absence of one or more factors is not dispositive, the parties seem to agree that at least four factors should be considered here: (1) who hired and fired the workers; (2) who supervised and controlled their work schedules; (3) who determined rate and method of payment; and (4) who managed employment records. *Compare* Pls. Br. in Opp'n to C/W Mot. to Dismiss 10 (citing *Carter v. Dutchess Cmty. College, 735 F.2d 8, 12 (2d Cir.2005)*); with C/W Reply Br. 4.

Despite having amended their complaint twice, plaintiffs have not pled sufficient facts to meet the economic realities test. The complaint contains only two facts that can possibly be used to infer that Cipriani/Witkoff and Douglas Elliman were joint employers: (1) that the two defendants entered into a joint venture to market apartment units at the 55 Wall Street building and (2) that the sales office was located on-site. *See.* Pls. Br. in Opp'n to C/W Mot. to Dismiss 11.

While defendants shared a common goal, i.e. to sell apartments, that is not sufficient, on its own, to defeat Cipriani/Witkoff's motion to dismiss. Even assuming that joint venture status [FN3] and physical proximity were elements of the economic realities test, we do not find them to be sufficient to establish joint employer status in this case. Maintaining an on-site real estate office is common in New York City and reveals nothing about the interactions between the parties that took place in that office.

FN3. A joint venture is defined under New York as an agreement to share control of an

Slip Copy                                                                    Page 4
Slip Copy, 2007 WL 4358456 (S.D.N.Y.)
(Cite as: Slip Copy)

entity and any losses associated with the entity. *See Accent Associates, Inc. v. Wheatley Const. Corp.,* 268 A.D.2d 494, 701 N.Y.S.2d 667 (2d Dep't 2000). However, pleading a joint venture does not trigger joint employer status because it is possible for joint venturers to separately employ different people for different aspects of a project.

While plaintiffs are correct to point out that joint employment status may exist even where common elements of the economic realities test are not present, no element cited by the plaintiffs is present here. *Liu v. Donna Karan International, Inc.,* No. 00 Civ. 4221(WK), 2001 WL 8595, at *3 (S.D.N.Y. Jan. 2, 2001)-which plaintiffs cite for the proposition that "to employ" is interpreted in "an expansive manner," Pls. Br. in Opp'n to C/W Mot. to Dismiss 10-is instructive. In that case, the question was whether the defendant had sufficient control over factory labor in order to be deemed a joint employer. The facts showed that Donna Karan "dictated the prices of the garments and the production requirements,""had representatives in the [ ] factories on a daily basis," and "controlled wages and hours of the workers through setting low prices and making large output demands."*Liu,* 2001 WL 8595 at *3. In contrast, in this case, the complaint contains no facts that indicate that Cipriani/Witkoff had a role in managing the Douglas Elliman employees that worked at the 55 Wall Street sales office. And nothing in the complaint suggests that Cipriani/Witkoff had a role in hiring or firing the plaintiffs, determining their working hours, paying them, or maintaining employment records.

**\*5** In sum, beyond reciting the elements of a joint employer arrangement, plaintiffs have not shown that Cipriani/Witkoff did, in fact, play a role in supervising plaintiffs' work. Thus, we find that the complaint does not sufficiently allege joint employer status. Accordingly, Counts 1, 2, 3, and 4 are dismissed as to the Cipriani/Witkoff defendants.

### 2. Common Law Claims

Cipriani/Witkoff also moves to dismiss plaintiffs' other claims against it-breach of contract, fraud, negligence, and unjust enrichment-on the grounds that plaintiffs have "failed to plead the elements of an agency relationship sufficient to bind the Cipriani/Witkoff Defendants."C/W Reply Br. 7. In response, plaintiffs rely on the principle that "the

question of the existence and scope of the agency relationship is a factual issue that cannot be adjudicated on the pleadings."Pls. Br. in Opp'n to C/W **Mot**. to **Dismiss** 15 (quoting *Adipar Ltd. v. PLD Int'l Corp.,* No. 01 Civ. 0765(MBM), 2002 WL 31740622, at *9 (S.D.N.Y. Dec. 6, 2002)).

As with plaintiffs' allegations seeking to establish joint employer status, we find that plaintiffs' additional claims against Cipriani/Witkoff must be dismissed because the complaint only contains conclusory **allegations** of an **agency**relationship with respect to plaintiffs' employment. The complaint simply states that the defendants acted "as agents for each other," Second Amend. Compl. 11, 12, 15, 16, 44, 47, 48, 88, 90, 92, but offers no facts from which inferences of actual or apparent authority in this context can be drawn. *See Cromer Finance Ltd. v. Berger,* 137 F.Supp.2d. 454, 487 (S.D.N.Y.2001) (dismissing agency claims because the complaint did not contain facts establishing communications or agreements evincing actual or apparent authority).

Plaintiffs' reliance on cases holding that agency claims should not be dismissed at the pleading stage is to no avail. *See* Pls. Br. in Opp'n to C/W **Mot**. to **Dismiss** 15-16. In those cases, the complaint contained facts that supported at least the possibility of an **agency**relationship. For example, in *Adipar,* the plaintiff **alleged** that when the parties met, the defendant told the plaintiff that it could not make an agreement without consulting the alleged principal. *See Adipar,* 2002 WL 31740622, at *9.[FN3] Also, it pled that the alleged principal controlled the agent's performance in significant ways. *See id.* at *10. Similarly, in *Commercial Financial Services, Inc. v. Great American Insurance Co .,* 381 F.Supp.2d 291 (S.D.N.Y.2005), the complaint asserted that the alleged agent countersigned certain documents for the alleged principal and signed other documents as the "Authorized Representative" of the alleged principal. *Id.* at 302.The complaint in this case contains no such factual allegations. Importantly, there is no allegation that Cipriani/Witkoff controlled, or even affected, Douglas Elliman's conduct with respect to its sales agents or employees. Again, the only facts in the complaint that relate to the relationship between Cipriani/Witkoff and Douglas Elliman are that they entered into a joint venture-itself an unsupported legal conclusion-and opened a sales office in the 55 Wall Street building. This vague attempt to draw Cipriani/Witkoff into this case is not enough to create an inference of an agency

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

relationship. Thus, because the remaining counts against Cipriani/Witkoff depend on the existence of an agency relationship between the defendants, they are all dismissed against Cipriani/Witkoff.

> FN4. We note that the motion to dismiss in *Adipar* was converted into a motion for summary judgment. However, because the plaintiff had not yet conducted discovery, the court examined the complaint, accepted all of its allegations as true, and construed it liberally.

### B. Claims Against Douglas Elliman

*6 Unlike plaintiffs' claims against Cipriani/Witkoff, for which settled principles of employment and agency law dictate a common result, the claims against Douglas Elliman must be examined individually. Douglas Elliman has moved to dismiss one of plaintiff Cannon's retaliation claims (Counts 3), plaintiffs' ERISA claim (Count 5), one of plaintiffs' breach of contract claims (Count 7), plaintiffs' fraud claim (Count 8), and plaintiffs' negligent misrepresentation (Count 9) and negligence (Count 10) claims.

### 1. Retaliation Against Plaintiff Cannon (Count 3)

Douglas Elliman has moved to dismiss plaintiff Cannon's federal retaliation claim (Count 3) but does not challenge her state retaliation claim (Count 4). The FLSA makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted any proceeding under or related to this chapter ...." 29 U.S.C. § 215(a)(3). Plaintiff Cannon claims that Douglas Elliman terminated her status as an affiliated broker after her lawyer sent a demand letter requesting her unpaid wages and overtime pay.[FN5] Pl. Br. in Opp'n to D-E Mot. to Dismiss 7. Douglas Elliman counters that this letter does not trigger the FLSA's retaliation provision because it was not a formal complaint and did not institute a proceeding.

> FN5. As this letter was sent after she was allegedly fired, the termination itself is not part of Cannon's retaliation claim. However, the FLSA has been held to encompass retaliation against former employees. *See Dunlop v. Carriage Carpet Co.,* 548 F.2d

139, 147 (6th Cir.1977); *see also Pantchenko v. C.B. Dolge Co., Inc.,* 581 F.2d 1052, 1055 (2d Cir.1978) (finding that Title VII's retaliation provision prohibited retaliation against former employees and approving of Dunlop's reasoning); *Rutherford v. Am. Bank of Commerce,* 565 F.2d 1162, 1165-66 (10th Cir.1977) (adopting *Dunlop*'s rule). This rule is particularly applicable here because Cannon's relationship with Douglas Elliman extended beyond her alleged employment at the 55 Wall Street sales office, thereby providing Douglas Elliman with means to harm her even after she was terminated from the 55 Wall Street sales office. Thus, the fact that Cannon was no longer an employee of Douglas Elliman does not affect the retaliation inquiry.

In *Lambert v. Genesee Hospital,* 10 F.3d 46 (2d Cir.1993), the Second Circuit strictly construed the FLSA's anti-retaliation provision, holding that "[t]he plain language of this provision limits the cause of action to retaliation for filing formal complaints [or] instituting a proceeding ... but does not encompass complaints made to a supervisor."*Id.* at 55.In *Lambert,* the plaintiff only made oral complaints to her supervisor regarding her compensation. *Id.* at 56.Cannon acknowledges that mere oral complaints are not sufficient but argues that more concerted action should fall under the protection of the FLSA's anti-retaliation provision. She argues that the demand letter her attorney sent to Douglas Elliman threatening to institute an action is distinguishable from the type of informal complaint that *Lambert* held to be insufficient.

Although we recognize that the *Lambert* rule is the minority position among the circuits,[FN6] it remains controlling in this Circuit. *See Kelly v. City of Mount Vernon,* 344 F.Supp.2d 396, 405-06 (S.D.N.Y.2004) (applying *Lambert* ). For example, cases have applied the Lambert rule even when the complaints to supervisors were accompanied by informal or formal complaints made to the New York state labor board. *See Caci v. The Wiz of Lake Grove, Inc.,* 267 F.Supp.2d. 297, 300 (E.D.N.Y.2003); *Lamont v. Frank Soup Bowl,* No. 99 Civ. 12482(JSM), 2001 WL 521815, at *6 (S.D.N.Y. May 16, 2001). Thus, we find that Cannon's threat of suit did not trigger the FLSA's anti-retaliation provision because it was not a formal complaint and did not institute a proceeding.

Slip Copy                                                                                                              Page 6
Slip Copy, 2007 WL 4358456 (S.D.N.Y.)
**(Cite as: Slip Copy)**

FN6.*See Lambert v. Ackerly,* 180 F.3d 997, 1003 (9th Cir.1999) (stating that the Second Circuit is the only circuit to rule that informal complaints made to supervisor are insufficient to trigger 29 U.S.C. § 215(a)(3)).

*7 We note, however, that Cannon's state law retaliation claim under Section 215 of the New York Labor Law (Count 4) remains as Douglas Elliman has not moved to dismiss it. The state provision is more comprehensive as to the types of complaints it protects. Thus, only the federal retaliation claim (Count 3) is dismissed.

### 2. ERISA Violation (Count 5)

Plaintiffs next claim that Douglas Elliman did not provide them with benefits to which they were entitled under Douglas Elliman's employee benefits plan (Count 5).[FN7] Under ERISA, a participant may bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). However, in this circuit, a plaintiff must exhaust the administrative remedies provided for by the plan before commencing suit. *Kennedy v. Empire Blue Cross and Blue Shield,* 989 F.2d 588, 594 (2d Cir.1993) (reaffirming "the firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases") (quotation marks and citation omitted); *see also Leonelli v. Pennwalt Corp.,* 887 F.2d 1195, 1199 (2d Cir.1989).

FN7. Cipriani/Witkoff is not named as a defendant in this count.

Douglas Elliman argues that plaintiffs' claims should be dismissed because they failed to exhaust the administrative remedies provided for by the plan. D-E Def. Br. 9. In response, plaintiffs assert that two exceptions to the exhaustion rule apply to allow their ERISA claim to proceed.

### (a) Statutory or Plan-Based Claims

The first exception is that exhaustion of administrative remedies is not required where a plaintiff alleges a statutory violation of ERISA as opposed to a plan-based claim. *See DePace v.*

*Matsushita Elec. Corp. of Am.,* 257 F.Supp.2d 543, 558 (E.D.N.Y.2003).[FN8] A statutory violation occurs when a plan is administered in a way that violates an ERISA provision whereas a plan-based claim involves the interpretation of the specific employee benefit plan at issue. *See id.*(finding the claim to be statutory because it "concern[ed] Matsushita's alleged fraudulent and misleading administration of the plan, not an interpretation of the terms of the plan itself.")

FN8. In *Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96 (2d Cir.2005), the court recognized that there was a split among the circuits as to the viability of this exception but declined to "decide whether administrative exhaustion is a prerequisite to a statutory ERISA claim." *Id.* at 102. However, district courts in this Circuit continue to apply the exception. *See, e.g., Am. Med. Ass'n v. United Healthcare Corp.,* No. 00 Civ. 2800(LMM), 2007 WL 1771498, at *14 (S.D.N.Y. June 18, 2007).

Plaintiffs claim that their claim is statutory: "[it] is grounded on the failure of the Douglas Elliman Defendants to offer coverage to them, as eligible participants, a statutory violation of ERISA." Pls. Br. in Opp'n to D-E Mot. to Dismiss 10. We are not persuaded by this argument. As an initial matter, while plaintiffs have assumed that they were indeed eligible for the Douglas Elliman plan, they have not alleged any specific facts about the ERISA plan at issue or their coverage thereunder. ERISA does not require employers to cover all employees. *See Shaw v. Delta Air Lines,* 463 U.S. 85, 91 (1983) ( "ERISA does not mandate that employers provide any particular benefits, and does not itself proscribe discrimination in the provision of employee benefits."). Thus, an examination of the plan would be necessary to determine whether plaintiffs were eligible and therefore improperly denied benefits. This is the definition of a plan-based claim and plaintiffs' claim is therefore not exempt from the exhaustion requirement. *See DePace,* 257 F.Supp.2d at 557-60;*see also Wolf v. Coca-Cola Co .,* 200 F.3d 1337, 1340 (11th Cir.2000) ( "[W]hether the plaintiff is eligible for benefits [requires] an examination of the terms of the company's ERISA plan. The plaintiff must be eligible for benefits under the terms of the plan itself. This requirement is necessary because companies are not required by ERISA to make their ERISA plans available to all common law employees.")

Slip Copy                                                               Page 7
Slip Copy, 2007 WL 4358456 (S.D.N.Y.)
(Cite as: Slip Copy)

*8 Furthermore, plaintiffs do not cite to a statutory provision of ERISA that was violated by the denial of benefits. In cases where plaintiffs' claims have been deemed to be statutory, the plaintiffs were able to identify the specific provision of ERISA that was violated. *See e.g., Zipf v. Am. Tel. & Tel. Co., 799 F.2d 889, 891-92 (3d Cir.1986)* (holding that exhaustion is not required in a case claiming a violation of § 510 of ERISA). Plaintiff makes no effort to do so here. Thus, the first exception to the exhaustion requirement does not apply.

### (b) Futility

The second exception excuses a plaintiff from exhausting administrative remedies where he or she can make "a *clear and positive showing* that pursuing available administrative remedies would be futile."*Davenport v. Harry N. Abrams, Inc.,* 249 F.3d 130, 133 (2d Cir.2001) (quoting *Kennedy,* 989 F.2d at 594). Plaintiffs argue that because they were not provided with any benefits, asking for them would have been futile. Pls. Br. in Opp'n to D-E Mot. to Dismiss 12 (quoting Second Amend. Compl. ¶ 160). Moreover, plaintiffs cite *DePace* for the proposition that where "bad faith" is alleged, the futility showing is met. *Id.* at 13.

With respect to plaintiffs' first argument, the Second Circuit has held that plaintiffs did not show futility where they failed to notify the plan administrator of a disputed claim. *See, Davenport,* 249 F.3d at 133-34.[FN9] In *Davenport,* the court rejected the futility argument because no formal application had been made. *See id.*Similarly, in this case, plaintiffs have not alleged that they made any formal demand for benefits but merely claim to have completed various benefits forms and returned them to Douglas Elliman's human resources department. Second Amend. Compl. ¶ 62. This action does not amount to an "unambiguous application for benefits and a formal or informal administrative decision denying benefits [such that] it is clear that seeking further administrative review of the decision would be futile."*Barnett v. IBM Corp.,* 885 F.Supp. 581, 588 (S.D.N.Y.1995). Thus, plaintiffs have not made sufficient allegations to trigger the futility exception.[FN10]

FN9. While we recognize that many of these decisions were made on motions for

summary judgment, plaintiffs do not need discovery to know if they made a formal demand.

FN10. In *Barnett,* the court explained the rationale for the rule that a clear application for benefits must be presented:
[I]f an informal or unsubstantiated denial of a "claim" that was never filed or formally presented is reviewable in the federal courts, then, in such situations, the courts and not ERISA trustees will be primarily responsible for deciding claims for benefits. 885 F.Supp. at 588;*see also Davenport,* 249 F.3d at 133 (noting that the exhaustion requirement is derived, in part, from "Congress' desire that ERISA trustees be responsible for their actions, not the federal courts").

Plaintiffs reliance on *DePace* is also misplaced. In that case, the plan administrator fraudulently induced plaintiffs into electing early retirement under the terms of the ERISA plan. The court did not require exhaustion because of defendant's "alleged fraudulent and misleading administration of the plan."257 F.Supp.2d at 558. Here, no fraudulent *administration* has been alleged. Unlike the plaintiff in *DePace,* plaintiffs do not contend that the Douglas Elliman Plan administrator fraudulently induced them into making an election that deprived them of benefits. Instead, their allegation of "bad faith" restates their overarching claim that that they were fraudulently induced into accepting an employment relationship in which the defendants never intended to compensate them. Thus, *DePace* and similar cases do not excuse plaintiffs' failure to exhaust the Douglas Elliman plan's administrative remedies. Accordingly, plaintiffs' ERISA claim (Count 5) is dismissed.

### 3. Breach of Contract (Count 7)

*9 Count 7 alleges that Douglas Elliman breached the employment contract with plaintiffs by not paying wages, commissions, and plaintiff Cannon's parking expenses. Douglas Elliman contends that the terms of the alleged contract are too vague to state a claim for breach of contract.[FN11]Specifically, Douglas Elliman claims that a definite compensation term is missing from the agreement. D-E Br. 13 (quoting *Ellenberg v. Schneider,* 109 Misc.2d 1058, 441 N.Y.S .2d 581, 585 (Sup.Ct. Nassau County 1981), which held that "an agreement must be definite as to compensation").

However, Douglas Elliman also cites cases that stand for the proposition that even if an exact compensation figure is not agreed upon, a valid contract may exist if there is a "provision for its computation." *See* D-E Br. 13 (quoting <u>Sherlock v. Ansonia Shoe Corp., 262 A.D. 914, 28 N.Y.S.2d 912, 914 (1st Dep't 1941)</u>).

> <u>FN11.</u> In contrast, Douglas Elliman does not dispute that plaintiff Cannon had separately entered into a valid agreement under which she acted as an affiliated broker.

We find that the alleged contractual terms do allow for a sufficient computation of overall compensation. The complaint alleges that plaintiff Klaris was told that "she and Ms. Cannon would be paid $85,000 per year in salary, plus additional payments for working in that job."Second Amend. Compl. ¶ 56. Elsewhere, plaintiffs allege that they were told they would receive a salary and commissions on their sales. *Id.* at ¶¶ 51, 53.Taken together, these alleged terms amount to an agreement to compensate plaintiffs at a salary of $85,000 per year plus any commissions they earned on sales.<u>FN12</u>The overall amount is ascertainable because plaintiffs are entitled to the inference that they were to receive commissions based on the standard commission schedule Douglas Elliman had in place.<u>FN13</u>Thus, it is possible to calculate what plaintiffs are entitled to and Douglas Elliman's motion to dismiss plaintiffs claims for unpaid salary and commissions is denied.

> <u>FN12.</u> The complaint also refers to "additional compensation" and it is unclear if this is meant to signify an amount of compensation separate from the commissions. In any event, the complaint only seeks to recover wages, commission payments, and Cannon's parking expenses in Count 7. Thus, we do not read the indefinite "additional compensation" term into the alleged contract and the contract is not rendered overly vague on this ground.

> <u>FN13.</u> The record shows that Douglas Elliman had a standard commission rate that it used to compensate its non-employee brokers. Plaintiff Cannon's separate broker contract with Douglas Elliman stated that she would "be paid commissions in accordance with the then current DE commission schedule...." Aff. of Peter C. Moskowitz in Supp. of D-E Mot. to

Dismiss, Ex. B. Douglas Elliman does not contend that this compensation term was too indefinite. Thus, while that commission schedule may have been different than the commission schedule used for employees, it would be premature to dismiss this count on the pleadings.

With respect to plaintiff Cannon's claim for parking expenses, we find that the complaint sufficiently alleges a contractual term. *See* Second Amend. Compl. ¶ 54. Although the amount to be spent on parking is not specified, it is easily ascertainable as Cannon would have had to submit receipts in order to receive reimbursement "for her parking expenses in connection with her work at the 55 Wall Street Office."*Id.* In sum, Count 7 states a claim against Douglas Elliman.

### 4. Fraud (Count 8)

Count 8 alleges that Douglas Elliman fraudulently induced plaintiffs to serve as their employees but never intended to compensate them for their efforts. Douglas Elliman moves to dismiss this count on the grounds that it merely "recycle[s] Plaintiffs' breach of contract claims in an improper attempt to convert the contract claims into an action for fraud."D-E Br. 16.

Douglas Elliman correctly cites case law holding that "[i]t is black letter law in New York that a claim for common law fraud will not lie if the claim is duplicative of a claim for breach of contract."<u>Clifton v. Vista Computer Servs., LLC, No. 01 Civ. 10206(JSM), 2002 WL 1585550, at *2 (S.D.N.Y. July 16, 2002)</u> (citing <u>Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 19-20 (2d Cir.1996)</u>). In response, plaintiffs argue that the exception to this rule for situations where the misrepresentations are "collateral or extraneous to the contract" applies in this case.<u>FN14</u>Pl. Br. in Opp'n to D-E Mot. to Dismiss 18; *see also Clifton, 2002 WL 1585550 at *3* (stating that alleging misrepresentations "collateral or extraneous to the terms of parties' agreement" is one method to maintain a fraud claim in conjunction with a breach of contract claim). We therefore must examine whether the alleged misrepresentations were distinct from the alleged breach of contract.

> <u>FN14.</u> There are two other exceptions to this rule. First, if plaintiffs can establish that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

defendant owed them a duty apart from the duty to perform under the contract, then they may maintain an action for fraud. *See Bridgestone/Firestone,* 98 F.3d at 20. Plaintiffs do not argue this exception applies.

Second, if plaintiffs seek special damages unrecoverable as contract damages, they may maintain separate fraud and contract actions. *See id.*Although, plaintiffs state that "[d]amages sought in such fraudulent inducement claims differ from damages sought through contract claims," Pls. Br. in Opp'n to D-E Mot. to Dismiss 19, they do not explain how this is so in this case, and there is no mention of special damages in the complaint. All the complaint seeks to recover is the unpaid wages and commissions and to add a claim for punitive damages to the fraud count. This is insufficient to trigger the application of the special damages exception.

*10 Plaintiffs maintain that Douglas Elliman engaged in a "campaign of misrepresentation" designed to induce them to work for free. Pls. Br. in Opp'n to D-E Mot. to Dismiss 20. Plaintiffs argue that because Douglas Elliman never intended to pay them, its numerous misrepresentations about plaintiffs paychecks were somehow "unrelated" to the contract. *Id.* This argument is illogical and borders on the frivolous. Despite dressing up the basic breach of contract allegations as some premeditated and continuing conspiracy, plaintiffs' fraud claim merely restates plaintiffs' contract claim against Douglas Elliman. As plaintiffs acknowledge, "allegation[s] that defendant intentionally planned to breach and had no intent to perform under the contract ... [are] insufficient to support a claim for fraud."FN15*Simas v. Merrill Corp.,* No. 02 Civ. 4400, 2004 WL 213013, at *7 (S.D.N.Y. Feb. 4, 2004). In *Simas,* for example, "[a]t issue [wa]s simply Merrill's obligation, under its compensation agreements, to pay Simas certain commissions and signing bonuses."*Id.; see also Metzler v. Harris Corp.,* No. Civ. 5847 HB, 2001 WL 194911, at *3 (S.D.N.Y. Feb. 23, 2001) (holding that "plaintiff's fraud claim is merely a disguised contract claim as the gravamen of the fraud claim is that defendant promised to pay him commissions and failed to do so"). This case is indistinguishable: plaintiffs' claims that Douglas Elliman continued to promise to pay plaintiffs their salaries does not alter the fact that Douglas Elliman's failure to honor the alleged compensation agreement is the basis for plaintiffs' claims. As Douglas Elliman correctly states:

> FN15. Plaintiff conspicuously tries to distinguish *Simas* and other similar cases but points to no facts or reasoning that make them inapplicable to the present case.

each of the alleged misrepresentations in the Complaint-that Plaintiffs were promised salary, commissions, and additional expenses as an inducement to work for the Douglas Elliman Defendants and forego other opportunities-is part of their contract claim.

D-E Reply Br. 8. Thus, Count 8 is dismissed.

### 5. Negligent Misrepresentation and Negligence (Counts 9 and 10)

Plaintiffs' final claims-for negligent misrepresentation and negligence-confront the same general problem as did plaintiffs' fraud claim. The fundamental issue is whether these claims simply reflect the underlying breach of contract claim or whether they contain the necessary elements of negligent misrepresentation and negligence claims.

### (a) Negligent Misrepresentation

"When the alleged misrepresentation [underlying a negligent misrepresentation claim] is a promise and not a statement of fact, a special relationship must exist between the parties in order for a promissory misrepresentation to give rise to a justiciable claim."*Clifton,* 2002 WL 1585550 at *5 (internal quotation marks and citation omitted). Thus, because plaintiffs allege that Douglas Elliman promised them wages and other benefits, plaintiffs must show that a special or fiduciary relationship existed. *See Stewart v. Jackson & Nash,* 976 F.2d 86, 89-90 (2d Cir.1992). A special relationship has been held to exist where there is:

*11 (1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance.

*N.Y. Islanders Hockey Club, LLP v. Comerica Bank-Texas,* 71 F.Supp.2d 108, 119 (E.D.N.Y.1999).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiffs argue that these elements are satisfied here because Douglas Elliman made statements on which plaintiffs relied and continued to make statements that induced plaintiffs to work in the sales office at 55 Wall Street. *See* Pls. Br. in Opp'n to D-E Mot. to Dismiss 23. However, this analogy is not apt. The cases plaintiffs cite involved ongoing negotiations in the context of business transactions, not promises made in the context of an employment relationship. *See* Pls. Br. in Opp'n to D-E Mot. to Dismiss 22 ("Such a special relationship may be found, for example, 'between a buyer and a seller in corporate acquisitions involving lengthy negotiations.' " *Dimon Inc. v. Folium Inc.,* 48 F.Supp.2d 359, 373-74 (S.D.N.Y.1999).). Plaintiffs do not cite a case in which an employer was held to be in a "special relationship" with prospective or current employees.

In fact, in numerous employment cases similar to the present case, negligent misrepresentation claims have been dismissed for failure to establish a fiduciary relationship. For example, in *Metzler,* the plaintiff alleged that the defendant caused him to leave his job and begin employment with the defendant by representing that he would receive a salary and commissions. 2001 WL 194911, at *2. The court dismissed the negligent misrepresentation claim because it did not "find there to be[ ] a fiduciary relationship between him and the defendant."*Id.; see also Stewart,* 976 F.2d at 90;*Clifton,* 2002 WL 1585550 at *5 (dismissing negligent misrepresentation claim in a case involving multiple employment contracts because plaintiff "alleged no facts to support a claim of a fiduciary relationship between the parties"). The result is the same here. The representations made by Douglas Elliman did not create a fiduciary relationship and no other grounds for a fiduciary relationship have been alleged. Thus, Count 9 is dismissed.

**(b) Negligence**

Plaintiffs' negligence claim further shows that they have alleged nothing more than a breach of contract claim. Douglas Elliman reasserts that plaintiffs have failed to establish that they were owed a duty of care. In response, plaintiffs contend that "Douglas Elliman assumed and undertook a legally enforceable duty" to compensate plaintiffs. Pls. Br. in Opp'n to D-E Mot. to Dismiss 24. Of course, plaintiffs neglect to clarify that the "undertaking" of this duty resulted solely from the alleged contract. Plaintiffs do not cite a case in which a standard negligence claim was allowed to

proceed in this context. Indeed, plaintiffs' theory appears to be so novel that the other employment contract cases cited in this opinion that dismissed redundant fraud and negligent misrepresentation claims did not even have to contend with a pure negligence claim.[FN16] Count 10 is dismissed.

> [FN16.] It has also not escaped us that plaintiffs argue on the one hand, that Douglas Elliman never intended to pay them and then, on the other hand, that Douglas Elliman was simply negligent in failing to pay them. While plaintiffs are generally free to pursue multiple claims and may plead theories in the alternative, asserting claims that are inconsistent with and unsupported by the factual allegations in a complaint is disingenuous at best.

### CONCLUSION

**\*12** For the foregoing reasons, all claims against Cipriani/Witkoff are dismissed. Counts 3, 5, 8, 9, and 10 are dismissed as to Douglas Elliman as well. However, we find that plaintiffs have stated a claim for breach of contract as alleged in Count 7. This claim, as well as Counts 1 (FLSA), 2 (New York state labor law), 4 (New York state retaliation), 6 (breach of contract), and 11 (unjust enrichment), which Douglas Elliman did not move to dismiss, may proceed solely against Douglas Elliman.

The parties are directed to appear before this Court for a conference on January 4, 2008 at 2:30 p.m.

S.D.N.Y.,2007.
Cannon v. Douglas Elliman, LLC
Slip Copy, 2007 WL 4358456 (S.D.N.Y.)

END OF DOCUMENT

**TAB 3**

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 799870 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

**H**De Lage Landen Financial Services, Inc. v.
Cardservice Intern., Inc.
E.D.Pa.,2001.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
DE LAGE LANDEN FINANCIAL SERVICES,
INC.,
v.
CARDSERVICE INTERNATIONAL, INC.,
v.
International Business Equipment, Inc., De Lage
Landen Financial Services, Inc., Pullman Bank &
Trust Co. and Howard Karjala.
No. CIV. A. 00-2355.

July 12, 2001.

*MEMORANDUM ORDER*
WALDMAN.
*1 Plaintiff De Lage Landen Financial Services Inc.
("DLL") filed this action seeking to recover allegedly
overdue lease payments. Defendant Cardservice
International, Inc. ("Cardservice") filed
counterclaims against DLL and the third-party
defendants, International Business Equipment, Inc.
("IBE"), Pullman Bank and Trust Company
("Pullman") and Howard Karjala. Cardservice's first
counterclaim is against all parties, except Pullman,
for violation of the California unfair trade practices
law. Its fifth and sixth counterclaims are for
fraudulent inducement against all parties except
Pullman. Its seventh counterclaim seeks rescission of
all lease agreements on the basis of fraud against all
parties except third-party defendant Howard Karjala.
Counterclaims eight through twelve seek declaratory
relief against all parties. Presently before the court is
the motion of DLL and Pullman to dismiss the counts
against them pursuant to Fed.R.Civ.P. 12(b)(6) and
9(b).[FN1]

> FN1. IBE and Mr. Karjala have never been
> served in this action and have not appeared
> or otherwise waived service. Counsel for
> Cardservice filed a "certificate of service"
> last November stating that its answer with
> counterclaims had been served by mail
> "upon counsel for plaintiff." This is clearly
> insufficient to effect service upon third-party
> defendants. *See*Fed.R.Civ.P. 14(a).

Jurisdiction is based upon diversity of citizenship.
The court exercises supplemental jurisdiction over
defendant's counterclaims against third-party
defendants.

The pertinent facts as alleged by Cardservice are as
follow.

On July 23, 1998, Cardservice and IBE entered a
lease agreement pursuant to which IBE leased
photocopiers ("copiers") to Cardservice on a cost-
per-copy basis, with a guaranteed minimum of
225,000 copies per month. The lease agreement
granted IBE the right to assign all of its rights under
the agreement, without its obligations. The lease
agreement also contains a choice of law clause which
states "[t]his agreement has been made in Berwyn,
Pennsylvania and ... is governed by and construed in
accordance with the laws of Pennsylvania."

Although the lease agreement contains a disclaimer
of all warranties, including that of fitness for a
particular purpose, Cardservice alleges that IBE
assured it upon entering the agreement that the
copiers were compatible with Cardservice's software
programs. IBE further assured Cardservice that its
obligations under the agreement were limited to its
minimum copy requirements and that it could receive
as many copiers as it needed. Cardservice does not
identify who at IBE initially made these
representations.

After signing the lease agreement but before the
copiers were delivered, Cardservice was visited by
Mr. Karjala, an IBE sales representative, who
reiterated that the copiers would meet Cardservice's
needs and that they could receive additional copiers
with no further obligations. Shortly after receiving
the copiers, Cardservice discovered that they were
not compatible with its software applications. After
unsuccessfully attempting to remedy the problem,
Mr. Karjala met with Don Wilson, Cardservice's
Controller, to discuss replacing the incompatible
copiers with new copiers. At this time Mr. Karjala
reassured Mr. Wilson that Cardservice was only
responsible for the 225,000 minimum copies
regardless of the number of copiers it received.
Cardservice subsequently entered two new

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 799870 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

agreements with IBE, dated October 6, 1998 ("second lease") and November 30, 1998 ("third lease").

The second and third leases each require Cardservice to pay for a minimum of 225,000 copies per month. The second lease listed seven copiers to be delivered to Cardservice and the third lease listed five.[FN2] Cardservice alleges that it entered the second and third leases based upon Mr. Karjala's representations that these agreements would supercede the parties' initial agreement. According to Cardservice, the parties agreed that the new leases would not increase its guaranteed minimum copy requirement above 225,000 copies.

> FN2. The seven copiers listed in the second lease were simply identified as "Konica 7060" copiers whereas the five copiers listed in the third agreement were specifically identified by their serial numbers. Cardservice alleges that it never received these five copiers.

*2 After signing the second and third leases and receiving new copiers, Cardservice discovered that the new copiers were also incompatible with its needs. It terminated its agreement with IBE by letter of January 20, 2000. Cardservice then learned that IBE had assigned all of its rights to payments under the leases to DLL "and/or Pullman" and that Cardservice had been paying and was expected to continue paying DLL based upon a guaranteed minimum of 675,000 total copies rather than 225,000. The 675,000 guaranteed minimum represented the aggregate guaranteed minimum requirements of the three leases. DLL sued Cardservice in this district as assignee of IBE's rights and Cardservice's counterclaims followed.

Dismissal for failure to state a claim is appropriate when it clearly appears that plaintiff can prove no set of facts to support the claim which would entitle him to relief. See _Conley v. Gibson_, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); _Robb v. Philadelphia_, 733 F.2d 286, 290 (3d Cir.1984). Such a motion tests the legal sufficiency of a claim accepting the veracity of the claimant's allegations. See _Markowitz v. Northeast Land Co._, 906 F.2d 100, 103 (3d Cir.1990); _Sturm v. Clark_, 835 F.2d 1009, 1011 (3d Cir.1987). A claim may be dismissed when the facts alleged and the reasonable inferences therefrom are legally insufficient to support the relief sought. See _Pennsylvania ex. rel. Zimmerman v. PepsiCo., Inc._, 836 F.2d 173, 179 (3d Cir.1988).

DLL and Pullman have moved to dismiss Cardservice's California unfair trade practices counterclaim on the basis of the Pennsylvania choice of law clause and offer no argument in support of the applicability of Pennsylvania law other than this clause. Cardservice argues that the choice of law clause is limited to interpretation of the contract and does not apply to tort claims.

A federal court sitting in diversity applies the choice of law rules of the forum state. See _Klaxon Co. v. Stentor Elec. Mfg. Co._, 313 U.S. 487, 497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); _Kruzits v. Okuma Machine Tool, Inc._, 40 F.3d 52, 55 (3d Cir.1994). Pennsylvania follows Section 187 of the Restatement (Second) of Conflict of Laws which " 'generally honor[s] the intent of the contracting parties and enforce[s] choice of law provisions in contracts executed by them.'" _Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc._, 94 F.Supp.2d 589, 593 (E.D.Pa.1999) (quoting _Kruzits_, 40 F.3d at 55). Not all choice of law provisions, however, are the same. The parties may choose to limit their chosen law to the interpretation and execution of the terms of their agreement or they may draft the provision more broadly to encompass collateral matters arising from the relationship, including tort claims. See _Id._ at 592; _Jiffy Lube Int'l Inc. v. Jiffy Lube of Pa., Inc._, 848 F.Supp. 569, 576 (E.D.Pa.1994); _Compositflex, Inc. v. Advanced Cardiovascular Sys., Inc._, 795 F.Supp. 151, 157 (W.D.Pa.1992).

The choice of law clause at issue states that the parties' agreement will be "governed by and construed in accordance with the laws of Pennsylvania." The operative terms "governed by" and "construed in accordance with" are limited to the interpretation and enforcement of the agreement. While the clause encompasses questions of fraudulent inducement, it does not encompass a statutory tort claim for deceptive business practices. See _In re Alleghany Int'l, Inc._, 954 F.2d 167, 178 (3d Cir.1992) (applying Pennsylvania law to question of whether contract was voidable for fraudulent inducement when contract provision stated it was to be "governed by and construed in accordance with" Pennsylvania law); _Compositflex_, 795 F.Supp. at 157 (California choice of law clause covering "all matters, including, but not limited to, matters of validity, construction, effect or performance"

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

governed trade secrets misappropriation claim).

**\*3** DLL and Pullman also argue that Cardservice's claims for fraudulent inducement are defective for lack of specificity. When pleading fraud or mistake, "the circumstances constituting fraud or mistake shall be stated with particularity."Fed.R.Civ.P. 9(b). Although a defendant's knowledge or other condition of mind may be averred generally, a party alleging fraud must "still allege facts that show the court their basis for inferring that the defendants acted with 'scienter.' "*In re Burlington Coat Factories Sec. Litig., 114 F.3d 1410, 1418 (3d Cir.1997).* When multiple defendants are accused of fraud, the complaint must also separately allege each defendant's fraudulent conduct. See *In re Home Health Corp. of America Sec. Litig., 1999 WL 79057, \*20 (E.D.Pa. Jan.29, 1999); Rosenbaum & Co. v. H.J. Myers & Co., 1997 WL 689288, \*3 (E.D.Pa. Oct.9, 1997).* It is insufficient to attribute individual acts of fraud to all defendant's generally. See *Vicom, Inc. v. Harbridge Merch. Servs. Inc., 20 F.3d 771, 777-78 (7th Cir.1994)* (allegations that misrepresentations were made with knowledge and consent of all defendants "falls short" of Rule 9(b) standards); *Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir.1993)* ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants' ").

Cardservice's fraud claims are predicated on the alleged representations of Howard Karjala and perhaps other unidentified IBE representatives to Don Wilson and perhaps other Cardservice representatives. Cardservice alleges only that DLL "and/or Pullman" were parties to assignments without Cardservice's knowledge. From this one cannot discern DLL's or Pullman's participation in or knowledge of any fraudulent such.[FN3]The agreement expressly permits IBE to assign its rights and does not require it to notify Cardservice upon doing so. Cardservice has failed to make specific averments of DLL's or Pullman's individual complicity in fraudulent conduct.

> FN3. Cardservice's averments actually suggest that it has no idea what role Pullman assumed with respect to the transactions at issue.

DLL and Pullman finally seek dismissal of Cardservice's claims for declaratory relief. Cardservice seeks declarations that the second and third leases successively superceded the first agreement (count eight), that it never received the five copiers identified in the third lease (count nine) and that defendants breached the third lease agreement by failing to deliver the five copiers (count ten). Cardservice seeks declarations that it has no obligations with respect to the five copiers identified in the third agreement (count eleven) and defining the rights and obligations of all parties under the various lease agreements (count twelve). DLL and Pullman correctly note that Cardservice's requests for declaratory relief are essentially replicative of the claims and counterclaims comprising the substance of this lawsuit and that resolution of the parties' dispute through the medium of declaratory relief will not simplify the issues. Cardservice correctly notes that the presence of an alternative remedy does not automatically preclude declaratory relief and contends that such relief is appropriate to educate the parties on their rights and obligations.

**\*4** The decision whether to entertain declaratory relief is within the sound discretion of the court. See28 U.S.C. § 2201(a) (federal court *may* grant declaratory relief in cases of actual controversy in which there is an independent basis of jurisdiction) (emphasis added); *Wilton v. Seven Falls Co., 515 U.S. 277, 282-83, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995).* A court should exercise its discretion to entertain declaratory actions when doing so will clarify legal relations and serve a useful purpose. See *Los Angeles County Bar Ass'n v. Eu, 979 F.2d 697, 703 (9th Cir.1992)* (court should consider whether declaratory relief would serve useful purpose, clarify legal relations and terminate controversy); *Fort Howard Paper Co. v. William D. Witter, Inc., 787 F.2d 784, 790 (2d Cir.1986)*(same). Where a declaratory judgment will not serve a useful purpose, the court may decline to entertain such relief.See *Wilton, 515 U.S. at 288;Dominium Mgmt. Servs., Inc. v. Nationwide Housing Group, 195 F.3d 358, 367 (8th Cir.1999)* (counterclaims seeking declaration that contract was unenforceable would serve no useful purpose); *Aluminum Co. of America v. Beazer East Inc., 124 F.3d 551, (3d Cir.1997); McGraw-Edison Co. v. Preformed Line Products Co., 362 F.2d 339, 343 (9th Cir.1966)* (declaratory judgment would serve no useful purpose where it would merely serve to determine issues involved in case already pending); *Old Republic Ins. Co. v. Hansa World Cargo Serv. Inc.,* 170, F.R.D. 361, 386 (S.D.N.Y.1997) (refusing to entertain declaratory judgment request concerning claims raised in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 799870 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

remainder of complaint).*See also Grand Trunk Western R.R. v. Consolidated Rail Corp., 746 F.2d 323, 326 (6th Cir.1984); Cartier v. Secretary of State. 506 F.2d 191, 200 (D.C.Cir.1974).*

Resolution of Cardservice's requests for declaratory judgments would require a determination of the same factual issues which underlie the parties' substantive legal claims. Insofar as each request is adjudicated discretely, the result would be an unacceptable series of minitrials and unwarranted expenditure of resources. *See Travelers Ins. Co. v. Davis, 490 F.2d 536, 544 (3d Cir.1972).* As the legal and declaratory claims are essentially redundant and adjudication of one would effectively resolve the other, there also would be no practical utility in adjudicating them simultaneously.

**\*5** ACCORDINGLY, this day of July, 2001, upon consideration of the Motion of counterclaim defendants Pullman Bank and De Lage Landen to Dismiss Counterclaims (Doc. # 20), and the response of Cardservice International thereto, IT IS HEREBY ORDERED that the Motion is GRANTED as to Cardservice's fifth, sixth and seventh counterclaims, without prejudice to replead with particularity; is GRANTED as to Cardservice's eighth, ninth, tenth, eleventh and twelfth counterclaims seeking declaratory relief; and, is otherwise DENIED.

E.D.Pa.,2001.
De Lage Landen Financial Services, Inc. v. Cardservice Intern., Inc.
Not Reported in F.Supp.2d, 2001 WL 799870 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 4

Westlaw.

Not Reported in A.2d                                                      Page 1
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**H**Eisenmann Corp. v. General Motors Corp.
Del.Super.,2000.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware.
EISENMANN CORP. and Eisenmann
Maschienenbau KG
v.
GENERAL MOTORS CORP.-C.A. No. 99C-07-260-
WTQ
**No. C.A.99C-07-260-WTQ.**

Jan. 28, 2000.

Letter Opinion and Order on General Motors
Corporation's Motion to Dismiss:
1) Motion Relating To The Forum Selection Clauses
In Counts VII, IX, X And XI-MOTION DENIED;
2) Motion Relating To Dismissal Via Forum Non
Conveniens-MOTION DENIED;
3) Motion To Dismiss Counts VII, IX, X, XI, XV
And XVI Because GM Was Not A Named Party To
The Purchase Orders That Formed Certain Contracts-
MOTION DENIED As To Counts VII, IX, X, XI
And GRANTED As To Counts XV And XVI;
4) Motion To Dismiss The Quantum Meruit Claims-
MOTION GRANTED As To Counts XVIII and XX
And DENIED As To Counts II, IV, VI and XIII;
5) Motion To Dismiss The Estoppel Claims-
MOTION DENIED As To Counts VII, IX, XI and
XIV;
6) Motion To Dismiss For Failure To State A Claim
For Not Making Payments Under The Contracts-
MOTION DENIED As To Counts I, III, V, XII, XIX,
XXI And XXII;
7) Motion To Dismiss For Failure To State A Claim
For A Contractual Surcharge In Count I-MOTION
GRANTED;
8) Motion To Dismiss For Failure To State A Claim
For Overtime And Disruption Costs In Count I-
MOTION DENIED;
9) Motion To Dismiss A Portion Of Count III Based
On A Contractual Preclusion From Asserting A
Claim On The Competitive Bid Process-MOTION
DENIED;
10) Motion To Dismiss A Portion of Count V On The
Allegation That GM Paid All That It Was
Contractually Required To For Certain Drawing And

Engineering Studies-MOTION DENIED;
11) Motion To Dismiss Counts VIII, X, And XII On
The Grounds That The Integrated Contracts Bar The
Bundling Claims-MOTION DENIED;
12) Motion To Dismiss Claims For Lost Opportunity
Costs In Counts X, XV, And XXII Because The
Contracts Are Barred By Express Disclaimers Of
Consequential Damages-MOTION GRANTED;
13) Motion To Dismiss Based On A Failure To State
A Claim For Breach Of An Oral Contract In Count
XXIII-MOTIONGRANTED.

Neal J. Levitsky, Esquire, Agostini Levitsky Isaacs &
Kulesza, Wilmington.
Gerard W. Ittig, Esquire, William H. Moore, Esquire,
Ittig & Ittig, P.C., Washington, D.C.
Frederick L. Cottrell, III, Esquire, Jeffrey L. Moyer,
Esquire, Richards, Layton & Finger, Wilmington.
David J. Zott, Esquire, Andrew B. Bloomer, Esquire,
Michael E. Berg, Esquire, Kirland & Ellis, Chicago,
IL.
QUILLEN, J.
**\*1** Gentlemen:

This is the Court's Letter Opinion and Order on
Defendant General Motors Corporation's ("GM")
Motion to Dismiss several breach of contract claims
brought against it by Eisenmann Corporation
("Eisenmann") and Eisenmann Maschienenbau KG
("EKG"). For the reasons stated herein, GM's Motion
to Dismiss is GRANTED in part and DENIED in
part.

FACTS

Eisenmann is in the business of designing and
building paint manufacturing facilities. GM
manufactures and sells automobiles and trucks.
Eisenmann and GM are both Delaware corporations.
Eisenmann has its principal place of business in
Illinois; GM has its principal place of business in
Michigan. EKG is a German Corporation.

GM allegedly contracted with Eisenmann and EKG
to perform design and construction services for GM
auto assembly plants on sixteen different construction
projects. These construction projects were to be
performed in several different U.S. States and foreign
countries. A detailed look at the claims alleged in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Complaint is necessary for resolution of the intricate Motion to Dismiss currently before the Court.[FN1]Suffice it to say preliminarily that the primary focus of the Motion at this stage should be directed to the contentions that Delaware is not the proper forum.

> FN1. A copy of any written instrument which is a part of a pleading is part thereof for all purposes. Super. Ct. Civ. R. 10(c). Thus, in a Motion to Dismiss, where, as here, the Plaintiff has provided contracts as part of the Complaint, the provisions therein are considered as part of the pleadings.

*A. Counts I and II-Janesville, Wisconsin*

Count I of the Complaint alleges a breach of contract violation by GM for services provided by Eisenmann at the GM automotive assembly plant in Janesville, Wisconsin. The contract sum for the entire Janesville project totaled $60.5 million. Eisenmann was to provide, among other things, engineering, design, and construction services for what is called a Light Duty Phosphate/ELPO system.[FN2]In addition to the ELPO system installation, the scope of Eisenmann's work included upgrading the electrical system, upgrading the ventilation systems, and performing various other construction projects in the plant. Eisenmann alleges that purchase orders which form the Janesville contract gave GM the right to order alterations in, additions to, and deductions from the work Eisenmann was contracted to do. Eisenmann claims that sixty field work orders containing changes were given by GM during the construction of the Light Duty Phosphate/ELPO system that amounted to approximately 350 changes in the project. Eisenmann seeks damages claiming that it performed the alterations and additions but was never paid for the extra work. Additionally, Eisenmann alleges that it is contractually entitled to a surcharge because the construction on the Light Duty Phosphate system did not begin until some eight months after the scheduled start of the project.

> FN2. A Phosphate/ELPO system is a manufacturing process for applying paint to new automobile bodies.

Eisenmann further claims that as a premise to the Janesville contract, GM agreed to run two shifts for 10 hours per day, four days per week at the Wisconsin plant so that Eisenmann would have access to the site on Fridays, Saturdays, and Sundays. Eisenmann alleges that GM did not comply with this understanding, and, because of GM's interference, Eisenmann and its subcontractors were refused access at scheduled work times. Eisenmann seeks damages for GM's interference and for overtime costs incurred in the amount of $3,351,210. Eisenmann also claims that, because incremental payments were not made on time, it is entitled to $2,832,827 in past due progress payments and $515,632 in lost opportunity costs.

*2 Asserting additional contractual breaches, Eisenmann states that GM was entitled to retain 10% of the progress payments that became due. Eisenmann claims that the retention amount was to be paid as part of the final payment, which was due 55 days after the completion of the project. Eisenmann argues that GM retained 10% of the progress payments and did not pay the retention over to it at the culmination of the project. Therefore, Eisenmann asks for approximately $4,544,306 for unpaid retention by GM and $579, 935 for lost opportunity costs resulting from the breach.

Finally, as to Count I, Eisenmann alleges that on September 18, 1998, GM terminated its Janesville contract, even though Eisenmann had completed its work. Eisenmann asserts that it was never paid the final payment for the work it did on the Janesville project. Eisenmann also states that GM wrongfully terminated its contract. All in all, Eisenmann requests total relief for the breaches of the Janesville contracts in the amount of $22,664,305.

In Count II, Eisenmann asserts a claim for quantum meruit relief in the same dollar amount for materials and services provided at the Janesville plant. In Count II, Eisenmann also requests payment for the services provided beyond what was required under the contract.

*B. Counts III and IV-Moraine, Ohio*

Pursuant to a purchase order, a contract was formed between GM and Eisenmann to provide engineering, design, and construction services for a Phosphate/ELPO system at GM's plant in Ohio. The contract sum was $65,198,520. The claims in Count III are quite similar to the Janesville claims. Eisenmann alleges that, under the contract, GM was

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
(Cite as: Not Reported in A.2d)

allowed to make alterations and additions to the work, and GM did not pay for the field orders, extra work, and spare parts. Eisenmann further alleges that GM owes it substantial payments for past due progress payments and lost opportunity costs. Eisenmann also alleges that final payment was never made within 55 days of completion and that the 10% retention payments were never made to it. In addition, Eisenmann argues that GM did not allow it to use a competitive bid process for major equipment and components, and that preclusion cost it an extra $350,000. All in all, Eisenmann requests $11,181,659 for damages resulting from GM's alleged breach of contract at the Moriane, Ohio plant.

In Count IV, Eisenmann asserts a claim for quantum meruit relief in the same dollar amount as Count III for materials and services provided at the Moriane plant.

### C. Counts V and VI-Oklahoma and Lake Orion Plants

Count V alleges that Eisenmann submitted a proposal to GM for engineering and design services for a GM plant in Oklahoma. The design services at issue included construction drawings and engineering studies. Eisenmann claims that on April 23, 1997, GM accepted its proposal to cover the complete cost of the construction drawings and assured it that a purchase order would be forthcoming.

**\*3** Eisenmann was also contracted to provide construction drawings and engineering studies at GM's Lake Orion, Michigan plant. GM issued a purchase order, dated February 17, 1998, that was the contractual basis of the work to be done at the Michigan plant. Eisenmann claims that this $1.3 million purchase order was to partially cover the cost of the engineering and design services at Lake Orion.

On July 28, 1998, Eisenmann states that it delivered to GM two sets of 13 volumes, each containing the results of the value engineering studies, and a CD-ROM with all of the construction drawings for these projects. Eisenmann alleges that the progress payments were late and GM refused to pay the balance due to Eisenmann after the projects were canceled. Eisenmann is asking for $2,270,792 for GM's non-payment for services provided and lost opportunity costs.

Eisenmann asserts a claim for quantum meruit relief in Count VI in the same dollar amount as Count V for labor, materials, and other services provided in performing the design work for the Oklahoma and Lake Orion plants.

### D. Count VII-Estoppel and Bundling Allegations in Moraine, Oklahoma, Generic,[FN3] and Silao, Mexico

> FN3. Although it is not crystal clear from the Complaint, it appears that the "Generic" plant was not done for, nor tied to, any geographic location.

In Count VII of the Complaint, Eisenmann claims that it submitted a proposal at GM's request for work to be performed on four different GM projects. They were the projects for Moraine (Ohio), Oklahoma, Generic, and Silao (Mexico). Eisenmann alleges that it offered a discount to GM if it was awarded three of the projects (Moraine, Oklahoma, and Generic). Eisenmann claims that the total price for the three projects would have been $638,500,000 if the projects were awarded separately, but the discounted price of $618,900,000 was given to GM if it awarded all three projects to Eisenmann. Eisenmann also alleges that it offered an additional discount rate on the contract if it was also awarded work at GM's plant in Silao, Mexico. (Compl.¶ 107).

Eisenmann states that the general price for preparing the studies for the Oklahoma and Generic projects would each cost $287,000,000 if they were awarded separately, but because of the packaging pricing, the price for the Oklahoma project was $280,000,000 and the price for the Generic project was $274,400,000. Eventually, GM canceled the Oklahoma project and requested that Eisenmann adapt the drawings for the Lake Orion plant in Michigan.[FN4] Eisenmann argues that these three construction projects were valued at $618,900,000. Eisenmann claims that GM reasonably should have expected that Eisenmann would devote significant resources to the project because the parties were in a long-term contractual relationship with each other. Eisenmann states that it devoted substantial resources to the projects by hiring and assigning additional engineers, purchasing additional equipment, and extending its manufacturing facility. Eisenmann states that it had no reason to know that GM would break its promises by not going forward with any of the major projects.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 4
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

FN4. Eisenmann claims that the Lake Orion project was similar in cost to the Oklahoma and Generic projects.

**\*4** Eisenmann also alleges that it "entered into currency exchange forward purchasing contracts. GM's cancellation of the Oklahoma, Lake Orion and Generic projects cost Eisenmann at least $5,114,117 in exchange rate transaction losses."Eisenmann seeks relief totaling $3,885,952 for costs incurred for additional overhead and layoff of added employees. Eisenmann further claims that it lost $661,850 in purchasing power on the Moraine project. In total, Eisenmann requests relief in the amount of $10,545,375 on this promissory estoppel claim.

### E. Count VIII-Breach of Contract on International Claims

Count VIII seeks damages for another bundling claim. Eisenmann alleges that on April 24, 1996, it, EKG, GM Worldwide Purchasing, GM do Brazil (a Brazilian corporation) and Opel (a German corporation alleged to be an agent of GM), met in Germany to discuss making improvements to four GM plants in Rosario, Argentina, Cordoba, Argentina, Poland, and Integrate, Thailand. Eisenmann stated that its total price for the work at the Rosario, Cordoba, Poland, and Integrate plants was 222,000,000 DM plus and additional $106,000,000 if the projects were awarded separately. At the meeting, "Eisenmann and EKG offered to do all of the projects for a discounted price of 211,000,000 DM plus $100,000,000 if the contracts for these four projects were awarded to them."(Compl. at ¶ 131).

On August 11, 1996, Opel issued two purchase orders to EKG for work to be performed at the Poland and Integrate plants. Eisenmann claims that these two purchase orders were one percent less than the discounted amount agreed to at the April 24, 1996 meeting.

On August 6, 1996, GM Provencorp (an alleged agent of GM) issued purchase orders for work to be completed at GM's plant in Rosario, Argentina. The total amount of Provencorp's purchase orders were $78,000,000, which was equal to the amounts agreed to at the April 24, 1996 meeting. Subsequently, Eisenmann alleges that GM directed Provencorp to cancel the planned improvements to the Fascia Paint

Shop at Rosario. Then Eisenmann claims that Provencorp, GM do Brazil, and GM de Argentina canceled all work to be performed at the Cordoba plant. In sum, it is Eisenmann's contention that GM canceled the projects included within the discount packages and yet unfairly obtained the discounted prices. Eisenmann claims that it offered the discount package price to GM on the reasonable expectation that packaging the work would increase its purchasing power and it lost that benefit when it did not receive the entire package of work. For that and other related breaches, Eisenmann asks this Court to award it 4,193,664 DM and $6,442,077 on Count VII for discounts unfairly obtained by GM.

### F. Count IX-Promissory Estoppel Claims on the International Bundling Agreements

Count IX's promissory estoppel claim arises out of the same April 24, 1996 meeting in Germany, where discounts were offered for work by Eisenmann if GM awarded it various contracts bundled together. Eisenmann's allegation is that on August 5, 1996, GM, through its agents Provencorp and GM de Argentina, issued purchase orders to Eisenmann for the Main Paint Shop portion of the work at the Rosario plant and GM deducted the entire $5,000,000 discount from those purchase orders, even though (as Eisenmann alleges) the discount should only apply if Eisenmann was awarded all three portions of the Rosario work, in addition to the Cordoba, Thailand, and Poland projects. Eisenmann argues that it was reassured by GM that the projects would not be canceled and that it relied on GM's promises to its detriment. Eisenmann asks this Court to award it 4,193,664 DM and $6,442,077 for Count IX because of GM's actions and inactions.

### G. Counts X and XI-Breach of Contract and Estoppel-Argentina

**\*5** The allegations in Count X also arise from the April 24, 1996 meeting in Germany. Eisenmann claims that its price to do the work at the Rosario plant was $90,000,000. Eisenmann offered to do the work for a cost of $85,000,000 if it was awarded the contracts for the Main Paint Shop, the Fascia Paint Shop, and the Conveyors, as well as the Cordoba, Poland, and Thailand plants. Apparently, purchase orders were issued for the Main Paint Shop and the Conveyor portions of the work at the Rosario plant, but a stop work order was put on the Fascia Paint Shop as of May 31, 1996. The purchase orders issued

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

for the Main Paint Shop and the Conveyor portions of the work at the Rosario plant were for $78,000,000. It is Eisenmann's claim that GM deducted the entire $5,000,000 discount for all three shops from the purchase order for the Main Paint Shop portion of the work. Eisenmann states that GM has refused to return the discounted portion even though Eisenmann was not awarded all of the projects. Eisenmann alleges that it has lost opportunity costs that were incurred. Additionally, Eisenmann claims that GM has not made its final payment for the work that Eisenmann and its agents did do even though final approval was given by GM on September 15, 1997. All in all, on Count X, Eisenmann requests recovery in the amount of $6,963,165.

Count XI deals with essentially the same transaction but asserts an estoppel claim. Eisenmann claims that it would return that, after GM discounted $5,000,000 from the Main Shop purchase order, it was assured by GM that it would return that portion of the the discount applicable to the canceled work. Eisenmann says that it accepted the purchase order based on GM's assurances. Eisenmann claims that it performed only a portion of the work, but did it at the full discount rate. Therefore, Eisenmann seeks a *pro-rata* portion of the discount for the Fascia Paint Shop part of the work and asks for lost opportunity costs incurred. The total amount of recovery sought in Count XI is $984,266.

### H. Counts XII, XIII, XIV-Claims for Work Done at the Silao, Mexico Plant

The Complaint alleges that on March 20, 1998, GM and Eisenmann met to discuss package pricing. (Compl. at ¶ 194). At that time, Eisenmann offered to discount the Silao project 5% under the Janesville unit pricing if Eisenmann was awarded the Oklahoma, Generic, Moraine, and Silao projects. Eisenmann claims that it did reduce the price of the Silao project by 5% and completed the work in accordance with the terms of the purchase order. Eisenmann states that the Oklahoma and Generic contracts were not awarded to it. Eisenmann claims that it is entitled to receive back the 5% discount, as well as past due progress payment it never received. In total, Eisenmann wishes to recover $646,168 for the claims made in Count XII.

In Count XIII, Eisenmann asserts claims in quantum meruit to recover the $646,168 it argues it is entitled to for the work done at the Silao plant. In Count XIV,

Eisenmann asserts a promissory estoppel claim to recover $646,168 for the money it claims to be owed for work done at the Silao plant.

### I. Count XV and XVI-Canada

*6 In Count XV, Eisenmann alleges that GM directed its agent, GM of Canada, to issue to Eisenmann purchase orders for improvements costing $7,760,781 and $5,175,526 for work to be done to the GM plant in Oshawa, Canada. Eisenmann alleges that it has not been paid for a portion of the improvements made and training given to GM employees at the plant. Eisenmann seeks payment of $824,531 for back payments and loss of opportunity costs.

In Count XVI, GM asserts a quantum meruit claim for $824,531 to recover for the sum of the work done to the same plant in Canada.

### J. Counts XVII and XVIII-Pontiac East Skid Systems

GM issued to Eisenmann a purchase order for the installation of Skid Systems in GM's plants in Pontiac East, Fort Wayne, and Janesville in the amount of $20,110,520. Eisenmann claims that $8,929,832 of the purchase order was to be used for the Pontiac East system. Eisenmann alleges that it is owed money for work done on the Pontiac East systems. Eisenmann seeks damages in the amount of $460,837 for the work done and not paid for, and also the lost opportunity costs it deserves.

In Count XVIII, a quantum meruit claim is lodged for the same amount for work done at the Pontiac East plant.

### K. Count XIX and XX-Fort Wayne Skid Systems

Eisenmann asserts a claim for relief for payments not made to it for work done on the Skid Systems at the Fort Wayne plant. Eisenmann claims that $5,329,290 of the purchase order for $20,110,520 was for the Fort Wayne plant. Eisenmann asserts that it did the work in accordance with the purchase order. Eisenmann claims that because of GM's late payments, nonpayment for some of the work, and lost opportunity costs, it is entitled to recovery in the amount of $376,663.

Count XX asserts a quantum meruit claim for the same amount for the Fort Wayne work.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 6
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

*L. Counts XXI and XXII-Janesville Skid Systems,
Lansing Monorail*

In Count XXI, Eisenmann asserts lost opportunity costs in the amount of $336,095 as a result of GM's late payments made towards the installation of the Janesville skid system.

In Count XXII, Eisenmann claims that it delivered and supervised the installation of the monorail system in Lansing. Eisenmann argues that because of GM's late payments on this system, it incurred $63,294 in lost opportunity costs on the Lansing Monorail.

*M. Count XXIII-Cost Estimates for Yellowstone*

Eisenmann claims that on June 22, 1998, GM requested that Eisenmann provide it engineering and cost estimates for GM's Yellowstone project. Eisenmann argues that GM accepted its offer, but no purchase order was ever issued. Eisenmann alleges that it began the work and cost estimates, but GM ordered it to stop performing the Yellowstone engineering and cost estimates on August 26, 1998 and refused to pay for work Eisenmann had already done. Eisenmann requests payment of $290,300 and states that GM's actions and inactions are a breach of contract.

NATURE OF PROCEEDINGS

*7 GM has filed a Motion to Dismiss arguing first that the claims in Counts VII-XI of the Complaint are barred by the forum selection clauses in the purchase order contracts. Second, GM argues that the remainder of the Complaint should be dismissed on the basis of the doctrine of *forum non conveniens.* Third, GM asks this Court to Dismiss several portions of the Complaint for various contractual reasons. This is the Court's Letter Opinion and Order on GM's several Motions.

STANDARD OF REVIEW

In evaluating a Motion to Dismiss under Superior Court Civil Rule **12(b)(6)**, the Court must assume all well pleaded facts in the Complaint to be true.*Nix v. Sawyer,* Del.Super., 466 A.2d 407, 410 (1983) (citing *Laventhol, Krekstein, Horwath & Horwath v. Tuckman,* Del.Supr., 372 A.2d 168 (1976)). All allegations in the Complaint must be accepted as true.

*State Use of Certain-Teed Products Corp. v. United Pacific Ins. Co.,* Del.Super., 389 A.2d 777, 778 (1978). A Complaint will not be dismissed unless the Plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof. *Nix,* 466 A.2d at 410 (citing *Diamond State Tel. Co. v. University of Del.,* Del.Supr., 269 A.2d 52 (1970)). A Complaint may not be dismissed unless it is clearly without merit, which may be a matter of law or fact. *Diamond State,* 269 A.2d at 58.

FORUM SELECTION CLAUSES

GM contends that Counts VII, IX, X, and XI of the Complaint cannot be litigated in Delaware because the Argentina, Poland and Thailand contracts and/or purchase orders each contain a forum selection provision agreed to by the parties.
If there is a forum selection clause in a contract, even when venue where the suit is filed is proper, the Court should decline to proceed when the parties freely agreed that litigation should be conducted in another forum. *Elia Corp. v. Paul N. Howard Co.,* Del.Super., 391 A.2d 214, 216 (1978). Forum selection clauses are *prima facia* valid and should be enforced unless the clause is shown by the resisting party to be unreasonable under the circumstances. *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 10 (1972). Such an agreement is only unreasonable when its enforcement would seriously impair the Plaintiff's ability to pursue its cause of action. *Id.* Mere inconvenience or additional expense is not the test of unreasonableness.*Elia Corp.,* 391 A.2d at 216.... In light of present day commercial realities, a forum clause should control absent a strong showing that it should be set aside. *M/S Bremen,* 407 U.S. at 15.

*Simm Associates, Inc. v. PNC National Bank,* Del.Super., C.A. No. 98C-02-219, Quillen, J. (Oct. 8, 1998).

The Argentina, Poland, and Thailand contracts appear to have been negotiated simultaneously. There are two Argentina contracts, as shown by purchase orders, that have a purported forum selection clause. Purchase order No 000000100 is between GM Provencorp S.A. and Eisenmann Corporation. Purchase order No 000000101 is between GM Provencorp S.A. and Eisenmann De Argentina S.A. Each of these contracts contains a forum selection clause that states: "This agreement shall be governed

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

by, and construed in accordance with the legal system and applicable laws of Argentina, and any dispute arising out of it shall be submitted to the jurisdiction of the Central Court of Buenos Aires."[FN5]

> FN5. Compl., Ex. H, Purchase Order No 000000100, Purchase Order No 000000101.This clause would appear to give the Argentine Court exclusive jurisdiction.

**\*8** The purchase orders No 000000100 and No 000000101 were signed by the parties and made into a final contract in Buenos Aires. It does not appear that the purchase orders contain any integration language explicitly within them.[FN6]

> FN6. The Contracts that are attached as part of the Complaint do not have an integration clause in them. GM, however, alleges that there is a standard Purchase Order Terms and Conditions Sheet that does contain an integration clause for the Wisconsin, Ohio, Indiana, Oklahoma, Michigan, Indiana, and Mexico projects. (*See* GM's Opening Br. at 22, n. 12, Dkt. No. 25; GM's Motion to Dismiss, Dkt. No. 15, Ex. C, at 31 (giving the May 1996 purchase order integration terms)). GM's allegations appear correct and they are not disputed in the papers submitted by Eisenmann. It appears that GM is also correct in claiming that the Canada contract is fully integrated by the language in the "Agreement Between Owner and Contractor" Section 2.1 that states: "*[t]he contract supersedes all prior negotiations, representations, or agreements, either written or oral, relating in any manner to the work, including the bidding documents that are not expressly listed in Article # of the Agreement-CONTRACT DOCUMENTS.*" GM's Opening Br. at 22, n. 12, Dkt. No. 25 and Ex. 17 at 2.1). GM claims that the Poland and Thailand contracts are fully integrated by the language in the purchase orders (incorporated into the Complaint at Ex. F and G) stating: "*[t]his contractual relationship is governed by our [Opel's] Standard Procurement Conditions.... No changes to our terms and conditions are valid without our written confirmation.*" (GM's Opening Br. at 22, n. 12, *See* Ex. 4 of Dkt. No. 25(emphasis in original)). GM also claims " [t]he Argentina contracts provide

that '*[t]he parties agree expressly in the terms of the contract, as in the general conditions and contractual requirements that appear in the request for quotation, as well as the agreed changes and amendments.*'" *Id.* (emphasis in original, Compl. at Ex. H). This language, employed in the Poland, Thailand, and Argentinean purchase orders, is insufficient in the context of a Motion to Dismiss to create a fully integrated agreement as a matter of law, which is discussed in greater detail later in this Letter Opinion. *See infra* page 34-36.

Additionally, as for the Poland and Thailand claims, a verified translation of the Standard Procurement Conditions states: "13. General: The laws of the Federal Republic of Germany apply to the contractual relationship and legal disputes associated with it.... It is agreed that the competent courts for Russelsheim have jurisdiction."[FN7]Certainly forum selection clauses are contained within these contracts.

> FN7. Translation of Standard Procurement Conditions, Dkt. No. 15, Ex. B. It could certainly be argued that this language does not create exclusive jurisdiction in the German Courts.

Eisenmann argues that the provisions of the contracts in the Complaint that require application of foreign law should not apply to its "bundling" claims because the Complaint sufficiently alleges independent causes of action against GM that are separate and apart from the written purchase orders of its subsidiaries containing the choice of law provisions. Eisenmann claims that it, EKG, and GM entered into "bundling" agreements whereas GM promised to direct its subsidiaries to award contracts to Eisenmann in return for a discounted Eisenmann price. Consequently, Eisenmann claims that GM received discounted prices for work that was actually performed but Eisenmann never received all of the contracts it was promised. Thus, Eisenmann contends that the forum selection provisions should not apply. Additionally, Eisenmann argues, that as a practical matter, it would be much more expensive for all parties to litigate this case in several different States and foreign countries then if it all happened in Delaware.

In this case, as to the Poland, Thailand, and Argentina contracts, the Court is inclined to not

Not Reported in A.2d                                                                        Page 8
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

follow the mandate of the forum selection provisions because the forum selection provisions relate to each individual contract. If the claim involved deals with the alleged breach of the "bundling" agreement, that action is separate and distinct from each of the individual contracts. Normally, forum selection agreements are only unreasonable when their enforcement would, under the circumstances, seriously impair the Plaintiff's ability to pursue its cause of action. *Elia Corp.* 391 A.2d at 216. Here, it is true that large corporations were dealing with each other through negotiations and created written contractual obligations that contained a forum selection clause. But, special circumstances exist in this situation in that the contractual forum selection provisions do not relate to the alleged "bundling" of the claims. Rather, the "bundling" of the claims related to all of the contracts in the Counts. Eisenmann clearly alleges that it gave GM a discounted rate for services if GM awarded it specific contracts. The parties to these contracts never made an agreement to refer their "bundling" disputes to a particular forum. Thus, the forum selection provisions in each contract should not preclude this Court from inquiring into the "bundling" claim issues, especially in a Motion to Dismiss where the Complaint will not be dismissed absent any reasonably conceivable set of circumstances susceptible of proof.[FN8] If it is true that GM agreed to discounts for bundling and subsequently canceled part of the bargain, Eisenmann may theoretically at least be in a position to recover damages. Therefore, GM's Motion (based on the forum selection clauses in the separate contracts) that Counts VII, IX, X, and XI of the Complaint must be dismissed is DENIED.

> FN8. It appears from a telefax attached to a subsequent Eisenmann Motion (Dkt. No. 33) that there may be some written evidence of the bundling claims.

FORUM NON CONVENIENS

**\*9** GM notes that the Complaint relates to sixteen separate construction projects in five countries and five different States, and none of the documents, witnesses, or other relevant evidence is located in Delaware. GM argues that litigating in Delaware would cause hardship and inconvenience and this action should be dismissed under the doctrine of *forum non conveniens.* This case does not involve a situation where there is a prior pendency of the same action elsewhere. Recently, the Delaware Supreme

Court has put forth a detailed discussion of the *forum non conveniens* factors in the case of *Ison v. E.I. DuPont de Nemours and Co. Inc.,* Del.Supr., 729 A.2d 832 (1999). The Supreme Court stated:
Delaware's modern jurisprudence in *forum non conveniens* ("FNC") cases has been consistent. In cases where there is no issue of prior pendency of the same action, our analysis has been guided since at least 1964 by what has come to be known as the "*Cryo-Maid* " factors, most recently set out as follows:
(1) the relative ease of access to proof;
(2) the availability of compulsory process for witnesses;
(3) the possibility of the view of the premises;
(4) whether the controversy is dependent upon the application of Delaware law which the courts of this state more properly should decide than those of another jurisdiction;
(5) the pendency or non pendency of a similar action or actions in another jurisdiction; and
(6) all other practical problems that would make the trial of the case easy expeditious and inexpensive.
Nevertheless, the trial court must find "overwhelming hardship" to the defendant if the case is to be dismissed.

*Id.* at 837-38; *Taylor v. LSI Logic Corp.,* Del.Supr., 689 A.2d 1196, 1198-99 (1997); *General Foods Corp. v. Cryo-Maid, Inc.,* Del.Supr., 198 A.2d 681, 684 (1964).

The Supreme Court also pointed out that "[i]t is not enough that all of the *Cryo-Maid* factors may favor Defendant. The trial Court must consider the weight of those factors in the particular case and determine whether any or all of them truly cause both inconvenience and hardship." *Ison,* 729 A.2d at 838 (quoting *Chrysler First Bus. Credit Corp. v. 1500 Locust Ltd. Partnership,* Del.Supr., 669 A.2d 104, 105 (1995)). The overwhelming hardship requirement simply requires that the Defendant show that this is one of the rare cases where dismissal is warranted based on a strong showing that the burden of litigating in Delaware is so severe as to cause manifest hardship to the Defendant. *Ison,* 729 A.2d at 842.

*A. Relative Ease of Access to Proof*

None of the projects that are the subject of this extensive lawsuit are located in Delaware. It appears that most, if not all of the witnesses will have to

Not Reported in A.2d                                                                    Page 9
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

come in from outside Delaware. *See* Affidavits of William Frank, Gregory Greenall (GM Canada), Armando Gutierrez (GM Mexico), Frederico Roldan (GM do Brazil), Oliver Mueller, Harvey G. Thomas (GM Delaware). The record is clear that witnesses and documents will have to be brought in from other States and from other countries to consider the numerous claims.

### B. The Availability of Compulsory Process for Witnesses

**\*10** GM argues that no known witnesses reside in Delaware. GM claims that it cannot compel attendance of witness who reside in other States or countries. GM also claims that Opel, Provencorp, S.A., General Motors de Argentina S.A., and GM of Canada are all parties on which several of Eisenmann's quantum meruit and estoppel claims are based. GM asserts that these corporations cannot be compelled to participate in this litigation.

Eisenmann aptly points out that the problem of compulsory process will exist no matter where this case is litigated. GM is a large multi-national corporation that exercises control over its subsidiaries and the several companies coordinate with each other. (*See* Nagle Dep. at 5). Foreign subsidiaries do come to the United States to meet with GM America. (Roldan Dep. at 16). Furthermore, Poland, Germany, and Argentina are in fact signatories to the Hague Convention. *See* 23 U.S.T. 2555. Evidence from foreign countries can be obtained. *See Ison,* 729 A.2d at 843. On that score, it appears that for the most part, service on the foreign corporations can be reached. Furthermore, because both Eisenmann and GM are both Delaware corporations, this State may be the place where service can be perfected on the most people in the least inconvenient manner.

### C. The Possibility of the View of the Premises

Because this action deals with over sixteen physical locations scattered around the United States and, for that matter, the world, no single jurisdiction would offer a view of the premises.

### D. Whether the Controversy Is Dependent upon the Application of Delaware Law Which the Courts of this State More Properly Should Decide than Those of Another Jurisdiction

Delaware has adopted the choice of law approach from the Second Restatement of Conflicts for both tort and contract. *Travelers Indemnity Co. v. Lake,* Del.Supr., 594 A.2d 38, 46 (1991); *Playtex Family Products, Inc. v. St. Paul Surplus Lines Ins. Co.,* Del.Supr., 564 A.2d 681, 688 (1989). Whatever law may ultimately determine the fate of each contract, the Court is certain that Delaware law will apply to very few, if any, of the claims in this case. This controversy is not dependent on the application of Delaware law.

### E. The Pendency or Nonpendency of a Similar Action or Actions in Another Jurisdiction

Currently, there are no other claims pending in other jurisdictions regarding this case. This factor remains important in the modern world as it relates generally to comity among available forums. While GM points out to the Court that subcontractors have asserted lien actions in Ohio and Canada, this is not a situation where competing forums have cases before them relating to the same claims where issues of comity apply. In the denial of jurisdiction for inconvenience, judicial discretion is to be exercised sparingly where there is no prior action pending elsewhere. *Taylor,* 689 A.2d at 1199; *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.,* Del.Supr., 263 A.2d 281, 283 n. 2 (1970). Furthermore, dismissal of this case would force the Plaintiff to start anew in several other jurisdictions simultaneously. *Parvin v. Kaufmann,* Del.Supr., 236 A.2d 425, 427 (1967).

### F. All Other Practical Problems That Make the Trial of the Case Easy, Expeditious, and Inexpensive

**\*11** An action commenced where the State of Delaware is the State of incorporation of the Defendant will ordinarily only be dismissed on the grounds of *forum non conveniens* in the rare case in which the combination of factors to be considered tips the scales overwhelmingly in favor of the Defendants. *Parvin,* 236 A.2d at 427. The Texas Supreme Court has noted that "the doctrine [of *forum non conveniens* ] is favored by multinational defendants because a forum non conveniens dismissal is often outcome-determinative, effectively defeating the claim and denying the plaintiff recovery." *Ison,* 729 A.2d at 841-42 (quoting *Dow Chemical Co. v. Castro Alfaro,* Tex.Supr., 786 S.W.2d 674, 679, *cert. denied,* 498 U.S. 1024 (1991)). It appears that GM is trying to achieve just such a result in this case. There is nothing about this case

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 10
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
(Cite as: Not Reported in A.2d)

that makes it easy or expeditious. This litigation involves work done by Eisenmann for GM which occurred in plants throughout the world. The fact is that Delaware seems to be the best forum in which to litigate this case because at least one Plaintiff and one Defendant have Delaware as a State of incorporation. If this Court were to dismiss this case and have the Plaintiffs litigate each portion of the case in different jurisdictions, the several cases would not proceed as expeditiously. Certainly having simultaneous litigation happening in several States and several countries does not conserve judicial resources, nor does it give Eisenmann or GM an opportunity to effectively control litigation expenses. All in all, denial of jurisdiction in Delaware would not seem to make this case easier to litigate nor would such denial make the case less expensive. Practical considerations favor allowing the parties to litigate the case in Delaware.

### G. Overwhelming Hardship

GM is a multi-national corporation that has to face litigation in every State. GM has been a party to 103 reported cases in Delaware since 1980. (West Search Result, Eisenmann Ex. 1). Furthermore, air travel, express mail, electronic data transmissions, and videotape depositions are part of the normal course of business for companies like GM and Eisenmann. _Monsanto Co. v. Aetna Casualty and Surety Co.,_ Del.Super., 559 A.2d 1301, 1307 n. 13 (1988)(quoting _Travelers Indemnity Co. v. Monsanto Co.,_ D. Conn., 692 F.Supp. 90, 92 (1988)). While the Court acknowledges that the costs of getting the information, witnesses, including the travel and lodging of those witnesses, will be high, the overall cost of maintaining this litigation will probably be less if it is in Delaware than if it is carried forth in splintered lawsuits in several different countries. GM argues that the burden of engaging discovery proceedings in several different countries will be substantial, if not monumental, for both parties. But, GM has not stated that the converse will cost less. Overall, GM has not proved that it will suffer overwhelming hardship by litigating in the State of its incorporation when it appears that Delaware is the most centralized location for Eisenmann's claims to be heard. GM has failed to show that any individual forum exists where it would be easier for the parties to litigate other than Delaware. Even if a better individual forum did exist, the "[C]ourt must require the defendant to show that this is one of those rare cases where the drastic relief of dismissal is

warranted based on a strong showing that the burden of litigating in this forum is so severe as to result in manifest hardship to the defendant."_Ison,_ 729 A.2d at 835. GM has not done so in this case.

**\*12** Certainly all of the _Cryo-Maid_ factors do not favor litigating this case in Delaware. On balance, however, the Plaintiffs' choice of forum should be respected. The Court will not dismiss the case on the basis of _forum non conveniens_ when it would force the Plaintiffs to litigate in several different jurisdictions and relief on all the major claims could be had in Delaware. This is not one of those rare cases where dismissal of the claim is warranted._Id._ at 842.[FN9]Litigating in Delaware should, in fact, conserve the resources of the parties. Therefore, GM's Motion to Dismiss on the basis of the doctrine of _forum non conveniens_ is DENIED

> FN9. As noted, the Delaware Supreme Court tightened the requirements for having cases dismissed under the doctrine of _forum non conveniens_ in _Ison._ The Court may have missed, however, an opportunity in _Ison_ to judicially review the outdated _Cryo-Maid_ factors that are said to be the basis for deciding _forum non conveniens_ cases. Some factors hardly seem appropriate for great weight in the Twenty-First Century.

### CONTRACT CLAIMS

### A. Counts VII, IX, X, XI, XV and XVI of the Complaint

GM argues that several of Eisenmann's claims in the Complaint are legally insufficient as a matter of law. First, GM claims that Counts VII, X, and XV of the Complaint, which allege that GM breached certain written contracts relating to projects in Poland, Thailand, Argentina, and Canada, should be dismissed because GM was not a party to those contracts. Eisenmann does not allege that GM was a party to those contracts but claims it has a cause of action against GM anyway. This is part of the "bundling" claim. The Complaint, in discussing Eisenmann's claims in Counts VII, X, and XV, states: "GM directed its agents, Opel, GM do Brazil, Provencorp, and GM de Argentina, to issue purchase orders to Eisenmann and EKG for work to be performed at GM's plants in Rosario, Argentina, Gliwice, Poland, and Integrate, Thailand."(Compl.¶

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 11
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

133). Similarly, as to the Oshawa, Canada contract, Eisenmann alleges that "GM directed its agent GM of Canada to issue purchase orders to Eisenmann for improvements for [a] GM plant in Oshawa, Canada."(Compl.¶ 220). Even though GM was not involved as a party to these contracts, Eisenmann claims that the specific allegations contained in Counts VII and X are legally sufficient to put GM on notice of the claims being brought against it.

Under an agency theory, a Court may attribute the actions of a subsidiary company to a parent where the subsidiary acts at the parent's discretion or on the parent's behalf. *C.R. Bard Inc. v. Guidant Corp.,* D. Del., 997 F.Supp. 556, 560 (1988) (citing *Mobil Oil Corp. v. Linear Films, Inc.,* D. Del., 718 F.Supp. 260, 271 (1989)).[FN10] This is not limited solely to a parent-subsidiary relationship. The pure agency relationship may develop whether the two separate corporations are parent and subsidiary or a completely unrelated outside of the limited agency setting. *Mobil Oil Corp., 718 F.Supp. at 271.* GM contends that Eisenmann cannot escape the fact that GM is not a party to the written contracts through "the bare allegation that Opel, Provencorp, S.A., General Motors de Argentina S.A. and General Motors of Canada, Ltd. are somehow 'general agent[s]' of GM." (GM's Opening Br. at 20). When applying an agency theory, the Court should focus its inquiry on the arrangement between the corporations, the authority given in the arrangement, and the relevance of that arrangement to the Plaintiffs' claim. *See generally, C.R. Bard, Inc., 997 F.Supp. at 560.* Eisenmann's allegation is basically that GM Worldwide Purchasing negotiated the contracts together to obtain discounts for several of its plants simultaneously. Then, each individual affiliate would issue the purchase order. If true, that activity would create an agency relationship sufficient to sue on the contract and survive a Motion to Dismiss. Here, contrary to GM's assertion, there are sufficient allegations in the Complaint that support an agency relationship in Counts VII and X. Count VII states:

> FN10. GM cites *Stinnes Interoil Inc. v. Petrokey Corp. et al.,* Del.Super., C.A. No. 82C-JN-109, Bifferato, J. (Aug. 24, 1983) for the proposition that "No claim as a matter of law where plaintiff had 'failed to allege any agency relationship between' corporate parent and subsidiary; that plaintiff 'was aware of the parent subsidiary relationship .... is insufficient to impose

liability on the parent." ' (GM's Opening Br. at 20). This quotation is a bit misleading. Judge Bifferato stated in full that:
> There is a fatal flaw in the plaintiff's agency theory as applied to the facts of this case. Even if there was an agency relationship, there is no evidence that the plaintiff was aware of it at the time it made the contracts in question or that it made the contracts under the belief that Petrokey was acting as the authorized agent of Diamond. Granted that there is evidence that Stinnes was aware of the parent/subsidiary relationship, but that fact, standing alone, is insufficient to impose liability on the parent. Thus neither apparent authority or inherent agency power was present in this case ....
> Therefore, this Court must agree with the defendant, Diamond, that the plaintiff has failed to allege any agency relationship between Diamond and Petrokey which would impose liability on Diamond under general principals of agency.
> This Court finds that it does not have jurisdiction to decided the subject matter of defendant's motion for summary judgment.

**\*13** Eisenmann and EKG met with GM Worldwide Purchasing, GM do Brazil, and Opel to discuss discount pricing for planned improvements .... Eisenmann and EKG offered to do all of the projects for a discounted price of 211,000,000 DM plus $100,000,000 if the contracts for these four projects were awarded to them....GM accepted Eisenmann and EKG's offer.... GM [then] directed its agents, Opel, GM do Brazil, Provencorp, and GM de Argentina, to issue purchase orders to Eisenmann and EKG for work to be performed at GM's Plants in Rosario, Argentina, Gliwice, Poland, and Integrate Thailand.
(Compl.¶¶ 131-33).

Count X states:
Eisenmann and EKG met with GM Worldwide Purchasing [and others] ... to discuss discount pricing for planned improvements to GM's plant in Rosario, Argentina.... Eisenmann offered to do the same work for a discounted price of $85,000,000 if the contracts for the Main Paint Shop, the Fascia Paint Shop, and the Conveyors were awarded to Eisenmann along with the contracts for work to be performed at GM's Cordoba, Poland, and Thailand plants....GM [then] directed its agents, GM de Argentina, Provencorp

Not Reported in A.2d                                                              Page 12
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

S.A. and GM do Brazil to issue purchase orders ....

(Compl.¶¶ 158-59, 168).

There is a sufficient agency relationship alleged that will survive a Motion to Dismiss by GM. Therefore, GM's Motion is DENIED as to Counts VII and X. GM claims that Counts IX and XI (asserting estoppel arguments) should be dismissed because the "claim lies solely against the [GM] foreign corporations that allegedly made the promises at issue, that accepted the alleged pricing discounts without awarding the corresponding work, and that allegedly owe the additional sums alleged."(GM's Opening Br. at 20-21). Because an agency claim has been sufficiently alleged by Eisenmann and because a Complaint will not be dismissed unless the Plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof (*Nix,* 466 A.2d at 410), GM's Motion to Dismiss Counts IX and XI of the Complaint is DENIED.

Count XV, however, is a bit different. To begin with, Eisenmann did not argue in its opposition brief that Count XV sufficiently alleged a breach of contract with GM, i.e. the bundling claims. (*See* Eisenmann's Opp. Br. at 19). Furthermore, in Count XV, Eisenmann does not state the circumstances as to how GM caused its Canadian affiliate, GM of Canada, to issue purchase orders to Eisenmann for work to be done at the Oshawa, Canada plant. Eisenmann **merely**alleges an **agency** relationship with no factual predicate whatsoever. Even under the notice pleading rules, it remains incumbent on the pleader to allege some factual predicate to support the **agency** allegations as to the particular contract. *See Rand Bond of North America, Inc. v. Saul Stone & Co.,* D. Ill., 726 F.Supp. 684, 687 (1989). Therefore, GM's Motion to Dismiss, as it relates to Count XV of the Complaint is GRANTED. Count XVI asserts a claim for quantum meruit against GM for GM's nonpayment of services at the Oshawa, Canada plant. The factual basis for this claim is the same as Eisenmann's claim in Count XV. Therefore, because the agency relationship is not sufficiently alleged on the Canada claim, the Motion to Dismiss Count XVI is GRANTED. GM is simply not the proper party against which to bring the quantum meruit claims in this Count.

*B. GM's Claims That Quantum Meruit and Estoppel Claims in Counts II, IV, VI, VII, IX, XI, XIII, XIV, XVI, XVIII and XX Are Precluded by the Written*

*Purchase Order Contracts*

*1. Quantum Meruit Claims*

*14 Quantum meruit literally means "as much as he deserves," and it is the reasonable worth or value of services rendered for the benefit of another.*Marta v. Nepa,* Del.Super., 385 A.2d 727, 730 (1978). With respect to the theory of quantum meruit, Courts of this State have long recognized that recovery on such a theory will be considered only if it is determined that the relationship of the parties is not governed by an express contract. *Chrysler Corp. v. Airtemp Corp.,* Del.Super., 426 A.2d 845, 854 (1980)(citing cases). If it is determined that the relationship of the parties and the services involved in the claim are the subject to an express contract, there is no occasion to pursue the theory of quantum meruit. *Id.* Michigan law, which at first glance appears to apply to most of the claims at issue in this case, is the same. *See Superior Ambulance Service v. City of Lincoln Park,* Mich.App., 173 N.W.2d 236, 240 (1969) ("[T]here can be no recovery in quantum meruit upon an implied contract where an alleged express contract, in substance, covers the same subject-matter"). Michigan Courts state that an implied contract cannot be implied at law while an express contract exists. *H.J. Tucker & Assoc. Inc. v. Allied Chucker and Eng'g Co.,* Mich.App., 595 N.W.2d 176, 188 (1999).[FN11]

> FN11. The *Tucker* case does state that a Plaintiff is not required to elect to proceed under express or implied contract if the trier of fact could find that an express contract might not exist. *See H.J. Tucker & Assoc. Inc.,* 595 N.W.2d at 188. Thus, as Eisenmann points out, there are circumstances where a party may recover for work performed outside the original contract.

The basis for Eisenmann's argument to support its claims for quantum meruit relief is that quantum meruit is a legal theory that is being pled in the alternative to the breach of contract Counts. Eisenmann states that it is entitled to bring alternative claims of breach of contract and implied contract simultaneously. While a Plaintiff is not required to elect to proceed under one theory or another if there is a chance that a contract does not exist, a contract cannot be implied in law while an express contract covering the same subject matter is in force between

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 13

Not Reported in A.2d, 2000 WL 140781 (Del.Super.)

**(Cite as: Not Reported in A.2d)**

the parties. _H.J. Tucker & Assoc., Inc._, 595 N.W.2d at 188. But while quantum meruit as a theory of recovery is inapplicable where an express contract exists, the theory may be used to formulate recovery where changes in the contract were authorized without an agreement as to price. _Hayman Co. v. Brady Mechanical, Inc._, Mich.App., 362 N.W.2d 243, 247 (1985).

In this case, the focus is on the express contracts alleged. These include the bundling contracts and the individual site contracts. The written express contracts are, at least partially, attached and incorporated into the Complaint. Those contracts, for the most part, govern the relationship of the parties. Eisenmann contends that it expected to be paid for extra work items, that it notified GM that late payments were having an effect on it, and that it notified GM that the denial of access to the work site was causing delays for which it expected to be paid. In at least two of the quantum meruit claims, Eisenmann makes a claim for quantum meruit relief not only on the late payments, but also to recover for the extra work items done. _See_ Compl. at ¶¶ 42 (Janesville), and 74 (Moraine). It appears that if a contractor did work above and beyond what was agreed to in the contract and where, as here, the contract allowed for modification of the work to be done without specifying how to calculate the price of the additional items, then Eisenmann should be able to recover in quantum meruit the amount of material and services it provided. As to these two Counts, Counts II and IV, it appears that changes in the contract's performance were authorized without a price being stipulated, and the claims for quantum meruit should not be dismissed at this early stage of the litigation. _See LeZontier v. Shock_, Mich.App., 260 N.W.2d 85, 88 (1977). As to Counts II and IV, the Motion to Dismiss is DENIED.

**\*15** As to the quantum meruit claims in Count VI (Oklahoma),Eisenmann states that it was to develop design and engineering studies for the Oklahoma and Lake Orion projects. Eisenmann's assertion is that GM said that a purchase order to cover the complete cost of the construction drawings and value engineering studies would be forthcoming but it never materialized, even though Eisenmann performed the work. Apparently, the purchase orders issued by GM did not cover the full costs of the design for both projects. If, in fact, GM did receive the benefit of the performance it agreed to beyond the purchase orders that it issued, then there might be a claim for relief in quantum meruit and the Court will not dismiss the allegations outright at this time. As to Count VI, the Motion to Dismiss is DENIED.

Count XIII deals with the GM plant in Silao, Mexico. Eisenmann has made allegations in Counts XII and XIII that GM received the benefit of a bundling discount for work performed at the Silao plant. Eisenmann claims that it has done work that it was not paid for because GM has reneged on its bundling promises. Eisenmann has claimed that GM has unjustly received a discount on the Silao project. Because there is not a written contract incorporated into the Complaint that deals with the bundling claims, the quantum meruit claims cannot be dismissed as to Count XIII. At this stage of the litigation, it is not inconceivable that a quantum meruit claim on this Count could be asserted for recovery for additional work done at the Mexico plant. Therefore, GM's Motion to Dismiss as to Count XIII is DENIED.

Not all the quantum meruit claims, however, survive this Motion to Dismiss. In Counts XVIII (Pontiac East), and XX (Fort Wayne), there are no contract claims that seek recovery beyond the terms of the written purchase orders.[FN12] GM is a party to each of these contracts. Simply, in both of those Counts, Eisenmann only seeks recovery for money that it was not paid in performing certain work as evidenced by the contract. There are no allegations seeking recovery beyond non-payment for services as provided in the purchase orders. In the face of express written contractual terms that exist between the parties, the claims of quantum meruit are inappropriate. Therefore, the claims for quantum meruit relief must be dismissed. Thus, GM's Motion to Dismiss as to Counts XVIII and XX is GRANTED.

FN12. Quantum meruit claims in Count XVI (Canada) have already been dismissed on other grounds. See _supra_ page 23.

### 2. Estoppel

Eisenmann, in Counts VII, IX, XI and XIV, allege that it is allowed to proceed based on a legal theory of estoppel, presumably promissory estoppel.

In order to prevail on a promissory estoppel theory, plaintiffs must show (1) that a promise was made, (2) that it was the reasonable expectation of the promisor

Not Reported in A.2d                                                                      Page 14
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

to induce action or forbearance on the part of the promisee, (3) that the promisee relied on the promise and took action to his detriment, and (4) that such promise is binding because injustice can be avoided only by enforcement of the promise.

**\*16**Hinman v. Red Clay Consolidated School District, Del.Super., C.A. No. 98C-08-253, Quillen, J. (Nov. 10, 1999); Keating v. Board of Education of the Appoquinimink School District, Del. Ch., Civ. A. No. 12589, Jacobs, V.C. (Nov. 3, 1993); see also Barber v. SMH, Inc., Mich.App., 509 N.W.2d 791, 797 (1993), app. denied,Mich.Supr., 519 N.W.2d 891 (1994).

Generally, the doctrine of promissory estoppel is invoked in situations where the formal requirements of contract formation have not been satisfied and where justice would be served by enforcing a promise. Carlson v. Arnot-Ogden Memorial Hospital, 3d Cir., 918 F.2d 411, 416 (1990). Where parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel. Terry Barr Sales Agency, Inc. v. All-Lock Co. Inc., 6th Cir., 96 F.3d 174, 181 (1996).

GM initially argues that where there is an enforceable contract, relief under an estoppel theory is not warranted. Secondly, GM argues that Eisenmann has failed to plead the necessary elements of estoppel. Conversely, Plaintiffs argue that its estoppel claims allege sufficient facts to sustain the cause of action and are pled in the alternative of the breach of contract claims in the Complaint.

Count VII seeks relief for an alleged bundling agreement at four project sites (Moraine, Oklahoma, Generic, and Silao). As noted earlier in this Opinion, there is no written and integrated contract incorporated into the Complaint that dealt with the bundling allegations. In Count VII, Eisenmann alleges that it had no reason to know that GM would break its promises and not go forward with any of the major projects. (Compl.¶ 113). Eisenmann alleges detrimental reliance by hiring additional personnel and purchasing additional equipment. All in all, it appears that Eisenmann has pled an estoppel claim in Count VII with sufficient particularity survive a Motion to Dismiss on Count VII. It is conceivable that this is a situation where justice could be served by enforcing GM's so-called promise. GM's Motion to Dismiss as to Count VII is DENIED.

Count IX and XI are estoppel claims, again dealing with bundling agreements at four sites (Rosario, Cordoba, Gliwice (Poland) and Integrate (Thailand)). Eisenmann claims that it relied on the statements of GM and accepted the discounted purchase orders because it was performing work at several GM plants. Eisenmann alleges that GM assured it that all the projects would go forward as planned and it had no reason to know that GM would cancel the work. Because there is no written, integrated agreement that deals with the bundling claims which are incorporated into the Complaint, Count IX and XI cannot be dismissed for failure to state a claim. As with Count VII, there are sufficient allegations in the Complaint to overcome a Motion to Dismiss. Therefore, GM's Motion to Dismiss as to Counts IX and XI are DENIED.

Count XIV is an estoppel claim dealing with an alleged 5% discount given to GM by Eisenmann if Eisenmann was awarded the Oklahoma, Generic, Moriane and Silao contracts. Eisenmann claims that it was promised all four projects but was not awarded all the work, and it accepted the Silao purchase order based on GM's statements that it would be awarded the other projects. Again, because of the alleged existence of the bundling promises, there is a claim for estoppel pled sufficiently to survive a Motion to Dismiss. Therefore, GM's Motion to Dismiss is DENIED as to Count XIV.

**\*17** All in all, the estoppel claims are sufficiently pled to survive a Motion to Dismiss. At this stage of the proceedings, it is conceivable that Eisenmann could recover under an estoppel theory. Also, whether or not Eisenmann's reliance was reasonable cannot be decided under a Rule 12 Motion. The Motion to Dismiss directed towards the estoppel claims (Counts VII, IX, XI, and XIV) is DENIED.

*C. Sufficiency of the Complaint for Certain Causes of Action Relating to Alleged Breaches of Contract*

GM asserts that several of the Plaintiffs' allegations in the Complaint fail to state a claim. In response to most of those allegations, Eisenmann simply asserts that the Complaint sufficiently puts GM on notice of the claims against it, and that GM's arguments are inappropriate for consideration on a Motion based on the pleadings.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*1. Allegations That Plaintiffs Have Failed to State a Claim for Payments Not Made by GM under the Parties' Contract in Counts I, III, V, XII, XV, XVII, XIX, XXI and XXII[FN13]*

> FN13. Counts XV and XVI have already been dismissed on other grounds earlier in this Letter Opinion.

GM asks this Court to Dismiss the above-stated breach of contract claims because Eisenmann has not sufficiently pled the fact that it complied with all of the contracts conditions precedent to receive payment. Indeed, many of Eisenmann's claims are based on past-due progress payments, late payments, and GM's failure to make final payments. GM argues that there are no allegations that Eisenmann sent GM invoices for the alleged payments due. In other words, GM argues that there is no proof from Eisenmann that it complied with what it needed to do to receive payment from GM.

GM is correct in stating that, as a general rule on a contract obligation, at some point in the litigation, the Plaintiff must allege the occurrence of conditions precedent in the contract. *Pobst v. Nanticoke Memorial Hospital,* C.A. No. 90C-JA-25, Lee, J. (July 30, 1991). Eisenmann claims that it and EKG are not required to plead that every element of the terms and conditions have been satisfied in order to state a claim for breach of contract. *See* Super. Ct. Civ. R. 9(c). In the context of a Motion to Dismiss, the Complaint will not be dismissed unless it appears to a certainty that under no set of facts which could be proved to support the claim asserted would the Plaintiff be entitled to relief. *Diamond State Telephone Co.,* 269 A.2d at 258. Lack of detail in the pleaded claim is not alone sufficient grounds to dismiss the Complaint. *Id.* (citing *Morgan v. Wells, Del. Ch., 80 A.2d 504 (1951)*). This is because the theory in adopting the Rules of Civil Procedure was to discard the niceties and technicalities of pleading by doing away with the troublesome burden of revealing the facts and settling the issues in dispute. *Costello v. Cording, Del.Super., 8 Terry 322, 91 A.2d 182, 184 (1952).* By now, it is axiomatic that the task of narrowing and clarifying the basic issues and ascertaining the facts relative to the other issues is the role of the deposition and discovery process. *See Delaware Valley Drug Co. v. Kline, Del.Super., 1 Storey 242, 144 A.2d 403, 405 (1958).*

*18 It appears that the Court would be acting prematurely if it dismissed Eisenmann's claims in this preliminary Motion. There is sufficient detail in the pleading by Eisenmann to support the claims presented. Eisenmann certainly alleges complete performance generally. *See* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 2d.* § 1303-04. Whether or not Eisenmann followed protocol in collecting money from GM for the work it did and its significance will have to be fleshed out in the discovery process. Thus, the Court will not eliminate Eisenmann's claims outright in the context of a Motion to Dismiss. GM's Motion to Dismiss Counts I, III, V, XII, XIX, XXI and XXII for failure to plead that all conditions precedent for payment have been satisfied is DENIED. Eisenmann will, however, have to respond and show any and all conditions necessary for payment to it are satisfied at some point in the litigation.[FN14]

> FN14. In support of its argument that the Plaintiffs failed to allege a conditions precedent to payment on the contract, GM cites *Rhone-Poulenc Basic Chemicals Co. v. American Motors Ins. Co., Del.Super., 616 A.2d 1192 (1992); Pobst v. Nanticoke Memorial Hospital et. al.,* C.A. No. 90C-JA-25, Lee, J. (July 30, 1991). Both of those cases, however, arose out of Motions for Summary Judgment and not in the context of a Motion to Dismiss.

*2. GM's Argument That Eisenmann's Count I Pleading for a "Surcharge and Disruption Costs" Fails to State a Claim*

In Count I of the Complaint, Eisenmann argues that in the event the Janesville project started after July 1995 it was entitled to a surcharge of $1,510,000. Eisenmann alleges that the work did not begin until March 1996 and GM has refused to make the surcharge payment. It appears that this provisions is evidenced in the record by a letter attached to the pleading, dated November 9, 1994, from Kevin Coursin of Eisenmann to Michelle Peltier of GM. That letter states: "In the event the entire project is delayed *by one year,* EISENMANN will add a fixed inflationary surcharge on each phase of the project as follows ... Medium Duty: $1,500,000."[FN15] Eisenmann's own pleadings state that the Janesville project began in March 1996. Thus, the Janesville project began within a year of the contract date. Any claim for the inflationary charge does not state a claim. Thus, the Motion to Dismiss in favor of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

GM on this point is GRANTED.

> FN15. Compl. at Ex. A, 7-8 (emphasis supplied). Eisenmann's footnote 3 of its reply brief is simply wrong.

As for the overtime and disruption costs in Count I, GM claims that recovery of such costs are governed by the GM Construction General Conditions. In that document, a procedure for alleged change in costs is given on page 16. The key portion of that document states: "If a Contractor shall contend during the performance of the work, that the Contractor is entitled to payment from the Owner for increase in the cost of the work... the Contractor ... shall, within seven days after the first observance of the occurrence, notify the Owner's Purchasing Department, in writing, of the amount of its claim and all details in connection with its contention."(GM Construction General Conditions at 16, § 47.4). Paragraph 47.6 states:"It is a condition precedent to the consideration or prosecution of claims by the Contractor that the foregoing provisions be strictly observed in each instance, and if the Contractor fails to comply, the Contractor shall be deemed to have waived the claim." (*Id.* at 47.6).[FN16]

> FN16. Again, Eisenmann is simply wrong that "GM has offered no proof that conditions precedent exist in the contracts between Eisenmann, EKG and GM." (Eisenmann Br. at 24). There has been some proof. But, the Court may excuse the nonoccurrence of a condition that would cause a disproportionate forfeiture unless its occurrence was a material part of the agreed Exchange. Restatement (Second) of Contracts § 229. Not every "condition" necessarily rises to the stature of a preclusive condition precedent, even if a boilerplace provision says so. The Court will not impose a non-material condition precedent on the parties when it would create an absurd result.

**\*19** GM claims that, because Eisenmann has not pled that it satisfied its condition precedent, the claim for overtime and disruption costs should be dismissed. But the task of narrowing and clarifying the basic issues and ascertaining the facts relative to other issues is the role of the deposition discovery process. *Delaware Valley Drug Co.,* 144 A.2d at 405. Eisenmann is not required to show that all conditions

precedent were met at this stage of the litigation. Certainly it would have to be proved that a condition precedent was satisfied, but it does not have to be pled in full with the detail that GM's theory would require. Eisenmann can respond through discovery to the denial that Eisenmann has complied with GM's General Construction Conditions. Therefore, GM's Motion to Dismiss on this point is DENIED.

### 3. Eisenmann's Claims in Count III for a Competitive Bid Process is Contrary to the Purchase Order Contract

Eisenmann states that, as a premise to the purchase order issued on the Moraine project, it would be allowed to use a competitive bid process. Eisenmann asserts that once the purchase order issued, GM refused to allow Eisenmann to use a competitive bid process, costing it $350,000. GM argues that the claim is precluded by the terms of the contract and that Eisenmann's allegations are contrary to the written intent of the contract and should be dismissed. GM admits that the payment provisions of the Moraine purchase orders do not even mention the competitive bid process. There is nothing that GM has cited in the purchase order that indicates a contractual preclusion to the competitive bid process being used. If in fact Eisenmann entered into the purchase order contracts with the understanding that it would be allowed to use a competitive bid process and subsequently it was not able to do so, then a possible claim exists. Eisenmann's allegations are sufficient to survive a Motion to Dismiss and GM's Motion is DENIED.

### 4. Eisenmann's Claims in Count V for Drawing and Engineering Studies

Eisenmann asserts in Count V that there is $1.9 million due for drawing and engineering studies resulting from GM's cancellation of the Oklahoma and Lake Orion projects. GM asserts that there is no claim in the Complaint that the agreed to amounts have not been paid and that the Plaintiffs attempt to recover an amount over and above the contractually agreed upon amount.

Count V of the Complaint states:
In March 1997, GM instructed Eisenmann to begin performing the engineering design services [for the Oklahoma project] and Eisenmann began the work in accordance with GM's direction..... Although a

formal purchase order was not issued, on or about April 23, 1997, GM accepted Eisenmann's proposal. On or about the same date GM promised that full funding would be available and that a purchase order to cover the complete cost of the construction drawings and value engineering studies would be forthcoming .... On or about May 14, 1997, GM issued [a] purchase order ... to partially cover the cost of general layout drawings and specifications. The amount of this purchase order was $250,000. This purchase order expressly incorporates Eisenmann's letter dated April 23, 1997, which states Eisenmann's understanding that additional purchase orders would be forthcoming to cover the costs of the complete engineering and design services.

*20 (Compl.¶¶ 79-81).

The purchase order for this project, incorporated into the Complaint at Ex. D, states that the reason for the purchase order was:

to cover cost of general layout and specification team engineering for the SGG paint shop in accord with the Eisenmann proposal dated 2/24/97, subsequent clarifications and Eisenmann letter dated 4/23/97. Not applied to a project, this is a general paint shop footprint job to be used as a template.

(May 14, 1997 Purchase Order, Compl. at Ex. D).

Eisenmann's April 23, 1997 letter states:

As informed by General Motors, EISENMANN is aware of the situation at Oklahoma City and that in consequence General Motors cannot issue the Purchase Order for the team engineering over $900[,]000.

Per our telephone conversation EISENMANN does agree to start/continue with the team engineering based on a Purchase Order from General Motors NAO over 250 [,]000.00.

It is understood, that this Purchase Order will later on be reissued / transferred into a Purchase Order from the final designated GM Plant.

It was also understood that the amount of $ 900[,]000.00 does not match up with EISENMANN's proposal, but that the team engineering scope will be adjusted and agreed with GM's project team members. If additional team engineering work will be required, GM's project team will make the necessary requests for additional funds to be released for a PO amendment....

(Eisenmann April 23, 1997 Letter, Dkt. No 25, Ex. 27).

So, the purchase order does incorporate Eisenmann's April 23, 1997 letter. The letter itself, however, is a bit contradictory. On one hand, it states: "It is understood that this Purchase Order will later on be reissued / transferred into a Purchase Order from the final designated plant."This indicates an agreement that further purchase orders would issue for more money. On the other hand, the letter states: "If additional team engineering work will be required [presumably beyond the $250,000], GM's Project Team will [have to] make the necessary requests for additional funds ...." In the context of a Motion to Dismiss, the Court will not attempt to interpret the language of this letter to determine whether or not there was an agreement that further purchase orders would issue. It appears that Eisenmann's claim does not facially fail as a matter of law because it is possible that Eisenmann relied on GM's representations and did the work only to find out later that it would not be paid for the work. Therefore, the Motion to Dismiss is DENIED.

*5. Eisenmann's Claims in Counts VIII, X, and XII for Alleged Discounts Are Precluded by Fully Integrated Contracts*

GM's basic argument on these Counts is that the pre-contractual parol evidence about alleged discounts offered is contrary to the terms of the parties written and integrated contracts for the Poland, Thailand, and Argentina contracts (Counts VII and X). The touchstone for the application of the parol evidence rule's application is the fact of an "integrated" written contract. *U.S. v. Clementon Sewerage Authority,* 3d Cir., 365 F.2d 609, 613 (1966). Until integration is established, the parol evidence rule has no effect. *See id.*Normally, where there is a binding agreement, either completely or partially integrated, evidence of prior or contemporaneous agreements or negotiations is not admissible in evidence to contradict a term of the writing. Restatement (Second) of Contracts § 215; *see also Scott-Douglas Corp. v. Greyhound Corp.,* Del.Super., 304 A.2d 309, 314 (1973) (citing Michigan Law). GM claims that the Poland and Thailand contracts are fully integrated by the language in the purchase orders (incorporated into the Complaint at Exs. F and G) stating: "*[t]his contractual relationship is governed by our [Opel's] Standard Procurement Conditions.... No changes to our terms and conditions are valid without our*

*written confirmation.*" (GM's Br. supporting its Mt. to Dismiss at 22, n. 12 (emphasis in original)).[FN17] GM also claims that the Argentinean contracts are integrated by stating: "[t]he Argentina contracts provide that '*[t]he parties agree expressly in the terms of the contract, as in the general conditions and contractual requirements that appear in the request for quotation, as well as the agreed changes and amendments).*'' *Id.*(emphasis in original) (Compl. at Ex. H).

> FN17. The contracts provided in the Complaint are written in German. GM has provided a translation. The language quoted appears in Tab 4 of GM's Br., not at 2 and 3.

**\*21** GM states that each of these contracts is complete on its face and none of the contracts provide for the payment of any discount amounts. The question of whether a contract is integrated is determined by the parties intent. 11 Williston on Contracts § 33.16. To begin with, the Court cannot agree on the current record that the contracts for Poland and Thailand are fully integrated. For one thing, Opel's Standard Procurement Conditions, which purportedly partially provide integration for the Poland and Thailand contracts, are not provided. Furthermore, the written consent language appears to bar only changes subsequent to the contract without a writing, but do not speak to agreements that occurred prior to the contract. And, where there is no merger clause, extrinsic evidence relating to the surrounding circumstances can be admitted regarding a party's intent. *See* 11 Williston on Contracts § 33.16, Restatement (Second) of Contracts § 214.[FN18]This Court, in the context of a Motion to Dismiss, will not foreclose the way for the light that reveals the true intention of the transaction, especially if the instrument does not appear to contain the entire agreement between the parties. *See Norfolk Southern Bus Corp. v. Virginia Dare Transportation Co.,* 4th Cir., 159 F.2d 306, 309 (1947), *cert. denied,*331 U.S. 827 (1947). Here, certainly the allegations of the bundling cast doubt about the totality of the agreement between the parties, and the language in the contract posed by GM does not appear to foreclose a look at the negotiation to see if the parties intended full integration.

> FN18. Note that the Restatement view is the more liberal minority position on this issue, but Corbin on Contracts also follows this view. 11 Williston On Contracts § 30:16; 3

Corbin on Contracts §§ 577, 582 *see* John D. Calimari & Joseph M. Perillo, Contracts, 149-50 (3d ed.1987).

As to the issue of whether the Argentina contracts are fully integrated, the Court is not faced with overwhelming evidence of complete integration by the language of the instrument. *See Masurovsky v. Green,* D.C.App., 687 A.2d 198, 203 (1996). If each of the agreements contained a tightly-worded integration clause, the result on the discounts might be a bit different. But, on the current record, the Court cannot say with certainty that the purchase orders are fully integrated agreements. And, it is certainly possible that Eisenmann could have a legally viable claim if it was supposed to be awarded the bundling discounts and was not. Therefore, the Motion to Dismiss as to Counts VII and X is DENIED.

Along the same lines, Count XII deals with the purchase order contract for the Silao, Mexico plant. The Mexico work does appear to have a more fully integrated purchase agreement insofar as the Purchase Order Terms and Conditions Sheet applies. (*See supra* n. 6).[FN19] But, given the bundling allegations and the possibility that GM unfairly took advantage of the discounted price when there were conditions not reduced to writing, the Court will not dismiss the claims outright at this early stage of litigation. *See* 3 Corbin on Contracts § 582 ("The writing cannot prove its own completeness and accuracy. Even though it contains an express statement to that effect, the assent of the parties thereto must still be proved"); *see also*11 Williston on Contracts § 30:2 ("The fundamental and cardinal rule is that the intention of the parties is to be ascertained as of the time they executed the contract, and effect is to be given to that intention if it can be done consistently with legal principles.... [S]upervening developments may cast legitimate doubt regarding the meaning of words or clauses..."). Because a Complaint will not be dismissed unless the Plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof (*Nix,* 466 A.2d at 410), GM's Motion to Dismiss is DENIED as to Count XII.[FN20]

> FN19. Eisenmann does not dispute the applicability of the Purchase Order Terms and Conditions to the Silao contract in its reply brief.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                   Page 19
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

FN20. If GM received a 5% discount because it agreed to "bundle" the Silao contract with the Oklahoma, Generic, and Moriane contracts, it would be unfair to preclude all recovery at the Motion to Dismiss stage of litigation, especially when, through a longstanding working relationship, Eisenmann expected that the additional purchase orders would follow and it would receive the benefit of the discounts. (Compl.¶¶ 107, 113). Eisenmann can continue this litigation on the theory that it should recover what it deserves as a result of having the 5% discount taken out of the Silao purchase order.

*6. GM's Claims That Eisenmann's Claims in Counts X, XV, and XXII for Lost Opportunity Costs Are Barred by its Express Disclaimer of Consequential Damages*

**\*22** GM states that an express waiver of consequential damages and loss of profit in the contracts that are the basis for Counts X, XV, and XXII bind the parties and preclude any finding of lost opportunity costs. Count X deals with the Rosario, Argentina plant. Eisenmann asserts costs in the Complaint at Count X that it incurred $317,380 in lost opportunity. (Compl. at ¶ 179). The contract between GM and Eisenmann in this instance had a limitation of liability clause which stated "neither party shall be liable to the other for consequential damages whatsoever and/or lost profit."(Compl. Ex. H, at 3). Therefore, because of the express contractual limitation, Eisenmann cannot recover for lost opportunity costs on Count X.

Count XV deals with Eisenmann's claim for lost opportunity costs relating to work done at the Oshawa, Canada plant. Eisenmann asserts in the Complaint that due to GM's late payments, it incurred $313,589 in lost opportunity costs.[FN21] A handwritten notation on the purchase order states: "The purchase order is accepted including the following: Neither party shall be liable to the other for consequential damages or lost profits. s/Robert Deering."(Compl. Ex. K, at 4). Thus, the express terms of the purchase order preclude recovery for lost opportunity costs. Similarly, Count XXII states, in a handwritten notation "neither party shall be liable to the other for consequential damages and lost profits."(Compl. Ex. S, at 6). Again, the express terms of the written contract precludes recovery for the lost opportunity

costs. Thus, the Motion to Dismiss is GRANTED for lost opportunity costs in Counts X, XV, and XVII.

FN21. The claims asserted concerning the Canada plant have been dismissed on other grounds earlier in this Letter Opinion.

*7. GM's Assertion That Eisenmann's Allegations in Count XXIII Do Not State a Claim for Breach of an Oral Contract*

GM states that Eisenmann's claim of loss through an alleged oral contract in Count XXIII of the Complaint falls short of stating a claim for breach of an oral contract. Eisenmann alleges in the Complaint that on June 11, 1998, GM requested that Eisenmann begin performing engineering and cost estimates for the Yellowstone project and subsequently canceled the project. The essential elements of price, terms, and duration are missing from Eisenmann's allegations. Simply, Eisenmann cannot recover on the bare allegation that it expected payment for cost estimates at GM's Yellowstone absent some substantial allegation that a contract of some sort existed. In Count XXIII, those allegations are not there. Thus, the Motion to Dismiss Count XXIII of the Complaint is GRANTED.[FN22]

FN22. Eisenmann presented no response to refute this contention in its brief.

CONCLUSION

For the foregoing reasons, as specifically indicated above, GM's Motion to Dismiss is DENIED in part and GRANTED in part. IT IS SO ORDERED.[FN23]

FN23. With regard to the Motion to Lift the Stay of Discovery on the intentional "bundling" claims, Dkt. No. 33, which was presented on January 24, 2000, the stay which was entered on September 29, 1999 is hereby lifted and discovery can proceed in normal course on all surviving Counts of the Complaint and immediately (at a mutually agreeable time and place within 30 days) for a Rule 30(b)(6) deposition of a GM representative as noticed in Ex. B of the Motion. IT IS SO ORDERED.

Del.Super.,2000.
Eisenmann Corp. v. General Motors Corp.
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 20
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 5**

Westlaw.

647 A.2d 382                                                        Page 1
647 A.2d 382, 1994 WL 267479 (Del.Supr.)
**(Cite as: 647 A.2d 382, 647 A.2d 382 (Table))**

**C**Matthews Office Designs, Inc. v. Taub
Investments
Del.,1994.
(The decision of the Court is referenced in the
Atlantic Reporter in a 'Table of Decisions Without
Published Opinions.')
Supreme Court of Delaware.
MATTHEWS OFFICE DESIGNS, INC., Plaintiff
Below, Appellant,
v.
TAUB INVESTMENTS, Defendant Below,
Appellee.
No. 430, 1993.

Submitted: April 5, 1994.
Decided: May 25, 1994.

Court Below: Superior Court of the State of
Delaware in and for New Castle County, C.A. No.
91C-02-254.
Superior Court, New Castle County

AFFIRMED.

Before VEASEY, C.J., MOORE and WALSH, JJ.

*ORDER*

VEASEY, Chief Justice.
    *1 This 25th day of May 1994, it appearing to
the Court that:

    (1) Plaintiff below-appellant Matthews Office
Design, Inc. ("Matthews") appeals from an order of
the Superior Court dated March 10, 1993, granting
summary judgment in favor of defendant below-
appellee Taub Investments ("Taub"). Matthews is a
corporation engaged in the business of office
furniture sales and office design in the Wilmington
area. Beginning in 1980, Matthews leased a
warehouse in the Germany Industrial Park to store
office furniture and equipment.

    (2) In 1985, Taub purchased the property, which
was occupied by Matthews, subject to the lease. In
1986, when the prior lease ended, Matthews and
Taub entered into a new rental agreement. Although
the warehouse was located on the 100-year

floodplain, Matthews had no flood insurance. On July
5, 1989, the creek behind the warehouse overflowed
as a result of unusually heavy rain. The warehouse
flooded, thereby destroying Matthews' inventory and
other property which was stored inside.

    (3) Matthews filed suit against Taub in the
Superior Court seeking damages for its economic loss
arising out of the flood. Matthews alleged that Taub
had breached its duty to disclose that the property
was subject to flooding. Matthews also claimed that
Taub breached express and implied warranties that
the property was suitable for the storage of office
furniture.

    (4) The Superior Court held that, because
Matthews had rented the warehouse for years prior to
its lease with Taub, it could not show reasonable
reliance on Taub's failure to disclose the warehouse's
presence on the 100-year floodplain. The court also
found that Matthews had more practical knowledge
of the property than Taub. The court further held that,
since the floodplain was a matter of public record,
Matthews could have discovered this information
after a reasonable investigation. As a result, Taub
owed no duty of disclosure to Matthews. Finally, the
Superior Court held that there is no implied warranty
of suitability under Delaware law for the type of
commercial property that was leased by Matthews.

    (5) This Court reviews a decision granting
summary judgment *de novo. Gilbert v. El Paso Co.,*
Del.Supr., 575 A.2d 1131, 1141 (1990). In a
summary judgment motion, the facts must be viewed
in the light most favorable to the nonmoving party.
*Bershad v. Curtiss-Wright Corp.,* Del.Supr., 535
A.2d 840, 844 (1987). Matthews claims that Taub
had a duty to disclose the fact that the warehouse was
located on a floodplain, that Matthews reasonably
relied on Taub's failure to disclose this fact, and that
Taub is therefore liable for fraud.

    (6) The elements of a common law fraud (or
deceit) cause of action are well established:
    (1) a false representation, usually one of fact,
made by the defendant;
    (2) the defendant's knowledge or belief that the
representation was false, or was made with reckless
indifference to the truth;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(3) an intent to induce the plaintiff to act or to refrain from acting;

**\*2** (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and

(5) damage to the plaintiff as a result of such reliance.

*Gaffin v. Teledyne, Inc.,* Del.Supr., 611 A.2d 467, 472 (1992). This Court has also recognized that:[F]raud does not consist merely of overt misrepresentations. It may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak. Thus, one is equally culpable of fraud who by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading.

*Stephenson v. Capano Dev., Inc.,* Del.Supr., 462 A.2d 1069, 1074 (1983).

(7) Matthews has not presented any basis for imposing a duty to disclose on Taub. "Generally, there is no duty to disclose a material fact or opinion, unless the defendant had a duty to speak." *Nicolet, Inc. v. Nutt,* Del.Supr., 525 A.2d 146, 149 (1987). There is no special relationship between Taub and Matthews that would create a duty on the part of Taub to speak. *See*Restatement (Second) of Torts § 551(2) (1976) (listing circumstances that can give rise to "a duty to exercise reasonable care to disclose" in a business transaction, including the existence of "a fiduciary or other similar relation of trust and confidence between [the parties]" or "customs of the trade" under which disclosure would be expected). Taub and Matthews are unrelated commercial entities, presumably managed by sophisticated businesspersons, who have negotiated a commercial lease. There is no evidence in the record that Taub deliberately concealed the fact that the warehouse was subject to flooding. Therefore, Matthews has not shown that, under the circumstances of this case, Taub had a duty to disclose that the property was situated on a floodplain. As a result, Taub cannot be held liable for fraud based on nondisclosure. *See Stephenson,* 462 A.2d at 1074;*Nicolet,* 525 A.2d at 149.

(8) Moreover, the record contradicts Matthews' claim of reasonable reliance. It is undisputed that Matthews leased the property for several years before Taub became the owner. There is no evidence that Matthews relied on Taub's failure to disclose when it

decided to renew its lease of the warehouse. Accordingly, we agree with the Superior Court that "[Taub]'s representations or lack thereof as to the condition of the property could have had no legally cognizable effect on [Matthews'] decision to lease the property." In light of this holding, we need not address the legal consequences, if any, of the floodplain being a matter of public record.

(9) Matthews' final argument is that an implied warranty of suitability should be extended to commercial leases. Although the Delaware landlord-tenant code imposes an obligation on a landlord to "[p]rovide a rental unit which ... is fit for the purpose for which it is expressly rented,"25 *Del.C.* § 5303(a)(2), the General Assembly expressly excluded commercial leases for property in excess of 5,000 square feet from being covered by the landlord-tenant code. *See*25 *Del.C.* § 5103(a)(1). We agree with the Superior Court that this exclusion reflects a legislative intent not to extend an implied warranty of fitness to commercial leases such as the one between Matthews and Taub, which involves a rental property of 7,600 square feet. Moreover, our holding is consistent with the decisions of "a majority of courts [which] adhere to the rule that there is no implied warranty of fitness or suitability in leases of real property for commercial purposes." Thomas M. Fleming, Annotation, *Implied Warranty of Fitness or Suitability in Commercial Leases-Modern Status,* 76 A.L.R.4th 928, 933 (1990). We therefore decline to extend an implied warranty of suitability to commercial leases which are expressly excluded from coverage under the Delaware landlord-tenant code.

**\*3** NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court be, and the same hereby is,

AFFIRMED.

Del.,1994.
Matthews Office Designs, Inc. v. Taub Investments
647 A.2d 382, 1994 WL 267479 (Del.Supr.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 6**

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 1

**H**MetCap Securities LLC v. Pearl Senior Care, Inc.
Del.Ch.,2007.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
METCAP SECURITIES LLC, and North American
Senior Care, Inc. Plaintiffs,
v.
PEARL SENIOR CARE, INC.; PSC SUB Inc.;
Geary Property Holdings, LLC; and Beverly
Enterprises, Inc. Defendants.
**No. Civ.A. 2129-VCN.**

Submitted Jan. 25, 2007.
Decided May 16, 2007.

Joel E. Friedlander, and James G. McMillan, III, of
Bouchard Margules & Friedlander, P.A.,
Wilmington, Delaware; and Martin Stein, of Heller,
Horowitz & Feit, P.C., New York, New York, for
Plaintiffs.
Bruce E. Jameson, and Laina M. Herbert, of Prickett,
Jones & Elliott, P.A., Wilmington, Delaware; Joseph
F. Donley, of Dechert LLP, New York, New York;
and H. Joseph Escher, III, of Dechert LLP, San
Francisco, California, for Defendants.

MEMORANDUM OPINION

NOBLE, Vice Chancellor.

I. INTRODUCTION

*1 An entity with no assets of its own was
formed for the special purpose of a future transaction
with a for-profit nursing home chain. It engaged the
services of an investment banking advisory firm,
agreeing to pay it a success fee upon the completion
of any transaction with the target company. The
assetless entity, along with two other acquiring
entities, eventually entered into a merger agreement
with the target company. The merger agreement
contained a standard no-brokers' fee provision,
stating that no broker, finder, financial advisor, or
investment banker could expect to receive a fee for

work performed in connection with the merger. The
provision contained a parenthetical exception for the
investment banking advisor engaged by the assetless
entity.

Three months after the merger agreement was
signed, the parties agreed that the three acquiring
entities would be exchanged for three other acquiring
entities, who would assume the obligation to acquire
the target company from the original group of
acquirers. Reference to the financial advisor's success
fee remained intact. That would soon change as
efforts to finalize their agreement came to a close.

Late into the final evening of negotiation of the
last set of amendments to the merger agreement, the
two principals representing the original acquiring
entities, who had previously delivered their signature
pages to a fellow law partner, left the negotiations
and went home. They gave him no instructions,
limitations, or conditions on which to proceed during
the negotiations. A few hours later, another partner,
still negotiating the terms of the amendment, would
agree to delete the merger agreement's one reference
to the financial advisor's fee. The practical effect of
this amendment was that the obligation to pay the
success fee was neither assigned to nor assumed by
the second group of acquirers.

Both the investment banking advisory firm and
the assetless entity which had engaged its services
bring suit for reformation. The firm also brings suit
for fraud, unjust enrichment, and for damages under a
third-party beneficiary contract theory. Before the
Court is a motion to dismiss on behalf of the second
group of acquirers and the target corporation.

II. BACKGROUND [FN1]

FN1. The Background is drawn from the
Amended Complaint (sometimes, the
"Complaint") and those documents
referenced by the Amended Complaint.

Plaintiff North American Senior Care, Inc.
("NASC") is a Delaware corporation and special
purpose entity formed in connection with a
transaction with Defendant Beverly Enterprises, Inc.
("Beverly"), a Delaware corporation that operates

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                             Page 2
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

nursing home facilities throughout the United States.[FN2] On August 16, 2005, NASC, along with NASC Acquisition Corp. ("NASC Acquisition") and SBEV Property Holdings LLC ("SBEV"), entered into a merger agreement (the "Merger Agreement") with Beverly whereby it would be acquired in an all-cash deal of more than $2 billion.[FN3]

FN2. Compl. ¶¶ 7, 11.

FN3. Id. ¶ 8; Herbert Aff. Ex. C ("Merger Agreement").

Sometime prior to the Merger Agreement, NASC had engaged Plaintiff MetCap Securities LLC ("MetCap") to serve as its financial and business advisor in connection with a Beverly transaction. The five-page agreement (the "Advisor Contract"), which was only between NASC and MetCap, provided for an "investment advisory fee" to be paid to MetCap, along with expenses, upon the closing of any business combination transaction with Beverly.[FN4]

FN4. Id. ¶ 9; Herbert Aff. Ex. B ("Advisor Contract"). Payment of the fee was guaranteed by SBEV. See Advisor Contract at 5. The Advisor Contract remained in force when the Beverly deal closed.

Although a court assessing a motion to dismiss typically only considers facts alleged in the complaint, it may also consider documents referred to in the complaint. See In re Gen. Motors (Hughes) S'holder Litig., 897 A.2d 162, 169 (Del.2006). Here, several documents are expressly or impliedly referenced in the Complaint: the Merger Agreement, the Advisor Contract, preliminary and final drafts of the Third Amendment to the Merger Agreement, and certain e-mails.

**\*2** The Merger Agreement, by Section 5.10, recited generally that no financial advisor's fees were owed, but it expressly referenced the MetCap fee:[FN5]

FN5. Compl. ¶ 10.

No broker, finder, financial advisor, investment banker or other Person (other than Wachovia Securities and MetCap Securities LLC, the fees and expenses of which will be paid by Parent) is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission in connection with the Merger based upon arrangements made by or on

behalf of Parent or Merger Sub.[FN6]

FN6. The Merger Agreement referred to NASC as "Parent" and to NASC Acquisition as "Merger Sub."

NASC, however, was without assets of its own.[FN7] Thus, for several months before August 2005, Leonard Grunstein, a principal of SBEV and a partner at the law firm of Troutman Sanders LLP ("Troutman Sanders"), sought financing to fund the obligations that would be incurred as part of a transaction with Beverly.[FN8] He negotiated extensively with Ronald Silva of Fillmore Capital Partners ("Fillmore Capital") and its counsel, Joseph Heil of the law firm of Dechert LLP ("Dechert").[FN9] In the course of these negotiations, Silva and Heil were given drafts of the Merger Agreement; each draft included Section 5.10 and its reference that the MetCap fee was to be paid by NASC.[FN10]

FN7. Id. ¶ 11.

FN8. Id. ¶ 13.

FN9. Id.

FN10. Id. ¶ 14.

The Merger Agreement was amended on September 22, 2005, to reflect the equity that was to be secured to fund the acquisition of Beverly. Section 2.11 of this amendment (the "Second Amendment")[FN11] provided that Fillmore Capital would deliver an "Equity Commitment Letter" by November 18, 2005, detailing Fillmore Capital's commitment to purchase the "common stock and preferred stock of Parent [NASC] for at least $350 million to cause Parent ... to make the proceeds of such purchase available as consideration for the [Beverly] merger."[FN12] The Second Amendment did not alter, or even reference, NASC's obligation (as "Parent") to pay the MetCap fee as described in Section 5.10 of the Merger Agreement.[FN13]

FN11. The First Amendment to the Merger Agreement is not pertinent to the dispute before the Court.

FN12. Id. ¶ 15. The Equity Commitment Letter was signed by Silva and attached as Exhibit C to the Second Amendment.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                        Page 3
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN13.*Id.* ¶¶ 15-16.

    In mid-November, Silva announced that he had raised the $350 million in equity that was the subject of the Second Amendment. Shortly thereafter, on November 20, 2005, the parties to the merger executed another amendment (the "Third Amendment"), which would shift the obligation to purchase Beverly from the NASC, NASC Acquisition, and SBEV, entities all represented, at least to some extent, by Pearl Senior Care, Inc. ("Pearl"), PSC Sub Inc. ("PSC"), and Geary Property Holdings, LLC ("Geary"),[FN14] all created at Silva's behest and represented by Dechert.[FN15] Before the negotiations had culminated in the final version of the Third Amendment, however, Grunstein (for SBEV) and Mark Goldsmith, also a Troutman Sanders partner, (for NASC and NASC Acquisition) signed signature pages on November 18, 2005, and had them delivered to Lawrence Levinson, another attorney at Troutman Sanders, to be held in escrow.[FN16] The signature pages were eventually attached to the final version of the Third Amendment.

    FN14.*Id.* ¶¶ 17-18.Silva is the president of Pearl and PSC, entities formed by Fillmore Capital. It should also be noted that the names of the substituted acquiring entities are taken from the Complaint. The Defendants maintain that Pearl and PSC have been incorrectly named in the Complaint and that their proper names are Pearl Senior Care, LLC and PSC Sub LLC.

    FN15. The Complaint (¶ 17) states that shortly before execution of the Third Amendment, Grunstein suggested that the names of the original acquiring entities be changed from NASC, NASC Acquisition, and SBEV to Pearl, PSC, and Geary, respectively. The reasons for the requested change are not alleged and the effects of that change are not clear, but the Court notes that the parties appear to agree that the name changes are not pertinent to their dispute, which focuses primarily on the execution of the Third Amendment.

    As a result of the Third Amendment, Fillmore Capital would not purchase the stock of NASC. As a consequence, perhaps not fully appreciated at the time, of this structural change, the pending dispute would evolve.

    FN16.*Id.* ¶ 19.

    **\*3** But negotiations were far from over. On November 20, 2005, various drafts of the Third Amendment were circulated throughout the day between, *inter alia,* Grunstein and Goldsmith (on behalf of the assignor acquiring entities) and Silva and Heil (on behalf of the assignee acquiring entities).[FN17] None of these drafts altered, much less referenced, Section 5.10 of the Merger Agreement. By 7:00 p.m. that evening, Beverly's Board of Directors had approved the latest draft of the Third Amendment-again, a draft that did not reference Section 5.10 or the MetCap fee. Around 10:00 p.m., Grunstein and Goldsmith, apparently believing that no further changes would be forthcoming, went home.

    FN17.*Id.* ¶ 20.

    But one of Grunstein and Goldsmith's other partners at Troutman Sanders, W. Brinkley Dickerson, stayed behind. At Heil's request, Dickerson, apparently without consulting with his partners, made the change to the Third Amendment that is at the center of the parties' dispute.[FN18] At 12:59 a.m. on November 21, 2005, a few hours after Grunstein and Goldsmith had left, Dickerson e-mailed Beverly's counsel at Covington & Burling LLP and copied several parties, including Grunstein (for SBEV) and Heil (for Silva and Pearl), but not Goldsmith (for NASC and NASC Acquisition).[FN19] Another draft had emerged. This time, a provision of the Merger Agreement-and perhaps a critical one for MetCap-was stricken. Section 3.9 of the Third Amendment deleted the parenthetical of Section 5.10, which concerned payment of the MetCap fee.[FN20] The obvious significance was that Pearl, as a party generally assuming NASC's duties under the Merger Agreement (an assignment made by the Third Amendment), would not have any even arguable contractual obligation to pay MetCap for its advisory services. The final version of the Third Amendment, which appeared around 4:00 a.m. on November 21, 2005, reflected this change, a change that MetCap and NASC would not discover until March 2006.

    FN18.*Id.* ¶ 23.

    FN19. Goldsmith e-mailed Dickerson earlier

Not Reported in A.2d                                                                                      Page 4
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

that evening at 9:36 p.m., informing him that, although he was unsure if the Third Amendment had to be signed that evening, he had given Levinson, another colleague at Troutman Sanders, his signed signature pages on behalf of NASC and NASC Acquisition. *See* Herbert Aff. Ex. H.

FN20. Section 3.9 of the Third Amendment provided: "Section 5.10 of the Merger Agreement is amended by deleting the parenthetical contained therein."

In their Complaint, MetCap and NASC explain that "[w]hat happened was that defendants caused the new version of Section 3.9 to be drafted; and signature pages were removed from a prior version of the Third Amendment and attached to the new unauthorized version."[FN21] This occurred, of course, after Grunstein and Goldsmith had departed. They allege that Dickerson was only "deal counsel" to all the buyers in the transaction, collectively "coordinating and representing everyone on the buyer's side,"[FN22] but that he lacked the authority to bind NASC, NASC Acquisition, or SBEV individually.[FN23]

FN21. Compl. ¶ 22.

FN22. *See* Tr. of Oral Arg. Jan. 27, 2007, at 44.

FN23. Compl. ¶ 23. It is not alleged that Troutman Sanders represented MetCap.

The Defendants' conduct with respect to the Third Amendment forms the basis for MetCap and NASC's claims. The Complaint makes no allegations of a separate agreement, such as an amendment to, or an assignment of, the Advisor Contract by which Pearl, PSC, or Geary, agreed expressly to assume NASC's obligation to pay MetCap.

The merger with Beverly closed on March 14, 2006.[FN24] Despite the work it performed in connection with the transaction, MetCap has yet to receive any portion of its advisory fee and now seeks recovery against Pearl, PSC, Geary, and Beverly.[FN25]

FN24. *Id.* ¶ 26.

FN25. Fillmore Capital reimbursed MetCap

$1.5 million for sums it had advanced in connection with the transaction. *Id.* ¶ 25. The Complaint does not address the status of MetCap's efforts, if any, to collect from SBEV under its guarantee of the Advisor Contract.

### III. CONTENTIONS

**\*4** Seeking to recover an investment advisory fee it claims it is owed, MetCap, along with NASC, filed a four-count Amended Complaint. In Count One, MetCap alleges that the Defendants, with the exception of Beverly, defrauded it of its fee by failing to disclose that Section 3.9 of the Third Amendment had been changed to remove the reference in the Merger Agreement regarding payment of MetCap for its services. Because of the silence of the Defendants with respect to this late-hour change, MetCap, to its detriment, continued working. In Count Two, MetCap alleges that all of the Defendants were unjustly enriched by the work it performed in connection with the merger because they knew that, after adoption of the Third Amendment, NASC was no longer a party to the Merger Agreement and, in addition, had no assets of its own. Without relief, MetCap argues that the Defendants will have received the benefit of its work through NASC's assignment of developed contract rights without assuming a material obligation that should have come with it: compensating MetCap for its services. In Count Three, MetCap alleges that Pearl became and remains obligated to pay the fee because MetCap, as an intended third-party beneficiary of the Merger Agreement before the Third Amendment, never consented to the change caused by Section 3.9 of the Third Amendment.[FN26] Finally, both MetCap and NASC seek reformation of the Third Amendment because of its alleged failure to express the agreement between the parties that Pearl would assume NASC's obligation to pay MetCap's fee.

FN26. Section 3.9 of the Third Amendment, throughout this Memorandum Opinion, will be used to refer to the final version which deleted the parenthetical contained in Section 5.10 of the Merger Agreement. Before the final revisions, Section 3.9 addressed subject matter not related to the pending dispute.

Pearl, PSC, Geary, and Beverly have collectively responded by moving to dismiss this action under

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Court of Chancery Rule 12(b)(6).[FN27] They focus on two points: first, NASC's counsel consented to the addition of Section 3.9 of the Third Amendment; and, second, any right MetCap has to a fee is governed solely by the Advisor Contract it has with NASC, as there is neither an agreement between MetCap and any of the Defendants nor an agreement in which any of the Defendants assumed NASC's obligation under the Advisor Contract.

> FN27. They also challenge, under Court of Chancery Rule 9(b), the adequacy of the Plaintiffs' efforts to plead fraud and mistake with particularity.

## IV. ANALYSIS

### A. *The Applicable Standard*

A motion to dismiss under Court of Chancery Rule 12(b)(6) may be granted only if "it appears with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiffs would not be entitled to relief."[FN28]This is because, in considering such a motion, the Court is required to accept the well-pleaded facts alleged in the complaint as true and to view these facts, and all reasonable inferences that may be drawn from them, in the light most favorable to the plaintiffs.[FN29]The Court is not, however, compelled to accept every strained interpretation of fact or every conclusory allegation unsupported by facts contained in the complaint.[FN30]

> FN28.*VLIW Tech., L.L.C. v. Hewlett-Packard Co., 840 A.2d 606, 610-11 (Del.2003)* ("Accordingly, under Delaware's judicial system of notice pleading, a plaintiff ... need only allege facts that, if true, state a claim upon which relief can be granted."); *see Palese v. Del. State Lottery Office, 2006 WL 1875915, at \*2 (Del. Ch. June 29, 2006), aff'd,913 A.2d 570 (Del.2006)* (TABLE); *see also Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc., 748 F.2d 774, 779 (2d Cir.1984)* (reminding that a court's role on such a motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof").

> FN29.*E.g., Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L .P., 829 A.2d 143, 148-49 (Del. Ch.2003)*. The Court may also consider documents integral to the complaint and incorporated by reference. *Id.* at 149.

> FN30.*In re Gen. Motors (Hughes) S'holder Litig., 897 A.2d at 168*.

### B. *The Complaint Fails to State a Claim for Fraud Against Pearl, PSC, or Geary*

MetCap's first claim is for fraud. The Complaint alleges that Pearl, PSC, and Geary defrauded MetCap when they: (1) inserted Section 3.9 of the Third Amendment at the last minute without the knowledge or authorization of either MetCap or NASC and (2) failed later to disclose this change.[FN31]The purpose and effect of the Defendants' conduct was, MetCap contends, to deprive it of its fee and to induce it to continue working on the merger.[FN32]

> FN31. Although Count One (the one alleging fraud) is brought only by MetCap against Pearl, PSC, and Geary, the parties appear to have joined issue as if both MetCap and NASC had asserted that claim. *See* Defs.' Opening Br. at 19 ("Plaintiffs have failed to allege ... that Defendants made any false statements."); Pls.' Ans. Br. at 33 ("Plaintiffs have a claim for fraud ..."); Defs.' Reply Br. at 13 ("[P]laintiffs' fraud claim is defeated by the imputation of Troutman Sanders' knowledge to Leonard Grunstein."). The Court, however, will address only the claims asserted in the Complaint. A fraud claim by NASC is not among them.

> FN32. Compl. ¶¶ 29-30.

\*5 To state a common law fraud claim, MetCap must plead facts supporting an inference that: (1) Pearl, PSC, or Geary falsely represented or omitted facts that they had a duty to disclose; (2) they knew or believed that certain representations were false or made representations with a reckless indifference to the truth; (3) they intended to induce MetCap to act or refrain from acting; (4) MetCap acted in justifiable reliance on the representation; and (5) MetCap was injured by its reliance.[FN33]

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

FN33.*See DCV Holdings, Inc. v. ConAgra, Inc.,* 889 A.2d 954, 958 (Del.2005); *see also Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983)* ("[F]raud does not consist merely of overt misrepresentations. It may also occur through deliberate concealment of facts, or by silence in the fact of a duty to speak. Thus, one is equally culpable of fraud who by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading.").

Metcap's claim for fraud fails because it depends upon the contention that the Defendants were knowingly silent as to the late-hour change to the Third Amendment and that there was a "duty to disclose" the change to MetCap.[FN34] Generally, a duty to disclose arises when there is a fiduciary or other similar relationship of trust between the parties or where the custom or course of dealing between the parties merits disclosure.[FN35] MetCap has failed to set forth any facts that would support any inference that the Defendants had some fiduciary or other obligation to disclose changes to the Merger Agreement to MetCap, which, of course, was not a party to the Merger Agreement. Where there is no fiduciary or contractual relationship, Delaware law generally does not impose a duty to speak.[FN36] Because MetCap makes no allegation that such a relationship existed between it and the Defendants or that it had engaged in a course of dealing with the Defendants entitling it to any particular disclosure, the Defendants owed no "duty to disclose" to MetCap and, accordingly, MetCap has not stated a claim for fraud against the Defendants.[FN37]

FN34. MetCap does not allege any false representation.

FN35.*See, e.g., Matthews Office Designs, Inc. v. Taub Invs.,* 1994 WL 267479, at *2 (Del. May 25, 1994).

FN36.*See Nicolet, Inc. v. Nutt,* 525 A.2d 146, 150 (Del.1987).

FN37. To the extent that MetCap might argue that the "duty to disclose" would arise out of its status as a third party beneficiary

to the Merger Agreement, *see* Part IV.D, *infra.*

C. *The Claim for Unjust Enrichment-It Survives in Part*

MetCap also asserts a claim for unjust enrichment against all Defendants. It argues that it was the "procuring cause" of the Beverly acquisition and that, absent a recovery, the assignee Defendants and Beverly will have received the benefit of its services without the corresponding obligation to pay MetCap for those services.[FN38]

FN38.*See* Compl. ¶¶ 33-34. The Complaint does not go much further than a broad brush allegation that MetCap was the "procuring cause" of the merger. For example, the Complaint notes MetCap's "substantial contribution and work in connection with the merger" and that it "conferred the benefit of its services directly upon defendants," but it makes no reference as to what exactly it performed for the Defendants.

Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[FN39] In finding a party is entitled to an equitable remedy for unjust enrichment, courts look to several factors: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.[FN40] Of cardinal significance is whether a contract already governs the parties' relationship. In short, if there is a contract between the complaining party and the party alleged to have been enriched unjustly, then the contract remains "the measure of [the] plaintiff's right."[FN41]

FN39.*Schock v. Nash,* 732 A.2d 217, 232 (Del.1999).

FN40.*Cantor Fitzgerald, L.P. v. Cantor,* 1998 WL 326686, at *6 (Del. Ch. June 16, 1998); *Khoury Factory Outlets, Inc. v. Snyder,* 1996 WL 74725, at *11 (Del. Ch. Jan. 8, 1996).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 7
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN41.*Wood v. Coastal States Gas Corp.,* 401 A.2d 932, 942 (Del.1979); *ID Biomedical Corp. v. TM Tech., Inc.,* 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995).*See, e.g., Bakerman v. Sidney Frank Importing Co., Inc.,* 2006 WL 3927242, at *18 (Del. Ch. Oct. 16, 2006) ("When the complaint alleges an express, enforceable contract that controls the parties' relationship, however, a claim for unjust enrichment will be dismissed."); *Albert v. Alex Brown Mgmt. Servs ., Inc.,* 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005) (dismissing an unjust enrichment claim "when the existence of a contractual relationship [was] not controverted").

There is, of course, no contract between MetCap and the Defendants. This fact, MetCap appears to assert, should itself be dispositive to the Court's analysis, leading it to conclude that the claim for unjust enrichment can withstand Defendants' motion to dismiss. The mere absence of a contract between the complaining party and the defendant, however, is not dispositive. Also crucial-but lacking here-is that some direct relationship be alleged between a defendant's enrichment and a plaintiff's impoverishment.

*6 Although the doctrine of unjust enrichment is one of "substantial flexibility," [FN42] it is axiomatic that there must be some relationship between the parties. A showing that the defendant was enriched unjustly by the plaintiff who acted *for* the defendant's benefit is essential. As one court cogently explained:

FN42.*Palese,* 2006 WL 1875915, at *5.

[T]o recover under a theory of quasi contract, a plaintiff must demonstrate that services were performed for the defendant resulting in its unjust enrichment. It is not enough that the defendant received a benefit from the activities of the plaintiff; if the services were performed at the behest of someone other than the defendants, the plaintiff must look to that person for recovery.[FN43]

FN43.*Michele Pommier Models, Inc. v. Men Women N.Y. Model Mgmt., Inc.,* 14 F.Supp.2d 331, 338 (S.D.N.Y.1998), *aff'd,* 173 F.3d 845 (2d Cir.1999).

With the focus on "for whom" MetCap's services were performed, the Complaint frames two discrete periods: (i) through execution of the Third Amendment and (ii) after the Third Amendment. Before the Third Amendment, MetCap's services, in accordance with the Advisor Contract, were performed for NASC; afterward, with NASC out of the transaction, the Defendants, or so it must be inferred from the Complaint, knew that MetCap was performing work, supporting the transaction, for their benefit.

The Complaint refers to the Advisor Contract between MetCap and NASC. That agreement evinces their understanding that MetCap would "act as [NASC's] financial and business advisor to assist [it] in proposed transactions involving Beverly Enterprises, Inc."[FN44] in exchange for NASC's "pay [ing] to [MetCap] an Investment Advisory Fee of Twenty Million Dollars ($20,000,000) ... [u]pon the closing of any ... Business Combination Transaction [with Beverly]."[FN45] Absent from the Advisor Contract, however, is any link to Pearl, PSC, Geary, or Beverly. It does not specify or even contemplate that advisory services would be provided to any party other than NASC.[FN46]Those services were not requested by any of the Defendants. The Advisor Contract does not reveal, and the Complaint does not allege, a relationship of agency between NASC and any one of the Defendants or that the Advisor Contract was amended to reflect a change in NASC's status as the sole recipient of MetCap's services. Furthermore, the Complaint makes no allegation that any of the Defendants expressly agreed to assume, either in whole or in part, NASC's obligation under the Advisor Contract to compensate MetCap.[FN47]

FN44. Advisor Contract at 1.

FN45.*Id.* at 2.

FN46. Particularly odd is MetCap's unjust enrichment claim against the target corporation in this transaction; the Advisor Contract makes plain that MetCap was advising the entity *acquiring* Beverly. *See id.* at 1-2.Under the agreement, that entity was, of course, NASC.

FN47. The Plaintiffs do contend that Pearl's duty to pay MetCap would have arisen under the parenthetical of Section 5.10 of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

the Merger Agreement if it had not been revised at the last minute by the Third Amendment.

Because our law precludes the doctrine of unjust enrichment from being invoked "to circumvent basic contract principles [recognizing] that a person not a party to [a] contract cannot be held liable to it,"[FN48] the Court must conclude that MetCap's route to recovery for work performed (or benefit conferred) through the Third Amendment is defined by its contract with NASC and that its unjust enrichment claim to that extent must be dismissed.[FN49]

> FN48. *WSFS v. Chillibilly's Inc.,* 2005 WL 730060, at *19 (Del.Super.Mar. 30, 2005). *See also* RESTATEMENT (SECOND) OF RESTITUTION § 110 (1988) ("A person who has conferred a benefit upon another as the performance of a contract with a third person is not entitled to restitution from the other *merely* because of the failure of performance by the third person.") (emphasis added). The parties engage in a minor debate about the guidance provided by Section 110 of the RESTATEMENT and how that guidance might be expanded by consideration of the tentative draft. Section 110 cannot be read as precluding *every* claim of unjust enrichment simply because there is an agreement between "A", who claims that "B" has been unjustly enriched at "A's" expense, and "C" (instead of "B"). To be fair, none of the Defendants, despite MetCap's characterization, has argued precisely this. The word "merely" in Section 110 serves as a reminder that something more is necessary to invoke the doctrine of unjust enrichment. The "more" that is required may be suggested by Section 29 of the RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT (tentative draft No. 3, 2004) which provides in part:
>
> A person who has conferred a benefit on a recipient as the performance of a contract with a third person is entitled to restitution from the recipient upon the failure of performance by the third person, but only as necessary to prevent unjust enrichment. In this context, the conclusion that a recipient would be unjustly enriched by the retention of a given benefit requires a determination that:

(a) absent liability in restitution, the claimant will not be compensated for the performance in question, and the recipient will retain the benefit of the claimant's performance free of any liability to pay for it; (b) liability in restitution will not subject the recipient to an obligation from which it was understood by the parties that the recipient would be free; and (c) liability in restitution will not subject the recipient to a forced exchange.

The tentative draft is, of course, just that: tentative. More importantly, if literally applied, MetCap's claim would fail because it has not alleged that "absent liability in restitution," it would not be paid. It has alleged that NASC is unable to pay; it has not alleged that SBEV will not pay under its guarantee of the Advisor Contract. As for whether liability would be imposed on Pearl for "an obligation from which it was understood by the parties that [it] would be free," the analysis is less clear. When the Advisor Contract was executed, Pearl obviously was not involved in any way and no one believed that it would become obligated. At some point, especially during the period shortly after the Second Amendment when it was anticipated that Pearl would acquire the stock of NASC, it could be argued that Pearl (and NASC and MetCap) expected that Pearl would become obligated. Pearl, however, did not buy the stock of NASC and, thus, a transaction which never occurred cannot be the basis for imposing the liability upon Pearl. Moreover, no benefit was arguably conferred by MetCap on Pearl until the Third Amendment.

> FN49. The Court is not insensitive to MetCap's predicament. Both MetCap and NASC allege that NASC was an entity with no assets of its own and, thus, seeking recovery from it would be futile. *See* Compl. ¶ 11 (alleging further that "it was contemplated that NASC would meet its financial obligations ... by means of funds that it would raise"). But the inability of a party to a contract to fulfill an obligation thereunder cannot serve as a basis to conclude that other entities, who are not party to the contract, are liable for that obligation. *See WSFS,* 2005 WL 730060, at *19 ("A greater injustice would result if this Court were to ignore the lease agreement [between the parties] and award unjust enrichment damages ... WSFS was in the better position to protect itself by claiming other collateral, or in the alternative,

Not Reported in A.2d                                                                                       Page 9
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

refusing to loan its funds ... Finding otherwise would be inequitable.").

Following the Third Amendment, MetCap's work was no longer for NASC; instead, the Court must infer from the Complaint that it was for the benefit of the Defendants, most likely for the benefit of Pearl. If, as alleged, Pearl knew of the services for its benefit, relied upon and benefited from those services, and understood that NASC could not (or would not) pay MetCap for those services, the Court cannot conclude "with reasonable certainty" that there is no set of facts that MetCap could prove to support its claim for unjust enrichment as to the benefits it conferred upon Pearl following the Third Amendment.[FN50]Thus, the motion to dismiss MetCap's unjust enrichment claim must be denied to that extent.[FN51]

> FN50. MetCap's claim of unjust enrichment against PSC, Geary, and Beverly do not survive the motion to dismiss. No non-conclusory facts are alleged to suggest in any fashion how any of these entities benefited from MetCap's services, contracted for by NASC and only arguably at some point benefiting Pearl.

> FN51. The Complaint provides little insight to the work of MetCap after the Third Amendment (or before the Third Amendment for that matter). How to establish appropriate compensation, assuming the MetCap is so entitled, may be a difficult task, but it is not one that the Court need confront now. Indeed, the Court, in this context, does not preclude any argument (if MetCap should choose to make one) as to when any particular benefit resulted.

D. *The Complaint Does Not State a Claim That MetCap Was a Third-Party Beneficiary of the Merger Agreement*

*7 Next, the Court considers MetCap's claim that it was a third-party beneficiary to the Merger Agreement, before the Third Amendment, and that, as such, the parties to the Merger Agreement could not vary or eliminate MetCap's right to a fee without its express consent because MetCap had acted in reliance upon its third-party rights.[FN52]For reasons set

forth, this claim does not survive the Defendants' motion to dismiss.

> FN52.*See* Compl. ¶¶ 12, 37-38. For MetCap to prevail, it must allege that (1) it was a third-party beneficiary of the Merger Agreement before the Third Amendment and (2) the terms of that agreement which benefited it could not be changed without its approval. The Merger Agreement, as amended by the Third Amendment, confers no rights, by its terms, upon MetCap.

Well-settled within precepts of contract law is recognition that non-parties to a contract ordinarily have no rights under it.[FN53]Fixation with privity between parties, however, waned as modern commerce spawned increasingly sophisticated and complex relationships.[FN54]An exception emerged that an intended-but not incidental-third-party beneficiary might also have enforceable legal rights under a contract, even if it was not a party to that contract.

> FN53.*E.g., Comrie v. Enterasys Networks, Inc.,* 2004 WL 293337, at *2 (Del. Ch. Feb. 17, 2004) (citing *Insituform of N. Am., Inc. v. Chandler,* 534 A.2d 257, 268 (Del. Ch.1987)) (recognizing "the general rule that strangers to a contract ordinarily acquire no rights under it ...").

> FN54.*See Wilmington Housing Auth. v. Fid. & Deposit Co. of Md.,* 47 A.2d 524, 528 (Del.1946) (holding that a third-party beneficiary may recover on a contract made for his benefit and noting that "the exceptions grafted upon the English doctrine by our Delaware Courts have breached the imaginary barrier erected by the seal against the overwhelming force of justice and reason supporting the American doctrine, thereby opening the way for us to wipe out the last vestiges of an 'outworn, archaic' rule which is in conflict with the demands of modern-day business and social policy"); *see also*13 RICHARD A. LORD, WILLISTON ON CONTRACTS § 37:1 (4th ed.2000) (noting that, while courts "recite[d] talismanically-and somewhat misleadingly-that 'strangers to a contract' have no rights under the contract, [i]n practice, the traditional common-law view proved too inflexible and harsh ... [and an] exception to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 10
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

this rule has grown up under our law....").

Delaware courts have often looked to *Insituform of North America, Inc. v. Chandler*[FN55] to determine whether a party is an intended third-party beneficiary under a contract. There, the Court explained that:

> FN55.534 A.2d 257 (Del. Ch.1987).

In order for third party beneficiary rights to be created, not only is it necessary that performance of the contract confer a benefit upon third parties that was intended, but the conferring of a *beneficial* effect on such third party-whether it be a creditor of the promisee or an object of his or her generosity-should be a material part of the contract's purpose.[FN56]

> FN56.*Id.* at 270 (emphasis in original).

Thus, three elements are essential: (1) an *intent* between the contracting parties to benefit a third party through the contract, (2) the benefit being intended to serve as a gift or in satisfaction of a pre-existing obligation to the third party, and (3) a showing that benefiting the third party was a *material* aspect to the parties agreeing to contract.[FN57]

> FN57.*See Madison Realty Partners 7, LLC v. AG ISA, LLC,* 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001).

MetCap alleges that Section 5.10 of the Merger Agreement made it an intended beneficiary.[FN58]Merely alleging that it was an intended beneficiary is, of course, not sufficient to state a claim.[FN59]First, MetCap must allege facts demonstrating that both NASC *and* Beverly intended to benefit MetCap. It has not done so. The no-brokers' fee provision makes plain that Beverly is not liable for any broker, finder, banking, or advisory fee and, although it references the MetCap fee, it does so by clarifying that that fee is entirely the responsibility of NASC as the acquiring entity under the Merger Agreement before the Third Amendment. It is the Advisor Contract between the Plaintiffs that is the sole agreement defining the scope of MetCap's services, the party to whom those services were to be rendered, the consideration it was to receive for those services, and the party responsible for paying it for those services .[FN60]That the Merger Agreement, a document executed after the Advisor Contract, makes reference to NASC's pre-existing obligation to

MetCap does not make MetCap a third-party beneficiary to the Merger Agreement. The pertinent provision in the Merger Agreement recites that no one is entitled to any fee for financial advisor services and the parenthetical simply notes that MetCap is an exception and is entitled to payment of fees by NASC (defined as "Parent"). The parenthetical merely reconfirms NASC's obligation to MetCap under the Advisor Contract and defeats any argument that the Merger Agreement, by its statement that no such obligation exists, eliminated NASC's obligation to MetCap. If MetCap has no rights as a third-party beneficiary under the Merger Agreement before the Third Amendment, it would follow that it has no rights after the Third Amendment because there is no plausible argument that its rights are greater under the Merger Agreement after the Third Amendment than before the Third Amendment. Also, the financial advisor services rendered by MetCap-up to the time of the Third Amendment-were for NASC, which remains liable-if insolvent-for that obligation.

> FN58. Compl. ¶ 12. For the text of Section 5.10, see Part II, *supra.*

> FN59.*See Delmar News, Inc. v. Jacobs Oil Co.,* 584 A.2d 531, 534 (Del.Super.1990) ("[A]side from stating a legal conclusion, [merely alleging the status as an intended beneficiary] falls far short of establishing that [one] was an intended beneficiary of the ... contract.").

> FN60. Although the acquiring entities changed following execution of the Merger Agreement, no assignment or other agreement was executed to assign, transfer, or alter NASC's continuing and freestanding obligation to remunerate MetCap. NASC may have no assets to satisfy its obligation, but that is not a dilemma for this Court to resolve in MetCap's favor on a third-party beneficiary basis. *See Street Search Partners, L.P. v. Ricon Int'l, L.L.C.,* 2005 WL 1953094, at *3 (Del.Super.Aug. 1, 2005) ("The Third Party Beneficiary doctrine is not meant to rescue a sophisticated corporate entity from its contractual appraisal of a business risk.").

**\*8** Second, to survive the Defendants' motion to dismiss, MetCap must draw the Court's attention to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

facts indicating that the parties intended for the parenthetical exception of the MetCap fee from the no-brokers' fee provision to be either a gift or a means of satisfying a pre-existing obligation. Neither is the case. Nowhere in the Complaint is it alleged that Beverly sought to confer a gift to MetCap, and the parenthetical exception language itself does not satisfy NASC's preexisting obligation, but merely restates that NASC alone is responsible for paying a fee it already was committed to paying.[FN61]

> FN61. The Court does not need to resolve whether payment of MetCap was material to the Merger Agreement. *See Insituform,* 534 A.2d at 270.*See also Madison Realty,* 2001 WL 406268, at *1, *5 (finding the engagement of third-party providers of "personnel, services, and infrastructure that [were] essential both to operate, and to acquire" a partnership's investment interests was not a material purpose of a partnership organized for "the limited purpose to purchase ... hold and otherwise manage ... equity or any debt securities [of the partnership]" and, thus, the third-parties were merely incidental beneficiaries with no more standing to sue for breach of the partnership agreement "than would the local utility company or the office supply store").

Moreover, even if MetCap had been a third party beneficiary of the Merger Agreement before the Third Amendment, its claim would, nonetheless, be dismissed. MetCap correctly notes that a contract benefiting a third party who has acted in reliance upon it cannot be amended to the detriment of the third party beneficiary without its consent.[FN62]MetCap, however, is confronted with the inescapable fact that the Third Amendment changed nothing regarding its rights. Before the Third Amendment, NASC was obligated to pay MetCap's fee. After the Third Amendment, NASC was obligated to pay MetCap's fee. Its right to seek to recover its fees from NASC has not changed. MetCap, instead, seeks to elevate its rights at the expense of entities which were not parties to the Merger Agreement at any time when it-even arguably-was expressly provided a benefit under the Merger Agreement.[FN63]

> FN62.*See*RESTATEMENT (SECOND) OF CONTRACTS § 311(3) (1981).

> FN63. Before the Third Amendment, the term "Parent" was defined as NASC. Thus, any reference to "Parent" prior to the Third Amendment meant NASC and only NASC. The Merger Agreement, by its terms, at no time in its history, ever expressly obligated any party other than NASC (assuming for these purposes that it did obligate NASC) to pay MetCap's fee.

In sum, MetCap has failed to allege a claim as a third-party beneficiary under the Merger Agreement.

*E. The Carefully Crafted Allegations of the Complaint Preclude Dismissal of NASC's Claim for Reformation; MetCap is Not so Fortunate*

Finally, both MetCap and NASC seek reformation of the Third Amendment to the Merger Agreement to reflect the parties' understanding, or so it is alleged, that Pearl was to assume all of NASC's obligations, including the obligation to pay MetCap. Specifically, they petition the Court to eliminate Section 3.9 of the Third Amendment, which deleted the parenthetical in Section 5.10 of the Merger Agreement. Under Delaware law, the Court may use its equitable power to "reform" a contract so that it expresses the "real agreement"[FN64] of the parties in three circumstances: mutual mistake, unilateral mistake, and fraud.[FN65] Count Four of the Complaint seeks reformation on the basis of unilateral mistake and fraud (or "knowing silence").[FN66]

> FN64.*Colvocoresses v. W.S. Wasserman Co.,* 28 A.2d 588, 589 (Del. Ch.1942) ("The very purpose of reformation by a Court of Equity is to make an erroneous instrument express correctly the real agreement between the parties; *no court can make a new contract for them."*) (emphasis added).

> FN65.*See e.g., Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.,* 794 A.2d 1141, 1151 (Del.2002); *James River-Pennington, Inc. v. CRSS Capital, Inc.,* 1995 WL 106554, at *2 (Del. Ch. Mar. 6, 1995) ("Reformation is appropriate only when the contract does not represent the parties' intent because of fraud, mutual mistake or, in exceptional cases, a unilateral mistake coupled with the other parties' knowing silence.").

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN66. Compl. ¶ 43.

MetCap and NASC first plead that reformation is necessary because the final draft of the Third Amendment did not comport with the prior understanding among the parties. The prior agreement to which the Plaintiffs cite is evidenced by the version of the Third Amendment that was circulated by e-mail at 9:04 p.m. on November 20, 2005.[FN67] In that version, Sections 1.1 and 1.2 made plain that NASC, NASC Acquisition, and SBEV were assigning all rights and obligations under the Merger Agreement and that Pearl, PSC, and Geary were assuming all of those rights and obligations. Significantly, no reference was made to Section 5.10 of the Merger Agreement or to the MetCap fee itself (*i.e.,* the parenthetical contained in Section 5.10. of the Merger Agreement remained intact).

> FN67. *Id.* ¶ 10.Dickerson sent the 9:04 p.m. e-mail. Recipients included Grunstein, Goldsmith, Heil, Silva, and Levinson. *See* Herbert Aff. Ex. I.

*9 MetCap and NASC assert that the agreement contained in the e-mail of 9:04 p.m. represents a specific prior agreement that differed materially from the version of the Third Amendment that appeared at 12:59 a.m. on November 21, 2005. Goldsmith and Grunstein had been involved in the negotiations all day on November 20, and no one had ever broached the subject of payment of MetCap's fee. They relied, so NASC alleges, on the course of conduct of negotiations among the parties that assured them that they would be consulted if any such changes were contemplated.

In *Cerberus International, Ltd. v. Apollo Management, L.P.,* the Supreme Court held that, regardless of whether mutual mistake or unilateral mistake is cited as the ground for reformation, "the plaintiff must show by clear and convincing evidence that the parties came to a specific prior understanding that differed materially from the written agreement."[FN68] Moreover, "[t]his understanding need only be complete as to the issue involved ... [i]t need not constitute a complete contract in and of itself."[FN69] Thus, the Court must determine here whether NASC has alleged facts demonstrating that the parties came to a "real agreement," not on all aspects of the merger itself, but on the more narrow issue of which entity was to pay MetCap.

FN68.794 A.2d 1141, 1151-52 (Del.2002).

FN69.*Id.* at 1152.

The *Cerberus* case is instructive in two factual respects. First, the Court concluded that a rational fact finder could have concluded that the parties had reached a specific prior understanding with respect to the disposition of certain proceeds because one party had stipulated that the specific disposition was a condition to going forward and the other party had consented. Second, the Court determined that there was no evidence in the record that the parties altered this agreement in subsequent negotiations.[FN70]

> FN70. As explained in *Cerberus:*
> First, we turn to the element of the prior agreement. Cilurzo told Harris in writing that having the proceeds from the options and warrants go to MTI's stockholders was a condition to further negotiations, and Harris responded in his handwritten note on that writing: "This looks fine." *Absent any evidence that this term was eliminated in the negotiation process* (and there is none on this record), it is certainly a permissible inference that the parties had a prior agreement relative to the proceeds from the options and warrants.
> *Id.* at 1153 (internal citations omitted) (emphasis added).

By contrast, the revision to the Third Amendment did occur within the context of a negotiation process. After Grunstein and Goldsmith departed, Dickerson continued to represent NASC and other "acquiring entities" that night as "deal counsel." [FN71] With respect to the negotiation of the Third Amendment, Pearl, PSC, and Geary, were represented by Heil. Because the change to the Third Amendment occurred during the negotiations between these two groups, there was an obvious divergence from the key facts in *Cerberus.* When Goldsmith and Grunstein left, the negotiations had not concluded, and it is difficult to accept that, in these circumstances, a "real agreement" between parties had been reached when those parties were still in the fluid process of negotiating, drafting, and arriving at a common understanding.

> FN71. The definitional contours of "deal counsel," a term without well-defined, independent significance, present a recurring

Not Reported in A.2d                                                                                           Page 13
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

conundrum. Indeed, it is not clear from the Complaint whether NASC seeks to describe a role for Dickerson that differs from Troutman Sanders generally. Whether an attorney representing others as "deal counsel" has exceeded the scope of his or her authority would, of course, depend upon the conduct and understanding of the parties whom he or she was representing. It would also be a question for this Court, one that could only be considered in light of, among other things, the nature of the parties' relationship and the existence of any limitation on that relationship.

It is not surprising that, in the context of negotiating complex transactional documents, parties (and their attorneys) routinely accept that those attorneys representing counterparties to a contract are acting with the requisite authority to bind their principals. Although a motion to dismiss provides the Court with a poor forum for considering the issue of apparent authority, especially because all reasonable inferences must be drawn in favor of the nonmoving party, the Court would eventually be guided by the general maxim within our law that "[i]f a third party relies on the agent's apparent authority in good faith and is justified in doing so by the surrounding circumstances, the principal is bound to the same extent as if actual authority had existed." *Old Guard Ins. Co. v. Jimmy's Grille, Inc.,* 2004 WL 2154286, at *3 (Del. Sept. 21, 2004) (citations omitted). For the moment, however, it is notable that MetCap and NASC have offered no allegation in their Complaint that Heil, as counsel to Pearl and its related entities during the negotiations, was aware of any limitation on Dickerson's authority whether as "deal counsel" or as a partner in Troutman Sanders for purposes of the Beverly transaction.

That NASC may now regret the outcome of Dickerson's efforts that evening is, of course, not cause to rewrite a contract negotiated by sophisticated counsel. The Complaint, however, alleges specifically that Dickerson had no authority to make the changes on behalf of NASC or SBEV because, again according to the Complaint, he was not separately representing NASC or SBEV.

*10 The Complaint, accordingly, may be read to allege that it had been agreed, perhaps through acquiescence, that the parenthetical of Section 5.10 of the Merger Agreement would not be changed (or was not to be the subject of further negotiation in the

absence of Goldsmith and Grunstein) even though negotiation of other issues was continuing. That sufficiently alleges the prior understanding that is essential to a reformation claim. Thus, the Complaint alleges that the Third Amendment, as the result of a unilateral mistake attributable to Dickerson, did not reflect the parties' intent.[FN72]

> FN72. By Court of Chancery Rule 9(b), both mistake and fraud must be pled with particularity. The Complaint, with its detailed, although selective, recitation of certain events of the evening of November 20, satisfies that standard.

Unilateral mistake alone does not provide a basis for reformation. It must be coupled with "knowing silence." [FN73] Dickerson did not send Goldsmith, NASC's principal in the negotiations, the final version of the Third Amendment.[FN74] Therefore, Goldsmith (and, presumably, NASC) was unaware of the Third Amendment. Similarly, Pearl, its counsel, and related entities, did not supply the information to NASC either.[FN75] Thereafter, Pearl and its counsel remained silent about the changes.

> FN73. *See, e.g., Universal Compression, Inc. v. Tidewater, Inc.,* 2000 WL 1597895, at *7 (Del. Ch. Oct. 19, 2000) (referring to "knowledge and concealment").

> FN74. An e-mail that Goldsmith had sent to Dickerson before "signing off" of his computer that evening indicates that he had signed multiple copies of the signature pages for NASC and NASC Acquisition and that he had instructed Dickerson that the signature pages had been left with Levinson. *See* Herbert Aff. Ex. H. The Court notes that Dickerson e-mailed the offending change to Grunstein (but, for reasons that cannot be gleaned from the Complaint, not to Goldsmith) within hours.

> FN75. Heil and others affiliated with Pearl received a copy of Dickerson's e-mail transmitting the Third Amendment; that e-mail does not reflect that a copy was sent to Goldsmith.

Under agency law, the knowledge of an agent is generally imputed to his principal except when the

agent's own interests become adverse.[FN76] In the context of "dual agency," or where an agent acts in a role common to two principals, the rule is much the same. That is, notice to, or knowledge of, an agent will be considered to be notice to, or knowledge of, both principals except in a situation of divided loyalties or where the agent's own interests run adverse to one of the principals.[FN77]

> FN76. *Albert,* 2005 WL 2130607, at *11 ("Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal."); *Ambrose v. Thomas,* 1992 WL 208478, at *2 (Del.Super.Mar. 13, 1992) ("In Delaware, well settled agency law provides where an agent acquires knowledge in the course of his or her agency and has no personal interest in the transaction adverse to the interest of the principal, any knowledge of or notice to the agent is chargeable to the principal whether or not knowledge or notice is actually communicated to the principal. This rule promotes the underlying policy of holding accountable one who transacts his business through another for what the other does or does not do in conducting that business. The principal should bear the burden rather than a third party who has dealt with the agent to the third party's detriment.") (internal citations omitted).

> FN77. *See Holley v. Jackson,* 158 A.2d 803, 808 (Del. Ch.1959) ( "Ordinarily the knowledge of an agent is imputed to his principal ... [but] where an agent is interested in the result of a transaction adversely to the interest of his principal, the rule of imputed knowledge on the part of the principal no longer obtains.") (citations omitted).

Dickerson was representing NASC; that is not disputed. NASC seeks to limit his role to that of "deal counsel." The question, however, is whether Dickerson's knowledge of the revision to Section 5.10 of the Merger Agreement through the Third Amendment (a revision which Dickerson himself accomplished) can be attributed to NASC within the context of whatever attorney-client relationship may have existed between NASC and Troutman Sanders. The Complaint carefully and somewhat flimsily-but

sufficiently-alleges facts that would support an inference-one that must be given in the "plaintiff-friendly" confines of Court of Chancery Rule 12(b)(6)-that, during the evening of November 20, Dickerson was somehow conflicted because of his role as "deal counsel" and the payment of his fees by Pearl (or its related entities). In the appropriate factual setting, the knowledge of a conflicted agent may not be imputed to the principal. That, accordingly, precludes the Court from attributing Dickerson's knowledge to NASC.[FN78]

> FN78. It may turn out that Dickerson's conflict, if indeed there was one, was limited or minimal or was understood and accepted by NASC and, thus, would not preclude imputation of his knowledge to NASC. It may also be that Pearl was entitled to rely upon Dickerson's apparent authority or that it reasonably assumed that Dickerson would share any material information regarding the transaction with Goldsmith, his partner. Those are arguments-however tempting-that the Court may not reach at this stage of the proceedings because of the incomplete development of the factual background.

Accordingly, the Complaint states, perhaps only marginally, a claim for reformation of the Third Amendment for the benefit of NASC.[FN79]

> FN79. The Complaint was carefully drafted with respect to Dickerson's role. It alleges that he did not have the authority to bind NASC. It alleges that he was paid for some of his work by Pearl or its related entities. It alleges that he was "deal counsel," but it provides no basis for gaining a full understanding of Dickerson's role. Without an understanding of Dickerson's actual role, it is difficult for the Court, within the confines imposed by Court of Chancery Rule 12(b)(6), to determine whether or not Dickerson had the authority to do what he did or, more importantly, whether Dickerson's knowledge may be imputed to NASC. Because the Court must give NASC the benefit of any reasonable inference that can be drawn from the allegations of the Complaint, the Complaint must be read to suggest that Dickerson was somehow conflicted and that his conflicted status would make it improper or inequitable to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 15
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

attribute his conduct or his knowledge to NASC, even though the Complaint scrupulously avoids any such express allegation and that inference is far from the one most likely to be drawn from the allegations of the Complaint. Ultimately, Dickerson's role will be a factual matter, one informed by an understanding of the ethics of the practice of law, and, if NASC has no more to offer than what has been set forth in its Complaint, its claim for reformation might fail not only because it is fairly charged with Dickerson's knowledge, but also because it is bound by Dickerson's conduct. NASC's position must be something more than a whine that it did not like what its lawyer did during the final hours of negotiation of the Third Amendment. Parties to a transaction and their counsel must be able to rely-and to act accordingly-on the negotiating authority generally accorded transactional attorneys. This is especially true when the negotiations are ongoing and the principals have abandoned the negotiation field after leaving signature pages. Nothing in this Memorandum Opinion should be viewed as undercutting that dynamic. The result here is more the product of Court of Chancery Rule 12(b)(6) than it is of substantive law.

Also, the Court expresses no view as to whether the reformation sought by NASC would bring the substantive result-Pearl's obligation to pay MetCap-that it seeks.

On the other hand, MetCap's effort to obtain reformation fails. MetCap is a party neither to the Merger Agreement nor to the Third Amendment. Reformation is available, perhaps subject to certain exceptions not present here, only to parties to the contract.[FN80] As such, MetCap, as a matter of law, may not pursue a claim for reformation of the Third Amendment.

> FN80. *See, e.g., Emmert v. Prade,* 711 A.2d 1217, 1219 (Del. Ch.1997); *Fritz v. Nationwide Mut. Ins. Co.,* 1990 WL 186448, at *3 (Del. Ch. Nov. 26, 1990); *but cf. Chase Manhattan Bank v. Iridium Africa Corp.,* 307 F.Supp.2d 608, 614 n.6 (D.Del.2004).

### V. CONCLUSION

*11 For the foregoing reasons, (i) Count One (Fraud) and Count Three (Third-Party Beneficiary) of the Amended Complaint will be dismissed; (ii) Count Two (Unjust Enrichment) of the Amended Complaint, except to the extent that it purports to assert a claim against Pearl based on benefits conferred after the Third Amendment to the Merger Agreement, will be dismissed; (iii) MetCap's claim for reformation presented in Count Four will be dismissed; and (iv) otherwise, Defendants' Motion to Dismiss will be denied. An implementing order will be entered.

Del.Ch.,2007.
MetCap Securities LLC v. Pearl Senior Care, Inc.
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 7

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 4226417 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

Page 1

**H**Pfizer, Inc. v. Ranbaxy Laboratories, Ltd.
D.Del.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
PFIZER INC., Pfizer Pharmaceuticals, LLC, Pfizer
Limited, C.P. Pharmaceuticals International C.V.,
Pfizer Ireland Pharmaceuticals, Warner-Lambert
Company, Warner Lambert Company LLC, and
Warner-Lambert Export, Ltd., Plaintiffs,
v.
RANBAXY LABORATORIES LIMITED and
Ranbaxy Inc., Defendants.
**Civil Action No. 07-138-JJF.**

Nov. 29, 2007.

**Background:** Patent owner brought action against
competitor alleging infringement of patents on drugs.
Competitor counterclaimed seeking declaratory
judgment that one patent and its term extension was
invalid and that other patent was invalid and not
infringed. Owner brought motion to dismiss
counterclaims.

**Holdings:** The District Court, Farnan, J., held that:

(1) possibility that new patent might issue at some
future point was insufficient to create real and
immediate legal case or controversy;

(2) possibility that patent might reissue at some
future point after claim had been invalidated was
insufficient to create jurisdiction under Hatch-
Waxman Act;

(3) res judicata doctrine prevented competitor from
claiming that patent was invalid as obvious; and

(4) competitor infringed patent.

Motion granted.

**[1] Federal Civil Procedure 170A** 🔑1742(1)

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)2 Grounds in General

170Ak1742 Want of Jurisdiction
    170Ak1742(1) k. In General. Most
Cited Cases
A court is authorized to dismiss a complaint or a
counterclaim if the court lacks subject matter
jurisdiction over the claim alleged. Fed.Rules
Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[2] Federal Courts 170B** 🔑29.1

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk29 Objections to Jurisdiction,
Determination and Waiver
                170Bk29.1 k. In General. Most Cited
Cases

**Federal Courts 170B** 🔑32

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk29 Objections to Jurisdiction,
Determination and Waiver
                170Bk32 k. Pleading. Most Cited Cases
A motion to dismiss for lack of subject matter
jurisdiction may present either a facial or factual
challenge to the court's subject matter jurisdiction.
Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[3] Federal Courts 170B** 🔑34

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk29 Objections to Jurisdiction,
Determination and Waiver
                170Bk34 k. Presumptions and Burden
of Proof. Most Cited Cases
When a facial challenge to subject matter jurisdiction
is raised, a court must accept all factual allegations
pled in the counterclaim as true and draw all
reasonable inferences in favor of the counterclaim
plaintiff. Fed.Rules Civ.Proc.Rule 12(b)(1), 28
U.S.C.A.

**[4] Federal Courts 170B** 🔑32

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 4226417 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk29 Objections to Jurisdiction, Determination and Waiver
                170Bk32 k. Pleading. Most Cited Cases

**Federal Courts 170B ☞33**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk29 Objections to Jurisdiction, Determination and Waiver
                170Bk33 k. Affidavits and Evidence in General. Most Cited Cases
On a motion to dismiss a counterclaim for lack of subject matter jurisdiction, a court's inquiry is limited to the allegations in the counterclaim, the documents referenced in or attached to the counterclaim, and matters in the public record. Fed.Rules Civ.Proc.Rules 12(b)(1), 56, 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ☞2533.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2533 Motion
                    170Ak2533.1 k. In General. Most Cited Cases
On a motion to dismiss a counterclaim for lack of subject matter jurisdiction, a court may consider documents integral to or explicitly relied upon in the counterclaim, and exhibits, without converting the motion to a summary judgment motion, if the counterclaim is based on the documents and the documents are undisputedly authentic. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[6] Federal Courts 170B ☞33**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk29 Objections to Jurisdiction, Determination and Waiver
                170Bk33 k. Affidavits and Evidence in General. Most Cited Cases

**Federal Courts 170B ☞34**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk29 Objections to Jurisdiction, Determination and Waiver
                170Bk34 k. Presumptions and Burden of Proof. Most Cited Cases
When reviewing a factual challenge to the court's subject matter jurisdiction, the court is not confined to the allegations of the counterclaim, and the presumption of truthfulness does not attach to the allegations in the counterclaim; instead, the court may consider evidence outside the pleadings, including affidavits, depositions and testimony, to resolve any factual issues bearing on jurisdiction. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[7] Federal Courts 170B ☞34**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk29 Objections to Jurisdiction, Determination and Waiver
                170Bk34 k. Presumptions and Burden of Proof. Most Cited Cases
Once a court's subject matter jurisdiction over a counterclaim is challenged, the counterclaim plaintiff bears the burden of proving that jurisdiction exists. Fed.Rules Civ.Proc.Rules 12(b)(1), 12(h)(3), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A ☞1041**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(L) Judgment on the Pleadings
            170AVII(L)1 In General
                170Ak1041 k. In General. Most Cited Cases
A motion for judgment on the pleadings is governed by the same standards that apply to a motion to dismiss for failure to state a claim upon which relief can be granted. Fed.Rules Civ.Proc.Rules 12(b)(6), 12(c), 28 U.S.C.A.

**[9] Federal Civil Procedure 170A ☞1772**

170A Federal Civil Procedure
    170AXI Dismissal

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 4226417 (D.Del.)

**(Cite as: --- F.Supp.2d ----)**

Page 3

170AXI(B) Involuntary Dismissal

170AXI(B)3 Pleading, Defects In, in General

170Ak1772 k. Insufficiency in General. Most Cited Cases

Dismissal for failure to state a claim upon which relief can be granted is not appropriate if the plaintiff alleges sufficiently detailed facts to raise a right to relief above the speculative level. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[10] Federal Civil Procedure 170A ☞1825**

170A Federal Civil Procedure

170AXI Dismissal

170AXI(B) Involuntary Dismissal

170AXI(B)5 Proceedings

170Ak1825 k. Motion and Proceedings Thereon. Most Cited Cases

The moving party bears the burden of demonstrating that dismissal for failure to state a claim upon which relief can be granted is appropriate. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[11] Federal Civil Procedure 170A ☞1052**

170A Federal Civil Procedure

170AVII Pleadings and Motions

170AVII(L) Judgment on the Pleadings

170AVII(L)1 In General

170Ak1052 k. Motion and Proceedings Thereon. Most Cited Cases

The moving party bears the burden of demonstrating that judgment on the pleadings is appropriate. Fed.Rules Civ.Proc.Rule 12(c), 28 U.S.C.A.

**[12] Declaratory Judgment 118A ☞231.1**

118A Declaratory Judgment

118AII Subjects of Declaratory Relief

118AII(L) Patents

118Ak231 Patents

118Ak231.1 k. In General. Most Cited Cases

Possibility that new patent might issue at some future point was insufficient to create type of real and immediate legal case or controversy as required for declaratory judgment jurisdiction; although patent owner sought reissue of patent that had claim invalidated and covenant to not sue that owner gave to competitor did not embrace reissue, question of whether new patent would ever reissue was

speculative, purely hypothetical, and unripe for judicial determination. 28 U.S.C.A. § 2201.

**[13] Declaratory Judgment 118A ☞341.1**

118A Declaratory Judgment

118AIII Proceedings

118AIII(E) Evidence

118Ak341 Presumptions and Burden of Proof

118Ak341.1 k. In General. Most Cited Cases

To establish jurisdiction under the Declaratory Judgment Act, the proponent bears the burden of proving that the facts alleged under all the circumstances show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. 28 U.S.C.A. § 2201.

**[14] Declaratory Judgment 118A ☞231.1**

118A Declaratory Judgment

118AII Subjects of Declaratory Relief

118AII(L) Patents

118Ak231 Patents

118Ak231.1 k. In General. Most Cited Cases

**Declaratory Judgment 118A ☞300**

118A Declaratory Judgment

118AIII Proceedings

118AIII(C) Parties

118Ak299 Proper Parties

118Ak300 k. Subjects of Relief in General. Most Cited Cases

Possibility that new patent might issue at some future point was insufficient to create type of real and immediate legal case or controversy as required for standing under Article III; although patent owner sought reissue of patent that had claim invalidated and covenant to not sue that owner gave to competitor did not embrace reissue, question of whether new patent would ever reissue was speculative, purely hypothetical, and unripe for judicial determination in declaratory judgment action by competitor. U.S.C.A. Const. Art. 3.

**[15] Declaratory Judgment 118A ☞231.1**

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 4226417 (D.Del.)
(Cite as: --- F.Supp.2d ----)

118A Declaratory Judgment
   118AII Subjects of Declaratory Relief
      118AII(L) Patents
         118Ak231 Patents
            118Ak231.1 k. In General. Most Cited Cases
Possibility that patent might reissue at some future point after claim had been invalidated was insufficient to create declaratory judgment jurisdiction under Hatch-Waxman Act, since patent applicant could not enforce pending reissue application against competitor, any reissued patent had not been listed in Food and Drug Administration (FDA) Orange Book and could not be until it had issued, and competitor did not have to certify against reissued patent. Federal Food, Drug, and Cosmetic Act, § 505(c)(2), 21 U.S.C.A. § 355(c)(2); 28 U.S.C.A. § 2201.

[16] Patents 291 ⟜327(13)

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k327 Operation and Effect of Decision
            291k327(13) k. Matters Concluded.
Most Cited Cases
Res judicata doctrine prevented competitor from claiming in subsequent litigation against patent owner that patent was invalid as obvious, where competitor had challenged validity of patent in prior litigation and competitor was required to raise all of its invalidity defenses at that time, including its challenge based on obviousness; although competitor contended that it was unable to appreciate impact of prior art due to certain facts which owner allegedly withheld until late in prior litigation, competitor's appropriate remedies rested in prior litigation through either extensions of time or applications for new trial or relief from judgment. 35 U.S.C.A. § 103.

[17] Judgment 228 ⟜540

228 Judgment
   228XIII Merger and Bar of Causes of Action and Defenses
      228XIII(A) Judgments Operative as Bar
         228k540 k. Nature and Requisites of Former Recovery as Bar in General. Most Cited Cases
The doctrine of res judicata is considered a rule of fundamental and substantial justice, and not merely a matter of technical practice or procedure.

[18] Judgment 228 ⟜540

228 Judgment
   228XIII Merger and Bar of Causes of Action and Defenses
      228XIII(A) Judgments Operative as Bar
         228k540 k. Nature and Requisites of Former Recovery as Bar in General. Most Cited Cases
Res judicata avoids the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.

[19] Judgment 228 ⟜540

228 Judgment
   228XIII Merger and Bar of Causes of Action and Defenses
      228XIII(A) Judgments Operative as Bar
         228k540 k. Nature and Requisites of Former Recovery as Bar in General. Most Cited Cases
Res judicata, also known as claim preclusion, requires a showing that there has been (1) a final judgment on the merits in a prior lawsuit involving (2) the same claim and (3) the same parties or their privies.

[20] Judgment 228 ⟜584

228 Judgment
   228XIII Merger and Bar of Causes of Action and Defenses
      228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
         228k584 k. Nature and Elements of Bar or Estoppel by Former Adjudication. Most Cited Cases
Res judicata requires that a plaintiff present in one suit all of the claims for relief that he may have arising out of the same transaction or occurrence; in this regard, the operative question is not whether the issue was actually litigated, but whether it could have been raised in the earlier proceeding.

[21] Judgment 228 ⟜585(5)

228 Judgment
   228XIII Merger and Bar of Causes of Action and Defenses

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 4226417 (D.Del.)
(Cite as: --- F.Supp.2d ----)

228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
228k58 5 Identity of Cause of Action in General
228k585(5) k. Effect of Change in Law or Facts. Most Cited Cases
A change in the law does not ordinarily affect the res judicata effect of a judgment.

[22] Patents 291 ☜249.1

291 Patents
291XII Infringement
291XII(A) What Constitutes Infringement
291k249 Patents for Compositions of Matter
291k249.1 k. In General. Most Cited Cases
Competitor infringed patent by filing abbreviated new drug application (ANDA) seeking approval from Food and Drug Administration (FDA) to engage in commercial manufacture, use, or sale of product containing patented atorvastatin calcium as active ingredient prior to expiration of patent. 35 U.S.C.A. § 271(e)(2).

[23] Judgment 228 ☜649

228 Judgment
228XIV Conclusiveness of Adjudication
228XIV(A) Judgments Conclusive in General
228k649 k. Nature, Rendition, and Form of Judgment in General. Most Cited Cases

Judgment 228 ☜713(1)

228 Judgment
228XIV Conclusiveness of Adjudication
228XIV(C) Matters Concluded
228k713 Scope and Extent of Estoppel in General
228k713(1) k. In General. Most Cited Cases
The party seeking to invoke the doctrine of collateral estoppel must demonstrate four elements: (1) the previous determination was necessary to the decision; (2) the identical issue was previously litigated; (3) the issue was actually decided in a decision that was final, valid, and on the merits; and (4) the party being precluded from relitigating the issue was adequately represented in the previous action.

[24] Judgment 228 ☜713(1)

228 Judgment
228XIV Conclusiveness of Adjudication
228XIV(C) Matters Concluded
228k713 Scope and Extent of Estoppel in General
228k713(1) k. In General. Most Cited Cases
On a collateral estoppel claim, the party sought to be estopped must have had a full and fair opportunity to litigate the issue to a final and valid judgment in the prior litigation.

Patents 291 ☜328(2)

291 Patents
291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
291k328 Patents Enumerated
291k328(2) k. Original Utility. Most Cited Cases

Patents 291 ☜328(2)

291 Patents
291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
291k328 Patents Enumerated
291k328(2) k. Original Utility. Most Cited Cases

Patents 291 ☜328(2)

291 Patents
291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
291k328 Patents Enumerated
291k328(2) k. Original Utility. Most Cited Cases
4,681,893. Infringed.

5,273,995. Recognized as Unenforceable.

6,455,574. Cited.

Rudolf E. Hutz, Esquire; Jeffrey B. Bove, Esquire and Mary W. Bourke, Esquire of Connoly Bove Lodge & Hutz LLP, Wilmington, DE, for Plaintiffs.
Darrell L. Olson, Esquire; Joseph M. Reisman, Esquire; William R. Zimmerman, Esquire, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                Page 6
--- F.Supp.2d ----, 2007 WL 4226417 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

Payson LeMeilleur, Esquire of Knobbe, Martens, Olson & BEAR, LLP, Irvine, California. Frederick L. Cottrell, III, Esquire and Jameson A.L. Tweedie, Esquire of Richards, Layton & Finger, P.A., Wilmington, DE, for Defendants.

### OPINION

FARNAN, District Judge.

**\*1** Pending before the Court are two motions filed by Plaintiffs, Pfizer Inc., Pfizer Pharmaceuticals, LLC, Pfizer Limited, C.P. Pharmaceuticals International C.V., Pfizer Ireland Pharmaceuticals, Warner-Lambert Company, Warner-Lambert Company, LLC and Warner-Lambert Export, Ltd. (collectively, "Pfizer"): (1) a Motion To Dismiss In Part Declaratory Judgment Counterclaims (D.I.14), and (2) a Motion To Dismiss And For Partial Judgment On The Pleadings Pursuant To Federal Rule Of Civil Procedure 12(c) (D.I.16). For the reasons discussed, the Court will grant Pfizer's Motions.

### BACKGROUND

Pfizer brought this action against Defendants Ranbaxy Laboratories Limited and Ranbaxy Inc. ("Ranbaxy") alleging infringement of two patents owned by Pfizer, United States Patents Nos. 4,681,893 (the " 893 patent") and 6,455,574 (the " 574 patent"). The 893 patent claims a genus of chemical compounds which embraces atorvastatin calcium. Pfizer sells a formulation containing atorvastatin calcium under the registered name Lipitor®.

The 574 patent relates to "pharmaceutical combinations of amlodipine or a pharmaceutically acceptable acid additional salt thereof and atorvastatin or a pharmaceutically acceptable salt thereof, kits containing such combinations and methods of using such combinations" to treat a variety of cardiac ailments. Pfizer sells a formulation containing amlodipine besylate under the registered name Norvasc®.

Both the 893 patent and the 574 patent are listed in the FDA's Orange Book as covering a product sold by Pfizer under the registered name Caduet®. Caduet® is essentially a product containing both amlodipine besylate and atorvastatin calcium.

In response, Ranbaxy filed an Amended Answer and Counterclaims. By its counterclaims, Ranbaxy seeks

a declaratory judgment that (1) the 893 patent and its term extension are invalid, and (2) the 574 patent is invalid and not infringed. Ranbaxy has also interjected United States Patent No. 5,273,995 (the " 995 patent") into this lawsuit by asserting in its Fourth, Fifth, Sixth and Seventh Counterclaims that the 995 patent is invalid and/or unenforceable and not infringed.

Like the 893 patent, the 995 patent also pertains to the atorvastatin calcium pharmaceutical composition sold by Pfizer under the registered name Lipitor®. The Court of Appeals for the Federal Circuit has determined, in prior litigation between the parties (the "Lipitor® Litigation"), that Claim 6 of the 995 patent is invalid for failure to satisfy 35 U.S. § 112. Pfizer has sought to reissue the 995 patent to correct the defect in Claim 6 and to correct defects in other claims. Pfizer has also provided Ranbaxy with a covenant not to sue Ranbaxy on all remaining claims of the original 995 patent.

### STANDARD OF REVIEW

#### I. Dismissal Under Fed.R.Civ.P. 12(b)(1)

**[1][2]** Pursuant to Federal Rule of Civil Procedure 12(b)(1), the Court is authorized to dismiss a complaint, or in this case, a counterclaim, if the Court lacks subject matter jurisdiction over the claims alleged. Motions brought under Rule 12(b)(1) may present either a facial or factual challenge to the Court's subject matter jurisdiction.

**\*2[3][4][5]** When a facial challenge to subject matter jurisdiction is raised, the Court must accept all factual allegations pled in the counterclaim as true and draw all reasonable inferences in favor of the counterclaim plaintiff. The Court's inquiry under Rule 12(b)(1) is limited to the allegations in the counterclaim, the documents referenced in or attached to the counterclaim, and matters in the public record. *Gould Electronics Inc. v. U.S.,* 220 F.3d 169, 176 (3d Cir.2000). However, the Court may consider "document[s] integral to or explicitly relied upon in the complaint" without converting the motion to dismiss to a motion for summary judgment. The Court may also consider exhibits to a motion to dismiss without converting the motion to a summary judgment motion, if the plaintiff's claims are based on the documents and the documents are undisputedly authentic. *Pension Benefit Guaranty Corp. v. White*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 4226417 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

*Consolidated Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993).

[6] In reviewing a factual challenge to the Court's subject matter jurisdiction, the Court is not confined to the allegations of the complaint, or in this case the counterclaim, and the presumption of truthfulness does not attach to the allegations in the counterclaim. *Mortensen v. First Fed. Sav. and Loan,* 549 F.2d 884, 891 (3d Cir.1977). Instead, the Court may consider evidence outside the pleadings, including affidavits, depositions and testimony, to resolve any factual issues bearing on jurisdiction. *Gotha v. United States,* 115 F.3d 176, 179 (3d Cir.1997).

[7] Pursuant to Rule 12(h)(3), subject matter jurisdiction may be raised at any time during the course of a case and may be raised *sua sponte* by the Court. Once the Court's subject matter jurisdiction over a counterclaim is challenged, the counterclaim plaintiff bears the burden of proving that jurisdiction exists. *Mortensen,* 549 F.2d at 891.

## II. Judgment On The Pleadings Under Fed.R.Civ.P. 12(c)

[8][9][10][11] A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is governed by the same standards that apply to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Specifically, the Court must accept the facts alleged in the pleadings as true and draw all reasonable factual inferences in the light most favorable to the nonmovant. The Supreme Court has retired the standard for dismissal under Rule 12(b)(6) announced in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ---- - ----, 127 S.Ct. 1955, 1964-1965, 167 L.Ed.2d 929 (2007) (citing *Conley,* 355 U.S. at 45-46). Instead, the Supreme Court has instructed that dismissal is not appropriate if the plaintiff alleges sufficiently detailed facts to "raise a right to relief above the speculative level." *Id.* The moving party bears the burden of demonstrating that dismissal is appropriate under Rule 12(b)(6) and that judgment on the pleadings is appropriate under Rule 12(c).

## DISCUSSION

### I. Motion To Dismiss In Part Declaratory Judgment Counterclaims

*3 [12] By its Motion To Dismiss In Part Declaratory Judgment Counterclaims, Pfizer requests the Court to dismiss Ranbaxy's Fourth, Fifth, Sixth and Seventh Counterclaims, all of which pertain to the 995 patent. Pfizer contends that there is no justiciable case or controversy between the parties and no declaratory judgment jurisdiction with respect to these counterclaims based on the covenant not to sue.

In response, Ranbaxy contends that Pfizer has not agreed to provide Ranbaxy with a covenant not to sue related to any reissue of the 995 patent. Thus, Ranbaxy contends that Pfizer may, and in fact intends, to assert any reissue of the 995 patent against Ranbaxy's generic product. Ranbaxy does not oppose the dismissal without prejudice of its Fourth and Fifth Counterclaims regarding noninfringement and invalidity of the 995 patent. In this regard, Ranbaxy acknowledges that the covenant not to sue precludes infringement liability on the existing 995 patent, and infringement and invalidity with respect to any reissued patent rests on the scope of the reissue. However, Ranbaxy maintains that the Court should exercise jurisdiction over its Sixth and Seventh Counterclaims concerning the unenforceability of the 995 patent, because these claims concern Pfizer's conduct before the Patent and Trademark Office ("PTO") in prosecuting the original 995 patent. Therefore, Ranbaxy contends that the reissue proceedings have no affect on its allegations that the 995 patent was procured through inequitable conduct.

The parties agree that Ranbaxy's Fourth and Fifth Counterclaims should be dismissed without prejudice. Accordingly, the Court will focus its decision on whether the Sixth and Seventh Counterclaims alleging unenforceability of the 995 patent should be dismissed.

[13] To establish jurisdiction under the Declaratory Judgment Act for the counterclaims asserted here, Ranbaxy bears the burden of proving that the facts alleged "under all the circumstances show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune    Inc.    v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 4226417 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

Page 8

*Genentech, Inc.*, --- U.S. ----, ----, 127 S.Ct. 764, 771, 166 L.Ed.2d 604 (2007). As the Supreme Court further explained, jurisdiction over a declaratory judgment action requires " 'the dispute [to] be definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' " *Id.* (citations omitted).

The standard announced by the Supreme Court in *MedImmune* replaces the "reasonable apprehension of imminent suit test" that had previously been used to determine whether jurisdiction exists under the Declaratory Judgment Act. *See Teva v. Novartis*, 482 F.3d 1330, 1339 (Fed.Cir.2007). As a result, Ranbaxy questions whether *MedImmune* abrogates the line of Federal Circuit cases holding that a covenant not to sue on an original patent divests the Court of jurisdiction, even when a reissue application covering the same subject matter as the original patent application is pending. *See e.g., Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058 (Fed.Cir.1995).

*4 Pfizer contends that *Super Sack* and its progeny are not altered by *MedImmune*, because those cases do not depend upon the reasonable apprehension of imminent suit test and instead turn on general Supreme Court precedent, which in effect applied the same test advanced in *MedImmune*, i.e. a totality of the circumstances test. Indeed, in *Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1346 (Fed.Cir.2007), the Federal Circuit noted that *Super Sack* has not been expressly overruled, and while *Super Sack* applied the "reasonable apprehension of imminent suit test," it did not depend upon it.

Examining the totality of the circumstances in light of the *MedImmune* standard for jurisdiction over declaratory judgment claims, the Court concludes that Ranbaxy cannot establish that a current and concrete controversy exists between the parties. The existence of issued and presently enforceable patent claims against a declaratory judgment plaintiff is a necessary prerequisite to the continued litigation of a declaratory judgment action. This basic principle of justiciability stands alone and apart from the "reasonable apprehension of imminent suit" test. *See e.g., GAF Building Materials Corp. v. Elk Corp. of Dallas*, 90 F.3d 479, 482-483 (Fed.Cir.1996) ("We

therefore hold that a threat is not sufficient unless it is made with respect to a patent that has issued before a complaint is filed.") In this case, Claim 6 of the 995 patent has been declared invalid, and Pfizer has agreed not to sue Ranbaxy with respect to the other claims of the 995 patent. As a result, there is no valid patent which currently exists that can be enforced against Ranbaxy. *See Merck & Co., Inc. v. Apotex, Inc.*, 488 F.Supp.2d 418, 423-425 (D.Del.2007) (Sleet, J.) (applying *MedImmune* standard and concluding that covenant not to sue divests court of subject matter jurisdiction).

Ranbaxy contends that because the covenant not to sue does not embrace any reissue of the 995 patent, subject matter jurisdiction still exists over its declaratory judgment counterclaims. However, the question of whether a new patent will ever be reissued is speculative, purely hypothetical and unripe for judicial determination. Accordingly, the Court concludes that these circumstances do not support jurisdiction under the *MedImmune* standard.

[14][15] For these same reasons, the Court also concludes that Article III standing is lacking in this case. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Ranbaxy has not suffered any injury in fact based upon the original 995 patent in light of the invalidity of Claim 6 and the covenant not to sue regarding the remaining claims. As for any reissue of the 995 patent, any injury Ranbaxy might suffer is, at this juncture, speculative. Pfizer has not yet indicated that it intends to assert a reissued patent against Ranbaxy, and it is unclear whether the 995 patent will in fact reissue. *Treemond Co. v. Shering Corp.*, 122 F.2d 702, 705 (3d Cir.1941) ("There can be no doubt than an 'actual controversy' does not exist until the patentee makes some claim that his patent is being infringed."). Indeed, jurisdiction under the Hatch-Waxman Act is also unsupported in this case, because (1) Pfizer cannot enforce a pending reissue application against Ranbaxy; (2) any reissued patent has not been listed in the FDA Orange Book and cannot be until it has issued, 21 U.S.C. § 355(c)(2); and (3) Ranbaxy has not had to certify against a reissued patent. *Teva*, 482 F.3d at 1344 (describing prerequisites for establishing a justiciable controversy under the Hatch-Waxman Act). Thus, the Court's exercise of jurisdiction in these circumstances would result in nothing more than an advisory opinion regarding the enforceability of a yet to be reissued patent, a result wholly inconsistent with the most

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 4226417 (D.Del.)
(Cite as: --- F.Supp.2d ----)

basic precepts of jurisdictional jurisprudence.

**\*5** In sum, the Court concludes that the possibility that a new patent may issue at some future point is insufficient to create the type of real and immediate legal case or controversy as required for declaratory judgment jurisdiction and standing under Article III. Accordingly, the Court will grant Pfizer's Motion To Dismiss Ranbaxy's Fourth, Fifth, Sixth and Seventh Counterclaims.

## II. Pfizer's Motion To Dismiss And For Partial Summary Judgment On The Pleadings

### A. Whether Pfizer Is Entitled To Dismissal Of Ranbaxy's First Counterclaim And Third Affirmative Defense On The Basis Of Res Judicata

[16] With respect to its Motion To Dismiss And For Partial Summary Judgment On The Pleadings, Pfizer requests the Court to dismiss Ranbaxy's First Counterclaim and its Third Affirmative Defense, both of which relate to the 893 patent. Specifically, Ranbaxy's First Counterclaim and Third Affirmative Defense allege that the 893 patent and its patent term extension are invalid as obvious under 35 U.S.C. § 103. Pfizer contends that the First Counterclaim and Third Affirmative Defense are barred by the doctrine of res judicata and/or collateral estoppel as a result of the final judgment entered in the prior Lipitor® litigation. According to Pfizer, Ranbaxy knew about the prior art upon which it now bases its obviousness claim, but declined to assert that art in the Lipitor® litigation. Thus, Pfizer contends that Ranbaxy is precluded from now raising its obviousness claim.

Ranbaxy contends that res judicata principles should be more narrowly applied in this case because the issue of obviousness was never presented at trial or adjudicated in the Lipitor® litigation, and significant factual and legal changes have occurred since the Lipitor® litigation that fundamentally alter the obviousness analysis of the 893 patent. With respect to the legal landscape, Ranbaxy contends that the Supreme Court's decision in KSR Int'l Co. v. Teleflex Inc., 127 S.Ct. (2007), "dramatically lowered the bar of 35 U.S.C. § 103" by removing the teaching, suggestion or motivation to combine the prior art test from the obviousness inquiry. (D.I. 19 at 2, 9-12.) With respect to the factual landscape, Ranbaxy contends that Pfizer withheld "critical information" about the test data it relied upon to gain the issuance

of EP 247 633, the European counterpart to the 893 patent. (Id. at 2, 13-14.)Ranbaxy asserts EP 247 633 as the prior art over which the 893 patent is obvious. According to Ranbaxy, it could not have presented an obviousness challenge to the 893 patent in the Lipitor® litigation because it was unable to timely analyze and compare the relevant data as a result of Pfizer's actions.

[17][18] The doctrine of res judicata is considered 'a rule of fundamental and substantial justice,' and not merely a 'matter of technical practice or procedure.'" Equal Employment Opportunity Commission v. U.S. Steel Corp., 921 F.2d 489, 492 (3d Cir.1990) (quoting Hart Steel Co. v. Railroad Supply Co., 244 U.S. 294, 37 S.Ct. 506, 61 L.Ed. 1148 (1917))."Res judicata avoids the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions."Id.

**\*6**[19] Res judicata, also known as claim preclusion, "requires a showing that there has been (1) a final judgment on the merits in a prior [law]suit involving (2) the same claim and (3) the same parties or their privies."Id. at 493 (citing United States v. Athlone Industries, Inc., 746 F.2d 977, 983 (3d Cir.1984)).

Ranbaxy does not dispute that the third element of the res judicata analysis is met here. However, Ranbaxy suggests that this proceeding does not involve the same claim or a final judgment on the merits of that claim, because obviousness was neither raised nor adjudicated in the Lipitor® litigation.

[20] Res judicata requires "that a plaintiff present in one suit all of the claims for relief that he may have arising out of the same transaction or occurrence."Lubrizol v. Exxon Corp., 929 F.2d 960, 963 (3d Cir.1991). In this regard, the operative question is not whether the issue was actually litigated, but whether it "could have been raised in the earlier proceeding."Board of Trustees v. Centra, 983 F.2d 495, 504 (3d Cir.1992); Gregory v. Chehi, 843 F.2d 111, 116 (3rd Cir.1988).

In the Lipitor® litigation, Ranbaxy challenged the validity of the 893 patent. As a result, Ranbaxy was required to raise all of its invalidity defenses at that time, including its challenge based on obviousness. Although Ranbaxy concedes that it was aware of the prior art it now asserts against the 893 patent,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 4226417 (D.Del.)
(Cite as: --- F.Supp.2d ----)

Page 10

Ranbaxy contends that it was unable to appreciate the impact of that prior art due to certain facts which Pfizer allegedly withheld. The Court does not find the grounds asserted by Ranbaxy to be sufficient to avoid the effects of res judicata in the circumstances of this case.[FN1] Ranbaxy was informed about the mislabeled data upon which it bases its change of fact argument at least as early as July 19, 2004, during the deposition of Francis J. Tinney, Ph.D. (D.I. 21, Ex. A at 48-50.) Mr. Tinney's deposition occurred more than one hundred days before trial. The parties then entered into a stipulation concerning the mislabeled data on September 3, 2004, nearly three months before trial. (D.I. 191 in Civ. Act. No. 03-209 .) That Ranbaxy may have needed more time to evaluate this data is not a change in the factual landscape which should affect this litigation. Rather, Ranbaxy's appropriate remedies rested in the previous Lipitor® litigation through either extensions of time there, or applications for a new trial and/or relief from judgment under Federal Rule of Civil Procedure 60(b).

To the extent that Ranbaxy directs the Court to case law suggesting that a change in factual circumstances precludes the application of res judicata, the Court concludes that those cases have little relevance to the present action. In addition to the fact that Ranbaxy was aware of the change in fact it now asserts during the previous Lipitor® litigation, the cases to which Ranbaxy cites arise in factual and legal contexts dissimilar to the circumstances here. See e.g., Brown v. Felsen, 442 U.S. 127, 132-134, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979) (noting in a bankruptcy case that "respondent's res judicata claim is unlike those customarily entertained by the courts); Commissioner v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948) (discussing the operation of res judicata in the unique circumstances of tax cases where each tax year presents a new claim and inequities among taxpayers would result if determinations which are erroneous or obsolete are permitted to perpetuate); In re Bose Corp., 476 F.3d 1331 (Fed.Cir.1997) (recognizing in the context of administrative proceedings that courts should "exercise caution in applying claim preclusion in an ex parte proceeding"). Accordingly, the Court is not persuaded that the case law cited by Ranbaxy counsels against the application of res judicata here.

*7 [21] Ranbaxy also contends that res judicata is precluded in this case, because the Supreme Court's KSR decision represents a change in the controlling

law. However, a change in the law does not ordinarily affect the res judicata effect of a judgment. Indeed, the Supreme Court has declined to recognize an exception to res judicata based upon a change in the controlling law. Federated Dept. Stores, Inc., v. Moitie, 452 U.S. 394, 398-399, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981). As the Supreme Court explained in Federated:

Nor are the res judicata consequences of a final, unappealed judgment on the merits altered by the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case. Angel v. Bullington, 330 U.S. 183, 187, 67 S.Ct. 657, 659, 91 L.Ed. 832 (1947); Chicot County Drainage District v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940); Wilson's Executor v. Deen, 121 U.S. 525, 534, 7 S.Ct. 1004, 1007, 30 L.Ed. 980 (1887). As this Court explained in Baltimore S.S. Co. v. Phillips, 274 U.S. 316, 325, 47 S.Ct. 600, 604, 71 L.Ed. 1069 (1927), an "erroneous conclusion" reached by the court in the first suit does not deprive the defendants in the second action "of their right to rely upon the plea of res judicata.... A judgment merely voidable because based upon an erroneous view of the law is not open to collateral attack, but can be corrected only by a direct review and not by bringing another action upon the same cause [of action]." We have observed that "[t]he indulgence of a contrary view would result in creating elements of uncertainty and confusion and in undermining the conclusive character of judgments, consequences which it was the very purpose of the doctrine of res judicata to avert." Reed v. Allen, 286 U.S. 191, 201, 52 S.Ct. 532, 534, 76 L.Ed. 1054 (1932).

Id.

To the extent Ranbaxy relies on a contrary statement by the Supreme Court in State Farm Mut. Auto. Ins. Co. v. Duel, 324 U.S. 154, 65 S.Ct. 573, 89 L.Ed. 812 (1945), the Court concludes that State Farm's discussion of res judicata is dicta, and in any event, State Farm has been superseded by Federated. See e.g., Forsman v. Chater, 1996 WL 396718, *1 (9th Cir. July 12, 1996). The Court's conclusion is consistent with the prevailing view by courts and commentators alike that a change in the law is insufficient to bar the application of res judicata.[FN2] See e.g., Wilson v. Lynaugh, 878 F.2d 846, 850-851 (5th Cir.1989), Precision Air Parts, Inc. v. Avco Corp., 736 F.2d 1499, 1503 (11th Cir.1984) ("The general rule in this circuit, and

--- F.Supp.2d ----                                                      Page 11
--- F.Supp.2d ----, 2007 WL 4226417 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

throughout the nation, is that changes in the law after a final judgment do not prevent the application of res judicata and collateral estoppel, even though the grounds on which the decision was based are subsequently overruled."); _Barzin v. Selective Service Local Board No. 14,_ 446 F.2d 1382, 1383 (3d Cir.1971) (recognizing that "a prior decision may serve as res judicata even if a contrary judicial decision on the legal issues involved intervenes between the first and second suits."); _see also_18 Wright, Miller & Cooper, _Federal Practice and Procedure: Jurisdiction_ § 4403 (2d ed.2002). Accordingly, the Court concludes that Ranbaxy has not demonstrated that res judicata is precluded in this action by a change in controlling law.

*8 In sum, the Court concludes that Pfizer is entitled to the dismissal of Ranbaxy's First Counterclaim and Third Affirmative Defense. Ranbaxy's First Counterclaim and Third Affirmative Defense implicate the validity of the 893 patent, a claim which was raised and litigated to a final judgment on the merits in the Lipitor® litigation between these same parties and/or their privies. Any failure by Ranbaxy to assert the obviousness claim it seeks to raise here does not diminish the res judicata effect of the final judgment in the Lipitor® litigation. Accordingly, the Court will grant Pfizer's Motion To Dismiss.

B. _Whether Pfizer Is Entitled To A Judgment Of Infringement Of the 893 Patent Based Upon The Doctrine Of Collateral Estoppel_

[22] By its Motion, Pfizer also requests the Court to enter judgment on the pleadings in its favor on the question of whether Ranbaxy infringes the 893 patent under 35 U.S.C. § 271(e)(2). Specifically, Pfizer contends that Ranbaxy is collaterally estopped from denying infringement of the 893 patent based on the inclusion of atorvastatin calcium in its new ANDA product.

[23][24] The party seeking to invoke the doctrine of collateral estoppel must demonstrate four elements: (1) the previous determination was necessary to the decision; (2) the identical issue was previously litigated; (3) the issue was actually decided in a decision that was final, valid, and on the merits; and (4) the party being precluded from relitigating the issue was adequately represented in the previous action. _See e.g., Novartis Pharms. Corp. v. Abbott Labs.,_ 375 F.3d 1328, 1333 (Fed.Cir.2004); _Henglein_

_v. Colt Indus. Operating Corp.,_ 260 F.3d 201, 209 (3d Cir.2001). The Third Circuit also considers whether the party being estopped had a full and fair opportunity to litigate the issue to a final and valid judgment in the prior litigation._Seborowski v. Pittsburgh Press Co.,_ 188 F.3d 163, 169 (3d Cir.1999); _National R.R. Passenger Corp. v. Pennsylvania Pub. Util. Comm'n,_ 288 F.3d 519, 525 (3d Cir .2002).

Ranbaxy does not contest infringement of the 893 patent, but contends that the Court should not enter a final judgment of infringement while invalidity is being contested. However, the Court has concluded that Ranbaxy is barred by the doctrine of res judicata in light of the Lipitor® litigation from contesting the validity of the 893 patent. Accordingly, the Court will grant Pfizer's Motion For Partial Summary Judgment and enter judgment against Ranbaxy and in favor of Pfizer on Pfizer's claim that Ranbaxy infringed the 893 patent under 35 U.S.C. § 271(e)(1) by filing an ANDA seeking approval from the FDA to engage in the commercial manufacture, use or sale of a product containing atorvastatin calcium as an active ingredient prior to the expiration of the patent.

**CONCLUSION**

For the reasons discussed, the Court will grant Pfizer's Motion To Dismiss In Part Declaratory Judgment Counterclaims and its Motion To Dismiss And For Partial Judgment On The Pleadings Pursuant To Federal Rule Of Civil Procedure 12(c). A judgment of infringement based on the 893 patent will be entered in favor of Pfizer and against Ranbaxy.

*9 An appropriate Order will be entered.

_**ORDER**_

At Wilmington, this 29th day of November 2007, for the reasons set forth in the Opinion issued this date;

IT IS HEREBY ORDERED that:

1. Plaintiffs' Motion To Dismiss In Part Declaratory Judgment Counterclaims (D.I.14) is **GRANTED.**

2. Plaintiffs' Motion To Dismiss And For Partial Judgment On The Pleadings Pursuant To Federal Rule Of Civil Procedure 12(c) (D.I.16) is

--- F.Supp.2d ----                                                    Page 12
--- F.Supp.2d ----, 2007 WL 4226417 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

*GRANTED.*

> FN1. Where the circumstances suggest a fraud or negligent misrepresentation by a party, some courts have declined to apply res judicata. *See* James Wm. Moore, et al., *Moore's Federal Practice* § 131.21 [1]. However, Ranbaxy's allegations regarding Pfizer's conduct do not, in the Court's view, rise to the level of either fraud or negligent misrepresentation, particularly where, as here, Ranbaxy was informed of the labeling error well prior to trial. Indeed, even Ranbaxy does not go so far as to characterize Pfizer's conduct as fraudulent or negligent.

> FN2. Courts have recognized an exception to this principle in the case of momentous legal changes invoking important and fundamental changes in constitutional rights. For example, the Court of Appeals for the Eleventh Circuit did not apply res judicata to a state court judgment because three months after that judgment was issued the Supreme Court overruled the separate but equal doctrine in *Brown v. Bd. of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). *See Precision Air, Inc.,* 736 F.2d at 1504 (discussing *Christian v. Jemison,* 303 F.2d 52, 54 (5th Cir.1962)). Whatever can be said of the changes in patent law that may flow as a result of the Supreme Court's decision in *KSR,* the Court cannot conclude that *KSR* stands on par with such precedent shifting cases as *Brown v. Bd. of Education.*

D.Del.,2007.
Pfizer, Inc. v. Ranbaxy Laboratories, Ltd.
--- F.Supp.2d ----, 2007 WL 4226417 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 8

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

**H**WestRM-West Risk Markets, Ltd. v. XL
Reinsurance America, Inc.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
WESTRM-WEST RISK MARKETS, LTD., Plaintiff
and Fourth Party Defendant,
v.
XL REINSURANCE AMERICA, INC. and
Greenwich Insurance Company, Defendants and
Third Party Plaintiffs,
v.
APARTMENT INVESTMENT AND
MANAGEMENT COMPANY, Swain & Baldwin
Insurance, Inc., and Ray Baldwin, Third Party
Defendants.
No. 02 Civ. 7344(MGC).

July 19, 2006.

Kasowitz, Benson, Torres & Friedman, LLP, New
York, NY, By: Kim Conroy, for WestRM-West Risk
Markets, Ltd.
Kelley Drye & Warren, LLP, New York, NY, By:
William Escobar, David Zalman, for XL Reinsurance
America, Inc. and Greenwich Insurance Company.
Baker Botts, LLP, Washington, DC, By: Sara Kropf,
Casey Cooper, Stephanie Dourado, for Swain &
Baldwin Insurance, Inc. and Ray Baldwin.
Latham & Watkins, LLP, New York, NY, By:
Noreen A. Kelly-Najah, James E. Brandt, for
Apartment Investment and Management Co.

*OPINION*

CEDARBAUM, J.
   *1 Third-party plaintiffs XL Reinsurance
America, Inc. ("XL") and Greenwich Insurance
Company ("Greenwich") move for summary
judgment on their claims for contractual
indemnification against third-party defendants
Apartment Investment and Management Company
("AIMCO"), Swain & Baldwin Insurance, Inc.
("Swain & Baldwin"), and Ray Baldwin
("Baldwin"). Swain & Baldwin, Baldwin
(collectively "the Baldwin Defendants"), and
AIMCO each move for summary judgment on all
claims asserted against them by Greenwich and XL.
For the reasons that follow, the motion of Greenwich

and XL is denied, AIMCO's motion is denied in part
and granted in part, and the Baldwin Defendants'
motion is granted.

BACKGROUND

   The following facts are undisputed, except where
specifically noted.

   This action was originally commenced by
WestRM-West Risk Markets, Ltd. ("WestRM") to
enforce the obligations of Greenwich and XL under
four surety bonds issued to WestRM as obligee.
Greenwich and XL are insurance companies licensed
to issue surety bonds. WestRM is a Swiss reinsurance
company. On or about December 28, 2001,
Greenwich and XL issued two bonds for $6.3 million
each to National Program Services ("NPS"). NPS
was an insurance agency located in New Jersey,
whose principal was Vito Gruppuso. On or about
January 31, 2002, Greenwich and XL issued two
additional bonds with face amounts of $6.25 million
each to AIMCO and NPS. AIMCO is a Maryland
corporation that owns and manages residential real
estate throughout the United States.

   The two January 2002 bonds ("the Bonds")
purport to secure the obligations of AIMCO and NPS
under a January 2002 Premium Finance Agreement
("the January PFA") with WestRM. The January
PFA explains that NPS procured an insurance policy
from Drummonds Insurance and that the $12.5
million insurance premium on that policy was paid
by WestRM on behalf of NPS as consideration for
the agreement of NPS and AIMCO to repay the $12.5
million to WestRM over the course of three years.
Greenwich and XL issued the Bonds to secure the
obligations of AIMCO and NPS to repay WestRM.
By letter dated May 16, 2002, WestRM advised
Greenwich and XL that AIMCO and NPS had each
defaulted on their payments under the January PFA
and demanded payment on the Bonds.

   It is undisputed that the name Ray Baldwin is
signed on the Bonds. Ray Baldwin is a Texas-based
insurance broker and President of Swain & Baldwin,
a Texas insurance agency. Although the exact nature
of Baldwin's relationship to AIMCO is disputed,
Baldwin's June 1996 Consulting Services Agreement

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

with AIMCO states that Baldwin was engaged by AIMCO as an independent contractor to provide consulting services in connection with AIMCO's insurance needs.

AIMCO has proffered an expert report that concludes that Baldwin did not sign the Bonds. Greenwich and XL have not proffered any evidence to the contrary. Greenwich and XL instead argue that perhaps Vito Gruppuso signed Baldwin's name on the Bonds pursuant to Baldwin's authorization. There is not, however, any evidence to support this theory. Baldwin testified at his deposition that "no one authorized by me signed my name to [the Bonds]." Kropf Decl. Ex. Q at 94.

**2** The Bonds are incorporated by reference into the January PFA, on which a signature line looks like that of Ray Baldwin also appears. The signature is on the last page of the PFA, signed on behalf of "Apartment Investment and Management Company." The parties, however, dispute whether Baldwin actually executed the PFA. AIMCO argues that the document was fabricated to make it appear as though Baldwin had executed it. AIMCO proffers an affidavit from Baldwin stating that, although the signature on the January PFA appears to be his, he did not execute the PFA. AIMCO also points out that Baldwin's undated and unnotarized signature appears only on the final page of the purported PFA, which contains no text from the agreement, header, page number, or other information to indicate that the page is actually part of the January PFA. AIMCO further notes that this page has been produced only in copy form with multiple fax lines that are different from the fax lines of the other pages of the PFA.

Summary judgment was entered for WestRM against Greenwich and XL in April 2004, on the ground that a clause in each of the four bonds waived all defenses to enforcement of the bonds. See *WestRM-West Risk Markets, Ltd. v. Lumbermens Mut. Cas. Co.*, 314 F.Supp.2d 229, 241 (S.D.N.Y.2004). Greenwich and XL now seek indemnification for their losses on the Bonds from AIMCO and from the Baldwin Defendants pursuant to a 2001 indemnity agreement ("the Indemnity Agreement"). Ray Baldwin's signature appears on the Indemnity Agreement twice on the same page, once on behalf of the "Principals," "Apartment Investment and Management Company/Real Estate Investment Management LLC," and once on behalf of the "Additional Corporate Indemnitor," "Apartment

Investment and Management Company."

The language of indemnity in the Agreement is as follows:
Undersigned agree to indemnify and exonerate Surety from liability and to pay to Surety upon demand all losses, costs and expenses, including reasonable attorney's fees, paid or incurred in good faith by Surety, by reason of having Executed any Bond and/or enforcing this Agreement. Surety shall have the right and sole discretion to determine whether a claim or liability involving any Bond shall be settled, compromised, paid, defended, prosecuted or appealed, and/or take any action it may deem necessary or expedient with respect to such claims. In the event of any payment by Surety, Surety shall be entitled to be indemnified by Undersigned for all disbursements made by Surety in good faith under the belief that it was liable or that it was necessary or expedient to make such payment, whether or not liability, necessity or expediency exists. An itemized statement of loss and expense incurred and paid by Surety, sworn to by an officer of Surety, shall be prima facie evidence of the fact and amount of the liability of Undersigned to Surety. Separate suits may be brought under this Agreement as causes of action accrue, and the pendency or termination of any such suit shall not bar subsequent action by Surety.

**3** Escobar Decl. Ex. 13. "Bonds" are defined in the Agreement as "[a]ny surety bond, undertaking, guaranty or other contractual obligation undertaken by Surety on behalf of or at the request of Principal before or after the date of this Agreement, and any renewal or extension thereof." *Id.*

The parties dispute whether Baldwin had the authority to execute this Indemnity Agreement on behalf of AIMCO. AIMCO argues that Baldwin was not authorized to execute it and proffers the testimony of AIMCO officer Thomas Toomey, who states that he did not authorize Baldwin to enter into the Indemnity Agreement and that he did not intend his November 2, 2000 letter of authorization to authorize Baldwin to do so. Greenwich and XL argue that Baldwin was authorized to execute the Indemnity Agreement and proffer three separate documents that purport to authorize Baldwin to "negotiate, purchase and finance the insurance programs for AIMCO," or "to negotiate and execute insurance premium finance" agreements for AIMCO. A November 2, 2000 letter from Thomas Toomey states that Baldwin "is authorized to negotiate and execute premium

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 3
Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

finance contracts and insurance premium/surety contracts on behalf of Apartment Investment and Management Company."Escobar Decl. Ex. 12.

## DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A genuine issue of material fact exists when the evidence is "such that a reasonable jury could return a verdict for the nonmoving party."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In deciding whether a genuine issue of fact exists, the court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party."*In re Chateaugay Corp.,* 10 F.3d 944, 957 (2d Cir.1993). The moving party bears the initial burden of informing the court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Summary judgment is appropriate if the nonmoving party fails "to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof."*Id.*

### I. Claim for Indemnification Against AIMCO

Both sides move for summary judgment on the claim of Greenwich and XL against AIMCO for contractual indemnification as set forth in Count IX of the Second Amended Complaint. Greenwich and XL argue that AIMCO is liable under the Indemnity Agreement, signed by Baldwin on behalf of AIMCO, for all losses that Greenwich and XL incurred as a result of issuing the Bonds.[FN1]AIMCO responds that the Bonds are void *ab initio* because Baldwin's signature on the Bonds was forged and argues that void bonds are not "Bonds" within the meaning of the Indemnity Agreement.

> FN1. Greenwich and XL now argue, for the first time in this action, that the Indemnity Agreement requires AIMCO to indemnify it for *all* losses arising from *any* bonds issued by Greenwich and XL on behalf of AIMCO,

or Real Estate Risk Management, or their affiliates. Greenwich and XL contend that NPS is an affiliate of Real Estate Risk Management and that AIMCO is therefore obligated to indemnify Greenwich and XL for their losses on the two bonds issued in December 2001 to NPS as the sole principal. However, the indemnification claim of Greenwich and XL against AIMCO in their Second Amended Complaint refers to only the two "AIMCO/NPS Bonds" (i.e., "the Bonds") and the "January PFA" that was secured by the Bonds. Complaint ¶¶ 259-260. There is no reference to the two NPS bonds or to the December PFA that these bonds secured. Greenwich and XL may not now amend their contractual indemnification claim against AIMCO as part of their motion for summary judgment. All of the arguments of Greenwich and XL relating to AIMCO's liability on the two December 2001 NPS bonds are disregarded as outside the scope of their indemnification claim.

**\*4** Summary judgment, however, cannot be granted for either side because a genuine issue of disputed fact exists as to whether the Bonds are covered by the Indemnity Agreement. The Agreement states that the Principals "agree to indemnify and exonerate Surety from liability and to pay to Surety upon demand all losses, costs and expenses, including reasonable attorney's fees, paid or incurred in good faith by Surety, by reason of having Executed any Bond and/or enforcing this Agreement.""Bond" is defined in the Agreement as "any surety bond, undertaking, guaranty or other contractual obligation undertaken by Surety *on behalf of or at the request of Principal* before or after the date of this Agreement, and any renewal or extension thereof."Escobar Decl. Ex. 13 (emphasis added). The threshold question is, therefore, whether the Bonds were issued by Greenwich and XL "on behalf of or at the request of" AIMCO.

Greenwich and XL proffer the January PFA, which incorporates the Bonds by reference, as evidence that the Bonds were issued "at the request of" and "on behalf of" AIMCO. Greenwich and XL argue that the signature of Ray Baldwin, AIMCO's alleged agent, on the PFA shows that AIMCO requested the issuance of the Bonds. In addition, Greenwich and XL contend that the terms of the PFA show that the issuance of the Bonds was "on behalf

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

of" or "in the interest of" AIMCO. Greenwich and XL note that, according to the terms of the PFA, AIMCO would have been forced to pay WestRM the full amount of the remaining payments due under the PFA if Greenwich and XL had not issued the Bonds that obligated Greenwich and XL to pay WestRM if AIMCO defaulted. Thus, the Bonds served AIMCO's "interests" by protecting AIMCO from direct liability to WestRM.

Greenwich and XL also proffer evidence that AIMCO received money from Vito Gruppuso following the completion of the WestRM transaction as proof that the issuance of the Bonds was "on behalf of" or "in the interest of" AIMCO. Greenwich and XL argue that AIMCO would not have received this money from Gruppuso were it not for the issuance of the Bonds, because the WestRM transaction that was secured by the Bonds allowed Gruppuso to pay the Drummonds Insurance policy premiums and to obtain the $11 million insurance payout. Greenwich and XL proffer a February 21, 2002 letter from Gruppuso to Drummonds Insurance as evidence that Gruppuso received an $11 million payout under the Drummonds Insurance policy. Greenwich and XL also proffer an internal AIMCO email as evidence that, pursuant to a November 2001 indemnity agreement between AIMCO and Gruppuso, Gruppuso paid AIMCO $3.1 million on November 29, 2001, another $3.1 million on February 29, 2002, and another $350,000 in April 2002.

AIMCO responds that the January PFA document is not proof that AIMCO had any interest in the WestRM transaction because there is evidence that Baldwin did not execute the PFA. AIMCO proffers the irregular signature page of the purported PFA copy and Baldwin's testimony that he did not execute the PFA as evidence that Baldwin did not execute the PFA and that AIMCO was therefore not a party to the PFA transaction. AIMCO also disputes that it received any consideration from the WestRM transaction, but does not proffer any evidence to contradict the evidence proffered by Greenwich and XL that AIMCO received payments from Gruppuso under the November 2001 indemnity agreement. AIMCO argues that, because there is no evidence that Baldwin executed the PFA or that AIMCO received any consideration from the WestRM transaction, there can be no genuine factual dispute as to whether the Bonds were issued at AIMCO's request or on its behalf.

*5 However, a reasonable jury could find that Baldwin executed the PFA because his signature appears on the last page of the document. A reasonable jury could conclude from this signature that the Bonds were issued at Baldwin's request. On the other hand, a reasonable jury could also find that AIMCO had no involvement in the transaction based on the evidence proffered by AIMCO that Baldwin did not execute the PFA. A reasonable jury could then conclude that the Bonds were issued neither at the request of nor on behalf of AIMCO. Based on the evidence proffered by both parties, there is a genuine issue of disputed fact as to whether the Bonds were issued "at the request of" or "on behalf of" AIMCO.

AIMCO responds that it is nonetheless entitled to summary judgment even if there is a genuine dispute as to whether the Bonds were issued "on behalf of" or "at the request of" AIMCO. AIMCO contends that the Indemnity Agreement is triggered in the first instance only by the existence of valid bonds and that the evidence here shows that the Bonds are invalid. AIMCO argues that the Bonds were void *ab initio* because Baldwin's signature on the Bonds was forged. As evidence of the forgery, AIMCO proffers an expert report that concludes that Baldwin did not sign the Bonds. Greenwich and XL have not proffered any evidence to the contrary.

In support of the argument that the forged signature renders the Bonds void *ab initio*, AIMCO cites several cases in which contracts were rendered void *ab initio* because one party's signature was forged. See *Opals on Ice Lingerie v. Body Lines Inc.*, 320 F.3d 362, 370 (2d Cir.2003)("Bodylines and Opals agree that the signature of Sautter on the Karnick Agreement was 'cut and pasted'-in other words, that it is a forgery, not a genuine signature. 'Under [New York] State law and general contract law, a forged signature renders a contract void *ab initio.* Because there can be no meeting of the minds of the parties when a forgery has been perpetrated, no contract existed in the case at hand." '); *Bangkok Crafts Corp. v. Capitolo Di San Pietro in Vaticano*, No. 03 Civ. 0015(RWS), 2004 WL 1406076, at *6 (S.D.N.Y. June 23, 2004)("There are no probative facts adduced to dispute that the signatures of Noè and Bordin on the 2000 License are forged, thus rendering the contract void *ab initio.*"); *Orlosky v. Empire Sec. Sys.*, 230 A.D.2d 401, 403 (3d Dep't 1997)(upholding lower court dismissal of claims for which a valid contract was a prerequisite because

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 5
Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

forged signature on contract rendered it "void *ab initio*").

However, AIMCO has not cited any authority or produced any evidence to show that the lack of a principal's signature on a bond has the same effect on the enforceability of that document as does the lack of a party's signature on a contract. See*Anixter, Inc. v. I.E.A. Elec. Group, Inc.,* 263 A.D.2d 412, 412 (1st Dep't 1999)("Summary judgment was properly granted on the subject payment bond, which is enforceable against defendant surety even though it may not have been signed by defendant contractor."); *Castine v. N .Y. State Tax Comm'n,* 447 N.Y.S.2d 119, 122 (Sup.Ct.1982)("The court is aware that the bond contains lines for the petitioners' signatures and will therefore assume that the surety expected or even intended that they should sign. However it will not assume that the signatures were conditions precedent to surety becoming liable on the undertaking, especially since they could easily have incorporated that requirement in the printed form itself. The court therefore concludes that it was not necessary for the petitioners to have signed the instrument presented for filing."); *Cubita v. Westchester Furniture Exch.,* 388 N.Y.S.2d 830, 832 (City Ct.1976)("There is no doubt that the undertaking herein was properly executed and acknowledged by the surety company but the failure of the principal herein, to execute the bond did not affect the liability of the surety who has properly executed it."). There is furthermore no language in the Bonds or in the Indemnity Agreement that makes the principal's signature on the Bonds a condition precedent to Greenwich and XL becoming liable on the Bonds or to the Bonds being covered by the Indemnity Agreement. The forgery of Baldwin's signature on the Bonds therefore does not entitle AIMCO to summary judgment on the indemnification claim. Both sides' motions for summary judgment on the contractual indemnification claim are denied.

## II. Claim for Indemnification Against Baldwin Defendants

*6 The Baldwin Defendants also move for summary judgment on the claim of Greenwich and XL for contractual indemnification as set forth in Count IX of the Second Amended Complaint. Greenwich and XL do not articulate a theory of liability for their indemnification claim against these defendants, either in their Complaint or in their opposition to the Baldwin Defendants' motion for summary judgment. Indeed, Greenwich and XL appear to have abandoned this claim. Counsel for Greenwich and XL stated several times at oral argument on this motion that Greenwich and XL were not asserting a contractual indemnification claim against Baldwin based on the Indemnity Agreement. *See* 3/23/06 Hr'g Tr. at 44-45, 51, 59. Counsel then later corrected this assertion, but promised to "lay it out so that it is clear as to what exactly the claims are" in a letter submission to the court. *Id.* at 59-61.In this letter submission, counsel makes no mention of a contractual indemnification claim against the Baldwin Defendants.

However, even if Greenwich and XL were to assert such a claim, they have failed to show that there are any genuine issues of disputed fact that would prevent the Baldwin Defendants from prevailing on their motion for summary judgment. First, the settled rule in New York is that "[w]hen an agent makes a contract for a disclosed principal, it becomes neither a party to the contract nor liable for the performance of the contract. Accordingly, it is not liable if the contract is breached."*Seguros Banvenez, S.A. v. S/S Oliver Drescher,* 761 F.2d 855, 860 (2d Cir.1985) (citing RESTATEMENT (SECOND) OF AGENCY §§ 320, 328). Although an agent might be held liable on a contract if he acted outside the scope of his agency in executing the contract, *seeid.,* neither Greenwich and XL nor Baldwin argue that Baldwin was not authorized to execute the Indemnity Agreement as AIMCO's agent. In addition, Swain & Baldwin do not appear anywhere in the contract and Greenwich and XL have articulated no basis upon which to require that Swain & Baldwin indemnify plaintiffs under the Indemnity Agreement. In short, Greenwich and XL have failed to proffer any evidence to show that a genuine issue of disputed fact exists as to whether the Baldwin Defendants were required to indemnify Greenwich and XL under the Indemnity Agreement. Summary judgment on the contractual indemnification claim is therefore granted in favor of the Baldwin Defendants.

## III. Subrogation Claims Against AIMCO and the Baldwin Defendants

AIMCO and the Baldwin Defendants move for summary judgment on the subrogation claims of Greenwich and XL as set forth in Counts XII and XIII of the Second Amended Complaint. Greenwich and XL argue that, because they made payment to WestRM under the Bonds after AIMCO's default,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 6
Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

they are subrogated to WestRM's claims (1) against AIMCO and the Baldwin Defendants for fraud and (2) against AIMCO for breach of the PFA contract. *See Pep'e v. McCarthy,* 249 A.D.2d 286, 287 (2d Dep't 1998)("It is well settled that a surety paying on a bond at the behest of a creditor is entitled by operation of law to be subrogated to the rights and remedies available to the creditor for enforcement of the debtor's obligation .").

*7 Baldwin's signature on the January PFA is the only evidence of any communication between the defendants and WestRM that has been proffered by Greenwich and XL in support of these subrogation claims. Greenwich and XL argue that Baldwin's signature on the PFA is sufficient to create a genuine issue of disputed fact as to whether AIMCO, through its agent Baldwin, executed the PFA and as to whether AIMCO was therefore a party to the contract and in communication with WestRM. Greenwich and XL also proffer Baldwin's testimony that the signature on the PFA looks like his signature and that Baldwin often signed stacks of documents at Gruppuso's request, as evidence that Baldwin signed the PFA.

AIMCO responds that the purported copy of the January PFA is inadmissible under Fed.R.Evid. 1003 and it therefore cannot create a genuine issue of disputed fact as to whether AIMCO was involved in the PFA transaction. AIMCO contends that the copy of the PFA is inadmissible because: (1) Baldwin testified that he did not knowingly sign the document and that he had never seen it before the dispute arose; (2) AIMCO's expert has concluded that the signature page of the PFA cannot be authenticated; (3) an original PFA has never been produced; (4) there is no other evidence that AIMCO participated in the conceptualization, drafting or negotiation of the PFA. AIMCO's arguments, however, go to the weight of the evidence, not to its admissibility. The January PFA proffered by Greenwich and XL is sufficient to create a genuine issue of disputed fact as to whether or not Baldwin executed the PFA and as to whether or not AIMCO was a party to the PFA transaction. AIMCO's summary judgment motion is therefore denied as to the subrogation claim for breach of contract.

As for the subrogation claims for fraud against AIMCO and the Baldwin Defendants, Greenwich and XL have failed to proffer any evidence of any affirmative misrepresentations by AIMCO or the Baldwin Defendants that induced WestRM to enter into the PFA transaction. Greenwich and XL fail to explain how Baldwin's signature on the PFA, the only alleged statement by any of the defendants to WestRM, is an affirmative misrepresentation. Greenwich and XL further fail to explain why or proffer evidence to show that AIMCO or the Baldwin Defendants had any duty to disclose information to WestRM. Finally, Greenwich and XL do not explain how WestRM reasonably or justifiably relied on any omissions or misrepresentations by AIMCO or the Baldwin Defendants, nor do they explain how that reliance caused harm to WestRM. Summary judgment is therefore granted in favor of AIMCO and the Baldwin Defendants on the subrogation claims for fraud.

## IV. Fraud Claim Against AIMCO

AIMCO moves for summary judgment on the fraud claim of Greenwich and XL as set forth in Count II of the Second Amended Complaint. AIMCO argues that there are no genuine issues of disputed fact as to whether AIMCO made any fraudulent misrepresentations or omissions to Greenwich and XL, or as to whether Greenwich and XL reasonably or justifiably relied on any misrepresentations or omissions by AIMCO, or as to whether the claimed losses of Greenwich and XL were caused by any misrepresentations or omissions by AIMCO.

*8 Greenwich and XL allege that AIMCO made one affirmative misrepresentation and several actionable omissions. The alleged misrepresentation was made in connection with another transaction involving AIMCO, in which Greenwich and XL issued bonds to Cananwill, Inc. to secure the obligations of the bond principal, "Apartment Investment and Management Company / Real Estate Risk Management, LLC," under a Premium Finance Agreement with Cananwill (the "Cananwill PFA"). The Indemnity Agreement on which Greenwich and XL rely in support of their contractual indemnification claims against AIMCO and the Baldwin Defendants, was signed in connection with the Cananwill bond issuance. Greenwich and XL argue that AIMCO's general counsel, Miles Cortez, made an affirmative misrepresentation by executing a bond release for the Cananwill bonds. The release was an affirmative misrepresentation, Greenwich and XL contend, because by executing the bond release, Cortez represented to Greenwich and XL that the principal named on the released bonds, "Apartment

Not Reported in F.Supp.2d                                                                                           Page 7
Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Investment and Management Company / Real Estate Risk Management, LLC," was a real company.

Greenwich and XL also allege that AIMCO made fraudulent omissions because it was under a duty to disclose and failed to disclose (1) that "Apartment Investment Management Co./Real Estate Risk Management," was not a real company, (2) that AIMCO had given Gruppuso $10 million to pay off AIMCO's debt on the Cananwill PFA, but that Cananwill claimed it never received the money, (3) that Gruppuso had obtained two surety bonds from Greenwich and XL to secure AIMCO's obligations under the Cananwill PFA and that both bonds listed the non-existent entity "Apartment Investment and Management Company/ Real Estate Risk Management LLC" as the Principal, (4) that AIMCO asked Gruppuso to sign an indemnity agreement on November 9, 2001 that required NPS to pay AIMCO over $700,000 and to indemnify AIMCO for any claims against AIMCO arising out of several insurance transactions in which NPS was involved, (5) that AIMCO requested a $25 million surety bond from Gruppuso to secure the November 2001 indemnity agreement, and (6) that AIMCO promised to pay Baldwin $200,000 if Gruppuso made good on the indemnity agreement.

In addition, Greenwich and XL argue that AIMCO was under a duty to disclose and failed to disclose its alleged superior knowledge of "ongoing fraudulent schemes in which AIMCO, Baldwin and Gruppuso were involved."Greenwich and XL Opp. Memo at 31. The assumption implicit in the argument of Greenwich and XL is that AIMCO's superior knowledge of the fraudulent schemes may be inferred from the proffered evidence concerning NPS, the Cananwill PFA and the indemnity agreement between AIMCO and NPS. However, the evidence proffered does not give rise to a reasonable inference that AIMCO *knew* prior to the issuance of the Bonds that Gruppuso was engaging in fraud. A jury could not reasonably infer from the proffered evidence that AIMCO had this knowledge and could not therefore find that AIMCO had a duty to disclose it to Greenwich and XL.

**\*9** Greenwich and XL further allege that "[h]ad Baldwin and AIMCO not made misrepresentations and had they disclosed their superior knowledge, [Greenwich and XL] would not have issued the bonds."*Id.* at 33.However, Greenwich and XL have proffered no evidence to show that they relied on the

existence of an entity named "Apartment Investment and Management Company/Real Estate Risk Management, LLC" in deciding to issue the Bonds to AIMCO and NPS. Indeed, AIMCO has proffered the testimony of Scott Adams, the agent of Greenwich and XL, as evidence that Greenwich and XL relied only on the belief that the Indemnity Agreement covered the Bonds and on the fact that Robert Nicosia had requested the Bonds in deciding to issue the Bonds. Adams testified: "I was presented a request by the agent of AIMCO [Robert Nicosia] to guarantee an obligation, and AIMCO signed an indemnity agreement saying they would hold me harmless. I don't care what the hypothetical situation would have been. Give me a hundred, a thousand. If AIMCO said they're going to hold me harmless, that was the basis of my decision, period."Kelly-Najah Decl. Ex. 9 at 215-216. Nor do the circumstances surrounding the Bond issuance show why Greenwich and XL would have relied on the existence of this entity in deciding to issue the Bonds, as the Bonds and January PFA bore no mention of this entity or of Real Estate Risk Management, LLC.

Furthermore, the circumstances of the Bond issuance do not show why Greenwich and XL would have relied on the non-existence of an indemnity agreement between AIMCO and Gruppuso, on the non-existence of the indemnity-related transactions, or on Cananwill's receipt of the $10 million payment from Gruppuso, in order to reach their decision to issue the Bonds. In light of Adams' testimony and the failure of Greenwich and XL to proffer any evidence to create a genuine issue of disputed fact as to whether they reasonably relied on AIMCO's alleged misrepresentation and omissions, summary judgment on this claim is granted for AIMCO.

V. Fraud Claim Against Ray Baldwin

Baldwin moves for summary judgment on the fraud claim of Greenwich and XL as set forth in Count II of the Second Amended Complaint. Baldwin argues that there are no genuine issues of disputed fact as to whether he made any fraudulent misrepresentations or omissions to Greenwich and XL, or as to whether Greenwich and XL reasonably or justifiably relied on any alleged misrepresentations or omissions by him, or as to whether the claimed losses of Greenwich and XL were caused by the alleged misrepresentations or omissions.

As in their fraud claim against AIMCO,

Not Reported in F.Supp.2d                                                                                            Page 8
Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Greenwich and XL argue that Baldwin committed fraud by making an affirmative misrepresentation and several actionable omissions. Greenwich and XL contend that, by signing the Indemnity Agreement that listed "Apartment Investment and Management Company/Real Estate Risk Management, LLC" as the principal, Baldwin misrepresented that this entity was a real company that had a legitimate relationship to AIMCO. However, Greenwich and XL must also proffer evidence that they reasonably or justifiably relied on Baldwin's alleged misrepresentation in deciding to issue the Bonds. As discussed in Part IV, *supra,* Greenwich and XL fail to show that there is a genuine issue of disputed fact as to whether they reasonably or justifiably relied on the existence of "Apartment Investment and Management Company/Real Estate Risk Management, LLC" in deciding to issue the Bonds.

*10 Greenwich and XL also argue that Baldwin committed fraud by failing to disclose information about which Baldwin had superior knowledge. Greenwich and XL contend that Baldwin was under a duty to disclose, and failed to disclose, that (1) "Apartment Investment Management Co./Real Estate Risk Management," was not a real company, (2) that AIMCO asked Gruppuso to sign an indemnity agreement on November 9, 2001, (3) that AIMCO requested a $25 million surety bond to secure the indemnity agreement, and (4) that AIMCO promised to pay Baldwin $200,000 if Gruppuso made good on the indemnity agreement. Greenwich and XL also implicitly argue that the proffered evidence gives rise to a reasonable inference that Baldwin knew prior to the issuance of the Bonds that Gruppuso was engaging in fraud.

However, Greenwich and XL fail to show that there is a genuine issue of disputed fact as to whether Baldwin owed them a duty to disclose any of the aforementioned information. In general, a duty to disclose based on "superior knowledge" only arises between two parties to a business transaction. See*Brass v. Am. Film Techn ., Inc.,* 987 F.2d 142, 150 (2d Cir.1993). Greenwich and XL do not dispute that Baldwin was not a party to the Bonds transaction. Rather, they argue that a third-party to a transaction, such as Baldwin, may still be under a duty to disclose certain information about the transaction to the fraud victim based on the third-party's "superior knowledge" of material facts relating to the transaction. See*Stevenson Equip., Inc. v. Chemig Const. Corp.,* 170 A.D.2d 769, 771 (3d

Dep't 1991). However, such a third-party duty to disclose has only been found where the third-party to the transaction has had some direct communication with the fraud victim regarding the fraudulent transaction. See*id.* at 770-71 (upholding finding of fraud against third party to a transaction when third-party (1) showed fraud victim goods being sold by fraud perpetrator, (2) was aware that victim was buying stolen goods, and (3) did not tell fraud victim that goods were stolen property). In this case, Greenwich and XL have proffered no evidence to show that they had any communication with Baldwin regarding the Bonds such as to give rise to a duty to disclose based on superior knowledge. Therefore, summary judgment on the fraud claim is granted in favor of Baldwin.

## VI. Aiding and Abetting Fraud Claim Against AIMCO

AIMCO moves for summary judgment on the claim of Greenwich and XL for aiding and abetting fraud as set forth in Count V of the Second Amended Complaint. "The essential elements of aiding and abetting fraud under New York law are: (1) the existence of a fraud; (2) a defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *Filler v. Hanvit Bank,* 01 Civ. 9510(MGC), 2003 WL 22110773, at *2 (S.D.N.Y. Sept. 12, 2003). AIMCO argues that there are no genuine issues of disputed fact as to whether AIMCO knew of the alleged fraud by Gruppuso, NPS, and Baldwin or as to whether AIMCO provided substantial assistance to that fraud.

*11 Greenwich and XL allege that Gruppuso, NPS and Baldwin were engaged in a scheme to defraud Greenwich and XL by concealing that the WestRM transaction was actually a loan and not an insurance program and by obtaining surety bonds from Greenwich and XL to transfer their liability for their loan repayment obligations to Greenwich and XL. Greenwich and XL argue that AIMCO provided substantial assistance to the underlying fraud by failing to disclose that "Apartment Investment and Management Company/Real Estate Risk Management, LLC," was not a real company. However, as discussed in Part IV, *supra,* Greenwich and XL have proffered no evidence to show that they relied on the existence of an entity named "Apartment Investment and Management Company/Real Estate Risk Management, LLC" in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

deciding to issue the Bonds to AIMCO and NPS.

Greenwich and XL further contend that AIMCO provided substantial assistance to the fraud by inducing Gruppuso to continue and to expand his fraudulent schemes. As evidence of this inducement, Greenwich and XL proffer a letter from AIMCO, dated October 23, 2001, in which AIMCO requested that Gruppuso agree to indemnify AIMCO for any claims arising under several insurance policies in exchange for AIMCO's agreement not to pursue any claims regarding the National Union policy. Greenwich and XL argue that Gruppuso undertook the fraud against Greenwich and XL in order to raise funds to satisfy his indemnification obligations to AIMCO. Greenwich and XL also proffer evidence that AIMCO's counsel executed a bond release to Greenwich and XL that, they argue, induced Greenwich and XL to issue the Bonds.

However, although AIMCO's request for indemnification from Gruppuso and AIMCO's execution of the bond release were arguably "but for" causes of Gruppuso's alleged fraud, they were not a proximate cause of the harm to Greenwich and XL in this case. To allege "substantial assistance" by an aider and abettor, "the complaint must allege that the acts of the aider and abettor proximately caused the harm to the plaintiff on which the primary liability is predicated. Allegations of a 'but for' causal relationship are insufficient. Aider and abettor liability will not attach where the injury was not a direct or reasonably foreseeable result of the defendant's conduct."*Id.* at *2 (internal citations, brackets and quotations omitted). Greenwich and XL have failed to proffer any evidence to show that their losses on the Bonds were a reasonably foreseeable result of AIMCO's execution of the bond release or of AIMCO's request for indemnification from Gruppuso. AIMCO's motion for summary judgment on this claim is therefore granted.

VII. Civil Conspiracy Claim Against AIMCO

AIMCO and the Baldwin Defendants move for summary judgment on the claim of Greenwich and XL for civil conspiracy as set forth in Count IV of the Second Amended Complaint. "In alleging conspiracy, the plaintiff carries the burden of proving (1) the corrupt agreement between two or more persons, (2) an overt act, (3) their intentional participation in the furtherance of a plan or purpose, and (4) the resulting damage."*Kashi v. Gratsos, 790*

F.2d 1050, 1055 (2d Cir.1986). In the Complaint, Greenwich and XL allege that AIMCO, the Baldwin Defendants, NPS, Gruppuso, and two insurance brokers, Pilgrim Organization and Pilgrim Agency ("the Pilgrim Defendants"), entered into a corrupt agreement to defraud several insurance, financing and surety companies, including Greenwich and XL.[FN2]

> FN2. Despite these allegations in the Complaint, Greenwich and XL proffer no evidence to show that the Pilgrim Defendants were a party to a corrupt agreement between AIMCO, Gruppuso, NPS and the Baldwin Defendants. Indeed, Greenwich and XL do not mention the Pilgrim Defendants' involvement in the alleged civil conspiracy in their opposition to the summary judgment motions.

*12 AIMCO and the Baldwin Defendants argue that they are entitled to summary judgment on this claim because there are no genuine issues of disputed fact as to whether there is a viable underlying claim for fraud against one of the coconspirators. A claim for civil conspiracy to commit fraud is not an independent cause of action under New York law, but rather is a means to hold coconspirators liable for one another's fraud. Therefore, if Greenwich and XL have no viable underlying claim for fraud against one of the coconspirators, their civil conspiracy claim must also fail. See*Linden v. Lloyd's Planning Serv., Inc., 299 A.D.2d 217, 218 (1st Dep't 2002).* As discussed in Parts IV and V, *supra,* Greenwich and XL have not proffered sufficient evidence in support of their fraud claims against Baldwin and AIMCO to survive summary judgment. Greenwich and XL must therefore proffer sufficient evidence to support their fraud claim against NPS and Gruppuso in order to defeat defendants' motion for summary judgment on the civil conspiracy claim.

In Count I of the Second Amended Complaint, Greenwich and XL allege that Gruppuso and NPS committed fraud by concealing information about which Gruppuso and NPS had "superior knowledge." Greenwich and XL allege that Gruppuso and NPS were under a duty to disclose, and failed to disclose, (1) that "Apartment Investment Management Co./Real Estate Risk Management" was not a real company, (2) that Baldwin and Gruppuso had engaged in a series of fraudulent insurance transactions prior to the WestRM transaction, (3) that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

AIMCO demanded that Gruppuso and NPS indemnify it in October 2000, (4) that AIMCO asked Gruppuso to sign an indemnity agreement on November 9, 2001 that required NPS to pay AIMCO over $700,000 plus additional money owed on various insurance policies, and (5) that the WestRM transactions were "designed to put money into Gruppuso's hands to satisfy NPS's obligations to AIMCO under the October 2000 and the November 2001 Indemnity Agreement."Complaint ¶ 199.

However, to prevail on their fraud claim, Greenwich and XL must also show that they reasonably relied on defendants' failure to disclose any of this information. Greenwich and XL do not proffer any evidence to support their conclusory statement in the Complaint that they "justifiably relied on Gruppuso and NPS's fraudulent omissions and representations when they issued the NPS and AIMCO/NPS Bonds."Complaint ¶ 201. To the contrary, the testimony of Scott Adams, the agent of Greenwich and XL, is evidence that Greenwich and XL relied only on the belief that the Indemnity Agreement covered the Bonds and on the fact that Robert Nicosia had requested the Bonds in order to reach their decision to issue the Bonds. Adams testified: "I was presented a request by the agent of AIMCO [Robert Nicosia] to guarantee an obligation, and AIMCO signed an indemnity agreement saying they would hold me harmless. I don't care what the hypothetical situation would have been. Give me a hundred, a thousand. If AIMCO said they're going to hold me harmless, that was the basis of my decision, period."Kelly-Najah Decl. Ex. 9 at 215-216. Nor does the proffered evidence showing the circumstances surrounding the Bonds transaction give rise to an inference that Greenwich and XL reasonably relied on defendants' failure to disclose this information. As a result of the failure of Greenwich and XL to proffer sufficient evidence to support their underlying fraud claims against NPS and Gruppuso, summary judgment is granted to AIMCO and the Baldwin Defendants on the civil conspiracy claim.

## VIII. Negligent Supervision Claim Against AIMCO

*13 AIMCO moves for summary judgment on the claim of Greenwich and XL for negligent supervision as set forth in Count VI of the Second Amended Complaint. AIMCO argues that there are no genuine issues of disputed fact as to whether AIMCO's supervision of Baldwin caused harm to Greenwich and XL or as to whether Gruppuso was the agent of Greenwich and XL. In their opposition to summary judgment, Greenwich and XL do not discuss their negligent supervision claim based on Gruppuso's conduct and proffer no evidence to show that Gruppuso was AIMCO's agent. Summary judgment is therefore granted to AIMCO on the claim against it for negligent supervision of Gruppuso.

To state a claim for negligent supervision or retention, a plaintiff must show "the standard elements of negligence" as well as that "the tort-feasor and the defendant were in an employee-employer relationship."*Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir.2004).* Causation is one of the "standard elements of negligence." RESTATEMENT (SECOND) OF TORTS § 281. In order to support their negligent supervision claim against AIMCO, Greenwich and XL must therefore proffer some evidence to show that Baldwin committed a tort and that AIMCO's negligent supervision of Baldwin caused harm to Greenwich and XL in this case. In their Complaint, Greenwich and XL do not clearly allege what tortious conduct by Baldwin forms the basis for the negligent supervision claim. It appears, however, from the opposition of Greenwich and XL to the motion that Baldwin's alleged execution of the January PFA was the tortious act by Baldwin that allegedly caused harm to Greenwich and XL. Yet, Greenwich and XL do not explain why this act was tortious or how it caused them harm. In light of the failure of Greenwich and XL to proffer any evidence that Baldwin committed a tortious act that caused injury to them, summary judgment is granted in favor of AIMCO.

## IX. Unjust Enrichment Claim Against AIMCO

AIMCO moves for summary judgment on the claim of Greenwich and XL for unjust enrichment as set forth in Count XI of the Second Amended Complaint. AIMCO argues that there are no genuine issues of disputed fact as to whether AIMCO was unjustly enriched at the expense of Greenwich and XL. To state a claim for unjust enrichment under New York law, a plaintiff must show "that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."*Briarpatch Ltd. v. Phoenix Pictures, Inc.,* 373 F.3d 296, 306 (2d Cir.2004).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 11
Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Greenwich and XL proffer the January PFA as evidence that AIMCO was enriched at the expense of Greenwich and XL through the WestRM transaction that the Bonds secured. The PFA states that "AIMCO will benefit from the [Drummonds Insurance] Policy pursuant to its agreement with NPS." Escobar Decl. Ex. 3. Greenwich and XL argue that the referenced "agreement" between AIMCO and NPS is an indemnity agreement from November 2001, in which NPS agreed to indemnify AIMCO against claims from AFCO, Cananwill and others, and to pay AIMCO $700,984 plus an additional sum of up to $10 million, to compensate AIMCO for premium payments made to National Union Fire Insurance. Greenwich and XL then proffer a February 21, 2002 letter from Gruppuso to Drummonds Insurance as evidence that Gruppuso received an $11 million payment under the Drummonds insurance policy. Greenwich and XL also proffer an internal AIMCO email as evidence that Gruppuso paid AIMCO $3.1 million on November 29, 2001, another $3.1 million on February 29, 2002, and another $350,000 in April, 2002.

*14 Greenwich and XL argue that equity and good conscience militate against permitting AIMCO to retain these funds. Greenwich and XL argue that AIMCO received this money as a result of Gruppuso's entering into and then breaching various premium finance agreements with WestRM. As a result of Gruppuso's misuse of these funds, Greenwich and XL were then required to pay off the liability of AIMCO and Gruppuso to WestRM under the PFAs. Equity thus militates against allowing AIMCO to retain these funds, which are the fruit of contractual breaches. In addition, Greenwich and XL proffer evidence that AIMCO was aware (1) that Baldwin and Gruppuso had executed transactions in the name of a non-existent company "Apartment Investment Management Co./Real Estate Risk Management," (2) that Gruppuso had been paid $10 million by AIMCO to pay off the another PFA, but the insurer claimed it never received the money, and (3) that Gruppuso had obtained two surety bonds from Greenwich and XL to secure AIMCO's obligations under another PFA and that both bonds listed the non-existent entity "Apartment Investment and Management Company/ Real Estate Risk Management LLC" as the Principal. Although this evidence was insufficient to support the fraud claim of Greenwich and XL against AIMCO, plaintiffs here are not required to show that AIMCO engaged in wrongful conduct, but rather need only show that the

circumstances of the transactions are such that equity and good conscience militate against permitting AIMCO to retain these funds. See *Blusal Meats, Inc. v. United States,* 638 F.Supp. 824, 831 (S.D.N.Y.1986)(noting that "[p]roof of wrongful conduct by the defendant is not required" to support a claim for unjust enrichment).

Greenwich and XL have thus proffered sufficient evidence to create a genuine issue of disputed fact as whether AIMCO was enriched at the expense of Greenwich and XL, and as to whether "equity and good conscience" militate against permitting AIMCO to retain the payments it received from Gruppuso. AIMCO's summary judgment motion on this claim is therefore denied.

### X. Unjust Enrichment Claim Against Baldwin Defendants

The Baldwin Defendants move for summary judgment on the claim of Greenwich and XL for unjust enrichment as set forth in Count XI of the Second Amended Complaint. The Baldwin Defendants argue that there are no genuine issues of disputed fact as to whether they were unjustly enriched at the expense of Greenwich and XL. In response, Greenwich and XL have proffered no evidence that the Baldwin Defendants were enriched at the expense of Greenwich and XL through the WestRM transaction that the Bonds secured. Summary judgment on this claim is therefore granted in favor of the Baldwin Defendants.

### CONCLUSION

For the foregoing reasons, the motion of Greenwich and XL for summary judgment is denied and the Baldwin Defendants' motion for summary judgment is granted. AIMCO's motion for summary judgment is granted as to the subrogation claim for fraud and claims for fraud, civil conspiracy, negligent supervision, and aiding and abetting fraud. AIMCO's motion is denied as to the subrogation claim for breach of contract and claims for contractual indemnification and unjust enrichment.

*15 SO ORDERED.

S.D.N.Y.,2006.
WestRM-West Risk Markets, Ltd. v. XL Reinsurance America, Inc.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 9

Westlaw

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22432915 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**H**U.S. Aircraft Ins. Group v. Dwiggins, L.L.C.
D.Del.,2003.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
UNITED STATES AIRCRAFT INSURANCE
GROUP, Plaintiff,
v.
DWIGGINS, L.L.C. and Bombardier Capital, Inc.,
Defendants.
**No. Civ.A. 03-173-SLR.**

Oct. 15, 2003.

Donald J. Wolfe, Jr., and Erica Niezgoda, of Potter
Anderson & Corroon L.L.P., Wilmington, Delaware,
for Defendant Bombardier Capital, Inc. Philip Le. B.
Douuglas, Thad T. Dameris, Lisa J. Fried, and
Vincent Morgan, of Pillsbury Winthrop L.L.P. New
York, New York, of counsel.
Sean J. Bellew, of Cozen O'Connor, Wilmington,
Delaware, for Plaintiff.Ann Thornon Field, of Cozen
O'Connor, Philadelphia, Pennsylvania, of counsel.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 Presently before the court is the motion of
Bombardier Capital, Inc. ("Bombardier") for
summary judgment, pursuant to Fed. R. Civ. P 56(b),
on Counts I and II of the complaint of United States
Aircraft Insurance Group ("USAIG"). (D.I.6) USAIG
filed suit against Dwiggins, L.L.C. ("Dwiggins") and
Bombardier on February 5, 2003, seeking recission or
a declaration of invalidity of an insurance policy
issued on September 10, 2002 to Dwiggins.
Bombardier is named as the beneficiary of a lessor's
interest coverage endorsement. (D.I.1) This court has
jurisdiction over this action pursuant to 28 U.S.C. §
1332, as there is complete diversity between the
parties and the matter in controversy exceeds
$75,000.

II. BACKGROUND

Dwiggins, a limited liability company organized

under the laws of Delaware, was formed by
American Virginia Tabacacaos, Industrisa e
Comercio, Importacaco e Exportacao de Tabacos
Ltda. ("American Virginia") and Luiz A.D. Ferreira,
President of American Virginia, for the purpose of
purchasing a Learjet 60 aircraft. The aircraft was
financed through an aircraft sale lease-back
agreement entered into with Bombardier as lessor,
and Wilmington Trust Company as owner-trustee.
Bombardier, with a lease interest of $9 million,
required Dwiggins to obtain hull coverage in the
amount of $13 million and liability coverage in the
amount of $100 million. (D.I. 43 at 4)

USAIG is in the business of insuring aviation
risks. On August 9, 2002, Health Lambert Group
("Heath Lambert"), a London-based broker,
contacted USAIG seeking hull and liability coverage
for the Learjet aircraft. (D.I. 20 at 3) Heath Lambert
indicated that Dwiggins would be the named insured
and that the aircraft would be for "industrial aid."
(*Id.*) Over the course of the next several days, USAIG
requested additional information regarding both
Dwiggins and the aircraft, to which Heath Lambert
responded. (D.I. 20 at 4) USAIG sought, in
particular, information pertaining to the aircraft's
primary hangar, international travel, pilot
qualifications, and maintenance issues. On August
28, 2002, USAIG faxed to Heath Lambert a quotation
for insurance coverage. (D.I.20, Exh. E) That
quotation included a sample "USAIG All-Clear"
policy outlining the general terms of insurance. (*Id.*)

On September 5, 2002, USAIG bound coverage
for Policy No. 360AC-344042, with an effective date
of September 10, 2002 [FN1] (the "Policy").[FN2]
Confirmation of the policy occurred in a two page fax
transmission sent by USAIG to Heath Lambert on
September 5, 2000. (D.I.20, Exh. H) The Policy
provides hull and liability coverage for a period
beginning on September 10, 2002 and ending on
September 10, 2003.

> FN1. The initial effective date was
> September 17, 2002, but it was subsequently
> amended by the parties.

> FN2. It is customary in the industry for an
> insurer to extend coverage to an insured,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 2
Not Reported in F.Supp.2d, 2003 WL 22432915 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

before a formal policy can be drafted and issued. Referred to as a "binder," these initial materials concerning the scope, exclusions, and special endorsements of the issued policy are consolidated into a single policy document which is transmitted to the insured. In this case, the policy was bound on September 5, and coverage commenced on September 10, notwithstanding the absence of a final formal policy document.

On September 11, 2002, USAIG faxed to Heath Lambert a certificate of insurance for Bombardier. Palmer & Cay, a broker based in Florida, also received a copy of the certificate. On September 19, 2002, USAIG received a call from Palmer & Cay, regarding concerns that Bombardier, as lessor, had over a products exclusion contained in the certificate of insurance. (*Id.* at 7) The products exclusion, as written, would have degraded the protection that Bombardier, as lessor, contractually required. On September 20, 2002, a new certificate of insurance and endorsement was transmitted to Palmer & Cay. (*Id.*)

**\*2** On October 7, 2002, the aircraft, on its inaugural flight, crashed while landing at the Santa Cruz Airport, State of Rio do Sul, SSSC, Brazil. On board the aircraft were Ferreira, Jose Maria Gelsi (corporate counsel for American Virginia), Robert Catao (Ferreira's Brazilian pilot), Sergio Barbosa (American Virginia pilot), and Telmos Goes (the pilot in command). Barbosa was killed in the incident, and the other passengers were seriously injured.

The October 7 crash occurred before USAIG had issued its formal policy coverage. (D.I. 20 at 8) The coverage summary page of the Policy states that its coverage extends to "[a]ny use approved by the Policyholder."(D.I. 7, Ex. A at 9) The coverage summary page also imposes minimum qualifications for the pilot in command and co-pilot. (*Id.*) The Policy on its face is clear and unambiguous with respect to the loss payable rights of Bombardier. Endorsement 11 of the Policy states that "[s]hould anyone do anything which makes your coverage invalid, we will still make a payment to that leinholder or lessor."[FN3](*Id.* at 29). The only exclusion to the lessor's interest coverage is in the event of "conversion, embezzlement or secretion of the aircraft, by you or anyone having a legal right to possess your aircraft."(*Id.*)

FN3. Endorsement 11 is what is known in the insurance industry as a "standard mortgagee clause." In the absence of such special endorsements, a leinholder's rights to payment under an insurance policy are subject to the same contractual defenses that an insurer might assert against the insured. See*Kimberly & Carpenter, Inc. v. National Liberty Ins. Co.,* 157 A. 730, 732 (Del.Super.1931) ("By the 'standard mortgagee clause' ... no default or breach on the part of the insured-mortgagor affects the right of the mortgagee.").

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)."Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."*Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial." ' *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995).

The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See*Anderson v. Liberty Lobby, Inc.,* 477

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22432915 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See* *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

IV. DISCUSSION

*3 In Count I of the complaint, USAIG asks for recission against all defendants on the basis that it was induced into issuing the Policy based upon material misrepresentations made by the defendants. (D.I. 1 at 5) In its reply brief to Bombardier's motion for summary judgment, USAIG contends that Count I is an action sounding in contract. (D.I. 20 at 22) In Count II of the complaint, USAIG requests declaratory judgment on the issue of coverage owed to either defendant based upon material misrepresentations made during the underwriting process. (D.I. 1 at 6) Count II advances a tort theory of negligent misrepresentation as its basis. (D.I. 20 at 23 (citing Rest. (2d) Torts § 552))

A. Action on the Contract

USAIG alleges that Dwiggins and Bombardier "made material misrepresentations ... during the underwriting process."(D.I. 1 at 5) These misrepresentations, contends USAIG, go to the issue of whether the Policy is void *abinitio.* USAIG argues that the "character of the misrepresentations-fraudulent, negligent or innocent-is to be fleshed out during discovery."(D.I. 20 at 22 n. 6)

To avoid a contract on the basis of misrepresentation, a party must prove the following elements: "(1) that there was a misrepresentation; (2) that the misrepresentation was either fraudulent or material; (3) that the misrepresentation induced the recipient to enter into the contract; and (4) that the recipient's reliance on the misrepresentation was reasonable." *Alabi v. DHL Airways, Inc.,* 583 A.2d 1358, 1361-62 (Del.Super.1990) (citing Rest. (2d) Contracts § 164).

For a statement to have been a basis for inducement into the contract, the relevant period for those statements is the underwriting period, which began on August 9, 2002 and ended on September 5, 2002, when USAIG bound coverage.

USAIG's complaint alleges two misrepresentations. First, that Dwiggins stated during the underwriting process that the aircraft was for personal use only when it allegedly intended to sell the aircraft to a third party. (D.I. 1 at ¶ 20) Second, that Dwiggins stated that the plane would be flown by pilots who possessed the qualifications required under the policy's "Limitations on use" clause. (*Id.* at ¶ 17-18, 25-28)

Taking the facts in the light most favorable to USAIG, it has not pled any facts to support the conclusion that Bombardier directly made either material or fraudulent misrepresentations to USAIG during the underwriting process. The only statements which USAIG alleges that Bombardier made were those statements pertaining to the products exclusion on the lessor endorsement and made on Bombardier's behalf by Palmer & Cay. (D.I. 20 at 7) These statements occurred on September 19, well after the underwriting process ended. (*Id.*) Consequently, even if a misrepresentation were made at that time, it could not, as a matter of law, be a basis for inducing USAIG into issuing the Policy.

To overcome this temporal deficiency in the facts, USAIG's advances a theory of agency, in which Bombardier is liable for any material or fraudulent misrepresentations made by Heath Lambert or Palmer & Cay. "When there is an agency relationship between the defendants ... the principal may be found liable for the fraudulent acts of its agent." *Sandvik AB v. Advent Intern. Corp.,* 83 F.Supp.2d 442, 448 (D.Del.1999); *seealso* Rest. (2d) Agency § 259.

*4 Agency is a question of fact which normally should not be considered upon summary judgment. *Allstate Auto Leasing Co. v. Caldwell,* 394 A.2d 748, 750 (Del.Super.1978). A nonmoving party, however, must provide a sufficient factual basis upon which a reasonable jury could find for the nonmoving party on that issue. *See* *Anderson,* 477 U.S. at 249. A principal may be liable for the acts of its agent, either on the basis of an express or an apparent agency. Rest. (2d) Agency §§ 26-27. An express agency exists when there is an overt authorization by the principal to the agent which causes the agent to believe that he can act on behalf of the principal. *Id.* at § 26. An apparent agency exists when the conduct of the principal causes a third person to reasonably believe an agency exists between the principal and the apparent agent. *Id.* at § 27.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22432915 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

In this case, USAIG alleges, *interalia,* that either Heath Lambert or Palmer & Cay acted as agent for Bombardier in the procurement of the insurance policy. As an initial matter, this court finds that whether Palmer & Cay was an agent of Bombardier is not relevant to USAIG's misrepresentation theory. According to USAIG, the first known communication between Palmer & Cay and USAIG occurred after the Policy had already been bound by USAIG. Consequently, this court concludes that any statements which Palmer & Cay might have made on behalf of Bombardier could not be the basis of USAIG's reliance.

With respect to Heath Lambert, USAIG has not alleged that it acted in reliance upon any apparent agency between Bombardier and Heath Lambert. Liability under an apparent agency theory is grounded on a third party's reasonable interpretation of the conduct of the alleged principal. *Id.* Consequently, the predicates for this reasonable belief would already be in the control of USAIG, and not facts which would be uncovered through the course of discovery. *See Johnson v. Chilcott,* 658 F.Supp. 1213, 1221 (D.Co.1987). To the extent that USAIG's claim rests upon the existence of an apparent agency by Heath Lambert on behalf of Bombardier, this court concludes that there is an insufficient factual basis to support a finding of apparent agency as to Heath Lambert, and summary judgment, therefore, is proper.

The existence of an express agency between Heath Lambert and Bombardier, however, is a factual question that, at a minimum, should be reserved until the completion of discovery. The court notes that USAIG has not provided even a *deminimis* factual basis to support the conclusion that an express agency existed between Heath Lambert and Bombardier. Nonetheless, it is possible that through discovery, USAIG may uncover evidence to substantiate its claim that Heath Lambert acted with the express authority of Bombardier during the relevant underwriting period.

This court concludes that with respect to Count I, summary judgment is granted as to whether Bombardier directly or through Palmer & Cay misrepresented material facts to USAIG. With respect to whether Bombardier through its alleged agent Heath Lambert misrepresented material fact to USAIG, summary judgment is denied at this time.

**B. Action in Tort**

**\*5** USAIG contends that Bombardier is liable because it may have had knowledge of the alleged intended use of the aircraft and failed to notify USAIG of Dwiggins' alleged misrepresentation in that regard. The essence of USAIG's tort argument is this:

[I]n light of Bombardier's financial relationship with Dwiggins' principals, including an extensive previous business history, that either Dwiggins informed Bombardier of its intentions concerning the aircraft or Bombardier negligently failed to reasonably ascertain that information. Bombardier then failed to exercise reasonable care in obtaining or communicating information to USAIG.

(D.I. 20 at 23) The tort of negligent misrepresentation is predicated upon the existence of a "pecuniary duty" to provide accurate information. Rest. (2d) Torts § 551.[FN4] The gravamen of the issue is this: whether a lessor, by virtue of its protection under a standard mortgagee clause of an insurance policy procured by the lessee, owes an independent legal obligation to the insurer.

> FN4. Neither party has briefed the court with respect to what state law should control. Delaware and Vermont have adopted the Second Restatement approach. *See Guardian Const. Co. v. Tetra Tech Richardson, Inc.,* 583 A.2d 1378, 1386 (Del.Super.1990); *McGee v. Vermont Federal Bank FSB,* 169 Vt. 529, 726 A.2d 42, 44 (Vt.1999). Negligent misrepresentation under New York law varies slightly in its wording but is essentially the same. *See Fromer v. Yogel,* 50 F.Supp.2d 227, 242 (S.D.N.Y.1999). Regardless of the controlling law, because the result would appear to be the same, the court withholds decision on this point.

This court has held that there must be special circumstances to justify an "extra-contractual tort duty to exercise due care." *See Pig Improvement Co., Inc. v. Middle States Holding Co.,* 943 F.Supp. 392, 406 (D.Del.1996); *see also Matthews Office Designs, Inc. v. Taub Investments,* 647 A.2d 382, 1994 WL 267479, at 2 (Del.1994) (table case). In *Pig Improvement,* a dispute arose concerning a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                   Page 5
Not Reported in F.Supp.2d, 2003 WL 22432915 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

transaction involving the sale of genetically-enhanced swine. The buyer alleged, *interalia,* that the seller breached a duty by negligently misrepresenting the condition of the porcine stock. This court concluded that the character of the transaction and the parity between the respective parties' business positions did not support the conclusion that a special legal duty was necessary. *Id.*

The sophistication of the parties is also a factor to be considered. *SeeBanque Arabe Et Int'l D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146 (2d Cir.1995) (holding that under New York law banking relationships do not invoke a duty to disclose); *seealsoChase Manhattan Bank v. Iridium Africa Corp.,* 197 F.Supp.2d 120, 138 (D.Del.2002) (applying New York law). In the present case, this dispute arises between an insurer specializing in aviation risks and a financial institution specializing in aircraft financing who are willing participants in a complex transaction. These factors do not weigh in favor of a conclusion that an extra-contractual duty is warranted.

USAIG fails to provide any special circumstances that support a conclusion that a special legal duty should be imposed upon a lessor. USAIG argues that *Citizens State Bank v. American Fire & Casualty Ins.,* 198 F.2d 57 (5th Cir.1952), stands for the proposition that a "mortgagee who is aware of the mortgagor's false statements made in procuring a policy of insurance can not collect under the policy."(D.I. 20 at 16) In *Citizens State Bank,* however, the mortgagee's president was also the express agent of the insurance company. Consequently, he had an existing and independent legal obligation to disclose to the principal, the insurance company, his knowledge with respect to the falsity of the mortgagor's statements.

**\*6** Through asserting an independent duty to disclose, USAIG attempts to reallocate the risk of ascertaining the truthfulness of an insured's representations to a third-party.[FN5]In the absence of actual fraud, [FN6] this court is not persuaded that an extra-contractual shifting of that risk is warranted. An insurer stands in a strong position to control and contractually allocate the risks it underwrites.

FN5. Notably, two of the cases upon which USAIG most relies, *Rubenstien v. Cosmopolitan Mut. Ins. Co.,* 61 A.D.2d 1029, 403 N.Y.S.2d 96 (2d Dep't 1978), and

*Outdoor Tech., Inc. v. Allfirst Fin. Inc.,* 2001 WL 541472 (Del.Super.Apr.12, 2001), are decisions involving commercial paper. These cases, however, do not provide appropriate analogies to the present case, as the Uniform Commercial Code imposes extra-contractual duties upon those involved in the passing of negotiable instruments. *See*U.C.C. §§ 3-401 et seq. (1992).

FN6. USAIG admits that it has not pled fraud in this case. (D.I. 20 at 22 n. 6)

Given the sophistication of the parties and the absence of any special circumstances in this case, this court concludes that a mortgagee, protected by a standard mortgage clause, has no independent legal duty of disclosure to the insurer of its mortgagor. Having concluded that Bombardier owed no legal duty to USAIG, the court must grant summary judgment to Bombardier as to Count II.

C. Bombardier's Rights Under the Policy

USAIG contends that summary judgment is not appropriate, as Bombardier has failed to affirmatively prove that it is entitled to receive payment under the Policy. (D.I. 20 at 12-13) USAIG is incorrect in this assertion. First, USAIG has not sought a declaratory judgment that, under the Policy, Bombardier is not entitled to performance; instead it has collaterally attacked the formation of the contract. Second, Bombardier is not seeking to litigate its rights under the Policy in this forum, and Bombardier is not required to do so. Consequently, this court does not decide whether the proof of loss requirements under the Policy has been satisfied or waived.

V. CONCLUSION

For the reasons stated, Bombardier's motion for summary judgment is granted in part and denied in part.

**ORDER**

At Wilmington this 15th day of October, 2003, consistent with the memorandum opinion issued this same day;

IT IS ORDERED that:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22432915 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

    1.   Defendant Bombardier Capital Inc.'s ("Bombardier") motion for summary judgment (D.I. 6) is granted as to Count I, except to the extent that Heath Lambert Group may have acted as Bombardier's agent during the underwriting process. The court reserves judgment on the motion on that issue pending the completion of discovery.

    2. Defendant Bombardier's motion for summary judgment on Count II is granted.

D.Del.,2003.
U.S. Aircraft Ins. Group v. Dwiggins, L.L.C.
Not Reported in F.Supp.2d, 2003 WL 22432915 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.