**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| WINSTAR HOLDINGS, LLC and IDT CORP., | C.A. No.:    07-828-GMS |
| Plaintiffs, | |
| - against - | |
| THE BLACKSTONE GROUP LP; IMPALA PARTNERS, LLC; and CITICORP, | |
| Defendants. | |

**DEFENDANT THE BLACKSTONE GROUP LP'S MEMORANDUM OF LAW IN**
**SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT**

Victoria W. Counihan (No. 3488)
Dennis A. Meloro (No. 4435)

GREENBERG TRAURIG, LLP
The Nemours Building
1007 N. Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone:    (302) 661-7000
Facsimile:    (302) 661-7360
counihanv@gtlaw.com
melorod@gtlaw.com

-- and --

Yosef J. Riemer
Vickie Reznik
David S. Flugman

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Dated: January 22, 2008

*Attorneys for Defendant,*
*The Blackstone Group LP*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS ......................................................................................5

    A.    Old Winstar's Bankruptcy Proceedings and the APA ............................5

           1.    Disclaimer of Other Representations and Warranties and Integration Clauses.......................................................................6

           2.    Provisions Concerning Disputes ...............................................7

    B.    The Bankruptcy Court's Order Approving the Asset Purchase Agreement ............7

    C.    The Allegations of the Complaint.........................................................8

    D.    The Ruling for Defendants on Transferring the Case to Delaware ........................9

ARGUMENT........................................................................................................10

I.    EACH AND EVERY ONE OF PLAINTIFFS' CLAIMS ARE BARRED AS A MATTER OF LAW BY DELAWARE'S THREE YEAR STATUTE OF LIMITATIONS.........................................................................................12

II.    THIS CASE CONSTITUTES AN IMPERMISSIBLE COLLATERAL ATTACK ON THE BANKRUPTCY COURT'S FINAL ORDER APPROVING THE SALE OF OLD WINSTAR'S ASSETS TO PLAINTIFFS. .........................................14

III.    ALL OF PLAINTIFFS' CLAIMS ARE FORECLOSED AS A MATTER OF LAW. .................................................................................................19

    A.    Plaintiffs' Claims for Fraud and Negligent Misrepresentation Are Barred Because Plaintiffs Cannot Establish Reasonable Reliance as a Matter of Law. ...........................................................................20

           1.    The Broad and Clear Disclaimer and Integration Clauses in the Asset Purchase Agreement Foreclose Plaintiffs' Allegations of Reasonable and Justifiable Reliance.......................................21

           2.    Plaintiffs' Business Sophistication Further Underscores the Absence of Reasonable and Justifiable Reliance as a Matter of Law. ...........................................................................24

    B.    Plaintiffs' Claims for Aiding and Abetting Fraud and Civil Conspiracy Should Be Dismissed Because The Fraud Claim is Legally Insufficient. .............26

    C.    Plaintiffs' Fraud, Aiding and Abetting Fraud, and Conspiracy Claims Fail As They Fall Beneath the Heightened Pleading Requirements of Rule 9(b)..........................................................................................27

    D.    Plaintiffs' Negligence Claim is Barred by New York's Statute of Limitations. ...............................................................................28

CONCLUSION......................................................................................................28

## TABLE OF AUTHORITIES

**Cases**

*Aetna Cas. & Surety Co. v. Aniero Concrete Co, Inc.*,
 404 F.3d 566 (2d Cir. 2005) ........................................................................22

*Atlantis Plastics Corp. v. Sammons*,
 558 A.2d 1062 (Del. Ch. 1989) ....................................................................13

*Belin v. Weissler*,
 No. 97 Civ. 8787 (RWS), 1998 WL 391114 (S.D.N.Y. July 14, 1998) ............................20

*Bell Atlantic Corp. v. Twombly*,
 __ U.S. __, 127 S.Ct. 1955 (2007)....................................................................11

*Buck v. Hampton Township School District*,
 452 F.3d 256 (3d Cir. 2006) ........................................................................11

*Celotex Corp. v. Edwards*,
 514 U.S. 300 (1995)....................................................................................15

*CFJ Assocs. of New York Inc. v. Hanson Industries*,
 711 N.Y.S.2d 232 (N.Y. App. Div. 2000) ......................................................25

*Christiana Marine Serv. Corp. v. Texaco Fuel & Marine Marketing, Inc.*,
 No. Civ. A 98C-02-217WCC, 2002 WL 13353609 (Del. Super. June 13, 2002) .............13

*Christie's Inc. v. Dominica Holding Corp.*,
 No. 05 Civ. 8728 (NRB), 2006 WL 2012607 (S.D.N.Y. July 18, 2006) ........................23

*Citibank, N.A. v. Plapinger*,
 485 N.E.2d 974 (N.Y. 1985)........................................................................22

*Dallas Aerospace, Inc. v. CIS Air Corp.*,
 No. 00 Civ. 1657 (BSJ), 2002 WL 31453789 (S.D.N.Y. Oct. 31, 2002) ...................21, 22

*Dannan Realty Corp. v. Harris*,
 5 N.Y.2d 317 (N.Y. 1959) ...................................................................... passim

*DDCLAB Ltd. v. E.I. DuPont De Nemours & Co.*,
 No. 03 Civ. 3654 (GBD), 2005 WL 425495 (S.D.N.Y. Feb. 18, 2005)...........................23

*Dymond v. Nat'l Broadcasting Co.*,
 559 F. Supp. 734 (D. Del. 1983)....................................................................12

*Emergent Capital Investment Mgmt., LLC v. Stonepath Group, Inc.*,
 165 F. Supp. 2d 615 (S.D.N.Y. 2001) ........................................................20, 25

*Gluck v. Unysis Corp.*,
 960 F.2d 1168 (3d Cir. 1992) ......................................................................19

*Gordon v. Diagnostek, Inc.,*
    812 F. Supp. 57 (E.D. Pa. 1993) ....................................................................................27

*Grove Press, Inc. v. Angleton,*
    649 F.2d 121 (2d Cir. 1981) ..........................................................................................26

*Harsco Corp. v. Segui,*
    91 F.3d 337 (2d Cir. 1996) ...............................................................................20, 24, 25

*Hydro Investors, Inc. v. Trafalgar Power, Inc.,*
    227 F.3d 8 (2d Cir. 2000) ..............................................................................................25

*In re American Business Fin. Servs., Inc.,*
    361 B.R. 747 (Bankr. D. Del. 2007) ..............................................................................27

*In re American Preferred Prescription, Inc.,*
    255 F.3d 87 (2d Cir. 2001) ............................................................................................16

*In re Clinton Street Food Corp.,*
    254 B.R. 523 (Bankr. S.D.N.Y. 2000) ..........................................................15, 16, 17, 18

*In re Global Home Prods. LLC,*
    369 B.R. 770 (D. Del. 2007) ..........................................................................................15

*In re HHG Corp.,*
    No. 01-B-11982 (ASH), 2006 WL 1288591 (Bankr. S.D.N.Y. May 2, 2006) ............15, 17

*In re LJM2 Co-Investment, L.P.,*
    866 A.2d 762 (Del. Ch. 2004) ......................................................................................15

*In re Medical Wind Down Holdings III, Inc.,*
    332 B.R. 98 (Bankr. D. Del. 2005) ..............................................................................4, 20

*In re Met-L-Wood Corp.,*
    861 F.2d 1012 (7th Cir. 1988) ......................................................................................16

*In re Penn Central Transportation Co.,*
    494 F.2d 270 (3d Cir. 1974) ..........................................................................................14

*In re Stadium Mgmt. Corp.,*
    895 F.2d 845 (1st Cir. 1990) ..........................................................................................15

*In re Stein & Day, Inc.,*
    113 B.R. 157 (Bankr. S.D.N.Y. 1990) ..........................................................................15

*In re Temtechco, Inc.,*
    Nos. 95-00596, 97-00077, 1998 WL 887256 (Bankr. D. Del. Dec. 18, 1998) ................15

*In re The IT Group, Inc.,*
    322 B.R. 729 (Bankr. D. Del. 2005) ..............................................................................14

*In re Winstar Communications, Inc. et al,*
    Case No. 01-1430 (KJC) ................................................................................................5

*Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*,
   871 F. Supp. 709 (S.D.N.Y. 1995) ................................................................26

*Kalisch-Jarcho, Inc. v. City of New York*,
   58 N.Y.S.2d 746 (N.Y. 1983) ......................................................................25

*Kidd v. Spector*, No. 93 Civ. 7297 (KTD),
   1998 WL 879698 (S.D.N.Y. Dec. 15, 1998) ...................................................24

*Krahmer v. Christie's Inc.*,
   903 A.2d 773 (Del. Ch. 2006) .....................................................................13

*La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*,
   914 F.2d 900 (7th Cir. 1990) ......................................................................16

*Lafferty v. St. Riel*,
   495 F.3d 72 (3d Cir. 2007) ....................................................................12, 14

*Lazard Freres & Co. v. Protective Life Ins. Co.*,
   108 F.3d 1531 (2d Cir. 1997) .....................................................................20

*Lum v. Bank of America*,
   361 F.3d 217 (3d Cir. 2004) ..................................................................11, 27

*MBIA Ins. Corp. v. Royal Indemn. Co.*,
   426 F.3d 204 (3d Cir. 2005) .......................................................................21

*Montville Township v. Woodmont Builders, LLC*,
   224 Fed. Appx. 514 (3d Cir. 2007) ...............................................................11

*Naporano Iron & Metal Co. v. Am. Crane Corp.*,
   79 F. Supp. 2d 494 (D.N.J. 1999) ...........................................................11, 27

*Oshiver v. Levin, Fishbein, Sedran & Berman*,
   38 F.3d 1380 (3d Cir. 1994) .......................................................................11

*Parker v. Google, Inc.*,
   242 Fed. Appx. 833 (3d Cir. 2007) ...............................................................28

*Portnoy v. American Tobacco Co.*,
   No. 06/16323, 1997 WL 638800 (N.Y. Sup. Ct. Suffolk Co. Sept. 26, 1997) .................26

*Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*,
   No. Civ. A. 19209, 2002 WL 1558382 (Del. Ch. July 9, 2002) ..........................21, 24, 25

*Reznor v. J. Artist Mgmt., Inc.*,
   365 F. Supp. 2d 565 (S.D.N.Y. 2005) .............................................................28

*RGC Int'l Investors, Inc., LDC v. ARI Newtork Servs., Inc.*,
   No. Civ. 03-0003-SLR, 2004 WL 189784 (D. Del. Jan. 22, 2004) ..............................22

*Schlaifer Nance & Co. v. Estate of Andy Warhol*,
   119 F.3d 91 (2d Cir. 1997) .........................................................................25

DEL 86206357v2 1/22/2008

*Sigma Star Foods Corp. v. McCormick & Co., Inc.*,
No. 95 Civ. 10133 (RPP), 1996 WL 41810 (S.D.N.Y. Feb. 2, 1996) ...........................4, 23

*Slocum v. Edwards*,
168 F.2d 627 (2d Cir. 1948) .................................................................................................15

*Southmark Props. v. Charles House Corp.*,
742 F.2d 862 (5th Cir. 1984) .............................................................................................17

*Triangle Underwriters, Inc. v. Honeywell Info. Sys., Inc.*,
604 F.2d 737 (2d Cir. 1979) ..............................................................................................28

*Valden Sportswear v. Montgomery Ward & Co.*,
591 F. Supp. 1188 (S.D.N.Y. 1984) ..................................................................................27

*VGS, Inc. v. Castiel, Inc.*,
No. C.A. 17995, 2003 WL 723285 (Del. Ch. Mar. 10, 2003) ....................................19, 25

*WestRM-West Risk Markets, Ltd. v. XL Reinsurance America, Inc.*,
No. 02 Civ. 7344 (MGC), 2006 WL 2034627 (S.D.N.Y. July 19, 2006) .........................26

*Winstar Holdings, LLC v. The Blackstone Group LP*,
No. 07 Civ. 4634 (GEL), 2007 WL 4323003 (S.D.N.Y. Dec. 10, 2007) ................. passim

*Yung v. Lee*,
160 Fed. Appx. 37 (2d Cir. 2005) ......................................................................................27

**Statutes**

10 Del. C. § 8106 ........................................................................................................3, 12, 13

10 Del. C. 8121 .....................................................................................................................12

11 U.S.C. § 363 ........................................................................................................1, 7, 15, 17

28 U.S.C. § 1452(a) ...............................................................................................................9

N.Y. C.P.L.R. § 214 ..............................................................................................................28

**Rules**

Fed. R. Civ. P. 12(b)(6) ...................................................................................................3, 10, 11

Fed. R. Civ. P. 60(b) ..................................................................................................... passim

Fed. R. Civ. P. 9(b) ....................................................................................................11, 19, 27

**Other Authorities**

15 Charles Alan Wright & Arthur Miller,
*Federal Practice & Procedure* § 3846 (2007) .................................................................12

## PRELIMINARY STATEMENT

This case arises out of an Order entered pursuant to 11 U.S.C. § 363 approving a proposed sale of substantially all of the assets of Winstar Communications, Inc. ("Old Winstar" or "Debtor") to Plaintiffs entered by the U.S. Bankruptcy Court for the District of Delaware ("Bankruptcy Court") as part of Old Winstar's bankruptcy.  Over five years later -- long after Delaware's three year statute of limitations has run -- Plaintiffs bring this action to collaterally attack important findings contained in the Bankruptcy Court's December 19, 2001 Order (the "Sale Approval Order").[1]  Among other things, that Order contained findings that "[e]ach of the Sale, the Management Agreement and the Asset Purchase Agreement was negotiated, proposed, and agreed to by the Debtors and [Plaintiffs] as parties thereto without collusion, in good faith, and from arm's-length bargaining position," and that "[t]he consideration provided by the Buyer for the Purchased Assets is (i) fair and reasonable, [and] (ii) is the highest or otherwise best offer for the Purchased Assets."  (Ex. A (Sale Approval Order) ¶¶ G, H.)  The Asset Purchase Agreement (or "APA"), which was the subject of the Sale Approval Order, states explicitly that no representations were being made to Plaintiffs concerning Old Winstar.  In fact, Plaintiffs expressly acknowledged in the APA that they were purchasing Old Winstar's assets on an "as-is, where-is" basis.  (Ex. C (APA) § 5.10.)  The APA also includes a mandatory forum selection clause in which Plaintiffs "irrevocably submit to the exclusive jurisdiction of [the Bankruptcy Court] . . . over any dispute arising out of or relating to [the APA] . . ."  (Ex. C (APA) § 9.10.)

---

[1]  (*See* Ex. A (Sale Approval Order) (All exhibits referred to herein are attached to this Memorandum of Law and hereafter will only be cited as "Ex." for simplicity. ).)  Pursuant to the Bankruptcy Court's August 2, 2001 order approving its retention, the Debtors had retained Defendant The Blackstone Group LP as their exclusive M&A advisor.  (Compl. ¶ 14.)  (*See* Ex. B (Blackstone Retention Approval Order).))

Plaintiffs' submission of any disputes to the Bankruptcy Court is also mandated by the Sale

Approval Order, in which the Bankruptcy Court "retain[ed] . . . exclusive jurisdiction to . . .

resolve any disputes arising under or related to the Asset Purchase Agreement." (*Id.* at ¶ 15.)

More than five years later, contrary to Plaintiffs' obligations under those exclusive

jurisdiction provisions and despite the Bankruptcy Court's explicit findings of good faith

negotiation and adequate consideration paid for Old Winstar's assets, Plaintiffs filed a $300

million damages action in New York state court asserting that The Blackstone Group LP

("Blackstone"), Impala Partners, LLC ("Impala"), and Citigroup Inc., as successor by merger to

Citicorp ("Citigroup"), induced them to enter into the APA by either making fraudulent or

negligent misrepresentations concerning Old Winstar or assisting Old Winstar in making such

misrepresentations.[2]  Defendants timely removed the case to the U.S. District Court for the

Southern District of New York (the "Southern District") and moved to have the case transferred

to this District for referral to the Bankruptcy Court.  Plaintiffs opposed that motion and cross-

moved to remand the case back to state court in New York.  Judge Gerard E. Lynch of the

Southern District issued a thirteen page opinion granting Defendants' motion and denying

Plaintiffs' cross motion, ruling that "the connection between this case and the [Old Winstar]

bankruptcy is obvious . . ." *Winstar Holdings, LLC v. The Blackstone Group LP*, No. 07 Civ.

4634 (GEL), 2007 WL 4323003, at *3 (S.D.N.Y. Dec. 10, 2007).  As Judge Lynch's opinion

explained:

> "Although the Plaintiffs' claims are asserted as tort claims of fraud
> in the inducement, the evaluation of those claims will necessarily
> involve the interpretation of the Bankruptcy Court-approved APA,

---

[2]    Blackstone, Impala, Citigroup, and Plaintiffs are all Delaware entities.  (*See* Compl. ¶¶ 2-6.)

> which contains provisions (including a merger clause, APA § 9.13;
> two disclaimers of warranties, *id.* §§ 5.10 , 9.3; and an 'as is'
> clause, *id.* § 5.10) that are arguably inconsistent with Plaintiffs'
> claims, and of the Bankruptcy Court's own orders and findings
> (including a finding that the consideration was fair and reasonable
> and a finding that the APA was negotiated in good faith, Order G,
> H)."

*Id.* at *11.

Now that this case has been referred to this District, it is time to judge the sufficiency of

the Complaint. There are three independent reasons why each of the claims against Blackstone

should be dismissed pursuant to Rule 12(b)(6). As discussed more fully in Part I, the first

infirmity is that all of the claims are time-barred under the applicable statute of limitations,

which is Delaware's three-year statute of limitations. *See* 10 Del. C. § 8106 (applying three year

statute of limitations to claims relating to injuries of the kind alleged by Plaintiffs). This case

was filed more than five years after Plaintiffs signed the APA and closed the transaction.

Because Plaintiffs' claims are untimely as a matter of law, they should be dismissed. (*See* Part I,

*infra*.)

Judge Lynch foreshadowed the second deficiency in the Complaint by noting that the

allegations are "arguably inconsistent" with "the Bankruptcy Court's own orders and findings

(including a finding that the consideration was fair and reasonable and a finding that the APA

was negotiated in good faith, Order  G, H)." *Winstar Holdings*, 2007 WL 4323003, at *11.  In

fact, the allegations are not just arguably inconsistent, but are wholly inconsistent with those

findings. The Sale Approval Order became final and binding when it was entered and the ten

day appeal period had run. Because there was no stay and no appeal, the only way that Order

could have been challenged was by bringing a motion to vacate pursuant to Fed. R. Civ. P. 60(b).

The time for filing such a motion, however, has long since passed, since such motions must be

made "not more than one year after the judgment, order, or proceeding was taken." Fed. R. Civ. P. 60(b).  Having failed to move to set aside the Sale Approval Order when such motions were still timely, Plaintiffs cannot now collaterally attack the findings in that Order.  As discussed more fully in Part II, those findings preclude them from going forward on their claims.  (*See* Part II, *infra*.)

Finally, the third deficiency in the Complaint arises from the other inconsistency Judge Lynch noted: the APA "contains provisions (including a merger clause, APA § 9.13; two disclaimers of warranties, *id.* §§ 5.10 , 9.3; and an 'as is' clause, *id.* § 5.10) that are arguably inconsistent with Plaintiffs' claims. . ." *Winstar Holdings*, 2007 WL 4323003, at *11.  Among the elements of a fraud or negligent misrepresentation claim is the requirement that the plaintiff have reasonably and justifiably acted in reliance on the alleged oral or written misrepresentations.  *See Dannan Realty Corp. v. Harris*, 5 N.Y.2d 317, 322 (N.Y. 1959); *In re Medical Wind Down Holdings III, Inc.*, 332 B.R. 98, 102 (Bankr. D. Del. 2005).  But the APA itself contains numerous provisions precluding any assertion of reasonable and justifiable reliance here as a matter of law.  For example, courts routinely hold that where a contract states (as this one does) that a purchase is being made on "as-is, where-is" basis, the buyer cannot as a matter of law assert that it reasonably and justifiably relied on some extra-contractual representations.  *See, e.g., Sigma Star Foods Corp. v. McCormick & Co., Inc.*, No. 95 Civ. 10133 (RPP), 1996 WL 41810, at *2-3 (S.D.N.Y. Feb. 2, 1996) (granting motion to dismiss fraud claim where contract provided that "[t]he Assets are sold 'as is and where is'").  Here, not only is there the "as-is, where-is" clause, but there are explicit statements in the APA that the Seller makes no representations and that the APA constitutes "the entire agreement among the parties" and "supercede[s] all prior agreements and understandings among the parties with respect thereto."

-4-

(Ex. C (APA) § 9.10; § 9.13.)  Moreover, Plaintiffs' admitted sophistication and experience in

the telecommunications industry further negates any basis for alleging reasonable reliance on any

representation Plaintiffs might claim to have received.  The inability to plead reasonable reliance

dooms Plaintiffs' fraud and misrepresentation claims.  And because those claims are invalid,

Plaintiffs' claims for aiding and abetting fraud and civil conspiracy are likewise foreclosed.  (*See*

Part III, *infra*.)

Because each of Plaintiffs' claims against Blackstone fails to state a claim as a matter of

both procedural and substantive law, Blackstone respectfully asks this Court to grant its motion

to dismiss Plaintiffs' Complaint in its entirety.[3]

## STATEMENT OF FACTS[4]

### A.    Old Winstar's Bankruptcy Proceedings and the APA

In April 2001, Old Winstar and certain of its subsidiaries and affiliates filed petitions for

relief in the Bankruptcy Court under chapter 11 of Title 11 of the United States Code, as

amended.[5]  (Complaint ¶ 13.)[6]  During the Fall of 2001, Old Winstar, with the assistance of

Blackstone, circulated an offering memorandum to prospective buyers and a number of those

contacted went on to conduct due diligence.  (Compl. ¶¶ 22-23.)  As part of that due diligence, in

meetings held over several days involving Plaintiffs and other interested purchasers, Plaintiffs

---

[3]  Counsel for the other Defendants have advised that they join in the points advanced in this memorandum of law.

[4]  For purposes of this motion, Blackstone assumes the validity of Plaintiffs' Complaint allegations.  Nothing in this section is intended to constitute an admission that any of the allegations in the Complaint are actually true.

[5]  Old Winstar's bankruptcy proceeding is still pending in the Bankruptcy Court.  *In re Winstar Communications, Inc., et al.*, Case No. 01-1430 (KJC).

[6]  For the Court's convenience, the Complaint is attached as Exhibit E to this Memorandum of Law.  For simplicity, the Complaint will be referred to herein as "Complaint" or "Compl." without the "Ex." designation.

were provided with information and access to Old Winstar's business records in a data room. (*Id.* at ¶ 22.) Over the course of nearly a week, a number of Plaintiffs' representatives reviewed the information provided and engaged in substantive discussions regarding Old Winstar's business. (*Id.* at ¶¶ 23-25.)

Thereafter, on December 18, 2001, Plaintiffs entered into the APA by which they contracted to buy Old Winstar's business assets for $42.5 million. (Compl. ¶¶ 1, 43.) The negotiated Agreement totals 47 pages and includes, among other things, detailed provisions regarding Definitions (Article I), the Purchase and Sale (Article II), the Purchase Price (Article III), Representations and Warranties of the Buyer (Article V), Covenants of the Parties (Article VI), and various Conditions to Closing (Article VII). (Ex. C (APA).) The APA as executed also includes numerous handwritten changes to the typed text -- both cross-outs and deletions, in each case initialed by the parties -- reflecting the active negotiations leading up to the final Agreement. (*See* Ex. C (APA) at 11, 12, 15, 17, 20, 21, 22, 24, 26, 27.)

1.   Disclaimer of Other Representations and Warranties and Integration Clauses

The only representations contained in the APA are representations by the Plaintiffs as the buyers. In fact, Section 5.10 of the APA states explicitly that "the Sellers make no representation or warranty whatsoever." (Ex. C (APA) §5.10.) Plaintiffs expressly disclaimed having placed any reliance on any representations made in connection with their purchase. Thus, Section 5.10 of the APA, entitled "Disclaimer of Other Representations and Warranties" specifies that the "Buyer [Plaintiffs] hereby acknowledges and agrees that the Buyer is purchasing the Purchased Assets on an 'as-is, where-is' basis and that the Sellers make no representation or warranty whatsoever and none shall be implied at law or in equity." (Ex. C (APA) § 5.10.) In fact, the APA does not even contain a list of the assets which Plaintiffs were actually purchasing; rather

the APA provides that the Buyer shall buy "all of the rights, title and interest that the Sellers possess at the time of the Closing" except for a list of "Excluded Assets" delineated on an attached schedule. (*Id.* §§ 2.1, 2.2.) The Agreement also contains an integration clause, which states that "[t]his Agreement (including the Exhibits and the Disclosure Schedule) and the Confidentiality Agreement constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings among the parties with respect thereto." (*Id.* at § 9.13.)

2.    <u>Provisions Concerning Disputes</u>

As noted above, the APA contains a mandatory forum selection clause by which the Plaintiffs agreed to "irrevocably submit to the exclusive jurisdiction of the [United States] Bankruptcy Court [for the District of Delaware] (or any court exercising appellate jurisdiction over the Bankruptcy Court) over *any dispute arising out of or relating to this Agreement* or any other agreement or instrument contemplated hereby or entered into in connection herewith or any of the transactions contemplated hereby or thereby." (Ex. C (APA) § 9.10 (emphasis added).) Likewise, Plaintiffs irrevocably agreed "that all claims in respect of such dispute or proceedings may be heard and determined in such courts" and "irrevocably waive[d], to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum in connection therewith." (*Id.*)

**B.    The Bankruptcy Court's Order Approving the Asset Purchase Agreement**

On December 10, 17, and 18, 2001, the Bankruptcy Court conducted a hearing on the Debtor's Motion to approve the APA. On December 19, 2001, the Bankruptcy Court issued the Sale Approval Order approving the APA and authorizing the Debtors to consummate the sale pursuant to 11 U.S.C. § 363. (Ex. A (Sale Approval Order) at 3-4.) In the Sale Approval Order,

-7-

the Bankruptcy Court found that the APA and related agreements "were negotiated, proposed and agreed to by the Debtors and [IDT Winstar Acquisition, Inc.] as parties thereto *without collusion, in good faith, and from arm's-length bargaining positions.*" (*Id.* at ¶ G (emphasis added).) The Bankruptcy Court also retained exclusive jurisdiction to resolve "any disputes arising under or related to the Asset Purchase Agreement." (*Id.* at ¶ 15.) The transaction closed on December 20, 2001 and Plaintiffs took control of Old Winstar's business. (Compl. ¶ 45.)

### C.    The Allegations of the Complaint

On May 10, 2007, in direct contravention of the Bankruptcy Court's Sale Approval Order and the APA's forum selection clause, Plaintiffs filed the instant suit in the New York Supreme Court for the County of New York alleging that the Defendants and Old Winstar itself fraudulently or negligently made misrepresentations about Old Winstar and that Plaintiffs had relied on those alleged misrepresentations in entering into the Bankruptcy Court-approved APA.[7] (Compl. ¶¶ 1, 22-30, 34, 36, 43, 60, 64, 88.) Specifically, Plaintiffs assert that Old Winstar and the Defendants made "material representations [ ] regarding the status of Old Winstar's business" (*id.* at ¶ 28) and that "[a]s a result" of what Plaintiffs contend were fraudulent or negligent representations, Plaintiffs "entered into an Asset Purchase Agreement . . ." (*Id.* at ¶ 43.) Plaintiffs further allege that "[i]f IDT and New Winstar had known the truth regarding Winstar's finances and operations, they would not have entered into the Agreement." (*Id.* at ¶ 60.) Despite Plaintiffs' disclaimer in the APA of reliance on any representations in connection with their purchase of Old Winstar's assets, all of Plaintiffs' claims are explicitly premised on the assertion that they acted in "reli[ance] on the oral and written misrepresentations of the

---

[7]    In their Complaint, Plaintiffs assert claims for fraud and aiding and abetting fraud (Counts 1 and 2), negligent misrepresentation (Count 3), negligence (Count 4), and civil conspiracy (Count 5).

Defendants" in connection with Plaintiffs' decision to enter into the APA.  (Compl. ¶ 1.)

Nowhere in the Complaint do Plaintiffs allege that any representation made to them in the APA

was false.  Nor could they make such an allegation since the APA contains no representations by

anyone but the Buyer.

### D.    The Ruling for Defendants on Transferring the Case to Delaware

On June 4, 2007, Defendant Impala, with the consent of all Defendants, removed the case

to the U.S. District Court for the Southern District of New York pursuant to the bankruptcy

removal provision, 28 U.S.C. § 1452(a).  On June 21, 2007, all Defendants filed a Joint Motion

to Transfer Venue to the U.S. District Court for the District of Delaware (for referral to the

Bankruptcy Court).  Plaintiffs opposed that motion and filed a Motion to Remand the case back

to New York state court.

On December 10, 2007 Judge Lynch issued a thirteen page Memorandum Opinion and

Order denying Plaintiffs' Motion to Remand and granting Defendants' Motion to Transfer Venue

to Delaware.  Judge Lynch found that the forum selection clause of the APA "plainly covers the

dispute at hand, which unquestionably is a dispute 'related to the APA'" and that "Plaintiffs

cannot be surprised by being asked to litigate a matter relating to the APA in the Delaware

Bankruptcy Court, as they themselves agreed in the APA to a choice of forum clause in which

they 'irrevocably submit to the exclusive jurisdiction' of that court 'over any dispute arising out

of or relating to this Agreement' and waived any objection to venue in that court."  *Winstar*

*Holdings*, 2007 WL 4323003, at *9.  Further, Judge Lynch noted that "the plaintiffs and the

Bankruptcy Court expressly stipulated that the Bankruptcy Court would be the exclusive forum

for resolving claims related to the sale."  *Id.* at *11.  As noted, Judge Lynch observed that

"[a]lthough the Plaintiffs' claims are asserted as tort claims of fraud in the inducement, the

evaluation of those claims will necessarily involve the interpretation of the Bankruptcy Court-

-9-

approved APA, which contains provisions (including a merger clause, APA § 9.13; two disclaimers of warranties, *id.* §§ 5.10 , 9.3; and an 'as is' clause, *id.* § 5.10) that are arguably inconsistent with Plaintiffs' claims, and of the Bankruptcy Court's own orders and findings (including a finding that the consideration was fair and reasonable and a finding that the APA was negotiated in good faith, Order ¶¶ G, H)." *Id.* at *11.  Finally, Judge Lynch noted that although the Debtor was not named as a defendant, "the defendants are sued for wrongdoing that essentially without exception is charged to have been committed jointly with the plaintiffs' counterparty in the APA, Old Winstar." *Id.* at *12.  Thus, Judge Lynch found that case arose in a case under Title 11 because "the connection between this case and the [Old Winstar] bankruptcy is obvious" and because the case is "intimately related to the administration of the bankruptcy." *Id.* at *3, *9.

Pursuant to Judge Lynch's ruling, the case was transferred to this District for referral to the Bankruptcy Court.  Plaintiffs have consented to the referral of this action to the Bankruptcy Court.  Defendants shortly anticipate filing a Joint Motion in this Court to refer the case to the Bankruptcy Court pursuant to the standing order of referral for bankruptcy-related cases in this District.

## **ARGUMENT**

While the Court, in considering a motion to dismiss pursuant to Rule 12(b)(6), must accept a plaintiff's allegations as true and draw all reasonable inferences in plaintiff's favor, in order to survive dismissal a claim must set forth "either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal

theory." *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S.Ct. 1955, 1969 (2007); *see also*

*Montville Twp. v. Woodmont Builders, LLC*, 224 Fed. Appx. 514, 517 (3d Cir. 2007).[8]  Moreover

under Fed. R. Civ. P. 9(b), Plaintiffs' claims for fraud, aiding and abetting fraud, and conspiracy

must be pleaded with particularity by stating the date, time, or place of the fraud, by alleging by

whom and to whom alleged misrepresentations were made, and by ascribing specific allegations

"to each individual defendant, thereby informing each defendant of the nature of its alleged

participation in the fraud." *Naporano Iron & Metal Co. v. Am. Crane Corp.*, 79 F. Supp. 2d 494,

511 (D.N.J. 1999); *see also Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004).

It is black letter law in this Circuit that in considering a Rule 12(b)(6) motion, a Court

may consider not only the complaint, but also any document which is integral to it, irrespective

of whether it is attached by plaintiff, including court orders and items appearing in the record of

the case.[9]  Because, even drawing all inferences in Plaintiffs' favor, the Complaint fails to state

any claim upon which relief can be granted, Defendant Blackstone respectfully requests that this

Court grant its motion to dismiss.

---

[8]  Although the point need not be reached for this case, the Supreme Court's recent decision in *Twombly* expressly rejected the long-standing "no set of facts" standard for testing the sufficiency of a complaint, and held instead that litigation should be dismissed under Fed. R. Civ. P. 12(b)(6) if a plaintiff has failed to put forth sufficient factual allegations to support the "plausibility" of its claim. 127 S.Ct. at 1966.

[9]  *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (in evaluating a motion to dismiss, a court may consider "any matters incorporated by reference or integral to the claim"); *Lum v. Bank of America*, 361 F.3d 217, 222 n.1 (3d Cir. 2004) (noting that the purpose of this rule is to "avoid the situation where a plaintiff with a legally deficient claim that is based on a particular document can avoid dismissal of that claim by failing to attach the relied upon document"); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994) ("We may also consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case."). While the Complaint in this case cites and references both the APA and the Sale Approval Order, Plaintiffs attached neither document to their Complaint. The foregoing authorities make clear, however, that this Court can nonetheless examine those documents on this motion, as well as Judge Lynch's Order transferring the case to this District.

I.    **EACH AND EVERY ONE OF PLAINTIFFS' CLAIMS ARE BARRED AS A MATTER OF LAW BY DELAWARE'S THREE YEAR STATUTE OF LIMITATIONS.**

Where, as here, a case was commenced in an improper forum and is subsequently transferred to the correct forum, the transferee court must apply the statute of limitations that would have been applied had the action originally been brought in the proper forum. *See Lafferty v. St. Riel*, 495 F.3d 72, 81 (3d Cir. 2007) (when the case is transferred after being initially filed in an improper forum, "the sounder interpretation is that the transferee forum's limitations statute applies"). This rule "prevents plaintiffs from filing wherever the law is most favorable in order to capture that forum's law and carry it with them on transfer to a proper venue." *Id.*; *see also* 15 Charles Alan Wright & Arthur Miller, *Federal Practice & Procedure* § 3846 (2007) (stating that for a court to hold otherwise "might well encourage forum shopping and generate transfer motions"). As Judge Lynch's opinion makes clear, this case should have been brought in Delaware rather than New York. *See Winstar Holdings*, 2007 WL 4323003, at *9 n.2, *12. Had it been filed in Delaware, Delaware's statute of limitations would have had to be applied. *See* 10 Del. C. § 8121; *see also Dymond v. Nat'l Broadcasting Co.*, 559 F. Supp. 734, 735 (D. Del. 1983). Now that the case is properly in Delaware, that statute also must be applied lest Plaintiffs be rewarded for their forum shopping.

Delaware's statute of limitations mandates that claims sounding in fraud or aiding and abetting fraud, negligent misrepresentation, negligence, or civil conspiracy be brought within a period of three years. *See* 10 Del. C. § 8106;[10] *see also Krahmer v. Christie's Inc.*, 903 A.2d

---

[10]  "No action to recover damages for trespass, no action to regain possession of personal chattels, no action to recover damages for the detention of personal chattels, no action to recover a debt not evidenced by a record or by an instrument under seal, no action based on a detailed statement of the mutual demands in the nature of debit and credit between parties arising out of contractual or fiduciary relations, no action based on a promise,

(Continued...)

-12-

773, 778 (Del. Ch. 2006) (noting three year statute of limitations applicable to fraud and

negligent misrepresentation claims); *Christiana Marine Serv. Corp. v. Texaco Fuel & Marine*

*Marketing, Inc.*, No. Civ. A 98C-02-217WCC, 2002 WL 13353609, at *3 (Del. Super. June 13,

2002) (recognizing application of three year statute of limitations to negligence claims); *Atlantis*

*Plastics Corp. v. Sammons*, 558 A.2d 1062, 1064 (Del. Ch. 1989) (civil conspiracy is subject to

the three year statute of limitations in 10 Del. C. § 8106).  Under well-settled Delaware law, the

three-year statute of limitations for tort-based claims runs from the date of injury "even if the

plaintiff is ignorant of the cause of action." *See Krahmer*, 903 A.2d at 778; *see also Christiana*,

2002 WL 13353609, at *3 ("The 3 year statute of limitations on cause of actions for . . . tort

claims accrues at the time of injury.").  Delaware's three-year statute of limitations renders each

and every one of Plaintiffs' claims time-barred as a matter of law.  Although Plaintiffs evidently

sought to evade that bar by filing suit in New York, the case never should have been brought

there.  As Judge Lynch noted, Plaintiffs "agreed in the APA to a choice of forum clause in which

they 'irrevocably submit to the exclusive jurisdiction' of [the Delaware Bankruptcy Court] 'over

any dispute arising out of or relating to this Agreement' and waived any objection to venue in

that court." *Winstar Holdings*, 2007 WL 4323003, at *9.  Judge Lynch found that forum

selection provision "plainly covers the dispute at hand, which unquestionably is a dispute

'related to the APA.'" *Id.*  Further, Judge Lynch recognized that "both the plaintiffs and the

Bankruptcy Court expressly stipulated that the Bankruptcy Court would be the exclusive forum

for resolving claims related to the sale." *Id.* at *11.  Thus, New York could not be deemed a

---

no action based on a statute, and no action to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant shall be brought after the expiration of 3 years from the accruing of the cause of such action." 10 Del. C. § 8106.

proper forum for resolution of this litigation. Instead, as a matter "intimately related to the administration of the bankruptcy," *id.*, Delaware was the only proper forum in which Plaintiffs could ever have brought proceedings and, as such, Delaware's statute of limitations must control. *See Lafferty*, 495 F.3d at 81.

Plaintiffs concede in their Complaint that any injuries they assert stem from their decision to enter into the APA, which they signed on December 18, 2001. (*See, e.g.*, Compl. ¶ 60 ("If IDT and New Winstar had known the truth regarding Winstar's finances and operations, they would not have entered into the Agreement . . . Therefore, they have been injured); ¶ 88 ("The natural and probable consequence of the Defendants' negligence was that IDT and New Winstar were induced to enter into the Agreement, and to incur additional subsequent losses, which have caused significant injury to IDT and New Winstar.").) That concession means that the three-year statute of limitations began to run on December 18, 2001, or at the latest when the transaction closed on December 20, 2001. (Compl. ¶ 45.) Plaintiffs did not file suit until May 10, 2007 -- long after the three year statute of limitations applicable to their claims had expired. (*See* Compl. at 19) Accordingly, all of Plaintiffs' claims should be dismissed as a matter of law.

## II.    THIS CASE CONSTITUTES AN IMPERMISSIBLE COLLATERAL ATTACK ON THE BANKRUPTCY COURT'S FINAL ORDER APPROVING THE SALE OF OLD WINSTAR'S ASSETS TO PLAINTIFFS.

Sale orders entered by Bankruptcy Courts are final for purposes of appeal and *res judicata. See In re Penn Cent. Transp. Co.*, 494 F.2d 270, 273-74 (3d Cir. 1974) (recognizing the finality of sale orders in bankruptcy proceedings); *In re The IT Group, Inc.*, 322 B.R. 729, 736 (Bankr. D. Del. 2005) (same); *In re LJM2 Co-Investment, L.P.*, 866 A.2d 762, 774-75 (Del.

Ch. 2004) (bankruptcy confirmation orders are entitled to full *res judicata* effect).[11]  Sales

entered pursuant to 11 U.S.C. § 363 are to be accorded a heightened degree of finality so as to

"prevent harmful effects on the bidding process" and also to effectuate the important public

policy of giving "finality to those orders and judgments upon which third parties rely." *In re*

*Global Home Prods. LLC*, 369 B.R. 770, 775 (D. Del. 2007); *In re Temtechco, Inc.*, Nos. 95-

00596, 97-00077, 1998 WL 887256, at *8 (Bankr. D. Del. Dec. 18, 1998); *see also In re HHG*

*Corp.*, No. 01-B-11982 (ASH), 2006 WL 1288591, at * 2 (Bankr. S.D.N.Y. May 2, 2006) ("As a

matter of public policy, sale orders entered under § 363(b) of the Bankruptcy Code are accorded

a heightened degree of finality" and should only be vacated in "limited circumstances of

compelling equity.").

　　　Because orders approving a sale in bankruptcy are final, absent a stay, the only

mechanism by which a party may challenge findings in such an order is by moving under one of

the narrow grounds laid out in Fed. R. Civ. P. 60(b) to vacate the judgment approving the sale.[12]

*See Celotex Corp. v. Edwards*, 514 U.S. 300, 313 (1995) (recognizing that if plaintiffs believed

an injunction issued by the Bankruptcy Court was improper they should have challenged it in

Bankruptcy Court or appealed to the District Court pursuant to § 158(a), and thus rejecting

plaintiff's independent action as an impermissible collateral attack); *Temtechco*, 1998 WL

---

[11]  *See also In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("[W]hen an order confirming a sale to a good faith purchaser is entered and a stay of that sale is not obtained, the sale becomes final and cannot be reversed on appeal.") (quoting *In re Stadium Mgmt. Corp.*, 895 F.2d 845, 847 (1st Cir. 1990)); *Slocum v. Edwards*, 168 F.2d 627, 631 (2d Cir. 1948) (validity of a sale in bankruptcy is not open to inquiry or impeachment in any collateral proceeding in either a state or federal court).

[12]  Not only are Plaintiffs bound by the terms of the sale, but "because a § 363 proceeding is *in rem*, it is final as to the entire world, including those who were not parties to the sale." *In re Clinton Street Food Corp.*, 254 B.R. 523, 531 (Bankr. S.D.N.Y. 2000).

887256 at *7 (recognizing that because plaintiffs brought an independent action seeking to set aside a sale order on grounds of fraud and misrepresentation, Rule 60(b) must be the procedural mechanism by which plaintiffs were proceeding). While Rule 60(b)(3) permits a party to move to vacate a final judgment on account of fraud, it requires that such a motion be made "not more than one year after the judgment, order, or proceeding was entered or taken." Fed. R. Civ. P. 60(b); *see also In re Am. Preferred Prescription, Inc.*, 255 F.3d 87, 92 (2d Cir. 2001) (recognizing that final orders entered by bankruptcy courts that are not timely appealed or challenged under Rule 60(b) are entitled to *res judicata* effect); *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 908 (7th Cir. 1990) ("However, except for the narrow exceptions set forth in Rule 60(b), bankruptcy sales, if they are to fulfill their role, must be final when made.").

Plaintiffs neither appealed, sought to stay, nor moved to vacate the Sale Approval Order. Instead, they took no action for more than five years before bringing this action making allegations that are contradicted by findings in the Sale Approval Order. (*See* Ex. A (Sale Approval Order) ¶¶ 10, G, H); *see also In re Clinton Street Food Corp.*, 254 B.R. 523, 532 (Bankr. S.D.N.Y. 2000) (dismissing fraud claim as barred by *res judicata* where all wrongful conduct alleged in the complaint occurred prior to the entry of the sale order which the court found to be an "essential element of every claim" and rejecting argument that common law claims were previously unknown as "either wrong or disingenuous, or both"). That Plaintiffs style their action as one for money damages as opposed to one to void the sale does not disguise their collateral attack on the Bankruptcy Court's Sale Approval Order. *See, e.g., In re Met-L-Wood Corp.*, 861 F.2d 1012, 1018 (7th Cir. 1988) (describing plaintiff's fraud suit "seeking heavy damages from the seller, the purchaser, the purchaser's purchaser . . . a law firm involved

-16-

in the transaction, and the secured creditors that benefited from the sale" as "a thinly disguised collateral attack on the judgment confirming the sale"); *Southmark Props. v. Charles House Corp.*, 742 F.2d 862, 868-69 (5th Cir. 1984) ("Appellants insist that because they seek only monetary relief and do not challenge the transfer of title . . . their claim does not disturb the earlier judgment . . . We are convinced, however, that . . . Appellant's [claims are] nothing more than not-so-thinly veiled attacks on the prior reorganization orders . . . The fact that the suit is brought under a different label in an independent action cannot camouflage its inevitable effect."). As the *Clinton Street Food Corp.* court held in a similar situation in which plaintiffs sought damages on a fraud claim arising out of the "improper procurement" of a sale order, Plaintiffs' fraud-based common law claims for damages are "indistinguishable" from claims to avoid a judicially-approved sale. 254 B.R. at 531. This is especially so in this case given the right to indemnification from the Debtor's estate for all damages potentially incurred by Defendants resulting from this litigation.[13]

As discussed above, the Sale Approval Order specifically approved the sale of Old Winstar's assets under the APA, pursuant to 11 U.S.C. § 363(b), and that Order is entitled to a "heightened degree of finality." *See In re HHG Corp.*, 2006 WL 1288591, at * 2. Nevertheless, Plaintiffs now allege that the Defendants fraudulently or negligently made misrepresentations about the value of Old Winstar's assets and that Plaintiffs relied on those alleged

---

[13]  Pursuant to the retention agreement by which Old Winstar retained Blackstone, the Debtors agreed to indemnify Blackstone for "all expenses (including reasonable fees, expenses and disbursements of counsel) as they are incurred in connection with investigation, preparing, pursuing, defending, or assisting in the defense of any action, claim, suit, investigation, or proceeding related to, arising out of or in connection with" Blackstone's retention. (*See* Ex. D (Blackstone Retention Agreement) at Attachment A.) Blackstone has been in communication with counsel for the Old Winstar Chapter 7 Trustee and anticipates filing a stipulation in the Bankruptcy Court concerning its right to payment from the Debtor's estate.

-17-

misrepresentations in entering into the APA approved by the Bankruptcy Court. (Compl. ¶¶ 22-30.) Indeed, all of Plaintiffs' claims are explicitly premised on their "reli[ance] on the oral and written misrepresentations of the Defendants" in connection with Plaintiffs' decision to enter into the APA -- even though Plaintiffs had purchased Old Winstar's assets on an "as-is, where-is basis." (Compl. ¶ 1; *see also* Ex. C (APA) § 5.10.) Consequently, Plaintiffs' allegations directly contradict and attack the findings of the Bankruptcy Court's Sale Approval Order, in which the Bankruptcy Court concluded and found that the APA and related agreements "were negotiated, proposed and agreed to by the Debtors and [IDT Winstar Acquisition, Inc.] as parties thereto *without collusion, in good faith, and from arm's-length bargaining positions*" (ex. A (Sale Approval Order) at ¶ G (emphasis added)) and that "[t]he consideration provided by the Buyer [IDT Winstar Acquisitions, Inc.] for the Purchased Assets [ ] is fair and reasonable." (*Id.* at ¶ H; *see also Temtecho*, 1998 WL 887256, at *8 (rejecting plaintiffs' attempt to relitigate a Bankruptcy Court finding that an asset sale had been made in good faith).

As noted above, the strict one-year time limitation imposed by Rule 60(b) to challenge the findings in the Sale Approval Order has long since passed. Fed. R. Civ. P. 60(b); *see also Clinton Street Food Corp.*, 254 B.R. at 532 ("the one year period is an absolute, outside limit, and a court lacks the power to grant motions filed beyond that time"). Accordingly, all of Plaintiffs' claims should be dismissed.[14]

---

[14]  Because all of Plaintiff's claims are based upon the same facts, they are all barred by *res judicata*. *See Clinton Street Food Corp.*, 254 B.R. at 531 (*res judicata* bars all claims premised on same facts as fraud claim).

## III.    ALL OF PLAINTIFFS' CLAIMS ARE FORECLOSED AS A MATTER OF LAW.

Even if the Bankruptcy Court finds that neither the Delaware statute of limitations nor the express terms of the Bankruptcy Court's Sale Approval Order bars Plaintiffs' claims, each of Plaintiffs' claims is nonetheless foreclosed as a matter of law.[15]  Plaintiffs' claims for fraud (Count 1) and negligent misrepresentation (Count 3) allege that Blackstone, along with co-defendants, misrepresented and omitted material facts to Plaintiffs in connection with the sale of Old Winstar's assets pursuant to the APA.  As described in detail below, these claims are barred as a matter of law because given the broad disclaimer and integration provisions in the APA, as well as the fact that Plaintiffs were sophisticated parties negotiating a multimillion dollar transaction at arm's length, Plaintiffs cannot establish that reliance on their part was reasonable and justifiable as a matter of law.  Likewise, Plaintiffs' claims for aiding and abetting fraud (Count 2) and civil conspiracy (Count 5) fail because both require the existence of an underlying fraud.  The fraud, aiding and abetting fraud, and conspiracy claims moreover fail because the allegations in the Complaint fail to meet the heightened pleading standards required by Fed. R. Civ. P. 9(b) to state these claims.  Finally, even if the Delaware statute of limitations was not applicable, Plaintiffs' claim for negligence (Count 4) would be time-barred by operation of the New York statute of limitations.  As such, this Court should dismiss Plaintiffs' Complaint in its entirety.

---

[15]    While the New York choice of law clause in the APA (ex. C (APA) § 9.9) does not require a court to apply New York's statute of limitations, it does require that  Plaintiffs' claims be governed by New York *substantive* law.  *See VGS, Inc. v. Castiel, Inc.*, No. C.A. 17995, 2003 WL 723285, at *7 n.29 (Del. Ch. Mar. 10, 2003) (enforcing New York choice of law provision "[b]ecause under Delaware law the parties' choice of law governing their contract should be respected as long as the law of that state and the parties have some relation to that state"); *Gluck v. Unysis Corp.*, 960 F.2d 1168, 1179-80 (3d Cir. 1992) (it is well-settled that "choice of law provisions in contracts do not apply to statutes of limitations, unless the reference is express").

**A.    Plaintiffs' Claims for Fraud and Negligent Misrepresentation Are Barred Because Plaintiffs Cannot Establish Reasonable Reliance as a Matter of Law.**

It is a "fundamental precept" of law that in order to state a claim for fraud or for negligent misrepresentation, a plaintiff must plead the required element of reasonable and justifiable reliance. *See Dannan Realty Corp. v. Harris*, 5 N.Y.2d 317, 322 (N.Y. 1959) ("the asserted reliance must be found to be justifiable under all the circumstances before a complaint can be found to state a cause of action in fraud").[16]  As discussed below, here, as a matter of law, Plaintiffs cannot make such an allegation.  As an initial matter, the broad anti-reliance provision in the APA, in which Plaintiffs disclaim any reliance on representations made in connection with their purchase of Old Winstar's assets, as well as the APA's complete integration clause, bar any allegation that Plaintiffs were relying on any alleged extra-contractual representations and negate the reasonableness of any such reliance on the part of Plaintiffs as a matter of law.  *See Dannan*, 5 N.Y.2d at 320-21 (granting motion to dismiss common law fraud claims in the face of broad anti-reliance clause); *See also Harsco Corp. v. Segui*, 91 F.3d 337, 345-48 (2d Cir. 1996) (affirming same).  Moreover, the fact that Plaintiffs were sophisticated purchasers with extensive experience in the telecommunications industry also bars such allegations, particularly given the disclaimer and integration language in the APA.  *See, e.g. Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 165 F. Supp. 2d 615, 623 (S.D.N.Y. 2001) (noting, in granting motion to dismiss fraud claim, that "in evaluating justifiable reliance, the plaintiff's sophistication and

---

[16]  *See also Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541 (2d Cir. 1997) ("Under New York law in order to sustain a claim of fraud, a party must establish, *inter alia*, justifiable reliance."); *Belin v. Weissler*, No. 97 Civ. 8787 (RWS), 1998 WL 391114, at *5 (S.D.N.Y. July 14, 1998) ("Under New York law, 'the asserted reliance must be found to be justifiable under all the circumstances before a complaint can be found to state a cause of action in fraud.'" (internal cite omitted)); *In re Medical Wind Down Holdings III, Inc.*, 332 B.R. 98, 102 (Bankr. D. Del. 2005) ("Because justifiable reliance is an element of both claims, the failure of such reliance will be fatal to a claim of fraud in the inducement or negligent misrepresentation.").

-20-

expertise is a principal consideration"); *See also MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 218 (3d Cir. 2005) (noting the importance of the fact that "sophisticated parties have inserted clear, anti-reliance language in their negotiated agreement" in determining whether justifiable reliance can be established as a matter of law).

      1.    The Broad and Clear Disclaimer and Integration Clauses in the Asset Purchase Agreement Foreclose Plaintiffs' Allegations of Reasonable and Justifiable Reliance.

For nearly fifty years, it has been well settled that where a party specifically disclaims reliance upon a particular representation in a contract, that party cannot, in a subsequent action for common law fraud, claim it was fraudulently induced to enter into the contract by the disclaimed representation. *Dannan*, 5 N.Y.2d at 320-21. Distinguishing the provision at issue in *Dannan* from a boilerplate merger clause, the New York Court of Appeals held pointedly that a plaintiff who has "made a representation in a contract that it was not relying on specific representations not embodied in the contract" cannot avoid his "bad bargain" by later claiming that he was defrauded. *Id.* at 323; *see also Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, No. Civ. A. 19209, 2002 WL 1558382, at *1 (Del. Ch. July 9, 2002) (granting motion to dismiss fraud claim in face of non-reliance clause in agreement for purchase of assets because by agreeing to these clauses, plaintiff "thereby acknowledged the unreasonableness of grounding its execution of the contract on statements of [seller] that were not included within the contract as binding legal promises"). *Dannan* has been interpreted as standing for "the principle that where parties have expressly allocated risks, the judiciary shall not intrude into their contractual relationship." *See Dallas Aerospace, Inc. v. CIS Air Corp.*, No. 00 Civ. 1657 (BSJ), 2002 WL 31453789, at *5-6 (S.D.N.Y. Oct. 31, 2002) (finding disclaimer that plaintiff "shall accept delivery of the Engine and Engine Records . . . as-is, where-is" sufficient to preclude plaintiff's claim alleging fraudulent misrepresentation based on the engine's airworthiness (ellipses in

-21-

original)); *see also RGC Int'l Investors, Inc., LDC v. ARI Newtork Servs., Inc.*, No. Civ. 03-0003-SLR, 2004 WL 189784, at *8 (D. Del. Jan. 22, 2004).

For a disclaimer to be sufficiently specific under *Dannan*, "there need not be a precise identity between the misrepresentation and the particular disclaimer." *Aetna Cas. & Surety Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 576 (2d Cir. 2005) (internal quotes omitted). Rather, the substance of the disclaimer provisions must track the substance of the alleged misrepresentations. *Id.* Notably, "the specificity requirement is further relaxed when the contracting parties are 'sophisticated business people' and the disclaimer clause is the result of negotiations between them." *Id.*, quoting *Citibank, N.A. v. Plapinger*, 485 N.E.2d 974, 976-77 (N.Y. 1985); *see also infra* § III(A)(2).

In this case, the plain language of the APA compels the result that Plaintiffs' fraud and negligent misrepresentation claims are legally invalid. All of the representations in the APA are found in Sections 5.1 - 5.9, but none of those representations are made by the Sellers. (Ex. C (APA) §§ 5.1-5.9.) As noted, the APA does not even contain a list of the specific assets being sold to Plaintiffs, but rather only a reference to a schedule listing specific assets which were *excluded* from the sale. (*Id.* at §§ 2.1, 2.2.) Section 5.10 of the APA (which is entitled "Disclaimer of Other Representations and Warranties") plainly states and specifies that the "Buyer hereby acknowledges and agrees that the Buyer is purchasing the Purchased Assets on an 'as-is, where-is' basis and that the Sellers make no representation or warranty whatsoever and none shall be implied at law or in equity." (Ex. C (APA) §§ 5.1-5.10.) Courts have consistently held that, in the context of sophisticated business transactions, where a disclaimer provides that assets are purchased on an "as-is, where-is" basis, the purchaser cannot later state a claim for fraud based on representations about those assets. *See, e.g., Dallas Aerospace*, 2002 WL

-22-

31453789, at *5-6; *Sigma Star Foods Corp.*, 1996 WL 41810, at *2-3 (granting motion to dismiss fraudulent misrepresentation claim where contract for sale of assets contained a disclaimer which provided that "[t]he Assets are sold 'as is and where is'" and that "[a]ll other warranties, express or implied, including warranties of condition or the assets, are hereby disclaimed by Seller"); *Christie's Inc. v. Dominica Holding Corp.*, No. 05 Civ. 8728 (NRB), 2006 WL 2012607, at *3 n.12, *4 (S.D.N.Y. July 18, 2006) (recognizing that a disclaimer stating that "all property is sold 'as is' without any representation or warranty of any kind" was sufficiently specific to fall within the *Dannan* rule).

Furthermore, the broad integration clause, which clearly states that "[t]his Agreement (including the Exhibits and the Disclosure Schedule) and the Confidentiality Agreement constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings among the parties with respect thereto" bars Plaintiffs from now asserting that they were relying on previous representations not contained in the APA. *See, e.g., DDCLAB Ltd. v. E.I. DuPont De Nemours & Co.*, No. 03 Civ. 3654 (GBD), 2005 WL 425495, at *6 (S.D.N.Y. Feb. 18, 2005) (granting motion to dismiss claim based on alleged oral promises made prior to the execution of a contractual agreement given the agreement's unambiguous integration clause).

Here, Plaintiffs premise their claims on an allegation of "reli[ance] on the oral and written misrepresentations of the Defendants." (Compl. ¶ 1.) However, because Plaintiffs specifically acknowledged in the APA that they were purchasing Old Winstar's assets with no representations or warranties whatsoever, and that the representations contained in the APA (none of which were made by Old Winstar) superseded all prior agreements and understandings between the parties, Plaintiffs cannot now maintain claims premised on reliance on

representations they have already disclaimed. *See Kidd v. Spector*, No. 93 Civ. 7297 (KTD), 1998 WL 879698, at *4 (S.D.N.Y. Dec. 15, 1998) (provision stating that the parties were not relying on representations aside from those contained in the contract, plaintiff was taking possession of property "as is," and defendants made no representations as to the condition of the property barred plaintiffs claim for fraud based on representations about the property). Because Plaintiffs cannot allege the requisite reasonable and justifiable reliance necessary to maintain claims for fraud and negligent misrepresentation, those claims should be dismissed. *See Harsco*, 91 F.3d at 348 (affirming dismissal of common law fraud and negligent misrepresentation claims pursuant to Rule 12(b)(6) in face of broad disclaimer of representations); *Progressive*, 2002 WL 1558382, at *1.

> 2.   Plaintiffs' Business Sophistication Further Underscores the Absence of Reasonable and Justifiable Reliance as a Matter of Law.

The absence of representations to Plaintiffs in the APA and the express language specifying that Plaintiffs were buying Old Winstar's assets "as-is, where-is" without representations and subject to an integration clause are not the only reasons why as a matter of law Plaintiffs cannot satisfy the requirements of reasonable and justifiable reliance on any claimed misrepresentations. Here, Plaintiffs were sophisticated parties negotiating a multimillion-dollar transaction. (*See* Compl. ¶¶ 1, 3; Ex. A (Sale Approval Order) ¶ G.)  In fact, Plaintiffs were intimately familiar with the telecommunications industry (the industry in which Old Winstar did business) because they themselves were in that same business. (*See* Compl. ¶ 2 ("Plaintiff IDT Corp. . . . is, among other things, a telephone company.).)  Enforcement of these types of contractual provisions is especially compelling where the contract at issue was

negotiated by a sophisticated Plaintiff. [17]  If Plaintiffs, with all their knowledge and experience,

truly believed -- as they now claim -- that the alleged representations made by Blackstone and

the other defendants were fundamental to their decision to execute the APA (*see* Compl. ¶ 1),

they "could have negotiated to have those representations reduced to writing and included in the

agreement." *See Progressive*, 2002 WL 1558382, at *8.[18]  They did not.

　　　　Accordingly, because for all these reasons Plaintiffs cannot establish reasonable and

justifiable reliance as a matter of law, their claims for fraud and negligent misrepresentation

should be dismissed.  *See Emergent Capital*, 165 F. Supp. 2d at 622-23 (granting motion to

dismiss fraud claim after considering "the integration clause, the entire contract, and the

sophistication and knowledge of the parties"); *Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227

F.3d 8, 20-22 (2d Cir. 2000) (affirming dismissal of negligent misrepresentation claim where

reasonable reliance on misrepresentations could not be established); *Harsco*, 91 F.3d at 348.

---

[17]  *See Emergent Capital*, 165 F. Supp. 2d at 623 (granting motion to dismiss where contract contained an anti-reliance clause, specifically relying on the "sophistication and knowledge of the parties" and the fact that the underlying "multi-million dollar transaction [was] executed following negotiations between sophisticated business people"); *Harsco*, 91 F.3d at 345-48 (affirming dismissal of fraud and negligent misrepresentation claims arising out of a multimillion-dollar, arm's-length deal between sophisticated parties where the purchase agreement disclaimed any representation or warranty on anything not expressly stated therein); *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.S.2d 377, 384 (N.Y. 1983) (enforcement of contractual waiver clause is "especially" warranted when the contract was "entered into at arm's length by sophisticated contracting parties"); *VGS*, 2003 WL 723285, at *8 (disallowing fraud claim where multimillion dollar transactions were negotiated at arm's length by sophisticated parties).

[18]  Further, Plaintiffs retained full access to Old Winstar's business records before purchasing Old Winstar's assets. (Ex. C (APA) § 6.2.) Such access "belie[s] [Plaintiffs'] claim that defendants' [alleged] misrepresentations induced [them] to enter into" the APA. *CFJ Assocs. of New York Inc. v. Hanson Industries*, 711 N.Y.S.2d 232, 236 (N.Y. App. Div. 2000) (finding no justifiable reliance where sophisticated plaintiff had right to inspect premises); *see also Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 N.Y.S.2d 91, 98 (2d Cir. 1997) (recognizing that "[w]here sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance").

-25-

**B.     Plaintiffs' Claims for Aiding and Abetting Fraud and Civil Conspiracy Should Be Dismissed Because The Fraud Claim is Legally Insufficient.**

Under New York law, in order to state a claim for aiding and abetting fraud, a plaintiff must adequately establish (1) the existence of a fraud; (2) defendant's knowledge of the fraud; and (3) that defendant provided substantial assistance to advance the fraud's commission. *WestRM-West Risk Markets, Ltd. v. XL Reinsurance America, Inc.*, No. 02 Civ. 7344 (MGC), 2006 WL 2034627, at *10 (S.D.N.Y. July 19, 2006). Because, as explained above, Plaintiffs cannot as a matter of law maintain their fraud claim, they cannot as a matter of law establish the first requisite element of a claim for aiding and abetting fraud -- the existence of a fraud. *Id.* Therefore, this Court should dismiss the aiding and abetting claim. (Count 2) *See id.* at *10-*11 (aiding and abetting fraud claim is inadequate where all elements of the claim are not established).

Plaintiffs' fifth claim, for civil conspiracy, fails for similar reasons. It is well-settled that "a claim for civil conspiracy is not an independent tort, but, rather, is a derivative claim of an underlying substantive tort." *See, e.g., Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*, 871 F. Supp. 709, 731 (S.D.N.Y. 1995). An allegation of civil conspiracy is only appropriate for the purpose of establishing joint liability by co-participants in a particular tortuous conduct. *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 123 (2d Cir. 1981). Because the Complaint fails to state a legally cognizable claim for fraud, Plaintiffs cannot separately maintain their derivative claim of civil conspiracy.[19] *See Valden Sportswear v. Montgomery Ward & Co.*,

---

[19]  Because one can only conspire to commit an intentional tort, neither negligence nor negligent misrepresentation can constitute the requisite underlying tortuous conduct. *See Portnoy v. American Tobacco Co.*, No. 06/16323, 1997 WL 638800, at *7 (N.Y. Sup. Ct. Suffolk Co. Sept. 26, 1997) ("Because a claim of conspiracy requires a showing of intentional conduct, there can hardly be conspiracy to commit negligence.").

591 F. Supp. 1188, 1191 (S.D.N.Y. 1984) ("Because the seventh claim fails to allege any act of tortuous conduct, the claim must be dismissed.").

### C.    Plaintiffs' Fraud, Aiding and Abetting Fraud, and Conspiracy Claims Fail As They Fall Beneath the Heightened Pleading Requirements of Rule 9(b).

Moreover, even if the anti-reliance and integration provisions in the APA did not bar Plaintiffs' fraud-based claims outright -- which they do -- the Complaint fails to state claims for fraud, aiding and abetting fraud, and conspiracy with the requisite particularity to survive dismissal under the heightened pleading standards of Fed. R. Civ. P. 9(b).  As stated above, Rule 9(b) requires that a plaintiff alleging fraud state the person by whom and to whom any alleged misrepresentation is made as well as the time, date, or place of the alleged fraud.  *See Lum*, 361 F.3d at 224.  Moreover where, as here, fraud is alleged against a group of defendants, Rule 9(b) mandates that the alleged misrepresentations are plead with particularity as to each defendant individually.  *See Naporano*, 79 F. Supp. 2d at 511; *Yung v. Lee*, 160 Fed. Appx. 37, 42 (2d Cir. 2005).  Here, Plaintiffs allege collective misrepresentations made by all Defendants and Old Winstar itself during the alleged "due diligence" period.  (Compl. ¶¶ 22-30.)  Yet Plaintiffs fail to identify the times or places the alleged misrepresentations were made, which representatives of the Defendants or Old Winstar allegedly made them, or to whom at IDT they were allegedly made.  (*Id.*)  Such generalized pleading falls far short of the particularity requirements of Rule 9(b) and requires that the fraud-based claims be dismissed as a matter of law.[20]

---

[20]    Aiding and abetting fraud and conspiracy to commit fraud are subject to the same heightened pleading requirements as fraud itself.  *See In re American Business Fin. Servs., Inc.*, 361 B.R. 747, 762 (Bankr. D. Del. 2007); *Gordon v. Diagnostek, Inc.*, 812 F. Supp. 57, 62 (E.D. Pa. 1993).

**D.    Plaintiffs' Negligence Claim is Barred by New York's Statute of Limitations.**

Finally, even if the Court decided not to apply Delaware's statute of limitations,

Plaintiffs' claim for negligence would still be time-barred by operation of the New York statute

of limitations on negligence claims, which is three years.  *See* N.Y. C.P.L.R. § 214 ("The

following actions must be commenced within three years: . . . (4) an action to recover damages

for an injury to property . . .").  As under the Delaware statute, a claim for negligence accrues

under the New York statute at the time of injury.  *Triangle Underwriters, Inc. v. Honeywell Info.*

*Sys., Inc.*, 604 F.2d 737, 744 (2d Cir. 1979) (negligence cause of action accrues when the acts or

omissions constituting the negligence produce the injury).  Because Plaintiffs' claims accrued at

the latest when the transaction closed in December 2001 and Plaintiffs did not file suit until May

2007, any negligence claim is barred by the New York statute of limitations.  *Reznor v. J. Artist*

*Mgmt., Inc.*, 365 F. Supp. 2d 565, 579 (S.D.N.Y. 2005) (recognizing that, under New York law,

a negligence cause of action "accrues when the acts or omissions constituting the negligence

produce the injury," and thus dismissing as time-barred plaintiff's negligence claim brought

more than three years after the injury accrued).

## CONCLUSION

For all the foregoing reasons, Defendant Blackstone respectfully requests that this Court

grant its Motion to Dismiss the Complaint with prejudice in its entirety.[21]

---

[21]    Dismissal with prejudice is warranted here because any attempt to replead would be futile given the glaring nature of the defects cited above.  *See Parker v. Google, Inc.*, 242 Fed. Appx. 833, 839 (3d Cir. 2007) (leave to amend a complaint is inappropriate where such amendment would not cure the deficiencies identified in a Rule 12(b)(6) motion).

Respectfully submitted,

GREENBERG TRAURIG, LLP

Dated:  January 22, 2008

Victoria W. Counihan (No. 3488)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 N. Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone:    (302) 661-7000
Facsimile:    (302) 661-7360
counihanv@gtlaw.com
melorod@gtlaw.com

-- and --

Yosef J. Riemer
Vickie Reznik
David S. Flugman

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Attorneys for Defendant*
*The Blackstone Group LP*

**EXHIBIT A**

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------x
                                  :

In re:                            : Chapter 11

WINSTAR COMMUNICATIONS, INC., et al.,  : Case No.: 01-1430 (JJF)

                                    : Jointly Administered

                Debtors.             :

                                    :

                                    :
---------------------------------------------------------x

**ORDER AUTHORIZING (i) SALE OF CERTAIN OF THE DEBTORS'
ASSETS FREE AND CLEAR OF LIENS, CLAIMS ENCUMBRANCES,
AND INTERESTS, (ii) APPROVING CURE AMOUNTS WITH RESPECT
TO CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
(iii) AUTHORIZING THE DEBTORS TO ENTER INTO AND APPROVING
MANAGEMENT AGREEMENT, (iv) APPROVING REGULATORY
TRANSITION PROCESS AND (v) GRANTING RELATED RELIEF**

This matter having come before the court on (I) the motion (the "Original
Motion"; terms not otherwise defined in this Sale Order shall have the meanings ascribed to such
terms in the Original Motion) filed by Winstar Communications, Inc. and its affiliated debtors
and debtors in possession in the above-captioned cases (collectively, the "Debtors"), requesting
the entry of (A) an order pursuant to sections 363(b) and 105(a) of title 11, United States Code
(the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of
Bankruptcy Procedure (the "Bankruptcy Rules") (i) approving bidding procedures, including bid
protections, (ii) approving the form and manner of notice of (a) the hearing to consider granting
certain bid protections (the "Bid Procedures Hearing"), (b) the hearing on the sale of certain of
the Debtors' assets (the "Sale Hearing"), (c) proposed cure payments and (d) assumption and
assignment of executory contracts and unexpired leases, and (iii) scheduling the Sale Hearing,

                                                        

and (B) an order authorizing and approving (i) the sale of certain of the Debtors' assets free and clear of liens, claims and encumbrances (the "Sale") and (ii) the assumption and assignment of certain executory contracts and unexpired leases, and (II) the supplement to the Original Motion filed with the Bankruptcy Court on December 14, 2001 (the "Motion Supplement", and together with the Original Motion, the "Motion") seeking entry of an order (i) authorizing the Debtors to enter into, and approving, a management agreement substantially in the form annexed to the Motion Supplement as Exhibit A (the "Management Agreement"), (ii) approving, and authorizing the Debtors to implement, the Debtors' proposed regulatory transition process (the "Regulatory Transition Process") and (iii) granting related relief, including an extension of the period under Bankruptcy Code section 365(d)(4) within which the Debtors may decide whether to assume or reject unexpired leases of nonresidential real property; and the Court having conducted a hearing on November 27, 2001, and having entered an order dated November 27, 2001 approving the Bidding Procedures; and an auction having been held at the offices of Shearman & Sterling, counsel to the Debtors, on December 5, 2001, in accordance with the Bidding Procedures previously approved by this Court; and following the conclusion of the Auction, the Debtors, in consultation with their financial advisors, and after consultation with counsel to each of the Creditors' Committee, the Agent for the Prepetition Lenders and the Agent for the DIP Lenders, having (i) reviewed each bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale, and (ii) identified the bid of IDT Winstar Acquisition, Inc. (the "Buyer"), as set forth in the Asset Purchase Agreement, dated as of December 18, 2001 (the "Asset Purchase Agreement") as the highest and best offer for the Purchased Assets (as defined below in Paragraph H) at the Auction (the "Successful Bid"); and a hearing on the Motion

having been commenced on December 10, 2001 and continued on December 17, 2001 and December 18, 2001 (the "Sale Hearing"); and all interested parties having been afforded an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered (i) the Motion, (ii) the objections thereto, if any, and (iii) the arguments of counsel made, and the evidence proffered or adduced at the Sale Hearing; and it appearing that the relief requested in the Motion and approval of the Sale of the assets to be acquired under the Asset Purchase Agreement (as defined therein, the "Purchased Assets") and the entry of an order approving the Sale (this "Sale Order") is in the best interests of the Debtors, their estates, creditors, and other parties in interest; and upon the record of the Sale Hearing, and these cases; and after due deliberation thereon; and good cause appearing therefor, it is hereby

FOUND AND DETERMINED AS FOLLOWS:[1]

A.     This Court has jurisdiction over the Motion and the transactions contemplated by the Motion pursuant to 28 U.S.C. §§157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(M). Venue of these cases and the Motion is proper pursuant to 28 U.S.C. §§1408 and 1409.

B.     The statutory predicates for the relief sought in the Motion are sections 105, 363 and 365 of 11 U.S.C. §§101 et seq. (the "Bankruptcy Code") and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure.

C.     As evidenced by the affidavits of service previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, the Cure Notices, the Sale of the Purchased

---

[1]     Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed.R.Bank.P. 7052.

Assets and of the related transactions contemplated thereby (including without limitation the entry of the Debtors into the Management Agreement and the implementation of the Regulatory Transition Process) has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure; (ii) such notice was reasonable, sufficient, and appropriate under the circumstances; and (iii) no other or further notice of the Motion, the Sale Hearing, the Cure Notices, the Sale of the Purchased Assets and all the related transactions contemplated thereby (including without limitation the entry of the Debtors into the Management Agreement and the implementation of the Regulatory Transition Process) shall be required.

D.       A reasonable opportunity to object or be heard with respect to the Motion and the relief requested in the Motion has been afforded to all interested persons and entities, including (i) counsel for the Buyer, (ii) counsel for The Bank of New York, as Agent under the Pre-Petition Credit Agreement, (iii) counsel for Citibank, N.A., as agent under the DIP Credit Agreement, (iv) counsel for the Official Committee of Unsecured Creditors (the "Creditors' Committee"), (v) the Office of the United States Trustee, (vi) each party identified by the Debtors as a potential Buyer of the Purchased Assets that was contacted as part of the Sale process, (vii) all entities known to have any asserted lien, claim, encumbrance, alleged interest in or with respect to the Purchased Assets, (viii) all applicable federal, state and local taxing authorities; and (ix) all other entities that have filed requests for notices pursuant to Bankruptcy Rule 2002.

E.       The Debtors (i) have full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated by the Motion, (ii) have all of the corporate power and authority necessary to consummate the transactions contemplated by the

4

Motion and the Asset Purchase Agreement and (iii) have taken all corporate action necessary to authorize and approve the Sale and the consummation by the Debtors of the transactions contemplated thereby.

F.    The Debtors have demonstrated sound business justifications for the Sale and the other transactions and actions contemplated by the Motion pursuant to section 363(b) of the Bankruptcy Code.

G.    Each of the Sale, the Management Agreement and the Asset Purchase Agreement were negotiated, proposed and agreed to by the Debtors and the Buyer as parties thereto without collusion, in good faith, and from arm's-length bargaining positions.  The Buyer is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such is entitled to all of the protections afforded thereby.

H.    The consideration provided by the Buyer for the Purchased Assets (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Purchased Assets and (iii) will provide a greater recovery for the Debtors' creditors and other interested parties than would be provided by any other practically available alternative.

I.    The transfer of the Purchased Assets to the Buyer under the Sale and the Asset Purchase Agreement will be a legal, valid, and effective transfer of such Purchased Assets, and will, upon the occurrence of the Closing (as defined in the Asset Purchase Agreement), vest in the Buyer all right, title and interest of the Debtors in the Purchased Assets free and clear of all Encumbrances and interests other than the Permitted Encumbrances (in each case, as defined in the Asset Purchase Agreement) (collectively, the "Interests") including, but not limited to, those (i) that purport to give to any party a right or option to give any of the foregoing in the future, any sale or contingent sale or title retention agreement or lease, or termination of the Debtors' or

the Buyer's interest in the Purchased Assets, or any similar rights, and (ii) relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Debtors' businesses prior to the Closing Date (as defined in the Asset Purchase Agreement).

J.    The transfer of the Purchased Assets to the Buyer free and clear of all Interests will not result in any undue burden or prejudice to any holders of any Interests since all such Interests of any kind or nature whatsoever shall attach to the net proceeds of the Sale (the "Sale Proceeds") in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets, subject to the Carveout (as defined in the Final Order Authorizing Debtors In Possession to Enter Into Post-Petition Credit Agreement and Obtain Post-Petition Financing Pursuant to Section 363 and 364 of the Bankruptcy Code, and Providing Adequate Protection and Granting Liens, Security Interests and Superpriority Claims, dated May 14, 2001 and entered in these cases) and to any claims and defenses the Debtors or other parties may possess with respect thereto.

K.    The Buyer would not consummate the transactions contemplated by the Sale, thus adversely affecting the Debtors, their estates, and their creditors, if the Sale of the Purchased Assets to the Buyer was not free and clear of all Interests of any kind or nature whatsoever, or if the Buyer would, or in the future could, be liable for any such Interests and if the assignment of the Purchased Assets could not be made under section 363 of the Bankruptcy Code.

L.    The Debtors may sell the Purchased Assets free and clear of all Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied. Those (i) holders of Interests and (ii) non-debtor parties who did not object, or who withdrew their objections, to the Sale, the Sale of the Purchased Assets or the Motion are deemed to have consented pursuant to Bankruptcy Code

section 363(f)(2). Those holders of Interests fall within one or more of the other subsections of Bankruptcy Code section 363(f) and are adequately protected by having their Interests, if any, attach to the proceeds of the Sale ultimately attributable to the property against or in which they claim or may claim an Interest. Notwithstanding anything contained herein or in the Asset Purchase Agreement to the contrary, the Sale of the Purchased Assets is subject to the consent of the DIP Lenders.

M.    Due to the regulated environment in which certain of the Purchased Assets are operated, the entry of this Sale Order is necessary to ensure the uninterrupted provision of services to customers of the Debtors (the "Customers") during the period in which the Buyer and the Debtors seek to comply with the applicable federal and state regulatory laws and to enter into contractual or other legal arrangements necessary for the consummation of the Sale, the transfer of the Licenses (as defined below) to the Buyer and the operation of the Purchased Assets by the Buyer (the "Compliance Items").

N.    Approval at this time of the Sale, the Asset Purchase Agreement and the Management Agreement, and all the transactions contemplated thereby and hereby (including the Regulatory Transition Process) is in the best interests of the Debtors, their creditors, their estate and other parties in interest.

NOW THEREFORE, BASED UPON THE FOREGOING FINDINGS OF FACT, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, EFFECTIVE IMMEDIATELY, THAT:

1.    The Motion is granted, as further described herein.

2.    All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits, provided, however, that nothing herein shall alter or impair the rights of any party

7

that has filed and served a timely objection to dispute the amount of a cure payment listed on an applicable Cure Notice, which rights are specifically reserved and which disputes shall be resolved either consensually or, as necessary, by further order of the Court. Notwithstanding anything in the Motion, the Asset Purchase Agreement or this Sale Order to the contrary, the Debtors shall not be authorized to assume and assign any executory contract(s) between any of the Debtors and the United States General Services Administration (the "GSA") without the prior consent of a person authorized to act on behalf of the GSA to the extent such consent is required by any contract or applicable law.

3.      The Asset Purchase Agreement substantially in the form attached as Exhibit A to the Notice of Filing of Asset Purchase Agreement, dated December 18, 2001 (including all exhibits, schedules and annexes thereto), and all of the terms and conditions thereof, are hereby approved.

4.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized to consummate the Sale of the Purchased Assets, pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, to enter into the Management Agreement and to implement the Regulatory Transition Process.

5.      The Debtors are authorized to execute and deliver, and are empowered to perform under, consummate and implement, the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement (including the Management Agreement), and to take all further actions as may be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer or reducing to possession, the Purchased Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by

8

the Asset Purchase Agreement, including without limitation the implementation of the Regulatory Transition Process. Notwithstanding anything in the Motion, the Asset Purchase Agreement or this Sale Order to the contrary, the Buyer assumes no employee liabilities that arose prior to the Closing Date, including any accrued but unbilled liabilities.

6.      The transfer of the Purchased Assets to the Buyer pursuant to, and subject to the terms of, the Asset Purchase Agreement shall constitute a legal, valid and effective transfer of the Purchased Assets, and shall, upon the occurrence of the Closing, vest in the Buyer all right, title and interest of the Debtors in and to the Purchased Assets to be acquired by such Buyer free and clear of all Interests of any kind or nature whatsoever, with all such Interests to attach to the Sale Proceeds in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets, subject to the Carveout and to any claims and defenses the Debtors or other parties may possess with respect thereto.

7.      In consideration for the Purchased Assets, and subject to the terms and conditions of the Asset Purchase Agreement, the Buyer shall assume the Assumed Liabilities (as defined therein) and, on the Closing Date, shall irrevocably (i) pay, at the Debtors' election, exercised prior to the Closing Date, (x) an amount in cash equal to $38,000,000 (the "Cash Payment") or (y) an amount in cash equal to $30,000,000 and cause to be issued to the Debtors a number of shares of Class B common stock of IDT Corporation, having a value equal to $12,500,000 based on the average closing price of such stock during the seven trading day period ended December 14, 2001 (the "IDT Shares", and together with the $30,000,000, the "Cash/Stock Payment"), and (ii) issue to the Debtors such number of shares of common stock of the Buyer, representing 5% of the outstanding shares of Buyer Common Stock as of the date hereof, all in accordance with the terms and conditions of the Asset Purchase Agreement.

9

Pursuant to the Escrow Agreement (as defined in the Asset Purchase Agreement), which is hereby approved, on or before the date of this Sale Order, the Buyer shall deliver or shall have delivered the Cash Payment to the Escrow Agent (as defined in the Asset Purchase Agreement) to be held in escrow pending Closing. On the Closing Date, the Debtors and the Buyer shall instruct the Escrow Agent to promptly release the Escrow Amount (as defined in the Asset Purchase Agreement) to an account or accounts designated by the Debtors, on behalf of the Debtors in accordance with the terms of the Escrow Agreement. Such account shall be an interest-bearing account in the name of one or more of the Debtors established at Citibank, N.A. for the purpose of receiving such funds (the "Proceeds Account"). The Sale Proceeds shall be maintained in the Proceeds Account and shall not be distributed to any party in interest, including professionals and secured parties, pending further order of the Court following notice and a hearing. Accrued interest on such funds shall constitute part of the Sale Proceeds available for distribution. The Buyer shall have no claim whatsoever to or against any of the funds in the Proceeds Account or to the IDT Shares or the Buyer Common Stock subsequent to the Closing. Any allocation of the Purchase Price agreed to by the Debtors and the Buyer shall not be binding on any other party.

        8.      On the Closing Date, the Buyer and the Debtors shall enter into the Management Agreement, and the Buyer shall deposit into an account at Citibank, N.A. (the "Operating Account") an amount in cash equal to $60 million in immediately available funds, to be used from and after the Closing Date through and including the Cutoff Date (as defined in the Management Agreement) exclusively to pay all costs set forth in subsection 3.1(a) of the Management Agreement. In the event that the Buyer shall fail to pay, as and when due, any such costs and the Debtors shall be held liable therefore, the Buyer hereby agrees to indemnify the

10

Debtors for all such costs. In the event that any funds shall be on deposit in the Account (as defined in the Management Agreement) after the Cutoff Date, and all accrued and unpaid costs required to be paid in accordance with the Management Agreement shall have been paid, any balance may, upon five (5) days' written notice to the Debtors, the Agent for the Postpetition Lenders and such telecommunications service providers that shall send written request to the Buyer requesting such notice and the Buyer shall provide such notice to each party to the extent such party shall continue to provide services to the Debtors or the Buyer, be withdrawn by the Buyer.

9.      Except as expressly permitted or otherwise specifically provided for in the Asset Purchase Agreement or this Sale Order, effective upon the occurrence of the Closing, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and other regulatory authorities, lenders, trade and other creditors holding Interests (including but not limited to any claims under any applicable revenue, pension, ERISA, tax, labor, environmental or natural resource law, rule or regulation, or any products liability law) of any kind or nature whatsoever against or in the Debtors or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors' businesses prior to the Closing Date of the Sale of the Purchased Assets, or the transfer of such Purchased Assets to the Buyer, hereby are forever barred, estopped, and permanently enjoined from asserting against the Buyer, its successors or assigns (to the extent allowed by law), its property, its officers, directors and shareholders or the Purchased Assets, such persons' or entities' Interests. Notwithstanding anything herein to the contrary, nothing

11

herein shall in any way affect or diminish any rights of the Debtors or any successor thereto (including any chapter 11 or chapter 7 trustee) with respect to obligations of the Buyer arising under the Asset Purchase Agreement, the Management Agreement or this Sale Order. This Sale Order shall be binding on the Debtors and the Debtors' estates, including, following any conversion of these cases, any successor chapter 7 estates, and any chapter 7 trustees appointed in these cases.

10.    The consideration provided by the Buyer for the Purchased Assets under the Asset Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

11.    Notwithstanding any provision to the contrary in this Sale Order, the Motion or the Asset Purchase Agreement, certain prototype laboratory equipment (as listed on Exhibit A hereto, the "Lab Equipment") and certain disbursement and investment accounts established in connection with the Lucent Credit Agreement (as listed on Exhibit B hereto, the "Accounts") shall be segregated from the Debtors' other assets, shall not constitute part of the Purchased Assets and shall not be included in the Sale. Nothing in this Sale Order, the Motion or the Asset Purchase Agreement shall impair or affect the rights and interests of Lucent in the Lab Equipment and the Accounts. The Buyer hereby reserves the right, subject to notice and a hearing, to seek to characterize the Lab Equipment as owned by the Debtors, and to the extent an Order so providing is entered by the court, the Lab Equipment shall constitute Purchased Assets.

12.    This Sale Order (a) shall be effective as a determination that, on the Closing Date, and subject to the occurrence of the Closing, all Interests of any kind or nature whatsoever existing prior to the Closing as to the Purchased Assets transferred pursuant to the

12

Asset Purchase Agreement (including but not limited to any claims under any applicable revenue, pension, ERISA, tax, labor, environmental or natural resource law, rule or regulation, or any products liability law) have been unconditionally released and terminated as to such Purchased Assets, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the act of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

13.    Each and every federal, state and local governmental agency, department or unit is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement, except the FCC as regards its approval of the transfer of the Licenses.

14.    Except as expressly permitted or otherwise specifically provided for in the Asset Purchase Agreement or this Sale Order in respect of the Asset Purchase Agreement or the Purchased Assets to be transferred pursuant to such Asset Purchase Agreement, the Buyer shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to such Purchased Assets and, to the extent allowed by law, the Buyer (and its officers, managers and members) shall not be liable for any other claims against the Debtors or any of their predecessors or affiliates, and the Buyer shall have no successor or vicarious liabilities of any kind or character whether known or unknown as of the Closing Date under the Asset

13

Purchase Agreement, now existing or hereafter arising, whether fixed or contingent, with respect

to the Debtors or any obligations of the Debtors, other than the Permitted Encumbrances, arising

prior to the Closing Date under the Asset Purchase Agreement, including, but not limited to, any

liabilities under any revenue, pension, ERISA, tax, labor, environmental or natural resource law,

rule or regulation, or any products liability law, arising, accruing, or payable under, out of, in

connection with, or in any way relating to the operation of the Debtors' businesses prior to the

Closing Date. After the Closing and the payment of the Purchase Price, the Buyer shall have no

liability to the Debtors or their estates for any diminution in value or other damage of any kind

whatsoever to the Regulated Assets or the Licenses that may result from the Buyer's operation of

the Debtors' business.

       15.    This Court retains and shall have exclusive jurisdiction to endorse and

implement the terms and provisions of the Asset Purchase Agreement, all amendments thereto,

any waivers and consents thereunder, and each of the agreements executed in connection

therewith (including the Management Agreement) in all respects, including, but not limited to,

retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Buyer, (b) compel

delivery of the purchase price or performance of other obligations owed to the Debtors, (c)

resolve any disputes arising under or related to the Asset Purchase Agreement, and (d) interpret,

implement, and enforce the provisions of the Asset Purchase Agreement and this Sale Order.

       16.    The transactions contemplated by the Asset Purchase Agreement are

undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy

Code, and accordingly, the reversal or modification on appeal of the authorization provided

herein to consummate the Sale of any Purchased Assets shall not affect the validity of the Sale of

such Purchased Assets to the Buyer, unless such authorization is duly stayed pending such

14

appeal prior to the Closing with respect to such Purchased Assets. The Buyer is a purchaser in good faith of the Purchased Assets, and the Buyer is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

17. The terms and provisions of the Asset Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors, the Buyer and their respective affiliates, successors and assigns and any affected third parties (including, but not limited to, all persons asserting Interests in the Purchased Assets to be sold to the Buyer pursuant to the Asset Purchase Agreement), notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

18. The failure specifically to include any particular provisions of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety. To the extent that any provision of this Sale Order is inconsistent with the Asset Purchase Agreement or the Management Agreement, the terms of this Sale Order shall control.

19. The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates and is, if occurring prior to the Closing Date, approved by counsel for each of the Creditors' Committee, the agent for the lenders under the Pre-Petition Credit Agreement, and the agent for the lenders under the DIP Credit Agreement. The Debtors shall also notify counsel for Lucent of any

modification, amendment or supplement to the Asset Purchase Agreement and, if such modification, amendment or supplement impairs or adversely affects Lucent's rights as a secured creditor in these chapter 11 cases, shall obtain Lucent's prior consent thereto.

20.    The transfer of the Purchased Assets pursuant to the Asset Purchase Agreement, and the transactions contemplated thereby constitute steps toward the formulation, or in anticipation of the formulation of, a chapter 11 plan for the Debtors and as such, in accordance with section 1146(c) of the Bankruptcy Code, the making or delivery of any instrument of transfer to effectuate the Asset Purchase Agreement and the transactions contemplated thereby shall not be taxed under any law imposing a stamp tax or a sale, transfer or any other similar tax, and the recordation of any instruments (including bills of sale, leases, assignments and amendments thereto) to evidence the Sale of the Purchased Assets shall not be subject to any such tax.

21.    All of the Debtors' interests in the Purchased Assets to be acquired by the Buyer under the Asset Purchase Agreement shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Buyer.  Upon the occurrence of the Closing, this Sale Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Purchased Assets acquired by the Buyer under the Asset Purchase Agreement and/or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in the Purchased Assets acquired by the Buyer under the Asset Purchase Agreement to the Buyer.

22.    As of the Closing Date, the Buyer shall be hereby granted immediate and unfettered access to the Purchased Assets (other than the Licenses) acquired by the Buyer.

<u>Regulatory Transition Process</u>

16

23.    The Debtors and the Buyer shall have a period (the "Regulatory Compliance Period") of one hundred-twenty (120) days (subject to extension) from the Closing Date to obtain the requisite federal and state regulatory approvals necessary to operate the Business and to enter into contractual or other legal arrangements necessary for the consummation of the Sale, transfer of the Licenses and the Regulated Assets (as defined below) to the Buyer and the operation of the Purchased Assets by the Buyer (the "Compliance Items"). In order to ensure the uninterrupted provision of services to the Customers during the Regulatory Compliance Period, and the orderly transfer of the Licenses and, to the extent required by any other applicable law, any other assets subject to similar transfer restrictions (the "Regulated Assets") to the Buyer, the Buyer, the Debtors and all providers of goods and services to the Debtors, including but not limited to the common carrier service providers that provide services to the Debtors and any landlords of properties used by the Debtors (the "Service Providers") are hereby authorized and directed as follows:

a.    As soon as practicable following the entry of this Sale Order, the Debtors and the Buyer are directed to file such applications as are required to seek the federal and state regulatory authority necessary for the Debtors to assign, and the Buyer to acquire, own and operate, the Licenses and the Regulated Assets.

b.    On the Closing Date, the Buyer and the Debtors are directed to enter into a Management Agreement substantially in the form appended as Exhibit E to the Asset Purchase Agreement, pursuant to which the Buyer shall be entitled to manage and operate the business of the Debtors during the Regulatory Compliance Period on the terms and conditions set forth therein.

c.    From the Closing Date to the Cutoff Date, all agreements and other arrangements with Service Providers relating to the Debtors providing service to Customers shall, subject to compliance with paragraph (d) below, remain in effect and

17

may not be canceled or terminated, and absent an event of default occurring after the Closing Date in respect of facts arising after the Closing Date that has not been cured within three (3) business days after written notice (by email and facsimile) thereof has been received by the Buyer (Attention: Chief Financial Officer, email: steveb@corp.idt.net, facsimile: 973-438-1414, and McDermott, Will & Emery, Attention: David C. Albalah, Esq., email: dalbalah@mwe.com, facsimile: 212-574-5444), no Service Provider shall reduce or otherwise alter in any adverse manner its performance under any such agreement(s) or arrangement(s) until the Cutoff Date.

     d.    The Buyer shall be responsible for, and is directed to pay on a timely basis, all charges incurred for services used by the Debtors to provide services to the Customers from the Closing Date to the Cutoff Date, including all charges incurred with respect to Service Providers. The rates charged by Service Providers for such services shall not exceed the rates for those services in effect as of the date of this Sale Order. Neither the Debtors or Buyer shall have any obligation or liability for services not actually being utilized and each Service Provider shall, upon written notice from the Debtors and the Buyer, immediately and without charge or further liability of any kind discontinue and disconnect any such services provided to the Debtors and/or the Buyer.

     e.    The Buyer is further authorized to promptly establish such contractual or other legal arrangements as the Buyer and the Debtors deem necessary to operate the Debtors' assets and to provide service to Customers (including interconnection and other common carrier service agreements with Service Providers) and that will permit Buyer to provide service to Customers in a manner similar to the manner in which the Debtors provided such service prior to the date of this Sale Order and that will enable the Customers to continue to receive service in an uninterrupted and transparent manner.

     f.    During the 120-day period commencing on the Closing Date, in the event that any contract with any Service Provider that is a telecommunications carrier shall be rejected: (i) no termination liabilities shall arise; (ii) such telecommunications carrier

18

shall provide telecommunications services in accordance with, and to the extent required by, applicable law in a non-discriminatory manner; and (iii) such telecommunications carrier will charge the Buyer for replacement circuits the lower of actual costs and tariff rates to set up or establish such replacement circuits.

24.     The Buyer is hereby directed to pay all costs of the ongoing operations of the Business in accordance with the Management Agreement. The Buyer shall have the ability during the Regulatory Compliance Period to direct the Debtors to seek the entry of one or more orders of the Court authorizing the Debtors to assume and assign to the Buyer any executory contract or unexpired lease to which the Debtors are a party, provided that the Buyer shall be solely responsible for paying any cure payment that is payable in connection with any such assumption and assignment. The Buyer shall have the ability during the Regulatory Compliance Period to direct the Debtors to reject any executory contract or unexpired lease to which the Debtors are a party provided that the Buyer must elect whether to assume and assign or reject any contracts with the GSA and must provide written notice of such election to the GSA on or before January 2, 2002. The Debtors may effect any such rejection by delivery of two (2) business days prior written notice (and the irrevocable waiver of the right to withdraw such notice) to the non-Debtor party to any such executory contract or unexpired lease of the Debtors' unequivocal intent to reject such executory contract or unexpired lease. In the event that the Buyer elects to reject any contract on account of which a prepayment has been made pursuant to Section 3.1(a) of the Management Agreement, the counterparty to such contract shall be obligated to refund promptly to the Buyer (without setoff or counterclaim) the unused portion of such prepayment and in the event of any dispute with respect thereto, the Buyer reserves the right to seek adjudication in the Bankruptcy Court. In the event that the Buyer elects rejection of

some or all of Debtors' contracts with the GSA, the Buyer agrees that it will continue to provide telecommunications services to GSA until GSA has received sixty (60) days' notice of discontinuance, or such longer period as the FCC requires. In all other respects, the Buyer shall manage the operations of the Business and shall be responsible for such operation pursuant to the terms and subject to the conditions of the Asset Purchase Agreement and the Management Agreement. The period within which the Debtors may elect to assume or reject unexpired leases of nonresidential real property under Bankruptcy Code section 365(d)(4) is hereby extended through the duration of the Term.

25.    Upon receipt of the required regulatory approvals and establishment of the necessary service agreements and arrangements, the Debtors are authorized to convey the Licenses and the Regulated Assets to the Buyer, in accordance with the terms and conditions of the Asset Purchase Agreement and the Management Agreement.

26.    As provided by Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure, the effectiveness of this Sale Order shall not be stayed for 10 days after entry on the docket and shall be effective and enforceable immediately upon such entry. The Buyer and the Debtors shall consummate the Sale as promptly as is practicable following Court approval of this Sale Order, so long as no stay of this Sale Order has been entered and is continuing.

Dated: Wilmington, Delaware
      December 19, 2001

HONORABLE JOSEPH J. FARNAN, JR.
UNITED STATES DISTRICT JUDGE

20

WP3:714361.3                                                    58222.1001

**EXHIBIT A**

**Description of Lab Equipment**

The following equipment currently is located at the Winstar lab facility, 2545 Horse Pen Road, Herdon, Virginia (the "Winstar Lab").

1.    Metropolis "evaluation" configuration description --

    a.    Metropolis 4500 System consisting of 1 Large Service Shelf, a High Speed optical Shelf and associated circuit packs;
    b.    Metropolis 2500 system consisting of a Large Service Shelf and associated circuit packs;
    c.    Metropolis 2000 system consisting of a Service Shelf and associated circuit packs.

The systems are installed in two seven foot equipment racks in the Winstar Lab.

2.    AnyMedia "evaluation" configuration description --

    a.    AnyMedia Access Unit consisting of common circuit packs & associated interface circuit packs;

    b.    Breakdown for AnyMedia:

        FAC 100 S1:1 SL1EJDCAA
        FAC 100 S1:1 SLC1EJDCAA
        COM100 S2:2 SLC1CGLCAA
        COM100 S2:3 SLC1CGLCA8
        DTP100 S1:1 SLC1DH0CAA
        DTP101 S1:2 SLC1DHKCAB
        LPA380 S3:3 E51SFBAAAA
        LPA300 S1:1 SLCUVR0BAA
        LPA380 S3:3 E51SFBAAAA
        LPU 116 S2:3 SN980CD953522L 107743536002 ESPQAYKAA
        Two tip ring cables - new
        Two T-1 Cables pieced together from parts
        Power cables

The trial configuration is a shelf mounted within a single seven foot equipment rack.

## EXHIBIT B

### Description of Accounts

| Account | Account Number |
|---|---|
| Fleet Bank Investment Account | 9427772529 |
| Fleet Bank Investment Account | 9428385707 |
| State Street Investment Account | 3274457 |
| State Street Investment Account | 3324773 |
| Fleet Bank Disbursement Account | 9427772510 |
| Fleet Bank Disbursement Account | 9428385694 |

**E<small>XHIBIT</small> B**



# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------------x
                                                    :
In re:                                              :    Chapter 11
                                                    :
WINSTAR COMMUNICATIONS, INC., et al.,               :    Case No.: 01-1430 (JJF)
                                                    :
                                       Debtors.     :    (Jointly Administered)
                                                    :
                                                    :
-----------------------------------------------------------------x
```

## ORDER PURSUANT TO SECTIONS 327(a) AND 328(a) OF THE BANKRUPTCY CODE AUTHORIZING THE RETENTION AND EMPLOYMENT OF THE BLACKSTONE GROUP L.P. AS FINANCIAL ADVISOR TO THE DEBTORS

Upon the amended application (the "Amended Application") of Winstar Communications, Inc. ("WCI") and certain of its direct and indirect subsidiaries, debtors and debtors in possession in these chapter 11 cases (collectively, the "Debtors"), seeking entry of an order pursuant to sections 327(a) and 328(a) of title 11, United States Code (the "Bankruptcy Code"), and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the retention and employment of The Blackstone Group L.P. ("Blackstone") as financial advisor to the Debtors upon the terms and conditions of the letter agreement between Blackstone and Winstar Wireless, Inc. and WCI, dated July 26, 2001 (the "July 26 Letter Agreement"); and upon the Affidavit of Arthur B. Newman, sworn to April 17, 2001, and the Supplemental Affidavit of Arthur B. Newman, dated May 21, 2001 (hereinafter the "Newman Affidavits") in support of the Amended Application; and the Debtors and Blackstone having agreed to modify the terms and conditions of the July 26 Letter Agreement to address certain informal opposition to the original terms and conditions thereof, and having agreed that the terms and conditions of Blackstone's engagement shall be as set forth in the revised letter agreement annexed to this Order as Exhibit A (the "Letter Agreement"); and the Court being satisfied that (i) Blackstone does not represent or hold any interest adverse to the Debtors or their

NYDOCS03/594222.2

estates as to the matters upon which it is to be engaged, (ii) Blackstone is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, and (iii) the retention and employment of Blackstone is necessary and in the best interests of the Debtors, their estates and their creditors; and adequate notice of the Amended Application having been provided; and after due deliberation and sufficient cause appearing therefor; it is hereby

**ORDERED,** that the Amended Application is GRANTED and APPROVED; and it is further

**ORDERED,** that in accordance with sections 327(a) and 328(a) of the Bankruptcy Code and Rules 2014 and 2016 of the Bankruptcy Rules, the Debtors are authorized and empowered to retain and employ Blackstone as financial advisor in these chapter 11 cases, to perform the financial advisory functions described in the Amended Application; and it is further

**ORDERED,** that Blackstone shall seek compensation and reimbursement of expenses upon proper applications for allowance of interim or final compensation in accordance with the procedures set forth in sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules and the rules and orders of this Court; and it is further

**ORDERED,** that the fees payable to Blackstone pursuant to the Letter Agreement, including the monthly advisory fees and any Transaction Fee, shall be subject to review solely under the standard set forth in Bankruptcy Code section 328(a), and pursuant thereto, the Court may allow compensation different from compensation on the terms and conditions set forth in the Letter Agreement only upon a finding that such terms and conditions have proven to be improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

Dated: August ♂, 2001

Wilmington, Delaware

HONORABLE JOSEPH J. FARNAN JR.
UNITED STATES DISTRICT JUDGE

Exhibit A

[The Blackstone Group, L.P. Engagement Letter]

# EXHIBIT

# A

July 26, 2001

Mr. Timothy R. Graham
Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.

685 Third Avenue
Suite 3100
New York, NY 10017

Dear Tim:

This letter agreement (this "Agreement") amends and supercedes our letter agreement dated April 16, 2001 (the "April 16 Agreement") and confirms the understanding and the agreement between The Blackstone Group L.P. ("Blackstone") and Winstar Communications, Inc., Winstar Wireless, Inc. and their affiliates that are debtors in possession in the pending chapter 11 bankruptcy cases (collectively, "Winstar" or the "Company") regarding the retention of Blackstone by Winstar as its financial advisor for the purposes set forth herein. This agreement together with the attached indemnification agreement is effective nunc pro tunc April 18, 2001 ("Effective Date").

Since April 6, 2001, Blackstone has acted as financial advisor to Winstar in connection with its reorganization under chapter 11 of Title 11, United States Code (the "Bankruptcy Code"). Effective as of July 6, 2001, the Company has requested Blackstone to serve as its exclusive M&A advisor to provide the financial advisory services described herein and has indicated it no longer requires the broader financial advisory services provided prior thereto. Under this Agreement, Blackstone will provide financial advisory services to Winstar in connection with (i) a sale of the Company, (ii) the sale of all or substantially all of the assets of the Company, (iii) an investment by a third party under a plan of reorganization, and/or (iv) a merger, acquisition or other similar transaction by the Company, in one or a series of transactions (each such transaction listed in (i) through (iv), a "Transaction").

The financial advisory services to be rendered by Blackstone include, without limitation, the following:

Mr. Timothy R. Graham, Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.
July 26, 2001
Page 2

- (a) Assisting in the development of financial data and presentations to the Company's Board of Directors, various creditors and other third parties regarding a Transaction;

- (b) Assisting the Company in preparing marketing materials in conjunction with a possible Transaction;

- (c) Assisting the Company in identifying potential buyers or parties in interest to a Transaction and assist in the due diligence process;

- (d) Assisting and advising the Company concerning the terms, conditions and impact of any proposed Transaction;

- (e) Negotiating a Transaction with potential buyers; and

- (f) Providing expert testimony with respect to any Transaction and bidding procedures therefor.

Notwithstanding anything contained in this Agreement or the April 16 Agreement to the contrary, Blackstone shall have no responsibility for designing or implementing any initiatives to improve the Company's operations, profitability, cash management or liquidity. Blackstone makes no representations or warranties about the Company's ability to (i) successfully improve its operations, (ii) maintain or secure sufficient liquidity to operate its business, or (iii) successfully complete a Transaction or consummate a reorganization. Blackstone is retained under this Agreement solely to provide advice regarding a Transaction and shall have no duties, responsibilities or obligations in respect of "crisis management."

The Company agrees to pay the following fees to Blackstone for its financial advisory services:

- (i) a monthly advisory fee in the amount of $200,000 for each of the two months during the period from May 6, 2001 through July 5, 2001 for services rendered in accordance with the April 16 Agreement. Blackstone has received $200,000 from the Company with respect to financial advisory services rendered for the month commencing April 6, 2001;

- (ii) a monthly advisory fee in the amount of $100,000 for the period commencing July 6, 2001 for services rendered in connection with a Transaction (the "Monthly Fee"), with the first such Monthly Fee due on July 6, 2001, and additional installments of the Monthly Fee payable in advance on each monthly anniversary of such date prior to the termination of this Agreement;

engagement me2.DOC

Mr. Timothy R. Graham, Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.
July 26, 2001
Page 3

(iii)    upon the consummation of a Transaction, a Transaction fee ("Transaction Fee") payable in cash equal to 1% of the first $200,000,000 of Consideration (as defined below) plus 1.25% of Consideration above $200,000,000.

In this Agreement, Consideration means the gross value of all cash, securities and other properties paid or payable, directly or indirectly, in one transaction or in a series or combination of transactions, in connection with the Transaction or a transaction related thereto. Consideration shall also include the face amount of any long-term liabilities, capital leases up to $50 million or preferred stock (including indebtedness for borrowed money and the amount set forth in the Company's financial statements for any pension liabilities and guarantees) indirectly or directly assumed or acquired, or otherwise repaid or retired by one or more purchasers of, or investors in, the Company, in connection with or in anticipation of the Transaction, excluding all operating lease obligations that are not characterized as liabilities on the balance sheet of the Company. If the Transaction involves an equity investment in the Company, Consideration shall equal 3% of the gross proceeds received by the Company. If the Transaction takes the form of a purchase of assets, Consideration shall also include the value offered for any current assets not purchased. If the Consideration to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such Consideration is paid; and

(iv)    reimbursement of all necessary and reasonable out-of-pocket expenses commencing on April 6, 2001, incurred during this engagement, including, but not limited to, out-of-town travel requested by the Company and related lodging, direct identifiable data processing and communication charges, courier services, working meals, reasonable fees and expenses of Blackstone's external counsel not to exceed $5,000 (unless consented to by the Company, which consent shall not be unreasonably withheld) and other necessary expenditures, payable upon rendition of invoices setting forth in reasonable detail the nature and amount of such expenses.

The Company shall use its good faith efforts to promptly apply to the bankruptcy court having jurisdiction over the Chapter 11 case or cases (the "Bankruptcy Court") for the approval pursuant to sections 327 and 328 of the Bankruptcy Code of this Agreement and Blackstone's retention by the Company under the terms of this Agreement and subject to the standard of review provided in section 328(a) of the Bankruptcy Code and not subject to any other standard of review under section 330 of the Bankruptcy Code. The Company shall supply Blackstone with a draft of such application and any proposed order authorizing Blackstone's retention sufficiently in advance of the filing of such application and proposed order to enable Blackstone

Mr. Timothy R. Graham, Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.
July 26, 2001
Page 4

and its counsel to review and comment thereon. Blackstone shall have no obligation to provide any services under this Agreement unless Blackstone's retention under the terms of this Agreement is approved under section 328(a) of the Bankruptcy Code by an order of the Bankruptcy Court acceptable to Blackstone in all respects. Blackstone acknowledges that in the event that the Bankruptcy Court approves its retention by the Company, Blackstone's fees and expenses shall be subject to the jurisdiction and approval of the Bankruptcy Court under section 328(a) of the Bankruptcy Code and any applicable fee and expense guideline orders; provided, however, that to the extent time records are required, Blackstone will keep them in one-half hour increments.

The advisory services and compensation arrangement set forth in this Agreement do not encompass other investment banking services or transactions that may be undertaken by Blackstone at the request of the Company, including the arranging of debt capital, issuing fairness opinions, or any other specific services not set forth in this Agreement. The terms and conditions of any such investment banking services, including compensation arrangements, would be set forth in a separate written agreement between Blackstone and the Company.

Except as contemplated by the terms hereof or as required by applicable law or legal process, Blackstone shall keep confidential all material non-public information provided to it by or at the request of the Company, and shall not disclose such information to any third party or to any of its employees or advisors except to those persons who have a need to know such information in connection with Blackstone's performance of its responsibilities hereunder and who are advised of the confidential nature of the information and who agree to keep such information confidential.

The Company will furnish or cause to be furnished to Blackstone such information as Blackstone and the Company believe appropriate to its assignment (all such information so furnished being the "Information"). The Company recognizes and confirms that Blackstone (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having independently verified the same, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information, (c) is entitled to rely upon the Information without independent verification, and (d) will not make an appraisal of any assets in connection with its assignment. The Company agrees to promptly notify Blackstone regarding any inquiries or solicitations related to a potential Transaction (to the extent any such inquiry or solicitation becomes known to the executive officers of the Company), and agrees to enter into any related negotiations with the assistance of Blackstone.

In the event that the Information belonging to the Company is stored electronically on Blackstone's computer systems, Blackstone shall not be liable for any damages resulting from unauthorized access, misuse or alteration of such information by persons not acting on its behalf,

*engagement me2.DOC*

Mr. Timothy R. Graham, Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.
July 26, 2001
Page 5

provided that in protecting the confidentiality of, and in preventing unauthorized access to, the
Company's information, Blackstone exercises the same degree of care (and in any event
exercises at least a reasonable degree of care) as it exercises with regard to its own most sensitive
proprietary information.

Except as required by applicable law, any advice to be provided by Blackstone under this
Agreement shall not be disclosed publicly or made available to third parties (other than the
Company's other professional advisors or, if appropriate in the Company's judgement, in the
Chapter 11 proceeding) without the prior written consent of Blackstone or as otherwise provided
herein. All services, advice and information and reports provided by Blackstone to the Company
in connection with this assignment shall be for the sole benefit of the Company (including its
board of directors) and shall not be relied upon by any other person.

The Company acknowledges and agrees that Blackstone has been retained to act solely as
financial advisor to the Company. In such capacity, Blackstone shall act as an independent
contractor, and any duties of Blackstone arising out of its engagement pursuant to this
Agreement shall be owed solely to the Company. Because Blackstone will be acting on the
Company's behalf in this capacity, it is customary for us to receive indemnification. A copy of
our standard form of indemnification agreement is attached to this Agreement as Attachment A.

In the event that Blackstone is requested or authorized by the Company or required by
government regulation, subpoena, or other legal process to produce documents, or to make its
current or former personnel available as witnesses at deposition or trial, arising as a result of or
in connection with Blackstone's engagement for the Company, the Company will, if Blackstone
is not a party to the proceeding in which the information is sought, reimburse Blackstone for the
reasonable fees and expenses of its counsel incurred in responding to such a request. Nothing in
this paragraph shall affect in any way the Company's obligations pursuant to the separate
indemnification agreement attached hereto.

The term of Blackstone's engagement hereunder shall extend until the earliest of the
effectiveness of the Plan for the Company under Chapter 11 of the Bankruptcy Code, the
consummation of a Transaction as defined above, or the conversion of any Chapter 11 case for
the Company to a case under Chapter 7 of the Bankruptcy Code. Blackstone's engagement
hereunder may be terminated upon 30 days' written notice without cause by either the Company
or Blackstone; termination for cause by either party will occur immediately upon delivery of
written notice to the other party. Notwithstanding the foregoing, (a) the provisions relating to the
payment of fees and expenses accrued through the date of termination, the status of Blackstone
as an independent contractor, and the limitation as to whom Blackstone shall owe any duties will
survive any such termination, (b) any such termination shall not affect the Company's
obligations under the indemnification agreement attached as Attachment A, and (c) Blackstone

*engagement ms2.DOC*

Mr. Timothy R. Graham, Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.
July 26, 2001
Page 6

shall be entitled to the full Transaction Fee in the event that a Transaction is consummated at any time prior to the expiration of nine full months following the termination of this Agreement.

Notwithstanding anything to the contrary provided elsewhere herein, none of the provisions of this Agreement shall in any way limit the activities of the private equity businesses of Blackstone and its affiliates in their businesses distinct from the restructuring advisory business of Blackstone provided that the Information is not shared with representatives of Blackstone and its affiliates who are not involved in the restructuring or mergers and acquisitions advisory businesses of Blackstone and that appropriate "Chinese wall" measures are taken to insure confidentiality.

This Agreement (including the attached indemnification agreement) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any provision of this Agreement is determined to be invalid or unenforceable in any respect, such determination will not affect such provision in any other respect, which will remain in full force and effect. No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed in and to be performed in that state.

The Company hereby agrees that any action or proceeding brought by the Company against Blackstone based hereon or arising out of Blackstone's engagement hereunder, shall be brought and maintained by the Company exclusively in the United States Bankruptcy Court for the District of Delaware. The Company irrevocably submits to the jurisdiction of the United States Bankruptcy Court for the District of Delaware for the purpose of any action or proceeding based hereon or arising out of Blackstone's engagement hereunder and irrevocably agrees to be bound by any judgment rendered thereby in connection with such action or proceedings. The Company hereby irrevocably waives, to the fullest extent permitted by law, any objection it may have or hereafter may have to the laying of venue of any such action or proceeding brought in any such court referred to above and any claim that such action or proceeding has been brought in an inconvenient forum and agrees not to plead or claim the same.

Mr. Timothy R. Graham, Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.
July 26, 2001
Page 7

        Please confirm that the foregoing correctly sets forth our agreement by signing and
returning to Blackstone the duplicate copy of this Agreement and the indemnification agreement
attached hereto as Attachment A.


                                        Very truly yours,

                                        THE BLACKSTONE GROUP L.P.


                                        By:_____

                                          Arthur B. Newman
                                          Senior Managing Director

Accepted and Agreed to as
of the date first written above:

  WINSTAR COMMUNICATIONS, INC.
  WINSTAR WIRELESS, INC.


By:_____
     Timothy R. Graham
     Executive Vice President
     Winstar Communications, Inc.
     Winstar Wireless, Inc.

engagement ma2.DOC

ATTACHMENT A

July 26, 2001

The Blackstone Group L.P.
345 Park Avenue
New York, NY 10154

INDEMNIFICATION AGREEMENT

Gentlemen:

This letter will confirm that we have engaged The Blackstone Group L.P. ("Blackstone") to advise and assist us in connection with the matters referred to in our letter of agreement dated as of July 26, 2001 (the "Engagement Letter"). This indemnification shall be effective nunc pro tunc April 18, 2001. In consideration of your agreement to act on our behalf in connection with such matters, we agree to indemnify and hold harmless you and your affiliates and your and their respective partners (both general and limited), members, officers, directors, employees and agents and each other person, if any, controlling you or any of your affiliates (you and each such other person being an "Indemnified Party") from and against any losses, claims, damages, expenses and liabilities whatsoever, whether they be joint or several, related to, arising out of or in connection with the engagement (the "Engagement") under the Engagement Letter and will reimburse each Indemnified Party for all expenses (including reasonable fees, expenses and disbursements of counsel) as they are incurred in connection with investigation, preparing, pursuing, defending or assisting in the defense of any action, claim, suit, investigation or proceeding related to, arising out of or in connection with the Engagement or this agreement, whether or not pending or threatened, whether or not any Indemnified Party is a party, whether or not resulting in any liability and whether or not such action, claim, suit, investigation or proceeding is initiated or brought by us. We will not, however, be liable under the foregoing indemnification provision for any losses, claims, damages or liabilities (or expenses relating thereto) that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from the bad faith, gross negligence or willful misconduct of Blackstone. We also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to us or our owners, parents, affiliates, security holders or creditors for or in connection with the Engagement except for any such liability for losses, claims, damages or liabilities incurred by us that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from the bad faith, gross negligence or willful misconduct of Blackstone.

If the indemnification provided for in the preceding paragraph is for any reason unavailable to an Indemnified Party in respect of any losses, claims, damages or liabilities referred to herein, then, in lieu of indemnifying such Indemnified Party hereunder, we shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages or liabilities (and expenses relating thereto) (i) in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by you, on the one hand, and us, on the other hand, from the Engagement or (ii) if and only if the allocation provided by clause (i) above is for any reason not available, in such proportion as is appropriate to reflect not only the relative benefits referred to in such clause (i) but also the relative fault of each of you and us, as well as any other relevant equitable considerations; provided, however, to the extent permitted by applicable law, in no event shall your aggregate contribution to the amount paid or payable exceed the aggregate amount of fees actually received by you under the Engagement Letter. For the purposes of this agreement, the relative benefits to us and you of the Engagement shall be deemed to be in the same proportion as (a) the total value paid or contemplated to be paid or received or contemplated to be received by us, our security holders and our creditors in the transaction or transactions that are subject to the Engagement, whether or not any such transaction is consummated, bears to (b) the fees paid or to be paid to Blackstone under the Engagement Letter.

No party to this agreement will, without the prior written consent of the other party (which consent will not be unreasonably withheld), settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (a "Judgment"), whether or not we or any Indemnified Party is an actual or potential party to such claim, action, suit or proceeding. In the event that we seek to settle or compromise or consent to the entry of any Judgment, we agree that such settlement, compromise or consent shall include an unconditional release of Blackstone and each other Indemnified Party hereunder from all liability arising out of such claim, action, suit or proceeding.

Promptly after receipt by an Indemnified Party of notice of any complaint or the commencement of any action or proceeding with respect to which indemnification is being sought hereunder, such person will notify us in writing of such complaint or of the commencement of such action or proceeding, but failure to so notify us will not relieve us from any liability which we may have hereunder or otherwise, except to the extent that such failure materially prejudices our rights. If we so elect or are requested by such Indemnified Party, we will assume the defense of such action or proceeding, including the employment of counsel reasonably satisfactory to Blackstone and the payment of the fees and disbursements of such counsel.

In the event, however, such Indemnified Party reasonably determines in its judgment that having common counsel would present such counsel with a conflict of interest or if we fail to assume the defense of the action or proceeding in a timely manner, then such Indemnified Party may employ separate counsel reasonably satisfactory to us to represent or defend it in any such

action or proceeding and we will pay the fees and disbursements of such counsel; provided, however, that we will not be required to pay the fees and disbursements of more than one separate counsel for all Indemnified Parties in any jurisdiction in any single action or proceeding. In any action or proceeding the defense of which we assume, the Indemnified Party will have the right to participate in such litigation and to retain its own counsel at such Indemnified Party's own expense.

The foregoing reimbursement, indemnity and contribution obligations of the Company under this agreement shall be in addition to any rights that an Indemnified Party may have at common law or otherwise, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company and such Indemnified Party.

The provisions of this agreement shall apply to the Engagement and any written modification of the Engagement and shall remain in full force and effect regardless of any termination or the completion of your services under the Engagement Letter.

This agreement and the Engagement Letter shall be governed by and construed in accordance with the laws of the state of New York applicable to contracts executed in and to be performed in that state.

Very truly yours,

WINSTAR COMMUNICATIONS, INC.
WINSTAR WIRELESS, INC.

By:_____

     Timothy R. Graham
     Executive Vice President
     Winstar Communications, Inc.
     Winstar Wireless, Inc.

Accepted and Agreed
to as of the date first
written above:

THE BLACKSTONE GROUP L.P.

By: _____

     Arthur B. Newman
     Senior Managing Director

**EXHIBIT C**

MASTER FINAL

EXECUTION COPY

ASSET PURCHASE AGREEMENT

AMONG

IDT WINSTAR ACQUISITION, INC.,

WINSTAR COMMUNICATIONS, INC.

AND

CERTAIN OF ITS SUBSIDIARIES
SET FORTH ON APPENDIX I HERETO

DATED AS OF DECEMBER 18, 2001

## TABLE OF CONTENTS

Page

### ARTICLE I
### DEFINITIONS

Section 1.1    *Definitions*................................................................................. *1*
Section 1.2    *Construction*.............................................................................. *6*

### ARTICLE II
### PURCHASE AND SALE

Section 2.1    *Purchase and Sale of Assets* ...................................................... *6*
Section 2.2    *Excluded Assets*........................................................................ *8*
Section 2.3    *Assumed Liabilities* ................................................................... *9*
Section 2.4    *Excluded Liabilities* ................................................................ *10*
Section 2.5    *Assumption of Certain Leases and Other Contracts* ...................... *10*
Section 2.6    *Intercompany Receivables* ......................................................... *11*
Section 2.7    *Winstar Building*..................................................................... *11*

### ARTICLE III
### PURCHASE PRICE

Section 3.1    *Purchase Price*........................................................................ *11*
Section 3.2    *Cash Payment at Signing* .......................................................... *12*
Section 3.3    *Allocation of Purchase Price* ..................................................... *12*

### ARTICLE IV
### THE CLOSING AND LICENSE TRANSFER

Section 4.1    *Time and Place of Closing*........................................................ *12*
Section 4.2    *Deliveries by the Sellers*.......................................................... *13*
Section 4.3    *Deliveries by the Buyer* ........................................................... *13*
Section 4.4    *Management Transition* ............................................................ *13*

### ARTICLE V
### REPRESENTATIONS AND WARRANTIES OF THE BUYER

Section 5.1    *Organization* ......................................................................... *13*
Section 5.2    *Authority Relative to this Agreement* ........................................... *13*
Section 5.3    *Consents and Approvals; No Violation*.......................................... *14*
Section 5.4    *Qualifications to Hold Permits* ................................................... *14*
Section 5.5    *Legal Proceedings and Judgments* .............................................. *14*
Section 5.6    *Brokers*................................................................................. *14*
Section 5.7    *Buyer Financing*..................................................................... *14*
Section 5.8    *Capitalization*........................................................................ *14*

Section 5.9    Valid Issuance of IDT and Buyer Shares ........................................................ 15
Section 5.10  Disclaimer of Other Representations and Warranties ..................................... 15

ARTICLE VI
COVENANTS OF THE PARTIES

Section 6.1    Conduct of Business ............................................................................................ 15
Section 6.2    Access to Information; Maintenance of Records ........................................... 15
Section 6.3    Expenses ................................................................................................................. 17
Section 6.4    Further Assurances .............................................................................................. 17
Section 6.5    Public Statements ................................................................................................ 17
Section 6.6    Governmental Authority Consents and Approvals ....................................... 18
Section 6.7    Tax Matters ........................................................................................................... 19
Section 6.8    Litigation Support ................................................................................................ 20
Section 6.9    Notification ............................................................................................................ 20
Section 6.10   Submission for Bankruptcy Court Approval .................................................. 20
Section 6.11   D&O Policies ........................................................................................................ 21
Section 6.12   Use of Winstar Name .......................................................................................... 21

ARTICLE VII
CONDITIONS TO CLOSING

Section 7.1    Conditions to Each Party's Obligations to Effect the Closing ........................ 21
Section 7.2    Conditions to Obligations of the Buyer ............................................................ 22
Section 7.3    Conditions to Obligations of the Sellers ........................................................... 22

ARTICLE VIII
TERMINATION AND ABANDONMENT

Section 8.1    Termination ........................................................................................................... 23
Section 8.2    Procedure and Effect of Termination ............................................................... 24

ARTICLE IX
MISCELLANEOUS PROVISIONS

Section 9.1    Amendment and Modification ........................................................................... 24
Section 9.2    Waiver of Compliance; Consents ....................................................................... 24
Section 9.3    Survival .................................................................................................................. 24
Section 9.4    No Impediment to Liquidation .......................................................................... 25
Section 9.5    Notices .................................................................................................................... 25
Section 9.6    Assignment ............................................................................................................ 26
Section 9.7    Third-Party Beneficiaries .................................................................................... 26
Section 9.8    Severability ............................................................................................................ 26
Section 9.9    Governing Law ...................................................................................................... 27
Section 9.10   Submission to Jurisdiction .................................................................................. 27
Section 9.11   Counterparts .......................................................................................................... 27
Section 9.12   Incorporation of Schedule and Exhibits .......................................................... 27
Section 9.13   Entire Agreement ................................................................................................. 27

Section 9.14    *Headings* ........................................................................................................ 27
Section 9.15    *Remedies* ........................................................................................................ 27
Section 9.16    *Bulk Sales or Transfer Laws* .......................................................................... 27

APPENDIX I        Subsidiaries of Winstar Parties Hereto

EXHIBITS

Exhibit A    Assumed Agreements
Exhibit B    Form of Bill of Sale
Exhibit C    Form of Escrow Agreement
Exhibit D    Form of Management Agreement
Exhibit E    Form of Sale Order

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "*Agreement*") is made as of December 18, 2001 by and among Winstar Communications, Inc., a Delaware corporation ("*Winstar*") and certain of its subsidiaries set forth on Appendix I hereto (collectively, the "*Sellers*"), and IDT Winstar Acquisition, Inc., a Delaware corporation (the "*Buyer*").

WHEREAS, the Buyer desires to purchase from the Sellers, and the Sellers desire to sell to the Buyer, the Purchased Assets (as hereinafter defined) upon the terms and conditions hereinafter set forth in this Agreement; and

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements hereinafter set forth, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    *Definitions.* (a) As used in this Agreement, the following terms have the meanings specified in this Section 1.1(a).

"*Accounts Receivable*" means any and all accounts receivable, notes and other amounts receivable from third parties (including, to the extent permissible under applicable law, revenues from all accounts of the former and current customers of the Business), together with any interest or unpaid financing charges accrued thereon, excluding, all Excluded Receivables.

"*Affiliate*" means, with respect to any specified Person, any other Person that directly, or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, *provided* that Net 2 Phase, Inc. and Liberty Media, Inc. shall not be deemed to be Affiliates of the Buyer.

"*AON Sublease*" means the Assignment and Assumption of Lease Documents by and between AON Service Corporation and Winstar, dated as of September 25, 2001, with respect to the Winstar Building and related agreements and documentation thereto, as amended as of the date hereof.

"*Assumed Agreements*" means any contract, agreement, real or personal property lease, commitment, understanding or instrument which relates to the Business or the Purchased Assets for which the Sellers have obtained an order authorizing the assignment and assumption thereof to the Buyer and which is listed on Exhibit A attached hereto, which Exhibit may be amended from time to time by the Buyer for a period of time up to 120 days after the Closing Date.

"*Bankruptcy Code*" means Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware or such other court having competent jurisdiction over the Chapter 11 Cases.

"*Bill of Sale*" means the Bill of Sale to be executed and delivered by the Sellers at the Closing, substantially in the form of Exhibit B attached hereto.

"*Business*" means the activities carried on by the Sellers for the purpose of providing local and long distance voice services, Internet access, data transport services, application services and hosting services and any activities related thereto; *provided* that "*Business*" shall not include any of the activities carried on by any of the Excluded Subsidiaries (none of which are material to the Business, ~~other than Office.com, Inc.~~).

"*Business Day*" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by law to be closed in the City of New York.

"*Buyer Representatives*" means the Buyer's accountants, employees, counsel, financial advisors and other authorized representatives.

"*Chapter 11 Cases*" means the Sellers' cases commenced under Chapter 11 of the Bankruptcy Code.

"*Code*" means the Internal Revenue Code of 1986, as amended through the date hereof.

"*Communications Act*" means the Communications Act of 1934, as amended.

"*Confidential Information*" has the meaning specified in the Confidentiality Agreement.

"*Confidentiality Agreement*" means, collectively, the confidentiality agreement, dated as of November 30, 2001, between Winstar or its advisors and the Buyer or its Affiliate.

"*Creditors' Committee*" means the official committee of unsecured creditors appointed in connection with the Chapter 11 Cases on April 27, 2001.

"*D&O Policies*" means the directors' and officers' liability insurance policies maintained by the Sellers and in effect as of the date hereof set forth on Schedule 1.1(a)(i).

"*Employee Records*" means all existing personnel files related to employees and former employees of the Sellers.

"*Encumbrances*" means any mortgages, pledges, liens, claims (as such term is defined in the Bankruptcy Code), charges, security interests, conditional and installment sale agreements, activity and use limitations, conservation easements, deed restrictions, encumbrances and charges of any kind.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Escrow Agent*" means Shearman & Sterling.

"*Escrow Agreement*" means the escrow agreement, dated as of the date hereof, by and among Winstar, the Buyer and the Escrow Agent, substantially in the form of Exhibit C.

"*Escrow Amount*" means, as of any date of determination, the amount on deposit, including any interest thereon, under the Escrow Agreement, without reduction or offset for any fees or costs, which shall be borne by Sellers.

"*Excess Inventory and Equipment*" means such inventory, equipment and other assets owned by the Sellers set forth on Schedule 1.1(a)(ii) which (x) has been sold by the Sellers prior to the date hereof or (y) was under binding contract dated prior to the date hereof to be sold and is subsequently sold pursuant thereto.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Excluded Subsidiaries*" means the Subsidiaries of Winstar set forth on Schedule 1.1(a)(iii).

"*FCC*" means the Federal Communications Commission (or any successor Governmental Authority).

"*FCC Consents*" means the granting by the FCC of its consent to the assignment of the FCC Licenses in connection with the consummation of the transactions contemplated hereby.

"*FCC Licenses*" means all licenses, authorizations, permits and construction permits issued by the FCC to the Sellers, including the Principal FCC Licenses, which are related to the Business, all of which are set forth on Schedule 1.1(a)(iv).

"*FCC Rules*" means the rules and regulations of the FCC, 47 Code of Federal Regulations, Part 1 et seq.

"*Final Order*" means, (i) for purposes of the FCC Consents, an administrative order issued by the FCC for which the deadline for lodging any administrative appeal, reconsideration, stay or review by any objecting Person has expired pursuant to the FCC Rules; and (ii) for purposes of the consents required from all other Governmental Authorities (including, the State Regulatory Consents), an action by any such Governmental Authority for which the time period has expired for any further action by such Governmental Authority.

"*Governmental Authority*" means any federal, state or local governmental or regulatory authority, department, agency, commission or body.

"*Intellectual Property*" means all of the following in any jurisdiction throughout the world: (i) patents, patent applications and patent disclosures, (ii) trademarks, service marks, trade dress, trade names, corporate names, logos and Internet domain names, together with all goodwill associated with each of the foregoing, (iii) copyrights and copyrightable works, (iv) registrations and applications for any of the foregoing, (v) trade secrets, confidential information and inventions and (vi) rights under any license agreements for any of the foregoing.

"*Knowledge*" means, with respect to each Seller, as to a particular matter, the actual knowledge of the acting chief executive officer, the chief financial officer or the general counsel of Winstar, ~~in each case after a reasonable degree of independent investigation~~.

*, and (iii) )obligations pursuant to the Communications Act of 1934, as amended 47 U.S.C.*

"*Material Adverse Effect*" means any change or changes in, or effect on, the Business or §151 et the Purchased Assets, since the date hereof, that is individually, or are in the aggregate, seq. and reasonably likely to be materially adverse to the Business or the Purchased Assets, each taken as regulations a whole, other than (i) any change or effect in any way resulting from or arising in connection promulgated with this Agreement or any of the transactions contemplated hereby (including any thereunder announcement with respect to this Agreement or any of the transactions contemplated hereby and the obtaining of any FCC Consents or State Regulatory Consents) and (ii) any change in or effect on the Purchased Assets or the Business which is cured (including by the payment of money) by the applicable Seller or any of its Affiliates before the Termination Date.

"*Permitted Encumbrances*" means (i) zoning, entitlement, conservation restriction and other land use and environmental regulations by Governmental Authorities which do not materially interfere with the present use of the Purchased Assets, and (ii) all exceptions, restrictions, easements, charges, rights-of-way and other Encumbrances set forth in any state, local or municipal franchise under which the Business is conducted which do not materially interfere with the present use of the Purchased Assets [and (i) Need Margaret counsel].

"*Person*" means any individual, corporation, partnership, limited partnership, limited liability company, syndicate, group, trust, association or other organization or entity or government, political subdivision, agency or instrumentality of a government.

"*Post-petition Agent*" means Citicorp USA, Inc.

"*Pre-petition Agent*" means The Bank of New York.

"*Principal FCC Licenses*" means all 38 and 28 GHZ spectrum licenses issued by the FCC to the Sellers set forth on Schedule 1.1(a)(iv).

"*Sale Hearing*" means the date of the scheduled hearing of the Bankruptcy Court during which the Bankruptcy Court considers the Sale Order.

"*SEC*" means the United States Securities and Exchange Commission.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Sellers' Representatives*" means the Sellers' accountants, employees, counsel, financial advisors and other authorized representatives.

"*State Regulatory Consents*" means any consents from state regulatory authorities with respect to the assignment of the State Regulatory Licenses in connection with the consummation of the transactions contemplated by this Agreement.

"*State Regulatory Licenses*" means any licenses, authorizations or permits issued by state regulatory authorities which are related to the Business and listed on Schedule 1.1(a)(v).

"*Subsidiary*" means, with respect to any Person, any corporation or other entity of which the outstanding securities or equity interests having ordinary voting power to elect a majority of

the board of directors or other Persons performing similar functions of such Person are owned directly or indirectly by such other Person.

"*Tax*" and "*Taxes*" means (i) all taxes, charges, fees, levies, penalties or other assessments of any kind whatsoever imposed by any federal, state, local or foreign taxing authority, including, but not limited to, income, excise, property, sales, transfer, franchise, payroll, withholding, social security or other taxes, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalties or additions attributable thereto or (ii) liability for the payment of any amounts of the type described in clause (i) above as a result of being party to any agreement or any express or implied obligation to indemnify or otherwise succeed to the liability of any other Person.

"*Tax Return*" means any return, report, information return or other document (including any related or supporting information) required to be supplied to any Governmental Authority with respect to Taxes.

"*Transferred Employee*" means each person who accepts the Buyer's offer of employment.

"*Winstar Building*" means 685 Third Avenue, in the Borough of Manhattan, New York County, City and State of New York.

(b) Each of the terms set forth below shall have the meaning ascribed thereto in the following section:

| Definition | Location |
|---|---|
| "*Agreement*" | Recitals |
| "*Assumed Liabilities*" | § 2.3 |
| "*Buyer*" | Recitals |
| "*Buyer Common Stock*" | § 3.1 |
| "*Buyer Financing*" | § 5.7 |
| "*Buyer Preferred Stock*" | § 3.1 |
| "*Buyer Shares*" | § 3.1 |
| "*Cash Payment*" | § 3.1 |
| "*Cash/Stock Payment*" | § 3.1 |
| "*Closing*" | § 4.1 |
| "*Closing Date*" | § 4.1 |
| "*Excluded Assets*" | § 2.2 |
| "*Excluded Liabilities*" | § 2.4 |
| "*Excluded Receivables*" | § 2.2(k) |
| "*IDT Class B Stock*" | § 3.1 |
| "*IDT Shares*" | § 3.1 |
| "*Management Agreement*" | § 4.4 |
| "*Other Regulatory Approvals*" | § 6.6(e) |
| "*Permits*" | § 2.1(f) |
| "*Purchase Price*" | § 3.1 |

| | |
|---|---|
| "*Purchased Assets*" | § 2.1 |
| "*Purchased Investments*" | § 2.1(m) |
| "*Sale Order*" | § 7.11 |
| "*Sellers*" | Recitals |
| "*Termination Date*" | § 8.1(g) |
| "*Topping Fee*" | § 6.10(d) |
| "*Transfer Taxes*" | § 6.7(b) |
| "*Transferable Permits*" | § 2.1(f) |
| "*Winstar*" | Recitals |

Section 1.2    *Construction.*  The terms "hereby," "hereto," "hereunder" and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used.  The term "including" when used herein without the qualifier, "without limitation," shall mean "including, without limitation." Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.  The word, "or," shall not be construed to be exclusive.  Provisions shall apply, when appropriate, to successive events and transactions.

ARTICLE II
PURCHASE AND SALE

Section 2.1    *Purchase and Sale of Assets.*  Except for the Excluded Assets, upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, the Sellers shall sell, assign, convey, transfer and deliver to the Buyer, and the Buyer shall, by payment of the Purchase Price, purchase and acquire from the Sellers, free and clear of all Encumbrances (except for Permitted Encumbrances), all of the rights, title and interest that the Sellers possess as of the Closing and have the right to transfer in, to and under the real, personal, tangible and intangible property or assets of every kind and description, wherever located, used, developed for use or intended for use in the conduct of the Business and related thereto and all other assets of the Sellers unless specifically excluded in <u>Section 2.2</u> and subject to <u>Section 4.4</u> (collectively, the "<u>*Purchased Assets*</u>").  Without limiting the effect of the foregoing, the parties hereto acknowledge and agree that the Purchased Assets shall include all rights, title and interest of the Sellers in, to and under all of the following (except the Excluded Assets):

(a) all inventories of supplies, materials and spares, other than the Excess Inventory and Equipment;

(b) all equipment (other than the Excess Inventory and Equipment);

(c) all machinery, vehicles, furniture and other tangible personal property;

(d) all of the Sellers' Accounts Receivable as of the Closing Date;

(e) the Assumed Agreements, in each case, to the extent the same are assignable under Section 365 of the Bankruptcy Code or to the extent consented to by the third party

6

or third parties to such agreements including any and all deposits and letters of credit related to any such Assumed Agreements, and with respect to such Assumed Agreements, all of Sellers' rights (including of recoupment), offsets, counterclaims and defenses (including under Sections 105(a), 361, 362, 363, 365, 366, 502, 503(b), 554 and 558 of the Bankruptcy Code);

(f) all permits, certificates, licenses (including the FCC Licenses and the State Regulatory Licenses), franchises and other governmental authorizations, consents and approvals held by the Sellers except to the extent related exclusively to the Excluded Assets (collectively, "*Permits*"), in each case, to the extent the same are assignable (the "*Transferable Permits*");

(g) to the extent assignable under Section 365 of the Bankruptcy Code or to the extent consented to by the third party or third parties to such agreements, all confidentiality, noncompete or nondisclosure agreements executed by vendors, suppliers or employees of the Sellers or other third parties, in each case, to the extent related to the Business;

(h) originals or copies of all employee records of the Sellers, books, operating records, operating, safety and maintenance manuals, engineering design plans, blueprints and as-built plans, specifications, procedures and similar items of the Sellers to the extent relating to the Purchased Assets, including books of account, all customer lists, billing records and other customer correspondence to the extent relating to the Business, all regulatory filings and other books and records relating to the Business in the possession of the Sellers;

(i) except as set forth on Schedule 2.2(d) and subject to Section 2.2(d), all of the rights, claims or causes of action of any of the Sellers against a third party related to the Purchased Assets, the operation of the Business or the Assumed Liabilities or Assumed Agreements arising out of transactions occurring prior to the Closing Date, except where such rights, claims or causes of action relate to the Excluded Liabilities; to the extent such rights, claims or causes of action relate to both Assumed Liabilities and Excluded Liabilities, the Buyer and each Seller shall share such rights, claims or causes of action in the same proportion as their respective liabilities bear to the total liability relating to those rights, claims or causes of action;

(j) all Intellectual Property owned by or licensed to the Sellers together with all related income, royalties, damages and payments due or payable at the Closing or thereafter (including damages and payments for past or future infringements or misappropriations thereof), the right to sue and recover for past infringements or misappropriations thereof, any and all corresponding rights that, now or hereafter, may be secured throughout the world and all copies and tangible embodiments of any such Intellectual Property;

(k) to the extent assignable under Section 365 of the Bankruptcy Code or to the extent consented to by the insurance providers, the rights of the Sellers under those

insurance policies which primarily cover risks covering the Business or the Purchased Assets, but excluding the D&O Policies;

(l)   all historical information relating to accounts of the customers of the Business which, at the Closing Date, are users of any of the services provided by the Sellers in the operation of the Business; and

(m) shares of stock, securities, bonds, debentures, evidences of indebtedness or other interests issued by any third party (not affiliated with any of the Sellers) and owned by any Seller primarily for investment, excluding those set forth on Schedule 2.2(b) (the "*Purchased Investments*").

Section 2.2    *Excluded Assets.*  Notwithstanding any provision herein to the contrary, the Sellers shall not sell, convey, assign, transfer or deliver to the Buyer, and the Buyer shall not purchase, and the Purchased Assets shall not include the Sellers' right, title and interest to the following assets of the Sellers (the "*Excluded Assets*"):

(a)  cash (including all cash residing in any collateral cash account securing any obligation or contingent obligation of the Sellers after giving effect to the Closing), cash equivalents and bank deposits existing as of the Closing Date, subject to the Buyer's rights under Section 2.1(e);

(b)  any equity interests issued by the Sellers and their Subsidiaries and those equity interests set forth on Schedule 2.2(b);

(c)  rights to any Tax refunds of any of the Sellers, whether such refund is received as a payment or as a credit against future Taxes and any net operating losses of the Sellers;

(d)  the Sellers' claims, causes of action, choses of action and rights of recovery pursuant to Sections 544 through 550 and Section 553 of the Bankruptcy Code, any other avoidance actions under any other applicable provisions of the Bankruptcy Code and the claims, causes of action, choses of action and rights of recovery, including claims relating to Lucent Technologies, Inc., set forth on Schedule 2.2(d);

(e)  subject to Section 6.2(c), the corporate charter, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, blank stock certificates, and other documents relating to the organization, maintenance, and existence of each Seller as a corporation or a limited liability company, as the case may be, any books, records or the like of the Sellers;

(f)  all of the assets set forth on Schedule 2.2(f);

(g)  all of the agreements to which any of the Sellers is a party which are not Assumed Agreements and any and all customer deposits, customer advances and credits and security deposits related to any such agreements which are not Assumed Agreements;

8

(h) the rights of each Seller under this Agreement and any other agreements between any of the Sellers and the Buyer relating to the transactions contemplated hereby;

(i) all of the real, personal, tangible or intangible property (including Intellectual Property) or assets owned by the Excluded Subsidiaries except to the extent that such property or assets relate to the Business;

(j) any and all prepaid workers compensation premiums (other than the portion relating to the Transferred Employees);

(k) all accounts receivable, notes and other amounts receivable relating to third parties, together with any interest or unpaid financing charges accrued thereon and all proceeds thereof, set forth on Schedule 2.2(k) (the "*Excluded Receivables*");

(l) claims against current or former directors, officers or other employees of, or agents, accountants or other advisors of or to, any of the Sellers;

(m) the rights of the Sellers under the terms of the $7,500,000 original principal amount subordinate note issued on October 3, 2001 by Wam!Net Inc. and Wam!Net Government Services, Inc. to Winstar Wireless, Inc. and any equity of Wam!Net Inc. held by the Sellers;

(n) the rights of the Sellers under the AON Sublease, subject to Section 2.7; and

(o) the Excess Inventory and Equipment.

Section 2.3    *Assumed Liabilities.*    On the Closing Date, the Buyer shall assume and agree to pay, perform and discharge when due the following liabilities and obligations of the Sellers (the "Assumed Liabilities"), in accordance with the respective terms and subject to the respective conditions thereof:

(a) all liabilities and obligations of any of the Sellers under the Assumed Agreements (including all pre-petition and post-petition cure amounts payable in order to effectuate the assumption and assignment of each Assumed Agreement), subject to all of the Sellers' rights (including of recoupment), offsets, counterclaims and defenses (including under Sections 105(a), 361, 362, 363, 365, 366, 502, 503(b), 554 and 558 of the Bankruptcy Code), and the Transferable Permits in accordance with the terms thereof;

(b) all liabilities and obligations relating to any customer deposits and customer advances and credits, the security deposits and the Sellers' rights under any letters of credit or similar instruments securing customer deposits, advances or credits with respect to the revenue from customer accounts, to the extent permissible under applicable law, *provided* that the Buyer has received possession of and rights to such security deposits, customer deposits, advances or credits and letters of credit;

(c) all liabilities and obligations under the Management Agreement; and

9

(d) all liabilities and obligations related to the Purchased Assets arising from any actions or omissions of the Buyer occurring after the Closing Date or the Business arising from any actions or omissions of the Buyer occurring after the Closing Date.

Section 2.4    *Excluded Liabilities.  The Buyer shall not assume or be obligated to pay, perform or otherwise discharge any liabilities or obligations of any of the Sellers other than the Assumed Liabilities (collectively, the "*Excluded Liabilities*").*

Section 2.5    *Assumption of Certain Leases and Other Contracts.  The Sellers shall assume and assign to the Buyer, effective upon the Closing, the Assumed Agreements on the following terms and conditions:*

(a) From and after the Closing Date until 120 days thereafter, the applicable Sellers shall assume and such Sellers shall assign to the Buyer the Assumed Agreements pursuant to Section 365 of the Bankruptcy Code.  The Assumed Agreements are listed on Exhibit A hereto, as amended from time to time pursuant to this Section 2.5(a), and are identified by the date of the Assumed Agreement (if available), the other party or parties to the Assumed Agreement and the address of such party or parties (if available), as the case may be.  From and after the date hereof until 120 days following the Closing Date, the Buyer shall have the right, in its sole discretion, to make additions and deletions to the list of Assumed Agreements by delivering a marked copy of such list to Sellers, and such changes shall be effective immediately upon receipt by Sellers.  The Sellers shall give prompt notice of such addition or deletion to the counter-party to such agreement, and to the respective counsels to the Pre-petition Agent, the Post-petition Agent and the Creditors' Committee.

(b) If there exists any default related to an Assumed Agreement which is required to be cured as a condition to the Sellers' assumption and assignment pursuant to Section 365(a) of the Bankruptcy Code, the Buyer shall promptly cure any such default (including, paying any and all such amounts, whether arising pre-petition or post-petition, to effect such cure pursuant to Section 365(a) of the Bankruptcy Code) as a condition to the assumption and assignment of such Assumed Agreement.  From time to time after the Closing, the Buyer shall provide funds to the Sellers or directly to the counter-party thereto (by wire transfer of immediately-available U.S. funds) in an amount sufficient to pay all such cure amounts required by the Bankruptcy Court, unless otherwise agreed by such counter-party, as a condition for assumption and assignment of the Assumed Agreements.  Immediately upon receipt by the Sellers of such funds, the Sellers shall hold such funds in trust for such counter-party, and shall pay all cure amounts for such Assumed Agreements.  The Buyer alone shall be liable for payment of any cure payment in respect of any Assumed Agreement.  From and after the Closing Date, the Buyer shall designate the contracts and other agreements of Sellers that it desires Sellers to reject and Sellers shall promptly make appropriate motions with the Bankruptcy Court and take all other action to reject all such designated contracts and other agreements.  In the case of non-residential real property leases, such notice shall be irrevocable and accompanied by delivery of all keys to the subject premises in the Buyer's possession.

WP3:714386.1                                                                                        58222.1001

(c) The Buyer shall be responsible for demonstrating and providing adequate assurance of future performance and any and all costs and expenses necessary in connection therewith regarding any of the Assumed Agreements under Section 365 of the Bankruptcy Code.

Section 2.6    *Intercompany Receivables.*  All intercompany receivables owed by and between the Sellers shall be cancelled on the Closing Date.

Section 2.7    *Winstar Building.*  The Buyer shall, at its option, be entitled to enter into a sublease following the Closing Date, with rent to be set at prevailing market rates in the building and otherwise on terms reasonably satisfactory to the Sellers, with the Sellers to occupy the office space in the Winstar Building to which the Sellers have occupancy rights under the terms of the AON Sublease (the thirty-first floor until January 31, 2002, the non-hub portion of the tenth floor until March 31, 2002, and the hub portion of the tenth floor until April 30, 2002). After the expiration of such term with respect to the hub portion of the tenth floor, the Buyer shall, at its option, be entitled to enter into an agreement with the Sellers to occupy such portion of the tenth floor of the Winstar Building (to the extent of such Sellers' occupancy rights) through the duration of the AON Sublease, and if the Buyer shall exercise such option, the Buyer shall pay rent at the prevailing market rate in the building for such space which rent shall be paid upon exercise of the option in a lump-sum payment based on the present value of such rent.

ARTICLE III
PURCHASE PRICE

Section 3.1    *Purchase Price.*  In consideration for the Purchased Assets, and subject to the terms and conditions of this Agreement, Buyer shall assume the Assumed Liabilities, and on the Closing Date, shall irrevocably (i) pay, at Sellers' election (which shall be exercised before the Closing Date), either (x) an amount in cash equal to $38,000,000 (the "*Cash Payment*") or (y) an amount in cash equal to $30,000,000 and cause to be issued to the Sellers a number of shares of Class B common stock, $0.01 par value per share, of IDT Corporation (the "*IDT Class B Stock*") having a value equal to $12,500,000 based on the average closing price of IDT Class B Stock during the seven trading day period ended December 14, 2001 (the "*IDT Shares*" and together with the $30,000,000, the "*Cash/Stock Payment*"), and (ii) issue to the Sellers such number of shares of common stock, $0.01 par value per share, of the Buyer (the "*Buyer Common Stock*"), representing 5% of the outstanding shares of Buyer Common Stock as of the date hereof (the "*Buyer Shares*" and together with either the Cash Payment or the Cash/Stock Payment, as applicable, the "*Purchase Price*").  It is understood and agreed that the Buyer shall issue to IDT Corporation or its designee shares representing the remaining 95% of the Buyer Common Stock and preferred stock, $0.01 par value per share, of the Buyer (the "*Buyer Preferred Stock*") which Buyer Preferred Stock grants to the holders thereof the right to recovery of amounts invested in the Buyer by its affiliates prior to any right of the Buyer or Sellers to receive amounts on account of the Buyer Common Stock (but having no other preferential rights or voting rights).

It is understood and agreed that the IDT Shares delivered at Closing shall not be registered in accordance with the Securities Act and shall be "restricted" as a result thereof.  IDT Corporation shall use its commercially reasonable ~~best~~ efforts to cause a registration statement to

11



*[handwritten annotations: "any shares held" / "divided by the number of IDT Shares issued as part of the Purchase Price" / "all or a portion of"]*

become effective with respect to such IDT Shares within 60 days following the Closing Date. In the event that the IDT Shares are not duly registered within 60 days following the Closing Date, the Sellers may require at any time within 30 days thereafter that IDT Corporation repurchase the IDT Shares from the Sellers for cash consideration of $10,000,000 in the aggregate.

Section 3.2    *Cash Payment at Signing.*    Pursuant to the Escrow Agreement, on or before the date hereof, the Buyer shall deliver, or shall have delivered, the Cash Payment to the Escrow Agent to be held in escrow pending the Closing.  On the Closing Date, the Sellers and *[held by it]* the Buyer shall instruct the Escrow Agent to promptly release the Escrow Amount in accordance with the terms of the Escrow Agreement.

Section 3.3    *Allocation of Purchase Price.*    Prior to the Closing, the Buyer and the Sellers shall use their reasonable best efforts to agree as to the allocation of the Purchase Price pursuant to Section 1060 of the Code and the rules and regulations thereunder. The Buyer and the Sellers agree to use such allocation in filing all required forms under Section 1060 of the Code and all other Tax Returns, and the Buyer and the Sellers further agree that they shall not take any position inconsistent with such allocation on any examination of any such Tax Return, in any refund claim or in any Tax litigation. The Buyer acknowledges that, based upon the manner it valued the Purchased Assets, a majority of the Purchase Price is, to the extent permitted by applicable Tax laws and rules, allocated to Accounts Receivable. Upon the request of the other, the Buyer and the Sellers agree to provide the other information reasonably *[equal to a price per share]* necessary to complete Form 8594. Not later than thirty (30) days prior to the filing of their respective Forms 8594 relating to this transaction, each party shall deliver to the other party a copy of its Form 8594. In the event of a dispute with respect to any part of the allocation of the Purchase Price, the Buyer and the Sellers shall attempt to reconcile their differences and any resolution by them as to any disputed allocation shall be final, binding and conclusive on the parties. If the Buyer and the Sellers are unable to reach a resolution on such differences within thirty (30) days after the date any such dispute arises, the Buyer and the Sellers shall submit the disputed allocations for determination and resolution to the Bankruptcy Court, which shall be instructed to determine and report to the parties, upon such disputed allocations, and such report shall be final, binding and conclusive on the parties hereto with respect to the disputed allocations.

*[handwritten: the substantial portion]*

ARTICLE IV
THE CLOSING AND LICENSE TRANSFER

Section 4.1    Time and Place of Closing.    Upon the terms and subject to the satisfaction of the conditions contained in Article VII of this Agreement, the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities and Assumed Agreements contemplated by this Agreement (the "Closing") shall take place at the offices of Shearman & Sterling, 599 Lexington Avenue, New York, New York, at 10:00 A.M. (local time) no later than the second (2nd) Business Day following the date on which the conditions set forth in Article VII have been satisfied (other than the conditions with respect to actions the respective parties hereto will take at the Closing itself) or, to the extent permitted, waived in writing, or at such other place or time as the Buyer and Winstar (on behalf of the Sellers) may mutually agree.  The date and time at which the Closing actually occurs is hereinafter referred to as the "*Closing Date.*"

12

Section 4.2    *Deliveries by the Sellers.*  At or prior to the Closing, the Sellers shall deliver to the Buyer the Bill of Sale, duly executed by the Sellers for the personal property included in the Purchased Assets.

Section 4.3    *Deliveries by the Buyer. At or prior to the Closing, the Buyer shall deliver the following to Winstar (on behalf of the Sellers) or the Escrow Agent, as the case may be:*

(a) the Purchase Price;

(b) copies of the Certificate of Incorporation and the Bylaws of the Buyer, each as in effect as of the Closing; and

(c) copies of the resolutions duly adopted by the Buyer's board of directors authorizing the execution, delivery and performance of this Agreement and each of the other transactions contemplated hereby.

Section 4.4    *Management Transition.*  The Sellers and the Buyer shall enter into a management agreement substantially in the form of Exhibit D (the "Management Agreement") on the date hereof.  Pursuant to the Management Agreement, the Buyer shall agree to fund the continued operations of the Business as set forth in the Management Agreement and shall act as manager of the operations in each state or jurisdiction for which a FCC Consent or State Regulatory Consent has not been obtained on behalf of Winstar and at the direction of Winstar and consistent with all applicable laws and regulations.  At such time as any State Regulatory Consent and any FCC Consent shall have become Final Orders, the corresponding State Regulatory License and FCC License shall be promptly transferred in a manner reasonably requested by the Buyer.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

As an inducement to the Sellers to enter this Agreement and to consummate the transactions contemplated hereby, the Buyer represents and warrants to the Sellers as follows:

Section 5.1    *Organization.*  The Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as is now being conducted.

Section 5.2    *Authority Relative to this Agreement.*  The Buyer has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by the board of directors of the Buyer and no other corporate proceedings on the part of the Buyer are necessary to authorize this Agreement or to consummate the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by the Buyer, and assuming that this Agreement constitutes a valid and binding agreement of the Sellers, constitutes a valid and binding agreement of the Buyer, enforceable against the Buyer in accordance with its terms,

13

except that such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

Section 5.3    *Consents and Approvals; No Violation.* Subject to the entry of the Sale Order, the receipt of the FCC Consents, the receipt of the State Regulatory Consents and receipt of the Other Regulatory Approvals which may be required, neither the execution and delivery of this Agreement by the Buyer nor the purchase by the Buyer of the Purchased Assets and the assumption by the Buyer of the Assumed Liabilities and Assumed Agreements pursuant to this Agreement will (a) conflict with or result in any breach of any provision of the Certificate of Incorporation or Bylaws (or other similar governing documents) of the Buyer or (b) require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority which has not been otherwise obtained or made (other than any filings required by the Securities Act, the Exchange Act or the rules of the New York Stock Exchange).

Section 5.4    *Qualifications to Hold Permits.* The Buyer is aware of no financial or other bases on which it would be reasonably be expected to be deemed not qualified to hold the FCC Licenses, the State Regulatory Licenses or any of the other Permits, including any foreign ownership that would disqualify or limit its ability to control the FCC Licenses and State Regulatory Licenses. Other than revocations for failure to pay fees or make required filings (all of which have been remedied prior to the date hereof), neither the Buyer nor any of its Affiliates has had any material permit, certificate, license, franchise or other government authorization, consent or approval revoked or rescinded or has been subject to any material proceeding or investigation by the FCC or any comparable state regulatory agency with respect to any of its or its Affiliates' operations.

Section 5.5    *Legal Proceedings and Judgments.* There are no material claims, actions, proceedings or investigations pending or, to the knowledge of the Buyer, threatened against or relating to the Buyer before any court or other Governmental Authority acting in an adjudicative capacity which could reasonably be expected to materially adversely affect the Buyer's ability to consummate the transactions contemplated hereby.

Section 5.6    *Brokers.* No Person is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by the Buyer or any of its Affiliates in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Buyer.

Section 5.7    *Buyer Financing.* As of the date hereof and as of the Closing Date, the Buyer has and will have funds available to it sufficient to (i) operate the Business pursuant to the terms of the Management Agreement, (ii) deliver the Purchase Price at the Closing, and (iii) pay all of its fees and expenses incurred in connection with the transactions contemplated hereby, including all cure payments that are required to be paid in respect of Assumed Agreements (the "*Buyer Financing*").

Section 5.8    *Capitalization.* The authorized capital stock of the Buyer shall consist of 10,000 shares of Buyer Common Stock and 500,000 shares of Buyer Preferred Stock, of which 950 shares of Buyer Common Stock and 68,000 shares of Buyer Preferred Stock shall be issued

WP3:714386.1                                                                                          58222.1001

and outstanding immediately prior to the Closing. All such issued and outstanding shares of Buyer Common Stock and Buyer Preferred Stock have been duly authorized and validly issued, are fully paid and nonassessable, and have been issued in accordance with all applicable laws. The Buyer has reserved an aggregate of 50 shares of Buyer Common Stock for issuance hereunder.

Section 5.9 *Valid Issuance of IDT and Buyer Shares.* The IDT Shares and the Buyer Shares, when issued and delivered hereunder will be duly and validly issued, fully paid, and nonassessable, with no personal liability attaching to ownership thereof, free of Encumbrances created by the Buyer or IDT Corporation and not subject to preemptive or similar rights of the shareholders of the Buyer and will be free of restrictions on transfer other than under applicable state and federal securities laws.

Section 5.10 *Disclaimer of Other Representations and Warranties.* The Buyer herby acknowledges and agrees that the Buyer is purchasing the Purchased Assets on an "as-is, where-is" basis and that the Sellers make no representation or warranty whatsoever and none shall be implied at law or in equity.

ARTICLE VI
COVENANTS OF THE PARTIES

Section 6.1 *Conduct of Business.* (a) Except as required (other than pursuant to a request, application or motion by any Seller) by the Bankruptcy Court and the Bankruptcy Code, during the period commencing on the date of this Agreement and ending on the Closing Date, the Sellers shall (i) operate the Business in the usual, regular and ordinary course as conducted during the 30 days prior to December 17, 2001 (ii) other than as permitted in writing by the Buyer, use their reasonable efforts to preserve in all material respects the Business, its employees and its operations, and (iii) refrain from executing any material contract other than in the ordinary course as conducted during the 30 days prior to December 17, 2001.

(b) Prior to the Closing Date, without the prior written consent of the Buyer, no Seller shall terminate, extend or otherwise amend any of the FCC Licenses or State Regulatory Licenses, other than in the ordinary course of business. Prior to the Closing Date, without the prior written consent of the Buyer, no Seller shall sell, lease (as lessor), transfer or otherwise dispose of, any of the Purchased Assets.

Section 6.2 *Access to Information; Maintenance of Records.* (a) Between the date of this Agreement and the Closing Date, each Seller shall, during ordinary business hours, upon reasonable notice (i) give the Buyer and the Buyer Representatives reasonable access to all books, records, plants, offices and other facilities and properties constituting the Purchased Assets to which the Buyer is not denied access by law, (ii) permit the Buyer to make such reasonable inspections thereof as the Buyer may reasonably request, (iii) furnish the Buyer with such financial and operating data and other information with respect to the Business as the Buyer may from time to time reasonably request, (iv) furnish the Buyer a copy of each material report, schedule or other document filed or received by such Seller with respect to the Business with the SEC and other Governmental Authorities; *provided, however,* that (A) any such access shall be

Rider 6.1 (c)

15

usual, regular and ordinary course as conducted during the 30 days prior to December 17, 2001 (ii) other than as permitted in writing by the Buyer, use their reasonable efforts to preserve in all material respects the Business, its employees and its operations, and (iii) refrain from executing any material contract other than in the usual regular and ordinary course as conducted during the 30 days prior to December 17, 2001.

(b) Prior to the Closing Date, without the prior written consent of the Buyer, no Seller shall terminate, extend or otherwise amend any of the FCC Licenses or State Regulatory Licenses, other than in the ordinary course of business. Prior to the Closing Date, without the prior written consent of the Buyer, no Seller shall sell, lease (as lessor), transfer or otherwise dispose of, any of the Purchased Assets. ~~other than as permitted by~~ *managed under the Management Agreement*

(c) Prior to the termination of the Management Agreement, the Buyer shall take no action or actions which would constitute the exercise of control over the FCC Licenses or with respect to State Regulatory Licenses, in violation of applicable law; provided that performance under the Management Agreement shall not be deemed a breach of this Section 7.1(d).

Section 6.2    *Access to Information; Maintenance of Records*

*[margin note: Rule 6.1(c)]*

. (a) Between the date of this Agreement and the Closing Date, each Seller shall, during ordinary business hours, upon reasonable notice (i) give the Buyer and the Buyer Representatives reasonable access to all books, records, plants, offices and other facilities and properties constituting the Purchased Assets to which the Buyer is not denied access by law, (ii) permit the Buyer to make such reasonable inspections thereof as the Buyer may reasonably request, (iii) furnish the Buyer with such financial and operating data and other information with respect to the Business as the Buyer may from time to time reasonably request, (iv) furnish the Buyer a copy of each material report, schedule or other document filed or received by such Seller with respect to the Business with the SEC and other Governmental Authorities; *provided, however,* that (A) any such access shall be conducted in such a manner so as not to interfere unreasonably with the operation of the Business, (B) such Seller shall not be required to take any action which would constitute a waiver of the attorney-client privilege and (C) such Seller need not supply the Buyer with any information which such Seller is under a legal obligation not to supply. Notwithstanding anything in this Section 6.2(a) to the contrary, the Buyer shall not have access to any of the Employee Records and personnel and medical records, which in such Seller's good faith judgment is sensitive or the disclosure of which could subject such Seller to any material risk of substantial liability.

(b) The Buyer and the Sellers acknowledge that they are subject to the Confidentiality Agreement. All information furnished to or obtained by the Buyer or any of the Buyer Representatives or the Sellers or any of the Sellers' Representatives pursuant to this Agreement shall be subject to the provisions of the Confidentiality Agreement and shall be treated as Confidential Information for all purposes of the Confidentiality Agreement. Furthermore, the Buyer acknowledges that the Sellers or any of the Sellers' Representatives may furnish Confidential Information to counsel for the Creditors' Committee and to the Pre-petition Agent and the Post-petition Agent and their respective counsel, subject to the provisions of the

conducted in such a manner so as not to interfere unreasonably with the operation of the Business, (B) such Seller shall not be required to take any action which would constitute a waiver of the attorney-client privilege and (C) such Seller need not supply the Buyer with any information which such Seller is under a legal obligation not to supply. Notwithstanding anything in this Section 6.2(a) to the contrary, the Buyer shall not have access to any of the Employee Records and personnel and medical records, which in such Seller's good faith judgment is sensitive or the disclosure of which could subject such Seller to any material risk of substantial liability.

(b) The Buyer and the Sellers acknowledge that they are subject to the Confidentiality Agreement. All information furnished to or obtained by the Buyer or any of the Buyer Representatives or the Sellers or any of the Sellers' Representatives pursuant to this Agreement shall be subject to the provisions of the Confidentiality Agreement and shall be treated as Confidential Information for all purposes of the Confidentiality Agreement. Furthermore, the Buyer acknowledges that the Sellers or any of the Sellers' Representatives may furnish Confidential Information to counsel for the Creditors' Committee and to the Pre-petition Agent and the Post-petition Agent and their respective counsel, subject to the provisions of the Confidentiality Agreement. The terms of the Confidentiality Agreement shall cease to apply to the parties thereto after the Closing Date.

(c) For a period of the later of (x) three (3) years (subject to Section 6.7(a)) after the Closing Date and (y) the date of entry of an order of the Bankruptcy Court closing the Chapter 11 Cases, or if converted to a case under Chapter 7 of the Bankruptcy Code, an order of the Bankruptcy Court closing such case, each party and its representatives shall have reasonable access to all of the books and records relating to the Business or the Purchased Assets, including all information pertaining to the Assumed Agreements, all Employee Records or other personnel and medical records required by law, legal process or subpoena, in the possession of the other party to the extent that such access may reasonably be required by such party in connection with the Assumed Liabilities or the Excluded Liabilities, or other matters relating to or affected by the operation of the Business and the Purchased Assets. Such access shall be afforded by the party in possession of such books and records upon receipt of reasonable advance notice and during normal business hours; *provided, however*, that (i) any such access shall be conducted in such a manner as not to interfere unreasonably with the operation of the business of any party or its Affiliates, (ii) no party shall be required to take any action which would constitute a waiver of the attorney-client privilege, and (iii) no party need supply the other party with any information which such party is under a legal obligation not to supply. The party exercising this right of access shall be solely responsible for any costs or expenses incurred by it pursuant to this Section 6.2(c). If the party in possession of such books and records shall desire to dispose of any such books and records upon or prior to the expiration of such period, such party shall, prior to such disposition, give the other party a reasonable opportunity at such other party's expense, to segregate and remove such books and records as such other party may select. Furthermore, the Buyer acknowledges that Winstar shall have reasonable access (as set forth above) to all Transferred Employees with respect to the litigation matters set forth on Schedule 2.2(d) for so long as such matters are pending. In addition to the foregoing, the Buyer agrees to maintain the Employee Records in its possession for a period of three (3) years after the Closing Date and to give former and current employees of the Sellers reasonable access to such Employee Records during such period.

Section 6.3    *Expenses.* Except to the extent specifically provided herein or in the Sale Order or the Management Agreement, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the party incurring such costs and expenses.

Section 6.4    *Further Assurances.* (a) Subject to the terms and conditions of this Agreement, each of the parties hereto shall use reasonable best efforts (subject, in the case of the Sellers or any Chapter 7 trustee, to available funding and without being required to make any payment to any third party or to incur any significant economic burden) to take, or cause to be taken, all action, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable laws and regulations to consummate and make effective the sale of the Purchased Assets in accordance with this Agreement, including using reasonable best efforts to ensure timely satisfaction of the conditions precedent to each party's obligations hereunder. Neither any of the Sellers, on the one hand, nor the Buyer, on the other hand, shall, without the prior written consent of the other party (it being understood that the written consent of Winstar shall have the same effect as the consent of all of the Sellers), take any action which would reasonably be expected to prevent or materially impede, interfere with or delay the transactions contemplated by this Agreement. From time to time on or after the Closing Date, each Seller shall, at its own expense, execute and deliver such documents to the Buyer as the Buyer may reasonably request in order to more effectively vest in the Buyer such Seller's title to the Purchased Assets subject to Permitted Encumbrances. From time to time after the date hereof, the Buyer shall, at its own expense, execute and deliver such documents to each Seller as such Seller may reasonably request in order to more effectively consummate the sale of the Purchased Assets and the assumption and assignment of the Assumed Liabilities and the Assumed Agreements in accordance with this Agreement.

(b) In the event that any Purchased Asset shall not have been conveyed to the Buyer at the Closing, the applicable Seller shall, subject to Section 6.4(c), use reasonable best efforts to convey such asset to the Buyer as promptly as is practicable after the Closing.

(c) To the extent that any of the Sellers' rights under any Assumed Agreement may not be assigned without the consent of another Person which consent has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful and such Seller shall cooperate (without being required to make any payment to any third party or to incur any significant economic burden) to obtain any such required consent(s) as promptly as reasonably possible unless failure to obtain such consent would not, individually or in the aggregate, have a Material Adverse Effect, and the Buyer agrees to fully cooperate with such Seller in its efforts to obtain any such consent (including the submission of such financial or other information concerning the Buyer and the execution of any assumption agreements or similar documents reasonably requested by a third party) without being required to make any payment to any third party or to incur any economic burden.

Section 6.5    *Public Statements.* Winstar and the Buyer shall consult with each other prior to issuing any public announcement, statement or other disclosure with respect to this Agreement or the transactions contemplated hereby, except that the parties may make disclosures with respect to this Agreement and the transactions contemplated hereby to the extent and under

17

the circumstances in which the parties are expressly permitted by the Confidentiality Agreement to make disclosures of Confidential Information or otherwise required by law or New York Stock Exchange regulations.

Section 6.6    *Governmental Authority Consents and Approvals.* (a) <u>FCC Consents</u>. Subject to <u>Section 6.6(d)</u>, within thirty (30) days after the entry of the Sale Order, the Buyer shall prepare and file, or cause to be prepared and filed, the necessary application or applications with the FCC seeking the FCC Consents and thereafter, shall promptly make all other filings and notifications and promptly seek all such consents, licenses, approvals, permits, waivers, orders or authorizations as may be required to obtain the FCC Consents. The Sellers shall cooperate with the Buyer to the fullest extent reasonably possible to provide all necessary information for the preparation of such applications within ten (10) Business Days after entry of the Sale Order, including those portions of such applications which are required to be completed by the Sellers. The Sellers and the Buyer shall prosecute such applications with all reasonable diligence and otherwise use their reasonable best efforts (including, with respect to Buyer, providing financial assurance to the extent required) to obtain grants of approval as expeditiously as practicable. The Buyer shall bear all reasonable fees payable by the Buyer and/or the Sellers to the FCC and to any outside counsel employed by the Sellers or Buyer in connection with the preparation and filing of the applications for the FCC Consents.

(b) <u>State Regulatory Consents</u>. Subject to <u>Section 6.6(e)</u>, within thirty (30) days after the entry of the Sale Order, the Sellers and/or the Buyer, as applicable, shall each file or cause to be filed with any state or local regulatory authorities analogous to the FCC applications for the approval of the assignment of the State Regulatory Licenses. The Sellers and the Buyer shall prosecute such applications with all reasonable diligence and otherwise use their reasonable best efforts (including, with respect to Buyer, providing financial assurance to the extent required) to obtain grants of approval as expeditiously as practicable. The Buyer shall bear all reasonable fees payable by the Buyer and/or the Sellers to the state and local regulatory entities and to any outside counsel employed by the Sellers or Buyer in connection with the preparation and filing of the applications for the State Regulatory Consents.

(c) <u>Other Governmental Authority Approvals</u>. The Sellers and the Buyer shall each use their reasonable best efforts to cooperate with each other in determining any filings, notifications and requests for approval (other than the FCC Consents and the State Regulatory Consents) required to be made and received prior to the Closing under applicable law or regulation (collectively, the "*Other Regulatory Approvals*"). In connection with any Other Regulatory Approvals, neither the Buyer nor any of the Sellers will, and each of them will use its reasonable best efforts not to, cause or permit any of its officers, directors, partners or other Affiliates to, take any action which could reasonably be expected to materially and adversely affect the submission of any required filings or notifications or the grant of any such approvals.

(d) <u>Cooperation</u>. The Sellers and the Buyer (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other party to review in advance any proposed written communication or information submitted to any such Governmental Authority in response thereto. In addition, each of the Sellers and the Buyer shall not agree to participate in any meeting with any

18

Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement, the transactions contemplated hereby or any such filing, notification or request for approval unless it consults with the other party in advance and, to the extent permitted by any such Governmental Authority, gives the other party the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to any restrictions under applicable laws, rules or regulations, each of the Sellers and the Buyer shall furnish the other party with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements and to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval. The Sellers and the Buyer shall also furnish the other party with such necessary information and assistance as such other party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration, or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval. The Sellers and the Buyer shall prosecute all required requests for approval with all necessary diligence and otherwise use their respective reasonable best efforts to obtain the grant thereof by a Final Order as soon as possible.

Section 6.7    *Tax Matters*. (a) <u>Cooperation on Tax Matters</u>. The Buyer and the Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of all Tax Returns in connection with matters relating to or affected by the operations of the Sellers prior to the Closing, including the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Notwithstanding anything to the contrary herein, the Buyer and the Sellers shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least six (6) years following the Closing Date. At the end of such period, each party shall provide the other with at least thirty (30) days prior written notice before destroying any such books and records, during which period the party receiving such notice can elect to take possession, at its own expense, of such books and records. The Sellers and the Buyer shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business.

(b) <u>Transfer Taxes</u>. All excise, sales, use, transfer, value added, registration, stamp, recording, documentary, conveyancing, franchise, property, transfer, gains and similar Taxes, levies, charges and recording, filing and other fees (collectively, "*Transfer Taxes*") incurred in connection with the transactions contemplated by this Agreement shall be paid by the Sellers. The Sellers shall, at their own expense, timely pay and file all necessary Tax returns and other documentation with respect to all such Transfer Taxes and, if required by applicable law, the Buyer shall join in the execution of any Tax Returns and other documentation at the Sellers' request. Notwithstanding the foregoing, the Sellers shall seek in the Sale Order a decretal paragraph which provides that, in accordance with Section 1146(c) of the Bankruptcy Code, the transactions contemplated hereby are steps in the formulation, or anticipation of the formulation, of a Chapter 11 plan for the Sellers and, as such, the making or delivery of any instrument of

19

transfer to effectuate the transactions contemplated hereby shall not be taxed under any law imposing a stamp tax or similar tax.

Section 6.8    *Litigation Support.*  In the event and for so long as any party is actively contesting or defending against any action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand in connection with (a) any transaction contemplated under this Agreement or (b) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving the Sellers, the other party will cooperate with the contesting or defending party and its counsel in the contest or defense, make available its personnel, and provide such testimony and access to its books and records as shall be reasonably necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending party.  In the event that the Sale Order is the subject of an appeal, the Buyer and the Sellers agree to use reasonable best efforts to seek an expedited review and decision of such appeal and to seek the dissolution of any stay which might be entered in connection with such an appeal; *provided* that each party shall bear the cost of complying with this provision.

Section 6.9    *Notification.*  The Sellers shall notify the Buyer and keep it advised of the occurrence, to the Knowledge of the Sellers, of (a) notice of any litigation or administrative proceeding commenced against any Seller which could, if adversely determined, have a Material Adverse Effect (other than any such action commenced in the Bankruptcy Court) and (b) any material damage or destruction of any of the Purchased Assets.  The Buyer shall notify the Sellers prior to the Closing Date and keep them advised of the occurrences of any event or occurrence which could reasonably be expected to materially adversely affect the Buyer's ability to consummate the transactions contemplated hereby.

Section 6.10    *Submission for Bankruptcy Court Approval.*  (a)  In connection with the transactions contemplated by this Agreement, the Sellers shall, within one (1) Business Day of the date hereof, file with the Bankruptcy Court a form of order or orders pursuant to Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code (A) authorizing and approving the sale to the Buyer pursuant to this Agreement of the Purchased Assets, and approving the terms of this Agreement, (B) finding the Buyer is acting in good faith, and is entitled to the protections of a Buyer under Section 363(m) of the Bankruptcy Code and (C) containing such other findings and provisions as may be reasonably requested by the Buyer (including a finding that notice of the transactions contemplated by this Agreement, including notice to all parties to the Assumed Agreements, has been properly given) in the form and substance of Exhibit E or otherwise in form and substance acceptable to the Buyer in its sole discretion (the "*Sale Order*").

(b)  The Sellers and the Buyer shall each use their reasonable best efforts, and shall cooperate, assist and consult with each other, to secure the Bankruptcy Court's approval of (i)  the Sale Order no later than one (1) Business Day after the date of this Agreement and (ii) any other order of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby, within five (5) days following the date of filing of the motion for approval thereof.  The Sellers and the Buyer shall consult with, and seek the advice of, one another regarding pleadings which any of them intend to file, or positions any of them intend to take, with the Bankruptcy Court in connection with or which might reasonably affect, the Bankruptcy

20

Court's approval of the Sale Order.  None of Sellers or the Buyer will file any pleading or take any position that is inconsistent with obtaining the Bankruptcy Court's approval of the Sale Order or any other such order.  The Sellers shall promptly (and, in any event, within one (1) Business Day after the receipt of any written request) provide the Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court (and other courts) pertaining to the motion for approval of the Sale Order or any other order relating to any of the transactions contemplated by this Agreement.

(c)  If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Order or other such order), the Sellers and the Buyer will cooperate in taking such steps diligently to prosecute such appeal, petition or motion and each of the Seller and the Buyer shall use its reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.

(d)  As a condition to Buyer's obligations hereunder, Sellers have agreed to pay to Buyer an amount equal to 2.5% of the Cash Payment (the "*Topping Fee*") if (i) this Agreement is terminated (other than as a result of a default by the Buyer in the performance of its obligations hereunder), (ii) the Sellers shall enter into one or more sale transactions and (iii) such transaction or transact shall be consummated and shall close, in accordance with its terms.  The Topping Fee shall be paid when the Sellers receive the purchase price from another buyer (it being understood that placing funds in escrow shall not constitute receipt by the Sellers until such funds are released to the Sellers).

Section 6.11  *D&O Policies*.  The Sellers shall maintain in effect the D&O Policies for the benefit of the Sellers' respective current and former directors and officers until such time as the D&O Policies expire in accordance with their terms.

Section 6.12  *Use of Winstar Name*.  The Sellers agree that no later than 60 days after the Closing Date, the Sellers (i) shall cause the names of Winstar and its Subsidiaries which currently utilize the name "Winstar" to be changed to a name that does not include the name "Winstar" or contain any references thereto and (ii) shall, and shall cause their Affiliates, not to advertise or hold themselves out as Winstar or an Affiliate thereof.  It is expressly understood and agreed by and between the parties that this covenant shall survive the Closing and that Buyer shall have all rights and remedies available at law or in equity to ensure strict compliance with this covenant by the Sellers, or their current or former Affiliates.

ARTICLE VII
CONDITIONS TO CLOSING

Section 7.1  *Conditions to Each Party's Obligations to Effect the Closing*.  The respective obligations of each party to effect the sale and purchase of the Purchased Assets shall be subject to the fulfillment at or prior to the Closing Date of the following conditions:

(a)  no preliminary or permanent injunction or other order or decree by any federal or state court which prevents the consummation of the sale of a material part of the

21

Purchased Assets contemplated hereby shall have been issued and remain in effect (each party agreeing to use its reasonable efforts to have any such injunction, order or decree lifted) and no statute, rule or regulation shall have been enacted by any Governmental Authority which prohibits the consummation of the sale of the Purchased Assets; and

(b) the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be in full force and effect and shall not have been stayed, modified, reversed or amended (except, if modified or amended with the written consent of the Sellers and the Buyer).

Section 7.2    *Conditions to Obligations of the Buyer.*  The obligation of the Buyer to effect the purchase of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions:

(a) the Sellers shall have performed and complied in all material respects with the covenants contained in this Agreement which are required to be performed and complied with by the Sellers on or prior to the Closing Date;

(b) the Sellers and the Buyer shall have entered into the Management Agreement substantially in the form of Exhibit D, if necessary, pursuant to Section 4.4;

(c) the Post-petition Agent, on behalf of its lender participants, shall have ~~agreed in writing that any and all of their Encumbrances on the Purchased Assets shall attach only to the proceeds of the transactions contemplated hereby and not to the Purchased Assets~~; and    consented to the sale of the Purchased Assets as provided herein

(d) the Buyer shall have received the other items to be delivered pursuant to and in Section 4.2.    the Sale Order,

Any condition specified in this Section 7.2 may be waived by the Buyer; *provided* that no such waiver shall be effective against the Buyer unless it is set forth in a writing executed by the Buyer.

Section 7.3    *Conditions to Obligations of the Sellers.*  The obligation of each Seller to effect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions:

(a) the Buyer shall have performed and complied in all material respects with the covenants contained in this Agreement which are required to be performed and complied with by the Buyer on or prior to the Closing Date and the representations and warranties of the Buyer which are set forth in this Agreement (without regard as to any qualifications therein as to materiality) shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date (except to the extent that any such representation or warranty speaks as of a particular date) as though made at and as of the Closing Date;

(b) each Seller shall have received the other items to be delivered to it pursuant to Section 4.3; and

22

(c) the Escrow Agent shall have simultaneously with the Closing released the Purchase Price in accordance with the Escrow Agreement in accordance with Section 3.2.

Any condition specified in this Section 7.3 may be waived by the Sellers; *provided* that no such waiver shall be effective against any Seller unless it is set forth in writing executed by such Seller.

## ARTICLE VIII
## TERMINATION AND ABANDONMENT

Section 8.1    *Termination.*  This Agreement may be terminated at any time prior to the Closing Date, unless otherwise stated, by:

(a) mutual written consent of Winstar (on behalf of the Sellers) and the Buyer;

(b) the Sellers, if there has been a material violation or breach by the Buyer of any covenant, representation or warranty made by it contained in this Agreement or the Management Agreement which has prevented the satisfaction of any condition to the obligations of the Sellers to effect the Closing;

(c) the Buyer, if there has been a material violation or breach by the Sellers of any covenant made by them in this Agreement or the Management Agreement which has prevented the satisfaction of any condition to the obligations of the Buyer to effect the Closing.

(d) the Buyer or the Sellers, if (i) there shall be any law or regulation that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited or (ii) consummation of the transactions contemplated hereby would violate any nonappealable final order, decree or judgment of (A) the Bankruptcy Court or (B) any court or governmental body having competent jurisdiction;

(e) the Buyer or the Sellers, if the Sale Order has not been entered by the Bankruptcy Court within one (1) Business Day after the date hereof; *provided* that the Buyer or the Sellers, as the case may be, shall not be entitled to terminate this Agreement pursuant to this Section 8.1(e) if the failure to obtain such approval within such time period results primarily from such party itself breaching any representation, warranty or covenant contained in this Agreement;

(f) the Buyer or the Sellers, if the Sale Order has been stayed, vacated, reversed or amended by any court of competent jurisdiction (except, as may be modified or amended with the written consent of the Sellers and the Buyer, in their sole discretion); and

(g) the Buyer or the Sellers, if the Closing Date shall not have occurred on or prior to noon, New York City time, on December 19, 2001 (the "*Termination Date*"); *provided* that the Buyer or the Sellers, as the case may be, shall not be entitled to terminate this Agreement pursuant to this Section 8.1(g) if the failure of the Closing to

23

occur on or prior to such date results primarily from such party itself breaching any representation, warranty or covenant contained in this Agreement.

Section 8.2    *Procedure and Effect of Termination.*  In the event of termination of this Agreement and abandonment of the transactions contemplated hereby by either or both of the parties pursuant to Section 8.1, written notice thereof shall forthwith be given by the terminating party to the other party (it being understood that notice to Winstar shall have the same effect as notice to all of the Sellers) and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any of the parties hereto.  If this Agreement is terminated as provided herein:

(a) said termination shall be the sole remedy, subject to Sections 6.10(d) and 8.2(b), of the parties hereto with respect to breaches of any covenant, representation or warranty contained in this Agreement and none of the parties hereto nor any of their respective trustees, directors, officers or Affiliates, as the case may be, shall have any liability or further obligation to the other party or any of their respective trustees, directors, officers or Affiliates, as the case may be, pursuant to this Agreement, except for the parties hereto in each case as stated in this Section 8.2, Section 9.15 and in Sections 6.2(b) and 6.3; *provided, however,* the Sellers shall not be responsible ~~for liability~~ for any misrepresentation or breach of any warranty or covenant by the Sellers contained ~~in~~ this Agreement prior to the time of such termination;
└ or liable

(b) the Escrow Amount shall be released to the Buyer or the Sellers as set forth in the Escrow Agreement;

(c) all filings, applications and other submissions made pursuant to this Agreement, to the extent practicable, shall be withdrawn from the agency or other Person to which they were made; and

(d) all Confidential Information from any and all of the Sellers shall be returned to Winstar, and all Confidential Information from the Buyer shall be returned to the Buyer.

## ARTICLE IX
## MISCELLANEOUS PROVISIONS

Section 9.1    *Amendment and Modification.*  This Agreement may be amended, modified or supplemented only by written agreement of Winstar (on behalf of the Sellers) and the Buyer.

Section 9.2    *Waiver of Compliance; Consents.*  Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, covenant or condition herein may be waived by the party entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, or condition shall not operate as a waiver of, or estoppel with respect to any subsequent or other failure.

Section 9.3    *Survival.*  The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing Date hereunder, and neither party shall

24

have any liability to the other after the Closing Date for any breach thereof. The representations and warranties set forth in this Agreement constitute the only representations and warranties made by the Buyer with respect to the transactions contemplated hereby and the Purchased Assets transferred pursuant hereto, and such representations and warranties supersede all representations and warranties, written or oral, previously made by the Buyer. Furthermore, the parties agree that, other than the right to terminate as contained in Article VIII of this Agreement, neither party shall have any recourse to the other party, or to any of the officers, directors, or Affiliates of such party, in the event any of the representations and warranties made herein or deemed made are untrue as at any time. The only remedy of the Seller for a breach of such representations and warranties shall be the Seller's option, under certain circumstances, not to close and to retain the Purchase Price in accordance with and subject to the limitations in Section 7.1, 7.3, 8.1(b) and 8.2(b). The parties agree that specific performance shall be available as a remedy to require performance of each party's covenants contained in this Agreement. The parties hereto agree that only the covenants contained in this Agreement to be performed at or after the Closing Date shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing Date for any breach thereof.

Section 9.4    *No Impediment to Liquidation*. Subject to Sections 2.2(e), 6.2(c), 6.4 and 6.7, nothing herein shall be deemed or construed as to limit, restrict or impose any impediment to the Sellers' right to liquidate, dissolve and wind-up its affairs and to cease all business activities and operations at such time as it may determine following the Closing, including conversion to Chapter 7. Subject to Sections 2.2(e), 6.2(c), 6.4 and 6.7, the Sellers shall not be obligated to retain assets or employees or to continue operations following the Closing (or to retain outsource assistance) in order to satisfy its obligations hereunder except to the extent that such would directly contravene the obligations of the Sellers under this Agreement or the Management Agreement.

Section 9.5    *Notices*. All notices and other communications hereunder shall be in writing and shall be deemed given (i) when personally sent/delivered, by facsimile transmission (with hard copy to follow) or sent by reputable express courier (charges prepaid) or (ii) five (5) days following mailing by registered or certified mail postage prepaid and return receipt requested. Unless another address is specified in writing, notices, demands and communications to any Seller and the Buyer shall be sent to the addresses indicated below:

(a) If to any of the Sellers, to:

c/o Winstar Communications, Inc.
The Winstar Building
685 Third Avenue
31st Floor
New York, New York 10017
Facsimile: (212) 792-9348
Attention: Paul Street, CRO

with a copy to:

WP3:714386.1                                                                 58222.1001

Shearman & Sterling
599 Lexington Avenue
New York, New York 10022
Facsimile: (212) 848-7179
Attention: Mark J. Shapiro, Esq.
          Stephen M. Besen, Esq.

(b) if to the Buyer, to:

c/o IDT Corporation
520 Broad Street
Newark, New Jersey 07102
Facsimile: (973) 438-1503
Attention: General Counsel

with a copy to:

McDermott, Will & Emery
50 Rockefeller Plaza
New York, New York 10020
Facsimile: (212) 547-5444
Attention: Mark S. Selinger, Esq.
          David C. Albalah, Esq.

Section 9.6    *Assignment.*  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns and with respect to any of the Sellers, any entity that may succeed to substantially all the assets of such Seller, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto, including by operation of law, without the prior written consent of the other party; *provided, however,* that the Buyer may assign this Agreement or any of the rights, interests or obligations hereunder to any Affiliate *provided* that Buyer shall remain liable hereunder. Any assignment of this Agreement or any of the rights, interests or obligations hereunder in contravention of this <u>Section 9.6</u> shall be null and void and shall not bind or be recognized by any of the Sellers or the Buyer. *Notwithstanding anything herein to the contrary, the Seller may, subject to applicable law, distribute the*

Section 9.7    *Third-Party Beneficiaries.*  Nothing in this Agreement shall be construed as giving any Person, including any counter-party to an Assumed Agreement, other than the parties hereto, any legal or equitable right, remedy or claim under or with respect to this Agreement.

Section 9.8    *Severability.*  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in

*Purchase Price, including any IDT Shares or Buyer Shares to its Creditors.*

good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 9.9    *Governing Law.*    This Agreement shall be governed by and construed in accordance with the laws of the State of New York (regardless of the laws that might otherwise govern under applicable New York principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies.

Section 9.10    *Submission to Jurisdiction.*    The parties hereto irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith or any of the transactions contemplated hereby or thereby. Each party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such dispute or proceedings may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum in connection therewith.

Section 9.11    *Counterparts.*    This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which, when executed and delivered, shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

Section 9.12    *Incorporation of Schedule and Exhibits.*    The Disclosure Schedule and all Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

Section 9.13    *Entire Agreement.*    This Agreement (including the Exhibits and the Disclosure Schedule) and the Confidentiality Agreement constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings among the parties with respect thereto.

Section 9.14    *Headings.*    The descriptive headings contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.15    *Remedies.*    Subject to Section 9.3, the Sellers and the Buyer hereby acknowledge and agree that money damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement and that, in such event, the Sellers or their successors or assigns, or the Buyer or its successors or assigns, as the case may be, may, in addition to any other rights and remedies existing in their favor, apply to the Bankruptcy Court or any other court of competent jurisdiction for specific performance, injunctive and/or other relief in order to enforce or prevent any violations of this Agreement.

Section 9.16    *Bulk Sales or Transfer Laws.*    The Buyer hereby waives compliance by the Sellers with the provisions of the bulk sales or transfer laws of all applicable jurisdictions.

WP3:714386.1                                                                58222.1001

* * * * *

28

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written by their respective officers thereunto duly authorized.

**IDT WINSTAR ACQUISITION, INC.**

By:

Name: Charles HF Gamer

Title: President

**WINSTAR COMMUNICATIONS, INC.**

By:

Name: T. R. Graham

Title: Executive Vice President

**WINSTAR WIRELESS, INC.**

By:

Name: T. R. GRAHAM

Title: VICE PRESIDENT

**WCI CAPITAL CORP.**

By:

Name: T. R. GRAHAM

Title: VICE PRESIDENT

**WINSTAR EQUIPMENT CORP.**

By:

Name: T. R. GRAHAM

Title: VICE PRESIDENT

WINSTAR EQUIPMENT II CORP.

By: _____
   Name: T. R. GRAHAM
   Title: VICE PRESIDENT


WINSTAR GOVERNMENT SOLUTIONS,
LLC.

By: _____
   Name: T. R. GRAHAM
   Title: VICE PRESIDENT


WINSTAR LMDS, LLC

By: _____
   Name: T. R. GRAHAM
   Title: VICE PRESIDENT


WINSTAR NETWORK EXPANSION, LLC

By: _____
   Name: T. R. GRAHAM
   Title: VICE PRESIDENT


WINSTAR WIRELESS FIBER CORP.

By: _____
   Name: T. R. GRAHAM
   Title: VICE PRESIDENT


WINSTAR WIRELESS OF DELAWARE, LLC

By: _____
   Name: T. R. GRAHAM
   Title: VICE PRESIDENT

**WINSTAR WIRELESS OF GEORGIA, LLC**

By: _____
   Name: T. R. GRAHAM
   Title: VICE PRESIDENT

**WINSTAR WIRELESS OF INDIANA, LLC**

By: _____
   Name: T. R. GRAHAM
   Title: VICE PRESIDENT

**WINSTAR WIRELESS OF NEW JERSEY, LLC**

By: _____
   Name: T. R. GRAHAM
   Title: VICE PRESIDENT

**WINSTAR WIRELESS OF NEW YORK, LLC**

By: _____
   Name: T. R. GRAHAM
   Title: VICE PRESIDENT

**WINSTAR WIRELESS OF PENNSYLVANIA, LLC**

By: _____
   Name: T. R. GRAHAM
   Title: VICE PRESIDENT

**WINSTAR WIRELESS OF VIRGINIA, LLC**

By: _____
   Name: T. R. GRAHAM
   Title: VICE PRESIDENT

**WINSTAR WIRELESS OF WEST VIRGINIA, LLC**

By: _____

     Name: *T. R. GRAHAM*

     Title: *VICE PRESIDENT*

**WWI LICENSE HOLDING, INC.**

By: _____

     Name: *T. R. GRAHAM*

     Title: *VICE PRESIDENT*

**WVF-CPQ 1, LLC**

By: _____

     Name: *T. R. GRAHAM*

     Title: *VICE PRESIDENT*

**WVF-CSC 1, LLC**

By: _____

     Name: *T. R. GRAHAM*

     Title: *VICE PRESIDENT*

**WVF-DL 1, LLC**

By: _____

     Name: *T. R. GRAHAM*

     Title: *VICE PRESIDENT*

**WVF-LU 2, LLC**

By: _____

     Name: *T. R. GRAHAM*

     Title: *VICE PRESIDENT*

**WVF-I LLC**

By:_____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


**WINSTAR CREDIT CORP.**

By:_____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


**WINSTAR INTERNATIONAL, INC.**

By:_____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


**WINSTAR MIDCOM ACQUISITION CORP.**

By:_____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


**WINSTAR NEW MEDIA COMPANY, INC.**

By:_____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT


**WINSTAR INTERACTIVE VENTURES I, INC.**

By:_____
    Name: T. R. GRAHAM
    Title: VICE PRESIDENT

WINSTAR PUERTO RICO, INC.

By:_____

Name: T. R. GRAHAM

Title: VICE PRESIDENT

APPENDIX I

## SUBSIDIARIES OF WINSTAR
## PARTIES HERETO

WCI Capital Corp.
Winstar Credit Corp.
Winstar Equipment Corp.
Winstar Equipment II Corp.
Winstar Government Solutions, LLC.
Winstar International, Inc.
Winstar LMDS, LLC
Winstar Midcom Acquisition Corp.
Winstar Network Expansion, LLC
Winstar Wireless Fiber Corp.
Winstar Wireless, Inc.
Winstar Wireless of Delaware, LLC
Winstar Wireless of Georgia, LLC
Winstar Wireless of Indiana, LLC
Winstar Wireless of New Jersey, LLC
Winstar Wireless of New York, LLC
Winstar Wireless of Pennsylvania, LLC
Winstar Wireless of Virginia, LLC
Winstar Wireless of Virginia, LLC
Winstar Wireless of West Virginia, LLC
WWI License Holding, Inc.
WVF-CPQ 1, LLC
WVF-CSC 1, LLC
WVF-DL 1, LLC
WVF-LU 2, LLC
WVF-I LLC
Winstar New Media Company, Inc.
Winstar Broadcasting Corp.
Winstar Interactive Ventures I, Inc.
Winstar Puerto Rico, Inc.

EXHIBIT A

## ASSUMED AGREEMENTS

None.

EXHIBIT B

FORM OF BILL OF SALE

NYDOCS02/592885.4
WP3:714386.1

EXHIBIT C

FORM OF ESCROW AGREEMENT

EXHIBIT D

FORM OF MANAGEMENT AGREEMENT

EXHIBIT E

FORM OF SALE ORDER

**IDT CORPORATION**
**520 Broad Street**
**Newark, New Jersey  07102**

December 18, 2001

     Reference is made to (a) the Asset Purchase Agreement, dated as of the date hereof (the "Purchase Agreement") among Winstar Communications, Inc., certain other Sellers and IDT Winstar Acquisition, Inc.and (b) the Management Agreement described therein.  Unless otherwise defined herein, capitalized terms which are used herein shall have the meaning assigned thereto in the Purchase Agreement.

     This letter shall confirm our agreement that IDT Corporation shall comply with its obligations contained in Section 3.1 of the Purchase Agreement to (a) deliver the shares of IDT Class B Stock, (b) use commercially reasonable efforts to register the shares of IDT Class B Stock as provided therein and (c) repurchase the shares of IDT Class B Stock under the circumstances and for the consideration described therein.  Furthermore, IDT Corporation shall reimburse the Buyer for any amounts withdrawn from the Account (as defined in the Management Agreement) and not utilized for the purposes described in the Management Agreement.  Sections 9.9, 9.10 and 9.15 of the Purchase Agreement are expressly adopted for purposes of this letter.

Very truly yours,

IDT Corporation

By: _____

Name: *Charles HF Garner*

Title: *EVP, New Ventures*

**EXHIBIT D**



The Blackstone Group®

# MEMORANDUM

**TO:**      Distribution

**FROM:**   Michelle Gaynor

**RE:**      Winstar Communications, Inc.
            Winstar Wireless, Inc.

**DATE:**    August 3, 2001

---

The attached Engagement Letter is for your file.

Distribution
J.  Abrams
D.  Casanova
Central Files
Fireproof Vault (Original)
R.  Gentile
J.  Page
C.  Riker

**MEMO**

To:    7/30

From:

Dennis Walsh
MAP

|  |  |
|---|---|
| **To:** | Michael A. Puglisi |
| **From:** | Geraldine Bolger |
| **Subject:** | Agreement Letter |
| **Date:** | July 30, 2001 |

---

Attached is the revised signed original agreement letter with Winstar .

Att.



The Blackstone Group

Arthur Newman
Senior Managing Director
July 26, 2001

Mr. Timothy R. Graham
Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.

685 Third Avenue
Suite 3100
New York, NY 10017

Dear Tim:

This letter agreement (this "Agreement") amends and supercedes our letter agreement dated April 16, 2001 (the "April 16 Agreement") and confirms the understanding and the agreement between The Blackstone Group L.P. ("Blackstone") and Winstar Communications, Inc., Winstar Wireless, Inc. and their affiliates that are debtors in possession in the pending chapter 11 bankruptcy cases (collectively, "Winstar" or the "Company") regarding the retention of Blackstone by Winstar as its financial advisor for the purposes set forth herein. This agreement together with the attached indemnification agreement is effective nunc pro tunc April 18, 2001 ("Effective Date").

Since April 6, 2001, Blackstone has acted as financial advisor to Winstar in connection with its reorganization under chapter 11 of Title 11, United States Code (the "Bankruptcy Code"). Effective as of July 6, 2001, the Company has requested Blackstone to serve as its exclusive M&A advisor to provide the financial advisory services described herein and has indicated it no longer requires the broader financial advisory services provided prior thereto. Under this Agreement, Blackstone will provide financial advisory services to Winstar in connection with (i) a sale of the Company, (ii) the sale of all or substantially all of the assets of the Company, (iii) an investment by a third party under a plan of reorganization, and/or (iv) a merger, acquisition or other similar transaction by the Company, in one or a series of transactions (each such transaction listed in (i) through (iv), a "Transaction").

The financial advisory services to be rendered by Blackstone include, without limitation, the following:

The Blackstone Group L.P.
345 Park Avenue
New York, NY 10154
Tel 212 583 5372
Fax 212 583 5707

Blackstone Financial Services®

Mr. Timothy R. Graham, Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.
July 26, 2001
Page 2

(a)   Assisting in the development of financial data and presentations to the Company's Board of Directors, various creditors and other third parties regarding a Transaction;

(b)   Assisting the Company in preparing marketing materials in conjunction with a possible Transaction;

(c)   Assisting the Company in identifying potential buyers or parties in interest to a Transaction and assist in the due diligence process;

(d)   Assisting and advising the Company concerning the terms, conditions and impact of any proposed Transaction;

(e)   Negotiating a Transaction with potential buyers; and

(f)   Providing expert testimony with respect to any Transaction and bidding procedures therefor.

Notwithstanding anything contained in this Agreement or the April 16 Agreement to the contrary, Blackstone shall have no responsibility for designing or implementing any initiatives to improve the Company's operations, profitability, cash management or liquidity. Blackstone makes no representations or warranties about the Company's ability to (i) successfully improve its operations, (ii) maintain or secure sufficient liquidity to operate its business, or (iii) successfully complete a Transaction or consummate a reorganization. Blackstone is retained under this Agreement solely to provide advice regarding a Transaction and shall have no duties, responsibilities or obligations in respect of "crisis management."

The Company agrees to pay the following fees to Blackstone for its financial advisory services:

(i)   a monthly advisory fee in the amount of $200,000 for each of the two months during the period from May 6, 2001 through July 5, 2001 for services rendered in accordance with the April 16 Agreement. Blackstone has received $200,000 from the Company with respect to financial advisory services rendered for the month commencing April 6, 2001;

(ii)  a monthly advisory fee in the amount of $100,000 for the period commencing July 6, 2001 for services rendered in connection with a Transaction (the "Monthly Fee"), with the first such Monthly Fee due on July 6, 2001, and additional installments of the Monthly Fee payable in advance on each monthly anniversary of such date prior to the termination of this Agreement;

engagement ma2.DOC

Mr. Timothy R. Graham, Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.
July 26, 2001
Page 3

(iii)   upon the consummation of a Transaction, a Transaction fee ("Transaction Fee") payable in cash equal to 1% of the first $200,000,000 of Consideration (as defined below) plus 1.25% of Consideration above $200,000,000.

In this Agreement, Consideration means the gross value of all cash, securities and other properties paid or payable, directly or indirectly, in one transaction or in a series or combination of transactions, in connection with the Transaction or a transaction related thereto (including, without limitation, amounts paid (A) pursuant to covenants not to compete, employment contracts, employee benefit plans or other similar arrangements and (B) to holders of any warrants, stock purchase rights, convertible securities or similar rights and to holders of any options or stock appreciation rights, whether or not vested). Consideration shall also include the face amount of any long-term liabilities or preferred stock (including indebtedness for borrowed money and the amount set forth in the Company's financial statements for any pension liabilities and guarantees) indirectly or directly assumed or acquired, or otherwise repaid or retired by one or more purchasers of, or investors in, the Company, in connection with or in anticipation of the Transaction, excluding all operating lease obligations that are not characterized as liabilities on the balance sheet of the Company. If the Transaction involves an investment in the Company, Consideration shall equal the total enterprise value of the Transaction (calculated based upon the amount of the investment and the percentage ownership acquired therefor), including the face amounts of any long-term liabilities or preferred stock (as defined above), indirectly or directly assumed or acquired, or otherwise repaid or retired, in connection with or in anticipation of the Transaction. If the Transaction takes the form of a purchase of assets, Consideration shall also include (i) the value of any current assets not purchased, minus (ii) the value of any current liabilities not assumed. If the Consideration to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such Consideration is paid; and

(iv)   reimbursement of all necessary and reasonable out-of-pocket expenses commencing on April 6, 2001, incurred during this engagement, including, but not limited to, out-of-town travel requested by the Company and related lodging, direct identifiable data processing and communication charges, courier services, working meals, reasonable fees and expenses of Blackstone's external counsel not to exceed $5,000 (unless consented to by the Company, which consent shall not be unreasonably withheld) and other necessary expenditures, payable upon rendition of invoices setting forth in reasonable detail the nature and amount of such expenses.

Mr. Timothy R. Graham, Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.
July 26, 2001
Page 4

The Company shall use its good faith efforts to promptly apply to the bankruptcy court having jurisdiction over the Chapter 11 case or cases (the "Bankruptcy Court") for the approval pursuant to sections 327 and 328 of the Bankruptcy Code of this Agreement and Blackstone's retention by the Company under the terms of this Agreement and subject to the standard of review provided in section 328(a) of the Bankruptcy Code and not subject to any other standard of review under section 330 of the Bankruptcy Code. The Company shall supply Blackstone with a draft of such application and any proposed order authorizing Blackstone's retention sufficiently in advance of the filing of such application and proposed order to enable Blackstone and its counsel to review and comment thereon. Blackstone shall have no obligation to provide any services under this Agreement unless Blackstone's retention under the terms of this Agreement is approved under section 328(a) of the Bankruptcy Code by an order of the Bankruptcy Court acceptable to Blackstone in all respects. Blackstone acknowledges that in the event that the Bankruptcy Court approves its retention by the Company, Blackstone's fees and expenses shall be subject to the jurisdiction and approval of the Bankruptcy Court under section 328(a) of the Bankruptcy Code and any applicable fee and expense guideline orders; provided, however, that to the extent time records are required, Blackstone will keep them in one-half hour increments.

The advisory services and compensation arrangement set forth in this Agreement do not encompass other investment banking services or transactions that may be undertaken by Blackstone at the request of the Company, including the arranging of debt capital, issuing fairness opinions, or any other specific services not set forth in this Agreement. The terms and conditions of any such investment banking services, including compensation arrangements, would be set forth in a separate written agreement between Blackstone and the Company.

Except as contemplated by the terms hereof or as required by applicable law or legal process, Blackstone shall keep confidential all material non-public information provided to it by or at the request of the Company, and shall not disclose such information to any third party or to any of its employees or advisors except to those persons who have a need to know such information in connection with Blackstone's performance of its responsibilities hereunder and who are advised of the confidential nature of the information and who agree to keep such information confidential.

The Company will furnish or cause to be furnished to Blackstone such information as Blackstone and the Company believe appropriate to its assignment (all such information so furnished being the "Information"). The Company recognizes and confirms that Blackstone (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having independently verified the same, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information, (c) is entitled to rely upon the Information without independent verification, and (d) will not make an appraisal of any assets in

engagement ma2.DOC

Mr. Timothy R. Graham, Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.
July 26, 2001
Page 5

connection with its assignment. The Company agrees to promptly notify Blackstone regarding any inquiries or solicitations related to a potential Transaction (to the extent any such inquiry or solicitation becomes known to the executive officers of the Company), and agrees to enter into any related negotiations with the assistance of Blackstone.

In the event that the Information belonging to the Company is stored electronically on Blackstone's computer systems, Blackstone shall not be liable for any damages resulting from unauthorized access, misuse or alteration of such information by persons not acting on its behalf, provided that in protecting the confidentiality of, and in preventing unauthorized access to, the Company's information, Blackstone exercises the same degree of care (and in any event exercises at least a reasonable degree of care) as it exercises with regard to its own most sensitive proprietary information.

Except as required by applicable law, any advice to be provided by Blackstone under this Agreement shall not be disclosed publicly or made available to third parties (other than the Company's other professional advisors or, if appropriate in the Company's judgement, in the Chapter 11 proceeding) without the prior written consent of Blackstone or as otherwise provided herein. All services, advice and information and reports provided by Blackstone to the Company in connection with this assignment shall be for the sole benefit of the Company (including its board of directors) and shall not be relied upon by any other person.

The Company acknowledges and agrees that Blackstone has been retained to act solely as financial advisor to the Company. In such capacity, Blackstone shall act as an independent contractor, and any duties of Blackstone arising out of its engagement pursuant to this Agreement shall be owed solely to the Company. Because Blackstone will be acting on the Company's behalf in this capacity, it is customary for us to receive indemnification. A copy of our standard form of indemnification agreement is attached to this Agreement as Attachment A.

In the event that Blackstone is requested or authorized by the Company or required by government regulation, subpoena, or other legal process to produce documents, or to make its current or former personnel available as witnesses at deposition or trial, arising as a result of or in connection with Blackstone's engagement for the Company, the Company will, if Blackstone is not a party to the proceeding in which the information is sought, reimburse Blackstone for the reasonable fees and expenses of its counsel incurred in responding to such a request. Nothing in this paragraph shall affect in any way the Company's obligations pursuant to the separate indemnification agreement attached hereto.

The term of Blackstone's engagement hereunder shall extend until the earliest of the effectiveness of the Plan for the Company under Chapter 11 of the Bankruptcy Code, the consummation of a Transaction as defined above, or the conversion of any Chapter 11 case for the Company to a case under Chapter 7 of the Bankruptcy Code. Blackstone's engagement

engagement.ms2.DOC

Mr. Timothy R. Graham, Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.
July 26, 2001
Page 6

hereunder may be terminated upon 30 days' written notice without cause by either the Company or Blackstone; termination for cause by either party will occur immediately upon delivery of written notice to the other party. Notwithstanding the foregoing, (a) the provisions relating to the payment of fees and expenses accrued through the date of termination, the status of Blackstone as an independent contractor, and the limitation as to whom Blackstone shall owe any duties will survive any such termination, (b) any such termination shall not affect the Company's obligations under the indemnification agreement attached as Attachment A, and (c) Blackstone shall be entitled to the full Transaction Fee in the event that a Transaction is consummated at any time prior to the expiration of nine full months following the termination of this Agreement.

Notwithstanding anything to the contrary provided elsewhere herein, none of the provisions of this Agreement shall in any way limit the activities of the private equity businesses of Blackstone and its affiliates in their businesses distinct from the restructuring advisory business of Blackstone provided that the Information is not shared with representatives of Blackstone and its affiliates who are not involved in the restructuring or mergers and acquisitions advisory businesses of Blackstone and that appropriate "Chinese wall" measures are taken to insure confidentiality.

This Agreement (including the attached indemnification agreement) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any provision of this Agreement is determined to be invalid or unenforceable in any respect, such determination will not affect such provision in any other respect, which will remain in full force and effect. No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed in and to be performed in that state.

The Company hereby agrees that any action or proceeding brought by the Company against Blackstone based hereon or arising out of Blackstone's engagement hereunder, shall be brought and maintained by the Company exclusively in the United States Bankruptcy Court for the District of Delaware. The Company irrevocably submits to the jurisdiction of the United States Bankruptcy Court for the District of Delaware for the purpose of any action or proceeding based hereon or arising out of Blackstone's engagement hereunder and irrevocably agrees to be bound by any judgment rendered thereby in connection with such action or proceedings. The Company hereby irrevocably waives, to the fullest extent permitted by law, any objection it may have or hereafter may have to the laying of venue of any such action or proceeding brought in any such court referred to above and any claim that such action or proceeding has been brought in an inconvenient forum and agrees not to plead or claim the same.

engagement ms2.DOC

JUL-27-2001  18:23        212 792 9348                    212 792 9348    P.01

Mr. Timothy R. Graham, Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.
July 26, 2001
Page 7


    Please confirm that the foregoing correctly sets forth our agreement by signing and
returning to Blackstone the duplicate copy of this Agreement and the indemnification agreement
attached hereto as Attachment A.


                                        Very truly yours,

                                        THE BLACKSTONE GROUP L.P.


                                        By: _Arthur Newman_

                                            Arthur B. Newman
                                            Senior Managing Director


Accepted and Agreed to as
of the date first written above:

WINSTAR COMMUNICATIONS, INC.
WINSTAR WIRELESS, INC.


By: _____
    Timothy R. Graham
    Executive Vice President
    Winstar Communications, Inc.
    Winstar Wireless, Inc.


_Winstar Revised Blackstone engagement letterl.DOC_

ATTACHMENT A

July 26, 2001

The Blackstone Group L.P.
345 Park Avenue
New York, NY 10154

INDEMNIFICATION AGREEMENT

Gentlemen:

This letter will confirm that we have engaged The Blackstone Group L.P. ("Blackstone") to advise and assist us in connection with the matters referred to in our letter of agreement dated as of July 26, 2001 (the "Engagement Letter"). This indemnification shall be effective nunc pro tunc April 18, 2001. In consideration of your agreement to act on our behalf in connection with such matters, we agree to indemnify and hold harmless you and your affiliates and your and their respective partners (both general and limited), members, officers, directors, employees and agents and each other person, if any, controlling you or any of your affiliates (you and each such other person being an "Indemnified Party") from and against any losses, claims, damages, expenses and liabilities whatsoever, whether they be joint or several, related to, arising out of or in connection with the engagement (the "Engagement") under the Engagement Letter and will reimburse each Indemnified Party for all expenses (including reasonable fees, expenses and disbursements of counsel) as they are incurred in connection with investigation, preparing, pursuing, defending or assisting in the defense of any action, claim, suit, investigation or proceeding related to, arising out of or in connection with the Engagement or this agreement, whether or not pending or threatened, whether or not any Indemnified Party is a party, whether or not resulting in any liability and whether or not such action, claim, suit, investigation or proceeding is initiated or brought by us. We will not, however, be liable under the foregoing indemnification provision for any losses, claims, damages or liabilities (or expenses relating thereto) that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from the bad faith, gross negligence or willful misconduct of Blackstone. We also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to us or our owners, parents, affiliates, security holders or creditors for or in connection with the Engagement except for any such liability for losses, claims, damages or liabilities incurred by us that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from the bad faith, gross negligence or willful misconduct of Blackstone.

If the indemnification provided for in the preceding paragraph is for any reason unavailable to an Indemnified Party in respect of any losses, claims, damages or liabilities referred to herein, then, in lieu of indemnifying such Indemnified Party hereunder, we shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages or liabilities (and expenses relating thereto) (i) in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by you, on the one hand, and us, on the other hand, from the Engagement or (ii) if and only if the allocation provided by clause (i) above is for any reason not available, in such proportion as is appropriate to reflect not only the relative benefits referred to in such clause (i) but also the relative fault of each of you and us, as well as any other relevant equitable considerations; provided, however, to the extent permitted by applicable law, in no event shall your aggregate contribution to the amount paid or payable exceed the aggregate amount of fees actually received by you under the Engagement Letter. For the purposes of this agreement, the relative benefits to us and you of the Engagement shall be deemed to be in the same proportion as (a) the total value paid or contemplated to be paid or received or contemplated to be received by us, our security holders and our creditors in the transaction or transactions that are subject to the Engagement, whether or not any such transaction is consummated, bears to (b) the fees paid or to be paid to Blackstone under the Engagement Letter.

No party to this agreement will, without the prior written consent of the other party (which consent will not be unreasonably withheld), settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (a "Judgment"), whether or not we or any Indemnified Party is an actual or potential party to such claim, action, suit or proceeding. In the event that we seek to settle or compromise or consent to the entry of any Judgment, we agree that such settlement, compromise or consent shall include an unconditional release of Blackstone and each other Indemnified Party hereunder from all liability arising out of such claim, action, suit or proceeding.

Promptly after receipt by an Indemnified Party of notice of any complaint or the commencement of any action or proceeding with respect to which indemnification is being sought hereunder, such person will notify us in writing of such complaint or of the commencement of such action or proceeding, but failure to so notify us will not relieve us from any liability which we may have hereunder or otherwise, except to the extent that such failure materially prejudices our rights. If we so elect or are requested by such Indemnified Party, we will assume the defense of such action or proceeding, including the employment of counsel reasonably satisfactory to Blackstone and the payment of the fees and disbursements of such counsel.

In the event, however, such Indemnified Party reasonably determines in its judgment that having common counsel would present such counsel with a conflict of interest or if we fail to assume the defense of the action or proceeding in a timely manner, then such Indemnified Party may employ separate counsel reasonably satisfactory to us to represent or defend it in any such

engagement ms2.DOC

action or proceeding and we will pay the fees and disbursements of such counsel; provided, however, that we will not be required to pay the fees and disbursements of more than one separate counsel for all Indemnified Parties in any jurisdiction in any single action or proceeding. In any action or proceeding the defense of which we assume, the Indemnified Party will have the right to participate in such litigation and to retain its own counsel at such Indemnified Party's own expense.

The foregoing reimbursement, indemnity and contribution obligations of the Company under this agreement shall be in addition to any rights that an Indemnified Party may have at common law or otherwise, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company and such Indemnified Party.

The provisions of this agreement shall apply to the Engagement and any written modification of the Engagement and shall remain in full force and effect regardless of any termination or the completion of your services under the Engagement Letter.

*engagement ma2.DOC*

JUL-27-2001 18:23    212 792 9348                212 792 9348    P.02

This agreement and the Engagement Letter shall be governed by and construed in accordance with the laws of the state of New York applicable to contracts executed in and to be performed in that state.

Very truly yours,

WINSTAR COMMUNICATIONS, INC.
WINSTAR WIRELESS, INC.

By: _____

Timothy R. Graham
Executive Vice President
Winstar Communications, Inc.
Winstar Wireless, Inc.

Accepted and Agreed
to as of the date first
written above:

THE BLACKSTONE GROUP L.P.

By: _____

Arthur B. Newman
Senior Managing Director

Winstar Forward Blackstone engagement letter1.DOC

TOTAL P.02

**EXHIBIT E**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ORIGINAL

|  |  |
|---|---|
| WINSTAR HOLDINGS, LLC and<br>IDT CORP., | : Index No.<br>: Date Purchased<br>:<br>: Plaintiff designates NEW YORK 07601582<br>: County as the place of trial. |
| Plaintiffs, | : |
| -against- | :<br>: The basis of this venue is<br>: residence of defendants; location where the cause<br>: of action arose; and Plaintiffs' designation. |
| THE BLACKSTONE GROUP LP;<br>IMPALA PARTNERS, LLC; and<br>CITICORP, | :<br>:<br>: **SUMMONS** |
| Defendants. | : Plaintiffs reside at<br>: 520 Broad Street<br>Newark, New Jersey<br><br>County of Essex |

FILED
MAY 10 2007
NEW YORK
COUNTY CLERKS...

To the above named Defendants:

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to

serve a copy of your answer on the Plaintiffs' Attorney within 20 days after the service of this

summons, exclusive of the day of service (or within 30 days after the service is complete if this

summons is not personally delivered to you within the State of New York); and in case of your

failure to appear or answer, judgment will be taken against you by default for the relief

demanded in the complaint.

Dated:   New York, New York
         May 10, 2007

                          MOUND COTTON WOLLAN & GREENGRASS

                          Philip C. Silverberg, Esq.
                          Gretchen Henninger, Esq.
                          One Battery Park Plaza
                          New York, NY 10004-1486
                          Telephone: (212) 804-4200

and

Melissa Roover, Esq.
GRAYSON & KUBLI, P.C
1420 Spring Hill Road, Suite 230
McLean, VA 22102
(703) 749-0000

Attorneys for Plaintiffs
WINSTAR HOLDINGS, LLC and
IDT CORP.

TO:    The Blackstone Group LP
       345 Park Avenue
       New York, NY 10154

       Impala Partners, LLC
       18 Marshall Street, Suite 112
       Norwalk, CT 06854

       Citicorp
       399 Park Avenue
       New York, NY 10043

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------X
WINSTAR HOLDINGS, LLC,
 and IDT CORP.,                                                    Index No.:

                    Plaintiffs,

         -against-

THE BLACKSTONE GROUP LP;                          **COMPLAINT** 7601582
IMPALA PARTNERS, LLC; and
CITICORP,

                    Defendants.
-----------------------------------------------------------------X

        Plaintiffs, Winstar Holdings, LLC and IDT Corp., by and through its attorneys, Mound

Cotton Wollan & Greengrass, as and for its complaint against Defendants, The Blackstone

Group LP, Impala Partners, LLC, and Citicorp, hereby allege as follows:

        1.      In 2001, Plaintiffs spent $42.5 million to acquire the business assets of Winstar

Communications, Inc., and related entities ("Old Winstar"). In doing so, they relied on the oral

and written misrepresentations of the Defendants regarding Old Winstar sales, customers, and

other material information. As a result, the Plaintiffs lost hundreds of millions of dollars. The

Plaintiffs bring this action to recover for those injuries.

                                        **PARTIES**

        2.      Plaintiff Winstar Holdings, LLC, formerly known as IDT Winstar Acquisition,

Inc. ("New Winstar"), is a Delaware corporation. It acquired the business assets of Old Winstar

in an Asset Purchase Agreement dated December 18, 2001.

1

3.    Plaintiff IDT Corp. ("IDT") is a Delaware corporation. It is, among other things, a telephone company. It provided the funds for the purchase of Old Winstar, and bore most of the resulting subsequent losses.

4.    Defendant The Blackstone Group LP ("Blackstone") is a Delaware limited partnership. Its principal office is at 345 Park Avenue, New York, NY 10154. In the sale of Old Winstar's assets, it acted as an investment advisor to various entities related to Old Winstar.

5.    Defendant Impala Partners, LLC ("Impala") is a Delaware limited partnership. Its principal office is at 18 Marshall Street, Suite 112, Norwalk, Connecticut 06854. Upon information and belief, at the time of the sale of Old Winstar's assets, it was acting as a restructuring advisor for Old Winstar.

6.    Defendant Citicorp ("Citicorp") is a Delaware corporation. Its principal office is at 399 Park Avenue, New York, New York 10043. It was the largest creditor of Old Winstar while Old Winstar was a debtor in bankruptcy. Impala's actions are, in large part, attributable to Citicorp because Citicorp acted as Impala's principal. Allegations regarding Citicorp include, but are not limited to, allegations regarding Impala that are imputed to Citicorp.

### JURISDICTION AND VENUE

7.    The Supreme Court of the State of New York, as a court of general original jurisdiction, has subject matter jurisdiction of this action.

8.    Personal jurisdiction exists in this action because, among other reasons: the Defendants transact business within the state or contracted to supply goods or services within the state; have committed a tortious act within the state; and own, use or possess real property within the state.

2

9.     Venue lies in this County because Defendants Blackstone's and Citicorp's principal offices are located in this County, the cause of action arose in the county, and the Plaintiffs designate the county.

## ALLEGATIONS

10.     In and around 2001, IDT examined several potential acquisitions in the field of telecommunications.

11.     Through 2001, Old Winstar provided telephone service to customers using a "fixed wireless" system. This system carried calls locally by wireless means, from customer locations to Old Winstar's local "hubs."

12.     On information and belief, Old Winstar maintained an office in New York City. It also maintained some of its books and records in New York City.

13.     Old Winstar was a publicly traded company. On April 18, 2001, Old Winstar petitioned for protection under Chapter 11 of the U.S. Bankruptcy Code. The bankruptcy petition was filed in the U.S. Bankruptcy Court for the District of Delaware.

14.     On information and belief, Blackstone was retained as a financial advisor, and Blackstone's responsibility was to obtain the highest possible sale price for the assets of Old Winstar. Upon information and belief, Blackstone's compensation varied with the sale price that it obtained for Old Winstar's assets. Specifically, Blackstone received, *inter alia,* a transaction fee equal to 1% of the first $200 million of consideration paid by an acquirer. This provided Blackstone with an incentive to maximize – or inflate -- that consideration.

15.     The division of Blackstone performing the financial advisory work for Old Winstar was Blackstone's Restructuring & Reorganization Advisory Group. This group claims

3

to have provided advisory services in over 150 "distressed situations." On information and belief, it is an unincorporated division of Blackstone.

16.    At all relevant times, the head of Blackstone's Restructuring & Reorganization Advisory Group was Arthur Newman ("Newman"). Newman also was a member of Blackstone's Executive Committee. The Executive Committee oversees all of Blackstone's policy decisions.

17.    Upon information and belief, Old Winstar retained Impala as a restructuring advisor, for the purpose of providing restructuring advice and other related services in connection with Old Winstar's Chapter 11 bankruptcy proceedings. As compensation, Impala charged Old Winstar $250,000 per month for the first two months of its services. Thereafter, Impala's compensation was $100,000 per month for the services of Paul Street, who acted as the Chief Restructuring Officer for Old Winstar. Impala charged various other amounts for other Impala personnel. In addition, upon the sale of all or substantially all of Old Winstar's assets, in one or more transactions, in which the aggregate consideration paid by the purchaser was less than $350 million, Impala earned a transaction fee of 0.25% of such consideration. Upon the sale of all or substantially all of the Old Winstar's assets, in one or more transactions, in which the aggregate consideration paid by the purchaser was equal to or greater than $350 million, Impala earned a transaction fee of 2.0% of such consideration. Thus Impala was motivated to obtain the highest possible sale price for the Winstar assets.

18.    Upon information and belief, Citicorp, as Old Winstar's largest creditor, assisted Old Winstar in negotiating its contract terms with Impala. Citicorp acted as Impala's principal.

19.    To promote the sale of Old Winstar's business assets, Blackstone prepared an offering statement. Upon information and belief, Impala assisted with the preparation of the

4

offering statement. Blackstone, Citicorp, and Impala also controlled bidder access to Winstar staff, and Winstar records.

20.    In connection with the sale of Old Winstar's business assets, Blackstone, Citicorp, and Impala assisted in the development of financial data and presentations to Old Winstar's Board of Directors, various creditors and other parties. Blackstone reviewed financial analyses generated by Old Winstar's finance staff and external advisors. Blackstone also performed various analyses, including cash reconciliation of Old Winstar's actual performance vs. various sets of projections. Blackstone petitioned for payment for this work, and the petition was granted.

21.    IDT was one of several entities that expressed an interest in acquiring Old Winstar's business assets.

22.    An auction of Old Winstar's business assets was planned for December 2001. Leading up to that auction, Blackstone circulated an "offering book." Blackstone also met with IDT and, on information and belief, other entities interested in bidding in the auction. In meetings organized by Blackstone, several Winstar officials also met with IDT and, on information and belief, other interested entities. The meetings generally were held within this County. Certain Old Winstar business records also were made available to IDT at that time, generally in an area known as the "data room," which was located within this County. Collectively, this communication and review was known as "due diligence."

23.    In accordance with the timing established for the auction, IDT's due diligence was conducted between Friday, November 30, 2001, and Wednesday, December 5, 2001.

24.    A number of IDT representatives engaged in this due diligence.

5

25.     Blackstone's representatives included Arthur Newman.  Newman engaged in substantive discussions about Old Winstar's business with representatives of IDT,  Howard Jonas, *inter alia*.

26.     Impala's representatives included Paul Street.

27.     Old Winstar's representatives included Chief Financial Officer David Duncan, *inter alia*.

28.     During this due diligence, Blackstone, Impala, and Old Winstar each made the following material representations (*inter alia*) regarding the status of Old Winstar's business:

      a.     that Old Winstar's business was generating $16 million or more per month in revenue;

      b.     that Old Winstar's "cash burn" (*i.e.*, losses) had been reduced to $10-12 million per month;

      c.     that Old Winstar had 9,000 paying customers;

      d.     that Old Winstar had 50,000 revenue-generating telephone lines;

      e.     that Old Winstar's "churn rate" (the rate at which existing customers discontinued service) was only 3% per year; and

      f.     that Old Winstar was employing an intercity optical network built by Lucent (the "Lucent network") to serve Old Winstar's customers.

29.     On occasions when Old Winstar made these representations, they were made in the presence of Blackstone, Citicorp, and Impala; and Blackstone, Citicorp, and Impala did not dispute them, even though they knew or should have known that these representations were false, and that the plaintiffs would rely on these representations.

30.     Each of these representations was false and fraudulent.  The truth, known to the Defendants but not to IDT, was as follows:

      a.     that Old Winstar's business was generating substantially less than $16 million per month in revenue, and its revenue was declining;

b.    that Old Winstar's cash burn was materially higher than $10-$12 million per month;

c.    that Old Winstar had far fewer than 9,000 paying customers, and indeed was providing service to many customers who were not paying Old Winstar;

d.    that Old Winstar had far fewer than 50,000 revenue-generating telephone lines, and in fact was carrying and paying for many lines that were not generating any revenue;

e.    that Old Winstar's "churn rate" was far higher than 3%, in part because Old Winstar continued to maintain and pay for telephone lines, and count them as revenue-generating, long after customers had discontinued service; and

f.    that the Lucent network carried no Old Winstar customer traffic in or around December 2001 and, indeed, most of the Lucent network never would.

31.    Notably, despite this information being solely within their possession, Blackstone, Impala, Citicorp, and Old Winstar did not provide client information in any detail that would have allowed IDT and New Winstar to uncover the Defendants' false statements and material omissions.

32.    Indeed, Blackstone, Citicorp and Impala fraudulently withheld information within their possession, custody or control, including but not limited to the following: (a) that Winstar was required to continue to serve federal and other customers without regard to profit, and (b) that local telephone companies could extort concessions from Old Winstar by threatening to discontinue termination of calls placed by Old Winstar customers.

33.    On information and belief, Blackstone, Citicorp, Impala, and Old Winstar all hid and blocked IDT's access to material information about Old Winstar's finances and operations. Indeed, IDT had no access to this important information.

7

34.    The figures in the documents that were offered to IDT, including receivables reports, historical financial statements and contract summaries, were heavily distorted by (*inter alia*) Old Winstar's recording of revenue – sometimes for years – from customers who had discontinued service.

35.    Unaware of the true state of Old Winstar's affairs, IDT established New Winstar, for the purpose of acquiring Old Winstar's business assets.  IDT injected a substantial amount of capital into New Winstar.

36.    The information that Blackstone, Impala, and Old Winstar provided during due diligence regarding Old Winstar's business and operations was material to IDT's decision to acquire Old Winstar's business assets.  Upon information and belief, Blackstone, Citicorp, and Old Winstar knew that this information was false, or they were negligent in not knowing that. Blackstone and Old Winstar intended that IDT and New Winstar would rely upon this information. IDT and New Winstar did rely upon this information.  This reliance was reasonable. IDT and New Winstar were deceived by this information.

37.    The information that Blackstone, Impala, Citicorp, and Old Winstar omitted to provide during due diligence regarding Old Winstar's business and operations was material to IDT's decision to acquire Old Winstar's business assets.  Upon information and belief, Blackstone and Old Winstar knew that this information was material, or they were negligent in not knowing that.  Blackstone and Old Winstar intended that IDT and New Winstar would rely upon the absence of this information. IDT and New Winstar did rely upon the absence of this information.  This reliance was reasonable.  IDT and New Winstar were deceived by the failure to disclose this information.

8

38.     As a direct and proximate result of the Defendants' misrepresentations and omissions, IDT and New Winstar submitted a bid in the auction for Old Winstar's assets, conducted on December 5, 2001.  Absent the misinformation provided by Blackstone and Old Winstar, Plaintiffs would not have done so.

39.     The apparent successful offeror in the auction was an entity other than IDT/New Winstar.  That entity was related to William J. Rouhana, Jr., the former Chairman of the Board and CEO of Old Winstar.  Despite this, Blackstone encouraged IDT to remain interested in purchasing Old Winstar's assets.

40.     On information and belief, the Rouhana entity was unable or unwilling to close the transaction.

41.     Between December 5, 2001 and December 17, 2001, there was no opportunity for any further due diligence by IDT because the Defendants did not permit it.

42.     On or about December 17, 2001, IDT learned that the Rouhana entity had failed to purchase Old Winstar's assets.  The bankruptcy court required IDT to sign an agreement for these assets (if IDT desired to purchase them) by noon on the following day.

43.     As a result of the Defendants' misrepresentations and omissions, on or about December 18, 2001, Old Winstar and New Winstar entered into an Asset Purchase Agreement (the "Agreement") for the transfer of Old Winstar's business assets, and certain other assets.

44.     On or about December 19, 2001, the bankruptcy court approved the Agreement.

45.     On or about December 20, 2001, the Agreement closed, *i.e.,* payment was made and assets were transferred.  On or around that date, New Winstar took over the operation of Winstar's business.

9

46.    New Winstar appointed employees to collect on accounts receivable. In many cases, the purported "customers" told those employees that service had been canceled years earlier, yet Old Winstar had continued to bill for the service.

47.    New Winstar learned that Old Winstar had inflated its reported revenue by a variety of means, including "swaps" (pairs of companies each reporting revenue from the other, without any actual payment), "dead" accounts, and "made-up" billing.

48.    As a result of the misrepresentations and material omissions during due diligence, New Winstar's revenues were materially less than represented. Between August 1, 2001 and July 31, 2002, a period that included several months preceding the asset purchase, Winstar's revenue was only $79.6 million, or less than $7 million a month. During the following year (8/02 - 7/03), revenue was only $87.5 million, and the year after that (8/03 - 7/04), revenue was only $71.6 million. In other words, Old Winstar's revenues had been overstated by over 200%.

49.    Much later, Winstar's business was sold to an entity independent of IDT.

50.    As a direct and proximate result of Blackstone's, Citicorp's, and Impala's tortuous misconduct, IDT and New Winstar have suffered losses of over $300 million.

## FIRST CAUSE OF ACTION
## (Fraud)

51.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 50 as if fully set forth herein.

52.    Blackstone, Citicorp, and Impala knowingly engaged in the various deceitful means enumerated above to deprive IDT and New Winstar of their property permanently.

53.    More specifically, Blackstone, Citicorp, and Impala made numerous false representations of material fact and material omissions, as set forth above and below. The Defendants knew that these representations and material omissions were false, or they made

10

them with reckless disregard for their truth or falsity. Blackstone, Citicorp, and Impala intended IDT and New Winstar to rely on these false statements and omissions. IDT and New Winstar reasonably relied on them. As a result, IDT and New Winstar were injured.

54.     The Defendants' false statements and material omissions were not mere projections or promises to perform, but actual representations of existing fact known only to the Defendants.

55.     The representations were made by individuals acting as agents of Blackstone, Citicorp, and Impala, who acted within the scope of their employment.

56.     The representations and omissions were made in New York, within this County. They were made during November and December 2001, by means of telephone, faxes, e-mail, in person, and indirectly through other authorized agents and through documents, as explained above.

57.     Blackstone, Citicorp, and Impala knew that these misrepresentations were false and the omissions material, or acted in reckless disregard for their truth or falsity.

58.     Blackstone, Citicorp, and Impala intended that IDT and New Winstar rely upon these misrepresentations and omissions, because they sought fraudulently to induce IDT and New Winstar to enter into the Agreement, and they sought to profit from that agreement. IDT and New Winstar reasonably relied on these misrepresentations and omissions.

59.     Blackstone, Citicorp, and Impala also failed to inform IDT and New Winstar of numerous material facts. For instance, Blackstone, Citicorp, and Impala failed to inform IDT and New Winstar that Old Winstar customers who had terminated service continued to be counted as Old Winstar customers, that Old Winstar continued to book revenue from such customers, and that Old Winstar continued to pay for telephone lines to service such customers.

11

As alleged above, Blackstone, Citicorp, and Impala also fraudulently withheld the material information that Winstar was required to continue to serve federal and other customers without regard to profit, and that local telephone companies could extort concessions from Winstar by threatening to discontinue termination of calls placed by Winstar customers. These all were material fraudulent omissions that Blackstone, Citicorp, and Impala had a duty to disclose to IDT and New Winstar.

60.    If IDT and New Winstar had known the truth regarding Winstar's finances and operations, they would not have entered into the Agreement. They would have retained the purchase price under that Agreement, and they would have avoided the losses that they necessarily experienced as a direct result of acquiring Old Winstar's business assets. Therefore they have been injured.

61.    For the reasons alleged above, Blackstone, Citicorp, and Impala acted recklessly, willfully and wantonly. Their conduct was gross, and morally reprehensible. Blackstone, Citicorp, and Impala exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.

61.    For the reasons alleged above, IDT and New Winstar are entitled to the following relief against Blackstone, Citicorp and Impala:

        a.    A monetary award of compensatory damages for fraud;

        b.    A monetary award of punitive damages in the maximum amount permitted by law;

        c.    Interest and costs; and

        d.    Such further relief as the Court deems just.

## SECOND CAUSE OF ACTION
## <u>(Aiding and Abetting Fraud)</u>

62.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 61 as if fully set forth herein.

63.    Based upon the allegations stated above, IDT and New Winstar are victims of fraud.

64.    Blackstone, Citicorp and Impala knowingly aided and abetted in Old Winstar's commission of fraud, and participated in the fraud, in the manners alleged above.

65.    Blackstone, Citicorp, and Impala's conduct was gross, and morally reprehensible. Blackstone, Citicorp and Impala exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.

66.    IDT and New Winstar suffered significant injury as a direct result of the fraud.

67.    For the reasons alleged above, IDT and New Winstar are entitled the following relief against Blackstone, Citicorp and Impala:

      a.    A monetary award of compensatory damages for aiding and abetting fraud;

      b.    A monetary award of punitive damages in the maximum amount permitted by law;

      c.    Interest and costs; and

      d.    Such further relief as the Court deems just.

## THIRD CAUSE OF ACTION
## <u>(Negligent Misrepresentation)</u>

68.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 67 as if fully set forth herein.

13

69.     Blackstone, Citicorp and Impala made the misrepresentations and omissions to IDT and New Winstar enumerated under the claim for fraud above, directly or indirectly.

70.     The individuals who made the direct misrepresentations to IDT and New Winstar acted as agents for Blackstone, Citicorp and Impala.

71.     Blackstone, Citicorp and Impala owed IDT and New Winstar a duty of care to ensure that its statements to IDT and New Winstar were true.

72.     IDT and New Winstar reasonably and justifiably relied on Blackstone and Impala for accurate information.

73.     Blackstone, Citicorp and Impala intended for IDT and New Winstar to rely upon the information that they provided.

74.     The information that Blackstone, Citicorp and Impala provided to IDT and New Winstar was false, in the manner described under the claim for fraud above.

75.     IDT and New Winstar were injured by the false information that Blackstone, Citicorp and Impala provided to them.

76.     Blackstone, Citicorp and Impala's negligent misrepresentations were willful and wanton.  They acted with such indifference as to whether IDT and New Winstar would be harmed as to be equivalent to an intent to harm them.

77.     Blackstone, Citicorp and Impala's conduct was gross, and morally reprehensible. Blackstone, Citicorp and Impala exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.

78.     For the reasons alleged above, IDT and New Winstar are entitled the following relief against Blackstone, Citicorp and Impala:

        a.      A monetary award of compensatory damages for negligent
                misrepresentation;

14

b.    A monetary award of punitive damages on account of Blackstone's willful and wanton negligence, in the maximum amount permitted by law;

c.    Interest and costs; and

d.    Such further relief as the Court deems just.

## FOURTH CAUSE OF ACTION
### (Negligence)

79.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 78 as if fully set forth herein.

80.    Blackstone, Citicorp and Impala are experienced professional organizations in the field of finance.

81.    Blackstone claims to be a world leader in private equity; among the largest in private equity real estate investments; a leader in private mezzanine and structured debt vehicles; and a leader in providing "unconflicted" advice and counsel to senior management. Blackstone's Restructuring & Reorganization Advisory Group claims to be a market leader, having advised in over 150 distressed situations, involving $350 billion of outstanding debt.

82.    Arthur Newman, the head of Blackstone's Restructuring & Reorganization Advisory Group, has forty years of experience, including thirty years in reorganization. He claims to have served as advisor on some of the largest business restructurings in history.

83.    Impala claims to be a world leader in restructuring advice to troubled companies. Impala claims to have been involved in transactions totaling over $7 billion since 1997.

84.    As alleged above, Blackstone, Citicorp and Impala directly and indirectly made representations to IDT and New Winstar regarding Old Winstar's finances and operations. On information and belief, Blackstone, Citicorp and Impala did not exercise due care in ascertaining or disseminating this information.

15

85.    Blackstone, Citicorp and Impala owed IDT and New Winstar a duty of care in ascertaining and disseminating this information.  It was reasonably foreseeable to Blackstone, Citicorp and Impala that their negligence would injure IDT and New Winstar, because IDT and New Winstar would be induced to enter into the Agreement, and then to incur significant additional losses.

86.    Blackstone, Citicorp and Impala failed to exercise reasonable care in this regard. To the contrary, their lack of care was willful and wanton.  They acted with malice, intending to harm IDT and New Winstar, because (on information and belief) the more that IDT and New Winstar paid under the Agreement, the more that Blackstone and Impala could receive as compensation.  In the alternative, Blackstone, Citicorp and Impala acted with such indifference as to whether IDT and New Winstar would be harmed as to be equivalent to intent to harm IDT and New Winstar.

87.    In all other respects, the Defendants failed to act with due care to provide accurate information to IDT and New Winstar.

88.    The natural and probable consequence of the Defendants' negligence was that IDT and New Winstar were induced to enter into the Agreement, and to incur additional subsequent losses, which have caused significant injury to IDT and New Winstar.

89.    Blackstone, Citicorp and Impala's conduct was gross, and morally reprehensible. Blackstone, Citicorp and Impala exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.  They were reckless and willful.

90.    For the reasons alleged above, IDT and New Winstar are entitled the following relief against Blackstone, Citicorp and Impala:

        a.    A monetary award of compensatory damages for negligence;

        b.     A monetary award of punitive damages on account of the Defendant's willful and wanton negligence, in the maximum amount permitted by law;

        c.     Interest and costs; and

        d.     Such further relief as the Court deems just.

### FIFTH CAUSE OF ACTION
### (Civil Conspiracy)

91. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 90 as if fully set forth herein.

92. The Defendants engaged in a combination and conspiracy involving four conspirators:

        a.     the officers, employees and agents of Blackstone; and

        b.     the officers, employees and agents of Impala; and

        c.     the officers, employees and agents of Citicorp; and

        d.     the officers, employees and agents of Old Winstar.

93. These conspirators combined for the purpose of injuring IDT and New Winstar. Specifically, the conspirators sought to deprive IDT and New Winstar of their property interests in the purchase price of the Agreement, and the funds used to pay for subsequent Winstar losses. The Defendants did so not only in the manners alleged above, but also by means of the following overt acts, *inter alia*:

        a.     announcing and conducting of the auction;

        b.     creating the data room, and the invitation to IDT and New Winstar representatives (and, on information and belief, others) to examine its contents;

        c.     engaging in other communications relating to Old Winstar's finances and operations, as alleged above;

        d.     the negotiation, preparation and execution of the Agreement; and

17

       e.     actions taken to obtain bankruptcy court approval of that Agreement.

94.     The Defendants' conspiracy has caused IDT and New Winstar injury, including the special damages of (*inter alia*) payment of the Purchase Price of $42,500,000 set forth in Section 3.1 of the Agreement. The Defendants' conspiracy deprived IDT and New Winstar of this amount. In addition to this, IDT and New Winstar have suffered special damages for losses incurred following the acquisition of Winstar's business assets, which total approximately $300 million.

95.     The conspirators acted recklessly, willfully and wantonly. Their conduct was gross, and morally reprehensible. They exhibited such wanton dishonesty as to imply a criminal indifference to civil obligations.

96.     For the reasons alleged above, IDT and New Winstar are entitled the following relief against Blackstone, Citicorp and Impala:

       a.     A monetary award of compensatory damages for civil conspiracy;

       b.     A monetary award of punitive damages for civil conspiracy, in the maximum amount permitted by law;

       c.     Interest and costs; and

       d.     Such further relief as the Court deems just.

**JURY REQUEST**

97.     The Plaintiffs request a jury for all issues that may be tried by a jury.

WHEREFORE, IDT and New Winstar seek the following relief against Blackstone, Citicorp and Impala:

a.    A monetary award of compensatory damages for fraud; aiding and abetting fraud, negligent misrepresentation, negligence, and civil conspiracy;

b.    A monetary award of punitive damages in the maximum amount permitted by law for fraud, aiding and abetting fraud, negligent misrepresentation, negligence, and civil conspiracy;

c.    Interest and costs; and

d.    Such further relief as the Court deems just.

Dated: New York, New York
       May 10, 2007

MOUND COTTON WOLLAN & GREENGRASS

Philip C. Silverberg, Esq.
Gretchen Henninger, Esq.
One Battery Park Plaza
New York, NY 10004-1486
Telephone: (212) 804-4200

and

Melissa Roover, Esq.
GRAYSON & KUBLI, P.C
1420 Spring Hill Road, Suite 230
McLean, VA 22102
(703) 749-0000

Attorneys for Plaintiffs
WINSTAR HOLDINGS, LLC and
IDT CORP.

19

WINSTAR HOLDINGS, LLC,
and IDT CORP.,

                        Plaintiffs,

        -against-

THE BLACKSTONE GROUP LP;
IMPALA PARTNERS, LLC; and
CITICORP,

                        Defendants.



## SUMMONS and COMPLAINT

MOUND, COTTON, WOLLAN & GREENGRASS
*Attorneys for*

Plaintiffs

*Office and Post Office Address, Telephone*

ONE BATTERY PARK PLAZA
NEW YORK, NY 10004
(212) 804-4200

To:

Attorney(s) for

Service of a copy of the within is
hereby admitted.

Dated:_____ 20_____

_____

