**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| WINSTAR HOLDINGS, LLC and IDT CORP., Plaintiffs, - against - THE BLACKSTONE GROUP LP; IMPALA PARTNERS, LLC; and CITICORP, Defendants. | Case No.: 07-828-GMS |

**COMPENDIUM OF UNREPORTED CASES WITH RESPECT TO DEFENDANT THE BLACKSTONE GROUP LP'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT**

Victoria W. Counihan (No. 3488)
Dennis A. Meloro (No. 4435)

GREENBERG TRAURIG, LLP
The Nemours Building
1007 N. Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
counihanv@gtlaw.com
melorod@gtlaw.com

-- and --

Yosef J. Riemer
Vickie Reznik
David S. Flugman

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Attorneys for Defendant The Blackstone Group LP*

Dated: January 22, 2008

| **Decision** | **Tab** |
|---|---|
| *Belin v. Weissler*,<br>No. 97 Civ. 8787 (RWS), 1998 WL 391114 (S.D.N.Y. July 14, 1998) | 1 |
| *Christiana Marine Serv. Corp. v. Texaco Fuel & Marine Mktg, Inc.*,<br>No. Civ. A 98C-02-217WCC, 2002 WL 1335360 (Del. Super. June 13, 2002) | 2 |
| *Christie's Inc. v. Dominica Holding Corp.*,<br>No. 05 Civ. 8728 (NRB), 2006 WL 2012607 (S.D.N.Y. July 18, 2006) | 3 |
| *Dallas Aerospace, Inc. v. CIS Air Corp.*,<br>No. 00 Civ. 1657 (BSJ), 2002 WL 31453789 (S.D.N.Y. Oct. 31, 2002) | 4 |
| *DDCLAB Ltd. v. E.I. DuPont de Nemours & Co.*,<br>No. 03 Civ. 3654 (GBD), 2005 WL 425495 (S.D.N.Y. Feb. 18, 2005) | 5 |
| *In re HHG Corp.*,<br>No. 01-B-11982 (ASH), 2006 WL 1288591 (Bankr. S.D.N.Y. May 2, 2006) | 6 |
| *In re Temtechco, Inc.*,<br>Nos. 95-00596, 97-00077, 1998 WL 887256 (Bankr. D.Del. Dec. 18, 1998) | 7 |
| *Kidd v. Spector*,<br>No. 93 Civ. 7297 (KTD), 1998 WL 879698 (S.D.N.Y. Dec. 15, 1998) | 8 |
| *Portnoy v. Am. Tobacco Co.*,<br>No. 06/16323, 1997 WL 638800 (N.Y. Sup. Ct. Suffolk Co. Sept. 26, 1997) | 9 |
| *Progressive Intern. Corp. v. E.I. Du Pont de Nemours & Co.*,<br>No. C.A. 19209 (VCS), 2002 WL 1558382 (Del. Ch. July 9, 2002) | 10 |
| *RGC Int'l Investors, Inc., LDC v. ARI Network Servs., Inc.*,<br>No. Civ. 03-0003-SLR, 2004 WL 189784 (D. Del. Jan. 22, 2004) | 11 |
| *Sigma Star Foods Corp. v. McCormick & Co., Inc.*,<br>No. 95 Civ. 10133 (RPP), 1996 WL 41810 (S.D.N.Y. Feb. 2, 1996) | 12 |
| *VGS, Inc. v. Castiel*,<br>No. C.A. 17995, 2003 WL 723285 (Del. Ch. Feb. 28, 2003, revised Mar. 10, 2003) | 13 |
| *WestRM-West Risk Mkts, Ltd. v. XL Reinsurance Am., Inc.*,<br>No. 02 Civ. 7344 (MGC), 2006 WL 2034627 (S.D.N.Y. July 19, 2006) | 14 |
| *Winstar Holdings, LLC v. The Blackstone Group LP*,<br>No. 07 Civ. 4634 (GEL), 2007 WL 4323003 (S.D.N.Y. Dec. 10, 2007) | 15 |

# TAB 1

Page 7 of 118

Westlaw.

Not Reported in F.Supp. Page 1

Not Reported in F.Supp., 1998 WL 391114 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

C
Belin v. Weissler
S.D.N.Y.,1998.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
David W. BELIN, as Trustee of the David W. Belin Living Trust, Plaintiff,
v.
Barry WEISSLER, Defendant.
**No. 97 Civ. 8787(RWS).**

July 14, 1998.

Goodkind Labaton Rudoff & Sucharow, New York City, by Joseph H. Einstein, of counsel, for plaintiff.
Jay Goldberg, P.C. and Michael G. Berger, New York City, by Debra A. Karlstein, Scott Lucas, of counsel, for defendant.

OPINION

SWEET, J.
*1 Defendant Barry Weissler ("Weissler") has moved for a dismissal of the complaint (the " Complaint") of plaintiff David W. Belin, as Trustee of the David W. Belin Living Trust ("Belin") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. For the reasons set forth below, Weissler's motion to dismiss will be granted.

***The Parties***

Belin, a citizen of Iowa, invested in The Busker on The Roof Limited Partnership Company (the " Limited Partnership").

Weissler, a citizen of New York, is the President of Busker Management, Inc., which is the general partner of the Limited Partnership. Together with his wife, Fran Weissler, Weissler directly or indirectly owns all or a significant portion of the stock of Busker Management, Inc.

***Prior Proceedings***

On November 25, 1997, Belin filed a complaint alleging that he had been induced to invest in the Limited Partnership as the result of a false and fraudulent representation made to him by Weissler. The instant motion was received February 17, 1998. Oral arguments were heard on May 6, 1998, at which time the motion was deemed fully submitted.

***Facts***

In considering a motion to dismiss, the facts alleged in the complaint are presumed to be true and all factual inferences must be drawn in the plaintiff's favor and against the defendants. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993) ; *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *Dwyer v. Regan,* 777 F.2d 825, 828-29 (2d Cir.1985). Accordingly, the factual allegations considered here and set forth below are taken from Belin's complaint and do not constitute findings of fact by the Court. They are presumed to be true only for the purpose of deciding the present motion.

According to Belin, he was defrauded into investing $100,000 in the Limited Partnership which was formed to produce *Busker Alley,* a musical play designed as a star vehicle for Tommy Tune, a widely known Broadway star.

Belin met Weissler at a dinner party shortly

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 8 of 118

Not Reported in F.Supp. Page 2

Not Reported in F.Supp., 1998 WL 391114 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

prior to December 12, 1994. At that time, Weissler attempted to interest Belin in investing in *Busker Alley*, and Belin expressed such an interest. Shortly thereafter, Weissler and his wife sent Belin certain promotional materials and financial projections for *Busker Alley*.Weissler contacted Belin again around January 1, 1995, and asked if Belin was still interested in *Busker Alley*.During that conversation, Belin asked Weissler what insurance coverage had been secured in the event Tommy Tune was unable to perform. Weissler responded that the insurance was in the approximate amount of $5.8 million.

In early February 1995, Weissler again contacted Belin about *Busker Alley*, and Belin advised Weissler that he remained undecided about making the investment. In an effort to encourage Belin, Weissler provided information concerning the last eight shows he and his wife had produced and the profits earned by the investors. When Belin spoke with Weissler yet again, Weissler called Belin's attention to the track record of his previous productions. During the course of that conversation, and relying upon the representations Weissler had made, including the representation as to insurance, Belin reached a preliminary decision to invest $100,000 in the Limited Partnership and so advised Weissler.

*2 In early March 1995, Belin continued to have concerns regarding the investment. Weissler again represented to Belin that there was $5.8 million of insurance on Tommy Tune. When asked by Belin how long Tommy Tune was committed to star in the show, Weissler answered that an eighteen-month contract had been signed. After a few days, based on Weissler's assurances that there was an insurance policy of $5.8 million in effect in the event of Tommy Tune's inability to perform and the commitment of Tommy Tune to star in the show, Belin invested $100,000 to become a limited partner in the Limited Partnership.

On or shortly after October 1, 1995, Tommy Tune suffered a serious injury which resulted in his inability to perform. The production was then closed and substantial losses were sustained by the Limited Partnership.

Subsequently, Belin learned that only $3.5 million in insurance had been secured, and that the insurers had denied liability. The dispute between the Limited Partnership and the insurers is the subject of an action pending in the Supreme Court of the State of New York entitled, *Busker on the Roof Limited Partnership Co. v. Lloyd's of London Underwriters*, Index No. 603759/96 (the "Insurance Action"). In the Insurance Action, the Limited Partnership has asserted causes of action of breach of contract, breach of fiduciary duty, and negligence and professional malpractice against its insurance broker, DeWitt Stern, for failing to procure insurance coverage in the amount of $5.8 million, as DeWitt Stern was retained to do. The complaint in the Insurance Action reveals that a policy of insurance on Tommy Tune was not issued until June 8, 1995, and that policy was only in the sum of $3 .5 million.

Based on the allegations above, Belin claims he was induced to invest $100,000 in the Limited Partnership by the false statements made by Weissler regarding the fact that an insurance policy had been issued and that it was in the amount of $5.8 million. Weissler induced the investment in order to reduce the amount that he directly or indirectly had at risk as his investment in the Limited Partnership.

### *Discussion*

### I. *Legal Standards*

### A. *Rule 12(b)(6)*

In deciding the merits of a motion to dismiss for failure to state a claim, all material allegations composing the factual predicate of the action are taken as true, for the court's task is to "assess the legal feasibility of the complaint, not assay the weight of the evidence which might be offered in support thereof."*Ryder Energy Distribution v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 9 of 118

Not Reported in F.Supp. Page 3

Not Reported in F.Supp., 1998 WL 391114 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

*Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir.1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980)). Thus, where it is beyond doubt that plaintiff can prove no set of facts in support of his or her claim which would warrant relief, the motion for judgment on the pleadings must be granted. *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 250, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson*, 335 U.S. 41, 45-46 (1957).

***3** Additionally, on a Rule 12(b)(6) motion, consideration is limited to the factual allegations in the complaint, "to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiff[ ] had knowledge and relied on in bringing suit." *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *see Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir.1991).

**B.** ***Fraud Under New York Law***

There are five elements necessary to sustain a claim of fraud under New York law: (1) misrepresentation of a material fact; (2) the falsity of that misrepresentation; (3) scienter, or intent to defraud; (4) reasonable reliance on that representation; and (5) damage caused by such reliance. *May Dep't Stores Co. v. International Leasing Corp.*, 1 F.3d 138, 141 (2d Cir.1993); *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970-71 (2d Cir.1987); *Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F.Supp. 576, 584 (S.D.N.Y.1995).

Additionally, in a diversity action alleging fraud, the plaintiff must comply with the heightened pleading standard of Rule 9(b), Fed.R.Civ.P., which requires that the circumstances constituting the fraud must be stated with particularity. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127 (2d Cir.1994); *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 265 (2d Cir.1993); *Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442, 444-45 (2d Cir.1971) . The pleading must be sufficiently particular to serve the three goals of Rule 9(b), which are (1) to provide a defendant with fair notice of the claims against him; (2) to protect a defendant from harm to his reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits. *See Di Vittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987); *O'Brien v. Price Waterhouse*, 740 F.Supp. 276, 279 (S.D.N.Y.1990), *aff'd*, 936 F.2d 674 (2d Cir.1991).

**II.** ***The Investment Documents Executed By Belin May Be Considered***

In support of the instant motion, Weissler has submitted various investment documents executed by Belin at the time of his investment in the Limited Partnership: a Subscription Representation Agreement (the "Subscription Agreement"), the Busker on the Roof Limited Partnership Agreement, dated August 18, 1994 (the "Partnership Agreement "), and an Investor Suitability Questionnaire (the " Suitability Questionnaire") (collectively, the " Investment Documents"). The Investment Documents evidence that Belin represented in writing that he relied solely on the Partnership Agreement in making the decision to invest in the Limited Partnership and that he understood the risks of such an investment. According to Belin, consideration of the Investment Documents on a motion to dismiss is improper.

***4** On a motion to dismiss, a court may consider the complaint and "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *International Audiotext Network v. American Telephone And Telegraph Co.*, 62 F.3d 69, 72 (2d Cir.1995) (*quoting Cortec Indus.*, 949 F.2d at 47). However,

"when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nevertheless take the document into consideration in deciding the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 10 of 118

Not Reported in F.Supp. Page 4

Not Reported in F.Supp., 1998 WL 391114 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

defendant's motion to dismiss, without converting the proceeding to one for summary judgment.

*Id.* (alternation in original) (*quoting Cortec Indus.*, 949 F.2d at 47). If courts lacked authority to consider documents integral to a complaint, "a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied."*Dykes v. Southeastern Pa. Transp. Auth.*, 68 F.3d 1564, 1566 n. 3 (3d Cir.1995).

Consideration of integral documents is particularly appropriate when the plaintiff has notice of those documents:

A finding that plaintiff has had notice of documents used by defendant in a 12(b)(6) motion is significant since ... the problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff that they may be so considered; it is for that reason-requiring notice so that the party against whom the motion to dismiss is made may respond-that Rule 12(b)(6) motions are ordinarily converted into summary judgment motions. Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.

*Cortec Indus.*, 949 F.2d at 48.

In *Cortec Industries*, the Second Circuit held that the district court was entitled to consider, in the motion to dismiss a securities fraud claim, the stock purchase agreement, offering memorandum, and warrants of which the plaintiffs had knowledge of and upon which they relied in bringing suit. *Id.* at 47-48.

Similarly, in the instant case, consideration of the Investment Documents is appropriate because Belin undisputedly had notice of them when he filed this action (and when Weissler filed his motion), and he must rely upon them to prove his interest in the Limited Partnership. In fact, that the Investment Documents are integral to Belin's complaint is further evidenced by his express reliance upon them in his opposition papers. For example, Belin specifically cites to the Partnership Agreement in contending that his allegations of scienter are sufficient.

Contrary to the authority cited by Belin, this is not a case of Weissler attempting to submit affidavits or "copies of correspondence to which no reference had been made in the complaint."*Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660 (2d Cir.1996). Rather, the Investment Documents are essential documents that form the basis of Belin's claim. As such-and particularly because Belin had actual notice of them-the Investment Documents will be considered in determining whether or not Belin has stated a claim upon which relief may be granted.

### III. *The Complaint Will Be Dismissed Because Belin Has Not Adequately Pleaded Reasonable Reliance*

*5 Belin contends that based on Weissler's oral representations that there was a $5.8 million insurance policy to protect investors in the event of Tommy Tune's inability to perform, he invested $100,000 in the Limited Partnership. Belin's claim, however, cannot be sustained because he has insufficiently pleaded reasonable or justifiable reliance.

Under New York law, Belin must establish actual, direct reliance upon the oral representations made by Weissler regarding the insurance on Tommy Tune. *See Turtur v. Rothschild Registry Int'l, Inc.*, No. 92 Civ. 8710, 1993 WL 338205, at *6 (S.D.N.Y. Aug.27, 1993); *Golden Budha Corp. v. Canadian Land Co.*, 931 F.2d 196, 202 (2d Cir.1991); *Devaney v. Chester*, 709 F.Supp. 1255, 1264 (S.D.N.Y.1989). A close study of Belin's complaint indicates that Weissler's oral representations may not have been the catalyst for Belin's investment.

According to the complaint, shortly after January 1, 1995, Weissler contacted Belin and inquired whether Belin was still interested in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 11 of 118

Not Reported in F.Supp. Page 5

Not Reported in F.Supp., 1998 WL 391114 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

investment. In that conversation Weissler indicated that there was $5.8 million of insurance in place. Belin remained undecided. Weissler again contacted Belin in early February 1995, and Belin advised Weissler that he had not yet decided whether or not to invest in the Limited Partnership. Belin asserts that Weissler delivered to him information regarding the last eight shows Weissler and his wife had produced and the profits earned by investors. Shortly thereafter, Weissler again contacted Belin and reiterated the financial information concerning his previous eight productions. As set out in the complaint, "[d]uring the course of that conversation, and relying upon the representations ... Weissler previously made, including the representation as to insurance, [Belin] reached a preliminary decision to invest $100,000 in the Limited Partnership; and so advised ... Weissler."(Compl.¶ 20). According to Belin, concerns regarding insurance lingered, and he finally invested in the Limited Partnership because of Weissler's representations regarding the $5.8 million insurance policy.

The complaint thus casts doubt as to whether it was the insurance representation or the track record of profit made by investors of Weissler's previous productions that caused Belin to invest.

Even if Belin's allegations of actual, direct reliance are adequately pleaded, the inquiry does not stop there. Under New York law, "the asserted reliance must be found to be justifiable under all the circumstances before a complaint can be found to state a cause of action in fraud."*Danann Realty Corp. v. Harris,* 5 N.Y .2d 317, 322, 157 N.E.2d 597, 599-600, 194 N.Y.S.2d 599, 603 (1959); *see Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1541 (2d Cir.) (stating that "in order to sustain a claim of fraud, a party must establish, *inter alia,* justifiable reliance"), *cert. denied,*522 U.S. 864, 118 S.Ct. 169, 139 L.Ed.2d 112 (1997); *Palmadessa,* 874 F.Supp. at 588 (dismissing common law fraud claim in part because plaintiff failed to show that "he was justified in taking action in reliance" upon defendant's representations"). Belin's reliance was neither justified nor reasonable.

*6 The Second Circuit addressed the requirement for reasonable reliance in *Lazard Freres,* 108 F.3d at 1542-43. The defendant in that case asserted as an affirmative defense to the plaintiff's breach of contract claim that it reasonably relied upon plaintiff's characterization of the contents of a report that defendant considered material to its decision to enter into a deal. *Id.* Defendant further claimed that plaintiff had structured the deal in such a way that defendant had to rely on plaintiff's characterization and commit to the deal before it had the opportunity to review the report itself. *Id.* at 1543.In fact, defendant alleged that it was forced to rely on plaintiff's representations or lose the chance to be a part of the transaction. Nonetheless, the Second Circuit found that the defendant in *Lazard Freres*"was under a further duty to protect itself from misrepresentation [and] could easily have done so by insisting on an examination of the [report] as a condition of closing. "*Id.*

*Lazard Freres* imposes a duty on sophisticated investors to obtain documentation of information material to their investment decisions:

[W]here, as here, a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation ..., he may truly be said to have willingly assumed the business risk that the facts may not be as represented. Succinctly put, a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament.

*Id.* (*quoting Rodas v. Manitaras,* 159 A.D.2d 341, 343, 552 N.Y.S.2d 618, 620 (1st Dep't 1990)).

Belin, by his own admission, is a sophisticated investor who represented that he had "sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks associated with investing in the [Limited] Partnership."(Suitability Questionnaire, at 9-10.) As stated in *Lazard Freres,* Belin had an obligation-if, as Belin contends, he was only investing in the Limited Partnership based on representations that Tommy Tune was insured for $5.8 million-to secure and review a copy of the insurance policy upon

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 12 of 118

Not Reported in F.Supp. Page 6

Not Reported in F.Supp., 1998 WL 391114 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

which his investment decision was allegedly premised. *See Lazard Freres,* 108 F.3d at 1543.

Belin asserts that *Lazard Freres* is inapplicable because it stands for the proposition that ready access to information may undercut a claim of reliance. Belin quotes the following passage to support his interpretation of *Lazard Freres* : " Finally, and most importantly, *all* of these cases involved situations in which the relevant facts were easily accessible to the relying party."*Id.* at 1542.

However, in the preceding passage, the Second Circuit was describing the cases upon which the plaintiff relied and explaining why plaintiff's citation to them was problematic. *Id.* at 1541-42.The court initially stated that "[i]t is well established that '[w]here sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.' " *Id.* at 1541 (*quoting Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 737 (2d Cir.1984)). In *Lazard Freres,* the court noted that the defendant *did not* have access to the relevant information. Rather, the information was exclusively known to the plaintiff.*Id.* at 1543.Therefore, the rule stated above (and to which the plaintiff cited) was not easily transferable to the situation faced by the Second Circuit. Nonetheless, even absent easy access to the information, the *Lazard Freres* court found that the defendant was under a further duty to protect itself by, for example, insisting that the information be provided to it as a condition to closing the deal. *Id.*

*7 The instant case involves an even weaker claim of reasonable reliance than did *Lazard Freres* because Belin *had* access to the information upon which he purportedly relied-he could have asked to see the insurance policy. By proceeding to make an investment without asking for a copy of the policy, Belin "willingly assumed the business risk" that the amount of insurance coverage was as represented by Weissler.

Under *Lazard Freres,* even if Belin did not have ready access to the relevant information, Belin's reliance would not be reasonable because, as a sophisticated investor, he should have confirmed that $5.8 million of insurance existed and not relied on Weissler's oral representations.

Furthermore, at the time Belin invested in the Limited Partnership, he executed a written agreement explicitly disclaiming reliance on oral representations.[FN1] As Weissler points out, rather than request a copy of the insurance policy, Belin represented in writing that he "has been provided an opportunity to obtain any additional information concerning the Offering, the Partnership and all other information," he "has been given the opportunity to ask questions of, and receive answers from, the General Partner concerning the terms and conditions of the Offering and other matters pertaining to this investment, and [he] has been given the opportunity to obtain such additional information necessary to verify the accuracy of the information contained in the Partnership Agreement or which has otherwise been provided in order for him to evaluate the merits and risks of an investment in the Partnership...." (Subscription Agreement, § 2.1(c)(ii)-(iii).)

FN1. Once again, this represents a weaker claim of reliance than did *Lazard Freres* because no disclaimer was present in that case.

Indeed, in the Subscription Agreement, Belin expressly represented that he "relied solely ... on the information contained in the Partnership Agreement, " and that "[n]o representations or warranties, other than as set forth in the Partnership Agreement, have been made" to him. (*Id.,* § 2.1(c)(i), (h).) Additionally, the Partnership Agreement Belin signed specifically provided that it "incorporates the entire agreement among the parties."(Partnership Agreement, at 36.) As the Second Circuit noted in *Lazard Freres,*"where a party specifically disclaims reliance upon a representation in a contract, it cannot later assert that it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon."108 F.3d at 1542; *see Warner Theatre Assoc. Ltd. Partnership v. Metropolitan Life Ins. Co.,* 97 Civ. 4914, 1997 WL

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 13 of 118

Not Reported in F.Supp. Page 7

Not Reported in F.Supp., 1998 WL 391114 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

685334, at *3 (S.D.N.Y. Nov.4, 1997); *Danann,* 5 N.Y.2d at 320-22, 157 N.E.2d at 598-600, 184 N.Y.S.2d at 601-03.

Belin asserts that the disclaimer and merger clauses are ineffective to vitiate his fraud claim because they are general and not specific, and broad, general disclaimers do not negate the element of reliance. Belin cites to *Northwestern National Insurance Co. v. Alberts,* 717 F.Supp. 148, 154 (S.D.N.Y.1989), where the court stated that the "disclaimer clauses [plaintiff] invoke[d] ... -regarding 'any representations or recommendations' or 'any information or advice' -[were] far too general to deny the ... allegations of reliance."

*8 The instant disclaimer, however, differs from the broad disclaimers cited by Belin. For example, in *Alberts* the disclaimers at issue were as follows: "neither [plaintiff] nor any of its employees or agents have made any representations or recommendations to me,""nor has [plaintiff] offered or provided any information or advice with respect to the advantages or disadvantages" of the transaction. *Alberts,* 717 F.Supp. at 154. Here, Belin's representations went beyond the general merger clause in the Partnership Agreement (stating that the document "incorporates the entire agreement among the parties") and the broad disclaimer in the Subscription Agreement (stating "[n]o representations or warranties, other than as set forth in the Partnership Agreement, have been made to [Belin] by the Partnership, the General Partner, or any officer, employee, agent, or affiliate of either of them").

Specifically, Belin completed a detailed Suitability Questionnaire in order to qualify as an investor in which Belin proclaimed himself to be a sophisticated investor, representing that he had read the Partnership Agreement and Subscription Agreement; that he understood the nature and risks of his investment; and that he had sufficient knowledge and experience to evaluate those risks because he has J.D. and M.B.A. degrees and manages over $40 billion in assets as a Trustee for Kemper Mutual Funds. More importantly, Belin specifically disclaimed reliance on any oral representations and expressly represented that he had been given an opportunity not only to obtain whatever additional information he required, but also to verify the accuracy of that information.[FN2] Belin executed the disclaimers subsequent to the time Weissler orally represented the amount of the insurance coverage. Having explicitly represented that he had an opportunity to verify the accuracy of information provided to him, Belin cannot now be heard to complain that he relied on information that he declined to verify, although he could have determined the amount of insurance secured for Tommy Tune simply by asking for a copy of the policy.

FN2. Section 2.1 of the Subscription Agreement states:

[Belin] has been furnished copies of the Partnership Agreement ..., has carefully read the Partnership Agreement, ... and has relied solely (except as indicated [herein] ) on the information contained in the Partnership Agreement;

[Belin] has been provided an opportunity to obtain any additional information concerning the Offering, the Partnership and all other information to the extent the Partnership or the General Partner possesses such information or could acquire it without unreasonable effort or expense;

[Belin] has been given the opportunity to ask questions of, and receive answers from, the General Partner concerning the terms and conditions of the Offering and other matters pertaining to this investment, and has been given the opportunity to obtain such additional information necessary to verify the accuracy of the information contained in the Partnership Agreement or which has otherwise been provided in order for him to evaluate the merits and risks of an investment in the Partnership.. ..

In light of the allegations in the complaint, Belin's own express representations and disclaimers, Belin cannot, as a matter of law, establish that he reasonably relied upon the oral misrepresentation by Weissler when he invested in the Limited Partnership.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 14 of 118

Not Reported in F.Supp.

Page 8

Not Reported in F.Supp., 1998 WL 391114 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

**IV.** ***Leave To Amend Is Denied***

Belin requests leave to amend his complaint. Additionally, he states that he will add a claim for negligent misrepresentation if granted leave.

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a complaint "shall be freely given when justice so requires."The federal courts, however, have interpreted Rule 15 to permit such amendments only when (1) the party seeking the amendment has not unduly delayed, (2) when that party is not acting in bad faith or with a dilatory motive, (3) when the opposing party will not be unduly prejudiced by the amendment, and (4) when the amendment is not futile. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see Mackensworth v. S.S. Am. Merchant,* 28 F.3d 246, 251 (2d Cir.1994); *Prudential Ins. Co. v. BMC Indus., Inc.,* 655 F.Supp. 710, 711 (S.D.N.Y.1987).

*9 An amendment is considered futile if the amended pleading fails to state a claim or would be subject to a successful motion to dismiss on some other basis. *See, e.g., S.S. Silberblatt, Inc. v. East Harlem Pilot Block,* 608 F.2d 28, 42 (2d Cir.1979); *Freeman v. Marine Midland Bank-New York,* 494 F.2d 1334, 1338 (2d Cir.1974).

Given the discussion above, it has been established not only that Belin has failed to adequately plead reliance to support a claim of fraud, but also that he will not be able to do so if he were granted leave to amend. The Investment Documents executed at the time of Belin's investment, as well as the complaint itself, negate any claim of reasonable reliance on Weissler's oral representations. Therefore, leave to amend would be futile.

Moreover, for the same reasons, Belin cannot state a viable claim for negligent misrepresentation. Like a claim of fraud, negligent misrepresentation requires reasonable reliance. *See Kimmell v. Schaeffer,* 89 N.Y.2d 257, 263-64, 675 N.E.2d 450, 454, 652 N.Y.S.2d 715, 719 (1996); *Heard v. New York,* 82 N.Y.2d 66, 74-75, 623 N.E.2d 541, 545-46, 603 N.Y.S.2d 414, 418-19 (1993).

Belin's claim is dismissed without leave to amend. His rights with respect to his investment, like the rights of the other investors in the Limited Partnership, will be determined by the outcome of the Insurance Action.

***Conclusion***

For the reasons set forth above, Weissler's motion to dismiss pursuant to Rule 12(b)(6) is granted.

It is so ordered.

S.D.N.Y.,1998.
Belin v. Weissler
Not Reported in F.Supp., 1998 WL 391114 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

# TAB 2

Page 2 of 12

Westlaw.

Not Reported in A.2d

Page 1

Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**H**
Christiana Marine Service Corp. v. Texaco Fuel and Marine Marketing
Del.Super.,2002.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
**CHRISTIANA** MARINE SERVICE CORPORATION, Plaintiff,
v.
**TEXACO** FUEL AND MARINE MARKETING INC. and **Texaco** Inc., Defendants.
**No. Civ.A. 98C-02-217WCC.**

Submitted Jan. 2, 2002.
Decided June 13, 2002.

On Defendant Texaco Fuel and Marine Marketing Inc., and Texaco Inc.'s Motion for Summary Judgment. Granted in part; denied in part.

John D. Balaguer, White & Williams LLP, Wilmington, Delaware, for Plaintiff, Christiana Marine.
James J. Maron & John P. Daniello, Maron & Marvel, P.A., Wilmington, Delaware, for Defendants, Texaco Inc.
Peter R. Kahana & Daniel M. Cohen, Berger & Montague, P.C., Philadelphia, PA, for Defendant, Texaco Fuel and Marine Marketing, Inc. and Texaco, Inc.

MEMORANDUM OPINION

CARPENTER, J.
*1 Defendants have filed a motion for summary judgment pursuant to Superior Court Civil Rule 12(b)(6) for failure to state a claim upon which relief could be granted. The core of this controversy centers upon an alleged oral long term requirement contract between Texaco Fuel and Marine Marketing, Inc. (hereinafter "Texaco"), and Christiana Marine Service Corporation (hereinafter " Christiana") a bunker fuel provider.[FN1] Christiana seeks compensatory damages without limitation to its lost profits; and consequential damages, consisting of Christiana's economic losses. The Court has heard oral argument on the motion and for the reasons set forth below, Texaco's motion for summary judgment is denied in part, and granted in part.

FN1. Christiana has sued Texaco's parent company, Texaco Incorporated, in addition to Texaco, pursuant to vicarious liability.

*FACTS*

Christiana Marine was incorporated in 1986, after its successor corporation, Compass Marine Corporation, ceased doing business. Christiana was a barge contractor that transported marine bunker fuel, a low grade black oil, in the Delaware River. Usually, when ships are at sea and need fuel, they will notify the oil providers in a particular port, such as Texaco or its competitors. The oil provider, is informed of the ship's arrival date, and the amount of bunker fuel needed to which the oil companies reply with their bids. Once awarded a contract, the oil company hires a barge contractor to transport the oil to the ships who requested the fuel.[FN2]

FN2. Christiana had two business locations: one in Chester, Pennsylvania, where delivery vessels were berthed during non-use and repair, and one in Wilmington, Delaware, where orders were received, invoices were sent, and where

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&prft=HT... 1/22/2008

Page 3 of 12

Not Reported in A.2d Page 2

Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

payments were received from Texaco.

In 1988 Texaco purchased a new supply facility, the Delaware Terminal Corporation ("DTC" ) in Wilmington, Delaware to increase Texaco's market share in the Delaware River area. Because DTC was in Wilmington, and not in, or as near to Philadelphia, it was slightly alienated from (1) the highest business activity where most other supply facilities were located; and (2) where most of the ships that had to be serviced were located.[FN3] Bunker fuel deliveries from a more distant area, such as Wilmington, were assessed higher rates to transport bunker fuel, as compared to the established rates in the Delaware River zone. In addition, DTC was not equipped to handle bunkers, and had experienced substantial congestion problems because of this.[FN4]To solve these problems, Texaco needed a barge carrier who would agree to provide below market prices for fuel deliveries from DTC, and who would also agree to exclude demurrage for loading delays at Texaco's congested terminal.[FN5]It was in this environment that the business relationship between Texaco and Christiana began.

FN3. Most supply facilities are located in Philadelphia, Pennsylvania.

FN4. Bruce Bond Dep. at 51. Barge contractors like Christiana, pick up the bunker fuel at the oil company's terminal and deliver the fuel to the ship at sea. Thus in this situation, Texaco would pay Christiana, Christiana's barges would go to DTC to pick up the bunker fuel, and then with the aid of its own tugboats, take the barges full of bunker fuel out to the ships who paid Texaco for the fuel.

FN5. Plaintiff's Response Brief at 2.

Before the alleged contract with Texaco, Christiana had a virtual monopoly on small to medium size bunker jobs in the Delaware River area, [FN6] and had sufficient equipment to conduct its usual business successfully. According to Christiana, Texaco proposed a long term agreement, which provided that Texaco would employ Christiana as its exclusive bunker barge contractor for all of its marine bunker fuel requirements, in exchange for Christiana's commitment to have ample equipment on hand to deliver Texaco's requirements upon demand.[FN7] In addition to these terms, Christiana and Texaco allegedly agreed that Texaco would receive discounted delivery charges, at below market rates, along with no additional penalties for loading delays at DTC.[FN8] In 1990, the parties apparently orally modified their business relationship and agreed that Christiana would "load and hold," would pay ship demurrage, and would pay extra unusual costs, which Texaco may have encountered, in return for Texaco's commitment to put through an average 200,000 bbls. of oil per month.[FN9]Christiana considered the 200,000 quote a minimum average, with Texaco anticipating a 225,000 or 250,000 bbls a month throughput. In other words, Christiana presumed the 200,000 barrels was a floor, not a ceiling. Regardless, Texaco did not meet this alleged "guaranteed" minimum monthly average, as it only put through 200,000 barrels as promised in eight months out of the forty-eight months Christiana and Texaco had a business relationship. Neither the initial agreement nor the subsequent modifications were in writing and the relationship was strictly based on the parties' oral understandings.

FN6. York's Report at 6 (citing the October 28, 1999 Bruce R. Bond deposition p. 238).

FN7. Texaco even published a pamphlet, which stated "[Christiana], our bunker barge contractor, and local operating agent is based in Wilmington, DE in close proximity to our loading facility. [Christiana] operates several barge units ranging in capacity from 1700-3000 metric tons. DTC and [Christiana] offer Texaco flexibility second to none any supplier on the river."

FN8. Because barge carriage is generally a small margin, fixed cost business, Christiana would have a unique

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&prft=HT... 1/22/2008

Page 4 of 12

Not Reported in A.2d Page 3

Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

opportunity to secure a steady, expanding stream of business, provided by Texaco, if it entered into this "agreement."

FN9. Bates Dep. at 86.

***2** Based upon Texaco's alleged representations that it planned to put through 200,000 bbls. of oil per month, Christiana went to the First National Bank of Maryland ("FNBM") and secured loans to purchase additional barges, tugboats, and equipment, that would be required for the work Texaco and Christiana anticipated. George Wood, the loan officer at FNBM was responsible for handling and securing approval for the loans and testified that he sensed there were "understandings" between the two parties as to future business. However, he did not know what the terms of that agreement were, nor did he investigate or require the production of agreements to approve the loans. Loan documents evidence that FNBM received a " favorable reference from Mr. Bruce Bond of Texaco," that Texaco referred to Mr. Bates as a " no-nonsense businessman who always gets the job done," that on a "monthly basis, Christiana moves roughly 150,000 barrels of bunkers, and [Texaco] wants to increase this to 200,000," and that "Texaco is looking for a long term relationship with Christiana."[FN10]

FN10. June 20, 1989 loan document.

The alleged oral contract between Christiana and Texaco ensued until Christiana wrote Texaco a letter in August of 1995, informing them that Christiana could not continue to provide bunker transportation because of the lack of Texaco's business and the cost of providing the service.[FN11]

FN11."It is with regret that [Christiana] had to inform Texaco last week that we could no longer provide bunker transportation in Philadelphia. The volume had gotten so small and the costs so high.... " August 16, 1995 letter from William Bates to C. Michael Bandy of Texaco.

*PROCEDURAL POSTURE*

On February 20, 1998, Christiana filed a complaint against Texaco and alleged six separate counts: (1) breach of contract-volume of business; (2) breach of contract-duration; (3) breach of contract-notice of termination; (4) breach of contract-duty of good faith and fair dealing; (5) promissory estoppel pursuant to Super. Ct. Civ. R. 8(e)(2); and (6) negligent misrepresentation. Texaco has filed a summary judgment motion requesting the dismissal of all claims.

*STANDARD OF REVIEW*

A motion for summary judgment may only be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[FN12]If a material fact is in dispute, or if it seems desirable to inquire more thoroughly into the facts, to clarify the application of the law, summary judgment is inappropriate.[FN13] Moreover, if it appears to the Court that there is any reasonable hypothesis, by which the nonmoving party might recover, the motion will be denied.[FN14] The Court is required to examine all pleadings, affidavits and discovery material provided to the Court,[FN15] accept all non-disputed facts as true, and must accept the non-movant's version of any disputed facts.[FN16]

FN12.*See Schueler v. Martin,* 674 A.2d 883, 885 (Del.Super.1996); *Pierce v. International Ins. Co. of Ill.,* 671 A.2d 1361, 1363 (Del.1996); *Moore v. Sizemore,* 405 A.2d 679, 680 (Del.1979).

FN13.*Kysor Industrial Corp. v. Margaux,* 674 A.2d 889, 894 (Del.Super.1996).

FN14.*Vanaman v. Milford Memorial Hospital, Inc.,* 272 A.2d 718, 720 (Del.1970).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&prft=HT... 1/22/2008

Page 5 of 12

Not Reported in A.2d
Page 4
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

FN15.*Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, 312 A.2d 322 (Del.Super.1973).

FN16.*Merrill v. Crothall-American, Inc.*, 606 A.2d 96 (Del.1992).

*DISCUSSION*

*A. Doctrine of Laches / Statute of Limitations*

Texaco asserts that Christiana's breach of contract, promissory estoppel, and negligent misrepresentation claims are all barred pursuant to the doctrine of laches because Christiana's time to bring suit started in July 1993, when it became clear the terms of the contract as alleged by Christiana were not being met.[FN17] Additionally, Texaco claims that Christiana consulted counsel in 1995, when it went out of business, to consider bringing a claim against Texaco; that Christiana intentionally misled Texaco "by writing Texaco a soothing, non-accusatory" 1995 letter saying nothing about a claim; that Christiana and its former attorney deliberately chose not tell Texaco about the alleged claim to inhibit Texaco from taking steps to defend itself. Texaco alleges that it was prejudiced (thus satisfying the element of laches that demands significant prejudice be shown) by Christiana's delay because: (1) out of the 48 months Christiana transported Texaco's bunker oil, Texaco only reached the alleged 200,000 barrels a month for 8 months, so if Christiana considered this "lower throughput" a breach of contract, they had an obligation to notify Texaco so it could have limited its damages by terminating the alleged contract at that point in time, and (2) Texaco is now unable to affectively defend itself as many documents and files regarding this relationship have been destroyed. Texaco stated that its computer files only date back until 1994, which makes locating precise and complete data for the relevant time period impossible.

FN17. Texaco's Brief at 20.

*3 Christiana contends that the alleged contract was a continuous one, and as such, the statute of limitations was not triggered until the entire contract had been terminated. Christiana claims the breach of contract occurred in August, 1995, which was the date of Mr. Bates' letter to Texaco notifying it that Christiana would be unable to participate in further business. Christiana also asserts that a laches agreement is unavailable to Texaco because Texaco "effectively" caused the termination of the agreement in its continuously low throughput, which caused Christiana to be prejudiced and to go out of business. And lastly, Christiana claims that Texaco is responsible for the lost computer files and documents, as Texaco took their mainframe computer out of service at the end of 1993. Christiana also points out that Texaco has been on notice of this lawsuit since May 1, 1996, and thus, could've kept records and documents for its defense as of that date.[FN18]

FN18. Plaintiff's Brief in Opposition to Defendant's Motion at 20.

"The test of laches is both unreasonable delay and consequent significant prejudice."[FN19] In an attempt to determine what constitutes unreasonable delay, the Court should first consider the time limitation fixed by the statute of limitations.[FN20] Delaware's statute of limitations for contract and negligence actions is found in 10 *Del. C.* § 8106. The 3 year limitation on cause of actions for an alleged breach of contract accrues at the time of the breach,[FN21] whereas a tort claim accrues at the time of the injury.[FN22]

FN19.*Wilkes v. H.M. Wrangell & Co.*, 293 F.Supp. 522, 524 (D.Del.1968)(citing *Gutierrez v. Waterman S.A. Corp.*, 373 U.S. 206, 215, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); *Claussen v. Mene Grande Oil Co.*, 275 F.2d 108, 113 (3d Cir.1960)).

FN20.*Wilkes*, 293 F.Supp. at 524.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&prft=HT... 1/22/2008

Page 6 of 12

Not Reported in A.2d Page 5

Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

FN21.*Fineberg v. Credit Int'l Bancshares, Ltd.,* 857 F.Supp. 338 (D.Del.1994); *Nardo v. Guido DeAscanis & Sons,* 254 A.2d 254 (Del.Super.1969).

FN22.*Howmet Corp. v. City of Wilmington,* 285 A.2d 423 (Del.Super.1971).

The Court finds that the statute of limitations, 10 *Del. C.* § 8106, did not begin to run until there was an affirmative termination by one of the parties. Christiana wrote the August 1995 letter to Texaco, which terminated the arrangement between these two parties. Until then, the two parties continuously conducted business with one another and Christiana operated as Texaco's bunker fuel contractor. As such, under the statute of limitations applicable to contracts, Christiana had until August, 1998 to file its claims against Texaco.[FN23] Since Christiana filed the instant action on February 20, 1998, it appears that Christiana successfully brought its claims within its window of opportunity. The Court finds that Christiana's claims have not been unreasonably delayed.

FN23. An issue not addressed by the parties is whether the statute of limitations would prevent the tort action from proceeding forward since the "time of the injury" may have occurred before the termination of the contract. Since that count is being dismissed on other grounds the issue will not be addressed.

Additionally, the Court is not convinced that Texaco has been unduly prejudiced by the delay in bringing this lawsuit. The basic foundation underlying this litigation is the lack of documentation evidencing this business relationship. Thus to argue the passing of time has limited Texaco's access to documentation is absurd. Whatever documents, if any, were ever created would appear to have minimal relevance to the issues being litigated and the individuals involved are still available to testify about the events.

Further, while it is undisputed that Texaco, during its business relationship with Christiana, failed most months to meet the alleged 200,000 bbls. throughput, this does not equate to an obligation by Christiana to terminate the relationship so Texaco could minimize its damages. While this fact may be relevant to the jury's determination of whether a contract existed and if so, the terms of that contract, it does not rise to the level of prejudice required to prevent a subsequent lawsuit. Texaco is an international corporation with significant resources but in this business relationship, it appears to have acted like a mom and pop grocery store relying upon a handshake and ones goodwill to perform an important business function. To argue that Christiana has tricked or mislead Texaco is simply an assertive legal effort to mine all possible avenues to prevent recovery. The argument is simply without merit. The Court finds neither unreasonably delay or prejudice and thus the claims are not barred by the doctrine of laches.

*B. Breach of Contract Claims*

*4 While it is the Court's province to define a contract, it is the jury's function to decide whether a contract exists.[FN24]In *Universal Products Co. v. Emerson,*[FN25] the Supreme Court of Delaware followed numerous other court's holdings that it is the Court's duty to determine whether a contract has been created, when the documentary evidence's authenticity is not challenged.[FN26]The *Emerson* court noted however, that the above rule does not apply "where the question, as to whether an alleged contract was made, turns on the proper conclusion to be drawn from a series of [documents] considered in connection with other pertinent facts and circumstances proved."[FN27]Stated differently, when other facts and circumstances germane to the issue are to be considered in addition to any documentary evidence, a jury is to decide whether or not a contract was formed, not the Court.

FN24.*Corletto v. Morgan,* 89 A. 738 (Del.Super.1914).

FN25.*Universal Products Co. v. Emerson,* 179 A. 387 (Del.1935).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&prft=HT... 1/22/2008

Page 7 of 12

Not Reported in A.2d
Page 6

Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

FN26.*Id.* at 393.

FN27.*Id.* at 394.

Texaco contends that there is simply no evidence, aside from the deposition testimony of Mr. Bates, to indicate that a contract, or long term agreement or "relationship" was ever contemplated by either of the parties. Indeed, Texaco's expert, Patrick J. Studdert, stated in his report that

[i]n all my years in the bunker transportation business, I have never had an oral agreement of the kind Mr. Bates said he had between Christiana and Texaco and I have never heard of one in any port. It is not the custom or practice in the bunker fuel transportation industry.[FN28]

FN28. Studdert's Report at 3.

Texaco asserts that "it is undisputed in the bunker fuel barge delivery industry-that deliveries are made by barge carriers for oil companies on an " as available basis." [FN29]Texaco further mentions that both parties' experts agree that barge carriers do not customarily have contracts like the one alleged by Christiana-long term oral contracts with minimum guaranteed monthly delivery quotas. Texaco then asserts that because Christiana did not exclusively work for Texaco, and it continued to conduct business with other oil companies, it cannot now claim that it purchased the additional barges, tugboats, and equipment from FNBM for the sole purpose of Texaco's alleged "long term agreement" to put through the amount of oil it allegedly promised.

FN29. Texaco's motion at 3.

Christiana contends that the record thus far is replete with evidence indicative of a contract, or that a contractual relationship was contemplated by these parties. Christiana points to (1) Mr. Bates' deposition testimony; (2) George Wood's deposition testimony (the First National Bank of Maryland (" FNBM")'s representative); and the mere evidence of Mr. Bates' extensive loans, taken to purchase more equipment, barges, and tugboats in 1991 and 1992. Christiana's expert, Robert B. York contends that Christiana and Texaco's relationship was contractual, and more specifically stated in his report that

"[a] contract existed between [Christiana] and [Texaco] which went far beyond the normal terms of and is in consistent with an "as available" bunker agreement per posted rates and which, based on testimony, is consistent with a Requirements Contract.[FN30]

FN30. York's Report at 20.

***5** The Court first finds that whether an oral contract, or a contract created by conduct was established between Christiana and Texaco, is not an issue that can be decided upon a motion for summary judgment. A reasonable jury may conclude that regardless of the fact a written contract was not prepared and signed, Texaco and Christiana had mutual, beneficial interests at stake in this business venture, and as such, an enforceable contract was created. The Restatement Second of Torts § 19 provides that "[t]he manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act." [FN31]Subsection (3) further states that "[t]he conduct of a party may manifest assent even though he does not in fact assent."[FN32]The jury may find that Texaco's conduct manifested an assent to be bound, based upon Mr. Bates' testimony, Mr. York's expert opinion and testimony, combined with other documents and evidence as to the events during the 48 month relationship. Texaco's arguments are simply ones that can be presented to the jury and used in their deliberations as to whether a contract existed. The type of business relationship between Texaco and Christiana is the core of this litigation, and to assert that the facts are settled and undisputed is simply unsupportable by the record when viewed in light most favorable to the non-moving party. Facts are not undisputed simply because one party believes their version is the only logical conclusion to draw from the events. Fortunately, jurors, not counsel, make such decisions.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&prft=HT... 1/22/2008

Page 8 of 12

Not Reported in A.2d Page 7

Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

FN31.Restatement (Second) Torts § 19.

FN32.*Id.*

*C. Negligent Misrepresentation Claim*

Finally, Texaco asserts that Christiana's negligent misrepresentation claim is barred by the economic loss doctrine and must be dismissed as all of Christiana's alleged losses are purely economic in nature, *i.e.,* lost profits, lost investments, and acquired debt. Texaco also asserts that Christiana cannot employ the Restatement (Second) of Torts § 552, a state law exception to the economic loss doctrine, because federal maritime law governs this case, and maritime law does not permit exceptions to the economic loss doctrine.[FN33]

FN33. The Court need not decide whether federal maritime law governs this action as Christiana's negligent misrepresentation will be dismissed on other grounds.

Christiana admits its damages are purely economic in nature, but contends (1) that the economic loss doctrine does not apply to its claims because the doctrine is applicable to torts under the products liability realm, i.e. when 'products' are involved; and (2) that even if the doctrine is applied to Christiana's claims, Delaware has adopted the Restatement (Second) of Torts § 552, an exception to the economic loss doctrine otherwise known as negligent misrepresentation. Christiana asserts it falls within this exception.

The economic loss doctrine "prohibits recovery in tort for losses unaccompanied by a bodily harm or a property damage."[FN34]The doctrine in its purest form forbids plaintiffs from recovering in tort for losses suffered that are solely economic in nature.[FN35]Economic loss is "any monetary loss[ ], costs of repair or replacement, loss of employment, loss of business or employment opportunities, loss of good will, and diminution in value ."[FN36]While initially a doctrine related to product liability actions, the courts have expanded the doctrine's application beyond its original scope to any kind of dispute arising from a commercial transaction where the alleged damages do no harm to a person or to property other than the bargained for item. The doctrine has become a significant shield for defendants to protect against the increasing amount of plaintiff's tort claims, which result when contract provisions limit their recoveries, or as in the instant case, where a contract may not have existed at all. While there appears to be no dispute that Christiana's damages are economic in nature, this fact alone does not necessarily result in the dismissal of the tort claim

FN34. Hon. Sheldon Gardner, Matthew Sheynes, *The Moorman Doctrine Today: A Look at Illinois' Economic-Loss Rule,* 89 Ill. B.J. 406, 406-11 (2001) (discussing case law dealing with the economic loss doctrine, future developments, and innocent fraud or negligent misrepresentation exclusion).

FN35.*Danforth v. Acorn Structures,Inc.,* 608 A.2d 1194,1195 (Del.1992)(citing *Moorman Mfg. Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443, 448 (Ill.Supr.1982).

FN36. Hon. Sheldon Gardner, Matthew Sheynes, *The Moorman Doctrine Today: A Look at Illinois' Economic-Loss Rule,* 89 Ill. B.J. at 406.*See also Danforth,* 608 A.2d at 1196(quoting *Moorman Mfg. Co.* 61 Ill.Dec. 746, 435 N.E.2d at 449)(noting that economic loss is defined as "damages for inadequate value, costs of repair, and replacement of the defective product, or consequent loss of profits-without any claim of personal injury or damage to other property.").

*6 The Restatement (Second) of Torts § 552 provides an exception to the economic loss doctrine's bright line rule and Delaware has explicitly adopted this exception in *Guardian Construction v. Tetra Tech Richardson.*[FN37]The Restatement provides that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&prft=HT... 1/22/2008

Page 9 of 12

Not Reported in A.2d Page 8

Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

FN37.583 A.2d 1378 (Del.Super.1990).

One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Delaware's narrow application and strict construction of § 552, has thus far held that for a plaintiff to invoke a negligent misrepresentation cause of action, two elements are required. First, " the plaintiff must show that the defendant supplied the information to the plaintiff for use in business transactions with third parties."[FN38]Christiana has satisfied this element. When viewed in a light most favorable to Christiana, there is sufficient evidence, which would indicate that Texaco allegedly informed Christiana, on several occasions, that it intended to put through 200,000 bbls. of oil per month. Christiana relied upon that information to secure loans from FNBM, and incur significant debt to purchase additional tug boats, barges, and equipment to transport Texaco's bunker oil. Thus, it appears that Christiana shared the information Texaco supplied to it, to use in its business transactions, the loans, with FNBM. Christiana as such, has satisfied the first prong of a negligent misrepresentation claim under § 552.

FN38.*Danforth v. Acorn Structures, Inc.*, Del.Super. C.A. No. 90C-JN-30, Herlihy, J. (Nov. 22, 1991)(Mem.Op.)

As such, the focus of the Court's attention is on the second requirement for negligent misrepresentation. In *Danforth v. Acorn Structures Inc.*,[FN39] the Court, again adhering to Illinois precedent, held that a plaintiff, in addition to the first element mentioned above, must also show that " the defendant is in the business of supplying information."[FN40]In relying upon Illinois precedent, the *Danforth* court did not delineate which types of businesses are "in the business of supplying information" that would meet the Restatement's definition, but instead referred to the Illinois cases that made such determinations.[FN41]

FN39. The first *Danforth* opinion granted the defendant's motion for summary judgment on the grounds that the plaintiff's claims were purely economic losses and were thus barred by the economic loss doctrine.*Danforth v. Acorn Structures Inc.*, C.A. No. 90C-JN-30, 1991 WL 215658 (Del.Super.Aug.27, 1991). Thereafter, the *Danforth* plaintiff filed a motion for reargument asserting his claims fell under the Restatement (Second) of Torts § 552 exception to the economic loss doctrine, and thus his negligent misrepresentation claim against the defendant should survive. *Danforth v. Acorn Structures, Inc.*, C.A. No. 90C-JN-30, 1991 WL 269956 (Del.Super.Nov.22, 1991). The Court's expansive discussion concerning the Restatement (Second) of Torts § 552, and the two requirements a plaintiff must satisfy to lift the economic loss doctrine's bar are found in the November 22, 1991 opinion.

FN40.*Danforth v. Acorn Structures, Inc.*, Del.Super. C.A. No. 90C-JN-30, 1991 WL 269956, (Del.Super.Nov.22, 1991). Since Danforth, Illinois law has altered its requirements for a negligent misrepresentation claim: a plaintiff must now demonstrate that: "(1) defendant is in the business of supplying information for the guidance of others in their business dealings; (2) defendant provided information that constitutes a misrepresentation; and (3) defendant supplied the information for guidance in the plaintiff's business dealings."*Tolan and Son, Inc. v. KLLM Architects, Inc.*, 308 Ill.App.3d 18, 241 Ill.Dec. 427, 719 N.E.2d 288, 296 (App.Ct.Ill.1999).

FN41.*Danforth*, at *4 (citing *Rankow v. First Chicago Bank*, 870 F.2d 356,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&prft=HT... 1/22/2008

Page 10 of 12

Not Reported in A.2d Page 9

Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

360-366 (7th Cir.1989); *Gerdes v. John Hancock Mutual Life Insurance Co.*, 712 F.Supp. 692, 697-98(N.D.Ill.1989)).

In *Rankow v. First Chicago Corp.*,[FN42] the Seventh Circuit, reversing the District Court's decision, held that shareholders had sufficiently alleged negligent misrepresentation, noting that "[a] precise, case-specific inquiry is required to determine whether a particular enterprise is in the business of supplying information for the guidance of others in their business transactions."[FN43]The *Rankow* court went further to hold that "[w]hether [a defendant] can be held liable for negligent misrepresentation depends upon the nature of the information at issue in a particular case and its relation to the kind of business being conducted."[FN44]In its attempts to determine whether a bank was "in the business of supplying information" the *Rankow* court noted that while "there has been no clear discussion in the cases to date as to what principle should be applied in determining whether a party is in the business of supplying information" the lower court decisions have found that " manufacturers and sellers who deal only in tangible products are generally not in the business of supplying information."[FN45]The *Rankow* court then noted that

FN42.870 F.2d 356 (7th Cir.1989).

FN43.*Rankow*, 870 F.2d at 360.

FN44.*Rankow*, 870 F.2d at 361.

FN45. Various Illinois cases, although not dispositive, are instructive in deciding whether a party is in the businesses of supplying information. *See e.g. Black, Jackson and Simmons Ins. Brokerage, Inc. v. Inter. Bus. Mach.*, 109 Ill.App.3d 132, 64 Ill.Dec. 730, 440 N.E.2d 282 (Ill.App.Ct.1982)(holding a computer hardware and software supplier was not in the business of supplying information as a seller of merchandise); *Knox College v. Celotex, Corp.*, 117 Ill.App.3d 304, 72 Ill.Dec. 703, 453 N.E.2d 8 (Ill.App.Ct.1983)(holding a roofing materials supplier was not in the business of supplying information); *Tan v. Boyke*, 156 Ill.App.3d 49, 108 Ill.Dec. 229, 508 N.E.2d 390 (Ill.App .Ct.1987)(seller of an apartment building was not a supplier of information); *Vacuum Industrial Pollution*, 764 F.Supp. 507 (N.D.Ill.1991)(holding an oil company who negligently cleaned a tank that contained a chemical catalyst was not a supplier of information);.

*7 a great many businesses involve an exchange of information as well as of tangible products-manufacturers provide operating or assembly instructions, and sellers provide warranty information of various kinds. But if we ask what the product is in each of these cases, it becomes clear that the product (a building, pecipitator, roofing material, computer or software) is not itself information, and that the information provided is merely incidental.[FN46]

FN46.*Rankow*, 870 F.2d at 364.

In a more recent opinion, *Tolan and Son Inc. v. KLLM Architects, Inc.*,[FN47] the Illinois court noted that "a great many businesses exchange information as well as products" and "[w]here the information supplied is merely ancillary to the sale of a product or service or in connection with the sale, defendant will not be found to be in the business of supplying information for the guidance of others in their business dealings."[FN48]The *Tolan* court further stated that "businesses that supply tangible goods and/or non-informational good or services ... may exchange information, [but] the information relates only to the goods or services and, thus, is "supplied incidental to the sale of the product."[FN49]

FN47.308 Ill.App.3d 18, 241 Ill.Dec. 427, 719 N.E.2d 288 (Ill.App.3d 1999).

FN48.*Tolan Sons Inc.*, 241 Ill.Dec. 427, 719 N.E.2d at 296.

FN49.*Tolan*, 241 Ill.Dec. 427, 719 N.E.2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&prft=HT... 1/22/2008

at 297.

The Court finds the above cited reasoning to be a fair interpretation of what it means to be "in the business of supplying information" for the purposes of a negligent misrepresentation claim. Based upon the above reasoning, and in heeding the prior precedent of *Guardian Construction,* and *Danforth,* the Court finds that Texaco was not "in the business of supplying information for the guidance of others." [FN50]The information Texaco supplied to Christiana is more aptly categorized as information incidentally supplied to Christiana for the ultimate service-that of transporting bunker fuel oil. Clearly, Texaco is generally in the business of supplying oil, not information.[FN51] The information Texaco supplied, if any, is best classified as ancillary to the provided service.[FN52]As such, this litigation will move forward as a contract dispute only and the tort claim is dismissed.

FN50.*See Tolan,* 241 Ill.Dec. 427, 719 N.E.2d at 296-96(delineating what business are pure information providers where the end product is an idea, what businesses are tangible product end manufacturers, and what businesses fall between the two.).*Tolan* notes that businesses such as accountants, lawyers, insurance brokers, stockbrokers, real estate brokers, and termite inspectors and environmental assessors are "pure information providers, which would constitute "in the business of supplying information for the guidance of others. *Tolan* also notes certain professions that are tangible good providers, which is where this Court finds Texaco falls-that of manufacturers of computers and software or products of any type.

FN51.*See Vacuum Industrial Pollution, Inc. v. Union Oil Co.,* 764 F.Supp. 507 (N.D.Ill.1991)(holding that a defendant oil company was not in the business of supplying information.).

FN52.*See* the Restatement (Second) of Torts § 552 comment a explaining that "by limiting the liability for negligence of a supplier of information to be used in commercial transactions to cases in which he manifests an intent to supply the information for the sort of use in which the plaintiff's loss occurs, the law promotes the important social policy of encouraging the flow of commercial information upon which the operation of the economy rests ."

While this Court has followed the earlier decisions of the Court that have addressed this issue, other jurisdictions have taken a more expansive view of § 552[FN53] and clearly an argument can be made that the decisions from Illinois followed by Delaware are too limiting and fail to give full effect to the negligent misrepresentation exception. The question of when does a business cross the line into the world of " supplying information" or whether that requirement is mandated, is anything but clear. If this matter reaches the Supreme Court it is suggested that they address these questions and provide clear direction to litigants and the Court to what is now murky waters.

FN53.*See Walpert, Smullian & Blumenthal, P.A. v. Katz,* 361 Md. 645, 762 A.2d 582 (Md.2000)(holding that the negligent misrepresentation requires: "(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge hat the plaintiff will probably rely on the statement, which if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence."); *Jacobson v. Environmental Risk Limited,* No. CV 950550991, 1996 WL 168086, at *3 (Conn.Super.Mar.4, 1996)(following the "governing principals" of the Restatement (Second) of Torts § 552 and holding that negligent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 12 of 12

Not Reported in A.2d
Page 11

Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

> misrepresentation requires a plaintiff to " allege and prove that the reliance on the misstatement was justified or reasonable," and "reasonableness is a question of fact for the trier to determine based on all of the circumstances.")

*CONCLUSION*

For the reasons set forth above, Texaco's motion for summary judgment as to the breach of contract claim is denied, but Texaco's motion for summary judgment as to Christiana's negligent misrepresentation claims is granted.

Del.Super.,2002.
Christiana Marine Service Corp. v. Texaco Fuel and Marine Marketing
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&prft=HT... 1/22/2008

# TAB 3

Page 16 of 118

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2006 WL 2012607 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Christie's Inc. v. Dominca Holding Corp.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
CHRISTIE'S INC., Plaintiff,
v.
DOMINICA HOLDING CORP. d/b/a Mihalarias Art and Stavros Mihalarias, Defendants.
**No. 05 Civ. 8728(NRB).**

July 18, 2006.

Michael E. Salzman, Hughes Hubbard & Reed LLP, New York, NY, for Plaintiff.
Victor Muskin, Scheichet & Davis, P.C., New York, NY, for Defendants.

MEMORANDUM AND ORDER

BUCHWALD, J.

*1 Christie's Inc. ("Christie's" or "plaintiff"), a fine art auction house, brings this diversity action against Dominica Holding Corporation d/b/a Mihalarias Art ("Dominica") and its president and owner, Stavros Mihalarias ("Mihalarias"), (collectively, "defendants"), for failure to pay the purchase price and buyer's commission for art works purchased at auction. Christie's now moves for partial summary judgment as to liability and to dismiss defendants' counterclaims. For the reasons set forth below, plaintiff's partial motion for summary judgment as to liability is denied, and its motion to dismiss defendants' counterclaims is denied.

*BACKGROUND*[FN1]

FN1. Except where indicated, there are no genuine issues regarding the following facts.

On May 3-4, 2005, Christie's held an auction (the "auction") entitled "Prints and Multiples" in its New York City sales room. Plaintiff's Rule 56.1 Statement ("Pl. 56.1 Stmt.") ¶ 5; Defendants' Response to Plaintiff's Rule 56.1 Statement ("Def. Resp .") ¶ 5. The auctioned works, including the ones at issue here, were made available for viewing prior to the auction.[FN2]Pl. 56.1 Stmt. ¶ 7; Def. Resp. ¶ 7.

FN2. Public viewing was allowed for a total of twenty-five hours over the four days preceding the start of the auction. Pl. 56.1 Stmt. ¶ 7; Def. Resp. ¶ 7.

Mihalarias registered to bid at the auction on behalf of Dominica, and subsequently was the winning bidder on a series of ten screenprints in Lot 658 created by Andy Warhol which contain images of Marilyn Monroe, entitled "Marilyn" (the " Marilyn Prints" or the "Prints"), as well as eleven additional lots (the "Additional Print Lots").[FN3] Pl. 56.1 Stmt. ¶¶ 6, 8, 9; Def. Resp. ¶¶ 6, 8, 9. Prior to placing his winning bid, Mihalarias did not fully inspect the Marilyn Prints.[FN4]Instead, he relied primarily on the descriptions contained in the auction catalogue entitled "Christie's New York Prints and Multiples" (the "catalogue"), which stated in part that each of the Marilyn Prints was " taped to the support" and that three of them had been "examined out of the frames."[FN5]Mihalarias Decl. ¶ 15; Pl.Ex. A.

FN3. Mihalarias bid $710,400 (representing a hammer price of $620,000 plus a buyer's premium of $90,400) for the Marilyn Prints and a total of $207,840 for the Additional Print Lots. Complaint ("

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 17 of 118

Not Reported in F.Supp.2d Page 2

Not Reported in F.Supp.2d, 2006 WL 2012607 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Compl.") ¶¶ 11, 12.

FN4. Though in his affidavit Mihalarias states that the descriptions were "confirmed by my viewing of one of the [Marilyn Prints] before the auction," Mihalarias Decl. ¶ 15, apparently, he viewed this print only shortly before the auction began. *Id.* at ¶ 34.

FN5. The catalogue contains reproductions of selections from the Marilyn Prints and has an entry which reads in part:

658

ANDY WARHOL

*Marilyn* (F. & S. 22-31)

[T]he complete set of ten screenprints in colors, 1967, on wove paper, eight signed with initials and dated in pencil on the reverse, two signed and dated in pencil on the reverse, all stamp numbered 27/250 (there were also 26 artist's proofs lettered A-Z), published by Factory Additions, New York, all the full sheets, *taped to the support* at the reverse of the sheet edges and in the center, soft creasing with associated minor ink loss and slight paper separation at the sheet corners, pale staining on the reverse, (F. & S. 22) with an area of pale blue staining in the upper right corner, otherwise all apparently in good condition, *three examined out of the frames*, all framed[.]

Pl.Ex. A (emphases added).

The next day, Mihalarias returned to Christie's in order to arrange for payment and shipment of the works he had purchased. Mihalarias Decl. ¶ 16. Believing the Marilyn Prints simply were taped to their supports, Mihalarias requested that the Prints be removed from their frames and shipped in cylindrical tubes, which he states is the normal method by which such prints are shipped.[FN6] *Id.* However, Jonathan Rendell ("Rendell"), the head of Christie's print department, informed Mihalarias that the Marilyn Prints were permanently glued to their supports and therefore could not be detached from their frames and sent in the manner he had requested. *Id.* at ¶ 17.Specifically, each of the Marilyn Prints was affixed with both glue and tape to a plexiglass support within their respective frames. *Id.* at ¶ 18; Def. 56.1 Stmt. ¶ 4.

FN6. Based on the catalogue entry, Mihalarias assumed the Marilyn Prints easily could be removed from their frames. According to defendants, this was a reasonable assumption given that within the print business, it is customary that tape used to secure prints to frame supports is easily removed without damaging the prints. Def. 56.1 Stmt. ¶¶ 1, 2.

Mihalarias asserts that he was entirely surprised by these disclosures and that he had never before seen such conditions in his prior experience in the print business. Mihalarias Decl. ¶¶ 18, 22; Def. 56.1 Stmt. ¶ 9. Mihalarias states that such highly unusual conditions would lead to a material decrease in the value of the Marilyn Prints and that he would not have bid as high a price if he had known that they could not be removed from their frames.[FN7]Mihalarias Decl. ¶ 31; Def. 56.1 Stmt. ¶¶ 10, 11. Upon learning of these conditions, Mihalarias refused to pay for the Marilyn Prints but offered to pay for the Additional Print Lots, though Christie's allegedly refused this offer. Compl. ¶ 26; Answer ¶ 26.

FN7. Indeed, this statement seems to have been borne out by the price of the subsequent resale of the Marilyn Prints. *See infra* p. 5.

*2 In a subsequent exchange of letters, Mihalarias confirmed his refusal to pay for the Marilyn Prints, and reiterated his willingness to proceed with the purchase of the Additional Print Lots. Pl. Exs. C, D. Christie's responded by informing him that he was in breach of contract and confirmed that the Marilyn Prints had been resold for $575,000, which was $135,400 less than defendants' winning bid. Pl.Ex. E. Christie's also reserved its right to apply any payments made by defendants first against their obligations with respect to the Marilyn Prints.[FN8] *Id.*

FN8. If the buyer fails to make payment by the seventh calendar day following the sale, the Conditions state that Christie's is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 18 of 118

Not Reported in F.Supp.2d Page 3

Not Reported in F.Supp.2d, 2006 WL 2012607 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

entitled in its "absolute discretion" to exercise a number of rights or remedies including: "where several amounts are owed by the buyer to [Christie's] ... in respect of different transactions, to apply any amount paid to discharge any amount owed in respect of any particular transaction, whether or not the buyer so directs."Pl.Ex. A. ¶ 4(f).

Procedural History

Christie's filed its complaint on October 14, 2005. The complaint contains three counts. Count One alleges that Dominica breached the contract for sale of the Marilyn Prints. Count Two asserts that Dominica breached the contract for sale of the Additional Print Lots .[FN9]Count Three is asserted against Mihalarias in his individual capacity and alleges that he is personally liable if Dominica is not the true buyer or is not a distinct legal entity.

FN9. At oral argument, plaintiff's counsel disclosed that the Additional Print Lots have since been individually resold for a net amount greater than the amount of Mihalarias' bid. As such, plaintiff no longer seeks damages as to this count.

On January 26, 2006 defendants answered the complaint, asserting affirmative defenses and counterclaims for fraudulent inducement, breach of contract, and lost profits. First, defendants assert that plaintiff's catalogue was intentionally false and misleading. Second, defendants allege that their bids to purchase the Additional Print Lots gave rise to separate and distinct contracts for each lot. Defendants claim that these contracts were breached by Christie's when it refused to complete the sales of the Additional Print Lots unless defendants waived the rescission of their purchase of the Marilyn Prints. Third, defendants allege damages of over $225,000 due to the loss of the opportunity to sell the Additional Print Lots at a subsequent exhibition.

Christie's made the instant motion for partial summary judgment as to liability and to dismiss the counterclaims on March 10, 2006.

*DISCUSSION*

I. Motion for Partial Summary Judgment

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the evidence submitted must be viewed in the light most favorable to the nonmoving party. *SeeAnderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Even if parties dispute material facts, summary judgment must be granted "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Golden Pacific Bancorp. v. F.D.I.C.,* 375 F.3d 196, 200 (2d Cir.2004) (internal citations and quotation marks omitted). In addition, once the moving party has made a sufficient showing, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."*Id.* (quoting *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998))."At this prediscovery stage, summary judgment is to be assessed only with great caution."*Serendip LLC v. Franchise Pictures LLC,* No. 00 Civ. 210(HB), 2000 WL 1277370, at *8 (S.D.N.Y. Sept. 7, 2000). In addition, "[t]he nonmoving party must have 'had the opportunity to discover information that is essential to his opposition' to the motion for summary judgment."*Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.,* 865 F.2d 506, 511 (2d Cir.1989) (quoting *Anderson,* 477 U.S. at 250 n. 5).

***3** This action essentially hinges on whether Christie's can enforce the terms of the contract of sale for the Marilyn Prints. Defendants argue that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 19 of 118

Not Reported in F.Supp.2d Page 4

Not Reported in F.Supp.2d, 2006 WL 2012607 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

any such obligation was vitiated by the misrepresentations contained in the catalogue entry. Specifically, defendants argue that there were four misrepresentations. First, they assert that the statement "taped to the support" was inaccurate because the Marilyn Prints were actually glued to their supports. Second, defendants argue that the statement that three of the Marilyn Prints were " examined out of the frames," created the false impression that the Prints could be removed from their frames and detached from their supports.[FN10] Third, defendants argue that it was misleading for the catalogue to state that eight of the Marilyn Prints were "signed with initials and dated in pencil on the reverse."Though not untrue, defendants allege that this statement implied that the Prints had been detached from the opaque supports which are customarily used. Fourth, defendants assert that the second and third statements also created the false impression that the more customary opaque, acid-free paper backings had been used, rather than the plexiglass supports actually utilized for the Marilyn Prints. Def. Mem. at 4-7.

FN10. Defendants assert that an examination of a print out of its frame would normally involve an examination of both sides of the print.

Christie's does not concede that there were any misrepresentations at all and in any case asserts that because defendants agreed to be bound by the Conditions,[FN11] their refusal to pay for the art works they purchased at auction is unjustified. Specifically, the Conditions contain the admonition that "[p]rospective buyers are strongly advised to examine personally any property in which they are interested, before the auction takes place.... Neither Christie's nor the seller provides any guarantee in relation to the nature of the property apart from the Limited Warranty.... The property is otherwise sold 'as is." ' [FN12]*Id.* at ¶ 2(a). The Limited Warranty in turn provides that "[o]nly UPPER CASE TYPE headings of lots in this catalogue indicate what is being warranted by Christie's. Christie's warranty does not apply to supplemental material which appears below the UPPER CASE TYPE headings of each lot and Christie's is not responsible for any errors or omissions in such material." *Id.* at ¶ 6. Christie's points out that the only text in the catalogue entry for the Marilyn Prints which contains uppercase letters is "ANDY WARHOL," Pl.Ex. A, and therefore none of the descriptions which defendants dispute is subject to the Limited Warranty.

FN11. The Conditions state in part that they "contain all the terms on which Christie's and the seller contract with the buyer.... By bidding at auction you agree to be bound by these terms."Pl.Ex. A at 313.

FN12. In addition, the Conditions provide that "[e]xcept as stated in the Limited Warranty ... all property is sold 'as is' without any representation or warranty of any kind by Christie's or the seller. Buyers are responsible for satisfying themselves concerning the condition of the property and the matters referred to in the catalogue entry."Pl.Ex. A at ¶ 2(c).

As an initial matter, we note that it is undisputed that a sale was completed when defendants successfully bid on the Marilyn Prints at auction, *see*N.Y. U.C.C. § 2-328(2) (McKinney 2005), and that defendants have failed to make any payments for the purchased works.[FN13]The next inquiry, then, is whether the misrepresentations at issue would excuse defendants' breach of the sale agreements. We note that at the very least with regard to how the Prints were attached to their supports, the catalogue entry differed from the actual conditions.[FN14]Construing the evidence in the light most favorable to defendants, it is clear that the Marilyn Prints were affixed to their supports using a qualitatively different means than that which had been described in the catalogue. Indeed, the Marilyn Prints were permanently affixed to the frames, thus significantly reducing their value. The issue, before us then, is whether these misstatements would constitute fraudulent inducement such as to render unenforceable the contract for sale.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 20 of 118

Not Reported in F.Supp.2d Page 5

Not Reported in F.Supp.2d, 2006 WL 2012607 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

FN13. In addition, defendants agreed to be bound by the terms in the catalogue when they placed a bid at auction. *SeeCsaky v. Meyer,* No. 94 Civ. 8117(JSM), 1995 WL 494574, at *1 (S.D.N.Y. Aug. 18, 1995); *Finnish Fur Sales Co., Ltd. v. Juliette Shulof Furs, Inc.,* 770 F.Supp. 139, 145 (S.D.N.Y.1991); Pl.Ex. A at 313.

FN14. Christie's attempt to trivialize the difference between the alleged conditions and the catalogue entry is disingenuous, at best. Christie's argument that this essentially is a dispute about "very sticky tape" versus "tape" rings hollow in light of the allegations that both glue and tape were used to attach the Marilyn Prints to their supports.

*4 Under New York law,[FN15] in order to succeed on a claim for fraudulent inducement, defendants must prove: "(1) misrepresentation of a material fact; (2) falsity of the representation; (3) scienter; (4) reasonable reliance; and (5) damages." [FN16] *Creative Waste Mgmt., Inc. v. Capitol Environmental Servs., Inc.,* No. 04 Civ. 9581(WCC), 2006 WL 1072018, at *19 (S.D.N.Y. April 21, 2006) (citing *May Dep't Stores Co. v. Int'l Leasing Corp., Inc.,* 1 F.3d 138, 141 (2d Cir.1993)). "A key element of a fraudulent inducement claim is reasonable reliance."*Brady v. Calyon Sec. (USA),* 406 F.Supp.2d 307, 316 (S.D.N.Y.2005) (citing *Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 186-87 (2d Cir.2004)).

FN15. The Conditions state, *see* Pl.Ex. A. ¶ 9, and neither party contests, that New York law governs this dispute.

FN16. Plaintiff does not appear to contest that defendants satisfy the requirements of scienter and damages. Indeed, it is clear that at least at this stage of the litigation, defendants have alleged facts sufficient to establish scienter.

Under New York law, a specific disclaimer normally bars a defense of fraudulent inducement. *SeeDannan Realty Corp. v. Harris,* 5 N.Y.2d 317, 320-21, 184 N.Y.S.2d 599, 602 (finding that specific disclaimer as to reliance on representations defeated subsequent allegations of fraud involving those representations); *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.,* 748 F.2d 729, 730 (2d Cir.1984) (granting summary judgment against buyer where it had "contractually disclaimed reliance upon the representations at issue and enjoyed absolute access to all relevant information necessary to confirm the validity of those representations"); *see alsoT.T. Exclusive Cars, Inc. v. Christie's Inc.,* No. 96 Civ. 1650(LMM), 1996 WL 737204, at *6 (S.D.N.Y. Dec. 24, 1996) ("[U]nder New York law a party's specific disclaimer will preclude it from maintaining a claim for fraudulent misrepresentation."); *Foxley v. Sotheby's Inc.,* 893 F.Supp. 1224, 1230 (S.D.N.Y.1995) ("[E]ven if provenance were misrepresented, a fraud claim is precluded because the auction catalog stated that Sotheby's made no representations or warranties of provenance.").

However, an exception to this rule exists where the misrepresented facts are peculiarly within the knowledge of the seller. *SeeDannan Realty Corp.,* 5 N.Y.2d at 322, 184 N.Y.S.2d at 603;*Tahini Investments, Ltd. v. Bobrowsky,* 99 A.D.2d 489, 490, 470 N.Y.S.2d 431, 433 (2d Dep't 1984) ("[E]ven where the parties have executed a specific disclaimer of reliance on a seller's representations, a purchaser may not be precluded from claiming reliance on any oral misrepresentations if the facts allegedly misrepresented are peculiarly within the seller's knowledge.").

Defendants do not dispute that the Conditions contain a sufficiently specific waiver.[FN17] *See Grumman,* 748 F.2d at 735 ("The *Danann* rule operates where the substance of the disclaimer provisions tracks the substance of the alleged misrepresentations, notwithstanding semantical discrepancies."); *Warner Theatre Assocs. Ltd. P'ship v. Metropolitan Life Ins. Co.,* No. 97 Civ. 4914(SS), 1997 WL 685334, at *3 n. 2 (S.D.N.Y. Nov. 4, 1997) (collecting cases). They do contend, however, that the misrepresentations at issue involved information peculiarly within Christie's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 21 of 118

Not Reported in F.Supp.2d Page 6

Not Reported in F.Supp.2d, 2006 WL 2012607 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

knowledge and that the defects at issue were not apparent "upon a viewing of the prints."Def. Mem. at 15.

FN17. As recounted above, *seesupra* pp. 8-9, the catalogue explicitly stated that property was sold "as is" and that buyers should inspect works for themselves.

*5 Mihalarias affirms that in reliance on the catalogue entry and his trust in Christie's based on prior dealings with it, he bid on the Marilyn Prints without undertaking a detailed inspection. He states only that he "view[ed] one of the prints before the auction."[FN18] *Id.* at ¶ 15.In addition, he asserts that "[t]he defects were discoverable only if one attempted to remove the prints from their frames, detach them from their supports and examine them loose."*Id.* at ¶ 34.However, this apparently "was not practical to attempt in the crowded time before the auction was to begin."*Id.* Mihalarias further states that he felt there was no reason to even request that this be done, in view of the content of the catalogue entry. *Id.*

FN18. At oral argument, counsel for defendants asserted that only one Marilyn Print was on display for public viewing in the time before the auction began.

Mihalarias, though a sophisticated buyer,[FN19] simply viewed one of the Marilyn Prints in the hectic time immediately preceding the auction rather than examining it closely during the days preceding the auction. This cursory viewing does not constitute the kind of careful examination typically required by courts before a buyer can claim that defects were peculiarly within the seller's knowledge. *SeeLazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1543 (2d Cir.1997) (noting that sophisticated party "was under a further duty to protect itself from misrepresentation"), *cert. denied,*522 U.S. 864, 118 S.Ct. 169, 139 (1997). In short, defendants failed thoroughly to examine the Marilyn Prints, as they were exhorted to do by the catalogue, during the ample time allowed for public viewing.

FN19. As defendants themselves highlight, Mihalarias possesses expertise in the print business. Mihalarias has been an art dealer for over thirty-five years and is a fellow of both the British Restorer's Association and the International Institute of Conservation. Pl. 56.1 Stmt. ¶ 4; Def. Resp. ¶ 4; Mihalarias Decl. ¶ 3. Indeed, Mihalarias once served as the Greek representative of Christie's Contemporary Art ("CCA") and has in the past purchased many other prints from Christie's. Mihalarias Decl. ¶ 5.

However, on the record before us, we cannot conclude as a matter of law that Mihalarias could have undertaken a sufficiently thorough inspection of the Marilyn Prints without extraordinary difficulty,[FN20] or that even if he had, he necessarily would have detected the flaws at issue.[FN21] Under these circumstances, Mihalarias' failure to conduct a more detailed inspection is excused. *SeeLazard Freres,* 108 F.3d at 1542 ("When matters are ... peculiarly within defendant's knowledge, ... plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth." (quoting *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir.1980)); *Dimon Inc. v. Folium, Inc .,* 48 F.Supp.2d 359, 368 (S.D.N.Y.1999) ("[T]he peculiar knowledge exception applies not only where the facts allegedly misrepresented literally were within the exclusive knowledge of the defendant, but also where the truth theoretically might have been discovered, though only with extraordinary effort or great difficulty.") (collecting cases). Accordingly, plaintiff's pre-discovery motion for summary judgment as to liability is denied.

FN20. For instance, it is not evident in the record how extensively potential buyers can inspect works prior to the start of auctions.

FN21. At oral argument, counsel for plaintiff argued that Mihalarias' own declaration provided such support when he stated that Rendell had showed him the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 22 of 118

Not Reported in F.Supp.2d Page 7

Not Reported in F.Supp.2d, 2006 WL 2012607 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

condition of the Marilyn Prints. *See* Mihalarias Decl. ¶ 18. However, it is not clear from this statement that Mihalarias would have been able to detect such flaws on his own had he viewed the back of the prints through their frames.

II. Motion to Dismiss Counterclaims

Plaintiff also moves to dismiss defendants' counterclaims. Granting of such a motion is appropriate where "it appears beyond doubt that the [non-moving party] can prove no set of facts in support of his claim which would entitle him to relief."*Interested Underwriters at Lloyd's of London Subscribing to Policy # 991361018 v. Church Loans and Investments Trust,* No. 05 Civ. 9522(VM), 2006 WL 1378990, at *1 (S.D.N.Y. May 16, 2006) (quoting *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999)). Applying this standard, plaintiff's motion to dismiss defendants' counterclaims is denied.

*6 First, in light of the preceding discussion regarding defendants' defense of fraudulent inducement, plaintiff's motion to dismiss defendants' claim of fraud is denied. Similarly, plaintiff's motion to dismiss defendants' claim for breach of the contracts of sale for the Additional Print Lots fails because it is not clear whether Christie's was entitled to apply the proceeds from the Additional Prints to the purchase price of the Marilyn Prints. Finally, the factual record and legal context are not yet sufficiently developed to determine the legal effect of the provision of the Conditions which states that "[n]either Christie's nor the seller will be liable for any special, incidental or consequential damages including, without limitation, loss of profits nor for interest."Pl.Ex. A. ¶ 6(iv).

*CONCLUSION*

For the reasons set forth above, plaintiff's partial motion for summary judgment as to liability is denied, and its motion to dismiss defendants' counterclaims is denied.

IT IS SO ORDERED.

S.D.N.Y.,2006.
Christie's Inc. v. Dominca Holding Corp.
Not Reported in F.Supp.2d, 2006 WL 2012607 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

# TAB 4

Page 24 of 118

Westlaw.

Not Reported in F.Supp.2d Page 1

Not Reported in F.Supp.2d, 2002 WL 31453789 (S.D.N.Y.), 49 UCC Rep.Serv.2d 142
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Dallas Aerospace, Inc. v. CIS Air Corp.
S.D.N.Y.,2002.

United States District Court,S.D. New York.
DALLAS AEROSPACE, INC. Plaintiff,
v.
CIS AIR CORPORATION, Defendant.
**No. 00 Civ. 1657(BSJ).**

Oct. 31, 2002.

Buyer of aircraft engine sued seller for breach of contract, fraudulent misrepresentation, negligent misrepresentation and unconscionability. On motion of seller for summary judgment, the District Court, Jones, J., held that: (1) seller did not breach contract when it delivered an engine that was not airworthy, where seller did not make any representations regarding airworthiness; (2) buyer failed to allege a special relationship supporting claim of negligent misrepresentation; (3) disclaimer of warranties was not unconscionable; and (4) buyer could not establish justifiable reliance any false representation as to airworthiness, and thus could not recover for fraudulent misrepresentation.

Motion granted.

West Headnotes

**[1] Sales 343 ⚿267**

343 Sales
343VI Warranties
343k265 Implied Warranty of Quality, Fitness, or Condition
343k267 k. Exclusion by Contract or Express Warranty or Refusal to Warrant. Most Cited Cases
Seller did not breach aircraft engine sale agreement when it delivered to buyer an engine that was not airworthy, where seller did not make any representations regarding the airworthiness of the engine, the agreement, under the heading " DISCLAIMER OF WARRANTY" and in bold typeface, disclaimed "any warranty, guaranty, or representation express or implied as to *** airworthiness," and the agreement also contained a standard integration clause, and where buyer signed a delivery form confirming that the engine and its records were purchased "as is." U.C.C. §§ 1-201(10), 2-316, 2-316(3)(a).

**[2] Sales 343 ⚿22(4)**

343 Sales
343I Requisites and Validity of Contract
343k22 Offer to Sell
343k22(4) k. Variance from Offer and Conditional Acceptance. Most Cited Cases
Purchase order which buyer of aircraft engine sent to seller when it wired payment to seller, nearly two weeks after the bill of sale transferred title of the engine to buyer and nearly two weeks after the engine was delivered to and accepted by buyer, which materially altered the contract as to warranties, could not become part of the agreement without the express consent of seller. N.Y. U.C.C. § 2-207(2)(b).

**[3] Fraud 184 ⚿13(3)**

184 Fraud
184I Deception Constituting Fraud, and Liability Therefor
184k8 Fraudulent Representations
184k13 Falsity and Knowledge Thereof
184k13(3) k. Statements Recklessly Made; Negligent Misrepresentation. Most Cited Cases
Buyer of aircraft engine could not recover from seller for negligent misrepresentation under New York law, where it failed to allege a special relationship, but only a one-time, buyer-seller relationship between two sophisticated business entities.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 25 of 118

Not Reported in F.Supp.2d Page 2

Not Reported in F.Supp.2d, 2002 WL 31453789 (S.D.N.Y.), 49 UCC Rep.Serv.2d 142
**(Cite as: Not Reported in F.Supp.2d)**

**[4] Sales 343 ⚿267**

343 Sales
343VI Warranties
343k265 Implied Warranty of Quality, Fitness, or Condition
343k267 k. Exclusion by Contract or Express Warranty or Refusal to Warrant. Most Cited Cases

Provisions of aircraft engine sale agreement disclaiming warranties were not unconscionable under New York law, though the engine was not airworthy, where the parties to the agreement were two sophisticated entities of equal bargaining power, and both were experienced in the business of buying and selling aircraft engines.

**[5] Fraud 184 ⚿23**

184 Fraud
184I Deception Constituting Fraud, and Liability Therefor
184k19 Reliance on Representations and Inducement to Act
184k23 k. Relations and Means of Knowledge of Parties. Most Cited Cases

**Fraud 184 ⚿36**

184 Fraud
184II Actions
184II(A) Rights of Action and Defenses
184k36 k. Defenses. Most Cited Cases

Even if seller of aircraft engine made a false representation as to airworthiness, buyer could not establish justifiable reliance thereon, and thus could not recover for fraudulent misrepresentation under New York law, where the sales agreement contained an express disclaimer of airworthiness, though mistakenly using the word "Aircraft" rather than engine, and though buyer, in the agreement, did not expressly deny reliance, where the agreement contained a standard merger clause and a provision that buyer "shall accept delivery *** as-is, " and where the engine's history was not peculiarly within the knowledge of the seller.

*Memorandum & Order*

JONES, J.

*Introduction*

*1 Plaintiff Dallas Aerospace and Defendant CIS Air Corporation ("CIS") are in the business of buying, selling and leasing commercial aircraft engines. (Compl.¶ 7.) This case arises out of a contractual dispute over a DC-9 jet engine ("Engine ") that Defendant sold to Plaintiff in August of 1997. In 1999, when Plaintiff attempted to re-sell the Engine, Plaintiff discovered that the Engine was installed on an aircraft damaged in a hard landing in Japan four years prior to Plaintiff's purchase of the Engine from Defendant. Plaintiff contends that Defendant misrepresented that the Engine was airworthy when in fact the Engine was "unairworthy " as a result of the hard landing. (Compl.¶ 20.) Plaintiff alleges breach of contract, fraudulent misrepresentation, negligent misrepresentation and unconscionability and seeks monetary damages in excess of $1,150,000, the purchase price of the Engine. (Comp.¶ 1.)

Defendant brings this motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). For the foregoing reasons, the motion is granted in its entirety.

*Standard of Review*

Summary judgment may not be granted unless " the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to summary judgment as a matter of law."Fed.R.Civ.P. 56(c); *seealsoCelotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Services, Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994). The burden is on the moving party to show that no genuine issue of material fact exists.*Gallo,* 22 F.3d at 1223. In determining

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 26 of 118

Not Reported in F.Supp.2d

Page 3

Not Reported in F.Supp.2d, 2002 WL 31453789 (S.D.N.Y.), 49 UCC Rep.Serv.2d 142
**(Cite as: Not Reported in F.Supp.2d)**

whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Corp.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied*,484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-movant. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994). Nonetheless, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*Breach of Contract*

[1] Plaintiff alleges that Defendant breached the Aircraft Engine Sale Agreement ("Agreement") when it delivered to Plaintiff an Engine that was not airworthy. (Compl.¶ 21.) Defendant asserts, however, that the Court should dismiss Plaintiff's breach of contract claim because Defendant did not make any representations regarding the airworthiness of the Engine in the Agreement. Defendant is correct. The Agreement between the parties expressly disclaims "any warranty, guaranty, or representation express or implied as to (i) the Aircraft's title, airworthiness, design, value, operation ... merchantability or fitness for a particular purpose."[FN1](Salisbury Dec., Ex. A, ¶ 8.) The Agreement also contains a standard integration clause, which reiterated that "no warranties, representations or undertakings have been made by either party except as expressly set forth herein."(Salisbury Dec., Ex. A, ¶ 13D.)

FN1. Although this provision refers to the *Aircraft's* airworthiness, rather than the *Engine's* airworthiness, the Aircraft Engine was the sole subject matter of the "Aircraft Engine Sale Agreement." Accordingly, the reference to "Aircraft" in this provision clearly is meant to refer to the Engine.

*2 The Uniform Commercial Code Section 2-316 governs exclusions and modifications of warranties and applies to the sale of a used aircraft engine. *SeeSky Acres Aviation Services, Inc. v. Styles Aviation, Inc.*, 620 N.Y.S.2d 442, 210 A.D.2d 393 (2d Dept.1994).U.C.C. Section 2-316 indicates that both implied warranties and specific warranties may be disclaimed so long as they are " conspicuous." U.C.C. 2-316(2). As Paragraph 8 of the Agreement is under the heading " DISCLAIMER OF WARRANTY" and is in bold typeface, the requirements for a conspicuous writing are met and the disclaimer is valid. *Sky Acres*, 210 A.D.2d at 394, 620 N.Y.S.2d at 442 (2d Dept.1994) ; *Commercial Credit Corp. v. CYC Realty*, 102 A.D.2d 970, 972, 477 N.Y.S.2d 842 (3rd Dept.1984); U.C.C. s 1-201(10); *Con Tel Credit Corp. v. Mr. Jay Appliances & TV, Inc.*, 128 A.D.2d 668, 669 513 N.Y.S.2d 166, 167 (2d Dept.1987).

Additionally, when Plaintiff took possession of the Engine, it signed a delivery form confirming that the Engine and its records were purchased "as is, where is." (Salisbury Dec. Ex. H; Ex. A ¶ 7.) The New York Uniform Commercial Code section 2-316(3)(a) provides that when the term "as is" is used in a contract for a sale of goods, all implied warranties concerning the condition of the goods are excluded. "Such terms in ordinary commercial usage are understood to mean that the buyer takes the entire risk of the quality of the goods involved." Official Uniform Comment to UCC Section 2-316(3) at ¶ 7. Thus, the delivery form further indicated that Defendant disclaimed liability for the condition of the Engine.

[2] In Plaintiff's opposition to Defendant's summary judgment motion, Plaintiff for the first time alleges that the Agreement was modified by a purchase order dated September 9, 1997. Plaintiff claims that it sent the purchase order to CIS when it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 27 of 118

Not Reported in F.Supp.2d Page 4

Not Reported in F.Supp.2d, 2002 WL 31453789 (S.D.N.Y.), 49 UCC Rep.Serv.2d 142
**(Cite as: Not Reported in F.Supp.2d)**

wired the payment to CIS on September 9, 1997. This is nearly two weeks after the Bill of Sale, dated August 26, 1997, transferred title of the Engine to Plaintiff and nearly two weeks after the Engine was delivered to and accepted by Plaintiff.

The purchase order specifically requires the Engine to have never been "subjected to extreme stress or heat as in a major engine failure accident, incident or fire."(Jackson Aff., Ex. 21.) Because this term materially alters the contract, it cannot become part of the Agreement without the express consent of Defendant. NY U .C.C. 2-207(2)(b); *Lorbrook Corp. v. G & T Industries, Inc.,* 162 A.D.2d 69,72, 562 N.Y.S.2d 978, 979 (3d Dept.1990).

Plaintiff has not provided any evidence that Defendant agreed to modify the Agreement with the new terms in the purchase order. Defendant claims not to have received the purchase order, let alone agree to it. (Dec. of Bruce Lewis at ¶ 3.) Moreover, the purchase order states that "all the terms and conditions of this purchase are stated in the contract."(*Id.*) The purchase order, therefore, does not purport to modify the terms of the Agreement.

*3 Because the terms of the Agreement expressly disclaim any warranty as to the Engine's airworthiness, Plaintiff cannot properly claim breach of contract relating to the airworthiness of the Engine. Thus, Defendant's motion for summary judgment is granted with respect to Plainitff's breach of contract claim.

*Negligent Misrepresentation*

In order to maintain a cause of action for negligent misrepresentation under New York law, Plaintiff must demonstrate the following: (1) Defendant negligently provided inaccurate information; (2) Plaintiff reasonably relied on the inaccurate information; and (3) a "special relationship" existed between Plaintiff and Defendant that imposed a duty of care on Defendant to convey accurate information to Plaintiff. *Western Intermodal Services, Ltd., v. Singamas Container Industry Co.. Ltd.,* No. 98 Civ. 8275, 2000 WL 343780, at *3 (S.D.N.Y. March 31, 2000); *Dimon Inc.v. Folium, Inc.,* 48 F.Supp.2d 359, 373 (S.D.N.Y.1999).

[3] Plaintiff, therefore, must allege a special relationship that "suggest [s] a closer degree of trust and reliance than that of the ordinary buyer and seller."*Patell Indus. Machine Co., Inc., v. Toyoda Machinery U.S.A., Inc.,* 880 F.Supp. 96, 99 (N.D.N.Y.1995); *Sanitoy, Inc. v. Shapiro,* 705 F.Supp. 152, 154 (S.D.N.Y.1989) (citing *American Protein Corp. v. AB Volvo,* 844 F.2d 56, 63 (2d Cir.1988)*cert. denied,*488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988)). Here, Plaintiff alleges nothing more than a one-time, buyer-seller relationship between two sophisticated business entities. "Courts generally find that an ordinary contractual relationship alone is insufficient to constitute a special relationship."*Congress Financial Corp. v. John Morrell & Co.,* 790 F.Supp. 459, 474 (S.D.N.Y.1992). Accordingly, the Court grants Defendant's summary judgment motion with respect to Plaintiff's negligent misrepresentation claim.

*Unconscionability*

[4] Plainitff asserts that the Court should refuse to enforce the disclaimer provisions in the contract on the grounds that the provisions are unconscionable. To establish unconscionability, Plaintiff generally must show "both a lack of meaningful choice and the presence of contractual terms which unreasonably favor one party ."*See State of New York v. Wolowitz,* 96 A.D.2d 47, 68, 468 N.Y.S.2d 131, 145 (2d Dep't 1983). The doctrine of unconscionability focuses on the manner in which the contract was entered and the status of the parties. *Seeid.*"Unconscionability has rarely been found in a wholly commercial setting."*See Price Brothers Co. v. Olin Construction, et al.,* 528 F.Supp. 716, 720 (W.D.N.Y.1981). The parties to this Agreement are two sophisticated entities of equal bargaining power. Both are experienced in the business of buying and selling aircraft engines. The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 28 of 118

Not Reported in F.Supp.2d Page 5

Not Reported in F.Supp.2d, 2002 WL 31453789 (S.D.N.Y.), 49 UCC Rep.Serv.2d 142
**(Cite as: Not Reported in F.Supp.2d)**

Court finds that the status of the parties was equal in negotiating the terms of the Agreement. Accordingly, the Court holds that the provision disclaiming the Engine's airworthiness is not unconscionable.

*Fraudulent Misrepresentation Claim*

*4 Under New York law, a claim of fraudulent misrepresentation requires Plaintiff to prove a false representation of a material fact upon which Plaintiff justifiably relied in entering into the agreement. *SeeFrankel v. ICD holdings S.A.*, 930 F.Supp. 54, 65 (S.D.N.Y.1996). Plaintiff alleges that "when CIS delivered to Plaintiff the Engine records, CIS knew the Engine Records falsely certified the Engine as airworthy."(Compl.¶ 25.) The Agreement specifies that Plaintiff's purchase of the Engine was contingent upon Plaintiff's receipt and acceptance of specified Engine records. (Salisburt Dec., Ex. A ¶ 2.) These Engine records included reports from ST Aerospace Engines Pte. Ltd ("ST Aerospace"), the repair facility that overhauled the Engine prior to Plaintiff's purchase of the Engine. ST Aerospace's reports detailed the work that was performed on the Engine and certified that the Engine was airworthy.

Plaintiff has presented evidence that the Defendant knew the Engine was involved in the hard landing and that Defendant failed to disclose that information to ST Aerospace. Plaintiff alleges that because Defendant misrepresented the Engine's history to ST Aerospace, ST Aerospace did not perform the extensive overhaul that is required to return an accident-related engine to service and, in turn, ST Aerospace's reports misrepresented that the Engine was airworthy. Plaintiff contends that the reports mislead Plaintiff as to the Engine's airworthiness. Viewing the evidence in the light most favorable to Plaintiff, this Court finds that Plaintiff has established a material issue of fact as to whether Defendant's representations to ST Aerospace were false.

[5] Although a reasonable jury may find that Defendant made a false representation, Plaintiff cannot establish justifiable reliance on any representation of airworthiness, including the Engine records, because the Agreement contains express disclaimers of any such representations. It is well established that a general, boilerplate disclaimer of a party's representations, such as that found in Paragraph 13D of the Agreement, cannot defeat a claim for fraud.[FN2] *See Bridger v. Goldsmith,* 143 N.Y. 424, 429, 38 N.E. 458 (1894); *Jackson v. State of New York,* 210 A.D. 115, 120, 205 N.Y.S. 658, 662 (4th Dep't 1924). However, a party cannot justifiably rely on a representation that has been *explicitly* disclaimed in the agreement. *See Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 320, 157 N.E.2d 597, 599, 184 N.Y.S.2d 599, 602 (1959) .

FN2. Paragraph 13D of the Agreement states that "[t]his Agreement contains the entire understanding of the parties with respect to the purchase and sale of the Engine, and no warranties, representations or undertakings have been made by either party except as expressly set forth herein."

Defendant relies on *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 157 N.E.2d 597, 184 N.Y.S.2d 599 (1959), to establish that Plaintiff could not justifiably rely on any representations regarding the Engine's airworthiness. In *Danann,* the plaintiff claimed that he was induced to purchase a lease to a building by defendant's misrepresentations as to the "operating expenses of the building and as to the profits to be derived from the investment."*Id.* at 5 N.Y.2d 319, 157 N.E.2d at 598, 184 N.Y.S.2d at 600. The contract, however, contained the following provision:

*5 The Seller has not made and does not make any representations as to the physical condition, rents, leases, *expenses, operation* or any other matter or thing affecting or related to the aforesaid premises, except herein specifically set forth, and the Purchaser hereby *expressly acknowledges that no such representations have been made, and the Purchaser further acknowledges that it has inspected the premises and agrees to take the premises "as is"*.... It is understood and agreed that all understandings and agreements heretofore had

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 29 of 118

Not Reported in F.Supp.2d Page 6

Not Reported in F.Supp.2d, 2002 WL 31453789 (S.D.N.Y.), 49 UCC Rep.Serv.2d 142
**(Cite as: Not Reported in F.Supp.2d)**

between the parties hereto are merged in this contract, which alone fully and completely expresses their agreement, *and that the same is entered into after full investigation, neither party relying upon any statement or representation,* not embodied in this contract, made by the other.

*Danann,* 5 N.Y.2d at 320, 184 N.Y.S.2d at 598, 157 N.E.2d at 601.In light of this contract provision, the Court of Appeals concluded that " [p]laintiff has in the plainest language announced and stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded."*Id.* The specific disclaimer destroyed the reliance that plaintiff had alleged in his complaint. *Id.*

Plaintiff asserts that *Danann* does not apply for two reasons: first, the Agreement does not specifically disclaim the Engine's airworthiness; and second, the Agreement does not contain language in which Plaintiff expressly *denies reliance* upon Defendant's representations. The Court is not persuaded by either of Plaintiff's arguments. Paragraph Eight specifically states the following:

Seller has not made and does not make, nor shall Seller be deemed to have made or given, and hereby expressly disclaims, any warranty, guaranty or representation, express or implied as to (i) the Aircraft's title, *airworthiness,* design, value, operation, condition, quality, durability, suitability, merchantabiltiy or fitness for a particular purpose....

(Salisbury Dec., Ex. A, ¶ 8) (emphasis added).

Plaintiff contends that this provision does not specifically disclaim a representation as to the Engine's airworthiness because the word "Aircraft" is used instead of "Engine." The sale of the Engine, not an Aircraft, was the sole subject matter of this Agreement. It is unreasonable for Plaintiff to argue that the provision does not specifically disclaim the "Engine's" airworthiness because of this obvious error.

Plaintiff's second argument, that the *Danann* standard is not satisfied because Plaintiff has not explicitly disclaimed reliance on Defendant's representations, is misplaced. In addition to the standard merger clause, the Agreement also has a provision that states Plaintiff "shall accept delivery of the Engine and Engine Records ... as-is, where-is. "(Salisbury Dec., Ex. A, ¶ 13D, ¶ 7.) Plaintiff's employees testified that they were familiar with the as-is, where-is clause as one that limits Defendant's liability as to the condition of the Engine. (Hofmann Dep., Ex. E, Salisbury Dec. at 52:14-54:15; Thompson Dep., Ex. N, Salisbury Dec. at 39:16-40:2.)

***6** The specificity of the disclaimer in Paragraph Eight also makes it impossible for Plaintiff to justifiably rely on a representation that the Engine was airworthy. *SeeHarsco Corp. v. H.H. Bowden, et al.,* No. 94 Civ. 6191, 1995 WL 152523, at *6 (S.D.N.Y. April 5, 1995) (dismissing plaintiff's complaint after finding language to be " sufficiently specific to encompass the particular alleged misrepresentations at issue"); *Western Intermodal Services, Ltd. v. Singamas Container Industry Co., Ltd.,* No. 98 Civ. 8275, 2000 WL 343780, at *3 n. 3 (S.D.N.Y. March 31, 2000). Moreover, Plaintiff's Senior Vice President, who signed the Agreement on behalf of Plaintiff, confirmed in his deposition testimony that Plaintiff was aware at the time of purchase that the Agreement did not contain any representations by CIS. (Thompson Dep., Ex. N, Salisbury Dec. at 40:3-15.)

The Second Circuit has stated that "*Danann* stands for the principle that where parties have expressly allocated risks, the judiciary shall not intrude into their contractual relationship."*See Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 735 (2d Cir.1984). Accordingly, this Court finds that Defendant's specific disclaimer precludes Plaintiff from alleging fraudulent misrepresentation based on the Engine's airworthiness.

There is, however, an exception to *Danann:* a specific disclaimer will not defeat a fraudulent misrepresentation claim if the allegedly misrepresented facts are "peculiarly" within the Defendant's knowledge. *SeeWarner Theatre Assocs. Limited P'ship v. Metropolitan Life Ins. Co.,* 149 F.3d 134, 136 (2d Cir.1998); *Danann,* 5 N.Y.2d at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 30 of 118

Not Reported in F.Supp.2d Page 7

Not Reported in F.Supp.2d, 2002 WL 31453789 (S.D.N.Y.), 49 UCC Rep.Serv.2d 142
**(Cite as: Not Reported in F.Supp.2d)**

322, 157 N.E.2d at 600, 184 N.Y.S.2d at 603. Plaintiff asserts that the Engine's history of its involvement in the hard landing was not readily available to Plaintiff. Contrary to Plaintiff's assertions, though, this Court finds that the Engine's history was not "peculiarly within the knowledge" of CIS. It is undisputed that Plaintiff is a sophisticated business entity engaged in major transactions of buying and selling aircraft engines. " Where sophiticated businessman engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance."*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d at 737; *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1543 (2d Cir.1997) (noting that a substantial and sophisticated player was under a duty to protect itself from misrepresentation).

Had Plaintiff contacted Pratt & Whitney, the Engine's manufacturer, it could have obtained an " Engine Event History" report for a nominal fee. *See Warner Theatre Assocs. Ltd. P'Ship,* 149 F.3d at 136 ("the peculiar knowledge exception is designed to address circumstances where a party would face high costs" in determining the truth or falsity of the representation). Plaintiff asserts that there is no proof that the Engine Event History was available in August of 1997. Plaintiff's employees, however, testified at their depositions that the Engine Event History was "readily available" prior to Plaintiff's purchase of the Engine from CIS.[FN3](Dep. of Curtis Jackson, Ex. J, Salisbury Dec; Dep. of Joseph Hofmann, Ex. E, Salisbury Dec.) Joseph Hofmann, a senior executive, also testified that he would have ordered the report had he been responsible for purchasing the Engine.

FN3. Curtis Jackson initially testified in his deposition that the Engine Event History was readily available, but then changed his testimony in a later declaration to reflect the availability of the reports in 1998 and 1999, but not 1997, when Plaintiff purchased the Engine. The Court disregards his later declaration. *SeeFederal Deposit Ins. Corp. v. Wrapwell Corp.,* No. 93 Civ 859, 2002 WL 14365, *16 (S.D.N.Y. Jan.3, 2002); R*askin v. Wyatt Co.,* 125 F.3d 55, 63 (2d Cir.1997) (following the rule that "a party cannot create a genuine issue of fact by submitting an affidavit that contradicts previous deposition testimony").

*7 Thus, this Court finds that the Engine's history, allegeldly making the Engine unairworthy, was not peculiarly within the knowledge of CIS.[FN4] *SeeBanque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146 (2d Cir.1995). Accordingly, the exception to *Danann* does not apply. Because the Agreement contained a specific disclaimer of any representations as to the Engine's airworthiness, Plaintiff did not reasonably rely on Defendant's alleged misrepresentation of the Engine's airworthiness. Plaintiff's claim of fraudulent misrepresentation is dismissed.

FN4. In addition to having access to the Pratt and Whitney report, CIS claims that Plaintiff could have also obtained the history of the Engine through Charlotte Air, a previous owner of the Engine, and Japan Air Systems, the owner of the Engine when it was involved in the hard landing. Because the Court finds that the availability of the Pratt & Whitney report takes the Engine's history outside the peculiarity of Defendant's knowledge, it need not address these other possible avenues of obtaining information.

*Conclusion*

Defendant's motion for summary judgment is granted in its entirety. The Clerk of the Court is directed to close this case.

SO ORDERED:

S.D.N.Y.,2002.
Dallas Aerospace, Inc. v. CIS Air Corp.
Not Reported in F.Supp.2d, 2002 WL 31453789

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 31 of 118

Not Reported in F.Supp.2d Page 8

Not Reported in F.Supp.2d, 2002 WL 31453789 (S.D.N.Y.), 49 UCC Rep.Serv.2d 142
**(Cite as: Not Reported in F.Supp.2d)**

(S.D.N.Y.), 49 UCC Rep.Serv.2d 142

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

# TAB 5

Page 33 of 118

Westlaw.

Not Reported in F.Supp.2d Page 1

Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

C
DDCLAB Ltd. v. E.I. DuPont De Nemours and Co.
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
DDCLAB LTD., Plaintiff,
v.
E.I. DU PONT DE NEMOURS AND COMPANY, Defendant.
**No. 03 CV 3654GBD.**

Feb. 18, 2005.

*MEMORANDUM DECISION & ORDER*

DANIELS, J.

*1 Plaintiff DDCLAB Ltd. ("DDCLAB") commenced this action, *inter alia,* for breach of contract claiming defendant E.I. Du Pont De Nemours and Company ("DuPont") failed to provide DDCLAB with a promised revolving line of credit. DuPont moved, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the complaint for failure to state a claim upon which relief can be granted. The motion is granted and the complaint is dismissed in its entirety.

The complaint alleges that in October of 2001, the parties began to negotiate the details of an agreement whereby defendant would invest money in plaintiff. DDCLAB was "looking for" an investment of six million dollars to expand its wholesale/retail business without financial restriction. (Compl.¶ 5). DDCLAB claims that at a October 16, 2001 meeting, DuPont's representatives indicated that DuPont would secure a revolving line of credit for DDCLAB at a low interest rate of 3-4%. (Compl.¶ 7). The complaint states that " [t]he revolving line of credit was to be set up with the banks as part of DuPont's investment in DDCLAB."(Compl.¶ 7). On February 25, 2002, DDCLAB was allegedly assured by DuPont "that once the deal was closed, DuPont would set up the revolving line of credit with a bank and DuPont would get the best deal for the borrowing for DDCLAB."(Compl.¶ 8). DuPont's representative allegedly indicated that the revolving line of credit would not be included in the letter of intent between the parties because DuPont would not be lending the money directly to DDCLAB. The complaint indicates that on May 31, 2002, it was again represented that the line of credit would be set up by DuPont with "one of its banks." (Compl.¶ 9). On June 12, 2002, the parties entered into a Commercial Agreement and an Investment Agreement (collectively "the Written Agreements") whereby DuPont invested one million dollars in DDCLAB thereby becoming a 19% shareholding in DDCLAB. The complaint states that "DDCLAB agreed to a smaller investment than it was originally seeking by DuPont of only one million dollars ($1,000,000) in consideration for DuPont's assurances that it would set up a revolving line of credit for DDCLAB once the Written Agreements were executed."(Compl.¶ 10).

The parties executed a Commercial Agreement and an Investment Agreement on June 12, 2002. The Commercial Agreement made no mention of DuPont's obligation to set up a revolving line of credit for DDCLAB.

The parties' Investment Agreement is a comprehensive forty-nine page contract detailing the particular rights and obligations of the parties, including the expressed representations of both contracting parties. Prior to setting forth the specific terms of the agreement, the introductory portion of the contract states:

WHEREAS, DUPONT and DDCLAB are, simultaneously with execution of this Investment Agreement, entering into a certain Commercial Agreement (the above agreements are hereafter referred to as the "Agreements"), which collectively provide for a constructive and mutually beneficial relationship between DUPONT and DDC LAB;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 34 of 118

Not Reported in F.Supp.2d Page 2

Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*2 WHEREAS, DDCLAB desires to obtain one million dollars ($1,000,000) of additional capital by selling DUPONT 19% of the fully diluted unregistered shares of its common stock and DUPONT desires to acquire the same, all subject to the terms and conditions of this Investment Agreement; and

WHEREAS, DUPONT desires to acquire an option to purchase up to an additional five percent (5%) of the number of issued and outstanding shares of DDCLAB Common Stock, and DDCLAB is willing to grant such an option to DUPONT as an inducement to DUPONT entering the Agreement;

NOW, THEREFORE, in consideration of the respective agreements herein contained and subject to the terms and considerations set forth herein, the parties agree ... (Compl. Ex. B at 1-2).

The Investment Agreement is silent as to any promise by DuPont to establish a revolving line of credit for DDCLAB. The agreement contained an integration provision stating:

This Agreement and the agreements referred to herein contain the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter. (*Id*. at ¶ 9.10).

The agreement further provides that any changes or additions to the agreement require DuPont's consent in writing. (*Id.* at ¶ 9 .1).

The complaint additionally alleges that on July 14, 2004, after the Written Agreements were signed, it was represented that "DuPont would set up a revolving line of credit with banks and other investors" and that "DuPont was working to package DDCLAB to the banks."(Compl.¶ 11). The complaint alleges that on July 17, 2002, DDCLAB advised DuPont "that DuPont's promise to set up the revolving line of credit for DDCLAB was crucial" to DDCLAB's business operations. (Compl.¶ 12). The complaint further states that on August 1, 2002, a DuPont's representative indicated, for the first time, that DuPont did not promise to set up a revolving line of credit for DDCLAB.

Plaintiff claims that it relied on defendant's promises concerning the revolving line of credit by accepting purchase orders for clothing and entering into contractual obligations with manufacturers to produce lines of clothing. DDCLAB contends that it would not have done so without the expectation of an influx of capital from the revolving line of credit. DDCLAB also allegedly hired additional sales personnel in response to DuPont's request that DDCLAB have the necessary personnel to handle the anticipated growth of DDCLAB's business. DDCLAB alleges that without the revolving line of credit, it has been unable to pay manufacturers for purchase orders; has lost profits, clients, and wholesale accounts; suffered damage to its reputation in the industry; and accumulated millions of dollars in debt. The complaint asserts two causes of action for breach of contract, as well as claims for promissory estoppel, fraud, negligent misrepresentation and breach of fiduciary duty.

*MOTION TO DISMISS STANDARD*

*3 In reviewing a complaint for dismissal under Rule 12(b)(6), the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor. *Bolt Elec ., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). The complaint should only be dismissed where it appears beyond doubt that the plaintiff can present no set of facts entitling it to relief. *Conley v. Gibson,* 355 U.S. 41, 46 (1957); *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984). On a motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), the Court is precluded from considering matters outside of the complaint.*Courtenay Communications, Corp. v. Hall,* 334 F.3d 210, 213 (2d Cir.2003). In this regard, a complaint includes any written instrument attached as an exhibit. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel., Co.,* 62

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 35 of 118

Not Reported in F.Supp.2d Page 3

Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

F.3d 69, 72 (2d Cir.1995)).

*BREACH OF CONTRACT*

In the first two causes of action for breach of contract, plaintiff alleges that the continuing promises made on behalf of DuPont gave rise to an enforceable contract between the parties, and that " DuPont has failed and neglected to perform by the terms of its agreement in that it failed to provide DDCLAB with a revolving line of credit."[FN1] (Compl.¶¶ 21, 28)

FN1. In the first cause of action, DDCLAB claims that it "entered into Written Agreements with DuPont in consideration for DuPont's promises that it would provide a revolving line of credit to DDCLAB."(Compl.¶ 19). In the second cause of action, DDCLAB alleges that it " entered into Written Agreements with DuPont in consideration for DuPont's promises that it would provide a revolving line of credit to DDCLAB once *'thedeal wasdone."* ' (Compl.¶ 26) (emphasis added).

DuPont argues that DDCLAB's conclusory assertion that it sold nineteen percent share of its equity to DuPont for one million dollars in consideration of DuPont's oral promises to set up a revolving line of credit fails for the following two reasons: (1) the existence of the comprehensive Written Agreements between the parties; and (2) DDCLAB's unequivocal declaration, through the Investment Agreement's merger clause, that the Written Agreements alone define the rights and obligations of the parties with respect to DuPont's investment in DDCLAB.

Plaintiff argues that its complaint is not based on a claim that, in consideration of defendant's oral promises to set up a revolving line of credit for DDCLAB, DDCLAB sold its equity shares to DuPont for one million dollars. Rather, DDCLAB contends that the complaint alleges that DDCLAB only entered into the Written Agreements because of DuPont's separate oral and written assurances that it would provide DDCLAB with access to a revolving line of credit. DDCLAB maintains that the revolving line of credit was purposefully separate from the Written Agreements, and that the parties agreed not to memorialized that obligation into the Written Agreements because DuPont was not investing the money directly into DDCLAB.

Where the parties' agreement is clearly set forth in a written document, a determination of the parties' contractual obligations and rights are generally to be determined by examination solely of the written agreement. *W.W.W. Assocs., Inc. v. Giancontieri,* 565 N.Y.S.2d 440, 443 (N.Y.1990). Thus, where the written agreement is "clear and complete on its face" and it "lucidly manifests the parties' intent" that the contract supercedes prior oral promises and constitutes the parties' entire agreement, "the parol evidence rule effectively bars any action to enforce the oral agreement."*Doherty v. New York Tel. Co.,* 609 N.Y.S.2d 306, 307 (N.Y.App.Div.1994) (citation omitted). The purpose of having a merger clause in a contract is so that the parole evidence rule may be applied to preclude the introduction of extrinsic evidence to alter, vary, or contradict the terms of the writing. *Jarecki v. Shung Hoo Louie,* 722 N.Y.S.2d 784, 786 (N.Y.2001) (citation omitted). Such a clause establishes the parties' intent that the written agreement is to be considered a fully integrated writing. *Primex Int'l Corp. v. Wal-Mart Stores, Inc.,* 657 N.Y.S.2d 385, 388 (N.Y.1997).

*4 The parole evidence rule is, however, inapplicable with regard to oral agreements that do not vary, modify, or otherwise contradict the parties' written contract. *Gem Corrugated Box Corp. v. Nat'l Kraft Container Corp.,* 427 F.2d 499, 503 (2d Cir.1970). Despite a strong integration clause contained in a written contract, an oral agreement can be treated as a separate and independent contractual obligation. *Lee v. Joseph E. Seagram & Sons, Inc.,* 552 F.2d 447, 451-52 (2d Cir.1977). The primary consideration in determining whether the oral agreement is distinct from the written contract is "whether, in the context of the particular

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 36 of 118

Not Reported in F.Supp.2d Page 4

Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

setting, the oral agreement was one which the parties would ordinarily be expected to embody in the writing."*Id.* at 451.

The complaint alleges that "DDCLAB agreed to a smaller investment than it was originally seeking by DuPont of only one million dollars ($1,000,000) in consideration for DuPont's assurances that it would set up a revolving line of credit for DDCLAB once the Written Agreements were executed."(Compl.¶ 10). The complaint further states "that the revolving line of credit was to be set up with the banks as part of DuPont's investment in DCCLAB ."(Compl.¶ 7). The terms of DuPont's investment in DDCLAB is set forth in the Investment Agreement in great detail. However, nowhere in the Investment Agreement, or in the Commercial Agreement, is there any mention of an obligation by DuPont to establish a revolving line of credit as part of its investment in DDCLAB. Moreover, the Investment Agreement specifically outlined the parties' respective consideration forming the basis for this agreement. The enumerated consideration did not include DuPont's future obligation to provide DDCLAB with a line of credit. The agreement indicates that DDCLAB would grant DuPont an option to purchase additional stock as an inducement to DuPont entering into the agreement. Yet, the agreement is silent as to DuPont's alleged obligation to provide a revolving line of credit which DDCLAB claims served as an inducement for DDCLAB to enter into the agreements for far less than the five million dollars it was seeking.

The complaint alleges that the contractual obligation to provide a line of credit was part of the investment deal with DuPont, and was the consideration for DDCLAB to enter into the Written Agreements. Reasonable businesspeople would therefore anticipate such an obligation to be set forth in the written contract.[FN2]Additionally, DuPont's alleged obligation is so closely connected to the principle transaction, it would clearly be made a part of the written agreement. *See,Mitchill v. Lath,* 160 N.E. 646, 647 (N.Y.1928). Where "the alleged oral agreement is closely related to the subject dealt with in the written agreement, and thus the transactions are necessarily and inextricably bound together," the parole evidence rule will bar the introduction of extrinsic evidence of a claimed oral agreement. *Backer v. Lewit,* 584 N.Y.S.2d 480, 482 & n. 1 (N.Y.App.Div.1992). Since the Investment Agreement contains an integration clause providing that the entire agreement and understanding between the parties are set forth in the agreement, and that the agreement supersedes all prior agreements and understandings, plaintiff is precluded from claiming a separate enforceable contract which induced it to execute the written agreement. Additionally, the Investment Agreement provides that it could not be modified absent written consent by DuPont. Since plaintiff has not alleged that such a written modification occurred, no breach of contract can be premised upon DuPont's alleged oral representations made after the agreement was executed.

FN2. In fact the complaint alleges that during negotiations, the parties considered whether to include the oral promise in the Written Agreements, and purposely decided to exclude it. Thus, as the parties themselves recognized, given the nature of the promise, it would have been otherwise reasonable to anticipate incorporating it into the Written Agreements. However, the parties opted not to proceed in that manner, and plaintiff chose to execute the contracts with full knowledge that such an oral promise was intentionally omitted and not made a part of the agreements.

*5 Even if providing a revolving line of credit was found to be an independent oral promise of DuPont, separate and apart from the Written Agreements, it would still be unenforceable. In order for a contract to be binding, there must be a " manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."*Express Indus. and Terminal Corp. v. New York State Dep't of Transp.,* 693 N.Y.S.2d 857, 860 (N.Y.1999) (citation omitted). Even though contractual terms need not be fixed with absolute certainty, *F & K Supply Inc. v. Willowbrook Dev.,* 732 N.Y.S.2d 734, 737 (N.Y.App.Div.2001), the material terms must be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 37 of 118

Not Reported in F.Supp.2d Page 5

Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

reasonably certain for there to be an enforceable contract. *Cobble Hill Nursing Home v. Henry and Warren Corp.*, 548 N.Y.S.2d 920, 923 (N.Y.1989).

No essential material terms were agreed upon by the parties with regard to the alleged oral contract. There is no indication as to the specific sum of financing DuPont purportedly promised to provide to DDCLAB. DDCLAB does, however, note that the parties knew DDCLAB was seeking a six million dollar investment, and settled for a one million dollar cash investment from DuPont. To the extent that such a claim is asserted to suggest that the parties agreed that DuPont would provide an additional five million dollar revolving line of credit, it fails. In the complaint, DDCLAB alleged it was "looking" for a six million dollar investment, not that it was imperative for the continued growth of its business to obtain that amount. The complaint is barren of any factual allegations to reasonably indicate that the parties agreed to a specific amount of financing.

Nor does the complaint reveal that the parties agreed on an interest rate. Although the complaint initially alleges that DuPont indicated that a low interest rate of 3-4% would be obtained, the complaint also alleges that DuPont "would get the best deal" it could for DDCLAB. Additionally, the complaint states that DuPont represented that it would secure the line of credit from its bank, but that DuPont subsequently indicated that it was working with "banks and other investors" and that " DuPont was working to package DDCLAB to the banks."Furthermore, although the complaint states that the revolving line of credit was to be established after the Written Agreements were signed, the complaint fails to allege any specific date as to when this was to be accomplished. Given the absence of specific material contractual terms, the purported agreement is too vague to be enforceable. *Seeeg.,Arcan Transp. Inc. v. Marine Midland Bank-Western*, 388 N.Y.S.2d 737, 738 (N.Y.App.Div.1976) (finding working capital agreement too inadequate to be enforceable where, *inter alia*, no interest rate was discussed, no repayment schedule was formulated, and no limit was set as to the amount of working capital defendant would be required to advance.).

Additionally, the oral promise is unenforceable as it is not supported by any independent consideration. "[T]wo entirely separate contracts, each based on independent consideration, may be made at the same time and be entirely distinct legally."*Backer*, 584 N.Y.S.2d at 482 n. 1 (citing Willston on Contracts § 637 [3d ed.] ). Although plaintiff contends that the oral contract is distinct from the Written Agreements, plaintiff has not identified any separate consideration supporting the collateral oral agreement. Plaintiff cannot rely on the consideration provided for in the Written Agreements. Plaintiff's assertion that it relied on such a promise in executing the Written Agreements is insufficient to create a separate oral contract.

*6 In light of the foregoing, the causes of action for breach of contract are dismissed.

*PROMISSORY ESTOPPEL*

DDCLAB's third cause of action for promissory estoppel must also be dismissed. "A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance."*Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir.2000). Promissory estoppel is a legal fiction which is used as consideration for contractual consideration where a party relies, to its detriment, on the promises of another without having entered into an enforceable contract. *See,Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F.Supp. 976, 993 (S.D.N.Y.1989). It is a narrow doctrine which generally only applies where there is no written contract, or where the parties' written contract is unenforceable for some reason. *See, Phoenix Racing, Ltd. v. Lebanon Valley Auto Racing Corp.*, 53 F.Supp.2d 199, 219 (N.D.N.Y.1999). When justice dictates, the doctrine of promissory estoppel may be invoked to avoid plaintiff from suffering an unconscionable injury. *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir.1995). Nevertheless, "applying

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 38 of 118

Not Reported in F.Supp.2d Page 6

Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

promissory estoppel to create contractual obligations where a comprehensive contract exists would contravene the fundamental rules that extrinsic evidence cannot be used to vary the unambiguous terms of a contract, ... and that obligations inconsistent with the terms of a contract cannot be implied."*See,Hartford,* 723 F.Supp. at 993 (citations omitted).

As previously discussed, no clear and unambiguous promise can be gleaned from a reading of the complaint. The complaint also fails to demonstrate DDCLAB's reasonable reliance on DuPont's alleged promises. "In assessing the reasonableness of a plaintiff's alleged reliance, [the Court is] to consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Capital Inv. Mgmt., LLC. v. Stonepath Group, Inc.,* 343 F.3d 189, 195 (2d Cir.2003) (citation omitted). Since the parties' Investment Agreement specified their rights and obligations with regard to the investment, it would have been unreasonable for DDCLAB to rely on DuPont's alleged oral promises. Those promises were regarding the same investment, and were deliberately withheld, and yet altered, the terms specified in the written agreement. *See,Four Finger Art Factory, Inc. v. Dinicola,* 2000 WL 145466, *8 (S.D.N.Y. Feb. 9, 2000); *Thayer v. Dial Indus. Sales, Inc.,* 85 F.Supp.2d 263, 272 (S.D.N.Y.2000) (quoting *M.H. Segan L.P. v. Hasbro Inc.,* 924 F.Supp. 512, 527 (S .D.N.Y.1996)).

Given the unambiguous integration clause in the parties' Investment Agreement, there existed no basis for DDCLAB's justifiable reliance on the alleged oral promises made prior the execution of that agreement. *See,Phoenix Racing,* 53 F.Supp. at 220;*Gebbia v. Toronto-Dominion Bank,* 762 N.Y.S.2d 38, 38-39 (N.Y.App.Div.2003). Nor could DDCLAB justifiably rely on DuPont's alleged oral promises made after the Investment Agreement was executed, given the absence of the requisite written consent by DuPont. The parties are established businesses represented by experienced and sophisticated businesspeople. The parties engaged in nine months of negotiations which ultimately culminated in two comprehensive Written Agreements. Any oral assurances by DuPont's representatives were not incorporated in the Written Agreements, and are not consistent with the terms of those Written Agreements. Any reliance by DDCLAB upon the alleged oral promises is simply unreasonable. Accordingly, the promissory estoppel claim is dismissed.

*FRAUD*

*7 In the fraud claim, DDCLAB alleges that DuPont knowingly, intentionally and/or recklessly promised a revolving line of credit to DDCLAB with the undisclosed intention not to perform both before and after the Written Agreements were executed.

To assert a claim for fraud under New York law, plaintiff must allege the following four elements: (1) defendant made a material misrepresentation; (2) defendant did so with intent of defrauding plaintiff; (3) plaintiff relied upon the representation; and (4) plaintiff suffered damages as a result of its reliance. *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995) (citation omitted). If the fraud claim is premised on the same facts as plaintiff's breach of contract cause of action, with the additional allegation that defendant never intended to perform under the contract, a fraud claim may not be maintained. *See,Astroworks, Inc. v. Astroexhibit,* 257 F.Supp.2d 609, 616 (S.D.N.Y.2003) (quoting, *PI, Inc. v. Quality Prods., Inc.,* 907 F.Supp. 752, 761 (S.D.N.Y.1995)); *Int'l Cabeltel Inc. v. Le Groupe Vedeotron Ltee,* 978 F.Supp. 483, 486 (S.D.N.Y.1997); *New York Univ. v. Cont'l Ins. Co .,* 639 N.Y.S.2d 283, 289 (N.Y.1995) (citations omitted). A fraud claim will nevertheless lie, notwithstanding the parties' contractual relationship, where plaintiff can either " (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the representation and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 39 of 118

Not Reported in F.Supp.2d Page 7

Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

unrecoverable as contract damages." *Bridgestone/Firestone Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir.1996) (citations and internal parenthetical omitted).

DDCLAB does not allege that DuPont owed any legal duty to DDCLAB separate and apart from its alleged contractual duty to provide a revolving line of credit in connection with DuPont's investment. The fraudulent misrepresentation at issue, *i.e.*, DuPont's assurances to set up the line of credit, is not collateral or extraneous to the alleged oral contract, but rather constitutes the heart of the alleged agreement. Moreover, DDCLAB is seeking $11,000,000 in compensatory and reliance damages, which is the exact amount of damages it is seeking in both of its breach of contract causes of action. The complaint fails to indicate that DDCLAB suffered any special damages as a result of alleged fraud in connection with the oral representations. Since the fraud claim is duplicitous of the breach of contract claims, it cannot survive a motion to dismiss.

*NEGLIGENT MISREPRESENTATION AND BREACH OF FIDUCIARY DUTY CLAIMS*

To state a claim for negligent misrepresentation under New York law, plaintiff must allege the following five elements: "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it: and (5) the plaintiff reasonably relied on it to his or her detriment."*Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 20 (2d Cir.2000)."A ' special relationship' requires a closer degree of trust than an ordinary business relationship."*Busino v. Meachem*, 704 N.Y.S.2d 690, 693 (N.Y.App.Div.2000); *seealso,United Safety of Am., Inc. v. Consol. Edison Co. of New York, Inc.*, 623 N.Y.S.2d 591, 593 (N.Y.App.Div.1995).

*8 To assert a cause of action for breach of fiduciary duty, plaintiff must plead the following three elements: (1) the existence of a fiduciary duty between the parties; (2) the breach of that duty by defendant; and (3) damages suffered by plaintiff as a result of defendant's breach. *See,Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 2002 WL 392291, *4 (S.D.N.Y. Mar. 13, 2002) (citing *Cramer v. Devon Group, Inc.*, 774 F.Supp. 176, 184 (S.D.N.Y.1991)). "Under New York law a fiduciary relationship arises when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another."*Reuben H. Connelly Corp. v. Mark I Mktg. Corp.*, 893 F .Supp. 285, 289 (S.D.N.Y.1995) (citation omitted). A conventional business relationship alone does not give rise to a fiduciary relationship.*Oursler v. Women's Interart Ctr., Inc.*, 566 N.Y.S.2d 295, 297 (N.Y.App.Div.1991); *Feigen v. Advance Capital Mgmt. Corp.*, 541 N.Y.S.2d 797, 799 (N.Y.App.Div.1989). In the context of a commercial contract, a fiduciary duty may nevertheless exists where the parties specifically agree to it or if " 'one party's superior position or superior access to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party." ' *See,Ross v.. FSG PrivatAir Inc.*, 2004 WL 1837366, *5 (S.D.N.Y. Aug. 17, 2004) (quoting *Calvin Klein Trademark Trust v. Wachner*, 123 F.Supp.2d 731, 734-34 (S.D.N.Y.2000). It is incumbent upon a plaintiff to plead some factors in the complaint from which it can be concluded that the parties had a fiduciary relationship. *Ross*, 2004 WL 1837366, *6 (quoting *Boley v. Pineloch Assocs., Ltd.*, 700 F.Supp. 673, 681 (S.D.N.Y.1988) ).

The complaint is bereft of any allegations regarding a prior or existing relationship between the parties which might have given rise to a special relationship of trust and confidence. Rather, the parties' relationship was that of sophisticated businesspeople engaged in an arms-length commercial transaction. Moreover, the complaint fails to reveal that DuPont possessed any special expertise or knowledge, or that DuPont was the only party with access to vital information. The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 40 of 118

Not Reported in F.Supp.2d

Page 8

Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

complaint merely indicates that the parties stood on equal footing throughout their negotiations, the execution of the Written Agreements, and their subsequent communications. Notwithstanding DDCLAB's contention to the contrary, a special or fiduciary duty is not imposed upon DuPont as a result of it becoming a minority shareholder in DDCLAB by virtue of the Investment Agreement. *See,Guandong Enter. (N. Am.) Fur Holdings Ltd. v. Hennessy*, 2002 WL 1000953, *21 (S.D.N.Y. May 15, 2002) (finding that no fiduciary relationship exists between two equal shareholders). Since DuPont did not owe any special or fiduciary duty to DDCLAB, outside of its contractual obligations set forth in the Written Agreements, the causes of action for negligent misrepresentation and breach of fiduciary duty must be dismissed.

*CONCLUSION*

*9 In light of the foregoing, defendant's motion to dismiss the complaint is granted, and the case is closed.

S.D.N.Y.,2005.
DDCLAB Ltd. v. E.I. DuPont De Nemours and Co.
Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

# TAB 6

C

In re HHG Corp.
Bkrtcy.S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States Bankruptcy Court,S.D. New York.
In re HHG CORP. a/k/a Extreme Championship Wrestling, Debtor.
**No. 01-B-11982 (ASH).**

May 2, 2006.

Joseph Capobianco, Reisman Peirez Reisman LLP, Garden City, NY, Gary B. Sachs, Sachs Kamhi & Kushner, P.C., Carle Place, NY, for Debtor.

*FINDINGS OF FACT*

HARDIN, Bankruptcy J.

***1** 1. On April 5, 2001, HHG Corp. (the " Debtor") filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code.

2. On June 20, 2001, the Debtor's case was converted to a case under chapter 7 of the Bankruptcy Code.

3. On June 22, 2001, Barbara Balaber-Strauss (the "Trustee") was appointed to serve as the chapter 7 trustee for the Debtor's estate.

4. On or about January 28, 2003, the Trustee entered into an Asset Purchase Agreement (the " APA") with WWE, pursuant to which WWE agreed to purchase, and the Trustee agreed to sell, the Assets (as that term is defined in the Asset Purchase Agreement).[FN1]

FN1. Order Pursuant to 11 U.S.C. §§ 105 and 363 Approving Sale of Assets to World Wrestling Entertainment, Inc. dated June 17, 2003 (Docket No. 102) (the "Sale Order").

5. The APA defined the term "Assets" to include, without limitation, "[a]ny and all intellectual property owned by the Estate or used by the Debtor in connection with the Debtor's professional wrestling business including without limitation, the name 'Extreme Championship Wrestling', 'ECW' and variants thereof [and] ... the entire ECW library of footage...."[FN2]

FN2.*See*APA. § 1(a)(i).

6. On March 14, 2003, a hearing was held with respect to the Trustee's proposed sale of assets to WWE.

7. At the conclusion of that hearing, the Court determined, among other things, that WWE's offer was the highest and best offer received for the Debtor's assets, and that consummation of the APA was in the best interests of the Debtor and its estate.

8. The Court thus directed counsel for WWE to settle an order on notice to all parties in interest, approving the APA, and authorizing the Trustee to consummate the transactions contemplated thereby.

9. On March 19, 2003, WWE filed with the Court, and served on all parties in interest, including Gordon, a Notice of Settlement of Order Approving Sale of Assets to World Wrestling Entertainment, Inc. and Granting Other Relief (Docket No. 85) (the "Notice of Settlement"), which included a proposed form of order identical in all material respects to the Sale Order.

10. The Proposed Order attached to the Notice of Settlement expressly provided, among other things, that "[t]he Assets include, without limitation, copyright ownership of the entire ECW library of footage and no party, including, without limitation, Tod Gordon or any affiliate, has any Claim against

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the ECW library."

11. Movants admit that they received the Notice of Settlement, and had actual knowledge of the proposed form of the Sale Order, including the provisions: (i) defining the assets conveyed to WWE to include "copyright ownership of the entire ECW library of footage," and (ii) declaring that "no party, including, without limitation, Todd Gordon or any affiliate, has any Claim against the ECW library."

12. Moreover, Movants admit that they made a tactical decision not to object, and "knowingly waived various ownership interests" in connection with the entry of the Sale Order.[FN3]

FN3. Memorandum of Law in Response to Objection of World Wrestling Entertainment, Inc., to the Motion of Eastern Championship Wrestling and Tod A. Gordon to Enforce and Interpret Order dated 6/17/2003 pursuant to 11 U.S.C. Sections 105 and 603 Approving Sale of Assets to World Wrestling Entertainment, Inc. (Docket No. 154) (the "Response Brief "), p. 6, fn. 4.

13. On June 17, 2003, the Court entered the Sale Order, which approved the APA, and authorized the Trustee to, among other things, "take all steps necessary or appropriate to carry out the terms and intent of the Asset Purchase Agreement, including, without limitation, the sale and transfer of the Assets to WWE."Sale Order, ¶ 2-3.

***2** 14. Neither the Movants, nor any other party in interest, appealed the entry of the Sale Order, or sought a stay of its implementation.

15. Following the entry of the Sale Order, Movants had actual knowledge that WWE was making active commercial use of the ECW library purchased from the Debtor.[FN4]

FN4.*See* Motion, ¶ 15, p. 5 ("Upon information and belief, WWE has made millions as a result of the Infringing Uses.... ").

16. Nevertheless, Movants waited until October 11, 2005, more than two years after entry of the Sale Order, to file their Motion, and thereby assert an interest in the ECW library of footage notwithstanding the express terms of the Sale Order.

17. For the reasons that follow, the relief requested by the Motion must be denied in its entirety, and with prejudice.

*CONCLUSIONS OF LAW*

18. An order approving a sale under section 363(b) of the Bankruptcy Code is a final order for *res judicata* purposes. *In re Clinton Street Food Corp.*, 254 B.R. 523, 530 (Bankr.S.D.N.Y.2000).

19. Moreover, because a section 363(b) sale of assets is an *in rem* proceeding, a bankruptcy sale order is "good against the world, not just the parties to a judgment or persons with notice of the proceeding."*Gekas v. Pipin (In re Met-L-Wood Corp.)*, 861 F.2d 1012, 1016 (7th Cir.1988).

20. As a matter of public policy, sale orders entered under section 363(b) of the Bankruptcy Code are accorded a heightened degree of finality in order to prevent precisely the sort of chaos that Movants seek to create-namely, "the chance the purchasers will be dragged into endless rounds of litigation to determine who has what rights in the [purchased] property."*In re Sax*, 796 F.2d 994, 998 (7th Cir.1986); *accordIn re Clinton Street Food Corp.*, 254 B.R. 523, 530-31 (Bankr.S.D.N.Y.2000) (noting "the important public policy favoring the finality of orders transferring ownership of bankruptcy estate assets.").

21. The express language of the Sale Order provides that the "ECW library of footage" was among the assets conveyed to WWE by the Trustee, and that that "no party, including, without limitation, Tod Gordon or any affiliate, has any

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Claim against the ECW library."Sale Order, ¶ 5.

22. It is undisputed Movants had actual notice of the terms of the Sale Order prior to its entry. As such, "it was incumbent upon [them] to continue to continue to scrutinize the terms of the sale as memorialized in the Sale Order."*In re Kenilworth Systems Corp.* ., 204 B.R. 665, 669 (E.D.N.Y.1997).

23. Nevertheless, it is undisputed that the Movants did not object to entry of the Sale Order, nor did they seek a stay of its implementation or file an appeal.

24. Instead, they made a tactical decision not to object to entry of the Sale Order, and to "knowingly waive various ownership interests" in connection with its entry.[FN5]

FN5. Response Brief, p. 6, fn. 4.

25. Having knowingly waived their opportunity to object to the entry of the Sale Order, the Movants are barred by the doctrine of *res judicata* from challenging its provisions, or seeking to assert an interest in the property expressly conveyed to WWE thereunder. *SeeIn re Clinton Street Food Corp.*, 254 B.R. at 530-31;*In re Kenilworth,* 204 B.R. at 669. [FN6]

FN6. The Court notes that Movants have not sought relief based on Fed.R.Civ.P. 60(b). As a practical matter, however, the Court finds that the facts of this case would not support relief under Rule 60(b) in any event since relief from a final judgment is simply not available based on a party's " dissatisfaction in hindsight with choices deliberately made by counsel," or "an attorney's failure to evaluate carefully the legal consequences of a chosen course of action."*Nemaizer v. Baker,* 793 F.2d 58, 62 (2d Cir.1986). Moreover, a Rule 60(b) motion would be time barred under both the one year and "reasonable time" standards incorporated in the Rule.

***3** 26. Movants' contention that *res judicata* does not apply because this Court lacked subject matter jurisdiction to enter the Sale Order to the extent it conveyed assets that did not belong to the Debtor is legally inaccurate, and based on a mischaracterization of what the Sale Order accomplished.

27. As a legal matter, even if the Court had not considered whether Movants had an interest in the ECW library, res judicata would still apply because Movants themselves, who had actual notice of the Sale Order, could have raised that issue as an objection to its entry. *In re Clinton Street,* 254 B.R. at 531 (finding that res judicata applied where "the trustee could have raised these claims to defeat Maui's bid and acquisition of the Penco assets.").

28. Moreover, as a practical matter, rather than authorizing the sale of assets that did not belong to the Debtor's estate, the Sale Order affirmatively determined that certain assets, including the ECW library of footage and related intellectual property rights, belonged to the Debtor's estate and could be sold by the Trustee. *See* Sale Order, ¶ 5 ("The Assets include, without limitation, copyright ownership of the entire ECW library of footage.").

29. The Sale Order further determined that no other party, including the Movants, which were identified by name, had any interest in or claim against the assets conveyed to WWE by the Sale Order. *See* Sale Order, ¶ 5 ("[N]o party including, without limitation, Tod Gordon or any affiliate, has any Claim against the ECW library.").

30. These determinations fall well within the bounds of this Court's subject matter jurisdiction, which clearly includes the power to "determine what is and what is not property of the estate," *DiBerto v. The Meadows at Madbury, Inc. (In re DiBerto),* 171 B.R. 461, 475 (Bankr.D.N.H.1994).

31. The Court thus had ample jurisdiction to enter the Sale Order, and if Movants believed themselves to be aggrieved by any of the provisions of the Sale Order, they were obligated to file a timely appeal and to seek a stay of its implementation.[FN7]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN7. In the absence of such a stay, which was neither sought, nor obtained, any appeal the Movants might have taken would have been rendered moot pursuant to 11 U.S.C. § 363(m), even if, as the Movants suggest, the assets conveyed by the Sale Order did not belong to the Debtor. *SeeIn re Sax,* 796 F.2d 994, 998 (7th Cir.1986) ("A stay is necessary to challenge a bankruptcy sale authorized under § 363(b)."); *Gilchrest v. Westcott (Matter of Gilchrest),* 891 F.2d 559, 561 (5th Cir.1990) ( "Gilchrist's failure to obtain a stay is fatal to his position, regardless of whether there was jurisdiction.").

32. Having failed to do so, they are now forever precluded by the doctrine of *res judicata* from relitigating the conclusions reached by the Sale Order. *In re Met-L-Wood Corp.,* 861 F.2d at 1016 ("[A]fter the time for appeal had lapsed, the order could not be attacked in a new lawsuit brought by a party to the sale proceeding ... such a suit would be barred by res judicata.").

33. Even if the Movants' initial failure to object could somehow be excused, their decision to lie in wait for more than two years after the entry of the Sale Order before asserting a claim of right in the ECW library cannot be, and would give rise to equitable estoppel or laches, particularly since they knew that WWE was making active commercial use of the ECW library in reliance on the Sale Order during the period of their silence. *SeeIn re DeArakie,* 199 B.R. 821, 827 (Bankr.S.D.N.Y.1996) (holding that a debtor was equitably estopped from enforcing exemption where he "stated that he was not opposed to the sale, and failed to object to the distribution of the proceeds made by the trustee."); *Canino v. Bleau (In re Canino),* 185 B.R. 584, 595 (9th Cir. B.A.P.1995) (holding that a debtor's failure to object to trustee's distribution of proceeds resulting from the sale of exempt property equitably estopped her from complaining, two years after the fact, that she should have received a greater share).

***4** 34. Movants allowed WWE to act in justifiable reliance on the provisions of the Sale Order and the Movants' "tacit approval" of the same for more than two years, and it would be profoundly inequitable to allow the Movants to raise a new claim of ownership to the ECW library or any of the other assets conveyed by the Sale Order at this late date.

35. Accordingly, the Motion must be denied.

A separate order consistent with these findings shall be entered forthwith.

Bkrtcy.S.D.N.Y.,2006.
In re HHG Corp.
Slip Copy, 2006 WL 1288591 (Bkrtcy.S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 7

Page 47 of 118

Westlaw.

Not Reported in B.R. Page 1

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

In re Temtechco, Inc.
Bkrtcy.D.Del.,1998.
Only the Westlaw citation is currently available.

United States Bankruptcy Court, D. Delaware.
In re: TEMTECHCO, INC. f/k/a Tempo Technology Corporation a/f/k/a Suprahards Manufacturing Corporation and Suprahards USA Sales Corporation Debtor(s)
Official Committee of Unsecured Creditors on its own behalf and on behalf and on behalf of Temtechco, Inc. f/k/a/ Tempo Technology Corporation a/f/k/a Suprahards Manufacturing Corporation and Suprahards USA Sales Corporation Plaintiff(s)
v.
CIBC WOOD GUNDY VENTURES, INC., CIBC Wood Gundy Capital Corp., Placer Dome, Inc., Placer International Finance, Inc., Sefico Holdings B.V., Tetra Leval Holdings & Finance S.A., William M. Hayes, Clifford L. Michel, Ian Austin, Quintin Jackson, Lars Hallden and John Hamann Defendant(s)
**No. 95-00596, 97-00077.**

Dec. 18, 1998.

Cory E. Friedman, David B. Stratton, David M. Fournier for Plaintiffs
Allen M. Terrell, Jr., Thomas L. Ambro, Jesse A. Finkelstein, Daniel J. DeFranceschi, Catherine G. Wagner for Defendants Placer Dome, Inc., Placer International Finance, Inc., William M. Hayes, Clifford L. Michel, and Ian Austin
Francis A. Monaco, Jr., Joseph J. Bodnar, and Richard I. Janvey for Defendant John Hamann
David Posner, Eric A. Rosen for Defendants Sefico Holdings B.V., Tetra Leval Holdings & Finance S.A., Quintin Jackson and the Estate of Lars Hallden
Teresa K.D. Currier, Michael P. Richman, Steven Wolowitz for Defendants CIBC Wood Gundy Ventures, Inc., and CIBC Wood Gundy Capital Corp.
Laura Davis Jones, John H. Drucker, and Laurence May for Debtor

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 48 of 118

Not Reported in B.R.

Page 2

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

TABLE OF CONTENTS

I. Introduction
II. History
III. U.S. Bankruptcy Court's Sale Hearing of June 13, 1995
IV. Appeal to the District Court
V. Appeal to the Court of Appeals for the Third Circuit
VI. Hearing on the Emergency Motion of the Official Committee of Unsecured Creditors for Leave to Assert Causes of Action on Behalf of Creditors and Debtor's Estate
VII. Issues in the Pending Complaint Related to:
A. The Sale Order
1. The Good Faith Purchaser Requirement
2. Lock-up Agreements and Bid Chilling
3. Employment of Mr. Hamann by CIBC After the Sale Claim

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 49 of 118

Not Reported in B.R.

Page 3

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

4. Valuation: Whether Sale of Assets was "For Value"
5. Liquidation Value
B. Accounts Receivable
C. Fair Value
D. Market Value v. Liquidation Value
E. Consideration
F. The Need for a Stay Pending Appeal
G. Rule 60(b): Fraud/Fraud on the Court

VIII. Motions to Dismiss
A. Fraud and "New" Evidence
B. Res Judicata and/or Collateral Estoppel
C. The Committee's Right to be Heard
D. Failure of Purchaser to Fulfill Payment Obligations

IX. Summary

MEMORANDUM OPINION [FN1]

FN1. This Memorandum Opinion constitutes our findings of fact and conclusions of law. An initial challenge to the court's jurisdiction is moot inasmuch as it was based on the fact that the sale order was on appeal to the court of appeals at the time the Complaint was filed. The court of appeals has since rendered its decision affirming the district court which affirmed the bankruptcy court.FITZGERALD, Bankruptcy J.

I. INTRODUCTION

*1 Before the court are requests to dismiss the Complaint filed by all Defendants, eight of which filed motions to dismiss and four of which filed answers. Defendants Hayes, Michel, Austin, Placer Dome, Placer International, CIBC Wood Gundy, CIBC Capital Corp., and Hamann filed motions to dismiss. Hamann also filed an answer to the Complaint as did Sefico Holdings, Tetra Laval,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 50 of 118

Not Reported in B.R.

Page 4

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

Jackson, and Hallden's estate.[FN2] The answers also request dismissal. The Complaint was filed as a result of the May 16, 1997, approval by the bankruptcy court of the official unsecured creditors' committee's emergency motion for leave to assert causes of action on behalf of creditors and Debtor's estate. For purposes of a motion to dismiss, the court must accept as true all allegations in the Complaint and draw all reasonable inferences in favor of the Committee as the nonmoving party. *Blaw Knox Retirement Income Plan v. White Consolidated Industries, Inc.*, 998 F.2d 1185, 1188 (3d Cir.1993), *cert. denied, White Consol. Industries, Inc. v. Pension Ben. Guar. Corp.*, 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994); *Ferry v. Mutual Life Ins. Co. of N.Y.*, 868 F.Supp. 764 (W.D.Pa.1994). If the Committee failed to state a claim upon which relief may be granted, then the motions to dismiss will be granted pursuant to Fed.R.Civ.P. 12(b)(6) made applicable to bankruptcy cases by Fed.R.Bankr.P. 7012(b).[FN3]

FN2. Lars Hallden, and not his estate, is named in the Complaint. No one has objected.

FN3. Defendants' motions to dismiss are based on Fed.R.Bankr.P. 7012(b) and 7009(b) and Fed.R.Civ.P. 12(b)(1), (6), and (7).

II. HISTORY

Tempo Technology Corporation ("Debtor"), a Delaware corporation, was incorporated in 1986 and engaged in the business of manufacturing industrial diamonds and other products for industrial drilling, saw blades, cutting tools, drilling bits, and other related products. Research and development on proprietary processes related to those products were also conducted.

Debtor's Board of Directors ("the Board") was composed of seven persons. Tempo CL Corp, which originated Debtor's technology, nominated two members. Sefico Holdings B.V. ("Sefico"), and its affiliate, Tetra Leval Holdings & Finance S.A. ("Tetra"), provided primary equity financing and nominated two members collectively. Placer Dome also provided primary equity financing and nominated two members. The seventh seat was nominated by certain other shareholders.

In the fall of 1994, Debtor sought additional financing in order to commercialize its products. CIBC Wood Gundy Ventures, Inc. ("CIBC") [FN4] notified the Board on August 12, 1994, that it was interested in investing in Debtor. Debtor subsequently granted CIBC full access to all financial and operations information of Debtor pursuant to a confidentiality agreement dated September 13, 1994.

FN4. In their brief, the CIBC defendants note that the Complaint does not make specific allegations against (CIBC) Capital Corp. or (CIBC) Wood Gundy Ventures. Further, they point out that CIBC, not Capital Corp., was a party to the Asset Purchase Agreement and the commitment letter. The CIBC defendants seek to have the Complaint dismissed against at least Capital Corp. Memorandum of Law of Defendants CIBC Wood Gundy Ventures, Inc., and CIBC Wood Gundy Capital Corp., etc., in Support of their Motion to Dismiss the Complaint Under Bankruptcy Rules 7012(b) and 7009(b) at 7, n.10. At the hearing on the motion for leave to assert the causes of action which are the subject of this Complaint and the Motions to Dismiss, references were to CIBC Wood Gundy Ventures, Inc. "and any affiliates". Transcript of Hearing on Emergency Motion of the Official Committee of Unsecured Creditors for Leave to Assert Causes of Action on behalf of creditors and the Debtor's Estate, May 16, 1997, at 29. Inasmuch as the motions to dismiss are granted, we need not reach the issue of whether Capital Corp. was properly named as a defendant.

CIBC conducted extensive due diligence pursuant to the agreement and presented an initial

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 51 of 118

Not Reported in B.R. Page 5

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

draft sheet calculating an investment of approximately $18 million, primarily in subordinated debentures. CIBC was to invest $6 million of its own money. CIBC notified Debtor, in a letter dated October 27, 1994, that it had hired a firm to conduct further due diligence regarding the proposed $18 million investment. The draft proposal required new management that was satisfactory to CIBC. Debtor therefore engaged an executive search firm to find new management. John Hamann was selected and appointed President of Debtor by the Board on November 9, 1994.

*2 Debtor was in need of cash prior to the closing of CIBC financing in order to continue operations. In a letter dated October 24, 1994, Placer Dome proposed to provide $2 million of secured financing as a bridge loan and the proposal was accepted by the Board.

By December of 1994, Debtor was in a perilous cash situation and several loan payments were not made. Without the CIBC investment, Debtor's forecast figures for 1995 predicted a net loss of $276,000. With the proposed $18 million investment by CIBC, Debtor's estimated net income forecasts were $2,747,000 in 1996, $9,693,000 in 1997, and $25,466,000 in 1998. Debtor's ability to be a profitable going concern was dependent upon improved production yields, increased sales volume, and long-term financing. The $18 million was essential to Debtor's continuing operations.

On January 10, 1995, CIBC submitted a revised draft sheet which decreased the investment proposal to $14 million in convertible loans. This proposal also required the Board to include Mr. Hamann as a member, and the Board accepted the terms of this draft sheet two days later. On January 31, 1995, Debtor entered into a Commitment Letter with CIBC, that contemplated a closing by March 31, 1995. The letter included a clause which stated:

As long as this letter agreement is in effect, neither the Company nor any of its shareholders, directors, officers, employees, agents or representatives (collectively, the "Company Parties" ) will, without CIBC WGV's prior written approval, (a) solicit, initiate, encourage or discuss any proposal or offer from any person other than [CIBC] relating to an equity financing of the Company (other than communications necessary to advise persons of the Company's lack of interest in any such proposal), or (b) furnish any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any person to do or seek the foregoing.

Adv. No. 97-00077, Affidavit of Clifford L. Michel, Docket No. 18, at Exhibit E.

The Complaint alleges that on February 3, 1995, the Chairman of the Board, Clifford L. Michel, issued a memo to the shareholders which stated that "[t]he ability of [Debtor] to operate after March 31, 1995, is dependent upon its ability to obtain additional financing from CIBC or other sources and there can be no assurance that the proposed financing arrangement currently being negotiated with CIBC will be consummated." Complaint at ¶ 34. Notwithstanding this representation to the shareholders, the Complaint further alleges that, at the Board of Directors' February 3, 1995, meeting, Michel, as Chairman and Secretary of the meeting, recorded that Mr. Hamann had been advised by CIBC that CIBC was confident that financing would be completed on a timely basis. Complaint at ¶ 35.

On February 15, 1995, Mr. Hamann reported to CIBC and the Board that the revised income statement showed an increase in the forecasted loss from $276,000 to $1.4 million. Mr. Hamann testified at the sale hearing that, in March, the Board realized that the operational objectives probably would not be met and so Debtor sought financing. *June 13, 1995, Sale Hearing Transcript* at 43-44. Debtor's March 7, 1995, cash flow report depicted Debtor running out of cash by the end of April 1995 if no investment was received.

*3 CIBC's investment closing did not occur at the end of March. On April 6, 1995, CIBC proposed to increase the investment to $16 million. Mr. Hamann continued to warn the Board that cash would not hold out beyond the end of the month. CIBC was asking for additional information and Mr. Hamann notified CIBC at the end of April 1995 that forecasted losses were increased from $100,000

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 52 of 118

Not Reported in B.R.

Page 6

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

to $3 million due to contamination problems, revised budgeting and a customer's manufacturing problems.

On May 1, 1995, CIBC proposed to purchase Debtor's assets in return for a $5 million first priority convertible loan. The Board did not accept this proposal. At its May 4, 1995, Board meeting, the Board recognized that cash was not sufficient to meet obligations beginning the week of May 15 and that further discussions with CIBC as to its investment proposal would be unproductive. Finally, on May 12, 1995, CIBC made a new purchase proposal which involved a chapter 11 bankruptcy filing.

On May 23, 1995, Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code. Debtor also filed a motion to sell substantially all of its assets to Tempo Acquisition Corporation ("TAC" ) under § 363 of the Bankruptcy Code pursuant to the Asset Purchase Agreement. TAC, which was incorporated on May 18, 1995, is owned by CIBC and Clairvest, Inc. The bankruptcy court scheduled an auction of the assets and a hearing to consider the sale motion. Debtor's sale motion required potential bidders to submit their bids and a $1.4 million deposit. The Order approved by Judge Balick also required that on or before May 24, 1995, notice be given via express mail or other next day notice to Debtor's twenty largest unsecured creditors, secured creditors, the United States Trustee, all entities who filed notices of appearance and requests for notices, and all parties to executory contracts or unexpired leases. Additionally, all other known creditors and Debtor's shareholders were to be served on or before May 25, 1995, by regular first class mail. A notice of the sale was also required to be published in *The Wall Street Journal* not less than ten days prior to the sale. Order of May 23, 1995, Docket No. 13A, at 8.

An auction was held the morning of June 13, 1995, and continued on June 14, 1995.[FN5] No bidders appeared at the auction. Diamond Abrasive Corporation ("DAC"), an unsecured creditor who opposed the sale, appeared at the auction but did not bid. DAC's opposition to the sale was founded upon the speed with which the sale came before the court. DAC contended that the sale should be stayed pending the creation of an official unsecured creditors' committee ("committee"). DAC alleged that the sale requirements precluded alternative bidders because the $1.4 million cash deposit was onerous, the assets were being sold "for a song," and the auction was to be held prior to a determination that the sale was better than general liquidation or any alternative proposal. *Objection of Diamond Abrasives Corporation to the Proposed Asset Purchase Agreement,* Bankr.No. 95-00596, Docket No. 35, at 3-4 (*see* Exhibit 1 to Appendix to the Memorandum of law in Support of Defendants Placer Dome, Inc. and Placer International Finance, Inc.'s Motion to Dismiss, Adv. 97-00077, Docket No. 16).

FN5. All references to the sale hearing will be to June 13, 1995.

III. U.S. BANKRUPTCY COURT'S SALE HEARING OF JUNE 13, 1995

*4 The hearing on the objections to the sale was held the afternoon of June 13, 1995.[FN6] In confirming the sale to TAC, Judge Balick applied the standards of *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143 (3rd Cir.1986), specifically the requirements of adequate notice, a fair and reasonable price, and good faith negotiations. *June 13, 1995, Sale Hearing Transcript* at 167-68.

FN6. Four unsecured creditors filed objections to the sale: DAC, Fansteel, Inc., Sandvik Hard Metals Company, and Carbidie Corporation. At the sale hearing, only DAC opposed the sale, for the objections of the other three were settled by that time. No other creditors opposed the sale, although all had what the court found to be "good, sufficient, accurate and reasonable notice of the Motion and the relief stated therein, of the hearing scheduled thereon of the sale, and of the opportunity to hold an auction prior to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 53 of 118

Not Reported in B.R. Page 7

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

sale."*Order of June 14, 1995, Approving Asset Purchase Agreement and Granting Related Relief* at 5.

The first issue addressed was whether there was adequate notice. On the bankruptcy filing date (three weeks before the sale), copies of the sale motion were sent to 31 of Debtor's largest unsecured creditors via express mail.*Id.* at 168.In addition, notices were sent to approximately 900 entities and published in the national edition of the *Wall Street Journal. Id.* Notice was given as to (1) the relief sought, including the sale of Debtor's assets and assumption of executory contracts and unexpired leases; (2) the time, date, and location for the auction; (3) the deadline for filing objections to the sale; and (4) the opportunity to obtain copies of the motion, proposed final order, and terms and conditions of the sale. *Id.* at 12.

The record established that approximately fifteen or sixteen entities requested information from Debtor, and that information was promptly provided.*Id.* at 13.Four entities sent representatives to view Debtor's operations and obtain information. *Id.* at 13, 168.Two of these entities were major competitors of Debtor, one was a private investor, and one was a venture capitalist. *Id.* at 168.Twenty days passed between notice and the auction.*Id.* Counsel for Debtor represented at the sale hearing that Board members actively solicited higher and better offers and contacted entities who might have had an interest. *Id.* at 14.The court pointed to the inquiries from the four entities and concluded that the notice of sale was adequate. She also took judicial notice of testimony at a prior hearing that Debtor sought investors before filing the chapter 11. *Id.* at 168.

The second requirement of *Abbotts Dairies* examined by the court was whether the price was fair and reasonable. CIBC, an owner of TAC (the purchaser), had initially been interested in investing in Debtor an amount substantially more than that offered for Debtor's assets at the sale. *Id.* at 169.However, the investment proposal of approximately $18 million, reduced to $14 million then increased to $16 million, envisioned an expansion of the business and investment of at least $9 million in additional equipment. *Id.* This investment proposition was abandoned by TAC as Debtor did not meet operational specifications set forth by TAC. *Id.* at 43 (testimony of John Hamann). TAC subsequently offered to purchase Debtor for approximately $3 million in the form of $150,000 in cash, preferred and common stock of TAC, an assumption of liabilities of an estimated value of over $2 million,[FN7] and an equity investment of $1.5 million. *Id.* at 8-9, 169.Expansion of Debtor's operations was no longer intended, and the sale would lead to a "slightly reduced work force and other savings."*Id.* at 169.Judge Balick found that although TAC originally had been interested in investing in Debtor a significantly higher sum than was ultimately paid for Debtor's assets, the sale price was based upon cost cutting and a reduced equity investment. Thus, she concluded that, even though the $3 million sale offer was significantly lower than the previous $14 million investment proposal, it was fair and reasonable.*Id.* at 169-70.

FN7. The postpetition administrative costs were assumed as well as pre-and postpetition claims of Debtor's employees who would continue employment with TAC. These liabilities were estimated to be in excess of a half million dollars. *See June 13, 1995, Sale Hearing Transcript* at 9 (statement of Attorney Drucker), and 55 (testimony of Mr. Hamann). In addition, TAC assumed a $1.5 million debtor-in-possession financing obligation. *Id.* at 55.

*5 The final analysis involved the good faith requirement. Judge Balick noted that negotiations were "spirited with some anger and continued for a period of time."*Id.* at 169.Additionally, TAC is composed of venture capital companies which are not affiliated with Debtor's management nor its board of directors. *Id.* at 169-70.The court found that Mr. Hamann, who was president of Debtor, was interested in staying with the facility's operations, but no employment offer had been forthcoming from TAC prior to the sale completion. *Id.* at 170.The bankruptcy court found that the standard

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 54 of 118

Not Reported in B.R. Page 8

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

set forth in *Abbotts Dairies* had been met and approved the sale of Debtor's assets to TAC. *Id.*

Upon court approval of the sale, DAC orally requested a stay pending appeal.*Id.* at 176.Judge Balick instructed DAC's counsel to "file the appropriate papers" and stated that she would schedule it. *Id.* DAC failed to file that motion, and the transaction closed an hour after the sale hearing concluded.

IV. APPEAL TO THE DISTRICT COURT

The Committee was formed on June 20, 1995, one week after the sale, and joined DAC in appealing the sale order. On appeal to the district court, DAC and the Committee argued that TAC was not a good faith purchaser in the "manner in which [the Debtor] and TAC closed the Asset Sale." *In re Tempo Technology Corp.*, 202 B.R. 363, 367 (D.Del.1996). DAC pointed to the depreciation of Debtor's assets due to CIBC's "dragging its feet" in the investment procedure, the chill of any bidding at the auction (by way of the $1 .4 million deposit requirement), Debtor's alleged refusal to provide information to prospective bidders, and the lockup of assets per the January 31, 1995, agreement. *Id.* at 367, 370.DAC also alleged collusion between TAC and Mr. Hamann as TAC was able to buy for " totally inadequate consideration" and the favorable employment opportunity offered Mr. Hamann with TAC upon the sale closing. *Id.* at 367.

Although the district court held that the appeal was moot, for a written request for a stay pending appeal was not filed, the court noted, in dictum, that the bankruptcy court applied the proper good faith standard and affirmed the holding of the bankruptcy court that Debtor consummated the sale in good faith. *Id.* at 370.The district court held that "there was no evidence of fraud, collusion, or interested dealing between the players."*Id.*

The district court found that although Mr. Hamann was hired as the top executive at TAC, Mr. Hamann had not been promised an employment contract prior to the sale and there was no inducement for him to support the Asset Purchase Agreement. *Id.* at 368.The court noted that the purchase negotiations between Debtor and TAC had been debated at arms length, *id.* at 370, and that " there was no evidence that TAC colluded with Debtor to attempt to take unfair advantage of other prospective bidders."*Id.* Evidence established attempts to solicit bids and Debtor's emergency cash flow need in the Spring of 1995 justified the speedy approval of the sale by the bankruptcy court. *Id.*" The entire bankruptcy record supports the bankruptcy court's finding that TAC was a good faith purchaser."*Id.*

V. APPEAL TO THE COURT OF APPEALS FOR THE THIRD CIRCUIT

***6** The Court of Appeals for the Third Circuit affirmed the district court's dismissal of the appeal as moot. Counsel for DAC had orally requested a stay pending appeal, but never filed a written motion as instructed by the judge.*In re Temtechco,* No. 96-7520, at 6 (3rd Cir. January 22, 1998) (unpublished). The court of appeals held that DAC " could have easily anticipated the bankruptcy court's approval of the sale and prepared accordingly."*Id.* The court was not persuaded by the argument that the sale was not in good faith because of the speed with which Debtor and TAC consummated the sale and the low sale price. *Id.*" 'Lawyers are not strangers to emergency motions" ' and " 'it is not unreasonable to expect practitioners to be prepared to request a stay in short order when a client wishes to appeal from a bankruptcy court's approval of a sale ." ' *Id.* at 6,*quoting In re CGI Industries, Inc.*, 27 F.3d 296, 300 n. 8 (7th Cir.1994).

Although the court of appeals affirmed the district court's dismissal of the appeal as moot, the court addressed the issue of good faith in dictum. DAC and the Committee specifically argued that " TAC paid so little for the assets that it cannot be considered a good faith purchaser."*Id.* at 5. The court looked to the fact findings of the bankruptcy court and determined that "the argument attacking the adequacy of the agreed price fails because it does not controvert the ample evidence that TAC

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 55 of 118

Not Reported in B.R. Page 9

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

acted in good faith."*Id.* at 6. The $3 million value of the cash, preferred and common stock in TAC, the assumption of certain liabilities and an equity investment, the spirited negotiations and the lack of affiliation between TAC and the management and Board of Debtor were evidence of the good faith nature of the sale. *Id.* at 5. Furthermore, the appellate court ruled that the non-existence of the Committee at the time of the sale did not justify the failure to obtain the stay, for all principals of the Committee, including DAC, had notice of the proposed sale. The court of appeals specifically noted that all Committee principals had notice of the proposed sale, and that DAC and the Committee had the same counsel and identical interests. The formation of the Committee after the sale was accorded no weight by the court of appeals and did not justify the failure to obtain a stay. The court of appeals also noted that "DAC clearly evinced a desire to seek a stay ... counsel could have sought the stay purely in its protection of DAC's interests. Therefore, the formation of the Committee after the fact does not justify the failure to obtain (or even seek) a stay."*Id.* at 7.

In *Pittsburgh Food & Beverage, Inc. v. Ranallo,* 112 F.3d 645 (3d Cir.1997), the court noted that failure to obtain a stay pending appeal of a sale renders the appeal moot because the court cannot grant effective relief once the sale is completed. Section 363(m) provides that, unless a stay pending appeal is granted, a reversal or modification on appeal of an order confirming the sale does not affect the validity of the sale.[FN8]In *Pittsburgh Food & Beverage* the motion for a stay pending appeal was denied by the bankruptcy and district courts. The trustee and the purchaser consummated the sale while the appeal was pending.

FN8.*See also In re Egbert Development, LLC,* 219 B.R. 903 (10th Cir.BAP1998) (appeal is moot when stay of an order lifting automatic stay was not sought prior to foreclosure sale). Encouragement of finality of the bankruptcy court's judgments under § 363(b)(1) is promoted by requiring a stay pending appeal. *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 147 (3d Cir.1986).Section 363(m)"places prospective appellants on notice of the need to obtain a stay pending appeal, or face dismissal for mootness ... should the district court affirm the bankruptcy court's finding of good faith." *Id.* at 150.

*7 In the matter before us, DAC seeks to set aside the sale based on "fraud, misrepresentation and other misconduct" of the Defendants. Complaint at ¶ 81. Based on *Pittsburgh Food & Beverage,* the relief sought cannot be achieved. The sale has been consummated and cannot be set aside. Moreover, we are bound by findings of the district court, affirmed on appeal, under the "law of the case " doctrine, inasmuch as that court addressed all the issues raised here with respect to the validity of the sale. *See In re City of Philadelphia Litigation (Africa v. City of Philadelphia),* 158 F.3d 711, 781, *aff'd*158 F.3d 723 (3d Cir.1998).[FN9]

FN9. The law of the case doctrine governs a court's exercise of discretion. Thus, in extraordinary circumstances, a court can reconsider a prior decision. However, we cannot reconsider the decision of the district court or the court of appeals. Further, the extraordinary circumstances required do not exist here. That is, there is no new evidence despite the Committee's assertions, no supervening new law exists, and the earlier decision is not "clearly erroneous" so as to "create manifest injustice." *In re City of Philadelphia Litigation (Africa v. City of Philadelphia),* 158 F.3d at 781. *See also v. Navarro,* 887 F.2d 553, 556 (5th Cir.1989), *rehearing denied*894 F.2d 99 (5th Cir.1990) (court may not consider matters decided by necessary implication absent presentation of substantially different evidence, intervening change in law, or prior decision that is clearly erroneous and would work a manifest injustice).

VI. HEARING ON THE EMERGENCY MOTION

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 56 of 118

Not Reported in B.R.

Page 10

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR LEAVE TO ASSERT CAUSES OF ACTION ON BEHALF OF CREDITORS AND DEBTOR'S ESTATE

The Committee filed a motion on May 14, 1997, in the bankruptcy court seeking authority to assert causes of action on behalf of the creditors and Debtor's estate. A hearing on the Committee's motion was conducted on May 16, 1997. At that hearing, Mr. Friedman, counsel for the Committee, stated that new information had been given to the Committee from Mr. Henry, a former founder and board member of Debtor during an interview with him in New York on May 2, 1997.[FN10] *Transcript of Hearing on Emergency Motion of the Official Committee of Unsecured Creditors for Leave to Assert Causes of Action on behalf of creditors and the Debtor's Estate (hereafter "Emergency Motion for Leave"), May 16, 1997,* at 15, 29. The court authorized the Committee to file the instant adversary action.

> FN10. For about a year after the June 1995 sale hearing, the Committee received documents through Rule 2004 procedures and through interviews of Mr. Henry. Through this process, the Committee came to the conclusion that Debtor's estate had causes of action against CIBC, Mr. Hamann, and others. *May 16, 1997, Transcript* at 16.

The Committee's Complaint alleges, *inter alia,* that CIBC used the exclusive lock-up agreement and intentionally delayed financing until Debtor ran out of cash.[FN11] CIBC and Mr. Hamann were accused of fraud by colluding to falsely represent that Mr. Hamann was working for Debtor when in fact he was furthering the plans of CIBC. Although the Complaint does not cite Rule 60(b) as a basis for this action, at the hearing on the emergency motion for leave to file this adversary Mr. Friedman referred to that portion of Rule 60(b), made applicable to bankruptcy cases by Fed.R.Bankr.P. 9024, which provides that the court may "entertain an independent action to relieve a party from a judgment, order, or proceeding ...." *See Transcript of Emergency Motion for Leave, May 16, 1997,* at 46. Thus he made it clear at the hearing that Rule 60(b) was the foundation of this adversary.

> FN11. DAC seeks to set aside the sale based on various theories. *See infra.* All counts revolve around the allegations that CIBC delayed financing until Debtor ran out of cash, refused to permit Debtor to seek alternate financing while refusing to supply financing, and rejected Debtor's proposals providing for infusions of cash.

As a result of the hearing, Judge Balick found that Debtor's estate could not or would not bring this action and had, in fact, conceded that the action was colorable. *Transcript of Emergency Motion for Leave, May 16, 1997,* at 96. Judge Balick also found that there was potential for a considerable benefit to the estate in the event that the Committee was successful and that there was the possibility of success on more than one cause of action. *Id.* at 97. *See In re STN Enterprises,* 779 F.2d 901, 905 (2nd Cir.1985) (if colorable claim for relief is presented, the court, in determining whether debtor unjustifiably failed to bring suit, must also inquire whether an action asserting the claim is likely to benefit the estate before authorizing committee to bring suit). The court found that if the actions were not brought, there would be little benefit to anyone except those who had earned fees in this case. The order permitted the Committee to "determine the appropriate [action] sounding in breach of contract, lender liability, fraud, breach of fiduciary duty, subordination, and piercing the corporate veil." *Order of May 16, 1997,* Bankr.No. 95-00596, Docket No. 208, at 2. However, Judge Balick specifically noted that she was not deciding the merits of the case. *Transcript of Emergency Motion for Leave Hearing, May 16, 1997,* at 97. The Complaint raises theories of "fraud, misrepresentation and other misconduct" of Defendants. *See* Complaint at ¶ 81 (Ninth Claim). *See also* ¶ 61 (Second Claim). The First and Third Claims for Relief seek damages for "Breach of Contract (Lender Liability)" against the CIBC defendants (First Claim) and Placer Dome and Sefico (Third Claim).[FN12] The Committee alleges

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 57 of 118

Not Reported in B.R. Page 11

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

grounds for piercing the corporate veil (Fifth Claim), for subordination of claims (Sixth Claim), and for recovery of preferential transfers (Seventh and Eighth Claims). It also asserts a claim for breach of fiduciary duty (Fourth Claim) against Hayes, Michel, Austin, Jackson, Hallden, Hamann, Placer Dome, Tetra Laval, and Sefico Holdings.

FN12. The First Claim asserts breach of the covenant of good faith and fair dealing by use of an exclusive lock-up and information gained as a result of a confidentiality agreement to delay completion of financing until Debtor was out of cash. The Third Claim asserts breach of the covenant of good faith and fair dealing by refusing to advance funds " without giving the Debtor any reasonable opportunity to find alternative financing and by publicly announcing their refusal to make additional allowances."Complaint at ¶ 64.

VII. ISSUES IN THE PENDING COMPLAINT RELATED TO:

(A) The Sale Order

*8 As will be seen, the Complaint attempts to revisit issues determined against the plaintiffs in the bankruptcy, district and circuit courts. The Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."11 U.S.C. § 363(b)(1).Section 363(m) guides opposition to final judgment of a sale order:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, *unless such authorization and such sale or lease were stayed pending appeal.*

11 U.S.C. § 363(m) (emphasis added).

The emphasized provision furthers the salutary " 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely." ' *In re Vetter Corp.*, 724 F.2d 52, 55 (7th Cir.1983)*quoting* 14 Collier on Bankruptcy ¶ 11-62.03 (14th ed.1977).*See also In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3rd Cir.1986).

1. The Good Faith Purchaser Requirement

When a bankruptcy court authorizes a sale of assets pursuant to § 363(b)(1), it is required to make a finding with respect to the "good faith" of the purchaser. *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d at 150. Judge Balick stated that " counsel have made innuendo and outright accusations from which the Court could speculate as to the motivations of all interested parties."*June 13, 1995, Sale Hearing Transcript* at 167. However, there was a lack of evidence to support DAC's position and the court was "constrained from speculating," *id.*, finding that TAC was a good faith purchaser. *Id.* at 167-70.Judge Balick found that the standards of *Abbotts Dairies* had been met and approved the sale. *Id.* at 170.Upon review, the district court and the court of appeals affirmed the good faith determination and held that the appeals were moot because no effective relief could be fashioned in light of the absence of a stay pending appeal. The Complaint adds nothing to the previously decided fact that TAC acted in good faith.

2. Lock-Up Agreements and Bid Chilling

The Committee complains of two lock-up agreements between Debtor and CIBC. The first was entered into on January 31, 1995. This provided in part that Debtor could not, without CIBC's prior written approval,

solicit, initiate, encourage or discuss any

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 58 of 118

Not Reported in B.R. Page 12

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

proposal or offer from any person other than CIBC WGV relating to an equity financing ... or ... furnish any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any person to do or seek the foregoing.

*9 Complaint ¶ 33, and Exhibit E to Affidavit of Clifford L. Michel, Adv. No. 97-00077,Docket No. 18.At the June 13, 1995, sale hearing, Mr. Hamann testified that before and after negotiations with CIBC ceased, efforts were made to solicit other investors for acquisition or financing in March of 1995. *June 13, 1995, Sale Hearing Transcript* at 44. Mr. Hamann testified that four or five venture capital firms were approached, as were private investors and the State of New Jersey. *Id.* With respect to the no-shop clause, Mr. Hamann testified on cross-examination with respect to efforts to solicit higher and better offers. *June 13, 1995, Sale Hearing Transcript* at 132-33.[O]ne of the things that was vigorously negotiated was an exclusion for directors of the company to shop. I was prohibited from shopping, but directors were not.

*Id.* at 133.He testified that those entities that expressed interest in Debtor's business were in fact contacted by one of the directors. *Id.*

The second lock-up agreement that the Committee alludes to is in the Asset Purchase Agreement, dated May 22, 1995, which provides that "[s]o long as this Agreement has not been terminated ..., without the prior written consent of the Buyer ... [Debtor] shall not ... solicit, initiate or accept any offer or proposal relating to the sale of all or any part of the Purchased Assets and/or the securities" of Debtor,

and shall not permit ... any ... entity acting on its behalf to negotiate nor enter into any agreement .. . with any ... entity other than the Buyer .... Notwithstanding the foregoing, nothing herein shall preclude (i) [Debtor] from ... (B) taking any action in the Chapter 11 Case seeking to sell the Purchased Assets pursuant to the Auction (as defined in Section 10.2(c) below).

*Asset Purchase Agreement,* Draft 5/22/95 at 39, ¶ 10.1.[FN13]

FN13. Paragraph 53 of Committee's Complaint alleges that the May 22, 1995, Asset Purchase Agreement gave CIBC "another" exclusive "lock-up" and prohibited Debtor, and anyone acting on its behalf, from soliciting or accepting any competing offer. Complaint at ¶ 53. Paragraph 54 of the Complaint alleges that Mr. Hamann "did everything possible to chill the bidding by discouraging any possible competing bid" including " refusing to provide adequate information to potential bidders ... and [refusing to] allow potential bidders to view the assets they sought to purchase".*Id* . at ¶ 54.The Committee also asserts that the requirement that $1.4 million be deposited before a bidder would be allowed to bid at the sale chilled the bidding. Both of these contentions were addressed at the sale hearing, at which Mr. Friedman argued that "the $1.4 million deposit required for bidding ... was predicated on the million dollars' worth of debtor-in-possession financing, where the evidence at trial was that only $500,000 has been advanced.... the only logical inference is that the $1.4 million opening price chilled bidding." *June 13, 1995, Sale Hearing Transcript,* at 152-53. With respect to the $1.4 million overbid, the court said:

DAC contends that the overbid of $1.4 million was a device to intentionally chill bidders, thus the price cannot be fair and reasonable. The financing, which may continue through and is needed to continue operations through June 30 and which is supplied by TAC, does not make the overbid an unreasonable amount.

*Id.* at 170.That is, in order to offer a higher bid, the bidder would have to replace the $1 million financing. *June 13, 1995, Sale Hearing Transcript* at 28, statement of Attorney Drucker. The court also ruled against DAC's allegations that the bidding was deliberately chilled and otherwise interfered with. *See June 13, 1995, Sale Hearing Transcript* at 167-70. The court approved the bidding procedures and found that the sale was in good faith. *Id.* at 167, 170.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 59 of 118

Not Reported in B.R. Page 13

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

Section 10.2 of the Asset Purchase Agreement details the bidding procedures, including a requirement for notice that competing bids would be entertained. The Asset Purchase Agreement also sets forth qualifications for bidding. The Draft Asset Purchase Agreement was filed and was before the court at the time of the sale.[FN14] Thus, all of these issues have been adjudicated previously.

FN14. *See* the description of the sale hearing in text beginning at page 10.

3. Employment of Mr. Hamann by CIBC after the Sale Claim

The Asset Purchase Agreement is fully integrated, as paragraph 12 .6 states that

[t]his Agreement and the documents referred to herein contain the entire agreement between the Parties with respect to the sale of the Purchased Assets and supersede any prior understandings, agreements or representations by or between the Parties, written or oral, which may have related to the subject matter hereof in any way.

*Asset Purchase Agreement*, Draft 5/22/95, ¶ 12.6. Thus, employment negotiations between TAC and Mr. Hamann prior to the Asset Purchase Agreement would not govern over the terms of the Asset Purchase Agreement unless incorporated therein.

***10** Paragraph 55 of the Committee's Complaint states that Mr. Hamann "falsely testified that he had no future expectation of further employment after the sale to CIBC." Complaint ¶ 55. At the sale hearing, Mr. Hamann testified that TAC was in no way obligated to offer employment to Mr. Hamann or other officers or shareholders of Debtor, there were no additional promises, coercion or bribes in connection with the execution of the asset purchase agreement. *June 13, 1995, Sale Hearing Transcript* at 64-65. Mr. Hamann admitted that he hoped that he would be considered for future employment, however. *Id.* at 65.

The motion for approval of the Asset Purchase Agreement specifically states that "Article 5 of the Asset Purchase Agreement provides for a number of conditions to closing including that TAC will have entered into employment or other agreements with ... John R. Hamann, President" as well as other employees. *Motion for Orders*, Bankr.No. 95-00596, Docket No. 13, at 17-18, ¶ 24. TAC also agreed to pay any amounts to Mr. Hamann that had been guaranteed by "Placer" [FN15] to Mr. Hamann as compensation. *Id.* Moreover, the Asset Purchase Agreement states, as one of the conditions of closing, that "[t]he Seller shall have entered into agreements with the employees listed on the *Employees Schedule* attached hereto in form and substance substantially similar to those agreements involving non-competition and confidentiality to which such employees are currently a party and such agreements shall be in full force and effect." *Asset Purchase Agreement* at ¶ 5.1(j). However, the Employees Schedule and nine other schedules specified in the Asset Purchase Agreement are not among documents provided to the undersigned. It does not appear that Judge Balick had a copy of the Employee Schedule as there was only one copy of the Asset Purchase Agreement filed with the court, which was the draft dated May 22, 1995, filed with the bankruptcy petition on May 23, 1995. However, the lack of an Employee Schedule in this adversary is not dispositive. Even if Mr. Hamann was less than candid in his testimony at the sale hearing concerning his prospects for employment, it was clear from the combination of the motion for approval of the Asset Purchase Agreement and from the Agreement itself that the employment of Mr. Hamann was contemplated. Any inconsistency between the provisions of the Asset Purchase Agreement and Mr. Hamann's testimony concerning his future employment with TAC could have been, and were, explored through cross-examination. Mr. Hamann testified that "the only thing that counts are written offers. I don't have any written offer from anybody." *June 13, 1995, Sale Hearing Transcript* at 113. He further testified on cross-examination that his discussions concerning employment with TAC occurred after the terms of the Asset Purchase Agreement were finalized. *Id.* at 114-15. The Asset Purchase Agreement moreover "contemplate[d] that the majority, if not all, the employees will be part of the new enterprise." *Id.* at 116. Mr. Hamann's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 60 of 118

Not Reported in B.R. Page 14

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

testimony was uncontroverted. Nothing new is raised in this Complaint and Mr. Hamann's credibility was subject to review by the bankruptcy court whose findings were upheld on appeal.

FN15. Placer Dome provided the bridge financing referred to *supra,* at p. 6.

4. Valuation: Whether Sale of Assets was "For Value"

***11** An argument raised by DAC at the sale hearing pertained to the valuation of Debtor's assets and whether TAC was paying "value." The value of all Debtor's assets as reflected on the balance sheet of January 1, 1995, which included the value of equipment determined by cost less depreciation, was $18,129,508. *June 13, 1995, Sale Hearing Transcript* at 69, 73. Mr. Hamann testified to a significantly lower liquidation value. *Id.* at 74-75.

5. Liquidation Value

At the sale hearing, Mr. Hamann was questioned as to his experience in the liquidation of corporations, and the evidence established that he had been involved in three turnarounds, one of which was a liquidation of a software company. *June 13, 1995, Sale Hearing Transcript* at 75-76. Mr. Hamann noted that Debtor was the first of its kind of business to file bankruptcy. He testified that, although there was no one in the world who had experience in liquidating abrasives, in his view valuation was similar to liquidation of a software company inasmuch as a willing buyer and willing seller are necessary and a customer who knows that he does not have to pay full price will not do so.*Id.* at 75, 78-79.He described two liquidation evaluations that he conducted with respect to Debtor's business. The first was as of May 12, 1995, and the second was June 12, 1995. As of the date of filing of the chapter 11 on May 23, 1995, he concluded that the likely liquidation value would be $2 million.*Id.* at 51.The plant, property and equipment were worth $1 million as of May 12. *Id.* at 74.Deducting the costs of liquidation, approximately $1.5 million would be available to creditors. *Id.* at 51.Under the first evaluation he concluded that secured creditors would receive $800,000 and unsecured creditors $700,000. A month later he concluded that $780,000 would be available for secured creditors and only $100,000 for unsecured creditors.*Id.* at 52.He further testified that much of Debtor's inventory was designed for specific customers who would not pay full value if the company was liquidating. *Id.* at 75.Thus, the value of Debtor's assets was significantly lower than it would have been if the assets were sold as a going concern.*Id.* at 74-75.

B. Accounts Receivable

Another issue pertained to the accounts receivable that were estimated at $1,249,360 as of January 1, 1995. *Id.* at 71.Mr. Hamann estimated the face value of the receivables to be approximately $500,000 to $600,000 at the time of the sale. *Id.* at 81.He noted that this figure was a " pure estimate" and that the controller would know the correct answer. *Id.* However, the controller was not called to testify. Mr. Hamann testified that, although Debtor's receivables collection was almost 100 percent, he estimated the liquidation value of the receivables at $350,000 on the theory that customers might elect not to pay anything if Debtor went into liquidation, thereby adding to the difficulty of collection. *Id.* at 82-83.Mr. Hamann said that an experienced sales representative had helped him arrive at the accounts receivable figure. *Id.* This sales representative was not called to testify as to his basis for the receivables estimate. The Committee asserted that after the sale was confirmed, TAC, led by Mr. Hamann, has actually collected nearly $1 million in receivables and that Mr. Hamann's statement of lower valuation and collectibility at the sale hearing was so misleading as to perpetrate a fraud on the court. Although it appears that Mr. Hamann severely underestimated the collectibility of Debtor's receivables, his testimony was not contradicted in any way and no other witnesses were called, despite the fact that an opportunity to do so was provided via discovery

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 61 of 118

Not Reported in B.R.

Page 15

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

and the trial process. Mr. Hamann's undervaluation coupled with the fact that he is now employed by TAC in an executive position is troubling and would raise serious questions about his loyalty to his fiduciary obligations to this estate but for the fact that there is no evidence of record except his testimony, even though he explained the limitations of his knowledge. Judge Balick, who actually heard the witness, had all this information available to her at the sale hearing, adjudged the testimony to be credible, noted the opportunity to perform discovery that had been afforded, found the sale to be in good faith, and was affirmed on appeal by the district court and the court of appeals. This issue, therefore, is not a proper subject for Rule 60(b).

C. Fair Value

***12** Generally speaking, a purchaser who pays 75 percent of the appraised value of the assets is considered to have tendered value. *See In re Abbots Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 149 (3rd Cir.1986). Where the purchaser is found to have acted in good faith, the auction price suffices to demonstrate that the purchaser "paid value" for the assets. *In re Gucci,* 126 F.3d 380, 390 (2nd Cir.1997), citing *In re Colony Hill Associates,* 111 F.3d 269, 276 (2nd Cir.1997).*See also In re Temtechco, Inc.,* No. 96-7520 at 6 ("the argument attacking the adequacy of the agreed price fails because it does not controvert the ample evidence that TAC acted in good faith").

In its opinion in *Temtechco,* the court of appeals further addressed the issue of "fair value" in relation to a "good faith" purchaser. Upon the bankruptcy court's determination that TAC was a good faith purchaser, there was no need for an independent assessment of whether the purchase price was adequate. *See In re Temtechco,* No. 96-7520 at 6. There was ample evidence that the purchaser acted in good faith. *Id.* Thus, the purchase price constitutes value in exchange for the assets.

D. Market Value v. Liquidation Value

The Supreme Court has adopted Black's Law Dictionary's definition of "market value" and noted that

> [t]he market value of ... a piece of property is the price which it might be expected to bring if offered for sale in a fair market; not the price which might be obtained on a sale at public auction or a sale forced by the necessities of the owner, but such a price as would be fixed by negotiation and mutual agreement, after ample time to find a purchaser, as between a vendor who is willing (but not compelled) to sell and a purchaser who desires to buy but is not compelled to take the particular ... piece of property.

*BFP v. Resolution Trust Corp.,* 511 U.S. 531, 537-38, 114 S.Ct. 1757, 1761, 128 L.Ed.2d 556, *rehearing denied*512 U.S. 1247, 114 S.Ct. 2771, 129 L.Ed.2d 884 (1994) (quoting Black's Law Dictionary 971 (6th ed.1990). "[F]air market value" presumes market conditions that, by definition, do not reflect a forced or emergency sale. *Id.* at 538, 114 S.Ct. at 1761. Property that *must* be sold within a specified time is simply worth less. *Id.* at 539, 114 S.Ct.. at 1762.[FN16]

FN16. In *BFP v. Resolution Trust Corp.,* a chapter 11 debtor brought fraudulent transfer proceedings to avoid a mortgage foreclosure sale. The debtor claimed that the price received at the sale was less than the "reasonably equivalent value" of the property. The court held that the " reasonably equivalent value" is the price received at the forced sale as long as the requirements of the state's foreclosure law were met. *Id.* at 545, 114 S.Ct. at 1765. Although the matter before us does not involve a state foreclosure proceeding, the definition of market value applies. Here there was an attempt to find buyers but only TAC came forward to bid at the sale hearing.

Mr. Hamann testified that if the sale was not expedited, the resulting loss of vendor, customer,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 62 of 118

Not Reported in B.R. Page 16

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

and employee confidence would erode the value of Debtor's business. *See generally June 13, 1995, Sale Hearing Transcript* at 66-78. Mr. Hamann's uncontradicted testimony that the financing Debtor obtained was necessary and that Debtor did not have sufficient cash to continue operations was relied on by the court. The reduced sale price was explained to the satisfaction of the bankruptcy court and the findings were affirmed on appeal.

E. Consideration

Mr. Hamann testified that under the Asset Purchase Agreement, the consideration paid was $150,000 in cash, the assumption of the million dollar debtor-in-possession financing obligation by the new company, the assumption of approximately $500,000 in obligations related to employee vacation and sick pay; $3 million in preferred stock in the new company, payable at 18, 30, and 42 months in $1 million increments, ten percent equity in the new company, and a million and a half dollars financing commitment to capitalize the company.*Id.* at 55.Mr. Hamann testified that there was " considerable debate" c oncerning the relative worth in liquidation vis-a-vis the Asset Purchase Agreement. The analysis conducted led him to the conclusion that the Asset Purchase Agreement had a cash value of $3 million. The discounted value of the preferred stock was estimated at $2 million and " common equity would be worth another million dollars", based on business projections. *Id.* at 56.

*13 On cross-examination, Mr. Hamann testified that in discounting the $3 million in preferred stock, he picked a discount rate of 15 per cent, representing a "compromise between ... prime rate and a venture capital rate."*Id.* at 92.This rate was picked as a combination of a discount rate representing the time value of money and the risk of the preferred. *Id.* at 93.Mr. Hamann stated that a venture capital investment conventionally involves a company that has very uncertain prospects for profitability which are generally two to three years out, but that Debtor had a business plan which called for profitability the year of the sale hearing, assuming Debtor obtained financing and continued in operation. *Id.* at 94-95.Thus the discount rate reflected the nature of the risk.[FN17]

FN17. On direct examination, Mr. Hamman testified that he viewed CIBC and Clairvest, Inc., the participants in TAC, to be merchant bankers and venture capitalists. *Id.* at 42.

Mr. Hamman was further questioned as to whether Debtor's performance was consistent with the business plan at the time of the filing. *Id.* at 94.Mr. Hamann testified that during his tenure with Debtor, the business plan had been met monthly except for May of 1995, inasmuch as the business plan contemplated financing, not bankruptcy. *Id.* at 94-95.The company's position in May of 1995 was consistent with the amount of cash coming in as supplemented by cash from stockholders, minus expenditures. *Id.* at 94-95.

All of the issues relating to value were adjudicated previously.

F. The Need for a Stay Pending Appeal

The court of appeals gave no weight to the fact that the Committee was not formed until six days after the sale was confirmed and closed. The court of appeals stated that, since DAC "clearly evinced a desire to seek a stay on the day the sale was authorized, counsel should have sought the stay purely in its protection of DAC's interest."*In re Temtechco,* 96-7520, at 7. Thus the district court's dismissal of the appeal as moot was affirmed.

The effect of § 3 63(m) was explained by the court of appeals subsequently. In *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.,* 141 F.3d 490, 499 (3d Cir.1998), the court ruled that not every unstayed sale would be moot on appeal, but the result of a reversal or modification of an order authorizing the sale would be restricted if reversal or modification would affect the validity of the sale. *Id.,* citing *In re Swedeland Development Group, Inc.,* 16 F.3d 552 (3d Cir.1994). The court

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 63 of 118

Not Reported in B.R. Page 17

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

depicted two prerequisites for § 363(m) "statutory" mootness: (1) the underlying sale was not stayed pending the appeal, and (2) reversal or modification of the order authorizing the sale would affect the validity of the sale. 141 F.3d at 499. The court stated that if there was no grant of a stay pending appeal, then the court must determine whether relief can be implemented in a manner that does not affect the validity of the sale. *Id.* The determination depends on the remedy requested. *Id.* In *Krebs,* the court held that a refund would attack the sale price, which is central to a sale and challenges its validity. Thus relief could not be granted on that basis. *Id.*

***14** Although courts are reluctant to set aside sale orders due to the policy of promoting the finality of judicial sales, there are exceptions. In *In re CADA Investments, Inc.,* 664 F.2d 1158 (9th Cir.1981), the court noted a willingness to set aside confirmed sales that were "tinged with fraud, error or similar defects which would in equity affect the validity of any private transaction."664 F.2d at 1162 . *See also In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 147-48 (3rd Cir.1986) (citing *In re CADA Investments, Inc.*)."Although the policy of finality normally protects confirmed sales from orders to set aside, sales are properly set aside when compelling equities outweigh the interests in finality. "*In re CADA Investments, Inc.,* 664 F.2d at 1162. These considerations are not operative here as the facts, taken in the light most favorable to the Committee as the nonmoving party, do not support their employ. All allegations of fraud, chilled bidding, etc., were raised in the bankruptcy court and on appeal and all were rejected. To the extent the Committee alleges that it interviewed additional witnesses since the sale was confirmed, we note that they had the opportunity to do so through discovery before the sale hearing and failed to take advantage of it.

The Complaint at issue seeks to attack the final sale order, including the finding of good faith and TAC's purchase price. The validity of the sale would be affected as the Committee seeks to set aside the sale order. As previously noted, this sale cannot be "undone" at this late date.

G. Rule 60(b): Fraud/Fraud on the Court

In addition to enabling the court to "entertain an independent action to relieve a party from a judgment, order, or proceeding" Rule 60(b)'s " savings clause" also permits the court to set aside a judgment for fraud upon the court." Fed.R.Civ.P. 60(b). Fraud on the court reaches matters that " harm [ ] the integrity of the judicial process."*In re Intermagnetics America, Inc.,* 926 F.2d 912, 917 (9th Cir.1991).

Several courts have looked to the definition of " fraud upon the court" provided in *Moore's Federal Practice:*

"Fraud upon the court" should, we believe, embrace only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication.

7 J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 60.33 at 515 (2d ed.1978), *quoted in Alexander v. Robertson,* 882 F.2d 421, 424 (9th Cir.1989).*See also Kupferman v. Consolidated Research & Mfg. Corp.,* 459 F.2d 1072, 1078 (2nd Cir.1972).

"[F]raud upon the court includes both attempts to subvert the integrity of the court and fraud by an officer of the court."*In re Intermagnetics America, Inc.,* 926 F.2d at 916. Officers of the debtor-in-possession are considered officers of the court. *Id.* at 917.They are required to act in the best interests of the estate and have accompanying fiduciary duties. *Id.* In *Hazel-Atlas Glass Co. v. Hartford-Empire Co.,* 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250,*rehearing denied*322 U.S. 772, 64 S.Ct. 1281, 88 L.Ed. 1596 (1944), the Supreme Court explained that the inquiry as to whether a judgment should be set aside for fraud upon the court under Rule 60(b) focuses not so much in terms of whether the alleged fraud prejudiced the opposing party, but more in terms of whether the alleged fraud harms the integrity of the judicial process:

***15** [T]ampering with the administration of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 64 of 118

Not Reported in B.R.

Page 18

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

322 U.S. at 246, 64 S.Ct. at 1001.

The standard to prove a Rule 60(b) "fraud on the court" is high, for "[a]n independent action for fraud may not be entertained 'if there was an opportunity to have the ground now relied upon to set aside the judgment fully litigated in the original action." ' *M.W. Zack Metal Co. v. Int'l. Navigational Corp. of Monrovia,* 675 F.2d 525, 529 (2d Cir.), *cert. denied*459 U.S. 1037, 103 S.Ct. 449, 74 L.Ed.2d 604 (1982) (citation omitted).

[I]t is well settled that a party seeking relief in an independent action for fraud under Rule 60(b) must establish that [there was] 'no opportunity to have the ground now relied upon to set aside the judgment fully litigated in the original action'... Such an action can not stand if it is merely an attempt to relitigate the case.

*Weldon v. United States,* 845 F.Supp. 72, 80-81 (N.D.N.Y.1994), *aff'd*70 F.3d 1 (2nd Cir.1995).

In order to obtain relief from a judgment via an independent action on the issue of fraud or fraud on the court these elements must be established:

1) the judgment ought not be enforced in equity and good conscience;

2) a good defense to the cause of action exists;

3) fraud, accident, or mistake prevented the defendant from obtaining the benefit of the defense;

4) no fault or negligence existed on the defendant's part and

5) no adequate remedy exists at law.

*Addington v. Farmer's Elevator Mutual Ins. Co.,* 650 F.2d 663, 667-68 (5th Cir.), *cert. denied* 454 U.S. 1098, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981). To sustain a "fraud on the court" claim under Rule 60(b), the order or judgment must be attacked on the basis of matters that were not known, and with diligence could not have been known, at the time the order or judgment was entered. *Id.* A final judgment should not be set aside on the ground of fraud when the information was available in the first action, in whole or in part. *Bulloch v. United States,* 763 F.2d 1115, 1121 (10th Cir.1985), *cert. denied*474 U.S. 1086, 106 S.Ct. 862, 88 L.Ed.2d 900 (1986), citing *Wilkin v. Sunbeam Corp.,* 466 F.2d 714 (10th Cir.1972), *cert. denied*409 U.S. 1126, 93 S.Ct. 940, 35 L.Ed.2d 258 (1973). In addition to the requirements under Rule 60(b), res judicata would also preclude the parties or their privies from relitigating issues that were or could have been raised. *Federated Dept. Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2428, 69 L.Ed.2d 103 (1981). In *Addington,* the court held that the allegations did not satisfy the necessary requirements. For example, it was alleged that perjured testimony had been adduced. The court found that this was an attempt to relitigate the credibility of the witness whose testimony previously had been accepted in the face of a similar claim. In the matter before us nothing new has been raised in the Complaint.

VIII. MOTIONS TO DISMISS

(A) Fraud and "New" Evidence

***16** CIBC's Reply Memorandum of Law in support of its motion to dismiss the Complaint focuses on res judicata and collateral estoppel. *Reply Memorandum of Law of Defendants CIBC Wood Gundy Ventures, Inc. and CIBC Wood Gundy Capital Corp. in Further Support of Their Motion to Dismiss the Complaint Under Bankruptcy Rules 7012(b) and 7009(b) (hereafter "CIBC's Reply Memorandum"),* Adv. No. 97-00077,Docket No. 41.CIBC alleges that the Committee has "recharacterized" the claims under a Rule 60(b) motion and that each issue was or previously could

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 65 of 118

Not Reported in B.R. Page 19

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

have been adjudicated at the sale hearing. *Id.* at 7. The Committee argues in its Surreply Memorandum of Law in opposition to CIBC's motion to dismiss that "[w]hile the Committee advanced many of the same arguments in the Third Circuit, they were never reached, because the Third Circuit affirmed the District Court's dismissal of the appeal based upon the absence of a stay."*Plaintiff's Surreply Memorandum of Law in Further Opposition to Defendants' ... Motion to Dismiss ...",*Adv. No. 97-00077,Docket no. 44, at 7. Correspondingly, " [t]he CIBC Defendants ... cannot now claim that they cannot be litigated because the Third Circuit considered them."*Id.*

As is evident in the record, throughout the May 16, 1997, hearing and in the resulting Complaint, the allegations of fraud were identical to the objections that were made at the June 13, 1995, sale hearing. They included the alleged collusion between CIBC and Mr. Hamann, bid chilling through the lock-up agreement and discouragement of potential investors, and Mr. Hamann's testimony as to future employment with TAC. None of these allegations will support Rule 60(b) relief.

Although the Committee now asserts that it has a witness and/or documents to support the contentions raised at the sale hearing, no new previously undiscoverable evidence is alleged in this adversary. Further, the alleged "new" evidence has never been specifically described, as Mr. Friedman referred in court to "documents" and " discussions with Mr. Henry" as the basis for his claim of fraud on the court. The present Complaint does not mention or describe "new" information in any more detail. Although Mr. Henry lives in Australia and Mr. Bogard, another board member, lives in Monaco, *id.* at 16, Mr. Friedman did not argue that this new, unspecified information could not have been obtained from Mr. Henry prior to the sale. Mr. Friedman claims that Mr. Henry now has stepped forward to supply the information that gives Debtor claims against CIBC and Mr. Hamann. However, there was no attempt at the sale hearing on June 13 and 14 of 1995 to question or produce any witnesses other than Mr. Hamann. There was no attempt to introduce additional documents, despite the fact that the opportunity for pretrial discovery existed. *See June 13, 1995, Sale Hearing Transcript* at 97.[FN18]Thus, the allegation falls short of the requirements of Rule 60(b) and falls within the doctrine of collateral estoppel. Further, issues were raised and tried at the sale hearing and res judicata bars their relitigation. *See Bonin v. Calderon,* 59 F.3d 815 (9th Cir.1995), *cert. denied* 516 U.S. 1051, 116 S.Ct. 718, 133 L.Ed.2d 671, *rehearing denied*516 U.S. 1142, 116 S.Ct. 977, 133 L.Ed.2d 897 (1996)."[A] district court does not abuse its discretion in denying a motion to amend where the movant presents no new facts but only new theories and provides no satisfactory explanation for his failure to develop his contentions originally."*Id.* at 845.*See also Gekas v. Met-L-Wood Corp.,* 80 B.R. 912, 915-16 (N.D.Ill.1987), *aff'd,*861 F.2d 1012 (7th Cir.1988), *cert. denied*490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 157 (1989)("A statement of 'clear and convincing probative facts' is necessary for a Rule 60(b) motion to be sufficient"). Although Mr. Friedman alluded to "fraud on the court" at the May 16, 1997, hearing, *Transcript of Emergency Motion for Leave Hearing, May 16, 1997,* at 46, "fraud on the court" and Rule 60(b) were not mentioned in the Complaint. "Fraud on the court" can only be brought for issues that were not and could not have been brought in the first instance. Nothing in this action qualifies.

FN18. Apparently the discovery opportunity was not utilized. The court said: "I am aware that there was an opportunity for discovery and that discovery was not forthcoming. You've had an opportunity to come back to the Court."*June 13, 1995, Sale Transcript Hearing* at 97.

(B) Res Judicata and/or Collateral Estoppel

*17 Under Federal Rule of Civil Procedure 60(b), a party may be relieved of a final judgment in appropriate cases. *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 863, 108 S.Ct. 2194, 2204, 100 L.Ed.2d 855 (1988). The court may entertain a Rule 60(b) motion without appellate

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 66 of 118

Not Reported in B.R. Page 20

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

leave and reopen a case which has already been reviewed upon appeal. *Standard Oil Co. of California v. United States,* 429 U.S. 17, 18-19, 97 S.Ct. 31, 32, 50 L.Ed.2d 21 (1976)."Res judicata does not preclude a litigant from making a direct attack [under Rule 60(b) ] upon the judgment before the court which rendered it."*Jordon v. Gilligan,* 500 F.2d 701, 710 (6th Cir.1974), *cert. denied*421 U.S. 991, 95 S.Ct. 1996, 44 L.Ed.2d 481 (1975).*See also Weldon v. United States,* 70 F.3d 1, 5 (2d Cir.1995) ; *W atts v. Pinckney,* 752 F.2d 406, 410 (9th Cir.1985). The doctrine of res judicata, however, bars a collateral attack on a final judgment. *Watts v. Pinckney,* 752 F.2d 406, 410 (9th Cir.1985) (emphasis in original). A direct attack is defined as follows:

> A direct attack on a judicial proceeding is an attempt to correct it, or to void it, in some manner provided by law to accomplish that object. It is an attack ... by appropriate proceedings between the parties to it seeking, for sufficient cause alleged, to have it annulled, reversed, vacated or declared void.

*Id.* (citation omitted).

In *Weldon I* (*Weldon v. United States,* 744 F.Supp. 408 (N.D.N.Y.1990), *aff'd*952 F.2d 394 (2d Cir.1991), *cert. denied*504 U.S. 988, 112 S.Ct. 2973, 119 L.Ed.2d 592 (1992)), Weldon brought a personal injury action after becoming ill from the swine flu vaccine. The district court granted summary judgment for the government and the court of appeals affirmed. Thereafter, Weldon brought a Rule 60(b) action, *Weldon v. United States,* 845 F.Supp. 72 (N.D.N.Y.1994), *aff'd*70 F.3d 1 (2d Cir.1995), (*Weldon II* ). The complaint charged that during the litigation of *Weldon I,* the United States had committed "fraud, misrepresentation, and other misconduct" and " fraud upon the court," for which she was entitled to equitable relief, specifically requesting vacatur of the summary judgment. *Weldon II,* 70 F.3d at 2. The district court denied the motion. On appeal, the court of appeals distinguished between a direct and a collateral attack. Because Weldon had "a full and fair opportunity to litigate her present claims in *Weldon I,*"*id.,* the court determined that Weldon was seeking to collaterally attack the judgment which action was impermissible.

Here, CIBC alleges that this Complaint is a collateral attack on the sale order. For the reasons previously discussed in this Memorandum Opinion, we agree. Thus, the issues cannot be relitigated through Rule 60(b).

(C) The Committee's Right to Be Heard

The Committee seeks relief on the ground that it was not formed at the time of the sale and, therefore, could not participate as a party in interest. CIBC objects to the Committee's standing.

***18** The creditors' committee is a fiduciary for all of the unsecured creditors of the estate. *See, e.g., In re SPM Manufacturing Corp.,* 984 F.2d 1305, 1315 (1st Cir.1993)(rehearing denied)."Thus the committee's fiduciary duty, as such, runs to the parties or class it represents .... It is charged with pursuing whatever lawful course best serves the interests of the class of creditors represented".*Id. See generally* 7 Collier on Bankruptcy ¶ 1103 (15th ed. (revised) 1998). A creditors' committee has numerous responsibilities to fulfill its role in a chapter 11 case:

> The creditors' committee is not merely a conduit through whom the debtor speaks to and negotiates with creditors generally. On the contrary, it is purposely intended to represent the necessarily different interests and concerns of the creditors it represents. It must necessarily be adversarial in a sense .... There is simply no other entity established by the Code to guard those interests. The committee as the sum of its members is not intended to be merely an arbiter but a partisan which will aid, assist, and monitor the debtor pursuant to its own self-interest.

*In re SPM Manufacturing Corp.,* 984 F.2d at 1317. The legislative history to § 1103 makes it clear that Congress envisioned that the official committee is intended to be the party that negotiates a chapter 11 plan on behalf of the constituency. FN19

FN19."[Committees] will be the primary

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 67 of 118

Not Reported in B.R. Page 21

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

> negotiating bodies for the formulation of the plan of reorganization. They will represent the various classes of creditors and equity security holders from which they are selected."H.R.Rep. No. 595, 95th Cong. 1st Sess. 401 (1978), *reprinted in* U.S.C.C.A.N. 5963, 6194, 6357. *See also* Harvey R. Miller, *The Changing Face of Chapter 11: A Reemergence of the Bankruptcy Judge as Producer, Director, and Sometimes Star of the Reorganization Passion Play,* 69 Am. Bankr.L.J.431, 447-49(1995).

Considerations of due process compel a relatively expansive right to participate in the reorganization proceedings. *See* 7 Collier on Bankruptcy, *supra,* at ¶ 1109.02[2][b]. The court in *In re Boomgarden,* 780 F.2d 657 (7th Cir.1985), noted that "[i]n bankruptcy proceedings, both debtors and creditors have a constitutional right to be heard on their claims, and 'the denial of that right to them [is] the denial of due process which is never harmless error." ' 780 F.2d at 660-61. *See also Turney v. F.D.I.C.,* 18 F.3d 865, 868 (10th Cir.1994)(due process requires notice and an opportunity to be heard at a meaningful time in a meaningful manner); *Republic Nat'l. Bank of Dallas v. Crippen,* 224 F.2d 565, 566 (5th Cir.1955)(the right to be heard is a constitutional right and its denial is denial of due process which is never harmless error). "The opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard." *Goldberg v. Kelly,* 397 U.S. 254, 268-69, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970).

In this case, the sale was expedited due to the exigent circumstances surrounding Debtor and the likely significant decline in value of Debtor's assets absent an immediate sale before the Committee was appointed. The Motion for Orders by which Judge Balick approved the sale depicted that Debtor's assets required continuous maintenance and operation, and that their value would be significantly diminished, if not eliminated, were the equipment not being used. *Motion for Orders* at 13, ¶ 16. Furthermore, the motion alleged that Debtor had to maintain its customer base in order to be productive and profitable, for, if Debtor ceased to operate for even a few days, Debtor would lose essential business and its value would be significantly less. *Id.* at ¶ 17.

*19 Although the Committee had not yet been formed, Judge Balick took precautions to ensure that all creditors, which included those who later composed the Committee, were notified and had full opportunity to be heard. *See Order (A) Scheduling Date ... and Prescribing ... Notice of[ ] Hearing ... on ... Asset Purchase Agreement.* Bankr.No. 95-00596 at Docket No. 13A.The fact that the Committee's appointment by the U.S. Trustee was delayed until after the sale hearing is unfortunate but the fact that Committee members and counsel in this adversary were fully advised of the sale and opposed it until all but DAC's objections were resolved establishes active involvement by creditors prior to the Committee's formation. The Committee, because it was formed after the sale closed, had no opportunity to seek a stay, but the court of appeals has already denied relief on this basis. We cannot grant relief previously denied by an appellate court.

(D) Failure of Purchaser to Fulfill Payment Obligations

In its recitation of facts in the Complaint, the Committee alleges that the purchaser is unable to redeem the preferred stock as it is required to do. Paragraph 57 of the Complaint states that "[o]nce CIBC purchased the Debtor's assets, it made its investment in the new Tempo Technology Corporation as debt, rather than equity, thereby insuring that the new Tempo Technology Corporation is perennially insolvent and, under Delaware law, unable to redeem the preferred stock the Debtor's estate received for the Debtor's assets ." Complaint at ¶ 5 7. This issue arises from various representations made in conjunction with the sale. [FN20]At least one payment was not made but the final payment is not yet due. These facts, if proven, clearly could not have been known at the sale hearing inasmuch as it would be a post-closing default. The Committee does not assert a cause of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 68 of 118

Not Reported in B.R. Page 22

Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

action on this basis, however, and a complaint on this ground would not be a proper subject for a Rule 60(b) action. Rather, a direct action for this alleged breach of contract may lie. Thus, nothing in this Memorandum Opinion affects any possible cause of action based upon TAC's alleged nonperformance of its contract since the sale closed.

FN20. In its response to DAC's objection to the sale, Debtor again represented that "the issuance of $3,000,000.00 face amount of TAC's redeemable preferred stock ...*will be redeemed* in payments of $1,000,000.00 each, eighteen months, thirty months and forty two months after closing."*Reply of Tempo Technology Corporation to Objection of Diamond Abrasive Corporation,* Bankr.No. 95-00596, Docket No. 39A, at 9, ¶ 11(c)(emphasis added). At the sale hearing, Mr. Hamann, on direct questioning, stated that the $3 million preferred was "payable at 18, 30, and 42 months at $1 million increments."*June 13, 1995, Sale Hearing Transcript* at 55. This value was discounted to an estimated $2 million as the then present value. *Id.* at 56.Judge Balick, in approving the sale, found that there was adequate notice, good faith negotiations, and a fair and reasonable price. *Id.* at 167-70.

IX. SUMMARY

In this case, the opportunity existed to litigate the claims raised by the Committee. We find that all the allegations relate to the same course of events leading up to the sale and were raised at the sale hearing and in the appeals to the district court and the court of appeals. The Committee is foreclosed from raising these claims in the guise of a Rule 60(b) motion. The Committee has alleged "new evidence" in the form of information from Mr. Henry but the "new evidence" was never specifically described and everything alleged in connection with this adversary proceeding was or could have been available to the Committee's members at the time of the sale hearing.

Therefore, assuming all facts alleged in the Complaint are true, and construing all reasonable inferences therefrom in favor of the Committee as the nonmoving party, there is no foundation under Rule 60(b) to grant the relief requested in this Complaint inasmuch as all issues were raised and addressed at the sale hearing and subsequently on appeal. The requests to dismiss the Committee's Rule 60(b) Complaint will be granted as there is no claim stated upon which relief may be granted.

***20** An appropriate order will be entered.

ORDER

AND NOW, this 18th day of December, 1998, for the reasons expressed in the foregoing Memorandum Opinion, it is ORDERED, ADJUDGED, and DECREED that the requests to dismiss the above-captioned Complaint are GRANTED and the Complaint is DISMISSED.

It is FURTHER ORDERED that the Clerk shall close this Adversary.

Bkrtcy.D.Del.,1998.
In re Temtechco, Inc.
Not Reported in B.R., 1998 WL 887256 (Bkrtcy.D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

# TAB 8

Page 70 of 118

Westlaw.

Not Reported in F.Supp.2d Page 1

Not Reported in F.Supp.2d, 1998 WL 879698 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Kidd v. Spector
S.D.N.Y.,1998.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
John M. KIDD, Plaintiff,
v.
Eric SPECTOR and Lorraine Peters, Defendants.
**No. 93 Civ. 7297(KTD).**

Dec. 15, 1998.

Joseph Ferraro, Rogers & Wells LLP, New York, New York, for Plaintiff.
John C. Re, Morgenthau, Greenes, Goldfarb & Aronauer, P.C., New York, New York, for Defendants.

*OPINION*

DUFFY, J.

*1 Plaintiff John M. Kidd brought this action for damages arising out of his purchase of a cooperative unit.

Specifically, Plaintiff claims that the sellers of the unit, defendants Eric Spector and Loraine Peters (collectively "Defendants"), misrepresented and concealed certain defects in the realty prior to the purchase. As a result, Plaintiff seeks "only his repair costs and interest arising out of the concealed defects".

The parties stipulated to an agreed set of facts in the Joint Pre-Trial Order. I heard testimony and received evidence at the two-day bench trial of the matter on November 23 and 24, 1998. The following constitutes my findings of fact and conclusions of law.

*Findings of Fact*

In December 1980, Defendants purchased three shares of stock in a cooperative housing corporation that owned the building and premises located at 55 Great Jones Street, New York, New York. The shares were allocated to unit # 1, a commercial space consisting of the ground floor and basement of the building (the "Unit"). The Defendants intended to use the Unit in connection with their small mail-order business.

In 1981, Defendants installed a wall of sheetrock on the interior of the ground floor. The sheetrock covered the entire back wall, including a pair of bricked-over windows and a door. Defendants installed the sheetrock because:

Cosmetically it was the cheapest solution to make it look decent as well as to cover over the air shaft windows such that it wouldn't be threat for entry ...

(Testimony of Eric Spector, Transcript at 45). Defendants also had a new heating system installed and several plumbing fixtures replaced. Shelves were also installed in the basement.

Defendants used the Unit until August 1988, when they moved to California. Thereafter, the Unit was left vacant, and Defendants began advertising the Unit for sale. The Unit had been on the market for several years when, in the Spring of 1992, Plaintiff noticed a "for sale" sign on the outside of the building and sought information concerning the Unit.

Plaintiff was eventually put in contact with Defendants in California, and it was agreed that Plaintiff would be shown the Unit when Spector next visited New York. A few weeks later, Spector arrived in New York and showed the Unit to Plaintiff. As the two toured the inside of the Unit and the outside of the building, they discussed:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 71 of 118

Not Reported in F.Supp.2d
Page 2

Not Reported in F.Supp.2d, 1998 WL 879698 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

General questions about water leakage, security. [Spector] told me there were skylights and windows but they were covered up by a wall. [Spector] showed me the electrical service. That is about it.

(Testimony of John M. Kidd, Transcript at 3).

Sometime after touring the Unit, Plaintiff was supplied with a one-page summary description of the property that was prepared by Spector.[FN1]The summary included, *interalia,* information about the Unit's square footage and ceiling height, plumbing, lighting, electrical and heating systems. Also included was a description of the Unit's architectural features-including a reference to the " covered over" windows and skylight.

FN1. Spector culled the information for the summary from an appraisal prepared in 1983 in support of a mortgage application for the property.

*2 Plaintiff toured the Unit at least three more times, although never again with Spector, before entering into a contract to purchase the unit from Defendants. The contract of sale, dated November 4, 1992, contained the following disclaimer:
Seller makes no representation as to the condition of the Unit. Purchaser has inspected the Unit and shall take the same "as is", as of the date of this contract, reasonable wear and tear excepted.

Contract of Sale ¶ 7.1. The contract also contained a merger clause:All prior oral or written representations, understandings or agreements had between the Parties with respect to the subject matter of this Contract ..., are merged in this Contract, which alone fully and completely expresses their agreement.

Contract of Sale ¶ 14.1. The transaction closed one month later on December 8, 1992.

Prior to closing, Plaintiff had the opportunity but did not conduct or cause anyone on his behalf to conduct: (1) a formal inspection of the Unit's electrical capacity, electrical service or electrical fixtures; (2) measurements of the Unit's ceiling heights or entire square footage; or (3) an inspection of the Unit's plumbing features. Moreover, Plaintiff did not ever attempt to have someone on his behalf inspect the Unit's heating units and system, nor did he attempt to have an exterminator inspect the Unit. While Plaintiff did perform a cursory inspection of shelving installed in the Unit, he did not attempt to have anyone else inspect the shelving. Also, there is absolutely no evidence in the record that Defendants sought to prevent such inspections.

After taking possession of the Unit, Plaintiff found several claimed defects. First, when Plaintiff removed the wood and tarpaper from the skylight, he found that the skylight was actually a metal security frame with no glass. Plaintiff also found that the bricked-up windows contained no glass. Then, after a heavy rainstorm, Plaintiff noticed water leaking from the back wall. When Plaintiff removed the sheetrock, he discovered that the back wall was in a state of disrepair.

Plaintiff also discovered that the Unit's heating system was not working properly because the heater on the first floor of the unit was not properly vented into a chimney flu, but only into an outer chamber of the chimney that was not open to the exterior of the building. Plaintiff also found that the connection to the chimney in the basement had been improperly installed and was obstructed by dirt and debris.

Plaintiff brought the instant action [FN2] seeking, *interalia,* recovery of his expenses [FN3] in repairing the above-mentioned defects. Specifically, Plaintiff claimed fraud in the inducement of the contract, alleging that Defendants misrepresented and actively concealed the Unit's defects.

FN2. The action was originally filed on September 24, 1993, in the Supreme Court for the State of New York, New York County. Defendants then removed the action on October 21, 1993-invoking this court's diversity jurisdiction. Plaintiff is a resident of New York, and defendants Spector and Peters are residents of California and Hawaii, respectively.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 72 of 118

Not Reported in F.Supp.2d Page 3

Not Reported in F.Supp.2d, 1998 WL 879698 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

FN3. The evidence adduced by Plaintiff as to the amount and cost of repairs is, I believe, highly suspect. No formal finding is being made on this point, however, because my disposition of this matter renders such finding unnecessary. Other findings could be made that would also defeat Plaintiff's claims, but such findings are also unnecessary.

*Findings of Law*

To prevail on his claims of fraud, Plaintiff must demonstrate:

that a representation of material fact was made; that such representation was false, and known to be false by the party making it, or was recklessly made; that such representation was made to deceive and to induce the other party to act on it; and that the party to whom the representation was made relied upon it to its injury or damage.

*3 *Itteson v. Lombardi,* 193 A.D.2d 374, 596 N.Y.S.2d 817, 819 (App.Div.1993) (citation omitted). With regard to the reliance element of his fraud claims, Plaintiff argues that:[H]e relied on the statements of defendant Spector as to the condition of the premises and upon the outward appearances of the rear wall, rear roof and heaters in purchasing the premises.

*See* Pl's Stmt. of the Elements of his Claim at 3. As a matter of New York law, however, Plaintiff claims of reliance cannot support a cause of action for fraud.

It is well settled that a party who specifically disclaims reliance upon a representation in a contract cannot later assert that it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon. *See Dannan Realty Corp. v. Harris,* 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597, 598 (N.Y.1959).*See alsoWarner Theatre Assoc. L.P. v. Metropolitan Life Ins. Co.,* 149 F.3d 134, 136 (2d Cir.1998); *Lazard Freres & Co. v. Protective Life Ins.,* 108 F.3d 1531, 1542 (2d Cir.), *cert.denied,*522 U.S. 864, 118 S.Ct. 169, 139 L.Ed.2d 112 (1997).

As the New York Court of Appeals held in *Dannan,* the combination of a merger clause and a specific disclaimer in a contract bars a party from claiming fraud in the inducement of the contract simply because the party relied on the facts disclaimed:

In this case, of course, the plaintiff made a representation in the contract that it was not relying on specific representations not embodied in the contract, while, it now asserts, it was in fact relying on such oral representations. Plaintiff admits then that it is guilty of misrepresenting to the seller its true intention. To condone this fraud would place the purchaser in a favored position ... If the plaintiff has made a bad bargain he cannot avoid it in this manner.

If the language here used is not sufficient to estop a party from claiming that he entered the contract because of fraudulent representations, then no language can accomplish that purpose.

5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597, 600 (emphasis added).*SeealsoLandes v. Sullivan,* 235 A.D.2d 657, 651 N.Y.S.2d 731, 733 (App.Div.1997) (buyers barred from claiming that they were fraudulently induced into purchasing condominium apartment where the "contract of sale indicated that [buyers] had an opportunity to inspect the premises, that they were taking the unit 'as is' and that they had not relied upon any representations by [seller] as to the physical condition of the premises").

In this case, the language could not be more clear. The contract expressly states that the parties are not relying on any representations aside from those contained in the contract. *See* Contract of Sale ¶ 7.1. The contract also states that Plaintiff inspected the Unit, was taking the Unit "as is" and that the Defendants had made no representations as to the condition of the Unit. Contract of Sale ¶ 7.1. Thus, Plaintiff's claims of reliance on Defendants' representations concerning the Unit are belied by the express terms of the contract.

*4 While Plaintiff claims that he should not be held to the terms of the contract because Defendants

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 73 of 118

Not Reported in F.Supp.2d

Page 4

Not Reported in F.Supp.2d, 1998 WL 879698 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

engaged in "active concealment" of the defects, he has provided no evidence that Defendants made any effort at all to hide any of the Unit's defects from Plaintiff. In fact, the record indicates that all the changes made to the Unit occurred years before Defendants even contemplated selling the Unit.

Accordingly, I find that Plaintiff's claims of fraud arise solely from representations allegedly made by Defendants as to the Unit. Because Plaintiff expressly disclaimed reliance on these representations in the contract, he cannot now claim reliance upon precisely the representations that he previously disclaimed.

Thus, I find that Plaintiff has failed to establish an essential element of his fraud claims, and as such, cannot prevail.[FN4]

FN4. I note that Plaintiff has abandoned his claims of fraud arising out of alleged defects in the Unit that were not "concealed "-including the Defendants' alleged misrepresentations concerning the Unit's ceiling height, square footage and electrical capacity. *See* Trial Transcript at 108-09. Even if they had not been abandoned, these claims-like Plaintiff's other fraud claims-could not succeed.

Plaintiff also has abandoned his two breach of contract claims. The first claim alleges that the contract of sale was breached because the Unit was " not in good repair and the plumbing, electrical service and wiring were faulty". The second alleges a violation because the Unit was not delivered " broom clean". Plaintiff ignored these claims in his pre-trial filings, and expressly abandoned them at trial along with the fraud claims above.

*Conclusion*

For the reasons stated above, I find for Defendants on all claims. The clerk of the court is directed to enter judgment for the Defendants and close this case.

SO ORDERED.

S.D.N.Y.,1998.
Kidd v. Spector
Not Reported in F.Supp.2d, 1998 WL 879698 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

# TAB 9

Page 2 of 9

Westlaw.

Not Reported in N.Y.S.2d

Page 1

Not Reported in N.Y.S.2d, 1997 WL 638800 (N.Y.Sup.)
**(Cite as: Not Reported in N.Y.S.2d)**

**H**

Portnoy v. American Tobacco Co.
N.Y.Sup.,1997.
Only the Westlaw citation is currently available.

NOT APPROVED BY REPORTER OF DECISIONS FOR REPORTING IN STATE REPORTS. NOT REPORTED IN N.Y.S.2d.

Supreme Court, Suffolk County, New York.
Leonard M. PORTNOY and Sue Portnoy, Plaintiffs,
v.
THE AMERICAN TOBACCO COMPANY, American Brands, Inc., Lorillard, Inc., Lorillard Tobacco Company, Philip Morris Incorporated, Philip Morris Companies, Inc., RJR Nabisco Inc., R.J. Reynolds Tobacco Company, Liggett Group, Inc., Liggett & Myers Tobacco Company, Brown & Williamson Industries, Inc., Brown & Williamson Tobacco Corporation, The Council for Tobacco Research-USA, Inc. and The Tobacco Institute, Inc., Defendants.
Salvatore Nociforo, Plaintiff,
v.
The American Tobacco Company, American Brands, Inc., Lorillard, Inc., Lorillard Tobacco Company, Philip Morris Incorporated, Philip Morris Companies, Inc., RJR Nabisco Inc., R.J. Reynolds Tobacco Company, Liggett Group, Inc., Liggett & Myers Tobacco Company, Brown & Williamson Industries, Inc., Brown & Williamson Tobacco Corporation, The Council for Tobacco Research-USA, Inc. and The Tobacco Institute, Inc., Defendants.
Catherine Kristich, as the Administrator of the Estate of John G. Kristich and Catherine Kristich, Individually, Plaintiff,
v.
The American Tobacco Company, American Brands, Inc., Lorillard, Inc., Lorillard Tobacco Company, Philip Morris Incorporated, Philip Morris Companies, Inc., RJR Nabisco, Inc., R.J. Reynolds Tobacco Company, Liggett Group, Inc., Liggett & Myers Tobacco Company, Brown & Williamson Industries, Inc., Brown & Williamson Tobacco Corporation, The Council For Tobacco Research-USA, Inc. and The Tobacco Institute, Inc., Defendant.
Carol Hansen, Jeff Fox as the Administrator of the Estate of Sidney Fox and Corinne Fox, Plaintiffs,
v.
The American Tobacco Company, American Brands, Inc., Lorillard, Inc., Lorillard Tobacco Company, Philip Morris Incorporated, Philip Morris Companies, Inc., RJR Nabisco, Inc., R.J. Reynolds Tobacco Company, Liggett Group, Inc., Liggett & Myers Tobacco Company, Brown & Williamson Industries, Inc., Brown & Williamson Tobacco Corporation, The Council For Tobacco Research-USA, Inc. and The Tobacco Institute, Inc., Defendants.
**No. 96/16323, 2-MG, 96-16324.**

Sept. 26, 1997.

Jay L. Feigenbaum, of Counsel, Finz & Finz, New York, City, for plaintiff.
Kasowitz, Benson, Torres & Friedman, New York, City, Attorneys for Liggett Group, Inc. and Liggett & Myers Tobacco Company.
Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., New York, City, Attorneys for Lorillard, Inc. and Lorillard Tobacco Company.
Debevoise & Plimpton, New York, City, Attorneys for The Council for Tobacco Research-USA, Inc.
Winston & Strawn, Thomas J. Quigley, of Counsel, New York, City, Attorneys for Philip Morris, Inc. and Philip Morris Companies, Inc.
Jones, Day, Reavis & Pogue, New York, City, Attorneys for RJR Nabisco, Inc. and R.J. Reynolds Tobacco Company.
Chadbourne & Parke, New York, City, Attorneys for Brown & Williamson Industries, Inc. and Brown & Williamson Tobacco Corporation, Individually and as Successor by to The American Tobacco Company and American Brands, Inc.
Seward & Kissel, New York, City, Attorneys for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 3 of 9

Not Reported in N.Y.S.2d

Page 2

Not Reported in N.Y.S.2d, 1997 WL 638800 (N.Y.Sup.)
**(Cite as: Not Reported in N.Y.S.2d)**

The Tobacco Institute, Inc.
BERLER, J.

*1 Because of the similarity of the motions to dismiss currently pending in the above actions, and because the attorneys for the plaintiffs and defendants in each of the above actions are the same, said motions are hereby consolidated for decision in the interest of judicial economy.

**BACKGROUND**

Throughout the history of this country, tobacco and tobacco products have played an important part in the American economy. To further the sale of tobacco, particularly cigarettes, smokers and potential smokers have been enticed by such catchy jingles and sayings as:

" L.S.M.F.T.-Lucky Strike Means Fine Tobacco." (American Tobacco Company)

" I'd Walk a Mile for a Camel" (R.J. Reynolds Tobacco Company)

" Alive with Pleasure" (Newport) (Lorillard, Inc.)

"Come to Marlboro Country" (Philip Morris, Inc.)

"Only Viceroy has this Exclusive Filter" (Brown & Williamson Tobacco Corp.)

"Tastes Great ... yet it Smokes so Mild" (Chesterfield) (Liggett Group).

Magazine and newspaper advertisements contained pictures of famous sports and entertainment figures smoking certain brands of cigarettes. The messages conveyed by such celebrities were, indeed, alluring and no doubt enticed many a person to smoke the brand of cigarette enjoyed by their heroes. For example:

"OLD GOLD has the most on the ball'... says Lou Gehrig in Blindfold cigarette test." (New York Journal American, July 30, 1928.).

"It takes Healthy Nerves to Win the World Series. 21 out of 23 Giants World Champions Smoke Camels" (April, 1934 New York newspaper).

"The Baseball Man's (Picture depicting Ted Williams, Stan Musial, Joe DiMaggio, Bob Elliott, Ewell Blackwell and Bucky Harris) Cigarette. Always Buy Chesterfield, They Satisfy" (Back Cover, Inside U.S.A., The Playbill for the New Century Theater, Week Beginning Monday, May 24, 1948).

"I've Smoked Camels For 8 Years. They have the Mildness that Counts with me." (Joe DiMaggio, Back Cover, April 20, 1942, Life Magazine.)

"Back on the Air for OLD GOLD Cigarettes-" Songs by Sinatra" (The Red Mill-The Playbill for the Forty-Sixth Street Theater, Week Beginning Monday, September 9, 1946, p. 34).

"More Doctors Smoke Camels than any other Cigarette." (Id. p. 13).

"Why Camels are first with famous sports stars . .. Mickey Mantle, Star Slugger, Zoe Ann Olsen, Olympic Diver, Julius Boros, Star Golf Pro, Pauline Betz, Pro Tennis Queen" (Back Cover, Life Magazine, September 21, 1953).

In more recent times, what young person is not familiar with "Joe Cool" (Camel Cigarettes).

Unfortunately, we have come to learn that cigarettes and other tobacco products may not be that healthy for us. Just recently, after years of determined efforts by health groups, state attorneys general and lawyers for sick smokers to reduce cigarette smoking, tobacco negotiators announced a historic settlement proposal that, if ratified, promises to change forever the way cigarette are marketed in the United States (New York Times, June 21, 1997, p. 1, col. 1); See also, Newsday, June 23, 1997, p. A5, col. 1). But See, Pear, Robert, A *New Leaf, Now* the *Archenemies Need Each Other,* New York Times, June 22, 1997, Sec. 4, p. 1, col. 1). Additionally, the court acknowledges the heroic efforts of former major league baseball star, Bill Tuttle, himself now afflicted with cancer, lecturing high school and youth groups about the dangers of chewing tobacco.

*2 In these proceedings, the various plaintiffs

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 4 of 9

Not Reported in N.Y.S.2d Page 3

Not Reported in N.Y.S.2d, 1997 WL 638800 (N.Y.Sup.)
**(Cite as: Not Reported in N.Y.S.2d)**

bring actions against fourteen defendants, six of whom are alleged to have designed, manufactured or sold cigarettes (the "Manufacturing defendants"), six of whom are alleged to be parent holding companies of the manufacturers based on their alleged "domination and control" over their respective manufacturing subsidiary (the " Corporate Parents") and the other two-The Council for Tobacco Research-USA, Inc ("CTR") and The Tobacco Institute, Inc. ("TI") on agency theories. CTR is a non-profit corporation formed to assist in funding research conducted by independent scientists relating to tobacco use and health. TI is a not-for-profit trade association located in Washington, D.C.

All of the respective plaintiffs assert the following causes of action:

(1) Failure to warn prior to 1969;
(2) Fraud and deceit;
(3) Negligent misrepresentation;
(4) Negligence and defective design;
(5) Strict Liability;
(6) Breach of express warranty;
(7) Breach of implied warranty of merchantability; and
(8) Breach of implied warranty of fitness for a particular purpose.

Plaintiffs Portnoy, Kristich and Fox assert, in addition to the above theories loss of consortium. Plaintiffs Kristich and Fox assert the further cause of action for wrongful death on behalf of their decedents. Plaintiffs Portnoy and Nociforo alleged to have started smoking in 1954. Plaintiff Kristich alleged to have started smoking in 1934, while plaintiffs Hansen and Fox claim to have started smoking in 1963 and 1943 respectively.

**THE INDIVIDUAL DEFENDANTS**

As noted in this court's prior decision dated February 19, 1997, while plaintiffs' pleading must be construed liberally ... and be deemed to allege whatever can reasonably be implied from its statements, it must still allege whatever can reasonably be implied from its statements, it must still allege the material elements of the cause of action [*Giamo & Vreeburg* v. *Smith,* 192 A.D.2d 41, 599 N.Y.S.2d 841, 843 (2nd Dep't, 1993), *app. dism.,*82 N.Y.2d 803, 604 N.Y.S.2d 559, 624 N.E.2d 697 (1993)]. Failure to allege those material elements may not be excused on "the exhortation to liberal construction contained in CPLR 3026... Liberality will not be used as a substitute for substance." [*State* of *New York* v.. *Oxford Nursing Home,* 96 Misc.2d 103, 408 N.Y.S.2d 911, 913 (Sup .Ct., Kings Co., 1978); see also, *Corris v. White,* 29 A.D.2d 470, 289 N.Y.S.2d 371, 374 (4th Dep't, 1968); *Shapolsky* v. *Shapolsky,* 22 A.D.2d 91, 253 N.Y.S.2d 816, 818 (1st Dep't, 1964).

Dismissal of a claim pursuant to CPLR 3211(a)(7) is required where a plaintiff cannot succeed upon any reasonable view of the facts stated (*Campaign* for *Fiscal Equity, Inc.* v. *State* of *New York,* 86 N.Y.2d 307, 318, 631 N.Y.S.2d 565, 571, 655 N.E.2d 661 (1995). Although well-pleaded facts must be taken as true on a motion to dismiss, legal or factual conclusions are not entitled to the same presumption (See, *O'Donnell, Fox & Meyer,* 198 A.D.2d 154, 604 N.Y.S.2d 67, 68 (1st Dep't, 1993); *Brown* v. *Albert Einstein College* of *Medicine* of *Yeshiva University,* 172 A.D.2d 197, 198, 568 N.Y.S.2d 61, 62 (1st Dep't, 1991); *Roberts* v. *Pollack,* 92 A.D.2d 440, 444, 461 N.Y.S.2d 272, 274 (1st Dep't, 1983).

*3 CPLR 3013 sets forth the minimum which must be pled:

"Statements in a pleading shall be sufficiently particular to give the court and parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved *and the material elements of each cause of action or defense.*" (emphasis added).

CPLR 3013 does not countenance a pleading solely on conclusory allegations pertaining to an element of the claim or defense (3 Weinstein-Korn-Miller, *New York Civil Practice,* Sec. 3013.03. The law in New York is well settled

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 5 of 9

Not Reported in N.Y.S.2d
Page 4
Not Reported in N.Y.S.2d, 1997 WL 638800 (N.Y.Sup.)
**(Cite as: Not Reported in N.Y.S.2d)**

that, in order to recover under each of the causes of action, these plaintiffs must plead and prove causation, in other words, a causal link between the injury complained of and the actions of each defendant (See, e.g., *Amatulli* v. *Delhi Construction Corp.*, 77 N.Y.2d 525, 532, 569 N.Y.S.2d 337, 341, 571 N.E.2d 645 (1991) (failure to warn); *Weissman* v. *Mertz*, 128 A.D.2d 609,610, 512 N.Y.S.2d 865, 867 (2nd Dep't, 1987), *app. dism.*,70 N.Y.2d 608, 521 N.Y.S.2d 224, 515 N.E.2d 909 (1987) (fraud); *Pappas* v. *Harrow Stores, Inc.*, 140 A.D.2d 501, 504, 528 N.Y.S.2d 404, 407 (2nd Dep't, 1988) (negligent misrepresentation); *Robinson* v. *Reed Prentice Division* of *Package Machinery*, 49 N.Y.2d 471, 480, 426 N.Y.S.2d 717, 721, 403 N.E.2d 440 (1980) (negligence); *Voss* v. *Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 107, 463 N.Y.S.2d 398, 402, 450 N.E.2d 204 (1983) (strict Liability); *Tardella* v. *RJR Nabisco, Inc.*, 178 A.D.2d 737, 738, 576 N.Y.S.2d 965, 966 (3rd Dep't, 1991) (warranty); *Gleason* v. *New York City Housing Authority*, 221 A.D. 504, 633 N.Y.S.2d 399, 400 (2nd Dep't, 1995) (wrongful death); *S.M. Pires* v. *Frota Oceanic Brasileira, S.A.*, 161 A.D.2d 129, 130, 554 N.Y.S.2d 855, 857 (1st Dep't, 1990) (loss of consortium).

Again, plaintiffs in each of these actions fail to allege the brand or brands of cigarettes smoked by each of them. Thus, plaintiffs fail to distinguish the actions of any one defendant from those of the others. As noted in the court's prior decision in *Portnoy*, plaintiffs must allege not just a duty and an injury, but how *each* (emphasis supplied) defendant caused that injury. Again, here, the complaints are devoid of any allegations linking any one, much less each defendant to the alleged injuries.

For example, each manufacturing defendant is entitled to know "the precise tortious conduct charged to [that] particular defendant." (*Aetna Casualty & Surety Co.* v. *Merchants Mutual Ins. Co.*, 84 A.D.2d 736, 737, 444 N.Y.S.2d 79, 80 (1st Dep't, 1981). To allow these allegations to stand against all of the manufacturing defendants would be, in effect, tantamount to reversing the burden of proof in a civil case and requiring each of these named defendants to prove by a preponderance of the credible evidence that they committed no tortious conduct to these plaintiffs. Therefore, these pleadings insofar as they purport to accuse the individual manufacturing defendants with perpetrating the enumerated torts are dismissed for failure to state a cause of action.

*4 With regard to the corporate parents of the manufacturing defendants, plaintiffs apparently seek to pierce the corporate veil of each of the Corporate Parents to impose liability on each and all of them for the alleged conduct of their respective subsidiaries. The doctrine of piercing the corporate veil is an infrequently imposed limitation on the principle that a corporation exists independently of its owners as a legally separate and distinct entity (See, *Morris v. New York State Dep't* of *Taxation% and* Finance, *82 N.Y.2d 135, 140, 603 N.Y.S.2d 807, 810, 623 N.E.2d 1157 (1993); see also,* American Protein Corp. v. AB Volvo, *844 F.2d 56, 60 (2d Cir., 1988),* cert. den., *488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988). The presumption of corporate separateness is especially applicable where a litigant seeks to hold a parent corporation liable for the alleged tortious conduct of its subsidiaries (See,* Meshel v. Resorts International *of* New York, Inc., *160 A.D.2d 211, 213, 553 N.Y.S.2d 342, 343 (2nd Dep't, 1990);* Horowitz v. Aetna Life Ins., *148 A.D.2d 584, 539 N.Y.S.2d 50, 53 (2nd Dep't, 1989). A parent must completely dominate and control its subsidiary before the corporate veil can be pierced (* Truglia v. KFC Corp., *692 F.Supp. 271, 275 (S.D.N.Y., 1988);* Coastal States Trading, Inc., v. Zenith Navigation S.A., *446 F.Supp. 330, 337 (S.D.N.Y., 1977).*

In New York, two elements must be pleaded (and proven) to establish liability under an" alter ego " or 'piercing the corporate veil" theory:

(1) the parent must exercise complete dominion in respect to the transaction attacked, i.e., that the subsidiary had no separate will of its own; and

(2) such domination must have been used to commit fraud or wrong against plaintiff, which proximately caused plaintiff's injury (*Morris, supra*, 82 N.Y.2d at 142, 603 N.Y.S.2d at 810-11, 623 N.E.2d 1157). To satisfy the first prong of this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 6 of 9

Not Reported in N.Y.S.2d

Page 5

Not Reported in N.Y.S.2d, 1997 WL 638800 (N.Y.Sup.)
**(Cite as: Not Reported in N.Y.S.2d)**

test, plaintiffs may not rely on conclusory statements but must allege specific facts showing that the parent corporation exercised dominion over the subsidiary (*Campo v. 1st International Bank FN,* 857 F.Supp. 264, 271 (E.D.N.Y., 1994); See also, *Abelman v. Shoratlantic Dvt. Co., Inc.,* 153 A.D.2d 821, 545 N.Y.S.2d 333 (2nd Dep't, 1989); *Cusumano v. Iota Industries, Inc.,* 100 A.D.2d 892, 893, 474 N.Y.S.2d 579, 580 (2nd Dep't, 1984).

Here, plaintiffs, in essence, contend that the Corporate Parents each controlled, dominated and directed the alleged acts of their subsidiaries, without alleging facts to support how the alleged domination was accomplished by any one of the six Corporate Parents. This is improper and will not be countenanced. However, even if plaintiffs sufficiently complied with the first prong of the test, "such domination, standing along is not enough; some showing of a wrongful or unjust act toward the Plaintiffs are required" (*Morris, supra,* 82 N.Y.2d at 141-42, 603 N.Y.S.2d at 811, 623 N.E.2d 1157); see also, *New York State Teamsters Conf. Pension* and *Retirement Fund v. Hoh,* 554 F.Supp. 519, 525 (N.D.N.Y., 1982).

*5 Accordingly, their complaint is also devoid of factual allegations indicating how each of the Parent Corporations utilized the alleged control and domination of their respective manufacturing subsidiaries to commit a fraud or wrong. Instead, all of the Corporate Parents are grouped together and there is the allegation that, collectively, they somehow utilized their domination and control over the Manufacturing Defendants to commit the fraud and the wrongful and unjust acts alleged herein. This is insufficient to meet the second prong of the test for alter ego (*Cresser v. The American Tobacco Company, et al,* N.Y.L.J., Aug 11, 1997, P. 30, Col. 3 (Sup.Ct., Kings Co., Kramer, J.). Therefore, said allegations are hereby dismissed.

Likewise dismissed are the pleadings against the two research defendants since they are devoid of any factual information supporting the claims that said defendants were dominated and controlled by the defendant manufacturers and how that domination served to "perpetrate a wrong or injustice against [[[plaintiffs]" (*Morris, supra,* 82 N.Y.2d at 142, 603 N.Y.S.2d at 811, 623 N.E.2d 1157; *Cresser,* supra).

**FRAUD AND NEGLIGENT MISREPRESENTATION**

Plaintiffs assert several allegations sounding in fraud, such as:

that unspecified defendants made claims and representations in its documents submitted to the government and to the public that nicotine was not addictive and that smoking cigarettes did not present a health risk;

that unspecified defendants acting individually and in concert, made material misrepresentations to the Federal government and to the public, including the medical profession and plaintiffs herein, regarding the composition, qualities and nature of cigarettes, specifically, but not limited to the levels of tar and nicotine in cigarettes, the propensities of tar and nicotine, the nature of tar and nicotine, the need for nicotine in cigarettes and the safety of tar and nicotine;

that unspecified defendants distributed information, including but not limited to reports and press releases to the public; and

that unspecified defendants created advertisements to disseminate results of the testing and research to the public.

However, none of these advertisements, reports, press releases or other information are specified by time or place, by whom representations were made, by what documents were submitted to the public or the government, or which of the defendants distributed or disseminated such unidentified documents. Curiously, plaintiffs fail to allege that they saw of heard any of these representations.

CPLR 3016(b) imposes a heightened standard of pleading for claims of fraud and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 7 of 9

Not Reported in N.Y.S.2d

Page 6

Not Reported in N.Y.S.2d, 1997 WL 638800 (N.Y.Sup.)
**(Cite as: Not Reported in N.Y.S.2d)**

misrepresentation when it provides:

"Where a cause of action or defense is based upon misrepresentation, fraud, mistake, willful default, breach of trust or undue influence, *the circumstances constituting the wrong shall be stated in detail* " (emphasis supplied).

A common law action for fraud has seven elements:

*6 (1) Defendant makes a representation of an alleged fact;

(2) This alleged fact is not true;

(3) Defendant knows that it is not true (Scienter);

(4) The alleged fact is a material one;

(5) Defendant makes the representation with intent to deceive;

(6) Plaintiff relies on this representation; and

(7) That reliance causes an injury to the plaintiff. (*Kuelling v. Roderick Lean Mfg. Co.*, 183 N.Y. 78, 75 N.E. 1098 (1905); *Bramex Assoc., Inc., v. CBI Agencies, Ltd.*, 149 A.D.2d 383, 540 N.Y.S.2d 243 (1st Dep't, 1989); Kreindler, Rodriguez, Beekman & Cook, *New York Law of Torts*, Sec. 16.29, p. 456).

Specific facts must be alleged and it is not sufficient to plead fraud or misrepresentation in conclusory terms (*Pontos Renovation, Inc. v. Kitano Arms Corp.*, 226 A.D.2d 192, 640 N.Y.S.2d 525 (1st Dep't, 1996). Plaintiffs' failure to be more specific in other cases has proven fatal (See, e.g., *LaPaw v. B.A.T. Industries P.L.C.*, et al, 96-CV-4373 (JG) (E.D.N.Y., March 6, 1997) (Gleeson, J.) (slip opinion); *Paugh v. R.J. Reynolds Tobacco Company*, 834 F.Supp. 228 (N.D.Ohio, 1993); *Rogers v. R.J. Reynolds Tobacco Company*, 557 N.E.2d 1045 (Ind.Ct.App., 1990); *Sola v. The American Tobacco Company* et al, Index No. 18205/96 (Sup.Ct., Bronx Co., Gonzalez, J .). This court is not satisfied with the sufficiency of the allegations sounding in fraud. Accordingly, these assertions in the complaint are dismissed.

With regard to the issue of negligent misrepresentation, plaintiffs' complaints, in conclusory fashion, make such assertions as:

All defendants had knowledge and expertise regarding the dangerous and addictive nature of nicotine;

Defendants had knowledge of the fact that it was manipulating the nicotine level in cigarettes with the intent to addict users to the cigarettes; and

Defendants were negligent in making false representations about cigarettes. However, plaintiffs do not identify what "knowledge" or " expertise" defendants had regarding the nature of nicotine. They do not identify the time or place of these "representations". They do not identify the person or entity making them.

There are five elements in a common law cause of action for negligent misrepresentation:

(1) Defendant made a statement of alleged fact;

(2) Said statement is false;

(3) Defendant knew, or should have known, of its falsity;

(4) Plaintiff relied on said statement; and

(5) Reliance on said statement caused injury to plaintiff (Kreindler, et al, *New York Law* of *Torts*, Sec. 16.30, p. 460)

Where physical harm is involved, the law is unclear in New York as to whether privity rules apply (See, Restatement (Second) of Torts, Secs. 311(1)(b), 311 cmt. a, f, 310 cmt. c-d (1965); *Brown v. Neff*, 159 Misc.2d 186, 603 N.Y.S.2d 707, 709-10 (Sup.Ct., Tompkins Co., 1993). However, dissemination of "advertisements of mass communication cannot establish 'privity' with unidentified members of the public" so as to support such a claim (*McGil v. General Motors*, 231 A.D. 449, 647 N.Y.S.2d 209 (1st Dep't, 1996); *Metral v. Horn*, 213 A.D.2d 524, 624 N.Y.S.2d 177 (2nd Dep't, 1995). Again, here, there is no indication of which defendant made which statement. Accordingly, the court holds that as to this theory, plaintiffs have, again, failed to make out a cause of action, and accordingly, the complaint as to this theory is dismissed.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 8 of 9

Not Reported in N.Y.S.2d

Page 7

Not Reported in N.Y.S.2d, 1997 WL 638800 (N.Y.Sup.)
**(Cite as: Not Reported in N.Y.S.2d)**

**CONSPIRACY, CONCERTED ACTION AND AIDING AND ABETTING**

*7 It appears that plaintiffs are bringing these actions against all defendants individually and as " Co-conspirators."

In New York, a claim for civil conspiracy is not an independent tort, but, rather, is a derivative claim of an underlying substantive tort (See, e.g., *Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.,* 871 F.Supp. 709, 731 (S.D.N.Y., 1995), citing, *Danahy v. Meese,* 84 A.D.2d 670, 446 N.Y.S.2d 611, 614 (4th Dep't, 1981); see also, *Schlotthauer v. Sanders,* 153 A.D.2d 729, 545 N.Y.S.2d 196, 197 (2nd Dep't, 1989). "The entire theory of conspiracy is that two or more persons are getting together to effectuate an unlawful purpose. This assumes an agreement to so act, either by express assent, or by inference from conduct (*Slays v. Gribetz,* 842 F.Supp. 764, 767 (S.D.N.Y.), *aff'd,*41 F.3d 1503 (2d Cir.1994), *cert. den.,*514 U.S. 1005, 115 S.Ct. 1316, 131 L.Ed.2d 197 (1995). Accordingly, allegations of conspiracy are only appropriate for the purpose of establishing joint liability by co-participants in a particular tortious conduct (*Grove Press, Inc. v. Angleton,* 649 F.2d 121, 123 (2d Cir.1981); *Valden Sportswear v. Montgomery Ward & Co.,* 591 F.Supp. 1188, 1191 (S.D.N.Y., 1984).

Initially, the court holds that to the extent plaintiffs' conspiracy, concerted action and aiding and abetting claims are being asserted against the Corporate Parents, they should be dismissed for the reason that those theories of collective liability only apply to intentional torts. Because a claim of conspiracy requires a showing of intentional conduct, "there can hardly be conspiracy to commit negligence" (*Lindsay v. Lockwood,* 163 Misc.2d 228, 625 N.Y.S.2d 393 (Sup.Ct., Monroe Co., 1994) . Accordingly, if plaintiffs are to state a viable cause of action for conspiracy, it must for one or more of the products liability causes of action.

As noted by Judge Arthur D. Spatt in *Sackett v. Liggett Group, Inc.,* 965 F.Supp. 391, 395 (E.D.N.Y., 1997), "Whether a plaintiff may maintain a cause of action to commit conspiracy to market defective products under New York law is unclear." There Justice Spatt allowed an allegation of civil conspiracy to survive a motion to dismiss for failure to state a cause of action, particularly because the area of tobacco litigation is new but developing rapidly.

A pleading of civil conspiracy requires allegations of the following:

(1) An agreement between two or more persons;

(2) for an unlawful purpose;

(3) intentional participation by said conspirators;

(4) in the furtherance of that plan or purpose; and

(5) resulting damages (*First Federal Savings & loan Ass'n v. Oppenheimer, Appel Dixon & Co.,* 629 F.Supp. 427, 443 (S.D.N.Y., 1986); In re *Houbigant, Inc.,* 914 F.Supp. 964, 989 (S.D.N.Y., 1995).

Here, plaintiffs have not sufficiently pleaded the existence of an agreement. Their allegations in this regard are purely conclusory. Additionally, unlike the situation herein, in *Sackett v. Liggett, supra,* the court could look to a named defendant, to wit: the Liggett Group, who may have entered into such an agreement. Here, defendants are unspecified and, therefore, the allegations of civil conspiracy cannot survive the motion to dismiss lodged here and, accordingly, the motions to dismiss all allegations of civil conspiracy are granted and said allegations are dismissed.

*8 Speaking now to the cause of actions for " Concerted Action", the court is advised that "The theory of concerted action 'provides for joint and several liability on the part of all defendants having an understanding, express or tacit, to participate in a common plan or design to commit a tortious act' " ( *Rastelli v. Goodyear Tire & Rubber Co.,* 79 N.Y.2d 289, 295, 582 N.Y.S.2d 373, 375, 591 N.E.2d 222 (1992). To establish a concerted action claim, a plaintiff must show that each defendant charged has acted tortiously and that one of the defendants committed an act in furtherance of the agreement which constitutes the tort (*Rastelli,* 79 N.Y.2d at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 9 of 9

Not Reported in N.Y.S.2d

Page 8

Not Reported in N.Y.S.2d, 1997 WL 638800 (N.Y.Sup.)
**(Cite as: Not Reported in N.Y.S.2d)**

295, 582 N.Y.S.2d at 375, 591 N.E.2d 222). However, parallel activity among companies developing and marketing the same product, without more, is insufficient to demonstrate the agreement element necessary to maintain a concerted action claim (*Sackman v. Liggett Group, Inc., supra,* at 396).

In *Sackman,* the court noted that a specifically named defendant, the Liggett, Group, Inc, as a member of the tobacco industry, had been in possession of scientific and medical evidence regarding the dangers of smoking cigarettes, but that, despite this knowledge, said defendant, along with other tobacco manufacturers, conspired to repress this information and misrepresent the health risks at issue. Therefore, they contended that this scheme led to continued use of cigarettes which allegedly caused one of the parties to contract lung cancer.

In the instant actions, however, there are no allegations as to who agreed with who. We are uninformed as to whether two, several or all defendants acted in concert to commit the tortious acts complained of. All that is alleged, albeit in conclusory form, is alleged parallel activity by members of the same industry, which, as noted above, is insufficient to state this cause of action. Accordingly, this cause of action asserted by these plaintiffs is dismissed.

Finally, with regard the tort of aiding and abetting, this cause of action asserted by these plaintiffs is deficient and is hereby dismissed as said plaintiffs have failed to plead the commission of an independent predicate tort by another specified defendant or defendants. Moreover, an essential element of aiding and abetting is that the defendant give "substantial assistance or encouragement" to the primary wrongdoer (Restatement (Second) of Torts, Sec. 876; *Lindsay v. Lockwood,* 163 Misc.2d 228, 232, 625 N.Y.S.2d 393, 396 (Sup.Ct., Monroe Co., 1994).

Therefore, these complaints are dismissed in their entirety for failure to state a cause of action ( CPLR 3211(a)(7) and 3013.

The foregoing constitutes the order of the court, but any party may settle order in accordance with the above.

N.Y.Sup.,1997.
Portnoy v. American Tobacco Co.
Not Reported in N.Y.S.2d, 1997 WL 638800 (N.Y.Sup.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

# TAB 10

Page 2 of 14

Westlaw.

Not Reported in A.2d

Page 1

Not Reported in A.2d, 2002 WL 1558382 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Progressive Intern. Corp. v. E.I. Du Pont de Nemours & Co.
Del.Ch.,2002.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
PROGRESSIVE INTERNATIONAL CORP., Plaintiff,
v.
E.I. DU PONT DE NEMOURS & CO., and L.J. HANNA, INC., Defendants.
**No. C.A. 19209.**

Submitted: June 25, 2002.
Decided: July 9, 2002.

Jeffrey L. Moyer and David A. Felice, Esquires, of Richards Layton & Finger, Wilmington, Delaware, Attorneys for Plaintiff.
Richard L. Horwitz, Kevin R. Shannon, and Erica L. Niezgoda, Esquires, of Potter Anderson & Corroon, Wilmington, Delaware, Attorneys for Defendants.

OPINION

STRINE, Vice Chancellor.

*1 Plaintiff Progressive International Corporation ("Progressive") brought this action to rescind a license agreement it entered into with defendant E.I. DuPont de Nemours & Co. ("Du Pont ") to manufacture and market certain kitchen utensils using DuPont's "SilverStone" trademark (the "License Agreement" or "Agreement"). Progressive hinges its request for rescission upon several theories, including fraud, negligent and innocent misrepresentation, mutual mistake of fact, and equitable estoppel. In the precise context of this case, each of these theories requires a showing that Progressive reasonably relied upon a statement by DuPont that was not embodied in the License Agreement.

In response, DuPont [FN1] has filed this motion to dismiss. It asserts, among other things, that the License Agreement contains an unambiguous integration clause, in which Progressive explicitly disclaimed any reliance on representations not contained within the four corners of the Agreement. Because Progressive's claims are based on supposed representations that are not memorialized within the text of the License Agreement itself, DuPont argues that Progressive cannot as a matter of law have justifiably relied on them.

FN1. Progressive has also sued defendant L.J. Hanna, Inc. ("Hanna"). For the sake of simplicity, I do not refer again to Hanna, which has joined DuPont's motion.

In this opinion, I conclude that DuPont's argument is a sound one. Progressive is an experienced commercial entity which had previously contracted with DuPont under an earlier licensing agreement. The License Agreement it signed with DuPont was not a contract of adhesion. Progressive had the freedom to walk away and not deal with DuPont, or to bargain for better terms, including the elimination of the integration clause.

In the License Agreement's integration clause, Progressive made two clear promises that preclude its claim for rescission as a matter of law. First, Progressive promised that DuPont had not made any representation, promise, or warranty " whatsoever, express or implied," outside the License Agreement's text concerning the subject matter of that contract to induce Progressive to enter into the Agreement.[FN2] Second, Progressive promised that it was not executing that Agreement in reliance upon any statement or representation of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 3 of 14

Not Reported in A.2d Page 2

Not Reported in A.2d, 2002 WL 1558382 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

DuPont not contained within the text of the Agreement.

FN2. License Agreement § 18.9.

Having agreed that DuPont had not made any non-contractual representations to induce Progressive to sign the Agreement and having agreed that it had not relied upon any such representations in deciding to sign the Agreement, Progressive could not reasonably base its decision to sign that Agreement on statements of DuPont that were not incorporated in the text of the Agreement. Stated differently, Progressive contractually agreed that it was not entering the License Agreement on the basis of extra-contractual representations by DuPont; as a result, it thereby acknowledged the unreasonableness of grounding its execution of the contract on statements of DuPont that were not included within the contract as binding legal promises.

To enable Progressive to proceed with its rescission claims would allow it to escape the plain language of a commercial contract it voluntarily chose to sign, and renege on a contractual promise it made to DuPont. Even assuming the facts are as Progressive has stated them to be, its unambiguous decision to foresake reliance on any representations not contained in the License Agreement renders its allegations of reasonable reliance unsustainable as a matter of law. Sophisticated parties are bound by the unambiguous language of the contracts they sign.

***2** DuPont has also moved to dismiss Progressive's claim that the License Agreement is unconscionable. The doctrine of unconscionability is sparingly used in the law, and is inapplicable to the License Agreement. None of the terms of that Agreement are so shockingly one-sided as to warrant a finding of unconscionability. This is not surprising, because it would be highly unusual for a court to conclude that the terms of a negotiated manufacturing agreement between two commercial entities were so fundamentally unfair that a court must act as a guardian for one of the parties. Here, the terms of the Agreement make clear that Progressive was able to bargain for protections for itself. Its after-the-fact regret that it did not obtain stronger guarantees, or simply walk away and not deal with DuPont, does not buttress an unconscionability claim. That Progressive must now pay the costs of the economic risks it assumed under the Agreement is a reality of the commercial freedom it enjoys in this society, and is not grounds for equity to rewrite the Agreement after the fact to salve Progressive's wounds at DuPont's expense. For these and the additional reasons detailed later in this opinion, DuPont's motion to dismiss is granted.

## I. *Factual Background*[FN3]

FN3. I have crafted the factual background from Progressive's complaint and the documents incorporated therein.

Plaintiff Progressive has been engaged in the business of marketing and distributing kitchen products (alternatively, "kitchenware") since 1973. Among many other business activities, defendant DuPont is engaged in the manufacture and licensing of certain non-stick coatings and applications for use in various consumer products. DuPont owns the trademark for SilverStone, a commercially successful mark, which has been used on non-stick cookwares since 1976.

### A. *The Parties Enter Preliminary Discussions for a Licensing Agreement*

In recent years, DuPont sought to capitalize on the success of its SilverStone cookware line by expanding into selected product areas, including " housewares." [FN4]As part of that general expansion, in mid-1999, DuPont engaged Progressive in discussions about executing a licensing agreement whereby Progressive would manufacture and market a line of kitchen utensils under the SilverStone brand.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 4 of 14

Not Reported in A.2d

Page 3

Not Reported in A.2d, 2002 WL 1558382 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN4. As defined by DuPont, this term encompasses, for present purposes, kitchen electrics, kitchen tools and gadgets, cutlery, outdoor barbeque grills, and outdoor barbeque accessories and utensils. *See* Presentation Materials From 9/23/01 Meeting, First Am. Compl. Ex. B (hereinafter "9/23 Presentation Materials") at 9.

Progressive is no stranger to DuPont, or for that matter, the SilverStone mark. On January 1, 1998, the two entities entered into an agreement under which Progressive licensed the SilverStone and Teflon trademarks from DuPont for use in bakeware liners (the "Bakeware Agreement"). In April of 1998, DuPont altered the branding strategy for the Bakeware Agreement. Believing that the Teflon name had become generic in the minds of consumers,[FN5] DuPont purportedly decided to make the SilverStone mark the primary brand under which the non-stick bakeware products would be marketed. DuPont did so, it is asserted, in order to recapture some of the brand equity it felt had eroded away from the Teflon mark.

FN5. While not explained in great detail in its pleadings, it appears that the Teflon mark refers specifically to the non-stick coating applied to the kitchen products. By contrast, the SilverStone mark appears to refer more generally to the finished non-stick kitchen products that use the non-stick coating.

At any rate, DuPont's preliminary interest in pursuing a new SilverStone agreement is evidenced by a letter to William Reibl, president of Progressive. Dated July 21, 1999, the letter notes that "we feel that Progressive could be a good fit for the SilverStone® licensing program in the areas of kitchen utensils, gadgets, and BBQ tools."[FN6]Reibl was informed that DuPont intended to introduce the expanded SilverStone line in 2000.

FN6. First Am. Compl., Ex. A at 2.

B. *The September 23rd Presentation*

*3 On September 23, 1999, DuPont made an exclusive confidential presentation (the "September 23rd Presentation") designed to better acquaint Progressive with the nascent SilverStone expansion, and to gauge its interest in a joint venture. The content of that Presentation in large part forms the basis of Progressive's complaint in this matter. While Progressive asserts that the Presentation contained no less than nine separate statements by DuPont it later relied upon when it entered into the License Agreement, those statements can be generally divided into two categories.

1. *DuPont's Assertions Regarding the Commercial Viability of Expanding Into the Housewares Market*

Several of DuPont's assertions during the September 23rd Presentation revolved around the supposed viability of growing the SilverStone line. Specifically, Progressive avers that DuPont made the following claims during the course of the Presentation:

- The housewares market dynamics were "ideal" for the expansion of the SilverStone line.[FN7]

FN7.*Id.* ¶ 8(a).

- The SilverStone brand name was under-utilized, and could easily be expanded to become an independent consumer product brand.
- SilverStone's brand equity was "strong, clear, and transferable," and the brand commanded a premium over comparable brands.
- The SilverStone brand extension into kitchen utensils was "commercially viable[,] and the idea had been well received by the trade."[FN8]

FN8.*Id.* ¶ 8(g).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 5 of 14

Not Reported in A.2d
Page 4

Not Reported in A.2d, 2002 WL 1558382 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

• The retailing of the SilverStone line of kitchenware would provide for greater profit margins than those available with respect to non-SilverStone kitchen products.[FN9]

FN9. *Id.* ¶ 8(h). At the September 23rd Presentation, DuPont bolstered this assertion by reference to an internal "price premium" study, which found, among other things, that based on an average kitchen utensil price of five dollars, " three-quarters are willing to pay at least 20% more" for a SilverStone utensil. 9/23 Presentation Materials at 29.

Progressive asserts that each of these representations was at best mistaken, and at worst, made with knowledge of its falsity. With respect to the statements concerning the commercial viability, demand, and transferability of the SilverStone mark, it avers that DuPont's representations were incorrect because they were based on consumer surveys conducted to gauge interest in a line of SilverStone *electric* products. Because these surveys did not measure the consumer appeal of a potential line of SilverStone *housewares,* Progressive argues, they were not a sound basis for gauging consumer interest in a new line of SilverStone kitchen products.

More important, Progressive claims that DuPont required it to keep the proposed venture and DuPont's branding strategy confidential from consumers, retailers, and others in the housewares industry. This shield of confidentiality, Progressive asserts, "effectively hamstrung" its efforts to engage in the type of comprehensive due diligence one would expect a company to perform before engaging in a venture of this type. That is, Progressive asserts that the stringent promise of confidentiality extracted by DuPont precluded it from properly performing its own investigation as to the commercial advisability of agreeing to a SilverStone license agreement.

2. *DuPont's Assertions Regarding Its Commitment to a Strategic Plan*

*4 Progressive also asserts that it relied on several statements DuPont made during the September 23rd Presentation regarding DuPont's " solid strategic plan" for the expansion of the SilverStone line.[FN10] Specifically, Progressive claims to have relied upon DuPont's assertions that (1) it was committed to building a successful SilverStone licensing program that would utilize its extensive industry contacts with manufacturers and retailers in the cookware field, and (2) the SilverStone product line would grow to include not only the kitchenware segment contemplated by Progressive, but would also include other products to be offered by additional licensees.

FN10. First Am. Compl. ¶ 8(c).

C. *Progressive and DuPont Sign the License Agreement*

As the parties moved closer to implementing an agreement, two other putatively false statements were alleged to have emanated from the DuPont camp. First, in October and November of 1999, DuPont told Progressive that the proposed line of SilverStone kitchenware "would not generally present any major coating problems."[FN11] In addition, DuPont allegedly informed Progressive that the cost of coating the new products would be in the range of fifteen to twenty cents per unit.

FN11. *Id.* ¶ 12.

Acting on the basis of all these representations, as well as "other miscellaneous representations," [FN12] Progressive and DuPont executed the 27-page License Agreement on December 8, 1999. Under the Agreement, Progressive was granted an exclusive five-year license to utilize the SilverStone mark in connection with the manufacture, sale, promotion, marketing, advertising, and distribution of SilverStone-branded "kitchen/cooking utensils,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 6 of 14

Not Reported in A.2d

Page 5

Not Reported in A.2d, 2002 WL 1558382 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

tools and gadgets" (hereinafter, "Kitchen Utensils" or "Utensils") in certain specified stores in the United States and Canada (the "License").[FN13]

FN12.*Id.* ¶ 15.Progressive never explains the substance of these other representations.

FN13. License Agreement, Schedule A.

The License came at a price. Progressive was required to pay DuPont earned royalties of five percent of its net sales, as well as advance royalties totaling $150,000 over the five-year term of the Agreement. In addition, the Agreement also required Progressive to pay certain minimum guaranteed royalties at one-year intervals ("Contract Periods"). Those royalties were deemed a "fixed, absolute obligation of [Progressive] ... notwithstanding any election by [Progressive] to terminate the LICENSE and regardless of whether sales of LICENSED PRODUCTS generate earned royalties in an amount equal to [the] Minimum Guarantee."[FN14]

FN14.*Id.* § 3.4.

By its terms, the Agreement could be automatically renewed for an additional five years if (1) Progressive remained in compliance with all terms therein, and (2) it generated earned royalties of $500,000 during Contract Period 5 (*i.e.*, the fifth year of the Agreement) .[FN15]But under Article 12, both DuPont and Progressive had the right, under certain circumstances, to terminate the Agreement. For instance, § 12.3 states that "[i]f either Party violates any of the material provisions provided in this LICENSE, the other Party shall have the right to terminate this LICENSE upon sixty (60) days written notice, provided that the breaching Party fails to cure the violation within the sixty (60) day period ...."[FN16]

FN15. The Agreement contained an exception to the provision requiring earned royalties of $500,000 during Contract Period 5. That exception is not material to this dispute.

FN16. License Agreement § 12.3.

*5 Most critically for present purposes, the Agreement also contained an integration clause. Section 18.9 of the License Agreement reads as follows:

*Integration.*This LICENSE and any attached schedules and exhibits, constitutes the entire agreement between the Parties pertaining to the subject matter contained herein and supercedes all prior and contemporaneous agreements, representations, and understandings of the Parties. Each of the Parties acknowledges that no other party, nor any agent or attorney of any other party, has made any promise, representation, or warranty whatsoever, express or implied, and not contained herein, concerning the subject matter hereof to induce the Party to execute or authorize the execution of this LICENSE, and acknowledges that the Party has not executed or authorized the execution of this instrument in reliance upon any such promise, representation, or warranty not contained herein....[FN17]

FN17.*Id.* § 18.9.

Thus, by the terms of the Agreement, both parties expressly agreed and stipulated that no party had made any representation to induce the other to execute the License Agreement, nor had either party executed the Agreement in reliance "upon any such . .. representation ... not contained [t]herein."[FN18] The final paragraph in the Agreement also states that "the Parties have read this LICENSE in its entirety, including the incorporated and attached Exhibits and Schedules, and by their execution below have agreed to all its terms and conditions."[FN19]

FN18.*Id.*

FN19.*Id.* at 18.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 7 of 14

Not Reported in A.2d

Page 6

Not Reported in A.2d, 2002 WL 1558382 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

D. *In Response to Poor Sales, Progressive Raises Certain "Production Claims" With DuPont*

Following the execution of the License Agreement, Progressive set about the task of designing and manufacturing its Kitchen Utensils. From the outset, however, it faced higher-than-expected costs-overruns it largely attributes to the inability of DuPont and its affiliates to transfer their knowledge of applying non-stick coating to the Kitchen Utensils. The Utensils debuted in April of 2000. By late 2001, however, Progressive claims that production costs had grown forty to fifty percent higher than was represented by DuPont during negotiations.

In August of 2000, the parties convened a conference call to discuss, among other things, three issues critical to Progressive. First, Progressive raised concerns about its higher-than-anticipated production costs. To remedy the problem, it suggested relaxing a requirement in the Agreement that DuPont-certified coaters must be used to coat the Utensils. DuPont was not amenable to that suggestion. Second, Progressive blamed the failure of the Kitchen Utensils to reach markets in time for the holiday season on a communication breakdown between DuPont's U.S. and Hong Kong offices. Finally, in supposed contravention of previous assurances, Progressive told DuPont that retailers had told it (Progressive) that the addition of the SilverStone mark added no value to the Utensils. [FN20]

FN20. It was also around this time that Progressive asserts that it learned it had been provided false information "with respect to the production capability and the history and existing market for the SilverStone brand."Ans. Br. at 7.

E. *DuPont Unveils a New Branding Strategy for the SilverStone Mark*

*6 Proof that an earlier DuPont representation had been false supposedly arose at a meeting between the parties in November of 2000. At that meeting, DuPont announced that it had designed a new "brand paradigm"-one that involved resurrecting the Teflon mark by combining SilverStone-branded cookware with Teflon non-stick coating. Because Progressive had allegedly entered the License Agreement in part upon the understanding that the SilverStone mark would be the brand around which a comprehensive branding strategy would be launched, it was " stunned by this revelation." [FN21]In its own words, Progressive claims that "DuPont had made the decision to go with Teflon and never told Progressive until long after [it] had agreed to expend millions for the right to use the SilverStone mark."[FN22]

FN21.*Id.* at 8.

FN22.*Id.* at 13.

Progressive was instructed to add certain Teflon tags [FN23] to its product lines, or risk being disassociated with DuPont when Teflon was reintroduced into the North American market. Progressive asserts that the reintroduction of Teflon had been contemplated by DuPont for several years and, indeed, had already been implemented in Europe.

FN23. It appears that the use of Teflon was purely a marketing issue, because the non-stick product Progressive was receiving from DuPont did not change.

Relations between the parties did not improve in the summer of 2001. In June, DuPont received its previously commissioned "SilverStone Marketing/Retail Strategy Study." According to Progressive, that study contradicted certain of DuPont's previous representations by establishing (1) that the Kitchen Utensils were too expensive for their target market, and (2) the sales volume required to support the License Agreement's royalty requirements could not be achieved in the limited channels identified by DuPont in 1999. Further,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 8 of 14

Not Reported in A.2d
Page 7

Not Reported in A.2d, 2002 WL 1558382 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Progressive claims that the study was not disclosed to them until mid-August.

Meanwhile, sales remained stagnant, and Progressive failed to make a quarterly guaranteed minimum royalty payment as required by the License Agreement. As a result, on August 28, 2001, Progressive received from DuPont a notice of breach and demand for cure as provided by Article 12 of the Agreement. On October 25, 2001, only days before the expiration of the contractual cure period, Progressive filed an action seeking to rescind the by-then nearly two-year-old License Agreement.

II. *Legal Analysis*

Under Delaware Court of Chancery Rule 12(b)(6), a motion to dismiss shall be granted where it appears with "reasonable certainty" that the non-moving party "could prevail on no set of facts that can be inferred from the pleadings."[FN24] In addressing a motion to dismiss for failure to state a claim, the court must assume the truthfulness of all well-pled allegations in complaint.[FN25]

FN24. *Solomon v. Pathe Communications Corp.*, 672 A.2d 35, 38 (Del.1996).

FN25. *In re USACafes, L.P. Litig.*, 600 A.2d 43, 47 (Del. Ch.1991).

Based on the allegedly false representations detailed above, Progressive has pled five separate counts all seeking the remedy of rescission: fraud, innocent or negligent misrepresentation, mutual mistake of fact, equitable estoppel, and unconscionability. A common thread runs through all the counts, except for unconscionability, in the sense that each requires that Progressive have *reasonably relied* on representations by DuPont that were not incorporated into the License Agreement. That is, to succeed on its claims of fraud, innocent or negligent misrepresentation, mutual mistake, and equitable estoppel, Progressive's action or inaction must have been taken in *justifiable reliance* upon promises or statements by DuPont that did not find a home in the Agreement.[FN26]

FN26. The case law may phrase this justifiable reliance requirement in slightly different terms, but the requirement is a common one for each of these causes of action. To allege a claim for common-law fraud, a plaintiff must plead (1) a false representation made by the defendant; (2) the defendant's knowledge or belief that the representation was false or made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff. *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del.1983); *see also* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS 728 (5th ed.1974).

A cause of action for negligent or innocent misrepresentation is the same as that for common-law fraud, with the exception that a defendant need not know or believe her statement is false or have proceeded in reckless disregard for the truth. *Stephenson*, 462 A .2d at 1074;*see also Zirn v. VLI Corp.*, 681 A.2d 1050, 1060-61 (Del.1996).

The standards for establishing a cause of action for equitable estoppel are stringent. The doctrine is applied cautiously, and only to prevent manifest injustice. *See, e.g., Two South Corp. v. City of Wilmington*, 1989 WL 76291, at *7 (Del. Ch.); 28 AM. JUR. *Estoppel and Waiver* § 129 (2001); *Singewald v. Girden*, 127 A .2d 607, 617 (Del. Ch.1956). A plaintiff raising an estoppel claim must demonstrate (1) a lack of knowledge, and the means of obtaining knowledge, of the truth of the facts in question; (2) that he relied upon the conduct of the party against whom the estoppel is claimed; and (3) that he suffered a prejudicial change of position. Moreover, the reliance upon the conduct of the party against whom the estoppel is raised must be *reasonable and justified under the circumstances. Two South Corp.*, 1989 WL 76291, at *7 (emphasis added).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 9 of 14

Not Reported in A.2d

Page 8

Not Reported in A.2d, 2002 WL 1558382 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

The elements required for a mutual mistake claim are framed somewhat differently. Under the Restatement (Second) formulation followed by Delaware courts, *see Wilson v. Pepper,* 1989 WL 268077, at *4 (Del. Ch.), *overruled on other grounds,*608 A.2d 731 (Del.1992); *Shore Builders, Inc. v. Dogwood, Inc.,* 616 F.Supp. 1004, 1011-12 (D.Del.1985), a party must demonstrate that (1) both parties were mistaken as to a basic assumption; (2) the mistake materially affects the agreed-upon exchange of performances; and (3) the party adversely affected did not assume the risk of the mistake. RESTATEMENT (SECOND) OF CONTRACTS § 151 (1981).

The Restatement describes three scenarios in which a party is said to assume the risk of mistake. The "most obvious" one of these, *id.,* is the scenario we have in this case: namely, when the *agreement itself* provides that that party bears the risk of mistake. *Id.* Thus, while the analysis for a claim of mutual mistake is couched in the language of equity, the resolution of the claim requires an examination of the language of the Agreement, which in this case demonstrates that extra-contractual representations could not serve as basic assumptions of the parties to that contract.

A. *Because Progressive's Reliance Was Unreasonable, Its Fraud, Misrepresentation, Mutual Mistake, and Estoppel Claims Must Be Dismissed*

*7 A failure of justifiable reliance is fatal to Progressive's fraud, misrepresentation, mutual mistake, and equitable estoppel claims. As a general matter, under the objective theory of contracts to which Delaware adheres, [FN27] it is presumed that the language of a contract governs when no ambiguity exists. Under the objective theory, " 'intent' does not invite a tour through [the plaintiff's] cranium, with [the plaintiff] as the guide."[FN28]This presumption that parties will be bound by the language of the contracts they negotiate holds even greater force when, as here, the parties are sophisticated entities that bargained at arm's length.[FN29]

FN27.*See, e.g., Haft v. Haft,* 671 A.2d 413, 417 (Del. Ch.1995); *Bell Atlantic Meridian Sys. v. Octel Communications Corp.,* 1995 WL 707916, at *5 (Del. Ch.); *Leeds and Parkview Convalescent Ctr., Inc. v. First Allied Connecticut Corp.,* 521 A.2d 1095, 1097 (Del. Ch.1986).

FN28. E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 3.6 (2d ed.2000) (quoting *Skycom Corp. v. Telstar Corp.,* 813 F.2d 810, 814 (7th Cir.1987)).

FN29.*See J.A. Moore Constr. Co. v. Sussex Assocs. L.P.,* 688 F.Supp. 982, 990 (D.Del.1988); *cf. Insituform Techs., Inc. v. Insitu, Inc.,* 1999 WL 240347, at *11 (Del. Ch.).

More specifically, Delaware courts have held that sophisticated parties may not reasonably rely upon representations that are inconsistent with a negotiated contract, when that contract contains a provision explicitly disclaiming reliance upon such outside representations.[FN30]In *Great Lakes Chem. Corp. v. Pharmacia Corp.,* for instance, this court considered whether a series of clauses in a purchase agreement between two corporations barred the buyer's fraud claims. One of those clauses stated that "[e]ach of [the sellers] expressly disclaims any and all liability that may be based on such information or errors [within due diligence information provided to the buyer] or omissions therefrom."[FN31]In holding that the parties' contractually negotiated disclaimers extinguished the fraud claims, Vice Chancellor Jacobs stated:

FN30.*See Great Lakes Chem. Corp. v. Pharmacia Corp.,* 788 A.2d 544 (Del. Ch.2001); *J.A. Moore,* 688 F.Supp. 982 (in a multi-million dollar construction contract, the court found that oral representations that conflicted with clear disclaimer provisions of the written contract could not be the subject of justifiable reliance by a plaintiff claiming fraud); *see also DCV Holdings, Inc. v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 10 of 14

Not Reported in A.2d

Page 9

Not Reported in A.2d, 2002 WL 1558382 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

*Conagra, Inc.*, 2002 WL 992164 (Del.Super.) (similar holding).

FN31.788 A.2d at 552.

Were this court to allow [the buyer] to disregard the clear terms of its disclaimers and to assert its claims of fraud, the carefully negotiated and crafted Purchase Agreement between the parties would... not be worth the paper it is written on. To allow [the buyer] to assert, under the rubric of fraud, claims that are explicitly precluded by contract, would defeat the reasonable commercial expectations of the contracting parties and eviscerate the utility of written contractual agreements.[FN32]

FN32.*Id.* at 556.

That reasoning applies with equal force here. Similar to the disclaimer provision in *Great Lakes,* the integration clause in the License Agreement provides that all parties expressly agreed and stipulated that no party had made any representation to induce the other to execute the License Agreement, nor had any party executed the Agreement in reliance "upon any such ... representation ... not contained herein."[FN33]

FN33. License Agreement § 18.9.

Absent fraud or other unconscionable circumstances not present here,[FN34] the existence of an integration clause between sophisticated parties is conclusive evidence that the parties intended the written contract to be their complete agreement.[FN35]There can be little question that Progressive, an entity in business for the better part of thirty years that had previously negotiated an agreement to license DuPont intellectual property, is such a sophisticated party. Thus, having negotiated the provisions of the License Agreement, Progressive is bound by all of its clear terms-including the integration clause.[FN36]

FN34. Progressive does not even attempt to argue that the integration clause was itself fraudulently induced.

FN35.*J.A. Moore,* 688 F.Supp. at 987 (citing FARNSWORTH ON CONTRACTS § 7.3 (1983)).

FN36. The fact that Progressive is a sophisticated business entity with a demonstrated course of dealing with DuPont is sufficient to distinguish the facts of this case from *Norton v. Poplos,* 443 A.2d 1 (Del.1982). In *Norton,* the Delaware Supreme Court held that Delaware law prohibited the use of contract disclaimers to release claims of fraud. However, the particular disclaimer provision at issue in *Norton* was an unnegotiated "boilerplate" clause in a real estate contract. Later cases have held that such disclaimer provisions are enforceable when the parties to the agreement are sophisticated entities that carefully negotiated its provisions, as was the case here. *See Great Lakes,* 788 A.2d at 555; *J.A. Moore,* 688 F.Supp. at 990-91.

*8 Nor does Progressive's assertion that its due diligence efforts were "effectively hamstrung" as a result of DuPont's policy of strict confidentiality during negotiations for the Agreement persuade me that it ought to be permitted to escape the preclusive effect of the integration clause. Progressive argues that the wall of confidentiality erected by DuPont as a condition to negotiation precluded it from engaging in all the due diligence necessary to protect an entity about to enter a large-scale licensing agreement. Having been so precluded, the argument goes, Progressive had no choice but to rely on the statements made by DuPont during the course of negotiations.

This argument is dissonant with commercial good sense. Even if DuPont insisted upon strict confidentiality, Progressive misconstrues the scope of meaningful choice still available to it when it negotiated the License Agreement. Taking as true its claim that it was precluded from doing its own marketing research regarding the viability of a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 11 of 14

Not Reported in A.2d

Page 10

Not Reported in A.2d, 2002 WL 1558382 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

SilverStone line of kitchen utensils, Progressive still had three options.

First, if Progressive felt that due diligence was truly foreclosed in a manner that posed unacceptable dangers, it could have taken the most cautious approach and walked away from any proposed deal. Second, Progressive could have taken a riskier course. Having been in the kitchen products business since 1973, Progressive could have drawn on its significant reserve of experience and expertise within that industry by exercising its own business judgment as to the commercial appeal of the SilverStone mark and the advisability of forging an agreement, the profitability of which would depend in some substantial measure on that factor. Indeed, given its long-standing expertise in the kitchenwares field, Progressive's decision to continue negotiations in the face of a confidentiality agreement can be read as an implicit admission that it had the means at its disposal to independently evaluate the merits of a proposed deal and decided to assume the risk of its own misjudgments.

But there was also a third and crucially important option available to Progressive. *To the extent that Progressive believed DuPont's representations-regarding the market appeal of SilverStone or other matters-were important or even fundamental to its decision to contract, Progressive could have negotiated to have those representations reduced to writing and included in the Agreement.* I do not quibble with Progressive's claim, for instance, that an assurance by DuPont that it had performed adequate market research might have been relevant to Progressive's decision whether to enter the Agreement. But if that were so, why didn't Progressive extract a warranty in the Agreement stating, for example, that DuPont had performed a reputable market study demonstrating the commercial viability of SilverStone non-stick cutlery?

Of course, no such provision appears in the contract. Instead, the Agreement plainly states that no promise regarding the market demand for SilverStone [FN37] had been made by DuPont to induce Progressive to sign the Agreement, and that Progressive was not relying upon any such promise in deciding to execute that Agreement. That is, by its own binding contractual representation, Progressive precluded its ability to reasonably rely on any oral statements made about consumer demand for SilverStone.

FN37. Or any other subject.

*9 This conclusion is consonant with the decision of this court in *DeBakey Corp. v. Raytheon Service Co.*[FN38] In that case, Raytheon argued that it had been denied the ability to perform adequate due diligence by its joint venture partner, ITS, and was thereby fraudulently induced into signing their joint venture agreement. In rejecting Raytheon's argument, this court held that

FN38.2000 WL 1273317 (Del. Ch.).

[a]bsent careful due diligence, RSC/Raytheon should have formalized RSC's representations by insisting that they be expressed and included in the JV Agreement as contractual representations and warranties.... Because RSC/Raytheon did not do that or conduct adequate due diligence ... it has not established that its reliance on ITS's representations were justified.... If it was truly important that RSC/Raytheon be assured that [a particular representation was true], it would have been reasonable-indeed, customary-for RSC/Raytheon to insist that that assurance be expressed as representations and warranties in the JV Agreement. The absence of such contract protections suggests that RSC/Raytheon did not believe that it needed them ....[FN39]

FN39.*Id.* at *27; *see also In re IBP, Inc. Shareholders Litig.*, 789 A.2d 14, 74 (Del. Ch.2001) ("To the extent that a contracting party chose not to negotiate for specific language regarding an issue, the most plausible inference is that the issue was simply not fundamental enough to buttress a rescission claim.").

Another of Progressive's arguments illustrates

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 12 of 14

Not Reported in A.2d

Page 11

Not Reported in A.2d, 2002 WL 1558382 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

the unreasonableness of any reliance it placed on statements by DuPont that were not included in the License Agreement. As grounds for rescission, Progressive alleges that it relied upon statements by DuPont regarding the cost to apply the non-stick SilverStone coating to the Kitchen Utensils during the term of the manufacturing agreement. Now, it is, of course, perfectly sensible for a party in Progressive's position to regard a cost factor like this as important. What is not commercially sensible or reasonable is for Progressive to have believed that the cost of applying SilverStone was critical to its decision to enter the License Agreement, and to have simultaneously promised that (i) DuPont made no statement regarding those costs to induce Progressive to sign the contract, and (ii) Progressive had not relied upon any such statement in agreeing to the deal. Not only that, Progressive expressly assumed the contractual risk of paying DuPont guaranteed minimum royalties that could not be reduced, regardless of manufacturing costs,[FN40] despite having allegedly relied upon an assurance that its cost of coating would only be fifteen to twenty cents per Kitchen Utensil.

FN40. License Agreement § 3.4.

Progressive's own contractual promises are impossible to square with its current argument that

[t]he cost of production figures required to coat the SilverStone-branded utensils was of vital importance because Progressive's subsistence under the License Agreement hinged upon defendants' representations concerning costs being accurate.... No matter how much it cost Progressive to make a seven dollar spatula, DuPont was paid a royalty fee on the seven dollars. Therefore, *defendants' representations as to the costs of production and the technology required to coat the utensils was one of the most important representations upon which Progressive relied* when it agreed to enter into the License Agreement with defendants.[FN41]

FN41. Ans. Br. at 20 (emphasis added).

***10** It would have been easy for the parties to have addressed Progressive's cost concerns with contractual language. For example, DuPont could have guaranteed that the per-unit cost of production would not exceed twenty cents per unit, or have given Progressive price relief from the Minimum Royalties or a right to terminate in that eventuality. But no provisions of this kind appear in the License Agreement. To the contrary, the plain terms of the Agreement allocate the risk of excessive coating costs entirely to Progressive in the early years of the Agreement.[FN42]

FN42.*See, e.g.,* License Agreement § 3.4.

When it signed the Agreement, Progressive averred that it had read all its terms and agreed to all its provisions, including the provision stating it was not relying upon any representations outside the four corners of the contract. But Progressive now asserts that it was-contrary to its promise to DuPont-relying on cost-of-production representations outside the scope of that Agreement. In essence, Progressive is saying to the court, " Believe us now when we tell you we made a false promise to DuPont then."

The law cannot sanction this type of argument. DuPont bargained for the promises made in the integration clause. Had Progressive insisted upon the elimination of that clause, DuPont might well have decided not to sign the License Agreement, precisely because it did not want to be subjected to after-the-fact rescission claims premised on oral discussions between the parties that were never formalized into contractual promises.

If Progressive is allowed to proceed with its fraudulent inducement claims, it will be released from its own breach of the License Agreement, a result that is unreasonable and that creates a troubling precedent for commercial parties forging future contracts. By contrast, if Progressive is expected to live up to its own words, the reasonable expectations of the parties to the License Agreement are enforced and the importance of contractual text is reinforced-results in keeping with the public policy of this state.[FN43]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 13 of 14

Not Reported in A.2d

Page 12

Not Reported in A.2d, 2002 WL 1558382 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN43.*See, e.g., MHM/LLC, Inc. v. Horizon Mental Health Mgmt., Inc .,* 1996 WL 592719, at *2 (Del. Ch.) ("[F]undamental rules of construction require strict adherence to the language of the contract when its provisions are clear." ); *see also City Inv. Co. Liquidating Trust v. Continental Cas. Co.,* 624 A.2d 1191, 1198 (Del.1993); FARNSWORTH ON CONTRACTS § 3.6.

Progressive makes a final argument that highlights the infirmity of its claims. It contends that it could only have bargained away its right to rely on extra-contractual representations if the contract was written so that Progressive was only disclaiming reliance upon those representations or subjects specifically identified in the contract. That is, for a disclaimer like the one contained in the integration clause to be of binding effect, it must be accompanied by a compendium listing every representation and issue that the parties were not relying upon as a basis for contracting with each other. Otherwise, Progressive says it could not know what representations or subjects it was *not* relying upon in executing the Agreement.

If adopted as law, Progressive's argument would impede commerce. It is not efficient for negotiators to identify all the material issues that are not part of the foundation of their relationship, and to list them in a contractual schedule. Indeed, that exercise would be wasteful and silly, as the integration clause in the License Agreement shows. By simple and unambiguous means, the parties to that Agreement identified all the representations and statements that could not have induced the execution of the Agreement: all representations and statements not included in the text of the Agreement itself. This method of identification does not become unclear simply because it is terse. And it is efficient, because it forces the parties to focus on the language of the contract and include therein any representations that form the foundation for their mutual agreement.

B. *The Mere Presence of Unequal Bargaining Power Is Insufficient to Support a Claim for Unconscionability*

*11 Progressive has also sought to set aside the License Agreement on grounds of unconscionability. But, at most, Progressive has merely suggested that it might have wielded less bargaining power than DuPont, in the sense that its desire to deal with DuPont was greater than DuPont's desire to deal with it. This sort of unequal bargaining power does not support an unconscionability claim.

A mere disparity in the bargaining power of parties to a contract will not support a finding of unconscionability.[FN44] Rather, to support such a finding, a court must find that the party with superior bargaining power used it to take unfair advantage of its weaker counterpart. For a contract clause to be unconscionable, its terms must be "so one-sided as to be oppressive."[FN45] Put another way, "[u]nconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party."[FN46] Courts have been reluctant to apply the doctrine, recognizing among other things that the parties' "bargaining power will rarely be equal."[FN47] Further, courts are particularly reluctant to apply the doctrine in favor of sophisticated corporations.[FN48]

FN44.*Tulowitzki v. Atlantic Richfield Co.,* 396 A.2d 956, 960 (Del.1970).

FN45.*Id.* ("The traditional test is this: a contract is unconscionable if it is 'such as no man in his senses and not under delusion would make on the one hand, and as no honest or fair man would accept, on the other." ') (internal citations omitted); *see also Graham v. State Farm Mut. Auto Ins. Co.,* 565 A.2d 908 (Del.1989).

FN46. FARNSWORTH ON CONTRACTS § 4.28 (2d ed.2000). The former portion of that formulation,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

regarding an absence of meaningful choice, has been deemed "procedural" unconscionability, while the latter, involving "unreasonably favorable" terms, has been deemed "substantive" unconscionability. *Id.*

FN47.*Id.*

FN48.*Id.*

The application of the doctrine of unconscionability is clearly inappropriate here. Nothing prevented Progressive from refusing to contract with DuPont if it did not have the leverage to forge an agreement on terms it believed were favorable. At any point, Progressive could have taken its ball and gone home. Likewise, it has failed to identify shockingly unfair terms that warrant having the court intervene on its behalf to relieve it of economic risks it voluntarily assumed. The absence of such outrageous terms is not surprising, given that Progressive is a business entity with thirty years of experience in the housewares industry, which made a voluntary decision to enter into an Agreement to license kitchen utensils.

III. *Conclusion*

For the reasons herein cited, DuPont's motion for summary judgment is granted as to all counts. The parties shall submit a conforming order within seven days.

Del.Ch.,2002.
Progressive Intern. Corp. v. E.I. Du Pont de Nemours & Co.
Not Reported in A.2d, 2002 WL 1558382 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 11

Page 75 of 118

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2004 WL 189784 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
RGC Intern. Investors, LDC v. Ari Network Services, Inc.
D.Del.,2004.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
RGC INTERNATIONAL INVESTORS, LDC, Plaintiff,
v.
ARI NETWORK SERVICES, INC. Defendant.
**No. Civ. 03-0003-SLR.**

Jan. 22, 2004.

Martin S. Lessner, and Sara Beth A. Reyburn, of Young Conway Stargatt & Taylor, LLP, Wilmington, Delaware, for Plaintiff, Michael R. Klein, Robert F. Hoyt, and Christopher A. Wilbur, of Wilmer, Cutler & Pickering, Washington, District of Columbia, of counsel.
Edward M. McNally, and Matthew F. Lintner, of Morris, James, Hitchens & Williams LLP, Wilmington, Delaware, for Defendant, Bruce G. Arnold, Ross A. Anderson, Lisa M. Arent, and John B. Tuffnell, of Whyte HirschboeckDudek S.C., Milwaukee, Wisconsin, of counsel.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 On January 2, 2003, plaintiff RGC International Investors, LDC filed the present action against defendant ARI Network Services, Inc. seeking a declaration of rights and obligations under a certain contract between the parties, damages for breach of that contract, and injunctive relief. (D.I.1) Presently before the court is plaintiff's motion for summary judgment. (D.I.23)

II. BACKGROUND

Plaintiff is a Cayman Islands limited duration company with its principal place of business in Bala Cynwyd, Pennsylvania. Defendant is a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin. On April 21, 2000, pursuant to a Stock Purchase Agreement ("SPA") (D.I.1, ex. 1), defendant issued and sold to RGC a debenture and an option to purchase additional shares of common stock ("the Securities"). (D.I.1) The transaction permitted defendant to borrow a total of $4,000,000, to be repaid in April 2003.

On August 28, 2002, the parties' representatives met at plaintiff's Pennsylvania offices to discuss the Securities. At that meeting, plaintiff proposed to sell the Securities back to defendant ("August 28 Offer"). (D.I.26, ¶ 6) Under that proposal, defendant would make an initial payment of $500,000. In return, plaintiff would promise to not exercise its default rights under the Securities for a period of eight months (the "stand-still period").(*Id.*) During the stand-still period, defendant would have the right to repurchase the Securities for $1 million cash with three days notice to plaintiff (hereinafter " Repurchase Agreement").(*Id.*) Defendant's representatives indicated at the meeting that it was inclined to accept plaintiff's proposal, but that the approval of defendant's board of directors would be necessary.(*Id* ., ¶ 7) Defendant requested that plaintiff confirm the terms of the August 28 Offer in writing so that it could be presented at the next meeting of defendant's board of directors on September 13, 2002.

On September 12, 2002, plaintiff transmitted to defendant a document entitled "Term Sheet for ARI Network Services, Inc.," confirming the offer (" Term Sheet"). (D.I.1, ex. 2) Defendant asserts that the Term Sheet was not an accurate reflection of the terms of the August 28 Offer. On September 13, 2002, defendant's board of directors voted to accept

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 76 of 118

Not Reported in F.Supp.2d Page 2

Not Reported in F.Supp.2d, 2004 WL 189784 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the August 28 Offer, and defendant sent a redlined version of the Term Sheet and a signed agreement reflecting certain alterations ("Amended Term Sheet ").[FN1](*Id.*, ex. 8) Defendant's alterations to the Term Sheet were intended to conform its acceptance with its understanding of the August 28 Offer.

FN1. The Amended Term Sheet made the following additions and corrections: (1) the date of the agreement was changed from September 12, 2001 to September 13, 2001; (2) the term "convertible preferred" was replaced with "convertible debentures; " (2) the $500,000 payment would be applied to the "principle amount" of the debenture; (3) the final agreement was conditioned upon mutual releases; (4) the agreements' confidentiality restrictions provided for sharing with accountants and lenders; and (5) the expiration date of the offer was changed from September 12, 2001 to September 17, 2001. (D.I.25, ex. 8)

On September 18, 2002, during a telephone conversation between plaintiff's employee Philip Ashton and defendant's employee Howard Schenfield, Ashton indicated that he had received the Amended Term Sheet and that he was "glad to have received [it], and that he did not see any problems with the deal."(D.I.25, ex. 9 at 13)

*2 On September 27, 2002, plaintiff entered into a transfer agreement (the "Transfer Agreement" ) with ARI Network Services Partners, Dolphin Offshore Partners, LP, and SDS Merchant Fund, LP (collectively "Taglich"). (D.I 31, ex. 2) The Transfer Agreement provided for the sale of the Securities for a total of $2.1 million, and included certain express warranties pertaining to the parties and the Securities.

On November 8, 2002, defendant commenced suit in Milwaukee County Circuit Court against plaintiff and Taglich. Defendant's claims against Taglich were settled when defendant acquired the Securities by paying $500,000 in cash, issuing new unsecured notes to Taglich for $3.9 million, and issuing new warrants for 250,000 of defendant's common stock at $1.00 per share. As part of that settlement, defendant received an assignment of any claims Taglich might assert against plaintiff (the " Taglich counterclaims").

III. STANDARD OF REVIEW

A court shall grant summary judgment only if " the pleadings, depositions, answers to interrogatories, and admissions on file, together with theaffidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *SeeMatsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10 (1986)."Facts that could alter the outcome are ' material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."*Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted).

If the moving party has demonstrated an absence of material fact, the nonmoving party then " must come forward with 'specific facts showing that there is a genuine issue for trial." ' *Matsushita*, 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *SeeAnderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *SeeCelotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 77 of 118

Not Reported in F.Supp.2d Page 3

Not Reported in F.Supp.2d, 2004 WL 189784 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

IV. DISCUSSION

Plaintiff's motion for summary judgment seeks declarations that no Repurchase Agreement exists affecting plaintiff's rights with respect to the Securities; that defendant's counterclaims are without merit; and that defendant violated the SPA' forum selection clause by bringing suit in Wisconsin. (D.I.23)

B. Choice of Law Clause

***3** A preliminary issue to resolve is whether the SPA's choice of law clause applies to the contract claims between plaintiff and defendant. Plaintiff argues that the SPA's choice of law clause applies to the present dispute. Defendant contends that under Delaware choice of law jurisprudence, Pennsylvania law should be applied as it is the jurisdiction with the strongest relationship to the contract at issue. *See* Rest. (2d) Conflict of Laws § 188. In so arguing, defendant asserts that the choice of law clause contained in the SPA and related agreements is not applicable as to the Repurchase Agreement, as that agreement is a distinct contract.

Paragraph 8(a) of the SPA states: "This Agreement shall be governed by and construed in accordance with the laws of the State of Wisconsin applicable to agreements made and to be performed in the State of Wisconsin (without regard to principles of conflict of laws)." (D.I.1, ex. 1) Each of the accompanying exhibits pertaining to the debenture, stock warrants, investment option and registration rights contain identical language. (D.I.1) If the court were to conclude, as defendant contends, that a Repurchase Agreement exists, the subject matter of that agreement is, nevertheless, inseparable from the subject matter of the SPA; the SPA and related agreements expressly select Wisconsin law to govern the rights and liabilities created thereunder.

Absent any evidence of the parties' intent to the contrary, any subsequent modification of those rights and liabilities between parties in privity with the original agreement, whether asserted as an amendment or as a separate contract, would still be governed by the choice of law provisions. *SeeBush v. National School Studios, Inc.*, 407 N.W.2d 883, 886 (Wis.1987) ("[P]arties to a contract may expressly agree that the law of a particular jurisdiction shall control their contractual relations." ); Rest. (2d) Conflict of Laws § 187. Consequently, the court concludes that Wisconsin law applies to the contract claims arising in the present case.

C. Existence of a Contract for the Repurchase of the Securities

Defendant contends that a Repurchase Agreement was created between the parties, arising from one of the following events: (1) defendant's acceptance of plaintiff's August 28 Offer; (2) defendant's acceptance of the Term Sheet; or (3) plaintiff's acceptance of defendant's Amended Term Sheet through plaintiff's conduct. Defendant further argues that these are genuine issues of material fact precluding summary judgment.

It is well established that essential to formation of a contract are an offer, an acceptance and consideration. *SeeBriggs v. Miller*, 186 N.W. 163, 164 (Wis.1922). It is also well established that an offer is freely revocable by the offeror at any time prior to its acceptance by the offeree. *See*Rest. (2d) Contracts §§ 36, 42. An offer may, by its express terms, expire at a time certain. *SeealsoAtlee v. Bartholemew*, 33 N.W. 110 (Wis.1887); Rest. (2d) Contracts § 36. Revocation of an offer may result either through direct communication to the offeree that the offer is revoked or through conduct which would cause a reasonable person to conclude that the offer is revoked, and of which the offeree has knowledge. *See*Rest. (2d) Contracts §§ 40, 42-43. An offer is revoked where the offeror makes a second offer to the offeree that is inconsistent with the first offer. *See* Farnsworth on Contracts § 3.17 (2d ed.1998); Corbin on Contracts § 2.20 (rev. ed.1993). It is also well established that where an offeree purports to accept an offer, but does so conditional upon the acceptance of additional terms, that communication is a rejection and counteroffer. *SeePick Foundry, Inc. v. General Door MFG. Co.,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 78 of 118

Not Reported in F.Supp.2d Page 4

Not Reported in F.Supp.2d, 2004 WL 189784 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

55 N.W.2d 407, 410 (Wis.1952).FN2

FN2.*SeealsoKoehring Co. v. Glowacki,* 253 N.W.2d 64, 68 (Wis.1977) (holding that where an acceptance is on different terms from the offer, it is a counteroffer as there is "no meeting of the minds."); *Hess v. Holt Lumber Co.,* 185 N.W. 522, 523 (Wis.1921) ("The acceptance of an offer upon terms varying from those of the offer, however slight, is a rejection of the offer." ); Rest. (2d) Contracts § 39.

*4 Plaintiff's August 28 Offer was superceded and revoked by the Term Sheet transmitted on September 12. As a consequence, the offeree's power of acceptance was terminated with respect to the August 28 Offer. *See* Rest. (2d) Contracts § 35 ( "A contract cannot be created by acceptance of an offer after the power of acceptance has been terminated").*SeealsoC.G. Schmidt, Inc. v. Tiedke,* 510 N.W.2d 756 (Wis.App.1993) (applying Rest. (2d) Contracts § 35); *Norca Corp. v. Tokheim Corp.,* 227 A.D.2d 458, 458-59 (N.Y.App.Div.2d Dept., 1996) (applying Rest. (2d)). Therefore, the court finds, as a matter of law, that no contract could have arisen from the August 28 Offer as the defendant's power of acceptance extinguished upon receipt of the Term Sheet.

The court also finds that no contract could arise from the Term Sheet transmitted by plaintiff on September 12. On September 13, defendant transmitted to plaintiff the Amended Term Sheet, which among other things extended the time for acceptance, conditioned consummation of the final agreement upon mutual releases, and changed the manner in which the $500,000 payment would be treated.

Wisconsin applies the common law mirror image rule to acceptances of offers. *SeePick Foundry,* 55 N.W.2d at 410. In *Pick Foundry,* the lessor of a warehouse executed a lease agreement and delivered duplicate original copies of the lease to the lessee. The lessee then made three alterations to the lease agreement, signed the agreement, and returned it to the lessor with a check for the first month's rent. The Wisconsin Supreme Court concluded that the "legal effect of the act of the defendant, in making three material alterations in the lease, was to reject plaintiff's offer and to make a new counter-offer."FN3*Pick Foundry,* 55 N.W.2d at 410. In the present case, defendant's transmission of the Amended Term Sheet to plaintiff constituted a counteroffer under Wisconsin law and, therefore, defendant's power of acceptance in the original Term Sheet was terminated as it had legally rejected the offer.

FN3. In *Pick Foundry,* the court characterized the alterations to the lease agreement as "material." 55 N.W.2d at 410 . However, under the strict application of the mirror image rule, any alteration in the lease agreement would constitute a rejection and counteroffer. *See Leuchtenberg v. Hoeschler,* 72 N.W.2d 758, 760-61 (Wis.1955). Notwithstanding, there is no indication that Wisconsin courts have abrogated the common law mirror image rule to contracts in this context. *See Superview Network, Inc. v. SuperAmerica, Inc.,* 827 F.Supp. 1392 (E.D.Wis.1993).

Whether materiality may now be a consideration under Wisconsin law, however, is of no consequence as the court concludes that the alterations in the Amended Term Sheet are material. The materiality standard applied to additional terms is whether consent may be presumed. *Union Carbide Corp. v. Oscar Mayer Foods Corp.,* 947 F.2d 1333, 1335-36 (7th Cir.1991). The Amended Term Sheet varied substantially from the original Term Sheet as it expressly conditioned the agreement upon "mutual releases," provided that the $500,000 payment would be applied to the principle amount owed on the debenture, and extended the period for acceptance by both parties by five days. (D.I.25, ex. 8)

The court also concludes that no contract could arise from the Amended Term Sheet transmitted by defendant on September 13. As discussed above, the Amended Term Sheet constituted a counteroffer. As such, the power of acceptance rested with plaintiff which did not exercise that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 79 of 118

Not Reported in F.Supp.2d Page 5

Not Reported in F.Supp.2d, 2004 WL 189784 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

power. The Amended Term Sheet, like the original Term Sheet, contained an express requirement stating: "This term sheet will be considered void if it is not executed by both parties."(D.I.25, ex. 8)

In *McWhorter v. Employers Mutual Casualty Co.,* the Wisconsin Supreme Court concluded that where a contract expressly requires written execution by both parties, a contract is not formed if one party fails to sign the contract. 137 N.W.2d 49 (Wis.1965). In that case, a customer at an automobile dealership signed a contract, tendered a down payment, and was given possession of the automobile by a salesman. The salesman and customer signed the contract, but the contract expressly provided that it was not valid until signed by the auto dealer. The court concluded that the customer's tendering of a down payment and the transfer of possession of the car could not constitute acceptance as they were "contrary to the method proposed in the offer for its acceptance."[FN4] *Id.* at 52.*Seealso*Rest. (2d) Contracts § 30 cmt. a ("[T]he offeror is entitled to insist upon a particular mode of manifestation of assent.").

FN4.*McWhorter* highlight's Wisconsin's strict application of this principle, as the consequence of the decision was that the automobile dealership was liable in tort for injuries arising from the vehicle's use by the intended purchaser of the vehicle.

*5 There is no dispute that the Amended Term Sheet was not executed by both parties. Instead, defendant argues that the court should disregard the Amended Term Sheet's clear language, and conclude that plaintiff's subsequent conduct constituted an acceptance.

A party's conduct can, under certain circumstances, constitute valid acceptance of an offer. *SeePick Foundry,* 55 N.W.2d at 410. In *Pick Foundry,* the Wisconsin Supreme Court concluded that the lessor's receipt of the lessee's counteroffer, awareness of the material alterations, coupled with its cashing of lessee's check for the first month's rent constituted acceptance of the counteroffer. The court held that "[i]f the conduct of the offeree is such as to lead the offeror to believe that the offer has been accepted, there may be an acceptance by estoppel."55 N.W.2d at 410 (quotations omitted). Similarly, in *Hoffman v. Ralston Purina Co.,* the Wisconsin Supreme Court concluded that where two parties had an existing business relationship, an offeree's silence coupled with retention of a check offered in accord and satisfaction, constituted acceptance. 273 N.W.2d 214, 219 (Wis.1979); *see alsoClay v. Bradley,* 246 N.W.2d 142 (Wis.1976). The present case is easily distinguished from those in which a party's conduct amounts to acceptance, in that defendant has not alleged that plaintiff retained any benefit under the alleged contract.

In the present case, the conduct that defendant alleges to be objective manifestations of plaintiff's acceptance are statements by plaintiff that it was " glad" to have received the Amended Term Sheet and that it did not see any "problems" with the transaction.[FN5] In a sophisticated transaction between parties negotiating at arms length, the court concludes, in light of the Amended Term Sheet's express requirements, that plaintiff's oral statements are an insufficient objective manifestation of an intent to accept defendant's counteroffer, and no reasonable jury could find otherwise.

FN5. Defendant asserts that discovery is necessary to inquire into plaintiff's intent, however, the controlling issue here is the objective manifestations of plaintiff's intent. *SeeHoffman v. Ralston Purina Co.,* 273 N.W.2d 214, 217 (Wis.1979) ("The question is not the actual intent of the offeree, but his manifested intent.).

Consequently, the court concludes that plaintiff and defendant did not enter into any agreement that amended or otherwise affected the terms, rights, and liabilities of the parties under the SPA and related agreements or that affected plaintiff's rights to transfer the existing securities to a third party.

D. Breach of SPA's Forum Selection Clause

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 80 of 118

Not Reported in F.Supp.2d Page 6

Not Reported in F.Supp.2d, 2004 WL 189784 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

On July 31, 2003, the court concluded that the forum selection clause contained in the SPA, which granted exclusive jurisdiction to the United States District Court for the District of Delaware over any suit arising from the SPA and related agreements, was prima facie valid and, therefore, denied defendant's motion to dismiss in favor of the Wisconsin litigation. (D.I.20) Plaintiff contends that defendant violated this clause by bringing suit in Wisconsin, and should be liable for damages arising from that breach. Generally, enforcement of a forum selection clause results in a transfer, dismissal or a retention of jurisdiction. In the present case, plaintiff obtained enforcement of its rights under the forum selection clause, as the Wisconsin court declined to hear the action, and this court denied defendant's motion to dismiss or stay the proceeding. Plaintiff has cited no authority for the proposition that under Wisconsin law it is also entitled to damages. Consequently, as plaintiff can not establish that under Wisconsin law it is entitled to any other remedy, the court will dismiss plaintiff's breach of contract claim as moot. *See Arizonans for Official English v. Arizona,* 520 U.S. 43, 67 (1997) (holding that an actual controversy must exist through all stages of litigation.).

D. Defendant's Counterclaims

*6 Defendant asserts ten counterclaims in its amended answer. (D.I.26) Claims one through three are contract claims premised upon the existence of a Repurchase Agreement. Having reached the conclusion that no such contract exists, summary judgment must be entered for plaintiff as to counterclaims one, two and three.

The remaining counterclaims are asserted by defendant as the assignee of Taglich and include claims of: (1) breach of warranty; (2) breach of contract; (3) indemnification; (4) breach of the covenant of good faith and fair dealing; (5) negligent misrepresentation; (6) intentional misrepresentation; and (7) securities fraud. (D.I.26)

The Taglich counterclaims arise from the Transfer Agreement, and allege both claims on the contract and in tort. The Transfer Agreement contained nine express warranties by plaintiff, including that: (1) plaintiff would have good and valid title, free and clear of any and all encumbrances, immediately prior to the transaction date; (2) the Securities were subject to sale and transfer by plaintiff without defendant's consent; (3) plaintiff had legal authority and power to conduct its business; (4) plaintiff had authority to execute the transaction and carry out all acts necessary to consummate the transaction; (5) other than the SPA and registration rights agreements, no other agreements existed between plaintiff and defendant; (6) the Transfer Agreement would not violate or conflict with any other agreement or commitment of plaintiff; (7) no governmental approval was required for the transaction; (8) the SPA and related agreements were in full force and effect and had not been rescinded or modified; (9) plaintiff's investment option in defendant, provided for under the SPA, had expired. The Transfer Agreement also expressly disclaimed the presence of any other representation by plaintiff upon which Taglich relied.[FN6] The parties agree that Taglich's contract claims are governed by New York law pursuant to the Transfer Agreement's choice of law clause. (D.I.30, 39)

FN6. That disclaimer provides that:

Other than the express representations and warranties, covenants and agreements made by [plaintiff] in this [Transfer] Agreement or in the Escrow Agreement, neither [plaintiff] nor any person or entity acting by or on behalf of [plaintiff] has made any representation, warranty, inducement, promise, agreement, assurance or statement, oral or written of any kind to [Taglich] in this Agreement or elsewhere, upon which [Taglich] is relying in entering into this Agreement and the transactions contemplated hereby.

(D.I.31, ¶ 9)

Defendant alleges that plaintiff did not disclose the existence of the Repurchase Agreement, the August 28 Offer, the Term Sheet, or the Amended Term Sheet. Defendant alleges that each of these events are material and that had Taglich been aware of them, it would not have entered into the contract.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 81 of 118

Not Reported in F.Supp.2d

Page 7

Not Reported in F.Supp.2d, 2004 WL 189784 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

(D.I.26, ¶ 21-22)

1. Breach of Warranty

Under New York law, breach of an express warranty requires: (1) the existence of an express warranty; (2) material breach of the warranty; (3) damages proximately resulting from the breach; and (4) justifiable reliance on the warranty. *See Metromedia Co. v. Fugazy,* 983 F.2d 350, 360 (2d Cir.1992). Defendant claims that plaintiff failed to " inform [Taglich] that such representations and warranties were untrue" or that it concealed information pertaining to plaintiff's negotiations with defendant for a Repurchase Agreement. (D.I.26, ¶ 64)

The Transfer Agreement contains no express warranty concerning the existence of negotiations between plaintiff and defendant, and the Transfer Agreement expressly disclaims all other representations not contained in the agreement. Consequently, defendant has failed to allege any representation by plaintiff that contravenes the warranties contained in the Transfer Agreement. Therefore, the court finds that defendant's counterclaim for breach of warranty is without merit, and summary judgment will be granted to plaintiff.

2. Breach of Contract

*7 Counterclaim five is for breach of contract and alleges that "by its false representations and warranties, omissions, concealments, and failure to perform as required by the Transfer Agreement," plaintiff breached its contract with Taglich. (D.I.26, ¶ 69) An action for breach of contract under New York law requires proof of: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages."*Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525 (2d Cir.1994). Defendant's argument is premised upon the existence of a Repurchase Agreement which would have precluded plaintiff from fulfilling its obligations under the Transfer Agreement. (D.I.26, ¶ 69) Having concluded that no Repurchase Agreement exists, defendant has failed to allege the presence of a contractual breach by plaintiff, and summary judgment will be granted.

3. Indemnification

Defendant's claim for indemnification arises from the costs associated with defendant's suit against Taglich and Taglich's settlement of that suit. As plaintiff breached no warranty or other contractual obligation owed to Taglich, there is no basis in law or equity to seek indemnification. *See* N.Y. Jur. Contrib. § 88 (2003) ("[I]t is clear that a claim for common-law indemnity will not lie where there is no basis for finding that the alleged indemnitor owed and breached any duty owed either to the injured party or to the alleged indemnitee."). Summary judgment will be granted to plaintiff.

4. Covenant of Good Faith and Fair Dealing

Defendant contends that plaintiff breached the covenant of good faith and fair dealing associated with the Transfer Agreement. Having concluded that plaintiff did not breach its contract with Taglich, as a matter of law, it could not have breached its contractual duty of good faith and fair dealing. *SeeSilvester v. Time Warner, Inc.,* 763 N.Y.S.2d 912, 918 (N.Y.Sup.Ct.2003) ("Where, as here, no party has acted in a way to prevent the performance of or the rights under the contract, the claim must fail ."). Defendant's counterclaim is without merit, and summary judgment will be granted to plaintiff.

5. Tort Claims

Counterclaims eight, nine, and ten sound in tort as they are for negligent misrepresentation, intentional misrepresentation, and securities fraud.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 82 of 118

Not Reported in F.Supp.2d Page 8

Not Reported in F.Supp.2d, 2004 WL 189784 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

According to defendant, these "claims ... do not depend on the existence of the Repurchase Agreement. Rather, the Taglich [tort] claims are based on [plaintiff's] failure to inform Taglich that [defendant] would make competing claims to the ownership of the [Securities]." (D.I. 33 at 24)

An essential element to each of the alleged torts is the presence of a duty to disclose. *SeeKimmell v. Schaefer,* 89 N.Y.2d 257, 263 (N.Y.1996); *Kaufman v. Cohen,* 307 A.D.2d 113, 119-20 (N.Y.App.Div.2003) (holding that where fraud is predicated on an omission there must be a duty to disclose). In the present case, plaintiff owed no duty to Taglich to disclose a non-existent contract. *See Canpartners Investments IV, LLC v. Alliance Gaming Corp.,* 981 F.Supp. 820, 826 (S.D.N.Y.1997) ("Regular business relations, such as those at issue here, do not rise to the level of a special relationship without more."); *Howard v. Galesi,* 1987 WL 18460, at 6 (S.D.N.Y.1987) (" Failure to disclose even material facts does not state a claim unless the defendant has a duty to disclose." ); *South Shore Skate Club, Inc. v. Fatscher,* 17 A.D.2d 840, 841 (N.Y.App.Div.1962) (holding no duty to disclose negotiations with a third-party).[FN7]

FN7. Defendant contends that it is too early for a choice of law determination to be made, and suggests that Pennsylvania law might apply to the Taglich tort claims. (D.I. 39 at 12) Because the court concludes that on this point, Pennsylvania law is consistent with New York law, the court does not need to resolve the choice of laws issue. *SeeBortz v. Noon,* 729 A.2d 555, 560-62 (Pa.1999) (discussing torts of intentional misrepresentation and negligent misrepresentation under Pennsylvania law). *SeeSunquest Information Systems, Inc. v. Dean Witter Reynolds, Inc.* 40 F.Supp.2d 644, 656 (W.D.Pa.1999) ("It is axiomatic, of course, that silence cannot amount to fraud in the absence of a duty to speak."); *Id.* ("A typical business relationship does not form the basis for such a relationship unless one party surrenders substantial control over some portion of his affairs to the other.") (quotations omitted). The court also notes, however, that if Pennsylvania law were to apply to the Taglich tort claims as defendant contends, its not clear that those claims would lie under the Pennsylvania "gist of the action" doctrine. *Id.* at 651 ("Pennsylvania courts examine the claim and determine whether the "gist" or gravamen of it sounds in contract or tort; a tort claim is maintainable only if the contract is "collateral" to conduct that is primarily tortious.").

***8** The tort claims fail for a second reason, that is, defendant is estopped from alleging that Taglich relied on extra-contractual representations. Under New York law an express disclaimer of reliance on extra-contractual representations is valid. *See Dannan Realty Corp. V. Harris,* 5 N.Y.2d 317 (N.Y.1959).[FN8] In *Dannan Realty,* the Court of Appeals distinguished an express disclaimer of reliance on extra-contractual representations from general merger clauses. *Id.* at 321-22.In upholding the validity of such express disclaimers, the court noted that "[t]o hold otherwise would be to say that it is impossible for two businessmen dealing at arm's length to agree that the buyer is not buying in reliance on any representations of the seller as to a particular fact."*Id.* at 323.

FN8. Pennsylvania law is in accord on this issue of express disclaimers of reliance. *See Sunquest Information Systems, Inc. v. Dean Witter Reynolds, Inc.,* 40 F.Supp.2d 644, 654-55 (W.D.Pa.1999) (discussing unavailability of tort of misrepresentation where the parties have expressly disclaimed reliance on extra-contractual representations).

In the present case, the Transfer Agreement expressly disclaims Taglich's reliance on any representations other than those contained in the agreement, and affirmatively represents that Taglich based its acceptance of the agreement on its own independent judgment as to the transaction, the Securities, and the defendant's business. Consequently, as a matter of law, defendant can not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 83 of 118

Not Reported in F.Supp.2d Page 9

Not Reported in F.Supp.2d, 2004 WL 189784 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

allege now that Taglich's assent was obtained through representations upon which Taglich has affirmatively denied relying. Therefore, the court concludes that defendant has failed to allege essential elements of counterclaims eight, nine, and ten, and summary judgment will be granted.

V. CONCLUSION

Having found that no material facts preclude entry of summary judgment, the court concludes that no Repurchase Agreement exists, and plaintiff is entitled to summary judgment as to its claims for declaratory relief and as to defendant's counterclaims. An appropriate order consistent with this opinion shall issue.

ORDER

At Wilmington, this 22nd day of January, 2004, consistent with the memorandum opinion issued this same day;

IT IS ORDERED that:

1. Plaintiff did not enter into any agreement that amended or otherwise affected the terms of the Securities Purchase Agreement and related securities or that affected plaintiff's rights to transfer the existing securities to the Taglich Partnerships. The clerk is directed to enter judgment for plaintiff RGC International Investors, LDC and against defendant ARI Network Services, Inc. on count one. (D.I.23-1)

2. Defendant's counterclaims are without merit and the clerk is directed to enter judgment in favor of plaintiff RGC International Investors, LDC and against defendant ARI Network Services, Inc. (D.I.23-2)

3. Plaintiff's motion for summary judgment that defendant violated the choice of forum clause in the Securities Purchase Agreement and related securities is denied and the claim is dismissed as moot. (D.I.23-3)

4. Plaintiff's motion to dismiss counts four through ten of defendant's counterclaims and to strike certain affirmative defenses is denied as moot. (D.I.29)

D.Del.,2004.
RGC Intern. Investors, LDC v. Ari Network Services, Inc.
Not Reported in F.Supp.2d, 2004 WL 189784 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

# TAB 12

Page 98 of 118

Westlaw.

Not Reported in F.Supp. Page 1

Not Reported in F.Supp., 1996 WL 41810 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

C
Sigma Star Foods Corp. v. McCormick & Co., Inc.
S.D.N.Y.,1996.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
SIGMA STAR FOODS CORP., Plaintiff,
v.
McCORMICK & COMPANY, INC. and Thomas Havekotte, Defendants.
**No. 95 Civ. 10133 (RPP).**

Feb. 2, 1996.

Brian T. Mastroberti, Law Office of Gregory J. Parisi, Mineola, New York, for plaintiff.
Leonard Gordon, Edward Maluf, Piper & Marbury, L.L.P., New York City, for defendant.

OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge:

*1 Defendant, McCormick & Company, Inc. ("McCormick"), moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Fed. R. Civ. P.) to dismiss the complaint of plaintiff, Sigma Star Foods Corp. ("Sigma") on the grounds that plaintiff has failed to state a claim upon which relief can be granted. For the following reasons McCormick's motion is granted.[FN1]

*BACKGROUND*

On May 4, 1995, Sigma, a New York corporation, purchased a Hassia Thermoforming Cup Machine Model THL24-28 ("Cup Machine"), including spare parts, from McCormick. (Complaint dated September 8, 1995 ("Complaint") ¶ 18; Plaintiff's Memorandum in Opposition to Motion to Dismiss ("Pl.'s Mem.") at p. 2.) This machine processes jelly into single serve cups for restaurant and institutional food service use. (Defendants' Memorandum in Support of Motion to Dismiss ("Defs.' Mem.") at p. 1.)

Plaintiff alleges that the defendants made false representations concerning the condition of the Cup Machine[FN2]; that these representations were made with the purpose and intent of inducing the plaintiff to purchase the machine; and that plaintiff relied on these representations in purchasing the Cup Machine. (Complaint ¶¶ 8, 9, 15, 19.) Plaintiff contends that it did not have an opportunity to inspect the Cup Machine in operation prior to purchasing it, and purchased the machine in reliance on McCormick's false representation that the Cup Machine was in good condition. (Pl.'s Mem. at pp. 5, 7; Complaint ¶¶ 13, 17.)

Plaintiff submits a letter dated August 8, 1995, from Jonathan Brunn, the president of Knight Technologies, a company retained by Sigma to inspect the machine after it was received in plaintiff's plant, which concludes that the Cup Machine was "inoperable at the time of purchase", May 4, 1995, and describes the machine as "incapable of operating." (Pl.'s Mem., Ex. B.)

The Sales Agreement between McCormick and Sigma (the "Agreement") dated March 15, 1995 states in pertinent part:

The Machine and Spare Parts are being purchased F.O.B. McCormick's plant... Sigma shall have the right to conduct another inspection of the Machine and Spare Parts at McCormick's plant, during normal business hours, and upon not less than 24 hours notice, before the date of shipment of the Machine and Spare Parts to Sigma. The parties will attempt to coordinate the inspection so that it will conducted [sic] after the Machine is crated for shipment. If as a result of this second inspection, Sigma concludes, in its reasonable judgment, that the condition of the Machine or the Spare Parts has materially worsened since the first inspection,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 99 of 118

Not Reported in F.Supp. Page 2

Not Reported in F.Supp., 1996 WL 41810 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Sigma shall have the right upon notice...to terminate this agreement and receive...a full refund of all deposits paid to McCormick...The Machine and Spare Parts are purchased "as is." Except as set forth above with respect to title to Machine and Spare Parts, all warranties, express or implied, are expressly disclaimed.

***2** (Defs.' Mem., Ex. 1.)

The Bill of Sale signed by McCormick (Seller) and Sigma (Buyer) dated May 4, 1995 states in pertinent part:

The Assets are sold "as is and where is." Seller has given Buyer the opportunity to inspect the assets prior to the date hereof, and Buyer has accepted the Assets in their condition. Seller has no obligations to make any repairs to the Assets...ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF CONDITION OF THE ASSETS...ARE HEREBY DISCLAIMED BY SELLER.

(*Id.*, Ex. 2.)

*DISCUSSION*

Defendant, McCormick, moves to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Fed. R. Civ. P.). Rule 12(b) states if "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56."Fed. R. Civ. P. 12(b). The necessity of translating a Rule 12(b)(6) motion into one under Rule 56 dissipates, however, if plaintiff had "actual notice of all the information in the movant's papers and...relied upon these documents in framing the complaint."*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991), *cert. denied,*503 U.S. 960 (1992). If a plaintiff fails to attach to its complaint or incorporate by reference a document "upon which it solely relies and which is integral to the complaint", a court may consider the document "in deciding defendant's motion to dismiss without converting the proceeding to one for summary judgement." *International Audiotext Network, Inc. v. American Telephone and Telegraph Co.*, 62 F.3d 69, 72 (2d Cir. 1995) quoting *Cortec Indus., Inc.*, 949 F.2d at 47.

Here, although Sigma does not attach the Agreement and the Bill of Sale of the Cup Machine, the complaint relies on the terms and effect of those documents. Not only did Sigma have knowledge of those documents, but it also employed counsel to review the terms of sale. (Defs.' Mem., Ex. 6.) The Agreement and the Bill of Sale are integral to plaintiff's complaint. Therefore, this Court may consider these documents in deciding McCormick's motion and is not required to convert it to a motion for summary judgment. *International Audiotext Network*, 62 F.2d at 72.

Under New York law, "a specific disclaimer defeats any allegation that the contract was executed in reliance upon the representations to the contrary."*Taormina v. Hibsher*, 626 N.Y.S.2d 559, 560 (A.D. 2d Dept. 1995.)If the disclaiming language of a contract is "sufficiently specific," the plaintiff will be barred from claiming that he was fraudulently induced to enter the contract because of oral misrepresentations. *S.R. Leon Co., Inc. v. Towers*, 194 A.D.2d 600, 601, 599 N.Y.S.2d 53, 54 (A.D. 2d Dept. 1993) (allegation that landlord orally misrepresented size of useable space was barred by terms of lease); *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320-321, 157 N.E.2d 597, 599, 184 N.Y.S.2d 599, 602 (N.Y. 1959) (purchaser had no right of action against seller for false representations when contract contained explicit acknowledgment that seller had made no representations as to physical condition and that purchaser had inspected premises).

***3** The Agreement and Bill of Sale, signed by both parties, clearly state that the assets were sold " as is", that McCormick expressly disclaimed all warranties, and that Sigma was given an opportunity to inspect the Cup Machine. Sigma's claim that it did not in fact inspect the Cup Machine while in operation, does not affect the terms of the Agreement. There is no indication that an operational inspection was a condition precedent to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 100 of 118

Not Reported in F.Supp.

Page 3

Not Reported in F.Supp., 1996 WL 41810 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

the contract. The express language in the Agreement and the Bill of Sale disclaiming any representation as to the condition of the machine is sufficiently specific to bar plaintiff's claims of fraudulent misrepresentation.

*CONCLUSION*

The plain language of the Agreement and the Bill of Sale preclude plaintiff's claim of fraudulent misrepresentation. Therefore, plaintiff has failed to state a claim for which relief can be granted and defendants' motion to dismiss is granted.

IT IS SO ORDERED.

FN1. Defendant, Thomas Havekotte (" Havekotte"), moved pursuant to Fed. R. Civ. P. 12(b)(2) to dismiss plaintiff's complaint on the grounds that this Court lacks personal jurisdiction over him. Plaintiff did not oppose Havekotte's motion. On January 23, 1996, at oral argument, the Court granted Havekotte's motion to dismiss.

FN2. In an effort to demonstrate that defendant knew that Cup Machine had " deficiencies and defects" in June 1994, plaintiff submits proposals dated June 1, and June 7, 1994 from Hassia USA, Inc. (" Hassia"), the manufacturer of the Cup Machine. The proposals provide quotes concerning the labor and parts necessary to modify the McCormick case packer control system and to replace the Hassia Programmer with a Slick 150 Processor. (Pl.'s Mem. at pp. 5-7, Ex. C.)

S.D.N.Y.,1996.
Sigma Star Foods Corp. v. McCormick & Co., Inc.
Not Reported in F.Supp., 1996 WL 41810 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

# TAB 13

Page 2 of 18

Westlaw.

Not Reported in A.2d

Page 1

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

VGS, Inc. v. Castiel
Del.Ch.,2003.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
VGS, INC., Plaintiff,
v.
David CASTIEL, Virtual Geosatellite Holdings, Inc., and Ellipso, Inc., Defendants,
VIRTUAL GEOSATELLITE HOLDINGS, INC., and Ellipso, Inc., Counterclaim Plaintiffs,
andVIRTUAL GEOSATELLITE, LLC, Counterclaim Plaintiff-Intervenor,
v.
VGS, INC., Peter D. Sahagen, Thomas Quinn, Neel Howard, and Sahagen Satellite Technology Group, LLC, Counterclaim Defendants.
**No. C.A. 17995.**

Submitted Jan. 21, 2003.
Decided Feb. 28, 2003.
As Revised March 10, 2003.

Thomas R. Hunt, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; William H. Jeffress, Jr., Jamie Steven Kilbergi, Baker Botts, L.L.P., Washington, D.C., for Defendant-Counterclaim Plaintiffs David Castiel, Virtual Geosatellite Holdings, Inc. and Ellipso, Inc., and Counterclaim Plaintiff-Intervenor Virtual Geosatellite LLC.
Brian A. Sullivan, Werb & Sullivan, Wilmington, Delaware; William A. Brewer, III, Daniel F. Perez, Thomas M. Corea, Bickel & Brewer, Dallas, Texas, for Counterclaim Defendants and Reply-Counterclaim Plaintiffs SST Global Technology LLC and Peter D. Sahagen.

*MEMORANDUM OPINION*

LAMB, Vice Chancellor.

I.

*1 This action arises out of a long-standing dispute principally between two people, and the companies they control. This tale first began when Peter Sahagen attempted to wrest control of a limited liability company, through the effectuation of merger, from David Castiel, the company's founder. Sahagen then sought a declaratory judgment from this court that the merger was valid. In June 2000, the court held a trial which resulted in the merger being rescinded. Castiel and his affiliates filed a counterclaim against Sahagen and Tom Quinn in that action alleging a breach of their duty of loyalty. Sahagen and his affiliates then filed an eleven count cross-counterclaim against Castiel and his affiliates alleging, among other things, that Castiel fraudulently induced Sahagen into investing with Castiel, and that Sahagen and his affiliates have breached several fiduciary duties that were owed directly to Sahagen or to the companies he invested in. The first trial did not resolve the counterclaim or the cross-counterclaim.

Summary judgment must be granted in favor of Castiel and his affiliates on all but one of the cross-counterclaims. Claims for fraudulent inducement and negligent misrepresentation (as well as claims of aiding and abetting those violations) are precluded for two reasons. First, an integration clause in the agreements at issue, combined with the sophistication of the parties and opportunities to conduct due diligence, precludes Sahagen from arguing that non-warranted statements can amount to fraudulent inducement or negligent misrepresentation. Second, the one statement that was warranted in the agreements at issue was true and accurate when it was made. Thus

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 3 of 18

Not Reported in A.2d

Page 2

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

there can be no fraud or negligent misrepresentation.

All but one of Sahagen's claims that Castiel and various of his affiliates breached their fiduciary duties must fail. These fiduciary duty claims are derivative in nature and there has been no demand made on the board of the limited liability company. Further, Sahagen has failed to demonstrate how demand would have been futile.

Finally, summary judgment must be granted, in part, in favor of Castiel and his affiliates on their counterclaim that Sahagen and Quinn breached their fiduciary duty of loyalty. This result is dictated by the "law of the case" doctrine, and it will avoid the need to re-litigate previously litigated issues.

II.

A. *Background*

On January 6, 1999, David Castiel formed Virtual Geosatellite, LLC ("Virtual Geo") pursuant to the Delaware Limited Liability Company Act. As originally constituted, the sole member of Virtual Geo was Virtual Geosatellite Holdings, Inc. ("VGHI "). On January 8, 1999, Ellipso, Inc. joined Virtual Geo as a member. Finally, on January 29, 1999, Sahagen Satellite Technology Group, LLC (now known as Sahagen Satellite Technology Global, LLC or "SST Global") was added as a third member.[FN1]

FN1. The relations between these various parties have been contentious for some time. In particular, there has already been a trial in the Court of Chancery to litigate claims related to a purported merger that was intended to wrest control of Virtual Geo from Castiel. For a more thorough discussion of those events *see VGS, Inc. v. Castiel*, 2000 WL 1277372 (Del.Ch. Aug.31, 2000), *aff'd*,781 A.2d 696 (Del.2001) (TABLE).

Pursuant to Virtual Geo's Second Amended and Restated Limited Liability Company Agreement (the "LLC Agreement"), VGHI received 660 LLC units (representing 63.46% of the total equity in Virtual Geo), SST Global received 260 LLC units (representing 25%), and Ellipso received 120 LLC units (representing 11.54%). SST Global, which is controlled by Peter Sahagen, contributed the only cash received by Virtual Geo-$5 million. VGHI and Ellipso, both of which are controlled by Castiel, contributed certain licensed intellectual property.

*2 Virtual Geo's stated purpose was "to construct, launch and operate a global fixed satellite service system employing nongeostationary satellites in subgeosynchronous elliptical orbits, developing the related [ground] segment and offering the related communication services."[FN2] That system, known as "Virtual Geo," was intended to provide technological advantages believed to be unique among its competitors in the broadband satellite market. Nonetheless, Virtual Geo was a high-risk business venture.

FN2. LLC Agreement § 4.01(a).

Management of Virtual Geo was vested in a Board of Managers. The LLC Agreement established a three-person Board of Managers consisting of Castiel (the Chairman, appointed by VGHI), Sahagen (the Vice Chairman of Finance, appointed by SST Global), and Tom Quinn (the Secretary, appointed by VGHI).

B. *Sahagen's Investment In Ellipso And Virtual Geo*

Sahagen is a "prolific investor" in the technology sector. Sahagen met Castiel through Sahagen's attorney, and after a series of meetings with Castiel and Ellipso's in-house counsel, Sahagen was invited to invest in Virtual Geo and Ellipso. Sahagen then conducted due diligence on Virtual Geo and Ellipso, including hiring a "technical expert " and consulting with his lawyers. Sahagen, through

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 4 of 18

Not Reported in A.2d Page 3

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Neel Howard (SST Global's Rule 30(b)(6) representative), had extensive discussions with employees of Ellipso.

Castiel allegedly made several representations to Sahagen during the course of negotiations. Specifically, Castiel allegedly represented that:

- Ellipso had the antenna technology and capability to employ a worldwide two-way television system;
- Ellipso was in full compliance with the FCC regarding its license, and that no further requirements needed to be met;
- Ellipso's license with the FCC was in full force and effect;
- Ellipso's license with the FCC was not subject to any limitations, defenses, or contingencies which might subject it to revocation or cancellation;
- one of Castiel's affiliated entities, Mobile Communications Holdings, Inc. ("MCHI"), had entered into a binding contract with Boeing Company for construction of the first two satellite systems that were to be part of Ellipso's system;
- MCHI and Ellipso were in full compliance with the construction progress milestones and certification schedules established by the FCC in issuing the license;
- MCHI had made substantial progress with respect to the deployment of its satellite system and, in connection therewith, MCHI had received a commitment from Boeing to invest $300 million of its own funds in deploying the system;
- SST Global's investment was going to be used only as a bridge until Ellipso and Virtual Geo received a substantial investment from Boeing;
- any funds invested in Virtual GEO would be used for, and devoted exclusively to, the business of Virtual Geo;
- Sahagen's investments would be used prudently, economically, efficiently, and in a manner designed to best achieve Ellipso's and Virtual Geo's business objectives; and

*3 • Castiel would hire a number of persons with impeccable credentials in the satellite and communications industries to manage and operate Virtual Geo.

Neel Howard testified, however, that he was aware of an antenna problem at Ellipso prior to Sahagen's investment in Ellipso.[FN3] Howard also testified that Castiel had a long history of promising investors that he would bring in new management and then refusing to do so.[FN4] Howard told Sahagen about this prior to Sahagen's investment.[FN5]

FN3. Castiel Parties Op. Br., Ex. B ("SST Global Dep.") at 78.

FN4. *Id.* at 60, 63, 68-70.

FN5. *Id.*

C. *Ellipso's Financial Condition Deteriorates*

During its existence, Ellipso raised between $75 million and $100 million in investment capital, over $60 million of which had been contributed before the formation of Virtual Geo. By January 1, 1999, Ellipso still had over $15 million in cash on its balance sheet. By December 31, 1999, however, Ellipso and its subsidiary, MCHI had just over $2 million in cash. As of March 31, 2000, Ellipso's financial condition had further deteriorated and its cash had declined to under $350,000 while its liabilities totaled over $360,000. Moreover, Ellipso was losing employees at a rapid rate during this period.

D. *Castiel Uses Virtual Geo's Cash For Ellipso*

On May 4, 1999, Virtual Geo's Board of Managers approved a cost-sharing arrangement with Ellipso. At that meeting, the Board authorized an agreement whereby Ellipso would "loan" employees to Virtual Geo at the cost of $50,000 per month for six months.

On June 11, 1999, Castiel, acting in his capacity as CEO of both Ellipso and Virtual Geo, executed a cost-sharing Services Agreement between Ellipso and Virtual Geo. The Services Agreement provided for monthly payments from Virtual Geo to Ellipso of $48,748 through

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 5 of 18

Not Reported in A.2d

Page 4

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

December 31, 1999. Essentially, the Services Agreement extended the previously approved cost-sharing arrangement for an additional six months.

On April 19, 2000, Castiel, in his capacity as CEO of Ellipso and Virtual Geo, executed Amendment No. 1 to the Services Agreement. The Amendment was backdated to December 17, 1999. Amendment No. 1 retroactively increased the fees to $100,000 per month for the period January 1 through May 31, 1999. It also retroactively increased to $130,000 per month the fee for the period June 1 through December 31, 1999. Finally, the Amendment increased the fee for the period January 1, 2000 going forward to $156,145 per month. Although the Ellipso Board was presented with, and then approved, a resolution to extend the Services Agreement into 2000, neither the extension to, nor amendment of, the Services Agreement was presented to Virtual Geo's Board for consideration.

In addition to amending the cost-sharing arrangement on a number of occasions, Castiel also determined the salary allocations for Ellipso's employees. A number of witnesses (all of whom are former or current employees of Ellipso/MCHI), testified that Castiel misallocated the time they actually spent working on Virtual Geo matters.[FN6] Further, Castiel may have charged Virtual Geo for Ellipso employees who never worked on Virtual Geo matters.[FN7]

FN6. *See* Tr. 82-84, 87-89 (Naughton); Tr. 171-72 (Incidardi); Tr. 690 (Howard); and Tr. 1296-97 (Blott). Citations to "Tr. __" refer to transcripts from the trial held before then-Vice Chancellor Steele on June 15 through June 23, 2000 that resulted in the opinion referred to in note 1, *supra.*

FN7. *See* Tr. 690 (Howard) ("I can't imagine that you're talking more than four or five employees, six, maybe, at the most, that would be doing any kind of work on Virtual Geo"); Tr. 125 (Lincoln) ("What he gave me was a list of probably 20 people that were working on Virtual Geo, at least according to the list; and there were only five, six people that had done anything for the project").

E. *Virtual Geo Struggles From Its Inception*

*4 As of December 31, 1999, Virtual Geo's current assets amounted to approximately $3 million, and losses for the year ended December 31, 1999 totaled almost $2.2 million. Four months later, Virtual Geo's current assets had declined by almost $500,000. Losses for the four months ended April 30, 2000 were approximately $1.5 million. Further, during the four months ended April 30, 2000, the " amounts due Ellipso" purportedly rose from $78,275 to $1,108,230, and "member's capital" fell from $2,969,316 to $1,497,351.

As Virtual Geo was expending cash at a rapid rate, prospects for obtaining additional capital became increasingly dim. Virtual Geo's last draft business plan, dated January 20, 2000, stated that SST Global's initial $5 million investment in the first quarter of 1999 was merely "seed capital." Such "seed capital" was not expected to carry Virtual Geo through the year 2000. The business plan, therefore, called for a pre-licensing round of venture capital financing in the amount of $25 million sometime between the fourth quarter of 1999 and year-end 2000. Virtual Geo was unsuccessful in obtaining this financing.

F. *Castiel Reneges On His Agreement To Secure Professional Management*

Castiel represented on several occasions that he would hire a number of persons with impeccable credentials in the satellite and communications industries to run Virtual Geo.[FN8] In the fall of 1999, Sahagen introduced a highly qualified management team to Virtual Geo. It became known as the "Dream Team" and consisted primarily of Air Force Lieutenant General Kenneth Minihan, a former director of the National Security Agency and the Defense Intelligence Agency, and Alf

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Andreassen, who was the former director of Bell Labs and President of AT & T Global Solutions. Virtual Geo's Board of Managers was optimistic about the prospects of hiring such qualified individuals.

FN8.*See* Tr. 848-49 (Sahagen) ("Q. Did Mr.-Doctor Castiel make any promises with respect to what he would do in that regard, concerning the management? A. Absolutely.... He said that he would go about locating just what I said, experienced management in the satellite business. He used the word [sic] 'big names,' meaning people who were accomplished, who had the contacts, had the credibility, had the background to raise billions of dollars for this kind of project); *see also* Tr. 651 (Howard).

After some negotiations, Castiel and Minihan reached agreement on almost every issue, including Castiel's plan for transitioning management control from Castiel to Minihan's team as it accomplished certain milestones, such as bringing a "major" investor to Virtual Geo. Castiel, however, subsequently began to have second thoughts about giving up control of Virtual Geo's operations. Jill Stern, General Counsel for Ellipso and Virtual Geo, drafted a contract so as not to include the progressive change of control issue that Castiel and Stern knew was a condition precedent to the Minihan team's agreement to join Virtual Geo. Unwilling to join Virtual Geo without such a provision in the contract, Minihan chose not to become part of Virtual Geo's management team.

G. *The FCC Declares Ellipso's License To Be Null And Void*

On or about June 30, 1997, Ellipso, through MHCI, became fully licensed by the FCC to launch and operate a complex satellite system (the "1997 License"). Based on the 1997 License, Ellipso was authorized to launch and operate a 16-satellite "Big LEO" system to provide two-way voice and data communications to customers equipped with mobile earth-station transceivers.

*5 The International Bureau granted the license over objections from several petitioners who argued that MCHI's license application should be denied for failure to show that it had access to funds sufficient to cover the cost of constructing the proposed system and operating it. The International Bureau granted MCHI's request for a waiver of such a requirement, but stressed that the license was conditioned on adherence to a construction progress-milestone schedule requiring that the system be constructed and put into service in a timely manner. The International Bureau stated that it would "carefully monitor [MCHI's] progress toward implementation," and would "not hesitate to cancel the license should it fail without justification to meet the milestone schedule."[FN9]

FN9.*In re Mobile Communications Holdings, Inc.*, DA 01-1315, at 1 (F.C.C. May 31, 2001).

The license order prescribed the following milestone schedule: begin construction of at least two of MCHI's authorized satellites by July 1998; begin construction of the other satellites by July 2000; complete construction of the first two satellites by July 2001; and complete a fully operational system by July 2003. The license order provided that unless the schedule is extended for good cause, "this authorization will become null and void in the event that the licensee fails to meet [this] progress schedule."[FN10]

FN10.*Id.* at 2.

Under the FCC's rules, each Big LEO licensee must file a statement within ten days of a progress milestone date specified in its license, either certifying that it has met the milestone requirement or giving notice that it has failed to meet it. To comply with this requirement, MCHI filed an affidavit on June 22, 1998, stating that it had met its July 1998 milestone by entering into a non-contingent contract with Boeing for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 7 of 18

Not Reported in A.2d

Page 6

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

construction of two satellites. In an affidavit filed on July 31, 2000, MCHI stated that "MCHI has entered into a binding, non-contingent contract with Teledyne Brown Engineering, Inc. relating to the construction of the satellites consistent with the milestones and technical specifications set forth in MCHI's [license order]."[FN11]

FN11.*Id.*

By Memorandum Opinion and Order dated May 31, 2001, the FCC rendered null and void the 1997 License.[FN12]The FCC concluded that Ellipso did not meet the milestone requirement to commence construction of all 16 satellites by the end of July 2000. The FCC found that the Boeing contract was not a non-contingent construction contract because the parties had adopted amendments that essentially nullified the contract. Specifically, on June 30, 1999, MCHI executed a third amendment to the Boeing contract, providing that Boeing could not perform any work thereafter except as subsequently authorized in writing by MCHI.[FN13]The FCC found that MCHI did not issue any work authorizations between then and October 12, 2000. The FCC then determined that between June 30, 1999 and October 12, 2000 Boeing was under no contractual duty to perform satellite construction for MCHI.[FN14]

FN12.*Id.* at 2-3.

FN13.*Id.*

FN14.*See id.* at 3.

Based in part on these facts, the FCC concluded that MCHI did not meet the milestone requirement to commence construction of all of its proposed satellites by the end of July 2000.[FN15] The FCC stated that to meet a milestone deadline for commencement of satellite construction, a licensee relying on others to perform the required work must enter into a binding contract for construction of the satellites that is not subject to material contingencies that remain unresolved as of the deadline.[FN16]The FCC found that MCHI was not a party to a non-contingent contract for construction of 16 satellites at the end of July 2000 or at any other times prior to October 12, 2000. [FN17] In fact, the FCC found that MCHI's "contract with Boeing for construction of two satellites was essentially abrogated on June 30, 1999."[FN18]

FN15. The FCC also determined that the contract with Teledyne Brown on which MCHI predicated its second milestone certification did not require Teledyne Brown to build or deliver satellites for MCHI. Although Teledyne Brown is involved in the aerospace industry, it does not manufacture or construct satellites. The FCC determined that the contract only engaged Teledyne Brown to provide consulting and managerial services in three successive phases. Further, the FCC found that the work schedule specified in the contract with Teledyne Brown was merely tentative because MCHI reserved the right to add to, change, or delete the work to be performed by Teledyne Brown and alter the times for performance. The FCC also noted that Teledyne Brown was to consult with MCHI in advance of each calendar quarter as to what work to perform in that period, and MCHI would not be liable for payment for any work performed without such prior approval. *See id.*All of these events, however, occurred well after Sahagen's investment in Ellipso.

FN16.*Id.* at 4.

FN17.*Id.*

FN18.*Id.*

III.

*6 The original complaint in this action was brought by VGS, Inc. against Castiel, Ellipso, and VGHI seeking a declaratory judgment that a purported merger between VGS, Inc. and Virtual

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 8 of 18

Not Reported in A.2d Page 7

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Geo was valid. Ellipso and VGHI then filed a counterclaim against VGS, Inc., Sahagen, Howard, Quinn and SST Global that alleged, among other things, that Sahagen and Quinn breached their fiduciary duty of loyalty.[FN19]

FN19.*See, e.g., VGS, Inc.,* 2000 WL 1277372 for more details surrounding this transaction.

Ellipso, VGHI and counterclaim-plaintiff-intervener Virtual Geo (together with Castiel and MCHI, the "Castiel Parties") have moved for summary judgment on Count II of their original counterclaim, which seeks a finding that Sahagen and Quinn have breached their fiduciary duty of loyalty.[FN20]

FN20. Although this court has previously entered judgment in favor of Castiel, VGHI, Ellipso and Virtual Geo, that trial only resolved the corporate governance issue. *See generally VGS, Inc.,* 2000 WL 1277372. The Castiel Parties still maintained duty of loyalty claims against Sahagen and Quinn.

Peter Sahagen and SST Global (collectively the "Sahagen Parties") then filed a cross-counterclaim against the Castiel Parties to recover their investment and to obtain an award of damages on behalf of Virtual Geo.[FN21] The Castiel Parties moved for summary judgment in their favor on the cross-counterclaims of the Sahagen Parties.

FN21. The Sahagen Parties moved to amend, for a second time, their complaint in October of 2000. This court granted in part and denied in part their motion on October 26, 2001. Since that time, the Sahagen Parties have not re-filed the Second Amended Complaint in its approved form. Rather, the Sahagen Parties have filed Second Amended Counterclaims. For the sake of this motion, this court will treat the Second Amended Counterclaims as the most current set of claims against the Castiel Parties. In addition, although this opinion refers to the parties collectively as the Sahagen Parties and the Castiel Parties, it should be noted that the Sahagen Parties' "counterclaims" are not being asserted against Virtual Geo.

The Sahagen Parties also previously filed many of these same claims under a different caption on April 19, 2000 (the "17997 action"). This court has taken the position that the 17997 action has been consolidated with the 17995 action.

There are eleven separate cross-counterclaims asserted by the Sahagen Parties. Counts I and X (which essentially replicate each other) allege common law fraud against the Castiel Parties based on statements and omissions made by Castiel, Ellipso, and VGHI. Counts II and XI (which essentially replicate each other) allege negligent misrepresentation against the Castiel Parties based on the same alleged statements and omissions in Counts I and X. Count V is a claim of civil conspiracy against the Castiel Parties based on the same fraud alleged in Counts I and X.

Count III of the Sahagen Parties' cross-counterclaims attempts to allege a direct claim against Castiel for a breach of his fiduciary duties of loyalty and care. This claim is largely based on an assertion of waste and mismanagement. Count IV alleges that the remaining Castiel Parties aided and abetted Castiel's breach of fiduciary duties. Count VIII asserts a derivative claim by the Sahagen Parties on behalf of Virtual Geo for breaches of fiduciary duties by the Castiel Parties. Count IX alleges a derivative claim by the Sahagen Parties on behalf of Ellipso against Castiel for breaches of fiduciary duty. The Castiel Parties have not briefed Count IX, yet they still move for summary judgment on that Count. Due to this lack of briefing, however, the court will not grant the Castiel Parties' motion for summary judgment on Count IX.

The final two Counts of the Sahagen Parties' cross-counterclaim are for a "constructive trust" (Count VI) and injunctive relief against the Castiel Parties (Count VII). These "Counts" are remedies, not causes of action, and thus do not provide an

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 9 of 18

Not Reported in A.2d Page 8

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

independent basis for recovery. Moreover, the Sahagen Parties already attempted to enjoin the Castiel Parties from expending any of Virtual Geo's funds, and this court denied that motion.[FN22] Thus the court will grant summary judgment in favor of the Castiel Parties on these Counts.

FN22. *See* Ruling on Pls.' Mot. For Prelim. Injunction, Lamb, V.C ., (Sept. 13, 2000).

IV.

*7 Under Delaware law, summary judgment may be granted only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[FN23] When considering a motion for summary judgment, the facts must be viewed in the light most favorable to the non-moving party, and the moving party has the burden of demonstrating that no material question of fact exists.[FN24] "When a moving party has properly supported its motion, however, the non-moving party must submit admissible evidence sufficient to generate a factual issue for trial or suffer an adverse judgment."[FN25]

FN23. *See Burkhart v. Davies,* 602 A.2d 56, 59 (Del.1991), *cert. denied,* 504 U.S. 912, 112 S.Ct. 1946, 118 L.Ed.2d 551 (1992).

FN24. *See Tanzer v. Int'l General Indus., Inc.,* 402 A.2d 382, 385 (Del.1979).

FN25. *Id.;* Ch. Ct. R. 56(e).

V.

A. *The Sahagen Parties Are Not Entitled To A Trial On Their Fraud And Misrepresentation Claims*

In Counts I and X of their cross-counterclaims (which essentially replicate each other), the Sahagen Parties allege that they were fraudulently induced into investing in Virtual Geo and Ellipso based on several representations made by Castiel, Ellipso, and MCHI. Specifically, Castiel purportedly induced Sahagen's investment by: (1) representing that he would hire new management if Sahagen invested in Ellipso and Virtual Geo; (2) representing that there were no problems with Ellipso's antenna technology; (3) misrepresenting the status of Ellipso's FCC license; and (4) misrepresenting his intentions with respect to how he planned to use the money Sahagen invested in Virtual Geo. To establish a claim for fraud, the Sahagen Parties must demonstrate the following: "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." [FN26]

FN26. *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970-71 (2d Cir.1987). The court will apply New York law to the Sahagen Parties' substantive claims made in connection with a Unit Purchase Agreement and Stock Purchase Agreement that are at issue in this suit. *See* note 29, *infra.*

On January 29, 1999, Sahagen, on behalf of SST Global, entered into a Stock Purchase Agreement with Ellipso. That same day, Sahagen, on behalf of SST Global, entered into a Unit Purchase Agreement with Virtual Geo. The Castiel Parties argue that the explicit language of those Agreements prevents the Sahagen Parties from pursuing a fraud in the inducement allegation as a matter of law.[FN27] For example, as part of the Stock Purchase Agreement, Ellipso made numerous representations and warranties to Sahagen. Moreover, Section 2.14 of that Agreement states:

FN27. This argument applies to all of the alleged fraudulent statements except for those relating to Ellipso's FCC license, which was specifically warranted in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 10 of 18

Not Reported in A.2d Page 9

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Stock Purchase Agreement. *See*Castiel Parties Reply Br., Ex. A. § 2.07.

[Ellipso] makes and has made no representations or warranties, express or implied, except as set forth in this Agreement. No representation or warranty of [Ellipso] shall be deemed to be made or enlarged as a result of disclosures made or information provided by [Ellipso] to [Sahagen] during the course of [Sahagen's] "due diligence" investigation of [Ellipso] or the Subsidiaries.[FN28]

FN28.*Id.* at § 2.14. Identical language is contained in the January 29, 1999 Unit Purchase Agreement between SST Global and Virtual Geo. *See*Castiel Parties Reply Br., Ex. B. § 2.14.

Finally, Section 10.03 is an integration clause whereby Sahagen agreed that the terms of the written Agreement constituted the sole understandings of the parties. Specifically, the provision states:

This Agreement (including the Disclosure Schedule, which is incorporated herein by this reference) and the Related Agreements constitute the sole understanding of the parties with respect to the subject matter thereof. Matters disclosed by Seller to Buyer pursuant to any Section of this Agreement shall be deemed to be disclosed with respect to all sections of this Agreement. [FN29]

FN29.*Id.* at § 10.03. Identical language is contained in the January 29, 1999 Unit Purchase Agreement between SST Global and Virtual Geo. *See*Castiel Parties Reply Br., Ex. B. § 10.03. Section 10.11 of both Agreements provides that New York law is the controlling law "for any litigation arising out of or relating to thus Agreement and transactions contemplated hereby...." In addition, New York has a substantial relationship to the Agreements because Sahagen resided in New York at the time he negotiated and executed the Agreements. Moreover, aspects of the Agreements were actually negotiated in New York. Because under Delaware law the parties' choice of law governing their contract should be respected as long as the law of that state and the parties have some relation to that state, New York law must govern the interpretation of the Agreements. *See Wilmington Trust Co. v. Wilmington Trust Co.*, 24 A.2d 309, 313 (Del.1942).

The law governing the Agreements also governs the effect, if any, that the Agreements may have on claims for fraud and negligent misrepresentation. *See*RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 201 cmt. (a), (c) (1971) ("(a) Under the rule of this section, questions involving the effect of a misrepresentation, duress, undue influence and mistake upon a contract are determined by the law chosen by the parties, if they have made an effective choice .... (c) The fact that a contract was entered into by reason of misrepresentation, undue influence or mistake does not necessarily means [sic] that a choice-of-law provision contained therein will be denied effect. This will be done if the misrepresentation, undue influence or mistake was responsible for the complainant's adherence to the provision"); *see also Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 309 (2d Cir.1994) (holding that a choice of law clause applying New York law was sufficiently broad to encompass tort and contract claims when the agreement covered any controversy "arising out of or relating to" that agreement); *Woodling v. The Garrett Corp.*, 813 F.2d 543, 552 (2d Cir.1987) (applying section 201 of the Restatement (Second) of Conflicts of Laws in recognizing that the validity and enforceability of a release are matters of substance).

***8** Usually under New York law, general provisions such as the ones at issue in this case do not preclude claims for fraud in the inducement. [FN30] This general law, however, does not apply when (1) the transaction at issue is a multi-million dollar transaction executed following negotiations with sophisticated parties and, (2) the complaining party has the opportunity to discover information that would make reliance on such representations

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 11 of 18

Not Reported in A.2d Page 10

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

unreasonable.[FN31]

FN30.*See Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597, 598-99 (N.Y.1959) (holding that "the parol evidence rule is not a bar to showing the fraud ... despite an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made"); *Mfrs. Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 315 (2d Cir.1993) (holding that when a contract specifically disclaims existence of or reliance upon certain representations, plaintiff cannot later claim fraudulent inducement based on reliance on those representations).

FN31.*In re Cinar Corp. Sec. Litig.,* 186 F.Supp.2d 279, 314 (E.D.N.Y.2002); *Emergent Capital Inv. Mgt., LLC v. Stonepath Group, Inc.,* 165 F.Supp.2d 615, 622-23 (S.D.N.Y.2001).

1. *The Parties To The Stock Purchase Agreement And Unit Purchase Agreement Were Sophisticated Parties Engaged In A Multi-Million Dollar Transaction*

The general rule articulated by *Danann Realty Corp.* does not apply to multi-million dollar transactions involving sophisticated parties. In *Emergent Capital,* the plaintiff claimed fraud, following a $2 million stock purchase, with respect to an oral representation about the size of a future stock offering. The plaintiff was a limited liability company, 90% of which was owned by two individuals employed by Wall Street firms and familiar with the securities market.[FN32]Despite the use of a general integration clause and a representations and warranties clause that did not specifically mention the future offering, the court found that the fraud claim was barred.[FN33]The court specifically relied on the "sophistication and knowledge of the parties" and noted that the plaintiff's initial investment was "a multi-million dollar transaction executed following negotiations between sophisticated business people...."[FN34]

FN32.*Emergent Capital,* 165 F.Supp.2d at 619.

FN33.*Id.* at 622-23.

FN34.*Id.* at 622;*see also In re Cinar Corp. Sec. Litig.,* 186 F.Supp.2d at 314 (citing *Emergent Capital* for an exception to the general rule articulated in *Mfrs. Hanover Trust* and *Danann Realty Corp.*).

The exception to the general *Danann* rule provided in *Emergent Capital* applies to the transactions at issue in the current dispute. The Stock Purchase and Unit Purchase Agreements were multi-million dollar transactions negotiated at length by sophisticated parties that were represented by counsel. The Stock Purchase Agreement between Ellipso and Sahagen Satellite Technology Group, LLC was for the sale of 20,000 shares of Ellipso common stock for $4.2 million. Similarly, the Unit Purchase Agreement between Virtual Geo and Sahagen Satellite Technology Group, LLC was for the sale of 260 common units of Virtual Geo for $5.2 million. Moreover, Sahagen Satellite Technology Group, LLC warranted its " Sophistication" as an "accredited investor." [FN35] SST Global's own 30(b)(6) representative has admitted that Sahagen "is a very prolific investor," [FN36] and this court has found Sahagen to be "an aggressive and apparently successful venture capitalist."[FN37]Finally, Sahagen was represented by sophisticated counsel, and also admittedly engaged in extensive due diligence, including the hiring of a "technical expert" and the consultation of Ellipso employees.[FN38]

FN35.*See*Castiel Parties Reply Br., Ex. A. § 3.08; Castiel Parties Reply Br., Ex. B. § 3.08.

FN36. SST Global Dep. at 116.

FN37.*VGS, Inc.,* 2000 WL 1277372, at *1.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 12 of 18

Not Reported in A.2d Page 11

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN38. SST Global Dep. at 75-78; 32-35.

2. *The Sahagen Parties Had An Opportunity To Discover Information That Would Make Reliance On The "Fraudulent" Representations Unreasonable*

When a complaining party has the opportunity to discover information that would make reliance on the alleged representations unreasonable, that party cannot thereafter take advantage of the *Danann* rule. FN39 In *Belin,* when confronted with a disclaimer clause similar to the ones at issue in this litigation, the court held that where a representation about the amount of an insurance policy was allegedly fraudulent, the allegedly fraudulent information did not amount to an actionable claim because the correct information "was readily ascertainable had [plaintiff] asked to see the insurance policy prior to closing on his investment ." FN40 The current litigation is highly analogous to the facts and issues of *Belin.*

FN39.*Belin v. Weissler,* 1998 WL 391114, at *5-7 (S.D.N.Y.1998); *Emergent Capital,* 165 F.Supp.2d at 623 (holding that a sophisticated investor "must show that he or she has made an independent inquiry into all available information").

FN40.*Id.,* at *7. *But cf. In re Cinar,* 186 F.Supp. at 285, 314 (holding that a general disclaimer clause was insufficient to defeat a fraud claim based on inflated estimates of the company's financial position as a result of improperly claimed tax credits because there was no way plaintiff could have discovered the improper tax credit).

*9 Here, it is undisputed that before entering into the Agreements Sahagen possessed information, or access to information, that demonstrated that the alleged oral representations made by Castiel were false. SST Global's Rule 30(b)(6) witness testified that Sahagen was well aware, before investing in Ellipso or Virtual Geo, that there were problems with the antenna technology and that Castiel would not seek new management, both in direct contradiction to alleged oral representations that underlie the Sahagen Parties' fraud claims. FN41

FN41.*See* SST Global Dep. at 77-79; 60; 63; 68-69. *Cf. C.P. Kelco U.S., Inc. v. Pharmacia Corp.,* 2002 WL 31230816, at *9-10 (D.Del.2002) (holding that a disclaimer did not preclude claims of fraud between highly sophisticated parties because the plaintiff had no opportunity to discover the alleged fraud before entering into the agreement).

Additionally, in *Belin,* the court held that the plaintiff could not pursue his fraud claim partly because he warranted that he had an opportunity to verify the representations given and could obtain whatever additional information he required. The court held that, "[h]aving explicitly represented that he had an opportunity to verify the accuracy of information provided to him, Belin cannot now be heard to complain that he relied on information that he declined to verify, although he could have determined the amount of [the insurance policy] simply be asking for a copy of the policy." FN42 Similarly, SST Global warranted in both Agreements that it "conducted a reasonable investigation" of Ellipso and Virtual Geo, and had " received such information ... and ha[d] been given such opportunity to ask such questions of, and receive answers from, representatives of [Ellipso and Virtual Geo], as [SST Global] deems sufficient to make an informed investment decision with respect to the Stock." FN43 Therefore, like the plaintiffs in *Belin* and *Emergent Capital,* the Sahagen Parties cannot take advantage of the *Danann* rule and summary judgment must be granted in favor of the Castiel Parties with regard to fraud claims stemming from statements or omissions that were not warranted in the Agreements. FN44

FN42.*Belin,* 1998 WL 391114, at *8. *See also Emergent Capital,* 165 F.Supp.2d at 623 (finding it relevant that the plaintiff

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

had access to information and executed a warranty that it had the opportunity to ask questions and receive answers from the defendant and to obtain any additional information it thought necessary before entering into the transaction).

FN43. Castiel Parties Reply Br., Ex. A. § 3.09; Castiel Parties Reply Br., Ex. B. § 3.09.

FN44. For the same reasons, the court will enter summary judgment in favor of the Castiel Parties on Counts II and XI of the Sahagen Parties' counterclaims to the extent they allege negligent misrepresentations not warranted in the Agreements. These Counts allege that the same misrepresentations discussed above give rise to a claim for negligent misrepresentation. This is essentially a lesser-included offense of fraud. As already discussed, the integration and merger clauses of the Agreements, in connection with the actions of Castiel and Sahagen prior to executing the Agreements, make Counts I and X untenable as a matter of law and must also make Counts II and XI invalid as a matter of law.

Summary judgment must also be granted in favor of the Castiel Parties with respect to Count V (civil conspiracy) of the Sahagen Parties' counterclaim. Since the Sahagen Parties are unable to survive a summary judgment motion based on their underlying claims, a claim for civil conspiracy must fail as well.

3. *The Undisputed Facts Show That The Warranties Provided Regarding The Status Of The FCC License Were Correct When Sahagen Entered Into The Stock Purchase Agreement*

The Sahagen Parties argue that Castiel made several material misrepresentations regarding the status of Ellipso's FCC license. Specifically, the Sahagen Parties argue that Castiel misrepresented that (1) the license was in full force and effect; (2) that MCHI was in full compliance with the construction and certification schedules established by the FCC; (3) that the license was not subject to any limitations that could subject it to cancellation or revocation; and (4) that Ellipso was in full compliance and no further requirements needed to be meet.

The FCC required that construction begin on at least two satellites by July 1998, and that construction of the remaining satellites begin by July 2000. The FCC also required MCHI to report when those goals were achieved. MCHI entered into a non-contingent contract with Boeing in June 1998 for the construction of two satellites. This contract was subsequently amended in November 1998, February 1999, and June 1999. MCHI reported to the FCC in June 1998 that it was in compliance with the July 1998 milestone.

*10 The crux of the Sahagen Parties' claims that relate to the FCC license is the fact that the FCC revoked Ellipso's license in May 2001. The Sahagen Parties argue the FCC found that MCHI abrogated its contract with Boeing when the November 1998 amendment was executed, resulting in MCHI being out of compliance with the FCC license and subjecting its license to revocation. Since this all occurred before the Sahagen Parties invested in Ellipso, the argument goes, the Castiel Parties breached the specific warranties provided in the Stock Purchase Agreement.

The facts as plainly found by the FCC, however, do not support the Sahagen Parties' claims. It is true that the FCC found that the November 1998 amendment required Boeing to develop and submit a proposal for a re-negotiated contract and forbade it from performing any other tasks without prior authorization from MCHI.[FN45] The FCC did not determine, however, that this amendment resulted in an abrogation of MCHI's contract with Boeing. Rather, the FCC determined that *as of June 30, 1999*-approximately six months after the Sahagen Parties invested in Ellipso and Virtual Geo-the Boeing contract was abrogated by amendment.[FN46]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 14 of 18

Not Reported in A.2d

Page 13

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN45.*In re Mobile Communications Holdings, Inc.*, DA 01-1315, at 3.

FN46.*See id.* at 3 ("It thus appears that between June 30, 1999 and October 12, 2000 Boeing was under no contractual duty to perform satellite construction for MCHI"); *see also id.* at 4 ("[MCHI's] contract with Boeing for construction of two satellites was essentially abrogated on June 30, 1999").

A plain reading of the FCC order demonstrates that there are no genuine issues of material fact related to Ellipso's warranties of the validity of its FCC license. The undisputed facts actually support the conclusion that MCHI and Ellipso were in compliance with the FCC's milestone and construction schedule at the time Sahagen invested in Ellipso and Virtual Geo.[FN47] There being no genuine issue of material fact, summary judgment in favor of the Castiel Parties on Counts I and X is appropriate as no misrepresentations regarding the FCC license can be shown.[FN48]

FN47.*See id* at 2 ("MCHI did, in fact, enter into a two-satellite construction contract with Boeing prior to the first milestone deadline").

FN48. The same misrepresentations are relied on to allege both fraud (Counts I and X) and negligent misrepresentation (II and XI). Because this court has determined there were no misrepresentations whatsoever with respect to the FCC license, summary judgment must be granted as to both the Sahagen Parties' fraud claim and negligent misrepresentation claim to the extent they rely on the FCC license. Because there are no litigable claims based on the FCC license, the Sahagen Parties' civil conspiracy claims (Count V) must fail as well.

B. *The Castiel Parties' Fiduciary Duty Claims Are Derivative And There Is No Evidence That Demand Would Have Been Futile*

1. *The Sahagen Parties' Direct Claims For Breach Of Fiduciary Duty (Counts III And IV) Are Actually Derivative Claims*

In Count III of their cross-counterclaim, the Sahagen Parties allege a direct claim for breach of the fiduciary duty of loyalty against Castiel.[FN49] This Count alleges as follows:

FN49. Count IV asserts alleges that Ellipso and MCHI aided and abetted this breach of fiduciary duty.

Castiel breached his fiduciary duties to SST Global by, among other things, diverting company funds (including SST Global's investments) to his own use, causing the company to pay for expenses which had no relationship to company business, engaging in acts of misfeasance and nonfeasance constituting gross negligence, wasting and depleting the cash and other assets of the company, and misrepresenting or failing to disclose material facts regarding Virtual Geo LLC's business and finances.[FN50]

FN50. Second Amended Reply, Answer, and Counterclaims of Peter D. Sahagen and SST Global, LLC at ¶ 79.

Essentially, the Sahagen Parties' claim appears to be nothing more than a claim for waste, mismanagement, and self-dealing. Such a claim is clearly derivative in nature and not a direct claim as the Sahagen Parties maintain. In deciding whether a claim is derivative or individual, a court looks to the "nature of the wrong alleged [not] the plaintiff's characterization of the claim in the complaint ."[FN51] To maintain a direct lawsuit, the injury alleged must affect a stockholder alone or affect a particular stockholder right "such as his preemptive rights as a stockholder, rights involving control of the corporation, or a wrong affecting the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 15 of 18

Not Reported in A.2d

Page 14

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

stockholders and not the corporation."FN52For these reasons, "claims of waste and self-dealing ... have been held to be derivative and not individual." FN53Thus, it is clear that the "individual" claims the Sahagen Parties assert are more appropriately characterized as derivative claims that are brought on Virtual Geo's behalf.

FN51.*Kramer v. Western Pac. Indus., Inc.,* 546 A.2d 348, 352 (Del.1988).

FN52.*In re Paxon Comm. Corp. S'holders. Litig.,* 2001 WL 812028, at *3 (Del.Ch. July 12, 2001).

FN53.*In re Rexene Corp. S'holders. Litig.,* 1991 WL 77529, at *3 (Del.Ch. May 8, 1991); *Kramer,* 546 A.2d at 353 ("A claim of mismanagement resulting in corporate waste, if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders.... Thus, the wrong alleged is entirely derivative in nature.").

*11 Responding to the Castiel Parties' arguments that Count III alleges solely derivative claims, the Sahagen Parties attempt in their answering brief to assert new breach of fiduciary duty claims that are more individual in nature.FN54 These new claims are permitted, according to the Sahagen Parties, because "[i]n his Counterclaims, Sahagen expressly states that Castiel's breaches include but are not limited to the breaches expressly enumerated therein."FN55In fact, this argument is based solely on the fact that Count III contains the words "among other things" when describing Castiel's alleged breaches of fiduciary duty. The court cannot permit a party, upon recognition that its original allegation standing alone cannot survive summary judgment as a direct claim, to assert for the first time in its answering brief new claims based solely on a clause containing the phrase " among other things." Therefore, the court will consider Count III, and the allegations set forth therein, as derivative in nature, requiring proof that demand would have been futile before permitting an individual stockholder to bring such a claim. The same is true for Count VIII, which explicitly alleges against the Castiel Parties a derivative claim for breach of fiduciary duty on behalf of Virtual Geo.

FN54.*See* Sahagen Parties Ans. Br. at 38 (" Castiel also breached their [sic] fiduciary duties to keep Sahagen adequately informed about the business of Virtual Geo, failed to provide him with books and records, failed to hold meetings, and failed to protect the value of his investment").

FN55.*Id.*

2. *The Sahagen Parties Have Failed To Establish A Genuine Issue Of Material Fact As To Whether Demand Would Have Been Futile*

The right of a member of a Delaware LLC to bring a derivative claim is governed by 6 *Del. C.* § 18-1000, which provides:

A member or an assignee of a limited liability company interest may bring an action in the Court of Chancery in the right of a limited liability company to recover a judgment in its favor if managers or members with authority to do so have refused to bring the action *or if an effort to cause those managers or members to bring the action is not likely to succeed.*FN56

FN56. Emphasis added.

This provision originates from the well-developed body of Delaware law governing derivative suits by stockholders of a corporation. Accordingly, case law governing corporate derivative suits is equally applicable to suits on behalf of an LLC.FN57

FN57.*See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,* 1998 WL 832631, at *5 n. 14 (Del.Ch. Nov.10, 1998) ("The derivative suit is a corporate action grafted onto the limited partnership form,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 16 of 18

Not Reported in A.2d

Page 15

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

and I look to corporate precedent to distinguish between limited partnership derivative actions and direct limited partner claims").

The Sahagen Parties concede that no demand was made of Virtual Geo's board.FN58 Under Delaware law, an individual plaintiff can only bring a derivative claim against an LLC without first making a demand of the board if such demand would have been futile.FN59A demand is considered futile when a reasonable doubt exists as to whether "(a) the [managers] were disinterested or independent, [or] (b) the challenged transaction was the product of a valid exercise of business judgment."FN60The presence of either situation excuses the lack of a demand.FN61

FN58.*See* Sahagen Parties Ans. Br. at 34.

FN59.*See*6 *Del. C.* § 18-1001; *Rales v. Blasband,* 634 A.2d 927, 932 (Del.1993) ("Because directors are empowered to manage, or direct the management of, the business and affairs of a corporation, the right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have refused or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation").

FN60.*Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984).

FN61.*See Brehm v. Eisner,* 749 A.2d 244, 256 (Del.2000) ("These prongs [of the *Aronson* test for determining whether demand is excused] are in the disjunctive. Therefore if either prong is satisfied, demand is excused.").

Both the Castiel Parties and the Sahagen Parties concede that the sole issue relating to whether demand on the Virtual Geo board would have been futile depends on whether Ambassador (Ret.) Gerald Helman would be disinterested and independent in a demand made by Sahagen to pursue litigation against Castiel for breach of fiduciary duty. This is because Castiel and Sahagen are the other two members of Virtual Geo's three-person Board of Managers. To support their argument that Helman was not disinterested or independent, the Sahagen Parties argue that Helman "is entirely dependent upon Castiel because his only other employment is as an officer in Ellipso, which Castiel controls."FN62The Sahagen parties also allege beholdeness on the part of Helman because he and Castiel are close friends.FN63In the same breath, however, the Sahagen Parties argue that Helman is beholden to Castiel because Helman once before acted to remove Castiel from a position of authority at Ellipso and Castiel terminated Helman. Helman is now allegedly afraid of similar reprisals. These arguments are all insufficient to satisfy the requirement that individual plaintiffs demonstrate futility before bringing a derivative claim on behalf of an LLC.

FN62. Sahagen Parties Ans. Br. at 36.

FN63.*Id.* at 37.

***12** It may be true that Helman's sole *employment* is as an officer of Ellipso, but this misses the point that Helman has other substantial sources of *income.*In his sworn affidavit, Helman stated that "I am not dependent on my Ellipso salary. My Ellipso salary is a supplement to my chief source of income. I am retired from a senior position in the Foreign Service of the Department of State and am receiving a full annuity that includes medical and other benefits."FN64The Sahagen Parties' second claim that because they are friends Helman is incapable of initiating a suit against Castiel, is defeated by their third claim that argues Helman has opposed Castiel, to the point that Castiel chose to fire Helman, at times prior to this litigation. Clearly their friendship has not stood in the way of their past business dealings and there is no reason to think that it should in the future. Finally, the Sahagen Parties' third contention does not prove that Helman is beholden to Castiel. If anything, this argument supports an inference that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 17 of 18

Not Reported in A.2d
Page 16
Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Helman is not beholden to Castiel. The very fact that Helman supposedly was willing to risk his job to vote his conscience, and against Castiel, in the past demonstrates that he is not beholden to Castiel and is willing to vote against him again should the situation call for it.

FN64. Helman Aff. ¶ 2.

For all these reasons, the court will grant summary judgment in favor of the Castiel Parties on Counts III, IV, and VIII of the Sahagen Parties' counterclaim for failure to seek demand and an inability to demonstrate that such demand would have been futile.[FN65]

FN65. The court will allow the Sahgen Parties to re-file their derivative action if demand is made and it is wrongfully refused.

C. *Summary Judgment Should Be Entered Against Sahagen And Quinn For Breach Of Their Duty Of Loyalty*

Count II of the complaint of Virtual Geo and Count II of the Castiel Parties' counterclaims allege that Sahagen and Quinn breached their duty of loyalty when, in the context of a merger, they attempted to wrest control of Virtual Geo from Castiel without his consent. Then-Vice Chancellor Steele, in a trial on a corporate governance issue, has already held that Sahagen and Quinn "owed a duty of loyalty to [Virtual Geo], its investors and Castiel, their fellow manager," and "that the actions of Sahagen and Quinn, in their capacity as managers constituted a breach of their duty of loyalty."[FN66] This holding, according to the Castiel Parties, is the "law of the case" and, consequently, summary judgment should be entered in favor of the Castiel Parties on Count II of their counterclaims.[FN67]

FN66. *VGS, Inc. v. Castiel,* 2000 WL 1277372, at *4, *5. *See also VGS, Inc. v. Castiel,* 2001 WL 1154430, at *1 (Del.Ch. Sept.25, 2001) ("In his August 31, 2000 decision, then Vice Chancellor Steele found that Peter Sahagen and Tom Quinn breached their duty of loyalty when they secretly executed a written consent to the merger of [Virtual Geo] with and into VGS, Inc., for the purpose of eliminating the majority control over the enterprise of the third manager, David Castiel").

FN67. *See Kenton v. Kenton,* 571 A.2d 778, 784 (Del.1990) ("The 'law of the case ' is established when a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation ") (citation omitted).

The doctrine of "law of the case" is not a hard and fast rule, however.[FN68] The Delaware Supreme Court has stated that "[t]he law of the case doctrine is not inflexible in that, unlike *res judicata,* it is not an absolute bar to reconsideration of a prior decision that is clearly wrong, produces an injustice, or should be revisited because of changed circumstances."[FN69] The Sahagen Parties urge this court not to apply the "law of the case" doctrine because to do so would "create an injustice." [FN70]

FN68. *See Gannett Co., Inc. v. Kanaga,* 750 A.2d 1174, 1181 (Del.2000).

FN69. *Id.* (citations omitted).

FN70. Sahagen Parties Ans. Br. at 39.

***13** The court does find that any such injustice would occur if the "law of the case" doctrine were applied only with respect to whether or not a breach of the duty of loyalty occurred. There have been no changed circumstances since then-Vice Chancellor Steele issued his opinion. It also was not clearly wrong since the Delaware Supreme Court has subsequently affirmed the decision.[FN71] Thus, the court concludes that the "law of the case" doctrine does apply to the current facts, and Sahagen and Quinn will be held to have breached their duty of loyalty. Otherwise, the Castiel Parties would be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

Page 18 of 18

Not Reported in A.2d

Page 17

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

forced to call witnesses to testify about what happened with respect to the attempted merger-testimony with which this court is all too familiar. Any such requirement would be redundant and serve to waste this court's time.

FN71.*VGS, Inc.*, 781 A.2d 696 (Del.2001).

The Sahagen Parties argue that even if the "law of the case" is applied to Sahagen's and Quinn's breaches, important issues remain for trial as to questions of cause in fact, proximate cause, damages, setoff, comparative fault, estoppel, unclean hands, and contribution. The Castiel Parties do not disagree.[FN72]Accordingly, the court will only grant summary judgment on Count II of the Castiel Parties' complaints to the extent that the " law of the case" doctrine instructs this court to find that Sahagen and Quinn breached their fiduciary duty of loyalty.

FN72.*See*Castiel Parties Reply Br. at 9-10.

VI.

For the foregoing reasons, summary judgment is granted in favor of the Castiel Parties on the Sahagen Parties' cross-counterclaim, except as to Count IX of that counterclaim. Summary judgment is granted in part in favor of the Castiel Parties on Count II of its counterclaim to the extent that the court finds that Quinn and Sahagen breached their duty of loyalty. The parties shall consult and present a conforming order within 10 days of this opinion.

Del.Ch.,2003.
VGS, Inc. v. Castiel
Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 1/22/2008

# TAB 14

Page 106 of 118

Westlaw.

Not Reported in F.Supp.2d Page 1

Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
WestRM-West Risk Markets, Ltd. v. XL Reinsurance America, Inc.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
WESTRM-WEST RISK MARKETS, LTD., Plaintiff and Fourth Party Defendant,
v.
XL REINSURANCE AMERICA, INC. and Greenwich Insurance Company, Defendants and Third Party Plaintiffs,
v.
APARTMENT INVESTMENT AND MANAGEMENT COMPANY, Swain & Baldwin Insurance, Inc., and Ray Baldwin, Third Party Defendants.
**No. 02 Civ. 7344(MGC).**

July 19, 2006.

Kasowitz, Benson, Torres & Friedman, LLP, New York, NY, By: Kim Conroy, for WestRM-West Risk Markets, Ltd.
Kelley Drye & Warren, LLP, New York, NY, By: William Escobar, David Zalman, for XL Reinsurance America, Inc. and Greenwich Insurance Company.
Baker Botts, LLP, Washington, DC, By: Sara Kropf , Casey Cooper, Stephanie Dourado, for Swain & Baldwin Insurance, Inc. and Ray Baldwin.
Latham & Watkins, LLP, New York, NY, By: Noreen A. Kelly-Najah, James E. Brandt, for Apartment Investment and Management Co.

*OPINION*

CEDARBAUM, J.

*1 Third-party plaintiffs XL Reinsurance America, Inc. ("XL") and Greenwich Insurance Company ("Greenwich") move for summary judgment on their claims for contractual indemnification against third-party defendants Apartment Investment and Management Company (" AIMCO"), Swain & Baldwin Insurance, Inc. (" Swain & Baldwin"), and Ray Baldwin ("Baldwin"). Swain & Baldwin, Baldwin (collectively "the Baldwin Defendants"), and AIMCO each move for summary judgment on all claims asserted against them by Greenwich and XL. For the reasons that follow, the motion of Greenwich and XL is denied, AIMCO's motion is denied in part and granted in part, and the Baldwin Defendants' motion is granted.

BACKGROUND

The following facts are undisputed, except where specifically noted.

This action was originally commenced by WestRM-West Risk Markets, Ltd. ("WestRM") to enforce the obligations of Greenwich and XL under four surety bonds issued to WestRM as obligee. Greenwich and XL are insurance companies licensed to issue surety bonds. WestRM is a Swiss reinsurance company. On or about December 28, 2001, Greenwich and XL issued two bonds for $6.3 million each to National Program Services ("NPS"). NPS was an insurance agency located in New Jersey, whose principal was Vito Gruppuso. On or about January 31, 2002, Greenwich and XL issued two additional bonds with face amounts of $6.25 million each to AIMCO and NPS. AIMCO is a Maryland corporation that owns and manages residential real estate throughout the United States.

The two January 2002 bonds ("the Bonds") purport to secure the obligations of AIMCO and NPS under a January 2002 Premium Finance Agreement ("the January PFA") with WestRM. The January PFA explains that NPS procured an insurance policy from Drummonds Insurance and that the $12.5 million insurance premium on that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 107 of 118

Not Reported in F.Supp.2d Page 2

Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

policy was paid by WestRM on behalf of NPS as consideration for the agreement of NPS and AIMCO to repay the $12.5 million to WestRM over the course of three years. Greenwich and XL issued the Bonds to secure the obligations of AIMCO and NPS to repay WestRM. By letter dated May 16, 2002, WestRM advised Greenwich and XL that AIMCO and NPS had each defaulted on their payments under the January PFA and demanded payment on the Bonds.

It is undisputed that the name Ray Baldwin is signed on the Bonds. Ray Baldwin is a Texas-based insurance broker and President of Swain & Baldwin, a Texas insurance agency. Although the exact nature of Baldwin's relationship to AIMCO is disputed, Baldwin's June 1996 Consulting Services Agreement with AIMCO states that Baldwin was engaged by AIMCO as an independent contractor to provide consulting services in connection with AIMCO's insurance needs.

AIMCO has proffered an expert report that concludes that Baldwin did not sign the Bonds. Greenwich and XL have not proffered any evidence to the contrary. Greenwich and XL instead argue that perhaps Vito Gruppuso signed Baldwin's name on the Bonds pursuant to Baldwin's authorization. There is not, however, any evidence to support this theory. Baldwin testified at his deposition that "no one authorized by me signed my name to [the Bonds]." Kropf Decl. Ex. Q at 94.

*2 The Bonds are incorporated by reference into the January PFA, on which a signature that looks like that of Ray Baldwin also appears. The signature is on the last page of the PFA, signed on behalf of "Apartment Investment and Management Company." The parties, however, dispute whether Baldwin actually executed the PFA. AIMCO argues that the document was fabricated to make it appear as though Baldwin had executed it. AIMCO proffers an affidavit from Baldwin stating that, although the signature on the January PFA appears to be his, he did not execute the PFA. AIMCO also points out that Baldwin's undated and unnotarized signature appears only on the final page of the purported PFA, which contains no text from the agreement, header, page number, or other information to indicate that the page is actually part of the January PFA. AIMCO further notes that this page has been produced only in copy form with multiple fax lines that are different from the fax lines of the other pages of the PFA.

Summary judgment was entered for WestRM against Greenwich and XL in April 2004, on the ground that a clause in each of the four bonds waived all defenses to enforcement of the bonds. *See WestRM-West Risk Markets, Ltd. v. Lumbermens Mut. Cas. Co.*, 314 F.Supp.2d 229, 241 (S.D.N.Y.2004). Greenwich and XL now seek indemnification for their losses on the Bonds from AIMCO and from the Baldwin Defendants pursuant to a 2001 indemnity agreement ("the Indemnity Agreement"). Ray Baldwin's signature appears on the Indemnity Agreement twice on the same page, once on behalf of the "Principals," "Apartment Investment and Management Company/Real Estate Investment Management LLC," and once on behalf of the "Additional Corporate Indemnitor," " Apartment Investment and Management Company."

The language of indemnity in the Agreement is as follows:

Undersigned agree to indemnify and exonerate Surety from liability and to pay to Surety upon demand all losses, costs and expenses, including reasonable attorney's fees, paid or incurred in good faith by Surety, by reason of having Executed any Bond and/or enforcing this Agreement. Surety shall have the right and sole discretion to determine whether a claim or liability involving any Bond shall be settled, compromised, paid, defended, prosecuted or appealed, and/or take any action it may deem necessary or expedient with respect to such claims. In the event of any payment by Surety, Surety shall be entitled to be indemnified by Undersigned for all disbursements made by Surety in good faith under the belief that it was liable or that it was necessary or expedient to make such payment, whether or not liability, necessity or expediency exists. An itemized statement of loss and expense incurred and paid by Surety, sworn to by an officer of Surety, shall be prima facie evidence of the fact and amount of the liability of Undersigned to Surety. Separate suits may be brought under this Agreement as causes of action

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 108 of 118

Not Reported in F.Supp.2d

Page 3

Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

accrue, and the pendency or termination of any such suit shall not bar subsequent action by Surety.

*3 Escobar Decl. Ex. 13. "Bonds" are defined in the Agreement as "[a]ny surety bond, undertaking, guaranty or other contractual obligation undertaken by Surety on behalf of or at the request of Principal before or after the date of this Agreement, and any renewal or extension thereof."*Id.*

The parties dispute whether Baldwin had the authority to execute this Indemnity Agreement on behalf of AIMCO. AIMCO argues that Baldwin was not authorized to execute it and proffers the testimony of AIMCO officer Thomas Toomey, who states that he did not authorize Baldwin to enter into the Indemnity Agreement and that he did not intend his November 2, 2000 letter of authorization to authorize Baldwin to do so. Greenwich and XL argue that Baldwin was authorized to execute the Indemnity Agreement and proffer three separate documents that purport to authorize Baldwin to " negotiate, purchase and finance the insurance programs for AIMCO," or "to negotiate and execute insurance premium finance" agreements for AIMCO. A November 2, 2000 letter from Thomas Toomey states that Baldwin "is authorized to negotiate and execute premium finance contracts and insurance premium/surety contracts on behalf of Apartment Investment and Management Company."Escobar Decl. Ex. 12.

DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A genuine issue of material fact exists when the evidence is "such that a reasonable jury could return a verdict for the nonmoving party."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In deciding whether a genuine issue of fact exists, the court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party."*In re Chateaugay Corp.,* 10 F.3d 944, 957 (2d Cir.1993). The moving party bears the initial burden of informing the court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Summary judgment is appropriate if the nonmoving party fails "to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof."*Id.*

I. Claim for Indemnification Against AIMCO

Both sides move for summary judgment on the claim of Greenwich and XL against AIMCO for contractual indemnification as set forth in Count IX of the Second Amended Complaint. Greenwich and XL argue that AIMCO is liable under the Indemnity Agreement, signed by Baldwin on behalf of AIMCO, for all losses that Greenwich and XL incurred as a result of issuing the Bonds.[FN1] AIMCO responds that the Bonds are void *ab initio* because Baldwin's signature on the Bonds was forged and argues that void bonds are not "Bonds" within the meaning of the Indemnity Agreement.

FN1. Greenwich and XL now argue, for the first time in this action, that the Indemnity Agreement requires AIMCO to indemnify it for *all* losses arising from *any* bonds issued by Greenwich and XL on behalf of AIMCO, or Real Estate Risk Management, or their affiliates. Greenwich and XL contend that NPS is an affiliate of Real Estate Risk Management and that AIMCO is therefore obligated to indemnify Greenwich and XL for their losses on the two bonds issued in December 2001 to NPS as the sole principal. However, the indemnification claim of Greenwich and XL against

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 109 of 118

Not Reported in F.Supp.2d Page 4

Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

> AIMCO in their Second Amended Complaint refers to only the two " AIMCO/NPS Bonds" (i.e., "the Bonds") and the "January PFA" that was secured by the Bonds. Complaint ¶¶ 259-260. There is no reference to the two NPS bonds or to the December PFA that these bonds secured. Greenwich and XL may not now amend their contractual indemnification claim against AIMCO as part of their motion for summary judgment. All of the arguments of Greenwich and XL relating to AIMCO's liability on the two December 2001 NPS bonds are disregarded as outside the scope of their indemnification claim.

*4 Summary judgment, however, cannot be granted for either side because a genuine issue of disputed fact exists as to whether the Bonds are covered by the Indemnity Agreement. The Agreement states that the Principals "agree to indemnify and exonerate Surety from liability and to pay to Surety upon demand all losses, costs and expenses, including reasonable attorney's fees, paid or incurred in good faith by Surety, by reason of having Executed any Bond and/or enforcing this Agreement.""Bond" is defined in the Agreement as "any surety bond, undertaking, guaranty or other contractual obligation undertaken by Surety *on behalf of or at the request of Principal* before or after the date of this Agreement, and any renewal or extension thereof."Escobar Decl. Ex. 13 (emphasis added). The threshold question is, therefore, whether the Bonds were issued by Greenwich and XL "on behalf of or at the request of" AIMCO.

Greenwich and XL proffer the January PFA, which incorporates the Bonds by reference, as evidence that the Bonds were issued "at the request of" and "on behalf of" AIMCO. Greenwich and XL argue that the signature of Ray Baldwin, AIMCO's alleged agent, on the PFA shows that AIMCO requested the issuance of the Bonds. In addition, Greenwich and XL contend that the terms of the PFA show that the issuance of the Bonds was "on behalf of" or "in the interest of" AIMCO. Greenwich and XL note that, according to the terms of the PFA, AIMCO would have been forced to pay WestRM the full amount of the remaining payments due under the PFA if Greenwich and XL had not issued the Bonds that obligated Greenwich and XL to pay WestRM if AIMCO defaulted. Thus, the Bonds served AIMCO's "interests" by protecting AIMCO from direct liability to WestRM.

Greenwich and XL also proffer evidence that AIMCO received money from Vito Gruppuso following the completion of the WestRM transaction as proof that the issuance of the Bonds was "on behalf of" or "in the interest of" AIMCO. Greenwich and XL argue that AIMCO would not have received this money from Gruppuso were it not for the issuance of the Bonds, because the WestRM transaction that was secured by the Bonds allowed Gruppuso to pay the Drummonds Insurance policy premiums and to obtain the $11 million insurance payout. Greenwich and XL proffer a February 21, 2002 letter from Gruppuso to Drummonds Insurance as evidence that Gruppuso received an $11 million payout under the Drummonds Insurance policy. Greenwich and XL also proffer an internal AIMCO email as evidence that, pursuant to a November 2001 indemnity agreement between AIMCO and Gruppuso, Gruppuso paid AIMCO $3.1 million on November 29, 2001, another $3.1 million on February 29, 2002, and another $350,000 in April 2002.

AIMCO responds that the January PFA document is not proof that AIMCO had any interest in the WestRM transaction because there is evidence that Baldwin did not execute the PFA. AIMCO proffers the irregular signature page of the purported PFA copy and Baldwin's testimony that he did not execute the PFA as evidence that Baldwin did not execute the PFA and that AIMCO was therefore not a party to the PFA transaction. AIMCO also disputes that it received any consideration from the WestRM transaction, but does not proffer any evidence to contradict the evidence proffered by Greenwich and XL that AIMCO received payments from Gruppuso under the November 2001 indemnity agreement. AIMCO argues that, because there is no evidence that Baldwin executed the PFA or that AIMCO received any consideration from the WestRM transaction, there can be no genuine factual dispute as to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 110 of 118

Not Reported in F.Supp.2d Page 5

Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

whether the Bonds were issued at AIMCO's request or on its behalf.

*5 However, a reasonable jury could find that Baldwin executed the PFA because his signature appears on the last page of the document. A reasonable jury could conclude from this signature that the Bonds were issued at Baldwin's request. On the other hand, a reasonable jury could also find that AIMCO had no involvement in the transaction based on the evidence proffered by AIMCO that Baldwin did not execute the PFA. A reasonable jury could then conclude that the Bonds were issued neither at the request of nor on behalf of AIMCO. Based on the evidence proffered by both parties, there is a genuine issue of disputed fact as to whether the Bonds were issued "at the request of" or "on behalf of" AIMCO.

AIMCO responds that it is nonetheless entitled to summary judgment even if there is a genuine dispute as to whether the Bonds were issued "on behalf of" or "at the request of" AIMCO. AIMCO contends that the Indemnity Agreement is triggered in the first instance only by the existence of valid bonds and that the evidence here shows that the Bonds are invalid. AIMCO argues that the Bonds were void *ab initio* because Baldwin's signature on the Bonds was forged. As evidence of the forgery, AIMCO proffers an expert report that concludes that Baldwin did not sign the Bonds. Greenwich and XL have not proffered any evidence to the contrary.

In support of the argument that the forged signature renders the Bonds void *ab initio*, AIMCO cites several cases in which contracts were rendered void *ab initio* because one party's signature was forged. *SeeOpals on Ice Lingerie v. Body Lines Inc.*, 320 F.3d 362, 370 (2d Cir.2003)("Bodylines and Opals agree that the signature of Sautter on the Karnick Agreement was 'cut and pasted'-in other words, that it is a forgery, not a genuine signature. ' Under [New York] State law and general contract law, a forged signature renders a contract void *ab initio.* Because there can be no meeting of the minds of the parties when a forgery has been perpetrated, no contract existed in the case at hand." '); *Bangkok Crafts Corp. v. Capitolo Di San Pietro in Vaticano*, No. 03 Civ. 0015(RWS), 2004 WL 1406076, at *6 (S.D.N.Y. June 23, 2004)("There are no probative facts adduced to dispute that the signatures of Noè and Bordin on the 2000 License are forged, thus rendering the contract void *ab initio.* "); *Orlosky v. Empire Sec. Sys.*, 230 A.D.2d 401, 403 (3d Dep't 1997)(upholding lower court dismissal of claims for which a valid contract was a prerequisite because forged signature on contract rendered it "void *ab initio* ").

However, AIMCO has not cited any authority or produced any evidence to show that the lack of a principal's signature on a bond has the same effect on the enforceability of that document as does the lack of a party's signature on a contract. *SeeAnixter, Inc. v. I.E.A. Elec. Group, Inc.*, 263 A.D.2d 412, 412 (1st Dep't 1999)("Summary judgment was properly granted on the subject payment bond, which is enforceable against defendant surety even though it may not have been signed by defendant contractor."); *Castine v. N .Y. State Tax Comm'n*, 447 N.Y.S.2d 119, 122 (Sup.Ct.1982)("The court is aware that the bond contains lines for the petitioners' signatures and will therefore assume that the surety expected or even intended that they should sign. However it will not assume that the signatures were conditions precedent to surety becoming liable on the undertaking, especially since they could easily have incorporated that requirement in the printed form itself. The court therefore concludes that it was not necessary for the petitioners to have signed the instrument presented for filing."); *Cubita v. Westchester Furniture Exch.*, 388 N.Y.S.2d 830, 832 (City Ct.1976)("There is no doubt that the undertaking herein was properly executed and acknowledged by the surety company but the failure of the principal herein, to execute the bond did not affect the liability of the surety who has properly executed it."). There is furthermore no language in the Bonds or in the Indemnity Agreement that makes the principal's signature on the Bonds a condition precedent to Greenwich and XL becoming liable on the Bonds or to the Bonds being covered by the Indemnity Agreement. The forgery of Baldwin's signature on the Bonds therefore does not entitle AIMCO to summary judgment on the indemnification claim. Both sides' motions for summary judgment on the contractual indemnification claim are denied.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 111 of 118

Not Reported in F.Supp.2d Page 6

Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

II. Claim for Indemnification Against Baldwin Defendants

*6 The Baldwin Defendants also move for summary judgment on the claim of Greenwich and XL for contractual indemnification as set forth in Count IX of the Second Amended Complaint. Greenwich and XL do not articulate a theory of liability for their indemnification claim against these defendants, either in their Complaint or in their opposition to the Baldwin Defendants' motion for summary judgment. Indeed, Greenwich and XL appear to have abandoned this claim. Counsel for Greenwich and XL stated several times at oral argument on this motion that Greenwich and XL were not asserting a contractual indemnification claim against Baldwin based on the Indemnity Agreement. *See* 3/23/06 Hr'g Tr. at 44-45, 51, 59. Counsel then later corrected this assertion, but promised to "lay it out so that it is clear as to what exactly the claims are" in a letter submission to the court. *Id.* at 59-61.In this letter submission, counsel makes no mention of a contractual indemnification claim against the Baldwin Defendants.

However, even if Greenwich and XL were to assert such a claim, they have failed to show that there are any genuine issues of disputed fact that would prevent the Baldwin Defendants from prevailing on their motion for summary judgment. First, the settled rule in New York is that "[w]hen an agent makes a contract for a disclosed principal, it becomes neither a party to the contract nor liable for the performance of the contract. Accordingly, it is not liable if the contract is breached."*Seguros Banvenez, S.A. v. S/S Oliver Drescher,* 761 F.2d 855, 860 (2d Cir.1985) (citing RESTATEMENT (SECOND) OF AGENCY §§ 320, 328). Although an agent might be held liable on a contract if he acted outside the scope of his agency in executing the contract, *seeid.,* neither Greenwich and XL nor Baldwin argue that Baldwin was not authorized to execute the Indemnity Agreement as AIMCO's agent. In addition, Swain & Baldwin do not appear anywhere in the contract and Greenwich and XL have articulated no basis upon which to require that Swain & Baldwin indemnify plaintiffs under the Indemnity Agreement. In short, Greenwich and XL have failed to proffer any evidence to show that a genuine issue of disputed fact exists as to whether the Baldwin Defendants were required to indemnify Greenwich and XL under the Indemnity Agreement. Summary judgment on the contractual indemnification claim is therefore granted in favor of the Baldwin Defendants.

III. Subrogation Claims Against AIMCO and the Baldwin Defendants

AIMCO and the Baldwin Defendants move for summary judgment on the subrogation claims of Greenwich and XL as set forth in Counts XII and XIII of the Second Amended Complaint. Greenwich and XL argue that, because they made payment to WestRM under the Bonds after AIMCO's default, they are subrogated to WestRM's claims (1) against AIMCO and the Baldwin Defendants for fraud and (2) against AIMCO for breach of the PFA contract. *SeePep'e v. McCarthy,* 249 A.D.2d 286, 287 (2d Dep't 1998)("It is well settled that a surety paying on a bond at the behest of a creditor is entitled by operation of law to be subrogated to the rights and remedies available to the creditor for enforcement of the debtor's obligation .").

*7 Baldwin's signature on the January PFA is the only evidence of any communication between the defendants and WestRM that has been proffered by Greenwich and XL in support of these subrogation claims. Greenwich and XL argue that Baldwin's signature on the PFA is sufficient to create a genuine issue of disputed fact as to whether AIMCO, through its agent Baldwin, executed the PFA and as to whether AIMCO was therefore a party to the contract and in communication with WestRM. Greenwich and XL also proffer Baldwin's testimony that the signature on the PFA looks like his signature and that Baldwin often signed stacks of documents at Gruppuso's request, as evidence that Baldwin signed the PFA.

AIMCO responds that the purported copy of the January PFA is inadmissible under Fed.R.Evid. 1003 and it therefore cannot create a genuine issue

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 112 of 118

Not Reported in F.Supp.2d

Page 7

Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

of disputed fact as to whether AIMCO was involved in the PFA transaction. AIMCO contends that the copy of the PFA is inadmissible because: (1) Baldwin testified that he did not knowingly sign the document and that he had never seen it before the dispute arose; (2) AIMCO's expert has concluded that the signature page of the PFA cannot be authenticated; (3) an original PFA has never been produced; (4) there is no other evidence that AIMCO participated in the conceptualization, drafting or negotiation of the PFA. AIMCO's arguments, however, go to the weight of the evidence, not to its admissibility. The January PFA proffered by Greenwich and XL is sufficient to create a genuine issue of disputed fact as to whether or not Baldwin executed the PFA and as to whether or not AIMCO was a party to the PFA transaction. AIMCO's summary judgment motion is therefore denied as to the subrogation claim for breach of contract.

As for the subrogation claims for fraud against AIMCO and the Baldwin Defendants, Greenwich and XL have failed to proffer any evidence of any affirmative misrepresentations by AIMCO or the Baldwin Defendants that induced WestRM to enter into the PFA transaction. Greenwich and XL fail to explain how Baldwin's signature on the PFA, the only alleged statement by any of the defendants to WestRM, is an affirmative misrepresentation. Greenwich and XL further fail to explain why or proffer evidence to show that AIMCO or the Baldwin Defendants had any duty to disclose information to WestRM. Finally, Greenwich and XL do not explain how WestRM reasonably or justifiably relied on any omissions or misrepresentations by AIMCO or the Baldwin Defendants, nor do they explain how that reliance caused harm to WestRM. Summary judgment is therefore granted in favor of AIMCO and the Baldwin Defendants on the subrogation claims for fraud.

IV. Fraud Claim Against AIMCO

AIMCO moves for summary judgment on the fraud claim of Greenwich and XL as set forth in Count II of the Second Amended Complaint. AIMCO argues that there are no genuine issues of disputed fact as to whether AIMCO made any fraudulent misrepresentations or omissions to Greenwich and XL, or as to whether Greenwich and XL reasonably or justifiably relied on any misrepresentations or omissions by AIMCO, or as to whether the claimed losses of Greenwich and XL were caused by any misrepresentations or omissions by AIMCO.

***8** Greenwich and XL allege that AIMCO made one affirmative misrepresentation and several actionable omissions. The alleged misrepresentation was made in connection with another transaction involving AIMCO, in which Greenwich and XL issued bonds to Cananwill, Inc. to secure the obligations of the bond principal, "Apartment Investment and Management Company / Real Estate Risk Management, LLC," under a Premium Finance Agreement with Cananwill (the "Cananwill PFA"). The Indemnity Agreement on which Greenwich and XL rely in support of their contractual indemnification claims against AIMCO and the Baldwin Defendants, was signed in connection with the Cananwill bond issuance. Greenwich and XL argue that AIMCO's general counsel, Miles Cortez, made an affirmative misrepresentation by executing a bond release for the Cananwill bonds. The release was an affirmative misrepresentation, Greenwich and XL contend, because by executing the bond release, Cortez represented to Greenwich and XL that the principal named on the released bonds, " Apartment Investment and Management Company / Real Estate Risk Management, LLC," was a real company.

Greenwich and XL also allege that AIMCO made fraudulent omissions because it was under a duty to disclose and failed to disclose (1) that " Apartment Investment Management Co./Real Estate Risk Management," was not a real company, (2) that AIMCO had given Gruppuso $10 million to pay off AIMCO's debt on the Cananwill PFA, but that Cananwill claimed it never received the money, (3) that Gruppuso had obtained two surety bonds from Greenwich and XL to secure AIMCO's obligations under the Cananwill PFA and that both

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 113 of 118

Not Reported in F.Supp.2d Page 8

Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

bonds listed the non-existent entity "Apartment Investment and Management Company/ Real Estate Risk Management LLC" as the Principal, (4) that AIMCO asked Gruppuso to sign an indemnity agreement on November 9, 2001 that required NPS to pay AIMCO over $700,000 and to indemnify AIMCO for any claims against AIMCO arising out of several insurance transactions in which NPS was involved, (5) that AIMCO requested a $25 million surety bond from Gruppuso to secure the November 2001 indemnity agreement, and (6) that AIMCO promised to pay Baldwin $200,000 if Gruppuso made good on the indemnity agreement.

In addition, Greenwich and XL argue that AIMCO was under a duty to disclose and failed to disclose its alleged superior knowledge of "ongoing fraudulent schemes in which AIMCO, Baldwin and Gruppuso were involved."Greenwich and XL Opp. Memo at 31. The assumption implicit in the argument of Greenwich and XL is that AIMCO's superior knowledge of the fraudulent schemes may be inferred from the proffered evidence concerning NPS, the Cananwill PFA and the indemnity agreement between AIMCO and NPS. However, the evidence proffered does not give rise to a reasonable inference that AIMCO *knew* prior to the issuance of the Bonds that Gruppuso was engaging in fraud. A jury could not reasonably infer from the proffered evidence that AIMCO had this knowledge and could not therefore find that AIMCO had a duty to disclose it to Greenwich and XL.

*9 Greenwich and XL further allege that "[h]ad Baldwin and AIMCO not made misrepresentations and had they disclosed their superior knowledge, [Greenwich and XL] would not have issued the bonds."*Id.* at 33.However, Greenwich and XL have proffered no evidence to show that they relied on the existence of an entity named "Apartment Investment and Management Company/Real Estate Risk Management, LLC" in deciding to issue the Bonds to AIMCO and NPS. Indeed, AIMCO has proffered the testimony of Scott Adams, the agent of Greenwich and XL, as evidence that Greenwich and XL relied only on the belief that the Indemnity Agreement covered the Bonds and on the fact that Robert Nicosia had requested the Bonds in deciding to issue the Bonds. Adams testified: "I was presented a request by the agent of AIMCO [Robert Nicosia] to guarantee an obligation, and AIMCO signed an indemnity agreement saying they would hold me harmless. I don't care what the hypothetical situation would have been. Give me a hundred, a thousand. If AIMCO said they're going to hold me harmless, that was the basis of my decision, period." Kelly-Najah Decl. Ex. 9 at 215-216. Nor do the circumstances surrounding the Bond issuance show why Greenwich and XL would have relied on the existence of this entity in deciding to issue the Bonds. as the Bonds and January PFA bore no mention of this entity or of Real Estate Risk Management, LLC.

Furthermore, the circumstances of the Bond issuance do not show why Greenwich and XL would have relied on the non-existence of an indemnity agreement between AIMCO and Gruppuso, on the non-existence of the indemnity-related transactions, or on Cananwill's receipt of the $10 million payment from Gruppuso, in order to reach their decision to issue the Bonds. In light of Adams' testimony and the failure of Greenwich and XL to proffer any evidence to create a genuine issue of disputed fact as to whether they reasonably relied on AIMCO's alleged misrepresentation and omissions, summary judgment on this claim is granted for AIMCO.

V. Fraud Claim Against Ray Baldwin

Baldwin moves for summary judgment on the fraud claim of Greenwich and XL as set forth in Count II of the Second Amended Complaint. Baldwin argues that there are no genuine issues of disputed fact as to whether he made any fraudulent misrepresentations or omissions to Greenwich and XL, or as to whether Greenwich and XL reasonably or justifiably relied on any alleged misrepresentations or omissions by him, or as to whether the claimed losses of Greenwich and XL were caused by the alleged misrepresentations or omissions.

As in their fraud claim against AIMCO,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 114 of 118

Not Reported in F.Supp.2d

Page 9

Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Greenwich and XL argue that Baldwin committed fraud by making an affirmative misrepresentation and several actionable omissions. Greenwich and XL contend that, by signing the Indemnity Agreement that listed "Apartment Investment and Management Company/Real Estate Risk Management, LLC" as the principal, Baldwin misrepresented that this entity was a real company that had a legitimate relationship to AIMCO. However, Greenwich and XL must also proffer evidence that they reasonably or justifiably relied on Baldwin's alleged misrepresentation in deciding to issue the Bonds. As discussed in Part IV, *supra,* Greenwich and XL fail to show that there is a genuine issue of disputed fact as to whether they reasonably or justifiably relied on the existence of " Apartment Investment and Management Company/Real Estate Risk Management, LLC" in deciding to issue the Bonds.

***10** Greenwich and XL also argue that Baldwin committed fraud by failing to disclose information about which Baldwin had superior knowledge. Greenwich and XL contend that Baldwin was under a duty to disclose, and failed to disclose, that (1) " Apartment Investment Management Co./Real Estate Risk Management," was not a real company, (2) that AIMCO asked Gruppuso to sign an indemnity agreement on November 9, 2001, (3) that AIMCO requested a $25 million surety bond to secure the indemnity agreement, and (4) that AIMCO promised to pay Baldwin $200,000 if Gruppuso made good on the indemnity agreement. Greenwich and XL also implicitly argue that the proffered evidence gives rise to a reasonable inference that Baldwin knew prior to the issuance of the Bonds that Gruppuso was engaging in fraud.

However, Greenwich and XL fail to show that there is a genuine issue of disputed fact as to whether Baldwin owed them a duty to disclose any of the aforementioned information. In general, a duty to disclose based on "superior knowledge" only arises between two parties to a business transaction. *SeeBrass v. Am. Film Techn ., Inc.,* 987 F.2d 142, 150 (2d Cir.1993). Greenwich and XL do not dispute that Baldwin was not a party to the Bonds transaction. Rather, they argue that a third-party to a transaction, such as Baldwin, may still be under a duty to disclose certain information about the transaction to the fraud victim based on the third-party's "superior knowledge" of material facts relating to the transaction. *SeeStevenson Equip., Inc. v. Chemig Const. Corp.,* 170 A.D.2d 769, 771 (3d Dep't 1991). However, such a third-party duty to disclose has only been found where the third-party to the transaction has had some direct communication with the fraud victim regarding the fraudulent transaction. *Seeid.* at 770-71 (upholding finding of fraud against third party to a transaction when third-party (1) showed fraud victim goods being sold by fraud perpetrator, (2) was aware that victim was buying stolen goods, and (3) did not tell fraud victim that goods were stolen property). In this case, Greenwich and XL have proffered no evidence to show that they had any communication with Baldwin regarding the Bonds such as to give rise to a duty to disclose based on superior knowledge. Therefore, summary judgment on the fraud claim is granted in favor of Baldwin.

VI. Aiding and Abetting Fraud Claim Against AIMCO

AIMCO moves for summary judgment on the claim of Greenwich and XL for aiding and abetting fraud as set forth in Count V of the Second Amended Complaint."The essential elements of aiding and abetting fraud under New York law are: (1) the existence of a fraud; (2) a defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission."*Filler v. Hanvit Bank,* 01 Civ. 9510(MGC), 2003 WL 22110773, at *2 (S.D.N.Y. Sept. 12, 2003). AIMCO argues that there are no genuine issues of disputed fact as to whether AIMCO knew of the alleged fraud by Gruppuso, NPS, and Baldwin or as to whether AIMCO provided substantial assistance to that fraud.

***11** Greenwich and XL allege that Gruppuso, NPS and Baldwin were engaged in a scheme to defraud Greenwich and XL by concealing that the WestRM transaction was actually a loan and not an

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 115 of 118

Not Reported in F.Supp.2d Page 10

Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

insurance program and by obtaining surety bonds from Greenwich and XL to transfer their liability for their loan repayment obligations to Greenwich and XL. Greenwich and XL argue that AIMCO provided substantial assistance to the underlying fraud by failing to disclose that "Apartment Investment and Management Company/Real Estate Risk Management, LLC," was not a real company. However, as discussed in Part IV, *supra,* Greenwich and XL have proffered no evidence to show that they relied on the existence of an entity named " Apartment Investment and Management Company/Real Estate Risk Management, LLC" in deciding to issue the Bonds to AIMCO and NPS.

Greenwich and XL further contend that AIMCO provided substantial assistance to the fraud by inducing Gruppuso to continue and to expand his fraudulent schemes. As evidence of this inducement, Greenwich and XL proffer a letter from AIMCO, dated October 23, 2001, in which AIMCO requested that Gruppuso agree to indemnify AIMCO for any claims arising under several insurance policies in exchange for AIMCO's agreement not to pursue any claims regarding the National Union policy. Greenwich and XL argue that Gruppuso undertook the fraud against Greenwich and XL in order to raise funds to satisfy his indemnification obligations to AIMCO. Greenwich and XL also proffer evidence that AIMCO's counsel executed a bond release to Greenwich and XL that, they argue, induced Greenwich and XL to issue the Bonds.

However, although AIMCO's request for indemnification from Gruppuso and AIMCO's execution of the bond release were arguably "but for " causes of Gruppuso's alleged fraud, they were not a proximate cause of the harm to Greenwich and XL in this case. To allege "substantial assistance" by an aider and abettor, "the complaint must allege that the acts of the aider and abettor proximately caused the harm to the plaintiff on which the primary liability is predicated. Allegations of a 'but for' causal relationship are insufficient. Aider and abettor liability will not attach where the injury was not a direct or reasonably foreseeable result of the defendant's conduct."*Id.* at *2 (internal citations, brackets and quotations omitted). Greenwich and XL have failed to proffer any evidence to show that their losses on the Bonds were a reasonably foreseeable result of AIMCO's execution of the bond release or of AIMCO's request for indemnification from Gruppuso. AIMCO's motion for summary judgment on this claim is therefore granted.

VII. Civil Conspiracy Claim Against AIMCO

AIMCO and the Baldwin Defendants move for summary judgment on the claim of Greenwich and XL for civil conspiracy as set forth in Count IV of the Second Amended Complaint. "In alleging conspiracy, the plaintiff carries the burden of proving (1) the corrupt agreement between two or more persons, (2) an overt act, (3) their intentional participation in the furtherance of a plan or purpose, and (4) the resulting damage."*Kashi v. Gratsos,* 790 F.2d 1050, 1055 (2d Cir.1986). In the Complaint, Greenwich and XL allege that AIMCO, the Baldwin Defendants, NPS, Gruppuso, and two insurance brokers, Pilgrim Organization and Pilgrim Agency ( "the Pilgrim Defendants"), entered into a corrupt agreement to defraud several insurance, financing and surety companies, including Greenwich and XL. FN2

FN2. Despite these allegations in the Complaint, Greenwich and XL proffer no evidence to show that the Pilgrim Defendants were a party to a corrupt agreement between AIMCO, Gruppuso, NPS and the Baldwin Defendants. Indeed, Greenwich and XL do not mention the Pilgrim Defendants' involvement in the alleged civil conspiracy in their opposition to the summary judgment motions.

*12 AIMCO and the Baldwin Defendants argue that they are entitled to summary judgment on this claim because there are no genuine issues of disputed fact as to whether there is a viable underlying claim for fraud against one of the coconspirators. A claim for civil conspiracy to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 116 of 118

Not Reported in F.Supp.2d Page 11

Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

commit fraud is not an independent cause of action under New York law, but rather is a means to hold coconspirators liable for one another's fraud. Therefore, if Greenwich and XL have no viable underlying claim for fraud against one of the coconspirators, their civil conspiracy claim must also fail. *SeeLinden v. Lloyd's Planning Serv., Inc.,* 299 A.D.2d 217, 218 (1st Dep't 2002). As discussed in Parts IV and V, *supra,* Greenwich and XL have not proffered sufficient evidence in support of their fraud claims against Baldwin and AIMCO to survive summary judgment. Greenwich and XL must therefore proffer sufficient evidence to support their fraud claim against NPS and Gruppuso in order to defeat defendants' motion for summary judgment on the civil conspiracy claim.

In Count I of the Second Amended Complaint, Greenwich and XL allege that Gruppuso and NPS committed fraud by concealing information about which Gruppuso and NPS had "superior knowledge." Greenwich and XL allege that Gruppuso and NPS were under a duty to disclose, and failed to disclose, (1) that "Apartment Investment Management Co./Real Estate Risk Management" was not a real company, (2) that Baldwin and Gruppuso had engaged in a series of fraudulent insurance transactions prior to the WestRM transaction, (3) that AIMCO demanded that Gruppuso and NPS indemnify it in October 2000, (4) that AIMCO asked Gruppuso to sign an indemnity agreement on November 9, 2001 that required NPS to pay AIMCO over $700,000 plus additional money owed on various insurance policies, and (5) that the WestRM transactions were "designed to put money into Gruppuso's hands to satisfy NPS's obligations to AIMCO under the October 2000 and the November 2001 Indemnity Agreement."Complaint ¶ 199.

However, to prevail on their fraud claim, Greenwich and XL must also show that they reasonably relied on defendants' failure to disclose any of this information. Greenwich and XL do not proffer any evidence to support their conclusory statement in the Complaint that they "justifiably relied on Gruppuso and NPS's fraudulent omissions and representations when they issued the NPS and AIMCO/NPS Bonds."Complaint ¶ 201. To the contrary, the testimony of Scott Adams, the agent of Greenwich and XL, is evidence that Greenwich and XL relied only on the belief that the Indemnity Agreement covered the Bonds and on the fact that Robert Nicosia had requested the Bonds in order to reach their decision to issue the Bonds. Adams testified: "I was presented a request by the agent of AIMCO [Robert Nicosia] to guarantee an obligation, and AIMCO signed an indemnity agreement saying they would hold me harmless. I don't care what the hypothetical situation would have been. Give me a hundred, a thousand. If AIMCO said they're going to hold me harmless, that was the basis of my decision, period."Kelly-Najah Decl. Ex. 9 at 215-216. Nor does the proffered evidence showing the circumstances surrounding the Bonds transaction give rise to an inference that Greenwich and XL reasonably relied on defendants' failure to disclose this information. As a result of the failure of Greenwich and XL to proffer sufficient evidence to support their underlying fraud claims against NPS and Gruppuso, summary judgment is granted to AIMCO and the Baldwin Defendants on the civil conspiracy claim.

VIII. Negligent Supervision Claim Against AIMCO

***13** AIMCO moves for summary judgment on the claim of Greenwich and XL for negligent supervision as set forth in Count VI of the Second Amended Complaint. AIMCO argues that there are no genuine issues of disputed fact as to whether AIMCO's supervision of Baldwin caused harm to Greenwich and XL or as to whether Gruppuso was the agent of Greenwich and XL. In their opposition to summary judgment, Greenwich and XL do not discuss their negligent supervision claim based on Gruppuso's conduct and proffer no evidence to show that Gruppuso was AIMCO's agent. Summary judgment is therefore granted to AIMCO on the claim against it for negligent supervision of Gruppuso.

To state a claim for negligent supervision or retention, a plaintiff must show "the standard elements of negligence" as well as that "the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 117 of 118

Not Reported in F.Supp.2d Page 12

Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

tort-feasor and the defendant were in an employee-employer relationship."*Ehrens v. Lutheran Church,* 385 F.3d 232, 235 (2d Cir.2004). Causation is one of the "standard elements of negligence." RESTATEMENT (SECOND) OF TORTS § 281. In order to support their negligent supervision claim against AIMCO, Greenwich and XL must therefore proffer some evidence to show that Baldwin committed a tort and that AIMCO's negligent supervision of Baldwin caused harm to Greenwich and XL in this case. In their Complaint, Greenwich and XL do not clearly allege what tortious conduct by Baldwin forms the basis for the negligent supervision claim. It appears, however, from the opposition of Greenwich and XL to the motion that Baldwin's alleged execution of the January PFA was the tortious act by Baldwin that allegedly caused harm to Greenwich and XL. Yet, Greenwich and XL do not explain why this act was tortious or how it caused them harm. In light of the failure of Greenwich and XL to proffer any evidence that Baldwin committed a tortious act that caused injury to them, summary judgment is granted in favor of AIMCO.

IX. Unjust Enrichment Claim Against AIMCO

AIMCO moves for summary judgment on the claim of Greenwich and XL for unjust enrichment as set forth in Count XI of the Second Amended Complaint. AIMCO argues that there are no genuine issues of disputed fact as to whether AIMCO was unjustly enriched at the expense of Greenwich and XL. To state a claim for unjust enrichment under New York law, a plaintiff must show "that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd. v. Phoenix Pictures, Inc.,* 373 F.3d 296, 306 (2d Cir.2004).

Greenwich and XL proffer the January PFA as evidence that AIMCO was enriched at the expense of Greenwich and XL through the WestRM transaction that the Bonds secured. The PFA states that "AIMCO will benefit from the [Drummonds Insurance] Policy pursuant to its agreement with NPS." Escobar Decl. Ex. 3. Greenwich and XL argue that the referenced "agreement" between AIMCO and NPS is an indemnity agreement from November 2001, in which NPS agreed to indemnify AIMCO against claims from AFCO, Cananwill and others, and to pay AIMCO $700,984 plus an additional sum of up to $10 million, to compensate AIMCO for premium payments made to National Union Fire Insurance. Greenwich and XL then proffer a February 21, 2002 letter from Gruppuso to Drummonds Insurance as evidence that Gruppuso received an $11 million payment under the Drummonds insurance policy. Greenwich and XL also proffer an internal AIMCO email as evidence that Gruppuso paid AIMCO $3.1 million on November 29, 2001, another $3.1 million on February 29, 2002, and another $350,000 in April, 2002.

*14 Greenwich and XL argue that equity and good conscience militate against permitting AIMCO to retain these funds. Greenwich and XL argue that AIMCO received this money as a result of Gruppuso's entering into and then breaching various premium finance agreements with WestRM. As a result of Gruppuso's misuse of these funds, Greenwich and XL were then required to pay off the liability of AIMCO and Gruppuso to WestRM under the PFAs. Equity thus militates against allowing AIMCO to retain these funds, which are the fruit of contractual breaches. In addition, Greenwich and XL proffer evidence that AIMCO was aware (1) that Baldwin and Gruppuso had executed transactions in the name of a non-existent company "Apartment Investment Management Co./Real Estate Risk Management," (2) that Gruppuso had been paid $10 million by AIMCO to pay off the another PFA, but the insurer claimed it never received the money, and (3) that Gruppuso had obtained two surety bonds from Greenwich and XL to secure AIMCO's obligations under another PFA and that both bonds listed the non-existent entity "Apartment Investment and Management Company/ Real Estate Risk Management LLC" as the Principal. Although this evidence was insufficient to support the fraud claim of Greenwich and XL against AIMCO, plaintiffs here are not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

Page 118 of 118

Not Reported in F.Supp.2d Page 13

Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

required to show that AIMCO engaged in wrongful conduct, but rather need only show that the circumstances of the transactions are such that equity and good conscience militate against permitting AIMCO to retain these funds. *SeeBlusal Meats, Inc. v. United States,* 638 F.Supp. 824, 831 (S.D.N.Y.1986)(noting that "[p]roof of wrongful conduct by the defendant is not required" to support a claim for unjust enrichment).

Greenwich and XL have thus proffered sufficient evidence to create a genuine issue of disputed fact as whether AIMCO was enriched at the expense of Greenwich and XL, and as to whether "equity and good conscience" militate against permitting AIMCO to retain the payments it received from Gruppuso. AIMCO's summary judgment motion on this claim is therefore denied.

X. Unjust Enrichment Claim Against Baldwin Defendants

The Baldwin Defendants move for summary judgment on the claim of Greenwich and XL for unjust enrichment as set forth in Count XI of the Second Amended Complaint. The Baldwin Defendants argue that there are no genuine issues of disputed fact as to whether they were unjustly enriched at the expense of Greenwich and XL. In response, Greenwich and XL have proffered no evidence that the Baldwin Defendants were enriched at the expense of Greenwich and XL through the WestRM transaction that the Bonds secured. Summary judgment on this claim is therefore granted in favor of the Baldwin Defendants.

CONCLUSION

For the foregoing reasons, the motion of Greenwich and XL for summary judgment is denied and the Baldwin Defendants' motion for summary judgment is granted. AIMCO's motion for summary judgment is granted as to the subrogation claim for fraud and claims for fraud, civil conspiracy, negligent supervision, and aiding and abetting fraud. AIMCO's motion is denied as to the subrogation claim for breach of contract and claims for contractual indemnification and unjust enrichment.

***15** SO ORDERED.

S.D.N.Y.,2006.
WestRM-West Risk Markets, Ltd. v. XL Reinsurance America, Inc.
Not Reported in F.Supp.2d, 2006 WL 2034627 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?rs=WLW8.01&destination=atp&vr=2.0&... 1/22/2008

# TAB 15

Winstar Holdings, LLC v. Blackstone Group L.P.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
WINSTAR HOLDINGS, LLC and IDT Corp., Plaintiffs,
v.
The BLACKSTONE GROUP L.P., Impala Partners, LLC, and Citicorp, Defendants.
**No. 07 Civ. 4634(GEL).**

Dec. 10, 2007.

Joseph M. Vann (Jed Lewin, of counsel), Cohen Tauber Spievack & Wagner LLP, New York, NY, and Melissa A. Roover (Alan M. Grayson, of counsel), Grayson & Kubli, P.C., McLean, VA, for plaintiffs.
Vickie Reznik (Yosef J. Riemer, David S. Flugman, of counsel), Kirkland & Ellis LLP, New York, NY, for defendant The Blackstone Group, L.P.
Andrew C. Gold (Stephen M. Rathkopf, of counsel), Herick, Feinstein LLP, New York, NY, for defendant Impala Partners, LLC.
Stephen L. Saxl (William Wargo, of counsel), Greenberg Traurig, LLP, New York, NY, for defendant Citicorp.

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge.

*1 The parties to this case agree on one thing: they don't want to be here. They disagree, however, on where they should be. Plaintiffs filed this action in the Supreme Court of the State of New York, where they believe it should remain; accordingly, they have moved to remand the case to the state court. Defendants removed the case to this Court, only in order to move to transfer the case to the United States Bankruptcy Court for the District of Delaware. The plaintiffs' motion will be denied, and defendants' motion granted.

**BACKGROUND**

Plaintiff IDT Corp. formed plaintiff Winstar Holdings, LLC, in order to acquire the assets of Winstar Communications, Inc. ("Old Winstar"), and related entities. Old Winstar had filed for bankruptcy protection in the Bankruptcy Court in Delaware, and was in the process of liquidation. With the approval of the Bankruptcy Court, Old Winstar retained defendant Blackstone Group, L.P. as its financial advisor, and defendant Impala Partners, LLC ("Impala") as a restructuring advisor. Defendant Citicorp, Old Winstar's largest creditor, played a role in negotiating the terms of the contract between Old Winstar and Impala. Plaintiffs purchased the business assets of Old Winstar from the bankruptcy estate at an auction approved by the Bankruptcy Court for $42.5 million pursuant to an Asset Purchase Agreement ("APA") dated December 18, 2001, which was approved by the Bankruptcy Court the following day. The APA contains a forum selection clause in which the parties agree that the United States Bankruptcy Court for the District of Delaware shall have exclusive jurisdiction to resolve any dispute arising out of or related to the APA. (APA § 9.10, Gold Decl. Ex. 1.) The Bankruptcy Court's order approving the sale similarly provides that that court retains "exclusive jurisdiction" to "resolve any disputes arising under or related to" the APA. (Sale Order ¶ 15, Gold Decl. Ex. 2.)

Plaintiffs allege that they were induced to enter the APA by various misrepresentations made by the defendants and by Old Winstar in an offering statement. Their claims sound solely in New York common law.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**DISCUSSION**

I. *Plaintiffs' Motion to Remand*

The threshold issue in addressing plaintiffs' remand motion is whether federal jurisdiction over this case exists because it "aris[es] in" a bankruptcy case or "aris[es] under" the bankruptcy code, or merely because it is "related to" a bankruptcy case. Although 28 U.S.C. § 1334(b) provides for federal jurisdiction in either situation, if the case is merely one "related to" the Old Winstar bankruptcy, and could not otherwise be brought in a federal court, statutory provisions requiring (28 U.S.C. § 1334(c)(2)) or permitting (28 U.S.C. § 1334(c)(1)) the Court to abstain from exercising jurisdiction and deferring to the state courts may apply. If, however, the case is a "core" bankruptcy proceeding that " arises under" the bankruptcy code or "arises in" a bankruptcy case, the mandatory abstention provision by its own terms do not apply and permissive abstention is less likely. Plaintiffs, accordingly, argue that the Court has, at most, " related to" jurisdiction,[FN1] while defendants contend that the case comes within the "arising in" or "arising under" headings of jurisdiction.

FN1. Plaintiffs argue, in fact, that defendants have not established even " related to" jurisdiction (P. Remand Mem. 10-12), but their arguments in this regard are unpersuasive. Whether an action is " related to" a bankruptcy depends on whether there is "a significant connection" between the action and the underlying bankruptcy. *In re Turner,* 724 F.2d 338, 341 (2d Cir.1983) (citations and internal quotation marks omitted). The "proceeding need not necessarily be against the debtor or against the debtor's property."*In re WorldCom, Inc. Sec. Litig.,* 293 B.R. 308, 317 (S.D.N.Y.2003), quoting *Celotex Corp. v. Edwards,* 514 U.S. 300, 308 n. 6 (1995). In any ordinary sense, the connection between this case and the bankruptcy is obvious: the sale that is the subject of the litigation was an aspect of the bankruptcy proceeding. More importantly, the outcome of the action " ' could alter the debtor's rights, liabilities, options or freedom of action' " and affect " 'the handling and administration of the bankrupt estate.' " *WorldCom,* 293 B.R. at 317, quoting *Celotex,* 514 U.S. at 308 n. 6 (1995). Although plaintiffs have not named Old Winstar as a defendant, Impala allegedly has indemnification rights against Old Winstar. While plaintiffs claim that the indemnification cannot apply to this case because of an exclusion for " willful misconduct," and because (according to plaintiffs) there is no estate left to affect, the bankruptcy proceedings are on-going, as is litigation that could bring assets into the estate. The Court cannot assume the correctness of plaintiffs' assertions, which turn on facts yet to be found or even in some instances to occur. It is unquestionable that the outcome of this case "could" affect the debtor, and that is sufficient to invoke the "related to" jurisdiction. "Related to" jurisdiction exists where "the outcome of [the] proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984) (citations and italics omitted); *In re Cuyahoga Equip. Corp.,* 980 F.2d 110, 114 (2d Cir.1992) (A litigation has a "significant connection with a pending bankruptcy proceeding" and "falls within the 'related to' jurisdiction of the bankruptcy court" if the outcome "might have any 'conceivable effect' on the bankrupt estate.") As the courts have recognized, " 'A key word in [the] test is 'conceivable.' Certainty, or even likelihood, is not required. Bankruptcy jurisdiction will exist so long as it is possible' " that the proceeding may affect the debtor's rights or the administration of the estate. *In re Dow Corning Corp.,* 86 F.3d 482, 491 (6th Cir.1996), quoting *In re Marcus Hook*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Dev. Park Inc.,* 943 F.2d 261, 264 (3d Cir.1991).

A. *"Arising Under" Jurisdiction*

*2 The most frequently cited explanation of the meaning of "arising under" jurisdiction can be found in the legislative history of the Bankruptcy Reform Act of 1978. The House Report accompanying the bill that became that Act noted that

The phrase "arising under" has a well defined and broad meaning in the jurisdictional context. By a grant of jurisdiction over all proceedings arising under title 11, the bankruptcy courts will be able to hear any matter under which a claim is made under a provision of title 11. For example, a claim of exemptions under 11 U.S.C. § 522 would be cognizable by the bankruptcy court, as would a claim of discrimination in violation of 11 U.S.C. § 525. Any action by the trustee under an avoiding power would be a proceeding arising under title 11, because the trustee would be claiming based on a right given by one of the sections in subchapter III of chapter 5 of title 11.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 445 (1977). As the leading commentator on bankruptcy law puts it, "What this language seems to mean is that, when a cause of action is one which is created by title 11, then that civil proceeding is one 'arising under title 11.' " 1 Collier on Bankruptcy ¶ 3.01[4][c][i] at 3-21 (15th ed. rev.2007).

The language of the statute is self-consciously patterned on that of the general federal question jurisdiction statute, which provides for federal court jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. *See also*U.S. Const. Art. III § 2, cl. 1 ("The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority."). While the precise meaning of "arising under" in the general federal question context has vexed courts and commentators, *see*13B Wright, Miller and Cooper, Federal Practice and Procedure § 3562 (2d ed.1984), it has been suggested that an action arises under federal law "if in order for the plaintiff to secure the relief sought he will be obliged to establish both the correctness and the applicability to his case of a proposition of federal law."Bator, Mishkin, Shapiro & Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 889 (2d ed.1973), quoted with approval in *Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U .S. 1, 9 (1983). Moreover, it is well established that a case does not arise under federal law unless " the plaintiff's statement of his own cause of action shows that it is based upon" federal law. *Louisville & Nashville R.R. Co. v. Mottley,* 211 U.S. 149, 152 (1908).

Applying these standards to this case, it is plain that the instant case does not arise under title 11. Simply put, plaintiffs' causes of action are based on state tort law, and rest on familiar common-law principles prohibiting fraud and misrepresentation. No proposition of bankruptcy law must be established for plaintiffs to prevail, and no provision of the bankruptcy code is implicated in their allegations. The causes of action asserted in the complaint are in no sense "created by" title 11 of the United States Code.

*3 Defendants argue that the case nevertheless arises under the bankruptcy code "because it will be necessary for the Delaware Bankruptcy Court to interpret" its own order approving the APA in the course of deciding the case. (D. Remand Mem. 9.) But this argument misconstrues what it means for a case to "arise under" bankruptcy law. It may be that provisions of the APA and of the Bankruptcy Court's order approving it will be relevant to the outcome of the case. However, as the Supreme Court held in *Mottley* in the context of general federal question jurisdiction, "[a]lthough such allegations show that very likely, in the course of the litigation, a question under [bankruptcy law] would arise, they do not show that the suit, that is, the plaintiff's original cause of action, arises under [title 11]."211 U.S. at 153.

Accordingly, this is not a case of "arising under " jurisdiction.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

B. *"Arising In" Jurisdiction*

The extent of the "arising in" jurisdiction is less clearly defined. The leading bankruptcy treatise refers to it as a "residual category of civil proceedings," that "includes such things as administrative matters, orders to turn over property of the estate and determinations of the validity, extent, or priority of liens."Collier on Bankruptcy, ¶ 3.01[4][c][iv] (15th ed.2004) (internal quotation marks and footnotes omitted). Courts too have stated that

[t]he meaning of 'arising in' proceedings is less clear, but seems to be a reference to those ' administrative' matters that arise only in bankruptcy cases. In other words, 'arising in' proceedings are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy.

*In re Wood,* 825 F.2d 90, 96-97 (5th Cir.1987).

Defendants argue that this standard is met, pointing out that had Old Winstar not been in bankruptcy, the sale would never have taken place, the alleged misrepresentations would never have occurred, and so this action would have no existence absent the bankruptcy. (D. Remand Mem. 7-9.) This argument may be somewhat oversimplified. The courts and commentators using the "no existence outside of the bankruptcy" formulation seem to be referring to proceedings that by their nature cannot exist outside of bankruptcy, and not merely to actions that, as a factual matter, have their origins in events occurring during a bankruptcy proceeding. The Bankruptcy Court in this district, for example, in a case relied upon by defendants themselves, puts the matter this way:

A claim "arises in" bankruptcy if, by its very nature, the claim can only be brought in a bankruptcy action, because it has no existence outside of bankruptcy. *See [In re] Riverside Nursing Home,* 144 B.R. [951,] 955 [S.D.N.Y.1992]; *176-60 Union Turnpike v. Howard Beach Fitness Center,* 209 B.R. 307, 311, n. 2 (S.D.N.Y.1997) (Sprizzo, J.). Matters involving the enforcement or construction of a bankruptcy court order are in this category.

*4 *In re Sterling Optical Corp.,* 302 B.R. 792, 801 (Bankr.S.D.N.Y.2003). Plaintiffs here sue for fraud. Such a claim is not one that *"by its very nature...* can only be brought in a bankruptcy action. "Rather, it is a garden-variety common-law claim that most usually is brought outside of bankruptcy.

The type of administrative matters cited in Collier, and in *Sterling,* as examples of "arising in" jurisdiction are closely tied to the administration of the estate itself. Actions such as motions for contempt of bankruptcy court orders, motions to change the composition of a creditors' committee or appoint or elect trustees or examiners, are matters that, while the cause of action is not created by title 11, could not "have been the subject of a lawsuit absent the filing of a bankruptcy case."Collier, ¶ 3.01[4][c][iv]. The mere fact that the cause of action would never have arisen absent this particular bankruptcy is not enough to confer jurisdiction.

Nevertheless, the claims at issue here are more closely connected to the administration of the bankruptcy than most garden-variety common-law claims. There is persuasive precedent for treating a state-law tort suit regarding the conduct of professionals involved in the administration of the bankruptcy estate as a matter that "arises in" a bankruptcy case. *In re Southmark Corp.,* 163 F.3d 925 (5th Cir.1999), involved a professional malpractice action against an accounting firm that worked for the court-appointed Examiner in a bankruptcy reorganization. When the defendant removed the case to the bankruptcy court that had presided over the reorganization, the plaintiff argued, like plaintiffs here, that mandatory abstention applied because the bankruptcy court's jurisdiction was of the "related to" variety because the matter was not a "core" bankruptcy proceeding. *Id.* at 928-29.Like plaintiffs here, the plaintiff in *Southmark* argued that its claims were simple state common-law tort claims that were not the sort that could arise only in a bankruptcy action, since " Southmark could have sued any accounting firm that worked for it on similar grounds of disloyalty, non-disclosure and malpractice."*Id.* at 930-31.

The Fifth Circuit rejected the argument, finding

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that "the professional malpractice claims alleged against [the accounting firm] are inseparable from the bankruptcy context."*Id.* at 931.The court's reasoning is instructive, and is applicable here:

A *sine qua non* in restructuring the debtor-creditor relationship is the court's ability to police the fiduciaries, whether trustees or debtors-in-possession and other court-appointed professionals, who are responsible for managing the debtor's estate in the best interest of creditors. The bankruptcy court must be able to assure itself and the creditors who rely on the process that court-approved managers of the debtor's estate are performing their work, conscientiously and cost-effectively.

*5 *Id.*

Here, too, plaintiffs' claims go directly to the proper performance of duties by professionals retained by the bankruptcy estate, with the approval of the Bankruptcy Court, to assist it in maximizing the assets of the estate. As the *Southmark* court pointed out, "[s]upervising the court-appointed professionals also bears directly on the distribution of the debtor's estate. If the estate is not marshaled and liquidated or reorganized expeditiously, there will be far less money available to pay creditors' claims."*Id.* Here, of course, the claim is not brought by the bankruptcy estate itself, and the claim is rather that the professionals advising the estate obtained *excessive* compensation by defrauding the purchaser of the estate's assets. But the matter is still intimately related to the administration of the bankruptcy. The Bankruptcy Court has a vital interest in policing the integrity of the bankruptcy process in general, and of the sales of estate assets under the court's supervision in particular.

The Bankruptcy Court itself recognized the importance of the sale to its on-going administration of the case. Its order approving the sale expressly provides that the Delaware Bankruptcy Court retains "exclusive jurisdiction to ... resolve any dispute arising under or related to the Asset Purchase Agreement."(Sale Order ¶ 15, Gold Decl. Ex. 2.) This language is broad, encompassing not merely contract disputes or disputes between the parties to the APA themselves, and at a minimum expresses the Bankruptcy Court's keen interest in the resolution of disputes relating to the sale of Old Winstar's assets. It plainly covers the dispute at hand, which unquestionably is a dispute "related to" the APA.[FN2]

FN2. Plaintiffs cannot be surprised by being asked to litigate a matter relating to the APA in the Delaware Bankruptcy Court, as they themselves agreed in the APA to a choice of forum clause in which they "irrevocably submit to the exclusive jurisdiction" of that court "over any dispute arising out of or relating to this Agreement," and waived any objection to venue in that court. (APA § 9.10, Gold Decl. Ex. 1.) Defendants do not contend that this clause of the APA, to which they were not parties, of itself controls the outcome of this motion. At a minimum, however, it reflects plaintiffs' own understanding that the Delaware Bankruptcy Court is the proper forum for disputes about the sale of Old Winstar.

The Second Circuit has construed the core jurisdiction of the bankruptcy courts "as broadly as possible," because wide bankruptcy jurisdiction is " essential to the efficient administration of bankruptcy proceedings."*Luan Investment S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.),* 304 F.3d 223, 229 (2d Cir.2002). Given this jurisdictional sweep, it is clear that this is a case " arising in" the Old Winstar bankruptcy case.

C. *Abstention*

Since this case "aris[es] in" a bankruptcy case and is not merely "related to" a bankruptcy case, mandatory abstention under 28 U.S.C. § 1334(c)(2) by its own terms does not apply. However, this Court may still, in its discretion, abstain from hearing the proceeding "in the interest of justice, or in the interest of comity with State courts or respect for State law."28 U.S.C. § 1334(c)(1). Such abstention is not appropriate here.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Federal courts should be "sparing" in their exercise of discretionary abstention. *In re Texaco Inc.*, 182 B.R. 937, 946-47 (Bankr.S.D.N.Y.1995), citing *New Orleans Public Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 358 (1989), *Willcox v. Consolidated Gas Co.*, 212 U.S. 19, 40 (1909), and *Chicot County v. Sherwood*, 148 U.S. 529, 534 (1893). There is little basis to invoke comity to the state courts here, and every reason to invoke the federal jurisdiction. Although plaintiffs' claims are based on state law, the state law claims are straightforward common-law claims that do not involve arcane or idiosyncratic provisions of New York law. As the case was promptly removed, the New York courts have invested no effort in the case.

*6 In contrast, the matter is closely tied to the bankruptcy case. The very sale that is the subject of the proceedings was a central aspect and basic function of the bankruptcy proceedings. The sale of Old Winstar's assets was pursuant to directives issued by the Bankruptcy Court, and the APA was specifically approved by that court. The conduct of the debtor and its advisors (who were retained with the approval of the Bankruptcy Court) that is the subject of the plaintiffs' claims is post-petition conduct that took place under the Bankruptcy Court's auspices. Although the plaintiffs' claims are asserted as tort claims of fraud in the inducement, the evaluation of those claims will necessarily involve the interpretation of the Bankruptcy Court-approved APA, which contains provisions (including a merger clause, APA § 9.13; two disclaimers of warranties, *id.* §§ 5.10, 9.3; and an " as is" clause, *id.* § 5.10) that are arguably inconsistent with plaintiffs' claims, and of the Bankruptcy Court's own orders and findings (including a finding that the consideration was fair and reasonable and a finding that the APA was negotiated in good faith, Order ¶¶ G, H). Most significantly, both the plaintiffs and the Bankruptcy Court expressly stipulated that the Bankruptcy Court would be the exclusive forum for resolving claims related to the sale.

Under all these circumstances, common sense dictates the conclusion that the Bankruptcy Court is the proper forum for resolving these disputes, and that the Court should exercise its discretion to direct the case to that forum.[FN3]

FN3. For the same reasons that abstention is inappropriate, the closely-related doctrine of equitable remand, 28 U.S.C. § 1452(b), is also inapplicable here.

II. *Defendants' Motion to Transfer*

In light of the above discussion, little further need be said regarding defendants' motion to transfer the case to the United States District Court for the District of Delaware for referral to its Bankruptcy Court. The *only* reason why this case belongs in federal court is because of its close association to the Old Winstar liquidation proceedings in Delaware. The case "arises in" those proceedings, the Delaware Bankruptcy Court reserved its jurisdiction to deal with matters related to the bankruptcy sale that is the subject of this proceeding, and the defendants are accused of fraud in executing a sale that was ordered and approved by that court.

There is a strong argument that venue must be laid in Delaware under the APA's mandatory choice of forum clause. As the Second Circuit has held, a contract clause electing a forum for all disputes " arising out of or related to" the contract encompasses claims of fraudulent inducement. *Turtur v. Rothschild Registry Int'l.*, 26 F.3d 304, 309-10 (2d Cir.1994). Although defendants are not parties to that clause, plaintiffs are. The plaintiffs agreed to resolve any disputes related to the APA in the Delaware Bankruptcy Court. Moreover, the defendants are sued for wrongdoing that essentially without exception is charged to have been committed jointly with the plaintiffs' counterparty in the APA, Old Winstar. *Weingrad v. Telepathy, Inc.*, No. 05 Civ.2024, 2005 WL 2990645, at *5-6 (S.D.N.Y. Nov. 7, 2005).

*7 But even if transfer is not mandatory pursuant to 28 U.S.C. § 1406, discretionary transfer under § 1404(a) in the interests of justice is clearly appropriate. As noted above, the whole point of federal jurisdiction here is the close connection of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the case to the bankruptcy proceedings. There is no plausible rationale for removing the case to federal court in order to decide it in a forum remote from the court where that proceeding is pending. Plaintiffs seek to avoid this obvious point by retreating to a conventional analysis of the factors ordinarily applicable in deciding transfer applications. Even if their convenience arguments did not ring hollow-and they do, where the physical distance between the courts involved is a short train ride and given that in real-world modern litigation the greatest expenditure of litigation effort in most cases takes place away from court-the plain fact is that in entering the APA plaintiffs "irrevocably waive[d]" any objections to venue in the District of Delaware on grounds of inconvenience.

**CONCLUSION**

For the reasons stated above, plaintiffs' motion to remand is denied and defendants' motion to transfer the case to the United States District Court for the District of Delaware is granted.

SO ORDERED.

S.D.N.Y.,2007.
Winstar Holdings, LLC v. Blackstone Group L.P.
Slip Copy, 2007 WL 4323003 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.